**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC. *et al.*,[1] | Case No. 25-80078 (SWE) |
|  | (Joint Administration Requested) |
| Debtors. |  |

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

## DEBTORS' EMERGENCY MOTION
### FOR ENTRY OF INTERIM AND FINAL ORDERS
### (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
### POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
### (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
### ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on April 2, 2025.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on April 2, 2025 at 3:00 p.m. (prevailing Central Time) in Courtroom 3, Floor 14, 1100 Commerce Street, Dallas, Texas 75242 before the Honorable Scott W. Everett, U.S. Bankruptcy Judge for the Northern District of Texas.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (650) 479-3207.  Video communication will be by use of the Cisco Webex platform. Connect via the Cisco Webex application or click the link on Judge Everett's home page.  The meeting code is 2304 017 9738.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  A copy of Judge Everett's WebEx Hearing Instructions can be found at the following link: WebEx Hearing Instructions.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Everett's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

Hooters of America, LLC and its affiliated debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of an order granting the relief described below.  In support hereof, the Debtors rely on the *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day

Declaration")[2] and the DIP Declarations (as defined below) filed concurrently herewith, and further represent as follows:

**INTRODUCTION**

1.    The Debtors are seeking authority to enter into a bespoke, consensual DIP Facility which will allow them to respect their current "whole business securitization" structure while providing needed liquidity to administer these Chapter 11 Cases.  The requested relief would permit the DIP Borrowers to borrow funds from the DIP Lender and then make Manager Advances to other Debtors in the corporate structure, consistent with the terms of the A&R Base Indenture and as specifically agreed to in the DIP Documents and the proposed DIP Orders.

2.    Specifically, the Debtors request authority to:   (i) enter into the DIP Facility (defined below) in an aggregate principal amount of up to $40 million of DIP Loans provided by the DIP Lender (defined below), comprised of up to $35 million in New Money Loans (defined below) and $5 million of Roll-Up Loans (defined below), and an uncommitted new money term loan Accordion Facility (as defined below) in an aggregate principal amount to be determined; (ii) use cash collateral of the Prepetition Lender (defined in the Interim Order) under the terms of the Interim Order (defined below); (iii) grant the DIP Lender priming liens and superpriority administrative expense claims in respect of the DIP Obligations (defined below); and (iv) grant Adequate Protection.

3.    The DIP Facility will provide the Debtors with sufficient liquidity to fund their business operations and administrative expenses during the contemplated duration of these Chapter 11 Cases.   If approved, the Debtors will use the proceeds of the DIP Facility to, among other things, (i) pay professional fees and other restructuring charges arising on account of the Chapter 11

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or the DIP Credit Agreement (defined below).

Cases, (ii) pay professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders in connection with the DIP Facility, (iii) provide for working capital, and for other general corporate purposes of the Debtors, and (iv) pay administration costs of the Chapter 11 Cases, all in accordance with the Initial Approved Budget agreed to by the Debtors and the DIP Lender and attached as **Exhibit 3** to the form of proposed interim order attached hereto as **Exhibit A** (the "Interim Order").

4.      The Debtors and their estates would suffer immediate and irreparable harm if they were denied the financing needed to sustain on-going business operations during the critical first weeks of these cases.   The DIP Facility ensures that the Debtors will have sufficient funding to continue to operate uninterrupted in these Chapter 11 Cases as they work towards a value-maximizing sale of certain of their assets and a comprehensive restructuring.   Further, as set forth in the *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Maib Declaration"), and *Declaration of George N. Koutsonicolis in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Koutsonicolis Declaration", together with Maib Declaration, the "DIP Declarations"), the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's length negotiations.

5.      As discussed in greater detail in the Cash Management Motion and the First Day Declarations, prior to the Petition Date, from time to time and in the ordinary course of business, Hooters of America, LLC ("HOA"), in its capacity as the manager of the Securitization Entities, advances funds to the Securitization Entities (such advances, the "Manager Advances") in connection with the operations of the Securitization Entities.  The Securitization Entities' obligation to reimburse HOA for the Manager Advances, which is entitled to priority right of reimbursement, is part of the Prepetition Lenders' collateral.  The proposed DIP Facility conforms to this prepetition flow of funds.  Although all Debtors—both Securitization Entities and Non-Securitization Entities—are first priority obligors and are providing priming liens as credit support for the DIP Facility, the DIP Facility is structured as a loan to HOA (as manager of the Securitization Entities), the proceeds of which will then be advanced as a Manager Advance to the Securitization Entities under the mechanics provided in the A&R Base Indenture.  Finally, all proceeds of the Manager Advance held by the Securitization Entities must be used in accordance with the Approved Budget.  This structure allows the Debtors to secure necessary liquidity in a way that does not run afoul of the prepetition structure, but also ensures the DIP Lenders have their bargained-for senior right to payment.

6.      The Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all stakeholders and is an exercise of sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form of the Interim Order attached hereto and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates, and

this matter under 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc from the United States District Court for the Northern District of Texas*, dated August 3, 1984.

8.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Local Rules"), and Section D of the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures").

## BACKGROUND

10.     On March 31, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

11.     Founded in 1983, the Debtors own and operate Hooters, an iconic brand in the casual dining and sports entertainment dining industries.  The Debtors' global portfolio of restaurants includes 151 Debtor-owned and operated locations and 154 franchised locations in 17 countries.  The Debtors are known for their world-famous chicken wings, beverages, live sports, and legendary hospitality.  The Debtors also partner with a major food products licensor to offer shoppers Hooters-branded frozen meals products at 1,250 grocery store locations.

12.     Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek entry of the Interim Order, and subsequently, the Final Order:

(i)     authorizing Hawk Parent, LLC ("Hawk Parent") and Hooters of America, LLC ("HOA"), as co-borrowers (the "DIP Borrowers"), to obtain, and all Debtors (collectively, the "DIP Guarantors" and together with the DIP Borrowers, the "DIP Loan Parties") to guarantee, on a joint and several basis, in each case, a senior secured, superpriority, priming debtor-in-possession term loan credit facility (the "DIP Facility," and the loans thereunder, the "DIP Loans"), subject to the terms and conditions set forth in the Interim Order and that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, attached thereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Credit Agreement"), by, among others, Celtic Master Fund LP, as the initial lender (the "Lender Representative") and certain of its affiliates and other persons that become lenders from time to time (the "DIP Lenders" and each, a "DIP Lender"), and U.S. Bank Trust Company, National Association ("US Bank"), as calculation agent and collateral agent (US Bank in such capacities and together with its successors and assigns in such capacities, the "DIP Agent" and together with the DIP Lenders and their successors and assigns, the "DIP Secured Parties" and each, a "DIP Secured Party"), in an aggregate principal amount not to exceed $40 million (the "Initial Facility Cap") to be made available to the DIP Borrowers from time to time in accordance with and subject to the terms and conditions of the Interim Order and the DIP Documents, which shall be comprised of:

(a)     a new money term loan facility with up to $35 million in aggregate principal amount of commitments to make New Money Loans (as defined below) (as such commitments may be reduced or increased from time to time including through the capitalization of interest paid in kind and by Commitments for Additional New Money Loans (as defined below), the "New Money Commitments") initially consisting of:

i.      a commitment of $5 million in aggregate principal amount to be borrowed in a single advance upon entry of the Interim Order and satisfaction of the other applicable conditions to any Interim DIP Loans (the "Interim New Money Loans," and together with any

Delayed Draw New Money Loans from time to time funded and any capitalized interest added to the principal amount of such loans, the "<u>New Money Loans</u>"); and

ii. a commitment for up to $30 million in aggregate principal amount of new money delayed draw term loans (such commitment, as the same may be reduced or increased from time to time including by Commitments for Additional New Money Loans, the "<u>Delayed Draw Term Loan Commitments</u>," and any such loans once funded and any such interest capitalized and added to the principal amount of such loans, the "<u>Delayed Draw New Money Loans</u>"), with up to $1 million per week available for borrowing prior to the entry of the Final Order and the remainder becoming available for borrowing on one or more draws after entry of the Final Order, *provided*, in each case, that the terms and conditions applicable to any such Delayed Draw New Money Loan described herein and in the DIP Credit Agreement have been satisfied and that any such borrowing is made in accordance with the then Approved Budget; and

(b) a roll-up loan facility in an initial aggregate principal amount equal to $5 million (the "<u>Roll-Up Amount</u>"), which shall be used for the roll-up and conversion (the "<u>Roll-Up</u>") of the aggregate outstanding principal amount of the Prepetition Bridge Loan (as defined below) on a cashless, dollar-for-dollar basis into DIP Loans (such DIP Loans, the "<u>Roll-Up Loans</u>,") upon entry of the Final Order; and

(c) the DIP Credit Agreement shall include provisions permitting the Delayed Draw Term Loan Commitments to be increased by an amount to be determined (any such amounts, once committed, the "<u>Commitments for Additional New Money Loans</u>"), with additional increases permitted to be requested by the DIP Borrowers provided that no Default (as defined in the DIP Credit Agreement) or Event of Default (as defined in the DIP Credit Agreement) then exists after the Final Order on the terms and subject to the conditions for "Accordion Increases" under and as defined in the DIP Facility Term Sheet (as defined in the RSA) (the "<u>DIP Term Sheet</u>") and the DIP Credit Agreement, and subject to the Interim Order;

(ii) authorizing the DIP Borrowers to incur, and the DIP Guarantors to jointly and severally, irrevocably and unconditionally guarantee, on a superpriority basis, the payment in full in cash of all DIP Obligations (as defined below) in accordance with the Interim Order and the applicable DIP Documents;

(iii) authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and all other loan documentation, including security agreements, collateral agreements, pledge agreements, control agreements, and guarantees, and all other agreements, documents, certificates, and instruments delivered in connection herewith or therewith, in each case, as amended, restated,

supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Interim Order and the Final Order, the "DIP Documents"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)    authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, and pay all principal, interest, fees, costs, expenses, charges and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute), whether or not such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, under and in accordance with the DIP Documents and the Interim Order (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)     authorizing the Debtors to effectuate the Roll-Up Loans in accordance with the DIP Documents and the DIP Orders;

(vi)    authorizing the DIP Guarantors to guarantee the DIP Obligations on a secured, joint and several basis;

(vii)   authorizing the Debtors to grant to the DIP Secured Parties, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve-Out (as defined below) and the priorities set forth in **Exhibit 3** of the Interim Order;

(viii)  authorizing the Debtors to grant to the DIP Agent, for the benefit of the DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in the Interim Order, subject to the Carve-Out, and subject to the priorities set forth in **Exhibit 3** of the Interim Order;

(ix)    authorizing each of the DIP Agent, on its own behalf and for the benefit of the DIP Secured Parties, and the DIP Lenders to take all actions to implement and effectuate the terms of the Interim Order;

(x)     upon entry of the Final Order, a waiver of (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral; and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the DIP Documents;

(xii)   authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral of the Prepetition Secured Parties under each of the Prepetition Financing Documents, solely in accordance with the Approved Budget (as defined below)

then in effect (the initial version of which (the "Initial Approved Budget") is attached to the Interim Order as **Exhibit 2**), subject to Permitted Variances, in each case pursuant to the terms and conditions set forth in the DIP Loan Documents, and to provide adequate protection to the Prepetition Credit Agreement Secured Parties for, among other things, any diminution in the value of the Prepetition Collateral, including on a dollar-for-dollar basis in respect of Cash Collateral, from and after the Petition Date to the extent such diminution in value occurs on account of (a) the Debtors' sale, lease or use of the Prepetition Collateral, including Cash Collateral during the Chapter 11 Cases, (b) the priming of the liens securing the obligations under the Prepetition Financing Documents, or (c) the imposition of the automatic stay pursuant to section 362 in accordance with sections 361, 362, 363, 364, and 507 of the Bankruptcy Code (including by the Carve-Out (as defined below)) (the foregoing clauses (a), (b) and (c) are each a "Diminution in Value");

(xiii)  authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xiv)  vacating and modifying the automatic stay to the extent set forth herein to the extent necessary to permit the Debtors, the DIP Agent, on its own behalf and for the benefit of the DIP Secured Parties, and the DIP Lenders, to implement and effectuate the terms and provisions of the DIP Documents and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

(xv)  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

(xvi)  scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion and the DIP Documents filed with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court").

### CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(B) AND SECTION D OF THE COMPLEX CASE PROCEDURES

14.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Sections D.10 and D.13 of the Complex Case Procedures:[3]

---

[3]    Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them elsewhere in this Motion, in the Interim Order, or in the DIP Credit Agreement, as applicable.  Further, the

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Hawk Parent LLC ("Hawk Parent") and Hooters of America, LLC ("HOA" and together, the "DIP Borrowers" or "Borrowers" and individually, each a "DIP Borrower" or a "Borrower") will be co-borrowers, jointly and severally liable.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | HOA Restaurant Group, LLC, Owl Restaurant Holdings, LLC, Owl Wings, LLC, Night Owl, LLC, HOA Holdings, LLC, Derby Wings, LLC, Derby Wings Holdings, LLC, Alamo Wings, LLC, TW Lonestar Wings, LLC, Elf Owl Investments, LLC, Owl Holdings, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Funding, LLC, HOA Restaurant Holder, LLC, Hoots Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA IP GP, LLC, HI Limited Partnership, HOA Franchising, LLC and Hoots Franchising, LLC.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | U.S. Bank Trust Company, National Association, as collateral agent and calculation agent (the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties").<br><br>*See* DIP Credit Agreement, Preamble. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Celtic Master Fund LP or certain of its affiliates (in such capacity, together with their successors and assigns in such capacity, the "DIP Lenders" and each, a "DIP Lender").<br><br>*See* DIP Credit Agreement, Preamble. |
| **Maturity / Termination Date**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earliest to occur (the "Termination Date") of:<br><br>i.     eighty-five (85) days after the Petition Date (the "Scheduled Maturity Date"),<br><br>ii.    the effective date of a Chapter 11 Plan,<br><br>iii.   thirty-five (35) days after the Petition Date unless on or before such day the Final DIP Order has been entered by the Bankruptcy Court,<br><br>iv.   the date of termination of the Commitments under the DIP Facility and the acceleration of the Loans pursuant to an Event of Default and in accordance with the terms of the DIP Documents; and<br><br>v.    the date of repayment in cash in full by the DIP Loan Parties of all DIP Obligations and termination of the Commitments in accordance with the terms of the DIP Facility; *provided* that if any such day described above is not a Business Day, the Termination Date shall be the Business Day immediately preceding such day.<br><br>On the Termination Date, the DIP Borrowers shall either (a) repay in cash to the DIP Agent for the ratable account of each DIP Lender, the aggregate principal amount of such DIP Lender's DIP Loans outstanding on such date, together with all other DIP Obligations or |

below summary chart is only a summary, and is qualified in its entirety by the terms of the Interim Order, which shall control.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (b) subject to the prior written consent of the DIP Lenders in their sole discretion, convert the DIP Facility into  new Class A Notes (as defined in the RSA) and Class B-1 Notes (as defined in the RSA) in accordance with terms and conditions pursuant to the RSA in connection with an Approved Plan and otherwise satisfactory to the Required DIP Lenders in their sole discretion and subject to documents acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion (such conversion, a "Conversion").<br><br>DIP Credit Agreement §1.01. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall be comprised of superpriority consensual priming term loans (the "DIP Loans" and the commitment by the DIP Lenders to provide the DIP Loans upon satisfaction of the terms and conditions set forth herein, the "DIP Loan Commitment"; the credit agreement that will document the terms and conditions of the DIP Facility, the "DIP Credit Agreement" and all other documents related to the DIP Facility and the DIP Credit Agreement, the "DIP Documents"), consisting of an aggregate principal amount up to $40,000,000 (as such principal amount may be increased from time to time through the capitalization of interest paid in kind and, to the extent the DIP Loan Parties receive consent from the Required Majority Consenting AHG Noteholders, through additional increases in the DIP Loan Commitments  pursuant to the mechanics and subject to the terms described in the DIP Documents, which shall be comprised of:<br><br>i.      A committed new money term loan facility (the "New Money Facility") in an aggregate principal amount of up to $35,000,000 plus an uncommitted new money term loan accordion facility (the "Accordion Facility") in an aggregate principal amount to be determined with the consent of the Required Majority Consenting AHG Noteholders, and, which shall be subject to the terms set forth herein (such commitments, the "New Money Commitments" and such loans advanced and interest capitalized thereon from time to time with respect thereto, collectively, the "New Money Loans"); and<br><br>ii.     a roll-up loan facility in an aggregate principal amount equal to $5,000,000 (the "Roll-Up Amount"), which shall be used for the roll-up and conversion (the "Roll-Up") of the Incremental Loan on a cashless, dollar-for-dollar basis into DIP Loans (such DIP Loans together with interest capitalized thereon, the "Roll-Up Loans").<br><br>Amounts paid or prepaid under the DIP Facility may not be reborrowed.  As used herein, "DIP Obligations" shall mean all obligations of the DIP Borrowers and/or DIP Guarantors in respect of the DIP Loans incurred in accordance with the DIP Documents and, so long as it remains in full force and effect, the RSA, including all principal and accrued interest on the DIP Loans, all fees, and all reimbursement, indemnity, and other obligations under the DIP Credit Agreement, the DIP Orders and the other DIP Documents (as defined below).<br><br>*See* DIP Credit Agreement, Recitals. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary conditions precedent for transactions of this type and others that are satisfactory to the DIP Lender, and in any event including the following:<br><br>**Conditions Precedent to Initial Advance:** |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | i.   satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Chapter 11 Cases and the receipt of all required court approvals of the DIP Facility; <br><br> ii.   the Lender Representative and the DIP Agent shall have received the following, each in form and substance satisfactory to the Required DIP Lenders: <br><br> a.   the DIP Agent shall have received executed counterparts to the DIP Documents from each DIP Lender; <br><br> b.   on a post-closing basis as provided for in the DIP Credit Agreement, a Promissory Note, duly executed by the Borrowers and payable to the Lenders or their registered assigns in the amount of the total amount of the Commitment of the Lenders; <br><br> c.   a certificate of an Officer of each DIP Loan Party countersigned by a second Officer or responsible person of such DIP Loan Party, pursuant to which officer attaches and certifies as to the following: <br><br> i.   the names and true signatures of the Officers of such DIP Loan Party authorized to sign and provide notice under each DIP Document to which such DIP Loan Party is or will be a party and the other documents to be executed and delivered by such DIP Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Officers; <br><br> ii.   a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each DIP Loan Party certifying as of a recent date not more than thirty (30) days prior to Interim Effective Date as to the subsistence in good standing or qualification of such DIP Loan Party in such jurisdictions; <br><br> iii.   true and complete copies of the Governing Documents (as defined in the DIP Credit Agreement) of such DIP Loan Party together with all amendments thereto, including a copy of the charter, certificate of formation or incorporation, or other publicly filed Governing Document of each DIP Loan Party certified as of a recent date not more than thirty (30) days prior to Interim Effective Date by an appropriate official of the jurisdiction of organization of such DIP Loan Party which shall set forth the same complete name of such DIP Loan Party as is set forth herein; <br><br> d.   an Approved Budget; <br><br> e.   such other agreements, instruments, approvals, and other documents, each satisfactory to the DIP Lenders in form and substance, as the DIP Lenders may reasonably request, including in respect of any "know-your-customer" requirements, Anti-Money Laundering Laws and Anti- |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Corruption Laws; |
| | f.  receipt of customary debtor in possession financing closing deliverables, resolutions, good standing certificates in each DIP Loan Party's jurisdiction of formation (to the extent such concept is applicable), incumbency certificates, organizational documents, and lien searches, all in form and substance reasonably satisfactory to the Required DIP Lenders; and |
| | g.  evidence of the reimbursement in full in cash of the reasonable and documented fees and expenses (including legal and other professional fees) of the DIP Agent, DIP Lender, and solely to the extent provided for in the Prepetition Credit Agreements, Prepetition Agents and Prepetition Lenders; |
| | iii.   the Petition Date shall have occurred; |
| | iv.   no later than three (3) days prior to filing, the DIP Loan Parties shall have provided the DIP Lenders with a copy of the "first day" motions, including without limitation the DIP motion, the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases; |
| | v.   orders approving all "first day" motions shall have been entered by the Bankruptcy Court, and in the case of any "first day" motions and orders that affect the rights or duties of the DIP Agent or DIP Lenders (including without limitation the DIP Orders and orders approving or otherwise impacting cash management practices) shall have been entered by the Bankruptcy Court, which orders shall be in form and substance reasonably acceptable to the Required DIP Lenders; |
| | vi.   an Interim DIP Order, substantially on the terms contemplated in the DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Required DIP Lenders, shall have been entered by the Bankruptcy Court within two (2) business days following the Petition Date and shall not have been reversed, amended, stayed, modified or appealed without prior written consent of the Required DIP Lenders.  For the avoidance of doubt, the DIP Facility (as defined herein) shall include all terms set forth in the proposed Interim DIP Order attached to the RSA, including, but not limited to those concerning collateral, lien and claim priority, adequate protection, and releases.  In the event of a conflict between the DIP Term Sheet, the Credit Agreement, and any of the DIP Orders (as defined below), the DIP Orders shall control; |
| | vii.   the DIP Lenders shall have received satisfactory evidence of the entry of all "first day" orders (including the approval of the cash management system), which shall be satisfactory in form and substance to the Required DIP Lenders, and which "first day" orders shall have been entered upon an application or motion of the Debtors (satisfactory in form and substance to the Required DIP Lenders) and upon prior written notice to such parties required to receive notice; |
| | viii.   the DIP Lenders shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the Required DIP Lenders evidencing the absence of any other liens or mortgages on the DIP Collateral, except the liens securing the Prepetition Loan Documents, Permitted Liens, and other existing liens acceptable to the Required DIP Lenders. |
| | ix.    since the Petition Date there shall not have been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect. |
| | x.    the representations and warranties of the Debtors contained in the section entitled "Representations and Warranties" shall be true and correct as described therein; |
| | xi.    all consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the transactions contemplated by the DIP Documents or the conduct of the DIP Loan Parties' business shall have been obtained and shall be in full force and effect; and |
| | xii.    other than the Bankruptcy Cases, there shall exist no claim, action, suit, investigation, litigation or proceeding (including shareholder or derivative litigation), threatened in writing or pending in any court or before any arbitrator or Governmental Authority which could reasonably be expected to have a Material Adverse Effect. |
| | **Conditions Precedent to All Advances:** |
| | i.    (a) with respect to the Initial Advance, the Interim DIP Order shall have been entered and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with respect to any Advance thereafter, a Final DIP Order, substantially on the terms contemplated by the DIP Documents and in form and substance acceptable to the Required DIP Lenders shall have been entered, and shall not have been vacated or reversed, and shall not be subject to any stay; |
| | ii.    the Lender Representative shall have received a duly executed notice of borrowing; |
| | iii.    other than as set forth in the RSA, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the Required DIP Lenders; |
| | iv.    since the Petition Date, there shall have been no Material Adverse Effect; |
| | v.    reimbursement in full in cash of the DIP Agent's and DIP Lenders' reasonable and documented fees and expenses (including legal and other professional fees); |
| | vi.    there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Chapter 11 Cases) in any court or before any governmental authority that, in the reasonable opinion of the Required DIP Lenders, materially and adversely affects any of the transactions contemplated |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | hereby, or that has or could be reasonably likely to result in a Material Adverse Effect; |
| | vii.  the Debtors shall be in compliance with the Milestones and the DIP Orders, as applicable; |
| | viii.  In connection with all DIP Manager Advances, the DIP Lenders, the DIP Agent shall have received (with copies to the Consenting AHG Noteholders): |
| |     a.  the Manager Advance Acknowledgment, duly executed by each of the parties thereto, which Schedule attached to such Manager Advance Acknowledgement shall have been updated to reflect the DIP Manager Advance to be made on or immediately following the Funding Date with the proceeds of the applicable DIP Loan; and |
| |     b.  a certificate of an Officer of each of the Borrowers (i) attaching the Approved Budget that identifies the amounts that will be paid via such proposed DIP Manager Advance or DIP Manager Advances and (ii) certifying that such proposed DIP Manager Advance or DIP Manager Advances will comply, and will be made in a manner that complies, in all respects with the Prepetition Base Indenture, the Management Agreement and all other Related Documents; provided that, the amount of DIP Manager Advances outstanding after giving effect to the applicable New Money Term Loan shall not be less than 100% of the DIP Obligations and there shall be no outstanding challenge to the treatment of any such payment as a DIP Manager Advance entitled to the Superpriority Manager Advance Payment Right; |
| | ix.  no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the DIP Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any DIP Loan Party without the prior written consent of the Required DIP Lenders; |
| | x.  the DIP Lenders shall have received the latest Approved Budget and Variance Report required to be delivered in accordance with the DIP Orders; |
| | xi.  the Trustee and the Independent Directors shall have agreed to a waiver of any objections related to the DIP Facility, entry of the DIP Orders and a release of claims in respect of the DIP Loans and advance of DIP proceeds; |
| | xii.  each of the representations and warranties of the Debtors in the DIP Credit Agreement, and any other DIP Documents, as applicable, shall be true and correct, unless otherwise agreed by the Required DIP Lenders; and |
| | xiii.  there shall be no defaults or Events of Default under the RSA or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the Required DIP Lenders or cured pursuant to the terms thereof. |
| | *See* DIP Credit Agreement §§ 4.01 & 4.02. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Interest; Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest shall accrue on the principal balance of the DIP Loans, from time to time, based on a 360 day year and charged for the actual number of days outstanding. DIP Borrowers shall pay interest, default interest, and any fees monthly in cash and in kind (as applicable) in arrears on the last business day of each calendar month and on the Termination Date.<br><br>**Interest Rate**:<br><br>New Money Loans and Roll-Up Loans: Bear interest at Prime + 3.00% paid in cash.<br><br>Manager Advances: Same as existing terms.<br><br>**Default Rate**<br><br>New Money Loans: During the continuance of an Event of Default, the New Money Loans and all other outstanding obligations under the DIP Facility will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable.<br><br>Manager Advances: Same as existing terms.<br><br>DIP Credit Agreement §1.01. |
| **Roll-Up Loans**<br>Complex Case Procedures D.10(c) | On the Interim Effective Date, the Incremental Lender shall become entitled to roll up the Incremental Loan into DIP Loans (subject to and upon entry of the Final DIP Order (as defined below)). Upon the Bankruptcy Court's entry of Final DIP Order, and from and after the Bankruptcy Court's entry of final order approving the DIP Facility, in form and substance agreed to by the Required DIP Lenders (the "Final DIP Order", and together with the Interim DIP Order, the "DIP Order," and each, a "DIP Order") each DIP Lender will be deemed to have funded Roll-Up Loans equal to the Roll-Up Amount.<br><br>*See* Interim Order ¶ 4(a). |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of all New Money Loans shall be applied by the Borrowers to fund Manager Advances solely for the following purposes: (a) to make interest payments in respect of the DIP Obligations outstanding on the relevant interest payment date and (b) for the payment of other amounts in accordance with the Approved Budget (provided, however, that the funds used to pay any professional fees and restructuring charges shall not be used for the purpose of paying the professional fees and restructuring charges in connection with any dispute against the DIP Lenders or, so long as the RSA remains in full force and effect, the Consenting AHG Noteholders).<br><br>No DIP Collateral (including Cash Collateral), Prepetition Collateral, DIP Loans, proceeds of any of the foregoing or any portion of the Carve-Out (as defined herein), may be used directly or indirectly by the Debtors, the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any trustee appointed in the Chapter 11 Cases or any Successor Cases, or any other person, party, or entity (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), to, (or to support any other party to), directly or indirectly:<br><br>i.       investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, threaten, initiate, assert, commence, support or prosecute (or finance the initiation or prosecution of) |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | any claim, counterclaim, cross-claim, Cause of Action, suit, arbitration, proceeding, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any nature or description (whether for monetary, injunctive, affirmative relief or otherwise) against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives, including, without limitation, (i) any objection or challenge to the amount, validity, enforceability, extent, perfection or priority the DIP Documents, the DIP Obligations, the DIP Liens, the DIP Collateral, the Adequate Protection Liens, the 507(b) Claims and the other Adequate Protection, the Prepetition Financing Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, (ii) any Avoidance Actions, (iii) any so-called "lender liability" claims, (iv) any claim or Cause of Action seeking the invalidation, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery with respect to the DIP Liens, the DIP Obligations, the DIP Documents, the DIP Collateral, the Adequate Protection Liens, the 507(b) Claims and the other Adequate Protection, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Financing Documents or the Prepetition Collateral, (vi) any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable nonbankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives;<br><br>ii.  object to, appeal or otherwise challenge the Interim Order, the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Documents or the transactions contemplated hereunder or thereunder;<br><br>iii.  object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties or the Prepetition Secured Parties under the Interim Order or the DIP Documents (other than to contest whether an Event of Default has occurred and is continuing);<br><br>iv.  object to or seek to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties' or Prepetition Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral or Prepetition Collateral (as applicable) in accordance with the DIP Documents or the Prepetition Financing Documents (as applicable) (other than to contest whether an Event of Default has occurred and is continuing);<br><br>v.  seek or request authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code, or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations and Prepetition Secured Obligations contemporaneously with the closing of such financing (or as otherwise agreed in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties, as applicable);<br><br>vi.  seek or request authorization to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Documents) in any portion of the DIP Collateral that are senior to or pari |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | passu with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims, the Prepetition Liens or the Prepetition Secured Obligations unless all DIP Obligations and Prepetition Secured Obligations have been Paid in Full (or as otherwise agreed in writing by the Required DIP Lenders or the requisite Prepetition Secured Parties, as applicable);<br><br>vii.     seek to pay any amount on account of any claims arising prior to the commencement of these Chapter 11 Cases, unless such payments are agreed to in writing by the Required DIP Lenders (or are otherwise included in the Approved Budget);<br><br>viii.     finance in any way any other action which, with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility, or otherwise seek or request to use Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the Required DIP Lenders) for any purpose prohibited under the Bankruptcy Code or the DIP Documents;<br><br>ix.     seek to modify the rights granted to the DIP Secured Parties or the Prepetition Secured Parties, in each case without such parties' prior written consent, which may be given o withheld by such party in the exercise of its respective sole discretion; or<br><br>x.     unless a Conversion (as defined in the DIP Credit Agreement) occurs, to make any distribution under a Chapter 11 Plan (a "Chapter 11 Plan") that does not provide for the indefeasible payment of DIP Obligations and the Prepetition Secured Obligations in full and in cash unless agreed by the Required DIP Lenders (as defined below);<br><br>*provided*, *however*, that no more than $25,000 (the "Challenge Budget") of the proceeds of the DIP Facility may be used for allowed fees and expenses incurred by any Committee prior to the Challenge Deadline to investigate (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, Cause of Action or Challenge, including by way of discovery, with respect to), the validity, enforceability, extent, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations and the Prepetition Credit Documents or any claims under or Causes of Action with respect thereto.<br><br>*See* Interim Order ¶¶ I(vi); 36. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Credit Agreement Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "Prepetition Loan Adequate Protection"):[4]<br><br>i.     Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition MA Loan Agent, the Prepetition Term Loan Agent, the Prepetition MA Loan Lender, in its capacity as such, and the Prepetition Term Loan Lender, in its capacity as such;<br><br>ii.     To the extent of any aggregate diminution in value of the Prepetition MA Loan Secured Parties' interests in the Prepetition MA Loan Collateral from and after |

