**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>Hooters of America, LLC, *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 25-80078 (SWE)<br><br>(Joint Administration Requested) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

**DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING DEBTORS TO CONTINUE
PREPETITION INSURANCE PROGRAM AND SATISFY
PREPETITION OBLIGATIONS RELATED THERETO, (B) RENEW,
AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE POLICIES,
(C) CONTINUE TO PAY BROKERAGE FEES, AND (D) MAINTAIN THEIR
<u>SURETY BOND PROGRAM AND (II) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on April 2, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 2, 2025 at 3:00 p.m. (prevailing Central Time) in Courtroom 3, Floor 14, 1100 Commerce Street, Dallas, Texas 75242 before the Honorable Scott W. Everett, U.S. Bankruptcy Judge for the Northern District of Texas.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (650) 479-3207.  Video communication will be by use of the Cisco Webex platform. Connect via the Cisco Webex application or click the link on Judge Everett's home page.  The meeting code is 2304 017 9738. Click the settings icon in the upper right corner and enter your name under the personal information setting.  A copy of Judge Everett's WebEx Hearing Instructions can be found at the following link: [WebEx Hearing Instructions](#).**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Everett's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Hooters of America, LLC and its affiliated debtors and debtors in possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their undersigned proposed counsel, hereby submit this motion (this "<u>Motion</u>") for entry of an order granting the relief described below.  In support hereof, the Debtors rely on the *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of*

*the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] filed concurrently herewith, and further represent as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates, and this matter pursuant to 28 U.S.C. § 1334.

2. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 363(b) — (c), and 1112(b)(4)(C) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules"), and Section B.8(b) of the *Procedures for Complex Cases in the Northern District of Texas*.

## BACKGROUND

5. On March 31, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and rule 1015-1 of the Local

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Rules. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in these Chapter 11 Cases.

6. Founded in 1983, the Debtors own and operate Hooters, an iconic brand in the casual dining and sports entertainment dining industries. The Debtors' global portfolio of restaurants includes 151 Debtor-owned and operated locations and 154 franchised locations in 17 countries. The Debtors are known for their world-famous chicken wings, beverages, live sports, and legendary hospitality. The Debtors also partner with a major food products licensor to offer shoppers Hooters-branded frozen meals products at 1,250 grocery store locations.

7. Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**RELIEF REQUESTED**

8. The Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order") (i) authorizing, but not directing, the Debtors to (a) continue prepetition insurance coverage and satisfy prepetition obligations related thereto in the ordinary course of business,[3] (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, (c) satisfy payment of prepetition obligations on account of and continue to pay Brokerage Fees (as defined herein), (d) continue their Surety Bond Program (as defined herein) on an uninterrupted basis and satisfy

---

[3] Nothing herein shall be deemed an admission of any payments due or past due under or related to any of the Insurance Policies (as defined herein).

prepetition obligations related thereto in the ordinary course of business, and (ii) granting related relief.

## THE INSURANCE PROGRAM AND RELATED OBLIGATIONS

9. In the ordinary course of business, the Debtors maintain an insurance program (the "Insurance Program") consisting of twenty-six (26) insurance policies (as may be amended, modified, or supplemented as described herein and, together with any insurance policies that the Debtors may purchase after the date hereof, the "Insurance Policies"). The Insurance Policies are negotiated by the Insurance Brokers (as defined herein) and administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, property, general liability, automobile liability, workers' compensation, excess liability, employment practices liability, cyber liability, directors and officers liability, and crime protection.[4] A schedule of the Insurance Policies is attached hereto as **Exhibit B**.[5]

10. The continuation and renewal of the Insurance Policies and entry into new insurance policies is essential to preserving the value of the Debtors' estates. Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the guidelines issued by the requirement of the United States Trustee for the Northern District of Texas (the "U.S. Trustee Guidelines").

---

[4] In addition to the Insurance Policies listed on **Exhibit B**, the Debtors maintain numerous Insurance Policies with respect to employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employees' wage and benefits programs (the "Wages Motion"). Notwithstanding the foregoing, this Motion seeks authority to pay any prepetition obligations on account of the related Insurance Policies to the extent not duplicative of the relief requested in the Wages Motion.

