**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

**ORDER (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION
WAGES, EMPLOYEE BENEFITS OBLIGATIONS, AND OTHER COMPENSATION
AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED
ADMINISTRATIVE OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on April 2, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 2, 2025 at 3:00 p.m. (prevailing Central Time) in Courtroom 3, Floor 14, 1100 Commerce Street, Dallas, Texas 75242 before the Honorable Scott W. Everett, U.S. Bankruptcy Judge for the Northern District of Texas.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (650) 479-3207. Video communication will be by use of the Cisco Webex platform. Connect via the Cisco Webex application or click the link on Judge Everett's home page. The meeting code is 2304 017 9738. Click the settings icon in the upper right corner and enter your name under the personal information setting. A copy of Judge Everett's WebEx Hearing Instructions can be found at the following link: WebEx Hearing Instructions.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Everett's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

Hooters of America, LLC and its affiliated debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of an order granting the relief described below. In support hereof, the Debtors rely on the *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] filed concurrently herewith, and further represent as follows:

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Section B.8(a) of the Procedures for Complex Cases in the Northern District of Texas.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

5.      Founded in 1983, the Debtors own and operate Hooters, an iconic brand in the casual dining and sports entertainment dining industries.  The Debtors' global portfolio of restaurants includes 151 Debtor-owned and operated locations and 154 franchised locations in 17 countries.  The Debtors are known for their world-famous chicken wings, beverages, live sports, and legendary hospitality.  The Debtors also partner with a major food products licensor to offer shoppers Hooters-branded frozen meals products at 1,250 grocery store locations.

6.      Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## RELIEF REQUESTED

7.      The Debtors respectfully request entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to (i) pay Prepetition Workforce Obligations (as defined herein) and related expenses arising under or related to Compensation and Benefits Programs (as defined herein) and (ii) continue their Compensation and Benefits Programs in effect as of the Petition Date (and as may be amended, renewed, replaced, modified, revised, supplemented, and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; and (b) granting related relief.

8.      Although the Debtors believe that all Compensation and Benefits Programs are vital to the Debtors' business, pursuant to the Order, the Debtors request authority to make payments on account of Prepetition Workforce Obligations only to the extent that the Debtors believe they are necessary to prevent immediate and irreparable harm to the Debtors' business and will not pay any amounts on account of compensation obligations that are in excess of the statutory cap under sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code (the "Employee Cap"). The Debtors believe that, as of the Petition Date, there will be approximately $4,044,254 in accrued amounts payable under the Compensation and Benefits Programs, as set forth below (the "Prepetition Workforce Obligations").

| Prepetition Workforce Obligations | Approximate Amount Due and Payable |
|---|---|
| Employee Wages | $2,438,702 |

4

| Prepetition Workforce Obligations | Approximate Amount Due and Payable |
|---|---|
| Independent Contractor Wages | $61,795 |
| Payroll Costs | $194,654 |
| Bonus Plans | $867,669 |
| Expense Reimbursements | $44,640 |
| Health Care Benefits | $93,220 |
| Flex Benefits | $2,108 |
| Life and AD&D Insurance | $75,030 |
| 401(k) Contributions | $127,779 |
| 401(k) Matches | $49,622 |
| Deductions | $89,035 |
| Payroll Taxes | $1,413,140 |
| **Total** | $4,044,254 |

## DEBTORS' EMPLOYEE OBLIGATIONS

### I.    Debtors' Workforce

9.    As of the Petition Date, the Debtors employ 5,957 employees (the "Employees"), including 1,945 full time employees (the "Full Time Employees"), and 4,012 part time employees (the "Part Time Employees").  Of the Debtors' Employees, 559 are salaried employees and 5,398 are paid hourly.  The majority of the Debtors' workforce is spread throughout the country at the Debtors' various locations and corporate office.  The Debtors' Employees serve a number of roles, including but not limited to accounting professionals, managers, marketing specialist, bartenders, servers, and kitchen staff.  The Debtors do not have any unionized employees.

10.     The Debtors also use the services of eight (8)[3] independent contractors (the "<u>Independent Contractors</u>") who support the Debtors' marketing, IT, and learning and development functions.  All of the Independent Contractors' services are important supplements to the efforts of the Debtors' Employees.

11.     The Employees and Independent Contractors perform a wide variety of functions, which are mission-critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees and Independent Contractors include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who have developed relationships with the customers, suppliers, and other key counterparties that are essential to the Debtors' businesses and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees and Independent Contractors, the Debtors' business operations will be halted immediately and the administration of the estates materially impaired.

12.     Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses.  Not only will these workers be irreparably harmed if the Debtors are not permitted to continue paying compensation, including the Prepetition Workforce Obligations, and providing health and other benefits during these Chapter 11 Cases, any interruption in payment will also likely jeopardize their continued performance and loyalty to the Debtors.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

## II.    Debtors' Compensation and Benefits Programs

13.     In the ordinary course of business, the Debtors make certain payments, contributions, deductions, and withholdings under or related to Wages, Payroll Costs, the Bonus

---

[3]    One of the Debtors' eight (8) independent contractor positions is currently open.  The Debtors are actively seeking to fill this role, which provides marketing assistance to the Debtors.  The rate of pay for this position is approximately $4,000 per month for a duration of three months.

