**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile:  (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' <u>EMERGENCY</u>**

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

**MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY
CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS,
SECTION 503(b)(9) CLAIMANTS, AND PACA/PASA CLAIMANTS,
(II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND
ELECTRONIC TRANSFER REQUESTS, AND (III) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on April 2, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 2, 2025 at 3:00 p.m. (prevailing Central Time) in Courtroom 3, Floor 14, 1100 Commerce Street, Dallas, Texas 75242 before the Honorable Scott W. Everett, U.S. Bankruptcy Judge for the Northern District of Texas.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (650) 479-3207. Video communication will be by use of the Cisco Webex platform. Connect via the Cisco Webex application or click the link on Judge Everett's home page. The meeting code is 2304 017 9738. Click the settings icon in the upper right corner and enter your name under the personal information setting. A copy of Judge Everett's WebEx Hearing Instructions can be found at the following link: WebEx Hearing Instructions.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Everett's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

Hooters of America, LLC and its affiliated debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below. In support hereof, the Debtors rely on the *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] filed concurrently herewith, and further represent as follows:

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. § 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

## BACKGROUND

4.      On March 31, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

5.      Founded in 1983, the Debtors own and operate Hooters, an iconic brand in the casual dining and sports entertainment dining industries.  The Debtors' global portfolio of restaurants includes 151 Debtor-owned and operated locations and 154 franchised locations in 17 countries.  The Debtors are known for their world-famous chicken wings, beverages, live sports, and legendary hospitality.  The Debtors also partner with a major food products licensor to offer shoppers Hooters-branded frozen meals products at 1,250 grocery store locations.

6.      Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these

Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## RELIEF REQUESTED

7.     The Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and the "Final Order"), (a) authorizing the Debtors to pay in the ordinary course of business certain (i) claims held by essential suppliers and service providers (the "Critical Vendors" and such claims, the "Critical Vendor Claims"), (ii) claims that are entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code (the "Section 503(b)(9) Claims"), (iii) claims that give rise to statutory constructive trusts under the Perishable Agricultural Commodities Act of 1930 or the Packers and Stockyards Act of 1921 ("PACA/PASA Claims") and together with the Critical Vendor Claims and the Section 503(b)(9) Claims, the "Prepetition Trade Claims," and the holders of such Prepetition Trade Claims, the "Prepetition Trade Claimants"); (b) authorizing the Debtors' banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

8.     The following table summarizes the categories of Prepetition Trade Claims that the Debtors request authority to pay pursuant to this Motion:

| Category | Description of Claims | Estimated Amount to Be Paid During Interim Period | Estimated Amount to Be Paid Under Final Order[3] |
|---|---|---|---|
| Critical Vendor Claims | Claims related to goods or services the Debtors require to generate revenue, perform under customer contracts, and maintain customer relationships. | $791,819 | $2,217,914 |
| 503(b)(9) Claims | Claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code. | $188,473 | $337,773 |
| PACA/PASA Claims | Claims that give rise to statutory constructive trusts under the Perishable Agricultural | $3,689,036 | $4,504,806 |

---

[3]   Estimated amounts payable under the Final Order are inclusive of amounts to be paid during the interim period, pursuant to the Interim Order.

| Category | Description of Claims | Estimated Amount to Be Paid During Interim Period | Estimated Amount to Be Paid Under Final Order[3] |
|---|---|---|---|
| | Commodities Act of 1930 and the Packers and Stockyards Act of 1921. | | |
| | **TOTAL:** | $4,669,328 | $7,060,493 |

9.      The Debtors also request that the Court authorize the Debtors to enter into written agreements (the "Trade Agreements") pursuant to which payment of certain Critical Vendor Claims shall be conditioned upon the vendor (a) agreeing to continue to provide products and services to the Debtors in accordance with trade terms no worse than those in place during the one hundred and eighty (180) days prior to the Petition Date (the "Customary Trade Terms"), or (b) accepting some discount on its prepetition claim amount.

10.      The Debtors further respectfully request that the Court schedule a final hearing to consider approval of this Motion on a final basis within twenty-one (21) days following the Petition Date or as soon thereafter as the Court's schedule permits.

