**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF KEITH MAIB,
CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A
FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Keith Maib, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.     I am a Senior Managing Director of Accordion Partners, LLC ("Accordion"), a restructuring advisory firm, as well as the Chief Restructuring Officer ("CRO") for Hooters of America, LLC, its affiliated debtors and debtors-in-possession (each, a "Debtor" and collectively, the "Debtors"), and the Debtors' non-debtor affiliates (together with the Debtors, the "Company"). Prior to becoming the Debtors' CRO, I have advised the Debtors in my capacity as a senior managing director with Accordion, and the Accordion team has served as one of the Debtors'

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

principal financial advisors since June 6, 2024.   As a result of my work with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

2.      I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of an Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith.[2]

3.      Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information I learned from my review of relevant documents, (c) information supplied to me by members of the Debtors' management and their advisors, and (d) my opinions based on my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.   I am not being specifically compensated for this testimony other than through payments received by Accordion as a professional retained by the Debtors in these Chapter 11 Cases and on account of my position as CRO of the Debtors.   I am authorized to submit this Declaration on behalf of the Debtors, and, if called to testify as a witness, I could and would testify competently to the facts set forth herein.

## I.      QUALIFICATIONS

4.      Accordion is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and

---

[2]    Capitalized terms used but not defined herein have the same meaning as ascribed to them in the DIP Motion and in the documents referenced therein.

distressed companies.    Specifically, Accordion's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.    Accordion provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic positions; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages.    In addition, Accordion provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications. Accordion is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

5.        I have over 40 years of diversified business experience, including financial restructuring and management consulting experience, specializing in advising management teams, boards, lenders, and other stakeholders engaged in financial or operational restructurings.  My areas of expertise include advising on financial and operational restructuring strategies, supplier management, cost cutting and revenue enhancement strategies, and, most relevant here, sizing, structuring, and raising debtor-in-possession financing.  I earned my bachelor's degree in business administration with an emphasis in accounting from the University of Kansas.  I have previously served as a partner at two Big 8 accounting Firms, and I have won numerous restructuring transaction awards, including Turnaround Management Association's restructuring transaction of the year in 2014.

6.        Prior to my current position as CRO of the Debtors, I served in the following interim officer positions: Chief Restructuring Officer of OSG Holdings, Inc., (provider of

3

outsourced printing, mailing and payment solutions), Interim Chief Financial Officer of Drybar Holdings LLC (national chain of hair salons); Chief Executive Officer of D&W Fine Pack LLC (plastics packaging); Chief Operating Officer of ARCA Technologies, LLC (electromechanical manufacturing); Chief Financial Officer of UniTek Global Services, Inc. (telecom infrastructure construction); Chief Restructuring Officer of Colt Defense, Inc. (commercial and military firearms manufacturing); Chief Restructuring Officer of AgFeed USA, LLC (international pork products); Chief Executive Officer of Playpower, Inc. (commercial playground manufacturing); Interim Chief Operating and Marketing Officer for Sunterra Corporation (hospitality, vacation ownership development, and marketing); Interim Chief Financial Officer of Norwood Promotional Products (consumer and promotional products); Chief Executive Officer of Worldnet Communications, Inc. (telecommunications); Chief Executive Officer of PennCorp Financial Group, Inc. (financial services and insurance); Chief Financial Officer of Acordia, Inc. (financial services and insurance brokerage); and Chief Operating Officer of Borland International, Inc. (technology and software development).

7.    The Company initially retained Accordion in June of 2024 to assist with a potential strategic transaction related to the Debtors' over-leveraged capital structure, including through negotiations with potential lenders.  On June 24, 2024, the board of directors of HOA Restaurant Group, LLC appointed me as CRO of the Company. From the outset of Accordion's retention, I have worked closely with the Company's management team and other advisors to evaluate the Company's ongoing liquidity and cash needs.[3]

---

[3]    The Debtors intend to file an application to retain Accordion as their financial advisor and for my designation as CRO.

