**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF KEITH MAIB,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Keith Maib, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.     I am a Senior Managing Director with Accordion Partners, LLC ("Accordion") a financial consulting firm.  I have been appointed by each of the debtors and debtors in possession (each individually, a "Debtor", and collectively, the "Debtors" or the "Company") as the chief restructuring officer (the "CRO") of the Debtors on June 6, 2024.

2.     I have more than 40 years of diversified business experience including serving as a partner in two international accounting firms.  I have extensive experience in guiding companies through periods of change and turmoil and am nationally recognized as a leading turnaround executive.  I have previously served as the Chief Restructuring Officer of OSG Holdings, Inc.,

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

(provider of outsourced printing, mailing, and payment solutions); Interim Chief Financial Officer of Drybar Holdings LLC (national chain of hair salons); Chief Executive Officer of D&W Fine Pack LLC (plastics packaging); Chief Operating Officer of ARCA Technologies, LLC (electromechanical manufacturing); Chief Financial Officer of UniTek Global Services, Inc. (telecom infrastructure construction); Chief Restructuring Officer of Colt Defense, Inc. (commercial and military firearms manufacturing); Chief Restructuring Officer of AgFeed USA, LLC (international pork products); Chief Executive Officer of Playpower, Inc. (commercial playground manufacturing); Interim Chief Operating and Marketing Officer for Sunterra Corporation (hospitality, vacation ownership development, and marketing); Interim Chief Financial Officer of Norwood Promotional Products (consumer and promotional products); Chief Executive Officer of Worldnet Communications, Inc. (telecommunications); Chief Executive Officer of PennCorp Financial Group, Inc. (financial services and insurance); Chief Financial Officer of Acordia, Inc. (financial services and insurance brokerage); and Chief Operating Officer of Borland International, Inc. (technology and software development).  I was a partner in the restructuring practices at Coopers & Lybrand LLC from 1995 to 1996 and Price Waterhouse LLC, where I was employed from 1981 to 1994.  I hold a Bachelor of Business Administration degree from the University of Kansas.

3.     On March 31, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Northern District of Texas (this "Court") for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code", and the Debtors' chapter 11 cases thereunder, these "Chapter 11 Cases").  To facilitate the Debtors' transition into chapter 11, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court (collectively, the "First

Day Motions"). The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value, by, among other things, the approval of the debtor-in-possession postpetition financing, the use of cash collateral, and the payment of certain tax, prepetition, and administrative obligations to facilitate the Debtors' restructuring efforts. The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

4.      As a result of my service with the Company, review of relevant documents, and discussions with other members of the Company's management team and its professionals, I am familiar with the Company and, in particular, the Debtors' day-to-day operations, business affairs, and books and records. I am authorized to submit this declaration (this "Declaration") in support of the Petitions and the First Day Motions to assist the Court and other parties in interest in understanding the Company's corporate history, business operations, prepetition corporate and capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Company's financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis.

## PRELIMINARY STATEMENT[2]

6.      The Debtors commence these Chapter 11 Cases with a restructuring support agreement (the "Restructuring Support Agreement" or the "RSA") supported by (i) each holder of claims under the Term Loan Credit Agreement and the Manager Advance Credit Agreement (collectively, the "Prepetition Lenders"), (ii) a substantial majority of certain holders of notes under the A&R Base Indenture (the "Ad Hoc Group of Noteholders"), and (iii) Hooters, Inc. and Hoot Owl Restaurants, LLC (together, the "Buyer Group").  The RSA follows months of diligence, discussions, and negotiations around value-maximizing, operationally focused restructuring transactions through a pre-arranged joint chapter 11 plan (the "Approved Plan"), which I believe will best position the Debtors for success.  Among other things, and as more fully described in the RSA, the RSA contemplates a sale transaction providing for the acquisition of a portfolio of certain Company-Owned Stores by the Buyer Group.  Importantly, the restructuring contemplated by the RSA will enable the Debtors to transition their business model from a hybrid structure of Company-Owned Stores and franchised stores to a pure franchise structure, which the Debtors believe will optimize their business.  These Chapter 11 Cases are also supported by up to $35 million of new money through a superpriority, senior-secured, priming debtor-in-possession term loan facility (the "DIP Facility") to be provided by certain of the existing lenders under the Prepetition Credit Agreements (the "DIP Lender"), which also includes a dollar-for-dollar roll-up of $5 million of the obligations under the Manager Advance Credit Agreement, which will provide the Debtors with sufficient liquidity to prosecute these Chapter 11 Cases, confirm the Approved Plan, and consummate the proposed sale transaction, while supporting their business throughout

