**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: chris.dickerson@ropesgray.com
        rahmon.brown@ropesgray.com
        michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: honeil@foley.com
        sajones@foley.com
        zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

### DISCLOSURE STATEMENT FOR
### JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF HOOTERS OF AMERICA, LLC AND ITS DEBTOR AFFILIATES

THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY JUNE 24, 2025, AT 4:00 P.M. (CENTRAL TIME) (THE "**VOTING DEADLINE**").

THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS THE FIRST DATE OF THE HEARING TO APPROVE THE DISCLOSURE STATEMENT, WHICH WAS MAY 19, 2025 (THE "**VOTING RECORD DATE**").

A HEARING TO CONSIDER CONFIRMATION OF THE PLAN AND FINAL APPROVAL OF THIS DISCLOSURE STATEMENT (THE "**COMBINED HEARING**") WILL BE HELD BEFORE THE HONORABLE SCOTT W. EVERETT, UNITED STATES BANKRUPTCY JUDGE, VIRTUALLY, TELEPHONICALLY, AND VIA WEBEX, ON JULY 1, 2025, AT [●] [●].M. (CENTRAL TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.  THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE JUNE 24, 2025, AT 4:00 P.M.  (CENTRAL TIME).

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**.  THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

**SECURITIES LAW NOTICES**: NEITHER THIS DISCLOSURE STATEMENT NOR THE MOTION SEEKING APPROVAL THEREOF CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.

THE OFFERING, ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF THE NEW EQUITY INTERESTS TO HOLDERS OF ALLOWED SECURITIZATION NOTE CLAIMS AND THE HOLDERS OF ALLOWED NON-SECURITIZATION MANAGER ADVANCE TERM LOAN CLAIMS SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, EXCEPT WITH RESPECT TO ANY NEW EQUITY INTERESTS ISSUED TO AN ENTITY THAT IS AN "UNDERWRITER" WITH RESPECT TO SUCH NEW EQUITY INTERESTS, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, WHICH SHALL BE ISSUED IN RELIANCE UPON SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER AND ON EQUIVALENT STATE LAW REGISTRATION EXEMPTIONS OR, SOLELY TO THE EXTENT SUCH EXEMPTIONS ARE NOT AVAILABLE, OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT.

**WITH RESPECT TO THE FOREGOING SECURITIES ISSUED PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS (I) AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, (II) IS AN "AFFILIATE" OF THE ISSUER (AS DEFINED IN RULE 144(A)(1) IN THE SECURITIES ACT), OR (III) HAS BEEN SUCH AN "AFFILIATE" WITHIN NINETY (90) DAYS OF SUCH TRANSFER, IN EACH CASE SUBJECT TO THE RESTRICTIONS, IF ANY, ON THE TRANSFERABILITY THEREOF IN THE SHAREHOLDERS AGREEMENT, IF ANY, AND THE NEW ORGANIZATIONAL DOCUMENTS.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.**

**THE OFFERING, ISSUANCE, AND DISTRIBUTION OF THE NEW DEBT PURSUANT TO <u>ARTICLE II</u> AND <u>ARTICLE III</u> OF THE PLAN AND, WHERE APPLICABLE, IN ACCORDANCE WITH THE TERMS OF THE CONFIRMATION ORDER, SHALL BE EXEMPT FROM, AMONG OTHER THINGS, THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT AND ANY OTHER APPLICABLE UNITED STATES OR STATE SECURITIES LAWS PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION EXEMPTIONS OR, SOLELY TO THE EXTENT SUCH EXEMPTIONS ARE NOT AVAILABLE, OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT. ACCORDINGLY, THE NEW DEBT, AND ANY NEW EQUITY INTERESTS ISSUED PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT, IF ANY, WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OR RULE 144A OF THE SECURITIES ACT, AND SUBJECT, FURTHER, TO ANY RESTRICTIONS ON TRANSFERABILITY THEREOF INCLUDED IN THE NEW NOTES DOCUMENTS, THE SHAREHOLDERS AGREEMENT, IF ANY, AND THE NEW ORGANIZATIONAL DOCUMENTS, AS APPLICABLE.**

**THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.**

**THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE**

**ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT, AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "CONTINUE," OR THE NEGATIVES THEREOF, AS WELL AS ANY SIMILAR OR COMPARABLE LANGUAGE.   FORWARD-LOOKING STATEMENTS ARE INHERENTLY SPECULATIVE, AND ARE BASED ON ESTIMATES AND ASSUMPTIONS.   THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.   FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.**

**FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.   IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL HEREIN.   PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.   THE DEBTORS AND WIND-DOWN ENTITY, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................... 1

    A.    Background and Overview of the Plan ................................................... 2

    B.    Restructuring Support Agreement ........................................................ 7

    C.    DIP Claims and Exit Facility ............................................................... 9

II. OVERVIEW OF THE DEBTORS' OPERATIONS AND PREPETITION EVENTS
LEADING TO THE CHAPTER 11 FILING .............................................................. 9

    A.    The Debtors' Business Operations ....................................................... 9

    B.    The Debtors' Corporate Structure ..................................................... 10

    C.    Prepetition Capital Structure .............................................................. 10

    D.    Events Leading to Commencement of the Chapter 11 Cases................... 15

III. OVERVIEW OF THE CHAPTER 11 CASES.................................................... 18

    A.    Commencement of Chapter 11 Cases.................................................. 18

    B.    First Day Motions ............................................................................ 18

    C.    Procedural Motions .......................................................................... 19

    D.    Retention of Chapter 11 Professionals ............................................... 20

    E.    Appointment of Creditors' Committee................................................ 20

    F.    Claims Bar Dates ............................................................................. 20

    G.    Exclusivity ...................................................................................... 20

    H.    Executory Contracts and Unexpired Leases ........................................ 21

    I.    Landlord Negotiations ...................................................................... 21

    J.    LAGS Royalties .............................................................................. 21

IV. SUMMARY OF THE PLAN .......................................................................... 21

    A.    General............................................................................................ 21

    B.    Administrative Claims and Priority Claims......................................... 22

    C.    Classification and Treatment of Claims and Interests ........................... 25

    D.    Means for Implementation of the Plan ................................................ 34

    E.    Treatment of Executory Contracts and Unexpired Leases ..................... 44

    F.    Provisions Governing Distributions ................................................... 47

    G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .............. 54

    H.    Settlement, Release, Injunction, and Related Provisions ........................... 58

I.    Conditions Precedent to Consummation of the Plan ................................................. 64

J.    Modification, Revocation, or Withdrawal of the Plan .............................................. 67

K.    Retention of Jurisdiction ......................................................................................... 68

L.    Miscellaneous Provisions ........................................................................................ 71

V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........ 73

A.    Continuation of the Chapter 11 Cases ..................................................................... 73

B.    Liquidation under Chapter 7 .................................................................................... 74

VI. CERTAIN SECURITIES LAW MATTERS ...................................................................... 74

A.    Section 1145 of the Bankruptcy Code ..................................................................... 75

B.    Section 4(a)(2) of the Securities Act ....................................................................... 76

VII. CERTAIN TAX CONSEQUENCES OF THE PLAN ....................................................... 78

A.    Consequences to Debtors ........................................................................................ 79

B.    Consequences to Holders of Certain Claims ........................................................... 81

C.    Withholding on Distribution and Information Reporting .......................................... 86

VIII. VOTING PROCEDURES AND REQUIREMENTS ........................................................ 86

A.    Voting Agent ........................................................................................................... 86

B.    Voting Deadline ....................................................................................................... 87

C.    Form, Content, and Manner of Notices .................................................................... 87

D.    Voting and Tabulation Procedures ........................................................................... 93

E.    Further Information, Additional Copies .................................................................... 98

IX. RISK FACTORS TO CONSIDER BEFORE VOTING ...................................................... 99

A.    General ..................................................................................................................... 99

B.    Factors Relating to the Debtors' Business Operations and Financial Condition ........ 99

C.    Certain Bankruptcy Law Considerations ................................................................ 101

D.    Factors Relating to Securities to Be Issued ........................................................... 102

E.    Factors Related to the DIP Facility, the Exit Facility, and the Restructuring Support
Agreement .............................................................................................................. 104

F.    Additional Factors ................................................................................................. 105

X. CONFIRMATION OF THE PLAN ................................................................................... 106

A.    Acceptance of the Plan .......................................................................................... 106

B.    Best Interests Test ................................................................................................. 107

C.    Feasibility .............................................................................................................. 108

D.    Valuation ............................................................................................................... 109

    E.     Notice and Combined Hearing ................................................................................ 109

XI. CONCLUSION AND RECOMMENDATION .................................................................. 108

EXHIBIT A:  Plan
EXHIBIT B:  Restructuring Support Agreement
EXHIBIT C:  Debtors' Organizational Structure
EXHIBIT D:  Financial Projections
EXHIBIT E:  Liquidation Analysis

# I.    INTRODUCTION

Hooters of America, LLC and certain of its affiliates, as debtors and debtors in possession (the "**Debtors**" and, together with their non-Debtor affiliates, "**Hooters**" or the "**Company**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "**Disclosure Statement**")[2] to certain holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Debtor Affiliates* dated May 5, 2025 (as may be amended, supplemented, or modified from time to time, the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor.

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises holders of Claims and Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and should be confirmed.

By Order dated [●], 2025 [Docket No. [●]] (the "**Conditional Disclosure Statement Order**"), the Bankruptcy Court conditionally approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code.  The Debtors will seek final approval of this Disclosure Statement at the Combined Hearing.  The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS.  THEREFORE, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, BY AND AMONG THE DEBTORS, THE PREPETITION LENDERS, THE CONSENTING AHG NOTEHOLDERS, AND THE BUYER GROUP, THE PLAN IS CURRENTLY SUPPORTED BY EACH OF THE PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT.**

---

[2]    Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or as the context otherwise requires.  The summary provided in this Disclosure Statement of any documents attached to the Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.

A. **Background and Overview of the Plan**[3]

The Plan encompasses a comprehensive restructuring of the Debtors, which is the product of the Debtors' arm's-length negotiations and an agreement with (i) certain holders of indebtedness arising under (x) the Amended and Restated Base Indenture (the "**Prepetition Securitization Indenture**"), dated August 19, 2021 by and between HOA Funding, LLC as the master issuer and Citibank, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee (the "**Prepetition Securitization Trustee**", and such holders forming the Ad Hoc Group the "**Consenting AHG Noteholders**" and such holders with the same investment advisor as the DIP Lenders, the "**DIP Noteholders**"), (y) the Prepetition MA Credit Agreement, and (z) the Prepetition Term Loan Credit Agreement (such holders, the "**Prepetition Lenders**") and (ii) Hooters, Inc. and Hoot Owl Restaurants, LLC (collectively, the "**Buyer Group**").

The transactions contemplated in the Plan will maximize value and allow for the Debtors' business to reorganize with a substantially reduced debt load and increase their cash flow on a go-forward basis. Specifically, the proposed restructuring contemplates, among others, things:

- consummation of a sale transaction with the Buyer Group pursuant to the Plan, which shall comprise of (i) the Buyer Group acquiring a portfolio of 103 Debtor-owned stores, and (ii) a wind down process for the remaining Debtor-owned stores (the "**Unallocated Stores**") pursuant to terms mutually agreed upon by the Debtors, DIP Lenders, and Consenting Creditors;

- with respect to the Securitization Entities:

  - the renaming of HOA Funding, LLC as "RoyaltyCo, LLC" ("**RoyaltyCo**") whose subsidiaries will continue to own the intellectual property and collect RoyaltyCo's shares of royalty and revenues from licenses and franchise agreements and payments from all franchised stores;

  - the issuance of New Class A-2I Notes to Holders of Securitization Class A-2 Note Claims;

  - the issuance of New Class B Notes to Holders of Securitization Class B Note Claims;

- With respect to the Non-Securitization Entities and RoyaltyCo:

  - The conversion of the DIP Facility into New Class A-1 Notes;

  - The issuance of New Class A-2II Notes to Holders of certain Non-Securitization Manager Advance Term Loan Claims;

---

[3]    **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

- The compromise and cancellation of Non-Securitization Term Loan Claims (Secured), representing the Parent Funded Debt Claims in excess of the value of the Securitization Manager Advance Claims;

- the acquisition of 50% of the equity interests in RoyaltyCo by Holders of certain Non-Securitization Manager Advance Term Loan Claims, with the remaining 50% of the equity interest in RoyaltyCo (the "**Noteholder Equity Entitlement**") to be allocated among the holders of Securitization Class B Notes Claims on a pro rata basis in accordance with their respective holdings of the Securitization Class B Notes Claims;

- the creation of a new entity ("**Brand Co.**") to be owned by the Buyer Group which will be engaged by RoyaltyCo pursuant to a brand management agreement (the "**Brand License Agreement**"), pursuant to which Brand Co. will oversee all brand-related, franchising-related, and management-related functions; and

- subject to the Wind-Down Budget and terms of the Plan, the orderly wind down of the Debtors' estates, including the Unallocated Stores on terms mutually agreed upon by the DIP Lenders, the Debtors, and the Consenting Creditors.

**In the event the Debtors proceed to confirmation under a different structure than currently contained in the Plan, holders of Claims or Interests could receive different forms of consideration than currently contemplated under the Plan. Pursuant to Bankruptcy Rule 3019, and subject to the terms of the Restructuring Support Agreement, the Debtors may proceed to confirmation under such a modified Plan without resoliciting votes on the Plan so long as the modified Plan does not adversely change the treatment of the Claim or Interest of any holder thereof. If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not adversely change the treatment of the Claim or Interest of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims or Interests who have previously accepted the Plan. For the avoidance of doubt, any and all rights of holders of Claims against the Debtors or Interests in the Debtors are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.**

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan:

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 1<br><br>Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: 100% |
| 2<br><br>Securitization Class A-2 Note Claims | Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, New Class A-2I Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Note Claims are Allowed in full. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●] % |
| 3<br><br>Securitization Class B Note Claims | On or after the Effective Date, each holder of Securitization Class B Notes will receive (i) its Pro Rata share of the Noteholder Equity Entitlement and (ii) New Class B Notes issued by RoyaltyCo in an amount equal to its respective Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●] % |

---

[4]    Recoveries are based on a total enterprise value of approximately $[●] for the Debtors, together with their non-debtor affiliates.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 4<br><br>Non-Securitization Manager Advance Term Loan Claims | Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued by RoyaltyCo, which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●]% |
| 5<br><br>Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 6<br><br>Non-Securitization Term Loan Claims (Secured) | Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, Holders of Allowed Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |
| 7<br><br>Securitization Manager Advance Claims | Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in Article II.B of the Plan shall be in full and final satisfaction, compromise, settlement, release, and discharge of an in exchange for all Class 7 Securitization Manager Advance Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 8<br><br>General Unsecured Claims | General Unsecured Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of General Unsecured Claims shall not receive any distribution on account of such Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 9<br><br>Other Intercompany Claims | On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each Allowed Other Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 10<br><br>Intercompany Interests | On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 11<br><br>Securitization Prepetition Master Issuer Equity Interests | On the Effective Date, Securitization Prepetition Master Issuer Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Securitization Prepetition Master Issuer Equity Interests on account of such Interests. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 12<br><br>Other Securitization Prepetition Equity Interests | On the Effective Date, Other Securitization Prepetition Equity Interests shall continue in full force and shall not be impaired. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |
| 13<br><br>Prepetition Non-Securitization Equity Interests | On the Effective Date, Non-Securitization Prepetition Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Non-Securitization Prepetition Equity Interests on account of such Interests. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

### B.      Restructuring Support Agreement

In connection with negotiation of the Restructuring Transactions, the Debtors entered into the *Restructuring Support Agreement*, dated as of March 31, 2025 (as amended from time to time, the "**Restructuring Support Agreement**"), a copy of which is annexed hereto as **Exhibit B**, with the Buyer Group and holders of approximately (i) 100% of the aggregate outstanding principal amount of Non-Securitization Manager Advance Term Loan Claims; (ii) 100% of the aggregate outstanding principal amount of the Non-Securitization Term Loan Claims (Secured), and (iii) 94% of the aggregate outstanding principal amount of the Securitization Notes Claims.

