## **Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT IS AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 20, this "*Agreement*") dated March 31, 2025 is entered into by and among (each of the following described in sub-clauses (a) through (d) of this preamble, individually, a "*Party*" and, collectively, the "*Parties*"):[1]

(a)    Hawk Parent, LLC, HOA Holdings, LLC, HOA Funding, LLC, and each of their subsidiaries listed on **Schedules 1-A** and **1-B** to this Agreement (collectively, the "*Company*" or "*Company Parties*");

(b)    the undersigned Holders of the Prepetition Lender Claims (in each case solely in their capacity as such, the "*Prepetition Lenders*");

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

(c)     the undersigned Holders of the Securitization Notes Claims that are members of the Ad Hoc Group (in each case solely in their capacity as such, the "***Consenting AHG Noteholders***"); and

(d)     Hooters, Inc., Restaurants of America, Inc., and Hoot Owl Restaurants, LLC (collectively, the "***Buyer Group***").

The terms of the Restructuring Term Sheet, a copy of which is attached hereto as **<u>Exhibit B</u>** (the "***Restructuring Term Sheet***") are hereby incorporated and included in the terms of this Agreement.[2]

## RECITALS

**WHEREAS**, the Company Parties, the Consenting Creditors, and the Buyer Group have negotiated or been apprised of the transactions contemplated by this Agreement (the "***Restructuring Transactions***") in good faith and at arm's-length and consent to and have agreed to consummate and support such Restructuring Transactions on the terms set forth in this Agreement, including the Restructuring Term Sheet and all other exhibits to this Agreement, and for such Restructuring Transactions to be memorialized in the Approved Plan;

**WHEREAS**, the Restructuring Transactions will include:

i.     the commencement by the Company Parties of voluntary chapter 11 cases (the "***Chapter 11 Cases***") under the Bankruptcy Code in the Bankruptcy Court on the terms set forth in this Agreement;

ii.     the Company Parties' entry into a superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $40,000,000 (the "***DIP Facility***"), on the terms and conditions set forth in the DIP Facility Term Sheet and the DIP Credit Agreement;

iii.     the Company Parties' entry into the Buyer Group Arrangements (as defined and more particularly described in the Restructuring Term Sheet) with the Buyer Group (or their respective affiliates), to be effectuated through the Approved Plan;

iv.     the confirmation and consummation of the Approved Plan that is consistent with this Agreement, including the Restructuring Term Sheet, and otherwise contains terms and conditions reasonably acceptable to the Required Consenting Creditors and, insofar as such terms or conditions relate to the Buyer Group Arrangements, the Buyer Group (the "***Approved Plan***");

v.     upon the Effective Date, (a) Holders of Securitization A-2 Notes Claims will be issued new notes in RoyaltyCo; (b) Holders of Securitization B Notes Claims will be issued

---

[2]     In the event of any inconsistencies between the terms of this Agreement and the terms of the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.  In the event of any inconsistencies between the terms of this Agreement (other than the Restructuring Term Sheet) and the terms of the DIP Facility Term Sheet, the terms of the DIP Facility Term Sheet shall govern.

new notes and equity interests in RoyaltyCo; and (c) Holders of DIP Facility Claims will be issued new notes; and (d) holders of Term Loan Claims will be issued new notes and equity interests in RoyaltyCo, all as more specifically described in the Restructuring Term Sheet; and

vi.    upon the Effective Date, the UAS Wind-Down Process.

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

*AGREEMENT*

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

"***Ad Hoc Group***" means the ad hoc group of Holders of Securitization Notes Claims under the Existing Securitization Indenture represented by the Ad Hoc Group Advisors.

"***Ad Hoc Group Advisors***" means (i) White & Case LLP ("***White & Case***"), counsel to the Ad Hoc Group, (ii) Gray Reed, local counsel to the Ad Hoc Group, and (iii) M3 Partners, LP, financial advisor to the Ad Hoc Group.

"***Affiliate***" of an Entity means another Entity that directly or indirectly owns, controls, or is under common control with such Entity.

"***Agreement***" has the meaning set forth in the preamble to this Agreement, and for the avoidance of any doubt, includes all exhibits, annexes, and schedules hereto in accordance with Section 20.

"***Alternative Restructuring***" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale or assignment of all or any material portion of assets, new-money investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing), plan proposal, recapitalization, restructuring, or liquidation of the Company Parties, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests of or in any one or more Company Parties, whether written or oral, that is an alternative to, or is inconsistent with, any material component of the Restructuring Transactions; *provided that*, for the avoidance of doubt, the Restructuring Transactions shall not constitute an Alternative Restructuring.

"***Approved Budget***" has the meaning set forth in the DIP Facility Term Sheet.

3

"*Approved Plan*" has the meaning set forth in the recitals to this Agreement.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under sections 2075 of title 28 of the United States Code, 27 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"*Brand Management & Services Agreement*" has the meaning set forth in the Restructuring Term Sheet.

"*Business Day*" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by Law or executive order.

"*Buyer Group*" has the meaning set forth in the preamble to this Agreement.

"*Buyer Group Advisors*" means (i) Morrison & Foerster LLP, as counsel to the Buyer Group, and (ii) North Point Advisors, as financial advisor to the Buyer Group.

"*Buyer Group Arrangements*" has the meaning set forth in the Restructuring Term Sheet.

"*Buyer Group Termination Event*" has the meaning set forth in <u>Section 11.07</u>.

"*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"*Chapter 11 Cases*" has the meaning set forth in the recitals to this Agreement.

"*Claim*" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code, against any Company Party.

"*Class A-2 Notes*" means those certain 4.723% senior secured notes, alphanumerically designated as "Class A-2" in accordance with, and outstanding in a principal amount of $266,579,000.00 under the Existing Securitization Indenture.

"*Class B Notes*" means those certain 7.432% senior secured notes, alphanumerically designated as "Class B" in accordance with, and outstanding in a principal amount of $40,000,000.00 under the Existing Securitization Indenture.

"*Company*" has the meaning set forth in the preamble to this Agreement.

"*Company Advisors*" means the Company's advisors and professionals, including (i) Ropes & Gray LLP ("*Ropes & Gray*") and Foley & Lardner LLP, as co-counsel to the Company Parties, (ii) SOLIC Capital, LLC, as investment banker to the Company Parties, (iii) Accordion

Partners LLC, as financial advisor to the Company Parties, and (iv) Kroll Restructuring Administration LLC, as claims agent to the Company Parties.

"***Company Party***" has the meaning set forth in the preamble to this Agreement.

"***Company Termination Event***" has the meaning set forth in <u>Section 11.06</u>.

"***Confirmation and Sale Order***" means the order entered by the Bankruptcy Court approving the Buyer Group Arrangements and confirming the Approved Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent with this Agreement and reasonably acceptable to the applicable Company Parties, the Required Consenting Creditors, and the Buyer Group.

"***Consenting AHG Noteholder Termination Event***" has the meaning set forth in <u>Section 11.05</u><u>Section 11.04</u> of this Agreement.

"***Consenting AHG Noteholders***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Claims***" means all Claims against any Company Party held by Consenting Creditors from time to time.

"***Consenting Creditors***" means the Consenting AHG Noteholders and the Prepetition Lenders.

"***Control Party***" means Drivetrain Agency Services, LLC, in its capacity as the Control Party under, and as defined in, the Existing Securitization Indenture.

"***Debtors***" means the Company Parties that commence the Chapter 11 Cases.

"***Definitive Documents***" means all of the definitive documents implementing the Restructuring Transactions (which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders), including: (a) this Agreement; (b) the Approved Plan (and the Plan Supplement and all related, exhibits, term sheets, or agreements related thereto); (c) the Confirmation and Sale Order; (d) the Disclosure Statement and any documents or Solicitation Materials related to the solicitation thereof, including the Disclosure Statement Approval Order; (e) the First Day Pleadings and all orders sought pursuant thereto, including the DIP Orders; (f) the DIP Facility Documents; (g) the Brand Management & Services Agreement; (h) the New Securitization Documents; (i) the Sale Documents; (j) the Wind-Down Budget; and (k) any documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement any of the foregoing.

"***DIP Credit Agreement***" means that certain *Superpriority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time) by and among Hawk Parent, LLC and Hooters of America, LL, as borrowers, certain subsidiaries from time to time party thereto as guarantors, the lenders from time party thereto, and U.S. Bank Trust Company, National Association, as collateral agent and calculation agent under the DIP Facility.

"***DIP Facility***" has the meaning set forth in the recitals to this Agreement.

"***DIP Facility Claims***" means any and all Claims arising under, derived from, based on or related to, the DIP Facility.

"***DIP Facility Documents***" means, collectively, the DIP Credit Agreement, the DIP Orders, the security and guaranty documents, fee letters, notes, the Approved Budget, and any other ancillary documents entered into in connection therewith.

"***DIP Facility Term Sheet***" means the DIP Facility Term Sheet that is attached as **Exhibit 3** to the Restructuring Term Sheet.

"***DIP Lenders***" has the meaning set forth in the Restructuring Term Sheet.

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disclosure Statement***" means the disclosure statement in respect of the Approved Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125 and 1126 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable law.

"***Disclosure Statement Approval Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

"***Divested Stores***" means the portfolio of 103 Debtor-owned stores, to be acquired by the Buyer Group through the Buyer Group Arrangements.

"***Effective Date***" means the effective date of the Approved Plan.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Existing Securitization Indenture***" means that certain Amended and Restated Base Indenture, dated August 19, 2021 by and between HOA Funding, LLC as the master issuer and CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee.

"***Fiduciary Out***" has the meaning set forth in <u>Section 11.06(f)</u> of this Agreement.

"***Fiduciary Out Notice***" has the meaning set forth in <u>Section 11.06(f)</u> of this Agreement.

"***Final DIP Order***" means the final order in the Chapter 11 Cases authorizing the Company's entry into the DIP Facility and use of Cash Collateral on a final basis, which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders.

"***First Day Pleadings***" means the motions and related pleadings that the Debtors intend to file upon the commencement of the Chapter 11 Cases.

"***Holder***" means any Person or Entity that is the record or beneficial owner of any Claim, including any investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold any Claim on behalf of any signatory to this Agreement.

"***Interim DIP Order***" means the interim order authorizing the Company's entry into the DIP Facility and use of Cash Collateral on an interim basis, which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders.

"***Joinder Agreement***" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit A**.

"***Law***" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"***Manager Advance Credit Agreement***" means that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

"***Milestones***" means the milestones defined in Section 3.01 of this Agreement.

"***New Securitization Documents***" means, collectively, the New Securitization Indenture and corresponding supplements for each of the Class A-1 Notes, Class A-2I Notes, Class A-2II Notes, and Class B Notes (each as defined in the Restructuring Term Sheet), all guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the Waterfall, an intercreditor agreement, and any other documents or agreements the Required Consenting Creditors and the Required DIP Lenders, in their sole discretion, deem necessary to effectuate the Approved Plan and Restructuring Transactions in this Agreement.

"***New Securitization Indenture***" means the new base indenture for each of the Class A-1 Notes, Class A-2I Notes, Class A-2II Notes, and Class B Notes, to be entered into and effective as of the Effective Date.

"***Non-Securitization Entities***" means the Company Parties listed in **Schedule 1-A**.

"***Outside Date***" means the earlier of (i) seventy-five (75) days following the Petition Date and (ii) June 16, 2025.

"***Party***" or "***Parties***" has the meaning set forth in the preamble to this Agreement.

"***Permitted Transferee***" has the meaning set forth in Section 6.02.

"***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means the date on which the Company Parties commence the Chapter 11 Cases.

"***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Approved Plan that, subject to the terms and conditions provided in this Agreement, may be filed by the Company with the Bankruptcy Court from time to time.

"***Post-Effective Date Debtors***" means, collectively, the Debtors following the Effective Date.

"***Prepetition Credit Agreements***" means the Prepetition Term Loan Credit Agreement and the Manager Advance Credit Agreement.

"***Prepetition Equity Interests***" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"***Prepetition Lender Advisors***" means (i) Sidley Austin LLP ("***Sidley***"), as counsel to the Prepetition Lenders and (ii) Houlihan Lokey, Inc. ("***Houlihan Lokey***"), as investment banker to the Prepetition Lenders.

"***Prepetition Lender Claim***" means any Claim against any Company Party arising under, derived from, based on or related to the loans under the Manager Advance Credit Agreement or the Prepetition Term Loan Credit Agreement, including, for the avoidance of doubt, any Manager Advances (as defined in the Prepetition Term Loan Credit Agreement), and any guarantees thereof.

"***Prepetition Lender Termination Event***" has the meaning set forth in Section 11.04.

"***Prepetition Lenders***" means those certain secured lenders (and/or investment advisors to secured lenders) under the Prepetition Credit Agreements.

"***Prepetition Term Loan Credit Agreement***" means that certain Credit Agreement, dated March 9, 2022, (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

"***Qualified Marketmaker***" means an Entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

"***Qualified Marketmaker Joinder***" has the meaning set forth in <u>Section 6.03</u> of this Agreement.

"***Qualified Marketmaker Joinder Date***" has the meaning set forth in <u>Section 6.03</u>.

"***Related Fund***" means, with respect to any Consenting Creditor, any fund, account, or investment vehicle that is controlled or managed by (i) such Consenting Creditor, (ii) an Affiliate of such Consenting Creditor, or (iii) the same investment manager, advisor or subadvisor as such Consenting Creditor or an Affiliate of such investment manager, advisor, or subadvisor, in each case, to the extent such Entity can be legally bound to this Agreement.

"***Required Consenting AHG Noteholders***" means, as of the date of determination, Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims held by the Consenting AHG Noteholders.

"***Required Consenting Creditors***" means the Required Consenting AHG Noteholders and the Required Prepetition Lenders.

"***Required DIP Lenders***" has the meaning set forth in the DIP Facility Term Sheet.

"***Required Prepetition Lenders***" means, as of the date of determination, Prepetition Lenders holding at least 66.67% in aggregate outstanding principal amount of the Prepetition Lender Claims.

"***Restructuring Expenses***" means the reasonable and documented fees and expenses related to the negotiation and implementation of the Restructuring Transactions pursuant to this Agreement, incurred by the Agent, the Ad Hoc Group, any Prepetition Lender, any DIP Lender, the Notes Trustee, and the Control Party, including but not limited to: (i) the legal fees and expenses of the Ad Hoc Group, Sidley, and any other counsel; (ii) the fees and expenses of Houlihan Lokey, as financial advisor to the Prepetition Lenders and DIP Lenders; and (iii) the fees and expenses of M3 Partners, LP, as financial advisor to the Ad Hoc Group.

"***Restructuring Term Sheet***" has the meaning set forth in the preamble to this Agreement.

"***Restructuring Transactions***" has the meaning set forth in the recitals to this Agreement.

"***RoyaltyCo***" has the meaning set forth in the Restructuring Term Sheet.

"***Sale Documents***" means collectively, the Confirmation and Sale Order, the Buyer Group Arrangements, and any ancillary documents to effectuate the Buyer Group Arrangements, each of which shall contain terms and conditions that are materially consistent with this Agreement.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

"***Securitization Class A-2 Note Claims***" has the meaning set forth in the Restructuring Term Sheet.

"*Securitization Class B Note Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Securitization Entities*" means the Company Parties listed in **Schedule 1-B**.

"*Securitization Notes Claims*" means, collectively, the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims.

"*Sellers*" means each of the Company Parties who shall be signatories to the Buyer Group Arrangements.

"*Solicitation*" means the solicitation of votes on the Approved Plan (including any non-voting election forms with respect to releases).

"*Solicitation Materials*" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Approved Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"*Support Effective Date*" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) each Company Party, (ii) by Prepetition Lenders holding at least 66.67% in aggregate principal amount of Prepetition Claims, (iii) Holders of Securitization Class A-2 Note Claims holding at least two thirds in aggregate principal amount of the Securitization Class A-2 Note Claims, (iv) Holders of Securitization Class B Note Claims holding at least two thirds in aggregate principal amount of the Securitization Class B Note Claims, and (v) each member of the Buyer Group.

"*Support Period*" means the period commencing on the Support Effective Date and ending on the Termination Date.

"*Term Loan Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Termination Date*" means the date on which termination of this Agreement is effective as to a Party in accordance with Section 10 of this Agreement.

"*Transfer*" has the meaning set forth in Section 6.01.

"*UAS Wind-Down Process*" means, upon the Effective Date, the orderly wind-down of the Debtors' estates and any Unallocated Stores on terms set forth in the Approved Plan and agreed to by the Debtors or Post-Effective Date Debtors, as applicable, and the Consenting Creditors.

"*Unallocated Stores*" means the stores of the Company Parties that are not acquired pursuant to the Buyer Group Arrangements.

"*Waterfall*" has the meaning set forth in the Restructuring Term Sheet.

"*Wind-Down Budget*" has the meaning set forth in the Restructuring Term Sheet.

2.      **Passage of Time.**

      With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules, such Milestone or other reference of time shall be extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

3.      **Restructuring.**

      Section 3.01    The Restructuring Transactions.

      (a)      The Approved Plan. Subject to the terms of this Agreement, the Company Parties will consummate the Restructuring Transactions prior to the Outside Date in the Chapter 11 Cases, in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and in accordance with the milestones set forth in the Restructuring Term Sheet (the "***Milestones***"); *provided* that, subject to the Outside Date, any Milestone may be extended or waived upon the written consent (with e-mail from counsel being sufficient) of the Required DIP Lenders and the Required Consenting AHG Noteholders in their respective sole discretion.

      Each of the Parties shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other in connection with the Approved Plan, the Restructuring Transactions, and the Milestones. Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court to carry out the purpose and intent of this Agreement (including to provide any reasonably necessary or reasonably requested information to federal, state, local, or foreign regulators), to obtain required regulatory approvals necessary for confirmation of the Approved Plan, including entry into and consummation of the Buyer Group Arrangements in connection therewith.

      Section 3.02    Definitive Documents.

      The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants materially consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14 hereof. Further, the Definitive Documents or any other documentation relating to the Restructuring Transaction not executed or in a form attached to this Agreement as of the Support Effective Date shall be materially consistent with this Agreement and otherwise be in form and substance acceptable to the Company Parties and the Required Consenting Creditors; *provided* that, the Approved Plan, the Disclosure Statement, Solicitation Materials, the Confirmation and Sale Order, the Buyer Group Arrangements, and any other Sale Documents related thereto shall also be in form and substance acceptable to the Buyer Group.

4. **Agreements of the Prepetition Lenders.**

Section 4.01   Support. Each Prepetition Lender, with respect to each of its respective Prepetition Lender Claims, hereby covenants and agrees, severally and not jointly, during the Support Period to:

(a)   support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Facility Term Sheet, the Approved Plan, the Sale Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement;

(b)   pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions hereof) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)   when properly solicited to do so, timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control) in support of the Approved Plan, including any Claims that are impaired under the Approved Plan and not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in this clause (c); *provided however*, (i) that if any Company Party is in breach of any representation, warranty, or covenant set forth in this Agreement, the Prepetition Lenders may change or withdraw (or cause or direct to be changed or withdrawn) any vote in support of the Approved Plan, and (ii) except with respect to the termination rights provided in the Company Termination Events under Section 11.06 (a), (d) or (e) herein, a Prepetition Lender's vote shall be immediately and automatically without further action of any Prepetition Lender revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Prepetition Lender;

(d)   consent to, support, grant, and, as applicable, opt-in or not opt-out of the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and Confirmation and Sale Order; and

(e)   not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), (ii) propose, support, vote for, encourage, seek, file, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any Entity regarding any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report, or comparable public statement or filing with respect to any Alternative Restructuring and timely vote (or cause to be voted) its Claims against any Alternative Restructuring, or

(iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)　　(i) not direct any trustee to take any action inconsistent with such Prepetition Lender's obligations under this Agreement or the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, and (ii) if any applicable trustee takes any action inconsistent with such Prepetition Lender's obligations under this Agreement, the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, such Prepetition Lender will use commercially reasonable efforts to direct such trustee (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring Transactions; *provided*, that it is acknowledged and agreed that actions taken by any administrative agent and/or collateral agent under the Prepetition Credit Agreements may constitute a Company Termination Event or a Consenting AHG Noteholder Termination Event unless the Prepetition Lenders have directed such agent to cease taking such action consistent with this Section 4.01(f);

(g)　　(i) act in good faith with regard to the successful consummation of the Restructuring Transactions materially consistent with this Agreement and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the applicable Company Parties and the Prepetition Lenders to be necessary to consummate the Restructuring Transactions;

(h)　　negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; *provided*, that the material terms of the Approved Plan are preserved;

(i)　　refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(j)　　promptly notify the Company Parties and the Consenting AHG Noteholders, in writing (e-mail to counsel being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(k)　　inform the Company Parties and the Consenting AHG Noteholders (e-mail to counsel being sufficient) reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions.

Section 4.02   Additional Provisions Regarding the Prepetition Lenders' Agreements. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any Prepetition Lenders to assert or raise any objection

13

permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any Prepetition Lender from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a Prepetition Lender in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, and the right to assert any and all Prepetition Lender Claims (so long as the exercise of any such right or the assertion of any such claim is not inconsistent with such Prepetition Lender's obligations hereunder); (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of the Prepetition Credit Agreements; (e) require any Prepetition Lender to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such Prepetition Lender is a party and that remains in full force and effect; (f) prevent any Prepetition Lender from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any Prepetition Lender to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such Prepetition Lender may reasonably determine.

Section 4.03    Additional Claims. To the extent any Prepetition Lender (a) acquires additional Claims entitled to vote on the Approved Plan; or (b) Transfers any Claims, then, in each case, each such Prepetition Lender shall promptly notify Ropes & Gray of such acquisition (which notification may be by e-mail from the Prepetition Lender Advisors, as applicable), and each such Prepetition Lender hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Approved Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 6 hereof.

5.    **Agreements of the Consenting AHG Noteholders.**

Section 5.01    Support. Each Consenting AHG Noteholder, with respect to each of its respective Securitization Notes Claims, hereby covenants and agrees, severally and not jointly, during the Support Period to:

(a)    support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Facility Term Sheet, the Approved Plan, the Sale Documents, the New Securitization Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement; *provided*, *however*, that DIP Facility Term Sheet shall be in form and substance reasonably acceptable to the Required Consenting AHG Noteholders;

(b)      pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions herein) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)      when properly solicited to do so, timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control) in support of the Approved Plan, including any Claims that are impaired under the Approved Plan and not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in this clause (c); *provided, however*, (i) that if any Company Party is in breach of any representation, warranty, or covenant set forth in this Agreement, the Consenting AHG Noteholders may change or withdraw (or cause or direct to be changed or withdrawn) any vote in support of the Approved Plan, and (ii) except with respect to the termination rights provided in the Company Termination Events under Section 11.06 (a), (d) and (e) herein, a Consenting AHG Noteholder's vote shall be immediately and automatically without further action of any Consenting AHG Noteholder revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting AHG Noteholder;

(d)      consent to, support, grant, and, as applicable, opt-in or not opt-out of the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and Confirmation and Sale Order;

(e)      not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), (ii) propose, support, vote for, encourage, seek, file, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any Entity regarding any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report, or comparable public statement or filing with respect to any Alternative Restructuring and timely vote (or cause to be voted) its Claims against any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)      (i) not direct any trustee to take any action inconsistent with such Consenting AHG Noteholder's obligations under this Agreement or the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, and (ii) if any applicable trustee takes any action inconsistent with such Consenting AHG Noteholder's obligations under this Agreement, the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, such Consenting AHG Noteholder will use commercially reasonable efforts to direct such trustee (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring Transactions; *provided*, that it is acknowledged and agreed that actions taken by any administrative agent and/or collateral agent under the Existing Securitization Indenture may constitute a Company Termination Event or a

Prepetition Lender Termination Event unless the Consenting AHG Noteholders have directed such agent to cease taking such action consistent with this <u>Section 5.01(f)</u>;

(g)    (i) act in good faith with regard to the successful consummation of the Restructuring Transactions materially consistent with this Agreement and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the applicable Company Parties and the Consenting AHG Noteholders to be necessary to consummate the Restructuring Transactions;

(h)    negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; provided, that the material terms of the Approved Plan are preserved;

(i)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(j)    promptly notify the Company Parties and the Prepetition Lenders in writing (e-mail to counsel being sufficient) after becoming aware of the issuance by any governmental authority, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(k)    inform the Company Parties and the Prepetition Lenders in writing (e-mail to counsel being sufficient) reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions.

Section 5.02    <u>Additional Provisions Regarding the Consenting AHG Noteholders'</u> <u>Agreements</u>. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any Consenting AHG Noteholders to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any Consenting AHG Noteholder from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a Consenting AHG Noteholder in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting AHG Noteholder's obligations hereunder; (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of the Existing Securitization Indenture; (e) require any Consenting AHG Noteholder to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such Consenting

16

AHG Noteholder is a party and that remains in full force and effect; (f) prevent any Consenting AHG Noteholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any Consenting AHG Noteholder to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such Consenting AHG Noteholder may reasonably determine.

Section 5.03    Additional Claims. To the extent any Consenting AHG Noteholder (a) acquires additional Claims entitled to vote on the Approved Plan; or (b) Transfers any Claims, then, in each case, each such Consenting AHG Noteholder shall promptly notify Ropes & Gray of such acquisition (which notification may be by e-mail from the Ad Hoc Group Advisors, as applicable), and each such Consenting AHG Noteholder hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Approved Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 6 hereof.

6.    **Transfers.**

Section 6.01    Transfers. Each Consenting Creditor agrees that during the Support Period, it shall not sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions) ("***Transfer***"), any Claims against or in the Company Parties, any option thereon, or any right or interest therein (including by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(a)    is a Consenting Creditor or a Related Fund; or

(b)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to the transferor (including with respect to any and all Claims it already may hold before such Transfer) by executing Joinder Agreement and delivering an executed copy of such Joinder Agreement to (i) Ropes & Gray, (ii) Sidley, and (iii) White & Case as promptly as practicable, but in no event later than three (3) Business Days following consummation of such Transfer. Notwithstanding anything to the contrary in this Section 6.01, Consenting Creditors shall be permitted to engage in ordinary course repurchase agreements and securities lending transactions so long as any such transactions are fully settled if and when needed for purposes of the Restructuring Transactions.

(c)    Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

Section 6.02   Permitted Transferees. Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims to an Entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become an Entity that meets the requirements of Section 6.01(a) or (b) hereof (a transferee that meets such requirements, a "**Permitted Transferee**"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title, or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 6.02, (iii) subject to Section 6.03, such Qualified Marketmaker must (A) subsequently Transfer the right, title or interest to such Claims within five (5) Business Days of its acquisition to a transferee described in the foregoing clause (i) that is not an Affiliate, affiliated fund, or affiliated Entity with a common advisor of such Qualified Marketmaker or (B) sign a Qualified Marketmaker Joinder on or before the Qualified Marketmaker Joinder Date, and (iii) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Claims of a Consenting Creditor (*i.e.*, received by such Qualified Marketmaker from a Holder that is not a Consenting Creditor) without such Transfer being subject to this Section 6.02.

