Judith Elkin, Esq. (TX Bar No. 06522200)
Maxim B. Litvak, Esq. (TX Bar No. 24002482)
Theodore S. Heckel, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
Email:  jelkin@pszjlaw.com
    mlitvak@pszjlaw.com
    theckel@pszjlaw.com

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Shirley S. Cho, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email:  bsandler@pszjlaw.com
    rfeinstein@pszjlaw.com
    scho@pszjlaw.com

*Counsel to the*
*Official Committee of Unsecured Creditors*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) SCHEDULING A COMBINED HEARING ON (A) ADEQUACY OF DISCLOSURE STATEMENT ON A FINAL BASIS AND (B) PLAN CONFIRMATION; (II) FIXING DEADLINES RELATED TO DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION; (III) APPROVING (A) SOLICITATION AND VOTING PROCEDURES, (B) FORM AND MANNER OF COMBINED HEARING NOTICE AND OBJECTION DEADLINE, AND (C) NOTICE OF NON-VOTING STATUS; (IV) CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT, AND (V) GRANTING RELATED RELIEF**

[Related Docket Nos. 261, 262 and 263]

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    General Background ...............................................................................4

    B.    Summary of Proposed Plan.....................................................................5

ARGUMENT AND AUTHORITIES .........................................................................................9

I.     THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT AND ENABLE THE DEBTORS TO INCUR THE COST AND EXPENSE OF SOLICITING VOTES ON A PLAN THAT PROVIDES UNSECURED CREDITORS WITH NO RECOVERY AND DEPRIVES UNSECURED CREDITORS OF AN OPPORTUNITY TO VOTE..........................................................9

    A.    The Plan Effectuates Improper Substantive Consolidation and Therefore, Violates the Absolute Priority Rule.......................................................10

II.    THE DISCLOSURE STATEMENT SHOULD NOT BE CONDITIONALLY APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION. ...............................................................................................14

III.   THE DISCLOSURE STATEMENT CONTAINS NO LIQUIDATION ANALYSIS, NO FINANCIAL PROJECTIONS AND NO VALUATION ANALYSIS. ......................16

    A.    The Disclosure Statement Does Not Contain Any Financial Information.............16

    B.    The Disclosure Statement does not Identify Unencumbered Assets. ...................17

IV.  THE DISCLOSURE STATEMENT CONTAINS NO INFORMATION ON THE PREPETITION MARKETING PROCESS OR THE BUYER GROUP AND ITS SALE TRANSACTIONS. ......................................................................................22

V.   THE DISCLOSURE STATEMENT DOES NOT CONTAIN SUFFICIENT INFORMATION ABOUT THE RELEASES OR THE CONSIDERATION BEING PROVIDED FOR THE RELEASES. ...............................................................24

RESERVATION OF RIGHTS ..............................................................................................27

CONCLUSION.................................................................................................................28

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
   361 B.R. 337 (S.D.N.Y. 2007) ........................................................................................ 13

*Bank of America, National Trust & Savings Association v. 203 N. LaSalle St. Partnership*,
   526 U.S. 434 (1999) ....................................................................................................... 17

*Bank of N. Ga. v. Strick Chex Columbus Two, LLC (In re Strick Chex Columbus Two,
   LLC)*,
   542 B.R. 914 (Bankr. N.D. Ga. 2015) ........................................................................... 19

*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific
   Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ......................................................................................... 26

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*,
   68 F.3d 914 (5th Cir. 1995) ........................................................................................... 27

*Far E. Nat'l Bank v. United States Tr. (In re Premier Golf Props., LP)*,
   477 B.R. 767 (B.A.P. 9th Cir. 2012) ............................................................................. 19

*In re ADPT DFW Holdings, LLC*,
   574 B.R. 87 (Bankr. N.D. Tex. 2017) ............................................................................11

*In re Aegean Marine Petroleum Network, Inc.*,
   599 B.R. 717 (Bankr. S.D.N.Y. 2019) ........................................................................... 27

*In re Age Refining, Inc.*,
   801 F.3d 530 (5th Cir. 2015) ......................................................................................... 26

*In re Applegate Prop., Ltd.*,
   133 B.R. 827 (Bankr. W.D. Tex. 1991) ......................................................................... 15

*In re Aspen Limousine Serv.*,
   187 B.R. 989 (Bankr. D. Col. 1995) ................................................................................ 4

*In re Bigler LP*,
   442 B. R. 537 (Bankr. S.D. Tex. 2010) ......................................................................... 24

*In re Blackjewel L.L.C.*,
   2020 Bankr. LEXIS 3413 (Bankr. S.D. W. Va. Dec. 7, 2020) ........................................ 19

*In re Cafeteria Operators*, L.P.,
   299 B.R. 400 (Bankr. N.D. Tex. 2003) ......................................................................... 19

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) .......................................................................................... 26

*In re Cypressword Land Partners I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) (*citing 203 N. LaSalle St. P'ship*, 526 U.S.
    at 445) .................................................................................................................. 17

*In re Ditech Corporation*,
    606 B.R. 544 (Bankr. S.D.N.Y 2019) .................................................................. 13

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................................. 13

*In re Gandy*,
    299 F.3d 489 (5th Cir. 2002) ................................................................................ 12

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................... 26

*In re GSC, Inc.*,
    453 B.R. 132 (Bankr. S.D.N.Y. 2011) .................................................................. 13

*In re Inman*,
    95 B.R. 479 (Bankr. W.D. Ky. 1988) ................................................................... 20

*In re Jennifer Convertibles, Inc.*,
    447 B.R. 713 (Bankr. S.D.N.Y. 2011) .................................................................. 13

I*n re Leslie Fay Cos., Inc.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) .................................................................. 13

*In re Ne. Chick Servs., Inc.*,
    43 B.R. 326 (Bankr. D. Mass. 1984) ..................................................................... 19

*In re S-Tek 1, Ltd. Liab. Co.*,
    No. 20-12241-j11, 2023 Bankr. LEXIS 673 (Bankr. D.N.M. Mar. 15, 2023) ................. 20

*In re Ultra Petroleum Corp.*,
    624 B.R. 178 (5th Cir. 2020)................................................................................. 13

*In re Van Tassel*,
    2011 Bankr. LEXIS 5641 (Bankr. E.D. Cal. June 7, 2011) .................................. 4

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007), *aff'd*, 255 F. App'x. 909, 911-12 (5th Cir.
    2007) ...................................................................................................................... 24

*Johnson v. RFF Family P'ship, LP (In re Johnson)*,
    554 B.R. 448 (Bankr. S.D. Ohio 2016)................................................................. 19

*Kunica v. St. Jean Fin., Inc.*,
    233 B.R. 46 (S.D.N.Y. 1999) ............................................................................... 14

*Northeastern Copy Servs. v. Bridgeport Park Assocs. (In re Northeastern Copy Servs.)*,
    175 B.R. 580 (Bankr. E.D. Pa. 1994)................................................................... 20

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 2013) ........................................................................................... 15

*Power Int'l, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*,
   250 F.3d 955 (5th Cir. 2001) ...........................................................................................11

*Republic Supply Co. v. Shoaf*,
   815 F.2d 1046 (5th Cir. 1987) ........................................................................................ 24

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
   624 F.2d 599 (5th Cir. 1980) .......................................................................................... 26

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996) ............................................................................................. 15

*Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*,
   366 B.R. 476 (Bankr. W.D. Pa. 2007) ............................................................................ 20

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*,
   844 F.2d 1142 (5th Cir. 1988) ........................................................................................ 14

*Timothy Dean's, Inc. v. White (In re Timothy Dean Rest. & Bar)*,
   342 B.R. 1 (Bankr. D.D.C. 2006) ................................................................................... 20

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) ............................................................................... 26

*U.S. Trust Nat'l Assoc. v. Venice MP LLC*,
   92 F. App'x. 948 (4th Cir. 2004) .................................................................................... 20

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*,
   860 F.2d 515 (2d Cir.1988) .............................................................................................11

*Wells Fargo Bank v. Sommers (In re Amco Ins.)*,
   444 F.3d 690 (5th Cir. 2006) .......................................................................................... 12