---

[4] NTD: Subject to review.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the Petition Date, for any reason provided for under the Bankruptcy Code ("<u>Diminution in Value</u>"), replacement liens (the "<u>Prepetition MA Loan Adequate Protection Liens</u>") on the Prepetition MA Loan Collateral and Prepetition Term Loan Collateral to secure adequate protection claims, which Prepetition MA Loan Adequate Protection Liens will be subject to the lien priority set forth in the "DIP Collateral; Priority" section above; |
| | iii.　To the extent of any aggregate Diminution in Value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Term Loan Collateral, adequate protection liens (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with Prepetition MA Loan Adequate Protection Liens, "<u>Prepetition Loan Adequate Protection Liens</u>") on all DIP Collateral to secure the Prepetition Loan 507(b) Claims (as defined below), which Prepetition Term Loan Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in <u>Annex IV</u> to the DIP Term Sheet, and (c) senior to any and all other all other liens on and security interests in the DIP Collateral; |
| | iv.　To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "<u>Prepetition Loan 507(b) Claims</u>"), which Prepetition Loan 507(b) Claims will be (a) subject and subordinate to the Carve-Out, and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in <u>Annex IV</u> to the DIP Term Sheet, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever; |
| | v.　Upon entry of the Final Order, the consummation of the Roll Up; and |
| | vi.　Delivery of all reports and notices provided for in the DIP Documents and the DIP Orders, in each case when and as required thereunder. |
| | Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Notes Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "<u>Prepetition Notes Adequate Protection</u>," and together with the Prepetition Loan Adequate Protection, the "<u>Adequate Protection</u>"): |
| | i.　Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition Notes Trustee, in its capacity as such, the Control Party in its capacity as such, and the ad hoc group of consenting Prepetition Noteholders (the "<u>Ad Hoc Group</u>"), in its capacity as such; |
| | ii.　To the extent of any Diminution in Value of the Prepetition Notes Secured Parties' interests in the Prepetition Notes Collateral, adequate protection liens (the "<u>Prepetition Notes Adequate Protection Liens</u>") on all DIP Collateral to secure the Prepetition Notes 507(b) Claims (as defined below), which Prepetition Notes Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in <u>Annex IV</u>, and (c) otherwise senior to any and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | all other liens on and security interests in the DIP Collateral; |
| | iii.  To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "Prepetition Notes 507(b) Claims"), which Prepetition Notes 507(b) Claims shall be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) otherwise senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever; and |
| | iv.  Delivery of all reports and notices provided for in the DIP Documents and the DIP Orders, in each case when and as required thereunder. |
| | The foregoing adequate protection liens (the "Adequate Protection Liens") shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP Agent, the Prepetition MA Loan Agent, the Prepetition Term Loan Agent or the Prepetition Notes Trustee determine (at the direction of the requisite creditors) to file any financing statements, notice of liens or similar instruments (in each consistent with the DIP Orders), the DIP Loan Parties will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings. |
| | *See* DIP Credit Agreement §§ 6.27 & 7.27; Interim Order ¶ 13. |
| **DIP Collateral Priority** Bankruptcy Rule 4001(c)(1)(B(i) | **DIP Collateral:** As security for the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent for the benefit of the DIP Secured Parties, was and is hereby granted legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective security interests in and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of the Debtors (the "DIP Collateral"), which shall include, without limitation, substantially all assets of the Debtors and all of the same collateral securing the Prepetition Financing Documents, including, without limitation, (a) the Manager Advance Collateral, (b) the Prepetition Collateral, any and all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments (including, without limitation, promissory notes), documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), tax refunds, hedge agreements, furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, liquor licenses, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, any other claims and causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtors, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance proceeds or other proceeds; (c) all owned real property interests and all proceeds of leased real property; (d) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (e) effective only upon entry of the Final Order, the proceeds or property recovered (whether by judgment, settlement or otherwise) of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents (the "Avoidance Actions"), provided that no liens shall attach to Avoidance Actions; and (f) effective only upon entry of the Final Order, the proceeds of or property recovered from (whether by judgment, settlement or otherwise) any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code (the "Recovery Actions"), provided that no liens shall attach to Recovery Actions; in each case subject and subordinate to the Carve-Out as set forth in the Interim Order (all such liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim Order and the DIP Documents, the "DIP Liens").  Notwithstanding anything in the Interim Order to the contrary, (i) in no event shall DIP Collateral include any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but the DIP Collateral shall include the proceeds of the sale or other disposition of such leases, and (ii) the DIP Liens shall only attach to the Debtors' liquor licenses to the extent permitted by applicable non-bankruptcy law, and, to the extent applicable non-bankruptcy law does not permit the DIP Liens to attach directly to the Debtors' liquor licenses, the DIP Liens shall be, subject to entry of the Final Order, legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective security interests in and liens on any proceeds from any sale or other disposition of the Debtors' liquor licenses and such proceeds shall constitute DIP Collateral.  The DIP Loan Parties shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the DIP Loan Parties and the DIP Agent (acting at the direction of the requisite DIP Lenders).  The DIP Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision hereof is reversed, modified, vacated, amended, waived or stayed, on appeal or otherwise.  The DIP Collateral will be free and clear of other liens, claims and encumbrances, except Prepetition Liens, Permitted Senior Liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the DIP Documents, if any, (as defined in the DIP Credit Agreement).<br><br>**Priority**.<br><br>All obligations of the DIP Loan Parties to the DIP Lenders and the DIP Agent under the DIP Facility shall have the following rankings and priorities (subject in all respects to the Carve-Out and the priorities set forth in Annex V to the DIP Term Sheet):<br><br>i.   *First Priority Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized and automatically valid, fully and properly perfected first priority liens on and security interests in all DIP Collateral that is not subject to Permitted Senior Liens (as defined below), including, for the avoidance of doubt, subject to entry of the Final DIP Order, proceeds of Avoidance Actions (collectively, the "Unencumbered |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Property"); |
| | ii. *Priming DIP Liens and Junior DIP Liens.* Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective liens on and security interests in all DIP Collateral (other than as described above in clause (a)), which DIP Liens (A) shall be subject and subordinate to Permitted Senior Liens, (B) shall be subject to the priorities set forth in Annex V to the DIP Term Sheet, and (C) shall be senior to all other liens on and security interests in any DIP Collateral (including, without limitation, any Prepetition Collateral and any DIP Collateral that would otherwise constitute Prepetition Collateral), including, without limitation, any Adequate Protection Liens and any Prepetition Obligations. |
| | It is understood and agreed that the priming liens described herein shall be subject to valid, non-avoidable and properly perfected liens that are (a) in existence on the Petition Date, (b) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (c) senior in priority to the Prepetition Liens, and (d) permitted to be incurred under the DIP Documents, in each case, to the extent indicated as "Permitted Senior Liens" on Schedule 7.08 to the DIP Credit Agreement (such liens, the "Permitted Senior Liens"). [5] |
| | To the fullest extent permitted by applicable law, all of the liens described herein with respect to the assets of the DIP Loan Parties shall be effective and perfected as of the date of the Interim DIP Order (solely to the extent of the then outstanding obligations) and/or the Final DIP Order and shall be granted without the necessity of the execution or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements, and the DIP Loan Parties shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the DIP Loan Parties and the DIP Agent (acting at the direction of the requisite DIP Lenders). |
| | Each DIP Order shall contain provisions prohibiting each of the DIP Loan Parties from incurring any indebtedness which (x) ranks *pari passu* with or senior to the DIP Obligations, (y) benefits from a first priority lien under section 364 of the Bankruptcy Code, or (z) except as set forth in the DIP Documents (including in Annex IV to the DIP Term Sheet), purports to have payment priority *pari passu* with or above DIP Manager Advances, and shall further prohibit any DIP Loan Party from creating, incurring, assuming or permitting to exist, directly or indirectly, any lien on or with respect to equity interests in Hawk Parent. |
| | Interim Order ¶¶ 5 & 6. |