[5] The Debtors believe that **Exhibit B** is a complete list of their Insurance Policies. To the extent that any Insurance Policy has been omitted from that list, the Debtors request that the order granting the relief sought herein apply to any and all of Debtors' Insurance Policies.

Accordingly, the Debtors request the authority to (a) maintain the existing Insurance Policies and to pay related prepetition obligations thereto, and (b) to renew, supplement, or enter into new Insurance Policies in the ordinary course of business on a postpetition basis consistent with prepetition practices, after consultation with the DIP Lender and Ad Hoc Group of Noteholders.

**A.    Insurance Premiums**

11.    In the ordinary course of business, the Debtors pay all premium obligations associated with their Insurance Policies (the "Insurance Premiums"). The Debtors pay certain of their Insurance Premiums directly to the Insurance Carriers in monthly installments. The majority of the Insurance Premiums are financed through third-party premium financing companies.

12.    The Debtors pay the Insurance Premiums related to their workers' compensation and automobile Insurance Policies directly to the Insurance Carriers and finance the remaining Insurance Premiums related to their Insurance Policies covering property, general liability, excess liability, employment practices liability, cyber liability, directors and officers' liability, and crime protection. The Debtors pay approximately $6.3 million annually in Insurance Premiums.

13.    As of the Petition Date, the Debtors do not believe that any amounts on account of the Insurance Policies are due and owing. Nevertheless, to ensure uninterrupted coverage under the Insurance Policies, the Debtors seek authority to pay any outstanding Insurance Premiums owed, including any administrative fees related to the Insurance Policies, and to continue to honor their obligations under the Insurance Policies as they come due in the ordinary course of business on a postpetition basis.

**B.    Self-Insured Retentions**

14.    Under certain Insurance Policies, the Debtors are required to pay self-insured retentions (the "Self-Insured Retentions"), depending upon the type of claim and Insurance Policy involved. Generally, if a claim is made under an Insurance Policy that contains a Self-Insured

Retention, the Debtors must make payments in the first instance up to the limit of the applicable Self-Insured Retention and, if the amount of the claim exceeds the limit of the Self-Insured Retention, the applicable Insurance Carrier is obligated to cover the excess costs.

15. As of the Petition Date, the Debtors do not believe that there are any material prepetition obligations owed to Insurance Carriers relating to Self-Insured Retentions, but, out of an abundance of caution, the Debtors seek authority to satisfy any outstanding prepetition Self-Insured Retentions owed in connection with the Insurance Policies, and to continue to honor their obligations under the Insurance Policies as they come due in the ordinary course of business on a postpetition basis.

C. **Premium Financing Arrangement**

16. Twenty (20) of the Insurance Policies are financed through two premium financing agreements (the "Premium Financing Agreements"). One of the Premium Financing Agreements is between the Hawk Parent, LLC and First Insurance Funding ("First Insurance"). The other Premium Financing Agreement is made between Hawk Parent, LLC and IPFS Corporation ("IPFS" and together with First Insurance, the "Premium Financing Providers"). The aggregate amount of annual Insurance Premiums financed under the Premium Financing Agreements is approximately $6.0 million, including applicable taxes and surcharges.

17. As of the Petition Date, the aggregate amount of the Debtors' remaining monthly payments under the Premium Financing Agreements is approximately $2.1 million. If the Debtors were unable to continue honoring their obligations under the Premium Financing Agreements, the Premium Financing Providers might seek relief from the automatic stay to terminate underlying insurance policies. The Debtors might then be required to obtain replacement insurance on an expedited basis and likely at significant cost to their estates. Even if the Premium Financing Providers did not terminate the underlying insurance policies, any interruption in the Debtors'

payments under the Premium Financing Agreements could have a severe, adverse effect on the Debtors' ability to finance insurance premiums in the future. Accordingly, the Debtors seek authority to honor any amounts owed on account of the Premium Financing Agreements, and to continue honoring any amounts that become due and owing on account of the Premium Financing Agreements in the ordinary course of business to ensure uninterrupted insurance coverage.