Plans, Paid Time Off, Expense Reimbursement, Employee Benefits Programs, and Deductions, Withholdings, and Payroll Taxes (each as defined below and, collectively, the "Compensation and Benefits Programs")[4] for Employees and Independent Contractors, as applicable.

### A.    Employee Wages

14.    The Debtors incur obligations to their Employees for, among other things, wages, salaries, and certain other compensation, including paid time off and overtime (the "Employee Wages") in the ordinary course of business. The Debtors use UKG Inc. ("UKG") to process Withholdings and Payroll Taxes (each, as defined herein), but the Debtors process payroll in-house by directly initiating transfers to Employees' bank accounts.[5] The Debtors' payroll is run on a bi-weekly basis. The Debtors payroll process is initiated every other Monday, finalized the following Thursday, and remitted and deposited into the Employees' bank accounts the following Saturday, Sunday, or Monday, depending on the Employee's bank. The Debtors' Employees receive their Employee Wages, less any applicable withholdings and deductions, in arrears every other week after the end of each applicable bi-weekly payroll cycle by either direct deposit or pay card. The Debtors' average bi-weekly net payroll is approximately $2,879,245. The payroll for the period ending March 23, 2025 was approximately $2,724,400 for all Employees

---

[4]    Certain of the Debtors' Employees are subject to individual employment agreements with the Debtors, which govern the specific terms of those Employees' employment, compensation, and benefits (collectively, the "Employment Agreements"). The terms of such Employees' compensation and benefits may differ from the Debtors' Compensation and Benefits Programs described in this Motion. The Debtors do not seek authority to pay any obligations to Employees under the Employment Agreements unless otherwise consistent with the relief requested in this Motion. The Debtors reserve the right to seek authority in the future by separate motion to pay any obligations to Employees under the Employment Agreements that are not otherwise consistent with the relief requested in this Motion.

[5]    Three of the Debtors' executives are wholly responsible for their own payroll tax obligations. The Debtors compensate these executives with a base salary on a bi-weekly basis. These payments are made from the Debtors' account ending in x6465, as further detailed in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Motion").

and was paid March 27, 2025.  The Debtors' next scheduled payment date is April 10, 2025 for the payroll period ending April 6, 2025.

15.     In addition, in August 2023, the U.S. Equal Employment Opportunity Commission ("EEOC") commenced a proceeding on behalf of certain of the Debtors' Employees. In connection with such proceeding, the EEOC obtained a $250,000 judgment against the Debtors on behalf of certain of the Debtors' Employees.  Pursuant to the judgment, the Debtors are required to pay the judgment amount to certain Employees as Employee Wages.  Accordingly, the Debtors owe such Employees an aggregate amount of $250,000 in Employee Wages.

16.     The Debtors estimate that, as of the Petition Date, approximately $2,438,702 in Employee Wages has accrued and is owing to Employees (the "Unpaid Employee Wages"). Failure to pay the Unpaid Employee Wages may lead to widespread departures at all levels of the Debtors' corporate structure.  The Debtors request authorization to honor all Unpaid Employee Wages and to continue paying Employee Wages in the ordinary course.

**B.     Independent Contractor Wages**

17.     In addition to the Employee Wages, the Debtors pay Independent Contractors pursuant to their agreements with the Debtors (the "Independent Contractor Wages," and together with the Employee Wages, the "Wages").  The Debtors pay Independent Contractors on a flat fee, monthly, or hourly basis.  For the Independent Contractors who are paid pursuant to a flat fee, half of the fee is paid at the commencement of the project and half is paid upon the project's completion.  In particular, two of the Independent Contractors are hired through a third-party staffing agency (the "Staffing Agency"), and payments on account of the two Independent Contractors are paid through the Staffing Agency.  The average monthly cost to the Debtors for payments to the Independent Contractors is approximately $30,706 per month.  As of the Petition

Date, the Debtors estimate that they owe approximately $61,795 on account of Independent

Contractor Wages (the "Unpaid Independent Contractor Wages").

18.     Failure to timely pay the Unpaid Independent Contractor Wages could interrupt the

Debtors' operations and have widespread negative effects throughout the Debtors' businesses.  The

Debtors request authorization to honor all Unpaid Independent Contractor Wages and to continue

paying Independent Contractor Wages in the ordinary course.

### C.      Payroll Costs

19.     The     Debtors     use     UKG     as     their     third-party     payroll     processor

(the "Payroll Processor") to support payroll processing by processing Withholdings and Payroll

Taxes (each, as defined herein) (the "Payroll Costs").  The Debtors average Payroll Processor cost

is  approximately  $61,000  per  month.    The  Debtors  estimate  that  approximately  $194,654  in

amounts  owed  to  UKG  remain  outstanding  as  of  the  Petition  Date.    The  Debtors  request

authorization to honor prepetition amounts owed to UKG to ensure continued access to UKG's

services during the Chapter 11 Cases and to continue their use of UKG in the ordinary course for

payroll administration during the pendency of these Chapter 11 Cases.