## PREPETITION TRADE CLAIMANTS

### A.      Debtors' Operations and Third-Party Vendors

11.      The Debtors operate in a highly competitive restaurant industry.  Operating the Debtors' restaurants requires the services of a variety of carefully-sourced third-party vendors, and the inability to conduct business with one vendor could result in a significant delay or even shutdown in operations, which would drastically harm the Debtors' relationships with customers. The Debtors' success therefore depends on their access to and relationships with a network vendors, suppliers, and third-party logistics providers. Certain of these vendors and suppliers are essential to the Debtors' business, which requires frequent deliveries and quick turnover of goods sold and, in addition, may be protected by a statutory trust for goods delivered to the Debtors under PACA or PASA (each as defined below).

B.    **Critical Vendor Analysis**

12.    The Debtors have spent significant time, with the assistance of their advisors, reviewing and analyzing their books and records and historical practice to identify critical business relationships and suppliers of products and services, the loss of which would immediately and irreparably harm their businesses.  In this process, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is an existing customer;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide the requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- whether failure to pay all or part of a particular vendor's claim could cause a contraction of trade terms or the vendor to hold goods owned by the Debtors or refuse to ship inventory or provide critical services on a postpetition basis; and

- the location of the vendor.

13.    Following this analysis, the Debtors designated certain vendors as Critical Vendors. Any material interruption in the provision of the products and services by the Critical Vendors, however brief, including, e.g., the delivery of key ingredients and essential services, could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of prepetition claims of

Critical Vendors.[4]  If the Debtors are unable to acquire goods from the Critical Vendors to fulfill

actual and projected orders, the Debtors will face a corresponding loss of revenues due to unmet

demand and the Debtors' customer relationships could suffer irreparable damage.

14.     It is essential to the Debtors' restructuring efforts to pay the Critical Vendor Claims

to maintain the supply of the food products and services critical to the Debtors' business

operations.  The Debtors believe that, as of the Petition Date, they owe more than $2,217,914 in

total accounts payable to the Debtors' Critical Vendors on account of prepetition claims, $791,819

of which will come due during the Interim Period.[5]

## C.     Trade Terms Conditions

15.     The loss of trade terms with Critical Vendors (whether on account of demands for

cash-in-advance, cash-on-delivery, or otherwise) would negatively impact the Debtors' liquidity.

The Debtors intend to pay prepetition Critical Vendor Claims only when, in their business

judgment and after consultation with the Ad Hoc Group of Noteholders and the DIP Lender, the

benefits to their estates from making such payments will exceed the costs to their estates.

16.     To preserve working capital and liquidity during these Chapter 11 Cases and ensure

that the Debtors continue to receive vital products and services, the Debtors seek authority, in their

discretion, after consultation with the Ad Hoc Group of Noteholders and the DIP Lender, to

condition any payment on account of Critical Vendor Claims on entry into a Trade Agreement,

under which such Critical Vendor may be required to (a) continue supplying products or services

to the Debtors on the Customary Trade Terms between the parties (including, but not limited to,

---

[4]     Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

[5]     These amounts do not include accounts payable to Critical Vendors that are entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, which accounts payable are discussed separately below.

credit limits, pricing, cash discounts, timing of payments, allowances, rebates, and other applicable terms and programs), or (b) agree to accept some discount on its prepetition claim.  The Debtors, however, reserve the right to after consultation with the Ad Hoc Group of Noteholders and the DIP Lender, negotiate different terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement, to the extent the Debtors determine that such trade terms are necessary to procure essential products and services or are otherwise in the best interests of the Debtors' estates.

17.    The Debtors hereby request authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.[6]  Maintaining normal trade credit terms will improve the Debtors' chances of successfully emerging from chapter 11 because purchasing goods on credit preserves working capital and liquidity, enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses.  This is particularly critical for the Debtors, who took the availability of their existing trade credit into account when sizing their postpetition liquidity needs.

18.    If a Critical Vendor refuses to provide products or services to the Debtors on Customary Trade Terms (or such other terms that the parties agree upon as a condition to providing Critical Vendor status) following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby request authority, in their discretion, subject to consultation with the DIP Lender and the Ad Hoc Group of Noteholders, and without further order of the Court but with notice to the affected Critical Vendor, the Ad Hoc Group of Noteholders, and the DIP Lender, (a) to declare such Trade Agreement immediately terminated (if applicable) and (b) to declare any payments made to such

---

[6]    These amounts do not include accounts payable to Critical Vendors that are entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, which accounts payable are discussed separately below.

Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

**D.    Section 503(b)(9) Claimants**

19.    A material portion of the Prepetition Trade Claimants hold Section 503(b)(9) claims on account of goods received by the Debtors within the twenty (20) days immediately preceding the Petition Date.  The Debtors generally obtain raw materials, goods, or other supplies from holders of Section 503(b)(9) Claims on an order-by-order basis.  The Debtors' vendors typically invoice the Debtors for goods they are delivering on or about the day they deliver the goods and the Debtors' general practice is to pay vendors within thirty days of receiving an invoice from any vendor.

20.    A vendor's refusal to fulfill new orders without payment of its Section 503(b)(9) Claims would negatively affect the Debtors' businesses and ability to satisfy customer demand.  Moreover, absent payment in full of all Section 503(b)(9) Claims, the Debtors will be unable to confirm a plan of reorganization and emerge from these Chapter 11 Cases.  The Debtors believe that, as of the Petition Date, approximately $337,773 is owed to Prepetition Trade Claimants on account of Section 503(b)(9) Claims, $188,473 of which will come due during the Interim Period.

**E.    PACA/PASA Claims**

21.    To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors request authority, but not direction, in their discretion, to continue to pay in the ordinary course of business and consistent with their historical practices claims arising, or of the type, under the Perishable Agricultural Commodities Act of 1930 ("PACA"), to those vendors who supply the Debtors with fresh and frozen fruits and vegetables. PACA addresses the regulation of the sale of "perishable agricultural commodities." 7 U.S.C.

§ 499a; *see Pacific Int'l Marketing v. A & B Produce, Inc.*, 462 F.3d 279, 285 (3d Cir. 2006).

Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and

fresh vegetables of every kind and character." 7 U.S.C. § 499a(b)(4). The Debtors also regularly

purchase meat and other similar products from vendors that may be eligible to assert claims  under

the Packers and Stockyards Act of 1921 (7 U.S.C. §§181-229b) ("PASA"). Accordingly, the

Debtors also request authority, but not direction, in their discretion, to continue to pay

PACA/PASA Claims in the ordinary course of business and consistent with their historical

practices.

22.     PACA provides various protections to fresh fruit and vegetable sellers, including

the establishment of a statutory constructive trust ("PACA Trust") consisting of a purchaser's

entire inventory of food or other derivatives of perishable agricultural commodities, the products

derived therefrom and the proceeds related to any sale of the commodities or products

(collectively, the "PACA Trust Assets").  *See* 7 U.S.C. § 499e(c)(2).  PACA Trust beneficiaries

are entitled to receive payment ahead of other creditors of the buyer, including creditors that have

liens or other security interest in the buyers' interests. *Bear Mountain Orchards v. Mich-Kim, Inc.*,

623 F.3d 163, 167 (3d Cir. 2010); *Pacific Int'l Marketing*, 262 F.3d at 283 ("PACA statutory trust

grants certain unpaid suppliers and sellers of produce and their agents an interest in the PACA

trust assets superior to that of a buyer's perfected, secured creditor."); *see also Idahoan Fresh v.*

*Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir. 1998).  Similarly, PASA creates a statutory

trust (the "PASA Trust," and together with the PACA Trust, the "Statutory Trusts") scheme which

is virtually identical to PACA in respect of delivery of livestock, meat products and related

products, products derived therefrom and the proceeds related to the sale of such commodities or

products (collectively, the "PASA Trust Assets," and together with the PACA Trust Assets, the

"Trust Assets"). *See In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The

Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act.").

23.      The Debtors believe that the fruits, vegetables, and meat products purchased from their vendors are covered by PACA and may be covered by PASA.  As a result, insofar as those vendors abide by the statutory requirements of PACA and PASA, such vendors will be eligible to assert PACA/PASA Claims granting them priority ahead of all other secured and unsecured creditors in the chapter 11 cases.  Accordingly, payment of PACA/PASA Claims in the amounts of $4,504,806 will not prejudice or affect the amount available for distributions to other creditors of the Debtors.[7]

## BASIS FOR RELIEF

### A.    The Court Should Authorize Payment of the Prepetition Trade Claims

#### I.    The Court May Authorize the Debtors to Pay the Prepetition Trade Claims Pursuant to Sections 105 and 363 of the Bankruptcy Code