**II.    THE DEBTORS' IMMEDIATE NEED FOR POSTPETITION FINANCING AND USE OF CASH COLLATERAL**

8.      I have reviewed the DIP Motion, and it is my belief that the relief sought therein is (a) critical to ensure uninterrupted operation of the Debtors' business and the success of the Debtors' chapter 11 cases, and (b) necessary to avoid immediate and irreparable harm to these chapter 11 estates.

9.      On March 31, 2025, the Debtors entered into the restructuring support agreement (the "RSA") with, among others, the Buyer Group.  The RSA contemplates a sale transaction to be implemented pursuant to a chapter 11 plan.  A key aspect of the sale transaction, though, is the Debtors' ability to continue their operations in the ordinary course amidst the overhang of these Chapter 11 Cases.

10.     The incremental liquidity provided under the Debtors' proposed DIP Facility is essential in this regard.  This determination results from the analysis undertaken by the Debtors where the Debtors have, in consultation with Accordion, performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors have determined that additional funding would be advisable to provide the Debtors with adequate cash to support their operational needs without imposing the material risk of immediate and potentially irreparable harm to the Debtors' business value.  The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses in the ordinary course, purchase inventory, pay their employees and vendors, service their customers, and pursue a value maximizing sale transaction during these Chapter 11 Cases.  Absent the liquidity provided under the proposed DIP Facility at the outset of these Chapter 11 Cases, I believe the Debtors' estates will be materially and perhaps irreparably harmed.

11.     In furtherance of assessing and then quantifying their cash needs, the Debtors,

with the assistance of Accordion, prepared an initial budget outlining the Debtors' funding needs in the initial thirteen (13) weeks post-Petition Date (the "Initial DIP Budget"). I believe that the Initial DIP Budget is fair, reasonable, and appropriate under the circumstances here.

### III.   THE MILESTONES THAT THE DEBTORS MUST MEET UNDER THE TERMS OF THE DIP FACILITY ARE REASONABLE

12.   The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones the Debtors must meet throughout these Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement. These milestones were heavily negotiated and required by the DIP Lender as a condition to providing DIP Facility.

13.   The DIP Facility, including the milestones, serves as an important component of these Chapter 11 Cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while the Debtors conduct a sale process. The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility. The DIP Facility, and the Debtors' ability to achieve the milestones contemplated therein, will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate a sale process to maximize the value of their estates.

### IV.   THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

14.   The Debtors' management team, legal advisors, and financial advisors were actively involved throughout the negotiations with the DIP Lender for the DIP Financing, which were conducted at arm's length and in good faith. The terms of the DIP Facility, including the rates, fees, certain customary waivers, and milestones, were negotiated over several weeks leading

6

up to the Petition Date, with the Debtors and their advisors negotiating the Interim Order, the DIP Credit Agreement, and each of the other DIP Documents through a vigorous, hard-fought process. The Debtors and their advisors worked hard to negotiate with the DIP Lender on the financing proposals, ultimately reaching an agreement with the DIP Lender on the most favorable terms of the DIP Facility available to the Debtors. Ultimately, the DIP Lender was only willing to lend on terms specifically set forth in the DIP Documents, which in my opinion was the best available offer to the Debtors.

15. I understand the DIP Lender would not have consented to providing postpetition financing without the Debtors' waiver of, among other things, their ability to surcharge against the DIP Collateral pursuant to Bankruptcy Code section 506(c). Based on my experience, such waiver is customary in debtor-in-possession financings, and I believe it is appropriate under the circumstances of these Chapter 11 Cases.