---

[2]     Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them in this Declaration.

these Chapter 11 Cases.  The RSA contemplates a case timeline that will avoid disruption and the administrative burden of a lengthy process while providing sufficient time to effectuate the value-maximizing transactions contemplated by the RSA.

7.      Underpinning the broad support by the parties to the RSA is these parties' belief in the Company's business.  Founded in 1983 as a beachside diner in Florida, the Company has established itself as a globally recognized brand with a famed service model and a distinctive sports entertainment atmosphere.  The Company directly owns and operates 151 restaurants in 22 states and maintains franchise agreements with 154 franchised restaurants across 19 states and 17 countries in the Americas, Europe, Asia, and Africa.  The Company employs approximately 5,957 employees.

8.      Despite its success as a celebrated brand, the Company experienced a series of challenges in recent years, including inflationary pressures and industry headwinds, which significantly impacted the Company's performance.  Moreover, in 2024, approximately $30,942,066 in debt service payments and $3,039,420 in Legacy Royalty Obligations became due and payable, which, together with its burdensome lease obligations, compounded these challenges. In response, the Company (i) implemented operational improvement initiatives, (ii) has closed 48 unprofitable stores since the start of 2024, (iii) engaged professionals, including the retention of the CRO, with expertise in complex transactions to analyze strategic alternatives, including third-party financings, asset sales, and engagement with the Company's existing capital structure, to assess, among other things, comprehensive solutions, and (iv) supplemented its governance by appointing an experienced independent fiduciary to its board.

9.      From June to September 2024, the Company also (i) executed a series of amendments to the Term Loan Credit Agreement and (ii) entered into the Manager Advance Credit

Agreement to fund Manager Advances pursuant to the Management Agreement, each for the purpose of obtaining additional liquidity and extending the Company's liquidity runway as it sought a holistic solution to address its business challenges.  The Company then initiated a comprehensive outreach process seeking strategic alternatives with potential third-party lenders.

10.    Ultimately on March 31, 2025, after months of lengthy, good-faith negotiations and significant diligence exploring various alternatives, the Company executed the RSA with the Prepetition Lenders, the Buyer Group, and the Ad Hoc Group of Noteholders for a comprehensive restructuring transaction.  The Special Committee and the boards of managers of the Debtors, with the advice of their restructuring advisors, determined that it is in the best interest of the Company and its stakeholders to commence these Chapter 11 Cases to avail the Company of the "breathing spell" afforded by chapter 11 and to implement the transactions contemplated by the RSA.

11.    To assist the Court and parties in interest in understanding the Company's business and the relief the Debtors seek through the First Day Motions, this Declaration is organized in four parts:

- *Part I* describes the Company's corporate history and business operations;

- *Part II* describes the Company's prepetition capital structure;

- *Part III* describes the circumstances leading to the filing of these Chapter 11 Cases; and

- *Part IV* discusses the First Day Motions.

## BACKGROUND

### I.    Corporate History and Business Operations

12.    The Hooters brand was originally founded by Hooter's, Inc. in Clearwater, Florida in 1983.  Following its early success as a beachside diner, the Company grew to amass an expansive network of Company-owned and franchised locations and established Hooters as the

household name that it is today: a renowned American institution known for world-famous chicken wings, beverages, live sports, and legendary hospitality. The Company offers a relaxed, fun dining experience that blends the classic sports bar vibe with a guest-friendly atmosphere and distinguishes itself from competitors by emphasizing personal service and customer enjoyment.