The Restructuring Support Agreement provides that the signatories thereto will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions set forth therein.  In addition, pursuant to the Restructuring Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan and to be subject to certain milestones which, if not achieved, enable the Required Consenting Creditors to terminate the Restructuring Support Agreement.  The relevant milestones to be achieved include:[5]

(a)    entry of the Interim DIP Order no later than two (2) business days after the Petition Date;

(b)    filing of the Plan and accompanying Disclosure Statement in form and substance acceptable to the Required DIP Lenders and Required AHG Noteholders no later than ten (10) calendar days after the Petition Date;[6]

(c)    the Company Parties and Buyer Group shall have entered into the Buyer Group Arrangements and any other Buyer Group Documents necessary to effectuate the Buyer Group Arrangements no later than twenty-eight (28) calendar days after the Petition Date;[7]

(d)    entry of the Final DIP Order no later than thirty-five (35) calendar days after the Petition Date;[8]

(e)    the Bankruptcy Court shall hold a hearing to consider conditional approval of the adequacy of the Disclosure Statement no later than forty (40) calendar days after the Petition Date;[9]

(f)    the Debtors shall commence solicitation of votes on the approved plan no later than forty (40) calendar days after the Petition Date;[10]

---

[5]    The Milestones may be extended from time to time in accordance with the Restructuring Support Agreement.

[6]    The deadline for filing the Plan, Disclosure Statement, and definitive documents was extended by the consent of the Requisite Consenting Creditors to May 6, 2025.

[7]    The deadline for entry into the Buyer Group Arrangements was extended by the consent of the Requisite Consenting Creditors to May 12, 2025.

[8]    The deadline for entry of the Final DIP Order was extended by the consent of the Requisite Consenting Creditors to May 13, 2025.

[9]    Per the *Debtors' Motion for Entry of Order (I) Scheduling a Combined Hearing on (A) Adequacy of Disclosure Statement on a Final Basis and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation and Voting Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status; (IV) Conditionally Approving the Disclosure Statement, and (V) Granting Related Relief,* filed contemporaneously herewith (the "**Scheduling Motion**"), the deadline for the conditional hearing on the adequacy of the Disclosure Statement was extended by the consent of the Requisite Consenting Creditors to fifty-three (53) days.

[10]    Per the Scheduling Motion, the deadline for the commencement of solicitation of votes was extended by the consent of the Requisite Consenting Creditors to fifty-four (54) days.

(g)     the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the approved plan, no later than seventy-five (75) calendar days after the Petition Date;[11]

(h)     occurrence of the plan effective date no later than eighty (80) calendar days following the Petition Date (the "**Outside Date**"); provided, however, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional 15 calendar days with the written consent of the Required DIP Lenders in consultation with the Required Consenting AHG Noteholders; provided that any additional extension of the Outside Date requires the written consent of both the Required DIP Lenders and the Required AHG Noteholders;[12]

The Debtors' Special Committee (as defined herein) reviewed and approved the Restructuring Support Agreement, as well as the Plan, and this Disclosure Statement.

### C.     **DIP Claims and the New Notes**

As set forth in further detail herein and in the term sheet annexed to the Restructuring Support Agreement as **Exhibit 1**, the Plan contemplates the DIP Facility shall be converted into senior-secured first-lien, first-out notes in the aggregate principal amount of up to $40,000,000, reflecting the sum of the Roll-Up and the total new-money component actually funded and outstanding as a Manager Advance under the DIP Facility as of the Plan Effective Date, *plus* accrued and unpaid interest.  The New Notes will be issued by RoyaltyCo and will be secured by a first lien on substantially all of the assets of RoyaltyCo and the reorganized Securitization Entities.  The New Notes will bear interest at a rate of Prime + 3.00%.  Additional details with respect to the New Notes will be set forth in the definitive documents to be included in the Plan Supplement.

## II.     **OVERVIEW OF THE DEBTORS' OPERATIONS AND PREPETITION EVENTS LEADING TO THE CHAPTER 11 FILING**

### A.     **The Debtors' Business Operations**

The "Hooters" brand has grown from its origins in 1983 into a renowned American institution known for world-famous chicken wings, beverages, live sports, and legendary hospitality.  Through company-owned and franchised locations, the Debtors offer a relaxing, fun dining experience that distinguishes itself from other competitors by placing strong emphasis on personal service and customer enjoyment.

---

[11]    Per the Scheduling Motion, the deadline for the combined hearing on the adequacy of the Disclosure Statement and confirmation of a chapter 11 plan was extended by the consent of the Requisite Consenting Creditors to ninety-three (93) days.

[12]    Per the Scheduling Motion, the deadline for the Outside Date was extended by the consent of the Requisite Consenting Creditors to one hundred (100).

Hooters restaurants can be found across the United States and in 17 countries across the globe. The Debtors directly own and operate 151 traditional sit-down Hooters restaurants and maintain 154 franchisee locations. The Debtors also maintain franchised "Hoots" locations, which are modern, fast-casual wings-to-go restaurants.

As of the Petition Date, the Debtors' labor force consists of approximately 5,957 employees, including 1,945 full-time employees and 4,012 part-time employees. The Debtors' corporate headquarters are in Atlanta, Georgia.

The Debtors' revenue primarily derives from two business segments: its company-owned stores and the franchise and license agreements. In the company-owned stores, the Debtors generate revenue from daily restaurant receipts. In the franchise agreements, the Debtors collect certain franchise fees and royalties from its franchised locations in exchange for providing certain services to the franchisees. The Debtors are also party to a licensing agreement with a major food products licensor to offer Hooters-branded frozen meals at 1,250 grocery store locations.

The Debtors have experienced a sharp decline in their profitability due to inflationary pressures, industry headwinds, and capital structure overhang. In 2024, the Debtors proactively began assessing and addressing initiatives to improve its operating performance. Around the same time, the Debtors engaged Ropes & Gray LLP and Accordion Partners, LLC to assist with restructuring initiatives and prepare for a potential transaction to address the financial challenges. Shortly thereafter, the Debtors engaged SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (collectively, "**SOLIC**") to assess and advise the Debtors on a range of strategic alternatives.

As further detailed below, the Debtors' balance sheet includes approximately $376 million of funded debt, consisting of approximately $13.4 million in principal amounts outstanding under the Prepetition MA Credit Agreement (as defined below), $56.0 million outstanding principal amounts outstanding under the Prepetition Term Loan Credit Agreement (as defined below), and $306.6 million in principal amounts outstanding under the Prepetition Securitization Indenture (as defined below).

## B.    The Debtors' Corporate Structure

A chart summarizing the Debtors' capital and corporate organization structure, as of the date hereof, is annexed hereto as **Exhibit C**. As set forth on **Exhibit C**, each of the Debtors is a direct or indirect subsidiary of Hawk Parent, LLC, and is organized under either Delaware, Georgia, Florida, Kansas, or Texas law. The board of managers of Hawk Parent, HOA Holdings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, and Hooters of America, LLC has delegated decision-making authority with respect to the Debtors' restructuring process to a special committee of a disinterested manager, Adam Paul.

## C.    Prepetition Capital Structure

### 1.    Indebtedness

As of the Petition Date, the Debtors' prepetition capital structure included approximately $376 million in funded debt. The Debtors' funded debt obligations (the "**Obligations**") are summarized below, and are comprised of, on a non-consolidated basis, prepetition secured debt

against the Non-Securitization Entities and prepetition secured debt against the Securitization Entities:[13]

| | As of Petition Date: Debt Instrument (Aggregate Principal) | Funded Debt ($ millions) | |
|---|---|---|---|
| Non-Securitization | Prepetition MA Credit Agreement | | |
| | *Manager Advance Loans* | $ 8.4 | |
| | *Amendment No. 1 Loans* | $ 5.0 | |
| | Prepetition Term Loan Credit Agreement | $ 56.0 | |
| Securitization | Prepetition Securitization Indenture | | |
| | *Class A-2 Notes* | $ | 266.6 |
| | *Class B Notes* | | 40.0 |
| **Total Secured Debt** | | **$** | **376.0** |

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.

(a)     Securitization Debt

(i)     Prepetition Securitization Indenture

On August 19, 2021, HOA Funding, LLC, as master issuer, entered into that certain Amended and Restated Base Indenture, by and among the Master Issuer and the Prepetition Securitization Trustee.  Under the Prepetition Securitization Indenture, the Master Issuer issued two series of notes on August 19, 2021: (i) $275,000,000 of Class A-2 senior secured notes and (ii) $40,000,000 of junior subordinated notes (collectively, the "**Securitization Notes**").

As of the Petition Date, approximately $267 million of Class A-2 Notes and $40 million of Class B Notes in principal remain outstanding, in addition to amounts owing from accrued and unpaid interest.

From time to time, in the ordinary course of business, Hooters of America, LLC, in its capacity as manager of the Securitization Entities (the "**Prepetition Manager**"), advances funds to, and on behalf of, the Securitization Entities in connection with the operation of the assets

---

[13]   As detailed below, certain Debtors are not obligors with respect to the funded debt balances presented here.

securitized pursuant to the Prepetition Securitization Indenture. The Securitization Entities are obligated to reimburse such Manager Advances on a priority basis as provided in that certain Amended and Restated Management Agreement, dated as of August 19, 2021, by and among the Securitization Entities, Hooters of America, LLC (as the Prepetition Manager), and the Prepetition Securitization Trustee (as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time). Other than limited recourse for breach of certain representations, warranties, and covenants, recourse under the Securitization Notes is limited to the assets of the Securitization Entities, and there is no cross-collateralization with the Prepetition Credit Agreements. The Prepetition Manager's priority right to reimbursement of the Manager Advances (the "**Repayment Right**") is part of the Prepetition Lenders' collateral under the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement.

The Prepetition Securitization Indenture, among other things, lays out a 30-step payment waterfall for application of funds the Securitization Entities receive from the operation of Company-Owned Stores and franchised restaurants. Under the payment waterfall, certain fixed expenses to operate the Securitization Entities are given priority. In particular, payments to HOA to reimburse Manager Advances are first in the payment waterfall. Payment of the Prepetition Manager's management fee is fourth. In respect of payments to noteholders, the Class A-2 Notes interest payments are sixth in the payment waterfall, while the Class B Notes interest payments are eighth. The Class A-2 Notes amortization payments are tenth and fourteenth. Amortization payments for the Class B Notes are twentieth and twenty-first. The Master Issuer's right to dividend proceeds is the last step of the payment waterfall.

As of the Petition Date, the Manager has claims against the Securitization Entities for reimbursement of an aggregate amount of not less than $28,338,913 for prepetition Manager Advances, which amounts (plus accrued and unpaid interest thereon) remain outstanding and collectively comprise the Securitization Manager Advance Claims. The Debtors do not dispute (i) the amount or validity of the prepetition Manager Advances as described in the preceding sentence, (ii) the Manager's right to reimbursement of any Manager Advances, *plus* all additional amounts and other obligations under the DIP Facility extended during the pendency of these Chapter 11 Cases in accordance with the Approved Budget, together with accrued and unpaid interest, fees and other charges and expenses, or (iii) that such amount benefits from the Existing Securitization Indenture's Waterfall with the Manager's Repayment Right being pledged as part of the Prepetition Loan Collateral and the DIP Collateral. Notwithstanding anything to the contrary herein, solely upon consummation of the Plan, (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Plan as Non-Securitization Manager Advance Term Loan Claims which shall be converted to New Class A-2II Notes on the payment priority set forth in the Waterfall, and (b) any remaining claimed Non-Securitization Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo as set forth in the Restructuring Support Agreement.

The Securitization Notes are secured by substantially all of the assets of the Securitization Entities arising from that certain Amended and Restated Guarantee and Collateral Agreement, dated as of August 19, 2021, by and among HOA Systems, LLC, HOA Holdco, LLC, HOA Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOOTS Restaurant

Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HI Limited Partnership, HOA IP GP, LLC, HOA Franchising, LLC, HOOTS Franchising, LLC and the Trustee.

(b)    Non-Securitization Debt

(i)    Term Loan Credit Agreement

On March 9, 2022, Hawk Parent LLC, as the borrower, the Subsidiary Guarantors, XYQ Cayman Ltd. as Initial Lender, and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent entered into that certain Credit Agreement dated March 9, 2022 (as amended by that certain First Amendment to the Credit Agreement, dated November 14, 2022, that certain Second Amendment to the Credit Agreement, dated as of December 27, 2022, that certain Third Amendment to the Credit Agreement, dated April 3, 2023, that certain Fourth Amendment to the Credit Agreement, dated April 20, 2023, that certain Fifth Amendment to the Credit Agreement, dated January 10, 2024, that certain Limited Waiver, Consent and Sixth Amendment to the Credit Agreement, First Amendment to the Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of June 24, 2024, that certain Limited Waiver, Consent and Seventh Amendment to Credit Agreement and Reaffirmation of Loan Documents, dated as of August 16, 2024, that certain Limited Waiver, Consent and Eighth Amendment to Credit Agreement, Second Amendment to Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date).

Pursuant to the Term Loan Credit Agreement, the Term Loan Lender made term loans in the aggregate principal amount of $70,000,000 to Hawk Parent. The Term Loans under the Prepetition Term Loan Credit Agreement have a maturity date of March 9, 2027, and bear interest at a rate of 10.5%. Collateral securing obligations under the Prepetition Term Loan Credit Agreement consists of substantially all assets of the Loan Parties, including the right to reimbursement of the Manager Advances. As of the Petition Date, approximately $56 million of principal remains outstanding under the Term Loans, in addition to amounts owing from accrued and unpaid interest and fees.

(ii)    Manager Advance Credit Agreement

On September 27, 2024, the Loan Parties, Celtic Master Fund LP as Initial Lender and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent entered into that certain Credit Agreement (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025, by and among the Loan Parties, the Manager Advance Lender and the Manager Advance Agent, as further amended, amended and restated, supplemented or otherwise modified from time to time). Pursuant to the Manager Advance Credit Agreement, the Manager Advance Lender made an initial term loan in the aggregate principal amount of $8,386,877, which funds were used as a Manager Advance to fund the expenses of the Securitization Entities.

On February 21, 2025, under the Prepetition MA Credit Agreement, the parties entered into the Incremental Loan, pursuant to which (i) the Manager Advance Lenders (a) provided a $5

million Incremental Loan under the Prepetition MA Credit Agreement and (b) agreed to waive certain requirements under the Prepetition MA Credit Agreement; and (ii) the Loan Parties agreed to certain milestones.  The funds advanced pursuant to the Prepetition MA Credit Agreement were secured on a pari passu basis with the Prepetition Term Loans under the Prepetition Term Loan Credit Agreement and secured by substantially all assets of the Loan Parties, including the Repayment Right.  The additional liquidity provided by the Prepetition Lenders to the Company allowed the Company to continue operating as a going concern while it finalized negotiations with the parties to the RSA regarding the terms of the transactions contemplated by the RSA.

As of the Petition Date, approximately $13.4 million of principal remains outstanding under the Manager Advance Credit Agreement, in addition to amounts owing from accrued and unpaid interest and fees.

(iii)    Intercreditor Agreement

On September 27, 2024, the Term Loan Agent, the Manager Advance Agent, Hawk Parent, and the guarantors party thereto entered into that certain Pari Passu Intercreditor Agreement, which provides that obligations under the Prepetition Term Loan Credit Agreement and the Manager Advance Credit Agreement are equal in priority with respect to the collateral shared between the two facilities.

(c)    <u>Intercompany Transactions</u>

As is customary for a company of Hooters' size and scale, the Debtors are party to a series of ordinary-course formal and informal relationships with each other.  Certain of the Company's intercompany transactions result in various intercompany balances, claims, and obligations.  The primary intercompany transactions giving rise to intercompany claims are cash receipt activities, disbursement activities, and expense allocations.  Historically, intercompany claims are not settled by actual transfers of cash among the Debtors.  Instead, the Debtors track all intercompany transactions in their accounting system, and concurrently record them on the applicable Debtors' balance sheets.  The Debtors' accounting system requires that all general-ledger entries be balanced at the legal entity-level.  The Debtors continue to track intercompany transactions on a postpetition Debtor-by-Debtor basis.

**2.**    **Trade Claims and Other Unsecured Debt**

In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, critical vendors.  As of the Petition Date, the Debtors estimate they have approximately $26.3 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9) of the Bankruptcy Code, as well as claims that give rise to statutory constructive trusts under the Perishable Agricultural Commodities Act of 1930 or the Packers and Stockyards Act of 1921).