Section 6.03   Joinder. If at the time of a proposed Transfer of any Claims to a Qualified Marketmaker, such Claims (i) may be voted or their consent solicited with respect to the Restructuring Transactions, then the proposed transferor must first vote or consent to such Claims in accordance with Section 6.01 hereof, or (ii) have not yet been and may yet be voted or yet have their consent solicited with respect to the Approved Plan or the Restructuring Transactions and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (such signed Joinder Agreement, the "**Qualified Marketmaker Joinder**"); *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

7.     **Agreements of the Company Parties.**

Section 7.01   Affirmative Commitments. The Company Parties, jointly and severally, hereby covenant and agree during the Support Period to:

(a)     support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and take any reasonable action necessary in a timely manner to effectuate the

Restructuring Transactions in a manner materially consistent with this Agreement (including, for the avoidance of doubt, the Milestones);

(b)    take all steps reasonably necessary and desirable to pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents in good faith and by obtaining the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)    consent to, support, and grant, as applicable, the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and the Confirmation and Sale Order;

(d)    comply with the Milestones;

(e)    use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is determined by the Required Consenting Creditors to be necessary to consummate the Restructuring Transactions;

(f)    to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(g)    act in good faith with regard to the successful consummation of the Restructuring Transactions consistent with this Agreement;

(h)    negotiate in good faith, execute, deliver, and perform its obligations under the Definitive Documents in accordance with the terms of this Agreement, and any other required agreements to effectuate and consummate the Restructuring Transactions and the transactions contemplated by the Definitive Documents;

(i)    use commercially reasonable efforts to obtain additional support for the Restructuring Transactions from their other material stakeholders;

(j)    notify in writing (e-mail being sufficient) the Prepetition Lenders, the Prepetition Lender Advisors, the Ad Hoc Group, and the Ad Hoc Group Advisors promptly, but no later than within two (2) Business Days of the Company Parties becoming aware of, the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority, or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions;

(k)    inform the Prepetition Lenders, the Prepetition Lender Advisors, the Ad Hoc Group, and the Ad Hoc Group Advisors promptly, but no later than within two (2) calendar days of the Company Parties becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the

Restructuring Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of material debt, or securement of material security from or by any Person or Entity in respect of any Company Party or any of its subsidiaries; (iii) the occurrence of any event or circumstance that would permit any Party to terminate, or that would result in the termination of, this Agreement of which any Company Party is reasonably aware; (iv) a material breach of this Agreement (including a material breach by any Company Parties); and (v) any representation or statement made or deemed to be made by any of the Company Parties under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(l)     upon reasonable request of any member of the Ad Hoc Group or the Ad Hoc Group Advisors, inform the Ad Hoc Group and the Ad Hoc Group Advisors as to: (i) the status and progress of the Restructuring Transactions, including progress in relation to the Definitive Documents and (ii) the status of obtaining any necessary or reasonably desirable authorizations (including any consents) from the Prepetition Lenders or DIP Lenders, the Buyer Group, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(m)     upon reasonable request of any of the Prepetition Lenders or the Prepetition Lender Advisors, inform the Prepetition Lenders and the Prepetition Lender Advisors as to: (i) the status and progress of the Restructuring Transactions, including progress in relation to the Definitive Documents and (ii) the status of obtaining any necessary or reasonably desirable authorizations (including any consents) from the Consenting AHG Noteholders, the Buyer Group, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(n)     in each case taking into account the Restructuring Transactions (i) use commercially reasonable efforts to conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, (ii) use commercially reasonable efforts to maintain its physical assets, properties, and facilities in their working order condition and repair, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, (v) maintain its good standing under the Laws of the state or other jurisdiction in which it is incorporated, organized, or formed; and (v) use commercially reasonable efforts to preserve intact its business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course, in a manner that is consistent in all material respects with past practices, and in compliance with applicable Law;

(o)     consult with the Consenting Creditors on a regular basis during the Chapter 11 Cases with respect to any strategic, regulatory, and other material transactions (including with respect to any settlements) impacting the Company Parties and their material Affiliates;

(p)     upon reasonable request of any of the Prepetition Lenders or members of the Ad Hoc Group, provide the Prepetition Lenders or the Ad Hoc Group, as applicable, with reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business;

(q)     provide draft copies of all Definitive Documents to the Prepetition Lender Advisors and Ad Hoc Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Prepetition Lender Advisors and Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; *provided, however*, that in the event that not less than two (2) Business Days' notice is impracticable or impossible under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings to the Prepetition Lender Advisors and Ad Hoc Group Advisors as soon as otherwise practicable before the time when the Company Parties intend to file any such motion or other pleading;

(r)     use commercially reasonable efforts to provide the Prepetition Lenders Advisors and Ad Hoc Group Advisors all material draft motions and pleadings not listed in subsection (r) above that the Company Parties or any of its Affiliates intend to file with the Bankruptcy Court at least two (2) calendar days prior to the date on which such party files such pleading; and

(s)     promptly pay Restructuring Expenses (for the avoidance of doubt, including fees of the DIP Lenders, Prepetition Lenders, and Ad Hoc Group Advisors) as provided for under the DIP Facility Term Sheet or DIP Facility Documents, as applicable.

Section 7.02   Negative Commitments. During the Support Period, the Company Parties hereby covenant and agree not to, directly or indirectly:

(a)     take any action that is inconsistent with this Agreement in any material respect, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement or the Approved Plan (including encouraging another Person to undertake any action prohibited by this Agreement); *provided that* none of the foregoing affect the Company Parties' right to exercise the Fiduciary Out or limit the Company Parties' rights under Section 11.06 (subject in all respects to the Parties' respective rights to terminate this Agreement pursuant to Section 10);

(b)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions (including encouraging another Person to undertake any action prohibited by this Agreement);

(c)     modify the Approved Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Approved Plan;

(e)     reserved;

(f)     sell, or file any motion or application seeking to sell, any material assets, other than in the ordinary course of business, without the prior written consent of the Required Consenting Creditors (which may be by e-mail);

(g)     commence any process to sell, transfer, dispose, or otherwise monetize any assets of any of the Company Parties in a transaction or a series of transactions, whether or not in the ordinary course of business, having a fair market value of $250,000 or greater without the prior written consent of the Required Consenting Creditors; and

(h)     other than as provided in this Agreement and the Restructuring Term Sheet, amend any of their corporate governance or organizational documents without prior written notice to the Required Consenting Creditors (which may be by e-mail);

(i)     other than in the ordinary course of business, (i) enter into any settlement regarding any Claims or Prepetition Equity Interests; (ii) enter into any material agreement that is materially inconsistent with this Agreement; (ii) amend, supplement, modify, or terminate any material agreement in a way that is materially inconsistent with this Agreement; (iii) knowingly allow any material agreement to expire if such expiration would frustrate or impede consummation of the Restructuring Transactions; or (iv) knowingly allow any material permit, license or regulatory approval to lapse, expire, terminate or be revoked, suspended or modified, in each case without the prior written consent of the Required Consenting Creditors (which may be by e-mail);

(j)     file with any court any motion, pleading, or Definitive Document (including any modifications or amendments thereto) that, in whole or in part, is materially inconsistent with this Agreement;

(k)     (i) operate its business outside the ordinary course, other than the Restructuring Transactions; or (ii) other than in the ordinary course of business or as contemplated by this Agreement transfer any material asset or right of the Company Parties (or its Affiliates) or any material asset or right used in the business of the Company Parties (or its Affiliates) to any Person or Entity; or

(l)     other than in the ordinary course of business or as contemplated by this Agreement engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction;

(m)     reject, terminate, settle, or renegotiate any material contract (including any executory contracts and unexpired leases) without the prior consultation with the Required Consenting Creditors;

(n)     without the prior written consent of the Required Consenting Creditors, obtain, seek, solicit or otherwise attempt to enter into any contract (other than the DIP Documents related to the DIP Facility) with respect to cash collateral usage, debtor-in-possession financing, exit financing, manager advances, and/or other financing arrangements; and

(o)    initiate or have initiated on its behalf, any litigation or proceeding of any kind against the other Parties in connection with the Restructuring, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document.

8.    **Additional Provisions Regarding Company Parties' Commitments.**

Section 8.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement will require the Company Parties or any directors, officers, managers, or members of the Company Parties, each in their capacities as a director, officer, manager, or member of the Company Parties, to take any action, including the Fiduciary Out, or to refrain from taking any action, to the extent such Person or Entity reasonably determines, after consulting with counsel, such action or inaction would be inconsistent with their fiduciary duties under applicable Law (as determined by them in good faith after consultation with outside legal counsel), and any such action or inaction taken or not taken pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement. The Company Parties shall promptly notify each of the Consenting Creditors of any such determination within twenty-four (24) hours following such determination.

Section 8.02    Notwithstanding anything to the contrary in this Agreement, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructurings as required by their fiduciary duties; (b) provide access to non-public information concerning any Company Party to any Entity or enter into nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructurings; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructurings; and (e) enter into or continue discussions or negotiations with Holders of Claims against or holders of equity interests in a Company Party (including any Party to this Agreement), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring; *provided*, that the Company Parties shall (i) as soon as practicably reasonable, but in no event later than two (2) calendar days of receiving such proposal, notify the Consenting Creditors and the Buyer Group of the receipt of such proposal (e-mail being sufficient); (ii) provide the Consenting Creditors and the Buyer Group with regular updates as to the status and progress of such Alternative Restructuring proposal if the Company Parties (or their Affiliates or agents) respond to any Alternative Restructuring proposal; and (iii) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from the Consenting Creditors relating to any Alternative Restructuring proposal; *provided further* that notwithstanding the foregoing, nothing herein shall impede, limit, or otherwise alter any Party's termination rights set forth herein or in any Definitive Document.

Section 8.03    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

9.    **Agreements of the Buyer Group.**

Section 9.01    Subject in all respects to Section 9.02 and Section 9.03, each member of the Buyer Group hereby covenants and agrees, severally, not jointly, during the Support Period to:

(a)    reserved;

(b)    support and not object to the Approved Plan, or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement;

(c)    pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions herein) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(d)    consent to, support, and grant, as applicable, the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and the Confirmation and Sale Order;

(e)    not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), or (ii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)    (i) act in good faith with regard to successful consummation of the Restructuring Transactions materially consistent with this Agreement; and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the Company Parties and Required Consenting Creditors to be necessary to consummate the Restructuring Transactions;

(g)    negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; *provided*, that the material terms of the Approved Plan and the Buyer Group Arrangements are preserved;

(h)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or

materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(i)     promptly notify the Company Advisors, the Prepetition Lender Advisors, and the Ad Hoc Group Advisors in writing (e-mail being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(j)     inform the Company Advisors, the Prepetition Lender Advisors, and the Ad Hoc Group Advisors reasonably promptly after becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings or legal suit for payment of material debt in respect of such member of the Buyer Group or any of its subsidiaries; or (iii) the occurrence of any termination event under this Agreement of which such member of the Buyer Group is reasonably aware.

Section 9.02   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any member of the Buyer Group to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any member of the Buyer Group from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a member of the Buyer Group in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such member's obligations hereunder; (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of any existing agreement between a member of the Buyer Group and any Company Party; (e) require any member of the Buyer Group to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such member is a party and that remains in full force and effect; (f) prevent any member of the Buyer Group from taking any action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any member of the Buyer Group to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such member of the Buyer Group may reasonably determine.

Section 9.03   Except as specifically set forth in this Section 9.03, and notwithstanding anything else in this Agreement to the contrary, the Parties understand and agree that (a) this Agreement constitutes a non-binding statement of the intentions of the Buyer Group relating to the Buyer Group Arrangements and does not contain all matters upon which agreement must be reached for the Buyer Group Arrangements to be consummated,  and (b) a binding commitment of the Buyer Group with respect to the Buyer Group Arrangements will result only if

the Company Parties and the Buyer Group execute Definitive Documents with respect to the Buyer Group Arrangements.  Notwithstanding anything to the contrary in this Agreement, the Buyer Group shall work in good faith and use all commercially reasonable best efforts to negotiate and document the Restructuring Transactions as set forth in the Restructuring Term Sheet.

10.   **Reserved.**

11.   **Termination of Agreement.**

Section 11.01   Generally. This Agreement will automatically terminate (as to all Parties) upon (i) the Effective Date or (ii) three (3) Business Days following the receipt of written notice, delivered in accordance with Section 26 hereof, from (a) the Required Prepetition Lenders (which, for the avoidance of doubt, may be delivered by e-mail by Sidley on behalf of any or all Entities constituting the Prepetition Lenders) to the other Parties at any time after the occurrence of any Prepetition Lender Termination Event; (b) the Required Consenting AHG Noteholders (which, for the avoidance of doubt, may be delivered by e-mail by White & Case on behalf of any or all Entities constituting the Consenting AHG Noteholders) to the other Parties at any time after the occurrence of any Consenting AHG Noteholder Termination Event; (c) each of the Company Parties (which for the avoidance of doubt, may be delivered by e-mail by Ropes & Gray on behalf of any or all Entities constituting the Company Parties) to the other Parties at any time after the occurrence of any Company Termination Event; or (d) any member of the Buyer Group (which, for the avoidance of doubt, may be delivered by e-mail by Morrison & Foerster LLP on behalf of any or all Entities constituting the Buyer Group) to the other Parties at any time after the occurrence of any Buyer Group Termination Event. No Party may terminate this Agreement based on a Prepetition Lender Termination Event, Consenting AHG Noteholder Termination Event, Company Termination Event, or Buyer Group Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Section 11.02   If the Chapter 11 Cases are commenced, each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required. The Company Parties acknowledge that after the Petition Date, the giving of notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code.

Section 11.03   Each of the dates and time periods in this Section 10 may be extended by mutual agreement (which may be evidenced by e-mail confirmation, including from respective counsel) among the Company Parties and the Required Consenting Creditors and, solely with respect to Sections 11.01(i), (ii)(d), and 11.07, the Buyer Group.

Section 11.04 A "**_Prepetition Lender Termination Event_**" will mean any of the following:

(a) the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 26 detailing any such breach;

(b) failure of a Company Party to meet any Milestone, unless such Milestone is satisfied prior to delivery of a notice to the Company Parties from the Required Prepetition Lenders notifying the Company Parties of the failure to meet the Milestone, or waived or extended in accordance with Section 3.01(a) of this Agreement, or unless such failure is the result of any act, omission, or delay on the part of the terminating Prepetition Lenders in material breach of their obligations under this Agreement;

(c) if the Required Consenting AHG Noteholders, any Company Party, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 10;

(d) the material breach by a Company Party of any of the representations, warranties, covenants, or other obligations of the Company Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Prepetition Lenders; _provided_, that this termination right may not be exercised by any Prepetition Lender that is in material breach of this Agreement;

(e) any Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any of the Prepetition Lenders or other Holders of Company Claims or Prepetition Equity Interests, its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring without the written consent of the Required Prepetition Lenders; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 7 hereof;

(f) any Company Party files, proposes, withdraws, or modifies any Definitive Documents or files or supports any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, and such withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Required Prepetition Lenders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document;

(g) any Company Party files a motion seeking to approve or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Required Prepetition Lenders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is

inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable;

(h) a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any Prepetition Lender Claims held by the Prepetition Lenders in manner inconsistent with the stipulations and waivers granted by any Company Party pursuant to the Final DIP Order;

(i) (a) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the DIP Facility, the Approved Plan, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, or otherwise acceptable to the Required Prepetition Lenders or (b) the filing of a motion by any Company Party seeking an order (without the prior written consent of the Required Prepetition Lenders) vacating or modifying a DIP Order, the Disclosure Statement Approval Order, or the Confirmation and Sale Order;

(j) the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts any of the Prepetition Lenders without the prior written consent of the Required Prepetition Lenders;

(k) the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements, confirmation of the Approved Plan, or entry into the New Securitization Documents or, in each case, disallowing any material provision thereof (without the written consent of the Required Prepetition Lenders), or that has a material impact on the ability to consummate the Restructuring Transactions, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(l) any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(m) a Company Party fails to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or is otherwise consented to by the Required Prepetition Lenders;

(n) a Company Party or any of its Affiliates (i) repudiates or asserts a defense to any obligation or liability under any Prepetition Credit Agreement or this Agreement or (ii) initiates any action, suit or proceeding, at law or in equity, against the Agent or any Prepetition Lender;

(o) reserved;

(p) the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not

been reversed, stayed, or vacated within three (3) Business Days after the Required Prepetition Lenders provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(q)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment, or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance, unless in each case such ruling, judgment, or order arises primarily from the actions of a Prepetition Lender or from the failure of a Prepetition Lender to comply with its obligation hereunder; or

(r)    any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Required Prepetition Lenders.

Section 11.05    A "*Consenting AHG Noteholder Termination Event*" will mean any of the following:

(a)    the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 26 detailing any such breach;

(b)    failure of a Company Party to meet any Milestone, unless such Milestone is satisfied prior to delivery of a notice to the Company Parties and DIP Lenders from the Required Consenting AHG Noteholders notifying the Company Parties and the DIP Lenders of the failure to meet the Milestone, or waived or extended in accordance with Section 3.01(a) of this Agreement, or unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting AHG Noteholders in material breach of their obligations under this Agreement;

(c)    if the Required Prepetition Lenders, any Company Party, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 10;

(d)    the material breach by any other Party of any of the representations, warranties, covenants, or other obligations of any of the Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Consenting AHG Noteholders; *provided*, that this termination right may not be exercised by any Consenting AHG Noteholder that is in material breach of this Agreement;

(e)    any Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any Consenting AHG Noteholder or other Holders of Company Claims or Prepetition Equity Interests, its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring

without the written consent of the Required Consenting AHG Noteholders; or (iii) breaches any of the covenants, agreements, or obligations set forth in Section 7 hereof;

(f)    any Party files, proposes, withdraws, or modifies any Definitive Documents or files or supports any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, and such withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Consenting AHG Noteholders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document;

(g)    any Party files a motion seeking to approve or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Required Consenting AHG Noteholders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable;

(h)    any Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any Securitization Notes Claims held by the Consenting AHG Noteholders;

(i)    (i) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the DIP Facility, the Approved Plan, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, or otherwise acceptable to the Required Consenting AHG Noteholders or (ii) the filing of a motion by any Company Party seeking an order (without the prior written consent of the Required Consenting AHG Noteholders) vacating or modifying a DIP Order, the Disclosure Statement Approval Order, or the Confirmation and Sale Order;

(j)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts any of the Consenting AHG Noteholders without the prior written consent of the Requisite Consenting AHG Noteholder;

(k)    the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements, confirmation of the Approved Plan, or entry into the New Securitization Documents or, in each case, disallowing any material provision thereof (without the written consent of the Required Consenting AHG Noteholders), or that has a material impact on the ability to consummate the Restructuring Transactions, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(l)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(m)      a Company Party fails to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or is otherwise consented to by the Required Consenting AHG Noteholders;

(n)      a Company Party or any of its Affiliates (i) repudiates or asserts a defense to any obligation or liability under the Existing Securitization Indenture or this Agreement or (ii) initiates any action, suit or proceeding at law or in equity, against the indenture trustee or any Holder of Securitization Notes Claims;

(o)      reserved;

(p)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated within three (3) Business Days after the Required Consenting AHG Noteholders provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(q)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment, or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance, unless in each case such ruling, judgment or order arises primarily from the actions of a Consenting AHG Noteholder or from the failure of a Consenting AHG Noteholder to comply with its obligation hereunder;

(r)      any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Required Consenting AHG Noteholders; or

(s)      failure by the Company Parties to pay the Ad Hoc Group Advisors' fees on the terms set forth in the DIP Facility Term Sheet.

Section 11.06   A "***Company Termination Event***" will mean any of the following:

(a)      the Consenting Creditors entitled to vote on the Approved Plan have (i) failed to timely vote their Claims in favor of the Approved Plan when properly solicited to do so, (ii) at any time change their votes to constitute rejections to the Approved Plan (except as otherwise permitted under this Agreement), or (iii) either fail to opt into the releases set forth in the Approved Plan or elect to opt out of the releases set forth in the Approved Plan, in each case in a manner inconsistent with this Agreement and, solely to the extent that the Consenting Creditors

31

who have failed to meet the requirement in the foregoing clause (i), or who change their votes as set forth in clause (ii), hold 33.33% or more of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims, as applicable; *provided*, that the Company Parties shall be entitled to pursue any and all other remedies against such Consenting Creditor(s) for any such breach, including specific performance, injunctive, or other equitable relief;

(b)    if, during the pendency of the Chapter 11 Cases, the Consenting Creditors no longer constitute "Required Lenders" under the Prepetition Credit Agreements or "Majority of Controlling Class Members" under the Existing Securitization Indenture;

(c)    if the Required Prepetition Lenders, the Required Consenting AHG Noteholders, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 11;

(d)    one or more of the Consenting Creditors, or the collateral agent or administrative agent under the Prepetition Credit Agreements or Existing Securitization Indenture (unless the requisite number of creditors direct such agent to withdraw or cease such actions consistent with Section 4.01(f) or Section 5.01(f), as applicable, hereof) file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Company or Ropes & Gray that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable;

(e)    the material breach by one or more of the Consenting Creditors of any of the representations, warranties, covenants, or other obligations of such Consenting Creditor set forth in this Agreement solely to the extent that (i) such breach would result in non-breaching Consenting Creditors holding less than 66.67% of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims and (ii) such breach has not been cured (if curable) before the date that is five (5) Business Days after receiving written notice from the Company Parties;

(f)    the board of directors, board of managers, or such similar governing body of any applicable Company Party determines in good faith, based on the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under any applicable Law (the "***Fiduciary Out***"); *provided* that counsel to such applicable Company Party shall provide notice of such determination (the "***Fiduciary Out Notice***") not later than one (1) Business Day thereafter (e-mail being sufficient) to the Prepetition Lender Advisors and Ad Hoc Group Advisors; or

(g)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such

ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance.

Section 11.07 A "*Buyer Group Termination Event*" will mean any of the following:

(a)      the Consenting Creditors entitled to vote on the Approved Plan have (i) failed to timely vote their Claims in favor of the Approved Plan when properly solicited to do so, (ii) at any time change their votes to constitute rejections to the Approved Plan, or (iii) either fail to opt into the releases set forth in the Approved Plan or elect to opt out of the releases set forth in the Approved Plan, in each case in a manner inconsistent with this Agreement and, solely to the extent that the Consenting Creditors who have failed to meet the requirements in the foregoing clause (i), or who change their votes as set forth in clause (ii), hold 33.33% or more of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims; *provided*, that the Buyer Group shall be entitled to pursue any and all other remedies against such Consenting Creditor(s) for any such breach, including specific performance, injunctive, or other equitable relief;

(b)      if the Required Prepetition Lenders, the Required Consenting AHG Noteholders, or any Company Party give notice of termination of this Agreement pursuant to this Section 11;

(c)      any Company Party or any of its Affiliates (i) publicly announces or announces in writing its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring without the written consent of the Buyer Group; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 7 hereof;

(d)      any Party files, proposes, withdraws, or modifies any Definitive Document or files or supports any motion or pleading (including a motion seeking to approve or support any Alternative Restructuring) with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, any Definitive Document, or the Buyer Group Arrangements and such filing, proposal, withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Buyer Group (e-mail from counsel being sufficient) that such filing, proposal, withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, any Definitive Document, or the Buyer Group Arrangements;

(e)      (i) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the Approved Plan, the Buyer Group Arrangements, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, the Buyer Group Arrangements, or any other Definitive Document, or otherwise acceptable to the Buyer Group or (ii) the filing of a motion by any Party seeking an order (without the prior written consent of the Buyer Group) vacating or modifying the Disclosure Statement Approval Order or the Confirmation and Sale Order;

(f)    one or more of the Consenting Creditors, or the collateral agent or administrative agent under the Prepetition Term Loan Credit Agreement or Existing Securitization Indenture (unless the requisite number of creditors direct such agent to withdraw or cease such actions consistent with Section 4.01(f) or Section 5.01(f), as applicable, hereof) file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Buyer Group Arrangements, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Buyer Group (e-mail from counsel being sufficient) that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement or the Buyer Group Arrangements;

(g)    the material breach by any other Party of any of the representations, warranties, covenants, or other obligations of any of the Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Buyer Group; *provided*, that this termination right may not be exercised by any member of the Buyer Group that is in material breach of this Agreement;

(h)    the material breach by one or more of the Consenting Creditors of any of the representations, warranties, covenants, or other obligations of the Consenting Creditors set forth in this Agreement solely to the extent that (i) such breach would result in non-breaching Consenting Creditors holding less than 66.67% of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims and (ii) such breach has not been cured (if curable) before the date that is five (5) Business Days after receiving written notice from the Buyer Group (e-mail from counsel being sufficient); *provided*, that this termination right may not be exercised by any Buyer Group Party that is in material breach of this Agreement and such breach would give rise to a Prepetition Lender Termination Event or Consenting AHG Noteholder Termination Event;

(i)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts the Buyer Group Arrangements without the prior written consent of the Buyer Group;

(j)    the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements or confirmation of the Approved Plan or disallowing any material provision thereof (without the written consent of the Buyer Group), or that has a material impact on the ability to consummate the Buyer Group Arrangements, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(k)    a Company Party or any of its Affiliates initiates any action, suit or proceeding, at law or in equity, against any member of the Buyer Group;

(l)    the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not

been reversed, stayed, or vacated within three (3) Business Days after the Buyer Group provides written notice to the other Parties that such order is materially inconsistent with this Agreement;

(m)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the entry of the Confirmation and Sale Order and (ii) thirty (30) Business Days after the Buyer Group provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is inconsistent with this Agreement;

(n)     any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Buyer Group; or

(o)     the Effective Date has not occurred on or before December 31, 2025.

Section 11.08  Mutual Termination. This Agreement may be terminated by mutual written agreement of the Company, the Buyer Group, and the Required Consenting Creditors. The Company will deliver written notice of any such termination to all Parties in accordance with Section 26 hereof.

Section 11.09  Effect of Termination. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party. Nothing in this Section 11.09 shall restrict any Company Party's right to terminate this Agreement in accordance with the Fiduciary Out, subject in all respects to the respective Parties' rights to terminate this Agreement pursuant to this Section 10.

Section 11.10  Automatic Termination. This Agreement shall terminate automatically without any further required action or notice (a) with respect to all Parties, immediately after the Effective Date and (b) solely with respect to an individual Consenting Creditor, upon the receipt of written notice from such Consenting Creditor (which, for the avoidance of doubt, may be delivered by e-mail by counsel on behalf of any Consenting Creditor) to the other Parties representing and certifying that it no longer beneficially owns or has investment

authority or discretion over any Consenting Claims; *provided* that such Consenting Claims were validly Transferred in accordance with Section 6.01.

Section 11.11    No Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms or the payment of damages to which a Party may be entitled under this Agreement.

## 12.    **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting, and execution and delivery of the Definitive Documents. In the case of any conflict or inconsistency between the Approved Plan and any form of or term sheet for a Definitive Document attached as an exhibit hereto, the terms of the Approved Plan shall control. In the case of any conflict or inconsistency between the Confirmation and Sale Order and the Approved Plan or any other Definitive Document, the Confirmation and Sale Order shall control.

## 13.    **Representations and Warranties.**

Section 13.01    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company Parties, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)    such Party is validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)    the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate (x) in any material respect any provision of Law, rule, or regulation applicable to it or (y) its charter or bylaws (or other similar governing documents) or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c)    the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as

may be necessary or required for disclosure to any applicable regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Restructuring Transactions; and

(d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 13.02    Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)    (i) is the beneficial owner of the Claims set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to such beneficial ownership of such Claims, (A) investment or voting discretion with respect to such Claims, (B) full power and authority to vote on and consent to matters concerning such Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners; *except*, in each case, to the extent that such Claim is held by a prime broker or pursuant to any derivatives or financing transactions in respect of such Claim, including repurchase agreements; *provided that*, at all times, such Consenting Creditor retains the power to take all actions necessary for it to timely vote such Claim in favor of the Approved Plan;

(b)    does not own or control any other "claims", "equity security" or "security" in respect of the Company Parties (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page to this Agreement;

(c)    other than related to the Restructuring Transactions, is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Creditor; and

(d)    by entering into this Agreement and performing its obligations hereunder is not taking any action that would constitute a breach of any Law or regulation or violation of any order or direction of any relevant court or governmental body.

## 14.    **Amendments and Waivers.**

This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by: (a) each Company Party; (b) the Required Prepetition Lenders; and (c) the Required Consenting AHG Noteholders; *provided, however*, that to the extent a modification, amendment, supplement, or condition or requirement of this Agreement materially affects the Buyer Group, a written waiver signed by each Entity constituting the Buyer Group must be obtained; *provided*, *further*, any modification, amendment, waiver, or supplement that treats or affects any Consenting Creditor in a manner that

is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and the recoveries contemplated hereunder), or that requires any Consenting Lender to incur any expenses, liabilities, or other obligations or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Consenting Creditor.

Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 14</u> shall be ineffective and void *ab initio.*

The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

15.    **Effectiveness.**

This Agreement will become effective and binding (i) as to the Company Parties, the Buyer Group, and the Consenting Creditors on the Support Effective Date; (ii) as to any Consenting Creditor that enters into a Joinder Agreement, upon delivery to the Company of such validly completed Joinder Agreement and the occurrence of the Support Effective Date; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement and the occurrence of the Support Effective Date.

16.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO

THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS SECTION 16 SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

17. **Remedies/Specific Performance.**

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to promptly comply with any of its obligations hereunder.

18. **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 10 hereof, Sections 16, 17, 19, 22, 25, and 27 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

19. **Successors and Assigns.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or Entity.

20. **Exhibits Incorporated by Reference; Conflicts.**

Each of the exhibits, schedules, annexes, and signature pages attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, schedules, annexes, and signature pages. In the event of any inconsistency between this Agreement (without reference to the exhibits, schedules, and annexes hereto) and the exhibits, schedules, and annexes hereto, the Restructuring Term Sheet (without reference to the exhibits, schedules, and annexes thereto) shall govern.

21. **Several, Not Joint, Claims.**

Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

22. **Severability and Construction.**

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

23.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements or agreements with respect to shared or common interest heretofore executed between the Parties or their advisors will continue in full force and effect in accordance with the terms thereof.

24.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement. Execution copies of this Agreement may be executed via PDF or other electronic means and may be delivered by e-mail, which will be deemed to be an original for the purposes of this <u>Section 24</u>.

25.     **Interpretation.**

Except as otherwise expressly provided in this Agreement, the term "including" means "including, without limitation," and the words "include" and "includes" shall have corresponding meanings.

26.     **Notices.**

All notices, requests, demands, document deliveries, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally; (b) when sent by e-mail; or (c) two (2) Business Days after deposit with an overnight courier service, with postage prepaid to the Parties at the following addresses (or at such other addresses for a Party as shall be specified by like notice):

(1)     If to the Company Parties, to:

Hooters of America, LLC
1815 The Exchange SE
Atlanta, GA 30339
Attention:   Keith Maib (kmaib@accordion.com)

with a copy (which will not constitute notice) to:

Ropes & Gray LLP
191 North Wacker, 32nd Floor
Chicago, IL 60606
Attention:   Chris L. Dickerson (chris.dickerson@ropesgray.com)
                    Rahmon J. Brown (rahmon.brown@ropesgray.com)
                    Michael Wheat (michael.wheat@ropesgray.com)

(2)     If to the Prepetition Lenders, to the addresses or electronic mail addresses set forth below the Prepetition Lender's signature, with a copy (which will not constitute notice) to:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attention:  Genevieve G. Weiner (gweiner@sidley.com)

and

Sidley Austin LLP
787 7th Avenue
New York, NY 10019
Attention:  Elizabeth R. Tabas Carson (etabas@sidley.com)
                Juliana L. Hoffman (jhoffman@sidley.com)


(3)     If to the Buyer Group, to the addresses or electronic mail address set forth below the Buyer Group entity's signature, with a copy (which will not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Benjamin W. Butterfield (bbutterfield@mofo.com)
                Sean Daly (sdaly@mofo.com)

(4)     If to the Consenting AHG Noteholders, to the addresses or electronic mail addresses set forth below the Consenting AHG Noteholder's signature, with a copy (which will not constitute notice) to:

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attn:   Brian Pfeiffer (brian.pfeiffer@whitecase.com)
            Amanda Parra Criste (aparracriste@whitecase.com)

-and-

White & Case LLP
1121 Avenue of the Americas
New York, NY 10020
Attn:  David Thatch (dthatch@whitecase.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by electronic mail will be effective upon confirmation of transmission. Any notice or consent to be provided by the Required Prepetition Lenders may be delivered by e-mail by Sidley on behalf of the Prepetition Lenders. Any notice or consent to be provided by the Required Consenting AHG Noteholders may be delivered by e-mail by White & Case on behalf of any or all Entities constituting the Consenting AHG Noteholders.  Any notice or consent to be provided by the Buyer Group may be delivered by e-mail by Morrison & Foerster LLP on behalf of the Buyer Group.

27.    **Confidentiality and Publicity.**

Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any Person or Entity (including for the avoidance of doubt, any other Consenting Creditor), other than legal, accounting, financial, and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Claims held by any member of the Ad Hoc Group, the Prepetition Lenders, or any of their respective subsidiaries (including, for the avoidance of doubt, any Claims acquired pursuant to any Transfer) or the signature page of such member of the Ad Hoc Group or the Prepetition Lenders; *provided, however,* that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Claims held by the Ad Hoc Group or the Prepetition Lenders, collectively.  Notwithstanding the foregoing, the Ad Hoc Group and the Prepetition Lenders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents to the extent required by Law or regulation; *provided, however*, that (i) if any of the Company Parties determines that it is required to attach a copy of this Agreement, a Joinder, or a Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific Ad Hoc Group member's holdings of Claims (including before filing any pleading with the Bankruptcy Court) and such Ad Hoc Group member's signature page and (ii) if disclosure of additional information of a member of the Ad Hoc Group is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each applicable member of the Ad Hoc Group (who shall have the right to seek a protective order prior to disclosure).  Notwithstanding the foregoing, the Company Parties will submit to the Required Consenting Creditors, the Prepetition Lender Advisors, the Ad Hoc Group Advisors, the Buyer Group, and the Buyer Group Advisors all press releases, public filings, public announcements, or other communications with any news media, or material mass communications, other than in the ordinary course of business and unrelated to this Agreement or the Restructuring Transactions, with any customers, vendors, or current or former employees, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days in advance of release (it being understood that such period may be shortened to the extent there are exigent circumstances) and will incorporate any comments provided by the Consenting Creditors and, solely as it relates to this Agreement or the Buyer Group Arrangements, comments provided by the Buyer Group and the Buyer Group Advisors.  Nothing contained herein shall be deemed to waive, amend, or modify the terms of any Confidentiality Agreement.

28.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

(b)    Each Party acknowledges for the benefit of the other Parties and their respective advisors that it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities that may be acquired by it pursuant to the transactions contemplated hereby and has had an opportunity to receive information from the Company Parties and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of Law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived. Each Party hereby further confirms for the benefit of the other Parties and their respective advisors that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties and/or the Restructuring Transactions, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company Parties set forth in this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

*[Signature Pages Follow]*

43

Docusign Envelope ID: 51F-12D7-D846-4BD8-A7C1-65B760486543

Case 25-80078-swe11    Doc 262-2    Filed 05/06/25    Entered 05/06/25 23:40:55    Desc
Exhibit B - Restructuring Support Agreement    Page 45 of 118

**Company Signature Page to**
**the Restructuring Support Agreement**

**AUTHORIZED SIGNATORY OF** the Company Parties:

Name: Keith Maib
Title:   Chief Restructuring Officer

[Prepetition Lender Signatures Pages on File with Company Parties]

[Consenting Noteholder Signature Pages on File with Company Parties]

[Consenting AHG Noteholders Signatures Pages on File with Company Parties]

[Buyer Group Signatures Pages on File with Company Parties]

## Schedule 1-A

### Non-Securitization Entities

Hawk Parent, LLC

HOA Holdings, LLC

Night Owl, LLC

Owl Wings, LLC

Owl Restaurant Holdings, LLC

Owl Holdings, LLC

Elf Owl Investments, LLC

TW Lonestar Wings, LLC

Alamo Wings, LLC

HOA Restaurant Group, LLC

Derby Wings Holdings, LLC

Derby Wings, LLC

Hooters of America, LLC (Manager)

## **Schedule 1-B**

### **Securitization Entities**

HOA Funding, LLC

HOA Holdco, LLC

HOA Systems, LLC

HOA Restaurant Holder, LLC

HOOTS Restaurant Holder, LLC

HOA IP GP, LLC

HOOTS Franchising, LLC

HOA Franchising, LLC

HOA Maryland Restaurant Holder, LLC

HOA Kansas Restaurant Holder, LLC

TW Restaurant Holder, LLC

DW Restaurant Holder, LLC

HI Limited Partnership

HOA Towson, LLC

HOA Waldorf, LLC

HOA Laurel, LLC

## EXHIBIT A

### Form of Joinder Agreement

This joinder agreement to the Restructuring Support Agreement, dated as of [●], 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Agreement***"), between the Company Parties, the Buyer Group, the Consenting AHG Noteholders, and the Prepetition Lenders, each as defined in the Agreement, is executed and delivered by _____ (the "***Joining Party***") as of _____, 2025.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2. <u>Effectiveness</u>. Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company Parties, the Joining Party shall hereafter be deemed to be a "Prepetition Lender" or "Consenting AHG Noteholder", as applicable, and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Prepetition Lenders or Consenting AHG Noteholders, as applicable, as set forth in <u>Section 13</u> of the Agreement to each other Party to the Agreement.

4. <u>Governing Law</u>. This joinder agreement shall be governed by and construed in accordance with the internal Laws of the State of New York, without regard to any conflict of Laws provisions which would require the application of the Law of any other jurisdiction.

**JOINDER PARTY:** _____

Date Executed: _____

By:_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Manager Advance Loan Claims | |
| Term Loan Claims | |
| Securitization Class A-2 Note Claims | |
| Securitization Class B Note Claims | |
| Other Claims | |

*[Signature Page to Joinder Agreement]*

# **EXHIBIT B**

## **Restructuring Term Sheet**

Execution Version

**HAWK PARENT, LLC, HOA FUNDING, LLC, ET AL.**

**NON-BINDING RESTRUCTURING TERM SHEET**

This transaction term sheet (this "Restructuring Term Sheet") sets forth all material terms of a proposed comprehensive sale and restructuring of the existing claims and indebtedness of Hawk Parent, LLC ("Parent"), HOA Holdings, LLC ("Holdings"), HOA Funding, LLC ("Master Issuer"), and their subsidiaries (collectively, the "Company" or "Company Parties" or, after the Petition Date (as defined below), the "Debtors")[1], which will be consummated through one or more in-court transactions (such transactions with respect to the Company Parties, the "Restructuring Transactions"). This is the Restructuring Term Sheet referred to in, and appended to, that certain Restructuring Support Agreement, dated as of March 31, 2025, by and among the Company Parties and the other Parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "RSA"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the RSA.

There shall be no consent right nor condition to the respective obligations and commitments of the Parties other than as expressly set forth in the RSA (including all exhibits thereto, including this Restructuring Term Sheet) or the Definitive Documents (including all exhibits thereto). In the event of any inconsistency between this Restructuring Term Sheet and the RSA, this Restructuring Term Sheet shall control. The Parties may supplement or replace this Restructuring Term Sheet with Definitive Documents with respect to all or any part of their respective obligations hereunder.

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE, DEEMED BINDING ON ANY OF THE PARTIES.

This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. This Restructuring Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

| Overview | |
|---|---|
| **Implementation** | This Restructuring Term Sheet contemplates the following implementation: |
| | i.  the commencement of chapter 11 cases (the "Chapter 11 Cases") by the Company Parties under the Bankruptcy Code in the Bankruptcy Court no later than March 31, 2025, in accordance with the RSA to pursue implementation of the Restructuring Transactions (the date of such commencement, the "Petition Date"); |
| | ii.  the funding of the DIP Facility by certain of the Prepetition Lenders, as more fully described below; |
| | iii.  the Buyer Group Arrangements (as defined herein) pursuant to which Hooters, Inc. and Hoot Owl Restaurants, LLC, or their respective designated affiliates (collectively, the "Buyer Group") will acquire a portfolio of 103 Company owned stores (the "Divested Stores") and Brand Management Co. will enter into the Brand Management & Services Agreement, each as more fully described in the other sections of this Restructuring Term |

---

[1] The Debtors listed on **Exhibit 1** hereto are the "Securitization Entities" and the Debtors listed on **Exhibit 2** hereto are the "Non-Securitization Entities."

Sheet, which shall be consummated pursuant to section 1123(b)(4) of the Bankruptcy Code and the terms of the Approved Plan (subject to the terms and conditions herein);

iv.   on the effective date of the Approved Plan (the "Plan Effective Date"):

    A.  with respect to the Securitization Entities:

    1.  Master Issuer will be renamed RoyaltyCo, LLC[2];

    2.  holders of Securitization Class A-2 Note Claims (as defined below) will be issued new Class A-2I Notes (as defined below) as more fully described in the "Securitization Class A-2 Note Claims" section, below;

    3.  holders of Securitization Class B Note Claims (as defined below) will be issued new Class B Notes (as defined below) as more fully described in the "Securitization Class B Note Claims" section, below;

    4.  the outstanding Securitization Manager Advance Claims (defined below) owed to Hooters of America, LLC (the "Prepetition Manager") will be cancelled;

    B.  with respect to the remaining Non-Securitization Entities and RoyaltyCo:

    1.  a conversion of the DIP Facility into new Class A-1 Notes (as defined, and on terms and conditions as described, below and in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders);

    2.  an exchange of certain of the Manager Advance Term Loan Claims for (y) the Class A-2II Notes, and (x) equity in RoyaltyCo, (each of (y) and (x) as defined, and on terms and conditions as described, below and in form and substance acceptable to the Required DIP Lenders and Required Consenting AHG Noteholders); and

v.   following the Plan Effective Date, the Debtors shall use the Wind-Down Amount and any other assets not purchased in connection with the Buyer Group Arrangements (as defined below) to commence and effectuate an orderly wind-down of the Debtors' estates in accordance with the Approved Plan.

| **Required DIP Lenders** | The DIP Lenders (as defined below) having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time (the "Required DIP Lenders"). |
| --- | --- |
| **Consenting Noteholders** | Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Notes Claims (as defined in the RSA) collectively held by the Consenting AHG Noteholders (the "Required Consenting AHG Noteholders"). |
| | Certain Holders of Securitization Notes Claims with the same investment adviser as the DIP Lender (the "DIP Noteholders" and, together with the Required Consenting AHG Noteholders, the "Consenting Noteholders").  The DIP Noteholders are parties to the RSA in their capacities as Holders of Securitization Notes Claims; provided, however, that the DIP Noteholders will not be counted for purposes of determining whether the Required Majority Consenting AHG Noteholders, or the Required Consenting AHG Noteholders, as applicable, have exercised any consent right hereunder. |
| | Any consent rights provided herein shall be exercised in good faith and a party shall not unreasonably withhold, condition or delay such consent; *provided*, that the obligations of the Buyer Group with respect to any consent rights are set forth in the RSA. |

---

[2] Final legal name to be confirmed based on Delaware name availability.

| DIP Financing | Pursuant to the terms set forth in that certain financing term sheet (the "<u>DIP Facility Term Sheet</u>"), attached hereto as **Exhibit 3**, and the RSA, the DIP Lenders (as defined in the DIP Facility Term Sheet) shall provide to Parent and Prepetition Manager as co-borrowers ("<u>DIP Borrowers</u>" and each a "<u>DIP Borrower</u>") a superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $40,000,000 million (as such principal amount may be increased from time to time pursuant to the mechanics described in the DIP Facility Term Sheet) (the "<u>DIP Facility</u>"; the loans thereunder the "<u>DIP Loans</u>"), guaranteed by and secured by priming liens granted by each of the Non-Securitization Entities and guaranteed by and secured by priming liens granted by each of the Securitization Entities (including the Master Issuer) (collectively, the "<u>DIP Guarantors</u>" and each, a "<u>DIP Guarantor</u>" and together with the DIP Borrowers, the "<u>DIP Loan Parties</u>" and each, a "<u>DIP Loan Party</u>"), and secured by substantially all of the assets of the DIP Loan Parties (including, without limitation, equity interests in the Securitization Entities and the Prepetition Manager's right to repayment of the Securitization Manager Advance Claims), which shall be available for borrowing in the amounts and on the dates, and upon the satisfaction of the conditions precedent set forth in the DIP Facility Term Sheet, each in accordance with the terms and conditions set forth in the DIP Documents (as defined in the DIP Facility Term Sheet).<br><br>The Debtors will seek authority from the Bankruptcy Court to enter into and perform under the DIP Documents and to use cash collateral and to continue to make and pay manager advances to the Securitization Entities in accordance with the then agreed budget, on the terms set forth in the DIP Documents. For the avoidance of doubt, the approval of the Proposed Budget (as defined and further described in the DIP Facility Term Sheet and in the RSA) shall be in the sole respective discretion of the DIP Lenders and the Required Majority Consenting AHG<br><br>Noteholders, in consultation with the Company Parties.<br><br>The proceeds of the DIP Facility shall be used to finance the Chapter 11 Cases (including the funding of new Securitization Manager Advance Claims to permit the Securitization Entities to finance the Securitization Entities' Chapter 11 Cases) in accordance with the terms and conditions set forth in the DIP Facility Term Sheet, including to fund all cure costs borne by RoyaltyCo.<br><br>The DIP Facility will consist of (i) new money in the amount of $35,000,000 to finance the Chapter 11 Cases on the terms and conditions set forth in the DIP Documents (as further described in the DIP Facility Term Sheet and in the RSA), which amount may be increased (the "<u>New Money Cap</u>")[3] in the sole respective discretion of the Required Majority Consenting AHG Noteholders,[3] the DIP Lenders, and the Debtors, *provided*, *however*, that the consent of the Required Majority Consenting AHG Noteholders is required for any DIP Loans that would, in the aggregate together with previously extended DIP Loans, exceed the New Money Cap and (ii) a roll-up of the Agreed Manager Advance Term Loan Claims (as defined below) (the "<u>Roll-Up</u>"). |
|---|---|
| **Claims and Interests Subject to Restructuring** | The claims and interests that will be restructured or otherwise addressed pursuant to the Restructuring Transactions include the following, to the extent such claims and interests have not otherwise been satisfied in whole or in part as of the Plan Effective Date:<br><br>**<u>Non-Securitization Entities</u>**<br><br>• "<u>Parent Funded Debt Claims</u>":<br><br>    ○ $8,387,000 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) and all other loan documents in connection therewith (the "<u>MA Credit Agreement</u>"); |

---

[3] The "<u>Required Majority Consenting AHG Noteholders</u>" shall mean Consenting AHG Noteholders collectively holding in excess of 50% of the aggregate outstanding principal amount of the Securitization Notes Claims collectively held by the Consenting AHG Noteholders.

    o   An additional $5,000,000 that was funded on February 21, 2025 pursuant to the MA Credit Agreement (such additional $5,000,000, the "Incremental Loan"); and

    o   $55,976,213 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Credit Agreement by and between XYQ Cayman Ltd., as lender, (the "Prepetition Term Loan Lender" and together with those certain lenders from time to time party to the MA Credit Agreement, the "Prepetition Lenders"), and Hawk Parent LLC, as borrower, dated [March 9, 2022], as amended, modified, or restated from time to time (the "Term Loan Credit Agreement" and, together with the MA Credit Agreement, the "Prepetition Credit Agreements" and such loans extended thereunder (including, for the avoidance of doubt, the Incremental Loan, the "Prepetition Loans") and all other loan documents in connection therewith.

- All of the Parent Funded Debt Claims are secured by the Securitization Manager Advance Claims (as defined below).

    o   To the extent of the value of the Securitization Manager Advance Claims, such Parent Funded Debt Claims are referred to herein as the "Manager Advance Term Loan Claims".

    o   The remaining Parent Funded Debt Claims in excess of the value of such Securitization Manager Advance Claims are referred to herein as the "Term Loan Claims".

- "General Unsecured Claims": prepetition claims against the Non-Securitization Entities that, as of the Petition Date, are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

- "Prepetition Equity Interests": all Prepetition Equity Interests in the Non-Securitization Entities.

**Securitization Entities**

- "Securitization Manager Advance Claims": The amount of prepetition manager advances to be agreed between the Required Consenting AHG Noteholders and the Prepetition Lenders (or, upon termination of the RSA, as may be finally determined by a Court of competent jurisdiction) to have been validly extended by the Prepetition Manager to the Securitization Entities, *plus* all additional amounts extended during the pendency of the Chapter 11 Cases in accordance with the approved Budget, accrued and unpaid interest, fees, and other charges and expenses arising and payable in respect of manager advances under that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated or otherwise modified from time to time, the "Management Agreement") and any valid Manager Advances form part of the "Obligations" (as defined in that certain Amended and Restated Base Indenture dated August 19, 2021 (as amended, restated, amended and restated or otherwise modified from time to time, the "Amended and Restated Base Indenture")).

- Notwithstanding anything to the contrary herein:

    o   the Consenting AHG Noteholders have agreed to the validity of the $5,000,000 Incremental Loan (the "Agreed Securitization Manager Advance Claims"), the Roll-Up of the Agreed Securitization Manager Advance Claims in the manner set forth herein and in the DIP Facility Term Sheet, and the treatment of the rolled-up Agreed Securitization Manager Advance Claims described herein;

    o   the Ad Hoc Group has reserved all rights with respect to any other prepetition manager advances other than the Agreed Securitization Manager Advance

<table>
<tr><td></td><td>

Claims, and expressly preserves all rights to challenge any such claims on any basis; *provided, however*, that (A) the Ad Hoc Group has agreed not to challenge the amount or validity of any prepetition manager advances so long as the RSA remains in full force and effect, and (B) the Ad Hoc Group has agreed, solely upon consummation of the Approved Plan, that (x) $18,000,000 of claimed Manager Advance Term Loan Claims will be converted to new Class A-2II Notes on the terms set forth below and the payment priority set forth in the Waterfall, and (y) any remaining claimed Manager Advance Term Loan Claims will be converted to equity in RoyaltyCo, all as more fully set forth herein; and

    o   the Debtors have agreed to the validity and amount of not less than $28,338,913 of manager advance claims, inclusive of the Agreed Securitization Manager Advance Claims, and to the treatment of such claims described above; *provided* that such agreement does not alter or affect the Ad Hoc Group's reservation of rights as set forth herein.

- "<u>Securitization Class A-2 Note Claims</u>": $266,579,000 in outstanding principal amount of Class A-2 Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Class A-2 Noteholders, and all other notes documents in connection therewith (the "<u>Securitization Class A-2 Notes</u>").

- "<u>Securitization Class B Notes Claims</u>": $40,000,000 in outstanding principal amount of Class B Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Class B Noteholders, and all other notes documents in connection therewith (the "<u>Securitization Class B Notes</u>").

- "<u>General Unsecured Claims</u>": prepetition claims against each Securitization Entity that, as of the Petition Date, are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

- "<u>Prepetition Securitization Equity Interests</u>": all Prepetition Equity Interests in the Securitization Entities other than the Master Issuer.

- "<u>Prepetition Master Issuer Equity Interests</u>": all Prepetition Equity Interests in the Master Issuer.

</td></tr>
<tr><td>

**Buyer Group Arrangements**

</td><td>

The Buyer Group Arrangements will be consummated pursuant to the Approved Plan to effectuate a sale of certain of the Debtors' assets pursuant to sections 1123(b)(4) and 1129 of the Bankruptcy Code.

**<u>Buyer Group Arrangements</u>**

On the Plan Effective Date, certain of the Debtors, on the one hand, and single purpose entities owned by a member of the Buyer Group (each, a "<u>Buyer Group SPE</u>") or Brand Management Co. (as defined herein), as applicable, on the other hand, will enter into a series of transactions pursuant to which:

1. each Divested Store (including all store-level assets and the proceeds of any existing liquor license related thereto) will be acquired by a Buyer Group SPE (and, for the avoidance of doubt, each Divested Store will be acquired by a separate Buyer Group SPE); *provided*, that each Divested Store shall have normalized levels of inventory, receivables, and operating cash at the store-level at closing; *provided*, *further*, that the obligation of each Buyer Group SPE to close with respect to its corresponding Divested Store shall, unless waived by the Buyer Group, be conditioned on (a) the receipt of approval from the relevant Governmental Authority for the transfer or acquisition of a

</td></tr>
</table>

liquor license for such Divested Store to such corresponding Buyer Group SPE, and (b) the assignment of the lease relating to such Divested Store to such corresponding Buyer Group SPE.

2. each lease relating to a Divested Store (including any security deposits related thereto) will be assigned by the corresponding Company Party to the corresponding Buyer Group SPE; *provided*, that the assignment of such lease shall be a condition to closing with respect to such Divested Store; *provided*, *further*, that (a) none of the Buyer Group, Buyer Group SPEs, RoyaltyCo, the DIP Lenders, nor the Consenting Creditors shall be required to provide or fund a corporate guaranty or other incremental credit support in connection with the assignment of such lease (including, for the avoidance of doubt, funding out of the Approved Budget) and (b) if the assignment of any lease relating to a Divested Store requires a corporate guaranty or other incremental credit support, such Divested Store shall be excluded from the Buyer Group Arrangements absent funding from the Buyer Group or another third party (in their respective sole discretion);

3. a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE;

4. royalty arrangements will be entered into between RoyaltyCo and Brand Management Co. in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of IP (as further described herein);

5. all gift card liabilities shall be borne by Brand Management Co. or the applicable franchisee; *provided*, that such liabilities must relate to gift cards that (a) were issued on or prior to March 21, 2025, and (b) have not been redeemed as of the closing of the Buyer Group Arrangements;

6. each Buyer Group SPE will assume, for its corresponding Divested Store, all current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; *provided*, that all cure costs, amounts owed to critical vendors (other than ordinary course trade payables that are not more than 30 days past due as of closing), administrative or priority tax claims allocable to the pre-closing period, and rent and payroll (including accrued vacation and bonuses) obligations allocable to the pre-closing period, in each case, relating to such Divested Store (including regional managers responsible for such Divested Store) shall be paid or funded by the Debtors at closing; *provided*, *further*, that the Buyer Group SPEs shall not assume any tort liability, breach of contract claim, employee claim or WARN obligation (such assumed liabilities, the "Buyer Group SPE Assumed Liabilities");

7. each Buyer Group SPE will put in place appropriate liability insurance for its corresponding Divested Store;

8. the Buyer Group SPEs shall be prohibited from making any equity distributions (other than for tax distributions) from amounts arising from, or relating to, the Divested Stores for the first two years after the Plan Effective Date;

9. Pursuant and subject to the Brand Management & Services Agreement (as defined below), Brand Management Co. will receive the BMC License (as defined below) over the Company's intellectual property rights (the "IP"), in a form to be mutually agreed upon as further described below;

10. Brand Management Co. will be engaged by RoyaltyCo pursuant to the Brand Management & Services Agreement (as defined below);

11. the Buyer Group shall be entitled to the Break-Up Fee on the terms and conditions set forth herein, subject to approval by the Bankruptcy Court; and

12. certain other agreements and arrangements as agreed upon by the Parties;

(such series of transactions, the "Buyer Group Arrangements"). In connection with such series of transactions, the Buyer Group shall provide the DIP Lenders and the Required Consenting

|  | AHG Noteholders with definitive documentation reasonably satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available at closing to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores.  The Debtors shall enter into the Buyer Group Arrangements pursuant to the Approved Plan and order confirming the Approved Plan (the "Confirmation and Sale Order").

Upon execution of the applicable Definitive Documents with respect to the Buyer Group Arrangements, including for the avoidance of doubt a binding commitment to enter into and consummate the Buyer Group Arrangements, and subject to approval by the Bankruptcy Court, the Buyer Group will be entitled to a $6 million break-up fee (the "Break-Up Fee"), which shall be subordinate only to estate professional fees and the DIP Facility; provided, that if the Bankruptcy Court does not approve the Break-Up Fee within twenty one (21) days after the date the applicable Definitive Documents with respect to the Buyer Group Arrangements are executed by the Buyer Group, that will constitute a "Buyer Group Termination Event" under the RSA.  The Break-Up Fee would be earned if the Debtors enter into an alternative transaction with respect to the Buyer Group Arrangements and would be payable solely from the proceeds of such alternative transaction after payment of estate professional fees and the DIP Facility in accordance with the terms herein, the DIP Documents, and the Approved Plan.  In the event the Buyer Group Arrangements close, the Buyer Group will not be entitled to expense reimbursement. |
|---|---|
| **Store Divestiture Transaction** | As part of the comprehensive transaction:

Divested Stores: the Buyer Group shall acquire a portfolio of 103 stores currently owned by certain of the Securitization Entities (comprised of 70 Accepted Stores and 33 Contingent Stores (as such terms are defined below)), including the assumption of Buyer Group SPE Assumed Liabilities, provided, that, unless waived by the respective Buyer Group SPE, for each Divested Store, (i) the assignment of the lease for such Divested Store to the corresponding Buyer Group SPE without any corporate guaranty or other incremental credit support shall be a condition to closing with respect to such Divested Store, and (ii) the transfer, acquisition, or such other arrangement as agreed to by the Buyer Group SPE in respect of a liquor license shall be a condition to closing with respect to each Divested Store.