## **STATUTES**

11 U.S.C. § 105(d)(2) ........................................................................................................... 4

11 U.S.C. § 105(d)(2)(B)(vi) ............................................................................................... 4

11 U.S.C. § 1107(a) .............................................................................................................. 4

11 U.S.C. § 1108 .................................................................................................................. 4

11 U.S.C. § 1121 .................................................................................................................. 4

11 U.S.C. § 1123(b)(3)(A) ................................................................................................. 25

11 U.S.C. § 1125 .................................................................................................................. 4

11 U.S.C. § 1125(b) ................................................................................................................ 15

11 U.S.C. § 1129(a)(2) ............................................................................................................. 4

11 U.S.C. § 1129(a)(7) ............................................................................................................ 13

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................................. 10

11 U.S.C. § 552(a) ............................................................................................................. 18, 19

## OTHER AUTHORITIES

5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)................................ 14

7 COLLIER ON BANKRUPTCY ¶ 1129.02[7] .............................................................................. 13

S. Rep. No. 95-989, at 25 (1978); H.R. Rep. No. 95-595, at 312 (1977) .................................... 23

## RULES

Fed. R. Bankr. P. 9019................................................................................................................ 25

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (the "Debtors"), by and through its undersigned counsel, hereby

files this *Objection* (the "Objection") to the *Debtors' Motion for Entry of Order (I) Scheduling a*

*Combined Hearing on (A) Adequacy of Disclosure Statement on a Final Basis and (B) Plan*

*Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan*

*Confirmation; (III) Approving (A) Solicitation and Voting Procedures, (B) Form and Manner of*

*Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status; (IV)*

*Conditionally Approving the Disclosure Statement, and (V) Granting Related Relief* [Docket No.

263] (the "DS Approval Motion")[2] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors' Plan – and the restructuring support agreement (the "RSA") on which

it is based[3] – proposes to allocate the entire value of ***every*** Debtor's estate to allegedly secured

lenders of the Non-Securitization Entities (the "Prepetition Term Lenders") and the noteholders of

the Securitization Entities  (the "Prepetition Noteholders", and together with the Prepetition Term

Lenders, the "Prepetition Lenders"), completely ignoring the existing distinction between the Non-

Securitization Entities and the Securitization Entities, as well as significant holes in the Prepetition

Lenders' collateral package.  Meanwhile, unsecured creditors holding claims against ***any*** Debtor

will receive nothing under the Plan, notwithstanding the existence of valuable unencumbered

assets, including deficiencies (as described further below) in the Prepetition Noteholders' asserted

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DS Approval Motion
or the related *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC, and
Its Debtor Affiliates* [Docket No. 262] (as amended, supplemented, or otherwise modified from time to time, the
"Disclosure Statement") and the *Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC, and Its Debtor
Affiliates* [Docket No. 261] (as amended, supplemented, or otherwise modified from time to time, the "Plan").

[3] The RSA is attached as Exhibit B to the Disclosure Statement.  The RSA is signed by the prepetition Debtors, the
"Prepetition Lenders" (as defined therein who hold debt against the Non-Securitization Entities) and the AHG
Noteholders (as defined therein) who hold certain notes payable by the Securitization Entities.

liens and security interests in the key restaurant-owning Securitization Entities. Under these circumstances, the Court should not approve the Disclosure Statement and allow the Debtors to incur the cost and expense of soliciting votes on a Plan that provides unsecured creditors with absolutely nothing and deprives unsecured creditors of an opportunity to vote.

2.      The primary assets in these cases reside at the Securitization Entities, which hold the company-owned restaurants, intellectual property, franchise agreements, and related rights and proceeds. A material portion of the assets of the Securitization Entities is unencumbered by the Prepetition Lenders (absent an allowed diminution claim), including without limitation, (a) leaseholds and fixtures at each of the company-owned restaurant locations, (b) liquor licenses and other permits at each of the company-owned restaurant locations, (c) postpetition revenues generated from the labor of the Debtors' employees at each of the company-owned restaurant locations, and (d) Avoidance Actions and other potential Causes of Action. Notably, the bulk of the Debtors' general unsecured claims are at the Securitization Entities.

3.      Further, there are deficiencies in the Prepetition Noteholders' collateral position at the Securitization Entities. The UCC-1 financing statements filed by Citibank, N.A., as securitization trustee for the Prepetition Noteholders, against the primary restaurant-owning Securitization Entities (HOA Restaurant Holder, LLC, TW Restaurant Holder, LLC, and DW Restaurant Holder, LLC) were filed on February 21, 2025 (i.e., during the 90-day preference period) and are therefore, avoidable.[4] Accordingly, the Plan is patently unconfirmable because it allocates no value to and provides no recovery for unsecured creditors, notwithstanding that there are material unencumbered assets that should be available to unsecured creditors.

---

[4] Prior UCC-1 financing statements filed by Citibank, N.A., as trustee, against these Securitization Entities lapsed prior to the Petition Date.

4.      Furthermore, although the Prepetition Term Lenders hold claims only against the structurally junior Non-Securitization Entities, the Plan allocates value to those lenders directly from the Estates of the Securitization Entities, apparently on account of a disputed intercompany claim allegedly owing by certain (unspecified) Securitization Entities to Non-Securitization Entities.  The Disclosure Statement fails to explain how the Prepetition Term Lenders could possibly be entitled to any value from the Securitization Entities, when unsecured creditors holding claims directly against those Debtors would receive nothing under the Plan, in violation of the absolute priority rule.

5.      The Disclosure Statement also should not be conditionally approved as currently proposed due to a lack of transparency.  Critical valuation evidence and financial projections are missing leaving unsecured creditors with insufficient time or information to evaluate the Plan.  The Disclosure Statement contains no information – be it legal or financial – to justify how all the value of the Debtors' assets is being distributed to the Prepetition Lenders, without regard to the specific Debtors against which those lenders hold claims or the specific assets against which they hold liens.

6.      With respect to the proposed Restructuring Transaction with Buyer Group, including the sale of the company-owned restaurants, the Disclosure Statement contains no information concerning the negotiation or substance of this cashless related-party sale transaction that underpins the Plan.  Creditors are, therefore, left without any information to determine if the sale was negotiated at arms' length and constitutes the highest or best sale of the Debtors' assets. The Disclosure Statement also fails to disclose or discuss the Debtors' unencumbered assets or the value thereof or potential Causes of Action, including Avoidance Actions, that are proposed to be

released under the Plan.  For these reasons, as set forth with more specificity below, the Disclosure

Statement cannot be approved even on a preliminary basis.[5]

## BACKGROUND

### A.     General Background

7.      On March 31, 2025 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the

"Court"), commencing the above-captioned cases (the "Chapter 11 Cases").  The Debtors are

authorized to continue operating their business and managing their property as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the

appointment of a trustee or examiner has been made in the Chapter 11 Cases.

8.      On April 15, 2025, the Office of the United States Trustee appointed the Committee,

consisting of:  (i) Firehouse Ltd; (ii) MCB HP Baltimore LLC; (iii) Millenium Properties, LLC;

(iv) PepsiCo Sales, Inc.; and (v) Eduardo Montano [Docket Nos. 187, 189].

9.      On April 17, 2025, the Committee selected Pachulski Stang Ziehl & Jones LLP as

counsel and Province, LLC as financial advisor.

---

[5] The Debtors' use of the combined disclosure statement/plan approval procedures of section 105(d)(2)(B)(vi) of the Bankruptcy Code does not abrogate the requirement that a disclosure statement contain adequate information.  *See In re Van Tassel*, 2011 Bankr. LEXIS 5641, *4 (Bankr. E.D. Cal. June 7, 2011) (In ruling on preliminary approval of a disclosure statement and use of the combined hearing process, the court stated: "Of course, adequacy of disclosure by the plan proponent is an essential element of plan confirmation.  Section 1129(a)(2) requires that for the plan to be confirmed, the plan proponent has complied with the applicable provisions of the Bankruptcy Code, which, of course, include the requirement for adequate disclosure."); *see also In re Aspen Limousine Serv.*, 187 B.R. 989, 995 (Bankr. D. Col. 1995) ("Section 105(d)(2) lets this Court 'mix and match' the opportunities and timing for a debtor, creditors, and parties-in-interest, to file plans and disclosure statements, and solicit acceptances of such plans. It is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, as long as those procedures are not inconsistent with other provisions of the Code. Thus, the Court is authorized to use Section 105(d)(2) options as long as they don't conflict with Sections 1121 and 1125.").