---

[5]    For the avoidance of doubt, as used herein and in Annex IV, no reference to the "Permitted Senior Liens" shall refer to or include the Prepetition Liens. In addition, for the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Senior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition Liens as such claim had on the Petition Date. DIP Orders shall provide that all parties in interest shall reserve the right to the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Senior Lien to the extent they have standing to do so.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Repayment Features<br>Bankruptcy Rule 4001(c)(1)(B) | **Voluntary Prepayments**.  The DIP Facility may be voluntarily prepaid, and the commitments thereunder voluntarily reduced by the DIP Borrowers, in whole or in part, without premium or penalty, at any time upon three (3) business days' prior written notice to the DIP Lenders (subject to actual breakage costs (if any)), which notice shall specify the principal amount of such prepayment and the date on which such prepayment is to be made.<br><br>**Mandatory Prepayments.**  Unless the Required DIP Lenders consent to waive such prepayment, mandatory prepayments of the DIP Loans shall be required in connection with a Change of Control (as defined below), Asset Disposition (other than (x) inventory in the ordinary course of business or (y) in accordance with the Sale Transactions (as defined in the RSA)), Extraordinary Receipts (as defined below), and the incurrence of Indebtedness (as defined in the DIP Credit Agreement) (other than Indebtedness otherwise permitted under the DIP Documents). Any mandatory payment resulting from Extraordinary Receipts or Asset Dispositions at any Securitization Entity will be applied in accordance with the Priority of Payments Waterfall in the Prepetition Base Indenture, including the repayment of any DIP Manager Advances if such payment is then used by the Debtors to permanently repay the outstanding principal amount of DIP Loans.  The terms used above, shall have the following definitions:<br><br>i.   **Change of Control**:  means the occurrence of any of the following (i) the sale, lease, transfer, or other Disposition, directly or indirectly, in one transaction or a series of related transactions, of all or substantially all of the assets of the DIP Loan Parties to any Person other than the Parent or a wholly-owned subsidiary of the Parent; (ii) the Parent ceasing to own, directly or indirectly, 100% of the total economic and voting power of the issued and outstanding Capital Stock of any other HOA DIP Loan Party; (iii) the termination of HOA in its capacity as Manager under the Management Agreement; (iv) the Ultimate Parent ceasing to own directly or indirectly, at least 51% of the total voting and economic power of the issued and outstanding Voting Stock of the Parent; (v) the adoption of a plan by the stockholders of Securitization Entities relating to the liquidation or dissolution of Securitization Entities or a Manager Termination Event (as defined in the Management Agreement); or (vi) a "change of control" or any comparable term under, and as defined in, any agreement governing any Indebtedness of any DIP Loan Party or any of their subsidiaries in an aggregate principal amount exceeding $5,000,000. For the avoidance of doubt, no Change of Control shall be deemed to have occurred solely by virtue of the consummation of the Sale Transactions in the manner described in the RSA and the Approved Plan.<br><br>ii.   **Extraordinary Receipts**:  means any cash or Cash Equivalents or other proceeds received by or paid to or for the account of any Person other than in the ordinary course of business in respect of tax refunds, pension plan reversions, proceeds of insurance, indemnity payments and purchase price adjustments received in connection with any purchase agreement (or other similar agreement) and payments in respect of judgments or settlements of claims, litigation or proceedings, any settlement of or payment in respect of any property, casualty insurance claim or condemnation proceeding relating to any asset of any DIP Loan Party or any of their subsidiaries; provided that for purposes of the DIP Credit Agreement provisions governing mandatory prepayments from proceeds of such Extraordinary Receipts, Extraordinary Receipts shall not include insurance proceeds that are anticipated to be received; *provided*, that no default then exists and all such amounts are applied as a Manager Advance to repay invoices and out-of-pocket expenses Incurred |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | to repair the fire damage and reopen at that certain restaurant owned by the DIP Loan Parties located at 2201 N Lamar Street, Dallas, Texas 75201.<br><br>**Manager Advance Reimbursement Offer**. Promptly, and in any event within two (2) business days following each date on which HOA has received a reimbursement of a DIP Manager Advance, the DIP Borrowers shall make an offer to prepay the DIP Loans by providing written notice to the DIP Lenders that includes, among other things, an acknowledgement that the DIP Lenders may elect to accept or reject such offer for prepayment in their sole discretion. If the DIP Lenders elect to accept such offer for prepayment, the Borrowers shall prepay the DIP Loans in the amount of such reimbursement, together with accrued and unpaid interest and other DIP Obligations on the amount so prepaid, payable in connection with such prepayment.<br><br>All voluntary or mandatory prepayments of the DIP Loans (including through the acceptance of any mandatory prepayment offer) shall be applied to prepay the DIP Loans and any DIP Manager Advances until all such DIP Loans and DIP Manager Advances are repaid in full. Any DIP Lender may decline to accept all (but not less than all) of its share of any such prepayment by providing written notice to the Lender Representative (as defined in the DIP Credit Agreement) within one (1) Business Day prior to the proposed date of such prepayment and any such declined amount shall also remain for purposes of calculating the then outstanding DIP Manager Advances, a corresponding amount of outstanding Manager Advances that may continue to be applied by the Debtors in accordance with the then Approved Budget.<br><br>*See* DIP Credit Agreement §§ 2.07 & 2.08. |
| **Permitted Variances** Bankruptcy Rule 4001(c)(l)(B) | **Approved Budgets**. The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral, including Manager Advances, in a manner consistent with the Approved Budget and exclusions set forth herein. Following the entry of the Interim Order, the Debtors shall, in a manner consistent with the DIP Credit Agreement, deliver proposed budgets and cash flow forecasts (and the sources and uses described therein, a "Proposed Budget") which shall become, together with the receipts and disbursements described therein, an Approved Budget (as defined below) as specified in and in accordance with the DIP Credit Agreement and the DIP Orders. The Initial Approved Budget shall be the Approved Budget until a subsequent Approved Budget becomes an Approved Budget in accordance with the terms of the DIP Credit Agreement and the DIP Orders. The Initial Approved Budget is an integral part of the Interim Order and has been relied upon (i) by the DIP Secured Parties to provide the DIP Facility and consent to the Interim Order (ii) by the Pre-Petition Term Loan Secured Parties to permit the use of the Cash Collateral and consent to the Interim Order, and (iii) by the Consenting AHG Noteholders as part of the consensual nature of the relief requested herein. The Debtors represent that the Initial Approved Budget is reasonable under the facts and circumstances. The Debtors believe that the Initial Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay postpetition obligations as they come due. Pursuant to the terms of the DIP Credit Agreement, the Debtors shall provide a Variance Report (as defined in the DIP Credit Agreement) every other calendar week and shall be in compliance with Permitted Variances (as defined below) on the terms and in accordance with the DIP Credit Agreement. Additional variances, if any, shall be subject to the approval of the Required DIP Lenders and the Required Majority Consenting AHG Noteholders[6] as specified in the DIP Credit Agreement and the DIP Orders. The Debtors shall operate solely in accordance with the |