18. In addition, to the extent that the Premium Financing Agreements expire during these Chapter 11 Cases, the Debtors seek authority to renew the Premium Financing Agreements or enter into new Premium Financing Agreements, as necessary or appropriate, in consultation with the DIP Lender and the Ad Hoc Group of Noteholders, in the ordinary course of business on a postpetition basis and without further approval of this Court. The Debtors respectfully submit that renewing and/or entering into new Premium Financing Agreements falls squarely within the ordinary course of the Debtors' businesses.

**D.  Brokerage Fees**

19. The Debtors obtain their Insurance Policies through Arthur Gallagher Risk Management Services, LLC and CAC Specialty and/or certain of their affiliates and subsidiaries (the "Insurance Brokers"). The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in a cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.

20. The Insurance Brokers collect fees for services rendered in addition to the Insurance Premiums paid on the Insurance Policies (the "Brokerage Fees"). The Debtors pay approximately $395,000 in Brokerage Fees per year. The Debtors pay the Brokerage Fees in four quarterly installments in the amount of $98,750 throughout the course of the year. As of the Petition Date, the Debtors owe $296,250 on account of the Brokerage Fees. Thus, the Debtors seek

authority to pay all outstanding prepetition Brokerage Fees and to continue to honor their obligations to the Insurance Brokers as they become due in the ordinary course of business on a postpetition basis consistent with historical practice.

**E.      Insurance Policy Audits**

21.     Certain of the Debtors' Insurance Policies under which the Debtors receive workers' compensation coverage are subject to routine audits (the "Insurance Policy Audits"), which may result in an adjustment of the premiums owed on account thereof. As of the Petition Date, the Debtors do not believe they owe any additional amounts on account of the Insurance Policy Audits. However, out of an abundance of caution, the Debtors seek authority, but not direction, to honor the prepetition amounts owed on account of the Insurance Policy Audits, and any other amounts that may become due and owing in the ordinary course of business.

## SURETY BOND PROGRAM

22.     Pursuant to their surety bond program (the "Surety Bond Program"), in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties (the "Obligees"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with utility deposits, excise taxes, and liquor licenses (the "Surety Bonds"). The Surety Bonds are issued by Chubb Insurance Group (the "Surety"). The Debtors estimate that as of the Petition Date, the total face principal amount on all Surety Bonds is approximately $1 million, consisting of 114 Surety Bonds with an average face amount of $9,000.

23.     Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate established and billed by each Obligee (collectively, the "Surety Premiums"). The Surety Premiums are generally determined on an annual basis and total approximately $18,000 per year. The Debtors remit premium payments when the bonds are issued or renewed on an annual basis.

24. The Debtors must be able to provide financial assurance to the Obligees to continue their operations during the chapter 11 process. This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying the Surety Premiums and providing collateral, renewing, or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, such as letters of credit, as needed, in connection with the Surety Bond Program. Failing to provide, maintain, or timely replace their Surety Bonds may prevent the Debtors from complying with their obligations under federal law, and consequently prevent them from undertaking essential functions related to their operations.

25. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of outstanding Surety Premiums. Nevertheless, to ensure uninterrupted coverage under the Surety Bond Program, the Debtors seek authority to pay any outstanding Surety Premiums owed, and to continue to honor their obligations under the Surety Bond Program as they come due in the ordinary course on a postpetition basis.

**BASIS FOR RELIEF**

**A.    Maintaining Insurance Coverage is Required by the Bankruptcy Code, the U.S. Trustee Guidelines, and Other Applicable Law**

26. Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). The Insurance Policies provide a comprehensive range of protection for the Debtors' business, properties, and assets, and in some cases, are required by the regulations, laws, and contracts that govern their commercial activities. In addition, the U.S. Trustee Guidelines provide that a debtor is "required to maintain" certain types of insurance following the Petition Date. *See* U.S. Trustee Guidelines § VII.