### D.      Bonus Plans

20.     In the ordinary course of business, in order to encourage and reward outstanding

performance,  the  Debtors  have  historically  maintained  two  incentive  bonus  plans:

(i) a performance-based   bonus   plan   for   certain   field-level   management   Employees

(the "Field Operations Incentive  Plan"), and (ii) a performance-based bonus plan for certain

corporate-level Employees engaged with the restaurant support center (the "RSC Incentive Plan,"

and together with the Field Operations Incentive Plan, each as further described below, the

"Bonus Plans").

21.     For the avoidance of doubt, the Debtors are not seeking relief to pay any payments to any "insider" as the term is defined in section 101(31) of the Bankruptcy Code ("Insiders") who may be eligible under the Bonus Plans.  To the extent any eligible Employee with a title of "Vice President" or "Manager" of a particular division is receiving payment under the Bonus Plans, such Employee does not exercise strategic control or authority over the Debtors' business or Company decisions made in these Chapter 11 Cases, does not determine the disposition of funds on strategic financing activities, nor participates in the overall management of the Debtors, and is not a member of the board or any board-related committees.

22.     As of the Petition Date, approximately $867,669 remains due on account of the Field Operations Incentive Plan (the "Unpaid Bonuses") for non-Insiders.  Payment of the Unpaid Bonuses is critical to maintaining the morale and productivity of the Debtors' Employees and to maximizing the value of the Debtors' estates.  Accordingly, by this Motion, the Debtors request authority, but not direction, to pay any Unpaid Bonuses in the ordinary course and consistent with past practice and to continue the use of the Bonus Plans in the ordinary course.

### 1.     The Field Operations Incentive Plan

23.     The Field Operations Incentive Plan is a performance-based bonus plan designed to reward eligible field-level management Employees based on the actual performance of the store(s) the eligible Employee oversees.  The Field Operations Incentive Plan bonus is discretionary, and the Debtors maintain the ability to terminate, alter, or not pay any bonus thereunder.

24.     To qualify for payment under the Field Operations Incentive Plan, Employees must be employed by the Debtors for the entire fiscal quarter and remain employed at the time the bonus is distributed.  Awards are generally paid prior to the end of the quarterly fiscal period following the period for which the award is calculated.  Field Operations Incentive Plan bonuses are

calculated based on specific performance metrics, including net sales and the total controllable income for bonus (the "TCIB").  TCIB is determined by subtracting the eligible Employee's specific controllable expenses from the store's total income for which the Employee has control. Achievement of the Debtors' company-wide EBITDA thresholds is required for the payout of the Field Operations Incentive Plan.  The Debtors estimate that the average quarterly payout is approximately $2,289 per eligible Employee under the Field Operations Incentive Plan.  As of Petition date, the Debtors estimate that they owe $867,669 on account of the Field Operations Incentive Plan.

### 2.    RSC Incentive Plan

25.    The RSC Incentive Plan is an annual performance-based bonus program designed to reward certain corporate-level Employees based on the Debtors' EBITDA and the Employee's position level.  The RSC Incentive Plan bonus is discretionary, and the Debtors maintain the ability to terminate, alter, or not pay any bonus thereunder.  Historically, the RSC Incentive Plan bonuses have been paid out in early March.  To qualify for payment under the RSC Incentive Plan, Employees must be employed at the time of the payout, with proration applied for those hired during the year.  The Debtors request authority, but not direction, to continue the RSC Incentive Plan on a postpetition basis in the ordinary course of business.

### E.    Paid Time Off Programs

26.    In the ordinary course of business, the Debtors offer certain eligible Employees with various forms of paid leave, including sick leave, bereavement leave, and other paid leave (*e.g.*, jury duty, voting leave, military leave, and personal leave) (collectively, "PTO").  Employees that are eligible do not accrue PTO; rather, PTO is allocated to the eligible Employee on January 1 of each year or upon hire, and it is replenished annually.  The number of PTO days allotted to eligible Employees adjusts based on the Employee's tenure.  Up to five (5) days of PTO

can roll over at the end of each year.  The Debtors modified their PTO program as of January 1, 2025, and are offering corporate-level Employees a one-time opportunity to roll over up to 160 hours of previously accrued sick time, which must be used by December 31, 2026. Employees are not paid for unused PTO upon termination of employment, and the Debtors therefore do not make any cash payments on account of PTO unless explicitly required by local state law.  The Debtors request authorization to honor all prepetition accrued PTO obligations, and to continue and renew, amend, or otherwise modify their policy for PTO in the ordinary course, in consultation with the DIP Lender and the Ad Hoc Group of Noteholders, allowing Employees to continue to use PTO pursuant to the Debtors' policies.

### F.      Expense Reimbursement

27.      The Debtors have expense reimbursement policies for certain preapproved travel, lodging, ground transportation, meals, automobile usage (gas or mileage), car rentals, phone expenses, and miscellaneous business expenses (collectively, "Business Expenses").  The Business Expenses are ordinary course expenses that certain of the Debtors' Employees incur in performing their job functions.  It is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for the Business Expenses.