24.      Courts have recognized that it is appropriate to authorize the payment of prepetition obligations, including payments to critical vendors, when it is necessary to protect and preserve the estate.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"); *see also In re Scotia Dev., LLC*, 2007 Bankr. LEXIS

---

[7]    The Debtors believe that many of the PACA Claims relate to transactions where goods were received by the Debtors in the twenty (20) day period prior to the Petition Date, and holders of PACA Claims who delivered goods to the Debtors in the ordinary course of business are also entitled to an administrative expense claim for the value of those goods under section 503(b)(9) of the Bankruptcy Code. The estimated amount of Section 503(b)(9) Claims held by Critical Vendors do not include amounts that the Debtors have described as being subject to PACA.

3262, at *7 (Bankr. S.D. Tex. Sept. 21, 2007) (outlining the factors for when a critical vendor

payment is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)

("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such

payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In so

doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of

the Bankruptcy Code support the payment of the Prepetition Trade Claims as provided herein.

    25.    Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets

outside the ordinary course of business must be based upon the sound business judgment of the

debtor.  *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy

Code provides "broad flexibility" to authorize a debtor to honor prepetition claims when supported

by an appropriate business justification).  Indeed, courts have recognized that there are instances

when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition

claim."  *In re CoServ,* 273 B.R. at 497.

    26.    Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a) ; *In re CoServ*, 273 B.R. at 497 ("These are simply

examples of claims that may require satisfaction for the debtor in possession to perform its

fiduciary obligations. In such instances, it is only logical that the bankruptcy court be able to use

Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of

preservation or enhancement of the estate."); *In re CEI Roofing, Inc.*, 315 B.R. at 56 (citing *In re*

*Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)).  No provision of the Bankruptcy Code

expressly prohibits the postpetition payment of prepetition trade claims.  Indeed, the above-

referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

27.    Further, there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497–98.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.*  Courts in the Fifth Circuit, including the Bankruptcy Court for the Northern District of Texas, have followed the *CoServ* court's three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ*, 273 B.R. at 498; *see also In re Scotia Dev., LLC*, 2007 WL 2788840, at *2 (applying *CoServ* factors); *In re Mirant Corp.*, 296 B.R. 427, 429–30 (Bankr. N.D. Tex. 2003) (same).

28.    The Debtors' request for authority to pay Prepetition Trade Claims as requested herein is appropriate, warranted under the circumstances, and satisfies the *CoServ* court's three-part test.  First, the Debtors deal directly with their Prepetition Trade Claimants, whether by procuring raw materials or finished products through a customer's supply agreement or by transferring funds to a customer who procures raw materials or finished products for the Debtors. Second, payment of the Prepetition Trade Claims, as described above, is essential to the continued operation of the Debtors' business.  Failure to pay such claims could harm the Debtors' ability to

obtain necessary products and services, prevent the Debtors from preserving favorable trade terms, and increase the likelihood for significant disruptions to the Debtors' postpetition operations. Finally, absent payment of the Prepetition Trade Claims, the Debtors' risk breaching contractual arrangements with their key customers; there is no practical or legal alternative outside of payment of the Prepetition Trade Claims.

29.     The resulting harm to the Debtors' estates far outweighs the cost associated with paying a portion of the Debtors' prepetition obligations to the Prepetition Trade Claimants.  As stated above, the Prepetition Trade Claimants provide goods and services that, in the Debtors' business judgment, are necessary to meet customer demand for the Debtors' food products and to ensure the continued functioning of the Debtors' business and preserve and maximize the going concern value of their businesses.  If the Prepetition Trade Claimants cease to continue to provide goods and services to the Debtors, the Debtors face a degradation in the value of their businesses due to interruption of the flow of necessary products and services to the Debtors and impairment of the Debtors' ability to provide food products to their customers.  Thus, the Debtors submit that their other creditors will be no worse off from implementation of the relief sought herein, and in fact will fare far better, if the Debtors are empowered to negotiate such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations.