## V. THE TERMS OF THE DIP FACILITY ARE REASONABLE

16. The proposed DIP Financing contemplates an aggregate of principal amount of $40 million, comprised of $35 million of new money term loan facility, and $5 million of roll-up (the "Roll-UP") facility converted from obligations under the Manager Advance Credit Agreement on a cashless, dollar-for-dollar basis, in accordance with the terms and conditions set forth in a DIP Credit Agreement. I believe the Roll-Up is a reasonable concession for the Debtors to agree to because (a) the DIP Lender was unwilling to provide the DIP Financing without the inclusion of the Roll-Up upon entry of the Interim Order, and (b) other parties in interest are not prejudiced by the Roll-Up because the obligations under the Manager Advance Credit Agreement are consensual and provide Adequate Protection on account of Diminution in Value.

17. Furthermore, under the DIP Financing, the Debtors propose providing to the DIP

Lender priming liens and security interests and superpriority claims that supersede all other security interests, liens, and claims on the DIP Collateral, except for the Carve Out.  Based on my experience, these liens on the encumbered and unencumbered assets are common features of postpetition financing facilities.  Given the limited interest from third-party financing providers, these priming liens and superpriority claims were necessary features of the DIP Financing proposal.  No third-party lender was willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis, other than the DIP Lender.

18.     Absent support from the DIP Lender, I believe this case would likely convert to chapter 7, as there is simply not enough cash on hand, or cash from operations, to fund the business and the administrative costs of chapter 11.  In particular, the DIP Lender provided the Debtors with necessary bridge financing in the time period leading up to these Chapter 11 Cases.  Without this bridge financing, the Debtors would have been at severe risk of liquidation and likely would not be in a position to conduct a value-maximizing sale process, as is the case here.  Given these circumstances, the Roll-up feature in the DIP Financing is reasonable and a sound exercise of the Debtors' business judgment.

19.     The Debtors have also agreed, after good faith, arms length negotiations with the DIP Lender and subject to Court approval, to pay certain interest and fees to the DIP Lender. Specifically, the Debtors have agreed to an interest rate of 3.00%[4] (the "Interest Rate"), and payment of Agency Fees as agreed with the DIP Agent.

20.     Based on my discussions with the Debtors and their advisors, I understand that the Debtors and the DIP Lender agree that the terms, covenants, interest rates, and fees under the DIP Credit Agreement, including the Interest Rate and Agency Fees, were subject to negotiation and

---

[4] After default, the appliable rate shall increase by 2.00% *per annum*

are an integral component of the overall terms of the DIP Facility.  I believe the Interest Rate and the Agency Fees are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund these Chapter 11 Cases and are integral component of the overall terms of the DIP Facility.

21.      In addition, I believe that the other terms of the DIP Facility are reasonable under the circumstances, including the Roll-Up.  The Roll-Up, in particular, was a heavily negotiated element of the DIP Facility.  The DIP Lender indicated that the Roll-Up was part and parcel of, and integral to, the overall DIP Facility and a condition precedent for the DIP Lender to extend postpetition financing to the Debtors.  It is my belief that the Prepetition Lender is oversecured as of the Petition Date.  Therefore, it is, in my view and experience, a matter of when–not if–the obligations owed to the Prepetition Lender will be repaid by the Debtors.  Accordingly, I believe the Roll-Up is justified and would not unduly prejudice any creditor.

## VI.    CONCLUSION

22.      Without access to the DIP Facility and the use of Cash Collateral, I believe the Debtors would suffer immediate and irreparable harm and will not be able to successfully conduct a sale process and administer these Chapter 11 Cases.  I believe that the DIP Facility should be approved, and the Debtors be authorized to pay the Interest Rate, and Agency Fees under the DIP Facility given the Debtors' financial circumstances and the lack of any other viable financing alternatives.  Based on my discussions with the Debtors' management team and their advisors, and my review of the terms of the DIP Facility, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are reasonable under the circumstances.

23.      Accordingly, I submit that the relief requested in the DIP Motion is necessary,

reasonable, and appropriate under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief

Dated: March 31, 2025

/s/ Keith Maib

Name: Keith Maib
Title: Chief Restructuring Officer
Hooters of America, LLC, and its Debtor
affiliates

10