13.    Today, the Company directly owns and operates 151 traditional sit-down Hooters restaurants and maintains 154 franchised locations. In 2017, the Company introduced Hoots, its modern, fast-casual, wings-focused restaurant platform, to compete in the wings-to-go and fast-casual sector, which now includes three franchised locations. Through its continued growth, the Company's footprint is now both nationwide and global. The Company possesses a sizable social media presence, and its reach is substantially extended through the digital marketing efforts of its employees and iconic brand ambassadors.

### A.    The Debtors' Workforce and Headquarters

14.    As of the Petition Date, the Debtors employ approximately 5,957 employees, including approximately 1,945 full-time employees and 4,012 part-time employees. Of the Debtors' employees, approximately 559 are salaried employees and 5,398 are paid hourly. The majority of the Debtors' workforce is spread throughout the country at the Debtors' various restaurant locations and their Atlanta, Georgia corporate headquarters. The Debtors do not have any unionized employees.

### B.    Business Segments

15.    The Company's revenue derives primarily from two business segments: (i) Franchise and License Agreements and (ii) Company-Owned Stores (each as defined below).

### 1.    Franchise & License Agreements

16.    The Company generates revenue through restaurant franchise agreements with franchisees (the "<u>Franchise Agreements</u>") by collecting certain franchise fees and royalties and

providing certain services to support the franchised restaurants. The Company is party to Franchise Agreements with 35 franchisees who operate 154 franchisee restaurants in total, and it provides certain services such as back-office, branding, marketing and other operational support to the franchisees to promote quality and consistency across its portfolio. In addition, the Company entered into a licensing agreement with a major food products licensor in 2024 for the manufacturing, supply, and distribution of Hooters-branded frozen meals and other food products in grocery stores across the country. Franchise Agreements and licenses generated approximately $22.6 million of revenue in fiscal year 2024, with no associated costs of sales.

### 2.      Company-Owned Stores

17.     The Company also directly owns and operates 151 Hooters restaurants (the "Company-Owned Stores"). The revenue of the Company-Owned Stores comes from three major categories: (i) food; (ii) bar; and (iii) merchandise. The Company-Owned Stores generated approximately $358.9 million of revenue in fiscal year 2024. In 2024, food sales accounted for $254.4 million (71% of Company-Owned Stores' revenue), bar sales accounted for $101.4 million (28% of Company-Owned Stores' revenue), and merchandise sales accounted for $3.1 million (1% of Company-Owned Stores' revenue). Despite providing the vast majority of the Company's revenue, and as discussed in greater detail below, Company-Owned Stores in recent years have, in general, not covered the Company's overhead expenses, and the need to reconfigure the loss-generating Company-Owned Stores is a key factor driving these Chapter 11 Cases.

## II.      The Debtors' Prepetition Corporate and Capital Structure

18.      A chart summarizing the Debtors' corporate structure is attached hereto as **Exhibit A**.  As of the Petition Date, the Debtors have funded principal debt obligations of approximately $376 million, consisting of obligations under the (i) Term Loan Credit Agreement; (ii) Manager Advance Credit Agreement; and (iii) A&R Base Indenture (all as defined herein).

19.      The following table summarizes the Debtors' funded debt obligations as of the Petition Date.

| Loans/Notes | Approx. Principal Amount Outstanding as of the Petition Date | Rate (Maturity) | Security |
|---|---|---|---|
| **Manager Advance Credit Agreement** | | | |
| Manager Advance Loans | $8,386,877, plus accrued and unpaid fees and expenses | Prime + 3% (Maturity: August 20, 2025) | Substantially all assets of the Loan Parties including the priority right to reimbursement of Manager Advances |
| Incremental Loan | $5,000,000, plus accrued and unpaid fees and expenses | | |
| **Term Loan Credit Agreement** | | | |
| Term Loans | $55,976,213, plus accrued and unpaid fees and expenses | 10.5% (Maturity: March 9, 2027) | Substantially all assets of the Loan Parties including the priority right to reimbursement of Manager Advances |
| **A&R Base Indenture** | | | |
| Class A-2 Notes | $266,579,032 | 4.723%, with a step-up following the Anticipated Repayment Date (Anticipated Repayment Date: August 2026) (Maturity: August 2051) | First lien on all assets of Securitization Entities (as defined below) |
| Class B Notes | $40,000,000 | 7.432%, with a step-up following the Anticipated Repayment Date (Anticipated Repayment Date: August 2026) (Maturity: August 2051) | Second lien on all assets of Securitization Entities |
| **Total (Approx.)** | **$375,942,122** | | |