**D.**    <u>**Events Leading to Commencement of the Chapter 11 Cases**</u>

As detailed herein, these Chapter 11 Cases arose due to several factors that affected the Company's performance and liquidity and led to the need to substantially alter the Company's

operating model, shifting from a hybrid of Company-Owned Stores and franchised stores to solely a franchise model, close underperforming stores, and reduce and simplify corporate overhead and infrastructure.  Accordingly, the Debtors have determined that seeking relief under chapter 11 and continuing their efforts to implement value-maximizing transactions pursuant to the Bankruptcy Code's protections and procedures is the best approach for the Debtors to maximize value for all stakeholders.

### 1.    Inflationary Pressures and Industry Headwinds

Inflationary pressures across various sectors have negatively impacted the Company's performance and financials.  In particular, increases in the cost of labor and commodities in recent years have raised the cost of "dining out," a cost which the Company has borne directly with respect to the Company-Owned Stores and has been unable to fully negate through top-line growth.  Like many other similarly situated casual dining restaurants, the Company's performance is acutely impacted by consumer preferences.  As inflationary pressures have made consumers increasingly cost-conscious, preferences for casual out-of-home dining experiences began to shift to more cost-efficient alternatives.  As a result, the Company began facing an increasingly tight liquidity crunch at the same time that it most needed cash reserves to adapt to industry-wide changes.  This strain on the Company's liquidity has inhibited the Company from making certain key capital and other expenditures for the purposes of operational improvement, including expenditures related to restaurant maintenance and refurbishments, employee training, and menu updates, which has further adversely affected the Company's performance and financial health.  The Company's lagging performance paired with the difficult macroeconomic environment have also forced the Company to close of certain of the Company-Owned Stores across various locations, exposing the Company to various litigation risks related thereto, including with respect to lease obligations.

### 2.    Capital Structure Overhang

These operational challenges have, in turn, hampered the Company's ability to meet its funded debt obligations, as critical funds were used to cover operating losses.  As noted above, the Company's debt balance totals approximately $376 million.  In 2024, the Company owed $30,942,066 in debt service payments.  The Company estimates that debt-service payments for 2025 under the current capital structure will total approximately $19 million if its capital structure remains unchanged.  The substantial size of the Company's debt-service obligations has put significant pressure on the business.  The Company also has upcoming interest payments, with $3.9 million coming due on May 20, 2025 under the Prepetition Securitization Indenture.  The Company's capital structure is further burdened by the approximately $353,000 average monthly payments it allegedly owes on account of the Legacy Royalty Obligations.

### 3.    Prepetition Restructuring Efforts

#### (a)    Prepetition Operational Initiatives

Prior to the filing of these Chapter 11 Cases, the Company took several actions to improve its operating performance.  Since the beginning of 2024, the Company has identified and since closed 48 underperforming Company-Owned Stores in order to streamline its business and

improve its financial performance.  The Company initiated a guest-obsessed training program for all staff and managers at its remaining locations, which has produced meaningful improvements in customer experience.  The Company also recently began an aggressive pursuit of retail partnerships, and in 2024 entered into a licensing agreement with a major grocery store chain to offer shoppers Hooters-branded frozen meal products at approximately 1,250 grocery stores around the United States.

(b)     Engagement of Restructuring Advisors

The Debtors engaged Ropes & Gray LLP and Accordion in June 2024 to, among other things, advise the Company with respect to prepetition restructuring initiatives, assist in the Company's operational and strategic analyses, engage with the Company's creditors, vendors, customers, and other parties in interest, prepare outreach initiatives and diligence materials for prospective counterparties to a transaction to address the Company's financial challenges, and, if necessary, advise on the Company's preparation of a chapter 11 filing.  Effective June 6, 2024, Keith Maib was appointed as the Company's CRO in furtherance of such efforts.  In October 2024, the Company also engaged SOLIC as investment banker to the Company to assess and advise the Company with respect to a wide range of strategic alternatives, prepare a plan for strategic engagement to maximize value for the Company's stakeholders, and develop and prepare materials for a marketing process in furtherance of that plan.

In July 2024, an experienced, independent fiduciary, Adam Paul, was appointed to the boards of managers of Hawk Parent, HOA Holdings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, and HOA as an independent manager.  In furtherance of the Company's strategic efforts, Hawk Parent's board of managers established a special committee to direct and oversee these efforts, including by granting the Special Committee the authority to approve the filing of the Petitions, and appointed Mr. Paul as the Special Committee's sole member.

(c)     Financing Efforts and Strategic Engagement

In June 2024, as the Company faced liquidity issues, the Company negotiated with its Term Loan Lenders and entered into certain covenants under the Prepetition Term Loan Credit Agreement allowing the Debtors to access and use $2 million previously required to be held in an operating account pursuant to a minimum cash covenant.  In September 2024, the Company negotiated and entered into (i) the Eighth Amendment to the Credit Agreement and (ii) the Manager Advance Credit Agreement, pursuant to which $8,386,877 held in the restricted cash reserve account under the Prepetition Term Loan Credit Agreement was released to pay down the Term Loan and was simultaneously re-lent by the Manager Advance Lender as the Manager Advance Loan under the Manager Advance Credit Agreement.  In November 2024, the Company obtained the consent of the requisite percentage of the Noteholders with respect to the Prepetition Securitization Indenture to allow the Debtors to access and use $3,393,995 previously required to be held in an interest reserve account.  As a result, the Company obtained access to a total of approximately $13.8 million of cash for use in operations throughout June and September 2024, extending the Company's liquidity runway as it sought long-term strategic alternatives to address its operating challenges.

After exploring various potential pathways, the Company ultimately determined to file these Chapter 11 Cases, in an effort to maximize the value of its assets and operations for the benefit of its creditors and all parties in interest. The Debtors sought, and obtained, an additional $5 million Incremental Loan on February 21, 2025, pursuant to the Prepetition MA Credit Agreement. The Incremental Loan provided necessary liquidity to allow the Company, the Prepetition Lenders, Consenting AHG Noteholders, and Buyer Group to negotiate and document the Restructuring Support Agreement and obtain a commitment on financing necessary to continue to fund operations prior to the filing of these Chapter 11 Cases.

(d)    <u>Prepetition Marketing Process</u>

In November 2024, the Debtors' proposed investment banker, SOLIC, acting at the direction of the Debtors, commenced formal market outreach with the goal of soliciting proposals for a comprehensive strategic transaction to sell the Debtors' business as a going concern. SOLIC contacted ninety-five (95) potentially interested parties of which thirty-eight (38) parties signed confidentiality agreements. Those thirty-eight (38) parties received the Debtors' CIM that included key information with respect to the Debtors' business. The Company also held extensive diligence calls to explain the Company's business trajectory and profile and sought to encourage parties to engage constructively in turn. Of the thirty-eight (38) parties, six (6) parties expressed interest in a comprehensive transaction. Ultimately, the Debtors received formal proposals from three (3) parties.

(e)    <u>Restructuring Support Agreement</u>

In March 2025, after months of good-faith, arm's-length negotiations, the Company determined in its business judgment that the transactions contemplated by the Restructuring Support Agreement are in the best interest of the Company and its stakeholders.

Importantly, the Restructuring Support Agreement provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of a substantial majority of the Company's creditor stakeholders. The transactions contemplated by the Restructuring Support Agreement will enable the Debtors to achieve a three-pronged operational overhaul.

First, the Restructuring Support Agreement provides a non-binding commitment for the sale of certain Company-Owned Stores to the Buyer Group through a chapter 11 plan of reorganization.

Second, by way of the proposed sale transaction, the Restructuring Support Agreement contemplates a transition from a hybrid business model involving both Company-Owned Stores and franchised stores to a pure franchise model. This transition will allow the Company to optimize its business by significantly reducing overhead costs while maximizing revenues from franchisees, an approach which has proven to be more profitable than that of the Company operating stores directly.

Third, the Restructuring Support Agreement provides for the infusion of up to $35 million of new money in the form of the DIP Facility, plus a dollar-for-dollar roll-up of $5 million of the obligations under the Manager Advance Credit Agreement, which, if approved, will allow the

Company to make necessary expenditures to administer these Chapter 11 Cases. Upon confirmation of the Plan, existing debt will be converted into new notes and equity in the go-forward business that, together with the sale contemplated by the Restructuring Support Agreement, will right-size the Company's balance sheet and provide the way for a profitable go-forward business.

These transactions are made possible by the Restructuring Support Agreement, which presents the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise. The signing of the Restructuring Support Agreement was undertaken only after careful consideration by the Company's management and the Special Committee. Critically, the Debtors' obligations under the Restructuring Support Agreement remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates. Based on the foregoing, the Company believes it has exercised reasonable business judgment in its decision to execute the Restructuring Support Agreement, and that such execution is in the best interest of all parties in interest.

## III.    OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On March 31, 2025 (the "**Petition Date**"), after executing the Restructuring Support Agreement, the Debtors commenced the Chapter 11 Cases. The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits [Docket No. 93];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 94];

- Continue insurance programs, surety bond programs, and the processing of workers' compensation claims [Docket No. 104];

- Continue the Debtors' customer programs, promotions, and practices [Docket No. 105];

- Pay certain prepetition taxes and assessments [Docket No. 109];

- Pay certain prepetition obligations for critical vendors and holders of 503(b)(9) and PACA/PASA claims, on an interim basis [Docket Nos. 107];

18

- Reject certain burdensome leases [Docket Nos. 157];

- Establish procedures for future rejection of any additional burdensome leases [Docket Nos. 158];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 106]; and

- Obtain postpetition financing, on an interim basis [Docket No. 98].

### C.   Procedural Motions

The Debtors have filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity.  The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

- Employ the Voting Agent [Docket No. 108];

- Jointly administer these Chapter 11 Cases [Docket No. 61];

- Extend the time for the Debtors to file their schedules of assets and liabilities, schedule of current income and expenditures, schedules of executory contracts and unexpired leases, statement of financial affairs, as well as Rule 2015.3 Financial Reports [Docket No. 103];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 231]; and

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 232].

### D.   Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.  These professionals include (i) Accordion Partners, LLC as financial advisor; (ii) SOLIC Capital Advisors, LLC and SOLIC Capital, LLC as investment banker; (iii) Ropes & Gray LLP as counsel to the Debtors; (iv) Foley & Lardner, LLP as co-counsel to the Debtors; (v) Kroll Restructuring LLC as claims and noticing agent and administrative advisor; and (vi) Keen-Summit Capital Partners LLC.

### E.   Appointment of Creditors' Committee

On April 15, 2025, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the Office of the United States Trustee for Northern District of Texas (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured

creditors in the Chapter 11 Cases [Docket No. 187], as amended by [Docket No. 189]. The members of the Creditors' Committee are: (a) Firehouse Ltd.; (b) MCB HP Baltimore LLC; (c) Millenium Properties, LLC; (d) PepsiCo Sales, Inc.; and (e) Eduardo Montano.

The Creditors' Committee has retained Pachulski Stang Ziehl & Jones LLP as counsel and Province LLC as its financial advisor.

### F.   Claims Bar Dates

On April 3, the Bankruptcy Court entered an order (the "**Claims Bar Date Order**") [Docket No. 99] approving (i) June 16, 2025 as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Claims Bar Date**"); (ii) September 29, 2025 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) the later of the (a) the General Bar Date or the Governmental Bar Date and (b) the date that is thirty (30) days following service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases (the deadlines established in clauses (i) through (iii), collectively, the "**Bar Dates**").

### G.   Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Periods currently remain in effect.

### H.   Executory Contracts and Unexpired Leases

As of the Petition Date, the Debtors were parties to approximately 151 unexpired leases of nonresidential real property (the "**Leases**") and approximately 379 executory contracts (the "**Contracts**"). Section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has a period of 120 days after the commencement of the chapter 11 case to assume, assign, or reject unexpired leases of nonresidential real property and executory contracts (the "**Assumption Period**"). Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Assumption Period an additional ninety (90) days.

On the Petition Date, the Debtors filed a motion to reject 36 Leases (the "**Lease Rejection Motion**") [Docket No. 15]. On April 7, 2025, the Bankruptcy Court entered an order granting the Rejection Motion [Docket No. 157].

Additionally, the Debtors filed a motion to implement certain procedures to govern the rejection of Leases and the abandonment of certain surplus, burdensome, or non-core assets in connection therewith (the "**Rejection Procedures Motion**") [Docket No. 16].  On April 7, 2025, the Bankruptcy Court entered an order (the "**Rejection Procedures Order**") granting the Rejection Procedures Motion [Docket No. 158].

### I.      Landlord Negotiations

Many of the Debtors' stores are subject to out of market lease terms.  As part of the Debtors' restructuring efforts, the Debtors retained the services of Keen-Summit Capital Partners LLC to assist with negotiating improved terms for many of the Company Owned Stores.

### J.      LAGS Royalties

Debtors HOA and HI Limited Partnership are parties to the Assumption, Indemnification and Hold Harmless Debtor Substitution and Release Agreement, dated as of March 21, 2001, pursuant to which the Company has paid, on average, approximately $4.2 million per year on account of purported legacy royalty obligations to Lags Equipment, LLC ("**LAGS**").  These purported obligations include a monthly royalty in perpetuity in the amount of three percent (3%) of the gross sales of the restaurants using the Hooters® trademark and indicia in certain geographical locations.  The Debtors are evaluating all of their rights and treatment and validity of the relevant agreements and purported obligations under the Bankruptcy Code and reserve all rights with respect thereto.

### IV.      SUMMARY OF THE PLAN

### A.      General

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (ii) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Under the Plan, Classes 2, 3, 4, 6, 7, 8, 9, 11, and 13 are impaired, and Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan (*i.e.*, Classes 6, 7, 8, 9, 10, 11, and 13) or a Holder's Claim is subject to an objection filed by the Debtors.  Classes 1, 5, and 12 are unimpaired, and Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan and are presumed to accept the Plan. Ballots are being furnished herewith to all Holders of Claims in Classes 2, 3, and 4 that are entitled to vote to facilitate their voting to

accept or reject the Plan.  Classes 6, 7, 8, 9, 10, 11, and 13 are deemed to reject the Plan and, therefore, Holders of Claims or Interests in such Classes will not vote on the Plan.

## B.    Administrative Claims and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims, DIP Claims and Administrative Claims, including Professional Fee Claims, and Other Postpetition Intercompany Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Except with respect to Professional Fee Claims and Restructuring Expenses, and except to the extent that an Administrative Claim (i) has been assumed by the Buyer Group or Brand Co. under the terms and conditions set forth in the Buyer Group Documents, (ii) has already been paid during the Chapter 11 Cases or (iii) a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (x) on the Effective Date, if such Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (y) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, as applicable, shall pay in full in Cash all Restructuring Expenses due and owing pursuant to invoices delivered to the Debtors at least one (1) Business Day prior to the Effective Date and that are required to be paid under or pursuant to the DIP Order.

Except as otherwise provided in this Article II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are DIP Claims, Restructuring Expenses, or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Reorganized Debtors and Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED**

**DEBTORS, THE WIND-DOWN ENTITY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

Objections to such requests, if any, must be Filed and served on the Debtors, or from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (if not the objecting party) and the requesting party on or before the Claims Objection Deadline.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability (as defined in the Buyer Group Documents) under the Buyer Group Documents shall be resolved between the Brand Co. or the Buyer Group, as applicable, and the Holder of such Assumed Liability.

### 2.    DIP Claims

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the New Class A-1 Principal Amount plus all interest accrued and unpaid thereon through and including the date of payment.

Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such DIP Claim, and subject to <u>Article II.B.</u> of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder of a DIP Claim shall receive, pursuant to the Restructuring Transactions, New Class A-1 Notes issued by RoyaltyCo in an amount equal to its respective DIP Claims.