Consideration: Acquisition consideration for each Divested Store will be comprised of assumption of the Buyer Group SPE Assumed Liabilities, and entry into new franchise agreements and royalty payment arrangements as set forth herein.

Franchise Agreements: With respect to each Divested Store, the corresponding Buyer Group SPE will enter into a franchise or license agreement on terms consistent with the Company's existing franchise or license agreements, as applicable, except as follows:

- A specified group of 70 Divested Stores (the "Accepted Stores") will pay royalties at the current rate (6%);

- A specified group of 33 Divested Stores (the "Contingent Stores") will be granted a 24-month royalty-free holiday post-closing and pay 6% royalties thereafter;

- All Divested Stores will continue annual contributions of 1% of net sales to the National Ad Fund; and

- There shall be no liquidated damages or similar franchisee obligations, subject to the terms regarding "Accepted Store Closings" below. |
| **Split of Royalties between RoyaltyCo and BrandCo** | So long as the Brand Management & Services Agreement has not been terminated as to Brand Management Co. (for the avoidance of doubt, such agreement would only be terminable upon a Bankruptcy Event (as defined in the Definitive Documents) or an "Unauthorized Change of Control" [4] with respect to Brand Management Co., certain limited breaches of the Brand |

---

[4] For purposes hereof "Unauthorized Change of Control" shall mean a transfer of control of Brand Management Co.

|  | Management & Services Agreement to be set forth in the Definitive Documents, or acts constituting gross negligence, actual fraud, or willful misconduct), Brand Management Co. will receive the following royalties and revenues (collectively, the "BMC Royalties"):<br><br>• 65% of the royalties paid by the Divested Stores;<br><br>• 50% of the royalties paid by any new stores or new locations that are opened; *provided*, that Brand Management Co. shall receive 100% of all franchise fees related to such new stores or new locations; and[5]<br><br>• 50% of any royalties or other revenue generated under any other license agreement or other license or services agreement or similar agreement (*e.g.*, non-restaurant use of IP) (such agreements, the "Other IP Agreements"); *provided,* that if such a license is capable of being structured as an annual royalty but instead is sold or otherwise significantly monetized (*e.g.*, via a one-time, up-front payment) in the future, Brand Management Co. shall receive only 25% of the proceeds from any such sale or other full monetization, and the remaining 75% shall go to RoyaltyCo. |
|---|---|
| **Accepted Store Closings** | • If a Buyer Group member closes, within the first two (2) years, a Divested Store that for the six (6) months prior to closing was profitable at a store-level after the payment of royalties and contribution to the ad fund, such Buyer Group member shall pay an $80,000 fee per such store to RoyaltyCo.<br><br>• No fee is required if stores are closed due to lease terminations by the landlord, severe weather related closures, or other circumstances outside of Buyer Group's control. |
| **RoyaltyCo Structure and Transaction** | On the Plan Effective Date, the following shall occur:<br><br>• the Master Issuer will be renamed from HOA Funding, LLC to RoyaltyCo, LLC (such renamed entity shall be referred to herein as "RoyaltyCo"). RoyaltyCo's subsidiary will continue to collect RoyaltyCo's shares of the royalties and revenues from licenses and franchise agreements. RoyaltyCo shall elect to be treated as a corporation for U.S. tax purposes.<br><br>• The structure for collecting and distributing royalties and revenues shall be on terms mutually agreeable to the Parties and in a manner that preserves RoyaltyCo's right to receive royalties and Brand Management Co.'s right to receive royalties.<br><br>• The Prepetition Master Issuer Equity Interests shall be cancelled for no consideration.<br><br>• The DIP Lenders or their delegates will acquire a 50% interest in newly issued shares of RoyaltyCo and the holders of Securitization Class B Notes Claims (or their respective delegates) will collectively acquire the remaining 50% interest in newly issued shares of RoyaltyCo (the "Noteholder Equity Entitlement"), with such 50% allocated among the holders of Securitization Class B Notes Claims on a pro rata basis in accordance with their respective holdings of the Securitization Class B Notes Claims.<br><br>• RoyaltyCo will be an obligor under the Class A-1 Notes, the Class A-2I Notes, the Class A-2II Notes, and the Class B Notes.<br><br>• Brand Management Co. will enter into the Brand Management & Services Agreement with RoyaltyCo pursuant to which Brand Management Co. will provide the services set forth therein in exchange for the BMC Royalties. |

---

to a person or entity that (i) is not in good standing and (ii) has not been a Hooters franchisee for at least two (2) years preceding such transfer.

[5] The term "franchise fees" as used herein is intended to refer to the approximately $30,000 in fees for start-up of a new franchise, consistent with past practices.

|  |  |
|---|---|
|  | • The Management Agreement by and between the Prepetition Manager and the Master Issuer shall be terminated. |
|  | • The entity that owns the IP ("IP HoldCo") shall retain debt-like obligations and liens in favor of the holders of claims under the New Securitization Documents; provided, so long as RoyaltyCo receives, for any twelve month period, royalties in an amount equal to at least 75% of the royalties received by RoyaltyCo for the first twelve months following the Effective Date (the "RoyaltyCo CF Covenant"), Brand Management Co. shall have the following rights, which rights shall be structured to survive any sale, refinancing, insolvency, or other similar event with respect to RoyaltyCo (or any of its successors or assigns) or any breach of contract, rejection, termination without cause, assumption, or assumption and assignment by RoyaltyCo (or any of its successors or assigns) (each such event, a "RoyaltyCo Trigger Event"): |
|  |     ○ the right to continue to manage and control the IP in accordance with the terms of the Brand Management & Services Agreement; |
|  |     ○ the right to enter into or renew franchise agreements with new or existing franchisees, as applicable, or enter into other IP Agreements, in each case, that would be reasonably expected to survive any RoyaltyCo Trigger Event; and |
|  |     ○ the right to issue licenses in the IP in connection with the foregoing that would reasonably be expected to survive any RoyaltyCo Trigger Event. |
|  | • Pursuant to the Brand Management & Services Agreement, IP HoldCo shall grant Brand Management Co., for no additional consideration, a comprehensive, exclusive, sublicensable in accordance with the Definitive Documents, license for purposes of performing all brand-related, franchising-related, and management-related functions (the "BMC License") on the terms and for the consideration set forth herein; provided, for the avoidance of doubt, such license would only be terminable upon the occurrence of an Unauthorized Change of Control or a Bankruptcy Event (as such terms are defined herein or in the Definitive Documents, respectively), failure to meet certain limited standards to be set forth in the Definitive Documents, failure to satisfy the RoyaltyCo CF Covenant, or acts constituting gross negligence, actual fraud, or willful misconduct; provided, further, that ownership and control, at both the equity and board level, of Brand Management Co. shall at all times be retained by franchisees. The BMC License will be subject to licenses existing prior to the Petition Date and include quality control and enforcement provisions as reasonably necessary to avoid potential loss of trademark rights, and require that all assignments be made and sublicenses be granted on arms-length terms for fair and reasonable value as determined by Brand Management Co. in its reasonable business judgment, taking into consideration its obligations under the Brand Management & Services Agreement and the interests of RoyaltyCo. |
|  | • The franchise or license agreement, as applicable, for each Divested Store will provide that, if the Brand Management & Services Agreement or BMC License is terminated (at RoyaltyCo's sole option) on account of a failure to satisfy the Royalty CF Covenant, the royalties paid by the applicable Buyer Group SPE on account of such Divested Store shall be reduced by 65% and the Buyer Group SPE shall have the go-forward right to renew the franchise or license agreement, without further modification, into perpetuity so long as such Divested Store is in compliance with the terms of its existing franchise or license agreement and such renewal is on substantially similar terms to such franchise or license agreement. |
| **Governance of RoyaltyCo** | RoyaltyCo's Board of Directors will be comprised of three individuals, one selected by the Prepetition Term Loan Lender, one selected by a majority of holders of the Securitization A-2 Notes Claims that are Consenting AHG Noteholders, and one selected by a majority of holders |

| | |
|---|---|
| | the Securitization B Notes Claims that are Consenting AHG Noteholders.  Definitive corporate governance documentation to be negotiated.  The independent directors of Master Issuer shall be removed. |
| **Waterfall** | Payment of principal and interest on each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes issued by RoyaltyCo to be set forth in an intercreditor arrangement in the New Indenture by and among the trustee acting on behalf of the holders of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Indenture to reflect the following waterfall (the "<u>Waterfall</u>"): |

1.  *First,* fees and expenses payable to (A) the trustee for each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes, and (B) independent certified public accountants and external legal counsel relating to defense of the IP or the operations of RoyaltyCo or the Guarantors; and any other fees, expenses, or operating costs of RoyaltyCo;

2.  *Second,* all accrued, unpaid interest on the Class A-1 Notes to the Class A-1 Noteholders;

3.  *Third*, all unpaid principal on the Class A-1 Notes to the Class A-1 Noteholders;

4.  *Fourth,* all accrued, unpaid interest not PIK'd on the Class A-2II and Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively;

5.  *Fifth,* accrued, unpaid interest not PIK'd on the Class B Notes to the Class B Noteholders in amount up to 2% per annum of the outstanding principal amount of the Class B Notes;

6.  *Sixth,* to the extent not otherwise paid, to the payment of or reserves for income taxes due by RoyaltyCo, in an amount not to exceed actual taxes due and payable for a rolling three quarters plus an estimate due for the current quarter;

7.  *Seventh,* all previously PIK'd interest on the Class A-2II and Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively;

8.  *Eighth,* all (a) until the Class A-2II Notes have been repaid in full, split (1) 50% of such proceeds to pay unpaid principal on the Class A-2II Notes to Class A-2II Noteholders and (2) 50% of such proceeds to pay unpaid principal on the Class A-2I Notes to Class A-2I Noteholders and (b) after repayment in full of the Class A-2II Notes, 100% of such proceeds to the repayment of the Class A-2I Notes to Class A-2I Noteholders until the Class A-2I Notes have been repaid in full;

9.  *Ninth*, all remaining accrued, unpaid interest not PIK'd on the Class B Notes to the Class B Noteholders;

10.  *Tenth,* all previously PIK'd interest on the Class B Notes to the Class B Noteholders;

11.  *Eleventh* all unpaid principal on the Class B Notes to Class B Noteholders until the Class B Notes have been repaid in full

12.  *Twelfth,* any accrued, unpaid ARD interest on Class A-2I Notes to Class A-2I Noteholders;

13.  *Thirteenth,* any accrued, unpaid ARD interest on Class B Notes to Class B Noteholders; and

14.  *Fourteenth*, 100% of residual amounts of RoyaltyCo to be distributed as cash

| | |
|---|---|
| | distributions to its owners. |
| **Brand Management Co.** | The Buyer Group will create a franchisee brand management company ("<u>Brand Management Co.</u>") that will be engaged by RoyaltyCo pursuant to a brand management and services agreement to be agreed between the Parties (the "<u>Brand Management & Services Agreement</u>") to oversee all brand-related, franchising-related, and management-related functions, including but not limited to: <br><br> • National Ad Fund Oversight and administration; <br><br> • Centralized Purchasing Organization ("<u>CPO</u>") operations oversight; <br><br> • Management of the franchise system, including any new franchising operations; and <br><br> • Developing, managing, licensing, and sub-licensing the licensed IP in furtherance of the Business (as defined below). <br><br> Brand Management Co. would perform all other acts or omissions it deems reasonably necessary or desirable in furtherance of the business of franchising, operating, or otherwise managing casual dining restaurants bearing the licensed trademarks, including but not limited to the Divested Stores (the "<u>Business</u>"), in its sole business judgment. <br><br> <u>Governance</u>: <br><br> • Neil Kiefer will lead the Brand Management Co. board of directors as chairman. <br><br> • The remainder of the Brand Management Co. board of directors will be comprised solely of members appointed by the Buyer Group. |
| **Definitive Document Consents** | The Definitive Documents shall be subject to the consent rights set forth in the RSA and any other consent rights set forth herein. |
| **Treatment of Claims and Interests** | |
| **Administrative Claims** | On the Plan Effective Date, or as soon as practicable thereafter (including following the occurrence of any bar date fixed by the Bankruptcy Court), each holder of an allowed claim for the costs and expenses of administration of the Debtors' estates under sections 503(b) or 507(b) the Bankruptcy Code that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("<u>Administrative Claims</u>") other than professional fee claims, shall be paid in full in cash. |
| **Professional Fee Claims** | On or before the Plan Effective Date, the Debtors shall establish and fund a professional fee escrow account (the "<u>Professional Fee Escrow Account</u>") in an amount sufficient to pay all estimated fees of the Debtors' estate professionals and those of any statutory committee that may have been appointed (collectively, the "<u>Retained Professionals</u>") through the Plan Effective Date of the Approved Plan (the "<u>Professional Fee Escrow Amount</u>"). <br><br> For the avoidance of doubt, the Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals.  Such funds shall not be considered property of the estates of the Debtors or the Wind-Down Entity, as applicable; *provided* that any amounts funded into the Professional Fee Escrow Account that remain after all allowed professional fee claims have been indefeasibly paid in full shall be considered property of RoyaltyCo. |
| **DIP Facility Claims (New Class A-1 Notes )** | On the Plan Effective Date, the DIP Facility shall be converted into senior-secured first-lien, first-out notes in the aggregate principal amount of up to $40,000,000, reflecting the sum of the Roll-Up and the total new-money component actually funded and outstanding as a Manager Advance under the DIP Facility (it being acknowledged and agreed that any amounts funded in |

11

| | |
|---|---|
| | accordance with the Approved Budget are funded as Manager Advances) as of the Plan Effective Date (which new money component shall not exceed the New Money Cap absent the consent of the Required Majority Consenting AHG Noteholders) (the "Class A-1 Principal Amount"), *plus* accrued and unpaid interest (the "Class A-1 Notes"), which will be subject to the following terms and the terms and conditions in the definitive documents relating thereto, as may be changed from time to time (such documents, together, including, without limitation, indentures, guarantees, security agreements, pledge agreements, opinions of counsel and other related definitive documents, collectively, the "Class A-1 Notes Documents"):<br><br>• Principal: Class A-1 Principal Amount, *plus* accrued and unpaid interest,<br><br>• Interest Rate: Prime + 3.00%, payable quarterly<br><br>• Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents<br><br>• Payment of principal and interest to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein).<br><br>• Borrower: RoyaltyCo<br><br>• Guarantors: Securitization Entities<br><br>• Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities<br><br>• Class A-1 Noteholders: DIP Lenders or certain of their affiliates; |
| **Priority Tax Claims** | On or before the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of an allowed claim of a Governmental Unit, as defined in section 101(27) of the Bankruptcy Code, against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code ("Priority Tax Claim") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each allowed Priority Tax Claim, each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Manager Advance Term Loan Claims (New Class A-2II Notes)** | The Agreed Securitization Manager Advance Claims will have been rolled up into the DIP Facility on a dollar-for-dollar basis upon approval of the Roll-Up (and thereafter treated as DIP Facility Claims).<br><br>On the Plan Effective Date, all other Manager Advance Term Loan Claims will be converted to:<br><br>(A) a senior-secured first-lien, second-out note in the aggregate principal amount of $18 million (the "Class A-2II Notes"), which will be subject to the following terms and the terms and conditions in the definitive documents relating thereto (such documents, together, including, without limitation, credit agreements, guarantees, security agreements, pledge agreements, opinions of counsel and other related definitive documents, collectively, the "Class A-2II Notes Documents"):<br><br>• Principal: $18 million<br><br>• Interest Rate: Fed funds; paid in cash, no subordination.  Payable quarterly.  All interest on the Class A-2II Notes shall PIK until such time as the Class A-1 Notes have been repaid in full<br><br>• Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents<br><br>• Payment of principal and interest to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II |

| | |
|---|---|
| | Notes, Class A-2I Notes, and Class B Notes. The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein). |
| | • Borrower: RoyaltyCo |
| | • Guarantors: Securitization Entities |
| | • Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall |
| | • Class A-2II Noteholders: DIP Lenders or certain of their affiliates |
| | • Class A-1 Notes and Class A-2II Notes Collateral: for both notes' documents, collateral shall include, without limitation, a lien senior to all other holders on all assets of RoyaltyCo and the Securitization Entities, as more specifically described in the Class A-1 Notes Documents and the Class A-2II Notes Documents; and |
| | (B) 50% of the equity in RoyaltyCo. |
| | Other than the DIP Facility (including, for the avoidance of doubt, up to the New Money Cap), no new Manager Advances will be permitted without the consent of the Required Majority Consenting AHG Noteholders. |
| **Term Loan Claims** | *Treatment*: No distributions shall be made on account of any Term Loan Claims. |
| | *Voting*: Holders of allowed Term Loan Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Term Loan Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Securitization Class A-2 Note Claims** | *Treatment*: On the Plan Effective Date, except to the extent that a holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment, each holder of Securitization Class A-2 Notes will receive new Class A-2I notes of RoyaltyCo with the following principal terms: |
| | • Notes will be issued by RoyaltyCo in a principal amount equal to that of the Securitization Class A-2 Notes and with the same interest rate as the Securitization Class A-2 Notes. Interest to be payable quarterly. All interest on the Class A-2I Notes shall PIK until such time as the Class A-1 Notes have been repaid in full |
| | • Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents |
| | • ARD interest to accrue beginning ten (10) years from Plan Effective Date. ARD interest to be 5% |
| | • Payment of principal and interest (including ARD interest) of the notes to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes. The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein) |
| | • Guarantors: Securitization Entities |
| | • Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall |

| | |
|---|---|
| | • Financial Covenants will be modified, prohibition on incurrence of other indebtedness redrafted to permit the Class A-1 Notes and the Class A-2II Notes, and the cash sweep and cash reserve triggers will be removed<br><br>(such notes, the "<u>Class A-2I Notes</u>").<br><br>*Voting*: This class is impaired under the Approved Plan. Holders of Securitization Class A-2 Note Claims may vote to accept or reject the Approved Plan. |
| **Securitization Class B Note Claims** | *Treatment*: On the Plan Effective Date, except to the extent that a holder of a Securitization Class B Note Claim agrees to a less favorable treatment, each holder of Securitization Class B Notes will receive (a) its *pro rata* share of the Noteholder Equity Entitlement and (b) new Class B notes of RoyaltyCo with the following principal terms:<br><br>• Notes will be issued by RoyaltyCo in a principal amount equal to that of the Securitization Class B Notes and with the same interest rate as the Securitization Class B Notes.  Interest to be payable quarterly.  All interest on the Class B Notes shall PIK until such time as the Class A-1 Notes have been repaid in full<br><br>• Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents<br><br>• ARD interest to accrue beginning ten (10) years from Plan Effective Date.  ARD interest to be 5%<br><br>• Payment of principal and interest (including ARD interest) of the notes to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein)<br><br>• Guarantors: Securitization Entities<br><br>• Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall<br><br>• Financial Covenants will be modified, prohibition on incurrence of other indebtedness redrafted to permit the Class A-1 Notes and the Class A-2II  Notes, and the cash sweep and cash reserve triggers will be removed<br><br>(such notes, the "<u>Class B Notes</u>").<br><br>*Voting*: This class is impaired under the Approved Plan. Holders of Securitization Class B Note Claims may vote to accept or reject the Approved Plan. |
| **Securitization Manager Advance Claims** | *Treatment*: On the Plan Effective Date, the prepetition Securitization Manager Advance Claims will be cancelled.<br><br>*Voting*: Holders of allowed Securitization Manager Advance Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. |
| **Other Secured Claims** | *Treatment*: On the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a secured claim that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("<u>Other Secured Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other |

|  | Secured Claim, each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor or the plan administrator, as applicable: |
|---|---|
|  | (i)       payment in full in cash, |
|  | (ii)      the collateral securing such holder's Other Secured Claim, or |
|  | (iii)     such other treatment as to render such holder's Other Secured Claim unimpaired. |
| **Priority Non-Tax Claims** | *Treatment*: On the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim, that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("<u>Priority Non-Tax Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other Priority Claim, each holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor or the Plan Administrator, as applicable:<br><br>(i)      payment in full in cash, or<br><br>(ii)     such other treatment as to render such holder's Priority Non-Tax Claim unimpaired. |
| **General Unsecured Claims** | *Treatment*: No distributions shall be made on account of any General Unsecured Claims.<br><br>*Voting*: Holders of allowed General Unsecured Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of General Unsecured Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Claims** | *Treatment:* Except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each allowed Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Intercompany Claims.<br><br>*Voting*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Intercompany Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Interests** | *Treatment:* Each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.<br><br>*Voting*: Holders of allowed Intercompany Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Prepetition Master Issuer Equity Interests** | *Treatment*: Prepetition Master Issuer Equity Interests shall be cancelled, and the holders thereof shall not receive or retain any property on account of such interests under the Approved Plan.<br><br>*Voting*: Holders of Prepetition Master Issuer Equity Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Prepetition Master Issuer Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |

| | |
|---|---|
| **Prepetition Securitization Equity Interests** | *Treatment*: Prepetition Securitization Equity Interests will not be impaired.<br><br>*Voting*: Holders of Prepetition Securitization Equity Interests will be conclusively deemed to have approved the Approved Plan.  Therefore, holders of Prepetition Securitization Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Prepetition Equity Interests** | *Treatment*: Prepetition Equity Interests in Parent or any other Non-Securitization Entity shall be cancelled, and the holders thereof shall not receive or retain any property on account of such interests under the Approved Plan.<br><br>*Voting*: Holders of Prepetition Equity Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Prepetition Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Other Terms Relevant to Restructuring** |
| **Executory Contracts** | As of and subject to the occurrence of the Plan Effective Date of the Approved Plan and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to reject filed by the Debtors on or before the date on which the Confirmation and Sale Order is entered; (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts (as such term will be defined in the Approved Plan); or (v) is specifically designated as a contract or lease to be rejected by the Debtors (with consent of the Required DIP Lenders and the Required Consenting AHG Noteholders) by the deadline to file the plan supplement; *provided*, that the Buyer Group, the Buyer Group SPEs, and Brand Management Co. shall take assignment of executory contracts and unexpired leases only as provided for in this Restructuring Term Sheet and as expressly set forth in the definitive documentation evidencing the Buyer Group Arrangements.  For the avoidance of doubt, the Debtors shall not assume any contract without the consent of the Required DIP Lenders and the Required Consenting AHG Noteholders.<br><br>As of and subject to the Plan Effective Date, (i) the Management Agreement, A&R Base Indenture, Series 2021-1 Supplement to Base Indenture, A&R Management Agreement, and A&R Guarantee & Collateral Agreement shall be terminated or cancelled, (ii) a new base indenture along (the "<u>New Indenture</u>") with one supplements for the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes shall be entered into, along with guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the Waterfall, an intercreditor agreement (collectively, the "<u>New Securitization Documents</u>"), and (iii) the Brand Management & Services Agreement shall be entered into with Brand Management Co. |
| **Chapter 11 Milestones** | The Restructuring Transactions shall be effectuated in accordance with the following deadlines (the "<u>Chapter 11 Milestones</u>"); *provided*, *however*, that such Milestones may be extended from time to time with the prior written consent of the Required DIP Lenders (e-mail from counsel being sufficient), *provided* that, unless otherwise specified, an extension of any Chapter 11 Milestone to a date that is (i) greater than five (5) calendar days from the date set forth herein (or from any new date established as provided herein) and (ii) greater than ten (10) calendar days from the original date set forth herein will also require the consent of the Required Consenting AHG Noteholders (e-mail from counsel being sufficient):<br><br>    (a)  No later than two (2) business days after the Petition Date, the Interim DIP Order shall have been entered;<br><br>    (b)  No later than ten (10) days after the Petition Date, the prearranged chapter 11 plan approving, among other things, the Buyer Group Arrangements in form and substance |

|  | acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders (the "Approved Plan") and the disclosure statement in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders (the "Disclosure Statement") shall have been filed; |
|---|---|
|  | (c)  No later than twenty-eight (28) days after the Petition Date, the Company Parties and Buyer Group shall have entered into the Buyer Group Arrangements and any other Sale Documents necessary to effectuate the Buyer Group Arrangements; |
|  | (d)  no later than thirty-five (35) calendar days after the Petition Date, the Final DIP Order shall have been entered; |
|  | (e)  No later than forty (40) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider conditional approval of the adequacy of the Disclosure Statement; |
|  | (f)  No later than forty (40) calendar days after the Petition Date, the Debtors shall commence solicitation of votes on the Approved Plan; |
|  | (g)  No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the Approved Plan; |
|  | (h)  No later than eighty (80) calendar days following the Petition Date (the "Outside Date"), the Plan Effective Date shall have occurred, *provided*, *however*, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional fifteen (15) calendar days with the written consent of the Required DIP Lenders in consultation with the Required Consenting AHG Noteholders; *provided* that any additional extension of the Outside Date requires the written consent of both the Required DIP Lenders and the Required Consenting AHG Noteholders; and |
|  | (i)  such other Milestones provided for in the DIP Facility Term Sheet shall be enforced. |
| **UAS Wind-Down Process** | Upon the Effective Date, and subject to the Wind-Down Budget and the Approved Plan, the Post-Effective Date Debtors shall wind down the Debtors' estates, including the Unallocated Stores, on terms mutually agreed upon by the Company Parties, the DIP Lenders, and the Consenting Creditors. |
| **Wind-Down Amount** | On or prior to the Plan Effective Date, the Debtors shall fund into a segregated account (the "Wind-Down Account") held in trust by the Wind-Down Entity that is administered by the Plan Administrator an amount to be agreed by the DIP Lenders, the Company Parties, and the Required Consenting AHG Noteholders (the "Wind-Down Amount"). |
| **Wind-Down Entity** | One or more liquidating trusts or other entities (which may be one or more of the post-Effective Date Debtors) established for the purpose of winding down the Debtors' estates and otherwise implementing the Approved Plan (subject to the terms and conditions set forth herein) (such entity, the "Wind-Down Entity"). The trustee, administrator, manager, or other similar position with respect to the Wind-Down Entity (the "Plan Administrator") shall be selected by the Debtors and the Required DIP Lenders, in consultation with the Required Consenting AHG Noteholders. |
| **Consent Rights of Required DIP Lenders and Required Consenting AHG Noteholders** | Notwithstanding anything to the contrary herein or in the Approved Plan, any and all consent rights of the Required DIP Lenders (in such capacity as DIP Lenders and/or Prepetition Lenders, as applicable) and Required Consenting AHG Noteholders and, to the extent applicable, the Required Majority Consenting AHG Noteholders, set forth in the RSA with respect to the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Approved Plan by reference and fully enforceable as if stated in full in the Approved Plan. |

17

| | |
|---|---|
| **Conditions Precedent to Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the satisfaction of the following conditions precedent, which conditions may be waived by mutual written consent of the Company Parties, the Required DIP Lenders, and the Required Consenting AHG Noteholders and, insofar as such terms or conditions relate to the Buyer Group Arrangements, the Buyer Group: |

<div style="margin-left:2em">

(i)     The RSA shall not have been terminated and shall remain in full force and effect;

(ii)    The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the RSA and this Restructuring Term Sheet;

(iii)   the DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the requisite DIP Lenders party thereto;

(iv)   The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(v)    The Confirmation and Sale Order confirming the Approved Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(vi)   The Class A-1 Notes Documents, the Class A-2II Notes Documents, the Class A-2I Note Documents, and the Class B Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Approved Plan and related transaction;