10. On May 5, 2025, the Debtors filed the Plan and the Disclosure Statement. Also, on May 5, 2025, the Debtors filed the DS Approval Motion. Through the DS Approval Motion, the Debtors seek preliminary approval of the Disclosure Statement and a Combined Hearing on final approval of the adequacy of the Disclosure Statement and the hearing to confirm the Plan.

**B.     Summary of Proposed Plan**[6]

11. The Plan provides for the implementation of the Restructuring Transactions whereby the Buyer Group (defined in the Plan as Hooters, Inc., Hoot Owl Restaurants, LLC, and their Buyer Group SPEs as applicable) would purchase 103 Debtor-owned stores. Modifying the Debtors' prepetition whole-business securitization structure, the Prepetition Lenders (both the Prepetition Term Lenders against the Non-Securitization Entities and the Prepetition Noteholders against the Securitization Entities) together with the DIP Lenders would receive a combination of debt and equity securities representing all the value of the Debtors. No cash is being paid for any assets by the Buyer Group[7] and no allocation of value is attributed to any Debtor.

12. The Buyer Group[8] will assume certain liabilities and enter into new franchise and royalty payment agreements in connection with the purchased stores. Additionally, Brand Co., a new entity to be owned by the Buyer Group, would enter into a brand management agreement with the new master issuer of the restructured securitization notes issued under the Plan ("RoyaltyCo"), pursuant to which Brand Co. would oversee all the Reorganized Debtors' brand-related, franchising-related and management-related functions. Approximately 48 company-owned stores

---

[6] For sake of brevity, the summary of the Plan set forth below only relates to those provisions of the Plan relevant to the Committee's Objection.

[7] While not yet disclosed, the Committee presumes some amount of cash may be paid by the Buyer Group to counterparties as cure payments under Executory Contracts assumed pursuant to the Restructuring Transactions.

[8] As discussed below, the Buyer Group consists of existing franchisees of the Debtors. The Buyer Group is a related-party of the Debtors and may be a non-statutory insider.

not being acquired by the Buyer Group would be wound down; the company will continue to

maintain 154 franchised locations.  *See* Plan, Art. IV.L.2.  All the documents necessary to effectuate

the Restructuring Transactions with the Buyer Group are defined in the Plan as the "Buyer Group

Arrangements" and "Buyer Group Documents".[9]  None of these documents are currently available

for review.

13.     Prior to the Petition Date, the Debtors maintained two distinct silos of funded debt:

approximately $304 million of securitization note claims (the "Securitization Debt" held by the

Prepetition Noteholders against the Securitization Entities) and approximately $69.4 million of

parent-funded debt or non-securitization loan claims (the "Non-Securitization Debt" held by the

Prepetition Term Lenders against the Non-Securitization Entities).[10]

(i)     **Securitization Debt:**  The Securitization Debt consists of two classes of
certain senior and subordinated notes (classified under the Plan in Classes 2 and 3)[11]
entitled to cash flow, royalties and license fees from franchised and company-owned
locations and allegedly secured by the assets of a subset of the Debtors known as the
Securitization Entities.[12]     All of the Debtors' operating restaurants and franchise
agreements and associated intellectual property rights are held across the Securitization
Entities.  Significantly, the Indenture prohibited the Securitization Entities from incurring
additional funded/secured debt.

The Securitization Debt is guaranteed and allegedly secured by substantially all of the
assets of the Securitization Entities, other than certain specified assets.  The assets excluded
from the liens of the Securitization Entities include real property and leases (and associated
fixtures), liquor licenses and other permits.  Avoidance Actions and other potential Causes
of Action, and their proceeds, also do not secure the Securitization Debt.  Pursuant to
section 552(a) of the Bankruptcy Code, postpetition revenues generated from the labor of
the Debtors' employees at each of the company-owned restaurant locations are also

---

[9] *See* Plan, Art. I.A.20 and 21.

[10] *See Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11
Petitions and First Day Motions* [Docket No. 19] (the "Maib Declaration") at ¶¶ 18-29.

[11] "Securitization Class A-2 Note Claims" means $266,579,032.04 in outstanding principal amount of Class A-2 Notes
and the "Securitization Class B Note Claims" means $40,000,000 in outstanding principal amount of Class B Notes.

[12] Debtors HOA Funding, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, HOOTS
Restaurant Holder, LLC, HOA IP GP, LLC, HOOTS Franchising, LLC, HOA Franchising, LLC, HOA Maryland
Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, TW Restaurant Holder, LLC, DW Restaurant Holder,
LLC, HI Limited Partnership, HOA Towson, LLC, HOA Waldorf, LLC, and HOA Laurel, LLC.

unencumbered. Additionally, the Committee has determined that certain of the UCC-1 financing statements filed on behalf of the Prepetition Noteholders to perfect their alleged liens against certain of the Securitization Entities were filed within the statutory preference period and are avoidable.

(ii) **Non-Securitization Debt:** The Non-Securitization Debt consists of certain Non-Securitization Manager Advance Term Loan Claims, Non-Securitization Term Loan Claims and Manager Advance Term Loan Claims of the Prepetition Term Lenders (classified under the Plan in Classes 4, 6 and 7) incurred and guaranteed by the Non-Securitization Entities.[13] The Non-Securitization Debt allegedly is secured by certain assets of the Non-Securitization Entities. Importantly, the Prepetition Term Lenders have no claims against any of the Securitization Entities or their assets. Commercial tort claims at the Non-Securitization Entities are also unencumbered as of the Petition Date.

Prior to the Petition Date, one of the Non-Securitization Entities, Debtor Hooters of America, LLC (the "Manager"), managed the Securitization Entities pursuant to a Management Agreement. Under the Management Agreement, the Manager can, in its discretion, make Manager Advances to one or more of the Securitization Entities to support the operations of whatever Securitization Entity receives the benefit of the Manager Advance. The Disclosure Statement states that Manager Advances totaling $28.8 million remain outstanding although the amount of, and obligation to pay, the Manager Advances has been disputed by certain Prepetition Noteholders.[14]

The Manager Advances are not governed by an independent loan or security agreement. Instead, the Indenture simply permits the Securitization Entities to repay Manager Advances – which accrue interest at the Prime Rate plus 3.00% – ahead of the Notes pursuant to a payment waterfall. Although the Disclosure Statement states that "the Manager has claims against the Securitization Entities for reimbursement of an aggregate amount of not less than $28,338,913 for prepetition Manager Advances,"[15] the Manager Advances appear to be largely undocumented and reflect unverified, intercompany claims allegedly owing by subsidiary Debtors to their corporate parent.

The Manager and other "parent" Debtors borrowed funds from the Prepetition Term Lenders to fund the Manager Advances. Although the Prepetition Term Lenders have no direct claim against any Securitization Entity, the Manager secured the Prepetition Term Lenders' claim by its own rights to repayment of Manager Advances.

---

[13] Debtors Hawk Parent, LLC, HOA Holdings, LLC, Night Owl, LLC, Owl Wings, LLC, Owl Restaurant Holdings, LLC, Owl Holdings, LLC, Elf Owl Investments, LLC, TW Lonestar Wings, LLC, Alamo Wings, LLC, HOA Restaurant Group, LLC, Derby Wings Holdings, LLC, Derby Wings, LLC, Hooters of America, LLC, and HOA Gift Cards, LLC.

[14] The Committee reserves all rights to challenge any Debtor's incurrence of, and obligation to repay, the Manager Advances.

[15] Disclosure Statement, Art. II.C.1, at p. 12.