---

[6]    As used herein, the terms "Required Majority Consenting AHG Noteholders" and "Required Consenting AHG Noteholders" have the meanings ascribed to such terms in the DIP Term Sheet.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject to the Permitted Variance (as defined in the DIP Credit Agreement). Upon the DIP Lenders receiving a certificate from the Debtors (in form and substance satisfactory to the Required DIP Lenders) that a Proposed Budget, including the cash flow forecast contained therein, was approved by the Required Majority Consenting AHG Noteholders and the Required DIP Lenders confirming their approval of the same with respect to such Proposed Budget, (which approval shall be in the Required DIP Lenders' sole discretion (and may be withheld for any reason)), such forecast and proposed budget shall become an "<u>Approved Budget</u>" (and such required consents, the "<u>Budget Consents</u>") and shall replace the then-operative Approved Budget for all purposes.  The Debtors shall operate in accordance with the Approved Budget and all disbursements including further payments made as Manager Advances including those amounts used for debt service, professional fees and capital expenditures) shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance).  The Debtors may submit additional Proposed Budgets to the DIP Lenders, the Control Party, the Prepetition Notes Trustee, or any of the Prepetition Noteholders, but until the DIP Loan Parties have the Budget Consents required for an Approved Budget, no Proposed Budget will be an Approved Budget and until the required Budget Consents are received, the Debtors shall continue to comply with the then-operative Approved Budget and the DIP Lenders shall be permitted to rely on such previously Approved Budget for purposes of determining the amount of New Money Loans to advance; provided that Prepetition Noteholders who are specified in the DIP Term Sheet whose consent is necessary for such Proposed Budget to become an Approved Budget (collectively, the Required DIP Lenders and any such specified other Persons, the "<u>Requisite Budget Approving Persons</u>") shall be deemed to consent to such Proposed Budget if (A) the Debtors deliver a Proposed Budget to such Prepetition Noteholders and (B) within three (3) Business Days, no more than 25% of Prepetition Noteholders who are Requisite Budget Approving Persons notify the Debtors of an objection to such Proposed Budget (the "<u>Noteholder Budget Consent</u>") (it being understood and agreed that if the Noteholder Budget Consent is not achieved in this manner, the Debtors may commence a process to affirmatively achieve consent from the Prepetition Noteholders who are Requisite Budget Approving Persons.<br><br>**Forecast Variances**.  Commencing on the second full week following the Petition Date, no later than 5:00 p.m. ET on the Wednesday of each subsequent calendar week, the DIP Loan Parties shall deliver to the DIP Lenders, the Control Party, and to the Consenting AHG Noteholders a variance report in form acceptable to the DIP Lenders in their sole discretion (each, a "<u>Variance Report</u>") setting forth (i) the DIP Loan Parties' aggregate cash receipts and disbursements on a line-by-line basis (including debt service, professional fees and capital expenditures) during the immediately preceding calendar week ending on Sunday; (ii) disbursements for the DIP Loan Parties' administrative expenses of the Chapter 11 Cases including professionals' fees; and (iii) the variance in dollar amounts and as a percentage of the actual aggregate cash receipts and disbursements (including debt service, professional fees and capital expenditures) for each weekly period ending on Sunday from those reflected for the corresponding period in the then-operative Approved Budget (such comparison, the "<u>Variance</u>").<br><br>"<u>Permitted Variance</u>" means a Variance from the then-current Approved Budget during any Variance Testing Period that is not more than 15.0% of each of (x) the cumulative receipts on a combined basis during the Variance Testing Period, and (y) all cumulative disbursements during the Variance Testing Period; *provided*, that disbursements on account of professional fees and expenses shall be tested on a line-by-line basis and subject to a Permitted Variance of not more than 15.0% from the then-current Approved Budget for each line item during any Variance Testing Period during the Variance Testing Period. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | "Variance Testing Period" means, starting the second full week following the Closing Date (as defined below), (i) the one-week period ending on the first Sunday thereafter, (ii) the two-week period ending on the second Sunday thereafter, (iii) the three-week period ending on the third Sunday thereafter, (iv) the four-week period ending on the fourth Sunday thereafter and (v) each subsequent four-week period ending on each Sunday thereafter; whereby the cumulative actuals are compared against the cumulative budget for the then-current Approved Budget plus actuals for any prior week not forecasted in the then-current Approved Budget.<br><br>The DIP Loan Parties hereby agree that during any Variance Testing Period, the Variance from the then-current Approved Budget shall not exceed the Permitted Variances.<br><br>Interim Order ¶ 16. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Substantially similar to such events of default as set forth in the Prepetition Credit Documents, as modified to reflect the nature of this financing, and including certain additional events of default appropriate for a debtor-in-possession financing facility and taking into account the DIP Loan Parties' present affairs.<br><br>The events of default ("Events of Default") in the DIP Credit Agreement shall include, without limitation, the following:<br><br>i.  **Breach of Representation**. The inaccuracy in any material respect of any representation or warranty of any DIP Loan Party on the date when made or deemed to have been made.<br><br>ii.  **Nonpayment**. The failure of any DIP Loan Party to pay when due (i) any interest on any DIP Loan or any fee or premium payable under the DIP Credit Agreement or any other DIP Document, and such failure continues for a period of five (5) Business Days or (ii) all or a portion of the principal of the DIP Loans.<br><br>iii.  **Noncompliance**. The failure of any DIP Loan Party (a) to comply with the Variance Covenant, (b) to satisfy any Milestone, (c) to have an Approved Budget; or (d) to comply with any negative covenant or affirmative covenants or agreements in the DIP Term Sheet, the DIP Facility Documentation or with any other covenant or agreement contained in the Financing Orders in any respect.<br><br>iv.  **Bankruptcy Event of Default**. The occurrence of any of the events or circumstances in the Chapter 11 Cases as specified in Annex III of the DIP Term Sheet.<br><br>v.  **Effectiveness**. Any DIP Document ceases to be in full force and effect or any DIP Loan Party asserts that its obligations under the DIP Facility, including the Guarantee or any other DIP Document is invalid, unenforceable or impaired.<br><br>"Default" shall mean any event, act or condition set forth in this section which, with notice or lapse of time, in each case, as set forth above, would (without cure or waiver) constitute an Event of Default under the DIP Facility.<br><br>*See* DIP Credit Agreement § 8.01. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Rights and Remedies Upon Event of Default** 4001(c)(l)(B) | The DIP Facility will provide upon the occurrence of an Event of Default, then, and in every such event, and at any time thereafter during the continuance of such event, upon written notice by the DIP Agent (acting upon the instructions of the Required DIP Lenders) to the DIP Loan Parties, to the Prepetition Secured Note Parties, any statutory committee appointed in the Chapter 11 Cases and the U.S. Trustee (with a copy filed with the Bankruptcy Court) and an opportunity for a hearing (*provided*, that the only issue that may be raised by any party in opposition to the actions proposed or available to be taken shall be whether, in fact, an Event of Default has occurred and is continuing), the DIP Agent (acting at the direction of the DIP Lenders) may take the following actions (which shall not be exclusive):<br><br>i.    (a) declare all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) terminate, reduce or restrict any unfunded commitments on account of the New Money Loans to the extent any such commitments remain outstanding (other than as required to fund the Carve-Out), and (c) terminate any DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations;<br><br>ii.    terminate, reduce or restrict the DIP Loan Parties' ability to use any Cash Collateral (subject to the Carve-Out to fund the wind down of the DIP Loan Parties in accordance with the Approved Budget and other than Cash Collateral for payroll and other expenses critically necessary to preserve the value of the business of the DIP Loan Parties);<br><br>iii.    sell or deliver any DIP Collateral or other asset at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the DIP Agent deems advisable (at the direction of the Required DIP Lenders), in its sole discretion and at the direction of the DIP Lenders;<br><br>iv.    the DIP Lenders may direct all DIP Loan Parties to repay the DIP Manager Advances on terms and conditions acceptable to the Required DIP Lenders pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules;<br><br>v.    declare that the application of the Carve-Out has occurred by causing the occurrence of the Trigger Date (as defined in the Interim Order);<br><br>vi.    charge the Default Rate (as defined below) under the DIP Facility; and<br><br>vii.    exercise all other rights and remedies available to the DIP Lenders under the DIP Documents, the DIP Orders, under applicable law, or in equity.<br><br>*See* DIP Credit Agreement § 8.01(1); Interim Order ¶ 28. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to, and all transactions contemplated by, the foregoing.  Accordingly, the Debtors shall indemnify and hold the DIP Secured Parties and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equity holders |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each such entity's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (each an "<u>Indemnified Party</u>") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility or of the Manager Advances, except to the extent the same is found in a final and non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's own gross negligence or willful misconduct.  The Debtors shall file a notice with the Court if any Indemnified Party asserts a claim against the Debtors under this paragraph.<br><br>Interim Order ¶ 37. |
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides a "Carve-Out" of (i) the fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by order of the Court (and, if applicable, in compliance with the Budget), the aggregate amount of any budgeted and unpaid, reasonable and documented fees, costs and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 331 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent payable under sections 330 or 331 and subsequently allowed by the Court (and, if applicable, in compliance with the Approved Cash Flow Forecast), (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at the direction of the Required DIP Lenders under and as defined in the DIP Documents, the Prepetition Term Loan Agent, acting at the direction of the Required Lenders under and as defined in the Prepetition Term Loan Agreement, or the Prepetition MA Loan Agent, acting at the direction of the Required Lenders under and as defined in the Prepetition MA Loan Agreement, as applicable, to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility or termination of the Debtors' right to use Cash Collateral, as applicable, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶ 11. |
| **Fees and Expenses**<br>Bankruptcy Rule<br>4001(c)(1)(B) | **Agency Fee**.  As agreed with the DIP Agent.<br><br>**Expenses**.  Subject to the review procedures set forth in the Interim Order, payment of all DIP Secured Parties' Fees and Expenses and Prepetition Secured Parties' Fees and Expenses shall not be subject to Court approval or the U.S. Trustee fee guidelines, and none of the DIP Professionals or the Prepetition Professionals shall be required to file with respect thereto any interim or final fee application with this Court. At any time that any of the DIP Professionals or the Prepetition Professionals seeks payment of fees and expenses from the Debtors after the Closing Date, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or otherwise modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the U.S. Trustee and counsel to the Committee (if appointed) (collectively, the "<u>Review Parties</u>") contemporaneously with the delivery of such fee and expense statements to the Debtors.  If any Review Party objects to the reasonableness of the fees and expenses of the DIP Secured Parties' Professionals or Pre-Petition Secured Parties' Professionals and cannot resolve such objection within ten (10) business days of receipt of such invoices (the "<u>Review Period</u>"), then such party shall file with this Court and serve on such professional an objection (the "<u>Fee Objection</u>") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within the Review Period shall constitute a waiver of any right of such party to object to the applicable invoice. The Debtors shall, upon expiration of the Review Period, pay in accordance with the terms and conditions of the Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on any invoice in which no Fee Objection has been timely filed. Notwithstanding the foregoing, the Debtors are hereby authorized and directed to pay, on or about the date of entry of the Interim Order, all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Secured Parties and the Prepetition Secured Parties incurred on or prior to such date, in each case without the need for any professional engaged by the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice as provided for herein (other than to the Debtors).  The Debtors shall pay all DIP Secured Parties' Fees and Expenses and Prepetition Secured Parties' Fees and Expenses (a) in the case of DIP Secured Parties' Fees and Expenses and Prepetition Secured Parties' Fees and Expenses invoiced prior to the entry of the Interim Order, within seven (7) days after entry of the Interim Order and (b) in the case of professional fees and expenses invoiced thereafter, within three (3) days after the expiration of the Review Period (with respect to any portion payable in accordance with the Review Period and Fee Objection procedures set forth in the Interim Order.  Any and all fees, costs and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with or with respect to the DIP Facility or the Chapter 11 Cases or (ii) to the Prepetition Secured Parties in connection with or with respect to |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | these matters, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.<br><br>Interim Order ¶ 33. |
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers**<br>Bankruptcy Rule 4001(c)(l)(B) | **Limitation on Charging Expenses Against Collateral**. Subject to the entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Required DIP Lenders and the Required Majority Consenting AHG Noteholders, no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Required Majority Consenting AHG Noteholders.<br><br>**No Marshaling**. Subject to entry of the Final Order and except to the extent of the Carve-Out, in connection with any disposition of or exercise of rights and remedies with respect to the DIP Collateral, the DIP Agent may use commercially reasonable efforts to first apply proceeds of the DIP Collateral that is Unencumbered Property to satisfy the DIP Obligations before applying proceeds of DIP Collateral that is Prepetition Collateral to satisfy the DIP Obligations, subject to the relative priorities set forth in <u>Annex IV</u> to the DIP Term Sheet, and in no event shall any of the DIP Secured Parties or, any of the Prepetition Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Obligations, the Prepetition Secured Obligations.<br><br>**Section 552(b)**. Subject to entry of the Final Order, in light of the subordination of their liens and superpriority administrative claims, each of the DIP Secured Parties and Prepetition Secured Parties is entitled to, subject to the Carve-Out, all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Prepetition Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Pre-Petition Collateral under section 552(b) of the Bankruptcy Code (subject to any provisions of the Final Order solely with respect to costs or expenses incurred following the entry of such Final Order). Subject to entry of the Final Order, and subject to the Carve-Out, the Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under section 552(b) of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Prepetition Liens, or the Prepetition Adequate Protection Liens on any property acquired by any of the Debtors or any of their estates or, subject to the Carve-Out, seeking to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, as applicable.<br><br>*See* Interim Order ¶¶ 19-21. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Parties shall comply with the following deadlines (the "<u>Chapter 11 Milestones</u>"); *provided*, *however*, that such Chapter 11 Milestones may be extended from time to time with the prior written consent of the Required DIP Lenders (with email being sufficient): |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | i.     The Debtors shall commence the Chapter 11 Cases no later than March 31, 2025; <br><br> ii.     No later than the Petition Date, the DIP Motion shall have been filed; <br><br> iii.     No later than two (2) business days after the Petition Date, the Interim DIP Order shall have been entered; <br><br> iv.     No later than ten (10) days after the Petition Date, the prearranged chapter 11 plan approving, among other things, the Buyer Group Arrangement (as defined in the RSA) in form and substance acceptable to the Required DIP Lenders (the "Approved Plan") and the disclosure statement in form and substance acceptable to the Required DIP Lenders (the "Disclosure Statement") shall have been filed; <br><br> v.     No later than twenty-eight (28) days after the Petition Date, the Loan Parties and Buyer Group shall have entered into the Buyer Group Arrangement (as defined in the RSA) and any other Sale Documents (as defined in the RSA) necessary to effectuate the Buyer Group Arrangement; <br><br> vi.     No later than thirty-five (35) calendar days after the Petition Date, the Final DIP Order shall have been entered; <br><br> vii.     No later than forty (40) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider conditional approval of the adequacy of the Disclosure Statement; <br><br> viii.     No later than forty (40) calendar days after the Petition Date, the Debtors shall commence solicitation of votes on the Approved Plan; <br><br> ix.     No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the Approved Plan; and <br><br> x.     No later than eighty (80) calendar days following the Petition Date (the "Outside Date"), the Plan Effective Date (as defined in the RSA) shall have occurred, *provided*, *however*, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional fifteen (15) calendar days with the written consent of the Required DIP Lenders; *provided*, *further*, that any additional extension of the Outside Date requires the written consent of the DIP Lenders. <br><br> **Manager's Application of Proceeds**.  Manager shall apply any proceeds received from the Securitization Entities or from an event that triggers a Mandatory Repayment, in accordance with the Priority of Payments Waterfall, which application if used to permanently repay the outstanding DIP Loans shall also correspondingly reduce the then outstanding DIP Manager Advances by an equal amount.   Manager may only waive its right to receive a reimbursement for any Manager Advances pursuant to the Priority of Payments Waterfall with the prior written consent of the Required DIP Lenders and the Required Consenting AHG Noteholders(it being understood that, with respect to the Required Consenting AHG Noteholders, continuing to use such proceeds in accordance with the then Approved Budget |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | shall not require a further consent from the Required Consenting AHG Noteholders).<br><br>**Authorization to File Financing Statement**s.  Subject to customary further assurances on DIP Collateral and perfection of such DIP Collateral, the DIP Agent, on behalf of the DIP Secured Parties, is authorized (but not obligated) to file financing statements, without notice to the DIP Loan Parties, with all appropriate jurisdictions to perfect or protect DIP Agent's and DIP Lenders' interest or rights hereunder. Such financing statements may indicate the DIP Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in DIP Agent's discretion (at the direction of the Required DIP Lenders).<br><br>*See* DIP Credit Agreement § 7.16. |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective immediately upon the entry of the Interim Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each DIP Loan Party, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Secured Parties, the Prepetition Credit Agreement Secured Parties, the Prepetition Notes Trustee and the Prepetition Noteholders, each in its capacity as such, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, financial advisors, investment bankers, agents, representatives, successors and assigns (collectively, the "Released Parties") from any and all claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which the DIP Loan Party may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to the DIP Term Sheet (as defined in the DIP Credit Agreement), the DIP Facility, the DIP Documents or any document or instrument relating thereto, the Prepetition Financing Documents, or any document or instrument relating thereto (collectively, the "Released Matters"); *provided*, that Released Matters shall not include any claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order. Each DIP Loan Party represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) the foregoing constitutes a full and complete release of all such claims.  Notwithstanding anything herein to the contrary, none of the Debtors shall release each other or any of the Released Parties with respect to any claims or counterclaims or other rights described or contemplated by the reserved matters in the "Reservation of Rights" as set forth in the DIP Term Sheet.<br><br>Interim Order ¶ 34. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order, including the Debtors' Stipulations and the releases set forth in Paragraph 34 of the Interim Order (the "Releases"), shall be binding upon the Debtors in all circumstances and for all purposes.<br><br>The Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order, including the Debtors' Stipulations and the Releases, shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, the Committee (if appointed) and any other statutory or non- |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors, in all circumstances and for all purposes unless: |

i. an adversary proceeding or contested matter (a "<u>Challenge</u>") is filed by a party in interest with requisite <u>standing</u> (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) by no later than (A) seventy-five (75) days after the entry of the Interim Order, (B) solely with respect to the Committee, the earlier of (1) sixty (60) days after the appointment of the Committee, or (2) ninety (90) days after the Petition Date, or (C) solely with respect to the Ad Hoc Group of Noteholders, and solely for Challenges with respect to prepetition Manager Advances other than Agreed Securitization Manager Advance Claims (as defined in the Restructuring Term Sheet), until consummation of an Approved Plan (as defined in the Restructuring Term Sheet) (the time period established by the foregoing, the "<u>Challenge Period</u>"), asserting or prosecuting any claims, counterclaims or causes of action, objections, contests or defenses against the Released Parties with respect to the Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order, including the Debtors' Stipulations and the Releases; and

ii. there is a final and non-appealable judgment entered against a Released Party in any such timely filed adversary proceeding or contested matter; *provided*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise; *provided further* that any party in interest that fails to file a Challenge within the Challenge Period shall be forever barred from asserting any claims against the Released Parties on behalf of any of the Debtors' estates, or challenging in any manner the Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order, including the Debtors' Stipulations and the Releases.