27.     To ensure that the Debtors comply with Section 1112(b)(4)(C) of the Bankruptcy Code, applicable state and federal regulations, and the U.S. Trustee Guidelines, the Debtors respectfully request authority to continue to honor obligations arising under the Insurance Policies in the ordinary course of business including any prepetition amounts due in connection with premiums, brokerage fees, fees incurred in connection with insurance audits, and, if necessary, to renew supplement, or purchase insurance coverage and enter into new premium financing agreements, as applicable, in consultation with the DIP Lender and the Ad Hoc Group of Noteholders, on a postpetition basis in the ordinary course of business consistent with prepetition practices.

**B.     Payments to Maintain the Insurance Program and the Surety Bond Program Are Warranted and Should Be Authorized**

28.     The Debtors believe that payments required to maintain the Insurance Program and the Surety Bond Program fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code. To the extent any such actions do not constitute ordinary course transactions, however, the Debtors request that the Court authorize the Debtors to continue payments to maintain the Insurance Program and the Surety Bond Program.

29.     Section 363(b) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"). Courts emphasize that the business judgment standard is not an onerous standard; rather it "is flexible and encourages

discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Perez*, 339 B.R. 385, 399 n.14 (Bankr. S.D. Tex. 2006) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with substantial freedom to tailor his orders to meet differing circumstances and to avoid shackling the judge with unnecessary rigid rules." (cleaned up)), *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007). As such, courts exhibit "[g]reat judicial deference . . . to [a debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005). Indeed, as long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

30. The Debtors submit that the relief requested in this motion represents a sound exercise of the Debtors' business judgment. Maintaining coverage under the Insurance Program is essential to the Debtors' operations as the Debtors could be exposed to significant liability if such coverage were to lapse or terminate. Such exposure could be detrimental to the success of these Chapter 11 Cases. Moreover, failure to timely pay insurance premiums could expose the Debtors to potential penalties and other costs associated with reestablishing lapsed policies or obtaining new insurance coverage.

31. Similarly, to continue their operations during these Chapter 11 Cases, the Debtors must be able to provide financial assurances to regulatory agencies that oversee the Debtors' businesses. Failing to provide, maintain, or timely replace their Surety Bonds would prevent the Debtors from complying with federal law and consequently prevent them from undertaking essential functions related to their operations, such as shipping and receiving goods. Based on the

Debtors' current circumstances, it is not likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the sureties. Moreover, the process of establishing a new Surety Bond Program would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the Surety Bonds in time to avoid defaults or other consequences of the applicable obligations.

32. Although the Debtors believe that any renewal, modification, or new execution of the Insurance Policies would constitute ordinary course transactions, which do not require Court approval, the Debtors nevertheless seek authority to continue to renew and modify the Insurance Policies consistent with their past practices, after consultation with the DIP Lender and the Ad Hoc Group of Noteholders, to assure the Insurance Carriers that the Debtors have full authority with respect to new or modified arrangements without the need to obtain further approval from the Court.

33. Courts in this district have permitted chapter 11 debtors to pay obligations, including prepetition obligations, related to insurance policies and bond programs as a routine matter in cases of similar complexity and have routinely granted such relief on a final basis without the need for an interim order. See, e.g., *In re Eiger BioPharmaceuticals*, No. 24-80040 (SGJ) (Bankr. N.D. Tex. Apr. 5, 2024) (approving on a final basis, without the need for an interim order, debtors' requests to maintain insurance policies, honor all obligations with respect thereto, and continue to pay obligations related to premium financing agreements, among other relief); *In re Eye Care Leaders Portfolio Holdings, LLC*, No. 24-80001 (MVL) (Bankr. N.D. Tex. Jan. 22, 2024) (same); *In re Impel Pharm. Inc.,* No. 23-80016 (SGJ) (Bankr. N.D. Tex. Dec. 21, 2023) (same); *In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Dec. 19, 2023) (same); *In re Lion Star Nacogdoches* Hosp., LLC, No. 23-43535 (MXM) (Bankr. N.D. Tex. Nov. 22, 2023) (same);

*In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. May 29, 2020) (approving on a final basis, without the need for an interim order, debtors' requests to maintain insurance policies, honor all obligations with respect thereto, continue to pay obligations related to premium financing agreements, and continue, renew, or supplement the surety bond program); *In re Erickson Inc.*, 16-34393 (HDH) (Bankr. N.D. Tex. Nov. 10, 2016) (same).