28.      Certain Employees may incur the Business Expenses personally, while others incur the Business Expenses on corporate credit cards issued by American Express (the "Corporate Card Program").  The Debtors have provided approximately twenty (20) Employees with corporate credit cards under the Corporate Card Program to cover legitimate business expenses incurred in the ordinary course of business in connection with their

Case 25-80078-swe11    Doc 11    Filed 04/01/25    Entered 04/01/25 00:17:40    Desc Main
Document      Page 13 of 35

employment.[6]  The Debtors are not seeking relief with respect to the Corporate Card Program in this Motion.  Instead, they are seeking authority to continue the Corporate Card Program in the ordinary course in the Cash Management Motion.

29.     Employees that incur Business Expenses personally are required to complete expense reports as soon as practically possible after incurring Business Expenses.  Upon the completion and submission of such expense reports, the Business Expenses are reviewed internally and approved for payment to the extent reasonable and compliant with the Debtors' expense reimbursement policy.  The Debtors pay approximately $155,271 of reimbursable Business Expenses to Employees on a monthly basis.

30.     Approximately $44,640 in reimbursable Business Expenses remain outstanding as of the Petition Date.  The Debtors request authorization to pay or reimburse all remaining prepetition Business Expenses and to continue to reimburse Business Expenses in the ordinary course of business.

**G.     Employee Benefits Programs**

31.     The Debtors offer eligible Employees the ability to participate in a number of insurance and benefits programs, including, without limitation, (a) medical, dental, vision, and COBRA coverage, (b) flexible spending accounts/health savings accounts, (c) life and accidental death and dismemberment insurance, (d) disability benefits, (e) health and wellness programs, (f) workers' compensation program, (g) employee severance, (h) stock compensation, and (i) a 401(k) plan provided to Employees in the ordinary course of business (collectively, the "Employee Benefits Programs").  The Debtors may have obligations under certain of these Employee Benefits Programs (the "Employee Benefits Obligations") that remain unpaid as of the

---

[6]    The Corporate Card Program is further described in the Cash Management Motion.

Petition Date because such obligations have accrued either in whole or in part prior to the Petition Date, but do not become payable in the ordinary course of the Debtors' businesses until after the Petition Date.

32.      The amounts set forth below reflect the approximate cost of such Employee Benefits Programs, which the Debtors are requesting authorization to continue to pay in the ordinary course of business, regardless of whether such obligations arose prepetition or postpetition. These programs are an important component of the total compensation offered to the Employees and are essential to the Debtors' efforts to maintain Employee morale and to minimize attrition. The Debtors believe that the expenses associated with such programs are reasonable and necessary in light of the potential attrition, loss of morale and loss of productivity that would occur if such programs were discontinued.

### 1.      Health Care Benefits

33.      In the ordinary course of their business, the Debtors offer their Employees the opportunity to participate in a number of health benefits programs, including medical, dental, and vision plans, among others (collectively, the "Health Care Benefits").[7] Specifically, the Debtors provide the following:

- **Medical Plans**: The Debtors offer medical insurance through Blue Cross Blue Shield ("BCBS"). Through BCBS, the Debtors maintain several medical plans (the "Medical Plans"). Under the Medical Plans, the Debtors make weekly premium payments to BCBS averaging approximately $85,091. The Debtors estimate that, as of the Petition Date, they owe approximately $89,858 on account of the Medical Plans.

- **Vison Plans**: The Debtors provide vision coverage to certain Employees through VSP (the "Vision Plans"). Under the Vision Plans, the Debtors make monthly premium payments to VSP averaging approximately

---

[7]   Where required under applicable non-bankruptcy law, including COBRA (as defined below), the Debtors provide eligible Employees with the opportunity to continue participating in the applicable benefits programs following their termination by the Debtors. The Debtors intend for the relief requested herein to apply to such former employees consistent with the Debtors' prepetition practices and the requirements of applicable law.

$4,190.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Vision Plans.

- <u>Dental Plans</u>:  The Debtors provide dental coverage to certain Employees through United Healthcare (the "<u>Dental Plans</u>").  Under the Dental Plans, the Debtors make weekly premium payments averaging approximately $2,686 and a monthly premium payment averaging approximately $1,386 to United Healthcare. The Debtors estimate that, as of the Petition Date, they owe approximately $3,089 on account of the Dental Plans.

- <u>COBRA</u>: In the ordinary course of business, the Debtors make payments in respect of Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("<u>COBRA</u>") for qualifying Employees and their qualifying dependents who incur a COBRA qualifying event or loss of coverage in connection with a self-insured benefit plan (the "<u>COBRA Benefits</u>").  VSP administers the Debtors vision COBRA benefits, and Optum Financial administers all of the Debtors' other COBRA Benefits.  The Debtors estimate that, as of the Petition Date, they owe approximately $272 on account of the COBRA Benefits.

- <u>Fundamental Care</u>.  The Debtors provide Employees, who are actively working at least fifteen (15) hours per week, and who enroll within the first thirty (30) days of employment, limited medical, vision, and short-term disability coverage through Beazley Insurance and limited dental coverage through Beam Dental (the "<u>Fundamental Care Plans</u>").  Under the Fundamental Care Plans, employees pay premiums to Beazley Insurance and Beam Dental. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Fundamental Care Plans.