30.     Accordingly, in light of the potential for immediate and irreparable consequences if the Prepetition Trade Claimants do not continue to provide uninterrupted and timely deliveries of products and services, the Debtors have determined, in the exercise of their business judgment, that payment of Prepetition Trade Claims necessary to the go-forward business is essential to avoid costly disruptions to their operations.  The Debtors have examined other options short of payment of the Prepetition Trade Claims and have determined that to avoid significant disruption of the Debtors' operations, the Debtors must pay all or part of the Prepetition Trade Claims.

31.     For these reasons, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, preserves value for the benefit of all stakeholders in these Chapter 11 Cases, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

32.     The importance of debtors paying claims of critical vendors to avoid significant disruption to business operations and immediate and irreparable harm to estates has been recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re CareMax, Inc.,* No. 24-80093 (MVL) (Bankr. N.D. Tex. Dec. 17, 2024) [Docket No. 229]; *In re KidKraft, Inc.*, No. 24-80045 (MVL) (Bankr. N.D. Tex. June 18, 2024) [Docket No. 200]; *In re Eiger Biopharmaceuticals, Inc.*, No. 24-80040 (SGJ) (Bankr. N.D. Tex. Apr. 5, 2024) [Docket No. 92]; *In re Ebix, Inc.*, No. 23-80049 (SWE) (Bankr. N.D. Tex. Dec. 19, 2023) [Docket No. 63]; *In re The Pill Club Pharmacy Holdings, LLC*, No. 23-41090 (ELM) (Bankr. N.D. Tex. Apr. 27, 2023) [Docket No. 86].

## II.    The Court May Authorize the Payment of Claims Entitled to Administrative Expense Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code

33.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of the Section 503(b)(9) Claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.  In other words, payment of the Section 503(b)(9) Claims of Prepetition Trade Claimants merely accelerates the timing of payment and does not change the ultimate treatment of such claims under a chapter 11 plan.

34.     The Debtors' ongoing ability to obtain products as provided herein is necessary to preserve the value of their estates.  Absent the payment of the Section 503(b)(9) Claims at the outset of these Chapter 11 Cases—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to products necessary to maintain the Debtors' operations and maximize the value of the Debtors' estates.  In addition, the Bankruptcy Code does not prohibit a debtor from paying Section 503(b)(9) Claims prior to confirmation.  As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, Hearing Transcript at 49:21–23, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06 10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

35.     Courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay administrative expense claims as they come due during the course of a chapter 11 case.  *See, e.g.*, *In re TGI Friday's, Inc.*, No. 24-80069 (SGJ) (Bankr. N.D. Tex. Jan. 7, 2025) [Docket No. 443]; *In re CareMax, Inc.*, No. 24-80093 (MVL) (Bankr. N.D. Tex. Dec. 17, 2024) [Docket No. 229]; *In re KidKraft, Inc.*, No. 24-80045 (MVL) (Bankr. N.D. Tex. June 18, 2024) [Docket No. 200]; *In re Eiger Biopharmaceuticals, Inc.*, No. 24-80040 (SGJ) (Bankr. N.D. Tex. Apr. 5, 2024) [Docket No. 92].  Similar relief is also appropriate here.

### III.     The Court Should Authorize Payment of PACA/PASA Claims

36.     The prompt and full payment of PACA/PASA Claims should be authorized by this Court. As described above, assets governed by PACA/PASA do not constitute property of the

Debtors' estates. *Cavendish Farms v. AmeriServe Food Distribution, Inc. (In re AmeriServe Food Distribution, Inc.)*, No. A–00–615, 2000 WL 33682393, at *2 (Bankr. D. Del. June 22, 2000); *In re Fresh Approach, Inc.*, 51 B.R. 412, 420 (Bankr. N.D. Tex. 1985) ("[t]his express exclusion of trust assets from property of the estate indicates that Congress intended a priority scheme consistent with that applied in cases of judicially imposed constructive trusts, i.e., that assets subject to the PSA (and by analogy, the PACA) trust were not property of the estate"). As a result, the distribution of assets to PACA/PASA claimants falls outside the priority scheme set forth in the Bankruptcy Code, and such claimants are entitled to payment from the Trust ahead of the Debtors' other creditors. *See, e.g.*, *In re Magic Rests., Inc.*, 205 F.3d 108, 112 (3d Cir. 2000); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1378 (3d Cir. 1994).