A.     **Securitization Debt**

1.     **A&R Base Indenture**

20.     On August 19, 2021, HOA Funding, LLC, as master issuer (the "Master Issuer"),
entered into that certain Amended and Restated Base Indenture, by and among the Master Issuer
and Citibank, N.A., as Trustee and Securities Intermediary (the "Trustee") (the "A&R Base
Indenture").  Under the A&R Base Indenture, the Master Issuer issued two series of notes on
August 19, 2021: (i) $275,000,000 of Class A-2 senior secured notes (the "Class A-2 Notes") and
(ii) $40,000,000 of junior subordinated notes (the "Class B Notes", together with the Class A-2
Notes, the "Notes", and such holders of Notes the "Noteholders").

21.     As of the Petition Date, approximately $267 million of Class A-2 Notes and
$40 million of Class B Notes in principal remain outstanding, in addition to amounts owing from
accrued and unpaid interest.

22.     From time to time, in the ordinary course of business, Hooters of America,
LLC ("HOA"), in its capacity as manager of the Securitization Entities (as defined below),
advances funds to, and on behalf of, the Securitization Entities (each such advance, a "Manager
Advance") in connection with the operation of the assets securitized pursuant to the A&R Base
Indenture.  The Securitization Entities are obligated to reimburse such Manager Advances on a
priority basis as provided in that certain Amended and Restated Management Agreement, dated as
of August 19, 2021, by and among the Securitization Entities, HOA (as the manager of the
Securitization Entities), and the Trustee (as the same may be further amended, amended and
restated, supplemented or otherwise modified from time to time) (the "Management Agreement").
HOA's priority right to reimbursement of the Manager Advances is part of the Prepetition Lenders'
collateral under the Term Loan Credit Agreement (as defined below) and the Manager Advance
Credit Agreement (as defined below).

23.     The A&R Base Indenture, among other things, lays out a 30-step payment waterfall for application of funds the Securitization Entities receive from the operation of Company-Owned Stores and franchised restaurants.  Under the payment waterfall, certain fixed expenses to operate the Securitization Entities are given priority.  In particular, payments to HOA to reimburse Manager Advances are second in the payment waterfall.  Payment of the securitization manager's management fee is fourth.  In respect of payments to noteholders, the Class A-2 Notes interest payments are sixth in the payment waterfall, while the Class B Notes interest payments are eighth. The Class A-2 Notes amortization payments are tenth and fourteenth.  Amortization payments for the Class B Notes are twentieth and twenty-first.  The Master Issuer's right to dividend proceeds is the last step of the payment waterfall.

24.     The Notes are secured by substantially all of the assets of the Securitization Entities arising from that certain Amended and Restated Guarantee and Collateral Agreement, dated as of August 19, 2021, by and among HOA Systems, LLC, HOA Holdco, LLC, HOA Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOOTS Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA Towson, LLC, HI Limited Partnership, HOA IP GP, LLC, HOA Franchising, LLC, HOOTS Franchising, LLC (collectively, the "Securitization Guarantors", together with the Master Issuer, the "Securitization Entities") and the Trustee.

**B.      Non-Securitization Debt**

**1.      Term Loan Credit Agreement**

25.     On March 9, 2022, Hawk Parent LLC ("Hawk Parent") as the borrower, HOA Holdings, LLC, Night Owl, LLC, Owl Wings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, Derby Wings Holdings, LLC, Derby Wings, LLC, Hooters of America, LLC, Owl Holdings, LLC, Elf Owl Investments, LLC, TW Lonestar Wings, LLC, Alamo Wings,

LLC, as guarantors (together with Hawk Parent, the "Loan Parties"), XYQ Cayman Ltd. as Initial

Lender (in such capacity, the "Term Loan Lender") and U.S. Bank and Trust Company, National