### 3.    Professional Fee Claims

#### (a)    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the DIP Lender, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

#### (b)    <u>Professional Fee Escrow</u>

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Debt or otherwise). The Professional Fee Escrow Account (including funds held in the Professional Fee Escrow Account) (i) shall not be and shall not be deemed property of the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down

Entity and (ii) shall be held in trust for the Professionals; provided, that funds remaining in the Professional Fee Escrow after all Professional Fee Claims have been Allowed and irrevocably paid in full or Disallowed shall promptly be paid to RoyaltyCo without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Allowed Professional Fee Claims shall be paid in Cash by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the DIP Agent, the Holders of Prepetition Lender Claims, the Prepetition Credit Agreements Agent, the Holders of Securitization Notes Claims, or be subject to claims, including any DIP Claims, Adequate Protection Claims, 507(b) Claims, or claims held by the Prepetition Lenders or the Securitization Noteholders, and shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Facility Documents, nor shall the Prepetition Lenders, the Securitization Noteholders, or the DIP Lenders  be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, the DIP Facility Documents, or the DIP Order

(c)    Professional Fee Reserve Amount

No later than one (1) Business Day prior to the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Effective Date, including any fees and expenses projected to be outstanding as of the Effective Date, and the Debtors shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(d)    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors or Wind-Down Entity shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred after the Effective Date by (i) the Debtors, (ii) the DIP Lenders, (iii) the Ad Hoc Group, (iv) the Prepetition Securitization Trustee, and (v) the Creditors' Committee, within five (5) Business Days of receipt of invoice therefor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and Wind-Down Entity may employ and pay any Professional for fees

incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### C.    Classification and Treatment of Claims and Interests

### 1.    Summary of Classification

All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Classes 2, 3, 7, 11, and 12 are comprised of Claims or Interests in or against the Securitization Entities. Classes 4, 6, and 13 are comprised of Claims or Interests in or against the Non-Securitization Entities. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan.

### (a)    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Securitization Class A-2 Note Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 3 | Securitization Class B Note Claims | Impaired | Yes |
| 4 | Non-Securitization Manager Advance Term Loan Claims | Impaired | Yes |
| 5 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 6 | Non-Securitization Term Loan Claims (Secured) | Unimpaired | No (Presumed to Accept) |
| 7 | Securitization Manager Advance Claims | Impaired | No (Deemed to Reject) |
| 8 | General Unsecured Claims | Impaired | No (Deemed to Reject) |
| 9 | Other Intercompany Claims | Impaired | No (Deemed to Reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to Reject) |
| 11 | Securitization Prepetition Master Issuer Equity Interests | Impaired | No (Deemed to Reject) |
| 12 | Other Securitization Prepetition Equity Interests | Unimpaired | No (Presumed to Accept) |
| 13 | Non-Securitization Prepetition Equity Interests | Impaired | No (Deemed to Reject) |

**2.      Treatment of Claims and Interests**

(a)      <u>Class 1 – Priority Non-Tax Claims</u>

(i)      *Classification*: Class 1 consists of all Priority Non-Tax Claims.

(ii)      *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority

Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired.

(iii)    *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

(b)    <u>Class 2 – Securitization Class A-2 Note Claims</u>

(i)    *Classification*: Class 2 consists of all Securitization Class A-2 Note Claims.

(ii)    *Treatment*: Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, New Class A-2I Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Notes Claims are Allowed in full.

(iii)    *Voting:* Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(c)    <u>Class 3 – Securitization Class B Note Claims</u>

(i)    *Classification*: Class 3 consists of all Securitization Class B Note Claims.

(ii)    Treatment: On or after the Effective Date, each holder of Securitization Class B Notes will receive (i) its Pro Rata share of the Noteholder Equity Entitlement and (ii) New Class B Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full.

(iii)    *Voting*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(d) <u>Class 4 – Non-Securitization Manager Advance Term Loan Claims</u>

 (i) *Classification*: Class 4 consists of all Non-Securitization Manager Advance Term Loan Claims.

 (ii) *Treatment*: Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued by RoyaltyCo which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests.

 (iii) *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(e) <u>Class 5 – Other Secured Claims</u>

 (i) *Classification*: Class 5 consists of all Other Secured Claims.

 (ii) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

        (iii)    *Voting*: Class 5 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

   (f)    <u>Class 6 – Non-Securitization Term Loan Claims (Secured)</u>

        (i)    *Classification*: Class 6 consists of all Non-Securitization Term Loan Claims (Secured).

        (ii)    *Treatment*: Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, Holders of Allowed Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral.

        (iii)    *Voting*: Class 6 is Unimpaired under the Plan. Each Holder of an Non-Securitization Term Loan Claims (Secured) is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Term Loan Claims (Secured) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

   (g)    <u>Class 7 – Securitization Manager Advance Claims</u>

        (i)    *Classification*: Class 7 consists of all Securitization Manager Advance Claims.

        (ii)    *Treatment*: Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in <u>Article II.B</u> of the Plan shall be in full and final satisfaction, compromise, settlement, release, and

discharge of and in exchange for all Class 7 Securitization Manager Advance Claims.

(iii)    *Voting*: Class 7 is Impaired under the Plan. Holders of Securitization Manager Advance Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Manager Advance Claims are not entitled to vote to accept or reject the Plan.

(h)    <u>Class 8 – General Unsecured Claims</u>

(i)    *Classification*: Class 8 consists of all General Unsecured Claims.

(ii)    *Treatment*: On the Effective Date, General Unsecured Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of General Unsecured Claims shall not receive any distribution on account of such Claims.

(iii)    *Voting:* Class 8 is Impaired under the Plan. Holders of General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(i)    <u>Class 9 – Other Intercompany Claims</u>

(i)    *Classification*: Class 9 consists of all Other Intercompany Claims.

(ii)    Treatment: On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each allowed Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that  Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims.

(iii)    *Voting*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Other Intercompany Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of allowed

Other Intercompany Claims will not be entitled to vote to accept or reject the Plan.

(j)     Class 10 – Intercompany Interests

(i)     *Classification*: Class 10 consists of all Intercompany Interests.

(ii)    Treatment: On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

(iii)   *Voting*: Class 10 is Impaired under the Plan. Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

(k)     Class 11 – Securitization Prepetition Master Issuer Equity Interests

(i)     *Classification*: Class 11 consists of all Securitization Prepetition Master Issuer Equity Interests.

(ii)    *Treatment*: On the Effective Date, Securitization Prepetition Master Issuer Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Securitization Prepetition Master Issuer Equity Interests on account of such Interests.

(iii)   *Voting*: Class 11 is Impaired under the Plan. Holders of Securitization Prepetition Master Issuer Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Prepetition Master Issuer Equity Interests are not entitled to vote to accept or reject the Plan.

(l)     Class 12 – Other Securitization Prepetition Equity Interests

(i)     *Classification*: Class 12 consists of all Other Securitization Prepetition Equity Interests.

31

(ii) *Treatment*: On the Effective Date, Other Securitization Equity Interests shall continue in full force and shall not be impaired.

(iii) *Voting*: Class 12 is Unimpaired under the Plan. Holders of Other Securitization Prepetition Equity Interests are presumed to have accepted the Plan. Therefore, Holders of Other Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

(m)     Class 13 – Non-Securitization Prepetition Equity Interests

(i) *Classification*: Class 13 consists of all Non-Securitization Prepetition Equity Interests.

(ii) *Treatment*: On the Effective Date, Non-Securitization Prepetition Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Non-Securitization Prepetition Equity Interests on account of such Interests.

(iii) *Voting*: Class 13 is Impaired under the Plan. Holders of Non-Securitization Prepetition Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

**3.      Special Provision Governing Unimpaired Claims**

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors', the Reorganized Debtors', and the Wind-Down Entity's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

4. **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

5. **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors', and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6. **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

7. **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

8. **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

D. <u>**Means for Implementation of the Plan**</u>

As discussed in greater detail in the Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support

Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

### 1. No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2. Sources of Consideration for Plan Distributions

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall fund distributions under the Plan with (i) Cash on hand, (ii) the issuance of the New Debt, and (iii) the issuance of the New Equity Interests.

### 3. New Debt

On the Effective Date, the Master Issuer will be renamed RoyaltyCo, LLC and all Other Securitization Prepetition Equity Interests shall revest in and be directly or indirectly held by RoyaltyCo. RoyaltyCo shall issue the New Debt and provide any related guarantees, pursuant to and subject to the terms and conditions set forth in the New Notes Documents. The Reorganized Debtors shall provide guarantees related to the New Debt pursuant to and subject to the terms and conditions set forth in in the New Notes Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Debt and related guarantees, including the New Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors (with the consent of the Required Consenting Creditors), the Reorganized Debtors may deem to be necessary to consummate the New Debt. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo. The obligations incurred by the Reorganized Debtors pursuant to the New Notes Indenture and the New Notes Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Notes Documents.

On the Effective Date, the New Notes Documents shall constitute legal, valid, binding, and authorized obligations of RoyaltyCo and the other Reorganized Debtors enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Notes Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted under the New Notes Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Notes Documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 4.     New Equity Interests

On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to the Plan. Any Person's acceptance of New Equity Interests shall be deemed to constitute its agreement to be bound by the Shareholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms. The Shareholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the New Equity Interests (and their respective successors and assigns), whether such New Equity Interests are received or to be received on or after the Effective Date and regardless of whether such holder executes or delivers a signature page to the Shareholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, RoyaltyCo may condition the receipt of any New Equity Interests issued pursuant to the Plan upon the receipt of duly executed counter - signature pages to the Shareholders Agreement, if any.

All of the New Equity Interests issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 5. New Organizational Documents

On or prior to the Effective Date, the New Organizational Documents shall be Filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 6. New Board

As of the Effective Date, except as set forth in this <u>Article IV.G</u>, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

The New Board will be comprised of three individuals, one selected by the Prepetition Term Loan Lender, one selected by a majority of holders of the Securitization A-2 Notes Claims that are Consenting AHG Noteholders, and one selected by a majority of holders the Securitization B Notes Claims that are Consenting AHG Noteholders. The identities of the New Board will be disclosed in the Plan Supplement prior to Confirmation.

### 7. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Buyer Group Documents), on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 8. Wind-Down Process and Wind-Down Officer

The Wind-Down Officer shall be appointed by the Debtors in consultation with the DIP Lenders and Required Consenting AHG Noteholders to serve on behalf of the Wind-Down Entity and to implement and take all actions on behalf of the Debtors and their Estates under the Plan, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. Once identified,

the identity of the Wind-Down Officer shall be disclosed in the Plan Supplement, and the Wind-Down Officer's engagement letter, shall be included in the Plan Supplement.  The Wind-Down Officer shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

On and after the Effective Date, subject to the terms of the Plan, the Wind-Down Officer will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Officer shall have the power and authority to take any action(s) necessary to effectuate the Wind-Down using funds in accordance with the Wind-Down Budget.  As soon as practicable after the Effective Date, the Wind-Down Officer shall cause the Debtors or Reorganized Debtors to comply with, and abide by, the terms of the Plan and take any actions as the Wind-Down Officer may determine to be necessary or desirable to carry out the purposes of the Plan, subject to the terms of the Plan.

The Wind-Down Officer shall be a successor to the rights, title and interests to the respective Non-Securitization Entities' property and assets.  The Wind-Down Entity will not be involved in any business operations on a go-forward basis and will be charged with conducting the Wind-Down Process.

The Wind-Down Officer shall serve as successor to and representative of the Wind-Down Entity's Estate under section 1123(b) of the Bankruptcy Code for the purposes of effectuating the Wind-Down Process, including to commence, litigate and settle any Retained Causes of Action, sell or monetize any remaining Assets of the Wind-Down Entity, and make distributions pursuant to the terms of the Plan.  The Wind-Down Officer shall act in a fiduciary capacity on behalf of the interests of the Holders of Claims and Interests entitled to distributions under the Plan.  The Wind-Down Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Entity is dissolved in accordance with the Plan and (ii) the date on which the Wind-Down Officer resigns, is terminated or is otherwise unable to serve.

9.    **Cancellation of Existing Interests, Indebtedness, and Other Obligations**

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, the other DIP Facility Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, and the other DIP Facility Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties under this Plan; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms

of the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Credit Agreement, as applicable; and (c) preserve any rights of (1) the Prepetition Agent and any predecessor thereof as against any money or property distributable to Holders of Non-Securitization Manager Advance Term Loan Claims, including any priority in respect of payment and the right to exercise any charging liens, (2) the Prepetition Securitization Trustee and any predecessor thereof, and the Control Party as against any money or property distributable to Holders of Securitization Notes Claims, including the Prepetition Securitization Trustee's priority in respect of payment under section 6.10 of the Securitization Notes Indenture and the right to exercise the Prepetition Securitization Trustee's charging lien under section 7.06(d) of the Prepetition Securitization Notes Indenture, and (3) the DIP Agent and any predecessor thereof as against any money or property distributable to Holders of DIP Claims, including any priority in respect of payment and the right to exercise any charging liens; and (d) allow the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, and the DIP Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.

Except for the foregoing, (i) subject to the performance by the Prepetition Agent of its obligations under the Plan, the Prepetition Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Loan Documents upon the occurrence of the Effective Date (provided, that the Surviving Prepetition Credit Facility Provisions shall survive in accordance with the terms of the Prepetition Loan Documents); (ii) subject to the performance by the Prepetition Securitization Trustee of its obligations under the Plan, the Prepetition Securitization Trustee and the Control Party and each of its agents shall be relieved of all further duties and responsibilities related to the Securitization Notes Documents upon the occurrence of the Effective Date; and (iii) subject to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its agents shall be relieved of all further duties and responsibilities related to the DIP Facility Documents upon the occurrence of the Effective Date (provided, that the Surviving DIP Provisions shall survive in accordance with the terms of the DIP Facility Documents).

The commitments and obligations (if any) of the Prepetition Lenders and/or any of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Term Loan Credit Agreement or the DIP Facility Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.]

### 10.    Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the New Debt and the New Equity Interests; (ii) the issuance of the New Debt; (iii) entry into the New Notes Documents; (iv) consummation of the Buyer Group Arrangements; (v) implementation of the Restructuring Transactions; and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors, Reorganized Debtors, or the Wind-Down Entity, and any corporate or other organizational action required by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Entity. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo after the Effective Date.

### 11.    Effectuating Documents; Restructuring Transactions

#### (a)    Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors and the Wind-Down Entity, as applicable, with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Buyer Group Arrangements, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or

obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Buyer Group Documents; (vii) the issuance of the New Debt; (viii) performing the Debtors' obligations under the Buyer Group Documents and any related agreements entered into in connection therewith, including the Transition Services Agreement (as defined in the Buyer Group APAs), and (ix) all other actions that the Debtors, Reorganized Debtors, or the Wind-Down Entity determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, or the Wind-Down Entity (collectively, the "**Restructuring Transactions**").  The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any direct or indirect parent entity of RoyaltyCo after the Effective Date.

(b)     Buyer Group Arrangements

On the Effective Date, certain of the Debtors will enter into the Buyer Group APAs with the Buyer Group or Brand Co. pursuant to which: (i) each Divested Store will be acquired by a Buyer Group SPE; (ii) each lease related to a Divested Store will be assigned by the corresponding Debtor to the corresponding Buyer Group SPE; (iii) a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE; (iv) royalty arrangements will be entered into between RoyaltyCo and Brand Co. in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of IP; (v) all gift card liabilities shall be borne by Brand Co. or the applicable franchisee (in each case, solely to the extent that such gift cards were issued on or prior to March 21, 2025 and have not been redeemed as of the closing of the Buyer Group Arrangements); (vi) each Buyer Group SPE will assume, for its corresponding Divested Store, certain current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; and (vii) the parties will enter into certain other agreements and arrangements as agreed upon by the Debtors, the Buyer Group or Brand Co., as applicable, and the Consenting Creditors.  The Plan Supplement will contain any agreements entered into to effectuate the Buyer Group Arrangements.

## 12.     Exemption from Certain Taxes and Fees[14]

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, including the Buyer Group Arrangements, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Notes Indenture, and (vi) the issuance, renewal,

---

[14] **NTD**: Tax sections remain subject to review

modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 13. Preservation of Causes of Action

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to the Buyer Group Documents, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan and the Buyer Group Documents, the Reorganized Debtors or the Wind-Down Entity, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived as of the Effective Date.

The Reorganized Debtors and Wind-Down Entity may pursue such Retained Causes of Action in accordance with their respective best interests. The Reorganized Debtors and Wind-Down Entity shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors and Wind-Down Entity shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; provided, that any proceeds received by the Reorganized Debtors or the Wind-Down Entity, as applicable, on account of Causes of Action assigned to the Buyer Group or Brand Co. shall be immediately transferred to the Buyer Group or Brand Co., as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Debtors or Wind-Down Entity shall not pursue any such Causes of Action against it, except as otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.** Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, or are assigned or transferred to the Brand Co. or the Buyer Group pursuant to the Buyer Group Documents, all such Causes of Action shall be expressly reserved by the Reorganized Debtors and Wind-Down Entity for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

**14.    Insurance Policies**

(a)    Director and Officer Liability Insurance

Each insurance policy, including any director and officer liability insurance policies, to which the Debtors are a party as of the Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors or Wind-Down Entity on behalf of the applicable Debtor effective as of the Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions with the Debtors after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

(b)    Other Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, each insurance policy to which the Debtors are a party as of the Effective Date shall be assumed by the Reorganized Debtor or Wind-Down Entity unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing.