(vii)  The RoyaltyCo shares shall have been issued (with all conditions precedent thereto having been satisfied or waived) and a shareholder rights agreement shall have been entered into by the appropriate parties;

(viii) All Restructuring Transaction Expenses and any other fees, expenses, and other amounts required to be paid pursuant to the RSA pursuant to an order of the Bankruptcy Court shall have been paid in full in cash;

(ix)   Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

(x)    The conditions precedent to closing the Buyer Group Arrangements and the Approved Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Plan Effective Date;

(xi)   Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions and the Approved Plan shall have been obtained (including as set forth in the applicable purchase agreement);

(xii)  No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the

</div>

|  |  |
|---|---|
|  | Restructuring Transactions, the Approved Plan, or any other transaction contemplated thereby; |
| | (xiii) The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; and |
| | (xiv) There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions or any material portion or aspect thereof. |
| **Releases, Exculpation Set Forth in the Approved Plan** | Releases to be mutually agreed. |
| **Indemnification and D&O Insurance** | Under the Approved Plan, each directors, officers, and employee liability insurance policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be a retained asset of the Debtors' bankruptcy estates and shall be maintained for the benefit of the beneficiaries thereunder. |
| **Consenting Noteholder Indemnification** | Nothing herein shall alter any indemnification rights which the Consenting Noteholders may have under the Prepetition Note Documents (as defined in the DIP Facility Term Sheet) or otherwise. |
| **Reservation of Rights** | Notwithstanding anything to the contrary herein, the Parties agree and acknowledge that (i) the full amount of the Incremental Loan was funded and the Consenting AHG Noteholders have consented to (a) its treatment as a Manager Advance and (b) the Manager's right to reimbursement thereof (plus interest) in accordance with the Priority of Payments Waterfall, and (ii) the Consenting AHG Noteholders have agreed, solely upon consummation of an Approved Plan, that (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Approved Plan as Manager Advance Term Loan Claims which shall be converted to new Class A-2II Notes on the terms set forth herein and with the payment priority set forth in the Waterfall, and (b) any remaining claimed prepetition Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo, LLC as set forth herein and in the RSA. Except as specified in the foregoing clauses (i) and (ii), the Prepetition Secured Note Parties preserve all rights, claims (including indemnification claims), arguments, and objections to dispute the validity and amount of any claimed prepetition Manager Advances, or the characterization of any claimed Manager Advances as prepetition Manager Advances (collectively, the "Prepetition Secured Note Parties Reserved Matters"), and neither the Debtors' stipulation to the Manager Advances (as set forth in the DIP Term Sheet and the Interim DIP Order) nor the fact that the Consenting AHG Noteholders have made the agreements reflected in clauses (i) and (ii) above shall operate as a waiver of any rights, claims (including indemnification claims), arguments, or objections or an admission in respect of a claimed prepetition Manager Advance, nor alters or affects the Consenting AHG Noteholders' reservation of rights as set forth herein. The Debtors, including the Manager in its capacity as Manager, each Prepetition Credit Secured Party and each DIP Secured Party preserve all rights, claims and counterclaims (including indemnification claims or counterclaims), arguments, and objections with respect to the Prepetition Secured Note Parties Reserved Matters.  Any claims that may result from the Consenting AHG Noteholders' pursuit of, or success on, the Prepetition Secured Note Parties' |

| | Reserved Matters do not become DIP Obligations; *provided, however*, that nothing herein alters any prepetition indemnification rights that may otherwise exist. |
|---|---|
| **Exemption from SEC Registration** | The issuance of all securities under the Approved Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code to the fullest extent permissible. |
| **Tax Considerations** | The Restructuring Transactions contemplated by this term sheet shall be structured in a tax-efficient manner, including preservation of all net operating losses and other credits, in consultation with and with the prior express consent of the Required DIP Lenders and the Required Consenting AHG Noteholders in their sole discretion, taking into account the tax considerations of the Company Parties and each Consenting Creditor; *provided*, that any such structuring that materially and negatively affects the Divested Stores, the Buyer Group SPEs, or Brand Management Co. shall require the prior express consent of the Buyer Group in its sole discretion. |
| **Retention of Jurisdiction** | The Approved Plan will provide for a retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) resolution of motions, adversary proceedings, or other contested matters, (iii) entry of such orders as necessary to implement or consummate the Approved Plan and any related documents or agreements, and (iv) other purposes. |
| **Restructuring Expenses** | All Restructuring Expenses (as defined in the RSA) due and owing shall be paid within ten (10) calendar days after the entry of (i) the Interim DIP Order and (ii) the Final DIP Order.<br><br>The Approved Plan shall provide for payment in full, in cash of all Restructuring Expenses due and owing pursuant to invoices delivered to the Company at least one (1) Business Day prior to the Plan Effective Date.<br><br>The Company shall pay or reimburse in cash all Restructuring Expenses that are incurred but unpaid or not invoiced as of the Plan Effective Date or incurred after the Plan Effective Date in connection with the Restructuring Transactions, within five (5) Business Days of receipt of invoice therefor. |
| **Representations and Warranties; Covenants** | The RSA shall include customary representations and warranties and covenants of the Company Parties, the Consenting Creditors, and the Buyer Group, including but not limited to the following:<br><br>• The Debtors shall use reasonable best efforts to cause the Independent Managers and the Indenture Trustee to join the RSA.<br><br>• The Debtors and the Buyer Group shall work in good faith to negotiate and document the Buyer Group Arrangements. |
| **Definitive Documents** | "Definitive Documents" means the following (without limitation):  (A) the Approved Plan; (B) the Confirmation and Sale Order; (C) the Disclosure Statement (and any documents or Solicitation Materials related to the solicitation thereof, including applicable motions and orders); (D) the "first day" pleadings and all orders sought pursuant thereto, including the DIP Orders; (E) the plan supplement documents to be attached to the Approved Plan and all related, exhibits, term sheets, or agreements related thereto; (F) the DIP Documents; (G) the New Indenture (H) the Class A-1 Note Documents; (I) the Class A-2II Notes Documents; (J) the Class A-2I Note Documents; (K) the Class B Note Documents; (L) the APAs; (M) the Brand Management & Services Agreement; and (N) the Wind-Down Budget.<br><br>The Restructuring Transactions contemplated herein will be implemented pursuant to the Definitive Documents, in each case on substantially the same terms set forth in and otherwise consistent in all material respects with this Restructuring Term Sheet, the DIP Facility Term Sheet, and the Approved Plan and each such document shall be in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders. |

|  | The Definitive Documents not executed or in a form attached to this Restructuring Term Sheet as of the date of execution of the RSA remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with the RSA.  Further, the Definitive Documents not executed or in a form attached to this Restructuring Term Sheet as of the date of execution of the RSA shall otherwise be in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders. |
|---|---|
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted pursuant to the RSA. |

21

**Execution Version**

**<u>Exhibit 1</u>**

**Securitization Entities**

HOA Funding, LLC

HOA Holdco, LLC

HOA Systems, LLC

HOA Restaurant Holder, LLC

HOOTS Restaurant Holder, LLC

HOA IP GP, LLC

HOOTS Franchising, LLC

HOA Franchising, LLC

HOA Maryland Restaurant Holder, LLC

HOA Kansas Restaurant Holder, LLC

TW Restaurant Holder, LLC

DW Restaurant Holder, LLC

HI Limited Partnership

HOA Towson, LLC

HOA Waldorf, LLC

HOA Laurel, LLC

**<u>Exhibit 2</u>**

**Non-Securitization Entities**

Hawk Parent, LLC

HOA Holdings, LLC

Night Owl, LLC

Owl Wings, LLC

Owl Restaurant Holdings, LLC

Owl Holdings, LLC

Elf Owl Investments, LLC

TW Lonestar Wings, LLC

Alamo Wings, LLC

HOA Restaurant Group, LLC

Derby Wings Holdings, LLC

Derby Wings, LLC

Hooters of America, LLC (Manager)

## EXHIBIT C

## DIP Facility Term Sheet

EXECUTION VERSION

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION TERM LOAN FACILITY
# TERM SHEET

Set forth below is a summary of the principal terms and conditions for a proposed senior secured superpriority debtor-in-possession financing facility (the "DIP Facility" and such liens thereunder, the "DIP Liens"). Capitalized terms used but not defined in this non-binding term sheet (the "DIP Term Sheet") shall have the meanings set forth in the Prepetition Credit Agreements (as defined below) or, as the context may require, the term sheet attached to the RSA (as defined below) (the "Restructuring Term Sheet").

This DIP Term Sheet is the "DIP Facility Term Sheet" referred to in, and appended to, that certain Restructuring Support Agreement, dated as of March 31, 2025, by and among the Company Parties and the other Parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "RSA").

Except with respect to the Reimbursement; Indemnity, Governing Law and Jurisdiction, and Fiduciary; Agency provisions, this DIP Term Sheet is intended for discussion purposes only and does not purport to summarize all the terms, conditions, representations, warranties and other provisions with respect to the transactions referred to herein. This DIP Term Sheet does not constitute an offer, agreement, or commitment by Celtic Master Fund LP or any of its affiliates (collectively, the "Proposed Lender") to enter into any transaction or to provide any financings. Any such commitment will (a) be subject to (i) completion of the Proposed Lender's credit approval process, (ii) the execution and delivery of definitive legal documents acceptable to all parties and their respective counsel, and (iii) the completion of the Proposed Lender's legal and business due diligence and satisfaction with the results thereof, and (b) assume the accuracy and completeness in all material respects of the information provided by or on behalf of the DIP Borrowers (as defined below).

The terms and conditions for the extensions of credit described herein are also dependent upon, among other things, authorization by the Bankruptcy Court (as defined below).

| Parties | **DIP Borrowers**: Hawk Parent LLC ("Hawk Parent") and Hooters of America, LLC ("HOA" and together, the "DIP Borrowers" or "Borrowers" and individually, each a "DIP Borrower" or a "Borrower") will be co-borrowers, jointly and severally liable.

**DIP Guarantors**: The issuers and guarantors under each of the Prepetition Notes Documents (as defined below) and the Prepetition Credit Documents (as defined below), including HOA and Hawk Parent, who will also guarantee the obligations of the other DIP Guarantors[1] subject to the terms and conditions set forth herein (each, a "DIP Guarantor" or a "Guarantor" and collectively, the "DIP Guarantors" or "Guarantors").

**DIP Loan Parties**: The DIP Borrowers and the DIP Guarantors (the "DIP Loan Parties" or "Loan Parties" and each, a "DIP Loan Party" or a "Loan Party").

The DIP Loan Parties and their subsidiaries shall each be a debtor and debtor-in-possession (the "Debtors") in separate but jointly administered chapter 11 cases (the "Chapter 11 Cases") to be |
|---|---|

[1] Such DIP Guarantors refer to, collectively, HOA Restaurant Group, LLC, Owl Restaurant Holdings, LLC, Owl Wings, LLC, Night Owl, LLC, HOA Holdings, LLC, Derby Wings, LLC, Derby Wings Holdings, LLC, Alamo Wings, LLC, TW Lonestar Wings, LLC, Elf Owl Investments, LLC, Owl Holdings, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Funding, LLC, HOA Restaurant Holder, LLC, Hoots Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA IP GP, LLC, HI Limited Partnership, HOA Franchising, LLC, Hoots Franchising, LLC and HOA Towson, LLC.

1

| | |
|---|---|
| | commenced (the date of commencement, the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").<br><br>**Lenders**: Celtic Master Fund LP or certain of its affiliates (in such capacity, together with their successors and assigns in such capacity, the "DIP Lenders" and each, a "DIP Lender").<br><br>**DIP Agent**: U.S. Bank Trust Company, National Association ("US Bank"), as collateral agent and calculation agent (the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties").|
| **Certain Defined Terms** | **Existing DIP Loan Party Debt Documents:**<br><br>1. **Prepetition MA Loan Documents**<br><br>• That certain Credit Agreement dated as of September 27, 2024 (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025 (the "First Amendment"), and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition MA Loan Credit Agreement"), and entered into by, among others, Hawk Parent, as parent and borrower, the guarantors party thereto from time to time, Celtic Master Fund LP as Initial Lender (in such capacity, together with its successors and assigns in such capacity, the "Prepetition MA Loan Lender") and US Bank as Collateral Agent and Calculation Agent (in such capacity, together with its successors and assigns in such capacity, the "Prepetition MA Loan Agent").<br><br>• The Prepetition MA Loan Lender and the Prepetition MA Loan Agent are collectively referred herein as the "Prepetition MA Loan Secured Parties".<br><br>• Pursuant to the First Amendment, an additional loan in an aggregate principal amount equal to $5,000,000 was funded to Hawk Parent (such loan, "Incremental Loan") by the Prepetition MA Loan Lender (in such capacity, the "Incremental Lender").<br><br>• The "Prepetition Pari Passu Intercreditor Agreement" shall mean that certain Pari Passu Intercreditor Agreement dated as of September 27, 2024, by and among the Prepetition MA Loan Agent, the Prepetition Term Loan Agent (as defined below), Hawk Parent and the guarantors party thereto from time to time.<br><br>• The Prepetition Pari Passu Intercreditor Agreement and all other instruments and documents executed at any time in connection with the Prepetition MA Loan Credit Agreement and designated as "Loan Documents" (as defined in the Prepetition MA Loan Credit Agreement) shall be referred to collectively as the "Prepetition MA Loan Documents". The Obligations (as defined in the Prepetition MA Loan Credit Agreement) shall be referred to herein as the "Prepetition MA Loan Secured Obligations" and shall rank *pari passu* with the Prepetition Term Loan Secured Obligations (as defined below) with respect to the right to payment and priority of collateral as more fully set forth in the Pari Passu Intercreditor Agreement. The collateral securing the Prepetition MA Loan Secured Obligations is referred to herein as the "Prepetition MA Loan Collateral." |

2

2. **Prepetition Term Loan Documents**

- That certain Credit Agreement dated as of March 9, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Term Loan Credit Agreement</u>" and, together with the Prepetition MA Loan Credit Agreement, the "<u>Prepetition Credit Agreements</u>" and each, a "<u>Prepetition Credit Agreement</u>"), among Hawk Parent, as parent and borrower, the guarantors party thereto from time to time, XYQ Cayman Ltd. as Initial Lender (in such capacity, together with its successors and assigns in such capacity the "<u>Prepetition Term Loan Lender</u>") and US Bank as Collateral Agent and Calculation Agent (in such capacity, together with its successors and assigns in such capacity, the "<u>Prepetition Term Loan Agent</u>" and together with the Prepetition MA Loan Agent, the "<u>Prepetition Agents</u>" and each, a "<u>Prepetition Agent</u>").

- The "<u>Prepetition Loan Parties</u>" shall mean, collectively, Hawk Parent and the guarantors under each of the Prepetition Credit Agreements.

- The Prepetition Term Loan Lender and the Prepetition Term Loan Agent are collectively referred herein as the "<u>Prepetition Term Loan Secured Parties</u>" and each, a "<u>Prepetition Term Loan Secured Party</u>" and together with the Prepetition MA Loan Secured Parties, the "<u>Prepetition Credit Agreement Secured Parties</u>" and each, a "<u>Prepetition Credit Agreement Secured Party</u>".

- The Prepetition Pari Passu Intercreditor Agreement and all other instruments and documents executed at any time in connection with the Prepetition Term Loan Credit Agreement and designated as "Loan Documents" (as defined in the Prepetition Term Loan Credit Agreement) shall be referred to collectively as the "<u>Prepetition Term Loan Documents</u>" and, together with the Prepetition MA Loan Documents, the "<u>Prepetition Credit Documents</u>". The Obligations (as defined in the Prepetition Term Loan Credit Agreement) shall be referred to herein as the "<u>Prepetition Term Loan Secured Obligations</u>" (together with the Prepetition MA Loan Obligations, the "<u>Prepetition Credit Agreement Secured Obligations</u>," and together with the Prepetition Notes Secured Obligations (as defined below), the "<u>Prepetition Obligations</u>") and rank *pari passu* with the Prepetition MA Loan Secured Obligations with respect to the right to payment and priority of collateral as more fully set forth in the Prepetition Pari Passu Intercreditor Agreement. The collateral securing the Prepetition Term Loan Secured Obligations is referred to herein as the "<u>Prepetition Term Loan Collateral</u>," and together with the Prepetition MA Loan Collateral, the "<u>Prepetition Loan Collateral</u>." The liens on Prepetition Loan Collateral securing the Prepetition Credit Agreement Secured Obligations are referred to herein as the "<u>Prepetition Credit Agreement Liens</u>."

3. **Prepetition Notes Documents and Manager Advance Documents:**

   a. **Prepetition Note Documents**

- That certain Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated as of August 19, 2021 (as amended, restated, amended and restated or otherwise modified and in effect immediately prior to the date hereof, the "<u>Prepetition Base Indenture,</u>" and together with all other agreements, guarantees, pledges, collateral and security documents, management agreements, control agreements, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including without limitation the "Indenture

Documents" and the "Related Documents" (each as defined in the Prepetition Base Indenture), collectively, the "Prepetition Notes Documents," and together with the Prepetition Credit Documents, the "Prepetition Financing Documents" and each, a "Prepetition Financing Document"), by and between HOA Funding, LLC (together with its successors and assigns, the "Master Issuer"), Citibank, N.A., as Trustee (in such capacity, together with its successors and assigns in such capacity, the "Prepetition Notes Trustee") and Securities Intermediary.

- Pursuant to that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect immediately prior to the date hereof, the "Management Agreement") by and among the Master Issuer, HOA, as the manager (HOA in such capacity, the "Manager"), the Securitization Guarantors,[2] HOA Franchising, LLC and Hoots Franchising, LLC, each as a Franchisor, and the Prepetition Notes Trustee, the Securitization Entities (as defined below) engaged the Manager to take certain actions on their behalf in connection with the Prepetition Notes Documents and in connection with such services, the parties thereto agreed to the terms thereof, including, without limitation, certain rights including the right of the Manager to make Manager Advances (as defined below) on behalf of the Securitization Entities and the right to payment of Management Fees (as defined in the Prepetition Base Indenture). The reimbursement of Manager Advances is required pursuant Section 5.11 of the Prepetition Base Indenture as in effect on the date hereof which describes the reimbursement requirement of Manager Advances on a weekly basis (the "Manager's Repayment Right" and such waterfall, the "Priority of Payments Waterfall").  As used herein, "Manager Advance" shall have the meaning given such term in the Prepetition Base Indenture. For the avoidance of doubt, nothing in the preceding sentence shall alter the rights of the Consenting AHG Noteholders as set forth below in the "Reservation of Rights" section.

- As of the Petition Date, the Manager asserts a claim against the Securitization Entities for reimbursement of an aggregate amount of not less than $ 28,338,913 for prepetition Manager Advances, which amounts (plus accrued and unpaid interest thereon) remain outstanding. None of the Debtors disputes the amount or validity of the prepetition Manager Advances as described in the preceding sentence. None of the Debtors disputes the Manager's right to reimbursement of any Manager Advances, *plus* all additional amounts and other obligations under the DIP Facility during the pendency of the Chapter 11 Cases, together with accrued and unpaid interest, fees and other charges and expenses or that such amount benefit from such "Priority of Payments Waterfall" with the Manager's Repayment Right being part of the Prepetition Loan Collateral and the DIP Collateral.

- The "Securitization Entities" shall mean, collectively, the Securitization Guarantors and the Master Issuer, and the "Non-Securitization Entities" shall mean the Debtors other than the Securitization Entities.  "Prepetition Notes" refers to all notes issued by the Master Issuer prior to the Petition Date pursuant to the Prepetition Base Indenture (the holders of Prepetition Notes, the "Prepetition Noteholders," and together with the

---

[2] The "Prepetition Securitization Guarantors" means, collectively, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, Hoots Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA IP GP, LLC, HI Limited Partnership, HOA Franchising, LLC, Hoots Franchising, LLC and HOA Towson, LLC.

|  | Prepetition Notes Trustee and the other Secured Parties (including the Control Party and the Manager) (each as defined in the Prepetition Base Indenture), the "<u>Prepetition Notes Secured Parties</u>" and together with the Prepetition Credit Agreement Secured Parties, the "<u>Prepetition Secured Parties</u>").  The Obligations (as defined in the Prepetition Base Indenture) shall be referred to herein as the "<u>Prepetition Notes Secured Obligations</u>."  The collateral securing the Prepetition Notes Secured Obligations is referred to herein as the "<u>Prepetition Notes Collateral</u>," and together with the Prepetition Loan Collateral, the "<u>Prepetition Collateral</u>."  The liens on Prepetition Notes Collateral securing Prepetition Notes Secured Obligations are referred to herein as the "<u>Prepetition Indenture Liens</u>," and together with the Prepetition Credit Agreement Liens, the "<u>Prepetition Liens</u>."

b. **<u>Manager Advance Reporting & Acknowledgment</u>**

- Prior to the Petition Date, as a condition to receiving funds from the Prepetition Loan Parties, the Manager provided that certain Manager Advance Acknowledgment, dated as of September 27, 2024 (as amended and restated by that certain Amended and Restated Manager Advance Acknowledgement, dated as of March 3, 2025, among the Securitization Entities and the Prepetition MA Loan Agent, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Manager Advance Acknowledgement</u>") by and among the Securitization Entities and the Prepetition MA Loan Agent. |
|---|---|
| **DIP Facility; Use of Proceeds** | <u>**DIP Facility**</u>: The DIP Facility shall be comprised of superpriority consensual priming term loans (the "<u>DIP Loans</u>" and the commitment by the DIP Lenders to provide the DIP Loans upon satisfaction of the terms and conditions set forth herein, the "<u>DIP Loan Commitment</u>"; the credit agreement that will document the terms and conditions of the DIP Facility, the "<u>DIP Credit Agreement</u>" and all other documents related to the DIP Facility and the DIP Credit Agreement, the "<u>DIP Documents</u>"), consisting of an aggregate principal amount up to $40,000,000 (as such principal amount may be increased from time to time through the capitalization of interest paid in kind and, to the extent the DIP Loan Parties receive consent from the Required Majority Consenting AHG Noteholders,[3] through additional increases in the DIP Loan Commitments pursuant to the mechanics and subject to the terms described below under the headings labeled "<u>Accordion Increase</u>" and "AHG Noteholder Consent Matters"), which shall be comprised of:

(a) A committed new money term loan facility (the "<u>New Money Facility</u>") in an aggregate principal amount of up to $35,000,000 *plus* an uncommitted new money term loan accordion facility (the "<u>Accordion Facility</u>") in an aggregate principal amount to be determined with the consent of the Required Majority Consenting AHG Noteholders, and, which shall be subject to the terms set forth herein (such commitments, the "<u>New Money Commitments</u>" and such loans advanced and interest capitalized thereon from time to time with respect thereto, collectively, the "<u>New Money Loans</u>"); and

(b) a roll-up loan facility in an aggregate principal amount equal to $5,000,000 (the "<u>Roll-Up Amount</u>"), which shall be used for the roll-up and conversion (the "<u>Roll-Up</u>") of the Incremental Loan on a cashless, dollar-for-dollar basis into DIP Loans (such DIP Loans together with interest capitalized thereon, the "<u>Roll-Up Loans</u>"). |

[3] Please see the below section entitled "AHG Noteholder Consent Matters" for a description of the respective consent rights for the Required Majority Consenting AHG Noteholders and the Required Consenting AHG Noteholders.

Amounts paid or prepaid under the DIP Facility may not be reborrowed. As used herein, "DIP Obligations" shall mean all obligations of the DIP Borrowers and/or DIP Guarantors in respect of the DIP Loans incurred in accordance with the DIP Documents and, so long as it remains in full force and effect, the RSA, including all principal and accrued interest on the DIP Loans, all fees, and all reimbursement, indemnity, and other obligations under the DIP Credit Agreement, the DIP Orders and the other DIP Documents (as defined below).

**DIP Loans**: Subject to the DIP Lenders' determination that the terms and conditions herein and in the definitive documents, including the restrictions on use of proceeds set forth below, have been satisfied, the proceeds of New Money Loans shall be applied by the Borrowers to fund Manager Advances solely for the following purposes: (a) to make interest payments in respect of the DIP Obligations outstanding on the relevant interest payment date and (b) for the payment of other amounts in accordance with the Approved Budget (provided, however, that the funds used to pay any professional fees and restructuring charges shall not be used for the purpose of paying the professional fees and restructuring charges in connection with any dispute against the DIP Lenders or the Consenting AHG Noteholders); *provided, further*, that the application of proceeds of the New Money Loans applied to fund DIP Manager Advances shall be in accordance with the Approved Budget and the DIP Obligations so long as identified in accordance with the Approved Budget (including the payment and capitalization of interest and other indemnification obligations) shall be DIP Manager Advances and the Manager shall have a corresponding right to repayment of such amounts to the full extent thereof.

**Use of Proceeds**: No portion of the DIP Loan Parties' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral"), the proceeds of the DIP Facility, the DIP Collateral (as defined below), or the Carve-Out (as defined below) may be used:

    (a)        for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;

    (b)        directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility;

    (c)        unless a Conversion (as defined below) occurs, to make any distribution under a Chapter 11 Plan (a "Chapter 11 Plan") that does not provide for the indefeasible payment of DIP Obligations and the Prepetition Obligations in full and in cash unless agreed by the Required DIP Lenders (as defined below);

*provided* that, advisors to the Committee, if one is appointed, may use the proceeds of the DIP Facility to investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Credit Documents at an aggregate expense for such investigation not to exceed $25,000, *provided further*, that no portion of such amount may be used to prosecute any claims.

The Manager's Repayment Right shall be part of the DIP Collateral (as defined below) securing the repayment of the DIP Obligations. Manager Advance Acknowledgement documentation similar to that required by the Prepetition Loan Parties shall be provided to the DIP Lenders and the Consenting AHG Noteholders with respect to Manager Advances to be provided by the

| | |
|---|---|
| | Manager to the Securitization Entities with the proceeds of the DIP Loans ("DIP Manager Advances"), with additional documentation relating to such Manager Advances being provided on the books and records of the DIP Loan Parties and otherwise on terms, along with any additional requirements, that are acceptable to the DIP Lenders and the Required Majority Consenting AHG Noteholders. Other than the payment of the Management Fee and payments on behalf of Non-Securitization Entities in accordance with the Approved Budget, cash proceeds released by the Securitization Entities to the Non-Securitization Entities shall (i) reduce the DIP Manager Advances and the DIP Loans or (ii) be deemed payments of interest in respect of the DIP Manager Advances and DIP Loans if they result in a permanent principal reduction of the DIP Loan Obligations, but amounts reapplied and used (or deemed used, including the capitalization of interest and fees) in accordance with the Approved Budget shall continue to be treated as outstanding DIP Manager Advances until such permanent principal reduction of the DIP Loan Obligation occurs.. |
| **DIP    Collateral; Priority** | **DIP Collateral**:  Substantially all assets and property of the DIP Loan Parties, which include, without limitation, (a) all existing (whether pre- or post-petition) and after-acquired or arising, tangible and intangible, personal and real property, and other assets of each of the DIP Loan Parties including the assets described as Prepetition Collateral; (b) all rights of HOA, in its capacity as Manager, to reimbursement for any Manager Advance and the Manager's Repayment Right on a super senior priority basis; (c) all interest, income and other payments arising in connection with any Manager Advance; (d) a pledge of all Equity Interests in the DIP Loan Parties (other than Hawk Parent) and their subsidiaries; (e) all proceeds relating to the foregoing, and (f) subject to entry of the Final DIP Order, the proceeds of all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "Avoidance Actions") (collectively, the "DIP Collateral").