14.    **New Notes/Equity:** Under the proposed Plan, Debtor HOA Funding LLC, the "Master Issuer" under the Securitization Notes Documents, would be renamed RoyaltyCo LLC and would issue new notes to holders of Securitization Notes Claims and Prepetition Term Lender Claims, as well as to the DIP Lender.  Debtor RoyaltyCo would continue to own the company's intellectual property and collect a share of royalty and revenues from licenses and franchise agreements and payments from all franchised stores.  Modifying the Debtors' prepetition whole-business securitization structure, the Prepetition Lenders (both the Prepetition Term Lenders holding claims against the Non-Securitization Entities and the Prepetition Noteholders holding claims against the Securitization Entities) together with the DIP Lenders would receive a combination of new debt and equity securities representing all the value of the Debtors.

(i)    **Class 2:** Securitization Class A-2 Note Claims would receive new Class A-2I notes in a principal amount equal to that of the prepetition securitization Class A-2 notes ($266m).  These new notes would be first lien notes.

(ii)    **Class 3:** Securitization Class B Note Claims would receive new Class B notes in a principal amount equal to that of the prepetition Class B notes ($40m); and their pro rata share of 50% of the equity interests in RoyaltyCo.  The Class B notes would be first-lien notes.

(iii)    **Class 4:** Non-securitization Manager Advance Term Loan Claims (*i.e.,* the claims held by the Prepetition Term Lender against the Non-Securitization Entities) would receive new Class A-2II notes and a pro rata share of the other 50% of the equity interests in RoyaltyCo.  Distributions to the holders of non-securitization debt claims would be on account of the Manager Advances (*i.e.,* disputed, undocumented, intercompany claims owing to the Manager, not the Prepetition Term Lender), and remaining non-securitization debt claims would effectively be released.  These Class A-2II notes would be first-lien, second-out notes in a principal amount not to exceed $18 million.

(iv)    **Class 6:** Non-Securitization Term Loan Claims are unimpaired and would receive the value of their collateral - excluding the Manager Advances, which are dealt with in Class 4.

(v)    **Class 7:** Securitization Manager Advance Claims (*i.e.,* the Manager's own undocumented, intercompany claims against one or more Securitization Entities arising from alleged Manager Advances) would not receive any distribution; instead, the Manager would "agree that the treatment provided to Class 4 Non-Securitization Manager Advance

Term Loan Claims and the DIP Claims" fully satisfies and discharges such claims.  Class 7 is deemed to reject the Plan.

15.    **General Unsecured Creditors**: Under the proposed Plan, notwithstanding the recovery of value by certain equity holders (as set forth below), the distribution of all asset value of the Securitization and Non-Securitization Entities – including all unencumbered assets – to the Prepetition Term Lenders and Prepetition Noteholders, General Unsecured Claims (Class 8) held against any Debtor will receive no distribution on account of such Claims and are not entitled to vote on the Plan.

16.    **Interests**: Under the proposed Plan, all prepetition equity interests in Securitization Entities HOA Funding LLC (the prepetition master issuer), HOA Holdco LLC and HOA Systems LLC would be canceled (Class 11).  ***However, all Other Securitization Equity Interests (Class 12) would remain in place***.  All Non-Securitization Equity Interests (Class 13) would be canceled.

## ARGUMENT AND AUTHORITIES

**I.    THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT AND ENABLE THE DEBTORS TO INCUR THE COST AND EXPENSE OF SOLICITING VOTES ON A PLAN THAT PROVIDES UNSECURED CREDITORS WITH NO RECOVERY AND DEPRIVES UNSECURED CREDITORS OF AN OPPORTUNITY TO VOTE.**

17.    The Debtors are seeking approval of a solicitation process subject to significant risk that their failure to provide any recovery to unsecured creditors or to allow unsecured creditors to vote on the Plan, despite the existence of material unencumbered assets, will cause these Estates to incur enormous expense and delay, including the possibility of re-solicitation.  The Plan effectuates improper substantive consolidation, violates the absolute priority rule, and cannot meet the best interest of creditors test because it ignores (a) the separate silos of assets and liabilities between the Securitization Entities and the Non-Securitization Entities and (b) the unencumbered asset values that are available in each silo for the benefit of unsecured creditors.  While the ultimate

determination of whether the Plan can be confirmed over these objections are confirmation issues, the issue now goes solely to the propriety of solicitation. Why should the Debtors be permitted to incur the cost and delay of soliciting the Plan that improperly disenfranchises unsecured creditors without any legitimate basis for doing so and at risk of re-solicitation? At a minimum, the Disclosure Statement must contain some discussion of these issues and how the Debtors believe, given the Plan structure and creditor treatment provisions, that the Debtors can meet the statutory requirements for confirmation. This lack of transparency on a complex but cashless Restructuring Transaction that conveys substantially all the value of the Debtors' estates to a related party and the Prepetition Lenders cannot be sustained.

### A. The Plan Effectuates Improper Substantive Consolidation and Therefore, Violates the Absolute Priority Rule.

18. The Disclosure Statement fails to explain how the Plan can be confirmed when it effectuates a substantive consolidation of the Estates, which results in an obvious violation of the absolute priority rule.[16] While the Plan expressly states that it does not effectuate a substantive consolidation,[17] this statement is belied by the Plan's own terms and the description of the Plan in the Disclosure Statement.

19. The Debtors maintained a cleanly divided "securitization" and "non-securitization" capital structure prepetition. Non-Securitization Debtors held certain unique assets and were obligated on certain debt, while Securitization Debtors held other assets and were obligated on

---

[16] Section 1129(b)(2)(B)(ii) provides that a plan must be "fair and equitable" in order to be "crammed down" on creditors. A plan is not "fair and equitable" unless it satisfies the "absolute priority" rule, which requires that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property …") 11 U.S.C. § 1129(b)(2)(B)(ii).

[17] The Plan states that: "The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan." Plan, Art. IV.B., at p. 34.

other debt.  Yet the Plan ignores these divisions entirely and simply carves up the Debtors'
aggregate value for the benefit of the Prepetition Lenders, without regard for which Prepetition
Lender holds claims or liens against which Debtors.  The Disclosure Statement fails to identify
which Debtors own which assets, which assets are pledged to which Prepetition Lenders or which
assets are unencumbered.

20.     Instead, the Plan purports to combine all the Debtors' assets together and distribute
the entirely of their aggregate value to the Prepetition Lenders in the manner agreed by those
parties under the RSA.  Under the Plan, the reorganized Securitization Entities would become
directly obligated to each of the Prepetition Lenders, including the Prepetition Term Lenders,
which previously had no direct claim against any Securitization Entity.  All the Prepetition Lenders
would be treated as if their liens extended to all the Debtors' assets, regardless of whether any
individual Debtor was even obligated to any particular Prepetition Lender.   Meanwhile, the
unsecured creditors of every Debtor would be ignored regardless of the availability of
unencumbered assets owned by any particular unsecured creditor's Debtor-obligor.  The Debtors
may not call this Plan treatment "substantive consolidation", but that is its obvious effect.

21.     Substantive consolidation occurs when the assets of separate debtors are
consolidated into a common fund and used to pay all creditors ratably – regardless of which debtor
owns the assets or owes the debts.[18]  Substantive consolidation is "an extreme and unusual remedy"

---

[18] *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 91 (Bankr. N.D. Tex. 2017) (citing *Power Int'l, Inc. v. Babcock &
Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955, 959 ns. 5 & 6 (5th Cir. 2001) (citing *Union Sav. Bank v.
Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988) (noting in dicta
that "it usually results in, inter alia, pooling the assets of, and claims against, the two entities; satisfying liabilities
from the resultant common fund; eliminating intercompany claims; and combining the creditors of the two companies
for purposes of voting on reorganization plans" and because it "affects the substantive rights of the parties . . . is
subject to heightened judicial scrutiny").)

and should be used "sparingly."[19]  None of the grounds for substantive consolidation exist here, and the Debtors should explain in the Disclosure Statement how their proposed Plan can be approved when it provides otherwise.[20]

22.      The Plan's proposed treatment not only disenfranchises *all* general unsecured creditors, including those who have claims against Debtors with unencumbered assets, but it also clearly violates the absolute priority rule by allocating value to structurally subordinate creditors (*i.e.,* equity) before allocating any value to the unsecured claims of structurally senior creditors.