If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (1) the Releases shall be binding on all parties in interest; and (2) the Released Parties shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtors), whether arising under the Bankruptcy Code or otherwise.

If any such Challenge is timely filed during the Challenge Period, the releases contained in the Interim Order shall nonetheless remain binding and preclusive on any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that the Releases were expressly and successfully challenged

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | in such Challenge as set forth in a final and non-appealable order of a court of competent jurisdiction.

Nothing in the Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any other statutory or non-statutory committees appointed or formed in Chapter 11 Cases, standing or authority to pursue any claim or Cause of Action belonging to the Debtors or their estates, including, without limitation, Challenges with respect the Debtors' stipulations, admissions, agreements, and other releases contained in the Interim Order, including the Debtors' Stipulations and Releases, and all rights to object to such standing are expressly reserved. Any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of the DIP Orders to the same extent as the Debtors, including with respect to the Releases, to the extent (and on the terms) approved by the DIP Orders.

*See* Interim Order ¶ 35. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Prepetition Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Lenders or the Prepetition Credit Agreement Secured Parties may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Credit Agreement Secured Parties; (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Credit Agreement Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order; and (e) subject to the terms and conditions of the Interim Order, allow the DIP Secured Parties to exercise, upon the occurrence of and at any time after the Maturity Date, all rights and remedies provided for in the Interim Order; and (f) implement all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order, without further notice, motion or application to, or order of the Court.

Interim Order ¶ 18. |

## THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

13.     A summary chart depicting the Debtors' corporate structure is included in the First Day Declaration.  As of the Petition Date, the Debtors have funded principal debt obligations of approximately $376 million, consisting of obligations under the (i) Term Loan Credit Agreement; (ii) Manager Advance Credit Agreement; and (iii) A&R Base Indenture (all as defined herein).

14.     The following table summarizes the Debtors' funded debt obligations as of the

Petition Date.

| Loans/Notes | Approx. Principal Amount Outstanding as of the Petition Date | Rate (Maturity) | Security |
|---|---|---|---|
| **Manager Advance Credit Agreement** | | | |
| Manager Advance Loans | $8,386,877, plus accrued and unpaid fees and expenses | Prime + 3% (Maturity: August 20, 2025) | Substantially all assets of the Loan Parties including the right to reimbursement of Manager Advances |
| Incremental Loans | $5,000,000, plus accrued and unpaid fees and expenses | | |
| **Term Loan Credit Agreement** | | | |
| Term Loans | $55,976,213, plus accrued and unpaid fees and expenses | 10.5% (Maturity: March 9, 2027) | Substantially all assets of the Loan Parties including the right to reimbursement of Manager Advances |
| **A&R Base Indenture** | | | |
| Class A-2 Notes | $266,579,032 | 4.723%, with a step-up following the Anticipated Repayment Date (Anticipated Repayment Date: August 2026) (Maturity: August 2051) | First lien on all assets of Securitization Entities (as defined below) |
| Class B Notes | $40,000,000 | 7.432%, with a step-up following the Anticipated Repayment Date (Anticipated Repayment Date: August 2026) (Maturity: August 2051) | Second lien on all assets of Securitization Entities |
| **Total (Approx.)** | **$375,942,122** | | |

## I.     PREPETITION INDEBTEDNESS

### A.  Securitization Debt

i.     <u>A&R Base Indenture</u>

15.     On August 19, 2021, HOA Funding, LLC, as master issuer (the "<u>Master Issuer</u>"),

entered into that certain Amended and Restated Base Indenture, by and among the Master Issuer

and Citibank, N.A., as Trustee and Securities Intermediary (the "<u>Trustee</u>") (the "<u>A&R Base</u>

<u>Indenture</u>").   Under the A&R Base Indenture, the Master Issuer issued two series of notes on

August 19, 2021:  (a) $275,000,000 of Class A-2 senior secured notes (the "Class A-2 Notes") and (b) $40,000,000 of junior subordinated notes (the "Class B Notes", together with the Class A-2 Notes, the "Notes", and such holders of Notes the "Noteholders").

16.     As of the Petition Date, approximately $267 million of Class A-2 Notes remain outstanding and $40 million of Class B Notes remain outstanding.

17.     From time to time, in the ordinary course of business, HOA, in its capacity as manager of the Securitization Entities (as defined below), advances funds to, and on behalf of, the Securitization Entities (each such advance, a "Manager Advance") in connection with the operation of the assets securitized pursuant to the A&R Base Indenture.  The Securitization Entities are obligated to reimburse such Manager Advances on a priority basis as provided in that certain Amended and Restated Management Agreement, dated as of August 19, 2021, by and among the Securitization Entities, HOA (as the manager of the Securitization Entities), and the Trustee (as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time) (the "Management Agreement").  HOA's priority right to reimbursement of the Manager Advances is part of the Prepetition Lenders' collateral under the Term Loan Credit Agreement (as defined below) and the Manager Advance Credit Agreement (as defined below).

18.     The A&R Base Indenture, among other things, lays out a 30-step payment waterfall for application of funds the Securitization Entities receive from the operation of Company-Owned Stores and franchised restaurants.  Under the payment waterfall, certain fixed expenses to operate the Securitization Entities are given priority.  In particular, payments to HOA to reimburse Manager Advances are second in the payment waterfall.  Payment of the Manager's management fee is fourth.  In respect of payments to noteholders, the Class A-2 Notes interest payments are sixth in the payment waterfall, while the Class B Notes interest payments are eighth.  The Class

A-2 Notes amortization payments are tenth and fourteenth.  Amortization payments for the Class B Notes are twentieth and twenty-first.  The Master Issuer's right to dividend proceeds is the last step of the payment waterfall.

19.     The Notes are secured by substantially all of the assets of the Securitization Entities arising from that certain Amended and Restated Guarantee and Collateral Agreement, dated as of August 19, 2021, by and among HOA Systems, LLC, HOA Holdco, LLC, HOA Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOOTS Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA Towson, LLC, HI Limited Partnership, HOA IP GP, LLC, HOA Franchising, LLC, HOOTS Franchising, LLC (collectively, the "Securitization Guarantors", together with the Master Issuer, the "Securitization Entities") and the Trustee.

**B. Non-Securitization Debt**

      i.     Term Loan Credit Agreement

20.     On March 9, 2022, Hawk Parent LLC ("Hawk Parent") as the borrower, HOA Holdings, LLC, Night Owl, LLC, Owl Wings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, Derby Wings Holdings, LLC, Derby Wings, LLC, Hooters of America, LLC, Owl Holdings, LLC, Elf Owl Investments, LLC, TW Lonestar Wings, LLC, Alamo Wings, LLC, as guarantors (together with Hawk Parent, the "Loan Parties"), XYQ Cayman Ltd. as Initial Lender (in such capacity, the "Term Loan Lender") and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent (in such capacity, the "Term Loan Agent") entered into that certain Credit Agreement dated March 9, 2022 (as amended by that certain First Amendment to the Credit Agreement, dated November 14, 2022, that certain Second Amendment to the Credit Agreement, dated as of December 27, 2022, that certain Third Amendment to the Credit Agreement, dated April 3, 2023, that certain Fourth Amendment to the Credit Agreement,

dated April 20, 2023, that certain Fifth Amendment to the Credit Agreement, dated January 10, 2024, that certain Limited Waiver, Consent and Sixth Amendment to the Credit Agreement, First Amendment to the Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of June 24, 2024, that certain Limited Waiver, Consent and Seventh Amendment to Credit Agreement and Reaffirmation of Loan Documents, dated as of August 16, 2024, that certain Limited Waiver, Consent and Eighth Amendment to Credit Agreement, Second Amendment to Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Term Loan Credit Agreement").

21.     Pursuant to the Term Loan Credit Agreement, the Term Loan Lender made term loans in the aggregate principal amount of $70,000,000 to Hawk Parent (the "Term Loans").  The Term Loans under the Term Loan Credit Agreement have a maturity date of March 9, 2027, and bear interest at a rate of 10.5%. Collateral securing obligations under the Term Loan Credit Agreement consists of substantially all assets of the Loan Parties, including the right to reimbursement of the Manager Advances.  As of Petition Date, approximately $56 million of principal remains outstanding under the Term Loans.

ii.     Manager Advance Credit Agreement

22.     On September 27, 2024, the Loan Parties, Celtic Master Fund LP as Initial Lender (in such capacity, the "Manager Advance Lender") and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent (the "Manager Advance Agent") entered into that certain Credit Agreement (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025, by and among the Loan Parties, the Manager Advance Lender and the Manager Advance Agent (the "Incremental Loan"), as further amended, amended and restated,

supplemented or otherwise modified from time to time, the "Manager Advance Credit Agreement" and together with the Term Loan Credit Agreement, the "Prepetition Credit Agreements"). Pursuant to the Manager Advance Credit Agreement, the Manager Advance Lender made an initial term loan in the aggregate principal amount of $8,386,877 (the "Manager Advance Loan"), which funds were used as a Manager Advance to fund the expenses of the Securitization Entities.

23.      On February 21, 2025, the parties entered into the Incremental Loan, pursuant to which (i) the Manager Advance Lenders (a) provided a $5 million Incremental Loan under the Manager Advance Credit Agreement and (b) agreed to waive certain requirements under the Manager Advance Credit Agreement; and (ii) the Loan Parties agreed to certain milestones.  The additional liquidity provided by the Prepetition Lenders to the Company allowed the Company to continue operating as a going concern while it finalized negotiations with the parties to the RSA regarding the terms of the transactions contemplated by the RSA.

24.      As of the Petition Date, approximately $13.4 million of principal remains outstanding under the Manager Advance Credit Agreement.

        iii.     Intercreditor Agreement

25.      On September 27, 2024, the Term Loan Agent, the Manager Advance Agent, Hawk Parent, and the guarantors party thereto entered into that certain Pari Passu Intercreditor Agreement (the "Intercreditor Agreement"), which provides that obligations under the Term Loan Credit Agreement and the Manager Advance Credit Agreement are equal in priority with respect to the collateral shared between the two facilities.

**C.  Legacy Liabilities**

26.      31.      HOA and HI Limited Partnership ("HILP") are parties to the Assumption, Indemnification and Hold Harmless Debtor Substitution and Release Agreement, dated as of March 21, 2001, pursuant to which the Company pays, on average, approximately $4.2 million per

year on account of purported legacy royalty obligations (the "Legacy Royalty Obligations") to Lags Equipment, LLC ("LAGS"). These purported obligations include a monthly royalty in perpetuity in the amount of three percent (3%) of the gross sales of the Company-Owned Stores using the Hooters® trademark and indicia in certain geographical locations. [7]

### D. Trade Claims and Other Unsecured Debt

27. In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, critical vendors. As of the Petition Date, the Debtors estimate they have approximately $26.3 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9) of the Bankruptcy Code, as well as claims that give rise to statutory constructive trusts under the Perishable Agricultural Commodities Act of 1930 or the Packers and Stockyards Act of 1921).

## THE DIP FACILITY

### I. The Debtors' Immediate Need for Postpetition Financing and Use of Cash Collateral

41. As set forth in the DIP Declarations, the Debtors need immediate access to the DIP Facility and the use of Cash Collateral to ensure they have: (i) sufficient working capital to operate their business and to administer their estates, (ii) the ability to timely pay administrative expenses to be incurred, and (iii) the ability to send a positive message to the Debtors' vendors, suppliers, and customers that these Chapter 11 Cases are sufficiently funded. Absent the liquidity provided under the proposed DIP Facility at the outset of these Chapter 11 Cases, the Debtors' estates will be materially and perhaps irreparably harmed. *See* Maib Decl. ¶ 10.

---

[7]   The Company does not concede nor consent to such Legacy Royalty Obligations as being true royalties and generally reserves all rights and defenses in connection with the Legacy Royalty Obligations and to challenge any purported liens asserted in connection therewith.