C. **Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity Support Payment of Any Prepetition Obligations with Respect to the Insurance Program and the Surety Bond Program**

34. To the extent the Debtors have any prepetition obligations related to the Insurance Program or the Surety Bond Program, payment of such obligations should be authorized pursuant to section 105(a) of the Bankruptcy Code and under the "doctrine of necessity". Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit payments of prepetition obligations prior to confirmation of a plan and emergence from chapter 11 when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "doctrine of necessity."

35. Under the "doctrine of necessity," bankruptcy courts may authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor. *See In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re CoServ, L.L.C.*, 273 B.R. 487, 496–99 (Bankr. N.D. Tex. 2002) (finding that section 105(a) used in conjunction with section 1107(a) can provide statutory basis to apply pre-Code "doctrine of necessity" and

justify post-petition payment of prepetition general unsecured claims to "critical vendors"); *Accord In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until its pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

36. Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 311 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108. *See In re CoServ, L.L.C.*, 273 B.R. at 497 (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). The doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence. *See In re Equalnet Commun. Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *Just for Feet, Inc.*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy the debtor's business by refusing to deliver new inventory on the eve of debtor's key sales season); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*),

80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment of prepetition wages, salaries, expenses and benefits); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546–47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agreed to provide postpetition trade credit).

37. For the reasons stated herein, and in light of the risks to the Debtors' operations and the critical need for the Debtors to protect their assets through maintenance of the Insurance Program and the Surety Bond Program, payment of any prepetition obligations related to the Insurance Program and Surety Bond Program is proper and justified under section 105(a) of the Bankruptcy Code as necessary to the Debtors' achievement of their chapter 11 objectives.

**D.     Authorizing and Directing Banks is Appropriate**

38. The Debtors also request that the Court authorize and direct the Debtors' banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their discretion, to receive, process, honor, and pay all checks or electronic fund transfers drawn on the Debtors' bank accounts presented for payment of, as well as to honor all fund transfer requests made by the Debtors related to the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that sufficient funds are available in the applicable bank accounts to cover the checks and electronic fund transfers. The Debtors also request that the Banks be authorized to rely on the Debtors' designation or representation that any particular check or electronic payment request has been approved pursuant to the Order.

39. The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court. The Debtors therefore submit that the payment-processing procedures described in this Motion are appropriate.

**EMERGENCY CONSIDERATION**

40. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the commencement of a chapter 11 case only "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and request that the Court grant the requested relief.

**WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

41. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this Motion.

**RESERVATION OF RIGHTS**

42. Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or

continue any applicable program postpetition, which decision shall be in the discretion of the Debtors. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**NOTICE**

43. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) the United States Attorney's Office for the Northern District of Texas; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (f) Sidley Austin, LLP as counsel to DIP Lender; (g) White & Case, LLP as counsel to the Ad Hoc Group of Noteholders; (h) the Indenture Trustee; (i) Seward & Kissel, LLP as counsel to the servicer and control party under the A&R Base Indenture; (j) the Insurance Carriers; (k) the Insurance Brokers; (l) the Premium Financing Providers; (m) banks and financial institutions where the Debtors maintain accounts; (n) counsel to any statutory committee appointed in these Chapter 11 Cases; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

44. The pleadings in these Chapter 11 Cases and supporting papers are available on the Debtors' website at https://cases.ra.kroll.com/Hooters or on the Bankruptcy Court's website at https://ecf.txnb.uscourts.gov/. You can request any pleading you need from (i) the proposed noticing agent at: HootersInfo@ra.kroll.com, (888) 575-4910 (toll-free), +1 (646) 844-3894 or (ii) proposed counsel for the Debtors at: Foley & Lardner LLP, c/o Stephen A. Jones, (sajones@foley.com) or Zachary C. Zahn (zzahn@foley.com), 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: March 31, 2025

Respectfully submitted:

*/s/ Holland N. O'Neil*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
mmoore@foley.com
zzahn@foley.com

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

-and-

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**CERTIFICATE OF SERVICE**

      I certify that on March 31, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

                                      */s/ Stephen A. Jones*
                                      Stephen A. Jones