34.    The Debtors estimate that as of the Petition Date, they owe approximately $93,220 for prepetition Health Care Benefits.  The Debtors request authorization to pay all prepetition amounts on account of the Health Care Benefits and to continue the Health Care Benefits in the ordinary course of business on a postpetition basis.

## 2.    Flexible Benefits

35.    The Debtors offer three types of flexible spending accounts to eligible Employees, who can contribute through pre-tax compensation deductions, a healthcare savings account through BCBS (the "<u>HSA</u>"), a healthcare savings account through Optum Financial (the "<u>HCFSA</u>"), a limited purpose flexible spending account through Optum Financial

(the "<u>LPFSA</u>"), and a dependent care flexible spending account through Optum Financial (the "<u>DCA</u>" and collectively with the HCFSA and the LPFSA, the "<u>Optum Flex Benefits</u>," and together with the HSA, the "<u>Flex Benefits</u>").  The Flex Benefits allow eligible Employees to set aside money on a pre-tax basis for qualified medical expenses or dependent care expenses as defined by the Internal Revenue Service.  The administration fees for HSA are rolled up in the premium the Debtors pay on account of the Medical Plans to BCBS.  As of the Petition Date, the Debtors estimate that they could owe up to approximately $2,108 on account of the Optum Flex Benefits.  The Debtors request authorization to honor all prepetition amounts on account of the Flex Benefits and to continue the Flex Benefits in the ordinary course of business on a postpetition basis.

### 3.    Life and AD&D Insurance

36.    The Debtors offer Full Time Employees the option to purchase basic employee life insurance coverage and basic accidental death and dismemberment insurance through Voya (the "<u>Life Insurance Plans</u>").  Employees may also elect to purchase at their own cost, voluntary life, AD&D, critical illness, hospital indemnity, short- and long-term disability, and voluntary accident insurance.  The Debtors estimate that as of the Petition Date, there is approximately $75,030 in accrued and unpaid premiums and other amounts owed under the Life Insurance Plans.  By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Life Insurance Plans and to continue providing the Life Insurance Plans in the ordinary course of business on a postpetition basis.

### 4.    Disability Benefits

37.    The Debtors offer a voluntary short-term disability insurance program, through which Employees may purchase coverage up to 60% of pre-disability earnings for a maximum benefit duration of twelve months (the "<u>Short-Term Disability Program</u>") and a voluntary

long-term disability insurance program, which provides Employees with up to 60% of pre-disability earnings lasting until the Employee is no longer considered disabled or reaches retirement age (the "Long-Term Disability Program," and together with the Short-Term Disability Program, the "Disability Programs").  The Debtors' Disability Programs insurance provider is Voya.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Disability Benefits.  By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Disability Programs to eligible Employees in the ordinary course of business on a postpetition basis.

### 5.      Health and Wellness Programs

38.     In the ordinary course of business, the Debtors offer several health and wellness programs (the "Health and Wellness Programs") to provide benefits to their Employees, including, but not limited to, resources such as a 24/7 NurseLine, which provides a round-the-clock access to registered nurses for health concerns and guidance, which offers support for clinical, legal, and financial services.  As of the Petition Date, the Debtors do not believe they owe any amount on account of the Health and Wellness Programs.  The Debtors request authority, but not direction, to continue the Health and Wellness Programs on a postpetition basis, in the ordinary course of business.

### 6.      Workers' Compensation Program

39.     The Debtors provide workers' compensation benefits (the "Workers' Compensation Program") to the Employees.  In particular, under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain policies and programs to provide Employees with workers' compensation benefits.  In accordance with this obligation, the Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate. The Workers' Compensation Program benefits provided by the Debtors are covered either under

(i) the Debtors' workers' compensation insurance policy administered by Pennsylvania Manufacturers Association Insurance Company (the "Standard Workers' Compensation Plan"), (ii) for Employees located in Texas, the workers' compensation insurance policy administered by Crum & Forster Specialty Insurance Company (the "Texas Workers' Compensation Plan"), or, (iii) for Employees located in Ohio, the workers' compensation coverage purchased from the through the third-party workers compensation administrator, Sheakley (the "OBWC" and, such policy, the "Ohio Workers' Compensation Policy," and collectively with the Standard Workers' Compensation Plan and the Texas Workers' Compensation Plan, the "Workers' Compensation Plans").

40.     The Debtors currently pay an average monthly premium of approximately $19,473 for the Standard Workers' Compensation Plan, including administrative fees. The Debtors pay the Standard Workers' Compensation Plan currently in effect on a monthly basis. The Standard Workers' Compensation Plan is scheduled to expire on January 1, 2026.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Standard Workers' Compensation Plan.

41.     For the Texas Workers Compensation Plan, the Debtors currently pay an annual premium of approximately $51,933, including administrative fees.   The Texas Workers' Compensation Plan is scheduled to expire on January 1, 2026.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Texas Workers' Compensation Plan.