37.    Delays in satisfying PACA/PASA Claims could adversely affect the Debtors' ability to obtain the necessary ingredients required to operate the Debtors' restaurants. Failing to pay PACA/PASA Claims in the ordinary course of business could subject the Debtors to numerous claims and contested proceedings by PACA/PASA claimants for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors.

38.    Finally, in certain circumstances, officers or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA or PASA. *See Bear Mountain Orchards v Mich-Kim, Inc.*, 623 F.3d 163, 172 (3d Cir. 2010) (finding that the court must "1) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (e.g., officer, director, and/or controlling shareholder) and 2) assess whether that individual's involvement with the corporation establishes that she was actually able to control the PACA trust assets at issue"); *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 421 (3d Cir. 2005); *see also*

*Golman Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will inquire (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to the PACA creditors, to determine personal liability). Thus, to the extent that any valid obligations arising under these trust-fund statutes remain unsatisfied by the Debtors, the Debtors' officers and directors may be exposed to lawsuits during the pendency of the Chapter 11 Cases regardless of the validity of such actions. Any such lawsuit would distract the Debtors and their officers and directors in the administration of these Chapter 11 Cases.

39.      Courts in this district and other jurisdictions have granted similar relief with respect to the treatment of PACA/PASA Claims in other chapter 11 cases to the relief being requested herein. *See, e.g.*, *In re TGI Friday's, Inc.*, No. 24-80069 (SGJ) (Bankr. N.D. Tex. Jan. 7, 2025) [Docket No. 443]; *In re Buca Texas Restaurants, L.P.*, No. 24-80058 (SGJ) (Bankr. N.D. Tex. Aug. 7, 2024) [Docket No. 81].

### IV.    Authorizing the Banks to Honor Checks Is Appropriate

40.      The Debtors also request that the Court authorize the Banks when requested by the Debtors, in their discretion, to receive, process, honor, and pay all checks or electronic fund transfers drawn on the Debtors' bank accounts presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that sufficient funds are available in the applicable bank accounts to cover the checks and electronic fund transfers. The Debtors also request that the Banks be authorized to rely on the Debtors' designation or representation that any particular check or electronic payment request has been approved pursuant to the Order.

41.     The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court. The Debtors therefore submit that the payment-processing procedures described in this Motion are appropriate.

## DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(h)

42.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

43.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm. As described herein, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## RESERVATION OF RIGHTS

44.     Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive,

or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

45. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) the United States Attorney's Office for the Northern District of Texas; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (f) Sidley Austin, LLP as counsel to the DIP Lender; (g) White & Case LLP as counsel to the Ad Hoc Group of Noteholders; (h) the Indenture Trustee; (i) Seward & Kissel, LLP as counsel to the servicer and control party under the A&R Base Indenture; (j) banks and financial institutions where the Debtors maintain accounts; (k) counsel to any statutory committee appointed in these Chapter 11 Cases; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

46. The pleadings in these Chapter 11 Cases and supporting papers are available on the Debtors' website at https://cases.ra.kroll.com/Hooters or on the Bankruptcy Court's website at https://ecf.txnb.uscourts.gov/. You can request any pleading you need from (i) the proposed noticing agent at: HootersInfo@ra.kroll.com, (888) 575-4910 (toll-free), +1 (646) 844-3894 or (ii)

proposed counsel for the Debtors at: Foley & Lardner LLP, c/o Stephen A. Jones, (sajones@foley.com) or Zachary C. Zahn (zzahn@foley.com), 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201.

47.    The pleadings in these Chapter 11 Cases and supporting papers are available on the Debtors' website at https://cases.ra.kroll.com/Hooters or on the Bankruptcy Court's website at https://ecf.txnb.uscourts.gov/. You can request any pleading you need from (i) the proposed noticing agent at: HootersInfo@ra.kroll.com, (888) 575-4910 (toll-free), +1 (646) 844-3894 or (ii) proposed counsel for the Debtors at: Foley & Lardner LLP, c/o Stephen A. Jones, (sajones@foley.com) or Zachary C. Zahn (zzahn@foley.com), 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and

Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively,

granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  March 31, 2025                    Respectfully submitted by:

*/s/ Holland N. O'Neil*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile:  (214) 999-4667
honeil@foley.com
sajones@foley.com
zzahn@foley.com

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

-and-

**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
Michael K. Wheat (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 31, 2025, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.


*/s/ Stephen A. Jones*
Stephen A. Jones