Association as collateral agent and calculation agent (in such capacity, the "Term Loan Agent")

entered into that certain Credit Agreement dated March 9, 2022 (as amended by that certain First

Amendment to the Credit Agreement, dated November 14, 2022, that certain Second Amendment

to the Credit Agreement, dated as of December 27, 2022, that certain Third Amendment to the

Credit Agreement, dated April 3, 2023, that certain Fourth Amendment to the Credit Agreement,

dated April 20, 2023, that certain Fifth Amendment to the Credit Agreement, dated January 10,

2024, that certain Limited Waiver, Consent and Sixth Amendment to the Credit Agreement, First

Amendment to the Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan

Documents, dated as of June 24, 2024, that certain Limited Waiver, Consent and Seventh

Amendment to Credit Agreement and Reaffirmation of Loan Documents, dated as of August 16,

2024, that certain Limited Waiver, Consent and Eighth Amendment to Credit Agreement, Second

Amendment to Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan

Documents (the "Eighth Amendment to the Credit Agreement"), and as further amended, restated,

supplemented, amended and restated or otherwise modified from time to time prior to the Petition

Date, the "Term Loan Credit Agreement").

26.    Pursuant to the Term Loan Credit Agreement, the Term Loan Lender made term

loans in the aggregate principal amount of $70,000,000 to Hawk Parent (the "Term Loans").  The

Term Loans under the Term Loan Credit Agreement have a maturity date of March 9, 2027, and

bear interest at a rate of 10.5%. Collateral securing obligations under the Term Loan Credit

Agreement consists of substantially all assets of the Loan Parties, including the priority right to

reimbursement of the Manager Advances.  As of the Petition Date, approximately $56 million of

principal remains outstanding under the Term Loans, in addition to amounts owing from accrued and unpaid interest and fees.

### 2.    Manager Advance Credit Agreement

27.    On September 27, 2024, the Loan Parties, Celtic Master Fund LP as Initial Lender (in such capacity, the "Manager Advance Lender") and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent (the "Manager Advance Agent") entered into that certain Credit Agreement (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025, by and among the Loan Parties, the Manager Advance Lender and the Manager Advance Agent (the "Incremental Loan"), as further amended, amended and restated, supplemented or otherwise modified from time to time, the "Manager Advance Credit Agreement" and together with the Term Loan Credit Agreement, the "Prepetition Credit Agreements"). Pursuant to the Manager Advance Credit Agreement, the Manager Advance Lender made an initial term loan in the aggregate principal amount of $8,386,877 (the "Manager Advance Loan"), which funds were used as a Manager Advance to fund the expenses of the Securitization Entities.

28.    On February 21, 2025, the parties entered into the Incremental Loan, pursuant to which (i) the Manager Advance Lenders (a) provided a $5 million Incremental Loan under the Manager Advance Credit Agreement and (b) agreed to waive certain requirements under the Manager Advance Credit Agreement; and (ii) the Loan Parties agreed to certain milestones. The additional liquidity provided by the Prepetition Lenders to the Company allowed the Company to continue operating as a going concern while it finalized negotiations with the parties to the RSA regarding the terms of the transactions contemplated by the RSA.

29.    As of the Petition Date, approximately $13.4 million of principal remains outstanding under the Manager Advance Credit Agreement, in addition to amounts owing from accrued and unpaid interest and fees.

### 3.    Intercreditor Agreement

30.    On September 27, 2024, the Term Loan Agent, the Manager Advance Agent, Hawk Parent, and the guarantors party thereto entered into that certain Pari Passu Intercreditor Agreement (the "Intercreditor Agreement"), which provides that obligations under the Term Loan Credit Agreement and the Manager Advance Credit Agreement are equal in priority with respect to the collateral shared between the two facilities.