Except as set forth in <u>Article IV.Q.1</u> of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Wind-Down Entity or draw on any collateral or security therefor.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, the Reorganized Debtors, the Wind-Down Officer, and the Wind-Down Entity, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, the Reorganized Debtors  and the Wind-Down Entity, as

applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

### 15.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors and Wind-Down Entity shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

### 16.    Dissolution of Certain Debtors

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the Wind-Down Entity. The Reorganized Debtors, the Wind-Down Officer, and Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

### E.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan (including the Buyer Group Documents), the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Assumption Schedule Filed with the Plan Supplement; (ii) as of the Effective Date, is subject to a pending motion to assume or reject such Executory Contract or Unexpired Lease Filed by the Debtors on or before the Confirmation Date; (iii) terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is a D&O Liability Insurance

Policy; (v) is deemed assumed pursuant to Article IV.O of the Plan, or (vi) is to be assumed by the Debtors and assigned to Brand Co. or the Buyer Group in connection with the Buyer Group Arrangements.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors and Wind-Down Entity has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with Article V.D of the Plan and payment of the applicable Cure Claim, if any; provided, further, that the Plan shall not be construed as limiting the Debtors' authority to assume and assign Executory Contracts and Unexpired Leases pursuant to the Buyer Group Documents. Any Executory Contract or Unexpired Lease assumed under the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Wind-Down Entity in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors and Wind-Down Entity with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, reserve the right to alter, amend, modify, or supplement the Assumption Schedule or Rejection Schedule with the consent of the Required Consenting Creditors, and subject to the terms of the Buyer Group Documents, at any time prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or the Buyer Group Documents restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan and the Buyer Group Documents shall not entitle the non-Debtor party thereto to terminate such Executory Contract or

Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the Buyer Group Arrangements and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

      **2.**      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>Article VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

      **3.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors, in consultation with the DIP Lenders and Required Consenting AHG Noteholders, may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**4.      Dispute Resolution**

Prior to the Combined Hearing, the Debtors shall provide Cure Notices of proposed Cures to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cures or the Debtors', the Reorganized Debtors', Brand Co.'s, the Buyer Group's, or the Wind-Down Entity's ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be Filed, served, and received by counsel to the Debtors by the objection deadline set forth in the applicable Cure Notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have consented to such assumption or Cure.

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors, the Reorganized Debtors, Brand Co., the Buyer Group, the Wind-Down Entity, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor, the Reorganized Debtor,  or Wind-Down Entity, as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, Reorganized Debtor, or Wind-Down Entity (as applicable) may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Combined Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Combined Hearing (an "**Adjourned Cure Dispute**"); provided, that the Reorganized Debtor and Wind-Down Entity may

settle any Adjourned Cure Dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

### 5. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 6. Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Reorganized Debtors, or Wind-Down Entity shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, Brand Co., the Buyer Group, or the Wind-Down Entity under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Reorganized Debtors, or the Wind-Down Entity, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

### 7. Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

F.    **Provisions Governing Distributions**

1.    **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

2.    **Rights and Powers of Distribution Agent**

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

3.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)    Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on

the Distribution Record Date, unless otherwise set forth in the DIP Order or the DIP Facility Documents. The Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan or otherwise in accordance with the applicable procedures of DTC. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

(b)    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, shall be deposited with the Prepetition Agent and the DIP Agent, as applicable, for distribution to Holders of Non-Securitization Manager Advance Term Loan Claims or DIP Claims in accordance with the terms of the Prepetition Term Loan Credit Agreement and the DIP Credit Agreement, as applicable. All distributions other than of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, may, with the consent of the Prepetition Agent and the DIP Agent, as applicable, be made by the Distribution Agent directly to Holders of Non-Securitization Manager Advance Term Loan Claims and DIP Claims in accordance with the terms of the Plan, the Prepetition Term Loan Credit Agreement, and the DIP Credit Agreement, as applicable. Notwithstanding the foregoing, all distributions (whether of Cash or other than of Cash) on account of Securitization Notes Claims, if any, shall be deposited with the Prepetition Securitization Trustee for distribution to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture, except to the extent that the Prepetition Securitization Trustee provides prior written consent to the Debtors that some or all of such distributions may be made by the Distribution Agent directly to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture. To the extent the Prepetition Agent, the Prepetition Securitization Trustee, or the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Agent, the Prepetition Securitization Trustee, and the DIP Agent shall be deemed a "Distribution Agent" for purposes of the Plan.

The amount of any reasonable and documented fees and expenses incurred by the Prepetition Agents, the Prepetition Securitization Trustee, and the DIP Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) shall be paid in Cash by the Reorganized Debtor or Wind-Down Entity and will not be deducted from distributions made to Holders of Non-Securitization Manager

Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtor and Wind-Down Entity and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent, as determined by the Debtors or the Reorganized Debtors, as applicable.

(c)     No Fractional Shares

No fractional shares or units of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of New Equity Interests that is not a whole number, such New Equity Interests shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares or units of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

(d)     Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this Article VI.C.4, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed New Equity Interests, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Debtors and the Wind-Down Entity without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

4.    **Securities Registration Exemption**[25]

The offer, issuance, and sale under the Plan of the New Equity Interests in exchange for Claims pursuant to <u>Article III</u> of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

The offering, issuance, and distribution of the New Debt in exchange for Claims pursuant to <u>Article II</u> and <u>Article III</u> of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Accordingly, the New Debt, and any New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act, if any, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law, such as under certain conditions, the resale provisions of Rule 144 or Rule 144A of the Securities Act, and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable.

With respect to the foregoing securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

None of the Debtors, the Wind-Down Entity, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests are exempt from

---

[25] **<u>NTD</u>:** Subject to ongoing review

registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests or New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. All such Persons and Entities including DTC shall be required to accept and conclusively rely upon the Plan or the Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests and the New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 5.    Compliance with Tax Requirements[15]

In connection with the Plan, to the extent applicable, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, the Reorganized Debtors,  and Wind-Down Entity, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent, the Reorganized Debtors,  or Wind-Down Entity, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor or Wind-Down Entity and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

---

[15] **NTD**: Tax sections remain subject to review

6.        **Allocations**

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

7.        **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

8.        **Setoffs and Recoupment**

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors  or the Wind-Down Entity, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors, the Reorganized Debtors,  or the Wind-Down Entity may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Wind-Down Entity of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor, the Reorganized Debtor,  or the Wind-Down Entity, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything herein to the contrary, neither the Reorganized Debtors, the Wind-Down Entity, nor the Debtors may set off and/or recoup against any distributions made on account of any Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims or any distributions to be made to parties to the Restructuring Support Agreement.

9.        **Claims Paid or Payable by Third Parties**

(a)        <u>Claims Paid by Third Parties</u>

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent to the extent the

Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors or the Wind-Down Entity may pursue any rights and remedies against such Holder under applicable law.

(b)     Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## G.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.     Allowance of Claims and Interests

After the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

### 2.     Claims and Interests Administration Responsibilities

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have the authority (i) to File, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy

Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

### 3. Estimation of Claims

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the Wind-Down Entity upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Time to File Objections to Claims

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be entitled to object to Claims before the Claims Objection Deadline, as such deadline may be extended from time to time. After the Effective Date, except as expressly provided herein to the contrary, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and filed on or before the Claims Objection

Deadline. The expiration of such period shall not limit or affect the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

### 6.    Disallowance of Claims

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the applicable Reorganized Debtor or the Wind-Down Entity. All Claims Filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.    Amendments to Claims

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Reorganized Debtor or the Wind-Down Entity. Absent such authorization, any new or amended Claim Filed after the General Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### 8.    Disputed Claims Reserve

Any amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Combined Hearing in consultation with the Required Consenting Creditors, based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Distribution Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B- 9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors,

the Distribution Agent, and the holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disputed Claim Reserve shall be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.[16]

To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Distribution Agent shall distribute to the holder thereof out of the Disputed Claims Reserve any amount or property to which such holder is entitled hereunder (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution). No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

In the event the remaining assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied pro rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed Pro Rata to all holders of Allowed General Unsecured Claims.

The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

### 9.    Distributions After Allowance

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

### 10.    Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property

---

[16] **NTD:** Subject to ongoing review

received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## H.    Settlement, Release, Injunction, and Related Provisions

### 1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

### 2.    Discharge of Claims and Termination of Interests

For the avoidance of doubt, upon consummation of the Buyer Group Arrangements as set forth in the Buyer Group Documents, the assets sold in such Buyer Group Arrangements shall be transferred to and vest in Brand Co. or the Buyer Group, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances (other than Permitted Liens and Assumed Liabilities, each as defined in the applicable Buyer Group Documents) pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order and Buyer Group APAs, as applicable.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such

debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Debtors, the Wind-Down Entity, or any of their Assets or property.

### 3.    Releases by the Debtors[17]

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan**

---

[17] **NTD**: Releases remain subject to review

or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing.

Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this Article VIII.C shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) releasing any contractual, post- Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any Retained Causes of Action or any Causes of Action assigned or transferred pursuant to the Buyer Group Documents and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties; provided however, that the special committee of officers of Hooters of America, LLC shall not so designate the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the DIP Lenders, or the DIP Agent, and the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the DIP Lenders, and the DIP Agent shall be and shall indefinitely remain Released Parties under the terms of the Plan. Notwithstanding anything to the contrary in the foregoing or in the defined term "Released Parties," Avoidance Actions against any Released Parties shall be deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged by the Debtors, the Wind-Down Entity, and the Estates.

4.      Releases by the Releasing Parties[18]

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Wind-Down Entity, the Estates, and

---

[18] **NTD**: Releases remain subject to review

the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, the Prepetition Credit Agreements, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in this Article VIII.D shall not be construed as releasing, and do not release, (i) any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) any contractual, post- Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any rights of Holders of Allowed Claims to receive distributions under the Plan, and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the

applicable Releasing Party will be null and void and the Releasing Party will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

     5.     **Exculpation**

Without affecting or limiting the releases set forth in Article VIII.C and Article VIII.D of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility Documents, the Restructuring Support Agreement, the Plan (including the New Notes Documents and the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the New Debt, the Prepetition Loan Documents, the Securitization Notes Documents, the prepetition and postpetition marketing process, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Debt, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this Article VIII.E of the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including, without limitation, the New Notes Documents, and the New Organizational Documents.

     6.     **Injunction**

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR

RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.E</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.

**BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING, WITHOUT LIMITATION, THE INJUNCTIONS SET FORTH IN THIS ARTICLE VIII.F.**

**THE INJUNCTIONS IN THIS ARTICLE VIII.F SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

### 7. Subordination Rights

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

### 8. Release of Liens

Except (i) with respect to the Liens securing the New Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Buyer Group Documents, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Entity and its successors and assigns.  On and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of this Article VIII.H.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## I.    Conditions Precedent to Consummation of the Plan

### 1.    Conditions Precedent to the Effective Date

It shall be a condition to consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B of the Plan):

(a)    The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(b)    The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the RSA and the Restructuring Term Sheet;

(c)    The DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the Required DIP Lenders party thereto;

(d)    The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(e)    The Confirmation Order confirming the Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(f)    The New Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Plan and related transaction;

(g)    The New Equity Interests shall have been issued (with all conditions precedent thereto having been satisfied or waived) and a shareholder rights agreement shall have been entered into by the appropriate parties;

(h)    All Restructuring Expenses and any other fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support

Agreement pursuant to an order of the Bankruptcy Court shall have been paid in full in cash;

(i)     Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

(j)     The conditions precedent to closing the Buyer Group Arrangements and the Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Effective Date;

(k)     Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions, the Buyer Group Arrangements, and the Plan shall have been obtained (including as set forth in the applicable purchase agreement);

(l)     No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the Restructuring Transactions, the Plan, or any other transaction contemplated thereby;

(m)     The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; and

(n)     There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions or the Buyer Group Arrangements any material portion or aspect thereof.

(o)     provided, that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

66

### 2. Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in this <u>Article IX</u> may be waived only by the Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group or Brand Co., to the extent the waiver adversely affects the Buyer Group or Brand Co., as applicable (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

### 3. Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### 4. Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

### J.     Modification, Revocation, or Withdrawal of the Plan

### 1. Modification and Amendments

The Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the Required DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group and Brand Co. (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of (a) the Required Consenting Creditors (which consent shall not be unreasonably withheld, conditioned, or delayed); (b) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (c) the Buyer Group and Brand Co. (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Buyer Group Arrangements.

## 2. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan, in accordance with Article X.A of the Plan occurring after the solicitation thereof but before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## 3. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, or (d) be used against the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths and weaknesses of any of the parties' positions, arguments, or claims.

## K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if

necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including the Buyer Group Arrangements;

9.      enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the consummation of the Plan, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, implementation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including with respect to the Buyer Group Arrangements;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other

provisions contained in <u>Article VIII</u> of the Plan and enter such orders as may be necessary or appropriate to implement such releases, exculpations, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Article VI.I</u> of the Plan;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     enforce or determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the DIP Facility Documents, the DIP Orders, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

17.     hear and determine disputes arising in connection with Buyer Group Arrangements;

18.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

20.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

23.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

24.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in the Plan, including under <u>Article VIII</u> hereof;

25.     enforce all orders previously entered by the Bankruptcy Court;

26.     hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

27.    enter an order concluding or closing the Chapter 11 Cases;

28.    recover all assets of the Debtors and property of the Debtors' Estates, wherever located, and

29.    enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in <u>Article VIII</u> of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## L.    Miscellaneous Provisions

### 1.    Immediate Binding Effect

Subject to <u>Article IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided*, that any material documents Filed shall be in consultation with the DIP Lenders, the Required Consenting AHG Noteholders, and the Buyer Group. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3.    Payment of Statutory Fees

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, the Wind-Down Entity shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the

U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

### 4. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with <u>Article IX.A</u> of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or any other party with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

### 5. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 6. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 7. Entire Agreement

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 8. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, which request shall be consistent with the terms of the Restructuring Support Agreement, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors

and (y) the Required Consenting Creditors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors, (y) the Required Consenting Creditors, and (z) the Buyer Group and Brand Co.; and (iii) nonseverable and mutually dependent.

### 9. Dissolution of Committee

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims. Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 10. Expedited Tax Determination

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed or to be Filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Effective Date.

## V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and the Consenting Stakeholders. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

### A. Continuation of the Chapter 11 Cases

If the Plan is not confirmed, as described herein the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell all or substantially all of their assets under section 363 of the Bankruptcy Code or pursuant to an alternative plan.

Absent a viable sale proposal, if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such alternative plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of their assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the

Bankruptcy Code.  Holders of Claims in Classes 2–4 and 6 would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by Holders of Other Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than what they would receive under the Plan.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Advisors and reliance upon the valuation methodologies utilized by the Advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in substantial diminution in the value to be realized by holders of Claims or Interests than the value provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### VI.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance and distribution under the Plan of the New Equity Interests to holders of Allowed Securitization Class B Notes Claims or Non-Securitization Manager Advance Term Loan Claims as provided in the Plan shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. The offering, issuance, and distribution under the Plan of the New Debt shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to

section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

## A.   <u>Section 1145 of the Bankruptcy Code</u>

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the above-described securities issued pursuant to section 1145 of the Bankruptcy Code (the "**1145 Securities**") will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is (i) an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents.  In addition, such section 1145 exempt securities may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim against, or interest in, the Debtor, with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement in connection with the plan, with the consummation of the plan or with the offer and sale of securities under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  While there is no precise definition of a "controlling" stockholder, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act ("Rule 144") which, in effect, permit the resale of securities received by such underwriters pursuant to a

chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, the availability of adequate current public information, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

### B.    Section 4(a)(2) of the Securities Act

With respect to the above described securities issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**Private Placement Securities**"), such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 or the resale provisions of Rule 144A of the Securities Act ("**Rule 144A**"), and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. The solicitation of votes on the Plan was only accepted from Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) that represented as to, and qualified as, either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act). Further, the Debtors believe that all Holders of DIP Claims and Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) are either "qualified institutional buyers" or "accredited investors".