**Priority**:  All obligations of the DIP Loan Parties to the DIP Lenders and the DIP Agent under the DIP Facility shall have the following rankings and priorities (subject in all respects to the Carve-Out and the priorities set forth in Annex IV hereto):

(a) *First Priority Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized and automatically valid, fully and properly perfected first priority liens on and security interests in all DIP Collateral that is not subject to Permitted Senior Liens (as defined below), including, for the avoidance of doubt, subject to entry of the Final DIP Order, proceeds of Avoidance Actions (collectively, the "Unencumbered Property");

(b) *Priming DIP Liens and Junior DIP Liens*. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective liens on and security interests in all DIP Collateral (other than as described above in clause (a)), which DIP Liens (A) shall be subject and subordinate to Permitted Senior Liens, (B) shall be subject to the priorities set forth in Annex IV hereto, and (C) shall be senior to all other liens on and security interests in any DIP Collateral (including, without limitation, any Prepetition Collateral and any DIP Collateral that would otherwise constitute Prepetition Collateral), including, without limitation, any Adequate Protection Liens and any Prepetition Obligations. |

|  | It is understood and agreed that the priming liens described herein shall be subject to valid, non-avoidable and properly perfected liens that are (a) in existence on the Petition Date, (b) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (c) senior in priority to the Prepetition Liens, and (d) permitted to be incurred under the DIP Credit Agreement (such liens, the "Permitted Senior Liens").[4]

To the fullest extent permitted by applicable law, all of the liens described herein with respect to the assets of the DIP Loan Parties shall be effective and perfected as of the date of the Interim DIP Order (solely to the extent of the then outstanding obligations) and/or the Final DIP Order and shall be granted without the necessity of the execution or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements, and the DIP Loan Parties shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the DIP Loan Parties and the DIP Agent (acting at the direction of the requisite DIP Lenders).

Each DIP Order shall contain provisions prohibiting each of the DIP Loan Parties from incurring any indebtedness which (x) ranks *pari passu* with or senior to the DIP Obligations, (y) benefits from a first priority lien under section 364 of the Bankruptcy Code, or (z) except as set forth in this DIP Term Sheet (including in Annex IV), purports to have payment priority *pari passu* with or above DIP Manager Advances, and shall further prohibit any DIP Loan Party from creating, incurring, assuming or permitting to exist, directly or indirectly, any lien on or with respect to equity interests in Hawk Parent. |
| **Availability** | **Initial Advance**: On the date of the Bankruptcy Court's entry of an interim order approving the DIP Facility (the "Interim Effective Date"), in form and substance agreed to by the Required DIP Lenders ("Interim DIP Order"), subject to (A) the execution and delivery of the DIP Documents, (B) compliance with the terms, conditions and covenants described in this DIP Term Sheet and the DIP Documents, (C) the consent of the Required Consenting AHG Noteholders, and (D) delivery of an Approved Budget (as defined below), each New Money Lender shall make a new money loan (an "Interim Term Loan") in an aggregate initial principal amount of not more than such New Money Lender's share of the up to $5,000,000 Initial Term Loan commitments (the "Initial Term Loan Commitments").

**Delayed Draw Advance**: After the Interim Effective Date and prior to the Termination Date (as defined below), or if earlier, prior to an Occurrence (as defined below), the remaining amount of the outstanding New Money Commitments shall be available for borrowing in one or more advances (the "Delayed Draw Term Loans" and such commitments inclusive of any additional commitments that become New Money Commitments agreed to from time to time pursuant to the "Accordion Increase" mechanic described below, the "Delayed Draw Term Loan Commitments"), subject to (A) the execution and delivery of the DIP Documents, (B) compliance with the terms, conditions and covenants described in this Term Sheet and the DIP Documents and (C) delivery of an Approved Budget (as defined below), which shall be delivered prior to |

---

[4] For the avoidance of doubt, as used herein and in Annex IV, no reference to the "Permitted Senior Liens" shall refer to or include the Prepetition Liens. In addition, for the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Senior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition Liens as such claim had on the Petition Date. DIP Orders shall provide that all parties in interest shall reserve the right to the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Senior Lien to the extent they have standing to do so.

|  | each draw and approved by the Required DIP Lenders prior to such draw. Subject to the terms hereof and of the DIP Documents, the Delayed Draw Term Loans may be borrowed from time to time prior to each draw in amounts, and at intervals, to be set forth in the Approved Budget and in the DIP Documentation; *provided* that no DIP Lender shall have an obligation to fund any subsequent advances after the occurrence of an Event of Default, Change of Control, Asset Disposition or if the DIP Loan Parties fail to obtain the requisite consent from the Required Majority Consenting AHG Noteholder described in the Section labeled "AHG Noteholder Consent Matters" below (any of the foregoing, an "Occurrence") unless such DIP Lender waives the Occurrence in its sole discretion; and provided further that prior to entry of the Final DIP Order, the aggregate principal amount of Delayed Draw Term Loan Commitments available for Borrowing shall not exceed $4,000,000 (or such other amount agreed by the DIP Lender in its sole discretion provided such additional amounts are also included in the then Approved Budget). |
|---|---|
|  | **Roll-Up Loans**: On the Interim Effective Date, the Incremental Lender shall become entitled to roll up the Incremental Loan into DIP Loans (subject to and upon entry of the Final DIP Order (as defined below)). Upon the Bankruptcy Court's entry of the Final DIP Order, and from and after the Bankruptcy Court's entry of a final order approving the DIP Facility, in form and substance agreed to by the Required DIP Lenders (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders," and each, a "DIP Order"), each DIP Lender will be deemed to have funded Roll-Up Loans equal to the Roll-Up Amount. |
| **Accordion Increase** | If no Default or Event of Default then exists, the Borrowers may request additional New Money Commitments from time to time pursuant to the terms, and subject to the conditions, described below. In order to increase the principal amount of outstanding New Money Loans and available New Money Commitments (collectively, the "Aggregate Outstandings") to a dollar amount in excess of $35,000,000 (such Aggregate Outstanding amount *plus* capitalized interest and, to the extent the Required Majority Consenting AHG Noteholders have previously consented to a commitment increase, such additional amount of Aggregate Outstandings then permitted, the "New Money Cap"), such additional commitment increases shall be conditioned on, and subject to (i) the additional conditions described below, (ii), and the DIP Loan Parties (x) receiving (A) the consent of the Required Majority Consenting AHG Noteholders and (B) the consent of at least one of the DIP Lenders agreeing to such requested commitment increase, and (y) delivering a duly executed and completed Borrower's Upsize Certificate (as defined below) to the DIP Lenders and the Collateral Agent, for such commitment increase (the consent described in this clause (ii)(y), the "Consent Threshold"). If the Consent Threshold is satisfied, the Required Consenting AHG Noteholders so consenting (or their affiliates) shall be offered the opportunity to participate in New Money Commitments for New Money Loans in excess of the New Money Cap on a ratable basis with the existing DIP Lenders providing such additional New Money Commitments (pro rata to the principal amount of their holdings (together with their affiliates' holdings) of Prepetition Notes plus any outstanding principal amount of their holdings (together with their affiliates' holdings) of Prepetition Loans). <br><br> **Mechanics for Requesting an Increase:** <br><br> If no Default or Event of Default then exists, the Borrowers may from time to time after entry of the Final DIP Order deliver a notice (an "Accordion Increase Request") to the DIP Lenders, the Ad Hoc Group (as defined in the RSA), the Control Party (as defined in the RSA), the Prepetition Notes Trustee and requesting an increase in the available DIP Commitments. Such Accordion Increase Request shall: |

1. Certify that no Default or Event of Default then exists;

2. Notify the addressees of the proposed increase request, including the proposed effective date for such increase (which date shall be a date not earlier than the fifth Business Day after such notice, the "Accordion Increase Effective Date") and the amount of such proposed increase (the proposed "Accordion Increase Amount"), and, in the case of an Accordion Increase Request that would result in the proposed Aggregate Outstandings in excess of the then applicable New Money Cap without the Consent Threshold having first been satisfied, that proposed Aggregate Outstandings would exceed the then applicable New Money Cap; and

3. Offer the opportunity to the DIP Lenders, and in the case of an increase that would result in Aggregate Outstandings in excess of the New Money Cap, to the Prepetition Noteholders, to elect to commit to provide such additional Delayed Draw Term Loans and New Money Commitments.

Following the receipt of an Accordion Increase Request, each DIP Lender (and in the case of an Accordion Increase Request which results in Aggregate Outstandings in excess of the then applicable New Money Cap, each Prepetition Noteholder (or its delegate)) shall have the right for a period of three (3) Business Days (the "Commitment Acceptance Period") to elect by written notice to the Borrowers and the Collateral Agent to:

4. increase its Commitment by delivering a written commitment notice (a "Commitment Acceptance") which includes (a) the name and notice details of such person and (b) the amount by which it elects to increase its DIP Commitment (which amount shall not exceed the requested accordion increase amount (provided, that if such person is not an existing DIP Lender, the additional DIP Commitment shall be in a minimum amount of at least $1,000,000) (the "Proposed Increase Amount")) and (c) any applicable fees (each such person electing to so commit, an "Accordion Increase Lender"); or

5. confirm that it does not elect to increase its DIP Commitment (it being understood that a failure to deliver a written notice of acceptance by the end of the Commitment Acceptance Period shall be deemed to be such DIP Lender or, as the context may require, such Prepetition Noteholder, electing not to increase its DIP Commitment).

If the aggregate amount of the proposed increase in DIP Commitments as demonstrated by the Commitment Acceptances exceeds the relevant proposed Accordion Increase Amount, then the proposed increase in each Accordion Increase Lender shall be reduced on a pro rata basis until the aggregate of the proposed increase in DIP Commitments of all the Accordion Increase Lenders equals the relevant Accordion Increase Amount (it being understood that, unless the DIP Lender agrees otherwise, the Prepetition Noteholders that become Accordion Increase Lenders shall only be able to participate ratably in Commitments provided after such date in excess of the New Money Cap) and the Collateral Agent shall inform all the Accordion Increase Lenders of such reduced Commitments accordingly.

No later than two (2) Business Days prior to the Accordion Increase Effective Date:

1. each DIP Lender which is an Accordion Increase Lender shall deliver to the Collateral Agent and the Borrowers a duly completed and executed Borrower's Upsize Certification;

2. each Accordion Increase Lender that was not already a "DIP Lender" shall deliver to the Borrowers and the Collateral Agent a duly completed and executed Accordion Accession

10

| | |
|---|---|
| | Letter in the form attached to the DIP Credit Agreement along with all supporting documentation required thereby; |
| | 3.  the Borrowers shall deliver a certificate in form and substance satisfactory to the DIP Lenders certifying that the Consent Threshold has been previously satisfied attaching any supporting documentation provided by the Prepetition Noteholders, the Control Party or the Ad Hoc Group, as the context may require, demonstrating the same (such fully completed certificate, a "Borrower's Upsize Certification"). |
| | On the Accordion Increase Effective Date, the Collateral Agent and the Borrowers shall execute each Borrower's Upsize Certification and each duly completed and executed Accordion Accession Letter delivered to it which shall take effect in accordance with the terms of the DIP Credit Agreement. |
| | Notwithstanding the foregoing, no DIP Lender or Prepetition Noteholder shall have any obligation to increase its DIP Commitments or become a Lender. Any decision to become a DIP Lender or to increase DIP Commitments shall be made by such DIP Lender, or as the context requires, such Prepetition Noteholder, in such person's sole discretion independently from any other person. If a DIP Lender or a Prepetition Noteholder declines or is deemed to have declined an Accordion Increase Request, the DIP Commitments and obligations of such DIP Lender or other Person shall remain unchanged. |
| **Reporting and Information** | **DIP Reporting:**<br><br>The DIP Orders and DIP Documents will contain the reporting and information covenants made by the DIP Loan Parties under the Prepetition Credit Agreements and the other Prepetition Credit Documents, as applied in all respects to this DIP Term Sheet and the DIP Facility *mutatis mutandis,* and the DIP Loan Parties shall also provide to the DIP Lenders the information and documentation set forth below:<br><br>i.  within forty-five (45) days after the end of each fiscal period, unaudited monthly balance sheet and income statement together with a compliance certificate;<br><br>ii.  no later than three (3) business days prior to funding a DIP Manager Advance (or, if not practicable, as soon as reasonably practicable), documentation outlining, on a line-by-line basis, the fees and expenses comprising such DIP Manager Advance, consistent with the documentation previously required by the Prepetition Loan Parties for extensions of credit to be provided to the Prepetition Notes Trustee<br><br>iii.  any other business or financial information which may be reasonably requested by any of the DIP Lenders and Consenting AHG Noteholders or, as the context may require, the Control Party, the Prepetition Notes Trustee, or any of the Prepetition Noteholders;<br><br>iv.  the Proposed Budgets, Approved Budget and Variance Reports (each as defined below) along with updates on modifications to such Proposed Budgets and Variance Reports requested by the Control Party, the Prepetition Notes Trustee, or any of the Prepetition Noteholders or any other person whose consent is required in order to approve a Proposed Budget or a Variance Report;<br><br>v.  as soon as practicable but in no event later than three (3) days in advance of filing (to the extent practicable), (a) the proposed filing versions of the Interim DIP Order and the Final DIP Order and the motion seeking their approval, (b) all other proposed orders and pleadings related to the DIP Facility, (c) all other "first day motions" and related orders, (d) any plan of reorganization or liquidation, and/or any disclosure statement and/or plan supplement related to such plan (which plan, disclosure statement and/or plan |

supplement shall comply with the requirements of the Interim DIP Order or Final DIP Order, as applicable), (e) any confirmation order relating to any plan of reorganization or liquidation, (f) any motion and proposed form of order filed with the Court relating to the assumption, rejection, modification or amendment of any material contract, and (g) all other material filings to be filed by or on behalf of the Debtors or any of their subsidiaries or affiliates;

vi.   (a) copies of any other motions to be filed by or on behalf of any DIP Loan Party in the Chapter 11 Cases at least three (3) business days prior to such filing (or, if not practicable, as soon as reasonably practicable), (b) all notices required to be given to all parties specified in any DIP Order; and (c) such other customary information (including access to the DIP Loan Parties' books, records, personnel and advisors) as the DIP Agent and/or the Required DIP Lenders may reasonably request;

vii.   at the request of the DIP Lenders, but not more often than once per calendar week, the DIP Loan Parties shall hold a call(each, an "Update Call") to provide updates on the DIP Loan Parties' business, asset sales, store closures, licensing, franchise opportunities (collectively, the "Opportunities") and such other topics as the DIP Lenders request (so long as, for any additional topics that have not otherwise been mutually agreed between the DIP Loan Parties and the DIP Lenders, the DIP Lenders provide an agenda for such additional topics one Business Day prior to such call (or such shorter period as agreed among the DIP Loan Parties and the DIP Lenders (including by email)); and

viii.   as soon as practicable, but in no event later than the next Business Day after receipt, information regarding any objections received by the Loan Parties or their advisors from any of the Prepetition Notes Secured Parties regarding any Proposed Increase in respect of New Money Commitments or any Proposed Budget.

**Prepetition Secured Party Reporting:**

The Debtors agree to provide the Prepetition Secured Parties, including the Prepetition Notes Secured Parties (including the Control Party), with the same reporting provided to the DIP Secured Parties contemporaneously with such reporting being provided to the DIP Secured Parties and will provide the Consenting AHG Noteholders and the Control Party with the opportunity to request an Update Call or any other reasonable reporting, and advance notice of any Update Call and the opportunity to participate in such Update Calls regarding the Opportunities and such other matters as the Control Party or Required Consenting AHG Noteholders may mutually agree with the Prepetition Notes Secured Parties.  In addition, the Debtors agree to provide the Consenting AHG Noteholders and the Control Party with copies of any requested amendments prior to executing any material amendments that could reasonably be expected to affect the Consenting AHG Noteholders' interests in advance of executing any such amendments (it being understood that the Consenting AHG Noteholders and the Control Party (and or their counsel) being copied or blind copied on an email notice from the Debtors shall be notice of the same).

| | |
|---|---|
| **Permitted Variances** | The DIP Facility shall contain provisions substantially consistent with the Prepetition MA Loan Credit Agreement relating to performance milestones, governance and reporting, including delivery of, and updates to, a budget which shall include a 13-week statement of receipts and disbursements for the next 13-weeks of the DIP Loan Parties and projection of the DIP Loan Parties cash flows for such period, prepared by the DIP Loan Parties in consultation with their financial advisors, broken down by week, which shall be updated no less than once every four (4) weeks for the subsequent 13-week period and include narrative descriptions where additional |

supporting evidence described the sources, uses and transactions contemplated (each as approved by the Required DIP Lenders and the Required Majority Consenting AHG Noteholders in their sole discretion, and including the sources and uses described therein, the "Proposed Budget"); provided that the DIP Loan Parties shall cooperate to address the Consenting AHG Noteholders reasonable requests for additional breakdown or detail. Upon the receipt of the consent of the Required Majority Consenting AHG Noteholders and the Required DIP Lenders with respect to such Proposed Budget (which approval shall be in the Required DIP Lenders and the Required Majority Consenting AHG Noteholders' sole discretion (and may be withheld for any reason)), such Proposed Budget shall become an "Approved Budget" (and such required consents, the "Budget Consents"). The first of these shall be delivered and approved prior to the Initial Advance and subsequently Approved Budgets shall replace the then-operative Approved Budget for all purposes. The DIP Loan Parties shall operate in accordance with the Approved Budget and all disbursements (including further payments made as DIP Manager Advances including those amounts used for debt service, professional fees and capital expenditures) shall be consistent with the provisions of the Approved Budget (subject to Permitted Variances). The DIP Loan Parties may submit additional budgets to the DIP Lenders, Consenting AHG Noteholders, the Control Party, the Prepetition Notes Trustee, or any of the other Prepetition Noteholders, but until the DIP Loan Parties have the Budget Consents required for an Approved Budget, no Proposed Budget will be an Approved Budget and until the required Budget Consents are received, the DIP Loan Parties shall continue to comply with the then-operative Approved Budget and the DIP Lenders shall be permitted to rely on such previously Approved Budget for purposes of determining the amount of New Money Loans to advance.

**Forecast Variances**: Commencing on the second full week following the Petition Date, no later than 5:00 p.m. ET on the Wednesday of each subsequent calendar week, the DIP Loan Parties shall deliver to the DIP Lenders, the Control Party, and the Consenting AHG Noteholders a variance report in form acceptable to the DIP Lenders in their sole discretion (each, a "Variance Report") setting forth (i) the DIP Loan Parties' aggregate cash receipts and disbursements on a line-by-line basis (including debt service, professional fees and capital expenditures) during the immediately preceding calendar week ending on Sunday; (ii) disbursements for the DIP Loan Parties' administrative expenses of the Chapter 11 Cases including professionals' fees; and (iii) the variance in dollar amounts and as a percentage of the actual aggregate cash receipts and disbursements (including debt service, professional fees and capital expenditures) for each weekly period ending on Sunday from those reflected for the corresponding period in the then-operative Approved Budget (such comparison, the "Variance").

"Permitted Variance" means a Variance from the then-current Approved Budget during any Variance Testing Period that is not more than 15.0% of each of (x) the cumulative receipts on a combined basis during the Variance Testing Period, and (y) all cumulative disbursements during the Variance Testing Period; provided, that disbursements on account of professional fees and expenses shall be tested on a line-by-line basis and subject to a Permitted Variance of not more than 15.0% from the then-current Approved Budget for each line item during any Variance Testing Period during the Variance Testing Period.

"Variance Testing Period" means, starting the second full week following the Closing Date (as defined below), (i) the one-week period ending on the first Sunday thereafter, (ii) the two-week period ending on the second Sunday thereafter, (iii) the three-week period ending on the third Sunday thereafter, (iv) the four-week period ending on the fourth Sunday thereafter and (v) each subsequent four-week period ending on each Sunday thereafter; whereby the cumulative actuals

| | |
|---|---|
| | are compared against the cumulative budget for the then-current Approved Budget plus actuals for any prior week not forecasted in the then-current Approved Budget.<br><br>The DIP Loan Parties hereby agree that during any Variance Testing Period, the Variance from the then-current Approved Budget shall not exceed the Permitted Variances. |
| **Adequate Protection** | Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Credit Agreement Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "Prepetition Loan Adequate Protection"): |

|   |   |
|---|---|
| i. | Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition MA Loan Agent, the Prepetition Term Loan Agent, the Prepetition MA Loan Lender, in its capacity as such, and the Prepetition Term Loan Lender, in its capacity as such; |
| ii. | To the extent of any aggregate diminution in value of the Prepetition MA Loan Secured Parties' interests in the Prepetition MA Loan Collateral from and after the Petition Date, for any reason provided for under the Bankruptcy Code ("Diminution in Value"), replacement liens (the "Prepetition MA Loan Adequate Protection Liens") on the Prepetition MA Loan Collateral and Prepetition Term Loan Collateral to secure adequate protection claims, which Prepetition MA Loan Adequate Protection Liens will be subject to the lien priority set forth in the "DIP Collateral; Priority" section above; |
| iii. | To the extent of any aggregate Diminution in Value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Term Loan Collateral, adequate protection liens (the "Prepetition Term Loan Adequate Protection Liens," and together with Prepetition MA Loan Adequate Protection Liens, "Prepetition Loan Adequate Protection Liens") on all DIP Collateral to secure the Prepetition Loan 507(b) Claims (as defined below), which Prepetition Term Loan Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other all other liens on and security interests in the DIP Collateral; |
| iv. | To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "Prepetition Loan 507(b) Claims"), which Prepetition Loan 507(b) Claims will be (a) subject and subordinate to the Carve-Out, and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever; |
| v. | Upon entry of the Final DIP Order, the consummation of the Roll Up; and |
| vi. | Delivery of all reports and notices provided for in the DIP Documents and the DIP |

Orders, in each case when and as required thereunder.

Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Notes Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "Prepetition Notes Adequate Protection," and together with the Prepetition Loan Adequate Protection, the "Adequate Protection"):

i.      Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition Notes Trustee, in its capacity as such, the Control Party in its capacity as such, and the ad hoc group of consenting Prepetition Noteholders (the "Ad Hoc Group"), in its capacity as such;

ii.     To the extent of any Diminution in Value of the Prepetition Notes Secured Parties' interests in the Prepetition Notes Collateral, adequate protection liens (the "Prepetition Notes Adequate Protection Liens") on all DIP Collateral to secure the Prepetition Notes 507(b) Claims (as defined below), which Prepetition Notes Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other all other liens on and security interests in the DIP Collateral;

iii.    To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "Prepetition Notes 507(b) Claims"), which Prepetition Notes 507(b) Claims shall be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever; and

iv.     Delivery of all reports and notices provided for in the DIP Documents and the DIP Orders, in each case when and as required thereunder.

The foregoing adequate protection liens (the "Adequate Protection Liens") shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP Agent, the Prepetition  MA Loan Agent, the Prepetition Term Loan Agent or the Prepetition Notes Trustee determine (at the direction of the requisite creditors) to file any financing statements, notice of liens or similar instruments (in each consistent with the DIP Orders), the DIP Loan Parties will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings.

The Interim DIP Order and Final DIP Order (as applicable) shall provide for the payment of all professional fees and expenses payable as Adequate Protection (a) in the case of fees invoiced prior to the entry of the Interim DIP Order, within seven (7) days after entry of the Interim DIP Order and (b) in the case of professional fees and expenses invoiced thereafter, within three (3) days after the expiration of the ten (10) day review period applicable to such fees and expenses under the DIP Orders.

| | |
|---|---|
| **DIP Orders** | The DIP Orders shall, among other things, (i) upon entry of the Interim DIP Order, provide that in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, (ii) upon entry of the Final DIP Order, approve the DIP Loan Parties' and the Prepetition Secured Parties' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (iii) contain stipulations by the DIP Loan Parties ratifying the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition Credit Agreements (including the amount and validity of the Manager Advances) but shall reserve on the matters described in "Reservation of Rights," below, solely as set forth therein, (iv) contain findings by the Court that the negotiation, extension and execution of the RSA and the DIP Loans do not violate the terms of Section 14.13 of the Prepetition Base Indenture or any similar non-petition or non-disturbance agreement entered into by the Prepetition Secured Parties, and (v) otherwise be in form and substance satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders. |
| **Closing Date** | The closing date of the DIP Facility (the "Closing Date") shall occur within two (2) business days of the Interim DIP Order being granted and shall be the first business day on which the conditions precedent set forth in definitive documentation governing the DIP Facility have been satisfied or waived by the DIP Lenders. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate and fees under the DIP Facility and for Manager Advances are set forth in Annex I hereto.<br><br>Interest shall accrue on the principal balance of the DIP Loans, from time to time, based on a 360-day year and charged for the actual number of days outstanding.  DIP Borrowers shall pay interest, default interest and any fees monthly in cash and in kind (as applicable) in arrears on the last business day of each calendar month and on the Termination Date. |
| **Voluntary Prepayments** | The DIP Facility may be voluntarily prepaid, and the commitments thereunder voluntarily reduced by the DIP Borrowers, in whole or in part, without premium or penalty, at any time upon three (3) business days' prior written notice to the DIP Lenders (subject to actual breakage costs (if any)), which notice shall specify the principal amount of such prepayment and the date on which such prepayment is to be made. |
| **Mandatory Prepayments & Manager Advance Reimbursement** | (a)    **Mandatory Prepayment**s: Unless the Required DIP Lenders consent to waive such prepayment, mandatory prepayments of the DIP Loans shall be required in connection with a Change of Control (as defined below), Asset Disposition (other than (x) inventory in the ordinary course of business or (y) in accordance with the Sale Transactions (as defined in the RSA)), Extraordinary Receipts (as defined below), and the incurrence of Indebtedness (as defined in the DIP Credit Agreement) (other than Indebtedness otherwise permitted under the DIP Documents). Any mandatory payment resulting from Extraordinary Receipts or Asset Dispositions at any Securitization Entity will be applied in accordance with the Priority of Payments Waterfall in the Prepetition Base Indenture, including the repayment of any DIP Manager Advances if such payment is then used by the Debtors to permanently repay the outstanding principal amount of DIP Loans. The terms used above, shall have the following definitions:<br><br>"Change of Control" means the occurrence of any of the following (i) the sale, lease, transfer, or other Disposition, directly or indirectly, in one transaction or a series of related transactions, of all or substantially all of the assets of the DIP Loan Parties to any Person other than the Parent or a wholly-owned subsidiary of the Parent; (ii) the Parent |

ceasing to own, directly or indirectly, 100% of the total economic and voting power of the issued and outstanding Capital Stock of any other DIP Loan Party; (iii) the termination of HOA in its capacity as Manager under the Management Agreement; (iv) the Ultimate Parent ceasing to own directly or indirectly, at least 51% of the total voting and economic power of the issued and outstanding Voting Stock of the Parent; (v) the adoption of a plan by the stockholders of Securitization Entities relating to the liquidation or dissolution of Securitization Entities or a Manager Termination Event (as defined in the Management Agreement); or (vi) a "change of control" or any comparable term under, and as defined in, any agreement governing any Indebtedness of any DIP Loan Party or any of their subsidiaries in an aggregate principal amount exceeding $5,000,000. For the avoidance of doubt, no Change of Control shall be deemed to have occurred solely by virtue of the consummation of the Sale Transactions in the manner described in the RSA and the Approved Plan.

"Extraordinary Receipts" means any cash or Cash Equivalents or other proceeds received by or paid to or for the account of any Person other than in the ordinary course of business in respect of tax refunds, pension plan reversions, proceeds of insurance, indemnity payments and purchase price adjustments received in connection with any purchase agreement (or other similar agreement) and payments in respect of judgments or settlements of claims, litigation or proceedings, any settlement of or payment in respect of any property, casualty insurance claim or condemnation proceeding relating to any asset of any DIP Loan Party or any of their subsidiaries; *provided* that for purposes of the DIP Credit Agreement provisions governing mandatory prepayments from proceeds of such Extraordinary Receipts, Extraordinary Receipts shall not include insurance proceeds that are anticipated to be received; *provided*, that no default then exists and all such amounts are applied as a Manager Advance to repay invoices and out-of-pocket expenses Incurred to repair the fire damage and reopen at that certain restaurant owned by the DIP Loan Parties located at 2201 N Lamar Street, Dallas, Texas 75201.