**B.      The Disclosure Statement Fails to Explain How the Plan Can Satisfy the Best Interest of Creditors Test.**

23.      The Plan cannot meet the best interest of creditors test.  The value of unencumbered assets, including Estate Causes of Action, Avoidance Actions, the Debtors' owned and leased real properties, and postpetition revenues, would be available for distribution to unsecured creditors in a hypothetical chapter 7 case.  Yet, no value at all would be distributed to any unsecured creditors under the Plan.  The risk that the Plan will fail to satisfy this confirmation requirement must be set out in the Disclosure Statement.

---

[19] *Wells Fargo Bank v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 696 n. 5 (5th Cir. 2006) (noting in a non-plan context that substantive consolidation "is an extreme and unusual remedy"); *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002) ("Substantive consolidation is an extreme and unusual remedy." (internal citations omitted)).

[20] The cases cited most often for analyzing substantive consolidation are *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988) and *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).  In general, substantive consolidation requires an analysis of (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtors are so entangled that consolidation would benefit all creditors.  However, as the Second Circuit emphasized in *Augie/Restivo*, "***the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors***".  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 519 (emphasis added); *see also In re Owens Corning*, 419 F.3d at 212-216 (In finding that substantive consolidation was inappropriate, the court concluded that substantive consolidation is about equity and therefore ***should only be used to accomplish an equitable result*.**); *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982), where the court held that substantive consolidation analysis boils down to weighing the economic prejudice of separateness versus economic prejudice of consolidation.).

24.    Section 1129(a)(7),[21] commonly known as the best interest of creditors test, prohibits confirmation of a chapter 11 plan if a dissenting impaired class would receive less than it would in a chapter 7 liquidation.[22]  Courts uniformly conclude that the debtor or any other applicable plan proponent has the burden of proving the test is met.[23]  The test "focuses on individual creditors rather than classes of claims ... [and] requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7."[24]  Thus, section 1129(a)(7) guarantees each creditor that it will receive as much in a reorganization as it would in liquidation.[25]

25.    The Disclosure Statement must explain the risk that the Plan will violate the best interest of creditors test set out in section 1129(a)(7) of the Bankruptcy Code.  This is especially true here where no liquidation analysis is even provided.

---

[21] Section 1129(a)(7) provides as follows:

(a)  The court shall confirm a plan *only* if *all* of the following requirements are met:
(7)  With respect to each impaired class of claims or interests –
(A)  each holder of a claim or interest of such class –
(i)  has accepted the plan; or
(ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; . . . .

11 U.S.C. § 1129(a)(7).

[22] *In re Ultra Petroleum Corp.*, 624 B.R. 178, 201 (5th Cir. 2020).

[23] *In re Ditech Corporation*, 606 B.R. 544, 606-607 (Bankr. S.D.N.Y 2019), *citing In re GSC, Inc.*, 453 B.R. 132, 179 n.66 (Bankr. S.D.N.Y. 2011); *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 366 (S.D.N.Y. 2007); *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 724 (Bankr. S.D.N.Y. 2011).

[24] *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (internal citation omitted); *see also, In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) (stating that in applying the best interest test, the court "must find that each [dissenting] creditor will receive or retain value that is not less than the amount he [or she] would receive if the debtor were liquidated.") (citation omitted).

[25] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7].

26.     Here, the Debtors are either gifting the value of all unencumbered assets to the Prepetition Lenders or simply releasing the applicable Estate Causes of Action, including Avoidance Actions against certain of the Prepetition Lenders, through the Releases.  In a hypothetical chapter 7 case, value would exist to pay unsecured creditors.  Since general unsecured creditors would receive nothing under the Plan, they would necessarily do better in a liquidation than under the Plan.  Therefore, the Plan fails the best interest of creditors test, the Disclosure Statement cannot be approved and votes should not be solicited without addressing the issue.

## II.     THE DISCLOSURE STATEMENT SHOULD NOT BE CONDITIONALLY APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION.

27.     The Disclosure Statement is statutorily deficient – lacking even the most basic factual and financial information to support the complex Restructuring Transactions contemplated by the Plan.  The Disclosure Statement should not be approved until it is modified and until stakeholders have had sufficient time to analyze all relevant factual and financial data that has yet to be provided.

28.     "Disclosure is the 'pivotal' concept in Chapter 11 reorganization."[26] A disclosure statement is the primary source of information creditors and other parties in interest rely on in making informed decisions about a debtor's plan of reorganization.[27]    Full disclosure is fundamental to the proper functioning of the bankruptcy process:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

---

[26] *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (*citing* 5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)).

[27]  *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988).

*Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 2013).[28]

29.    In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."[29]

30.    Adequate information is defined in the Bankruptcy Code as: "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...."[30]

31.    The Disclosure Statement is deficient and cannot be approved conditionally or otherwise.  Indeed, the Debtors acknowledge their Disclosure Statement is deficient.  In paragraph 24 of the DS Approval Motion, the Debtors expressly indicate that adequate information includes: (i) information on available assets and their value, (ii) a liquidation analysis, (iii) financial information, valuations or *pro forma* projections relevant to creditors' analysis of the plan, (iv) accounting and valuation methods upon which the financial information in the disclosure statement are based, and (v) the actual or projected value of any avoidance actions.[31]  ***None of this critical information is in the Disclosure Statement.***

---

[28] *See also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

[29] *In re Applegate Prop., Ltd.,* 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).

[30] *See* 11 U.S.C. § 1125(b).

[31] *See* DS Approval Motion, ¶ 24(b), (h), (i), (m), and (o).

## III.    THE DISCLOSURE STATEMENT CONTAINS NO LIQUIDATION ANALYSIS, NO FINANCIAL PROJECTIONS AND NO VALUATION ANALYSIS.

### A.    The Disclosure Statement Does Not Contain Any Financial Information.

32.    The Disclosure Statement currently contains no Liquidation Analysis and no Financial Projections.[32]  The Disclosure Statement is also lacking any valuation analysis (whether consolidated or Debtor by Debtor) – including the identification and valuation of unencumbered assets.  This information is critical to any meaningful analysis of the Restructuring Transactions contemplated by the Plan.

33.    The Disclosure Statement cannot be approved, even on a conditional basis, without this critical information.  The Plan Restructuring Transactions include a sale of substantially all the Debtors' operating assets for no cash to a group consisting of the Debtors' original founders, the issuance of new complex debt securities under a reorganized business structure that eliminates the Debtors' prepetition securitization structure, and the assumption of various debt and executory contracts.  Yet no Financial Projections are included in the Disclosure Statement to enable creditors to assess the feasibility of the Plan and no valuation analysis is even contemplated so that the bona fides of the economics of the Restructuring Transactions can be assessed.  Nor is a Liquidation Analysis provided even though one is necessary to assess whether the Plan meets the best interest of creditors test.

34.    Furthermore, as the Debtors' company-owned stores are being sold as a going concern, a going concern valuation analysis must be provided.  Yet it appears the Debtors do not intend to provide any valuation information.  The lack of any Debtor by Debtor, unconsolidated valuation analysis, coupled with the lack of information about the prepetition marketing process

---

[32] The current Disclosure Statement indicates the Liquidation Analysis and Financial Projections are "to come".  These documents were still "to come" when the Debtors filed their *Witness and Exhibit List* [Docket No. 420] two business days before the hearing on the DS Approval Motion.

(as discussed below), makes it impossible to assess whether the Buyer Group is paying fair value for the assets of the Debtors[33] or whether the Plan meets the best interests of creditors test.

35.      The Disclosure Statement cannot be approved without this information being provided.

**B.      The Disclosure Statement does not Identify Unencumbered Assets.**

36.      The Disclosure Statement does not identify unencumbered assets or explain how the value of such assets can be distributed to the Prepetition Lenders instead of general unsecured creditors.  The value of unencumbered assets must be made available for distribution to unsecured creditors; yet, the Plan simply (and incorrectly) assumes none exist.