42.     The Debtors engaged Accordion Partners, LLC ("Accordion") as their financial advisor in June 2024 to help the Company assess the Debtors' liquidity constraints. Accordion conducted a detailed review and analysis of their projected cash needs. Based upon that review, the Debtors, in consultation with their advisors, determined that the use of Cash Collateral alone would be insufficient to fund the operation of their businesses for the duration of these Chapter 11 Cases, and that additional funding is necessary. The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, administer their estates during the Chapter 11 Cases, and fund the Sale Transactions (as defined in the RSA). *See* Maib Decl. ¶ 22. Without immediate access to postpetition financing and Cash Collateral, the Debtors will be unable to: (i) continue to serve their customers and generate revenue during these Chapter 11 Cases; (ii) access working capital for their business; (iii) fund payments to their workforce and critical third-party vendors; (iv) fund the payments authorized by the Court pursuant to the First Day Motions and other pleadings filed contemporaneously herewith; (v) operate their Cash Management System; or (vi) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases. *See* Maib Decl. ¶ 10.

43.     Furthermore, as demonstrated by the DIP Budget, the need to access the DIP Facility is further underscored by the fact that it would be imprudent, in fact impossible, to administer these cases without immediate access to additional capital. Immediate access to the DIP Facility and continued access to the Cash Collateral is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates. *Id*. The DIP Facility will provide the Debtors with the necessary liquidity to administer these Chapter 11 Cases and conduct the contemplated

transactions pursuant to the RSA, without which the Debtors' ability to successfully execute these Chapter 11 Cases will be severely jeopardized to the detriment of all stakeholders in these cases.

## II.    The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable

44.    The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement (the "Milestones").  These Milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility. *See*  Maib Decl. ¶ 14.

45.    The DIP Facility, including the Milestones, serves as an important component of these Chapter 11 Cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while the Debtors conduct a sale process.  The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility.  The DIP Facility, and the Debtors' ability to achieve the Milestones contemplated therein, will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate the Sale Transactions to maximize the value of their estates. *See* Maib Decl. ¶ 13.

## III.    The Debtors' Efforts to Secure Postpetition Financing

46.    During the prepetition period, SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (together, "SOLIC") assisted the Debtors with evaluating potential financing alternatives. SOLIC initiated a comprehensive process to seek strategic alternatives.  SOLIC contacted several potential third-parties to solicit interest in providing postpetition financing.  The Debtors received

one proposal for postpetition financing submitted by the DIP Lender (who is the Prepetition

Lender) and another from the AHG Noteholders. *See* Koutsonicolis Decl. ¶ 10.

47.     In light of the Debtors' financial position, their existing leveraged capital structure,

and substantial debt service payments, and that the Prepetition Lender would not consent to

"priming" debtor-in-possession financing, the Debtors were unable to find any other interested

third-party financing parties. *See* Maib Decl. ¶ 17.

48.     After solicitation of alternative postpetition financing by the Debtors and their

advisors, no other party was willing to offer DIP financing on terms better than the terms of the

DIP Facility provided by the DIP Lenders. *See Id.*  Accordingly, given time and liquidity

constraints and the responses from the marketing process, the Debtors determined that the DIP

Facility represented the most viable path to obtaining critical funding because, among other things,

it (i) provides sufficient financing to meet the Debtors' liquidity needs and (ii) allows the Debtors

to immediately work towards conducting a fulsome sale and restructuring process. *See* Maib Decl.

¶ 10.

## IV.     The DIP Facility Was Negotiated in Good Faith and at Arm's Length

49.     The Debtors' management team, legal advisors, and financial advisors were

actively involved throughout the negotiations with the DIP Lender for the DIP Financing, which

were conducted at arm's length and in good faith.  The terms of the DIP Facility, including the

rates, fees, certain customary waivers, and Milestones were negotiated over several weeks leading

up to the Petition Date, with the Debtors and their advisors negotiating the Interim Order, the DIP

Credit Agreement, and each of the DIP Documents through a vigorous, hard-fought process.  These

discussions were highly iterative, hard fought, and proceeded in good faith, with each party

agreeing to certain concessions in order to facilitate a restructuring and recapitalization of the

Debtors' balance sheet that maximizes value for all stakeholders.  The Debtors believe that the

DIP Facility contains reasonable and appropriate terms and provisions under the circumstances and given the absence of any alternative third-party financing, the Debtors and their advisors worked hard to negotiate the most favorable terms of the DIP Facility. Ultimately, the DIP Lender was only willing to lend on terms specifically set forth in the DIP Documents, which the Debtors believe are the best available offer to the Debtors. *See* Maib Decl. ¶ 14.

50.     The DIP Facility and related financing arrangements (i) reflect substantial arm's length and good faith negotiations between the Debtors and the DIP Lender, (ii) are fair, reasonable, and appropriate under the circumstances, and (iii) are in accordance with current market terms. Accordingly, the DIP Facility is in the best interest of the Debtors' estates and should be approved.

## V.     The Terms of the DIP Facility Are Reasonable

51.     As discussed in greater detail in the Cash Management Motion and the First Day Declarations, prior to the Petition Date, from time to time and in the ordinary course of business, HOA, in its capacity as the manager of the Securitization Entities, makes Manager Advances in connection with the operations of the Securitization Entities. The Securitization Entities' obligation to reimburse HOA for the Manager Advances, which is entitled to priority right of reimbursement, is part of the Prepetition Lenders' collateral. The proposed DIP Facility conforms to this prepetition flow of funds. Although all Debtors—both Securitization Entities and Non-Securitization Entities—are first priority obligors and are providing priming liens as credit support for the DIP Facility, the DIP Facility is structured as a loan to HOA (as manager of the Securitization Entities), the proceeds of which will then be advanced as a Manager Advance to the Securitization Entities under the mechanics provided in the A&R Base Indenture. Finally, all proceeds of the Manager Advance held by the Securitization Entities must be used in accordance with the Approved Budget. This structure allows the Debtors to secure necessary liquidity in a

way that does not run afoul of the prepetition structure, but also ensures the DIP Lenders have their bargained-for senior right to payment.

52. The DIP Financing also contemplates a Roll-Up of the Prepetition Manager Advance Obligations and Prepetition Term Loan Obligations. The DIP Lender was unwilling to provide the DIP Financing without the inclusion of the Roll-Up. Absent the DIP Facility, the Debtors would be unable to protect against any disruption to their business during these Chapter 11 Cases, which likely would prevent them from maximizing the value of their estates for the benefit of all parties in interest. Additionally, general unsecured creditors or other parties in interest are not prejudiced by the Roll-Up because the Prepetition Manager Advance Obligations and Prepetition Term Loan Obligations are fully secured by perfected, first priority liens on property. The Roll-Up merely affects the timing, not the amount or certainty, of the DIP Lender's recovery. Maib Decl. ¶ 21. Given these circumstances, the Roll-Up Loans are a reasonable and appropriate component of the DIP Facility and should be approved.

53. In connection with negotiating the DIP Facility, the Debtors have agreed, subject to Court approval, to pay an Agency Fee as agreed with the DIP Agent.[8]

54. The DIP Lender would not have consented to providing postpetition financing without the Debtors' waiver of, among other things, their ability to surcharge against the DIP Collateral pursuant to Bankruptcy Code section 506(c). Such waiver is customary in debtor-in-possession financings and appropriate under the circumstances of these Chapter 11 Cases. Maib Decl. ¶ 15.

55. Furthermore, under the DIP Financing, the Debtors propose providing to the DIP Lender priming liens, security interests and superpriority claims that supersede all other security

---

[8] The description of fees is intended as an illustrative summary only and is qualified in its entirety by the terms of the DIP Credit Agreement and the other DIP Documents.

interests, liens, and claims on the DIP Collateral, except for the Carve Out.  These liens on encumbered and unencumbered assets are common features of postpetition financing facilities. Given the limited interest from third party financing providers, these priming liens and superpriority claims were necessary features of the DIP Financing proposal.  No third-party lender was willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis. Maib Decl. ¶ 17.

56.     There are no alternative financing sources available to the Debtors, and the Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral to preserve value for their stakeholders and to prevent immediate and irreparable harm to the value of the Debtors' estates.  Absent this support from the DIP Lender, these Chapter 11 Cases would likely convert to chapter 7, as there is simply not enough cash on hand, or cash from operations, to fund the business and the administrative costs of chapter 11.  Given these circumstances, the terms, including the Roll-Up, interest rates, and fees, under the DIP Credit Agreement were subject to negotiation and are an integral component of the overall terms of the DIP Facility.  These terms are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund these Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility.  *See* Maib Decl. ¶ 20.  Specifically, the Debtors have agreed to such terms as consideration for the extension of postpetition financing. The Debtors considered the terms described above when determining that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to ensure the smooth administration of their Chapter 11 Cases and continue "business as usual." Accordingly, this Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents.

**BASIS FOR RELIEF**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing**

A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

57.    The Court should authorize the Debtors to enter into the DIP Documents (consistent with the terms of this Motion and the form of Interim Order), obtain access to the DIP Facility, and continue using Cash Collateral.[9]   Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

58.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not

---

[9]    The form of DIP Credit Agreement will be filed on record sufficiently in advance of the Final Hearing to ensure the Court and parties in interest have a chance to review the same.

second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

59.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization) (internal quotations omitted).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.***  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

60.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment.  The DIP Facility will allow the Debtors to (a) access working

capital for their business; (b) fund payments to their workforce and critical third-party vendors;
(c) fund the payments authorized by the Court pursuant to the First Day Pleadings filed
contemporaneously herewith; (d) operate their Cash Management System; (e) satisfy
administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases, and
(f) provide a path towards a value-maximizing restructuring transactions.  The Debtors negotiated
the DIP Facility with the DIP Lender in good faith, at arm's length, and with the assistance of their
respective advisors, and the Debtors believe that they have obtained the best financing available
under the circumstances.

### B.  The Debtors Should Be Authorized to Grant Liens and Superpriority Claims

61.     The Debtors propose to obtain financing under the DIP Facility by providing
security interests and liens as set forth herein and in the Interim Order pursuant to sections
364(c) and (d) of the Bankruptcy Code.   Specifically, the Debtors propose to provide to the DIP
Lenders postpetition security interest in and liens on the DIP Collateral that are legal, binding,
continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid,
fully and properly perfected and effective immediately upon entry of the Interim Order.

62.     The above-described liens on encumbered and unencumbered assets are common
features of postpetition financing facilities and, as set forth in greater detail in paragraphs 17 and
18 of the Maib Declaration, were a necessary feature here to provide security for the proposed
financing.  The statutory requirement for obtaining postpetition credit under section 364(c) is a
finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable
under Section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."   11 U.S.C. §
364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under
section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing,
among other things, that unsecured credit cannot be obtained by allowing a lender only an

administrative claim).   Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to

whether:

> a.   the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> b.   the credit transaction is necessary to preserve the assets of the estate; and
>
> c.   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4,

2016); *Los Angeles Dodgers*, 457 B.R. at 312–13; *Ames*, 115 B.R. at 37–40.  "The statute

imposes no duty [on a debtor] to seek credit from every possible lender before concluding that

such credit is unavailable."  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

Instead, "a debtor need only demonstrate that 'it has reasonably attempted, but failed, to obtain

unsecured credit under sections 364(a) or (b).'"  *In re BDC Grp., Inc.*, 2023 WL 4111476, at *2

(Bankr. N.D. Iowa June 21, 2023) (quoting Ames, 115 B.R. at 37).

63.     The Debtors satisfy each part of the test.  First, despite outreach to numerous

sophisticated third-party institutions, who regularly lend to distressed companies on a postpetition

basis, the Debtors were unable to obtain alternative viable and actionable DIP financing proposals

superior to the proposed DIP Facility.  *See* Koutsonicolis Decl. ¶ 12.  In addition, no postpetition

financing proposals were provided to the Debtors on an unsecured or junior basis.  *See* Maib Decl.

¶ 17.  Second, entry into the DIP Facility is necessary to ensure that the Debtors are able to

sufficiently finance these Chapter 11 Cases all the way through, protecting them against a value

destructive result.  *See* Maib Decl. ¶ 22.  Finally, taken as a whole and in light of the Debtors' cash

position, capital structure, and lack of unencumbered assets, the terms of the DIP Facility are fair,

reasonable, and adequate under the circumstances.  *See* Koutsonicolis Decl. ¶ 16.

64.     Absent the DIP Facility, which will provide assurances that the Debtors will have

sufficient liquidity to administer these Chapter 11 Cases, the value of the Debtors' estates would be

significantly impaired to the detriment of all stakeholders.   *See* Maib Decl. ¶ 10.   Without

postpetition financing, the Debtors lack sufficient funds to operate their enterprise for anything

other than a short-term basis, continue paying their debts as they come due, and cover the projected

costs of these Chapter 11 Cases.   *See id.* at ¶ 18.   Given the Debtors' circumstances, the Debtors

believe that the terms of the DIP Facility, as set forth herein and in the form of the Interim Order,

are reasonable as more fully set forth above and in the DIP Declaration.   For all these reasons, the

Debtors submit that they have met the standard for obtaining postpetition financing.