42.     Ohio is a monopolistic state for workers' compensation insurance, meaning workers' compensation coverage is not available for purchase from private companies. Consequently, the Debtors make monthly payments to the OBWC through Sheakley in exchange for workers' compensation coverage in that state.  Under the current policy, the Debtors pay approximately $2,000 in premiums on account of the Ohio Workers' Compensation Policy on a

monthly basis.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Ohio Workers' Compensation Policy.

43.    The amounts of workers' compensation claims vary by month, depending on the claims resolved during the month.  As of Petition Date, the Debtors do not believe that they owe any amounts on account of the workers' compensation claims, but request authority to pay amounts on account of the Workers' Compensation Plans on a postpetition basis in the ordinary course of business.

44.    Failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors and could cause employee departures, which would disrupt the business.  Accordingly, the Debtors respectfully request authorization to (a) lift the automatic stay to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum and (b) pay all workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims, as they become due in the ordinary course of the Debtors' business.

### 7.    Employee Severance

45.    The Debtors offer a severance plan policy to certain active Employees (the "Severance Plan").   Under the Severance Policy, eligible Employees receive severance benefits based on their salary, job level, and years of service.  These benefits are provided in accordance with the terms set forth in their employment and/or severance agreements, which include certain restrictive covenants such as non-compete, non-solicitation, and confidentiality clauses.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Severance Plan, but request authority to continue to honor the Severance Policy on a

postpetition basis in the ordinary course of business.  The Debtors believe that honoring these severance obligations is critical to maintaining current Employee morale and loyalty.

### 8.    Stock Compensation

46.    The Debtors have historically provided stock compensation to certain Employees in the form of awarded options (the "Stock Compensation").  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Stock Compensation.  The Debtors are not seeking relief on account of the Stock Compensation.

### 9.    401(k) Plans

47.    The Debtors sponsor a 401(k) safe harbor retirement savings plan through Empower (the "Company 401(k) Plan").    Employees are eligible to participate in the Company 401(k) Plan after completing two months of employment and reaching at least 21 years of age.  Employees who participate in the Company 401(k) Plan can make pre-tax payroll contributions to their 401(k) accounts up to the maximum amount permitted by the Internal Revenue Code.  Each participating Employee's 401(k) contributions are deducted automatically from their bi-weekly paychecks (the "401(k) Contributions").    The Debtors match an Employee's 401(k) Contributions up to four percent (4%) of such Employee's earnings (each, a "401(k) Match," and collectively, the 401(k) Matches).  The 401(k) Match is made by the Debtors each bi-weekly pay period.  As of the Petition Date, the Debtors estimate that they have accrued approximately $127,779 of 401(k) Contributions by Employees.  Additionally, as of the Petition Date, the Debtors estimate that they owe approximately $49,622 on account of 401(k) Matches.

48.    As plan sponsor of the 401(k) Plans, the Debtors have a fiduciary duty arising under Title IV of the Employee Retirement Income Security Act of 1974, as amended, to administer the 401(k) Plans in accordance with its terms.  Moreover, the failure of the Debtors as plan sponsor to

20

administer the 401(k) Plans in accordance with its terms would be a violation of the qualification standards of Section 401(a) of the Internal Revenue Code.  Disqualification of the 401(k) Plans, which covers a large number of Employees of the Debtors, would generally cause the trust under the plan to lose its tax-exempt status under Section 501(a) of the Internal Revenue Code causing participants to be currently taxed on their balances under the plan, and would adversely affect the Debtors' ability to take a current tax deduction under Section 404(a)(5) of the Internal Revenue Code.  The Debtors request authorization to process 401(k) Contributions and to pay any amounts that become due on account of the 401(k) Match during the pendency of these Chapter 11 Cases in the ordinary course of business.

### 10.      Other Employee Benefits

49.      In addition to the foregoing, in the ordinary course of business, the Debtors have certain other practices, programs, and policies that provide benefits to their non-insider Employees, including, but not limited to, (i) tuition reimbursement to eligible Employees, (ii) identity theft prevention services, (iii)  legal benefits plans that provide access to lawyers, (iv) pet insurance , (v) discounts on auto and home insurance, (vi) a discounted gym membership, and (vii) discounts on car rentals (collectively, the "Other Employee Benefit Programs").  As of the Petition Date, the Debtors do not believe they owe any amounts on account of accrued but unpaid Other Employee Benefits.  The Debtors request authority, but not direction, to pay any accrued but unpaid obligations related to the Other Employee Benefit Programs and to continue to honor the Other Employee Benefits Programs on a postpetition basis in the ordinary course of business.

### H.      Deductions, Withholdings, and Payroll Taxes

50.      For each applicable pay period, the Debtors routinely deduct certain amounts from Employee Wages, including, without limitation, garnishments, child support, and similar deductions, as well as pre- and after-tax deductions payable pursuant to certain of the

Compensation and Benefits Programs discussed herein (such as an Employee's share of health care insurance premiums, contributions under health savings plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "Deductions"). On average, the Debtors withhold and remit approximately $2,174,484 per bi-weekly pay period on account of all Deductions. As of the Petition Date, the Debtors estimate that they owe approximately $89,035 on account of the Deductions, and the Debtors request authority, but not direction, to deduct and pay any accrued but unpaid Deductions and to continue the Deductions on a postpetition basis in the ordinary course of business.