### C.    Legacy Liabilities

31.    HOA and HI Limited Partnership ("HILP") are parties to the Assumption, Indemnification and Hold Harmless Debtor Substitution and Release Agreement, dated as of March 21, 2001, pursuant to which the Company pays, on average, approximately $4.2 million per year on account of purported legacy royalty obligations (the "Legacy Royalty Obligations") to Lags Equipment, LLC ("LAGS"). These purported obligations include a monthly royalty in perpetuity in the amount of three percent (3%) of the gross sales of the Company-Owned Stores using the Hooters® trademark and indicia in certain geographical locations.[3]

### D.    Trade Claims and Other Unsecured Debt

32.    In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, critical vendors. As of the Petition Date, the Debtors estimate they have approximately $26.3 million in accounts payable outstanding

---

[3]    The Company does not concede nor consent to such Legacy Royalty Obligations as being true royalties and generally reserves all rights and defenses in connection with the Legacy Royalty Obligations and to challenge any purported liens asserted in connection therewith.

before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9) of the Bankruptcy Code, as well as claims that give rise to statutory constructive trusts under the Perishable Agricultural Commodities Act of 1930 or the Packers and Stockyards Act of 1921).

## III.    Events Leading to These Chapter 11 Cases

33.    As detailed herein, these Chapter 11 Cases arose due to several factors that affected the Company's performance and liquidity and led to the need to substantially alter the Company's operating model, shifting from a hybrid of Company-Owned Stores and franchised stores to solely a franchise model, close underperforming stores, and reduce and simplify corporate overhead and infrastructure.  Accordingly, the Debtors have determined that seeking relief under chapter 11 and continuing their efforts to implement value-maximizing transactions pursuant to the Bankruptcy Code's protections and procedures is the best approach for the Debtors to maximize value for all stakeholders.

### A.    Operational Challenges and Capital Structure Overhang

### 1.    Inflationary Pressure and Industry Headwinds

34.    Inflationary pressures across various sectors have negatively impacted the Company's performance and financials.  In particular, increases in the cost of labor and commodities in recent years have raised the cost of "dining out," a cost which the Company has borne directly with respect to the Company-Owned Stores and has been unable to fully negate through top-line growth.  Like many other similarly situated casual dining restaurants, the Company's performance is acutely impacted by consumer preferences.  As inflationary pressures have made consumers increasingly cost-conscious, preferences for casual out-of-home dining experiences began to shift to more cost-efficient alternatives.  As a result, the Company began facing an increasingly tight liquidity crunch at the same time that it most needed cash reserves to

adapt to industry-wide changes.  This strain on the Company's liquidity has inhibited the Company from making certain key capital and other expenditures for the purposes of operational improvement, including expenditures related to restaurant maintenance and refurbishments, employee training, and menu updates, which has further adversely affected the Company's performance and financial health.  The Company's lagging performance paired with the difficult macroeconomic environment have also forced the Company to close of certain of the Company-Owned Stores across various locations, exposing the Company to various litigation risks related thereto, including with respect to lease obligations.

### 2.    Capital Structure Overhang

35.    These operational challenges have, in turn, hampered the Company's ability to meet its funded debt obligations, as critical funds were used to cover operating losses.  As noted above, the Company's debt balance totals approximately $376 million.  In 2024, the Company owed $30,942,066 in debt service payments.  The Company estimates that debt-service payments for 2025 under the current capital structure will total approximately $19 million if its capital structure remains unchanged.  The substantial size of the Company's debt-service obligations has put significant pressure on the business.  The Company also has upcoming interest payments, with $3.9 million coming due on May 20, 2025 under the A&R Base Indenture.  The Company's capital structure is further burdened by the approximately $353,000 average monthly payments it allegedly owes on account of the Legacy Royalty Obligations.

### B.    Prepetition Operational Initiatives

36.    Prior to the filing of these Chapter 11 Cases, the Company took several actions to improve its operating performance.  Since the beginning of 2024, the Company has identified and since closed 48 underperforming Company-Owned Stores in order to streamline its business and improve its financial performance.  The Company initiated a guest-obsessed training program for

all staff and managers at its remaining locations, which has produced meaningful improvements in customer experience. The Company also recently began an aggressive pursuit of retail partnerships, and in 2024 entered into a licensing agreement with a major grocery store chain to offer shoppers Hooters-branded frozen meal products at approximately 1,250 grocery stores around the United States.