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

Rule 144A is a safe harbor provision under the Securities Act that permits the resale of unregistered securities to "qualified institutional buyers," as such term is defined in Rule 144A. Under Rule 144A, securities can be resold to qualified institutional buyers so long as the conditions set forth in Rule 144A are satisfied.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities under Rule 144 after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities under Rule 144 after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act. Therefore, the Debtors believe that, although the Private Placement Securities may be resold privately in accordance with Rule 144A, the Rule 144 exemption will not be available with respect to any Private Placement Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act (including Rule 144A), non-affiliated holders of Private Placement Securities will be required to hold their Private Placement Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

*****

*Legends.*  To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing New Equity Interests held by holders of 10% or more of the outstanding New Equity Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all Private Placement Securities, will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors or the Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities.  The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws (including Rule 144A). All persons who receive such securities will be deemed to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any such securities except in accordance with an exemption from registration, including under Rule 144 or Rule 144A under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) such securities will be subject to the other restrictions described above.  The Reorganized Debtors shall agree to provide, upon the request of any holders or prospective purchaser (designated by a holder) of New Debt, any information required to be provided to such holder or

prospective purchaser to satisfy the conditions set forth in Rule 144A(d)(4) under the Securities Act related to the New Debt.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) UNDER THE SECURITIES ACT, AND RULE 144 AND RULE 144A UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VII.    CERTAIN TAX CONSEQUENCES OF THE PLAN[19]

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of Non-Securitization Term Loan Claims (Secured), Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, and General Unsecured Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan, holders of Claims not entitled to vote on the Plan or to holders of Claims acting in their capacity as Commitment Parties under the Rights Offering Backstop Commitment Agreement.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences

---

[19] **NTD**: Tax sections remain subject to review

of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that all Non-Securitization Term Loan Claims (Secured), Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, General Unsecured Claims, and New Equity Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated) and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon individual circumstances. All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.** [20]

## A.   Consequences to Debtors

### 1.   Cancellation of Debt

Hawk Parent, LLC is treated as a partnership for U.S. federal income tax purposes, and each other relevant Debtor is disregarded as an entity separate from Hawk Parent, LLC for U.S. federal income tax purposes. Accordingly, as described further below, the U.S. federal income tax consequences of the Plan will generally not be borne by Hawk Parent, LLC, but will be borne by Hawk Parent, LLC's partners (i.e., the holders of interests in Hawk Parent, LLC).

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**CODI**") upon satisfaction of its outstanding indebtedness for total consideration having a value that is less than the amount of such indebtedness. CODI is taxable as ordinary income. The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness discharged, over (ii) the sum of (a) the issue price of any new indebtedness of the taxpayer issued, (b) the amount of cash paid, and (c) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange (*e.g.*, Class A-1 Notes).

---

[20]   **NTD:** Subject to ongoing review

Where an entity that is a partnership for U.S. federal income tax purposes, such as Hawk Parent, LLC, realizes CODI, such CODI is allocated to its partners, and the partners (rather than the partnership) are subject to tax on such amount. Accordingly, the U.S. holders of interests in Hawk Parent, LLC will be treated as receiving their allocable share of the CODI realized by Hawk Parent, LLC.

There are exceptions to the recognition of CODI. For example, a taxpayer is not required to include CODI in gross income if either the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or the taxpayer is insolvent, as specifically defined under the Tax Code, at the time the CODI is triggered. In the case of any entity taxed as a partnership, such as Hawk Parent, LLC, any exception to the recognition of CODI is applied at the partner level rather than at the entity level.

As a result of the consummation of the transactions contemplated by the Plan, including the conversion of the DIP Facility into new Class A-1 Notes, Hawk Parent, LLC expects to realize substantial CODI. The precise amount of CODI realized by Hawk Parent, LLC (and further allocated to the partners of Hawk Parent, LLC) will depend on the value as of the Effective Date of the Class A-1 Notes issued in satisfaction of the DIP Facility. U.S. holders of interests allocated CODI that is realized by Hawk Parent, LLC may have a U.S. federal income tax liability in respect of that CODI, but will not receive any distributions from any of the Debtors in order to satisfy that liability.

U.S. holders of interests are urged to consult their tax advisors as to the particular tax consequences to them of the allocation of such CODI, including the ability to offset any such CODI with available losses, if any, and whether or not they may avail themselves of any exception under the Tax Code to the recognition of CODI.

### 2.    Treatment of Buyer Group Arrangements

The U.S. federal income tax consequences to the Debtors of the implementation of the Plan depends in significant part on whether the Debtors elect to consummate the Buyer Group Arrangements. If the Debtors engage in the Buyer Group Arrangements, then pursuant to the Plan and the Acquisition Agreement, and in accordance with the transaction steps set forth in **Exhibit B** to the Plan, Buyer Group is intended to be treated — and the discussion herein assumes would be treated — as purchasing significant assets of the Debtors and its subsidiaries (after otherwise giving effect to the Plan) in a taxable transaction. Pursuant to the Buyer Group Arrangements, Buyer Group would obtain a new cost basis in the assets deemed acquired based on the fair market value of such assets on the Effective Date. Buyer Group would not succeed to any tax attributes of the [●] (such as NOL carryforwards and current year NOLs, tax credits or tax basis in assets).

It is currently contemplated that the Buyer Group Arrangements would be structured as a direct acquisition of certain assets of HOA Restaurant Holder, LLC (after otherwise giving effect to the Plan) and a constructive acquisition of all of the then assets of HOA Restaurant Holder, LLC's direct and indirect subsidiaries. The constructive asset acquisition occurs by reason of the fact that HOA Restaurant Holder, LLC would convert to a limited liability company that is disregarded for U.S. federal income tax purposes (referred to herein as "**HOA RH**") prior to the consummation of the Plan, such that, by acquiring all of the assets of HOA RH, Buyer Group

80

would be treated for U.S. federal income tax purpose as acquiring all of the underlying assets of HOA RH and its subsidiaries (each of which is also a disregarded for U.S. federal income tax purposes). The consideration for the acquisition of the assets in the Buyer Group Arrangements would be the direct and indirect assumption of certain of the obligations of HOA RH and its subsidiaries under the Plan.

The Buyer Group generally would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the amount of any other obligations directly or indirectly assumed by the Buyer Group and (ii) the tax basis in the assets transferred (including any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes). Taking into account available NOLs and other tax attributes, and current economic conditions, the Debtors expect that no U.S. federal, but some state and/or local, income tax liability would be incurred upon the transfer. [The determination as to whether or not to elect the Buyer Group Arrangements will be based on all facts and circumstances as of the time the election is made, including the projected enterprise value of the Wind-Down Entity, the timing of the Effective Date, estimated available Tax Attributes and other factors.] Nevertheless, the actual facts may vary from those projected, estimated or assumed, and the Buyer Group's ability to utilize applicable tax attributes to offset any gain attributable to the transfer may be subject to limitation, which could result in tax consequences different from those expected, and any resulting tax liability would remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

Although the Debtors expect the Buyer Group Arrangements would be treated as a taxable asset acquisition, there is no assurance that the IRS would not take a contrary position. Were the transfer of assets to the Buyer Group in the Buyer Group Arrangements determined not to be a taxable sale but instead treated as a "reorganization" for tax purposes, the [●] would succeed to the Tax Attributes of the Debtors (including tax basis in assets), subject to the attribute reduction attributable to the substantial COD incurred and other applicable limitations (as discussed above). Following the Buyer Group Arrangements, HOA RH and [●] would be dissolved pursuant to the Plan.]

## B. <u>Consequences to Holders of Certain Claims</u>

As used herein, the term "U.S. holder" means a beneficial owner of a Non-Securitization Term Loan Claims (Secured), Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, Securitization Manager Advance Claims, General Unsecured Claim, or New Equity Interest that is for U.S. federal income tax purposes:

(i)     an individual who is a citizen or resident of the United States;

(ii)    a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

(iii)    an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

(iv)    a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  Partners in a partnership holding any such instruments are urged to consult their own tax advisors.

### 1.    U.S. Holders of Allowed Securitization Class B Notes Claims

Pursuant to the Plan, and in complete and final satisfaction of their Claims, holders of Allowed Securitization Class B Notes Claims will receive, amongst other things, 50% of the New Equity Interests.

The New Equity Interests distributed will be issued by RoyaltyCo.

The U.S. federal income tax consequences of the Plan to a U.S. holder of Non-Securitization Term Loan Claims (Secured), Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, and Securitization Manager Advance Claims will depend in part on whether the Term Loan Debt, Manager Advance Debt, and Securitization Debt constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of 5 years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of 10 years or more constitute securities.  Additionally, the IRS has ruled that new debt obligations with a term of less than 5 years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.  The Term Loan Debt had a 5-year maturity at issuance, the Manager Advance Debt had a 2-year maturity at issuance, the Securitization Notes had a 30-year maturity at issuance.  The following discussion assumes that the [●] Debt qualify as "securities" for U.S. federal income tax purposes and takes no position as to the [●] Debt.  *U.S. holders of [●] Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal*

*income tax purposes of their Claims and the respective consideration received as "securities" for U.S. federal income tax purposes.*

In addition, if the Debtors engage in the Buyer Group Arrangements, the Debtors expect that U.S. holders of Allowed [●] Claims would have a fully taxable transaction with the consequences described below in "Fully Taxable Exchange."

(a)    Recapitalization Treatment

If the exchange by a U.S. holder of Securitization Class B Notes Claims for New Equity Interests, qualifies for Recapitalization treatment, the U.S. holder generally will not recognize gain or loss.  However, a U.S. holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued original issue discount ("**OID**") not previously included in income.  *See* Section VII.B.3 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In an exchange that qualifies for Recapitalization treatment, a U.S. holder's aggregate tax basis in the New Equity Interests received in exchange for its Allowed Securitization Class B Notes Claim, would equal such U.S. holder's aggregate adjusted tax basis in the Claim exchanged therefor, increased by any gain and interest income recognized in the exchange, and decreased by any deductions claimed in respect of any previously accrued but unpaid interest.  A U.S. holder's holding period in the New Equity Interests received in exchange for its Allowed Securitization Class B Notes Claims would include its holding period in the Allowed Claim exchanged therefor, except to the extent of any consideration received in respect of accrued but unpaid interest or possibly accrued OID or treated as imputed interest income.

(b)    Fully Taxable Exchange

In the case of a taxable exchange, a U.S. holder of an Allowed Securitization Class B Notes Claim generally would recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of the New Equity Interests, received (other than, in each case, to the extent received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  See Section VII.B.2 — "Character of Gain or Loss," below.  A U.S. holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income.  *See* Section VII.B.3 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In the event of the subsequent disallowance of any Disputed Securitization Class B Notes Claim, it is possible that a U.S. holder of a previously Allowed Securitization Class B Notes Claim may receive additional distributions in respect of its Claim.  Accordingly, it is possible that the recognition of any loss realized by a U.S. holder with respect to an Allowed Securitization Class B Notes Claim may be deferred until all Securitization Class B Notes Claims are Allowed or Disallowed.  Alternatively, it is possible that a U.S. holder will have additional gain in respect of any additional distributions received due to the disallowance of a Disputed Securitization Class B Notes Claim, except to the extent of any portion treated as an interest income under the imputed

83

interest provisions of the Tax Code. The discussion herein assumes that the installment method does not apply, either because the exchange is not eligible or because the U.S. holder of Allowed Securitization Class B Notes Claims elects out of such treatment.  See also "Tax Treatment of Disputed Claims Reserve," below.

In the case of a taxable exchange, a U.S. holder's tax basis in the New Equity Interests, received would equal the fair market value of such New Equity Interests, as applicable.  The U.S. holder's holding period in the New Equity Interests generally begins on the day following the Effective Date.

### 2.        Character of Gain or Loss

When gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss is determined by a number of factors, including the tax status of the U.S. holder, whether the [●] Claim or General Unsecured Claim constitutes a capital asset in the hands of the U.S. holder and how long it has been held, whether the [●] Claim or General Unsecured Claim was acquired at a market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction.

In addition, a U.S. holder that acquired a Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code.  A U.S. holder that purchased its Claim from a prior holder would be considered to have purchased such Claim with "market discount" if the U.S. holder's adjusted tax basis in its Claim is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount.  Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally would be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. holder, on a constant yield basis) during the U.S. holder's period of ownership, unless the U.S. holder elected to include the market discount in income as it accrued.  If a U.S. holder of Claims did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would in the case of a fully taxable exchange become deductible at the time of the exchange (but would continue to be deferred in the event of Recapitalization treatment).

### 3.        Distributions in Respect of Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of a Securitization Class A-2 Notes Claim or Securitization Class B Notes Claim is received in satisfaction of accrued interest during the U.S. holder's holding period, such amount would be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income).  Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued but unpaid OID.  Accordingly, it is also unclear whether, in similar circumstances or by analogy, any U.S. holder of a Securitization Class A-2 Notes Claim or Securitization Class B Notes Claim would be

required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such Claim that is not paid in full.

The Plan provides that, unless otherwise required by law (as reasonably determined by the Wind-Down Entity), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed therein (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Article VI.F of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 4.    Actual and Constructive Distributions on New Equity Interests

Under section 305 of the Tax Code, certain transactions that affect an increase in the proportionate interest of a shareholder (treating holders of rights to acquire stock as existing shareholders) in the corporation's assets are treated as creating deemed distributions to such shareholder in respect of such "stock" interest. Any deemed distribution would be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the shareholder in connection with such distribution. Accordingly, U.S. holders of New Equity Interests are urged to consult their own tax advisors regarding the U.S. federal income tax consequences of the acquisition, ownership, and disposition of the New Equity Interests.

The gross amount of any distribution of cash or property made to a U.S. holder with respect to New Equity Interests generally would be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits of the Reorganized Parent or [●], as applicable, as determined under U.S. federal income tax principles. Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a U.S. holder that is a corporation and certain holding period and other requirements are satisfied. Any dividend received by a U.S. holder that is a corporation may be subject to the "extraordinary dividend" provisions of the Tax Code.

Distributions in excess of current and accumulated earnings and profits of the Reorganized Parent or [●], as applicable, as determined under U.S. federal income tax principles, first would be treated as a non-taxable return of capital to the extent of the U.S. holder's adjusted tax basis in its New Equity Interests and would be applied against and reduce (but not below zero) such basis dollar-for-dollar, and, thereafter as gain from the sale or exchange of stock, which would be treated as long-term capital gain if such U.S. holder's holding period in its New Equity Interests exceeds one year as of the date of the distribution.

5.      **Disposition of New Equity Interests**

(a)      Sale, Exchange, or Other Taxable Disposition

Except as discussed below, U.S. holders of New Equity Interests generally would recognize capital gain or loss upon a subsequent sale or other taxable disposition of such New Equity Interests in an amount equal to the difference between the U.S. holder's adjusted tax basis in the New Equity Interests and the sum of the Cash plus the fair market value of any property received from such sale or other disposition. Any such gain or loss generally would be long-term capital gain or loss if the U.S. holder's holding period for its New Equity Interests, is more than one year at the time of sale or other disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. holders. The deductibility of capital loss is subject to significant limitations.

If the New Equity Interests are issued by Reorganized Parent, any gain recognized by a U.S. holder upon a subsequent disposition of the New Equity Interests received (or any stock or property received for it in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any accrued market discount carried over to the New Equity Interests not previously included in income (*see* **Section VII.B.2** above — "Character of Gain or Loss"), (ii) any ordinary loss deductions incurred upon exchange or previously as a result of the write-down of the Securitization Class B Notes Claim, decreased by any income (other than interest income) recognized by the U.S. holder upon exchange of the Securitization Class B Notes Claim, and (iii) with respect to a cash-basis U.S. holder and in addition to clause (ii) above, any amounts which would have been included in its gross income if the U.S. holder's Securitization Class B Notes Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

C.      **Withholding on Distributions and Information Reporting**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

## VIII.    VOTING PROCEDURES AND REQUIREMENTS[21]

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (each, a "**Voting Creditor**") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.    Voting Agent

The Debtors have retained Kroll Restructuring Administration LLC ("Kroll" or the "**Voting Agent**") as their claims, noticing, and Voting Agent pursuant to the *Order Authorizing Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Voting Agent* [Docket No. 108].   Pursuant to the Scheduling Order, Kroll is authorized to assist the Debtors in (a) distributing the Solicitation Packages, (b) receiving, tabulating,  and  reporting on Ballots cast to accept or reject the Plan by Holders of Claims, (c) responding to inquiries from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages and all other related documents and matters related thereto.