(b) <u>Manager Advance Reimbursement Offer</u>. Promptly, and in any event within two (2) business days following each date on which HOA has received a reimbursement of a DIP Manager Advance, the DIP Borrowers shall make an offer to prepay the DIP Loans by providing written notice to the DIP Lenders that includes, among other things, an acknowledgement that the DIP Lenders may elect to accept or reject such offer for prepayment in their sole discretion. If the DIP Lenders elect to accept such offer for prepayment, the Borrowers shall prepay the DIP Loans in the amount of such reimbursement, together with accrued and unpaid interest and other DIP Obligations on the amount so prepaid, payable in connection with such prepayment.

All voluntary or mandatory prepayments of the DIP Loans (including through the acceptance of any mandatory prepayment offer) shall be applied to prepay the DIP Loans and any DIP Manager Advances until all such DIP Loans and DIP Manager Advances are repaid in full. Any DIP Lender may decline to accept all (but not less than all) of its share of any such prepayment by providing written notice to the Lender Representative (as defined in the DIP Credit Agreement) within one (1) Business Day prior to the proposed date of such prepayment and any such declined amount shall also remain for purposes of calculating the then outstanding DIP Manager Advances, a corresponding amount of outstanding Manager Advances that may continue to be applied by the Debtors in accordance with the then Approved Budget.

| | |
|---|---|
| **Conditions Precedent to Initial Advance** | The closing of the DIP Facility, each Advance and the DIP Loan Parties' right to use Cash Collateral pursuant to the terms hereof, will be subject to customary closing conditions, including, without limitation, the satisfaction of the applicable conditions precedent listed on <u>Annex II.A</u> attached hereto, and such other conditions as set forth herein.<br><br>Modifications of the Interim DIP Order shall require approval of the Required DIP Lenders in their sole discretion. |
| **Conditions Precedent to All Advances** | The obligation of each DIP Lender to make any Advance, including the availability of any Delayed Draw Term Loans and any further availability of the balance of the DIP Facility, will be subject to the satisfaction of each of the applicable conditions precedent listed on <u>Annex II.B</u> attached hereto, on and as of the date of each such Advance.<br><br>Modifications of the DIP Orders shall require approval of (i) the Required DIP Lenders and (ii) the Required Majority Consenting AHG Noteholders or the Required Consenting AHG Noteholders (as more specifically set forth in this Term Sheet or in the Interim DIP Order), each in their respective discretion (and of the Control Party with respect to any provisions that could reasonably be expected to affect the Control Party). |
| **Covenants** | Substantially similar to such covenants as set forth in the Prepetition Credit Documents and Manager Advance Acknowledgement, as modified to reflect the nature of the cases, this financing, and including certain additional covenants appropriate for a debtor-in-possession financing facility (including, without limitation, certain milestones and provisions regarding DIP Manager Advances, direction and application of proceeds (as set forth below), any sale process and continued retention of the Financial Advisor.<br><br><u>Milestones</u>.  The DIP Loan Parties shall comply with the following deadlines (the "<u>Chapter 11 Milestones</u>"); *provided*, *however*, that such Chapter 11 Milestones may be extended from time to time with the prior written consent of the Required DIP Lenders (with email being sufficient):[5]<br><br>(a)  The Debtors shall commence the Chapter 11 Cases no later than March 31, 2025;<br><br>(b)  No later than the Petition Date, the DIP Motion shall have been filed;<br><br>(c)  No later than two (2) business days after the Petition Date, the Interim DIP Order shall have been entered;<br><br>(d)  No later than ten (10) days after the Petition Date, the prearranged chapter 11 plan approving, among other things, the Buyer Group Arrangement (as defined in the RSA) in form and substance acceptable to the Required DIP Lenders (the "<u>Approved Plan</u>") and the disclosure statement in form and substance acceptable to the Required DIP Lenders(the "<u>Disclosure Statement</u>") shall have been filed;<br><br>(e)  No later than twenty-eight (28) days after the Petition Date, the Loan Parties and Buyer Group shall have entered into the Buyer Group Arrangement (as defined in the RSA) and any other Sale Documents (as defined in the RSA) necessary to effectuate the Buyer Group Arrangement;<br><br>(f)  No later than thirty-five (35) calendar days after the Petition Date, the Final DIP Order shall have been entered;<br><br>(g)  No later than forty (40) days after the Petition Date, the Bankruptcy Court shall hold a |

---

[5] The consent rights for the Required Consenting AHG Noteholders with respect to the Chapter 11 Milestones are as set forth in the Restructuring Term Sheet.  Nothing herein is intended to, or does, alter such consent rights. ]

hearing to consider conditional approval of the adequacy of the Disclosure Statement;

(h) No later than forty (40) calendar days after the Petition Date, the Debtors shall commence solicitation of votes on the Approved Plan;

(i) No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the Approved Plan; and

(j) No later than eighty (80) calendar days following the Petition Date (the "Outside Date"), the Plan Effective Date (as defined in the RSA) shall have occurred, provided, however, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional fifteen (15) calendar days with the written consent of the Required DIP Lenders; provided, further that any additional extension of the Outside Date requires the written consent of the DIP Lenders.

Manager's Application of Proceeds.  Manager shall apply any proceeds received from the Securitization Entities or from an event that triggers a Mandatory Repayment, in accordance with the Priority of Payments Waterfall, which application if used to permanently repay the outstanding DIP Loans shall also correspondingly reduce the then outstanding DIP Manager Advances by an equal amount.  Manager may only waive its right to receive a reimbursement for any Manager Advances pursuant to the Priority of Payments Waterfall with the prior written consent of the Required DIP Lenders and the Required Consenting AHG Noteholders (it being understood that, with respect to the Required Consenting AHG Noteholders, continuing to use such proceeds in accordance with the then Approved Budget shall not require a further consent from the Required Consenting AHG Noteholders).

Authorization to File Financing Statements. Subject to customary further assurances on DIP Collateral and perfection of such DIP Collateral, the DIP Agent, on behalf of the DIP Secured Parties, is authorized (but not obligated) to file financing statements, without notice to the DIP Loan Parties, with all appropriate jurisdictions to perfect or protect DIP Agent's and DIP Lenders' interest or rights hereunder. Such financing statements may indicate the DIP Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in DIP Agent's discretion (at the direction of the Required DIP Lenders).

| **Representations and Warranties** | Substantially similar to the representations and warranties set forth in the Prepetition Credit Documents and in the Manager Advance Acknowledgement, as modified to reflect the Chapter 11 Cases, the nature of this financing, and including certain additional representations and warranties appropriate for a debtor-in-possession financing facility, the cases, the Manager Advances, the proposed sale transaction and taking into account the DIP Loan Parties' present affairs. |
| --- | --- |
| **Carve-Out** | The DIP Orders shall include customary carve-out provisions that shall be subject to approval by the DIP Lenders in their sole consent (the "Carve-Out"). |
| **Events of Default** | Substantially similar to such events of default as set forth in the Prepetition Credit Documents, as modified to reflect the nature of this financing, and including certain additional events of default appropriate for a debtor-in-possession financing facility and taking into account the DIP Loan Parties' present affairs. <br><br> The events of default ("Events of Default") in the DIP Credit Agreement shall include, without limitation, the following: |

19

|  | a. | **Breach of Representation**. The inaccuracy in any material respect of any representation or warranty of any DIP Loan Party on the date when made or deemed to have been made; |
|  | b. | **Nonpayment**. The failure of any DIP Loan Party to pay when due (i) any interest on any DIP Loan or any fee or premium payable under the DIP Credit Agreement or any other DIP Document, and such failure continues for a period of five (5) Business Days or (ii) all or a portion of the principal of the DIP Loans. |
|  | c. | **Noncompliance**. The failure of any DIP Loan Party (a) to comply with the Variance Covenant, (b) to satisfy any Milestone, (c) to have an Approved Budget; or (d) to comply with any negative covenant or affirmative covenants or agreements in this DIP Term Sheet, the DIP Facility Documentation or with any other covenant or agreement contained in the Financing Orders in any respect; |
|  | d. | **Bankruptcy Event of Default**.  The occurrence of any of the events or circumstances in the Chapter 11 Cases as specified in Annex III. |
|  | e. | **Effectiveness**. Any DIP Document ceases to be in full force and effect or any DIP Loan Party asserts that its obligations under the DIP Facility, including the Guarantee or any other DIP Document is invalid, unenforceable or impaired; |
|  | | "**Default**" shall mean any event, act or condition set forth in this section which, with notice or lapse of time, in each case, as set forth above, would (without cure or waiver) constitute an Event of Default under the DIP Facility. |
| **Remedies** | | The DIP Facility will provide upon the occurrence of an Event of Default, then, and in every such event, and at any time thereafter during the continuance of such event, upon written notice by the DIP Agent (acting upon the instructions of the Required DIP Lenders) to the DIP Loan Parties, to the Prepetition Secured Note Parties, any statutory committee appointed in the Chapter 11 Cases and the U.S. Trustee (with a copy filed with the Bankruptcy Court) and an opportunity for a hearing (*provided*, that the only issue that may be raised by any party in opposition to the actions proposed or available to be taken shall be whether, in fact, an Event of Default has occurred and is continuing), the DIP Agent (acting at the direction of the DIP Lenders) may take the following actions (which shall not be exclusive): |
|  | (a) | (i) declare all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) terminate, reduce or restrict any unfunded commitments on account of the New Money Loans to the extent any such commitments remain outstanding (other than as required to fund the Carve-Out), and (iii) terminate any DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations; |
|  | (b) | terminate, reduce or restrict the DIP Loan Parties' ability to use any Cash Collateral (subject to the Carve-Out to fund the wind down of the DIP Loan Parties in accordance with the Approved Budget and other than Cash Collateral for payroll and other expenses critically necessary to preserve the value of the business of the DIP Loan Parties); |
|  | (c) | sell or deliver any DIP Collateral or other asset at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the DIP Agent deems advisable (at the direction of the Required DIP Lenders), in its sole discretion and at the direction |

|  | of the DIP Lenders; |
|---|---|
|  | (d) the DIP Lenders may direct all DIP Loan Parties to repay the DIP Manager Advances on terms and conditions acceptable to the Required DIP Lenders pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules; |
|  | (e) declare that the application of the Carve-Out has occurred by causing the occurrence of the Trigger Date (as defined in the DIP Orders); |
|  | (f) charge the Default Rate (as defined below) under the DIP Facility; and |
|  | (g) exercise all other rights and remedies available to the DIP Lenders under the DIP Documents, the DIP Orders, under applicable law, or in equity. |
| **Maturity/ Termination Date** | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earliest to occur (the "<u>Termination Date</u>") of (i) eighty-five (85) days after the Petition Date (the "<u>Scheduled Maturity Date</u>"), (ii) the effective date of a Chapter 11 Plan, (iii) thirty-five (35) days after the Petition Date unless on or before such day the Final DIP Order has been entered by the Bankruptcy Court, ((iv) the date of termination of the Commitments under the DIP Facility and the acceleration of the Loans pursuant to an Event of Default and in accordance with the terms of the DIP Documents; and (v) the date of repayment in cash in full by the DIP Loan Parties of all DIP Obligations and termination of the Commitments in accordance with the terms of the DIP Facility; *provided* that if any such day described above is not a Business Day, the Termination Date shall be the Business Day immediately preceding such day.<br><br>On the Termination Date, the DIP Borrowers shall either (a) repay in cash to the DIP Agent for the ratable account of each DIP Lender, the aggregate principal amount of such DIP Lender's DIP Loans outstanding on such date, together with all other DIP Obligations or (b) subject to the prior written consent of the DIP Lenders in their sole discretion, convert the DIP Facility into new Class A Notes (as defined in the RSA) and Class B-1 Notes (as defined in the RSA) in accordance with terms and conditions pursuant to the RSA in connection with an Approved Plan and otherwise satisfactory to the Required DIP Lenders in their sole discretion and subject to documents acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion (such conversion, a "<u>Conversion</u>").<br><br>Any confirmation order entered in the Chapter 11 Cases ("<u>Confirmation Order</u>") shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Agent and the DIP Lenders under the DIP Facility, other than after  (A) the payment in full and in cash to the DIP Agent and the DIP Lenders of all obligations under the DIP Facility on or before the effective date of such Chapter 11 Plan or (B) a Conversion). |
| **Required          DIP Lenders** | DIP Lenders having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time, date or, if no Loan is outstanding, one or more Lenders having or holding an aggregate principal amount of the Commitment as of such date representing more than 50% of the total Commitments hereunder as of such date (the "<u>Required DIP Lenders</u>"). |
| **Credit Bidding** | The DIP Agent, upon the instruction of the Required DIP Lenders, shall have the right to credit bid up to the full amount of the outstanding DIP Obligations.  The Prepetition Term Loan Agent, |

| | |
|---|---|
| | upon the instruction of the Prepetition Term Loan Lender, and the Prepetition MA Loan Agent, upon the Prepetition MA Loan Lender, shall have the right to credit bid up to the full amount of their Prepetition Obligations. The Prepetition Notes Trustee, upon instruction from the Prepetition Noteholders as set forth in the Prepetition Notes Documents, shall have the right to credit bid up to the full amount of their Prepetition Obligations. |
| **Section 506(c) Waiver** | The Final DIP Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Required DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Required DIP Lenders. |
| **No Marshaling** | The Final DIP Order shall include a ruling that the DIP Agent, the DIP Lenders, and each of the Prepetition Secured Parties may exercise all remedies available under the DIP Documents and Prepetition Financing Documents, in a manner consistent with the DIP Orders, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy.  The Final DIP Order shall include a ruling that in no event shall any of the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility or the Prepetition Financing Documents. |
| **Section 552(b)** | The Final DIP Order shall include a ruling that the DIP Secured Parties and the Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. |
| | Furthermore, the Final DIP Order shall include a ruling that the DIP Loan Parties and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties on any property acquired by any of the DIP Loan Parties or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties upon the collateral securing the DIP Facility or the Prepetition Financing Agreements, as applicable. |
| **Application of Funds** | The DIP Documents will provide in connection with a voluntary or mandatory prepayment or after the exercise of remedies provided for in the DIP Documents (or after the DIP Obligations have automatically become immediately due and payable), any amounts received on account of the DIP Obligations shall be applied in the following order: |
| | (a) *First*, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to (i) the DIP Agent and then (ii) the DIP Lenders in their respective capacities as such; |

| | |
|---|---|
| | (b) *Second*, to the DIP Loans, ratably among the Lenders entitled thereto in accordance with the amounts of principal, interest and premium, if any, due to such Lenders until paid in full in cash; |
| | (c) *Third*, to the payment of all other DIP Obligations of the DIP Lenders that are due and payable to the DIP Agent and the other DIP Lenders on such date; and |
| | (d) *Last,* the balance, if any, after all of the DIP Obligations have been paid in full, to the DIP Borrowers or as otherwise required by applicable law. |
| **Amendments** | No amendment or waiver of any provision of this DIP Term Sheet or the DIP Facility, and no consent to any departure by the DIP Borrowers or any DIP Lender therefrom, shall be effective unless in writing and agreed to by (i) the Required DIP Lenders, (ii) the DIP Borrowers, and (iii) with respect to this DIP Term Sheet and matters relating to the DIP Facility requiring that the Debtors receive consent of the Required Consenting AGH Noteholders, (a) the Required Consenting AHG Noteholders and (b) and of the Control Party (solely with respect to any provisions that could reasonably be expected to affect the Control Party).  Such amendment or waiver may be in the form of an email or other written communication and may come from primary counsel to the DIP Lenders or the DIP Borrowers, as applicable, and shall be acknowledged by the DIP Agent (at the direction of the Required DIP Lenders). Each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, *provided* that the DIP Documents shall provide that without the consent of each DIP Lender no such amendment, waiver or consent shall:

(a) Extend, increase or reinstate the DIP Loan Commitment of any DIP Lender, without the written consent of each DIP Lender directly and adversely affected thereby;

(b) postpone any date scheduled for any payment of principal or interest with respect to any DIP Loan (other than any interest at the Default Rate) or with respect to any fee or premium payable pursuant to Annex I without the written consent of each DIP Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment, any condition precedent or any Event of Default (other than a nonpayment Event of Default) shall not constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of interest or any payment of fees;

(c) extend the Scheduled Maturity Date of any DIP Loan without the written consent of the DIP Lenders;

(d) amend, modify or waive any provision of the Application of Payments (as defined in the DIP Credit Agreement) or the definition of any term defined in the DIP Credit Agreement (including those terms defined by reference to another agreement, instrument or other source);

(e) reduce the principal of, or the rate of interest specified herein on, any DIP Loan or any fees or other amounts payable hereunder or under any related documents without the written consent of each DIP Lender directly and adversely affected thereby; change this provision on amendments or the definition of "Required DIP Lenders" or any other provision specifying the number of DIP Lenders required to take any action under the |

| | |
|---|---|
| | DIP Facility without the written consent of each DIP Lender directly and adversely affected thereby; |
| | (f) amend, modify or waive any provision of this DIP Term Sheet affecting the rights, duties or obligations of the DIP Agent without the prior written consent of the DIP Agent; |
| | (g) release or subordinate the DIP Liens of the DIP Agent in all or substantially all of the DIP Collateral without the written consent of one or more DIP Lenders having or holding an aggregate principal amount of Loans outstanding that represents at least 75% of the DIP Loans; or |
| | (h) consent to the assignment or transfer by any DIP Loan Party of any of its rights and obligations under any DIP Document without the written consent of one or more Lenders having or holding an aggregate principal amount of Loans outstanding that represents at least 75% of the of the DIP Loans. |
| **Guarantee** | All DIP Obligations will be unconditionally guaranteed, jointly and severally, on a first priority secured basis (the "<u>Guarantee</u>") by each of the DIP Loan Parties, if any, other than the DIP Borrowers. |
| **Reimbursement; Indemnity** | The DIP Facility will provide for customary indemnification and reimbursement provisions for facilities of this kind, in addition, the Interim DIP Order shall approve such indemnity and reimbursement provisions and provide that Debtors shall pay all costs or expenses (including attorney's fees and expenses) incurred by the DIP Agent, the DIP Lenders, the Control Party, the Prepetition Notes Trustee and the Consenting Noteholders (including reasonable and documented out-of-pocket fees and disbursements of outside counsel), in each case incurred, the DIP Lenders and Prepetition Secured Parties in connection with the preparation, negotiation, administration, of the DIP Documents, any Default or Events of Default, workout, restructuring or negotiations with respect to the DIP Documents or DIP Loans, any legal proceedings, court approval and enforcement of the DIP Documents or the DIP Orders and the Chapter 11 Cases and the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any successor cases by the DIP Agent, any DIP Lender, the Control Party, the Prepetition Notes Trustee and any Consenting Noteholder, or any workout, restructuring or negotiations in connection therewith or in respect of such DIP Loans (including, without limitation, the legal fees and expenses of (i) Sidley Austin LLP, counsel for the DIP Lenders, (ii) Shipman & Goodwin LLP, counsel to the DIP Agent, (iii) White & Case LLP, counsel for the Consenting AHG Noteholders, (iv) Seward & Kissel LLP, counsel for the Control Party, (v) Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C, counsel for the Prepetition Notes Trustee, (vi) one local counsel in each applicable jurisdiction for the Lenders as a group and a separate local counsel in each applicable jurisdiction for the DIP Agent, (vii) one of each of any specialty/regulatory/tax counsel as reasonably required by the DIP Agent or the DIP Lenders, (viii) one local counsel for each of the Control Party, the Prepetition Notes Trustee, and the Consenting AHG Noteholders (taken as a whole) in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions, in each case, in relevant jurisdictions material to the interests of the DIP Lenders) and (ix) in the event of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction for each DIP Lender, group of similarly affected DIP Lenders (taken as a whole), or group of similarly affected) subject to such conflict); (vii) the Consenting AHG Noteholders (taken as a whole) subject to such conflict).. <br><br> The Interim DIP Order will provide that the Debtors shall defend, protect, indemnify, pay and hold harmless the DIP Agent, each DIP Lender, the Control Party, the Prepetition Notes Trustee, |

|  | each Consenting Noteholder, and each of their respective officers, directors, affiliates, attorneys, employees and agents (each an "<u>Indemnified Party</u>") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and disbursements of any kind or nature whatsoever, including, but not limited to, reasonable and documented out-of-pocket fees and disbursements of one counsel for the DIP Agent's Indemnified Parties and one counsel for the DIP Lenders' Indemnified Parties (taken as a whole) (and, in the event of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction for each Indemnified Party or group of similarly affected Indemnified Parties (taken as a whole) subject to such conflict) arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this DIP Term Sheet, any documents or instruments relating thereto, and/or the transactions contemplated hereby or thereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, preparation, execution, delivery, administration or enforcement of the DIP Term Sheet, any documents or instruments relating thereto, and/or the transactions contemplated hereby, (iii) DIP Borrowers failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this DIP Term Sheet, (iv) the enforcement of any of the rights and remedies of the DIP Agent, any DIP Lender, or any of the Control Party, the Prepetition Notes Trustee, Consenting AHG Noteholder under this DIP Term Sheet and any documents or instruments relating thereto, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any anti-terrorism law by the DIP Borrowers, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any governmental body or instrumentality or any other person with respect to any transaction contemplated by, or referred to in, or any matter related to, this DIP Term Sheet, any documents or instruments relating thereto, whether or not the DIP Agent, any DIP Lender, the Control Party, the Prepetition Notes Trustee, or any Consenting Noteholder is a party thereto; except to the extent any portion of such claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and disbursements are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Governing Law and Jurisdiction** | The DIP Loan Parties submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury.  New York law shall govern this DIP Term Sheet and the DIP Facility (without regard to the principles of conflicts of laws thereof that would mandate the application of the laws of any other jurisdiction). |
| **Release** | Each DIP Loan Party, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lender, the Prepetition MA Loan Agent, the Prepetition MA Loan Lender, the Control Party, the Prepetition Notes Trustee and the Prepetition Noteholders, each in its capacity as such, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, financial advisors, investment bankers, agents, representatives, successors and assigns (collectively, the "<u>Released Parties</u>") from any and all claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which the DIP Loan Party may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to this DIP Term |

| | Sheet, the DIP Facility, the DIP Documents or any document or instrument relating thereto, the Prepetition MA Loan Credit Agreement, the Prepetition MA Loan Documents, or any document or instrument relating thereto, the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Documents, or any document or instrument relating thereto, or the Prepetition Notes Documents or any document or instrument relating thereto (collectively, the "Released Matters"); *provided*, that Released Matters shall not include any claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order. Each DIP Loan Party represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) that the foregoing constitutes a full and complete release of all such claims. Notwithstanding anything herein to the contrary, none of the Debtors shall release each other or any of the Released Parties with respect to any claims or counterclaims and or other rights described or contemplated by the reserved matters in the "Reservation of Rights" below. |
|---|---|
| **Tax** | The DIP Facility will (i) be structured in a tax-efficient manner in consultation with and with the prior express consent of the DIP Lenders and (ii) include customary provisions reasonably acceptable to the DIP Lenders to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever. |
| **Structure Flex** | The DIP Lenders retain the right to modify the terms, conditions, pricing and/or structure of the DIP Facility and the other transactions and documents described herein and to make structuring changes in relation to the transactions (a) for tax reasons or (b) in response to reasonable comments from independent directors of the Securitization Entities with the consent of the Required Consenting AHG Noteholders. |
| **Reservation of Rights** | Notwithstanding anything to the contrary herein, the Parties agree and acknowledge that (i) the full amount of the Incremental Loan was funded and the Consenting AHG Noteholders have consented to (a) its treatment as a Manager Advance and (b) the Manager's right to reimbursement thereof (plus interest) in accordance with the Priority of Payments Waterfall, and (ii) the Consenting AHG Noteholders have agreed, solely upon consummation of an Approved Plan, that (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Approved Plan as Manager Advance Term Loan Claims which shall be converted to new Class A-2II Notes on the terms set forth in the RSA and with the payment priority set forth in the Waterfall (as defined in the Restructuring Term Sheet), and (b) any remaining claimed prepetition Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo, LLC as set forth herein and in the RSA.  Except as specified in the foregoing clauses (i) and (ii), the Prepetition Secured Note Parties preserve all rights, claims (including indemnification claims), arguments, and objections to dispute the validity and amount of any claimed prepetition Manager Advances, or the characterization of any claimed Manager Advances as prepetition Manager Advances (collectively, the "Prepetition Secured Note Parties Reserved Matters"), and neither the Debtors' stipulation to the Manager Advances (as set forth in this DIP Term Sheet and in the Interim DIP Order) nor the fact that the Consenting AHG Noteholders have made the agreements reflected in clauses (i) and (ii) above shall operate as a waiver of any rights, claims (including indemnification claims), arguments, or objections or an admission in respect of a claimed prepetition Manager Advance, nor alters or affects the Consenting AHG Noteholders' reservation of rights as set forth herein. The Debtors, including |

|  | the Manager in its capacity as Manager, each Prepetition Credit Secured Party and each DIP Secured Party preserve all rights, claims and counterclaims (including indemnification claims or counterclaims), arguments, and objections with respect to the Prepetition Secured Note Parties Reserved Matters.  Any claims that may result from the Consenting AHG Noteholders' pursuit of, or success on, the Prepetition Secured Note Parties' Reserved Matters do not become DIP Obligations; *provided*, *however*, that nothing herein alters any prepetition indemnification rights that may otherwise exist. |
|---|---|
| **AHG Noteholder Consent Matters** | The Debtors and DIP Lenders have agreed to provide consultation, consent (not to be unreasonably conditioned, withheld or delayed), and information rights to the Prepetition Noteholders constituting at least the Required Consenting AHG Noteholders (or, as specifically provided below, the Required Majority Consenting AHG Noteholders) including the following matters which will be included in the Interim DIP Order:<br><br>(a) consent to the form and substance of (i) modifications of the Interim DIP Order and Final DIP Order; (ii) the Approved Plan and (iii) the Disclosure Statement;<br><br>(b) (i) consultation in respect of the extension of the Outside Date by up to an additional fifteen (15) calendar days and (ii) consent in respect of any additional extension of the Outside Date;<br><br>(c) consent to (i) increases to the amount of cash pay interest or fees charged on the DIP Loans by the DIP Lenders (other than capitalization of interest and application of the default rate as provided for in the DIP Documents); (ii) waive any provision of this DIP Term Sheet expressly requiring the Required Consenting AHG Noteholders consent (including this section titled "AHG Noteholder Consent Matters" and the "Reservation of Rights" section); and (iii) in response to reasonable comments from independent directors of the Securitization Entities to the matters described in clause (b) of the "Structure Flex" section, above;<br><br>(d) the Required Majority Consenting AHG Noteholders' consent to (i) increases to the then applicable New Money Cap; and (ii) any Proposed Budget becoming an Approved Budget; and<br><br>(e) to provide:<br><br>    i. notice of any Accordion Increase Request;<br><br>    ii. the reporting and information described in "Reporting and Information" above; and<br><br>    iii. copies of (a) any material amendments requested by the Debtors to the DIP Facility (to the extent reasonably practicable, such notices shall be provided in advance of such amendments becoming effective if they relate to matters that are described or that are of the type that would require more than a "Required Lender" consent under the  DIP Facility) and (b) of the deliveries provided to the DIP Lenders described in <u>Annex II</u> and <u>Annex III</u>.<br><br>Such AHG Noteholder consent and consultation rights shall be set forth in the DIP Orders and shall be enforceable against the DIP Loan Parties.  The AHG Noteholders may request additional information about material amendments from the Debtors.  All parties' rights are reserved to seek Bankruptcy Court approval of any matter that requires such Required Majority Consenting AHG Noteholder consent in lieu of obtaining such consent. |

| | |
|---|---|
| | With respect to the matters described in subsection (d), above, requiring the consent of the Required Majority Consenting AHG Noteholders, counsels to the Ad Hoc Group and the Control Party shall set up a consent process reasonably acceptable to the Ad Hoc Group, the Debtors, the Required DIP Lenders, and the Control Party, as the context may require, for obtaining such notices and acceptances in a timely manner. It being understood that if a specific item requires the consent of the Required Majority Consenting AHG Noteholders in addition to receiving affirmative consents as to such matters from the Required Majority Consenting AHG Noteholders, the Debtors (and correspondingly the DIP Collateral Agent, DIP Secured Parties and the Control Party, as the context may require) may rely on having received no objection in writing by the third (3rd) Business Day after such notice or request is provided to the Consenting AHG Noteholders.  It being understood that a failure to object in writing to such proposed increase by the third Business Day thereafter will be deemed to be an acceptance as to the consents so specified and evidence of such consent having been obtained by the Required Majority Consenting AHG Noteholders. |
| **Assignments; Participation** | To be consistent with Prepetition MA Loan Credit Agreement. |
| **Fiduciary; Agency** | It is understood and agreed that the DIP Lender will act under this DIP Term Sheet and the transaction contemplated hereby as an independent contractor and nothing herein, the transaction contemplated hereby or otherwise, shall be deemed to create a fiduciary duty or fiduciary or agency relationship between any Debtor, any direct or indirect equity owners of the Debtors or any of their subsidiaries or affiliates or any of their respective affiliates, subsidiaries, investors, employees or creditors ("Borrower Related Persons"), on the one hand, and the DIP Lender or any of its subsidiaries or affiliates or any of their respective affiliates, investors, employees or creditors, on the other. The Debtors agree on their own behalf and on behalf of the Borrower Related Persons that they shall not make, and hereby waives, any claim based on an assertion of such a fiduciary duty or agency relationship. Nothing in this DIP Term Sheet is intended to confer upon any other person (including affiliates, stockholders, employees or creditors of the DIP Borrowers or other Borrower Related Person) any rights or remedies hereunder or by reason hereof. |