37.      The Prepetition Noteholders' collateral expressly excludes, among other assets, leaseholds, fixtures, liquor licenses, and other permits.  Moreover, the Prepetition Noteholders have no liens on other valuable assets, including postpetition revenues generated from the labor of the Debtors' employees, Avoidance Actions, and other potential Causes of Action.  Meanwhile, the Prepetition Term Lenders have no claim at all (let alone a secured claim) against any Securitization Entity.  Nevertheless, the Plan proposes to distribute all the Debtors' collective value to the Prepetition Lenders, including to structurally subordinate creditors of the Non-Securitization Entities, while providing no value to unsecured creditors of any individual Debtor.

38.      Although the Disclosure Statement disclaims substantive consolidation, that is the obvious effect of the Plan, which consolidates the assets of the Securitization Entities and Non-Securitization Entities into a new entity and allocates the undisclosed value of those assets solely

---

[33] *See Bank of America, National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 437 (1999) (in order for a debtor's prebankruptcy equity holders to contribute new value and receive ownership interests in the reorganized entity, the opportunity cannot be given exclusively to the old equity holders under a plan without consideration of alternatives so that market value can be established); *see also*, *In re Cypressword Land Partners I*, 409 B.R. 396, 438 (Bankr. S.D. Tex. 2009) (*citing 203 N. LaSalle St. P'ship*, 526 U.S. at 445).

to the Prepetition Lenders through the Restructuring Transactions. In fact, the Securitization Entities and the Non-Securitization Entities have different creditors, as well as substantial unencumbered assets, the value of which should be made available for distribution to each entity's respective unsecured creditors.

39.    The Committee submits that such blatant violations of the absolute priority rule, best interests test, and restrictions on substantive consolidation make the Plan patently unconfirmable. Moreover, the Debtors utterly fail to acknowledge these flaws in their Disclosure Statement.

40.    If the Plan does not, as the Debtors represent, effectuate substantive consolidation, the Debtors must identify and value the unencumbered assets of each Debtor and must clearly distinguish between the creditors of each Debtor. The Debtors' unencumbered assets include significant value generated *postpetition* through the provision of services at the Debtors' restaurants, as well as pre-existing leaseholds and fixtures, commercial tort claims, Avoidance Actions (including potential claims against the Prepetition Lenders themselves), and their proceeds.

41.    Section 552(a) of the Bankruptcy Code provides that, except as to proceeds of existing collateral covered under a prepetition security agreement, "property acquired by the estate or by the debtor after commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before commencement of the case." 11 U.S.C. §552(a). In accordance with section 552(a), postpetition revenues or receivables generated by the dining and hospitality services provided by any Debtor are not subject to the liens of the Prepetition Lenders. These services are based on the ongoing and future postpetition labor of the Debtors' employees rendered for the benefit of each Debtor's customers. Therefore, none of the Prepetition

Lenders have a lien on the postpetition receivables generated, or to be generated, by the postpetition work of the Debtors' employees. *See In re Cafeteria Operators*, L.P., 299 B.R. 400, 410 (Bankr. N.D. Tex. 2003) (Hale, J.) ("Restaurant revenues are primarily the fruit of Debtors' labor").

42.    Hence, any valuation of the Debtors' assets under the Plan or otherwise must be performed on a Debtor-by-Debtor basis and must reflect an appropriate allocation between the value of the prepetition assets that are validly encumbered by prepetition liens and the value of assets that are unencumbered by virtue of section 552(a). These assets include valuable revenues created by the postpetition efforts of the Debtors' workforce.

43.    "From a plain reading of § 552, revenues generated post-petition solely as a result of the debtor's labor are not subject to a pre-petition lender's security interest."[34] "As a general rule, postpetition revenue is not cash collateral. Under § 552(a), a creditor's prepetition security interest does not extend to property acquired by the debtor postpetition even if there is an 'after acquired' clause in the security agreement."[35]

44.    Courts have consistently held that postpetition revenues and receivables from a debtor's business operations or labor are not subject to liens in connection with prepetition security agreements.[36] The rights of unsecured creditors to recover from the ***newly-created and***

---

[34] *Cafeteria Operators,* 299 B.R. at 405 (citing 11 U.S.C. § 552)..

[35] *Far E. Nat'l Bank v. United States Tr. (In re Premier Golf Props., LP)*, 477 B.R. 767, 771 (B.A.P. 9th Cir. 2012); *see also In re Blackjewel L.L.C.*, 2020 Bankr. LEXIS 3413, at *47 (Bankr. S.D. W. Va. Dec. 7, 2020) ("[I]t is well settled that § 552(b) cuts off any security interest in accounts receivable arising post-petition.").

[36] *See Bank of N. Ga. v. Strick Chex Columbus Two, LLC (In re Strick Chex Columbus Two, LLC)*, 542 B.R. 914 (Bankr. N.D. Ga. 2015); *see also, e.g., Premier Golf Props.*, 477 B.R. at 777 (finding that a golf club's revenue from green fees and driving range fees were "not proceeds of the Bank's security interest and [did] not constitute the Bank's cash collateral"); *Johnson v. RFF Family P'ship, LP (In re Johnson)*, 554 B.R. 448, 466–67 (Bankr. S.D. Ohio 2016) (finding that section 552(a) terminated any interest of a secured creditor in an NHL player's postpetition contract earnings and that such earnings did not constitute proceeds of prepetition collateral for purposes of section 552(b)); *In re Ne. Chick Servs., Inc.*, 43 B.R. 326, 329, 331 (Bankr. D. Mass. 1984) (finding that no security interest attached to the debtor's postpetition receivables from the sale of chickens and eggs, because the secured creditor did "not have a right to proceeds arising from the sale of what is not [its] (pre-petition) collateral"); *Shearer v. Tepsic (In re*

**postpetition assets** of the Debtors' estates must be fully preserved in the Plan and such value cannot be distributed to the Prepetition Lenders or sold without accounting for their value, which must be preserved for distribution to unsecured creditors.

45.    As to the Debtors' remaining unencumbered assets (including real property, leaseholds, certain licenses, Avoidance Actions, commercial tort claims, other Causes of Action, or their proceeds[37]), they too must be valued and their value distributed to the general unsecured creditors of the applicable Debtors.    The Debtors cannot simply pool all these valuable unencumbered assets – which they neither identify nor value – and either distribute them to the Prepetition Lenders or gratuitously release them pursuant to the Plan release provisions.    To be clear, no Prepetition Lender holds a lien on any Debtor's real property, leaseholds, liquor licenses, or the value created postpetition by the Debtors' employees; *i.e.,* the assets required to operate the Debtors' restaurants.    The Debtors' proposal to simply gift the value of their entire going-concern to the Prepetition Lenders under these circumstances, without making any disclosure in the Disclosure Statement of these flaws, is incomprehensible.

---

*Emergency Monitoring Techs., Inc.),* 366 B.R. 476, 500 (Bankr. W.D. Pa. 2007) (finding that section 552(a) operated to terminate a "security interest as of, and with respect to—in particular—receivables generated after, the date of the Debtor's bankruptcy petition filing" and that section 552(b) did not change the result because "accounts receivable that are generated post-bankruptcy, in any event, cannot constitute 'proceeds, products, offspring, or profits' of accounts receivable that are generated pre-bankruptcy"); *Northeastern Copy Servs. v. Bridgeport Park Assocs. (In re Northeastern Copy Servs.),* 175 B.R. 580, 583 (Bankr. E.D. Pa. 1994) ("Although the proceeds of NE's sale of its property are Concord's cash collateral, . . . Mammoth's revenues are not Concord's cash collateral.  Thus, Mammoth may proceed to utilize its revenues free from any alleged lien thereon of Concord."); *In re S-Tek 1, Ltd. Liab. Co.*, No. 20-12241-j11, 2023 Bankr. LEXIS 673, at *25–26 (Bankr. D.N.M. Mar. 15, 2023) ("Section 552 cuts off the attachment of Surv-Tek's security interest in after-acquired accounts receivable because S-Tek's post-petition accounts receivable are not proceeds, products, offspring, or profits of its pre-petition accounts receivable."); *U.S. Trust Nat'l Assoc. v. Venice MP LLC*, 92 F. App'x. 948, 953 (4th Cir. 2004) (finding that revenues generated by the sale of food at the debtor's restaurant were not "proceeds" of prepetition inventory where such revenues derived from operation of the debtor's service-oriented business); *Timothy Dean's, Inc. v. White (In re Timothy Dean Rest. & Bar)*, 342 B.R. 1, 23–24 (Bankr. D.D.C. 2006) (finding that a hotel's postpetition receivables from room service and other guest charges were not subject to security interests and were not proceeds of the sale of inventory); *In re Inman*, 95 B.R. 479, 480–81 (Bankr. W.D. Ky. 1988) (finding that revenues generated from the operation of a debtor's fast-food restaurants were not proceeds from the sale of inventory subject to a creditor's security interest).