65.     In the event that a debtor is unable to obtain unsecured credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the

Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of

debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b)

or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not

otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a

lien."   As described above, the Debtors are unable to obtain unsecured credit.   Therefore,

approving a superpriority claim in favor of the DIP Lender is reasonable and appropriate.

66.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain

credit secured by a senior or equal lien on property of the estate already subject to a lien, after

notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which

such senior or equal lien is proposed to be granted."   11 U.S.C. § 364(d)(1).   The Debtors may

incur 'priming' liens under the DIP Facility if either (i) the prepetition lender has consented or

(ii) the prepetition lender's interests in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

67.     Here, there will be no need for a priming fight, as the AHG Noteholders have consented to the DIP Facility and are receiving Adequate Protection to the extent of any Diminution of Value of their respective interests.

### C.     No Comparable Alternatives to the DIP Facility Are Reasonably Available on More Favorable Overall Terms

68.     To grant a senior lien on estate property, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders under section 364(d) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37 ("A court, however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections

364(a) or (b)…Similarly, obtaining credit under section 364(d) may not be authorized if it appears

that credit can be obtained under the other subsections of 364.").

69.     As noted above, the Debtors do not believe that a more favorable alternative DIP

financing is reasonably available, making the DIP Facility the most favorable to the Debtors under

the circumstances.    The DIP Facility provides the Debtors with the liquidity they need at the

lowest cost available while simultaneously placing the Debtors on an optimal path for a

successful restructuring.    Therefore, the Debtors submit that the requirement of section 364 of the

Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is

satisfied.

### D.     The Repayment Features of the DIP Financing Are Appropriate

70.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate."   11 U.S.C. § 363(b)(1).   To do so, "the debtor must articulate some business

justification, other than the mere appeasement of major creditors."    *In re Ionosphere Clubs*, 98

B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor

prepetition claims where supported by an appropriate business justification); *see also In re

Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions

critical to the survival of the business of the debtor are exceptions to the general rule of

nonpayment of prepetition claims prior to plan confirmation).   In addition, under section 1107(a)

of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty… to

'protect and preserve the estate, including an operating business' going-concern value.'"   *In

re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (internal citation omitted).

71.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature

in debtor in possession financing arrangements.   Courts in this Circuit have approved similar DIP

features, including on the first day of the case.  *See, e.g.*, *In re Buca Texas Restaurants, L.P.*, Case No. 24-80058 (SGJ) (Bankr. N.D. Tex Aug. 29, 2024) [Dkt. 206] (authorizing $12.1 million in new money DIP financing plus $24.2 million roll up); *In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (SGJ) (Bankr. N.D. Tex. Oct. 27, 2020) [Docket No. 52] (authorizing DIP advance in interim order in order to repay prepetition loan obligations); *In re Ebix, Inc.*, Case No. 23-80004 (SWE) (Bankr. N.D. Tex. Jan. 26, 2024) [Docket No. 255] (final DIP order approving roll-up); *In re Rockall Energy Holdings, LLC,* Case No. 22-90000 (MXM) (Bankr. N.D. Tex May 3, 2022) [Dkt. 408] (authorizing $17 million in new money DIP financing plus a $34 million roll up); *In re Fresh Acquisitions, LLC*, Case No. 21-30721 (SGJ) (Bankr. N.D. Tex. May 14, 2021) [Docket No. 157] (authorizing incurrence of $3.0 million in new money DIP financing plus a $500,000 roll-up on a final basis); *In re CiCi's Holdings, Inc.*, Case No. 21-30146 (SGJ) (Bankr. N.D. Tex. Jan. 27, 2021 and Feb. 18, 2021) [Docket Nos. 51 and 130] (authorizing incurrence of $9.0 million in DIP financing, with a first-day "baby roll-up" of $500,000 on an interim basis and a total $6.0 million roll-up on a final basis); *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Sept. 21, 2012) [Docket No. 440] (authorizing refinancing of $367,600,000 plus accrued and unpaid interest under the post-petition facility); *In re Reddy Ice Holdings, Inc.*, No. 12-32349 (SGJ) (Bankr. N.D. Tex. May 4, 2012) [Docket No. 249] (authorizing $70,000,000 in DIP financing that included the roll up of prepetition debt).[10]

72.    The DIP Financing contemplates an overall ratio of Roll-Up Loans to New Money Loans of approximately 1:7.   That is, for every $1 of new money advanced, approximately $0.14 of prepetition debt will be rolled up.   Pending the Final Hearing, the Debtors seek authority to

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

borrow up to $35 million of New Money Loans, and $5 million of Roll-Up Loans.

73.     The roll-up of funds as set forth herein and in the forms of Interim and Final Orders is a sound exercise of the Debtors' business judgment, is a material component of the DIP Financing, and is required by the DIP Lender as a condition to their commitment to provide postpetition financing.   *See* Maib Decl. ¶ 18.

74.     The roll-up of the prepetition amounts owed to the DIP Lender merely accelerates the satisfaction of the prepetition obligations owed to the DIP Lender without affecting recovery to other creditors, because the Debtors believe that these obligations are fully secured by perfected, first priority liens on property, and the refinancing is otherwise justified by the facts and the terms of the DIP Facility (as reflected in the Interim Order).

75.     Absent support from the DIP Lender, this case would likely convert to chapter 7, as there is simply not enough cash on hand, or cash from operations, to fund the business and the administrative costs of chapter 11.   The roll-up of the prepetition obligations owing to the DIP Lender merely affects the timing, not the amount or certainty, of the DIP Lender's recovery—the prepetition secured claim held by the DIP Lender is required by section 1129 of the Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided, absent consent (which consent the Debtors do not have here).   Given these circumstances, the roll-up feature in the DIP Financing is reasonable and a sound exercise of the Debtors' business judgment.

## II.     The Debtors Should Be Authorized to Continue to Use Cash Collateral

76.     A debtor's use of property of the estate, including cash collateral, is governed by section 363 of the Bankruptcy Code.   Under section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."   11 U.S.C. § 363(c)(2).   Section 363(e) of the Bankruptcy Code further

provides that parties with a security interest in a debtor's cash collateral are entitled to adequate protection as a condition to the debtor's use of such assets. *Id.* § 363(e) ("[O]n request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."). The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and other Prepetition Collateral in accordance with the terms and conditions of the Interim Order. Additionally, as set forth in the form of Interim Order, the Debtors propose to provide the Prepetition Lenders with a variety of adequate protection to compensate them for a postpetition diminution in value of their collateral, if any, including cash collateral, resulting from the use, sale, or lease of sch collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations").

77.     The Bankruptcy Code does not expressly define "adequate protection" or proscribe a particular form that it must take. *See In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection.") (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987)). *See also* 11 U.S.C. § 361 (providing a non-exhaustive list of examples of adequate protection, including (i) a lump sum or periodic cash payments; (ii) replacement liens; and (iii) administrative priority claims). Generally, courts decide what constitutes adequate protection on a case-by-case basis. *See In re First S. Sav. Ass'n*, 820 F.2d at 710 (noting, with respect to adequate protection, that "[i]ts application is left to the vagaries of each case") (quoting *In re Becker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *Resolution Tr. Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Mosello*, 195 B.R. 277, 289

(Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry.");

*In re Wythe Berry Fee Owner LLC*, 2023 WL 2483427 (Bankr. S.D.N.Y. Mar. 13, 2023)

"[A]dequate protection can take many forms and 'must be determined based upon equitable

considerations arising from the particular facts of each proceeding'") (quoting *In re Dynaco Corp.*,

162 B.R. 389, 394 (Bankr. D.N.H. 1993)).

78.     The Debtors submit that the proposed Adequate Protection Obligations are

sufficient to protect the Prepetition Lenders from any potential diminution in value to Cash

Collateral.   In light of the foregoing, the Debtors further submit that the proposed Adequate

Protection Obligations to be provided for the benefit of the Prepetition Lenders are appropriate.

Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to

protect against any diminution in value but is fair and appropriate under the circumstances of these

Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral, subject to the

terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their

estates.

### III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Loan Documents

79.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court

approval, to pay certain the reasonable fees and expenses of the DIP Lender.   Courts in this district

and others have approved the payment of similar fees in large or complex chapter 11 cases. *See*,

*e.g.*, *In re Eye Care Leaders Portfolio Holdings, LLC*, No. 24-80001 (MVL) (Bankr. N.D. Tex. Jan.

29, 2024) [Docket No. 71]; *In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Dec. 19, 2023)

[Docket No. 64, ¶¶ 4(b), (c)] (approving upfront and exit fees of 3% and 2% of committed amount,

respectively); *In re Tuesday Morning*, No. 23-90001 (ELM) (Bankr. N.D. Tex. Feb. 16, 2023)

[Docket No. 112 ¶ 66]; *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D.

Tex. Oct. 27, 2020) [Docket No. 52, ¶ 65] (approving among other fees exit fees in the amount of

2.0%); *In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. May 28, 2020)

[Docket No. 67, ¶ 71] (approving an upfront fee of 2.0% to the DIP Facility).

80.      It is understood and agreed by all parties, that these fees are an integral component

of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for

the extension of postpetition financing.      Accordingly, the Court should authorize the Debtors to

pay the fees provided under the DIP Loan Documents in connection with entering into those

agreements.

### IV.      The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e)

81.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under this section
> [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant
> under this section of a priority or a lien, does not affect the validity of any
> debt so incurred, or any priority or lien so granted, to an entity that extended
> such credit in good faith, whether or not such entity knew of the pendency
> of the appeal, unless such authorization and the incurring of such debt, or
> the granting of such priority or lien, were stayed pending appeal.

82.      As explained in the DIP Declarations, the DIP Loan Documents are the result of (i)

the Debtors' reasonable and informed determination that the DIP Lender provided the best

postpetition financing alternative available under the circumstances and (ii) extended arm's length,

good faith negotiations between the Debtors and the DIP Lender.      The Debtors submit that the

terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the

proceeds of the DIP Facility will be used only for purposes that are permissible under the

Bankruptcy Code.      Further, no consideration is being provided to any party to the DIP Loan

Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis**

83.     The form of Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to it under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim Order.     Finally, the form of Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and an appropriate opportunity for the Debtors to obtain relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Loan Documents or applicable law.

84.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.    *See, e.g.*, *In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. July 10, 2020) [Docket No. 429] (modifying automatic stay as necessary to effectuate the terms of the order); *In re Taco Bueno Restaurants, Inc.*, No. 18-33678 (SGJ) (Bankr. N.D. Tex. Nov. 30, 2018) [Docket No. 117] (same).   These provisions are also consistent with the Complex Case Procedures.

VI.     **Failure to Obtain Immediate Interim Access to the DIP Facility and Use of Cash Would Cause Immediate and Irreparable Harm**

85.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.   Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

86.     For the reasons noted above, the Debtors have an immediate postpetition need to use cash on hand, and access the liquidity provided by the DIP Facility.   The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases without access to cash.   The Debtors will use cash, among other things, to fund the operation of their business, maintain business relationships with their vendors and suppliers, make payroll, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest and to fund the administration of these Chapter 11 Cases.   In short, the Debtors' ability to administer these Chapter 11 Cases through the use of cash (to the extent it might be "cash collateral") is vital to preserve and maximize the value of the Debtors' estates.

87.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.   The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating in the normal course, pay their administrative expenses, and to otherwise implement the relief requested in the Debtors' first day motions.   This relief will enable the Debtors to preserve and

maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates

and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

88.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than

35 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to

file objections to this Motion.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

89.     To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

28.     The Debtors will provide notice of this Motion to the following parties or their

respective counsel: (a) the Office of the United States Trustee for the Northern District of Texas;

(b) the United States Attorney's Office for the Northern District of Texas; (c) the state attorneys

general for all states in which the Debtors conduct business; (d) the Internal Revenue Service;

(e) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis;

(f) Sidley Austin, LLP as counsel to the DIP Lender; (g) White & Case, LLP as counsel to the Ad

Hoc Group of Noteholders;  (h) Indenture Trustee; (i) Seward & Kissel, LLP as counsel to the

servicer and control party under the A&R Base Indenture; (j) banks and financial institutions

where the Debtors maintain accounts; (k) counsel to any statutory committee appointed in these

Chapter 11 Cases; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice

is necessary.

29.     The pleadings in these Chapter 11 Cases and supporting papers are available on the

Debtors' website at https://cases.ra.kroll.com/Hooters or on the Bankruptcy Court's website at

https://ecf.txnb.uscourts.gov/. You can request any pleading you need from (i) the proposed

noticing agent at: HootersInfo@ra.kroll.com, (888) 575-4910 (toll-free), +1 (646) 844-3894 or (ii)

proposed counsel for the Debtors at: Foley & Lardner LLP, c/o Stephen A. Jones,

(sajones@foley.com) or Zachary C. Zahn (zzahn@foley.com), 2021 McKinney Avenue, Suite

1600, Dallas, Texas 75201.

## NO PRIOR REQUEST

90.     No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an interim order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: March 31, 2025

Respectfully submitted by:

*/s/ Holland N. O'Neil*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

-and-

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*