51.    In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes and Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings"). The Debtors must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities within approximately 24 hours of the disbursement of the Employees' payroll payments. In the aggregate, the Payroll Taxes total approximately $1,276,693 per bi-weekly pay period (including both the Employee and employer portions).

52.    As of the Petition Date, the Debtors estimate that they will owe approximately $1,413,140 on account of prepetition Payroll Taxes. The Debtors request authorization to pay, and to continue to utilize UKG to process, any Payroll Taxes as they come due in the ordinary course of business. The Debtors also request authorization to forward any prepetition Deductions or Withholdings (and to continue to forward Deductions and Withholdings on a postpetition basis

whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**BASIS FOR RELIEF**

**I.     The Court Should Authorize the Continuation of the Compensation and Benefits Programs and the Payment of the Prepetition Workforce Obligations**

    **A.     Payment of Certain Prepetition Workforce Obligations Is Required by Law**

53.     Sections 541(b)(7) and 541(d) of the Bankruptcy Code provide grounds for granting the relief requested with respect to Withholdings and Deductions.  These amounts include amounts earmarked by law, including for taxes and support payments, and Employee contributions to Compensation and Benefits Programs.  These amounts are held in trust, are not part of the Debtors' estates, and are required to be paid.  *See* 11 U.S.C. § 541(b), (d); 26 U.S.C. § 7501(a); *see also Wood v. United States*, 808 F.2d 411, 414 (5th Cir. 1987) ("The withheld funds are held in trust by the employer for the United States."); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  Failure to pay could subject the Debtors' directors and officers to personal liability.  *See In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Wigley*, 333 B.R. 768, 776–77 (Bankr. N.D. Tex. 2005) (same).

54.     Because many of the Withholdings and Deductions are not property of the Debtors' estates, their application or payment for their intended purposes will not adversely affect the Debtors' estates or their creditors.  To prevent potentially irreparable harm to employee morale and, in certain cases, to comply with the clear and unambiguous requirements of section 541(b)(7) of the Bankruptcy Code, the Debtors desire to apply and remit the Withholdings and Deductions for the purposes for which the Withholdings and Deductions were taken.

23

**B.    The Payment of Prepetition Workforce Obligations Is Appropriate Under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code**

55.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Prepetition Workforce Obligations to priority treatment.  As priority claims, the Debtors are required to pay such claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and Independent Contractors and should not negatively affect recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Prepetition Workforce Obligations at this time enhances value for the benefit of all interested parties.  The relief sought through this Motion is to allow the Debtors to continue in the ordinary course of business and avoid disruption to their operations.  Especially now, as the Debtors pursue an orderly chapter 11 process, it is crucial that the Debtors are able to retain their Employees and Independent Contractors that are familiar with their operations and have valuable relationships with vendors and customers.  Disruptions to the Debtors' operations, including spending time to identify new potential employees and training new employees would be detrimental to the Debtors' operations and the success of these Chapter 11 Cases.

**C.    Maintaining Compensation and Benefits Programs and Paying Prepetition Workforce Obligations Is a Sound Exercise of the Debtors' Business Judgment**

56.    Section 363 of the Bankruptcy Code permits a debtor to "enter into transactions . . . in the ordinary course of business" and use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1), (c).  Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Compensation and Benefits Programs as such actions are in the ordinary course of business.  Out of an abundance of caution,

24

however, the Debtors request entry of an order granting the relief requested herein to avoid any
disruptions to their business operations.

57.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval,
to pay prepetition obligations where a sound business purpose exists for doing so.
*In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *In re Montgomery Ward
Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the
debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy
Code); *see also In re Phoenix Steel Corp*., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Further,
"[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a
decision made arbitrarily or capriciously), courts will generally not entertain objections to the
debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville
Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986);
*see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the
presumptions of the business judgment rule on the merits is a near-Herculean task").

58.     The Debtors have determined, in the sound exercise of their business judgment, that
continuing their Compensation and Benefits Programs and paying the Prepetition Workforce
Obligations is critical to the success of these Chapter 11 Cases.  Any delay or disruption in the
provision of the Compensation and Benefits Programs likely will destroy the Debtors'
relationships with the Employees and Independent Contractors and irreparably impair workforce
morale at the very time when the dedication, confidence, and cooperation of the Employees and
Independent Contractors is most critical.  In addition, bolstering the morale of the Employees and
Independent Contractors and ensuring the uninterrupted availability of their services will assist the
Debtors in maintaining a "business as usual" atmosphere to the extent possible and preserving the
Debtors' ability to continue to operate their businesses and preserve relationships with customers

and other important constituencies. Finally, the Debtors must continue their corporate policies of permitting certain Employees and Independent Contractors to incur business-related expenses and thereafter seek reimbursement by submitting appropriate invoices to maintain necessary oversight and quality control, including through the Corporate Card Program, ensuring key Employees and Independent Contractors can perform their jobs effectively.

59.      Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit, and related obligations, including any amounts arising under the Compensation and Benefits Programs that accrued prepetition.