### C.      Strategic Review and Lender Engagement

#### 1.      Engagement of Restructuring Advisors

37.      The Company engaged Ropes & Gray LLP ("Ropes & Gray") and myself and my team at Accordion in June 2024, among other things, advise the Company with respect to prepetition restructuring initiatives, assist in the Company's operational and strategic analyses, engage with the Company's creditors, vendors, customers, and other parties in interest, prepare outreach initiatives and diligence materials for prospective counterparties to a transaction to address the Company's financial challenges, and, if necessary, advise the Company's preparation of a chapter 11 filing. Effective June 6, 2024, I was appointed as the Company's CRO in furtherance of such efforts. In October 2024, the Company also engaged SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (together, "SOLIC") as investment banker to the Company to assess and advise the Company with respect to a wide range of strategic alternatives, prepare a plan for strategic engagement to maximize value for the Company's stakeholders, and develop and prepare materials for a marketing process in furtherance of that plan.

#### 2.      Appointment of Independent Manager and Special Committee

38.      In July 2024, an experienced, independent fiduciary, Adam Paul, was appointed to the boards of managers of Hawk Parent, HOA Holdings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, and HOA as an independent manager (the "Independent Manager"). Currently the President of AP Advisors LLC and a Senior Managing Director of Gordian Group,

LLC, Mr. Paul has over 25 years of experience representing both debtor and creditor clients in complex US and Non-US reorganizations, both in and out of court, and advising boards of directors and senior officers regarding fiduciary duties and restructuring strategies. Mr. Paul has been included in *Chambers USA, America's Leading Lawyers for Business*, *IFLR 1000* and *The Legal 500*. Mr. Paul has been nominated for numerous awards personally including for Lawyer of the Year-Restructuring and Insolvency by the IFLR and his work has frequently won deal of the year awards at leading restructuring awards programs, such as those organized by the Turnaround Management Association, IFLR, GRR and The American Lawyer. In furtherance of the Company's strategic efforts, Hawk Parent's board of managers established a special committee to direct and oversee these efforts (the "Special Committee"), including by granting the Special Committee the authority to approve the filing of the Petitions, and appointed Mr. Paul as the Special Committee's sole member.

### 3. Financing Efforts and Strategic Engagement

39. In June 2024, as the Company faced liquidity issues, the Company negotiated with its Term Loan Lenders and entered into certain covenants under the Term Loan Credit Agreement allowing the Debtors to access and use $2 million previously required to be held in an operating account pursuant to a minimum cash covenant. In September 2024, the Company negotiated and entered into (i) the Eighth Amendment to the Credit Agreement and (ii) the Manager Advance Credit Agreement, pursuant to which $8,386,877 held in the restricted cash reserve account under the Term Loan Credit Agreement was released to pay down the Term Loan and was simultaneously re-lent by the Manager Advance Lender as the Manager Advance Loan under the Manager Advance Credit Agreement. In November 2024, the Company obtained the consent of the requisite percentage of the Noteholders with respect to the A&R Base Indenture to allow the Debtors to access and use $3,393,995 previously required to be held in an interest reserve account.

As a result, the Company obtained access to a total of approximately $13.8 million of cash for use in operations throughout June and September 2024, extending the Company's liquidity runway as it sought long-term strategic alternatives to address its operating challenges.

40.     In November 2024, SOLIC initiated a comprehensive process to seek strategic alternatives.  Overall, SOLIC contacted over 95 potential third-party investors and executed confidentiality agreements with 38 parties, to whom SOLIC provided access to key information about the Company's business for the evaluation of a potential transaction.  Among other things, the Company held extensive diligence calls to explain the Company's business trajectory and profile and sought to encourage parties to engage constructively in turn.

41.     In March 2025, after months of good-faith, arm's-length negotiations, the Company determined in its business judgment that the transactions contemplated by the RSA are in the best interest of the Company and its stakeholders.

42.     Importantly, the RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of a substantial majority of the Company's creditor stakeholders.  The transactions contemplated by the RSA enable the Debtors to achieve a three-pronged operational overhaul.

43.     First, the RSA provides a non-binding commitment for the sale of certain Company-Owned Stores to the Buyer Group through a chapter 11 plan of reorganization.