### B.    Voting Deadline

The deadline for a Holder of a Claim in the Voting Class to vote to accept or reject the Plan is **June 24, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Voting Deadline**").  Any vote to accept or reject the Plan received by the Voting Agent after the Voting Deadline may count only in the Debtors' sole discretion.  To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered to the Voting Agent:  (i) by first-class mail in the return envelope provided with each Ballot, (ii) by overnight courier, (iii) by hand delivery, (iv) via E-Ballot, or only with respect to pre-validated Beneficial Holder Ballots or Master Ballots, via electronic mail to HootersBallots@ra.kroll.com so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

Holders of Claims mailing their Ballots to the Voting Agent shall mail them to the following address:

| Kroll Address for Receipt of Ballots |
| --- |
| **If by First Class Mail, Hand Delivery, or Overnight Mail** |
| **Hooters Ballot Processing Center**<br>**c/o Kroll Restructuring Administration LLC**<br>**850 Third Avenue, Suite 412**<br>**Brooklyn, NY 11232** |

---

[21]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the Scheduling Motion.

**IN ALL INSTANCES, HOLDERS SHALL CONSULT THEIR BALLOT FOR SPECIFIC INSTRUCTIONS REGARDING SUBMISSION OF THEIR VOTES AND ANY ELECTIONS.**

C.    <u>Form, Content, and Manner of Notices</u>

1.    **The Combined Hearing Notice**

The Combined Hearing will be held before the Honorable Scott W. Everett, United States Bankruptcy Judge, in Courtroom 3, Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242, on **July 1, 2025 at [●] _.m. (prevailing Central Time)**.  Within five (5) Business Days after entry of the Scheduling Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and Holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail, a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Plan Objection Deadline and procedures for filing objections and responses to the adequacy of the Disclosure Statement and confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3).   The Debtors will separately serve Holders of Claims in Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, within five (5) Business Days after entry of the Scheduling Order, or as soon as reasonably practicable thereafter in the *Wall Street Journal*, or a similar national publication.

2.    **The Solicitation Package**

The following materials shall constitute the Solicitation Packages:

a.    the Combined Hearing Notice, in substantially the form attached as <u>Exhibit 3</u> to the Scheduling Order;

b.    the Scheduling Order (without attachments, except a copy of these Solicitation and Voting Procedures, appended as <u>Exhibit 2</u> to the Scheduling Order);

c.    the fully compiled Disclosure Statement with all exhibits thereto, including the Plan;

d.    a Ballot customized (where possible and appropriate) for such Holder or a Master Ballot in the case of an Indenture Trustee of the Securitization Note Claims, substantially in the form attached hereto as <u>Exhibits 5-A</u>, <u>5-B</u>, <u>6-A</u>, <u>6-B</u>, and <u>7</u>;[22]

e.    a postage-prepaid return envelope; and

---

[22]    Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

    f.     such other materials as the Bankruptcy Court may direct.

Holders of Claims or Interests in the Non-Voting Classes shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status, and the Opt-In Form.

    **3.**    **Form of Ballots**

Holders of Claims in the Voting Classes that are otherwise eligible to vote (as set forth herein), shall receive ballots substantially in the forms attached to the Scheduling Order as Exhibits 5-A, 5-B, 6-A, 6-B, and 7 (the "**Ballots**"), as applicable.[23] All Holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt-in to the non-debtor release provisions in <u>Article VIII.D</u> of the Plan (the "**Non-Debtor Release Provisions**"). Holders of Claims in the Voting Classes that properly and timely elect to opt-in to the Non-Debtor Release Provisions in will be a Releasing Party and Released Party.

The Debtors will distribute Ballots to each of the Holders of Securitization Class A-2 Note Claims, Holders of Securitization Class B Note Claims, and Holders of Non-Securitization Manager Advance Term Loan Claims. To be eligible to vote, a Holder must be either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act), and certify as to such applicable status in the Ballot. Votes cast by Holders who do not make the applicable certifications will not count.

The Debtors will distribute to the Indenture Trustee or the bank, broker, or other financial institution that holds the Securitization Class A-2 Notes "in street name" at DTC on behalf of the Class 2 Beneficial Holder (each, a "**Nominee**") two forms of Ballots with respect to Holders of Class 2 Securitization Class A-2 Note Claims, Holders of which are entitled to vote on the Plan: (a) a form of Ballot for a beneficial owner of a Securitization Class A-2 Note Claim (each, a "**Class 2 Beneficial Holder**" and each corresponding ballot, a "**Class 2 Beneficial Holder Ballot**"), which the Nominee, at its election, will distribute to the Class 2 Beneficial Holders and (b) a form of Ballot for the Nominee of the Class A-2 Beneficial Holder (or agent thereof) to transmit the votes of one or more Beneficial Holders (each, a "**Class 2 Master Ballot**").

Additionally, the Debtors will distribute to the Indenture Trustee or Nominee two forms of Ballots with respect to Holders of Class 3 Securitization Class B Note Claims, Holders of which are entitled to vote on the Plan: (a) a form of Ballot for a beneficial owner of a Securitization Class B Note Claim (each, a "**Class 3 Beneficial Holder**" and each corresponding ballot, a "**Class 3 Beneficial Holder Ballot**" and together with the Class 2 Beneficial holder Ballot, the "**Beneficial Holder Ballots**"), which the Nominee, at its election, will distribute to the Class 3 Beneficial Holders and (b) a form of Ballot for the Nominee of the Class 3 Beneficial Holder (or agent thereof)

---

[23]    Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon, Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

to transmit the votes of one or more Beneficial Holders (each, a "**Class 3 Master Ballot**" and together with the Class 2 Master Ballot, the "**Master Ballots**").

### 4.    Distributions of the Solicitation Package

To reduce costs and the impact on the environment, the Debtors propose to send the Disclosure Statement, Plan, and Scheduling Order (without attachments, except the Solicitation and Voting Procedures annexed as Exhibit 2 thereto) in electronic format (on a USB flash drive) instead of printed hard copies. Only the Ballots and the Combined Hearing Notice, and such other materials as the Court may ordered included with the Solicitation Packages, will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be available at no charge through the Debtors' restructuring website maintained by the Voting Agent at https://cases.ra.kroll.com/Hooters/. However, the Debtors propose that if online access or service by USB flash drive imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (e.g., the party does not own or have access to a computer or the internet), such party may request a paper copy of the Plan, Disclosure Statement, and Scheduling Order (without attachments, except the Solicitation and Voting Procedures annexed as Exhibit 2 thereto) by contacting the Voting Agent by: (a) calling +1 (646) 844-3894 (international, toll) or (888) 575-4910 (U.S./Canada, toll free), (b) writing to Hooters Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing HootersInfo@ra.kroll.com (with "Hooters Solicitation Inquiry" in the subject line). Upon receipt of such request, the Debtors will provide such party with a paper copy of the Plan and the Disclosure Statement free of charge.

On or before the date that is one (1) Business Day after entry of the Scheduling Order, or as soon as reasonably practicable thereafter (the "**Deadline to Mail Solicitation Packages**"), the Debtors shall cause the Voting Agent to distribute the Solicitation Package to Nominee on behalf of Holders of Claims in the Voting Classes as of the Voting Record Date. In addition, the Debtors shall cause the Voting Agent to serve a Solicitation Package (without Ballots) on the U.S. Trustee, counsel to the Official Committee of Unsecured Creditors, and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1. Following the Voting Deadline, the Debtors, with the assistance of the Voting Agent, shall complete a final tabulation of the Ballots and submit a final voting report on or before the date that is four (4) days prior to the Combined Hearing.

The Debtors are not required to mail Solicitation Packages to Holders of Other Intercompany Claims or Intercompany Interests.[24]

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each Holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

---

[24]    Such Claims and Interests are held by the Debtors or the Debtors' affiliates.

Nominees shall promptly distribute such Solicitation Packages (including Beneficial Holder Ballots) to Beneficial Holders within five (5) Business Days of receipt of the Solicitation Packages using one of the following two methods:

Each Nominee may elect to (i) "pre-validate" the Beneficial Holder Ballot, i.e., execute the Beneficial Holder Ballot, validate the Beneficial Holder's position in the Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, as of the Voting Record Date by including a medallion guarantee stamp on the Beneficial Holder Ballot, forward the Solicitation Package and executed Beneficial Holder Ballot (including the Nominee's DTC participant number) to the Beneficial Holder as of the Voting Record Date, and instruct the Beneficial Holder to (a) indicate its vote to accept or reject the Plan, and (b) return the executed Beneficial Holder Ballot directly to the Voting Agent via email at HootersBallots@ra.kroll.com or first-class mail; or (ii) forward the Solicitation Package together with the unexecuted Beneficial Holder Ballot to the Beneficial Holder as of the Voting Record Date with instructions for the Beneficial Holder to complete and return the executed Beneficial Holder Ballot to the Nominee.   In the event that a Nominee elects to proceed pursuant with option (ii) in the immediately preceding sentence, such Nominee must advise its Beneficial Holders to return their Beneficial Holder Ballot to the Nominee by a date that would permit the Nominee sufficient time to prepare and return its Master Ballot to the Voting Agent so that the Master Ballot is **actually received** by the Voting Agent by the Voting Deadline.   If it is a Nominee's customary and accepted practice to forward the Solicitation Packages to (and collect votes or elections from) Beneficial Holders by voter information form, electronic mail, telephone, or other customary means of communication, as applicable, including online submission of votes, the Nominee could employ that method of communication or submission in lieu of, or in addition to, sending the full Solicitation Package and/or Beneficial Holder Ballot.  Moreover, if it is the Nominee's customary internal practice to provide Beneficial Holders with an electronic link to solicitation materials (including, but not limited to, the Disclosure Statement and Plan), the Nominee may follow such customary practice in lieu of forwarding the flash drive or paper copies containing the Disclosure Statement and Plan.   In such instances, the Nominee may return any excess or unused flash drives or paper copies to the Voting Agent.   Any Beneficial Holder holding a Securitization Class A-2 Note Claim or Securitization Class B Note Claim, as applicable, as a record Holder in its own name is permitted to vote on the Plan by completing and signing a Beneficial Holder Ballot and returning it directly to the Voting Agent on or before the Voting Deadline.   If a Beneficial Holder holds Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and should execute and return a separate Beneficial Holder Ballot for each block of Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, it holds through any Nominee.

In addition to accepting a hard copy Ballot, pre-validated Beneficial Holder Ballot, and Master Ballot via first class mail, overnight courier, and hand delivery to the Voting Agent, Ballots (excluding Master Ballots, pre-validated Beneficial Holder Ballots, and Beneficial Holder Ballots) may be submitted via electronic, online transmissions, through a customized online balloting portal on the Debtors' case website maintained by Kroll ("**E-Ballot**"). Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing E-Ballot (which allows a Holder to submit an electronic signature). If applicable, instructions for electronic, online transmission of Ballots will be set forth on the forms of Ballots and in the E-Ballot online portal. The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted through E-Ballot in this manner and the voting party's electronic signature will be deemed to be immediately legally valid and effective. Ballots submitted by electronic mail, facsimile, or electronic means other than the online balloting portal will not be accepted, provided that, Master Ballots submitted by Nominees on behalf of their Beneficial Holder clients and pre-validated Beneficial Holder Ballots submitted by Beneficial Holders of Securitization A-2 Notes Claims or Securitization Class B Notes Claims, as applicable, may be returned directly to the Voting Agent by electronic mail at HootersBallots@ra.kroll.com. Where applicable, instructions for electronic, online transmissions of Ballots are set forth on the forms of the Ballots.

> 5.      **Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan**

Holders of Claims in the Non-Voting Classes listed above, in lieu of a Solicitation Package, will receive the Combined Hearing Notice, a Notice of Non-Voting Status, and Opt-In Form, substantially in the form attached to the Scheduling Order as <u>Exhibit 3</u>, <u>Exhibit 8</u> and <u>Exhibit 9</u>; *provided that*, the Debtors are not required to serve Holders of Other Intercompany Claims or Intercompany Interests copies of the Combined Hearing Notice, Notice of Non-Voting Status, Opt-In Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the Holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in <u>Article VIII</u> of the Plan and advises such Holders in Non-Voting Classes that they will not be bound by the Non-Debtor Release Provisions unless they timely and properly opt in. The Notice of Non-Voting Status also includes a form to complete and return if the party elects to opt-in to such Non-Debtor Release Provisions. A Holder that properly and timely elects to opt-in to the Non-Debtor Release Provisions will be a Releasing Party or Released Party under the Plan. Holders of Claims and Interests in the Non-Voting Classes who choose to opt-in to the Non-Debtor Release provisions may do so (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the E-Ballot so that (in each instance) it is actually received by the Voting Agent no later than **June 24, 2025 at 4:00 p.m.**

(**prevailing Central Time**) (the "**Opt-In Deadline**"), which the Debtors may extend, in their discretion, without further order of the Court. The Notice of Non-Voting Status includes information on how parties can opt-in electronically via the E-Ballot. An encrypted opt-in data and audit trail will be created through the electronic submission process and become part of the record of any opt-in election submitted in this manner. Additionally, the parties' electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the E-Ballot and the Debtors' restructuring website are the sole methods for Holders of Claims and Interests in Non-Voting Classes to transmit opt-in elections electronically.

### 6. Undeliverable Mailings

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable. For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date. The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

### D. Voting and Tabulation Procedures

### 1. Voting Record Date

The voting record date has been set at **May 19, 2025**, which is the date used for determining which Holders of Claims in the Voting Classes are entitled to vote on the Plan.

### 2. Holders of Claims Entitled to Vote

Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) (each, a "**Voting Class**" and, collectively, the "**Voting Classes**") are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below.

A Holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

a.     as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

b.     as of the Voting Record Date, such creditor's Claim has been Disallowed, expunged, disqualified or suspended;

c.     such creditor has not timely filed a Proof of Claim as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or

disputed, except to the extent that such creditor's deadline to file a Claim has not yet occurred, in which case the creditor will be entitled to vote at $1.00 on account of their Claim that has been scheduled in an undetermined amount or as contingent, unliquidated, or disputed;

d.      such creditor's Claim is subject to an objection or request for estimation as of the Voting Record Date, subject to the procedures set forth below; or

e.      such Holder is not, or fails to certify that it is, either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act).

With respect to transfers of claims filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and, if the Holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such claim only if: (i) all actions necessary to transfer such claim are completed by the Voting Record Date or (ii) the transferee files, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the Holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

### 3.      Parties Not Entitled to Vote

Holders of Claims and Interests in Classes 1 (Priority Non-Tax Claims), 5 (Other Secured Claims), 6 (Non-Securitization Term Loan Claims (Secured)), and 12 (Other Securitization Prepetition Equity Interests) will have their Claims and Interests adjusted, reinstated, or otherwise receive treatment as to render such Holders Unimpaired in the Debtors' or Reorganized Debtors' discretion (collectively, the "**Unimpaired Classes**"). Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of such Claims and Interests in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Classes 7 (Securitization Manager Advance Claims), 8 (General Unsecured Claims), 9 (Other Intercompany Claims), 10 (Intercompany Interests), 11 (Securitization Prepetition Master Issuer Equity Interests), and 13 (Non-Securitization Prepetition Equity Interests) will receive no recovery under the Plan. Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, such Holders are deemed to reject the Plan and, accordingly, are not entitled to vote on the Plan (the "**Deemed Rejecting Classes**" and, together with the Unimpaired Classes, the "**Non-Voting Classes**").

4.      **Establishing Claim Amounts for Voting Purposes**

**Class 2 Securitization Class A-2 Note Claims and Class 3 Securitization Class B Note Claims.**  The amount of each Securitization Class A-2 Note Claim and Securitization Class B Note Claim, for voting purposes only, will be based (a) on the applicable Notes held by each registered Holder thereof, if any, as evidenced on the books and records of the applicable indenture trustee or (b) on the amount of applicable Notes held by a Beneficial Holder (as defined below) thereof through a Nominee (as defined below) as of the Voting Record Date as evidenced by the securities position report(s) from the Depository Trust Company (the "DTC"), or other similar depository.