<u>**Annex I**</u>

**Interest, Premiums, Fees, Etc.**

| | |
|---|---|
| **Interest:** | To be paid in cash on a monthly basis in arrears. |
| | <u>Interest Rate</u>: Prime + 3.00%; after a default, the applicable rate shall increase by 2.00% *per annum* above the otherwise applicable rate (the "<u>Default Rate</u>"). |
| **Agency Fees**: | As agreed with the DIP Agent. |

## Annex II

### Summary of Conditions Precedent to the DIP Facility

This Summary of Conditions Precedent to the DIP Facility outlines certain of the conditions precedent to the DIP Facility referred to in the Senior Secured Superpriority Debtor-in-Possession Term Loan Facility Term Sheet (the "DIP Term Sheet"):

### A.  Conditions Precedent to Initial Advance

i.    satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Chapter 11 Cases and the receipt of all required court approvals of the DIP Facility;

ii.    the Lender Representative and the DIP Agent shall have received the following, each in form and substance satisfactory to the Required DIP Lenders:

   a.    the DIP Agent shall have received executed counterparts to the DIP Documents from each DIP Lender;

   b.    a certificate of an Officer of each DIP Loan Party countersigned by a second Officer or responsible person of such DIP Loan Party, pursuant to which officer attaches and certifies as to the following:

      i.    the names and true signatures of the Officers of such DIP Loan Party authorized to sign and provide notice under each DIP Document to which such DIP Loan Party is or will be a party and the other documents to be executed and delivered by such DIP Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Officers;

      ii.    a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each DIP Loan Party certifying as of a recent date not more than thirty (30) days prior to Interim Effective Date as to the subsistence in good standing or qualification of such DIP Loan Party in such jurisdictions;

      iii.    true and complete copies of the Governing Documents (as defined in the DIP Credit Agreement) of such DIP Loan Party together with all amendments thereto, including a copy of the charter, certificate of formation or incorporation, or other publicly filed Governing Document of each DIP Loan Party certified as of a recent date not more than thirty (30) days prior to Interim Effective Date by an appropriate official of the jurisdiction of organization of such DIP Loan Party which shall set forth the same complete name of such DIP Loan Party as is set forth herein;

   c.    an Approved Budget;

   d.    such other agreements, instruments, approvals, and other documents, each satisfactory to the DIP Lenders in form and substance, as the DIP Lenders may reasonably request, including in respect of any "know-your-customer" requirements, Anti-Money Laundering Laws and Anti-Corruption Laws;

   e.    receipt of customary debtor in possession financing closing deliverables, resolutions, good

standing certificates in each DIP Loan Party's jurisdiction of formation (to the extent such concept is applicable), incumbency certificates, organizational documents, and lien searches, all in form and substance reasonably satisfactory to the Required DIP Lenders; and

f.   evidence of the reimbursement in full in cash of the reasonable and documented fees and expenses (including legal and other professional fees) of the DIP Agent, DIP Lender, and, solely to the extent provided for in the Prepetition Credit Agreements, Prepetition Agents and Prepetition Lenders;

iii.   the Petition Date shall have occurred;

iv.   no later than three (3) days prior to filing, the DIP Loan Parties shall have provided the DIP Lenders with a copy of the "first day" motions, including without limitation the DIP motion, the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases;

v.   orders approving all "first day" motions shall have been entered by the Bankruptcy Court, and in the case of any "first day" motions and orders that affect the rights or duties of the DIP Agent or DIP Lenders (including without limitation the DIP Orders and orders approving or otherwise impacting cash management practices) shall have been entered by the Bankruptcy Court, which orders shall be in form and substance reasonably acceptable to the Required DIP Lenders;

vi.   an Interim DIP Order, substantially on the terms contemplated in this DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Required DIP Lenders, shall have been entered by the Bankruptcy Court within two (2) business days following the Petition Date and shall not have been reversed, amended, stayed, modified or appealed without prior written consent of the Required DIP Lenders. For the avoidance of doubt, the DIP Facility (as defined herein) shall include all terms set forth in the proposed Interim DIP Order attached to the RSA, including, but not limited to those concerning collateral, lien and claim priority, adequate protection, and releases.  In the event of a conflict between this DIP Term Sheet, the DIP Credit Agreement, and any of the DIP Orders (as defined below), the DIP Orders shall control;

vii.   the DIP Lenders shall have received satisfactory evidence of the entry of all "first day" orders (including the approval of the cash management system), which shall be satisfactory in form and substance to the Required DIP Lenders, and which "first day" orders shall have been entered upon an application or motion of the Debtors (satisfactory in form and substance to the Required DIP Lenders) and upon prior written notice to such parties required to receive notice.

viii.   the DIP Lenders shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to the Required DIP Lenders evidencing the absence of any other liens or mortgages on the DIP Collateral, except the liens securing the Prepetition Loan Documents, Permitted Liens, and other existing liens acceptable to the Required DIP Lenders.

ix.   since the Petition Date there shall not have been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

x.   the representations and warranties of the Debtors contained in the section entitled "Representations and Warranties" shall be true and correct as described therein;

xi.   all consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the transactions contemplated by the DIP Documents or the conduct of the DIP Loan Parties' business shall have been obtained and shall be in full force and effect; and

xii.   other than the Bankruptcy Cases, there shall exist no claim, action, suit, investigation, litigation or proceeding (including shareholder or derivative litigation), threatened in writing or pending in any court or before any arbitrator or Governmental Authority which could reasonably be expected to have a Material Adverse Effect.

**B.   Conditions Precedent to All Advances**

i.   (a) with respect to the Initial Advance, the Interim DIP Order shall have been entered and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with respect to any Advance thereafter, a Final DIP Order, substantially on the terms contemplated by this DIP Term Sheet and in form and substance acceptable to the Required DIP Lenders shall have been entered, and shall not have been vacated or reversed, and shall not be subject to any stay;

ii.   the Lender Representative shall have received a duly executed notice of borrowing;

iii.   other than as set forth in the RSA, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the Required DIP Lenders;

iv.   since the Petition Date, there shall have been no Material Adverse Effect;

v.   reimbursement in full in cash of the DIP Agent's and DIP Lenders' reasonable and documented fees and expenses (including legal and other professional fees);

vi.   there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Chapter 11 Cases) in any court or before any governmental authority that, in the reasonable opinion of the Required DIP Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to result in a Material Adverse Effect;

vii.   the Debtors shall be in compliance with the Milestones and the DIP Orders, as applicable;

viii.   In connection with all DIP Manager Advances, the DIP Lenders, the DIP Agent shall have received (with copies to the Consenting AHG Noteholders):

a.   the Manager Advance Acknowledgment, duly executed by each of the parties thereto, which Schedule attached to such Manager Advance Acknowledgement shall have been updated to reflect the DIP Manager Advance to be made on or immediately following the Funding Date with the proceeds of the applicable DIP Loan; and

b.   a certificate of an Officer of each of the Borrowers (i) attaching the Approved Budget that identifies the amounts that will be paid via such proposed DIP Manager Advance or DIP Manager Advances and (ii) certifying that such proposed DIP Manager Advance or DIP Manager Advances will comply, and will be made in a manner that complies, in all respects

with the Prepetition Base Indenture, the Management Agreement and all other Related Documents; *provided* that, the amount of DIP Manager Advances outstanding after giving effect to the applicable New Money Term Loan shall not be less than 100% of the DIP Obligations and there shall be no outstanding challenge to the treatment of any such payment as a DIP Manager Advance entitled to the Superpriority Manager Advance Payment Right;

ix.     no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the DIP Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any DIP Loan Party without the prior written consent of the Required DIP Lenders;

x.      the DIP Lenders shall have received the latest Approved Budget and Variance Report required to be delivered in accordance with the DIP Orders;

xi.     the Trustee and the Independent Directors shall have agreed to a waiver of any objections related to the DIP Facility, entry of the DIP Orders and a release of claims in respect of the DIP Loans and advance of DIP proceeds;

xii.    each of the representations and warranties of the Debtors in this DIP Term Sheet, the DIP Credit Agreement, and any other DIP Documents, as applicable, shall be true and correct, unless otherwise agreed by the Required DIP Lenders; and

xiii.   there shall be no defaults or Events of Default under the RSA or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the Required DIP Lenders or cured pursuant to the terms thereof.

## Annex III

"Bankruptcy Event of Default" means the occurrence of any of the following events or circumstances in the Chapter 11 Cases:

(a)    the bringing of a motion or taking of any action by any of the DIP Loan Parties to use cash collateral of the DIP Agent and the other DIP Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Required DIP Lenders, except as provided in the Interim DIP Order or the Final DIP Order;

(b)    the entry of an order in any of the Chapter 11 Cases terminating or modifying the Debtors' exclusive right to file a Plan of Reorganization with respect to the Debtors pursuant to section 1121 of the Bankruptcy Code;

(c)    the RSA is terminated for any reason or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required DIP Lenders;

(d)    any DIP Loan Party's failure to object to a motion seeking to terminate or modify the DIP Loan Parties' exclusive right to file a Plan of Reorganization within the required time for filing such objection;

(e)    the filing by any of the DIP Loan Parties of a Plan of Reorganization (or plan of liquidation) or disclosure statement attendant thereto, or any amendment, modification or supplement to such Plan of Reorganization (or plan of liquidation) or disclosure statement attendant thereto, other than an Approved Plan;

(f)    (i) the entry of an order in any of the Chapter 11 Cases (i) approving a disclosure statement in respect of a plan other than an Acceptable Disclosure Statement (an "Alternate Disclosure Statement") or confirming a Plan of Reorganization (or a plan of liquidation) that is not an Approved Plan (an "Alternate Plan"), or (ii) any of the DIP Loan Parties or any of their subsidiaries proposes or supports, or fails to contest in good faith, the entry of the Alternate Disclosure Statement or Alternate Plan, unless Alternate Plan (along with the attendant Alternate Disclosure Statement) contemplates indefeasibly paying the DIP Obligations in full, in cash on the effective date of such plan;

(g)    any or all of the DIP Loan Parties or their respective subsidiaries shall withdraw or terminate the Approved Plan without the prior written consent of the Required DIP Lenders;

(h)    (i) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order in any material respect without the written consent of the Required DIP Lenders or (ii) the Interim DIP Order or the Final DIP Order not being in full force and effect;

(i)    after entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against, the DIP Agent, any DIP Lender, any other DIP Secured Party or any of the Collateral without the prior written consent of the Required DIP Lenders;

(j)    the entry of an order granting relief from the Automatic Stay under section 362 of the Bankruptcy Code so as to allow a third-party to exercise remedies against a material portion of the Collateral or the assets of any of the DIP Loan Parties or their subsidiaries;

(k)      the appointment of a trustee under section 1104 of the Bankruptcy Code, a receiver or an examiner (other than a fee examiner) in any of the Chapter 11 Cases with expanded powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code to operate or manage the financial affairs, the business, or reorganization of the DIP Loan Parties and/or their subsidiaries;

(l)      the sale, without the Required DIP Lenders' consent, of all or substantially all of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in any of the Chapter 11 Cases or otherwise that does not result in either the payment in full in cash of all the DIP Obligations, treatment of the DIP Obligations in accordance with the RSA, or as otherwise agreed by the Required DIP Lenders;

(m)      the dismissal of any of the Chapter 11 Cases, or any DIP Loan Party and/or its subsidiaries shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code;

(n)      (A) the conversion of any of the Chapter 11 Cases to a Chapter 7 case, (B) the appointment of a Chapter 11 trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any DIP Loan Party and/or its Subsidiaries under section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases, (C) the grant, Incurrence, creation, assumption or allowance of (other than as provided for herein) any other superpriority claim (including any adequate protection claim) or any other DIP Lien (including any Adequate Protection Liens) or right of payment that is *pari passu* with or senior to the claims, DIP Liens and rights to payment in favor of the DIP Agent (for the benefit of the DIP Secured Parties) and the DIP Secured Parties securing the DIP Obligations or of the Prepetition Agents (for the benefit of the Prepetition Secured Parties) and the Prepetition Secured Parties securing the Prepetition Obligations in any of the Chapter 11 Cases or (D) the reduction, disallowance or reduction of the amount of the Manager Advances or the granting of any right of payment senior or *pari passu* to the Superpriority Manager Advance Payment Right (as defined in the DIP Credit Agreement) against the Securitization Entities or their estates that is not included in the Approved Budget;

(o)      the entry of a final, non-appealable order of the Bankruptcy Court substantively consolidating any of the Debtors' estates;

(p)      the Bankruptcy Court shall enter an order in favor of the Committee, if any, any ad hoc committee or any other parties in interest, (i) sustaining an objection to claims of the DIP Agent or any of the DIP Lenders, (ii) avoiding any DIP Liens held by the DIP Agent or any of the DIP Lenders, (iii) sustaining an objection to claims of the Prepetition Agents or any of the Prepetition Lenders, (iv) avoiding any DIP Liens held by the Prepetition Agents or any of the Prepetition Lenders except as otherwise agreed by the Required DIP Lenders in writing or (v) reducing, disallowance or reducing the amount of the Manager Advances or granting any right of payment senior or *pari passu* to the Superpriority Manager Advance Payment Right against the Securitization Entities or their estates that is not included in the Approved Budget;

(q)      any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter an order (i) approving payment of any prepetition claim in excess of $100,000 in the aggregate other than (x) as approved for in the "first day" and "second day" orders in any of the Chapter 11 Cases and included in the Approved Budget or otherwise consented to by the Required DIP Lenders in writing; (ii) granting relief from or modifying the Automatic Stay (x) to permit foreclosure on any assets without the consent of the Required DIP Lenders or (y) to allow any creditor (other than the DIP Agent) to execute upon or enforce a DIP Lien on any material portion of the Collateral or restrict the right to, priority of payment of or guarantee of the Superpriority Manager Advance Payment Right; (iii) except with respect to the Prepetition Loan

Documents as provided in the DIP Orders, approving any settlement or other stipulation not approved by the Required DIP Lenders (which approval shall not be unreasonably withheld) and not included in the Approved Budget with any secured creditor of any DIP Loan Party or its subsidiaries providing for payments as adequate protection or otherwise to such secured creditor; and (iv) permitting other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(r)     the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against the DIP Agent, any DIP Lender or any other DIP Secured Party and, as to any suit or action brought by any Person other than a DIP Loan Party or a subsidiary, officer or employee of a DIP Loan Party, where such suit or action remains unopposed by a DIP Loan Party for thirty (30) days and asserts or seeks by or on behalf of a DIP Loan Party or its subsidiaries, a claim or any legal or equitable remedy or the entry of an order in any of the Chapter 11 Cases that would (x) have the effect of invalidating, disgorging (in connection with payments made), avoiding, subordinating or challenging any or all of the DIP Obligations or DIP Liens of the DIP Agent (on behalf of the DIP Secured Parties) to any other claim, changing the size, frequency or priority of payment of the Manager Advances, or (y) have a Material Adverse Effect on the rights and remedies of the DIP Agent or the collectability of all or any portion of the DIP Obligations (other than a challenge as to whether an Event of Default has, in fact, occurred and is continuing);

(s)     any DIP Loan Party or its subsidiaries shall engage in or support (except to the extent provided in the DIP Orders) any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders;

(t)     the entry of an order in any of the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under this Agreement;

(u)     the failure of any DIP Loan Party or its subsidiaries to perform in all material respects any of its obligations under the DIP Orders, any Sale Order or the Scheduling Order, in each case, as determined by the Bankruptcy Court;

(v)     any DIP Loan Party or its subsidiaries shall attempt to invalidate, reduce or otherwise impair the DIP Loans, the DIP Liens granted to or the security interests of the DIP Lenders and the DIP Agent under the DIP Documents;

(w)     any DIP Lien or security interest created by this Agreement or the DIP Orders with respect to the DIP Collateral shall, for any reason, cease to be valid;

(x)     the filing of any motion or application in any of the Chapter 11 Cases, or the entry of any order of the Bankruptcy Court in any of the Chapter 11 Cases (i) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code and such motion does not provide for the payment of all DIP Obligations in full immediately upon the consummation of such financing; (ii) to revoke, reverse, stay, modify, supplement or amend any of the DIP Orders in a manner inconsistent with the DIP Documents;

(y)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than the Obligations in, or as otherwise permitted under the applicable DIP Documents or permitted under the DIP Orders, entitled to superpriority administrative expense claim status in any of the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the DIP Agent and the other DIP Secured Parties under this

Agreement and the other DIP Documents, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 of the Bankruptcy Code or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any DIP Lien on the DIP Collateral having a priority senior to or *pari passu* with the DIP Liens and security interests granted herein (including, without limitation, the Superpriority Manager Advance Payment Right), except, in each case, as expressly provided in the DIP Documents or with express prior written consent of the Required DIP Lenders (and, with respect to any provisions that materially affect the rights, privileges, immunities or duties of the DIP Agent, the DIP Agent);

(z)     the Interim DIP Order (prior to the entry of the Final DIP Order) or, on and after entry thereof, the Final DIP Order shall cease (i) to create a valid and perfected DIP Lien on the DIP Collateral, (ii) to grant valid, perfected and enforceable superpriority claims with respect to the DIP Facility with the priority provided in the RSA (including, without limitation, the Superpriority Manager Advance Payment Right) or (iii) to be in full force and effect;

(aa)     an order of the Bankruptcy Court shall be entered reversing, modifying, amending, staying, vacating, or subjecting to stay pending appeal, in the case of modification or amendment, any DIP Document, the Prepetition Loan Documents, the Superpriority Manager Advance Payment Right, the Approved Plan or the Confirmation Order in a manner adverse to the DIP Lenders without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications or supplements that affect the rights, privileges, immunities or duties of the DIP Agent, the DIP Agent);

(bb)     an order in any of the Chapter 11 Cases shall be entered (i) charging any of, or authorizing the recovery of any amount from, the DIP Collateral under section 506(c) of the Bankruptcy Code, (ii) prohibiting or limiting the extension under section 552(b) of the Bankruptcy Code of the DIP Liens of the Prepetition Agents on the DIP Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any DIP Loan Party after the Petition Date or (iii) prohibiting, limiting, subordinating or reducing the amount of the Manager Advances below the amount of the outstanding DIP Obligations or the Superpriority Manager Advance Payment Right;

(cc)     if the Final DIP Order (A) does not (i) include a waiver, in form and substance reasonably satisfactory to the Required DIP Lenders, of the right to surcharge, or recover any amount from, the DIP Collateral under section 506(c) of the Bankruptcy Code, or (ii) prohibit the imposition of any exception to the extension under section 552(b) of the Bankruptcy Code of the DIP Liens of the of the Prepetition Agents on the DIP Collateral to any proceeds, products, offspring, or profits of the DIP Collateral acquired by any DIP Loan Party after the Petition Date or (B) reaffirms the full amount of the Manager Advances and the Superpriority Manager Advance Payment Right;

(dd)     an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the DIP Loan Parties;

(ee)     the filing of any motion or application in any of the Chapter 11 Cases, or the entry of any order of the Bankruptcy Court in any of the Chapter 11 Cases providing for the rejection or repudiation of the Management Agreement or any portion of the Manager Advances and/or the DIP Agent's or other DIP Secured Parties' right thereto without the prior written consent of the Required DIP Lenders;

(ff)     an order materially adversely impacting the rights and interests of the DIP Secured Parties under the DIP Documents, as reasonably determined by the Required DIP Lenders in good faith, shall have been entered by the Bankruptcy Court or any other court of competent jurisdiction;

(gg)     without the Required DIP Lenders' prior written consent, the entry of any order by the Bankruptcy Court granting, or the filing by any DIP Loan Party of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the DIP Collateral without the consent of the DIP Agent (at the direction of the Required DIP Lenders) or to obtain any financing under section 364 of the Bankruptcy Code other than the DIP Documents;

(hh)     any DIP Loan Party or any of its subsidiaries or any person acting validly on behalf of any of them shall file any motion seeking authority to consummate a sale or other Disposition of assets (constituting DIP Collateral or otherwise) outside the ordinary course of business and as contemplated by the RSA, the Approved Budget (for the avoidance of doubt, a Credit Bid Sale and a Sale Transaction shall each be permitted hereunder, in each case, to the extent in accordance with an Approved Bankruptcy Court Order) without the consent of the Required DIP Lenders;

(ii)     any DIP Loan Party or any of its subsidiaries shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise or on account of any prepetition Indebtedness or payables, in each case, except as otherwise permitted under this Agreement, one or more "first day" or "second day" orders, the DIP Orders, or other Approved Bankruptcy Court Orders and consistent with the Approved Budget (subject to Permitted Variances);

(jj)     (i) any DIP Loan Party or any of its subsidiaries shall file a motion or application seeking, or the Bankruptcy Court shall enter an order precluding, the Prepetition Agents from having the right to or being permitted to "credit bid" any amount of the applicable Prepetition Obligations, with respect to the assets of the DIP Loan Parties or (ii) the Bankruptcy Court enters an order prohibiting, restricting, precluding or otherwise impairing the unqualified right of the Prepetition Agents from having the right to or being permitted to "credit bid" any amount of the applicable Prepetition Obligations, with respect to the assets of the Debtors;

(kk)     other than pursuant to the Approved Plan, the Securitization Indenture, the Prepetition Credit Agreements or any Prepetition Loan Documents shall be amended, waived, supplemented or otherwise modified in a manner that adversely and disproportionately impacts the interests of the Prepetition Agents, the Prepetition Noteholders, the Prepetition Trustee and the Prepetition Lenders, as applicable, in the Prepetition Collateral and/or the right to payment from the assets of the Debtors without the consent of the Required DIP Lenders and the DIP Agent;

(ll)     any of the DIP Loan Parties or any of their subsidiaries shall (i) file a motion or other pleading, or agree in writing to support any other person's motion, to disallow, in whole or in part, the DIP Secured Parties' claims in respect of the DIP Obligations under the DIP Documents and/or Prepetition Credit Agreement Secured Parties' Prepetition Obligations under the Prepetition Loan Documents or (ii) contest any provision of this Agreement, the Manager Advance Acknowledgement or the Superpriority Manager Advance Payment Right;

(mm)    the DIP Loan Parties or any of their subsidiaries or any other person shall file a motion or an application seeking entry of any of the orders described in clauses (n), (q), (pp) and (qq) of this Annex III and the DIP Loan Parties and their subsidiaries shall not contest (in good faith and as reasonably determined by the Required DIP Lenders) such motion or application;

(nn)     unless otherwise approved by the Required DIP Lenders, the Bankruptcy Court shall grant an order providing for a change in venue with respect to any of the Chapter 11 Cases and such order shall not be reversed or vacated within thirty (30) days;

(oo)    the DIP Loan Parties and their subsidiaries shall fail (a) to comply with Section 7.16, (b) to have an Approved Budget or (c) to comply with any negative covenant or affirmative covenants or agreements in the DIP Documents or with any other covenant or agreement contained in the DIP Orders in any respect;

(pp)    without the consent of the Required DIP Lenders, (i) the DIP Loan Parties and their subsidiaries shall use the proceeds of the DIP Loans in a manner which is not in accordance with the Approved Budget (subject to Permitted Variances) and (ii) the variances from the then-current Approved Budget shall exceed the Permitted Variances and/or (iii) the application of such proceeds is for payments that are not Manager Advances;

(qq)    the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after the Petition Date;

(rr)    the entry of a Sale Order that is not in accordance with the RSA or an Approved Plan, as applicable;

(ss)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) brought by a DIP Loan Party or a subsidiary or any Person other than a DIP Loan Party or a subsidiary, officer or employee of a DIP Loan Party, where such suit or action asserts or seeks by or on behalf of a DIP Loan Party or its subsidiaries to terminate the Manager and such suit or action remains unopposed by a DIP Loan Party for thirty (30) days;

(tt)    unless all of the DIP Collateral has been released from the DIP Liens of the DIP Agent in accordance with the provisions of the DIP Documents, any Loan Party or any of their subsidiaries shall assert in writing that any such DIP Lien is invalid, unenforceable or impaired;

(uu)    the DIP Agent fails to have a perfected security interest in any portion of the DIP Collateral with a value greater than $100,000 or its non-U.S. currency equivalent;

(vv)    any DIP Loan Party fails to comply for five (5) consecutive days with its material obligations contained in the DIP Orders or the DIP Documents, except for a failure with respect to assets or property with an aggregate value of less than $100,000 or its non-U.S. currency equivalent; or

(ww)    any DIP Loan Party fails to comply with its post-closing obligations set forth in the DIP Credit Agreement and such failure continues and is not waived by the DIP Lender for three (3) days.

**Annex IV**

**Lien; Priority Chart**

| Priority | DIP Collateral That Constitutes or Would Otherwise Constitute Prepetition Loan Collateral | | DIP Collateral That Constitutes or Would Otherwise Constitute Prepetition Notes Collateral | | DIP Collateral That Would Otherwise Constitute Unencumbered Property[6] | |
|---|---|---|---|---|---|---|
| | *Liens* | *Claims* | *Liens* | *Claims* | *Liens* | *Claims* |
| *First* | Carve-Out | Carve-Out | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| *Second* | Permitted Senior Liens | Claims secured by Permitted Senior Liens | Permitted Senior Liens | Claims secured by Permitted Senior Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | Priming DIP Liens | DIP Superpriority Claims | Priming DIP Liens | DIP Superpriority Claims | Prepetition Loan Adequate Protection Liens / Prepetition Notes Adequate Protection Liens (*pari passu*) | Prepetition Loan 507(b) Claims / Prepetition Notes 507(b) Claims (*pari passu*) |
| *Fourth* | Prepetition Loan Adequate Protection Liens | Prepetition Loan 507(b) Claims | Prepetition Notes Adequate Protection Liens | Prepetition Notes 507(b) Claims | - | - |
| *Fifth* | Prepetition Credit Agreement Liens* *\*Include liens on Manager Advance Collateral* | Prepetition Credit Agreement Secured Obligations | Prepetition Indenture Liens | Prepetition Notes Secured Obligations (subject to Priority of Payments Waterfall) *\*Includes, among other things, any rights and claims in respect of any Manager Advances "Manager Advance Collateral"* | | |
| *Sixth* | Prepetition Notes Adequate Protection Liens | Prepetition Notes 507(b) Claims | Prepetition Loan Adequate Protection Liens | Prepetition Loan 507(b) Claims | | |

---

[6] Subject to certain exclusions as set forth in Paragraph 5(a) of the Interim DIP Order (other than for Carve-Out).