[37] The right of general unsecured creditors to Avoidance Actions and other Causes of Action or their proceeds was preserved in the DIP Order.

46.    Additionally, as described above, the Committee has determined that UCC-1 financing statements identifying certain Securitization Entities were filed within the statutory preference period and are avoidable through Avoidance Actions which the Committee intends to assert, together with other Causes of Action.[38]

47.    Indeed, the Committee, in the limited time it has been in existence and without receiving full document discovery,[39] has already identified other potential Causes of Action against several of the Released Parties.[40]  While it is premature for the Committee to fully assess the value of all such potential Causes of Action, they must at least be fully investigated and disclosed in the Disclosure Statement.  However, under the Plan, the Debtors are simply sweeping any such Causes of Action under the rug by releasing them without investigation[41] or valuation.  The Disclosure Statement fails to disclose these flaws.[42]

---

[38] The Debtors have already waived their right to assert this and any other Causes of Action against the Prepetition Lenders in the DIP Order, leaving the Committee as the only fiduciary able to assert any such Causes of Action for the benefit of all creditors.

[39] On May 6, 2025, the Committee served the Debtors with a Request for Production of Documents that it needed for its statutorily-mandated investigation into the Debtors and their various prepetition transactions.  To date, the Committee has received minimal documents from the Debtors notwithstanding the Debtors' expedited Milestones and the impending Challenge Period (as defined below).

[40] For example, in the months leading up to the Petition Date, certain Securitization Entities appear to have transferred millions of dollars to the Manager, including in the form of "repayments" of Manager Advances, for the benefit of the Prepetition Term Lender.  The Debtors state in the Disclosure Statement that each of the Securitization Entities remains obligated to repay over $28 million in additional Manager Advances, without providing any evidence that any Manager Advances were permitted or appropriate, or that any individual Securitization Entity received any benefit in exchange.  These Manager Advances allegedly serve as the mechanism for diverting value to the Prepetition Term Lenders under the Plan.  Yet, the Debtors have failed to substantiate these intercompany transfers and incurrences, which might well give rise to Causes of Action and undermine the entire premise for allocating value to the Prepetition Term Lenders.

[41] Under the DIP Order, the Committee has 60 days from the date of its formation (which is June 13, 2025) to challenge the liens and claims of the Prepetition Lenders (the "Challenge Deadline").

[42] Indeed, the RSA apparently reflects a settlement pursuant to which the Prepetition Noteholders have agreed to allow Manager Advances in an amount that is substantially less than the amount claimed by the Debtors, but *only* if the Plan is confirmed in accordance with the RSA.  The Prepetition Noteholders have reserved the right to challenge the Manager Advances if the Plan is not confirmed.

IV.    **THE DISCLOSURE STATEMENT CONTAINS NO INFORMATION ON THE PREPETITION MARKETING PROCESS OR THE BUYER GROUP AND ITS SALE TRANSACTIONS.**

48.    The Plan effectuates a cashless sale of substantially all the Debtors' assets through a series of complex Restructuring Transactions which the Debtors allege are in the best interest of all stakeholders.  Yet the Disclosure Statement is devoid of any information that would enable creditors or the Court to assess the validity of this conclusory statement.

49.    As a preliminary matter. the Debtors allege they conducted a thorough marketing process prior to filing the Chapter 11 Cases, but they do not disclose any substantive information as to the results of the process.  The entire process is described in one short paragraph in the Disclosure Statement which concludes with the statement that the process yielded three formal proposals.[43]  Not one of these proposals is discussed, however, leaving creditors unable to determine the comparative value between the results of the marketing process and the Debtors' decision to enter into the RSA and the transaction with the Buyer Group.[44]

50.    Nor does the Disclosure Statement contain any information about the Buyer Group or the substance of the Restructuring Transactions the Court is being asked to approve.  The Buyer Group is comprised of two existing Hooters franchisees (including Hooters Inc., the original Hooters founders), who collectively currently own and operate over 30% of the domestic franchised Hooters locations, including 14 of the 30 highest volume restaurants.[45]  Given the long term historical relationship between the Buyer Group and the Debtors (both as founders of the

---

[43] *See* Disclosure Statement, Art. II.D.3(d), at p. 17.

[44] The Committee has been informed that postpetition, the Debtors have received alternative sale proposals to that of the Buyer Group. None of this information is contained in the Disclosure Statement.

[45] *See* "Hooters of America Takes Strategic Action to Continue its Iconic Legacy Under Pure Franchise Business Model" (BusinessWire, March 31, 2025), available at
https://www.businesswire.com/news/home/20250331979797/en/Hooters-of-America-Takes-Strategic-Action-to-Continue-its-Iconic-Legacy-Under-Pure-Franchise-Business-Model

Debtors and now the largest franchisee), the Buyer Group might well qualify as a non-statutory insider,[46] and the RSA and resultant Plan Restructuring Transactions must be closely scrutinized.[47] The facts surrounding the close relationship between the Buyer Group and the Debtors and the negotiation of the RSA must be disclosed so that creditors and the Court can assess whether the RSA was negotiated and the Plan proposed in good faith and at arms' length.

51.     Additionally, although it is customary for a disclosure statement to contain financial information about a buyer who will be assuming liabilities so that creditors and the Court can assess the feasibility of a plan and future performance of assumed and assigned executory contracts, no such information is provided for the Buyer Group.  Nor are any financials or financial projections provided with respect to the Restructuring Transactions contemplated by the Plan.

52.     Furthermore, the Disclosure Statement does not contain any details about the Buyer Group APA or any of the Buyer Group Documents or Buyer Group Arrangements.  While the Buyer Group APA, Buyer Group Arrangements, and other Buyer Group Documents allegedly will be included in the Plan Supplement, the Plan Supplement will not be filed until one week before the Voting Deadline.[48] ***Therefore, votes will be solicited before any of this critical documentation is available to creditors.***  These documents must be included with the Disclosure Statement to

---

[46] Even if the Buyer Group does not meet the statutory definition of the term "insider" (*see* 11 U.S.C. § 101(31)), the statute's use of the word "includes" means the term can be expanded to include "non-statutory insiders".  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 390 (2018).  The legislative history pertaining to the definition of "insider" clearly states that "[a]n insider is one who has a ***sufficiently close relationship with the debtor*** that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *See* S. Rep. No. 95-989, at 25 (1978); H.R. Rep. No. 95-595, at 312 (1977) (emphasis added)

[47] Transactions between a debtor and an insider are subject to heightened scrutiny.  *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (Court can replace business judgment standard with fairness standard in evaluating a transaction with an insider); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("[C]ourts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor.") (collecting cases); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) (stating that controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny"); *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (dealings between a debtor and an insider must be rigorously scrutinized by the courts).

[48] *See* DS Approval Motion, Proposed Timeline, ¶ 8; *See* Plan, Art. I.A.114, definition of "Plan Supplement".

permit creditors, the Court and the Committee to analyze the documents and take meaningful discovery.

## V.    THE DISCLOSURE STATEMENT DOES NOT CONTAIN SUFFICIENT INFORMATION ABOUT THE RELEASES OR THE CONSIDERATION BEING PROVIDED FOR THE RELEASES.