## II.      The Court May Also Grant the Motion Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity

60.      Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit payments of prepetition obligations prior to confirmation of a plan and emergence from chapter 11 when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "doctrine of necessity."

61.      Under the "doctrine of necessity," bankruptcy courts may authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 493 n.10, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity" and stating that "wage claims typically are payable out of necessity as well as by virtue of their priority"); *see also In re CEI Roofing, Inc.*, 315 B.R. 50, 61 (Bankr. N.D. Tex. 2006) (approving of *CoServ* and the application of the doctrine of necessity to prepetition wages and benefits);

*In re Lehigh and New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until its pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

62.    Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108. *See In re CoServ, L.L.C.*, 273 B.R. at 497 (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). For example, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty . . . to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. at 59 (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497). The doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence. *Ionosphere Clubs*, 98 B.R. at 175–76; *In re Equalnet Commun. Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of legal or factual inevitability of payment"); *CoServ*, 273 B.R. at 497 (recognizing the "doctrine of necessity").

63.    Paying Prepetition Workforce Obligations will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue without interruption. The Debtors believe that without these payments, the Employees and Independent Contractors may become demoralized and unproductive because of the significant financial strain and other hardship many of the Employees and Independent Contractors will experience as a result.  Indeed, the Debtors believe that without the requested relief, it is possible that Employees and Independent Contractors at all levels of the Debtors' organization will leave for alternative employment.  Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to implement their chapter 11 strategy.  The loss of valuable Employees and Independent Contractors and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time, during which the Debtors are stabilizing operations and restructuring their obligations in chapter 11.  Further, if the Debtors lose valuable Employees and Independent Contractors, they will incur significant expenses in locating, recruiting, and training replacements that would far exceed the costs of the Compensation and Benefits Programs for a lost Employee or Independent Contractor.

64.    In light of the foregoing, the Debtors respectfully submit that the continuation of their Compensation and Benefits Programs and payment of the Prepetition Workforce Obligations is essential to the success of these Chapter 11 Cases, represents an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors' estates, their creditors, and all stakeholders.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Compensation and Benefits Program and to continue the Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

III.    **The Court Should Waive the Automatic Stay as It Applies to Workers' Compensation Claims**

65.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

66.    The Debtors request authority under section 362(d) of the Bankruptcy Code to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the Employees' financial well-being and morale and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' business to the detriment of all parties in interest.

IV.    **The Court Should Authorize the Banks to Honor and Process the Debtors' Payment in Accordance with the Motion**

67.    The Debtors respectfully request that the Court authorize and direct the Debtors' banks and financial institutions (the "Banks") to receive, process, honor, and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that funds are available in the Debtors' accounts to cover the checks and fund

transfers.  The Debtors also request that the Banks be authorized to rely on the Debtors' designation

or representation that any particular check has been approved by the Order.

68.     The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in

the ordinary course of business and have implemented controls to ensure that prepetition claims

will not be paid out except as authorized by this Court.  The Debtors therefore submit that the

payment-processing procedures described in this Motion are appropriate.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

69.     The Court may grant the relief requested in this Motion immediately if the "relief

is necessary to avoid immediate and irreparable harm."   Fed. R. Bankr. P. 6003;

*In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  The Fifth Circuit

has interpreted the language "immediate and irreparable harm" in the context of preliminary

injunctions. In that context, the Fifth Circuit has instructed that harm is irreparable "if it cannot be

undone through monetary remedies."  *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d

262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202

(5th Cir. 1984)).  The Debtors believe an orderly transition into chapter 11 is critical to the viability

of their operations and that any delay in granting the relief requested would disrupt the Debtors'

operations and cause irreparable harm.  The Employees and Independent Contractors would suffer

significant hardship, and some may immediately seek alternative employment opportunities if the

relief requested herein is delayed, irreparably jeopardizing the viability of the Debtors' ongoing

operations.  Further, failure to receive the requested relief at the outset of these Chapter 11 Cases

would disrupt the "business as usual" message that is critical to the Debtors' ability to stabilize

their operations and maintain Employee and Independent Contractors confidence during this

process.  The Debtors submit that, for these reasons, among other reasons set forth above, the relief

requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

70.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.   Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## EMERGENCY CONSIDERATION

71.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Failure to receive the relief requested in this Motion during the first twenty-one days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. The Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

72.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this Motion.

## RESERVATION OF RIGHTS

73.     Nothing in this Motion:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

74.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) the United States Attorney's Office for the Northern District of Texas; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (f)  Sidley Austin, LLP as counsel to the DIP Lender; (g) White & Case LLP, as counsel to the Ad Hoc Group of Noteholders;  (h) the Indenture Trustee; (i) Seward & Kissel, LLP, as counsel to the servicer and control party under the A&R Base Indenture; (j) all third party providers of the Compensation and Benefit Programs; (k) banks and financial institutions where the Debtors maintain accounts; (l) counsel to any statutory committee appointed in these chapter 11 cases; and (m) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the

nature of the relief requested, no further notice is necessary.


[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form annexed hereto, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  March 31, 2025

Respectfully submitted by:

*/s/ Holland N. O'Neil*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

-and-

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 31, 2025, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

/s/ *Stephen A. Jones*

Stephen A. Jones