44.     Second, by way of the proposed sale transaction, the RSA contemplates a transition from a hybrid business model involving both Company-Owned Stores and franchised stores to a pure franchise model.  This transition will allow the Company to optimize its business by significantly reducing overhead costs while maximizing revenues from franchisees, an approach which has proven to be more profitable than that of the Company operating stores directly.

45.     Third, the RSA provides for the infusion of up to $35 million of new money in the form of the DIP Facility, which also includes a dollar-for-dollar roll-up of $5 million of the obligations under the Manager Advance Credit Agreement, which, if approved, will allow the Company to make necessary expenditures to administer these Chapter 11 Cases. [4]  Upon confirmation of the Approved Plan, existing debt will be converted into new notes and equity in the go-forward business that, together with the sale contemplated by the RSA, will right-size the Company's balance sheet and provide the way for a profitable go-forward business.

46.     These transactions are made possible by the RSA, which presents the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise. The signing of the RSA was undertaken only after careful consideration by the Company's management and the Special Committee.  Critically, the Debtors' obligations under the RSA remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates.  Based on the foregoing, the Company believes it has exercised reasonable business judgment in its decision to execute the RSA, and that such execution is in the best interest of all parties in interest.

## IV.    First Day Motions and Related Relief Requested

47.     In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety. [5]

---

[4]    Please refer to the DIP Motion for further specifics of the DIP Facility, including the ability of the Debtors to upsize the DIP Facility under certain circumstances and with the requisite consent.

[5]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

(i)     **Administrative Motions:**

    (1)    <u>Joint Administration Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

    (2)    <u>Claims Agent Application</u>.  *Debtors' Emergency Application for Appointment of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent;*

    (3)    <u>Creditor Matrix Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated Top 30 Creditors List, (C) Serve Certain Parties in Interest by Email, (D) Redact Certain Personally Identifiable Information of Individuals, (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Bar Dates, and (III) Granting Related Relief;* and

    (4)    <u>Schedules and SOFA Extension Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief.*

(ii)    **Financing Motions:**

    (5)    <u>DIP Motion</u>.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief.*

(iii)   **Operational Motions:**

    (6)    <u>Cash Management Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief;*

    (7)    <u>Insurance Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Prepetition Insurance Program and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase*

*Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain Their Surety Bond Program, and (II) Granting Related Relief;*

(8)   Taxes Motion. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

(9)   Utilities Motion. *Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (II) Granting Related Relief;*

(10)  Wages Motion. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief;*

(11)  Critical Vendor Motion. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, Section 503(b)(9) Claimants, and PACA/PASA Claimants, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests, and (III) Granting Related Relief;*

(12)  Customer Programs Motion. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Their Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

(13)  Lease Rejection Motion. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Rejection of Certain Nonresidential Real Property Leases, (II) Abandoning Certain Personal Property, and (III) Granting Related Relief; and*

(14)  Contract Rejection Procedures Motion. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief.*

48.   The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay claims of certain taxing authorities

and critical vendors, continue to honor certain customer programs, extend the deadline for filing schedules of assets and liabilities and statements of financial affairs, reject certain unexpired leases, continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Chapter 11 Cases, and obtain debtor-in-possession financing to fund the costs of administering these Chapter 11 Cases and the Debtors' ongoing business operations. For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

49.    The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

50.    I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors, and I can attest to such facts. I believe the relief requested in each of the First Day Motions listed above (i) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these Chapter 11 Cases, (ii) is critical to ensure the maximization of value of the Debtors' estates, (iii) is essential to achieving a successful reorganization, and (iv) serves the best interests of the Debtors' stakeholders.

## CONCLUSION

51.     The Debtors' ultimate goal in these Chapter 11 Cases is to achieve an orderly, efficient, consensual, and successful reorganization and value maximizing result for the Debtors' stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 31, 2025

/s/ *Keith Maib*

Keith Maib
Chief Restructuring Officer
Hooters of America, LLC, and its debtor affiliates

## EXHIBIT A

**Organizational Structure Chart**