**Class 4 Non-Securitization Manager Advance Term Loan Claims**.  The amount of each Non-Securitization Manager Advance Term Loan Claim, for voting purposes only, will be based on and reconciled against the applicable lender registry maintained by the Debtors and/or the applicable administrative agent for such loan facility, as applicable.

To the extent that any discrepancy exists between the aggregate Claims amount as indicated on a Ballot by a Holder of Claims in one or more Voting Classes and the aggregate Claims amount as listed on the applicable lender registry, books and records or securities position report, for each Voting Class in which a Holder votes Claims, the aggregate Claims amount as listed on the applicable lender registry, books and records or securities position report, as applicable, shall govern for tabulation purposes.

5.      **Tabulation of Ballots**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.      Whenever a Holder of Claims casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent and thus, supersede any previously received, valid Ballot.  Following the Voting Deadline, no Ballot may be changed or revoked absent further order of the Court or as directed by the Debtors.

b.      Whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, the Ballot will not be counted.

c.      Whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

d.      A Holder of Claims shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor.  Any such Holder's Ballot (other than a Master Ballot) that partially accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

e.    A Holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

f.    A Holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

g.    The Debtors, unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

h.    The following Ballots shall not be counted:

i.    any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waive the late submission;

ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

iii.    any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

iv.    any Ballot cast by a person or entity that is not entitled to vote, even if such individual or entity holds a Claim in a Voting Class;

v.    any unsigned Ballot, provided that Ballots submitted by E-Ballot, Master Ballots submitted via e-mail by Nominees on behalf of their Beneficial Holder clients, and pre-validated Beneficial Holder Ballots submitted directly to Kroll by Beneficial Holders, via electronic mail will be deemed to contain a legal, valid signature;

vi.    any Ballot containing a vote that the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code;

vii.    any Ballot transmitted to the Voting Agent by e-mail or facsimile or other means not specifically approved herein.   For the avoidance of doubt, Master Ballots and pre-validated Beneficial Holder Ballots may be submitted via e-mail; or

viii.    any Ballot cast by a person or entity that does not certify that it is either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act).

Votes cast by (or on behalf of) Beneficial Holders of the Debtors are subject to the following tabulating procedures:

a.     votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees of certain Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, as of the Voting Record Date, as evidenced by the securities position report(s) from the DTC, the applicable indenture trustee, or other applicable depository firm.  Votes submitted by a Nominee will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

b.     if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

c.     if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of certain Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable;

d.     for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Beneficial Holder includes interest and/or fees in the amount voted on its Ballot) to have voted only the principal amount of its Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable;

e.     a single Nominee may complete and deliver to the Voting Agent multiple Master Ballots.   Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.  Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly;

f.     the amount of Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, held by directly registered and Beneficial Holders for voting purposes only will be established through the indenture trustees or applicable Nominees, as the case may be, in the amount of the applicable positions held by such registered Holders as of the Voting Record Date, as evidenced by the securities position report(s) from the DTC, the applicable indenture trustee, or other applicable depository firm; and

97

g.     all Nominees are required to retain the Beneficial Holder Ballots cast by their respective Beneficial Holders (or a record thereof if such vote was otherwise cast in accordance with the Nominees' customary practices) for inspection for a period of one (1) year following the Voting Deadline.

Each Holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification.   Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Court) determines.   Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.   Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.   Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.

The Debtors (in consultation with the DIP Lenders, Ad Hoc Group, and Creditors' Committee) are further authorized to reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their Claim Holders. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **June 27, 2025 at 4:00 p.m. (Prevailing Central Time)**.

**6.      Amendments to the Plan and Solicitation and Voting Procedures**

The Debtors reserve the right, and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Combined Hearing Notice, Opt-In Form, and Solicitation Packages, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution; *provided that* all such modifications shall be made in accordance with the terms of

the document being modified, the Plan, and the Restructuring Support Agreement. For the avoidance of doubt, in the event the Restructuring Support Agreement is terminated, all consent rights set forth therein will terminate and will no longer be applicable.

### E.   **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## IX.   **RISK FACTORS TO CONSIDER BEFORE VOTING**

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.   **General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below, as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.   **Factors Relating to the Debtors' Business Operations and Financial Condition**

#### 1.   **Competition**

Companies operating in the food service industry face a high level of competition, and results of the Debtors' operations are sensitive to, and may be adversely affected by, competitive pricing, promotional pressures, additional competitor restaurant openings, and other factors. The Reorganized Debtors will compete with numerous other companies providing similar services, including international, national, and local restaurants and third-party food delivery providers. The Reorganized Debtor's ability to successfully implement their business plan depends on their ability to attract and retain customers in this highly competitive environment.

### 2. Right-Sizing Real Estate Portfolio

The Debtors' efforts to divest or close restaurants during the Chapter 11 Cases is part of the Debtors' wider effort to cut costs and maintain profitability. The Debtors forward-looking financial projections are based on the divestment and closure of certain restaurants. The actual lease savings realized by the Company may be substantially less than the Debtors anticipate.

### 3. Customer Preferences

The restaurants industry fluctuates according to changes in customer preferences, which are dictated by seasonality, perceived value, and industry trends. The success of the Debtors' business is highly dependent on the Debtors' ability to anticipate, identify, or react to changing styles or trends. If the Debtors are unable to anticipate, identify, or react sufficiently to such changing styles or trends, the Debtors' revenue and overall performance, as well as its brand image and membership figures, may be adversely affected.

### 4. Pending and Future Litigation

There is, or may be in the future, certain litigation that could result in a material judgment against the Debtors, the Reorganized Debtors, or the Wind-Down Entity. Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtor or Wind-Down Entity.

### 5. Market Value of the Debtors' Restaurant Business

The fair market values of the Hooters brand that the Debtors currently own and operate may increase or decrease depending on a number of factors, many of which are beyond the Debtors' control, including the general economic and market conditions affecting the restaurant industry sectors.

### 6. Operational Disruptions or Cost Increases Related to Their Supply Chain, Labor, or Other Causes

In addition, the Debtors rely on certain third parties to provide supplies and services necessary for their restaurant business, including, but not limited to, foodservice inventory as well as the Debtors' workforce to operate the restaurant locations. The failure of these suppliers to provide the materials or for the Debtors to maintain the necessary human resources required to operate the restaurant business could result in an operational disruption, leading to lost revenue.

### 7. Governmental Laws and Regulations May Impose Significant Costs and Liabilities

The Debtors' operations are subject to federal, state, and local laws and regulations that may, among other things, require them to obtain and maintain specific permits or other governmental approvals. Failure to comply with these laws and regulations may result in the assessment of financial penalties, the imposition of remedial obligations, the denial or revocation of permits or other authorizations, and the issuance of injunctions that may limit or prohibit some or all of the Debtors' operations. The application of these laws and regulations, the modification

of these laws or regulations, or the adoption of new laws or regulations could materially limit future opportunities or materially increase the Debtors' costs, including their capital expenditures.

### 8. RoyaltyCo's Future Success Depends on the Performance of Brand Co.

Brand Co., an entity to be formed and owned by the Buyer Group, is expected to be engaged by RoyaltyCo under the Brand License Agreement to oversee all brand, franchising, and management functions. The success of RoyaltyCo will be largely dependent on the ability of Brand Co. to support and grow the business. There is no assurance that the past performance of the Buyer Group will be indicative of Brand Co.'s future results, or that Brand Co. will be able to grow the business with the same success the Buyer Group has had in the past or as is currently planned.

### C. Certain Bankruptcy Law Considerations

### 1. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

### 2. Non-Consensual Confirmation

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

### 3. Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtor based on certain assumptions, as set forth in **Exhibit D** hereto. The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or the Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demand for the Reorganized Debtors' products and services, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or public health pandemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

The Debtors' projections reflect the projected impact of value-creating programs. However, the Debtors cannot state with certainty that such value-creating programs will achieve their targeted results.

### 4. Allowed Claims Could Exceed Estimates

There can be no assurance that the Allowed amount of Claims participating in distributions will not be significantly more than projected, which in turn, could cause the value of distributions to Holders of such Allowed Claims to be reduced. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.

### 5. U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims and Interests, *see* **Section VII** of this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### D.    Factors Relating to Securities to Be Issued

#### 1.    Potential Dilution

The ownership percentage represented by the New Equity Interests distributed under the Plan as of the Effective Date will be subject to dilution from the MIP or any other equity issued in connection with any other equity that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other equity issuances by RoyaltyCo could adversely affect the value of the New Equity Interests.  The amount and dilutive effect of any of the foregoing could be material.

#### 2.    Significant Holders of New Equity Interests

Certain Prepetition Lenders and Holders of Securitization Class B Notes are expected to acquire a significant ownership interest in the New Equity Interests issued pursuant to the Plan. Such Prepetition Lenders and Holders of Securitization Class B Notes may, among other things, exercise a controlling influence over the business and affairs of RoyaltyCo and have the power to elect directors, control the appointment of a majority of the board of directors, and approve significant mergers and other material corporate transactions, without the approval of other stockholders.

This concentration of ownership could also facilitate or hinder a negotiated change of control of RoyaltyCo and, consequently, have an impact upon the value of the New Equity Interests.

#### 3.    Interests Subordinated to the RoyaltyCo's Indebtedness

In any subsequent liquidation, dissolution, or winding up of RoyaltyCo, the New Equity Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

#### 4.    Market for Securities

There is currently no market for the New Equity Interests or the New Debt, and there can be no assurance as to the development or liquidity of any market for any such securities. RoyaltyCo is under no obligation to list any such securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, RoyaltyCo. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 5. Restrictions on Ability to Resell New Debt and New Equity Interests

The New Equity Interests and the New Debt will not be registered under applicable federal or state securities law.  Absent such registration, the New Equity Interests may be offered and sold only in transactions that are not subject to, or that are exempt from, the registration requirements of applicable securities laws.  These restrictions could significantly limit holders' ability to resell the New Equity Interests.

In particular, any New Equity Interests issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities, and the New Debt, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, and subject to the foregoing, while the New Equity Interests issued pursuant to section 1145(a) of the Bankruptcy Code may generally be resold by the holder thereof without registration under the Securities Act, such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of RoyaltyCo as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 or Rule 144A under the Securities Act.

Furthermore, the liquidity of any market for the New Equity Interests will depend upon, among other things, the number of holders of the New Equity Interests, RoyaltyCo's financial performance, and the market for similar securities, none of which can be determined or predicted. Additionally, the New Equity Interests and New Debt may be subject to certain restrictions on transfer under the Shareholders Agreement, if any, New Organizational Documents, and New Notes Documents, as applicable.  Accordingly, there can be no assurance that an active trading market for the New Equity Interests or New Debt will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Equity Interests and New Debt may be substantially limited.  For a discussion of transfer restrictions on the New Equity Interests and New Debt under applicable federal or state securities law, see Section VI of this Disclosure Statement.

### E. Factors Related to the DIP Facility, the New Notes, and the Restructuring Support Agreement

### 1. Risks Related to the DIP Facility

The DIP Facility is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

**2.      Risks Related to the New Notes and Post-Effective Date Indebtedness**

The New Notes Indenture is intended to provide RoyaltyCo liquidity to operate its business and carry out the Reorganized Debtors' business plan after the Effective Date.  However, there is no assurance that the Reorganized Debtor will be able to meet all of the terms and conditions of the New Notes Documents, which may hinder the Debtors' ability to consummate the Plan.  There is a risk that RoyaltyCo defaults under the New Notes Indenture and the secured parties thereunder take enforcement actions against RoyaltyCo, including execution or foreclosure against assets thereof.  RoyaltyCo and the Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their compliance with affirmative and negative covenants, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond their control.  They may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if they need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

**3.      The Restructuring Support Agreement or Other Plan Documents Could Be Terminated**

The Restructuring Support Agreement is an important component of the Debtors' ability to consummate the Plan.  Pursuant to its terms, the Restructuring Support Agreement may be terminated under certain circumstances, including if a Consenting Stakeholder thereunder delivers a written notice of termination, or if the Debtors materially breach, or file a pleading with the Bankruptcy Court that is inconsistent with, the Restructuring Support Agreement.

The Debtors' entry into the Restructuring Support Agreement and other Plan documents will be subject to approval by the Bankruptcy Court.  There can be no assurance that the Bankruptcy Court will approve the Debtors' entry into the Restructuring Support Agreement or other Plan documents.

**F.      Additional Factors**

**1.      Debtors Could Withdraw the Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

**2.      Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.      **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4.      **No Legal or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.      **No Admission Made**

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

## X.      <u>CONFIRMATION OF THE PLAN</u>

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A.      <u>Acceptance of the Plan</u>

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are

receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

> (i) **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

> (ii) **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

> (iii) **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the Holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE COMBINED HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B. <u>Best Interests Test</u>

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under

chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests" test. The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the amount such holder would receive or retain in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit E**.

The Debtors believe that any liquidation analysis is subjective, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### C.   **Feasibility**

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of RoyaltyCo, the Reorganized Debtors, or any successor under the Plan.

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections (collectively, the "**Financial Projections**"), attached hereto as **Exhibit D**. Moreover, **Section IX** hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they

will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, unless required to do so by the SEC or other regulatory bodies.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by a variety of factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

### D.   Valuation

Assuming all DIP Claims are paid in full under the Plan, and before giving effect to any dilution from the MIP, the Plan implies an enterprise value of the Company of approximately $[●] million.  The estimated recoveries set forth in this Disclosure Statement are based on such implied enterprise value.  The Debtors may receive higher and better offers for the Debtors' assets.  Any such offers would be negotiated at arms'-length and would be subject to a Court-approved sale process.  If competitive bids are received, the Debtors believe such bids may be the best indicators of the Company's value.

### E.   Notices and Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a Combined Hearing upon appropriate notice to all required parties.  The Combined Hearing is scheduled for July 1, 2025 at [●]:[●]  [●].m. (Central Time).  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Combined Hearing, at any subsequent continued Combined Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Everett, together with proof of service thereof, and served upon all of the below parties.

**If to the Debtors, to:**

Hooters of America, LLC                    Ropes & Gray LLP
1815 The Exchange SE                       1211 Sixth Ave
Atlanta, GA 30339                          New York, New York 10036

Attn: Keith Maib, CRO
E-mail: kmaib@accordion.com

Attn:  Ryan Preston Dahl
Email:     ryan.dahl@ropesgray.com

Ropes & Gray LLP
191 N. Wacker Dr., 32nd Floor
Chicago, IL 60606
Attn: Chris Dickerson, Rahmon Brown,
Michael Wheat
Email:  chris.dickerson@ropesgray.com,
rahmon.brown@ropesgray.com,
michael.wheat@ropesgray.com

Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Attn: Holland N. O'Neil,
Stephen A. Jones, Zachary C. Zahn
Email: honeil@foley.com
sajones@foley.com
zzahn@foley.com

**If to the Creditors' Committee, to:**

Pachulski Stang Ziehl & Jones LLP
700 Louisiana Street, Suite 4500
Houston, TX 77002
Attn: Maxim Litvak, Judith Elkin,
Theodore S. Heckel
Email: jelkin@pszjlaw.com
mlitvak@pszjlaw.com
theckel@pszjlaw.com

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Attn: Bradford J. Sandler, Robert J.
Feisntein, Shirley S. Cho
bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
scho@pszjlaw.com

**If to the DIP Lenders, to:**

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attn: Genevieve G. Weiner
Email: gweiner@sidley.com

Sidley Austin LLP
787 7th Avenue
New York, NY 10019
Attn: Elizabeth R. Tabas Carson,
Juliana L. Hoffman
Email: etabas@sidley.com
jhoffman@sidley.com

**If to the Buyer Group, to:**

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Benjamin W. Butterfield,
Sean Daly

Email: bbutterfield@mofo.com
        sdaly@mofo.com

**If to the AHG Noteholders, to:**

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attention: Brian Pfeiffer,
         Amanda Parra Criste
Email: brian.pfeiffer@whitecase.com
        aparracriste@whitecase.com

White & Case LLP
1121 Avenue of the Americas
New York, NY 10021
Attention: David Thatch

Email: dthatch@whitecase.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

## XI.    <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in Classes 2, 3, and 4 to vote in favor thereof.

Dated: May 6, 2025          **FOLEY & LARDNER LLP**
Dallas, Texas

*/s/ Holland N. O'Neil*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
mmoore@foley.com
zzahn@foley.com

*Proposed Co-Counsel to the Debtors*

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

**ROPES & GRAY LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Proposed Counsel to the Debtors*