53.     The Plan contains two categories of broad general releases benefiting a litany of parties and their professionals: (a) the Debtor Release and (b) the Third Party Releases (the "Releases").    The Plan recites that Releases are in exchange ***"for good and valuable consideration"***.[49]    Although the Non-Debtor Releases are subject to an "opt-in" provision, absolutely no consideration is being provided for the Releases by any Released Party.    Both Releases must pass muster under Fifth Circuit law.[50]    ***Consideration is a specific requirement – one that is not eliminated by mere consent.***    Here, no consideration is being provided by any Released Party to the Debtors for the Debtor Release.    ***And more importantly, no consideration is being provided by any Released Party (which includes the Prepetition Lenders) to any general unsecured creditor in exchange for the Third Party Releases.***

54.     The opt-in provision does not absolve the Debtors of their statutory obligation to provide adequate information in the Disclosure Statement in support of the Releases and to provide creditors with the information necessary to decide whether to opt into the Third-Party Releases. Here, the Disclosure Statement is devoid of any information for creditors to determine whether or not to opt in.    Specifically, there is no disclosure regarding any of the following:

---

[49] Plan, Art. VIII.C and D. at pp. 59-60 (emphasis added).

[50] Under Fifth Circuit law, non-debtor releases do not violate the Bankruptcy Code **only** if they are (a) consensual, (b) specific in language, (c) a condition of settlement, **and** (d) **given for consideration**. *See*, *e.g.*, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007), *aff'd*, 255 F. App'x. 909, 911-12 (5th Cir. 2007) (emphasis added); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).  *See also In re Bigler LP*, 442 B. R. 537, 543-44 (Bankr. S.D. Tex. 2010) ("But, such releases must satisfy the requirements of a valid settlement of claims under the Code.  It would require, *inter alia*, consent and consideration by each participant in the agreement to be valid.").

- Which persons or entities qualify as "Released Parties" and who are their so-called "Related Parties"?
- What potential claims or Causes of Action against the Released Parties have been investigated by the Debtors such that a decision was made to include the Releases in the Plan ***and what potential claims or Causes of Action against the Released Parties are being investigated by the Committee***?
- Who are the targets and what are the potential legal theories of recovery?
- What is the value of the potential claims or Causes of Action owned by the Estates against the non-debtor Released Parties under the Plan?
- What, if any, consideration is being provided to the Estates and/or the creditors in exchange for either the Debtor Releases or the Third Party Releases?
- If the Releases are gratuitous, what is the justification for granting the Releases given the requirements of Fifth Circuit law that even consensual releases be supported by consideration?

55.     Without this information, the Disclosure Statement is woefully deficient and cannot be approved because creditors have insufficient information to assess the Releases or to make an informed decision with respect to the opt-in provision.

56.     Relatedly, the Disclosure Statement does not contain sufficient information to assess the so-called Plan settlement under Rule 9019.[51]   While section 1123(b)(3)(A) of the Bankruptcy Code permits a plan to provide for the settlement of causes action owned by the estate, the Bankruptcy Code requires that the proper procedures be followed for approval of a settlement and that the evidence support the proposed settlement and releases.

57.     The Fifth Circuit requires consideration of the following factors in approving a settlement under Rule 9019: (a) the probability of success in litigation; (b) the likely difficulties in collecting any judgment; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors with

---

[51] *See* Plan, Art. VIII.A., at p. 58; Disclosure Statement, Art. IV.H.1, at p. 58 (designating the Releases to be part of a settlement for which approval is being sought pursuant to Bankruptcy Rule 9019.).

deference to their reasonable views; and (e) the extent to which the settlement is truly the product

of arms-length bargaining, and not of fraud or collusion.[52]

58.     This test was established to ensure that a debtor is settling claims and causes of

action *for the benefit of the estate, not for the benefit of some other person*.  A debtor is a fiduciary

and has a duty to maximize value for its estate.  Here, the Debtors cannot meet the requirements

for approval of a settlement and release of all claims and Causes of Action.  As a preliminary

matter, not only are no claims or Causes of Action identified, but as set forth in the Committee's

DIP Objection, the Committee has identified significant Avoidance Actions against the Prepetition

Lenders which are being "given" to the Prepetition Lenders and then forgiven pursuant to the self-

negotiated Debtor Release.   Thus, the Debtor Release is not benefiting the Estate – only the

Prepetition Lenders who would be the target of the Causes of Action being released.

59.     Nor is any consideration provided for the Debtor Release by any Released Party.

The participation of certain (but not all) of the Released Parties in negotiating the Plan is not

consideration for a release – especially here where the unsecured creditors get no benefit from

either the Plan or its implementation.[53]  As one court put it: "[T]hird-party releases are not a merit

---

[52] *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).

[53] *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) ("While I have little doubt that many of the Debtor Releasees undertook substantial (and certainly sometimes exhausting) efforts to formulate and negotiate the current (and former) Plans, I do not believe that those contributions rise to the level of the critical financial contribution contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases.") (citations omitted); *see also*, *In re Continental Airlines*, 203 F.3d 203, 215 (3d Cir. 2000) ("[W]e have found no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001) ("[T]here is no showing that the individual releasees have made a substantial contribution of assets to the reorganization. As in Zenith, the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest. However, the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization."); *Cf. Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009) (exculpation clause designed to absolve the released parties, including the non-debtor plan proponent, from any negligent conduct that occurred during the course of the bankruptcy not permissible).

badge that somebody gets in return for making a positive contribution to a restructuring.  They are not a participation trophy, and they are not a gold star for doing a good job.  Doing positive things in a restructuring case – even important positive things – is not enough."  *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019).  The Debtors must disclose what, if any, consideration is actually being paid by ***each*** beneficiary of the Releases.

60.    Most significantly, Fifth Circuit precedent provides that in approving a settlement, critical factors are (a) whether creditors support the settlement and (b) whether the settlement was reached between insiders without the participation of creditors.[54]  Given that unsecured creditors had absolutely no role in the negotiation of the RSA, the Plan or the Releases in favor of the Released Parties, including the Prepetition Lenders and insiders of the Debtors, and that the sole beneficiaries of the Plan and primary beneficiaries of the Releases are each of the Prepetition Lenders and the Debtors' officers, directors and employees – all of whom negotiated the Plan and the "settlement" on behalf of themselves without any unsecured creditor input – this Court cannot make the findings required by the Fifth Circuit in approving the so-called settlement or the Debtor Release.  The Releases are impermissible and cannot be approved.

## RESERVATION OF RIGHTS

61.    As drafted, the Disclosure Statement does not accurately, let alone adequately, disclose the information necessary for creditors to make an informed judgment about the Plan and it should not be approved, even on a conditional basis.

---

[54] *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995) ("In examining such a compromise, the bankruptcy court must consider the 'paramount interest of the creditors' and the nature of the negotiations as factors bearing on the wisdom of the compromise. The court's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims.").

62.     The issues discussed above subject the Debtors' proposed solicitation process to significant risks and potential problems which may necessitate re-solicitation.  General unsecured creditors are entitled to share in, at a minimum, the net proceeds of unencumbered assets. Therefore, unsecured creditors have been improperly disenfranchised such that the vote of unsecured creditors ultimately will have to be solicited making conditional approval of the Disclosure Statement and related solicitation procedures a time-consuming and economic risk.

63.     The Committee reserves its right in all respects to supplement this Objection at or prior to the hearing on the DS Approval Motion, and to further object to both the Disclosure Statement and the Plan.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court deny conditional approval of the Disclosure Statement, deny the DS Approval Motion to the extent set forth herein, and grant the Committee such further relief as may be just and proper under the circumstances.

*(remainder of page intentionally left blank)*

Dated: June 6, 2025

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/  Judith Elkin

Judith Elkin, Esq. (TX Bar No. 06522200)
Maxim B. Litvak, Esq.  (TX Bar No. 24002482)
Theodore S. Heckel, Esq. (admitted *pro hac vice*)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile: (713) 691-9407
Email:  jelkin@pszjlaw.com
          mlitvak@pszjlaw.com
          theckel@pszjlaw.com

  - and -

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Shirley S. Cho, Esq. (admitted *pro hac vice*)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email: bsandler@pszjlaw.com
          rfeinstein@pszjlaw.com
          scho@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I certify that on June 6, 2025, a true and correct copy of the foregoing was caused to be served by this Court's CM/ECF to all parties that are registered to receive such notice in the above cases.

/s/ Judith Elkin

Judith Elkin