## Exhibit A

## Amended Disclosure Statement

**ROPES & GRAY LLP**

Ryan Preston Dahl (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**

Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email:  chris.dickerson@ropesgray.com
          rahmon.brown@ropesgray.com
          michael.wheat@ropesgray.com

**FOLEY & LARDNER LLP**

Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: honeil@foley.com
          sajones@foley.com
          zzahn@foley.com

*Counsel to the Debtors*          *Co-Counsel to the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Jointly Administered) |

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC

**DISCLOSURE STATEMENT FOR THE**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF HOOTERS OF AMERICA, LLC AND ITS AFFILIATED DEBTORS**

**THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

(8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY JULY 21, 2025, AT 4:00 P.M. (CENTRAL TIME) (THE "**VOTING DEADLINE**").

THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS THE FIRST DATE OF THE HEARING TO APPROVE THE DISCLOSURE STATEMENT, WHICH WAS JUNE 6, 2025 (THE "**VOTING RECORD DATE**").

A HEARING TO CONSIDER CONFIRMATION OF THE PLAN AND FINAL APPROVAL OF THIS DISCLOSURE STATEMENT (THE "**COMBINED HEARING**") WILL BE HELD BEFORE THE HONORABLE SCOTT W. EVERETT, UNITED STATES BANKRUPTCY JUDGE, VIRTUALLY, TELEPHONICALLY, AND VIA WEBEX, ON JULY 29, 2025, AT [●] [●].M. (CENTRAL TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.  THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE JULY 21, 2025 AT 4:00 P.M.  (CENTRAL TIME).

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**. THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

SECURITIES LAW NOTICES: NEITHER THIS DISCLOSURE STATEMENT NOR THE MOTION SEEKING APPROVAL THEREOF CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.

THE OFFERING, ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF THE NEW EQUITY INTERESTS TO HOLDERS OF ALLOWED SECURITIZATION NOTE CLAIMS AND THE HOLDERS OF ALLOWED NON-SECURITIZATION MANAGER ADVANCE TERM LOAN CLAIMS SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, EXCEPT WITH RESPECT TO ANY NEW EQUITY INTERESTS ISSUED TO AN ENTITY THAT IS AN "UNDERWRITER" WITH RESPECT TO SUCH NEW EQUITY INTERESTS, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, WHICH SHALL BE ISSUED IN RELIANCE UPON SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER AND ON EQUIVALENT STATE LAW REGISTRATION EXEMPTIONS OR, SOLELY TO THE EXTENT SUCH EXEMPTIONS ARE NOT AVAILABLE, OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT.

ALTHOUGH THE FOREGOING EQUITY SECURITIES ISSUED PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE AS CONTEMPLATED BY THE PLAN GENERALLY WILL BE FREELY TRANSFERABLE UNDER THE SECURITIES ACT BY THE RECIPIENTS THEREOF, THEY WILL BE SUBJECT TO: (I) RESTRICTIONS THAT MAY BE APPLICABLE TO ANY PERSON RECEIVING SUCH SECURITIES, THAT IS, OR WITHIN NINETY (90) DAYS OF SUCH TRASFER HAS BEEN, AN "AFFILIATE" OF THE ISSUER (AS DEFINED IN RULE 144(A)(1) IN THE SECURITIES ACT), AS DETERMINED IN ACCORDANCE WITH APPLICABLE U.S. FEDERAL SECURITIES LAWS AND REGULATIONS OR IS OTHERWISE AN "UNDERWRITER" AS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE AND (II) THE RESTRICTIONS, IF ANY, ON THE TRANSFERABILITY THEREOF IN THE SHAREHOLDERS AGREEMENT, IF ANY, AND THE NEW ORGANIZATIONAL DOCUMENTS.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE OFFERING, ISSUANCE, AND DISTRIBUTION OF THE NEW DEBT PURSUANT TO <u>ARTICLE II</u> AND <u>ARTICLE III</u> OF THE PLAN AND, WHERE APPLICABLE, IN ACCORDANCE WITH THE TERMS OF THE CONFIRMATION ORDER, SHALL BE EXEMPT FROM, AMONG OTHER THINGS, THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT AND ANY OTHER APPLICABLE UNITED STATES OR STATE SECURITIES LAWS PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION EXEMPTIONS OR, SOLELY TO THE EXTENT SUCH EXEMPTIONS ARE NOT AVAILABLE, OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT. ACCORDINGLY, THE NEW DEBT, AND ANY NEW EQUITY INTERESTS ISSUED PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT, IF ANY, WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OR RULE 144A OF THE SECURITIES ACT, AND SUBJECT, FURTHER, TO ANY RESTRICTIONS ON TRANSFERABILITY THEREOF INCLUDED IN THE NEW NOTES DOCUMENTS, THE SHAREHOLDERS AGREEMENT, IF ANY, AND THE NEW ORGANIZATIONAL DOCUMENTS, AS APPLICABLE.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE

ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT, AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "CONTINUE," OR THE NEGATIVES THEREOF, AS WELL AS ANY SIMILAR OR COMPARABLE LANGUAGE.  FORWARD-LOOKING STATEMENTS ARE INHERENTLY SPECULATIVE, AND ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL HEREIN.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND WIND-DOWN ENTITY, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................ 1
    A.    Background and Overview of the Plan .......................................................... 2
    B.    Restructuring Support Agreement ................................................................. 7
    C.    DIP Claims and Exit Facility ....................................................................... 9

II. OVERVIEW OF THE DEBTORS' OPERATIONS AND PREPETITION EVENTS
LEADING TO THE CHAPTER 11 FILING ................................................................... 9
    A.    The Debtors' Business Operations .............................................................. 9
    B.    The Debtors' Corporate Structure ............................................................. 10
    C.    Prepetition Capital Structure ..................................................................... 10
    D.    Events Leading to Commencement of the Chapter 11 Cases..................... 15

III. OVERVIEW OF THE CHAPTER 11 CASES........................................................... 18
    A.    Commencement of Chapter 11 Cases ....................................................... 18
    B.    First Day Motions ...................................................................................... 18
    C.    Procedural Motions.................................................................................... 19
    D.    Retention of Chapter 11 Professionals ..................................................... 20
    E.    Appointment of Creditors' Committee ...................................................... 20
    F.    Claims Bar Dates ....................................................................................... 20
    G.    Exclusivity ................................................................................................. 20
    H.    Executory Contracts and Unexpired Leases .............................................. 21
    I.    Landlord Negotiations ............................................................................... 21
    J.    LAGS Royalties ........................................................................................ 21

IV. SUMMARY OF THE PLAN ................................................................................... 21
    A.    General........................................................................................................ 21
    B.    Administrative Claims and Priority Claims............................................... 22
    C.    Classification and Treatment of Claims and Interests ............................... 25
    D.    Means for Implementation of the Plan ...................................................... 34
    E.    Treatment of Executory Contracts and Unexpired Leases ....................... 44
    F.    Provisions Governing Distributions .......................................................... 47
    G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .............. 54
    H.    Settlement, Release, Injunction, and Related Provisions .......................... 58
    I.    Conditions Precedent to Consummation of the Plan ................................. 64
    J.    Modification, Revocation, or Withdrawal of the Plan................................ 67
    K.    Retention of Jurisdiction............................................................................ 68
    L.    Miscellaneous Provisions .......................................................................... 71

V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN........ 73
    A.    Continuation of the Chapter 11 Cases ...................................................... 73
    B.    Liquidation under Chapter 7 ...................................................................... 74

VI. CERTAIN SECURITIES LAW MATTERS ............................................................ 74
    A.    Section 1145 of the Bankruptcy Code ...................................................... 75
    B.    Section 4(a)(2) of the Securities Act ......................................................... 76

VII. CERTAIN TAX CONSEQUENCES OF THE PLAN.............................................. 78
    A.    Consequences to Debtors........................................................................... 79
    B.    Consequences to Holders of Certain Claims ............................................. 81
    C.    Withholding on Distribution and Information Reporting........................... 86

VIII. VOTING PROCEDURES AND REQUIREMENTS .......................................................... 86
    A.    Voting Agent ............................................................................................... 86
    B.    Voting Deadline .......................................................................................... 87
    C.    Form, Content, and Manner of Notices ..................................................... 87
    D.    Voting and Tabulation Procedures ........................................................... 93
    E.    Further Information, Additional Copies ..................................................... 98
IX. RISK FACTORS TO CONSIDER BEFORE VOTING ...................................................... 99
    A.    General ......................................................................................................... 99
    B.    Factors Relating to the Debtors' Business Operations and Financial Condition ........ 99
    C.    Certain Bankruptcy Law Considerations .................................................. 101
    D.    Factors Relating to Securities to Be Issued .............................................. 102
    E.    Factors Related to the DIP Facility, the Exit Facility, and the Restructuring Support
        Agreement ................................................................................................... 104
    F.    Additional Factors ..................................................................................... 105
X. CONFIRMATION OF THE PLAN ................................................................................... 106
    A.    Acceptance of the Plan ............................................................................. 106
    B.    Best Interests Test ..................................................................................... 107
    C.    Feasibility ................................................................................................... 108
    D.    Valuation .................................................................................................... 109
    E.    Notice and Combined Hearing ................................................................. 109
XI. CONCLUSION AND RECOMMENDATION ................................................................... 108

EXHIBIT A:  Plan
EXHIBIT B:  Restructuring Support Agreement
EXHIBIT C:  Debtors' Organizational Structure
EXHIBIT D:  Financial Projections
EXHIBIT E:  Liquidation Analysis
EXHIBIT F:  Valuation Analysis

# I.     INTRODUCTION

Hooters of America, LLC and certain of its affiliates, as debtors and debtors in possession (the "**Debtors**" and, together with their non-Debtor affiliates, "**Hooters**" or the "**Company**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "**Disclosure Statement**") to certain holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* dated June 16, 2025 (as may be amended, supplemented, or modified from time to time, the "**Plan**"),[2] a copy of which is annexed to this Disclosure Statement as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor.

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises holders of Claims and Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and should be confirmed.

By Order dated [●], 2025 [Docket No. [●]] (the "**Conditional Disclosure Statement Order**"), the Bankruptcy Court conditionally approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code.  The Debtors will seek final approval of this Disclosure Statement at the Combined Hearing.  The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS.  THEREFORE, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, BY AND AMONG THE DEBTORS, THE PREPETITION LENDERS, THE CONSENTING AHG NOTEHOLDERS, AND THE BUYER GROUP, THE PLAN IS CURRENTLY SUPPORTED BY EACH OF THE PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT.**

---

[2]    Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or as the context otherwise requires.  The summary provided in this Disclosure Statement of any documents attached to the Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistences between the terms of this Disclosure Statement and the Plan, the Plan shall govern.

A.    <u>**Background and Overview of the Plan**</u>[3]

The Plan encompasses a comprehensive restructuring of the Debtors, which is the product of the Debtors' arm's-length negotiations and an agreement with (i) certain holders of indebtedness arising under (x) the Amended and Restated Base Indenture (the "**Prepetition Securitization Indenture**"), dated August 19, 2021 by and between HOA Funding, LLC as the master issuer and Citibank, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee (the "**Prepetition Securitization Trustee**", and such holders forming the Ad Hoc Group the "**Consenting AHG Noteholders**" and such holders with the same investment advisor as the DIP Lenders, the "**DIP Noteholders**"), (y) the Prepetition MA Credit Agreement, and (z) the Prepetition Term Loan Credit Agreement (such holders, the "**Prepetition Lenders**") and (ii) Hooters, Inc. and Hoot Owl Restaurants, LLC (collectively, the "**Buyer Group**").

The transactions contemplated in the Plan will maximize value and allow for the Debtors' business to reorganize with a substantially reduced debt load and increase their cash flow on a go-forward basis.  Specifically, the proposed restructuring contemplates, among other things:

- Consummation of a sale transaction with the Buyer Group pursuant to the Plan, which shall comprise of (i) the Buyer Group acquiring a portfolio of 103 Debtor-owned stores, and (ii) a wind down process for the remaining Debtor-owned stores (the "**Unallocated Stores**") pursuant to terms mutually agreed upon by the Debtors, DIP Lenders, and Consenting Creditors;

- With respect to the Securitization Entities:

    - The renaming of [HOA Funding, LLC] as "RoyaltyCo, LLC" ("**RoyaltyCo**") whose subsidiaries will continue to own the intellectual property and collect RoyaltyCo's shares of royalty and revenues from licenses and franchise agreements and payments from all franchised stores, in accordance with the reorganized membership agreement to be included in the Plan Supplement;

    - The issuance of New Class A-2I Notes to Holders of Securitization Class A-2 Note Claims;

    - The issuance of New Class B Notes to Holders of Securitization Class B Note Claims;

- With respect to the Non-Securitization Entities and RoyaltyCo:

    - The conversion of the DIP Facility into New Class A-1 Notes;

    - The issuance of New Class A-2II Notes to Holders of certain Non-Securitization Manager Advance Term Loan Claims;

---

[3]    **This overview is qualified in its entirety by reference to the Plan**.  The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

- The Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable;

- The acquisition of 50% of the equity interests in RoyaltyCo by Holders of certain Non-Securitization Manager Advance Term Loan Claims, with the remaining 50% of the equity interest in RoyaltyCo (the "**Noteholder Equity Entitlement**") to be allocated among the Holders of Securitization Class B Notes Claims on a pro rata basis in accordance with their respective holdings of the Securitization Class B Notes Claims;

- The creation of a new entity ("**Brand Management Co.**") to be owned by the Buyer Group, which either directly or through a subsidiary will oversee all brand-related, franchising-related, and management-related functions as specified in the definitive agreement and further detailed in the Plan Supplement; and

- Subject to the Wind-Down Budget and terms of the Plan, the orderly wind down of the Debtors' estates, including the Unallocated Stores on terms mutually agreed upon by the DIP Lenders, the Debtors, and the Consenting Creditors as detailed in the Plan Supplement.

**In the event the Debtors proceed to confirmation under a different structure than currently contained in the Plan, Holders of Claims or Interests could receive different forms of consideration than currently contemplated under the Plan. Pursuant to Bankruptcy Rule 3019, and subject to the terms of the Restructuring Support Agreement, the Debtors may proceed to confirmation under such a modified Plan without resoliciting votes on the Plan so long as the modified Plan does not adversely change the treatment of the Claim or Interest of any Holder thereof. If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not adversely change the treatment of the Claim or Interest of any Holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all Holders of Claims or Interests who have previously accepted the Plan. For the avoidance of doubt, any and all rights of Holders of Claims against the Debtors or Interests in the Debtors are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.**

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan:

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 1<br><br>Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such Holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: 100% |
| 2<br><br>Securitization Class A-2 Note Claims | Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, New Class A-2I Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Note Claims are Allowed in full. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●] % |
| 3<br><br>Securitization Class B Note Claims | On or after the Effective Date, each holder of Securitization Class B Notes will receive (i) its Pro Rata share of the Noteholder Equity Entitlement and (ii) New Class B Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●] % |

---

[4]    Recoveries are based on a total enterprise value of approximately $[●] for the Debtors, together with their non-debtor affiliates.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 4<br><br>Non-Securitization Manager Advance Term Loan Claims | Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued by RoyaltyCo, which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests. | Impaired<br><br>**Entitled** to Vote | Estimated Allowed Amount: $[●]<br><br>Estimated Percentage Recovery: [●]% |
| 5<br><br>Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 6<br><br>Non-Securitization Term Loan Claims (Secured) | Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, each such Holder shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |
| 7<br><br>Securitization Manager Advance Claims | Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in Article II.B of the Plan shall be in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Class 7 Securitization Manager Advance Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 8<br><br>General Unsecured Claims | On the Effective Date, General Unsecured Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of General Unsecured Claims shall not receive any distribution on account of such Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 9<br><br>Other Intercompany Claims | On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each Allowed Other Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[4] |
|---|---|---|---|
| 10<br><br>Intercompany Interests | On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 11<br><br>Securitization Prepetition Master Issuer Equity Interests | On the Effective Date, Securitization Prepetition Master Issuer Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Securitization Prepetition Master Issuer Equity Interests on account of such Interests. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |
| 12<br><br>Other Securitization Prepetition Equity Interests | On the Effective Date, Other Securitization Prepetition Equity Interests shall continue in full force and shall not be impaired. | Unimpaired<br><br>**Not Entitled** to Vote (Presumed to Accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 100% |
| 13<br><br>Prepetition Non-Securitization Equity Interests | On the Effective Date, Non-Securitization Prepetition Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Non-Securitization Prepetition Equity Interests on account of such Interests. | Impaired<br><br>**Not Entitled** to Vote (Deemed to Reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

## B.    Restructuring Support Agreement

In connection with negotiation of the Restructuring Transactions, the Debtors entered into the *Restructuring Support Agreement*, dated as of March 31, 2025 (as amended from time to time, the "**Restructuring Support Agreement**"), a copy of which is annexed hereto as **Exhibit B**, with the Buyer Group and holders of approximately (i) 100% of the aggregate outstanding principal amount of Non-Securitization Manager Advance Term Loan Claims; (ii) 100% of the aggregate outstanding principal amount of the Non-Securitization Term Loan Claims (Secured), and (iii) 94% of the aggregate outstanding principal amount of the Securitization Notes Claims.

The Restructuring Support Agreement provides that the signatories thereto will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions set forth therein.  In addition, pursuant to the Restructuring Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan and to be subject to certain milestones which, if not achieved, enable the Required Consenting Creditors to terminate the Restructuring Support Agreement.  The relevant milestones to be achieved include:[5]

(a)     entry of the Interim DIP Order no later than two (2) business days after the Petition Date;

(b)     filing of the Plan and accompanying Disclosure Statement in form and substance acceptable to the Required DIP Lenders and Required AHG Noteholders no later than ten (10) calendar days after the Petition Date;[6]

(c)     the Company Parties and Buyer Group shall have entered into the Buyer Group Arrangements and any other Buyer Group Documents necessary to effectuate the Buyer Group Arrangements no later than twenty-eight (28) calendar days after the Petition Date;[7]

(d)     entry of the Final DIP Order no later than thirty-five (35) calendar days after the Petition Date;[8]

(e)     the Bankruptcy Court shall hold a hearing to consider conditional approval of the adequacy of the Disclosure Statement no later than forty (40) calendar days after the Petition Date;[9]

(f)     the Debtors shall commence solicitation of votes on the approved plan no later than forty (40) calendar days after the Petition Date;[10]

(g)     the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of

---

[5]   The Milestones may be extended from time to time in accordance with the Restructuring Support Agreement.

[6]   The deadline for filing the Plan, Disclosure Statement, and definitive documents was extended by the consent of the Requisite Consenting Creditors to May 6, 2025.

[7]   The deadline for entry into the Buyer Group Arrangements was extended by the consent of the Requisite Consenting Creditors to June 16, 2025.

[8]   The deadline for entry of the Final DIP Order was extended by the consent of the Requisite Consenting Creditors to May 16, 2025.

[9]   Per the *Debtors' Motion for Entry of Order (I) Scheduling a Combined Hearing on (A) Adequacy of Disclosure Statement on a Final Basis and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation and Voting Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status; (IV) Conditionally Approving the Disclosure Statement, and (V) Granting Related Relief*, filed contemporaneously herewith (the "**Scheduling Motion**"), the deadline for the conditional hearing on the adequacy of the Disclosure Statement was extended by the consent of the Requisite Consenting Creditors to seventy-nine (79) days.

[10]  Per the Scheduling Motion, the deadline for the commencement of solicitation of votes was extended by the consent of the Requisite Consenting Creditors to eighty (80) days.

the approved plan, no later than seventy-five (75) calendar days after the Petition Date;[11]

(h)     occurrence of the plan effective date no later than eighty (80) calendar days following the Petition Date (the "**Outside Date**"); provided, however, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional 15 calendar days with the written consent of the Required DIP Lenders in consultation with the Required Consenting AHG Noteholders; provided that any additional extension of the Outside Date requires the written consent of both the Required DIP Lenders and the Required AHG Noteholders.[12]

The Debtors' Special Committee (as defined herein) reviewed and approved the Restructuring Support Agreement, as well as the Plan, and this Disclosure Statement.

### C.     DIP Claims and the New Notes

As set forth in further detail herein and in the term sheet annexed to the Restructuring Support Agreement as **Exhibit 1**, the Plan contemplates the DIP Facility shall be converted into senior-secured first-lien, first-out notes in the aggregate principal amount of up to $40,000,000, reflecting the sum of the Roll-Up and the total new-money component actually funded and outstanding as a Manager Advance under the DIP Facility as of the Plan Effective Date, *plus* accrued and unpaid interest. The New Notes will be issued by RoyaltyCo and will be secured by a first lien on substantially all of the assets of RoyaltyCo and the reorganized Securitization Entities. The New Notes will bear interest at a rate of Prime + 3.00%. Additional details with respect to the New Notes will be set forth in the definitive documents to be included in the Plan Supplement.

## II.     OVERVIEW OF THE DEBTORS' OPERATIONS AND PREPETITION EVENTS LEADING TO THE CHAPTER 11 FILING

### A.     The Debtors' Business Operations

The "Hooters" brand has grown from its origins in 1983 into a renowned American institution known for world-famous chicken wings, beverages, live sports, and legendary hospitality. Through company-owned and franchised locations, the Debtors offer a relaxing, fun dining experience that distinguishes itself from other competitors by placing strong emphasis on personal service and customer enjoyment.

Hooters restaurants can be found across the United States and in 17 countries across the globe. The Debtors directly own and operate 151 traditional sit-down Hooters restaurants and

---

[11]   Per the Scheduling Motion, the deadline for the combined hearing on the adequacy of the Disclosure Statement and confirmation of a chapter 11 plan was extended by the consent of the Requisite Consenting Creditors to one-hundred and twenty-one (121) days.

[12]   Per the Scheduling Motion, the deadline for the Outside Date was extended by the consent of the Requisite Consenting Creditors to one-hundred and twenty-eight (128) days.

maintain 154 franchisee locations.  The Debtors also maintain franchised "Hoots" locations, which are modern, fast-casual wings-to-go restaurants.

As of the Petition Date, the Debtors' labor force consists of approximately 5,957 employees, including 1,945 full-time employees and 4,012 part-time employees.  The Debtors' corporate headquarters are in Atlanta, Georgia.

The Debtors' revenue primarily derives from two business segments: its company-owned stores and the franchise and license agreements.  In the company-owned stores, the Debtors generate revenue from daily restaurant receipts.  In the franchise agreements, the Debtors collect certain franchise fees and royalties from its franchised locations in exchange for providing certain services to the franchisees.  The Debtors are also party to a licensing agreement with a major food products licensor to offer Hooters-branded frozen meals at 1,250 grocery store locations.

The Debtors have experienced a sharp decline in their profitability due to inflationary pressures, industry headwinds, and capital structure overhang.  In 2024, the Debtors proactively began assessing and addressing initiatives to improve its operating performance.  Around the same time, the Debtors engaged Ropes & Gray LLP and Accordion Partners, LLC ("**Accordion**") to assist with restructuring initiatives and prepare for a potential transaction to address the financial challenges.  Shortly thereafter, the Debtors engaged SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (collectively, "**SOLIC**") to assess and advise the Debtors on a range of strategic alternatives.

As further detailed below, the Debtors' balance sheet includes approximately $376 million of funded debt, consisting of approximately $13.4 million in principal amounts outstanding under the Prepetition MA Credit Agreement (as defined below), $56.0 million outstanding principal amounts outstanding under the Prepetition Term Loan Credit Agreement (as defined below), and $306.6 million in principal amounts outstanding under the Prepetition Securitization Indenture (as defined below).

### B.      The Debtors' Corporate Structure

A chart summarizing the Debtors' capital and corporate organization structure, as of the date hereof, is annexed hereto as **Exhibit C**.  As set forth on **Exhibit C**, each of the Debtors is a direct or indirect subsidiary of Hawk Parent, LLC ("**Hawk Parent**"), and is organized under either Delaware, Georgia, Florida, Kansas, or Texas law.  The board of managers of Hawk Parent, HOA Holdings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, and Hooters of America, LLC has delegated decision-making authority with respect to the Debtors' restructuring process to a special committee of a disinterested manager, Adam Paul.

### C.      Prepetition Capital Structure

#### 1.      Indebtedness

As of the Petition Date, the Debtors' prepetition capital structure included approximately $376 million in funded debt.  The Debtors' funded debt obligations (the "**Obligations**") are summarized below, and are comprised of, on a non-consolidated basis, prepetition secured debt

against the Non-Securitization Entities and prepetition secured debt against the Securitization Entities:[13]

| | As of Petition Date: Debt Instrument (Aggregate Principal) | Funded Debt ($ millions) | |
|---|---|---|---|
| **Non-Securitization** | Prepetition MA Credit Agreement | | |
| | *Manager Advance Loans* | $ 8.4 | |
| | *Amendment No. 1 Loans* | $ 5.0 | |
| | Prepetition Term Loan Credit Agreement | $ 56.0 | |
| **Securitization** | Prepetition Securitization Indenture | | |
| | *Class A-2 Notes* | $ 266.6 | |
| | *Class B Notes* | | 40.0 |
| | **Total Secured Debt** | **$ 376.0** | |

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.

(a)     Securitization Debt

(i)     Prepetition Securitization Indenture

On August 19, 2021, HOA Funding, LLC, as master issuer, entered into that certain Amended and Restated Base Indenture, by and among the Master Issuer and the Prepetition Securitization Trustee.  Under the Prepetition Securitization Indenture, the Master Issuer issued two series of notes on August 19, 2021: (i) $275,000,000 of Class A-2 senior secured notes and (ii) $40,000,000 of junior subordinated notes (collectively, the "**Securitization Notes**").

As of the Petition Date, approximately $267 million of Class A-2 Notes and $40 million of Class B Notes in principal remain outstanding, in addition to amounts owing from accrued and unpaid interest.

From time to time, in the ordinary course of business, Hooters of America, LLC, in its capacity as manager of the Securitization Entities (the "**Prepetition Manager**"), advances funds (the "**Manager Advances**") to, and on behalf of, the Securitization Entities in connection with the operation of the assets securitized pursuant to the Prepetition Securitization Indenture.  The

---

[13]     As detailed below, certain Debtors are not obligors with respect to the funded debt balances presented here.

Securitization Entities are obligated to reimburse such Manager Advances on a priority basis as provided in that certain Amended and Restated Management Agreement, dated as of August 19, 2021, by and among the Securitization Entities, the Prepetition Manager, and the Prepetition Securitization Trustee (as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time).   Other than limited recourse for breach of certain representations, warranties, and covenants, recourse under the Securitization Notes is limited to the assets of the Securitization Entities, and there is no cross-collateralization with the Prepetition Credit Agreements.   The Prepetition Manager's priority right to reimbursement of the Manager Advances (the "**Repayment Right**") is part of the Prepetition Lenders' collateral under the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement.

The Prepetition Securitization Indenture, among other things, lays out a 30-step payment waterfall for application of funds the Securitization Entities receive from the operation of company-owned stores and franchised restaurants.   Under the payment waterfall, certain fixed expenses to operate the Securitization Entities are given priority.   In particular, payments to Hooters of America, LLC to reimburse Manager Advances are first in the payment waterfall. Payment of the Prepetition Manager's management fee is fourth.   In respect of payments to noteholders, the Class A-2 Notes interest payments are sixth in the payment waterfall, while the Class B Notes interest payments are eighth.   The Class A-2 Notes amortization payments are tenth and fourteenth.   Amortization payments for the Class B Notes are twentieth and twenty-first.   The Master Issuer's right to dividend proceeds is the last step of the payment waterfall.

As of the Petition Date, the Prepetition Manager has claims against the Securitization Entities for reimbursement of an aggregate amount of not less than $28,338,913 for prepetition Manager Advances, which amounts (plus accrued and unpaid interest thereon) remain outstanding and collectively comprise the Securitization Manager Advance Claims.   The Debtors do not dispute (i) the amount or validity of the prepetition Manager Advances as described in the preceding sentence, (ii) the Prepetition Manager's right to reimbursement of any Manager Advances, *plus* all additional amounts and other obligations under the DIP Facility extended during the pendency of these Chapter 11 Cases in accordance with the Approved Budget, together with accrued and unpaid interest, fees and other charges and expenses, or (iii) that such amount benefits from the Existing Securitization Indenture's Waterfall with the Manager's Repayment Right being pledged as part of the Prepetition Loan Collateral and the DIP Collateral. Notwithstanding anything to the contrary herein, solely upon consummation of the Plan, (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Plan as Non-Securitization Manager Advance Term Loan Claims which shall be converted to New Class A-2II Notes on the payment priority set forth in the Waterfall, and (b) any remaining claimed Non-Securitization Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo as set forth in the Restructuring Support Agreement.

The Securitization Notes are secured by substantially all of the assets of the Securitization Entities arising from that certain Amended and Restated Guarantee and Collateral Agreement, dated as of August 19, 2021, by and among HOA Systems, LLC, HOA Holdco, LLC, HOA Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOOTS Restaurant

Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HI Limited Partnership, HOA IP GP, LLC, HOA Franchising, LLC, HOOTS Franchising, LLC and Citibank, N.A., as Trustee.

(b) <u>Non-Securitization Debt</u>

(i) Prepetition Term Loan Credit Agreement

On March 9, 2022, Hawk Parent, as the borrower, the Subsidiary Guarantors, XYQ Cayman Ltd. as Initial Lender (the "**Term Loan Lender**"), and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent (in such capacity, the "**Term Loan Agent**") entered into that certain Credit Agreement dated March 9, 2022 (as amended by that certain First Amendment to the Credit Agreement, dated November 14, 2022, that certain Second Amendment to the Credit Agreement, dated as of December 27, 2022, that certain Third Amendment to the Credit Agreement, dated April 3, 2023, that certain Fourth Amendment to the Credit Agreement, dated April 20, 2023, that certain Fifth Amendment to the Credit Agreement, dated January 10, 2024, that certain Limited Waiver, Consent and Sixth Amendment to the Credit Agreement, First Amendment to the Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of June 24, 2024, that certain Limited Waiver, Consent and Seventh Amendment to Credit Agreement and Reaffirmation of Loan Documents, dated as of August 16, 2024, that certain Limited Waiver, Consent and Eighth Amendment to Credit Agreement, Second Amendment to Collateral Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date).

Pursuant to the Prepetition Term Loan Credit Agreement, the Term Loan Lender made term loans (the "**Term Loans**") in the aggregate principal amount of $70,000,000 to Hawk Parent. The Term Loans under the Prepetition Term Loan Credit Agreement have a maturity date of March 9, 2027, and bear interest at a rate of 10.5%. Collateral securing obligations under the Prepetition Term Loan Credit Agreement consists of substantially all assets of the Loan Parties (as defined in the Prepetition Term Loan Credit Agreement), including the right to reimbursement of the Manager Advances. As of the Petition Date, approximately $56 million of principal remains outstanding under the Term Loans, in addition to amounts owing from accrued and unpaid interest and fees.

(ii) Prepetition MA Credit Agreement

On September 27, 2024, the Loan Parties (as defined in the Prepetition MA Credit Agreement), Celtic Master Fund LP (the "**Manager Advance Lender**") as Initial Lender and U.S. Bank and Trust Company, National Association as collateral agent and calculation agent (in such capacity, the "**Manager Advance Agent**") entered into that certain Credit Agreement (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025, by and among the Loan Parties (as defined in the Prepetition MA Credit Agreement), the Manager Advance Lender and the Manager Advance Agent, as further amended, amended and restated, supplemented or otherwise modified from time to time). Pursuant to the Prepetition MA Credit Agreement, the Manager Advance Lender made an initial term loan in the aggregate principal amount of $8,386,877 (the

13

"**Manager Advance Loan**"), which funds were used as a Manager Advance to fund the expenses of the Securitization Entities.

On February 21, 2025, the parties entered into the Incremental Loan, pursuant to which (i) the Manager Advance Lender (a) provided a $5 million loan (the "**Incremental Loan**") under the Prepetition MA Credit Agreement and (b) agreed to waive certain requirements under the Prepetition MA Credit Agreement; and (ii) the Loan Parties (as defined in the Prepetition MA Credit Agreement) agreed to certain milestones.  The funds advanced pursuant to the Prepetition MA Credit Agreement were secured on a *pari passu* basis with the Term Loans under the Prepetition Term Loan Credit Agreement and secured by substantially all assets of the Loan Parties (as defined in the Prepetition MA Credit Agreement), including the Repayment Right.  The additional liquidity provided by the Prepetition Lenders to the Company allowed the Company to continue operating as a going concern while it finalized negotiations with the parties to the Restructuring Support Agreement regarding the terms of the transactions contemplated thereunder.

As of the Petition Date, approximately $13.4 million of principal remains outstanding under the Prepetition MA Credit Agreement, in addition to amounts owing from accrued and unpaid interest and fees.

(iii)    Intercreditor Agreement

On September 27, 2024, the Term Loan Agent, the Manager Advance Agent, Hawk Parent, and the guarantors party thereto entered into that certain Pari Passu Intercreditor Agreement, which provides that obligations under the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement are equal in priority with respect to the collateral shared between the two facilities.

(c)    <u>Intercompany Transactions</u>

As is customary for a company of Hooters' size and scale, the Debtors are party to a series of ordinary-course formal and informal relationships with each other.  Certain of the Company's intercompany transactions result in various intercompany balances, claims, and obligations.  The primary intercompany transactions giving rise to intercompany claims are cash receipt activities, disbursement activities, and expense allocations.  Historically, intercompany claims are not settled by actual transfers of cash among the Debtors.  Instead, the Debtors track all intercompany transactions in their accounting system, and concurrently record them on the applicable Debtors' balance sheets.  The Debtors' accounting system requires that all general-ledger entries be balanced at the legal entity-level.  The Debtors continue to track intercompany transactions on a postpetition Debtor-by-Debtor basis.

**2.**    **Trade Claims and Other Unsecured Debt**

In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, critical vendors.  As of the Petition Date, the Debtors estimate they have approximately $26.3 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9) of the Bankruptcy

Code, as well as claims that give rise to statutory constructive trusts under the Perishable Agricultural Commodities Act of 1930 or the Packers and Stockyards Act of 1921).

### D. Events Leading to Commencement of the Chapter 11 Cases

As detailed herein, these Chapter 11 Cases arose due to several factors that affected the Company's performance and liquidity and led to the need to substantially alter the Company's operating model, close underperforming stores, and reduce and simplify corporate overhead and infrastructure. Accordingly, the Debtors have determined that seeking relief under chapter 11 and continuing their efforts to implement value-maximizing transactions pursuant to the Bankruptcy Code's protections and procedures is the best approach for the Debtors to maximize value for all stakeholders.

### 1. Inflationary Pressures and Industry Headwinds

Inflationary pressures across various sectors have negatively impacted the Company's performance and financials. In particular, increases in the cost of labor and commodities in recent years have raised the cost of "dining out," a cost which the Company has borne directly with respect to the company-owned Stores and has been unable to fully negate through top-line growth. Like many other similarly situated casual dining restaurants, the Company's performance is acutely impacted by consumer preferences. As inflationary pressures have made consumers increasingly cost-conscious, preferences for casual out-of-home dining experiences began to shift to more cost-efficient alternatives. As a result, the Company began facing an increasingly tight liquidity crunch at the same time that it most needed cash reserves to adapt to industry-wide changes. This strain on the Company's liquidity has inhibited the Company from making certain key capital and other expenditures for the purposes of operational improvement, including expenditures related to restaurant maintenance and refurbishments, employee training, and menu updates, which has further adversely affected the Company's performance and financial health. The Company's lagging performance paired with the difficult macroeconomic environment have also forced the Company to close certain of the company-owned stores across various locations, exposing the Company to various litigation risks related thereto, including with respect to lease obligations.

### 2. Capital Structure Overhang

These operational challenges have, in turn, hampered the Company's ability to meet its funded debt obligations, as critical funds were used to cover operating losses. As of the Petition Date, the Company's debt balance totaled approximately $376 million. In 2024, the Company owed $30,942,066 in debt service payments. The Company previously estimated that debt-service payments for 2025 under its then-current capital structure would total approximately $19 million. The substantial size of the Company's debt-service obligations has put significant pressure on the business. The Company's capital structure is further burdened by the approximately $353,000 average monthly payments it allegedly owes on account of the Legacy Royalty Obligations (as defined below).

### 3.    Prepetition Restructuring Efforts

(a)    <u>Prepetition Operational Initiatives</u>

Prior to the filing of these Chapter 11 Cases, the Company took several actions to improve its operating performance.  Since the beginning of 2024, the Company has identified and since closed 48 underperforming company-owned stores in order to streamline its business and improve its financial performance.  The Company initiated a guest-obsessed training program for all staff and managers at its remaining locations, which has produced meaningful improvements in customer experience.  Prior to the Petition Date, the Company began an aggressive pursuit of retail partnerships, and in 2024 entered into a licensing agreement with a major grocery store chain to offer shoppers Hooters-branded frozen meal products at approximately 1,250 grocery stores around the United States.

(b)    <u>Engagement of Restructuring Advisors</u>

The Debtors engaged Ropes & Gray LLP and Accordion in June 2024 to, among other things, advise the Company with respect to prepetition restructuring initiatives, assist in the Company's operational and strategic analyses, engage with the Company's creditors, vendors, customers, and other parties in interest, prepare outreach initiatives and diligence materials for prospective counterparties to a transaction to address the Company's financial challenges, and, if necessary, advise on the Company's preparation of a chapter 11 filing.  Effective June 6, 2024, Keith Maib was appointed as the Company's Chief Restructuring Officer in furtherance of such efforts.  In October 2024, the Company also engaged SOLIC as investment banker to the Company to assess and advise the Company with respect to a wide range of strategic alternatives, prepare a plan for strategic engagement to maximize value for the Company's stakeholders, and develop and prepare materials for a marketing process in furtherance of that plan.

In July 2024, an experienced, independent fiduciary, Adam Paul, was appointed to the boards of managers of Hawk Parent, HOA Holdings, LLC, Owl Restaurant Holdings, LLC, HOA Restaurant Group, LLC, and HOA as an independent manager.  In furtherance of the Company's strategic efforts, Hawk Parent's board of managers established a special committee (the "**Special Committee**") to direct and oversee these efforts, including by granting the Special Committee the authority to approve the filing of the petitions commencing these Chapter 11 Cases, and appointed Mr. Paul as the Special Committee's sole member.

(c)    <u>Financing Efforts and Strategic Engagement</u>

In June 2024, as the Company faced liquidity issues, the Company negotiated with its Prepetition Term Loan Lenders and entered into certain covenants under the Prepetition Term Loan Credit Agreement allowing the Debtors to access and use $2 million previously required to be held in an operating account pursuant to a minimum cash covenant.  In September 2024, the Company negotiated and entered into (i) the Eighth Amendment to the Credit Agreement and (ii) the Prepetition MA Credit Agreement, pursuant to which $8,386,877 held in the restricted cash reserve account under the Prepetition Term Loan Credit Agreement was released to pay down the Term Loan and was simultaneously re-lent by the Manager Advance Lender as the Manager Advance Loan under the Prepetition MA Credit Agreement.  In November 2024, the Company

16

obtained the consent of the requisite percentage of the Noteholders with respect to the Prepetition Securitization Indenture to allow the Debtors to access and use $3,393,995 previously required to be held in an interest reserve account. As a result, the Company obtained access to a total of approximately $13.8 million of cash for use in operations throughout June and September 2024, extending the Company's liquidity runway as it sought long-term strategic alternatives to address its operating challenges.

After exploring various potential pathways, the Debtors ultimately determined to file these Chapter 11 Cases, in an effort to maximize the value of its assets and operations for the benefit of its creditors and all parties in interest. The Debtors sought, and obtained, an additional $5 million Incremental Loan on February 21, 2025, pursuant to the Prepetition MA Credit Agreement. The Incremental Loan provided necessary liquidity to allow the Debtors, the Prepetition Lenders, Consenting AHG Noteholders, and Buyer Group to negotiate and document the Restructuring Support Agreement and obtain a commitment on financing necessary to continue to fund operations prior to the filing of these Chapter 11 Cases.

(d)     Prepetition Marketing Process

In November 2024, the Debtors' proposed investment banker, SOLIC, acting at the direction of the Debtors, commenced formal market outreach with the goal of soliciting proposals for a comprehensive strategic transaction to sell the Debtors' business as a going concern. SOLIC contacted ninety-five (95) potentially interested parties of which thirty-eight (38) parties signed confidentiality agreements. Those thirty-eight (38) parties received the Debtors' confidential information memorandum which included key information with respect to the Debtors' business. The Company also held extensive diligence calls to explain the Company's business trajectory and profile and sought to encourage parties to engage constructively in turn. Of the thirty-eight (38) parties, six (6) parties expressed interest in a comprehensive transaction. Ultimately, the Debtors received formal proposals from three (3) parties. After months of arm's-length, good-faith negotiations, the Debtors determined that the transactions contemplated by the Restructuring Support Agreement are in the best interests of the Debtors and its stakeholders. Throughout these Chapter 11 Cases, the Debtors continued to negotiate with interested parties and evaluate further proposals. The marketing process continued postpetition as further discussed in Article III.K Alternative Proposals hereof.

(e)     Restructuring Support Agreement

In March 2025, after months of good-faith, arm's-length negotiations, the Company determined in its business judgment that the transactions contemplated by the Restructuring Support Agreement are in the best interest of the Company and its stakeholders.

Importantly, the Restructuring Support Agreement provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of a substantial majority of the Company's creditor stakeholders. The transactions contemplated by the Restructuring Support Agreement will enable the Debtors to achieve a three-pronged operational overhaul.

First, the Restructuring Support Agreement provides a non-binding commitment for the

17

sale of certain company-owned stores to the Buyer Group through a chapter 11 plan of reorganization.

Second, by way of the proposed sale transaction, the Restructuring Support Agreement contemplates a transition from a hybrid business model involving both company-owned stores and franchised stores to a pure franchise model. This transition will allow the Company to optimize its business by significantly reducing overhead costs while maximizing revenues from franchisees, an approach which has proven to be more profitable than that of the Company operating stores directly.

Third, the Restructuring Support Agreement provides for the infusion of up to $35 million of new money in the form of the DIP Facility, plus a dollar-for-dollar roll-up of $5 million of the obligations under the Prepetition MA Credit Agreement, which will allow the Company to make necessary expenditures to administer these Chapter 11 Cases. Upon confirmation of the Plan, existing debt will be converted into new notes and equity in the go-forward business that, together with the sale contemplated by the Restructuring Support Agreement, will right-size the Company's balance sheet and provide the way for a profitable go-forward business.

These transactions are made possible by the Restructuring Support Agreement, which presents the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise. The signing of the Restructuring Support Agreement was undertaken only after careful consideration by the Company's management and the Special Committee. Critically, the Debtors' obligations under the Restructuring Support Agreement remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates. Based on the foregoing, the Company believes it has exercised reasonable business judgment in its decision to execute the Restructuring Support Agreement, and that such execution is in the best interest of all parties in interest.

## III.   OVERVIEW OF THE CHAPTER 11 CASES

### A.   Commencement of Chapter 11 Cases

On March 31, 2025 (the "**Petition Date**"), after executing the Restructuring Support Agreement, the Debtors commenced the Chapter 11 Cases. The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.   First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits [Docket No. 93];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 94];

- Continue insurance programs, surety bond programs, and the processing of workers' compensation claims [Docket No. 104];

- Continue the Debtors' customer programs, promotions, and practices [Docket No. 105];

- Pay certain prepetition taxes and assessments [Docket No. 109];

- Pay certain prepetition obligations for critical vendors and holders of 503(b)(9) and PACA/PASA claims, on an interim basis [Docket Nos. 107];

- Reject certain burdensome leases [Docket Nos. 157];

- Establish procedures for future rejection of any additional burdensome leases [Docket Nos. 158];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 106]; and

- Obtain postpetition financing, on an interim basis [Docket No. 98].

**C.** **Procedural Motions**

The Debtors have filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity.  The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

- Employ Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent [Docket No. 108];

- Jointly administer these Chapter 11 Cases [Docket No. 61];

- Extend the time for the Debtors to file their schedules of assets and liabilities, schedule of current income and expenditures, schedules of executory contracts and unexpired leases, statement of financial affairs, as well as Rule 2015.3 Financial Reports [Docket No. 103];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 231]; and

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 232].

### D.    Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.  These professionals include (i) Accordion as financial advisor [Docket Nos. 225; 357]; (ii) SOLIC as investment banker [Docket Nos. 226; 361]; (iii) Ropes & Gray LLP as counsel to the Debtors [Docket Nos. 224; 356]; (iv) Foley & Lardner, LLP as co-counsel to the Debtors [Docket Nos. 223; 355]; (v) Kroll as claims and noticing agent and solicitation agent [Docket Nos. 5; 108]; and (vi) Keen-Summit Capital Partners LLC [Docket Nos. 230; 358].

### E.    Appointment of Creditors' Committee

On April 15, 2025, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the Office of the United States Trustee for Northern District of Texas (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [Docket No. 187], as amended by [Docket No. 189].  The members of the Creditors' Committee are: (a) Firehouse Ltd.; (b) MCB HP Baltimore LLC; (c) Millenium Properties, LLC; (d) PepsiCo Sales, Inc.; and (e) Eduardo Montano.

The Creditors' Committee has retained Pachulski Stang Ziehl & Jones LLP as counsel and Province LLC as its financial advisor.

### F.    Claims Bar Dates

On April 3, the Bankruptcy Court entered an order (the "**Claims Bar Date Order**") [Docket No. 99] approving (i) June 16, 2025 as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Claims Bar Date**"); (ii) September 29, 2025 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) the later of the (a) the General Bar Date or the Governmental Bar Date and (b) the date that is thirty (30) days following service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases (the deadlines established in clauses (i) through (iii), collectively, the "**Bar Dates**").

### G.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Periods currently remain in effect.

### H.    Executory Contracts and Unexpired Leases

As of the Petition Date, the Debtors were parties to approximately 151 unexpired leases of nonresidential real property (the "**Leases**") and approximately 379 executory contracts (the "**Contracts**").  Section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has a period of 120 days after the commencement of the chapter 11 case to assume, assign, or reject unexpired leases of nonresidential real property and executory contracts (the "**Assumption Period**").  Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Assumption Period an additional ninety (90) days.

On the Petition Date, the Debtors filed a motion to reject 36 Leases (the "**Lease Rejection Motion**") [Docket No. 15].  On April 7, 2025, the Bankruptcy Court entered an order granting the Lease Rejection Motion [Docket No. 157].

Additionally, the Debtors filed a motion to implement certain procedures to govern the rejection of Leases and the abandonment of certain surplus, burdensome, or non-core assets in connection therewith (the "**Rejection Procedures Motion**") [Docket No. 16].  On April 7, 2025, the Bankruptcy Court entered an order (the "**Rejection Procedures Order**") granting the Rejection Procedures Motion [Docket No. 158].

### I.    DIP Financing

On March 31, 2025, the Debtors filed a motion (the "**DIP Motion**") [Docket No. 4] with the Bankruptcy Court seeking authorization to, among other things: (i) enter into a postpetition financing facility (the "**DIP Facility**") with the DIP Lender in an aggregate principal amount of up to $40 million, consisting of up to $35 million in new money loans and $5 million in roll-up loans; (ii) use the cash collateral of the Prepetition Lender pursuant to the terms of the Interim Order; (iii) grant the DIP Lender priming liens and superpriority administrative expense claims in respect of the DIP Obligations (as defined below); and (iv) provide adequate protection.

On April 3, 2025, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 98] approving the DIP Motion on an interim basis and providing the Debtors with immediate access to $5 million of new money.  On May 16, 2025, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 299] approving the DIP Motion on a final basis, providing a cumulative total of $35 million of postpetition financing to the Debtors.

### J.    Landlord Negotiations

Many of the Debtors' stores are subject to out of market lease terms.  As part of the Debtors' restructuring efforts, the Debtors retained the services of Keen-Summit Capital Partners LLC to assist with negotiating improved terms for many of the Company Owned Stores.

On June 11, 2025, the Debtors made the difficult decision to close an additional 30 stores. On June 12, 2025 the Debtors filed the *Amended First Notice Rejection of Unexpired Leases* pursuant to the Rejection Procedures Order to formally reject the leases associated with these stores [Docket No. 457].

### K.    <u>Alternative Proposals</u>

In addition to the Buyer Group's proposal, the Debtors have received competing proposals from other interested parties for the assets that the Buyer Group seeks to acquire.

Shortly after commencing these Chapter 11 Cases, the Debtors received a proposal (as further amended, supplemented, revised, or otherwise modified the "**NextGen Proposal**") from Next Gen Sports LLC ("**NextGen**"). The NextGen Proposal was based on similar terms as the Buyer Group Arrangements, and the Debtors negotiated the terms of the NextGen Proposal in parallel with the Buyer Group Arrangements.  The latest iteration of the NextGen Proposal is on substantially similar terms as the Buyer Group Arrangements and also includes a $15 million upfront cash payment, a portion of which would be used to repay DIP Claims.

Thereafter, the Debtors received another proposal (as further amended, supplemented, revised, or otherwise modified the "**American Pub Proposal**") from American Pub, LLC ("**American Pub**" and together with NextGen, the "**Alternative Bidders**"), with whom the Debtors engaged in negotiations. The Debtors have estimated, based on expected performance metrics and various assumptions, that the American Pub Proposal provides a total value of $110,635,000, consisting of: (i) immediate and near-term payments, valued at $28,250,000; (ii) certain remodel capital commitments, operational improvements, increased royalty rates, a one-time performance bonus, and a 50-unit expansion commitment, valued at $32,035,000; and (iii) exit multiple value creation and revenue increases, valued at $50,635,000.  The American Pub Proposal also included reopening and closure commitments, lease negotiation flexibility, cryptocurrency partnership support, and a new store opening commitment.

The Debtors requested that the Alternative Bidders submit best and final bids on or before June 9, 2025 at 5:00 p.m., prevailing Central Time (the "**Alternative Bid Deadline**").  Should either of the Alternative Bidders submit a "qualifying" bid by the Alternative Bid Deadline, the Debtors retain the option to pivot to an auction process to determine which proposal to move forward with as part of the Restructuring Transactions.  In addition, the Debtors retain the right to terminate the Restructuring Support Agreement if the governing bodies of the Debtors determine in good faith that continued performance under the Restructuring Support Agreement, including consummation of the Buyer Group Arrangements, would be inconsistent with any governing body's exercise of its fiduciary duties (the "**Fiduciary Out**").  The Buyer Group's consent rights under the Plan and Disclosure Statement are subject to the Restructuring Support Agreement remaining in effect. Nonetheless, the Buyer Group Arrangements as set forth in the Plan represent a baseline for consummation of a sale of the Debtors' assets, such that re-solicitation of the Plan would not be required under the Bankruptcy Code because any alternative transaction would be on improved terms.

### L.    LAGS Royalties

Hooters of America, LLC and certain debtor affiliates are parties to the Settlement and Amendment to License Agreement, dated September 13, 1999, pursuant to which the Company has paid, on average, approximately $4.2 million per year on account of purported legacy royalty obligations (the "**Legacy Royalty Obligations**") to Lags Equipment, LLC ("**LAGS**").  These purported obligations include a monthly royalty in perpetuity in the amount of three percent (3%) of the gross sales of the restaurants using the Hooters® trademark and indicia in certain geographical locations. LAGS has invoked their purported royalty right on numerous occasions throughout these Chapter 11 Cases, most recently, LAGS filed their objection to the Debtors' DIP Motion[14], arguing, among other things, that their alleged collateral was not adequately protected (the "**DIP Objection**") and filed two motions[15] under Section 2004 of the Federal Rules of Bankruptcy Procedure, for examination of the Debtors and the DIP Lenders.  The motion with respect to the DIP Lenders has since been withdrawn, and in an effort to resolve LAGS' DIP Objection, the Debtors agreed to escrow funds subject to the purported Legacy Royalty Obligations as adequate assurance should LAGS ultimately be determined to hold an interest in those amounts.  In sum, the Debtors along with their advisors are working diligently to evaluate the validity of the relevant agreements and purported obligations under the Bankruptcy Code and reserve all rights with respect thereto.

Treatment of the Legacy Royalty Obligations will hinge on the determination of the extent of LAGS's interests in those assets.  To the extent it is determined that LAGS holds a first lien, perfected security interest in the Legacy Royalty Obligations, those interests will be treated as Other Secured Claims under the Plan.  If it is determined that LAGS lacks such an interest in the Legacy Royalty Obligations, LAGS's claims will be treated as General Unsecured Claims.  In any event, amounts paid to LAGS prior to the Petition Date may be clawed back, and any claims held by LAGS (regardless of ownership) may be subject to avoidance or other equitable remedies.

### IV.    SUMMARY OF THE PLAN

#### A.    General

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity

---

[14]    *Lags Equipment, LLC's Objection to Final Relief on Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 205].

[15]    *Lags Equiptment, LLC's Emergency Motion for Rule 2004 Examination of the Debtors and for Production of Related Documents* [Docket No. 339]; *Lags Equiptment, LLC's Emergency Motion for Rule 2004 Examination of the DIP Lenders and for Production of Related Documents* [Docket No. 340].

interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (ii) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class. Under the Plan, Classes 2, 3, 4, 7, 8, 9, 11, and 13 are Impaired, and Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan (*i.e.*, Classes 7, 8, 9, 10, 11, and 13) or a Holder's Claim is subject to an objection filed by the Debtors. Classes 1, 5, 6, and 12 are Unimpaired, and Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan and are presumed to accept the Plan. Ballots (as defined below) are being furnished herewith to all Holders of Claims in Classes 2, 3, and 4 (the "**Voting Classes**") that are entitled to vote to facilitate their voting to accept or reject the Plan. Classes 1, 5, 6, 7, 8, 9, 10, 11, 12 and 13 (the "**Non-Voting Classes**") are presumed to accept or deemed to reject the Plan and, therefore, Holders of Claims or Interests in such Classes will not vote on the Plan unless such Classes of Claims or Interests are entitled to vote to accept or reject the Plan.

## B.  <u>Administrative Claims and Priority Claims</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims, DIP Claims and Administrative Claims, including Professional Fee Claims, and Other Postpetition Intercompany Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in <u>Article III</u> of the Plan.

### 1.  **Administrative Claims**

Except with respect to Professional Fee Claims and Restructuring Expenses, and except to the extent that an Administrative Claim (i) has been assumed by the Buyer Group or Brand Management Co. under the terms and conditions set forth in the Buyer Group Documents, (ii) has already been paid during the Chapter 11 Cases or (iii) a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (x) on the Effective Date, if such Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (y) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; <u>provided</u> that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, shall pay in full in Cash all Restructuring Expenses, Expenses, including the fees and expenses of the DIP Agent and the Prepetition Agent, due and owing pursuant to invoices delivered to the Debtors at least one (1) Business Day prior to the Effective Date and that are required to be paid under or pursuant to the DIP Order.

Except as otherwise provided in <u>Article II.A</u> of the Plan or the Claims Bar Date Order, and except with respect to Administrative Claims that are DIP Claims, Restructuring Expenses, or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Reorganized Debtors and Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the day that is the first Business Day that is thirty (30) days following the Effective Date ("**Administrative Claims Bar Date**"); <u>provided</u>, <u>that</u> the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

Objections to such requests, if any, must be Filed and served on the Debtors, or from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (if not the objecting party) and the requesting party on or before the Claims Objection Deadline.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability (as defined in the Buyer Group Documents) under the Buyer Group Documents shall be resolved between Brand Management Co. or the Buyer Group, as applicable, and the Holder of such Assumed Liability.

## 2.    DIP Claims

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the New Class A-1 Principal Amount plus all interest accrued and unpaid thereon through and including the date of payment.

Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such DIP Claim, and subject to <u>Article II.B</u> of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder of a DIP Claim shall receive, pursuant to the Restructuring Transactions, New Class A-1 Notes issued by RoyaltyCo in an amount equal to its respective DIP Claims.

## 3.    Professional Fee Claims

(a)    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Objections to any Professional

Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the DIP Lender, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

(b)     Professional Fee Escrow

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Debt or otherwise). The Professional Fee Escrow Account (including funds held in the Professional Fee Escrow Account) (i) shall not be and shall not be deemed property of the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Entity and (ii) shall be held in trust for the Professionals; provided, that funds remaining in the Professional Fee Escrow after all Professional Fee Claims have been Allowed and irrevocably paid in full or Disallowed shall promptly be paid to RoyaltyCo without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Allowed Professional Fee Claims shall be paid in Cash by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the DIP Agent, the Holders of Prepetition Lender Claims, the Prepetition Credit Agreements Agent, the Holders of Securitization Notes Claims, or be subject to claims, including any DIP Claims, Adequate Protection Claims, 507(b) Claims, or claims held by the Prepetition Lenders or the Securitization Noteholders, and shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Facility Documents, nor shall the Prepetition Lenders, the Securitization Noteholders, or the DIP Lenders  be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, the DIP Facility Documents, or the DIP Order.

(c)     Professional Fee Reserve Amount

No later than one (1) Business Day prior to the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Effective Date, including any fees and expenses projected to be outstanding as of the Effective Date, and the Debtors shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims.  If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim.  When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be

released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(d) <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors or Wind-Down Entity shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred after the Effective Date by (i) the Debtors, (ii) the DIP Lenders, (iii) the Ad Hoc Group, (iv) the Prepetition Securitization Trustee, and (v) the Creditors' Committee, within five (5) Business Days of receipt of invoice thereof.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and Wind-Down Entity may employ and pay any Professional for fees incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**4.** **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**C.** **<u>Classification and Treatment of Claims and Interests</u>**

**1.** **Summary of Classification**

All Claims and Interests, except for Claims addressed in <u>Article II</u> of the Plan, are classified in the Classes set forth in <u>Article III</u> of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth in the Plan.  Classes 2, 3, 7, 11, and 12 are comprised of Claims or Interests in or against the Securitization Entities.  Classes 4, 6, and 13 are comprised of Claims or Interests in or against the Non-Securitization Entities.  Certain of the Debtors may

27

not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan.

(a)    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Securitization Class A-2 Note Claims | Impaired | Yes |
| 3 | Securitization Class B Note Claims | Impaired | Yes |
| 4 | Non-Securitization Manager Advance Term Loan Claims | Impaired | Yes |
| 5 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 6 | Non-Securitization Term Loan Claims (Secured) | Unimpaired | No (Presumed to Accept) |
| 7 | Securitization Manager Advance Claims | Impaired | No (Deemed to Reject) |
| 8 | General Unsecured Claims | Impaired | No (Deemed to Reject) |
| 9 | Other Intercompany Claims | Impaired | No (Deemed to Reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to Reject) |
| 11 | Securitization Prepetition Master Issuer Equity Interests | Impaired | No (Deemed to Reject) |
| 12 | Other Securitization Prepetition Equity Interests | Unimpaired | No (Presumed to Accept) |
| 13 | Non-Securitization Prepetition Equity Interests | Impaired | No (Deemed to Reject) |

2.      **Treatment of Claims and Interests**

(a)     Class 1 – Priority Non-Tax Claims

    (i)      *Classification*: Class 1 consists of all Priority Non-Tax Claims.

    (ii)     *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such Holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired.

    (iii)    *Voting*: Class 1 is Unimpaired under the Plan.  Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

(b)     Class 2 – Securitization Class A-2 Note Claims

    (i)      *Classification*: Class 2 consists of all Securitization Class A-2 Note Claims.

    (ii)     *Treatment*: Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, New Class A-2I Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Note Claims are Allowed in full.

    (iii)    *Voting:* Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

29

(c)     Class 3 – Securitization Class B Note Claims

(i)     *Classification*: Class 3 consists of all Securitization Class B Note Claims.

(ii)    *Treatment*: On or after the Effective Date, each holder of Securitization Class B Notes will receive (i) its Pro Rata share of the Noteholder Equity Entitlement and (ii) New Class B Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full.

(iii)   *Voting*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(d)     Class 4 – Non-Securitization Manager Advance Term Loan Claims

(i)     *Classification*: Class 4 consists of all Non-Securitization Manager Advance Term Loan Claims.

(ii)    *Treatment*: Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued by RoyaltyCo which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests.

(iii)   *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(e)     Class 5 – Other Secured Claims

(i)     *Classification*: Class 5 consists of all Other Secured Claims.

(ii)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of

such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

(iii)  *Voting*: Class 5 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

(f)  Class 6 – Non-Securitization Term Loan Claims (Secured)

(i)  *Classification*: Class 6 consists of all Non-Securitization Term Loan Claims (Secured).

(ii)  *Treatment*:  Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, Holders of Allowed Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral.

(iii)  *Voting*: Class 6 is Unimpaired under the Plan. Each Holder of a Non-Securitization Term Loan Claim (Secured) is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders

31

of Non-Securitization Term Loan Claims (Secured) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to the Non-Securitization Term Loan Claims (Secured).

(g)　　Class 7 – Securitization Manager Advance Claims

(i)　　*Classification*: Class 7 consists of all Securitization Manager Advance Claims.

(ii)　　*Treatment*: Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in Article II.B of the Plan shall be in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Class 7 Securitization Manager Advance Claims.

(iii)　　*Voting*: Class 7 is Impaired under the Plan. Holders of Securitization Manager Advance Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Manager Advance Claims are not entitled to vote to accept or reject the Plan.

(h)　　Class 8 – General Unsecured Claims

(i)　　*Classification*: Class 8 consists of all General Unsecured Claims.

(ii)　　*Treatment*: On the Effective Date, General Unsecured Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of General Unsecured Claims shall not receive any distribution on account of such Claims.

(iii)　　*Voting:* Class 8 is Impaired under the Plan. Holders of General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(i)　　Class 9 – Other Intercompany Claims

(i)　　*Classification*: Class 9 consists of all Other Intercompany Claims.

(ii)     *Treatment*: On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each Allowed Other Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that  Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims.

(iii)    *Voting*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Other Intercompany Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of allowed Other Intercompany Claims will not be entitled to vote to accept or reject the Plan.

(j)    Class 10 – Intercompany Interests

(i)     *Classification*: Class 10 consists of all Intercompany Interests.

(ii)    *Treatment*: On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner.  Each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

(iii)    *Voting*: Class 10 is Impaired under the Plan. Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

(k)    Class 11 – Securitization Prepetition Master Issuer Equity Interests

(i)     *Classification*: Class 11 consists of all Securitization Prepetition Master Issuer Equity Interests.

(ii)    *Treatment*: On the Effective Date, Securitization Prepetition Master Issuer Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Securitization

Prepetition Master Issuer Equity Interests on account of such Interests.

(iii) *Voting*: Class 11 is Impaired under the Plan.  Holders of Securitization Prepetition Master Issuer Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Securitization Prepetition Master Issuer Equity Interests are not entitled to vote to accept or reject the Plan.

(l) <u>Class 12 – Other Securitization Prepetition Equity Interests</u>

(i) *Classification*: Class 12 consists of all Other Securitization Prepetition Equity Interests.

(ii) *Treatment*: On the Effective Date, Other Securitization Prepetition Equity Interests shall continue in full force and shall not be impaired.

(iii) *Voting*: Class 12 is Unimpaired under the Plan.  Holders of Other Securitization Prepetition Equity Interests are presumed to have accepted the Plan.  Therefore, Holders of Other Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

(m) <u>Class 13 – Non-Securitization Prepetition Equity Interests</u>

(i) *Classification*: Class 13 consists of all Non-Securitization Prepetition Equity Interests.

(ii) *Treatment*: On the Effective Date, Non-Securitization Prepetition Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Non-Securitization Prepetition Equity Interests on account of such Interests.

(iii) *Voting*: Class 13 is Impaired under the Plan. Holders of Non-Securitization Prepetition Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

**3.    Special Provision Governing Unimpaired Claims**

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors', the Reorganized Debtors', or the Wind-Down Entity's

rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors', the Reorganized Debtors', and the Wind-Down Entity's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

4.     **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

5.     **Subordinated Claims**

Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors', and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6.     **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

7.     **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### 8. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### D. Means for Implementation of the Plan

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

### 1. No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2. Sources of Consideration for Plan Distributions

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall fund distributions under the Plan with (i) Cash on hand, (ii) the issuance of the New Debt, and (iii) the issuance of the New Equity Interests.

### 3. New Debt

On the Effective Date, the Master Issuer will be renamed RoyaltyCo, LLC and all Other Securitization Prepetition Equity Interests shall revest in and be directly or indirectly held by RoyaltyCo.  RoyaltyCo shall issue the New Debt and provide any related guarantees, pursuant to and subject to the terms and conditions set forth in the New Notes Documents.  The Reorganized Debtors shall provide guarantees related to the New Debt pursuant to and subject to the terms and conditions set forth in in the New Notes Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to

the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Debt and related guarantees, including the New Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors (with the consent of the Required Consenting Creditors) may deem to be necessary to consummate the New Debt. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo. The obligations incurred by the Reorganized Debtors pursuant to the New Notes Indenture and the New Notes Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Notes Documents.

On the Effective Date, the New Notes Documents shall constitute legal, valid, binding, and authorized obligations of RoyaltyCo and the other Reorganized Debtors enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Notes Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted under the New Notes Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Notes Documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 4. New Equity Interests

On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to the Plan. Any Person's acceptance of New Equity Interests shall be deemed to constitute its agreement to be bound by the Shareholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms. The Shareholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the New Equity Interests (and their respective successors and assigns), whether such New Equity Interests are received or to be

received on or after the Effective Date and regardless of whether such holder executes or delivers a signature page to the Shareholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, RoyaltyCo may condition the receipt of any New Equity Interests issued pursuant to the Plan upon the receipt of duly executed counter-signature pages to the Shareholders Agreement, if any.

All of the New Equity Interests issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable.  Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 5.    New Organizational Documents

On or prior to the Effective Date, the New Organizational Documents shall be Filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 6.    New Board

As of the Effective Date, except as set forth in Article IV.G of the Plan, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

The New Board will be comprised of three individuals, one selected by the Prepetition Term Loan Lender, one selected by a majority of holders of the Securitization Class A-2 Notes Claims that are Consenting AHG Noteholders, and one selected by a majority of holders the Securitization Class B Notes Claims that are Consenting AHG Noteholders.  The identities of the New Board will be disclosed in the Plan Supplement prior to Confirmation.

### 7.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Buyer Group Documents), on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective

Reorganized Debtor and Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## 8.    Wind-Down Process and Wind-Down Officer

The Wind-Down Officer shall be appointed by the Debtors in consultation with the DIP Lenders and Required Consenting AHG Noteholders to serve on behalf of the Wind-Down Entity and to implement and take all actions on behalf of the Debtors and their Estates under the Plan, in consultation with the DIP Lenders and Required Consenting AHG Noteholders.  Once identified, the identity of the Wind-Down Officer shall be disclosed in the Plan Supplement, and the Wind-Down Officer's engagement letter, shall be included in the Plan Supplement.  The Wind-Down Officer shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

On and after the Effective Date, subject to the terms of the Plan, the Wind-Down Officer will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Officer shall have the power and authority to take any action(s) necessary to effectuate the Wind-Down using funds in accordance with the Wind-Down Budget.  As soon as practicable after the Effective Date, the Wind-Down Officer shall cause the Debtors or Reorganized Debtors to comply with, and abide by, the terms of the Plan and take any actions as the Wind-Down Officer may determine to be necessary or desirable to carry out the purposes of the Plan, subject to the terms of the Plan.

The Wind-Down Entity shall be a successor to the rights, title and interests to the respective Non-Securitization Entities' property and assets.  The Wind-Down Entity will not be involved in any business operations on a go-forward basis and will be charged with conducting the Wind-Down Process.

The Wind-Down Officer shall serve as successor to and representative of the Wind-Down Entity's Estate under section 1123(b) of the Bankruptcy Code for the purposes of effectuating the Wind-Down Process, including to commence, litigate and settle any Retained Causes of Action, sell or monetize any remaining Assets of the Wind-Down Entity, and make distributions pursuant to the terms of the Plan.  The Wind-Down Officer shall act in a fiduciary capacity on behalf of the interests of the Holders of Claims and Interests entitled to distributions under the Plan.  The Wind-Down Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Entity is dissolved in accordance with the Plan and (ii) the date on which the Wind-Down Officer resigns, is terminated or is otherwise unable to serve.

## 9.    Cancellation of Existing Interests, Indebtedness, and Other Obligations

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the

other Securitization Notes Documents, the DIP Credit Agreement, the other DIP Facility Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, and the other DIP Facility Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties under the Plan; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Credit Agreement, as applicable; (c) preserve any rights of (1) the Prepetition Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of Non-Securitization Manager Advance Term Loan Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors, and, (2) the Prepetition Securitization Trustee, any predecessor thereof, and the Control Party as against any money or property distributable to Holders of Securitization Notes Claims, including the Prepetition Securitization Trustee's priority in respect of payment under section 6.10 of the Securitization Notes Indenture and the right to exercise the Prepetition Securitization Trustee's charging lien under section 7.06(d) of the Prepetition Securitization Notes Indenture, and (3) the DIP Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of DIP Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; and (d) allow the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, and the DIP Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.

Except for the foregoing, (i) subject to the performance by the Prepetition Agent of its obligations under the Plan, the Prepetition Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Loan Documents upon the occurrence of the

Effective Date and the Prepetition MA Credit Agreement and the Prepetition Term Credit Agreement shall automatically be terminated on the Effective Date except to the extent they expressly survive by their terms (provided, that the Surviving Prepetition Credit Facility Provisions shall survive in accordance with the terms of the Prepetition Loan Documents); (ii) subject to the performance by the Prepetition Securitization Trustee of its obligations under the Plan, the Prepetition Securitization Trustee and the Control Party and each of its agents shall be relieved of all further duties and responsibilities related to the Securitization Notes Documents upon the occurrence of the Effective Date; and (iii) subject to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its agents shall be relieved of all further duties and responsibilities related to the DIP Facility Documents upon the occurrence of the Effective Date (provided, that the Surviving DIP Provisions shall survive in accordance with the terms of the DIP Facility Documents).

The commitments and obligations (if any) of the Prepetition Lenders and/or any of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Term Loan Credit Agreement or the DIP Facility Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

## 10. Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the New Debt and the New Equity Interests; (ii) entry into the New Notes Documents; (iii) consummation of the Buyer Group Arrangements; (iv) implementation of the Restructuring Transactions; and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors, Reorganized Debtors, or the Wind-Down Entity, and any corporate or other organizational action required by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Entity. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals

contemplated by <u>Article IV.K</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo after the Effective Date.

### 11.   Effectuating Documents; Restructuring Transactions

(a)   <u>Restructuring Transactions</u>

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors and the Wind-Down Entity, as applicable, with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Buyer Group Arrangements, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Buyer Group Documents; (vi) the issuance of the New Debt; (vii) performing the Debtors' obligations under the Buyer Group Documents and any related agreements entered into in connection therewith, including the Transition Services Agreement (as defined in the Buyer Group APAs), and (viii) all other actions that the Debtors, Reorganized Debtors, or the Wind-Down Entity determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, or the Wind-Down Entity (collectively, the "**Restructuring Transactions**"). The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any direct or indirect parent entity of RoyaltyCo after the Effective Date.

(b)   <u>Buyer Group Arrangements</u>

On the Effective Date, certain of the Debtors will enter into the Buyer Group APAs with the Buyer Group or Brand Management Co. pursuant to which: (i) each Divested Store will be acquired by a Buyer Group SPE; (ii) each lease related to a Divested Store will be assigned by the corresponding Debtor to the corresponding Buyer Group SPE; (iii) a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE; (iv) royalty arrangements will be entered into between RoyaltyCo and Brand Management Co. in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of intellectual property; (v) all gift card liabilities shall

be borne by Brand Management Co. or the applicable franchisee (in each case, solely to the extent that such gift cards were issued on or prior to March 31, 2025 and have not been redeemed as of the closing of the Buyer Group Arrangements); (vi) each Buyer Group SPE will assume, for its corresponding Divested Store, certain current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; and (vii) the parties will enter into certain other agreements and arrangements as agreed upon by the Debtors, the Buyer Group or Brand Management Co., as applicable, and the Consenting Creditors. The Plan Supplement will contain any agreements entered into to effectuate the Buyer Group Arrangements.

## 12.  Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, including the Buyer Group Arrangements, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Notes Indenture, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## 13.  Preservation of Causes of Action

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to the Buyer Group Documents, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan and the Buyer Group Documents, the Reorganized Debtors or the Wind-Down Entity, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived as of the Effective Date.

The Reorganized Debtors and Wind-Down Entity may pursue such Retained Causes of Action in accordance with their respective best interests. The Reorganized Debtors and Wind-Down Entity shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors and Wind-Down Entity shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise,

release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; provided, that any proceeds received by the Reorganized Debtors or the Wind-Down Entity, as applicable, on account of Causes of Action assigned to the Buyer Group or Brand Management Co. shall be immediately transferred to the Buyer Group or Brand Management Co., as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Debtors or Wind-Down Entity shall not pursue any such Causes of Action against it, except as otherwise expressly provided in the Plan, including <u>Article IV</u> and <u>Article VIII</u> of the Plan.** Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, or are assigned or transferred to the Brand Management Co. or the Buyer Group pursuant to the Buyer Group Documents, all such Causes of Action shall be expressly reserved by the Reorganized Debtors and Wind-Down Entity for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

### 14.   Insurance Policies

#### (a)   Director and Officer Liability Insurance

Each insurance policy, including any director and officer liability insurance policies, to which the Debtors are a party as of the Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors or Wind-Down Entity on behalf of the applicable Debtor effective as of the Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions with the Debtors after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

#### (b)   Other Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, each insurance policy to which the Debtors are a party as of the Effective Date shall be assumed by the Reorganized Debtors or Wind-Down Entity unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing.

Except as set forth in <u>Article IV.Q.1</u> of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Wind-Down Entity or draw on any collateral or security therefor.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, the Reorganized Debtors and the Wind-Down Entity, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

### 15.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors and Wind-Down Entity shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

### 16.    Dissolution of Certain Debtors

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the Wind-Down Entity. The Reorganized Debtors and Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

E. **Treatment of Executory Contracts and Unexpired Leases**

1. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan (including the Buyer Group Documents), the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Assumption Schedule Filed with the Plan Supplement; (ii) as of the Effective Date, is subject to a pending motion to assume or reject such Executory Contract or Unexpired Lease Filed by the Debtors on or before the Confirmation Date; (iii) terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is a D&O Liability Insurance Policy; (v) is deemed assumed pursuant to Article IV.O of the Plan, or (vi) is to be assumed by the Debtors and assigned to Brand Management Co. or the Buyer Group in connection with the Buyer Group Arrangements.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors and Wind-Down Entity has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with Article V.D of the Plan and payment of the applicable Cure Claim, if any; provided, further, that the Plan shall not be construed as limiting the Debtors' authority to assume and assign Executory Contracts and Unexpired Leases pursuant to the Buyer Group Documents. Any Executory Contract or Unexpired Lease assumed under the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Wind-Down Entity in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after

the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors and Wind-Down Entity with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, reserve the right to alter, amend, modify, or supplement the Assumption Schedule or Rejection Schedule with the consent of the Required Consenting Creditors, and subject to the terms of the Buyer Group Documents, at any time up to and including the later of the three (3) Business Days prior to the initial closing under the Buyer Group APAs and five (5) Business Days following the final resolution of any Disputed Contract, on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or the Buyer Group Documents restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan and the Buyer Group Documents shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the Buyer Group Arrangements and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

**2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>Article VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree, in consultation with the DIP Lenders and Required Consenting AHG Noteholders.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim.  The Debtors, in consultation with the DIP Lenders and Required Consenting AHG Noteholders, may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Dispute Resolution

Prior to the Combined Hearing, the Debtors shall provide Cure Notices of proposed Cures to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cures or the Debtors', the Reorganized Debtors', Brand Management Co.'s, the Buyer Group's, or the Wind-Down Entity's ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be Filed, served, and received by counsel to the Debtors by the objection deadline set forth in the applicable Cure Notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have consented to such assumption or Cure.

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors, the Reorganized Debtors, Brand Management Co., the Buyer Group, the Wind-Down Entity, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by

a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor, the Reorganized Debtor,  or Wind-Down Entity, as applicable.  To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, Reorganized Debtors, or Wind-Down Entity (as applicable) may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Combined Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Combined Hearing (an "**Adjourned Cure Dispute**"); provided, that the Reorganized Debtor and the Wind-Down Entity may settle any Adjourned Cure Dispute with the applicable counterparty after the Effective Date without further notice to any party or any action, order, or approval of the Bankruptcy Court.

## 5. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 6. Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Reorganized Debtors, or

Wind-Down Entity shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, or the Wind-Down Entity under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Reorganized Debtors, Brand Management Co., the Buyer Group, or the Wind-Down Entity, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

### 7.     Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

### F.     Provisions Governing Distributions

### 1.     Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date.   If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.   Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.   Any such Claims shall be released pursuant to Article VIII of the Plan and

shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

### 2.      Rights and Powers of Distribution Agent

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions thereof.

### 3.      Delivery of Distributions and Undeliverable or Unclaimed Distributions

(a)      Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, unless otherwise set forth in the DIP Order or the DIP Facility Documents.  The Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or the Plan or otherwise in accordance with the applicable procedures of DTC.  For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

(b)      Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors.  In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, shall be deposited with the Prepetition Agent and the DIP Agent, as applicable, for distribution to Holders of Non-Securitization Manager Advance Term Loan Claims or DIP Claims in accordance with the terms of the Prepetition Term

Loan Credit Agreement and the DIP Credit Agreement, as applicable.  Distributions other than Cash will not be made to or by the DIP Agent or the Prepetition Agent and the DIP Agent and Prepetition Agent shall have no responsibility with respect to such distributions. Rather, all distributions other than of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, may, with the consent of the Prepetition Agent and the DIP Agent, as applicable, be made by the Distribution Agent directly to Holders of Non-Securitization Manager Advance Term Loan Claims and DIP Claims in accordance with the terms of the Plan, the Prepetition Term Loan Credit Agreement, and the DIP Credit Agreement, as applicable. Notwithstanding the foregoing, all distributions (whether of Cash or other than of Cash) on account of Securitization Notes Claims, if any, shall be deposited with the Prepetition Securitization Trustee for distribution to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture, except to the extent that the Prepetition Securitization Trustee provides prior written consent to the Debtors that some or all of such distributions may be made by the Distribution Agent directly to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture. To the extent the Prepetition Agents, the Prepetition Securitization Trustee, or the DIP Agent effectuates, or is requested to effectuate, any distributions pursuant to the Plan, the Prepetition Agent, the Prepetition Securitization Trustee, and the DIP Agent shall be deemed a "Distribution Agent" for purposes of the Plan.

The amount of any reasonable and documented fees and expenses incurred by the Prepetition Agents, the Prepetition Securitization Trustee, and the DIP Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) shall be paid in Cash by the Reorganized Debtor or Wind-Down Entity and will not be deducted from distributions made to Holders of Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims, as applicable.  The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtors and Wind-Down Entity and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent, as determined by the Debtors or the Reorganized Debtors, as applicable.

(c)    <u>No Fractional Shares</u>

No fractional shares or units of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of New Equity Interests that is not a whole number, such New Equity Interests shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof.  The total number of authorized and/or issued shares or units of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

(d)    <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u> <u>that</u> such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of <u>Article VI.C.4 of the Plan</u>, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed New Equity Interests, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Debtors and the Wind-Down Entity without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

## 4.    Securities Registration Exemption

The offer, issuance, and sale under the Plan of the New Equity Interests in exchange for Claims pursuant to <u>Article III</u> of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

The offering, issuance, and distribution of the New Debt in exchange for Claims pursuant to <u>Article II</u> and <u>Article III</u> of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.  Accordingly, the New Debt, and any New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act, if any, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law, such as under certain conditions, the resale provisions of Rule 144 or Rule 144A of the Securities Act,

and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable.

With respect to the foregoing equity securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

None of the Debtors, the Wind-Down Entity, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests and New Debt under applicable securities laws. DTC, any transfer agent (as applicable) and all other Persons shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests and New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in the Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests or New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## 5.  Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent, the Reorganized Debtors, or Wind-Down Entity, as applicable, with the Cash necessary to satisfy the withholding tax pursuant Article VI.E of the Plan and such person fails to comply before the date

that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor or Wind-Down Entity and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 6.    Allocations

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed under the Plan.

### 7.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 8.    Setoffs and Recoupment

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors  or the Wind-Down Entity, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors, the Reorganized Debtors,  or the Wind-Down Entity may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Wind-Down Entity of any such claim they may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding anything herein to the contrary, neither the Reorganized Debtors, the Wind-Down Entity, nor the Debtors may set off and/or recoup against any distributions made on account of any Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims or any distributions to be made to parties to the Restructuring Support Agreement.

9.      **Claims Paid or Payable by Third Parties**

(a)      Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtors, the Reorganized Debtors, the Wind-Down Entity, or the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  In the event such Holder fails to timely repay or return such distribution, the Debtors, Reorganized Debtors, or the Wind-Down Entity may pursue any rights and remedies against such Holder under applicable law.

(b)      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

G.      **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.      **Allowance of Claims and Interests**

After the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim

or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

## 2.    Claims and Interests Administration Responsibilities

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have the authority to (i) File, withdraw, or litigate to judgment objections to Claims or Interests; (ii) settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

## 3.    Estimation of Claims

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.   In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated.   All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.   Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.       Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the Wind-Down Entity upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.       Time to File Objections to Claims

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be entitled to object to Claims before the Claims Objection Deadline, as such deadline may be extended from time to time.  After the Effective Date, except as expressly provided in the Plan to the contrary, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to Proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline.  The expiration of such period shall not limit or affect the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

### 6.       Disallowance of Claims

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the applicable Reorganized Debtor or the Wind-Down Entity.  All Claims Filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.       Amendments to Claims

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Reorganized Debtor or the Wind-Down Entity. Absent such authorization, any new or amended Claim Filed after the General Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### 8.    Disputed Claims Reserve

Any amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Combined Hearing in consultation with the Required Consenting Creditors, based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Distribution Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B- 9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Distribution Agent, and the Holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disputed Claim Reserve shall be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Distribution Agent shall distribute to the holder thereof out of the Disputed Claims Reserve any amount or property to which such holder is entitled under the Plan (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution). No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

In the event the remaining assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied pro rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed Pro Rata to all holders of Allowed General Unsecured Claims.

The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

9.     **Distributions After Allowance**

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

10.     **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

**H.     Settlement, Release, Injunction, and Related Provisions**

1.     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein and in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

2.     **Discharge of Claims and Termination of Interests**

For the avoidance of doubt, upon consummation of the Buyer Group Arrangements as set forth in the Buyer Group Documents, the assets sold in such Buyer Group Arrangements shall be transferred to and vest in Brand Management Co. or the Buyer Group, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances (other than Permitted Liens and Assumed Liabilities, each as defined in the applicable Buyer Group Documents) pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order and Buyer Group APAs, as applicable.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Debtors, the Wind-Down Entity, or any of their Assets or property.

### 3.      Releases by the Debtors

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or**

rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing.

Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in Article VIII.C of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) releasing any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Buyer Group Document, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any Retained Causes of Action or any Causes of Action assigned or transferred pursuant to the Buyer Group Documents and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties; provided however, that the special committee of officers of Hooters of America, LLC shall not so designate the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, the Consenting AHG Noteholders, the DIP Lenders, or the DIP Agent, and the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, the Consenting AHG Noteholders, the DIP Lenders, and the DIP Agent shall be and shall indefinitely remain Released Parties under the terms of the Plan.  Notwithstanding anything to the contrary in the foregoing or in the defined term "Released Parties," Avoidance Actions against any Released Parties shall be deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged by the Debtors, the Wind-Down Entity, and the Estates.

### 4.      Releases by the Releasing Parties

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Wind-Down Entity, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, the Prepetition Credit Agreements, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in **Article VIII.D** of the Plan shall not be construed as releasing, and do not release, (i) any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or

otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any rights of Holders of Allowed Claims to receive distributions under the Plan, and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the applicable Releasing Party will be null and void and the Releasing Party will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

5.    **Exculpation**

Without affecting or limiting the releases set forth in <u>Article VIII.C</u> and <u>Article VIII.D</u> of the Plan, and notwithstanding anything in the Plan to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility Documents, the Restructuring Support Agreement, the Plan (including the New Notes Documents and the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the New Debt, the Prepetition Loan Documents, the Securitization Notes Documents, the prepetition and postpetition marketing process, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Debt, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in

**Article VIII.E of the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including, without limitation, the New Notes Documents, and the New Organizational Documents.**

6. Injunction

**UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.E OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE**

ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.

THE RELEASES AND INJUNCTIONS SET FORTH IN ARTICLE VIII OF THE PLAN IN FAVOR OF NON-DEBTOR PARTIES SHALL ONLY APPLY TO HOLDERS OF CLAIMS OR INTERESTS IF SUCH HOLDER OF A CLAIM OR INTEREST TIMELY OPTS INTO THE RELEASES.  FOR THE AVOIDANCE OF DOUBT, ALL HOLDERS OF CLAIMS AND INTERESTS, WHETHER OR NOT THEY OPT INTO THE RELEASES, SHALL BE ENJOINED FROM ASSERTING OR CONTINUING TO PURSUE ANY CLAIM OR CAUSE OF ACTION ARISING PRIOR TO ENTRY OF THE CONFIRMATION ORDER AGAINST THE DEBTORS OR THEIR ESTATES TO THE EXTENT SUCH CLAIMS ARE ADDRESSED BY, OR SATISFIED IN ACCORDANCE WITH, THE PLAN.

THE INJUNCTIONS IN ARTICLE VIII.F OF THE PLAN SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

### 7.    Subordination Rights

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

### 8.    Release of Liens

Except (i) with respect to the Liens securing the New Debt or (ii) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Buyer Group Documents, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors,  or the Wind-Down Entity, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust,

Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Entity and its successors and assigns.  On and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of Article VIII.H of the Plan.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

The Prepetition Agent and the DIP Agent will reasonably cooperate with respect to any requests made in writing by the Debtors or Reorganized Debtors regarding specific release documentation reasonably required, and the Debtors or Reorganized Debtors will pay the fees and expenses of the Prepetition Agent and the DIP Agent promptly on request for any work necessary and requested by the Debtors or Reorganized Debtors to effectuate the Plan, including with respect to releases.

## I.    Conditions Precedent to Consummation of the Plan

### 1.    Conditions Precedent to the Effective Date

It shall be a condition to consummation of the Plan that the conditions in (a)-(n) shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B of the Plan); provided, that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred:

(a)    The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(b)    The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the Restructuring Support Agreement and the Restructuring Term Sheet;

(c)    The DIP Facility shall be in full force and effect and there shall be

no defaults continuing unless waived by the Required DIP Lenders party thereto;

(d)    The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(e)    The Confirmation Order confirming the Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(f)    The New Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Plan and related transaction;

(g)    The New Equity Interests shall have been issued (with all conditions precedent thereto having been satisfied or waived) and a shareholder rights agreement shall have been entered into by the appropriate parties;

(h)    All Restructuring Expenses and, including the fees and expenses of the Prepetition Agent and the DIP Agent, and and any other fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement pursuant to an order of the Bankruptcy Court shall have been paid in full in Cash;

(i)    The Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

(j)    The conditions precedent to closing the Buyer Group Arrangements and the Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Effective Date;

(k)    Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions, the Buyer Group Arrangements, and the Plan shall have been obtained (including as set forth in the applicable purchase agreement);

(l)     No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the Restructuring Transactions, the Plan, or any other transaction contemplated thereby;

(m)     The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; and

(n)     There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions or the Buyer Group Arrangements any material portion or aspect thereof.

## 2.     Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived only by the Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group or Brand Management Co., whose consent rights under the Plan are subject in all respects to the Restructuring Support Agreement remaining in effect at the time of any such waiver and are solely to the extent the waiver adversely affects the Buyer Group or Brand Management Co., as applicable (such consent not to be unreasonably withheld, conditioned, or delayed), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

## 3.     Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## 4.     Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## J.     <u>Modification, Revocation, or Withdrawal of the Plan</u>

## 1.     Modification and Amendments

The Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the Required DIP

Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group and Brand Management Co. (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of (a) the Required Consenting Creditors (which consent shall not be unreasonably withheld, conditioned, or delayed); (b) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (c) the Buyer Group and Brand Management Co., whose consent rights under the Plan are subject in all respects to the Restructuring Support Agreement remaining in effect at the time any modification is requested (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Buyer Group Arrangements.

### 2.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan, in accordance with Article X.A of the Plan occurring after the solicitation thereof but before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.      Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date, in consultation with the DIP Lenders and Required Consenting AHG Noteholders.  If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, or (d) be used against the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths and weaknesses of any of the parties' positions, arguments, or claims.

### K.      Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the

Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4. adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including the Buyer Group Arrangements;

9. enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

10. resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the consummation of the Plan, interpretation, or

71

enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, implementation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including with respect to the Buyer Group Arrangements;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, exculpations, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I of the Plan;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     enforce or determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the DIP Facility Documents, the DIP Orders, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

17.     hear and determine disputes arising in connection with Buyer Group Arrangements;

18.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

20.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

23. hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

24. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in the Plan, including under Article VIII of the Plan;

25. enforce all orders previously entered by the Bankruptcy Court;

26. hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

27. enter orders concluding or closing the Chapter 11 Cases;

28. recover all assets of the Debtors and property of the Debtors' Estates, wherever located, and

29. enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

### L.    **Miscellaneous Provisions**

#### 1.    **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Ad Hoc Group, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties, any of such individuals, the Reorganized Debtors, nor the Wind-Down Entity will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

#### 2.    **Immediate Binding Effect**

Subject to <u>Article IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors,  the Wind-Down Entity, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

#### 3.    **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; <u>provided</u>, <u>that</u> any material documents Filed shall be in consultation with the DIP Lenders, the Required Consenting AHG Noteholders, and the Buyer Group.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 4.    **Payment of Statutory Fees**

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors and Wind-Down Entity, as applicable, shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain

obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything in the Plan to the contrary, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

### 5. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or any other party with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

### 6. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 7. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8. Entire Agreement

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 9. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, which request shall be consistent with the terms of the Restructuring Support Agreement, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the

Debtors , (y) the Required Consenting Creditors, and (z) solely to the extent that the Restructuring Support Agreement remains effective as to the Buyer Group, and to the extent that such alteration materially impacts the Buyer Group, then the Buyer Group and Brand Management Co. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors, (y) the Required Consenting Creditors, and (z) the Buyer Group and Brand Management Co; and (iii) nonseverable and mutually dependent.

### 10.    Dissolution of Committee

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided, that following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 11.    Expedited Tax Determination

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed or to be Filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Effective Date.

## V.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and the Consenting Stakeholders.  The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Plan is not confirmed, as described herein the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell all or substantially all of their assets under section 363 of the Bankruptcy Code or pursuant to an alternative plan.

Absent a viable sale proposal, if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such alternative plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of their assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Classes 2–4 and 6 would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by Holders of Other Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than what they would receive under the Plan.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Advisors and reliance upon the valuation methodologies utilized by the Advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in substantial diminution in the value to be realized by Holders of Claims or Interests than the value provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### VI.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance and distribution under the Plan of the New Equity Interests to Holders of Allowed Securitization Class B Notes Claims or Non-Securitization Manager Advance Term Loan Claims as provided in the Plan shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.  The offering, issuance, and distribution under the Plan

of the New Debt shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

### A.      Section 1145 of the Bankruptcy Code

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the above-described securities issued pursuant to section 1145 of the Bankruptcy Code (the "**1145 Securities**") will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is (i) an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents. In addition, such section 1145 exempt securities may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim against, or interest in, the debtor, with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement in connection with the plan, with the consummation of the plan or with the offer and sale of securities under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. While there is no precise definition of a "controlling" stockholder, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act ("Rule 144") which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, the availability of adequate current public information, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

## B.    Section 4(a)(2) of the Securities Act

With respect to the above described securities issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**Private Placement Securities**"), such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 or the resale provisions of Rule 144A of the Securities Act ("**Rule 144A**"), and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. The solicitation of votes on the Plan will only be accepted from Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) that represent as to, and qualify as, either (a) a "qualified institutional buyer," as such term is defined in Rule 144A, or (b) an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act). Further, the Debtors believe that all Holders of DIP Claims and Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) are either "qualified institutional buyers" or "accredited investors".

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

Rule 144A is a safe harbor provision under the Securities Act that permits the resale of unregistered securities to "qualified institutional buyers," as such term is defined in Rule 144A. Under Rule 144A, securities can be resold to qualified institutional buyers so long as the conditions set forth in Rule 144A are satisfied.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted

securities under Rule 144 after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities under Rule 144 after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act. Therefore, the Debtors believe that, although the Private Placement Securities may be resold privately in accordance with Rule 144A, the Rule 144 exemption will not be available with respect to any Private Placement Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act (including Rule 144A), non-affiliated holders of Private Placement Securities will be required to hold their Private Placement Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

*****

*Legends.* To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing all Private Placement Securities, will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors or the Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws (including Rule 144A). All persons who receive such securities will be deemed to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any such securities except in accordance with an exemption from registration, including under Rule 144 or Rule 144A under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) such securities will be subject to the other restrictions described above. The Reorganized Debtors shall agree to provide, upon the request of any holders or prospective purchaser

(designated by a holder) of New Debt, any information required to be provided to such holder or prospective purchaser to satisfy the conditions set forth in Rule 144A(d)(4) under the Securities Act related to the New Debt.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) UNDER THE SECURITIES ACT, AND RULE 144 AND RULE 144A UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VII. CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of Non-Securitization Manager Advance Term Loan Claims, Securitization Class A-2 Notes Claims, Securitization Class B Notes Claims, and New Equity Interests. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan, holders of Claims not entitled to vote on the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, small business investment companies,

regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that all Non-Securitization Manager Advance Term Loan Claims, Securitization Class A-2 Notes Claims, Securitization Class B Notes Claims, and New Equity Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated) and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon individual circumstances. All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.**

A.    **Consequences to Debtors**

The Debtors currently expect that the Restructuring Transactions will be consummated as set forth in Article IV of the Plan which includes, but is not limited to, (i) conversion of the DIP Facility into new Class A-1 Notes, (ii) issuance of New Class A-2II Notes to Holders of certain Non-Securitization Manager Advance Term Loan Claims, (iii) compromise and cancellation of Non-Securitization Term Loan Claims (Secured), representing the Parent Funded Debt Claims in excess of the value of the Securitization Manager Advance Claims, (iv) issuance of New Class A-2I Notes to Holders of Securitization Class A-2 Note Claims, (v) issuance of New Class B Notes to Holders of Securitization Class B Note Claims, (vi) compromise and cancellation of the Securitization Manager Advance Claims, (vii) cancellation of the Securitization Prepetition Master Issuer Equity Interests for no consideration, (viii) the issuance of the New Equity Interests to Holders of Securitization Class B Note Claims and Holders of certain Non-Securitization Manager Advance Term Loan Claims, and (ix) the Buyer Group Arrangements (the "Expected Structure"). The discussion below assumes that the Expected Structure is utilized. If the Debtors (in conjunction with other parties in interest) determine, prior to the Effective Date, that the Restructuring Transactions will be consummated other than pursuant to the Expected Structure, a supplemental disclosure will be filed containing a discussion of certain tax consequences of such alternative structure.

Hawk Parent, LLC is expected to be treated as a partnership for U.S. federal income tax purposes, and each other relevant Debtor is expected to be disregarded as an entity separate from Hawk Parent, LLC for U.S. federal income tax purposes. Accordingly, as described further below,

the U.S. federal income tax consequences of the Plan will generally not be borne by a Debtor, but will be borne by Hawk Parent, LLC and its members.

### 1.    Cancellation of Debt

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**CODI**") upon satisfaction of its outstanding indebtedness for total consideration having a value that is less than the amount of such indebtedness.  CODI is taxable as ordinary income.  The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness discharged, over (ii) the sum of (a) the issue price of any new indebtedness the taxpayer issued, (b) the amount of cash paid, and (c) the fair market value of any other consideration given, in each case, in exchange for such discharged indebtedness at the time of the exchange.

Where an entity that is a partnership for U.S. federal income tax purposes, such as Hawk Parent, LLC, realizes CODI, such CODI is allocated to its partners, and the partners (rather than the partnership) are subject to tax on such amount (except that the partnership may have tax withholding obligations in respect of its non-U.S. partners).  Accordingly, the U.S. holders of interests in Hawk Parent, LLC will be treated as receiving their allocable share of the CODI realized by Hawk Parent, LLC.

There are exceptions to the recognition of CODI.  For example, a taxpayer is not required to include CODI in gross income if either the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or the taxpayer is insolvent, as specifically defined under the Tax Code, at the time the CODI is triggered.  In the case of any entity taxed as a partnership, such as Hawk Parent, LLC, any exception to the recognition of CODI is applied at the partner level rather than at the entity level.

Under the Expected Structure, Hawk Parent may realize substantial CODI. The precise amount of CODI realized by Hawk Parent (and further allocated to the partners of Hawk Parent) will depend on, among other things, the value as of the Effective Date of the New Debt.  U.S. Holders of interests allocated CODI that is realized by Hawk Parent may have a U.S. federal income tax liability in respect of that CODI, but will not receive any distributions from any of the Debtors in order to satisfy that liability.

U.S. holders of interests in Hawk Parent, LLC are urged to consult their tax advisors as to the particular tax consequences to them of the allocation of such CODI, including the ability to offset any such CODI with available losses, if any, and whether or not they may avail themselves of any exception under the Tax Code to the recognition of CODI.

### 2.    Taxable Gain and Loss

Under the Expected Structure, which includes (i) cancellation of the Securitization Prepetition Master Issuer Equity Interests for no consideration, including in connection with the transfer of all the assets and liabilities of HOA Funding, LLC to an entity treated as a corporation for U.S. federal income tax purposes by Hawk Parent, LLC and its applicable subsidiaries, (ii) compromise and cancellation of the Securitization Manager Advance Claims, and (iii) the Buyer Group Arrangements, Hawk Parent, LLC is expected to realize gain or loss in an amount

equal to the difference, if any, between (i) the sum of (A) aggregate fair market value of the assets transferred or deemed transferred and (B) the amount of any other obligations to which such assets are directly or indirectly subject and (ii) the aggregate tax basis in such assets (including, for the avoidance of doubt, any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes).  Where Hawk Parent, LLC is treated as transferring assets in satisfaction of a nonrecourse liability, the amount realized would be no less than the amount of such liabilities.  The treatment of the Expected Structure is uncertain, and it is possible that Hawk Parent, LLC will not be permitted to recognize loss under the Expected Structure.

The allocable portion of any gain recognized by U.S. holders of interests in Hawk Parent, LLC will result in a cash tax obligation to the extent not offset by, for example, available losses. The transferees, including RoyaltyCo and the Buyer Group, would obtain a new cost basis in the assets deemed acquired based on the fair market value of such assets on the Effective Date.  The transferees generally will not succeed to any of the Debtors' existing tax attributes.  Hawk Parent, LLC and its members are expected to realize a material amount of gain as a result of the Expected Structure.

Furthermore, depending on the nature of assets held by Hawk Parent, LLC, all or a substantial portion of the gain recognized by U.S. holders of interests in Hawk Parent, LLC may be treated as ordinary income under depreciation recapture rules applicable to the disposition of depreciable property or, in the case of the disposition of real property, as "unrecaptured Section 1250 gain" (i.e., certain previously claimed depreciation deductions with respect to depreciable real property) which is currently subject to the U.S. federal income tax at a maximum rate of 25%.

U.S. holders of interests in Hawk Parent, LLC are urged to consult their tax advisors as to the particular tax consequences to them of the allocation of such gain, including the ability to offset any such gain with available losses, if any.

## B.    Consequences to Holders of Certain Claims

For purposes of Article VII.B of the Plan, the term "U.S. Holder" means a beneficial owner of Non-Securitization Manager Advance Term Loan Claims, Securitization Class A-2 Notes Claims, Securitization Class B Notes Claims, or New Equity Interest that is for U.S. federal income tax purposes:

<blockquote>

(i)      an individual who is a citizen or resident of the United States;

(ii)     a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

(iii)    an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

</blockquote>

> (iv)    a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  Partners in a partnership holding any such instruments are urged to consult their own tax advisors.

## 1.    U.S. Holders of Non-Securitization Manager Advance Term Loan Claims, Securitization Class A-2 Notes Claims or Securitization Class B Notes Claims

Pursuant to the Plan, and in complete and final satisfaction of their Claims, (i) Holders of Non-Securitization Manager Advance Term Loan Claims will receive 50% of the New Equity Interests and New Class A-2II Notes, (ii) holders of Securitization Class A-2 Notes Claims will receive New Class A-2I Notes, and (iii) holders of Securitization Class B Notes Claims will receive the remaining 50% of the New Equity Interests and New Class B Notes (each an "**Exchange**").

The New Equity Interests transferred will be issued by RoyaltyCo, which intends to elect to be treated as a corporation for U.S. federal income tax purposes as of the Effective Date.

The U.S. federal income tax consequences of the Plan to a U.S. Holder are uncertain and may depend in part on whether or not the Term Loan, the Incremental Loan, Class A-2 Notes, Class B Notes, New Class A-2II Notes, New Class A-2I Notes, or New Class B Notes, as applicable, constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of 5 years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of 10 years or more constitute securities.  Additionally, the IRS has ruled that new debt obligations with a term of less than 5 years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.  The Term Loan had 5-year maturity at issuance, the Incremental Loan had a six-month maturity at issuance, Class A-2 Notes had 30-year maturity at issuance (but an anticipated repayment term of 7 years), Class B Notes had 30-year maturity at issuance  (but an anticipated repayment term of 7 years), New Class A-2II Notes will have a 30-year maturity at issuance, New Class A-2I Notes will have a 30-year maturity at issuance, and New Class B Notes

will have a 30-year maturity at issuance.  The following discussion assumes that the none of the Term Loan, the Incremental Loan, Class A-2 Notes, Class B Notes, or New Class A-2I Notes qualify as "securities" for U.S. federal income tax purposes.  Further, this discussion assumes that no Exchange qualifies as a tax-free "reorganization" for U.S. federal income tax purposes, including because HOA Funding, LLC is an entity disregarded from its regarded owner (Hawk Parent, LLC) before giving effect to any of the transactions described herein.  *U.S. Holders are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Claims and the respective consideration received as "securities" for U.S. federal income tax purposes.*

(a)    Recapitalization Treatment

Although not expected, if, nevertheless, an Exchange qualifies for recapitalization treatment, the U.S. Holder generally will not recognize gain or loss.  However, a U.S. Holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued original issue discount ("**OID**") not previously included in income.  *See* Section VII.B.3 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

If an Exchange qualifies for recapitalization treatment, a U.S. Holder's aggregate tax basis in the security received would equal such U.S. Holder's aggregate adjusted tax basis in the Claim exchanged therefor, increased by any gain and interest income recognized in the Exchange, and decreased by any deductions claimed in respect of any previously accrued but unpaid interest.  A U.S. Holder's holding period in the security received would include its holding period in the Claim exchanged therefor, except to the extent of any consideration received in respect of accrued but unpaid interest or possibly accrued OID or treated as imputed interest income.

(b)    Fully Taxable Exchange

In the case of a taxable exchange, a U.S. Holder generally would recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of the New Equity Interests and/or the issue price of the Notes received (other than, in each case, to the extent received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section VII.B.2 — "Character of Gain or Loss," below.  A U.S. Holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income.  *See* Section VII.B.3 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In the event of the subsequent disallowance of any Claim, it is possible that a U.S. Holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to a Claim may be deferred until all Claims are Allowed or Disallowed.  Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any additional distributions received due to the disallowance of a Claim, except to the extent of any portion treated as an interest income under the imputed interest provisions of the Tax Code.  The discussion herein assumes that the

installment method does not apply, either because the exchange is not eligible or because the U.S. Holder elects out of such treatment. *See also* <u>Section VII</u> "Tax Treatment of Disputed Claims Reserve," below.

In the case of a taxable exchange, a U.S. Holder's tax basis in the New Equity Interests and/or Notes, received would equal the fair market value of such New Equity Interests and/or issue price of the Notes, as applicable. The U.S. Holder's holding period in the New Equity Interests and/or Notes generally begins on the day following the Effective Date.

(c)    <u>Section 351 Exchange Treatment</u>

The U.S. Holders receiving New Equity Interests currently expect to take the position that the Exchanges to which they are a party will qualify for non-recognition treatment under section 351 of the Tax Code (the "**Section 351 Exchange**"). A Section 351 Exchange generally applies if one or more persons transfer property to an entity classified as a corporation for U.S. federal income tax purposes in exchange for stock in such corporation and, immediately after the transfer, such persons own at least 80% of the total combined voting power of all classes of stock entitled to vote and at least 80% of the total number of shares of each other class of stock in the corporation (the "**Section 351 Requirements**").

Assuming that the Section 351 Requirements will be met with respect to the Exchanges, U.S. Holders will not recognize any gain or loss as a result of the Exchanges to the extent they solely receive the New Equity Interests. In the event that the Section 351 Requirements are not met with respect to the Exchanges, U.S. Holders generally will recognize gain or loss equal to the difference, if any, between (i) the fair market value of the New Equity Interests and/or Notes received in the Exchange and (ii) the sum of the U.S. Holder's adjusted tax basis in the Claims exchanged therefor.

Also, the Exchanges may be treated as a partial tax-free contribution with "boot" under section 351(b) of the Tax Code to the extent such U.S. Holders are deemed to transfer appreciated property to the RoyaltyCo. U.S. Holders would generally not be permitted to recognize loss where their Exchange is part of a Section 351 Exchange. Complex rules apply to such U.S. Holders, including in connection with the apportionment of tax basis between their New Equity Interests and the debt interests issued by RoyaltyCo.

**2.    Character of Gain or Loss**

If any gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss is determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction.

In addition, a U.S. Holder that acquired a Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. A U.S. Holder that purchased its Claim from a prior holder would be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim is less than the adjusted issue price

87

of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally would be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would in the case of a fully taxable exchange become deductible at the time of the exchange (but would continue to be deferred in the event of recapitalization Section 351 Exchange treatment).

### 3.    Distributions in Respect of Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder is received in satisfaction of accrued interest during the U.S. Holder's holding period, such amount would be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued but unpaid OID. Accordingly, it is also unclear whether, in similar circumstances or by analogy, any U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to a Claim that is not paid in full.

The Plan provides that, unless otherwise required by law (as reasonably determined by the Wind-Down Entity), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed therein (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Article VI.F of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 4.    Actual and Constructive Distributions on New Equity Interests

Under section 305 of the Tax Code, certain transactions that affect an increase in the proportionate interest of a shareholder (treating holders of rights to acquire stock as existing shareholders) in the corporation's assets are treated as creating deemed distributions to such shareholder in respect of such "stock" interest. Any deemed distribution would be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the shareholder in connection with such distribution. Accordingly, U.S. holders of New Equity Interests are urged to consult their own tax advisors regarding the U.S. federal

income tax consequences of the acquisition, ownership, and disposition of the New Equity Interests.

The gross amount of any distribution of cash or property made to a U.S. Holder with respect to New Equity Interests generally would be includible in gross income by a U.S. Holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits of RoyaltyCo as determined under U.S. federal income tax principles. Dividends received by non-corporate U.S. Holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a U.S. Holder that is a corporation and certain holding period and other requirements are satisfied. Any dividend received by a U.S. Holder that is a corporation may be subject to the "extraordinary dividend" provisions of the Tax Code.

Distributions in excess of current and accumulated earnings and profits of RoyaltyCo, as determined under U.S. federal income tax principles, first would be treated as a non-taxable return of capital to the extent of the U.S. Holder's adjusted tax basis in its New Equity Interests and would be applied against and reduce (but not below zero) such basis dollar-for-dollar, and, thereafter as gain from the sale or exchange of stock, which would be treated as long-term capital gain if such U.S. Holder's holding period in its New Equity Interests exceeds one year as of the date of the distribution.

### 5. Disposition of New Equity Interests

(a)   Sale, Exchange, or Other Taxable Disposition

Except as discussed below, U.S. Holders of New Equity Interests generally would recognize capital gain or loss upon a subsequent sale or other taxable disposition of such New Equity Interests in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the New Equity Interests and the sum of the Cash plus the fair market value of any property received from such sale or other disposition. Any such gain or loss generally would be long-term capital gain or loss if the U.S. Holder's holding period for its New Equity Interests, is more than one year at the time of sale or other disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

If the New Equity Interests are issued by RoyaltyCo, any gain recognized by a U.S. Holder upon a subsequent disposition of the New Equity Interests received (or any stock or property received for it in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any accrued market discount carried over to the New Equity Interests not previously included in income (*see* Section VII.B.2 above — "Character of Gain or Loss"), (ii) any ordinary loss deductions incurred upon exchange or previously as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (iii) with respect to a cash-basis U.S. Holder and in addition to clause (ii) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### C.   Withholding on Distributions and Information Reporting

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

**The foregoing summary has been provided for informational purposes only and does not, and is not intended to, constitute legal or tax advice.  All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

### VIII.   VOTING PROCEDURES AND REQUIREMENTS[16]

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.   Voting Agent

The Debtors have retained Kroll as their claims, noticing, and Voting Agent pursuant to the *Order Authorizing Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Voting Agent* [Docket No. 108].   Pursuant to the Scheduling Order, Kroll is authorized to assist the Debtors in (a) distributing the Solicitation Packages, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims, (c) responding to inquiries from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages and all other related documents and matters related thereto.

---

[16]   Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the Scheduling Motion.

B.    **Voting Deadline**

The Voting Deadline for a Holder of a Claim in a Voting Class to vote to accept or reject the Plan is **July 21, 2025 at 4:00 p.m. (prevailing Central Time).** Any vote to accept or reject the Plan received by the Voting Agent after the Voting Deadline may count only in the Debtors' sole discretion. To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered to the Voting Agent: (i) first-class mail in the return envelope provided with each Ballot, (ii) by overnight courier, (iii) by hand delivery, (iv) via E-Ballot, or only with respect to pre-validated Beneficial Holder Ballots or Master Ballots, via electronic mail to HootersBallots@ra.kroll.com so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

Holders of Claims mailing their Ballots to the Voting Agent shall mail them to the following address:

| Kroll Address for Receipt of Ballots |
| :---: |
| **If by First Class Mail, Hand Delivery, or Overnight Mail** |
| **Hooters Ballot Processing Center**<br>**c/o Kroll Restructuring Administration LLC**<br>**850 Third Avenue, Suite 412**<br>**Brooklyn, NY 11232** |

**IN ALL INSTANCES, HOLDERS SHALL CONSULT THEIR BALLOT FOR SPECIFIC INSTRUCTIONS REGARDING SUBMISSION OF THEIR VOTES AND ANY ELECTIONS.**

C.    **Form, Content, and Manner of Notices**

1.    **The Combined Hearing Notice**

The Combined Hearing will be held before the Honorable Scott W. Everett, United States Bankruptcy Judge, in Courtroom 3, Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242, on **July 29, 2025 at [●] _.m. (prevailing Central Time)**. Within five (5) Business Days after entry of the Scheduling Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and Holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail, a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Objection Deadline and procedures for filing objections and responses to the adequacy of the Disclosure Statement and confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve Holders of Claims in Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, within five (5) Business Days after entry of the Scheduling Order, or as soon as reasonably practicable thereafter in the *Wall Street Journal*, or a similar national publication.

##### 2.     The Solicitation Package

The following materials shall constitute the Solicitation Packages:

a.     the Combined Hearing Notice, in substantially the form attached as <u>Exhibit 3</u> to the Scheduling Order;

b.     the Scheduling Order (without attachments, except a copy of these Solicitation and Voting Procedures, appended as <u>Exhibit 2</u> to the Scheduling Order);

c.     the fully compiled Disclosure Statement with all exhibits thereto, including the Plan;

d.     a Ballot customized (where possible and appropriate) for such Holder or a Master Ballot in the case of an Indenture Trustee of the Securitization Note Claims, substantially in the form attached to the Scheduling Order as <u>Exhibits 5-A</u>, <u>5-B</u>, <u>6-A</u>, <u>6-B</u>, and <u>7</u> (collectively, the "**Ballots**");[17]

e.     a postage-prepaid return envelope; and

f.     such other materials as the Bankruptcy Court may direct.

Holders of Claims or Interests in the Non-Voting Classes shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status, and the Opt-In Form.

##### 3.     Form of Ballots

Holders of Claims in the Voting Classes eligible to vote to accept or reject the Plan shall receive Ballots which are customized to each particular Voting Class.[18]  All Holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt-in to the non-debtor release provisions in <u>Article VIII.D</u> of the Plan (the "**Non-Debtor Release Provisions**").  Holders of Claims in the Voting Classes that properly and timely elect to opt-in to the Non-Debtor Release Provisions in will be a Releasing Party and Released Party.

The Debtors will distribute Ballots to each of the Holders of Securitization Class A-2 Note Claims, Holders of Securitization Class B Note Claims, and Holders of Non-Securitization Manager Advance Term Loan Claims. To be eligible to vote, a Holder must be either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act), and certify as to

---

[17]   Official Bankruptcy Form No. B 314 can be found at <u>http://www.uscourts.gov/forms/bankruptcy-forms,</u> the official website for the United States Bankruptcy Courts.

[18]   Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon, Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

such applicable status in the Ballot. Votes cast by Holders who do not make the applicable certifications will not count.

The Debtors will distribute to the Indenture Trustee or the bank, broker, or other financial institution that holds the Securitization Class A-2 Notes "in street name" at DTC on behalf of the Class 2 Beneficial Holder (each, a "**Nominee**") two forms of Ballots with respect to Holders of Class 2 Securitization Class A-2 Note Claims, Holders of which are entitled to vote on the Plan: (a) a form of Ballot for a beneficial owner of a Securitization Class A-2 Note Claim (each, a "**Class 2 Beneficial Holder**" and each corresponding ballot, a "**Class 2 Beneficial Holder Ballot**"), which the Nominee, at its election, will distribute to the Class 2 Beneficial Holders and (b) a form of Ballot for the Nominee of the Class 2 Beneficial Holder (or agent thereof) to transmit the votes of one or more Class 2 Beneficial Holders (each, a "**Class 2 Master Ballot**").

Additionally, the Debtors will distribute to the Indenture Trustee or Nominee two forms of Ballots with respect to Holders of Class 3 Securitization Class B Note Claims, Holders of which are entitled to vote on the Plan: (a) a form of Ballot for a beneficial owner of a Securitization Class B Note Claim (each, a "**Class 3 Beneficial Holder**" and Class 3 Beneficial Holders and Class 2 Beneficial Holders, together the "**Beneficial Holders**" and each corresponding ballot, a "**Class 3 Beneficial Holder Ballot**" and together with the Class 2 Beneficial Holder Ballot, the "**Beneficial Holder Ballots**"), which the Nominee, at its election, will distribute to the Class 3 Beneficial Holders and (b) a form of Ballot for the Nominee of the Class 3 Beneficial Holder (or agent thereof) to transmit the votes of one or more Class 3 Beneficial Holders (each, a "**Class 3 Master Ballot**" and together with the Class 2 Master Ballot, the "**Master Ballots**").

## 4.    Distributions of the Solicitation Package

To reduce costs and the impact on the environment, the Debtors propose to send the Disclosure Statement, Plan, and Scheduling Order (without attachments, except the Solicitation and Voting Procedures annexed as Exhibit 2 thereto) in electronic format (on a USB flash drive) instead of printed hard copies.  Only the Ballots and the Combined Hearing Notice, and such other materials as the Court may order included with the Solicitation Packages, will be provided in paper format.  Moreover, the Plan and the Disclosure Statement will be available at no charge through the Debtors' restructuring website maintained by the Voting Agent at https://cases.ra.kroll.com/Hooters/.  However, the Debtors propose that if online access or service by USB flash drive imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (e.g., the party does not own or have access to a computer or the internet), such party may request a paper copy of the Plan, Disclosure Statement, and Scheduling Order (without attachments, except the Solicitation and Voting Procedures annexed as Exhibit 2 thereto) by contacting the Voting Agent by: (a) calling +1 (646) 844-3894 (international, toll) or (888) 575-4910 (U.S./Canada, toll free), (b) writing to Hooters Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing HootersInfo@ra.kroll.com (with "Hooters Solicitation Inquiry" in the subject line).  Upon receipt of such request, the Debtors will provide such party with a paper copy of the Plan and the Disclosure Statement free of charge.

On or before the date that is one (1) Business Day after entry of the Scheduling Order, or as soon as reasonably practicable thereafter, the Debtors shall cause the Voting Agent to distribute

the Solicitation Package to Nominees on behalf of Holders of Claims in the Voting Classes as of the Voting Record Date. In addition, the Debtors shall cause the Voting Agent to serve a Solicitation Package (without Ballots) on the U.S. Trustee, counsel to the Creditors' Committee, and all parties in interest required to be notified under Bankruptcy Rule 2002 and Rule 2002-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "**Local Rules**"). Following the Voting Deadline, the Debtors, with the assistance of the Voting Agent, shall complete a final tabulation of the Ballots and submit a final voting report (the "**Voting Report**") on or before the date that is four (4) days prior to the Combined Hearing.

The Debtors are not required to mail Solicitation Packages to Holders of Other Intercompany Claims or Intercompany Interests.[19]

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each Holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

Nominees shall promptly distribute such Solicitation Packages (including Beneficial Holder Ballots) to Beneficial Holders within five (5) Business Days of receipt of the Solicitation Packages using one of the following two methods:

Each Nominee may elect to (i) "pre-validate" the Beneficial Holder Ballot, i.e., execute the Beneficial Holder Ballot, validate the Beneficial Holder's position in the Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, as of the Voting Record Date by including a medallion guarantee stamp on the Beneficial Holder Ballot, forward the Solicitation Package and executed Beneficial Holder Ballot (including the Nominee's DTC participant number) to the Beneficial Holder as of the Voting Record Date, and instruct the Beneficial Holder to (a) indicate its vote to accept or reject the Plan, and (b) return the executed Beneficial Holder Ballot directly to the Voting Agent via email at HootersBallots@ra.kroll.com or first-class mail; or (ii) forward the Solicitation Package together with the unexecuted Beneficial Holder Ballot to the Beneficial Holder as of the Voting Record Date with instructions for the Beneficial Holder to complete and return the executed Beneficial Holder Ballot to the Nominee. In the event that a Nominee elects to proceed pursuant with option (ii) in the immediately preceding sentence, such Nominee must advise its Beneficial Holders to return their Beneficial Holder Ballot to the Nominee by a date that would permit the Nominee sufficient time to prepare and return its Master Ballot to the Voting Agent so that the Master Ballot is **actually received** by the Voting Agent by the Voting Deadline. If it is a Nominee's customary and accepted practice to forward the Solicitation Packages to (and collect votes or elections from) Beneficial Holders by voter information form, electronic mail, telephone, or other customary means of communication, as applicable, including online submission of votes, the Nominee could employ that method of

---

[19]    Such Claims and Interests are held by the Debtors or the Debtors' affiliates.

communication or submission in lieu of, or in addition to, sending the full Solicitation Package and/or Beneficial Holder Ballot.  Moreover, if it is the Nominee's customary internal practice to provide Beneficial Holders with an electronic link to solicitation materials (including, but not limited to, the Disclosure Statement and Plan), the Nominee may follow such customary practice in lieu of forwarding the flash drive or paper copies containing the Disclosure Statement and Plan.   In such instances, the Nominee may return any excess or unused flash drives or paper copies to the Voting Agent.   Any Beneficial Holder holding a Securitization Class A-2 Note Claim or Securitization Class B Note Claim, as applicable, as a record Holder in its own name is permitted to vote on the Plan by completing and signing a Beneficial Holder Ballot and returning it directly to the Voting Agent on or before the Voting Deadline.   If a Beneficial Holder holds Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and should execute and return a separate Beneficial Holder Ballot for each block of Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, it holds through any Nominee.

In addition to accepting a hard copy Ballot, pre-validated Beneficial Holder Ballot, and Master Ballot via first class mail, overnight courier, and hand delivery to the Voting Agent, Ballots (excluding Master Ballots, pre-validated Beneficial Holder Ballots, and Beneficial Holder Ballots) may be submitted via electronic, online transmissions, through a customized online balloting portal on the Debtors' case website maintained by Kroll ("**E-Ballot**").   Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing E-Ballot (which allows a Holder to submit an electronic signature).   If applicable, instructions for electronic, online transmission of Ballots will be set forth on the forms of Ballots and in the E-Ballot online portal. The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted through E-Ballot in this manner and the voting party's electronic signature will be deemed to be immediately legally valid and effective.  Ballots submitted by electronic mail, facsimile, or electronic means other than the online balloting portal will not be accepted, provided that, Master Ballots submitted by Nominees on behalf of their Beneficial Holder clients and pre-validated Beneficial Holder Ballots submitted by Beneficial Holders of Securitization Class A-2 Notes Claims or Securitization Class B Notes Claims, as applicable, may be returned directly to the Voting Agent by electronic mail at HootersBallots@ra.kroll.com.    Where applicable, instructions for electronic, online transmissions of Ballots are set forth on the forms of the Ballots.

5.       **Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan**

Holders of Claims or Interests in the Non-Voting Classes, in lieu of a Solicitation Package, will receive the Combined Hearing Notice, a Notice of Non-Voting Status, and Opt-In Form, substantially in the form attached to the Scheduling Order as Exhibit 3, Exhibit 8 and Exhibit 9; *provided that*, the Debtors are not required to serve Holders of Other Intercompany Claims or Intercompany Interests copies of the Combined Hearing Notice, Notice of Non-Voting Status, Opt-In Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the Holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and Plan.  In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article VIII of the Plan and advises such Holders in Non-Voting Classes that they will not be bound by the Non-Debtor Release Provisions unless they timely and properly opt in.  The Notice of Non-Voting Status also includes a form (an "**Opt-In Form**") to complete and return if the party elects to opt-in to such Non-Debtor Release Provisions.  A Holder that properly and timely elects to opt-in to the Non-Debtor Release Provisions will be a Releasing Party and Released Party under the Plan.  Holders of Claims and Interests in the Non-Voting Classes who choose to opt-in to the Non-Debtor Release Provisions may do so by submitting their Opt-In Form (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the E-Ballot so that (in each instance) it is actually received by the Voting Agent no later than **July 21, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Opt-In Deadline**"), which the Debtors may extend, in their discretion, without further order of the Bankruptcy Court.  The Notice of Non-Voting Status includes information on how parties can opt-in electronically via the E-Ballot.  An encrypted opt-in data and audit trail will be created through the electronic submission process and become part of the record of any opt-in election submitted in this manner.  Additionally, the parties' electronic signature will be deemed to be legally valid and effective immediately.  For the avoidance of doubt, the E-Ballot and the Debtors' restructuring website are the sole methods for Holders of Claims and Interests in Non-Voting Classes to transmit opt-in elections electronically.

6.       **Undeliverable Mailings**

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable.  For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date.  The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Deadline.

### D.   Voting and Tabulation Procedures

#### 1.   Voting Record Date

The Voting Record Date has been set as **June 6, 2025**, which is the date used for determining which Holders of Claims in the Voting Classes are entitled to vote on the Plan.

#### 2.   Holders of Claims Entitled to Vote

Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), and Class 4 (Non-Securitization Manager Advance Term Loan Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below.

A Holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

a.   as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim was zero ($0.00);

b.   as of the Voting Record Date, such creditor's Claim has been Disallowed, expunged, disqualified or suspended;

c.   such creditor has not timely filed a Proof of Claim as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed, except to the extent that such creditor's deadline to file a Claim has not yet occurred, in which case the creditor will be entitled to vote at $1.00 on account of their Claim that has been scheduled in an undetermined amount or as contingent, unliquidated, or disputed;

d.   such creditor's Claim is subject to an objection or request for estimation as of the Voting Record Date, subject to the procedures set forth below; or

e.   such Holder is not, or fails to certify that it is, either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act).

With respect to transfers of Claims Filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package and, if the Holder of such Claim was otherwise entitled to vote with respect to the Plan, cast a Ballot on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date or (ii) the transferee files, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the Holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

### 3.      Parties Not Entitled to Vote

Holders of Claims and Interests in Classes 1 (Priority Non-Tax Claims), 5 (Other Secured Claims), 6 (Non-Securitization Term Loan Claims (Secured)), and 12 (Other Securitization Prepetition Equity Interests) will have their Claims and Interests adjusted, reinstated, or otherwise receive treatment as to render such Holders Unimpaired in the Debtors' or Reorganized Debtors' discretion (collectively, the "**Unimpaired Classes**").  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of such Claims and Interests in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Classes 7 (Securitization Manager Advance Claims), 8 (General Unsecured Claims), 9 (Other Intercompany Claims), 10 (Intercompany Interests), 11 (Securitization Prepetition Master Issuer Equity Interests), and 13 (Non-Securitization Prepetition Equity Interests) will receive no recovery under the Plan.  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, such Holders are deemed to reject the Plan and, accordingly, are not entitled to vote on the Plan.

### 4.      Establishing Claim Amounts for Voting Purposes

**Class 2 Securitization Class A-2 Note Claims and Class 3 Securitization Class B Note Claims.**  The amount of each Securitization Class A-2 Note Claim and Securitization Class B Note Claim, for voting purposes only, will be based (a) on the applicable Notes held by each registered Holder thereof, if any, as evidenced on the books and records of the applicable indenture trustee or (b) on the amount of applicable Notes held by a Beneficial Holder thereof through a Nominee (as defined below) as of the Voting Record Date as evidenced by the securities position report(s) from DTC, or other similar depository.

**Class 4 Non-Securitization Manager Advance Term Loan Claims**.  The amount of each Non-Securitization Manager Advance Term Loan Claim, for voting purposes only, will be based on and reconciled against the applicable lender registry maintained by the Debtors and/or the applicable administrative agent for such loan facility, as applicable.

To the extent that any discrepancy exists between the aggregate Claims amount as indicated on a Ballot by a Holder of Claims in one or more Voting Classes and the aggregate Claims amount as listed on the applicable lender registry, books and records or securities position report, for each Voting Class in which a Holder votes Claims, the aggregate Claims amount as listed on the applicable lender registry, books and records or securities position report, as applicable, shall govern for tabulation purposes.

### 5.    Tabulation of Ballots

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.    Whenever a Holder of Claims casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent and thus, supersede any previously received, valid Ballot.   Following the Voting Deadline, no Ballot may be changed or revoked absent further order of the Court or as directed by the Debtors.

b.    Whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, the Ballot will not be counted.

c.    Whenever a Holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

d.    A Holder of Claims shall be deemed to have voted the full amount of its  Claim  in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor.  Any such Holder's Ballot (other than a Master Ballot) that partially accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

e.    A Holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

f.    A Holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

g.    The Debtors, unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

h.    The following Ballots shall not be counted:

i.    any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waive the late submission;

ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

     iii.     any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

     iv.     any Ballot cast by a person or entity that is not entitled to vote, even if such individual or entity holds a Claim in a Voting Class;

     v.     any unsigned Ballot, provided that Ballots submitted by E-Ballot, Master Ballots submitted via e-mail by Nominees on behalf of their Beneficial Holder clients, and pre-validated Beneficial Holder Ballots submitted directly to Kroll by Beneficial Holders, via electronic mail will be deemed to contain a legal, valid signature;

     vi.     any Ballot containing a vote that the Bankruptcy Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code;

     vii.     any Ballot transmitted to the Voting Agent by e-mail or facsimile or other means not specifically approved by the Bankruptcy Court.  For the avoidance of doubt, Master Ballots and pre-validated Beneficial Holder Ballots may be submitted via e-mail; or

     viii.     any Ballot cast by a person or entity that does not certify that it is either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act).

     Votes cast by (or on behalf of) Beneficial Holders of the Debtors are subject to the following tabulating procedures:

     a.     votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees of certain Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, as of the Voting Record Date, as evidenced by the securities position report(s) from the DTC, the applicable indenture trustee, or other applicable depository firm.  Votes submitted by a Nominee will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

     b.     if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

     c.     if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of certain Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable;

d.      for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Beneficial Holder includes interest and/or fees in the amount voted on its Ballot) to have voted only the principal amount of its Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable;

e.      a single Nominee may complete and deliver to the Voting Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot. Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly;

f.      the amount of Securitization Class A-2 Note Claims or Securitization Class B Note Claims, as applicable, held by directly registered and Beneficial Holders for voting purposes only will be established through the indenture trustees or applicable Nominees, as the case may be, in the amount of the applicable positions held by such registered Holders as of the Voting Record Date, as evidenced by the securities position report(s) from the DTC, the applicable indenture trustee, or other applicable depository firm; and

g.      all Nominees are required to retain the Beneficial Holder Ballots cast by their respective Beneficial Holders (or a record thereof if such vote was otherwise cast in accordance with the Nominees' customary practices) for inspection for a period of one (1) year following the Voting Deadline.

Each Holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots

previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.

The Debtors (in consultation with the DIP Lenders, Ad Hoc Group, and Creditors' Committee) are further authorized to reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their Claim Holders. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **July 24, 2025 at 4:00 p.m. (Prevailing Central Time)**.

### 6.    Amendments to the Plan and Solicitation and Voting Procedures

The Debtors reserve the right, and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Combined Hearing Notice, Opt-In Form, and Solicitation Packages, and related documents without further order of the Bankruptcy Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution; provided, that all such modifications shall be made in accordance with the terms of the document being modified, the Plan, and the Restructuring Support Agreement. For the avoidance of doubt, in the event the Restructuring Support Agreement is terminated, all consent rights set forth therein will terminate and will no longer be applicable.

### E.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

### IX.    RISK FACTORS TO CONSIDER BEFORE VOTING

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS**

**DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below, as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.    Factors Relating to the Debtors' Business Operations and Financial Condition

#### 1.    Competition

Companies operating in the food service industry face a high level of competition, and results of the Debtors' operations are sensitive to, and may be adversely affected by, competitive pricing, promotional pressures, additional competitor restaurant openings, and other factors.  The Reorganized Debtors will compete with numerous other companies providing similar services, including international, national, and local restaurants and third-party food delivery providers.  The Reorganized Debtor's ability to successfully implement their business plan depends on their ability to attract and retain customers in this highly competitive environment.

#### 2.    Right-Sizing Real Estate Portfolio

The Debtors' efforts to divest or close restaurants during the Chapter 11 Cases is part of the Debtors' wider effort to cut costs and maintain profitability.  The Debtors forward-looking financial projections are based on the divestment and closure of certain restaurants.  The actual lease savings realized by the Company may be substantially less than the Debtors anticipate.

#### 3.    Customer Preferences

The restaurants industry fluctuates according to changes in customer preferences, which are dictated by seasonality, perceived value, and industry trends.  The success of the Debtors' business is highly dependent on the Debtors' ability to anticipate, identify, or react to changing styles or trends.  If the Debtors are unable to anticipate, identify, or react sufficiently to such changing styles or trends, the Debtors' revenue and overall performance, as well as its brand image and membership figures, may be adversely affected.

4.      **Pending and Future Litigation**

There is, or may be in the future, certain litigation that could result in a material judgment against the Debtors, the Reorganized Debtors, or the Wind-Down Entity.  Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtor or Wind-Down Entity.

5.      **Market Value of the Debtors' Restaurant Business**

The fair market values of the Hooters brand that the Debtors currently own and operate may increase or decrease depending on a number of factors, many of which are beyond the Debtors' control, including the general economic and market conditions affecting the restaurant industry sectors.

6.      **Operational Disruptions or Cost Increases Related to Their Supply Chain, Labor, or Other Causes**

In addition, the Debtors rely on certain third parties to provide supplies and services necessary for their restaurant business, including, but not limited to, foodservice inventory as well as the Debtors' workforce to operate the restaurant locations.  The failure of these suppliers to provide the materials or for the Debtors to maintain the necessary human resources required to operate the restaurant business could result in an operational disruption, leading to lost revenue.

7.      **Governmental Laws and Regulations May Impose Significant Costs and Liabilities**

The Debtors' operations are subject to federal, state, and local laws and regulations that may, among other things, require them to obtain and maintain specific permits or other governmental approvals.  Failure to comply with these laws and regulations may result in the assessment of financial penalties, the imposition of remedial obligations, the denial or revocation of permits or other authorizations, and the issuance of injunctions that may limit or prohibit some or all of the Debtors' operations.  The application of these laws and regulations, the modification of these laws or regulations, or the adoption of new laws or regulations could materially limit future opportunities or materially increase the Debtors' costs, including their capital expenditures.

8.      **RoyaltyCo's Future Success Depends on the Performance of Brand Management Co.**

Brand Management Co., an entity to be formed and owned by the Buyer Group, is expected to be engaged by RoyaltyCo under the Brand License Agreement to oversee all brand, franchising, and management functions.  The success of RoyaltyCo will be largely dependent on the ability of Brand Management Co. to support and grow the business.  There is no assurance that the past performance of the Buyer Group will be indicative of Brand Management Co.'s future results, or that Brand Management Co. will be able to grow the business with the same success the Buyer Group has had in the past or as is currently planned.

### C.   Certain Bankruptcy Law Considerations

#### 1.   Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

#### 2.   Non-Consensual Confirmation

If any impaired class of claims or interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class.  The Debtors believe that the Plan satisfies these requirements.

#### 3.   Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions, as set forth in **Exhibit D** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or the Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demand for the Reorganized Debtors' products and services, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or public health pandemics may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

The Debtors' projections reflect the projected impact of value-creating programs. However, the Debtors cannot state with certainty that such value-creating programs will achieve their targeted results.

### 4.      Allowed Claims Could Exceed Estimates

There can be no assurance that the Allowed amount of Claims participating in distributions will not be significantly more than projected, which in turn, could cause the value of distributions to Holders of such Allowed Claims to be reduced.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.

### 5.      U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims and Interests, *see* **Section VII** of this Disclosure Statement.

### 6.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7.      Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### D.      Factors Relating to Securities to Be Issued

### 1.      Potential Dilution

The ownership percentage represented by the New Equity Interests distributed under the Plan as of the Effective Date will be subject to dilution from a management incentive plan ("**MIP**") or any other equity issued in connection with any other equity that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other equity issuances by RoyaltyCo could adversely affect the value of the New Equity Interests.  The amount and dilutive effect of any of the foregoing could be material.

2.      **Significant Holders of New Equity Interests**

Certain Prepetition Lenders and Holders of Securitization Class B Notes are expected to acquire a significant ownership interest in the New Equity Interests issued pursuant to the Plan. Such Prepetition Lenders and Holders of Securitization Class B Notes may, among other things, exercise a controlling influence over the business and affairs of RoyaltyCo and have the power to elect directors, control the appointment of a majority of the board of directors, and approve significant mergers and other material corporate transactions, without the approval of other stockholders.

This concentration of ownership could also facilitate or hinder a negotiated change of control of RoyaltyCo and, consequently, have an impact upon the value of the New Equity Interests.

3.      **Interests Subordinated to the RoyaltyCo's Indebtedness**

In any subsequent liquidation, dissolution, or winding up of RoyaltyCo, the New Equity Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

4.      **Market for Securities**

There is currently no market for the New Equity Interests or the New Debt, and there can be no assurance as to the development or liquidity of any market for any such securities. RoyaltyCo is under no obligation to list any such securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, RoyaltyCo.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

5.      **Restrictions on Ability to Resell New Debt and New Equity Interests**

The New Equity Interests and the New Debt will not be registered under applicable federal or state securities law.  Absent such registration, the New Equity Interests may be offered and sold only in transactions that are not subject to, or that are exempt from, the registration requirements of applicable securities laws.  These restrictions could significantly limit holders' ability to resell the New Equity Interests.

In particular, any New Equity Interests issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities, and the New Debt, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from

registration under the Securities Act and other applicable law.  In addition, and subject to the foregoing, while the New Equity Interests issued pursuant to section 1145(a) of the Bankruptcy Code may generally be resold by the holder thereof without registration under the Securities Act, such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of RoyaltyCo as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer.  Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 or Rule 144A under the Securities Act.

Furthermore, the liquidity of any market for the New Equity Interests will depend upon, among other things, the number of holders of the New Equity Interests, RoyaltyCo's financial performance, and the market for similar securities, none of which can be determined or predicted. Additionally, the New Equity Interests and New Debt may be subject to certain restrictions on transfer under the Shareholders Agreement, if any, New Organizational Documents, and New Notes Documents, as applicable.  Accordingly, there can be no assurance that an active trading market for the New Equity Interests or New Debt will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Equity Interests and New Debt may be substantially limited.  For a discussion of transfer restrictions on the New Equity Interests and New Debt under applicable federal or state securities law, *see* <u>Section VI</u> of this Disclosure Statement.

### E.  <u>Factors Related to the DIP Facility, the New Notes, and the Restructuring Support Agreement</u>

#### 1.  **Risks Related to the DIP Facility**

The DIP Facility is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

#### 2.  **Risks Related to the New Notes and Post-Effective Date Indebtedness**

The New Notes Indenture is intended to provide RoyaltyCo liquidity to operate its business and carry out the Reorganized Debtors' business plan after the Effective Date.  However, there is no assurance that the Reorganized Debtor will be able to meet all of the terms and conditions of the New Notes Documents, which may hinder the Debtors' ability to consummate the Plan.  There is a risk that RoyaltyCo defaults under the New Notes Indenture and the secured parties thereunder take enforcement actions against RoyaltyCo, including execution or foreclosure against assets thereof.  RoyaltyCo and the Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their compliance with affirmative and negative covenants, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond their control.  They may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if

they need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 3. The Restructuring Support Agreement or Other Plan Documents Could Be Terminated

The Restructuring Support Agreement is an important component of the Debtors' ability to consummate the Plan.  Pursuant to its terms, the Restructuring Support Agreement may be terminated under certain circumstances, including if a Consenting Stakeholder thereunder delivers a written notice of termination, or if the Debtors materially breach, or file a pleading with the Bankruptcy Court that is inconsistent with, the Restructuring Support Agreement.

The Debtors' entry into the Restructuring Support Agreement and other Plan documents will be subject to approval by the Bankruptcy Court.  There can be no assurance that the Bankruptcy Court will approve the Debtors' entry into the Restructuring Support Agreement or other Plan documents.

### F. Additional Factors

### 1. Debtors Could Withdraw the Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.      No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

## X.      <u>CONFIRMATION OF THE PLAN</u>

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all Impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A.      <u>Acceptance of the Plan</u>

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

(i)  **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

(ii)  **Unsecured Creditors**.  Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(iii)  **Interests**.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the Holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE COMBINED HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

**B.**     **Best Interests Test**

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interests" test.  The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the amount such holder would receive or retain in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit E**.

The Debtors believe that any liquidation analysis is subjective, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## C.   **Feasibility**

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of RoyaltyCo, the Reorganized Debtors, or any successor under the Plan.

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections (collectively, the "**Financial Projections**"), attached hereto as **Exhibit D**.  Moreover, Section IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, unless required to do so by the SEC or other regulatory bodies.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by a variety of factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their

entirely, and the historical consolidated financial statements (including the notes and schedules thereto).

### D.    Valuation

Assuming all DIP Claims are paid in full under the Plan, and before giving effect to any dilution from the MIP, the Plan implies an enterprise value of the Company of approximately $[●] million.  The estimated recoveries set forth in this Disclosure Statement are based on such implied enterprise value.  The Debtors may receive higher and better offers for the Debtors' assets.  Any such offers would be negotiated at arms'-length and would be subject to a Court-approved sale process.  If competitive bids are received, the Debtors believe such bids may be the best indicators of the Company's value.

### E.    Notices and Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing to consider the confirmation of a plan upon appropriate notice to all required parties.  The Combined Hearing is scheduled for **July 29, 2025 at [●]:[●]  [●].m. (Central Time).**  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Combined Hearing, at any subsequent continued Combined Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be Filed with the Bankruptcy Court by the Objection Deadline (**July 21, 2025 at 4:00 p.m. (Prevailing Central Time)**), with a copy to the chambers of Judge Everett, together with proof of service thereof, and served upon all of the below parties.

**If to the Debtors, to:**

| | |
|---|---|
| Hooters of America, LLC | Ropes & Gray LLP |
| 1815 The Exchange SE | 1211 Sixth Ave |
| Atlanta, GA 30339 | New York, New York 10036 |
| Attn: Keith Maib, CRO | Attn:  Ryan Preston Dahl |
| E-mail: kmaib@accordion.com | Email:     ryan.dahl@ropesgray.com |
| | |
| | Ropes & Gray LLP |
| | 191 N. Wacker Dr., 32nd Floor |
| | Chicago, IL 60606 |
| | Attn: Chris Dickerson, Rahmon Brown, Michael Wheat |
| | Email:   chris.dickerson@ropesgray.com, rahmon.brown@ropesgray.com, michael.wheat@ropesgray.com |

Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Attn: Holland N. O'Neil,
Stephen A. Jones, Zachary C. Zahn
Email: honeil@foley.com
sajones@foley.com
zzahn@foley.com

**If to the Creditors' Committee, to:**

Pachulski Stang Ziehl & Jones LLP
700 Louisiana Street, Suite 4500
Houston, TX 77002
Attn: Maxim Litvak, Judith Elkin,
Theodore S. Heckel
Email: jelkin@pszjlaw.com
mlitvak@pszjlaw.com
theckel@pszjlaw.com

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Attn: Bradford J. Sandler, Robert J.
Feinstein, Shirley S. Cho
bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
scho@pszjlaw.com

**If to the DIP Lenders, to:**

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attn: Genevieve G. Weiner
Email: gweiner@sidley.com

Sidley Austin LLP
787 7th Avenue
New York, NY 10019
Attn: Elizabeth R. Tabas Carson,
Juliana L. Hoffman
Email: etabas@sidley.com
jhoffman@sidley.com

**If to the Buyer Group and Brand Management Co., to:**

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Benjamin W. Butterfield,
Ilayna Guevrekian
Email: bbutterfield@mofo.com
Iguevrekian@mofo.com

**If to the AHG Noteholders, to:**

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attention: Brian Pfeiffer,
Amanda Parra Criste
Email: brian.pfeiffer@whitecase.com
aparracriste@whitecase.com

White & Case LLP
1121 Avenue of the Americas
New York, NY 10021
Attention: David Thatch

Email: dthatch@whitecase.com

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## XI.   <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in Classes 2, 3, and 4 to vote in favor thereof.

Dated: June 16, 2025
      Dallas, Texas

**FOLEY & LARDNER LLP**

*/s/ Draft*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
mmoore@foley.com
zzahn@foley.com

*Co-Counsel to the Debtors*

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
ryan.dahl@ropesgray.com

**ROPES & GRAY LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Counsel to the Debtors*

## **Exhibit A**

### **Plan**

## **Exhibit B**

### **Restructuring Support Agreement**

## **Exhibit C**

**Debtors' Organizational Structure**



## **Exhibit D**

**Financial Projections**

To come.

## Exhibit E

## Liquidation Analysis

To come.

# **EXHIBIT A**

**Plan**

**ROPES & GRAY LLP**

Ryan Preston Dahl (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: ryan.dahl@ropesgray.com

- and -

**ROPES & GRAY LLP**

Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Counsel to the Debtors*

**FOLEY & LARDNER LLP**

Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Co-Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Jointly Administered) |

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF HOOTERS OF AMERICA, LLC AND ITS AFFILIATED DEBTORS

# TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................... 1

    A.    Defined Terms ........................................................................................ 1

    B.    Rules of Interpretation ........................................................................ 20

    C.    Computation of Time .......................................................................... 21

    D.    Governing Law .................................................................................... 21

    E.    Reference to Monetary Figures ........................................................... 21

    F.    Reference to the Debtors .................................................................... 21

    G.    Controlling Document ........................................................................ 21

    H.    Certain Consent Rights ...................................................................... 22

**ARTICLE II ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** ........................... 22

    A.    Administrative Claims ........................................................................ 23

    B.    DIP Claims ......................................................................................... 24

    C.    Professional Fee Claims ..................................................................... 24

    D.    Priority Tax Claims ............................................................................ 25

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................................................................................ 26

    A.    Summary of Classification .................................................................. 26

    B.    Treatment of Claims and Interests ..................................................... 27

    C.    Special Provision Governing Unimpaired Claims .............................. 32

    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code   33

    E.    Subordinated Claims .......................................................................... 33

    F.    Elimination of Vacant Classes ........................................................... 33

    G.    Voting Classes; Presumed Acceptance by Non-Voting Classes ......... 33

    H.    Controversy Concerning Impairment ................................................. 33

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** .................................. 34

    A.    Finality of Distributions .................................................................... 34

    B.    No Substantive Consolidation ............................................................ 34

    C.    Sources of Consideration for Plan Distributions ............................... 34

    D.    New Debt ........................................................................................... 34

    E.    New Equity Interests .......................................................................... 35

    F.    New Organizational Documents ......................................................... 36

    G.    New Board ......................................................................................... 36

i

| | | |
|---|---|---|
| H. | Vesting of Assets in the Reorganized Debtors | 36 |
| I. | Wind-Down Process and Wind-Down Officer | 37 |
| J. | Cancellation of Existing Interests, Indebtedness, and Other Obligations | 37 |
| K. | Corporate Action | 39 |
| L. | Effectuating Documents; Restructuring Transactions | 40 |
| M. | Exemption from Certain Taxes and Fees | 41 |
| N. | Preservation of Causes of Action | 41 |
| O. | Insurance Policies | 42 |
| P. | Closing of Chapter 11 Cases | 43 |
| Q. | Dissolution of Certain Debtors | 43 |

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .... 44**

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 44 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 45 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 45 |
| D. | Dispute Resolution | 46 |
| E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 47 |
| F. | Reservation of Rights | 47 |
| G. | Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) | 48 |

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .... 48**

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 48 |
| B. | Rights and Powers of Distribution Agent | 48 |
| C. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 49 |
| D. | Securities Registration Exemption | 51 |
| E. | Compliance with Tax Requirements | 52 |
| F. | Allocations | 53 |
| G. | No Postpetition Interest on Claims | 53 |
| H. | Setoffs and Recoupment | 53 |
| I. | Claims Paid or Payable by Third Parties | 53 |

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .... 54**

| | | |
|---|---|---|
| A. | Allowance of Claims and Interests | 54 |
| B. | Claims and Interests Administration Responsibilities | 55 |
| C. | Estimation of Claims | 55 |
| D. | Adjustment to Claims Register Without Objection | 55 |

E.      Time to File Objections to Claims ........................................................ 56

F.      Disallowance of Claims ......................................................................... 56

G.      Amendments to Claims .......................................................................... 56

H.      Disputed Claims Reserve ...................................................................... 56

I.      Distributions After Allowance ............................................................. 57

J.      Single Satisfaction of Claims ............................................................... 58

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
            PROVISIONS ...................................................................... 58**

A.      Compromise and Settlement of Claims, Interests, and Controversies ................. 58

B.      Discharge of Claims and Termination of Interests ............................... 58

C.      Releases by the Debtors ........................................................................ 59

D.      Releases by the Releasing Parties ........................................................ 60

E.      Exculpation ........................................................................................... 62

F.      Injunction ............................................................................................. 63

G.      Subordination Rights ............................................................................ 64

H.      Release of Liens ................................................................................... 64

**ARTICLE IX CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .... 65**

A.      Conditions Precedent to the Effective Date ......................................... 65

B.      Waiver of Conditions ............................................................................ 67

C.      Substantial Consummation .................................................................... 67

D.      Effect of Non-Occurrence of Conditions to the Effective Date........... 67

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
            PLAN ..................................................................................... 67**

A.      Modification and Amendments.............................................................. 67

B.      Effect of Confirmation on Modifications ............................................. 68

C.      Revocation or Withdrawal of the Plan.................................................. 68

**ARTICLE XI RETENTION OF JURISDICTION ................................................... 68**

**ARTICLE XII MISCELLANEOUS PROVISIONS ................................................. 71**

A.      Votes Solicited in Good Faith............................................................... 71

B.      Immediate Binding Effect ..................................................................... 71

C.      Additional Documents .......................................................................... 72

D.      Payment of Statutory Fees .................................................................... 72

E.      Reservation of Rights............................................................................ 72

F.      Successors and Assigns......................................................................... 72

G.      Service of Documents ........................................................................... 73

H.      Term of Injunctions or Stays.................................................................................... 74

I.      Entire Agreement ................................................................................................... 74

J.      Nonseverability of Plan Provisions......................................................................... 74

K.      Dissolution of Committee ....................................................................................... 75

L.      Expedited Tax Determination ................................................................................. 75

## INTRODUCTION

Hooters of America, LLC and its Debtor affiliates propose this *Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors*.  Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in <u>Article IA</u> of the Plan.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    ***Ad Hoc Group*** means the ad hoc group of Holders of Securitization Notes Claims under the Prepetition Securitization Indenture represented by the Ad Hoc Group Advisors.

2.    ***Ad Hoc Group Advisors*** means (i) White & Case LLP, counsel to the Ad Hoc Group, (ii) Gray Reed, local counsel to the Ad Hoc Group, and (iii) M3 Partners, LP, financial advisor to the Ad Hoc Group.

3.    ***Adjourned Cure Dispute*** shall have the meaning ascribed to such term in <u>Article V.D</u> of the Plan.

4.    ***Administrative Claim*** means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) Restructuring Expenses; (iv) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (v) fees payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; and (vi) DIP Claims.

5.    ***Administrative Claims Bar Date*** means the deadline for filing request for payment of an Administrative Claim, except for Professional Fee Claims, Restructuring Expenses, and DIP Claims, which shall be the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

6.     **Affiliates** means "Affiliates" as such term is defined in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that directly or indirectly wholly owns or controls such Entity or any other Entity that is directly or indirectly wholly-owned or controlled by such Entity.

7.     **Allowed** means with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest arising on or before the Effective Date that is either (a) evidenced by a Proof of Claim or Interest that is, as applicable, timely Filed by the Claims Bar Date in accordance with the Claims Bar Date Order, (b) for which Claim under the Plan, the Bankruptcy Code, DIP Orders, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed, (c) listed in the Schedules, if any, as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed by the applicable Claims Bar Date;  (z) Allowed pursuant to the Plan or a Final Order (including the DIP Order) provided that with respect to a Claim or Interest described in clauses (a) - (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that, with respect to such Claim or Interest, no objection to the allowance thereof or motion for estimation has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection or motion is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; provided, further, that unless expressly waived by the Plan, the Allowed amount of a Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

8.     **Alternative Proposals** means proposals other than the Buyer Group's proposal, for the acquisition of assets which the Buyer Group seeks to acquire.

9.     **Approved Budget** means the budget approved by the Required DIP Lenders and Required Majority Consenting AHG Noteholders in accordance with the DIP Facility Documents.

10.     **Assumption Dispute** means a pending objection relating to assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

11.     **Assumption Schedule** means the schedule of Executory Contracts and Unexpired Leases that will be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to another Entity pursuant to the Plan or the Buyer Group Arrangements, as applicable, to be Filed as part of the Plan Supplement, and as may be amended, supplemented, or modified from time to time in accordance with the Plan, the Confirmation Order, and the Buyer Group Documents.

12.     **Avoidance Actions** means any and all actual or potential avoidance, recovery, subordination, or other similar Claims and Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, or other similar related, local, state, federal statutes and common law.

13.     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

14.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent any reference made under section 157 of the Judicial Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of the District Court having jurisdiction over the Chapter 11 Cases under section 151 of the Judicial Code.

15.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under sections 2075 of title 28 of the United States Code, 27 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

16.     ***Brand Management Co.*** means a new entity owned by the Buyer Group, which either directly or through a subsidiary will oversee all brand-related, franchising-related, and management-related functions as specified in the Brand License Agreement, appended to the Plan Supplement.

17.     ***Brand License Agreement*** means that certain agreement between Brand Management Co. and RoyaltyCo with respect to the brand-related, franchising-related, and management-related functions to be performed by Brand Management Co. on and after the Effective Date, together with all schedules, exhibits, and ancillary documents thereto.

18.     ***Business Day*** means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York are required or authorized to close by law or other governmental action.

19.     ***Buyer Group*** means Hooters, Inc. and Hoot Owl Restaurants, LLC, and, as applicable, their respective Buyer Group SPEs.

20.     ***Buyer Group APAs*** means the two separate asset purchase agreement by and among the Debtors and the Buyer Group, pursuant to which the Buyer Group (or their respective Buyer Group SPEs) will acquire substantially all assets of certain Debtor-owned restaurants and assume certain limited liabilities related thereto, together with all schedules, exhibits, and ancillary documents thereto, on the terms and conditions set forth in therein.

21.     ***Buyer Group Arrangements*** means the series of transactions and agreements contemplated by the Buyer Group APAs and the Brand License Agreement, each of which will be approved by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.

22.     ***Buyer Group Documents*** means the Buyer Group APAs, the Brand License Agreement, the Assumption Schedule, the Rejection Schedule, the Plan, and the Confirmation Order, together with all schedules, exhibits, and ancillary documents thereto, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors and the Buyer Group.

3

23.     **Buyer Group SPE** means a single purpose entity, wholly-owned, directly or indirectly, by a member of the Buyer Group, which will acquire certain assets and assume certain liabilities, in each case, on the terms and conditions set forth in the Buyer Group APAs.

24.     **Cash** means the legal tender of the United States of America or the equivalent thereof.

25.     **Cause of Action** means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any Claim pursuant to section 362; (iv) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Actions.

26.     **Chapter 11 Cases** means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Chapter 11 Case No. 25-80078 (SWE).

27.     **Claim** shall have the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

28.     **Claims Bar Date** means such time and date established pursuant to the Claims Bar Date Order by which Proofs of Claim must be Filed for all Claims and Interests (other than Administrative Claims and Claims held by Governmental Units).

29.     **Claims Bar Date Order** means that certain order entered by the Bankruptcy Court on April 3, 2025 [Docket No. 99], establishing the Claims Bar Date.

30.     **Claims Objection Deadline** means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and an opportunity for a hearing, upon a motion by the Reorganized Debtors or Wind-Down Entity that is Filed before the date that is 180 days after the Effective Date.

31.     **Claims Register** means the official register of Claims maintained by Kroll Restructuring Administration LLC, as the claims, noticing, and solicitation agent in the Chapter 11 Cases.

32.     **Class** means any group of Claims or Interests classified under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

33. **Class A-2 Notes** means those certain 4.723% senior secured notes, alphanumerically designated as "Class A-2" in accordance with, and outstanding in a principal amount of $266,579,032.04 under the Prepetition Securitization Indenture.

34. **Class B Notes** means those certain 7.432% senior secured notes, alphanumerically designated as "Class B" in accordance with, and outstanding in a principal amount of $40,000,000.00 under the Prepetition Securitization Indenture.

35. **Combined Hearing** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and final approval of the Disclosure Statement.

36. **Confirmation** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

37. **Confirmation Date** means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

38. **Confirmation Order** means the order entered by the Bankruptcy Court approving the Buyer Group Arrangements and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent with the Restructuring Support Agreement and reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Buyer Group.

39. **Consenting AHG Noteholders** means Holders of the Securitization Notes Claims that are members of the Ad Hoc Group (in each case solely in their capacity as such) or become a party to the Restructuring Support Agreement.

40. **Consenting Creditors** means the Consenting AHG Noteholders and the Prepetition Lenders (in each case solely in their capacity as such).

41. **Consenting Stakeholders** means the Buyer Group, Prepetition Lenders, and the Consenting AHG Noteholders that are or become party to the Restructuring Support Agreement together with their respective successors and permitted assigns.

42. **Control Party** means Drivetrain Agency Services, LLC, not in its individual capacity but solely as the control party as defined under the Prepetition Securitization Indenture.

43. **Creditors' Committee** means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on April 15, 2025, pursuant to the *Appointment of the Official Unsecured Creditors' Committee* [Docket No. 187] as amended by [Docket No. 189].

44. **Cure Claim** means a Claim based upon the applicable Debtor's monetary defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

45.     ***Cure Notice*** means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objection to proposed assumptions of Executory Contacts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

46.     ***D&O Liability Insurance Policies*** means any insurance policy to which one or more of the Debtors is a party that provides liability coverage for any of the Debtors' directors and officers.

47.     ***Debtor*** means each of the Debtors, in its respective individual capacity as debtor and debtor in possession in the Chapter 11 Cases.

48.     ***Debtors*** means, collectively (i) Hooters of America, LLC; (ii) Owl Holdings, LLC; (iii) Hawk Parent, LLC; (iv) HOA Holdings, LLC; (v) Night Owl, LLC; (vi) Owl Wings, LLC; (vii) Owl Restaurant Holdings, LLC; (viii) HOA Restaurant Group, LLC; (ix) Derby Wings Holdings, LLC; (x) Derby Wings, LLC; (xi) HOA Gift Cards, LLC; (xii) Elf Owl Investments, LLC; (xiii) TW Lonestar Wings, LLC; (xiv) Alamo Wings, LLC; (xv) HOA Holdco, LLC; (xvi) HOA Systems, LLC; (xvii) HOA Funding, LLC; (xviii) HOA Restaurant Holder, LLC; (xix) HOOTS Restaurant Holder, LLC; (xx) HOA IP GP, LLC; (xxi) HOOTS Franchising, LLC; (xxii) HOA Franchising, LLC; (xxiii) HOA Maryland Restaurant Holder, LLC; (xxiv) HOA Kansas Restaurant Holder, LLC; (xxv) TW Restaurant Holder, LLC; (xxvi) DW Restaurant Holder, LLC; (xxvii) HI Limited Partnership; (xxviii) HOA Towson, LLC; (xxix) HOA Waldorf, LLC; and (xxx) HOA Laurel, LLC.

49.     ***Definitive Documents*** means all of the definitive documents implementing the Restructuring Transactions (which, for the avoidance of doubt, shall be Filed and entered in a form acceptable to the Required Consenting AHG Noteholders and the Buyer Group), including: (a) the Restructuring Support Agreement; (b) the Plan (and the Plan Supplement and all related, exhibits, term sheets, or agreements related thereto); (c) the Confirmation Order; (d) the Disclosure Statement and any documents or Solicitation Materials including the Disclosure Statement Approval Order; (e) the first day pleadings and all orders sought pursuant thereto, including the DIP Orders; (f) the DIP Facility Documents; (g) [reserved]; (h) the New Notes Documents; (i) the Buyer Group Documents (including the Buyer Group APAs and the Brand License Agreement); (j) the New Organizational Documents; (k) the Wind-Down Budget; and (l) any documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement any of the foregoing.

50.     ***DIP Agent*** means U.S. Bank Trust Company, National Association, in its capacity as collateral agent and calculation agent under the DIP Credit Agreement, and any successor and permitted assign.

51.     ***DIP Claims*** means Claims in respect of any obligations, including all interest, premiums, fees, expenses, and other amounts owing under the DIP Facility Documents, including the fees and expenses of the DIP Agent, and in accordance therewith, held by, or otherwise owing to, any or all of the DIP Agent and the DIP Lenders.

52.    **DIP Credit Agreement** means that certain *Superpriority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time) by and among Hawk Parent, LLC and Hooters of America, LLC, as borrowers, certain subsidiaries from time to time party thereto as guarantors, the lenders from time party thereto, and U.S. Bank Trust Company, National Association, as collateral agent and calculation agent under the DIP Facility.

53.    **DIP Facility Documents** means, collectively, the DIP Credit Agreement, the DIP Order, the security and guaranty documents, fee letters, notes, the Approved Budget, and any other ancillary documents entered into in connection therewith.

54.    **DIP Facility** means that certain superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $40,000,000 on the terms and conditions set forth in the DIP Facility Term Sheet and the DIP Credit Agreement.

55.    **DIP Lenders** means, collectively Celtic Master Fund LP and certain of its Affiliates and other persons that become lenders from time to time.

56.    **DIP Liens** means Liens on property of the Debtors arising out of or related to the DIP Facility as provided by the DIP Order.

57.    **DIP Motion** means the *Motion* Filed by the Debtors on the Petition Date seeking, among other things, entry of an order approving the Debtors' entry into the DIP Facility [Docket No. 4].

58.    **DIP Noteholders** means certain Holders of Securitization Notes Claims with the same investment advisor as the DIP Lenders.

59.    **DIP Order** means, one or more orders entered by the Bankruptcy Court, in connection with the Debtors' DIP Motion, setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing.

60.    **DIP Roll-Up Amount** means $5,000,000.

61.    **Disallowed** means any Claim, or any portion thereof, that (i) has been disallowed by Final Order,  settlement, the Plan, or Confirmation Order; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.

62.    **Disclosure Statement** means the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors*, Filed

by the Debtors in support of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with, among other things, applicable securities Law, sections 1125 and 1126 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable law, in form and substance reasonably satisfactory to the Required Consenting Creditors.

63.    ***Disclosure Statement Approval Order*** means one or more orders entered by the Bankruptcy Court: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

64.    ***Disclosure Statement Motion*** means the motion of the Debtors seeking entry of an order approving the Disclosure Statement and authorizing solicitation of the Plan.

65.    ***Disputed*** means, with respect to a Claim, a Claim that is (i) not yet Allowed or Disallowed, (ii) subject to a pending objection that has been Filed and has not been resolved pursuant to a Final Order, or (iii) is listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Claims Bar Date Order.

66.    ***Disputed Claims Reserve*** means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date comprised of Cash or other sources of distributions under the Plan, as applicable, in an amount to be determined by the Debtors in consultation with the Required Consenting Creditors based on the amount of Disputed Claims as of the Combined Hearing.

67.    ***Disputed Contract*** means any executory contract or unexpired lease designated to be assumed by the Debtors and assigned to the Buyer Group, subject as of the Effective Date, to an informal or formal objection to the cure amount by the contract counterparty.

68.    ***Distribution Agent*** means, as applicable, the Debtors or the Wind-Down Entity or any Entity that the Debtors or the Wind-Down Entity select, in consultation with the Creditors Committee and the Required Consenting Creditors, to make or to facilitate distributions in accordance with the Plan.

69.    ***Distribution Record Date*** means, other than with respect to securities deposited with the DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be two (2) Business Days following the Confirmation Date or such other date as agreed upon among the Debtors and the Required Consenting Creditors.

70.    ***Divested Stores*** means the Associated Restaurant Assets to be acquired, and the Associated Restaurant Liabilities to be assumed, by the Buyer Group SPEs on the terms and conditions set forth in the Buyer Group APAs.

71.    ***DTC*** means the Depository Trust Company.

72.     ***Effective Date*** means, with respect to the Plan, the date that is a Business Day selected by the Debtors, in consultation with the Consenting Stakeholders and the Buyer Group, on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX of the Plan have been satisfied or waived in accordance with the Plan; and (iii) the Plan is declared effective. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

73.     ***Entity*** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

74.     ***Estate*** means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

75.     ***Exculpated Fiduciaries*** means, collectively, and in each case solely in their capacities as such: (i) the Debtors, (ii) each independent director of the Debtors, and (iii) the Creditors' Committee and each of its members.

76.     ***Exculpated Party*** means each of the Exculpated Fiduciaries in their capacity as such, and, in each case, subject to the maximum extent permitted by law.

77.     ***Executory Contract*** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

78.     ***File***, ***Filed***, or ***Filing*** means file, filed, or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

79.     ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated, revoked, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

80.     ***General Unsecured Claim*** means any Claim that is neither secured by collateral, subordinated,  nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court and is not a: (a) Priority Tax Claim; (b) Priority Non-Tax Claim; (c) Securitization Class A-2 Note Claim; (d) Securitization Class B Note Claim; (e) Non-Securitization Manager Advance Term Loan Claim; (f) Securitization Manager Advance Claim; (g) Other Secured Claim; or (h) Non-Securitization Term Loan Claim (Secured).  For the avoidance of doubt, General Unsecured Claims shall include any Prepetition Term Loan

Deficiency Claims and any Claims or cause of action, whether existing now or arising in the future, known or unknown, and whether held by any governmental or quasi-governmental entity—including but not limited to local, state, federal, or foreign or private party, against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Effective Date.

81.     ***Governmental Unit*** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

82.     ***Holder*** means any Person or Entity holding a Claim or an Interest, as applicable, solely in its capacity as such.

83.     ***Impaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

84.     ***Incremental Loan*** means, the $ 5,000,000 funded to the Debtors on February 21, 2025, under the Prepetition MA Credit Agreement.

85.     ***Indemnification Obligations*** has the meaning set forth in <u>Article IV.N.2</u> of the Plan.

86.     ***Insider*** shall have the meaning as set forth in section 101(31) of the Bankruptcy Code.

87.     ***Intercompany Interest*** means an Interest held by a Debtor in another Debtor.

88.     ***Interest*** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security.

89.     ***Judicial Code*** means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

90.     ***Lien*** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

91.     ***Manager Advance*** shall have the meaning given to such term in the Prepetition Securitization Indenture.

92.     ***Master Issuer*** means HOA Funding, LLC, as Master Issuer under the Prepetition Securitization Indenture.

93.     ***New Board*** means the initial board of directors of RoyaltyCo selected in accordance with <u>Article IV.G</u> of the Plan.

94.     ***New Class A-1 Notes*** means the new first-lien, first-out notes to be issued by RoyaltyCo to Holders of DIP Claims under the Plan in a principal amount equal to the New Class A-1 Principal Amount plus accrued and unpaid interest and on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

95.     ***New Class A-1 Principal Amount*** means the sum of the DIP Roll-Up Amount and the total new-money component actually funded and outstanding as a Manager Advance under the DIP Facility as of the Effective Date (which new money component shall be funded consistent with the terms of the DIP Order).

96.     ***New Class A-2I Notes*** means new first-lien notes to be issued by RoyaltyCo to Holders of Allowed Securitization Class A-2 Notes Claims under the Plan in a principal amount equal to that of the Securitization Class A-2 Notes Claims on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

97.     ***New Class A-2II Notes*** means new first-lien, second-out notes to be issued by RoyaltyCo to Holders of Allowed Manager Advance Term Loan Claims under the Plan in a principal amount not to exceed $18,000,000 on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

98.     ***New Class B Notes*** new first-lien notes to be issued by RoyaltyCo to Holders of Allowed Securitization Class B Notes Claims under the Plan in a principal amount equal to that of the Securitization Class B Notes Claims on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

99.     ***New Debt*** means the indebtedness to be issued by RoyaltyCo and guaranteed by the Reorganized Debtors under the New Notes Documents, including the New Class A-1 Notes, New Class A-2I Notes, New Class A-2II Notes, and New Class B Notes.

100.     ***New Equity Interests*** means the equity interests in RoyaltyCo after giving effect to the Restructuring Transactions.

101.     ***New Organizational Documents*** means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of RoyaltyCo, in form and substance satisfactory to the Required Consenting Creditors.

102.     ***New Notes Documents*** means, collectively, the New Notes Indenture and corresponding supplement(s) for the New Class A-1 Notes, New Class A-2I Notes, New Class A-2II Notes, and New Class B Notes, all guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the priority of payments provisions in the New Notes Indenture, an intercreditor agreement, and any other documents or agreements the Required Consenting Creditors and the Required DIP Lenders, in their sole discretion, deem necessary to effectuate the Plan and Restructuring Transactions.

103.     ***New Notes Indenture*** means the new base indenture for each of the New Class A-1 Notes, New Class A-2I notes, New Class A-2II notes, and New Class B notes, to be entered into and effective as of the Effective Date.

104.    ***Non-Securitization Entities*** means, collectively, Hawk Parent, LLC, HOA Holdings, LLC, Night Owl, LLC, Owl Wings, LLC, Owl Restaurant Holdings, LLC, Owl Holdings, LLC, Elf Owl Investments, LLC, TW Lonestar Wings, LLC, Alamo Wings, LLC, HOA Restaurant Group, LLC, Derby Wings Holdings, LLC, Derby Wings, LLC, Hooters of America, LLC, and HOA Gift Cards, LLC.

105.    ***Noteholder Equity Entitlement*** means 50% of the New Equity Interests to be allocated among the Holders of Securitization Class B Notes Claims on a *pro rata* basis in accordance with their respective holdings of the Securitization Class B Notes Claims.

106.    ***Non-Securitization Manager Advance Term Loan Claims*** means Parent Funded Debt Claims, to the extent of the value of the Securitization Manager Advance Claims.

107.    ***Non-Securitization Prepetition Equity Interests*** means all Prepetition Equity Interests in the Non-Securitization Entities.

108.    ***Non-Securitization Term Loan Claims (Secured)*** means Parent Funded Debt Claims in excess of the value of the Securitization Manager Advance Claims but only to the extent of any Term Loan Non-Repayment Collateral.

109.    ***Other Intercompany Claim*** means any Claim held by a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor against a Debtor arising before the Petition Date; provided, for the avoidance of doubt, the Other Intercompany Claims shall not include the Securitization Manager Advance Claims.

110.    ***Other Postpetition Intercompany Claim*** means any Claim held by a Debtor or a non- Debtor direct or indirect subsidiary of a Debtor against a Debtor arising after the Petition Date.

111.    ***Other Secured Claim*** means a Secured Claim, other than an Administrative Claim, a DIP Claim, a Priority Tax Claim, a Non-Securitization Manager Advance Term Loan Claim, or a Securitization Notes Claim, including, for the avoidance of doubt, any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more of the Debtors, the reimbursement obligation for which is either secured by a Lien on collateral of is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

112.    ***Other Securitization Prepetition Equity Interests*** means all Prepetition Equity Interests in the Securitization Entities other than the Master Issuer, HOA Holdco, LLC, and HOA Systems, LLC.

113.    ***Parent Funded Debt Claims*** means, collectively, (i) $8,387,000 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition MA Credit Agreement, <u>plus</u> (ii) the Incremental Loan, <u>plus</u> (iii) $55,976,213 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Term Loan Credit Agreement, all as secured by the Securitization Manager Advance Claims.

114.    ***Person*** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

115. ***Petition Date*** means March 31, 2025.

116. ***Plan*** means this joint chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, and the terms hereof and with the consent of the Required Consenting Creditors and the Buyer Group.

117. ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms of applicable documents, schedules, and exhibits to the Plan to be Filed with the Bankruptcy Court (in each case, in form and substance reasonably satisfactory to the Required Consenting Creditors and, if such document constitutes a Buyer Group Document, the Buyer Group), including, but not limited to, the following: (i) Buyer Group APAs, (ii) Brand License Agreement, (iii) Identities of the New Board, (iv) Schedule of Retained Causes of Action, (v) Shareholders Agreement, (vi) New Organizational Documents, (vii) the identity of the Wind-Down Officer, (viii) the Wind-Down Officer's engagement letter, (ix) the Wind-Down Budget, (x) Assumption Schedule, and (xi) Rejection Schedule; provided that through the Effective Date, the Debtors shall have the right to amend the documents contained in the Plan Supplement in accordance with the terms of the Plan and with the consent of the Required Consenting Creditors, and, to the extent such document is a Buyer Group Document, the Buyer Group. The Plan Supplement shall be Filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.

118. ***Prepetition Agents*** means U.S. Bank Trust Company, National Association as collateral agent and calculation agent under the Prepetition Term Credit Agreement and U.S. Bank Trust Company, National Association as collateral agent and calculation agent under the Prepetition MA Credit Agreement.

119. ***Prepetition Credit Agreements*** means the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement together with all collateral and security documents, control agreements, manager advance acknowledgements, other agreements, guarantees, pledges, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including without limitation the "Loan Documents" (as defined in the Prepetition MA Credit Agreement), in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

120. ***Prepetition Equity Interests*** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (in each case whether or not arising under or in connection with any employment agreement).

121.    ***Prepetition Lender Claim*** means any Claim against any Debtor arising under, derived from, based on or related to the loans under the Prepetition MA Credit Agreement or the Prepetition Term Loan Credit Agreement, including, for the avoidance of doubt, any Manager Advances (as defined in the Prepetition Term Loan Credit Agreement), and any guarantees thereof.

122.    ***Prepetition Lenders*** means those certain secured lenders under the Prepetition Credit Agreements that are party to the Restructuring Support Agreement.

123.    ***Prepetition MA Credit Agreement*** means that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

124.    ***Prepetition Management Agreement*** means that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect immediately prior to the Petition Date).

125.    ***Prepetition Manager*** means Hooters of America, LLC.

126.    ***Prepetition Securitization Indenture*** means that certain Amended and Restated Base Indenture, dated August 19, 2021, by and between HOA Funding, LLC as the master issuer and CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee under the Prepetition Securitization Indenture.

127.    ***Prepetition Securitization Trustee*** means CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee under the Prepetition Securitization Indenture.

128.    ***Prepetition Term Loan Credit Agreement*** means that certain Credit Agreement, dated March 9, 2022, (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

129.    ***Prepetition Term Loan Deficiency Claims*** means the Prepetition Lenders' deficiency Claims for the amount of the Parent Funded Debt Claims that exceed the total value of the Securitization Manager Advance Claims and the Term Loan Non-Repayment Right Collateral.

130.    ***Priority Non-Tax Claim*** means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim and (ii) a Priority Tax Claim.

131.    ***Priority Tax Claim*** means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

132.    ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed

Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

133. ***Professional*** means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

134. ***Professional Fee Claims*** means all Claims for compensation of any Professional Fees incurred by such Professional on or after the Petition Date through and including the Effective Date to the extent such fees and expenses have not been previously paid pursuant to an order of the Bankruptcy Court.

135. ***Professional Fee Escrow*** means an escrow account established and funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount pursuant to Article II.C.2 of the Plan.

136. ***Professional Fee Reserve Amount*** means the aggregate unpaid Professional Fee Claims through and including the Effective Date, as estimated in accordance with Article II.C.3 of the Plan.

137. ***Professional Fees*** means fees and expenses (including transaction and success fees) incurred by a Professional.

138. ***Proof of Claim*** means a proof of Claim Filed in the Chapter 11 Cases.

139. ***Reinstate, Reinstated*, or *Reinstatement*** means, with respect to Claims and Interests, leaving a Claim or Interest Unimpaired under the Plan.

140. ***Rejection Schedule*** means the schedule of Executory Contracts and/or Unexpired Leases to be rejected pursuant to the Plan, as may be amended, supplemented, or modified from time to time in accordance with the Plan, and the Confirmation Order.

141. ***Related Party*** means, in their capacities as such, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

142. **Released Parties** means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Wind-Down Entity, (iii) the Consenting Creditors, (iv) the Sponsors, (v) the DIP Agent, (vi) the DIP Lenders, (vii) the Prepetition Securitization Trustee, (viii) the Control Party, (ix) the Prepetition Agents, and (x) each Holder of a Prepetition Lender Claim or Securitization Notes Claim that votes for, and does not object to, the Plan and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law. Notwithstanding the foregoing, any Entity or Person, other than the Prepetition Securitization Trustee and the Control Party, shall not be a Released Party if it: (x) does not opt into the releases set forth in Article VIII.D of the Plan or (y) Files with the Bankruptcy Court an objection to the Plan that is not consensually resolved before Confirmation or supports any such objection or objector, shall not be deemed a Released Party.

143. **Releasing Parties** means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are presumed to accept the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party (a) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v) or (b) would be obligated to grant a release under principles of agency if it were so directed by an entity in clauses (i) through (v); provided, that, in each case, an Entity shall not be a Releasing Party if it: (x) does not affirmatively elect to opt into the releases set forth in Article VIII.D of this Plan; or (y) timely objects to the releases set forth in Article VIII.D of this Plan, either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation.

144. **Reorganized Debtors** means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established by the Debtors in connection with the implementation of the Restructuring Transactions. For the avoidance of doubt, Reorganized Debtors shall not include any Wind-Down Entity, Brand Management Co., or the Buyer Group.

145. **Repayment Right** means the Prepetition Manager's priority right to reimbursement of the Manager Advances that is part of the respective Prepetition Lenders' collateral under the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement.

146. **Required Consenting AHG Noteholders** means, as of the date of determination, Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims held by the Consenting AHG Noteholders (which, for the avoidance of doubt, shall be calculated without reference to Securitization Notes Claims held by the DIP Noteholders).

147. **Required Consenting Creditors** means the Required Consenting AHG Noteholders (which, for the avoidance of doubt, shall be calculated without reference to Securitization Notes Claims held by the DIP Noteholders) and the Required Prepetition Lenders (in each case solely in their capacity as such).

16

148.    ***Required DIP Lenders*** means the DIP Lenders having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time.

149.    ***Required Majority Consenting AHG Noteholders*** means Consenting AHG Noteholders collectively holding in excess of 50% of the aggregate outstanding principal amount of the Securitization Notes Claims collectively held by the Consenting AHG Noteholders.

150.    ***Required Prepetition Lenders*** means, as of the date of determination, Prepetition Lenders holding at least 66.67% in aggregate outstanding principal amount of the Prepetition Lender Claims.

151.    ***Restructuring Expenses*** means the reasonable and documented fees and expenses related to the negotiation and implementation of the Restructuring Transactions pursuant to the Restructuring Support Agreement, incurred by the Prepetition Agents, the Ad Hoc Group, any Prepetition Lenders, any DIP Lender, the DIP Agent, the Prepetition Securitization Trustee, and the Control Party, including but not limited to the fees and expenses of: (i)  White & Case LLP, Sidley Austin LLP, and any other counsel; (ii)  Houlihan Lokey, Inc., as financial advisor to the Prepetition Lenders and DIP Lenders; (iii) Shipman & Goodwin LLP, as counsel to the DIP Agent and the Prepetition Agent, and (iv) M3 Partners, LP, as financial advisor to the Ad Hoc Group.

152.    ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated as of March 31, 2025, by and between the Debtors and the Consenting Stakeholders, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

153.    ***Restructuring Transactions*** shall have the meaning set forth in Article IV.K.1 of the Plan.

154.    ***Retained Causes of Action*** means the Causes of Action, if any, that belong to the Debtors or their Estates under section 1123(b)(3) of the Bankruptcy Code and are preserved and retained by the applicable Reorganized Debtors or Wind-Down Entity under the Plan, and are not released, waived or transferred to another Person pursuant to the Plan, which shall include (but not be limited to) all Causes of Actions or other claims  identified on the Schedule of Retained Causes of Action; provided, that the Retained Causes of Action shall not include any Causes of Action assigned or transferred to the Buyer Group or Brand Management Co. pursuant to the Buyer Group Documents (which, for the avoidance of doubt, shall be transferred to the Buyer Group or Brand Management Co. in accordance with the Buyer Group Documents).

155.    ***RoyaltyCo*** means, HOA Funding, LLC, as reorganized under the Plan and renamed pursuant to the New Organizational Documents on and after the Effective Date.

156.    ***Schedule of Retained Causes of Action*** means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan; provided, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party that is released pursuant to Article VIII of the Plan be retained.

157.    ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended, supplemented, or modified from time to time.

158.    ***Secured Claim*** means a Claim (a) secured by a Lien on any Debtor's interest in property, which Lien is valid, perfected, and enforceable pursuant to applicable law,  to the extent of the value of such interest as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code (including the DIP Order) or (b) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

159.    ***Securities Act*** means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

160.    ***Security*** shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

161.    ***Securitization Class A-2 Note Claims*** means $266,579,032.04 in outstanding principal amount of Class A-2 Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Securitization Indenture, as supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Holders of Class A-2 Notes, and all other notes documents in connection therewith.

162.    ***Securitization Class B Note Claims*** means $40,000,000 in outstanding principal amount of Class B Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Securitization Indenture, as supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Holders of Class B Notes, and all other notes documents in connection therewith.

163.    ***Securitization Entities*** means, collectively, HOA Funding, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, HOOTS Restaurant Holder, LLC, HOA IP GP, LLC, HOOTS Franchising, LLC, HOA Franchising, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, TW Restaurant Holder, LLC, DW Restaurant Holder, LLC, HI Limited Partnership, HOA Towson, LLC, HOA Waldorf, LLC, and HOA Laurel, LLC.

164.    ***Securitization Manager Advance Claims*** means the claim of the Prepetition Manager against the Securitization Entities, which is Allowed hereunder, for reimbursement of (a) prepetition Manager Advances totalling $28,338,913 (including the Manager Advance made with proceeds of the Incremental Loan), (b) all additional Manager Advances extended to the Securitization Entities during the pendency of the Chapter 11 Cases in accordance with the DIP Order (including the Approved Budget) (c) accrued and unpaid interest, fees, and other charges and expenses arising and payable in respect of any such Manager Advances under the Prepetition Management Agreement, and (d) any other Manager Advances that form part of the "Obligations" (as defined in the Prepetition Securitization Indenture (as amended, restated, amended and restated or otherwise modified from time to time).

165. **Securitization Notes Claims** means, collectively, the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims, which for the avoidance of doubt shall include any Securitization Class A-2 Note Claims and any Securitization Class B Note Claims held by the DIP Noteholders.

166. **Securitization Noteholders** means the Holders of Securitization Notes Claims.

167. **Securitization Notes Documents** means the Prepetition Securitization Indenture together with all other agreements, guarantees, pledges, collateral and security documents, management agreements, control agreements, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including the "Indenture Documents" and "Related Documents" (each as defined in the Prepetition Securitization Indenture), in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

168. **Securitization Prepetition Master Issuer Equity Interests** means the Prepetition Equity Interests in the Master Issuer.

169. **Shareholders Agreement** means any shareholders agreement, equity holders agreement, operating agreement, or other similar agreement for RoyaltyCo, as applicable, to which Holders of New Equity Interests shall become party to on or immediately after the Effective Date governing, among other things, the relative rights of Holders of New Equity Interests.

170. **Sponsors** means the Holders of Interests in Hawk Parent, LLC.

171. **Solicitation Materials** means all documents, forms, and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

172. **Term Loan Non-Repayment Right Collateral** means any and all collateral securing the obligations under the Prepetition Term Loan Credit Agreement and Prepetition Manager Advance Credit Agreement other than the Repayment Right.

173. **U.S. Trustee** means the Office of the United States Trustee for the Northern District of Texas.

174. **Unallocated Stores** means the Excluded Assets and Excluded Liabilities that relate to stores owned by the Debtors that are not acquired by the Buyer Group pursuant to the Buyer Group Arrangements.

175. **Unexpired Lease** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

176. **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

177. **Voting Deadline** means the date by which all Persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan and submit an election with respect to the releases

by holders of Claims and Interests provided in <u>Article VIII.D</u> of the Plan in accordance with the Disclosure Statement Approval Order.

178.    ***Waterfall*** means the priority of payments waterfall for the reimbursement of Manager Advances pursuant to the Prepetition Management Agreement, as may be amended from time to time in accordance with the terms of the Plan.

179.    ***Wind-Down Budget*** means the budget governing the fees, expenses, and disbursements required to fund the Wind-Down Process, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

180.    ***Wind-Down Entity*** means, collectively, one or more liquidating trusts or other entities established for the purpose of winding down the Debtors' estates and otherwise implementing the Plan, which shall be acceptable to the DIP Lenders and Required Consenting AHG Noteholders; the Wind-Down Entities may be composed of one or more of the Non-Securitization Entities, and HOA Holdco, LLC and HOA Systems, LLC.[2]

181.    ***Wind-Down Officer*** means the Person or Entity appointed pursuant to <u>Article IV.I</u> of the Plan, in his or her capacity as such, to oversee the Wind-Down Process.

182.    ***Wind-Down Process*** means, upon the Effective Date, the orderly wind-down of the Wind-Down Entities in accordance with the Wind-Down Budget.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise specified herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references

---

[2]    The Composition of the Wind-Down Entities shall be determined prior to Confirmation in consultation with the Required Consenting Creditors.

in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (xv) any reference to an Entity as a Holder of a Claim or Interest includes such Entity's permitted successors and assigns.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors, the Reorganized Debtors, or the Wind-Down Entity shall mean the Debtors and the Reorganized Debtors or the Wind-Down Entity, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement (other than the Buyer Group Documents), any other instrument or document created

or executed pursuant to the Plan (other than the Buyer Group Documents), or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that in the event of a conflict between the Confirmation Order, on the one hand, and any of the Plan and the Plan Supplement, on the other hand, the Confirmation Order shall govern and control in all respects. In the event of any inconsistency between the Plan and the Buyer Group Documents, the Buyer Group Documents shall control.

H.    *Certain Consent Rights*

Notwithstanding anything in the Plan to the contrary, any and all consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A of the Plan) and fully enforceable as if stated in full herein, subject to the limitations and other terms and conditions set forth in the Restructuring Support Agreement. For the avoidance of doubt, the Buyer Group's consent rights are subject in all respects to the Restructuring Support Agreement remaining in effect.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent and DIP Lenders as set forth in the DIP Facility Documents and DIP Order, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the Buyer Group as set forth in the Buyer Group Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II

## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims, and Administrative Claims, including Professional Fee Claims, and Other Postpetition Intercompany

Claims, have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims*

Except with respect to Professional Fee Claims and Restructuring Expenses, and except to the extent that an Administrative Claim (i) has been assumed by the Buyer Group or Brand Management Co. under the terms and conditions set forth in the Buyer Group Documents, (ii) has already been paid during the Chapter 11 Cases or (iii) a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (x) on the Effective Date, if such Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (y) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, shall pay in full in Cash all Restructuring Expenses, including the fees and expenses of the DIP Agent and the Prepetition Agent, due and owing pursuant to invoices delivered to the Debtors at least one (1) Business Day prior to the Effective Date and that are required to be paid under or pursuant to the DIP Order.

Except as otherwise provided in this Article II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are DIP Claims, Restructuring Expenses, or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Reorganized Debtors and Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

Objections to such requests, if any, must be Filed and served on the Debtors, or from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (if not the objecting party) and the requesting party on or before the Claims Objection Deadline.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability (as defined in the Buyer Group Documents) under the Buyer Group Documents shall be resolved between the Brand Management Co. or the Buyer Group, as applicable, and the Holder of such Assumed Liability.

B.    *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the New Class A-1 Principal Amount plus all interest accrued and unpaid thereon through and including the date of payment.

Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such DIP Claim, and subject to Article II.B., on the Effective Date or as soon as reasonably practicable thereafter, each such Holder of a DIP Claim shall receive, pursuant to the Restructuring Transactions, New Class A-1 Notes issued by RoyaltyCo in an amount equal to its respective DIP Claims.

C.    *Professional Fee Claims*

1.    FINAL FEE APPLICATIONS

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the DIP Lender, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

2.    PROFESSIONAL FEE ESCROW

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Debt or otherwise). The Professional Fee Escrow Account (including funds held in the Professional Fee Escrow Account) (i) shall not be and shall not be deemed property of the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Entity and (ii) shall be held in trust for the Professionals; provided, that funds remaining in the Professional Fee Escrow after all Professional Fee Claims have been Allowed and irrevocably paid in full or Disallowed shall promptly be paid to RoyaltyCo without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Allowed Professional Fee Claims shall be paid in Cash by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the DIP

Agent, the Holders of Prepetition Lender Claims, the Prepetition Credit Agreements Agent, the Holders of Securitization Notes Claims, or be subject to claims, including any DIP Claims, Adequate Protection Claims, 507(b) Claims, or claims held by the Prepetition Lenders or the Securitization Noteholders, and shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Facility Documents, nor shall the Prepetition Lenders, the Securitization Noteholders, or the DIP Lenders be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, the DIP Facility Documents, or the DIP Order

3.   PROFESSIONAL FEE RESERVE AMOUNT

No later than one (1) Business Day prior to the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Effective Date, including any fees and expenses projected to be outstanding as of the Effective Date, and the Debtors shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors without any further action or order of the Bankruptcy Court.

4.   POST-EFFECTIVE DATE FEES AND EXPENSES

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors or Wind-Down Entity shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred after the Effective Date by (i) the Debtors,  (ii) the DIP Lenders, (iii) the Ad Hoc Group, (iv) the Prepetition Securitization Trustee, and (v) Creditors' Committee, within five (5) Business Days of receipt of invoice therefor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and Wind-Down Entity may employ and pay any Professional for fees incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.   *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed

Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Classes 2, 3, 7, 11, and 12 are comprised of Claims or Interests in or against the Securitization Entities.  Classes 4, 6, and 13 are comprised of Claims or Interests in or against the Non-Securitization Entities.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan.

1.    CLASS IDENTIFICATION

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Securitization Class A-2 Note Claims | Impaired | Yes |
| 3 | Securitization Class B Note Claims | Impaired | Yes |
| 4 | Non-Securitization Manager Advance Term Loan Claims | Impaired | Yes |

| 5 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 6 | Non-Securitization Term Loan Claims (Secured) | Unimpaired | No (Presumed to Accept) |
| 7 | Securitization Manager Advance Claims | Impaired | No (Deemed to Reject) |
| 8 | General Unsecured Claims | Impaired | No (Deemed to Reject) |
| 9 | Other Intercompany Claims | Impaired | No (Deemed to Reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to Reject) |
| 11 | Securitization Prepetition Master Issuer Equity Interests | Impaired | No (Deemed to Reject) |
| 12 | Other Securitization Prepetition Equity Interests | Unimpaired | No (Presumed to Accept) |
| 13 | Non-Securitization Prepetition Equity Interests | Impaired | No (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

1.    <u>CLASS 1 – PRIORITY NON-TAX CLAIMS</u>

a.    *CLASSIFICATION*: Class 1 consists of all Priority Non-Tax Claims.

b.    *TREATMENT*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired.

c.    *VOTING*: Class 1 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan,

and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

2.    CLASS 2 – SECURITIZATION CLASS A-2 NOTE CLAIMS

a.    *CLASSIFICATION*: Class 2 consists of all Securitization Class A-2 Note Claims.

b.    *TREATMENT*: Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, New Class A-2I Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Note Claims are Allowed in full.

c.    *VOTING:* Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

3.    CLASS 3 – SECURITIZATION CLASS B NOTE CLAIMS

a.    *CLASSIFICATION*: Class 3 consists of all Securitization Class B Note Claims.

b.    *TREATMENT*: On or after the Effective Date, each holder of Securitization Class B Notes will receive (i) its Pro Rata share of the Noteholder Equity Entitlement and (ii) New Class B Notes issued by RoyaltyCo in an amount equal to its respective Allowed Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full.

c.    *VOTING*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

4.    CLASS 4 – NON-SECURITIZATION MANAGER ADVANCE TERM LOAN CLAIMS

a.    *CLASSIFICATION*: Class 4 consists of all Non-Securitization Manager Advance Term Loan Claims.

b.    *TREATMENT*: Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued

28

by RoyaltyCo which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests.

c.    *VOTING*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

5.    <u>CLASS 5 – OTHER SECURED CLAIMS</u>

a.    *CLASSIFICATION*: Class 5 consists of all Other Secured Claims.

b.    *TREATMENT*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

c.    *VOTING*: Class 5 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

6.    <u>CLASS 6 – NON-SECURITIZATION TERM LOAN CLAIMS (SECURED)</u>

a.    *CLASSIFICATION*: Class 6 consists of all Non-Securitization Term Loan Claims (Secured).

b.    *TREATMENT*:  Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, Holders of Allowed Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral,

as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral.

c.     *VOTING*: Class 6 is Unimpaired under the Plan. Each Holder of Non-Securitization Term Loan Claims (Secured) is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Term Loan Claims (Secured) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to the Non-Securitization Term Loan Claims (Secured).

7.     CLASS 7 – SECURITIZATION MANAGER ADVANCE CLAIMS

a.     *CLASSIFICATION*: Class 7 consists of all Securitization Manager Advance Claims.

b.     *TREATMENT*: Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in Article II.B of this Plan shall be in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Class 7 Securitization Manager Advance Claims.

c.     *VOTING*: Class 7 is Impaired under the Plan. Holders of Securitization Manager Advance Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Manager Advance Claims are not entitled to vote to accept or reject the Plan.

8.     CLASS 8 – GENERAL UNSECURED CLAIMS

a.     *CLASSIFICATION*: Class 8 consists of all General Unsecured Claims.

b.     *TREATMENT*: On the Effective Date, General Unsecured Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of General Unsecured Claims shall not receive any distribution on account of such Claims.

c.     *VOTING:* Class 8 is Impaired under the Plan. Holders of General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

9.     CLASS 9 – OTHER INTERCOMPANY CLAIMS

a.     *CLASSIFICATION*: Class 9 consists of all Other Intercompany Claims.

b.  *TREATMENT*: On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each allowed Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that  Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims.

c.  *VOTING*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Other Intercompany Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of allowed Other Intercompany Claims will not be entitled to vote to accept or reject the Plan.

10.  CLASS 10 – INTERCOMPANY INTERESTS

a.  *CLASSIFICATION*: Class 10 consists of all Intercompany Interests.

b.  *TREATMENT*: On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

c.  *VOTING*: Class 10 is Impaired under the Plan. Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.  CLASS 11 – SECURITIZATION PREPETITION MASTER ISSUER EQUITY INTERESTS

a.  *CLASSIFICATION*: Class 11 consists of all Securitization Prepetition Master Issuer Equity Interests.

b.  *TREATMENT*: On the Effective Date, Securitization Prepetition Master Issuer Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Securitization Prepetition Master Issuer Equity Interests on account of such Interests.

c.  *VOTING*: Class 11 is Impaired under the Plan. Holders of Securitization Prepetition Master Issuer Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore,

Holders of Securitization Prepetition Master Issuer Equity Interests are not entitled to vote to accept or reject the Plan.

12.   CLASS 12 – OTHER SECURITIZATION PREPETITION EQUITY INTERESTS

    a.   *CLASSIFICATION*: Class 12 consists of all Other Securitization Prepetition Equity Interests.

    b.   *TREATMENT*: On the Effective Date, Other Securitization Prepetition Equity Interests shall continue in full force and shall not be impaired.

    c.   *VOTING*: Class 12 is Unimpaired under the Plan. Holders of Other Securitization Prepetition Equity Interests are presumed to have accepted the Plan. Therefore, Holders of Other Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

13.   CLASS 13 – NON-SECURITIZATION PREPETITION EQUITY INTERESTS

    a.   *CLASSIFICATION*: Class 13 consists of all Non-Securitization Prepetition Equity Interests.

    b.   *TREATMENT*: On the Effective Date, Non-Securitization Prepetition Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of Non-Securitization Prepetition Equity Interests on account of such Interests.

    c.   *VOTING*: Class 13 is Impaired under the Plan. Holders of Non-Securitization Prepetition Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors', the Reorganized Debtors', and the Wind-Down Entity's legal and equitable rights with respect to any Reinstated

Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors', and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Finality of Distributions*

As discussed in greater detail in the Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.    *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

C.    *Sources of Consideration for Plan Distributions*

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall fund distributions under the Plan with (i) Cash on hand, (ii) the issuance of the New Debt, and (iii) the issuance of the New Equity Interests.

D.    *New Debt*

On the Effective Date, the Master Issuer will be renamed RoyaltyCo, LLC and all the Other Securitization Prepetition Equity Interests shall revest in and be directly or indirectly held by RoyaltyCo.  RoyaltyCo shall issue the New Debt and provide any related guarantees, pursuant to and subject to the terms and conditions set forth in the New Notes Documents.  The Reorganized Debtors shall provide guarantees related to the New Debt pursuant to and subject to the terms and conditions set forth in in the New Notes Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be

authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Debt and related guarantees, including the New Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors may deem to be necessary to consummate the New Debt. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo. The obligations incurred by the Reorganized Debtors pursuant to the New Notes Indenture and the New Notes Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Notes Documents.

On the Effective Date, the New Notes Documents shall constitute legal, valid, binding, and authorized obligations of RoyaltyCo and the other Reorganized Debtors enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Notes Documents are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted under the New Notes Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Notes Documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.    *New Equity Interests*

On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to the Plan. Any Person's acceptance of New Equity Interests shall be deemed to constitute its agreement to be bound by the Shareholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms. The Shareholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the New Equity Interests (and their respective successors and assigns), whether such New Equity Interests are received or to be received on or after the Effective Date and regardless of whether such holder executes or delivers

a signature page to the Shareholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, RoyaltyCo may condition the receipt of any New Equity Interests issued pursuant to the Plan upon the receipt of duly executed counter-signature pages to the Shareholders Agreement, if any.

All of the New Equity Interests issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.    *New Organizational Documents*

On or prior to the Effective Date, the New Organizational Documents shall be Filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

G.    *New Board*

As of the Effective Date, except as set forth in this Article IV.G, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

The New Board will be comprised of three individuals, one selected by the Prepetition Term Loan Lender, one selected by a majority of holders of the Securitization Class A-2 Notes Claims that are Consenting AHG Noteholders, and one selected by a majority of holders the Securitization Class B Notes Claims that are Consenting AHG Noteholders.  The identities of the New Board will be disclosed in the Plan Supplement prior to Confirmation.

H.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Buyer Group Documents), on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor and Wind-Down Entity, free and clear of all Liens, Claims, charges, or other

encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Wind-Down Process and Wind-Down Officer*

The Wind-Down Officer shall be appointed by the Debtors in consultation with the DIP Lenders and Required Consenting AHG Noteholders to serve on behalf of the Wind-Down Entity and to implement and take all actions on behalf of the Debtors and their Estates under the Plan, in consultation with the DIP Lenders and Required Consenting AHG Noteholders.  Once identified the identity of the Wind-Down Officer shall be disclosed in the Plan Supplement, and the Wind-Down Officer's engagement letter shall be included in the Plan Supplement.  The Wind-Down Officer shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

On and after the Effective Date, subject to the terms of the Plan, the Wind-Down Officer will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Officer shall have the power and authority to take any action(s) necessary to effectuate the Wind-Down Process using funds in accordance with the Wind-Down Budget.  As soon as practicable after the Effective Date, the Wind-Down Officer shall cause the Debtors or Reorganized Debtors to comply with, and abide by, the terms of the Plan and take any actions as the Wind-Down Officer may determine to be necessary or desirable to carry out the purposes of the Plan, subject to the terms of the Plan.

The Wind-Down Entity shall be a successor to the rights, title and interests to the respective Non-Securitization Entities' property and assets.  The Wind-Down Entity will not be involved in any business operations on a go-forward basis and will be charged with conducting the Wind-Down Process.

The Wind-Down Officer shall serve as successor to and representative of the Wind-Down Entity's Estate under section 1123(b) of the Bankruptcy Code for the purposes of effectuating the Wind-Down Process, including to commence, litigate and settle any Retained Causes of Action, sell or monetize any remaining Assets of the Wind-Down Entity, and make distributions pursuant to the terms of the Plan.  The Wind-Down Officer shall act in a fiduciary capacity on behalf of the interests of the Holders of Claims and Interests entitled to distributions under the Plan.  The Wind-Down Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Entity is dissolved in accordance with the Plan and (ii) the date on which the Wind-Down Officer resigns, is terminated or is otherwise unable to serve.

J.      *Cancellation of Existing Interests, Indebtedness, and Other Obligations*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, the other DIP Facility

Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, and the other DIP Facility Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties under this Plan; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Credit Agreement, as applicable; and (c) preserve any rights of (1) the Prepetition Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of Non-Securitization Manager Advance Term Loan Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors, and, (2) the Prepetition Securitization Trustee, any predecessor thereof, and the Control Party as against any money or property distributable to Holders of Securitization Notes Claims, including the Prepetition Securitization Trustee's priority in respect of payment under section 6.10 of the Securitization Notes Indenture and the right to exercise the Prepetition Securitization Trustee's charging lien under section 7.06(d) of the Prepetition Securitization Notes Indenture, and (3) the DIP Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of DIP Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; and (d) allow the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, and the DIP Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.

Except for the foregoing, (i) subject to the performance by the Prepetition Agent of its obligations under the Plan, the Prepetition Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Loan Documents upon the occurrence of the Effective Date and the Prepetition MA Credit Agreement and the Prepetition Term Credit

Agreement shall automatically be terminated on the Effective Date except to the extent they expressly survive by their terms (<u>provided, that</u> the Surviving Prepetition Credit Facility Provisions shall survive in accordance with the terms of the Prepetition Loan Documents); (ii) subject to the performance by the Prepetition Securitization Trustee of its obligations under the Plan, the Prepetition Securitization Trustee and the Control Party and each of its agents shall be relieved of all further duties and responsibilities related to the Securitization Notes Documents upon the occurrence of the Effective Date; and (iii) subject to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its agents shall be relieved of all further duties and responsibilities related to the DIP Facility Documents upon the occurrence of the Effective Date (<u>provided, that</u> the Surviving DIP Provisions shall survive in accordance with the terms of the DIP Facility Documents).

The commitments and obligations (if any) of the Prepetition Lenders and/or any of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Term Loan Credit Agreement or the DIP Facility Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

K.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the New Debt and the New Equity Interests; (ii) entry into the New Notes Documents; (iii) consummation of the Buyer Group Arrangements; (iv) implementation of the Restructuring Transactions; and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors, Reorganized Debtors, or the Wind-Down Entity, and any corporate or other organizational action required by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Entity. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this <u>Article IV.K</u> shall be effective notwithstanding any requirements under non-

bankruptcy law. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any affiliate of RoyaltyCo after the Effective Date.

L.    *Effectuating Documents; Restructuring Transactions*

1.    <u>RESTRUCTURING TRANSACTIONS</u>

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors and the Wind-Down Entity, as applicable, with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Buyer Group Arrangements, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Buyer Group Documents; (vii) the issuance of the New Debt; (viii) performing the Debtors' obligations under the Buyer Group Documents and any related agreements entered into in connection therewith, including the Transition Services Agreement (as defined in the Buyer Group APAs); and (ix) all other actions that the Debtors, Reorganized Debtors, or the Wind-Down Entity determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, or the Wind-Down Entity (collectively, the "***Restructuring Transactions***"). The foregoing does not extend to any equity holder or board actions required under applicable law with respect to RoyaltyCo and any direct or indirect parent entity of RoyaltyCo after the Effective Date.

2.    <u>BUYER GROUP ARRANGEMENTS</u>

On the Effective Date, certain of the Debtors will enter into a series of transactions with the Buyer Group or Brand Management Co. pursuant to which: (i) each Divested Store will be acquired by a Buyer Group SPE; (ii) each lease related to a Divested Store will be assigned by the corresponding Debtor to the corresponding Buyer Group SPE; (iii) a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE; (iv) royalty arrangements will be entered into between RoyaltyCo and Brand Management Co. in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of IP; (v) all gift card liabilities shall be borne by Brand Management Co. or the applicable franchisee (in each case, solely to the extent that such gift cards

were issued on or prior to March 31, 2025 and have not been redeemed as of the closing of the Buyer Group Arrangements); (vi) each Buyer Group SPE will assume, for its corresponding Divested Store, certain current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; and (vii) the parties will enter into certain other agreements and arrangements as agreed upon by the Debtors, the Buyer Group, or Brand Management Co., as applicable, and the Consenting Creditors.  The Plan Supplement will contain any agreements entered into to effectuate the Buyer Group Arrangements.

M.    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, including the Buyer Group Arrangements, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Notes Indenture, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

N.    *Preservation of Causes of Action*

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to the Buyer Group Documents, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article VIII</u> of the Plan and the Buyer Group Documents, the Reorganized Debtors or the Wind-Down Entity, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan, which shall be deemed released and waived as of the Effective Date.

The Reorganized Debtors and Wind-Down Entity may pursue such Retained Causes of Action in accordance with their respective best interests. The Reorganized Debtors and Wind-Down Entity shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors and Wind-Down Entity shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do

any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; provided, that any proceeds received by the Reorganized Debtors or the Wind-Down Entity, as applicable, on account of Causes of Action assigned to the Buyer Group or Brand Management Co., shall be immediately transferred to the Buyer Group or Brand Management Co., as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Debtors or Wind-Down Entity shall not pursue any such Causes of Action against it, except as otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.** Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, or are assigned or transferred to Brand Management Co. or the Buyer Group pursuant to the Buyer Group Documents, all such Causes of Action shall be expressly reserved by the Reorganized Debtors and Wind-Down Entity for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

O.    *Insurance Policies*

1.    DIRECTOR AND OFFICER LIABILITY INSURANCE

Each insurance policy, including any director and officer liability insurance policies, to which the Debtors are a party as of the Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors or Wind-Down Entity on behalf of the applicable Debtor effective as of the Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions with the Debtors after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

2.    OTHER INSURANCE POLICIES

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, each insurance policy to which the Debtors are a party as of the Effective Date shall be assumed by the Reorganized Debtor or Wind-Down Entity unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing.

Except as set forth in <u>Article IV.Q.1</u> of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Wind-Down Entity or draw on any collateral or security therefor.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, the Reorganized Debtors and the Wind-Down Entity, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

P.    *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Reorganized Debtors and Wind-Down Entity shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

Q.    *Dissolution of Certain Debtors*

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the Wind-Down Entity. The Reorganized Debtors and Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan (including the Buyer Group Documents), the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Assumption Schedule Filed with the Plan Supplement; (ii) as of the Effective Date, is subject to a pending motion to assume or reject such Executory Contract or Unexpired Lease Filed by the Debtors on or before the Confirmation Date; (iii) terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is a D&O Liability Insurance Policy; (v) is deemed assumed pursuant to <u>Article IV.O</u> of the Plan; or (vi) is to be assumed by the Debtors and assigned to Brand Management Co. or the Buyer Group in connection with the Buyer Group Arrangements.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors and Wind-Down Entity has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; <u>provided</u>, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with <u>Article V.D</u> of the Plan and payment of the applicable Cure Claim, if any; provided, further, that the Plan shall not be construed as limiting the Debtors' authority to assume and assign Executory Contracts and Unexpired Leases pursuant to the Buyer Group Documents. Any Executory Contract or Unexpired Lease assumed under the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Wind-Down Entity in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the

44

Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors and Wind-Down Entity with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, reserve the right to alter, amend, modify, or supplement the Assumption Schedule or Rejection Schedule with the consent of the Required Consenting Creditors, and subject to the terms of the Buyer Group Documents, at any time up to and including the later of the three (3) Business Days prior to the initial closing under the Buyer Group APAs and five (5) Business Days following the final resolution of any Disputed Contract, on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or the Buyer Group Documents restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan and the Buyer Group Documents shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the Buyer Group Arrangements and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>Article VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors, in consultation with the DIP Lenders and Required Consenting AHG Noteholders, may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Dispute Resolution*

Prior to the Combined Hearing, the Debtors shall provide Cure Notices of proposed Cures to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cures or the Debtors', the Reorganized Debtors', Brand Management Co.'s, the Buyer Group's, or the Wind-Down Entity's ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be Filed, served, and received by counsel to the Debtors by the objection deadline set forth in the applicable Cure Notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have consented to such assumption or Cure.

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors, the Reorganized Debtors, Brand Management Co., the Buyer Group, the Wind-Down Entity, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor, the Reorganized Debtor,  or Wind-Down Entity, as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, Reorganized Debtor, or Wind-Down Entity (as applicable) may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Combined Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Combined Hearing (an "***Adjourned Cure Dispute***"); provided, that the Reorganized Debtor and the Wind-Down Entity may settle any Adjourned Cure Dispute with the applicable counterparty after the Effective Date without further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Reorganized Debtors, or Wind-Down Entity shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the

Debtors, the Reorganized Debtors, or the Wind-Down Entity under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Reorganized Debtors, Brand Management Co., the Buyer Group, or the Wind-Down Entity, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

G.      *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

B.      *Rights and Powers of Distribution Agent*

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      RECORD DATE FOR DISTRIBUTION

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, unless otherwise set forth in the DIP Order or the DIP Facility Documents.  The Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan or otherwise in accordance with the applicable procedures of DTC. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

2.      DELIVERY OF DISTRIBUTIONS

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, shall be deposited with the Prepetition Agent and the DIP Agent, as applicable, for distribution to Holders of Non-Securitization Manager Advance Term Loan Claims or DIP Claims in accordance with the terms of the Prepetition Term Loan Credit Agreement and the DIP Credit Agreement, as applicable.  Distributions other than Cash will not be made to or by the DIP Agent or the Prepetition Agent and the DIP Agent and Prepetition Agent shall have no responsibility with respect to such distributions.  Rather, all distributions other than of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, may, with the consent of the Prepetition Agent and the DIP Agent, as applicable, be made by the Distribution Agent directly to Holders of Non-Securitization Manager Advance Term Loan Claims and DIP Claims in accordance with the terms of the Plan, the Prepetition Term Loan Credit Agreement, and the DIP Credit Agreement, as applicable.

Notwithstanding the foregoing, all distributions (whether of Cash or other than of Cash) on account of Securitization Notes Claims, if any, shall be deposited with the Prepetition Securitization Trustee for distribution to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture, except to the extent that the Prepetition Securitization Trustee provides prior written consent to the Debtors that some or all of such distributions may be made by the Distribution Agent directly to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture. To the extent the Prepetition Agent, the Prepetition Securitization Trustee, or the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Agent, the Prepetition Securitization Trustee, and the DIP Agent shall be deemed a "Distribution Agent" for purposes of the Plan.

The amount of any reasonable and documented fees and expenses incurred by the Prepetition Agents, the Prepetition Securitization Trustee, and the DIP Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) shall be paid in Cash by the Reorganized Debtor or Wind-Down Entity and will not be deducted from distributions made to Holders of Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtor and Wind-Down Entity and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent, as determined by the Debtors or the Reorganized Debtors, as applicable.

3.     NO FRACTIONAL SHARES

No fractional shares or units of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of New Equity Interests that is not a whole number, such New Equity Interests shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares or units of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.     UNDELIVERABLE DISTRIBUTIONS AND UNCLAIMED PROPERTY

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this Article VI.C.4,

"Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed New Equity Interests, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Debtors and the Wind-Down Entity without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

D.      *Securities Registration Exemption*

The offer, issuance, and sale under the Plan of the New Equity Interests in exchange for Claims pursuant to Article III of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

The offering, issuance, and distribution of the New Debt in exchange for Claims pursuant to Article II and Article III of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Accordingly, the New Debt, and any New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act, if any, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law, such as under certain conditions, the resale provisions of Rule 144 or Rule 144A of the Securities Act, and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable

With respect to the foregoing equity securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule

144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

None of the Debtors, the Wind-Down Entity, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests and New Debt under applicable securities laws. DTC, any transfer agent (as applicable), and all other Persons shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests and New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests or New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent, the Reorganized Debtors, or Wind-Down Entity, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor or Wind-Down Entity and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.      *Allocations*

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

G.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors or the Wind-Down Entity, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind-Down Entity may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Wind-Down Entity of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor, the Reorganized Debtor, or the Wind-Down Entity, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything herein to the contrary, neither the Reorganized Debtors, the Wind-Down Entity, nor the Debtors may set off or recoup against any distributions made on account of any Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims or any distributions to be made to parties to the Restructuring Support Agreement.

I.      *Claims Paid or Payable by Third Parties*

1.      CLAIMS PAID BY THIRD PARTIES

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent. To the extent a Holder of a Claim receives a distribution on

account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Debtor, the Wind-Down Entity, or the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors or the Wind-Down Entity may pursue any rights and remedies against such Holder under applicable law.

## 2.    CLAIMS PAYABLE BY INSURANCE CARRIERS

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## 3.    APPLICABILITY OF INSURANCE POLICIES

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims and Interests*

After the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have the authority (i) to File, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the Wind-Down Entity upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be entitled to object to Claims before the Claims Objection Deadline, as such deadline may be extended from time to time. After the Effective Date, except as expressly provided herein to the contrary, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline. The expiration of such period shall not limit or affect the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

F.    *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the applicable Reorganized Debtor or the Wind-Down Entity. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

G.    *Amendments to Claims*

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Reorganized Debtor or the Wind-Down Entity. Absent such authorization, any new or amended Claim Filed after the General Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

H.    *Disputed Claims Reserve*

Any amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Combined Hearing in consultation with the Required Consenting Creditors, based on the Debtors' good faith estimates

or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Distribution Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B- 9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Distribution Agent, and the holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disputed Claim Reserve shall be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Distribution Agent shall distribute to the holder thereof out of the Disputed Claims Reserve any amount or property to which such holder is entitled hereunder (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution). No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

In the event the remaining assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied pro rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed Pro Rata to all holders of Allowed General Unsecured Claims.

The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

I.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

B.      *Discharge of Claims and Termination of Interests*

For the avoidance of doubt, upon consummation of the Buyer Group Arrangements as set forth in the Buyer Group Documents, the assets sold in such Buyer Group Arrangements shall be transferred to and vest in Brand Management Co. or the Buyer Group, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances (other than Permitted Liens and Assumed Liabilities, each as defined in the applicable Buyer Group Documents) pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Sale Order and the Asset Purchase Agreement, as applicable.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action

of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "*event of default*" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Debtors, the Wind-Down Entity, or any of their Assets or property.

C.      *Releases by the Debtors*

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of**

the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing.

Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this Article VIII.C shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) releasing any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any Retained Causes of Action or any Causes of Action assigned or transferred pursuant to the Buyer Group Documents and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties; provided however, that the special committee of officers of Hooters of America, LLC shall not so designate the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, the Consenting AHG Noteholders, the DIP Lenders, or the DIP Agent, and the Prepetition Lenders, the Prepetition Agent, the DIP Lenders, the Prepetition Securitization Trustee, the Consenting AHG Noteholders, the Control Party, and the DIP Agent shall be and shall indefinitely remain Released Parties under the terms of the Plan.  Notwithstanding anything to the contrary in the foregoing or in the defined term "Released Parties," Avoidance Actions against any Released Parties shall be deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged by the Debtors, the Wind-Down Entity, and the Estates.

D.      *Releases by the Releasing Parties*

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the

Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Wind-Down Entity, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, New Notes Indenture, the Buyer Group Documents, the Prepetition Credit Agreements, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in this Article VIII.D shall not be construed as releasing, and do not release, (i) any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (ii) any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) any rights of Holders of Allowed Claims to receive

**distributions under the Plan, and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the applicable Releasing Party will be null and void and the Releasing Party will have no obligations to offer or consent to such releases of such party or any of its Related Parties.**

E.    *Exculpation*

**Without affecting or limiting the releases set forth in <u>Article VIII.C</u> and <u>Article VIII.D</u> of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility Documents, the Restructuring Support Agreement, the Plan (including the New Notes Documents and the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the New Debt, the Prepetition Loan Documents, the Securitization Notes Documents, the prepetition and postpetition marketing process, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Debt, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this <u>Article VIII.E</u> of the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including, without limitation, the New Notes Documents, and the New Organizational Documents.**

F.     *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.E</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS

PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.

THE RELEASES AND INJUNCTION SET FORTH IN THIS ARTICLE VIII IN FAVOR OF NON-DEBTOR PARTIES SHALL ONLY APPLY TO HOLDERS OF CLAIMS OR INTERESTS IF SUCH HOLDER OF A CLAIM OR INTEREST TIMELY OPTS INTO THE RELEASES.  FOR THE AVOIDANCE OF DOUBT, ALL HOLDERS OF CLAIMS AND INTERESTS, WHETHER OR NOT THEY OPT INTO THE RELEASES SHALL BE ENJOINED FROM ASSERTING OR CONTINUING TO PURSUE ANY CLAIM OR CAUSE OF ACTION ARISING PRIOR TO ENTRY OF THE CONFIRMATION ORDER AGAINST THE DEBTORS OR THEIR ESTATES TO THE EXTENT SUCH CLAIMS ARE ADDRESSED BY, OR SATISFIED IN ACCORDANCE WITH, THIS PLAN.

THE INJUNCTIONS IN THIS **ARTICLE VIII.F** SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

G.    *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

H.    *Release of Liens*

Except (i) with respect to the Liens securing the New Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Buyer Group Documents, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Entity and its successors and assigns.  On and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the

provisions of this Article VIII.H.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

The Prepetition Agent and the DIP Agent will reasonably cooperate with respect to any requests made in writing by the Debtors or Reorganized Debtors regarding specific release documentation reasonably required, and the Debtors or Reorganized Debtors will pay the fees and expenses of the Prepetition Agent and the DIP Agent promptly on request for any work necessary and requested by the Debtors or Reorganized Debtors to effectuate the Plan, including with respect to releases.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to consummation of the Plan that the conditions in (1)-(14) shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B of the Plan); provided that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "Prerequisite Condition") may be required to occur prior to another condition precedent (a "Subsequent Condition") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred:

1.      The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

2.      The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the Restructuring Support Agreement and the Restructuring Term Sheet;

3.      The DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the Required DIP Lenders party thereto;

4.      The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

5.      The Confirmation Order confirming the Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

6.      The New Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Plan and related transaction;

7.      The New Equity Interests shall have been issued (with all conditions precedent thereto having been satisfied or waived) and a shareholder rights agreement shall have been entered into by the appropriate parties;

8.      All Restructuring Expenses, including the fees and expenses of the Prepetition Agent and the DIP Agent, and any other fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement pursuant to an order of the Bankruptcy Court shall have been paid in full in cash;

9.      Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

10.      The conditions precedent to closing the Buyer Group Arrangements and the Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Effective Date;

11.      Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions, the Buyer Group Arrangements, and the Plan shall have been obtained (including as set forth in the applicable purchase agreement);

12.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the Restructuring Transactions, the Plan, or any other transaction contemplated hereby;

13.      The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; and

14.      There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions or the Buyer Group Arrangements or any material portion or aspect thereof.

B.      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this <u>Article IX</u> may be waived only by the Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group or Brand Management Co., whose consent rights under the Plan are subject in all respects to the Restructuring Support Agreement remaining in effect at the time of any such waiver and are solely to the extent the waiver adversely affects the Buyer Group or Brand Management Co., as applicable (such consent not to be unreasonably withheld, conditioned, or delayed), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.      *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

The Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the Required DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (iii) the Buyer Group and Brand Management Co. (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of (a) the Required Consenting Creditors (which consent shall not be unreasonably withheld, conditioned, or delayed); (b) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); and (c) the Buyer Group and Brand Management Co., whose consent rights under the Plan are subject in all respect to the Restructuring Support Agreement remaining in effect at the time any modification is requested (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after

Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Buyer Group Arrangements.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan, in accordance with Article X.A of the Plan occurring after the solicitation thereof but before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date, in consultation with the DIP Lenders and Required Consenting AHG Noteholders.  If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, or (d) be used against the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths and weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors, the Reorganized Debtors, or the Wind-Down Entity,

as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption,  assumption and assignment, or rejection  of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including the Buyer Group Arrangements;

9.      enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the consummation of the Plan, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, implementation, or enforcement of the Plan

or any Entity's obligations incurred in connection with the Plan, including with respect to the Buyer Group Arrangements;

12.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, exculpations, injunctions, and other provisions;

14.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I of the Plan;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    enforce or determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the DIP Facility Documents, the DIP Orders, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

17.    hear and determine disputes arising in connection with Buyer Group Arrangements;

18.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

20.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

23.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

24.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in the Plan, including under Article VIII hereof;

25.     enforce all orders previously entered by the Bankruptcy Court;

26.     hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

27.     enter an order concluding or closing the Chapter 11 Cases;

28.     recover all assets of the Debtors and property of the Debtors' Estates, wherever located, and

29.     enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

A.     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Ad Hoc Group, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties, any of such individuals, the Reorganized Debtors, nor the Wind-Down Entity will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

B.     *Immediate Binding Effect*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms

of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

C.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided*, that any material documents Filed shall be in consultation with the DIP Lenders, the Required Consenting AHG Noteholders, and the Buyer Group.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.      *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors and Wind-Down Entity, as applicable, shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

E.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or any other party with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor,

administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the Reorganized Debtors or Wind-Down Entity, the Consenting AHG Noteholders, Counsel to the DIP Lender, and the Buyer Group or Brand Management Co. shall be served on:

| | |
|---|---|
| Debtors: | Hooters of America, LLC<br>1815 The Exchange SE,<br>Atlanta, GA 30339<br>Attn: Keith Maib (kmaib@accordion.com)<br><br>with copies to: |
| Counsel to Debtors: | Ropes & Gray LLP<br>191 North Wacker, 32nd Floor<br>Chicago, IL 60606<br>Attn:  Chris L. Dickerson<br>(chris.dickerson@ropesgray.com)<br>Rahmon J. Brown (rahmon.brown@ropesgray.com)<br>Michael Wheat (michael.wheat@ropesgray.com)<br><br>- and -<br><br>Foley & Lardner LLP<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201<br>Attn: Holland N. O'Neil (honeil@foley.com)<br>Stephen A. Jones (sajones@foley.com)<br>Zachary C. Zahn (zzahn@foley.com) |
| Counsel to the Consenting AHG Noteholders: | White & Case LLP<br>200 South Biscayne Blvd., Suite 4900<br>Miami, FL 33131<br>Attn:   Brian Pfeiffer (brian.pfeiffer@whitecase.com)<br>        Amanda Parra Criste<br>(aparracriste@whitecase.com)<br><br>-and-<br><br>White & Case LLP<br>1121 Avenue of the Americas<br>New York, NY 10020<br>        Attn:  David Thatch (dthatch@whitecase.com) |

| | |
|---|---|
| Counsel to the DIP Lender: | Sidley Austin LLP<br>1999 Avenue of the Stars, 17th Floor<br>Los Angeles, CA 90067<br>Attention:  Genevieve G. Weiner<br>(gweiner@sidley.com)<br><br>and<br><br>Sidley Austin LLP<br>787 7th Avenue<br>New York, NY 10019<br>Attention:  Elizabeth R. Tabas Carson<br>(etabas@sidley.com)<br>Juliana L. Hoffman (jhoffman@sidley.com) |
| Counsel to the Buyer Group and Brand Management Co. | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attention: Benjamin W. Butterfield<br>(bbutterfield@mofo.com)<br>Ilayna Guevrekian<br>(iguevrekian@mofo.com) |

H. *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I. *Entire Agreement*

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

J. *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, which request shall be consistent with the terms of the Restructuring Support Agreement, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void

or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors , (y) the Required Consenting Creditors, and (z) solely to the extent that the Restructuring Support Agreement remains effective as to the Buyer Group, and to the extent that such alteration materially impacts the Buyer Group, then the Buyer Group and Brand Management Co. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors, (y) the Required Consenting Creditors, and (z) the Buyer Group and Brand Management Co; and (iii) nonseverable and mutually dependent.

K.      *Dissolution of Committee*

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims. Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

L.      *Expedited Tax Determination*

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed or to be Filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Effective Date.

****

Respectfully submitted, as of June 16, 2025

Hawk Parent, LLC
HOA Holdings, LLC
Night Owl, LLC
Owl Wings, LLC
Owl Restaurant Holdings, LLC
Owl Holdings, LLC
Elf Owl Investments, LLC
TW Lonestar Wings, LLC
Alamo Wings, LLC
HOA Restaurant Group, LLC
Derby Wings Holdings, LLC
Derby Wings, LLC
Hooters of America, LLC
HOA Funding, LLC
HOA Holdco, LLC
HOA Systems, LLC
HOA Restaurant Holder, LLC
HOOTS Restaurant Holder, LLC
HOA IP GP, LLC
HOOTS Franchising, LLC
HOA Franchising, LLC
HOA Maryland Restaurant Holder, LLC
HOA Kansas Restaurant Holder, LLC
TW Restaurant Holder, LLC
DW Restaurant Holder, LLC
HI Limited Partnership
HOA Towson, LLC
HOA Waldorf, LLC
HOA Laurel, LLC
HOA Gift Cards, LLC

By:    /s/ Keith Maib
Name: Keith Maib
Title: Authorized Officer

# <u>EXHIBIT A</u>

**Restructuring Support Agreement**

## **EXHIBIT B**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT IS AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 20, this "***Agreement***") dated March 31, 2025 is entered into by and among (each of the following described in sub-clauses (a) through (d) of this preamble, individually, a "***Party***" and, collectively, the "***Parties***"):[1]

(a)     Hawk Parent, LLC, HOA Holdings, LLC, HOA Funding, LLC, and each of their subsidiaries listed on **Schedules 1-A** and **1-B** to this Agreement (collectively, the "***Company***" or "***Company Parties***");

(b)     the undersigned Holders of the Prepetition Lender Claims (in each case solely in their capacity as such, the "***Prepetition Lenders***");

---

[1]     Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

(c)      the undersigned Holders of the Securitization Notes Claims that are members of the Ad Hoc Group (in each case solely in their capacity as such, the "***Consenting AHG Noteholders***"); and

(d)      Hooters, Inc., Restaurants of America, Inc., and Hoot Owl Restaurants, LLC (collectively, the "***Buyer Group***").

The terms of the Restructuring Term Sheet, a copy of which is attached hereto as **<u>Exhibit B</u>** (the "***Restructuring Term Sheet***") are hereby incorporated and included in the terms of this Agreement.[2]

## <u>RECITALS</u>

**WHEREAS**, the Company Parties, the Consenting Creditors, and the Buyer Group have negotiated or been apprised of the transactions contemplated by this Agreement (the "***Restructuring Transactions***") in good faith and at arm's-length and consent to and have agreed to consummate and support such Restructuring Transactions on the terms set forth in this Agreement, including the Restructuring Term Sheet and all other exhibits to this Agreement, and for such Restructuring Transactions to be memorialized in the Approved Plan;

**WHEREAS**, the Restructuring Transactions will include:

i.   the commencement by the Company Parties of voluntary chapter 11 cases (the "***Chapter 11 Cases***") under the Bankruptcy Code in the Bankruptcy Court on the terms set forth in this Agreement;

ii.  the Company Parties' entry into a superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $40,000,000 (the "***DIP Facility***"), on the terms and conditions set forth in the DIP Facility Term Sheet and the DIP Credit Agreement;

iii. the Company Parties' entry into the Buyer Group Arrangements (as defined and more particularly described in the Restructuring Term Sheet) with the Buyer Group (or their respective affiliates), to be effectuated through the Approved Plan;

iv.  the confirmation and consummation of the Approved Plan that is consistent with this Agreement, including the Restructuring Term Sheet, and otherwise contains terms and conditions reasonably acceptable to the Required Consenting Creditors and, insofar as such terms or conditions relate to the Buyer Group Arrangements, the Buyer Group (the "***Approved Plan***");

v.   upon the Effective Date, (a) Holders of Securitization A-2 Notes Claims will be issued new notes in RoyaltyCo; (b) Holders of Securitization B Notes Claims will be issued

---

[2]    In the event of any inconsistencies between the terms of this Agreement and the terms of the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.  In the event of any inconsistencies between the terms of this Agreement (other than the Restructuring Term Sheet) and the terms of the DIP Facility Term Sheet, the terms of the DIP Facility Term Sheet shall govern.

new notes and equity interests in RoyaltyCo; and (c) Holders of DIP Facility Claims will be issued new notes; and (d) holders of Term Loan Claims will be issued new notes and equity interests in RoyaltyCo, all as more specifically described in the Restructuring Term Sheet; and

vi.     upon the Effective Date, the UAS Wind-Down Process.

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

*AGREEMENT*

1.     **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

"***Ad Hoc Group***" means the ad hoc group of Holders of Securitization Notes Claims under the Existing Securitization Indenture represented by the Ad Hoc Group Advisors.

"*Ad Hoc Group Advisors*" means (i) White & Case LLP ("***White & Case***"), counsel to the Ad Hoc Group, (ii) Gray Reed, local counsel to the Ad Hoc Group, and (iii) M3 Partners, LP, financial advisor to the Ad Hoc Group.

"***Affiliate***" of an Entity means another Entity that directly or indirectly owns, controls, or is under common control with such Entity.

"***Agreement***" has the meaning set forth in the preamble to this Agreement, and for the avoidance of any doubt, includes all exhibits, annexes, and schedules hereto in accordance with Section 20.

"***Alternative Restructuring***" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale or assignment of all or any material portion of assets, new-money investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing), plan proposal, recapitalization, restructuring, or liquidation of the Company Parties, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests of or in any one or more Company Parties, whether written or oral, that is an alternative to, or is inconsistent with, any material component of the Restructuring Transactions; *provided that*, for the avoidance of doubt, the Restructuring Transactions shall not constitute an Alternative Restructuring.

"***Approved Budget***" has the meaning set forth in the DIP Facility Term Sheet.

"***Approved Plan***" has the meaning set forth in the recitals to this Agreement.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Texas.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under sections 2075 of title 28 of the United States Code, 27 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"***Brand Management & Services Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***Business Day***" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by Law or executive order.

"***Buyer Group***" has the meaning set forth in the preamble to this Agreement.

"***Buyer Group Advisors***" means (i) Morrison & Foerster LLP, as counsel to the Buyer Group, and (ii) North Point Advisors, as financial advisor to the Buyer Group.

"***Buyer Group Arrangements***" has the meaning set forth in the Restructuring Term Sheet.

"***Buyer Group Termination Event***" has the meaning set forth in <u>Section 11.07</u>.

"***Cash Collateral***" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claim***" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code, against any Company Party.

"***Class A-2 Notes***" means those certain 4.723% senior secured notes, alphanumerically designated as "Class A-2" in accordance with, and outstanding in a principal amount of $266,579,000.00 under the Existing Securitization Indenture.

"***Class B Notes***" means those certain 7.432% senior secured notes, alphanumerically designated as "Class B" in accordance with, and outstanding in a principal amount of $40,000,000.00 under the Existing Securitization Indenture.

"***Company***" has the meaning set forth in the preamble to this Agreement.

"***Company Advisors***" means the Company's advisors and professionals, including (i) Ropes & Gray LLP ("***Ropes & Gray***") and Foley & Lardner LLP, as co-counsel to the Company Parties, (ii) SOLIC Capital, LLC, as investment banker to the Company Parties, (iii) Accordion

4

Partners LLC, as financial advisor to the Company Parties, and (iv) Kroll Restructuring Administration LLC, as claims agent to the Company Parties.

"***Company Party***" has the meaning set forth in the preamble to this Agreement.

"***Company Termination Event***" has the meaning set forth in <u>Section 11.06</u>.

"***Confirmation and Sale Order***" means the order entered by the Bankruptcy Court approving the Buyer Group Arrangements and confirming the Approved Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent with this Agreement and reasonably acceptable to the applicable Company Parties, the Required Consenting Creditors, and the Buyer Group.

"***Consenting AHG Noteholder Termination Event***" has the meaning set forth in <u>Section 11.05</u><u>Section 11.04</u> of this Agreement.

"***Consenting AHG Noteholders***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Claims***" means all Claims against any Company Party held by Consenting Creditors from time to time.

"***Consenting Creditors***" means the Consenting AHG Noteholders and the Prepetition Lenders.

"***Control Party***" means Drivetrain Agency Services, LLC, in its capacity as the Control Party under, and as defined in, the Existing Securitization Indenture.

"***Debtors***" means the Company Parties that commence the Chapter 11 Cases.

"***Definitive Documents***" means all of the definitive documents implementing the Restructuring Transactions (which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders), including: (a) this Agreement; (b) the Approved Plan (and the Plan Supplement and all related, exhibits, term sheets, or agreements related thereto); (c) the Confirmation and Sale Order; (d) the Disclosure Statement and any documents or Solicitation Materials related to the solicitation thereof, including the Disclosure Statement Approval Order; (e) the First Day Pleadings and all orders sought pursuant thereto, including the DIP Orders; (f) the DIP Facility Documents; (g) the Brand Management & Services Agreement; (h) the New Securitization Documents; (i) the Sale Documents; (j) the Wind-Down Budget; and (k) any documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement any of the foregoing.

"***DIP Credit Agreement***" means that certain *Superpriority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time) by and among Hawk Parent, LLC and Hooters of America, LL, as borrowers, certain subsidiaries from time time party thereto as guarantors, the lenders from time time party thereto, and U.S. Bank Trust Company, National Association, as collateral agent and calculation agent under the DIP Facility.

"***DIP Facility***" has the meaning set forth in the recitals to this Agreement.

"***DIP Facility Claims***" means any and all Claims arising under, derived from, based on or related to, the DIP Facility.

"***DIP Facility Documents***" means, collectively, the DIP Credit Agreement, the DIP Orders, the security and guaranty documents, fee letters, notes, the Approved Budget, and any other ancillary documents entered into in connection therewith.

"***DIP Facility Term Sheet***" means the DIP Facility Term Sheet that is attached as **Exhibit 3** to the Restructuring Term Sheet.

"***DIP Lenders***" has the meaning set forth in the Restructuring Term Sheet.

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disclosure Statement***" means the disclosure statement in respect of the Approved Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125 and 1126 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable law.

"***Disclosure Statement Approval Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

"***Divested Stores***" means the portfolio of 103 Debtor-owned stores, to be acquired by the Buyer Group through the Buyer Group Arrangements.

"***Effective Date***" means the effective date of the Approved Plan.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Existing Securitization Indenture***" means that certain Amended and Restated Base Indenture, dated August 19, 2021 by and between HOA Funding, LLC as the master issuer and CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee.

"***Fiduciary Out***" has the meaning set forth in Section 11.06(f) of this Agreement.

"***Fiduciary Out Notice***" has the meaning set forth in Section 11.06(f) of this Agreement.

"***Final DIP Order***" means the final order in the Chapter 11 Cases authorizing the Company's entry into the DIP Facility and use of Cash Collateral on a final basis, which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders.

"***First Day Pleadings***" means the motions and related pleadings that the Debtors intend to file upon the commencement of the Chapter 11 Cases.

"***Holder***" means any Person or Entity that is the record or beneficial owner of any Claim, including any investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold any Claim on behalf of any signatory to this Agreement.

"***Interim DIP Order***" means the interim order authorizing the Company's entry into the DIP Facility and use of Cash Collateral on an interim basis, which, for the avoidance of doubt, shall be filed and entered in a form acceptable to the Required Consenting AHG Noteholders.

"***Joinder Agreement***" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit A**.

"***Law***" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"***Manager Advance Credit Agreement***" means that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

"***Milestones***" means the milestones defined in Section 3.01 of this Agreement.

"***New Securitization Documents***" means, collectively, the New Securitization Indenture and corresponding supplements for each of the Class A-1 Notes, Class A-2I Notes, Class A-2II Notes, and Class B Notes (each as defined in the Restructuring Term Sheet), all guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the Waterfall, an intercreditor agreement, and any other documents or agreements the Required Consenting Creditors and the Required DIP Lenders, in their sole discretion, deem necessary to effectuate the Approved Plan and Restructuring Transactions in this Agreement.

"***New Securitization Indenture***" means the new base indenture for each of the Class A-1 Notes, Class A-2I Notes, Class A-2II Notes, and Class B Notes, to be entered into and effective as of the Effective Date.

"***Non-Securitization Entities***" means the Company Parties listed in **Schedule 1-A**.

"***Outside Date***" means the earlier of (i) seventy-five (75) days following the Petition Date and (ii) June 16, 2025.

"***Party***" or "***Parties***" has the meaning set forth in the preamble to this Agreement.

"***Permitted Transferee***" has the meaning set forth in Section 6.02.

"***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means the date on which the Company Parties commence the Chapter 11 Cases.

"***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Approved Plan that, subject to the terms and conditions provided in this Agreement, may be filed by the Company with the Bankruptcy Court from time to time.

"***Post-Effective Date Debtors***" means, collectively, the Debtors following the Effective Date.

"***Prepetition Credit Agreements***" means the Prepetition Term Loan Credit Agreement and the Manager Advance Credit Agreement.

"***Prepetition Equity Interests***" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"***Prepetition Lender Advisors***" means (i) Sidley Austin LLP ("***Sidley***"), as counsel to the Prepetition Lenders and (ii) Houlihan Lokey, Inc. ("***Houlihan Lokey***"), as investment banker to the Prepetition Lenders.

"***Prepetition Lender Claim***" means any Claim against any Company Party arising under, derived from, based on or related to the loans under the Manager Advance Credit Agreement or the Prepetition Term Loan Credit Agreement, including, for the avoidance of doubt, any Manager Advances (as defined in the Prepetition Term Loan Credit Agreement), and any guarantees thereof.

"***Prepetition Lender Termination Event***" has the meaning set forth in <u>Section 11.04</u>.

"***Prepetition Lenders***" means those certain secured lenders (and/or investment advisors to secured lenders) under the Prepetition Credit Agreements.

"***Prepetition Term Loan Credit Agreement***" means that certain Credit Agreement, dated March 9, 2022, (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

"***Qualified Marketmaker***" means an Entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

"***Qualified Marketmaker Joinder***" has the meaning set forth in <u>Section 6.03</u> of this Agreement.

"***Qualified Marketmaker Joinder Date***" has the meaning set forth in <u>Section 6.03</u>.

"***Related Fund***" means, with respect to any Consenting Creditor, any fund, account, or investment vehicle that is controlled or managed by (i) such Consenting Creditor, (ii) an Affiliate of such Consenting Creditor, or (iii) the same investment manager, advisor or subadvisor as such Consenting Creditor or an Affiliate of such investment manager, advisor, or subadvisor, in each case, to the extent such Entity can be legally bound to this Agreement.

"***Required Consenting AHG Noteholders***" means, as of the date of determination, Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims held by the Consenting AHG Noteholders.

"***Required Consenting Creditors***" means the Required Consenting AHG Noteholders and the Required Prepetition Lenders.

"***Required DIP Lenders***" has the meaning set forth in the DIP Facility Term Sheet.

"***Required Prepetition Lenders***" means, as of the date of determination, Prepetition Lenders holding at least 66.67% in aggregate outstanding principal amount of the Prepetition Lender Claims.

"***Restructuring Expenses***" means the reasonable and documented fees and expenses related to the negotiation and implementation of the Restructuring Transactions pursuant to this Agreement, incurred by the Agent, the Ad Hoc Group, any Prepetition Lender, any DIP Lender, the Notes Trustee, and the Control Party, including but not limited to: (i) the legal fees and expenses of the Ad Hoc Group, Sidley, and any other counsel; (ii) the fees and expenses of Houlihan Lokey, as financial advisor to the Prepetition Lenders and DIP Lenders; and (iii) the fees and expenses of M3 Partners, LP, as financial advisor to the Ad Hoc Group.

"***Restructuring Term Sheet***" has the meaning set forth in the preamble to this Agreement.

"***Restructuring Transactions***" has the meaning set forth in the recitals to this Agreement.

"***RoyaltyCo***" has the meaning set forth in the Restructuring Term Sheet.

"***Sale Documents***" means collectively, the Confirmation and Sale Order, the Buyer Group Arrangements, and any ancillary documents to effectuate the Buyer Group Arrangements, each of which shall contain terms and conditions that are materially consistent with this Agreement.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

"***Securitization Class A-2 Note Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Securitization Class B Note Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Securitization Entities***" means the Company Parties listed in **Schedule 1-B**.

"***Securitization Notes Claims***" means, collectively, the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims.

"***Sellers***" means each of the Company Parties who shall be signatories to the Buyer Group Arrangements.

"***Solicitation***" means the solicitation of votes on the Approved Plan (including any non-voting election forms with respect to releases).

"***Solicitation Materials***" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Approved Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Support Effective Date***" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) each Company Party, (ii) by Prepetition Lenders holding at least 66.67% in aggregate principal amount of Prepetition Claims, (iii) Holders of Securitization Class A-2 Note Claims holding at least two thirds in aggregate principal amount of the Securitization Class A-2 Note Claims, (iv) Holders of Securitization Class B Note Claims holding at least two thirds in aggregate principal amount of the Securitization Class B Note Claims, and (v) each member of the Buyer Group.

"***Support Period***" means the period commencing on the Support Effective Date and ending on the Termination Date.

"***Term Loan Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Termination Date***" means the date on which termination of this Agreement is effective as to a Party in accordance with Section 10 of this Agreement.

"***Transfer***" has the meaning set forth in Section 6.01.

"***UAS Wind-Down Process***" means, upon the Effective Date, the orderly wind-down of the Debtors' estates and any Unallocated Stores on terms set forth in the Approved Plan and agreed to by the Debtors or Post-Effective Date Debtors, as applicable, and the Consenting Creditors.

"***Unallocated Stores***" means the stores of the Company Parties that are not acquired pursuant to the Buyer Group Arrangements.

"***Waterfall***" has the meaning set forth in the Restructuring Term Sheet.

"***Wind-Down Budget***" has the meaning set forth in the Restructuring Term Sheet.

2.      **Passage of Time.**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules, such Milestone or other reference of time shall be extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

3.      **Restructuring.**

Section 3.01    The Restructuring Transactions.

(a)      The Approved Plan. Subject to the terms of this Agreement, the Company Parties will consummate the Restructuring Transactions prior to the Outside Date in the Chapter 11 Cases, in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and in accordance with the milestones set forth in the Restructuring Term Sheet (the "***Milestones***"); *provided* that, subject to the Outside Date, any Milestone may be extended or waived upon the written consent (with e-mail from counsel being sufficient) of the Required DIP Lenders and the Required Consenting AHG Noteholders in their respective sole discretion.

Each of the Parties shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other in connection with the Approved Plan, the Restructuring Transactions, and the Milestones. Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court to carry out the purpose and intent of this Agreement (including to provide any reasonably necessary or reasonably requested information to federal, state, local, or foreign regulators), to obtain required regulatory approvals necessary for confirmation of the Approved Plan, including entry into and consummation of the Buyer Group Arrangements in connection therewith.

Section 3.02    Definitive Documents.

The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants materially consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14 hereof. Further, the Definitive Documents or any other documentation relating to the Restructuring Transaction not executed or in a form attached to this Agreement as of the Support Effective Date shall be materially consistent with this Agreement and otherwise be in form and substance acceptable to the Company Parties and the Required Consenting Creditors; *provided* that, the Approved Plan, the Disclosure Statement, Solicitation Materials, the Confirmation and Sale Order, the Buyer Group Arrangements, and any other Sale Documents related thereto shall also be in form and substance acceptable to the Buyer Group.

4.    **Agreements of the Prepetition Lenders.**

Section 4.01    Support. Each Prepetition Lender, with respect to each of its respective Prepetition Lender Claims, hereby covenants and agrees, severally and not jointly, during the Support Period to:

(a)    support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Facility Term Sheet, the Approved Plan, the Sale Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement;

(b)    pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions hereof) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)    when properly solicited to do so, timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control) in support of the Approved Plan, including any Claims that are impaired under the Approved Plan and not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in this clause (c); *provided however*, (i) that if any Company Party is in breach of any representation, warranty, or covenant set forth in this Agreement, the Prepetition Lenders may change or withdraw (or cause or direct to be changed or withdrawn) any vote in support of the Approved Plan, and (ii) except with respect to the termination rights provided in the Company Termination Events under Section 11.06 (a), (d) or (e) herein, a Prepetition Lender's vote shall be immediately and automatically without further action of any Prepetition Lender revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Prepetition Lender;

(d)    consent to, support, grant, and, as applicable, opt-in or not opt-out of the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and Confirmation and Sale Order; and

(e)    not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), (ii) propose, support, vote for, encourage, seek, file, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any Entity regarding any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report, or comparable public statement or filing with respect to any Alternative Restructuring and timely vote (or cause to be voted) its Claims against any Alternative Restructuring, or

(iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)    (i) not direct any trustee to take any action inconsistent with such Prepetition Lender's obligations under this Agreement or the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, and (ii) if any applicable trustee takes any action inconsistent with such Prepetition Lender's obligations under this Agreement, the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, such Prepetition Lender will use commercially reasonable efforts to direct such trustee (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring Transactions; *provided*, that it is acknowledged and agreed that actions taken by any administrative agent and/or collateral agent under the Prepetition Credit Agreements may constitute a Company Termination Event or a Consenting AHG Noteholder Termination Event unless the Prepetition Lenders have directed such agent to cease taking such action consistent with this Section 4.01(f);

(g)    (i) act in good faith with regard to the successful consummation of the Restructuring Transactions materially consistent with this Agreement and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the applicable Company Parties and the Prepetition Lenders to be necessary to consummate the Restructuring Transactions;

(h)    negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; *provided*, that the material terms of the Approved Plan are preserved;

(i)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(j)    promptly notify the Company Parties and the Consenting AHG Noteholders, in writing (e-mail to counsel being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(k)    inform the Company Parties and the Consenting AHG Noteholders (e-mail to counsel being sufficient) reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions.

Section 4.02    Additional Provisions Regarding the Prepetition Lenders' Agreements. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any Prepetition Lenders to assert or raise any objection

permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any Prepetition Lender from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a Prepetition Lender in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, and the right to assert any and all Prepetition Lender Claims (so long as the exercise of any such right or the assertion of any such claim is not inconsistent with such Prepetition Lender's obligations hereunder); (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of the Prepetition Credit Agreements; (e) require any Prepetition Lender to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such Prepetition Lender is a party and that remains in full force and effect; (f) prevent any Prepetition Lender from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any Prepetition Lender to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such Prepetition Lender may reasonably determine.

Section 4.03    Additional Claims. To the extent any Prepetition Lender (a) acquires additional Claims entitled to vote on the Approved Plan; or (b) Transfers any Claims, then, in each case, each such Prepetition Lender shall promptly notify Ropes & Gray of such acquisition (which notification may be by e-mail from the Prepetition Lender Advisors, as applicable), and each such Prepetition Lender hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Approved Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 6 hereof.

5.    **Agreements of the Consenting AHG Noteholders.**

Section 5.01    Support. Each Consenting AHG Noteholder, with respect to each of its respective Securitization Notes Claims, hereby covenants and agrees, severally and not jointly, during the Support Period to:

(a)    support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Facility Term Sheet, the Approved Plan, the Sale Documents, the New Securitization Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement; *provided*, *however*, that DIP Facility Term Sheet shall be in form and substance reasonably acceptable to the Required Consenting AHG Noteholders;

14

(b)     pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions herein) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)     when properly solicited to do so, timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control) in support of the Approved Plan, including any Claims that are impaired under the Approved Plan and not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in this clause (c); *provided, however*, (i) that if any Company Party is in breach of any representation, warranty, or covenant set forth in this Agreement, the Consenting AHG Noteholders may change or withdraw (or cause or direct to be changed or withdrawn) any vote in support of the Approved Plan, and (ii) except with respect to the termination rights provided in the Company Termination Events under Section 11.06 (a), (d) and (e) herein, a Consenting AHG Noteholder's vote shall be immediately and automatically without further action of any Consenting AHG Noteholder revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting AHG Noteholder;

(d)     consent to, support, grant, and, as applicable, opt-in or not opt-out of the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and Confirmation and Sale Order;

(e)     not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), (ii) propose, support, vote for, encourage, seek, file, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any Entity regarding any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report, or comparable public statement or filing with respect to any Alternative Restructuring and timely vote (or cause to be voted) its Claims against any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)     (i) not direct any trustee to take any action inconsistent with such Consenting AHG Noteholder's obligations under this Agreement or the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, and (ii) if any applicable trustee takes any action inconsistent with such Consenting AHG Noteholder's obligations under this Agreement, the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, such Consenting AHG Noteholder will use commercially reasonable efforts to direct such trustee (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring Transactions; *provided*, that it is acknowledged and agreed that actions taken by any administrative agent and/or collateral agent under the Existing Securitization Indenture may constitute a Company Termination Event or a

Prepetition Lender Termination Event unless the Consenting AHG Noteholders have directed such agent to cease taking such action consistent with this <u>Section 5.01(f)</u>;

(g)    (i) act in good faith with regard to the successful consummation of the Restructuring Transactions materially consistent with this Agreement and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the applicable Company Parties and the Consenting AHG Noteholders to be necessary to consummate the Restructuring Transactions;

(h)    negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; provided, that the material terms of the Approved Plan are preserved;

(i)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(j)    promptly notify the Company Parties and the Prepetition Lenders in writing (e-mail to counsel being sufficient) after becoming aware of the issuance by any governmental authority, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(k)    inform the Company Parties and the Prepetition Lenders in writing (e-mail to counsel being sufficient) reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions.

Section 5.02    <u>Additional Provisions Regarding the Consenting AHG Noteholders' Agreements</u>. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any Consenting AHG Noteholders to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any Consenting AHG Noteholder from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a Consenting AHG Noteholder in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting AHG Noteholder's obligations hereunder; (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of the Existing Securitization Indenture; (e) require any Consenting AHG Noteholder to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such Consenting

AHG Noteholder is a party and that remains in full force and effect; (f) prevent any Consenting AHG Noteholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any Consenting AHG Noteholder to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such Consenting AHG Noteholder may reasonably determine.

Section 5.03    Additional Claims. To the extent any Consenting AHG Noteholder (a) acquires additional Claims entitled to vote on the Approved Plan; or (b) Transfers any Claims, then, in each case, each such Consenting AHG Noteholder shall promptly notify Ropes & Gray of such acquisition (which notification may be by e-mail from the Ad Hoc Group Advisors, as applicable), and each such Consenting AHG Noteholder hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Approved Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 6 hereof.

6.    **Transfers.**

Section 6.01    Transfers. Each Consenting Creditor agrees that during the Support Period, it shall not sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions) ("***Transfer***"), any Claims against or in the Company Parties, any option thereon, or any right or interest therein (including by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(a)    is a Consenting Creditor or a Related Fund; or

(b)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to the transferor (including with respect to any and all Claims it already may hold before such Transfer) by executing Joinder Agreement and delivering an executed copy of such Joinder Agreement to (i) Ropes & Gray, (ii) Sidley, and (iii) White & Case as promptly as practicable, but in no event later than three (3) Business Days following consummation of such Transfer. Notwithstanding anything to the contrary in this Section 6.01, Consenting Creditors shall be permitted to engage in ordinary course repurchase agreements and securities lending transactions so long as any such transactions are fully settled if and when needed for purposes of the Restructuring Transactions.

(c)    Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

Section 6.02    Permitted Transferees. Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims to an Entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become an Entity that meets the requirements of Section 6.01(a) or (b) hereof (a transferee that meets such requirements, a "***Permitted Transferee***"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title, or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 6.02, (iii) subject to Section 6.03, such Qualified Marketmaker must (A) subsequently Transfer the right, title or interest to such Claims within five (5) Business Days of its acquisition to a transferee described in the foregoing clause (i) that is not an Affiliate, affiliated fund, or affiliated Entity with a common advisor of such Qualified Marketmaker or (B) sign a Qualified Marketmaker Joinder on or before the Qualified Marketmaker Joinder Date, and (iii) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Claims of a Consenting Creditor (*i.e.*, received by such Qualified Marketmaker from a Holder that is not a Consenting Creditor) without such Transfer being subject to this Section 6.02.

Section 6.03    Joinder. If at the time of a proposed Transfer of any Claims to a Qualified Marketmaker, such Claims (i) may be voted or their consent solicited with respect to the Restructuring Transactions, then the proposed transferor must first vote or consent to such Claims in accordance with Section 6.01 hereof, or (ii) have not yet been and may yet be voted or yet have their consent solicited with respect to the Approved Plan or the Restructuring Transactions and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (such signed Joinder Agreement, the "***Qualified Marketmaker Joinder***"); *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

7.    **Agreements of the Company Parties.**

Section 7.01    Affirmative Commitments. The Company Parties, jointly and severally, hereby covenant and agree during the Support Period to:

(a)    support and not object to the Approved Plan or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and take any reasonable action necessary in a timely manner to effectuate the

Restructuring Transactions in a manner materially consistent with this Agreement (including, for the avoidance of doubt, the Milestones);

(b)  take all steps reasonably necessary and desirable to pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents in good faith and by obtaining the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(c)  consent to, support, and grant, as applicable, the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and the Confirmation and Sale Order;

(d)  comply with the Milestones;

(e)  use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is determined by the Required Consenting Creditors to be necessary to consummate the Restructuring Transactions;

(f)  to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(g)  act in good faith with regard to the successful consummation of the Restructuring Transactions consistent with this Agreement;

(h)  negotiate in good faith, execute, deliver, and perform its obligations under the Definitive Documents in accordance with the terms of this Agreement, and any other required agreements to effectuate and consummate the Restructuring Transactions and the transactions contemplated by the Definitive Documents;

(i)  use commercially reasonable efforts to obtain additional support for the Restructuring Transactions from their other material stakeholders;

(j)  notify in writing (e-mail being sufficient) the Prepetition Lenders, the Prepetition Lender Advisors, the Ad Hoc Group, and the Ad Hoc Group Advisors promptly, but no later than within two (2) Business Days of the Company Parties becoming aware of, the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority, or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions;

(k)  inform the Prepetition Lenders, the Prepetition Lender Advisors, the Ad Hoc Group, and the Ad Hoc Group Advisors promptly, but no later than within two (2) calendar days of the Company Parties becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the

Restructuring Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of material debt, or securement of material security from or by any Person or Entity in respect of any Company Party or any of its subsidiaries; (iii) the occurrence of any event or circumstance that would permit any Party to terminate, or that would result in the termination of, this Agreement of which any Company Party is reasonably aware; (iv) a material breach of this Agreement (including a material breach by any Company Parties); and (v) any representation or statement made or deemed to be made by any of the Company Parties under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(l)        upon reasonable request of any member of the Ad Hoc Group or the Ad Hoc Group Advisors, inform the Ad Hoc Group and the Ad Hoc Group Advisors as to: (i) the status and progress of the Restructuring Transactions, including progress in relation to the Definitive Documents and (ii) the status of obtaining any necessary or reasonably desirable authorizations (including any consents) from the Prepetition Lenders or DIP Lenders, the Buyer Group, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(m)        upon reasonable request of any of the Prepetition Lenders or the Prepetition Lender Advisors, inform the Prepetition Lenders and the Prepetition Lender Advisors as to: (i) the status and progress of the Restructuring Transactions, including progress in relation to the Definitive Documents and (ii) the status of obtaining any necessary or reasonably desirable authorizations (including any consents) from the Consenting AHG Noteholders, the Buyer Group, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(n)        in each case taking into account the Restructuring Transactions (i) use commercially reasonable efforts to conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, (ii) use commercially reasonable efforts to maintain its physical assets, properties, and facilities in their working order condition and repair, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, (v) maintain its good standing under the Laws of the state or other jurisdiction in which it is incorporated, organized, or formed; and (v) use commercially reasonable efforts to preserve intact its business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course, in a manner that is consistent in all material respects with past practices, and in compliance with applicable Law;

(o)        consult with the Consenting Creditors on a regular basis during the Chapter 11 Cases with respect to any strategic, regulatory, and other material transactions (including with respect to any settlements) impacting the Company Parties and their material Affiliates;

(p)      upon reasonable request of any of the Prepetition Lenders or members of the Ad Hoc Group, provide the Prepetition Lenders or the Ad Hoc Group, as applicable, with reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business;

(q)      provide draft copies of all Definitive Documents to the Prepetition Lender Advisors and Ad Hoc Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Prepetition Lender Advisors and Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; *provided, however*, that in the event that not less than two (2) Business Days' notice is impracticable or impossible under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings to the Prepetition Lender Advisors and Ad Hoc Group Advisors as soon as otherwise practicable before the time when the Company Parties intend to file any such motion or other pleading;

(r)      use commercially reasonable efforts to provide the Prepetition Lenders Advisors and Ad Hoc Group Advisors all material draft motions and pleadings not listed in subsection (r) above that the Company Parties or any of its Affiliates intend to file with the Bankruptcy Court at least two (2) calendar days prior to the date on which such party files such pleading; and

(s)      promptly pay Restructuring Expenses (for the avoidance of doubt, including fees of the DIP Lenders, Prepetition Lenders, and Ad Hoc Group Advisors) as provided for under the DIP Facility Term Sheet or DIP Facility Documents, as applicable.

Section 7.02   Negative Commitments. During the Support Period, the Company Parties hereby covenant and agree not to, directly or indirectly:

(a)      take any action that is inconsistent with this Agreement in any material respect, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement or the Approved Plan (including encouraging another Person to undertake any action prohibited by this Agreement); *provided that* none of the foregoing affect the Company Parties' right to exercise the Fiduciary Out or limit the Company Parties' rights under Section 11.06 (subject in all respects to the Parties' respective rights to terminate this Agreement pursuant to Section 10);

(b)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions (including encouraging another Person to undertake any action prohibited by this Agreement);

(c)      modify the Approved Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Approved Plan;

(e)     reserved;

(f)     sell, or file any motion or application seeking to sell, any material assets, other than in the ordinary course of business, without the prior written consent of the Required Consenting Creditors (which may be by e-mail);

(g)     commence any process to sell, transfer, dispose, or otherwise monetize any assets of any of the Company Parties in a transaction or a series of transactions, whether or not in the ordinary course of business, having a fair market value of $250,000 or greater without the prior written consent of the Required Consenting Creditors; and

(h)     other than as provided in this Agreement and the Restructuring Term Sheet, amend any of their corporate governance or organizational documents without prior written notice to the Required Consenting Creditors (which may be by e-mail);

(i)     other than in the ordinary course of business, (i) enter into any settlement regarding any Claims or Prepetition Equity Interests; (ii) enter into any material agreement that is materially inconsistent with this Agreement; (ii) amend, supplement, modify, or terminate any material agreement in a way that is materially inconsistent with this Agreement; (iii) knowingly allow any material agreement to expire if such expiration would frustrate or impede consummation of the Restructuring Transactions; or (iv) knowingly allow any material permit, license or regulatory approval to lapse, expire, terminate or be revoked, suspended or modified, in each case without the prior written consent of the Required Consenting Creditors (which may be by e-mail);

(j)     file with any court any motion, pleading, or Definitive Document (including any modifications or amendments thereto) that, in whole or in part, is materially inconsistent with this Agreement;

(k)     (i) operate its business outside the ordinary course, other than the Restructuring Transactions; or (ii) other than in the ordinary course of business or as contemplated by this Agreement transfer any material asset or right of the Company Parties (or its Affiliates) or any material asset or right used in the business of the Company Parties (or its Affiliates) to any Person or Entity; or

(l)     other than in the ordinary course of business or as contemplated by this Agreement engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction;

(m)     reject, terminate, settle, or renegotiate any material contract (including any executory contracts and unexpired leases) without the prior consultation with the Required Consenting Creditors;

(n)     without the prior written consent of the Required Consenting Creditors, obtain, seek, solicit or otherwise attempt to enter into any contract (other than the DIP Documents related to the DIP Facility) with respect to cash collateral usage, debtor-in-possession financing, exit financing, manager advances, and/or other financing arrangements; and

(o)      initiate or have initiated on its behalf, any litigation or proceeding of any kind against the other Parties in connection with the Restructuring, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document.

8.      **Additional Provisions Regarding Company Parties' Commitments.**

Section 8.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement will require the Company Parties or any directors, officers, managers, or members of the Company Parties, each in their capacities as a director, officer, manager, or member of the Company Parties, to take any action, including the Fiduciary Out, or to refrain from taking any action, to the extent such Person or Entity reasonably determines, after consulting with counsel, such action or inaction would be inconsistent with their fiduciary duties under applicable Law (as determined by them in good faith after consultation with outside legal counsel), and any such action or inaction taken or not taken pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement. The Company Parties shall promptly notify each of the Consenting Creditors of any such determination within twenty-four (24) hours following such determination.

Section 8.02    Notwithstanding anything to the contrary in this Agreement, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructurings as required by their fiduciary duties; (b) provide access to non-public information concerning any Company Party to any Entity or enter into nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructurings; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructurings; and (e) enter into or continue discussions or negotiations with Holders of Claims against or holders of equity interests in a Company Party (including any Party to this Agreement), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring; *provided*, that the Company Parties shall (i) as soon as practicably reasonable, but in no event later than two (2) calendar days of receiving such proposal, notify the Consenting Creditors and the Buyer Group of the receipt of such proposal (e-mail being sufficient); (ii) provide the Consenting Creditors and the Buyer Group with regular updates as to the status and progress of such Alternative Restructuring proposal if the Company Parties (or their Affiliates or agents) respond to any Alternative Restructuring proposal; and (iii) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from the Consenting Creditors relating to any Alternative Restructuring proposal; *provided further* that notwithstanding the foregoing, nothing herein shall impede, limit, or otherwise alter any Party's termination rights set forth herein or in any Definitive Document.

Section 8.03    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

23

9.      **Agreements of the Buyer Group.**

Section 9.01    Subject in all respects to <u>Section 9.02 and Section 9.03</u>, each member of the Buyer Group hereby covenants and agrees, severally, not jointly, during the Support Period to:

(a)      reserved;

(b)      support and not object to the Approved Plan, or any of the Restructuring Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary in a timely manner to effectuate the Restructuring Transactions in a manner materially consistent with this Agreement;

(c)      pursue, consummate, and implement the Restructuring Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions herein) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Restructuring Transactions;

(d)      consent to, support, and grant, as applicable, the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and the Confirmation and Sale Order;

(e)      not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Restructuring Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another Person or Entity to undertake any action prohibited by this Agreement), or (ii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring Transactions as set forth herein, as applicable;

(f)      (i) act in good faith with regard to successful consummation of the Restructuring Transactions materially consistent with this Agreement; and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Restructuring Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the Company Parties and Required Consenting Creditors to be necessary to consummate the Restructuring Transactions;

(g)      negotiate in good faith appropriate additional or alternative provisions to address any legal, regulatory, or structural impediment that could prevent, hinder, or delay the consummation of the Restructuring Transactions; *provided*, that the material terms of the Approved Plan and the Buyer Group Arrangements are preserved;

(h)      refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or

materially delay the consummation of the Restructuring Transactions (including encouraging another Person or Entity to undertake any action prohibited by this Agreement);

(i)    promptly notify the Company Advisors, the Prepetition Lender Advisors, and the Ad Hoc Group Advisors in writing (e-mail being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions; and

(j)    inform the Company Advisors, the Prepetition Lender Advisors, and the Ad Hoc Group Advisors reasonably promptly after becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings or legal suit for payment of material debt in respect of such member of the Buyer Group or any of its subsidiaries; or (iii) the occurrence of any termination event under this Agreement of which such member of the Buyer Group is reasonably aware.

Section 9.02    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any member of the Buyer Group to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (b) prevent any member of the Buyer Group from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (c) limit the rights of a member of the Buyer Group in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such member's obligations hereunder; (d) except as specifically provided for in this Agreement, constitute a waiver or amendment of any term or provision of any existing agreement between a member of the Buyer Group and any Company Party; (e) require any member of the Buyer Group to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such member is a party and that remains in full force and effect; (f) prevent any member of the Buyer Group from taking any action as is necessary to preserve or defend the validity, existence, and priority of its Claims or any lien securing any such Claims (including the filing of proofs of claim); or (g) require any member of the Buyer Group to (A) take, or refrain from taking, any action where to do so would breach (x) any Law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such member of the Buyer Group may reasonably determine.

Section 9.03    Except as specifically set forth in this Section 9.03, and notwithstanding anything else in this Agreement to the contrary, the Parties understand and agree that (a) this Agreement constitutes a non-binding statement of the intentions of the Buyer Group relating to the Buyer Group Arrangements and does not contain all matters upon which agreement must be reached for the Buyer Group Arrangements to be consummated,  and (b) a binding commitment of the Buyer Group with respect to the Buyer Group Arrangements will result only if

the Company Parties and the Buyer Group execute Definitive Documents with respect to the Buyer Group Arrangements.  Notwithstanding anything to the contrary in this Agreement, the Buyer Group shall work in good faith and use all commercially reasonable best efforts to negotiate and document the Restructuring Transactions as set forth in the Restructuring Term Sheet.

10.     **Reserved.**

11.     **Termination of Agreement.**

Section 11.01 <u>Generally</u>. This Agreement will automatically terminate (as to all Parties) upon (i) the Effective Date or (ii) three (3) Business Days following the receipt of written notice, delivered in accordance with <u>Section 26</u> hereof, from (a) the Required Prepetition Lenders (which, for the avoidance of doubt, may be delivered by e-mail by Sidley on behalf of any or all Entities constituting the Prepetition Lenders) to the other Parties at any time after the occurrence of any Prepetition Lender Termination Event; (b) the Required Consenting AHG Noteholders (which, for the avoidance of doubt, may be delivered by e-mail by White & Case on behalf of any or all Entities constituting the Consenting AHG Noteholders) to the other Parties at any time after the occurrence of any Consenting AHG Noteholder Termination Event; (c) each of the Company Parties (which for the avoidance of doubt, may be delivered by e-mail by Ropes & Gray on behalf of any or all Entities constituting the Company Parties) to the other Parties at any time after the occurrence of any Company Termination Event; or (d) any member of the Buyer Group (which, for the avoidance of doubt, may be delivered by e-mail by Morrison & Foerster LLP on behalf of any or all Entities constituting the Buyer Group) to the other Parties at any time after the occurrence of any Buyer Group Termination Event. No Party may terminate this Agreement based on a Prepetition Lender Termination Event, Consenting AHG Noteholder Termination Event, Company Termination Event, or Buyer Group Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Section 11.02 If the Chapter 11 Cases are commenced, each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required. The Company Parties acknowledge that after the Petition Date, the giving of notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code.

Section 11.03 Each of the dates and time periods in this <u>Section 10</u> may be extended by mutual agreement (which may be evidenced by e-mail confirmation, including from respective counsel) among the Company Parties and the Required Consenting Creditors and, solely with respect to <u>Sections 11.01(i)</u>, <u>(ii)(d)</u>, and <u>11.07</u>, the Buyer Group.

Section 11.04   A "***Prepetition Lender Termination Event***" will mean any of the following:

(a)      the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 26 detailing any such breach;

(b)      failure of a Company Party to meet any Milestone, unless such Milestone is satisfied prior to delivery of a notice to the Company Parties from the Required Prepetition Lenders notifying the Company Parties of the failure to meet the Milestone, or waived or extended in accordance with Section 3.01(a) of this Agreement, or unless such failure is the result of any act, omission, or delay on the part of the terminating Prepetition Lenders in material breach of their obligations under this Agreement;

(c)      if the Required Consenting AHG Noteholders, any Company Party, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 10;

(d)      the material breach by a Company Party of any of the representations, warranties, covenants, or other obligations of the Company Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Prepetition Lenders; *provided*, that this termination right may not be exercised by any Prepetition Lender that is in material breach of this Agreement;

(e)      any Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any of the Prepetition Lenders or other Holders of Company Claims or Prepetition Equity Interests, its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring without the written consent of the Required Prepetition Lenders; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 7 hereof;

(f)      any Company Party files, proposes, withdraws, or modifies any Definitive Documents or files or supports any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, and such withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Required Prepetition Lenders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document;

(g)      any Company Party files a motion seeking to approve or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Required Prepetition Lenders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is

inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable;

(h)      a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any Prepetition Lender Claims held by the Prepetition Lenders in manner inconsistent with the stipulations and waivers granted by any Company Party pursuant to the Final DIP Order;

(i)      (a) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the DIP Facility, the Approved Plan, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, or otherwise acceptable to the Required Prepetition Lenders or (b) the filing of a motion by any Company Party seeking an order (without the prior written consent of the Required Prepetition Lenders) vacating or modifying a DIP Order, the Disclosure Statement Approval Order, or the Confirmation and Sale Order;

(j)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts any of the Prepetition Lenders without the prior written consent of the Required Prepetition Lenders;

(k)      the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements, confirmation of the Approved Plan, or entry into the New Securitization Documents or, in each case, disallowing any material provision thereof (without the written consent of the Required Prepetition Lenders), or that has a material impact on the ability to consummate the Restructuring Transactions, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(l)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(m)      a Company Party fails to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or is otherwise consented to by the Required Prepetition Lenders;

(n)      a Company Party or any of its Affiliates (i) repudiates or asserts a defense to any obligation or liability under any Prepetition Credit Agreement or this Agreement or (ii) initiates any action, suit or proceeding, at law or in equity, against the Agent or any Prepetition Lender;

(o)      reserved;

(p)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not

been reversed, stayed, or vacated within three (3) Business Days after the Required Prepetition Lenders provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(q)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment, or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance, unless in each case such ruling, judgment, or order arises primarily from the actions of a Prepetition Lender or from the failure of a Prepetition Lender to comply with its obligation hereunder; or

(r)     any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Required Prepetition Lenders.

Section 11.05  A "*Consenting AHG Noteholder Termination Event*" will mean any of the following:

(a)     the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 26 detailing any such breach;

(b)     failure of a Company Party to meet any Milestone, unless such Milestone is satisfied prior to delivery of a notice to the Company Parties and DIP Lenders from the Required Consenting AHG Noteholders notifying the Company Parties and the DIP Lenders of the failure to meet the Milestone, or waived or extended in accordance with Section 3.01(a) of this Agreement, or unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting AHG Noteholders in material breach of their obligations under this Agreement;

(c)     if the Required Prepetition Lenders, any Company Party, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 10;

(d)     the material breach by any other Party of any of the representations, warranties, covenants, or other obligations of any of the Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Consenting AHG Noteholders; *provided*, that this termination right may not be exercised by any Consenting AHG Noteholder that is in material breach of this Agreement;

(e)     any Company Party or any of its Affiliates (i) publicly announces, or announces in writing, to any Consenting AHG Noteholder or other Holders of Company Claims or Prepetition Equity Interests, its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring

without the written consent of the Required Consenting AHG Noteholders; or (iii) breaches any of the covenants, agreements, or obligations set forth in <u>Section 7</u> hereof;

(f)      any Party files, proposes, withdraws, or modifies any Definitive Documents or files or supports any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, and such withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Consenting AHG Noteholders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document;

(g)      any Party files a motion seeking to approve or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Required Consenting AHG Noteholders (e-mail from counsel being sufficient) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, as applicable;

(h)      any Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any Securitization Notes Claims held by the Consenting AHG Noteholders;

(i)      (i) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the DIP Facility, the Approved Plan, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, or any other Definitive Document, or otherwise acceptable to the Required Consenting AHG Noteholders or (ii) the filing of a motion by any Company Party seeking an order (without the prior written consent of the Required Consenting AHG Noteholders) vacating or modifying a DIP Order, the Disclosure Statement Approval Order, or the Confirmation and Sale Order;

(j)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts any of the Consenting AHG Noteholders without the prior written consent of the Requisite Consenting AHG Noteholder;

(k)      the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements, confirmation of the Approved Plan, or entry into the New Securitization Documents or, in each case, disallowing any material provision thereof (without the written consent of the Required Consenting AHG Noteholders), or that has a material impact on the ability to consummate the Restructuring Transactions, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(l)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(m)      a Company Party fails to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or is otherwise consented to by the Required Consenting AHG Noteholders;

(n)      a Company Party or any of its Affiliates (i) repudiates or asserts a defense to any obligation or liability under the Existing Securitization Indenture or this Agreement or (ii) initiates any action, suit or proceeding at law or in equity, against the indenture trustee or any Holder of Securitization Notes Claims;

(o)      reserved;

(p)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated within three (3) Business Days after the Required Consenting AHG Noteholders provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(q)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment, or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance, unless in each case such ruling, judgment or order arises primarily from the actions of a Consenting AHG Noteholder or from the failure of a Consenting AHG Noteholder to comply with its obligation hereunder;

(r)      any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Required Consenting AHG Noteholders; or

(s)      failure by the Company Parties to pay the Ad Hoc Group Advisors' fees on the terms set forth in the DIP Facility Term Sheet.

Section 11.06 A "*Company Termination Event*" will mean any of the following:

(a)      the Consenting Creditors entitled to vote on the Approved Plan have (i) failed to timely vote their Claims in favor of the Approved Plan when properly solicited to do so, (ii) at any time change their votes to constitute rejections to the Approved Plan (except as otherwise permitted under this Agreement), or (iii) either fail to opt into the releases set forth in the Approved Plan or elect to opt out of the releases set forth in the Approved Plan, in each case in a manner inconsistent with this Agreement and, solely to the extent that the Consenting Creditors

31

who have failed to meet the requirement in the foregoing clause (i), or who change their votes as set forth in clause (ii), hold 33.33% or more of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims, as applicable; *provided*, that the Company Parties shall be entitled to pursue any and all other remedies against such Consenting Creditor(s) for any such breach, including specific performance, injunctive, or other equitable relief;

(b)     if, during the pendency of the Chapter 11 Cases, the Consenting Creditors no longer constitute "Required Lenders" under the Prepetition Credit Agreements or "Majority of Controlling Class Members" under the Existing Securitization Indenture;

(c)     if the Required Prepetition Lenders, the Required Consenting AHG Noteholders, or the Buyer Group give notice of termination of this Agreement pursuant to this Section 11;

(d)     one or more of the Consenting Creditors, or the collateral agent or administrative agent under the Prepetition Credit Agreements or Existing Securitization Indenture (unless the requisite number of creditors direct such agent to withdraw or cease such actions consistent with Section 4.01(f) or Section 5.01(f), as applicable, hereof) file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Company or Ropes & Gray that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable;

(e)     the material breach by one or more of the Consenting Creditors of any of the representations, warranties, covenants, or other obligations of such Consenting Creditor set forth in this Agreement solely to the extent that (i) such breach would result in non-breaching Consenting Creditors holding less than 66.67% of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims and (ii) such breach has not been cured (if curable) before the date that is five (5) Business Days after receiving written notice from the Company Parties;

(f)     the board of directors, board of managers, or such similar governing body of any applicable Company Party determines in good faith, based on the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under any applicable Law (the "***Fiduciary Out***"); *provided* that counsel to such applicable Company Party shall provide notice of such determination (the "***Fiduciary Out Notice***") not later than one (1) Business Day thereafter (e-mail being sufficient) to the Prepetition Lender Advisors and Ad Hoc Group Advisors; or

(g)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such

ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days of its issuance.

Section 11.07 A "*Buyer Group Termination Event*" will mean any of the following:

(a)      the Consenting Creditors entitled to vote on the Approved Plan have (i) failed to timely vote their Claims in favor of the Approved Plan when properly solicited to do so, (ii) at any time change their votes to constitute rejections to the Approved Plan, or (iii) either fail to opt into the releases set forth in the Approved Plan or elect to opt out of the releases set forth in the Approved Plan, in each case in a manner inconsistent with this Agreement and, solely to the extent that the Consenting Creditors who have failed to meet the requirements in the foregoing clause (i), or who change their votes as set forth in clause (ii), hold 33.33% or more of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims; *provided*, that the Buyer Group shall be entitled to pursue any and all other remedies against such Consenting Creditor(s) for any such breach, including specific performance, injunctive, or other equitable relief;

(b)      if the Required Prepetition Lenders, the Required Consenting AHG Noteholders, or any Company Party give notice of termination of this Agreement pursuant to this Section 11;

(c)      any Company Party or any of its Affiliates (i) publicly announces or announces in writing its intention not to support or pursue the Restructuring Transactions; (ii) enter into definitive documentation regarding an Alternative Restructuring without the written consent of the Buyer Group; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 7 hereof;

(d)      any Party files, proposes, withdraws, or modifies any Definitive Document or files or supports any motion or pleading (including a motion seeking to approve or support any Alternative Restructuring) with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Restructuring Transactions, any Definitive Document, or the Buyer Group Arrangements and such filing, proposal, withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Buyer Group (e-mail from counsel being sufficient) that such filing, proposal, withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Restructuring Transactions, any Definitive Document, or the Buyer Group Arrangements;

(e)      (i) entry of an order approving any of the Definitive Documents and/or Restructuring Transactions (including, but not limited to, the Approved Plan, the Buyer Group Arrangements, and the Sale Documents) that is not consistent with this Agreement, the Restructuring Transactions, the Buyer Group Arrangements, or any other Definitive Document, or otherwise acceptable to the Buyer Group or (ii) the filing of a motion by any Party seeking an order (without the prior written consent of the Buyer Group) vacating or modifying the Disclosure Statement Approval Order or the Confirmation and Sale Order;

(f)      one or more of the Consenting Creditors, or the collateral agent or administrative agent under the Prepetition Term Loan Credit Agreement or Existing Securitization Indenture (unless the requisite number of creditors direct such agent to withdraw or cease such actions consistent with Section 4.01(f) or Section 5.01(f), as applicable, hereof) file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Buyer Group Arrangements, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Buyer Group (e-mail from counsel being sufficient) that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement or the Buyer Group Arrangements;

(g)      the material breach by any other Party of any of the representations, warranties, covenants, or other obligations of any of the Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Buyer Group; *provided*, that this termination right may not be exercised by any member of the Buyer Group that is in material breach of this Agreement;

(h)      the material breach by one or more of the Consenting Creditors of any of the representations, warranties, covenants, or other obligations of the Consenting Creditors set forth in this Agreement solely to the extent that (i) such breach would result in non-breaching Consenting Creditors holding less than 66.67% of the aggregate outstanding principal amount of Prepetition Lender Claims, Securitization Class A-2 Note Claims, or Securitization B Note Claims and (ii) such breach has not been cured (if curable) before the date that is five (5) Business Days after receiving written notice from the Buyer Group (e-mail from counsel being sufficient); *provided*, that this termination right may not be exercised by any Buyer Group Party that is in material breach of this Agreement and such breach would give rise to a Prepetition Lender Termination Event or Consenting AHG Noteholder Termination Event;

(i)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any asset of the Company in a manner that materially impacts the Buyer Group Arrangements without the prior written consent of the Buyer Group;

(j)      the Bankruptcy Court enters an order denying entry into the Buyer Group Arrangements or confirmation of the Approved Plan or disallowing any material provision thereof (without the written consent of the Buyer Group), or that has a material impact on the ability to consummate the Buyer Group Arrangements, and such order remains in effect for fifteen (15) calendar days after entry of such order;

(k)      a Company Party or any of its Affiliates initiates any action, suit or proceeding, at law or in equity, against any member of the Buyer Group;

(l)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not

been reversed, stayed, or vacated within three (3) Business Days after the Buyer Group provides written notice to the other Parties that such order is materially inconsistent with this Agreement;

(m)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring Transactions, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the entry of the Confirmation and Sale Order and (ii) thirty (30) Business Days after the Buyer Group provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is inconsistent with this Agreement;

(n)    any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Buyer Group; or

(o)    the Effective Date has not occurred on or before December 31, 2025.

Section 11.08  Mutual Termination. This Agreement may be terminated by mutual written agreement of the Company, the Buyer Group, and the Required Consenting Creditors. The Company will deliver written notice of any such termination to all Parties in accordance with Section 26 hereof.

Section 11.09  Effect of Termination. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party. Nothing in this Section 11.09 shall restrict any Company Party's right to terminate this Agreement in accordance with the Fiduciary Out, subject in all respects to the respective Parties' rights to terminate this Agreement pursuant to this Section 10.

Section 11.10  Automatic Termination. This Agreement shall terminate automatically without any further required action or notice (a) with respect to all Parties, immediately after the Effective Date and (b) solely with respect to an individual Consenting Creditor, upon the receipt of written notice from such Consenting Creditor (which, for the avoidance of doubt, may be delivered by e-mail by counsel on behalf of any Consenting Creditor) to the other Parties representing and certifying that it no longer beneficially owns or has investment

authority or discretion over any Consenting Claims; *provided* that such Consenting Claims were validly Transferred in accordance with Section 6.01.

Section 11.11   No Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms or the payment of damages to which a Party may be entitled under this Agreement.

## 12.   **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting, and execution and delivery of the Definitive Documents. In the case of any conflict or inconsistency between the Approved Plan and any form of or term sheet for a Definitive Document attached as an exhibit hereto, the terms of the Approved Plan shall control. In the case of any conflict or inconsistency between the Confirmation and Sale Order and the Approved Plan or any other Definitive Document, the Confirmation and Sale Order shall control.

## 13.   **Representations and Warranties.**

Section 13.01   Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company Parties, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)   such Party is validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)   the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate (x) in any material respect any provision of Law, rule, or regulation applicable to it or (y) its charter or bylaws (or other similar governing documents) or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c)   the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as

may be necessary or required for disclosure to any applicable regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Restructuring Transactions; and

(d)     this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 13.02  Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)     (i) is the beneficial owner of the Claims set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to such beneficial ownership of such Claims, (A) investment or voting discretion with respect to such Claims, (B) full power and authority to vote on and consent to matters concerning such Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners; *except*, in each case, to the extent that such Claim is held by a prime broker or pursuant to any derivatives or financing transactions in respect of such Claim, including repurchase agreements; *provided that*, at all times, such Consenting Creditor retains the power to take all actions necessary for it to timely vote such Claim in favor of the Approved Plan;

(b)     does not own or control any other "claims", "equity security" or "security" in respect of the Company Parties (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page to this Agreement;

(c)     other than related to the Restructuring Transactions, is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Creditor; and

(d)     by entering into this Agreement and performing its obligations hereunder is not taking any action that would constitute a breach of any Law or regulation or violation of any order or direction of any relevant court or governmental body.

## 14.    **Amendments and Waivers.**

This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by: (a) each Company Party; (b) the Required Prepetition Lenders; and (c) the Required Consenting AHG Noteholders; *provided, however*, that to the extent a modification, amendment, supplement, or condition or requirement of this Agreement materially affects the Buyer Group, a written waiver signed by each Entity constituting the Buyer Group must be obtained; *provided, further*, any modification, amendment, waiver, or supplement that treats or affects any Consenting Creditor in a manner that

is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and the recoveries contemplated hereunder), or that requires any Consenting Lender to incur any expenses, liabilities, or other obligations or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Consenting Creditor.

Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 14</u> shall be ineffective and void *ab initio.*

The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

15. **Effectiveness.**

This Agreement will become effective and binding (i) as to the Company Parties, the Buyer Group, and the Consenting Creditors on the Support Effective Date; (ii) as to any Consenting Creditor that enters into a Joinder Agreement, upon delivery to the Company of such validly completed Joinder Agreement and the occurrence of the Support Effective Date; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement and the occurrence of the Support Effective Date.

16. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO

THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS SECTION 16 SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

17. **Remedies/Specific Performance.**

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to promptly comply with any of its obligations hereunder.

18. **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 10 hereof, Sections 16, 17, 19, 22, 25, and 27 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

19. **Successors and Assigns.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or Entity.

20. **Exhibits Incorporated by Reference; Conflicts.**

Each of the exhibits, schedules, annexes, and signature pages attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, schedules, annexes, and signature pages. In the event of any inconsistency between this Agreement (without reference to the exhibits, schedules, and annexes hereto) and the exhibits, schedules, and annexes hereto, the Restructuring Term Sheet (without reference to the exhibits, schedules, and annexes thereto) shall govern.

21. **Several, Not Joint, Claims.**

Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

22. **Severability and Construction.**

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

23.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements or agreements with respect to shared or common interest heretofore executed between the Parties or their advisors will continue in full force and effect in accordance with the terms thereof.

24.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement. Execution copies of this Agreement may be executed via PDF or other electronic means and may be delivered by e-mail, which will be deemed to be an original for the purposes of this Section 24.

25.    **Interpretation.**

Except as otherwise expressly provided in this Agreement, the term "including" means "including, without limitation," and the words "include" and "includes" shall have corresponding meanings.

26.    **Notices.**

All notices, requests, demands, document deliveries, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally; (b) when sent by e-mail; or (c) two (2) Business Days after deposit with an overnight courier service, with postage prepaid to the Parties at the following addresses (or at such other addresses for a Party as shall be specified by like notice):

(1)    If to the Company Parties, to:

Hooters of America, LLC
1815 The Exchange SE
Atlanta, GA 30339
Attention:   Keith Maib (kmaib@accordion.com)

with a copy (which will not constitute notice) to:

Ropes & Gray LLP
191 North Wacker, 32nd Floor
Chicago, IL 60606
Attention:   Chris L. Dickerson (chris.dickerson@ropesgray.com)
                   Rahmon J. Brown (rahmon.brown@ropesgray.com)
                   Michael Wheat (michael.wheat@ropesgray.com)

(2)    If to the Prepetition Lenders, to the addresses or electronic mail addresses set forth below the Prepetition Lender's signature, with a copy (which will not constitute notice) to:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attention:  Genevieve G. Weiner (gweiner@sidley.com)

and

Sidley Austin LLP
787 7th Avenue
New York, NY 10019
Attention:  Elizabeth R. Tabas Carson (etabas@sidley.com)
            Juliana L. Hoffman (jhoffman@sidley.com)


(3)    If to the Buyer Group, to the addresses or electronic mail address set forth below the Buyer Group entity's signature, with a copy (which will not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Benjamin W. Butterfield (bbutterfield@mofo.com)
            Sean Daly (sdaly@mofo.com)

(4)    If to the Consenting AHG Noteholders, to the addresses or electronic mail addresses set forth below the Consenting AHG Noteholder's signature, with a copy (which will not constitute notice) to:

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attn:   Brian Pfeiffer (brian.pfeiffer@whitecase.com)
        Amanda Parra Criste (aparracriste@whitecase.com)

-and-

White & Case LLP
1121 Avenue of the Americas
New York, NY 10020
Attn:  David Thatch (dthatch@whitecase.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by electronic mail will be effective upon confirmation of transmission. Any notice or consent to be provided by the Required Prepetition Lenders may be delivered by e-mail by Sidley on behalf of the Prepetition Lenders. Any notice or consent to be provided by the Required Consenting AHG Noteholders may be delivered by e-mail by White & Case on behalf of any or all Entities constituting the Consenting AHG Noteholders.  Any notice or consent to be provided by the Buyer Group may be delivered by e-mail by Morrison & Foerster LLP on behalf of the Buyer Group.

27.     **Confidentiality and Publicity.**

Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any Person or Entity (including for the avoidance of doubt, any other Consenting Creditor), other than legal, accounting, financial, and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Claims held by any member of the Ad Hoc Group, the Prepetition Lenders, or any of their respective subsidiaries (including, for the avoidance of doubt, any Claims acquired pursuant to any Transfer) or the signature page of such member of the Ad Hoc Group or the Prepetition Lenders; *provided, however,* that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Claims held by the Ad Hoc Group or the Prepetition Lenders, collectively.  Notwithstanding the foregoing, the Ad Hoc Group and the Prepetition Lenders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents to the extent required by Law or regulation; *provided, however*, that (i) if any of the Company Parties determines that it is required to attach a copy of this Agreement, a Joinder, or a Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific Ad Hoc Group member's holdings of Claims (including before filing any pleading with the Bankruptcy Court) and such Ad Hoc Group member's signature page and (ii) if disclosure of additional information of a member of the Ad Hoc Group is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each applicable member of the Ad Hoc Group (who shall have the right to seek a protective order prior to disclosure).  Notwithstanding the foregoing, the Company Parties will submit to the Required Consenting Creditors, the Prepetition Lender Advisors, the Ad Hoc Group Advisors, the Buyer Group, and the Buyer Group Advisors all press releases, public filings, public announcements, or other communications with any news media, or material mass communications, other than in the ordinary course of business and unrelated to this Agreement or the Restructuring Transactions, with any customers, vendors, or current or former employees, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days in advance of release (it being understood that such period may be shortened to the extent there are exigent circumstances) and will incorporate any comments provided by the Consenting Creditors and, solely as it relates to this Agreement or the Buyer Group Arrangements, comments provided by the Buyer Group and the Buyer Group Advisors.  Nothing contained herein shall be deemed to waive, amend, or modify the terms of any Confidentiality Agreement.

28.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

(b)    Each Party acknowledges for the benefit of the other Parties and their respective advisors that it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities that may be acquired by it pursuant to the transactions contemplated hereby and has had an opportunity to receive information from the Company Parties and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of Law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived. Each Party hereby further confirms for the benefit of the other Parties and their respective advisors that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties and/or the Restructuring Transactions, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company Parties set forth in this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

*[Signature Pages Follow]*

Docusign Envelope ID: 51F-12D7-D246-4BD8-A7C2-65B7Q04B6543

Case 25-80078-swe11    Doc 465-1    Filed 06/16/25    Entered 06/16/25 23:27:15    Desc
Exhibit A - Amended Disclosure Statement    Page 259 of 368

**Company Signature Page to**
**the Restructuring Support Agreement**

**AUTHORIZED SIGNATORY OF** the Company Parties:

Name: Keith Maib
Title:   Chief Restructuring Officer

[Prepetition Lender Signatures Pages on File with Company Parties]

[Consenting Noteholder Signature Pages on File with Company Parties]

[Consenting AHG Noteholders Signatures Pages on File with Company Parties]

[Buyer Group Signatures Pages on File with Company Parties]

**<u>Schedule 1-A</u>**

**Non-Securitization Entities**

Hawk Parent, LLC

HOA Holdings, LLC

Night Owl, LLC

Owl Wings, LLC

Owl Restaurant Holdings, LLC

Owl Holdings, LLC

Elf Owl Investments, LLC

TW Lonestar Wings, LLC

Alamo Wings, LLC

HOA Restaurant Group, LLC

Derby Wings Holdings, LLC

Derby Wings, LLC

Hooters of America, LLC (Manager)

### Schedule 1-B

**Securitization Entities**

HOA Funding, LLC

HOA Holdco, LLC

HOA Systems, LLC

HOA Restaurant Holder, LLC

HOOTS Restaurant Holder, LLC

HOA IP GP, LLC

HOOTS Franchising, LLC

HOA Franchising, LLC

HOA Maryland Restaurant Holder, LLC

HOA Kansas Restaurant Holder, LLC

TW Restaurant Holder, LLC

DW Restaurant Holder, LLC

HI Limited Partnership

HOA Towson, LLC

HOA Waldorf, LLC

HOA Laurel, LLC

## <u>EXHIBIT A</u>

### Form of Joinder Agreement

This joinder agreement to the Restructuring Support Agreement, dated as of [●], 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Agreement***"), between the Company Parties, the Buyer Group, the Consenting AHG Noteholders, and the Prepetition Lenders, each as defined in the Agreement, is executed and delivered by _____ (the "***Joining Party***") as of _____, 2025.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2. <u>Effectiveness</u>. Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company Parties, the Joining Party shall hereafter be deemed to be a "Prepetition Lender" or "Consenting AHG Noteholder", as applicable, and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Prepetition Lenders or Consenting AHG Noteholders, as applicable, as set forth in <u>Section 13</u> of the Agreement to each other Party to the Agreement.

4. <u>Governing Law</u>. This joinder agreement shall be governed by and construed in accordance with the internal Laws of the State of New York, without regard to any conflict of Laws provisions which would require the application of the Law of any other jurisdiction.

**JOINDER PARTY**: _____

Date Executed: _____

By: _____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Manager Advance Loan Claims | |
| Term Loan Claims | |
| Securitization Class A-2 Note Claims | |
| Securitization Class B Note Claims | |
| Other Claims | |

*[Signature Page to Joinder Agreement]*

## **EXHIBIT B**

**Restructuring Term Sheet**

HAWK PARENT, LLC, HOA FUNDING, LLC, ET AL.

NON-BINDING RESTRUCTURING TERM SHEET

This transaction term sheet (this "Restructuring Term Sheet") sets forth all material terms of a proposed comprehensive sale and restructuring of the existing claims and indebtedness of Hawk Parent, LLC ("Parent"), HOA Holdings, LLC ("Holdings"), HOA Funding, LLC ("Master Issuer"), and their subsidiaries (collectively, the "Company" or "Company Parties" or, after the Petition Date (as defined below), the "Debtors")[1], which will be consummated through one or more in-court transactions (such transactions with respect to the Company Parties, the "Restructuring Transactions"). This is the Restructuring Term Sheet referred to in, and appended to, that certain Restructuring Support Agreement, dated as of March 31, 2025, by and among the Company Parties and the other Parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "RSA"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the RSA.

There shall be no consent right nor condition to the respective obligations and commitments of the Parties other than as expressly set forth in the RSA (including all exhibits thereto, including this Restructuring Term Sheet) or the Definitive Documents (including all exhibits thereto). In the event of any inconsistency between this Restructuring Term Sheet and the RSA, this Restructuring Term Sheet shall control. The Parties may supplement or replace this Restructuring Term Sheet with Definitive Documents with respect to all or any part of their respective obligations hereunder.

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE, DEEMED BINDING ON ANY OF THE PARTIES.

This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. This Restructuring Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

| Overview | |
|---|---|
| **Implementation** | This Restructuring Term Sheet contemplates the following implementation: |
| | i. the commencement of chapter 11 cases (the "Chapter 11 Cases") by the Company Parties under the Bankruptcy Code in the Bankruptcy Court no later than March 31, 2025, in accordance with the RSA to pursue implementation of the Restructuring Transactions (the date of such commencement, the "Petition Date"); |
| | ii. the funding of the DIP Facility by certain of the Prepetition Lenders, as more fully described below; |
| | iii. the Buyer Group Arrangements (as defined herein) pursuant to which Hooters, Inc. and Hoot Owl Restaurants, LLC, or their respective designated affiliates (collectively, the "Buyer Group") will acquire a portfolio of 103 Company owned stores (the "Divested Stores") and Brand Management Co. will enter into the Brand Management & Services Agreement, each as more fully described in the other sections of this Restructuring Term |

---

[1] The Debtors listed on **Exhibit 1** hereto are the "Securitization Entities" and the Debtors listed on **Exhibit 2** hereto are the "Non-Securitization Entities."

|  | Sheet, which shall be consummated pursuant to section 1123(b)(4) of the Bankruptcy Code and the terms of the Approved Plan (subject to the terms and conditions herein); |
|---|---|
|  | iv.    on the effective date of the Approved Plan (the "<u>Plan Effective Date</u>"): |
|  | A.    with respect to the Securitization Entities: |
|  | 1.    Master Issuer will be renamed RoyaltyCo, LLC[2]; |
|  | 2.    holders of Securitization Class A-2 Note Claims (as defined below) will be issued new Class A-2I Notes (as defined below) as more fully described in the "Securitization Class A-2 Note Claims" section, below; |
|  | 3.    holders of Securitization Class B Note Claims (as defined below) will be issued new Class B Notes (as defined below) as more fully described in the "Securitization Class B Note Claims" section, below; |
|  | 4.    the outstanding Securitization Manager Advance Claims (defined below) owed to Hooters of America, LLC (the "<u>Prepetition Manager</u>") will be cancelled; |
|  | B.    with respect to the remaining Non-Securitization Entities and RoyaltyCo: |
|  | 1.    a conversion of the DIP Facility into new Class A-1 Notes (as defined, and on terms and conditions as described, below and in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders); |
|  | 2.    an exchange of certain of the Manager Advance Term Loan Claims for (y) the Class A-2II Notes, and (x) equity in RoyaltyCo, (each of (y) and (x) as defined, and on terms and conditions as described, below and in form and substance acceptable to the Required DIP Lenders and Required Consenting AHG Noteholders); and |
|  | v.    following the Plan Effective Date, the Debtors shall use the Wind-Down Amount and any other assets not purchased in connection with the Buyer Group Arrangements (as defined below) to commence and effectuate an orderly wind-down of the Debtors' estates in accordance with the Approved Plan. |
| **Required DIP Lenders** | The DIP Lenders (as defined below) having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time (the "<u>Required DIP Lenders</u>"). |
| **Consenting Noteholders** | Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Notes Claims (as defined in the RSA) collectively held by the Consenting AHG Noteholders (the "<u>Required Consenting AHG Noteholders</u>"). |
|  | Certain Holders of Securitization Notes Claims with the same investment adviser as the DIP Lender (the "<u>DIP Noteholders</u>" and, together with the Required Consenting AHG Noteholders, the "<u>Consenting Noteholders</u>").  The DIP Noteholders are parties to the RSA in their capacities as Holders of Securitization Notes Claims; provided, however, that the DIP Noteholders will not be counted for purposes of determining whether the Required Majority Consenting AHG Noteholders, or the Required Consenting AHG Noteholders, as applicable, have exercised any consent right hereunder. |
|  | Any consent rights provided herein shall be exercised in good faith and a party shall not unreasonably withhold, condition or delay such consent; *provided*, that the obligations of the Buyer Group with respect to any consent rights are set forth in the RSA. |

---

[2] Final legal name to be confirmed based on Delaware name availability.

| DIP Financing | Pursuant to the terms set forth in that certain financing term sheet (the "DIP Facility Term Sheet"), attached hereto as **Exhibit 3**, and the RSA, the DIP Lenders (as defined in the DIP Facility Term Sheet) shall provide to Parent and Prepetition Manager as co-borrowers ("DIP Borrowers" and each a "DIP Borrower") a superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $40,000,000 million (as such principal amount may be increased from time to time pursuant to the mechanics described in the DIP Facility Term Sheet) (the "DIP Facility"; the loans thereunder the "DIP Loans"), guaranteed by and secured by priming liens granted by each of the Non-Securitization Entities and guaranteed by and secured by priming liens granted by each of the Securitization Entities (including the Master Issuer) (collectively, the "DIP Guarantors" and each, a "DIP Guarantor" and together with the DIP Borrowers, the "DIP Loan Parties" and each, a "DIP Loan Party"), and secured by substantially all of the assets of the DIP Loan Parties (including, without limitation, equity interests in the Securitization Entities and the Prepetition Manager's right to repayment of the Securitization Manager Advance Claims), which shall be available for borrowing in the amounts and on the dates, and upon the satisfaction of the conditions precedent set forth in the DIP Facility Term Sheet, each in accordance with the terms and conditions set forth in the DIP Documents (as defined in the DIP Facility Term Sheet).<br><br>The Debtors will seek authority from the Bankruptcy Court to enter into and perform under the DIP Documents and to use cash collateral and to continue to make and pay manager advances to the Securitization Entities in accordance with the then agreed budget, on the terms set forth in the DIP Documents.  For the avoidance of doubt, the approval of the Proposed Budget (as defined and further described in the DIP Facility Term Sheet and in the RSA) shall be in the sole respective discretion of the DIP Lenders and the Required Majority Consenting AHG<br><br>Noteholders, in consultation with the Company Parties.<br><br>The proceeds of the DIP Facility shall be used to finance the Chapter 11 Cases (including the funding of new Securitization Manager Advance Claims to permit the Securitization Entities to finance the Securitization Entities' Chapter 11 Cases) in accordance with the terms and conditions set forth in the DIP Facility Term Sheet, including to fund all cure costs borne by RoyaltyCo.<br><br>The DIP Facility will consist of (i) new money in the amount of $35,000,000 to finance the Chapter 11 Cases on the terms and conditions set forth in the DIP Documents (as further described in the DIP Facility Term Sheet and in the RSA), which amount may be increased (the "New Money Cap") in the sole respective discretion of the Required Majority Consenting AHG Noteholders,[3] the DIP Lenders, and the Debtors, *provided*, *however*, that the consent of the Required Majority Consenting AHG Noteholders is required for any DIP Loans that would, in the aggregate together with previously extended DIP Loans, exceed the New Money Cap and (ii) a roll-up of the Agreed Manager Advance Term Loan Claims (as defined below) (the "Roll-Up"). |
| **Claims and Interests Subject to Restructuring** | The claims and interests that will be restructured or otherwise addressed pursuant to the Restructuring Transactions include the following, to the extent such claims and interests have not otherwise been satisfied in whole or in part as of the Plan Effective Date:<br><br>**Non-Securitization Entities**<br><br>• "Parent Funded Debt Claims":<br><br>    o $8,387,000 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) and all other loan documents in connection therewith (the "MA Credit Agreement"); |

---

[3] The "Required Majority Consenting AHG Noteholders" shall mean Consenting AHG Noteholders collectively holding in excess of 50% of the aggregate outstanding principal amount of the Securitization Notes Claims collectively held by the Consenting AHG Noteholders.

      o   An additional $5,000,000 that was funded on February 21, 2025 pursuant to the MA Credit Agreement (such additional $5,000,000, the "Incremental Loan"); and

      o   $55,976,213 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Credit Agreement by and between XYQ Cayman Ltd., as lender, (the "Prepetition Term Loan Lender" and together with those certain lenders from time to time party to the MA Credit Agreement, the "Prepetition Lenders"), and Hawk Parent LLC, as borrower, dated [March 9, 2022], as amended, modified, or restated from time to time (the "Term Loan Credit Agreement" and, together with the MA Credit Agreement, the "Prepetition Credit Agreements" and such loans extended thereunder (including, for the avoidance of doubt, the Incremental Loan, the "Prepetition Loans") and all other loan documents in connection therewith.

- All of the Parent Funded Debt Claims are secured by the Securitization Manager Advance Claims (as defined below).

      o   To the extent of the value of the Securitization Manager Advance Claims, such Parent Funded Debt Claims are referred to herein as the "Manager Advance Term Loan Claims".

      o   The remaining Parent Funded Debt Claims in excess of the value of such Securitization Manager Advance Claims are referred to herein as the "Term Loan Claims".

- "General Unsecured Claims": prepetition claims against the Non-Securitization Entities that, as of the Petition Date, are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

- "Prepetition Equity Interests": all Prepetition Equity Interests in the Non-Securitization Entities.

**Securitization Entities**

- "Securitization Manager Advance Claims": The amount of prepetition manager advances to be agreed between the Required Consenting AHG Noteholders and the Prepetition Lenders (or, upon termination of the RSA, as may be finally determined by a Court of competent jurisdiction) to have been validly extended by the Prepetition Manager to the Securitization Entities, *plus* all additional amounts extended during the pendency of the Chapter 11 Cases in accordance with the approved Budget, accrued and unpaid interest, fees, and other charges and expenses arising and payable in respect of manager advances under that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated or otherwise modified from time to time, the "Management Agreement") and any valid Manager Advances form part of the "Obligations" (as defined in that certain Amended and Restated Base Indenture dated August 19, 2021 (as amended, restated, amended and restated or otherwise modified from time to time, the "Amended and Restated Base Indenture")).

- Notwithstanding anything to the contrary herein:

      o   the Consenting AHG Noteholders have agreed to the validity of the $5,000,000 Incremental Loan (the "Agreed Securitization Manager Advance Claims"), the Roll-Up of the Agreed Securitization Manager Advance Claims in the manner set forth herein and in the DIP Facility Term Sheet, and the treatment of the rolled-up Agreed Securitization Manager Advance Claims described herein;

      o   the Ad Hoc Group has reserved all rights with respect to any other prepetition manager advances other than the Agreed Securitization Manager Advance

|  | Claims, and expressly preserves all rights to challenge any such claims on any basis; *provided, however,* that (A) the Ad Hoc Group has agreed not to challenge the amount or validity of any prepetition manager advances so long as the RSA remains in full force and effect, and (B) the Ad Hoc Group has agreed, solely upon consummation of the Approved Plan, that (x) $18,000,000 of claimed Manager Advance Term Loan Claims will be converted to new Class A-2II Notes on the terms set forth below and the payment priority set forth in the Waterfall, and (y) any remaining claimed Manager Advance Term Loan Claims will be converted to equity in RoyaltyCo, all as more fully set forth herein; and |
|---|---|
|  | o   the Debtors have agreed to the validity and amount of not less than $28,338,913 of manager advance claims, inclusive of the Agreed Securitization Manager Advance Claims, and to the treatment of such claims described above; *provided* that such agreement does not alter or affect the Ad Hoc Group's reservation of rights as set forth herein. |
|  | • "<u>Securitization Class A-2 Note Claims</u>": $266,579,000 in outstanding principal amount of Class A-2 Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Class A-2 Noteholders, and all other notes documents in connection therewith (the "<u>Securitization Class A-2 Notes</u>"). |
|  | • "<u>Securitization Class B Notes Claims</u>": $40,000,000 in outstanding principal amount of Class B Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Class B Noteholders, and all other notes documents in connection therewith (the "<u>Securitization Class B Notes</u>"). |
|  | • "<u>General Unsecured Claims</u>": prepetition claims against each Securitization Entity that, as of the Petition Date, are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court. |
|  | • "<u>Prepetition Securitization Equity Interests</u>": all Prepetition Equity Interests in the Securitization Entities other than the Master Issuer. |
|  | • "<u>Prepetition Master Issuer Equity Interests</u>": all Prepetition Equity Interests in the Master Issuer. |
| **Buyer Group Arrangements** | The Buyer Group Arrangements will be consummated pursuant to the Approved Plan to effectuate a sale of certain of the Debtors' assets pursuant to sections 1123(b)(4) and 1129 of the Bankruptcy Code.<br><br>**<u>Buyer Group Arrangements</u>**<br><br>On the Plan Effective Date, certain of the Debtors, on the one hand, and single purpose entities owned by a member of the Buyer Group (each, a "<u>Buyer Group SPE</u>") or Brand Management Co. (as defined herein), as applicable, on the other hand, will enter into a series of transactions pursuant to which:<br><br>1.   each Divested Store (including all store-level assets and the proceeds of any existing liquor license related thereto) will be acquired by a Buyer Group SPE (and, for the avoidance of doubt, each Divested Store will be acquired by a separate Buyer Group SPE); *provided*, that each Divested Store shall have normalized levels of inventory, receivables, and operating cash at the store-level at closing; *provided*, *further*, that the obligation of each Buyer Group SPE to close with respect to its corresponding Divested Store shall, unless waived by the Buyer Group, be conditioned on (a) the receipt of approval from the relevant Governmental Authority for the transfer or acquisition of a |

liquor license for such Divested Store to such corresponding Buyer Group SPE, and (b) the assignment of the lease relating to such Divested Store to such corresponding Buyer Group SPE.

2. each lease relating to a Divested Store (including any security deposits related thereto) will be assigned by the corresponding Company Party to the corresponding Buyer Group SPE; *provided*, that the assignment of such lease shall be a condition to closing with respect to such Divested Store; *provided*, *further*, that (a) none of the Buyer Group, Buyer Group SPEs, RoyaltyCo, the DIP Lenders, nor the Consenting Creditors shall be required to provide or fund a corporate guaranty or other incremental credit support in connection with the assignment of such lease (including, for the avoidance of doubt, funding out of the Approved Budget) and (b) if the assignment of any lease relating to a Divested Store requires a corporate guaranty or other incremental credit support, such Divested Store shall be excluded from the Buyer Group Arrangements absent funding from the Buyer Group or another third party (in their respective sole discretion);

3. a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE;

4. royalty arrangements will be entered into between RoyaltyCo and Brand Management Co. in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of IP (as further described herein);

5. all gift card liabilities shall be borne by Brand Management Co. or the applicable franchisee; *provided*, that such liabilities must relate to gift cards that (a) were issued on or prior to March 21, 2025, and (b) have not been redeemed as of the closing of the Buyer Group Arrangements;

6. each Buyer Group SPE will assume, for its corresponding Divested Store, all current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; *provided*, that all cure costs, amounts owed to critical vendors (other than ordinary course trade payables that are not more than 30 days past due as of closing), administrative or priority tax claims allocable to the pre-closing period, and rent and payroll (including accrued vacation and bonuses) obligations allocable to the pre-closing period, in each case, relating to such Divested Store (including regional managers responsible for such Divested Store) shall be paid or funded by the Debtors at closing; *provided*, *further*, that the Buyer Group SPEs shall not assume any tort liability, breach of contract claim, employee claim or WARN obligation (such assumed liabilities, the "Buyer Group SPE Assumed Liabilities");

7. each Buyer Group SPE will put in place appropriate liability insurance for its corresponding Divested Store;

8. the Buyer Group SPEs shall be prohibited from making any equity distributions (other than for tax distributions) from amounts arising from, or relating to, the Divested Stores for the first two years after the Plan Effective Date;

9. Pursuant and subject to the Brand Management & Services Agreement (as defined below), Brand Management Co. will receive the BMC License (as defined below) over the Company's intellectual property rights (the "IP"), in a form to be mutually agreed upon as further described below;

10. Brand Management Co. will be engaged by RoyaltyCo pursuant to the Brand Management & Services Agreement (as defined below);

11. the Buyer Group shall be entitled to the Break-Up Fee on the terms and conditions set forth herein, subject to approval by the Bankruptcy Court; and

12. certain other agreements and arrangements as agreed upon by the Parties;

(such series of transactions, the "Buyer Group Arrangements"). In connection with such series of transactions, the Buyer Group shall provide the DIP Lenders and the Required Consenting

| | AHG Noteholders with definitive documentation reasonably satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available at closing to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores.  The Debtors shall enter into the Buyer Group Arrangements pursuant to the Approved Plan and order confirming the Approved Plan (the "<u>Confirmation and Sale Order</u>"). |
|---|---|
| | Upon execution of the applicable Definitive Documents with respect to the Buyer Group Arrangements, including for the avoidance of doubt a binding commitment to enter into and consummate the Buyer Group Arrangements, and subject to approval by the Bankruptcy Court, the Buyer Group will be entitled to a $6 million break-up fee (the "<u>Break-Up Fee</u>"), which shall be subordinate only to estate professional fees and the DIP Facility; _provided_, that if the Bankruptcy Court does not approve the Break-Up Fee within twenty one (21) days after the date the applicable Definitive Documents with respect to the Buyer Group Arrangements are executed by the Buyer Group, that will constitute a "Buyer Group Termination Event" under the RSA.  The Break-Up Fee would be earned if the Debtors enter into an alternative transaction with respect to the Buyer Group Arrangements and would be payable solely from the proceeds of such alternative transaction after payment of estate professional fees and the DIP Facility in accordance with the terms herein, the DIP Documents, and the Approved Plan.  In the event the Buyer Group Arrangements close, the Buyer Group will not be entitled to expense reimbursement. |
| **Store Divestiture Transaction** | As part of the comprehensive transaction:<br><br><u>Divested Stores</u>: the Buyer Group shall acquire a portfolio of 103 stores currently owned by certain of the Securitization Entities (comprised of 70 Accepted Stores and 33 Contingent Stores (as such terms are defined below)), including the assumption of Buyer Group SPE Assumed Liabilities, _provided_, that, unless waived by the respective Buyer Group SPE, for each Divested Store, (i) the assignment of the lease for such Divested Store to the corresponding Buyer Group SPE without any corporate guaranty or other incremental credit support shall be a condition to closing with respect to such Divested Store, and (ii) the transfer, acquisition, or such other arrangement as agreed to by the Buyer Group SPE in respect of a liquor license shall be a condition to closing with respect to each Divested Store.<br><br><u>Consideration</u>: Acquisition consideration for each Divested Store will be comprised of assumption of the Buyer Group SPE Assumed Liabilities, and entry into new franchise agreements and royalty payment arrangements as set forth herein.<br><br><u>Franchise Agreements</u>: With respect to each Divested Store, the corresponding Buyer Group SPE will enter into a franchise or license agreement on terms consistent with the Company's existing franchise or license agreements, as applicable, except as follows:<br><br>• A specified group of 70 Divested Stores (the "<u>Accepted Stores</u>") will pay royalties at the current rate (6%);<br><br>• A specified group of 33 Divested Stores (the "<u>Contingent Stores</u>") will be granted a 24-month royalty-free holiday post-closing and pay 6% royalties thereafter;<br><br>• All Divested Stores will continue annual contributions of 1% of net sales to the National Ad Fund; and<br><br>• There shall be no liquidated damages or similar franchisee obligations, subject to the terms regarding "Accepted Store Closings" below. |
| **Split of Royalties between RoyaltyCo and BrandCo** | So long as the Brand Management & Services Agreement has not been terminated as to Brand Management Co. (for the avoidance of doubt, such agreement would only be terminable upon a Bankruptcy Event (as defined in the Definitive Documents) or an "Unauthorized Change of Control" [4] with respect to Brand Management Co., certain limited breaches of the Brand |

---

[4] For purposes hereof "Unauthorized Change of Control" shall mean a transfer of control of Brand Management Co.

| | Management & Services Agreement to be set forth in the Definitive Documents, or acts constituting gross negligence, actual fraud, or willful misconduct), Brand Management Co. will receive the following royalties and revenues (collectively, the "BMC Royalties"):<br><br>• 65% of the royalties paid by the Divested Stores;<br><br>• 50% of the royalties paid by any new stores or new locations that are opened; *provided*, that Brand Management Co. shall receive 100% of all franchise fees related to such new stores or new locations; and[5]<br><br>• 50% of any royalties or other revenue generated under any other license agreement or other license or services agreement or similar agreement (*e.g.*, non-restaurant use of IP) (such agreements, the "Other IP Agreements"); *provided,* that if such a license is capable of being structured as an annual royalty but instead is sold or otherwise significantly monetized (*e.g.*, via a one-time, up-front payment) in the future, Brand Management Co. shall receive only 25% of the proceeds from any such sale or other full monetization, and the remaining 75% shall go to RoyaltyCo. |
|---|---|
| **Accepted Store Closings** | • If a Buyer Group member closes, within the first two (2) years, a Divested Store that for the six (6) months prior to closing was profitable at a store-level after the payment of royalties and contribution to the ad fund, such Buyer Group member shall pay an $80,000 fee per such store to RoyaltyCo.<br><br>• No fee is required if stores are closed due to lease terminations by the landlord, severe weather related closures, or other circumstances outside of Buyer Group's control. |
| **RoyaltyCo Structure and Transaction** | On the Plan Effective Date, the following shall occur:<br><br>• the Master Issuer will be renamed from HOA Funding, LLC to RoyaltyCo, LLC (such renamed entity shall be referred to herein as "RoyaltyCo"). RoyaltyCo's subsidiary will continue to collect RoyaltyCo's shares of the royalties and revenues from licenses and franchise agreements. RoyaltyCo shall elect to be treated as a corporation for U.S. tax purposes.<br><br>• The structure for collecting and distributing royalties and revenues shall be on terms mutually agreeable to the Parties and in a manner that preserves RoyaltyCo's right to receive royalties and Brand Management Co.'s right to receive royalties.<br><br>• The Prepetition Master Issuer Equity Interests shall be cancelled for no consideration.<br><br>• The DIP Lenders or their delegates will acquire a 50% interest in newly issued shares of RoyaltyCo and the holders of Securitization Class B Notes Claims (or their respective delegates) will collectively acquire the remaining 50% interest in newly issued shares of RoyaltyCo (the "Noteholder Equity Entitlement"), with such 50% allocated among the holders of Securitization Class B Notes Claims on a pro rata basis in accordance with their respective holdings of the Securitization Class B Notes Claims.<br><br>• RoyaltyCo will be an obligor under the Class A-1 Notes, the Class A-2I Notes, the Class A-2II Notes, and the Class B Notes.<br><br>• Brand Management Co. will enter into the Brand Management & Services Agreement with RoyaltyCo pursuant to which Brand Management Co. will provide the services set forth therein in exchange for the BMC Royalties. |

---

to a person or entity that (i) is not in good standing and (ii) has not been a Hooters franchisee for at least two (2) years preceding such transfer.
[5] The term "franchise fees" as used herein is intended to refer to the approximately $30,000 in fees for start-up of a new franchise, consistent with past practices.

- The Management Agreement by and between the Prepetition Manager and the Master Issuer shall be terminated.

- The entity that owns the IP ("IP HoldCo") shall retain debt-like obligations and liens in favor of the holders of claims under the New Securitization Documents; provided, so long as RoyaltyCo receives, for any twelve month period, royalties in an amount equal to at least 75% of the royalties received by RoyaltyCo for the first twelve months following the Effective Date (the "RoyaltyCo CF Covenant"), Brand Management Co. shall have the following rights, which rights shall be structured to survive any sale, refinancing, insolvency, or other similar event with respect to RoyaltyCo (or any of its successors or assigns) or any breach of contract, rejection, termination without cause, assumption, or assumption and assignment by RoyaltyCo (or any of its successors or assigns) (each such event, a "RoyaltyCo Trigger Event"):

  o the right to continue to manage and control the IP in accordance with the terms of the Brand Management & Services Agreement;

  o the right to enter into or renew franchise agreements with new or existing franchisees, as applicable, or enter into other IP Agreements, in each case, that would be reasonably expected to survive any RoyaltyCo Trigger Event; and

  o the right to issue licenses in the IP in connection with the foregoing that would reasonably be expected to survive any RoyaltyCo Trigger Event.

- Pursuant to the Brand Management & Services Agreement, IP HoldCo shall grant Brand Management Co., for no additional consideration, a comprehensive, exclusive, sublicensable in accordance with the Definitive Documents, license for purposes of performing all brand-related, franchising-related, and management-related functions (the "BMC License") on the terms and for the consideration set forth herein; provided, for the avoidance of doubt, such license would only be terminable upon the occurrence of an Unauthorized Change of Control or a Bankruptcy Event (as such terms are defined herein or in the Definitive Documents, respectively), failure to meet certain limited standards to be set forth in the Definitive Documents, failure to satisfy the RoyaltyCo CF Covenant, or acts constituting gross negligence, actual fraud, or willful misconduct; provided, further, that ownership and control, at both the equity and board level, of Brand Management Co. shall at all times be retained by franchisees. The BMC License will be subject to licenses existing prior to the Petition Date and include quality control and enforcement provisions as reasonably necessary to avoid potential loss of trademark rights, and require that all assignments be made and sublicenses be granted on arms-length terms for fair and reasonable value as determined by Brand Management Co. in its reasonable business judgment, taking into consideration its obligations under the Brand Management & Services Agreement and the interests of RoyaltyCo.

- The franchise or license agreement, as applicable, for each Divested Store will provide that, if the Brand Management & Services Agreement or BMC License is terminated (at RoyaltyCo's sole option) on account of a failure to satisfy the Royalty CF Covenant, the royalties paid by the applicable Buyer Group SPE on account of such Divested Store shall be reduced by 65% and the Buyer Group SPE shall have the go-forward right to renew the franchise or license agreement, without further modification, into perpetuity so long as such Divested Store is in compliance with the terms of its existing franchise or license agreement and such renewal is on substantially similar terms to such franchise or license agreement.

| | |
|---|---|
| **Governance of RoyaltyCo** | RoyaltyCo's Board of Directors will be comprised of three individuals, one selected by the Prepetition Term Loan Lender, one selected by a majority of holders of the Securitization A-2 Notes Claims that are Consenting AHG Noteholders, and one selected by a majority of holders |

| | |
|---|---|
| | the Securitization B Notes Claims that are Consenting AHG Noteholders.  Definitive corporate governance documentation to be negotiated.  The independent directors of Master Issuer shall be removed. |
| **Waterfall** | Payment of principal and interest on each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes issued by RoyaltyCo to be set forth in an intercreditor arrangement in the New Indenture by and among the trustee acting on behalf of the holders of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Indenture to reflect the following waterfall (the "<u>Waterfall</u>"):<br><br>1. *First*, fees and expenses payable to (A) the trustee for each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes, and (B) independent certified public accountants and external legal counsel relating to defense of the IP or the operations of RoyaltyCo or the Guarantors; and any other fees, expenses, or operating costs of RoyaltyCo;<br><br>2. *Second,* all accrued, unpaid interest on the Class A-1 Notes to the Class A-1 Noteholders;<br><br>3. *Third*, all unpaid principal on the Class A-1 Notes to the Class A-1 Noteholders;<br><br>4. *Fourth,* all accrued, unpaid interest not PIK'd on the Class A-2II and Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively;<br><br>5. *Fifth,* accrued, unpaid interest not PIK'd on the Class B Notes to the Class B Noteholders in amount up to 2% per annum of the outstanding principal amount of the Class B Notes;<br><br>6. *Sixth,* to the extent not otherwise paid, to the payment of or reserves for income taxes due by RoyaltyCo, in an amount not to exceed actual taxes due and payable for a rolling three quarters plus an estimate due for the current quarter;<br><br>7. *Seventh,* all previously PIK'd interest on the Class A-2II and Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively;<br><br>8. *Eighth,* all (a) until the Class A-2II Notes have been repaid in full, split (1) 50% of such proceeds to pay unpaid principal on the Class A-2II Notes to Class A-2II Noteholders and (2) 50% of such proceeds to pay unpaid principal on the Class A-2I Notes to Class A-2I Noteholders and (b) after repayment in full of the Class A-2II Notes, 100% of such proceeds to the repayment of the Class A-2I Notes to Class A-2I Noteholders until the Class A-2I Notes have been repaid in full;<br><br>9. *Ninth*, all remaining accrued, unpaid interest not PIK'd on the Class B Notes to the Class B Noteholders;<br><br>10. *Tenth,* all previously PIK'd interest on the Class B Notes to the Class B Noteholders;<br><br>11. *Eleventh* all unpaid principal on the Class B Notes to Class B Noteholders until the Class B Notes have been repaid in full<br><br>12. *Twelfth,* any accrued, unpaid ARD interest on Class A-2I Notes to Class A-2I Noteholders;<br><br>13. *Thirteenth,* any accrued, unpaid ARD interest on Class B Notes to Class B Noteholders; and<br><br>14. *Fourteenth*, 100% of residual amounts of RoyaltyCo to be distributed as cash |

| | |
|---|---|
| | distributions to its owners. |
| **Brand Management Co.** | The Buyer Group will create a franchisee brand management company ("Brand Management Co.") that will be engaged by RoyaltyCo pursuant to a brand management and services agreement to be agreed between the Parties (the "Brand Management & Services Agreement") to oversee all brand-related, franchising-related, and management-related functions, including but not limited to:<br><br>• National Ad Fund Oversight and administration;<br><br>• Centralized Purchasing Organization ("CPO") operations oversight;<br><br>• Management of the franchise system, including any new franchising operations; and<br><br>• Developing, managing, licensing, and sub-licensing the licensed IP in furtherance of the Business (as defined below).<br><br>Brand Management Co. would perform all other acts or omissions it deems reasonably necessary or desirable in furtherance of the business of franchising, operating, or otherwise managing casual dining restaurants bearing the licensed trademarks, including but not limited to the Divested Stores (the "Business"), in its sole business judgment.<br><br>Governance:<br><br>• Neil Kiefer will lead the Brand Management Co. board of directors as chairman.<br><br>• The remainder of the Brand Management Co. board of directors will be comprised solely of members appointed by the Buyer Group. |
| **Definitive Document Consents** | The Definitive Documents shall be subject to the consent rights set forth in the RSA and any other consent rights set forth herein. |
| **Treatment of Claims and Interests** | |
| **Administrative Claims** | On the Plan Effective Date, or as soon as practicable thereafter (including following the occurrence of any bar date fixed by the Bankruptcy Court), each holder of an allowed claim for the costs and expenses of administration of the Debtors' estates under sections 503(b) or 507(b) the Bankruptcy Code that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("Administrative Claims") other than professional fee claims, shall be paid in full in cash. |
| **Professional Fee Claims** | On or before the Plan Effective Date, the Debtors shall establish and fund a professional fee escrow account (the "Professional Fee Escrow Account") in an amount sufficient to pay all estimated fees of the Debtors' estate professionals and those of any statutory committee that may have been appointed (collectively, the "Retained Professionals") through the Plan Effective Date of the Approved Plan (the "Professional Fee Escrow Amount").<br><br>For the avoidance of doubt, the Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the estates of the Debtors or the Wind-Down Entity, as applicable; *provided* that any amounts funded into the Professional Fee Escrow Account that remain after all allowed professional fee claims have been indefeasibly paid in full shall be considered property of RoyaltyCo. |
| **DIP Facility Claims (New Class A-1 Notes )** | On the Plan Effective Date, the DIP Facility shall be converted into senior-secured first-lien, first-out notes in the aggregate principal amount of up to $40,000,000, reflecting the sum of the Roll-Up and the total new-money component actually funded and outstanding as a Manager Advance under the DIP Facility (it being acknowledged and agreed that any amounts funded in |

|  | accordance with the Approved Budget are funded as Manager Advances) as of the Plan Effective Date (which new money component shall not exceed the New Money Cap absent the consent of the Required Majority Consenting AHG Noteholders) (the "Class A-1 Principal Amount"), *plus* accrued and unpaid interest (the "Class A-1 Notes"), which will be subject to the following terms and the terms and conditions in the definitive documents relating thereto, as may be changed from time to time (such documents, together, including, without limitation, indentures, guarantees, security agreements, pledge agreements, opinions of counsel and other related definitive documents, collectively, the "Class A-1 Notes Documents"): |
|---|---|
|  | • Principal: Class A-1 Principal Amount, *plus* accrued and unpaid interest, |
|  | • Interest Rate: Prime + 3.00%, payable quarterly |
|  | • Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents |
|  | • Payment of principal and interest to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein). |
|  | • Borrower: RoyaltyCo |
|  | • Guarantors: Securitization Entities |
|  | • Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities |
|  | • Class A-1 Noteholders: DIP Lenders or certain of their affiliates; |
| **Priority Tax Claims** | On or before the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of an allowed claim of a Governmental Unit, as defined in section 101(27) of the Bankruptcy Code, against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code ("Priority Tax Claim") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each allowed Priority Tax Claim, each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Manager Advance Term Loan Claims (New Class A-2II Notes)** | The Agreed Securitization Manager Advance Claims will have been rolled up into the DIP Facility on a dollar-for-dollar basis upon approval of the Roll-Up (and thereafter treated as DIP Facility Claims). |
|  | On the Plan Effective Date, all other Manager Advance Term Loan Claims will be converted to: |
|  | (A) a senior-secured first-lien, second-out note in the aggregate principal amount of $18 million (the "Class A-2II Notes"), which will be subject to the following terms and the terms and conditions in the definitive documents relating thereto (such documents, together, including, without limitation, credit agreements, guarantees, security agreements, pledge agreements, opinions of counsel and other related definitive documents, collectively, the "Class A-2II Notes Documents"): |
|  | • Principal: $18 million |
|  | • Interest Rate: Fed funds; paid in cash, no subordination.  Payable quarterly.  All interest on the Class A-2II Notes shall PIK until such time as the Class A-1 Notes have been repaid in full |
|  | • Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents |
|  | • Payment of principal and interest to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II |

| | |
|---|---|
| | Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein). |
| | • Borrower: RoyaltyCo |
| | • Guarantors: Securitization Entities |
| | • Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall |
| | • Class A-2II Noteholders: DIP Lenders or certain of their affiliates |
| | • Class A-1 Notes and Class A-2II Notes Collateral: for both notes' documents, collateral shall include, without limitation, a lien senior to all other holders on all assets of RoyaltyCo and the Securitization Entities, as more specifically described in the Class A-1 Notes Documents and the Class A-2II Notes Documents; and |
| | (B) 50% of the equity in RoyaltyCo. |
| | Other than the DIP Facility (including, for the avoidance of doubt, up to the New Money Cap), no new Manager Advances will be permitted without the consent of the Required Majority Consenting AHG Noteholders. |
| **Term Loan Claims** | *Treatment*: No distributions shall be made on account of any Term Loan Claims. |
| | *Voting*: Holders of allowed Term Loan Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Term Loan Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Securitization Class A-2 Note Claims** | *Treatment*: On the Plan Effective Date, except to the extent that a holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment, each holder of Securitization Class A-2 Notes will receive new Class A-2I notes of RoyaltyCo with the following principal terms: |
| | • Notes will be issued by RoyaltyCo in a principal amount equal to that of the Securitization Class A-2 Notes and with the same interest rate as the Securitization Class A-2 Notes.  Interest to be payable quarterly.  All interest on the Class A-2I Notes shall PIK until such time as the Class A-1 Notes have been repaid in full |
| | • Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents |
| | • ARD interest to accrue beginning ten (10) years from Plan Effective Date.  ARD interest to be 5% |
| | • Payment of principal and interest (including ARD interest) of the notes to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein) |
| | • Guarantors: Securitization Entities |
| | • Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall |

|  | • Financial Covenants will be modified, prohibition on incurrence of other indebtedness redrafted to permit the Class A-1 Notes and the Class A-2II Notes, and the cash sweep and cash reserve triggers will be removed<br><br>(such notes, the "<u>Class A-2I Notes</u>").<br><br>*Voting*: This class is impaired under the Approved Plan. Holders of Securitization Class A-2 Note Claims may vote to accept or reject the Approved Plan. |
|---|---|
| **Securitization Class B Note Claims** | *Treatment*: On the Plan Effective Date, except to the extent that a holder of a Securitization Class B Note Claim agrees to a less favorable treatment, each holder of Securitization Class B Notes will receive (a) its *pro rata* share of the Noteholder Equity Entitlement and (b) new Class B notes of RoyaltyCo with the following principal terms:<br><br>• Notes will be issued by RoyaltyCo in a principal amount equal to that of the Securitization Class B Notes and with the same interest rate as the Securitization Class B Notes.  Interest to be payable quarterly.  All interest on the Class B Notes shall PIK until such time as the Class A-1 Notes have been repaid in full<br><br>• Maturity Date: thirty (30) years or as otherwise agreed in the Definitive Documents<br><br>• ARD interest to accrue beginning ten (10) years from Plan Effective Date.  ARD interest to be 5%<br><br>• Payment of principal and interest (including ARD interest) of the notes to be set forth in the New Securitization Documents by and among the agent(s) acting on behalf of each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes.  The New Securitization Documents to reflect the terms set forth in the Waterfall (as set forth herein)<br><br>• Guarantors: Securitization Entities<br><br>• Collateral: First lien on substantially all of the assets of RoyaltyCo and the Securitization Entities, paid out in accordance with the Waterfall<br><br>• Financial Covenants will be modified, prohibition on incurrence of other indebtedness redrafted to permit the Class A-1 Notes and the Class A-2II  Notes, and the cash sweep and cash reserve triggers will be removed<br><br>(such notes, the "<u>Class B Notes</u>").<br><br>*Voting*: This class is impaired under the Approved Plan. Holders of Securitization Class B Note Claims may vote to accept or reject the Approved Plan. |
| **Securitization Manager Advance Claims** | *Treatment*: On the Plan Effective Date, the prepetition Securitization Manager Advance Claims will be cancelled.<br><br>*Voting*: Holders of allowed Securitization Manager Advance Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. |
| **Other Secured Claims** | *Treatment*: On the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a secured claim that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("<u>Other Secured Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other |

| | Secured Claim, each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor or the plan administrator, as applicable: |
|---|---|
| | (i) payment in full in cash, |
| | (ii) the collateral securing such holder's Other Secured Claim, or |
| | (iii) such other treatment as to render such holder's Other Secured Claim unimpaired. |
| **Priority Non-Tax Claims** | *Treatment*: On the Plan Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim, that is not assumed by the Buyer Group pursuant to the Buyer Group Arrangements ("<u>Priority Non-Tax Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other Priority Claim, each holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor or the Plan Administrator, as applicable: |
| | (i) payment in full in cash, or |
| | (ii) such other treatment as to render such holder's Priority Non-Tax Claim unimpaired. |
| **General Unsecured Claims** | *Treatment*: No distributions shall be made on account of any General Unsecured Claims. <br><br> *Voting*: Holders of allowed General Unsecured Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of General Unsecured Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Claims** | *Treatment:* Except as provided herein, including with respect to the Securitization Manager Advance Claims, (i) each allowed Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Intercompany Claims. <br><br> *Voting*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Intercompany Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Interests** | *Treatment:* Each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest. <br><br> *Voting*: Holders of allowed Intercompany Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Prepetition Master Issuer Equity Interests** | *Treatment*: Prepetition Master Issuer Equity Interests shall be cancelled, and the holders thereof shall not receive or retain any property on account of such interests under the Approved Plan. <br><br> *Voting*: Holders of Prepetition Master Issuer Equity Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Prepetition Master Issuer Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |

15

| Prepetition Securitization Equity Interests | *Treatment*: Prepetition Securitization Equity Interests will not be impaired.<br><br>*Voting*: Holders of Prepetition Securitization Equity Interests will be conclusively deemed to have approved the Approved Plan.  Therefore, holders of Prepetition Securitization Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |
|---|---|
| Prepetition Equity Interests | *Treatment*: Prepetition Equity Interests in Parent or any other Non-Securitization Entity shall be cancelled, and the holders thereof shall not receive or retain any property on account of such interests under the Approved Plan.<br><br>*Voting*: Holders of Prepetition Equity Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Prepetition Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Other Terms Relevant to Restructuring** ||
| Executory Contracts | As of and subject to the occurrence of the Plan Effective Date of the Approved Plan and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to reject filed by the Debtors on or before the date on which the Confirmation and Sale Order is entered; (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts (as such term will be defined in the Approved Plan); or (v) is specifically designated as a contract or lease to be rejected by the Debtors (with consent of the Required DIP Lenders and the Required Consenting AHG Noteholders) by the deadline to file the plan supplement; *provided*, that the Buyer Group, the Buyer Group SPEs, and Brand Management Co. shall take assignment of executory contracts and unexpired leases only as provided for in this Restructuring Term Sheet and as expressly set forth in the definitive documentation evidencing the Buyer Group Arrangements.  For the avoidance of doubt, the Debtors shall not assume any contract without the consent of the Required DIP Lenders and the Required Consenting AHG Noteholders.<br><br>As of and subject to the Plan Effective Date, (i) the Management Agreement, A&R Base Indenture, Series 2021-1 Supplement to Base Indenture, A&R Management Agreement, and A&R Guarantee & Collateral Agreement shall be terminated or cancelled, (ii) a new base indenture along (the "<u>New Indenture</u>") with one supplements for the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes, and Class B Notes shall be entered into, along with guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the Waterfall, an intercreditor agreement (collectively, the "<u>New Securitization Documents</u>"), and (iii) the Brand Management & Services Agreement shall be entered into with Brand Management Co. |
| Chapter 11 Milestones | The Restructuring Transactions shall be effectuated in accordance with the following deadlines (the "<u>Chapter 11 Milestones</u>"); *provided*, *however*, that such Milestones may be extended from time to time with the prior written consent of the Required DIP Lenders (e-mail from counsel being sufficient), *provided* that, unless otherwise specified, an extension of any Chapter 11 Milestone to a date that is (i) greater than five (5) calendar days from the date set forth herein (or from any new date established as provided herein) and (ii) greater than ten (10) calendar days from the original date set forth herein will also require the consent of the Required Consenting AHG Noteholders (e-mail from counsel being sufficient):<br><br>(a)  No later than two (2) business days after the Petition Date, the Interim DIP Order shall have been entered;<br><br>(b)  No later than ten (10) days after the Petition Date, the prearranged chapter 11 plan approving, among other things, the Buyer Group Arrangements in form and substance |

| | |
|---|---|
| | acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders (the "<u>Approved Plan</u>") and the disclosure statement in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders (the "<u>Disclosure Statement</u>") shall have been filed;<br><br>(c) No later than twenty-eight (28) days after the Petition Date, the Company Parties and Buyer Group shall have entered into the Buyer Group Arrangements and any other Sale Documents necessary to effectuate the Buyer Group Arrangements;<br><br>(d) no later than thirty-five (35) calendar days after the Petition Date, the Final DIP Order shall have been entered;<br><br>(e) No later than forty (40) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider conditional approval of the adequacy of the Disclosure Statement;<br><br>(f) No later than forty (40) calendar days after the Petition Date, the Debtors shall commence solicitation of votes on the Approved Plan;<br><br>(g) No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the Approved Plan;<br><br>(h) No later than eighty (80) calendar days following the Petition Date (the "<u>Outside Date</u>"), the Plan Effective Date shall have occurred, *provided*, *however*, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional fifteen (15) calendar days with the written consent of the Required DIP Lenders in consultation with the Required Consenting AHG Noteholders; *provided* that any additional extension of the Outside Date requires the written consent of both the Required DIP Lenders and the Required Consenting AHG Noteholders; and<br><br>(i) such other Milestones provided for in the DIP Facility Term Sheet shall be enforced. |
| **UAS Wind-Down Process** | Upon the Effective Date, and subject to the Wind-Down Budget and the Approved Plan, the Post-Effective Date Debtors shall wind down the Debtors' estates, including the Unallocated Stores, on terms mutually agreed upon by the Company Parties, the DIP Lenders, and the Consenting Creditors. |
| **Wind-Down Amount** | On or prior to the Plan Effective Date, the Debtors shall fund into a segregated account (the "<u>Wind-Down Account</u>") held in trust by the Wind-Down Entity that is administered by the Plan Administrator an amount to be agreed by the DIP Lenders, the Company Parties, and the Required Consenting AHG Noteholders (the "<u>Wind-Down Amount</u>"). |
| **Wind-Down Entity** | One or more liquidating trusts or other entities (which may be one or more of the post-Effective Date Debtors) established for the purpose of winding down the Debtors' estates and otherwise implementing the Approved Plan (subject to the terms and conditions set forth herein) (such entity, the "<u>Wind-Down Entity</u>"). The trustee, administrator, manager, or other similar position with respect to the Wind-Down Entity (the "<u>Plan Administrator</u>") shall be selected by the Debtors and the Required DIP Lenders, in consultation with the Required Consenting AHG Noteholders. |
| **Consent Rights of Required DIP Lenders and Required Consenting AHG Noteholders** | Notwithstanding anything to the contrary herein or in the Approved Plan, any and all consent rights of the Required DIP Lenders (in such capacity as DIP Lenders and/or Prepetition Lenders, as applicable) and Required Consenting AHG Noteholders and, to the extent applicable, the Required Majority Consenting AHG Noteholders, set forth in the RSA with respect to the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Approved Plan by reference and fully enforceable as if stated in full in the Approved Plan. |

| **Conditions Precedent to Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the satisfaction of the following conditions precedent, which conditions may be waived by mutual written consent of the Company Parties, the Required DIP Lenders, and the Required Consenting AHG Noteholders and, insofar as such terms or conditions relate to the Buyer Group Arrangements, the Buyer Group: |
|---|---|

(i) The RSA shall not have been terminated and shall remain in full force and effect;

(ii) The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the RSA and this Restructuring Term Sheet;

(iii) the DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the requisite DIP Lenders party thereto;

(iv) The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(v) The Confirmation and Sale Order confirming the Approved Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

(vi) The Class A-1 Notes Documents, the Class A-2II Notes Documents, the Class A-2I Note Documents, and the Class B Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Approved Plan and related transaction;

(vii) The RoyaltyCo shares shall have been issued (with all conditions precedent thereto having been satisfied or waived) and a shareholder rights agreement shall have been entered into by the appropriate parties;

(viii) All Restructuring Transaction Expenses and any other fees, expenses, and other amounts required to be paid pursuant to the RSA pursuant to an order of the Bankruptcy Court shall have been paid in full in cash;

(ix) Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

(x) The conditions precedent to closing the Buyer Group Arrangements and the Approved Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Plan Effective Date;

(xi) Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions and the Approved Plan shall have been obtained (including as set forth in the applicable purchase agreement);

(xii) No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the

| | |
|---|---|
| | Restructuring Transactions, the Approved Plan, or any other transaction contemplated thereby; |
| | (xiii)    The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; and |
| | (xiv)    There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions or any material portion or aspect thereof. |
| **Releases, Exculpation Set Forth in the Approved Plan** | Releases to be mutually agreed. |
| **Indemnification and D&O Insurance** | Under the Approved Plan, each directors, officers, and employee liability insurance policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be a retained asset of the Debtors' bankruptcy estates and shall be maintained for the benefit of the beneficiaries thereunder. |
| **Consenting Noteholder Indemnification** | Nothing herein shall alter any indemnification rights which the Consenting Noteholders may have under the Prepetition Note Documents (as defined in the DIP Facility Term Sheet) or otherwise. |
| **Reservation of Rights** | Notwithstanding anything to the contrary herein, the Parties agree and acknowledge that (i) the full amount of the Incremental Loan was funded and the Consenting AHG Noteholders have consented to (a) its treatment as a Manager Advance and (b) the Manager's right to reimbursement thereof (plus interest) in accordance with the Priority of Payments Waterfall, and (ii) the Consenting AHG Noteholders have agreed, solely upon consummation of an Approved Plan, that (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Approved Plan as Manager Advance Term Loan Claims which shall be converted to new Class A-2II Notes on the terms set forth herein and with the payment priority set forth in the Waterfall, and (b) any remaining claimed prepetition Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo, LLC as set forth herein and in the RSA.  Except as specified in the foregoing clauses (i) and (ii), the Prepetition Secured Note Parties preserve all rights, claims (including indemnification claims), arguments, and objections to dispute the validity and amount of any claimed prepetition Manager Advances, or the characterization of any claimed Manager Advances as prepetition Manager Advances (collectively, the "<u>Prepetition Secured Note Parties Reserved Matters</u>"), and neither the Debtors' stipulation to the Manager Advances (as set forth in the DIP Term Sheet and the Interim DIP Order) nor the fact that the Consenting AHG Noteholders have made the agreements reflected in clauses (i) and (ii) above shall operate as a waiver of any rights, claims (including indemnification claims), arguments, or objections or an admission in respect of a claimed prepetition Manager Advance, nor alters or affects the Consenting AHG Noteholders' reservation of rights as set forth herein. The Debtors, including the Manager in its capacity as Manager, each Prepetition Credit Secured Party and each DIP Secured Party preserve all rights, claims and counterclaims (including indemnification claims or counterclaims), arguments, and objections with respect to the Prepetition Secured Note Parties Reserved Matters.  Any claims that may result from the Consenting AHG Noteholders' pursuit of, or success on, the Prepetition Secured Note Parties' |

| | |
|---|---|
| | Reserved Matters do not become DIP Obligations; *provided, however*, that nothing herein alters any prepetition indemnification rights that may otherwise exist. |
| **Exemption from SEC Registration** | The issuance of all securities under the Approved Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code to the fullest extent permissible. |
| **Tax Considerations** | The Restructuring Transactions contemplated by this term sheet shall be structured in a tax-efficient manner, including preservation of all net operating losses and other credits, in consultation with and with the prior express consent of the Required DIP Lenders and the Required Consenting AHG Noteholders in their sole discretion, taking into account the tax considerations of the Company Parties and each Consenting Creditor; *provided*, that any such structuring that materially and negatively affects the Divested Stores, the Buyer Group SPEs, or Brand Management Co. shall require the prior express consent of the Buyer Group in its sole discretion. |
| **Retention of Jurisdiction** | The Approved Plan will provide for a retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) resolution of motions, adversary proceedings, or other contested matters, (iii) entry of such orders as necessary to implement or consummate the Approved Plan and any related documents or agreements, and (iv) other purposes. |
| **Restructuring Expenses** | All Restructuring Expenses (as defined in the RSA) due and owing shall be paid within ten (10) calendar days after the entry of (i) the Interim DIP Order and (ii) the Final DIP Order. |
| | The Approved Plan shall provide for payment in full, in cash of all Restructuring Expenses due and owing pursuant to invoices delivered to the Company at least one (1) Business Day prior to the Plan Effective Date. |
| | The Company shall pay or reimburse in cash all Restructuring Expenses that are incurred but unpaid or not invoiced as of the Plan Effective Date or incurred after the Plan Effective Date in connection with the Restructuring Transactions, within five (5) Business Days of receipt of invoice therefor. |
| **Representations and Warranties; Covenants** | The RSA shall include customary representations and warranties and covenants of the Company Parties, the Consenting Creditors, and the Buyer Group, including but not limited to the following:<br><br>• The Debtors shall use reasonable best efforts to cause the Independent Managers and the Indenture Trustee to join the RSA.<br><br>• The Debtors and the Buyer Group shall work in good faith to negotiate and document the Buyer Group Arrangements. |
| **Definitive Documents** | "Definitive Documents" means the following (without limitation): (A) the Approved Plan; (B) the Confirmation and Sale Order; (C) the Disclosure Statement (and any documents or Solicitation Materials related to the solicitation thereof, including applicable motions and orders); (D) the "first day" pleadings and all orders sought pursuant thereto, including the DIP Orders; (E) the plan supplement documents to be attached to the Approved Plan and all related, exhibits, term sheets, or agreements related thereto; (F) the DIP Documents; (G) the New Indenture (H) the Class A-1 Note Documents; (I) the Class A-2II Notes Documents; (J) the Class A-2I Note Documents; (K) the Class B Note Documents; (L) the APAs; (M) the Brand Management & Services Agreement; and (N) the Wind-Down Budget. |
| | The Restructuring Transactions contemplated herein will be implemented pursuant to the Definitive Documents, in each case on substantially the same terms set forth in and otherwise consistent in all material respects with this Restructuring Term Sheet, the DIP Facility Term Sheet, and the Approved Plan and each such document shall be in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders. |

| | The Definitive Documents not executed or in a form attached to this Restructuring Term Sheet as of the date of execution of the RSA remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with the RSA. Further, the Definitive Documents not executed or in a form attached to this Restructuring Term Sheet as of the date of execution of the RSA shall otherwise be in form and substance acceptable to the Required DIP Lenders and the Required Consenting AHG Noteholders. |
|---|---|
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted pursuant to the RSA. |

**Execution Version**

## **Exhibit 1**

### **Securitization Entities**

HOA Funding, LLC

HOA Holdco, LLC

HOA Systems, LLC

HOA Restaurant Holder, LLC

HOOTS Restaurant Holder, LLC

HOA IP GP, LLC

HOOTS Franchising, LLC

HOA Franchising, LLC

HOA Maryland Restaurant Holder, LLC

HOA Kansas Restaurant Holder, LLC

TW Restaurant Holder, LLC

DW Restaurant Holder, LLC

HI Limited Partnership

HOA Towson, LLC

HOA Waldorf, LLC

HOA Laurel, LLC

**<u>Exhibit 2</u>**

**Non-Securitization Entities**

Hawk Parent, LLC

HOA Holdings, LLC

Night Owl, LLC

Owl Wings, LLC

Owl Restaurant Holdings, LLC

Owl Holdings, LLC

Elf Owl Investments, LLC

TW Lonestar Wings, LLC

Alamo Wings, LLC

HOA Restaurant Group, LLC

Derby Wings Holdings, LLC

Derby Wings, LLC

Hooters of America, LLC (Manager)

## **EXHIBIT C**

## **DIP Facility Term Sheet**

EXECUTION VERSION

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION TERM LOAN FACILITY
## TERM SHEET

Set forth below is a summary of the principal terms and conditions for a proposed senior secured superpriority debtor-in-possession financing facility (the "DIP Facility" and such liens thereunder, the "DIP Liens"). Capitalized terms used but not defined in this non-binding term sheet (the "DIP Term Sheet") shall have the meanings set forth in the Prepetition Credit Agreements (as defined below) or, as the context may require, the term sheet attached to the RSA (as defined below) (the "Restructuring Term Sheet").

This DIP Term Sheet is the "DIP Facility Term Sheet" referred to in, and appended to, that certain Restructuring Support Agreement, dated as of March 31, 2025, by and among the Company Parties and the other Parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "RSA").

Except with respect to the Reimbursement; Indemnity, Governing Law and Jurisdiction, and Fiduciary; Agency provisions, this DIP Term Sheet is intended for discussion purposes only and does not purport to summarize all the terms, conditions, representations, warranties and other provisions with respect to the transactions referred to herein. This DIP Term Sheet does not constitute an offer, agreement, or commitment by Celtic Master Fund LP or any of its affiliates (collectively, the "Proposed Lender") to enter into any transaction or to provide any financings. Any such commitment will (a) be subject to (i) completion of the Proposed Lender's credit approval process, (ii) the execution and delivery of definitive legal documents acceptable to all parties and their respective counsel, and (iii) the completion of the Proposed Lender's legal and business due diligence and satisfaction with the results thereof, and (b) assume the accuracy and completeness in all material respects of the information provided by or on behalf of the DIP Borrowers (as defined below).

The terms and conditions for the extensions of credit described herein are also dependent upon, among other things, authorization by the Bankruptcy Court (as defined below).

| Parties | **DIP Borrowers**: Hawk Parent LLC ("Hawk Parent") and Hooters of America, LLC ("HOA" and together, the "DIP Borrowers" or "Borrowers" and individually, each a "DIP Borrower" or a "Borrower") will be co-borrowers, jointly and severally liable. |
|---|---|
| | **DIP Guarantors**: The issuers and guarantors under each of the Prepetition Notes Documents (as defined below) and the Prepetition Credit Documents (as defined below), including HOA and Hawk Parent, who will also guarantee the obligations of the other DIP Guarantors[1] subject to the terms and conditions set forth herein (each, a "DIP Guarantor" or a "Guarantor" and collectively, the "DIP Guarantors" or "Guarantors"). |
| | **DIP Loan Parties**: The DIP Borrowers and the DIP Guarantors (the "DIP Loan Parties" or "Loan Parties" and each, a "DIP Loan Party" or a "Loan Party"). |
| | The DIP Loan Parties and their subsidiaries shall each be a debtor and debtor-in-possession (the "Debtors") in separate but jointly administered chapter 11 cases (the "Chapter 11 Cases") to be |

---

[1] Such DIP Guarantors refer to, collectively, HOA Restaurant Group, LLC, Owl Restaurant Holdings, LLC, Owl Wings, LLC, Night Owl, LLC, HOA Holdings, LLC, Derby Wings, LLC, Derby Wings Holdings, LLC, Alamo Wings, LLC, TW Lonestar Wings, LLC, Elf Owl Investments, LLC, Owl Holdings, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Funding, LLC, HOA Restaurant Holder, LLC, Hoots Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA IP GP, LLC, HI Limited Partnership, HOA Franchising, LLC, Hoots Franchising, LLC and HOA Towson, LLC.

| | |
|---|---|
| | commenced (the date of commencement, the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").<br><br>**Lenders**: Celtic Master Fund LP or certain of its affiliates (in such capacity, together with their successors and assigns in such capacity, the "DIP Lenders" and each, a "DIP Lender").<br><br>**DIP Agent**: U.S. Bank Trust Company, National Association ("US Bank"), as collateral agent and calculation agent (the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties"). |
| **Certain Defined Terms** | **Existing DIP Loan Party Debt Documents:**<br><br>1. **Prepetition MA Loan Documents**<br><br>• That certain Credit Agreement dated as of September 27, 2024 (as amended by that certain Limited Waiver, First Amendment to Credit Agreement, Omnibus Amendment and Reaffirmation of Loan Documents, dated as of February 21, 2025 (the "First Amendment"), and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition MA Loan Credit Agreement"), and entered into by, among others, Hawk Parent, as parent and borrower, the guarantors party thereto from time to time, Celtic Master Fund LP as Initial Lender (in such capacity, together with its successors and assigns in such capacity, the "Prepetition MA Loan Lender") and US Bank as Collateral Agent and Calculation Agent (in such capacity, together with its successors and assigns in such capacity, the "Prepetition MA Loan Agent").<br><br>• The Prepetition MA Loan Lender and the Prepetition MA Loan Agent are collectively referred herein as the "Prepetition MA Loan Secured Parties".<br><br>• Pursuant to the First Amendment, an additional loan in an aggregate principal amount equal to $5,000,000 was funded to Hawk Parent (such loan, "Incremental Loan") by the Prepetition MA Loan Lender (in such capacity, the "Incremental Lender").<br><br>• The "Prepetition Pari Passu Intercreditor Agreement" shall mean that certain Pari Passu Intercreditor Agreement dated as of September 27, 2024, by and among the Prepetition MA Loan Agent, the Prepetition Term Loan Agent (as defined below), Hawk Parent and the guarantors party thereto from time to time.<br><br>• The Prepetition Pari Passu Intercreditor Agreement and all other instruments and documents executed at any time in connection with the Prepetition MA Loan Credit Agreement and designated as "Loan Documents" (as defined in the Prepetition MA Loan Credit Agreement) shall be referred to collectively as the "Prepetition MA Loan Documents". The Obligations (as defined in the Prepetition MA Loan Credit Agreement) shall be referred to herein as the "Prepetition MA Loan Secured Obligations" and shall rank *pari passu* with the Prepetition Term Loan Secured Obligations (as defined below) with respect to the right to payment and priority of collateral as more fully set forth in the Pari Passu Intercreditor Agreement. The collateral securing the Prepetition MA Loan Secured Obligations is referred to herein as the "Prepetition MA Loan Collateral." |

2. **Prepetition Term Loan Documents**

- That certain Credit Agreement dated as of March 9, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement" and, together with the Prepetition MA Loan Credit Agreement, the "Prepetition Credit Agreements" and each, a "Prepetition Credit Agreement"), among Hawk Parent, as parent and borrower, the guarantors party thereto from time to time, XYQ Cayman Ltd. as Initial Lender (in such capacity, together with its successors and assigns in such capacity the "Prepetition Term Loan Lender") and US Bank as Collateral Agent and Calculation Agent (in such capacity, together with its successors and assigns in such capacity, the "Prepetition Term Loan Agent" and together with the Prepetition MA Loan Agent, the "Prepetition Agents" and each, a "Prepetition Agent").

- The "Prepetition Loan Parties" shall mean, collectively, Hawk Parent and the guarantors under each of the Prepetition Credit Agreements.

- The Prepetition Term Loan Lender and the Prepetition Term Loan Agent are collectively referred herein as the "Prepetition Term Loan Secured Parties" and each, a "Prepetition Term Loan Secured Party" and together with the Prepetition MA Loan Secured Parties, the "Prepetition Credit Agreement Secured Parties" and each, a "Prepetition Credit Agreement Secured Party".

- The Prepetition Pari Passu Intercreditor Agreement and all other instruments and documents executed at any time in connection with the Prepetition Term Loan Credit Agreement and designated as "Loan Documents" (as defined in the Prepetition Term Loan Credit Agreement) shall be referred to collectively as the "Prepetition Term Loan Documents" and, together with the Prepetition MA Loan Documents, the "Prepetition Credit Documents". The Obligations (as defined in the Prepetition Term Loan Credit Agreement) shall be referred to herein as the "Prepetition Term Loan Secured Obligations" (together with the Prepetition MA Loan Obligations, the "Prepetition Credit Agreement Secured Obligations," and together with the Prepetition Notes Secured Obligations (as defined below), the "Prepetition Obligations") and rank *pari passu* with the Prepetition MA Loan Secured Obligations with respect to the right to payment and priority of collateral as more fully set forth in the Prepetition Pari Passu Intercreditor Agreement. The collateral securing the Prepetition Term Loan Secured Obligations is referred to herein as the "Prepetition Term Loan Collateral," and together with the Prepetition MA Loan Collateral, the "Prepetition Loan Collateral." The liens on Prepetition Loan Collateral securing the Prepetition Credit Agreement Secured Obligations are referred to herein as the "Prepetition Credit Agreement Liens."

3. **Prepetition Notes Documents and Manager Advance Documents:**

a. **Prepetition Note Documents**

- That certain Amended and Restated Base Indenture, supplemented by the Series 2021-1 Supplement, each dated as of August 19, 2021 (as amended, restated, amended and restated or otherwise modified and in effect immediately prior to the date hereof, the "Prepetition Base Indenture," and together with all other agreements, guarantees, pledges, collateral and security documents, management agreements, control agreements, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including without limitation the "Indenture

Documents" and the "Related Documents" (each as defined in the Prepetition Base Indenture), collectively, the "Prepetition Notes Documents," and together with the Prepetition Credit Documents, the "Prepetition Financing Documents" and each, a "Prepetition Financing Document"), by and between HOA Funding, LLC (together with its successors and assigns, the "Master Issuer"), Citibank, N.A., as Trustee (in such capacity, together with its successors and assigns in such capacity, the "Prepetition Notes Trustee") and Securities Intermediary.

- Pursuant to that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect immediately prior to the date hereof, the "Management Agreement") by and among the Master Issuer, HOA, as the manager (HOA in such capacity, the "Manager"), the Securitization Guarantors,[2] HOA Franchising, LLC and Hoots Franchising, LLC, each as a Franchisor, and the Prepetition Notes Trustee,  the Securitization Entities (as defined below) engaged the Manager to take certain actions on their behalf in connection with the Prepetition Notes Documents and in connection with such services, the parties thereto agreed to the terms thereof, including, without limitation, certain rights including the right of the Manager to make Manager Advances (as defined below) on behalf of the Securitization Entities and the right to payment of Management Fees (as defined in the Prepetition Base Indenture). The reimbursement of Manager Advances is required pursuant Section 5.11 of the Prepetition Base Indenture as in effect on the date hereof which describes the reimbursement requirement of Manager Advances on a weekly basis (the "Manager's Repayment Right" and such waterfall, the "Priority of Payments Waterfall").  As used herein, "Manager Advance" shall have the meaning given such term in the Prepetition Base Indenture. For the avoidance of doubt, nothing in the preceding sentence shall alter the rights of the Consenting AHG Noteholders as set forth below in the "Reservation of Rights" section.

- As of the Petition Date, the Manager asserts a claim against the Securitization Entities for reimbursement of an aggregate amount of not less than $ 28,338,913 for prepetition Manager Advances, which amounts (plus accrued and unpaid interest thereon) remain outstanding. None of the Debtors disputes the amount or validity of the prepetition Manager Advances as described in the preceding sentence. None of the Debtors disputes the Manager's right to reimbursement of any Manager Advances, *plus* all additional amounts and other obligations under the DIP Facility during the pendency of the Chapter 11 Cases, together with accrued and unpaid interest, fees and other charges and expenses or that such amount benefit from such "Priority of Payments Waterfall" with the Manager's Repayment Right being part of the Prepetition Loan Collateral and the DIP Collateral.

- The "Securitization Entities" shall mean, collectively, the Securitization Guarantors and the Master Issuer, and the "Non-Securitization Entities" shall mean the Debtors other than the Securitization Entities.  "Prepetition Notes" refers to all notes issued by the Master Issuer prior to the Petition Date pursuant to the Prepetition Base Indenture (the holders of Prepetition Notes, the "Prepetition Noteholders," and together with the

---

[2] The "Prepetition Securitization Guarantors" means, collectively, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, Hoots Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOA Laurel, LLC, HOA Waldorf, LLC, HOA IP GP, LLC, HI Limited Partnership, HOA Franchising, LLC, Hoots Franchising, LLC and HOA Towson, LLC.

|  | Prepetition Notes Trustee and the other Secured Parties (including the Control Party and the Manager) (each as defined in the Prepetition Base Indenture), the "Prepetition Notes Secured Parties" and together with the Prepetition Credit Agreement Secured Parties, the "Prepetition Secured Parties"). The Obligations (as defined in the Prepetition Base Indenture) shall be referred to herein as the "Prepetition Notes Secured Obligations." The collateral securing the Prepetition Notes Secured Obligations is referred to herein as the "Prepetition Notes Collateral," and together with the Prepetition Loan Collateral, the "Prepetition Collateral." The liens on Prepetition Notes Collateral securing Prepetition Notes Secured Obligations are referred to herein as the "Prepetition Indenture Liens," and together with the Prepetition Credit Agreement Liens, the "Prepetition Liens."

      b. **Manager Advance Reporting & Acknowledgment**

- Prior to the Petition Date, as a condition to receiving funds from the Prepetition Loan Parties, the Manager provided that certain Manager Advance Acknowledgment, dated as of September 27, 2024 (as amended and restated by that certain Amended and Restated Manager Advance Acknowledgement, dated as of March 3, 2025, among the Securitization Entities and the Prepetition MA Loan Agent, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Manager Advance Acknowledgement") by and among the Securitization Entities and the Prepetition MA Loan Agent. |
|---|---|
| **DIP Facility; Use of Proceeds** | **DIP Facility**: The DIP Facility shall be comprised of superpriority consensual priming term loans (the "DIP Loans" and the commitment by the DIP Lenders to provide the DIP Loans upon satisfaction of the terms and conditions set forth herein, the "DIP Loan Commitment"; the credit agreement that will document the terms and conditions of the DIP Facility, the "DIP Credit Agreement" and all other documents related to the DIP Facility and the DIP Credit Agreement, the "DIP Documents"), consisting of an aggregate principal amount up to $40,000,000 (as such principal amount may be increased from time to time through the capitalization of interest paid in kind and, to the extent the DIP Loan Parties receive consent from the Required Majority Consenting AHG Noteholders,[3] through additional increases in the DIP Loan Commitments pursuant to the mechanics and subject to the terms described below under the headings labeled "Accordion Increase" and "AHG Noteholder Consent Matters"), which shall be comprised of:

(a) A committed new money term loan facility (the "New Money Facility") in an aggregate principal amount of up to $35,000,000 *plus* an uncommitted new money term loan accordion facility (the "Accordion Facility") in an aggregate principal amount to be determined with the consent of the Required Majority Consenting AHG Noteholders, and, which shall be subject to the terms set forth herein (such commitments, the "New Money Commitments" and such loans advanced and interest capitalized thereon from time to time with respect thereto, collectively, the "New Money Loans"); and

(b) a roll-up loan facility in an aggregate principal amount equal to $5,000,000 (the "Roll-Up Amount"), which shall be used for the roll-up and conversion (the "Roll-Up") of the Incremental Loan on a cashless, dollar-for-dollar basis into DIP Loans (such DIP Loans together with interest capitalized thereon, the "Roll-Up Loans"). |

---

[3] Please see the below section entitled "AHG Noteholder Consent Matters" for a description of the respective consent rights for the Required Majority Consenting AHG Noteholders and the Required Consenting AHG Noteholders.

Amounts paid or prepaid under the DIP Facility may not be reborrowed.  As used herein, "DIP Obligations" shall mean all obligations of the DIP Borrowers and/or DIP Guarantors in respect of the DIP Loans incurred in accordance with the DIP Documents and, so long as it remains in full force and effect, the RSA, including all principal and accrued interest on the DIP Loans, all fees, and all reimbursement, indemnity, and other obligations under the DIP Credit Agreement, the DIP Orders and the other DIP Documents (as defined below).

**DIP Loans**: Subject to the DIP Lenders' determination that the terms and conditions herein and in the definitive documents, including the restrictions on use of proceeds set forth below, have been satisfied, the proceeds of New Money Loans shall be applied by the Borrowers to fund Manager Advances solely for the following purposes: (a) to make interest payments in respect of the DIP Obligations outstanding on the relevant interest payment date and (b) for the payment of other amounts in accordance with the Approved Budget (provided, however, that the funds used to pay any professional fees and restructuring charges shall not be used for the purpose of paying the professional fees and restructuring charges in connection with any dispute against the DIP Lenders or the Consenting AHG Noteholders); *provided, further*, that the application of proceeds of the New Money Loans applied to fund DIP Manager Advances shall be in accordance with the Approved Budget and the DIP Obligations so long as identified in accordance with the Approved Budget (including the payment and capitalization of interest and other indemnification obligations) shall be DIP Manager Advances and the Manager shall have a corresponding right to repayment of such amounts to the full extent thereof.

**Use of Proceeds**: No portion of the DIP Loan Parties' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral"), the proceeds of the DIP Facility, the DIP Collateral (as defined below), or the Carve-Out (as defined below) may be used:

   (a)      for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;

   (b)      directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility;

   (c)      unless a Conversion (as defined below) occurs, to make any distribution under a Chapter 11 Plan (a "Chapter 11 Plan") that does not provide for the indefeasible payment of DIP Obligations and the Prepetition Obligations in full and in cash unless agreed by the Required DIP Lenders (as defined below);

*provided* that, advisors to the Committee, if one is appointed, may use the proceeds of the DIP Facility to investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Credit Documents at an aggregate expense for such investigation not to exceed $25,000, *provided further*, that no portion of such amount may be used to prosecute any claims.

The Manager's Repayment Right shall be part of the DIP Collateral (as defined below) securing the repayment of the DIP Obligations. Manager Advance Acknowledgement documentation similar to that required by the Prepetition Loan Parties shall be provided to the DIP Lenders and the Consenting AHG Noteholders with respect to Manager Advances to be provided by the

| | |
|---|---|
| | Manager to the Securitization Entities with the proceeds of the DIP Loans ("<u>DIP Manager Advances</u>"), with additional documentation relating to such Manager Advances being provided on the books and records of the DIP Loan Parties and otherwise on terms, along with any additional requirements, that are acceptable to the DIP Lenders and the Required Majority Consenting AHG Noteholders. Other than the payment of the Management Fee and payments on behalf of Non-Securitization Entities in accordance with the Approved Budget, cash proceeds released by the Securitization Entities to the Non-Securitization Entities shall (i) reduce the DIP Manager Advances and the DIP Loans or (ii) be deemed payments of interest in respect of the DIP Manager Advances and DIP Loans if they result in a permanent principal reduction of the DIP Loan Obligations, but amounts reapplied and used (or deemed used, including the capitalization of interest and fees) in accordance with the Approved Budget shall continue to be treated as outstanding DIP Manager Advances until such permanent principal reduction of the DIP Loan Obligation occurs.. |
| **DIP Collateral; Priority** | **DIP Collateral**:  Substantially all assets and property of the DIP Loan Parties, which include, without limitation, (a) all existing (whether pre- or post-petition) and after-acquired or arising, tangible and intangible, personal and real property, and other assets of each of the DIP Loan Parties including the assets described as Prepetition Collateral; (b) all rights of HOA, in its capacity as Manager, to reimbursement for any Manager Advance and the Manager's Repayment Right on a super senior priority basis; (c) all interest, income and other payments arising in connection with any Manager Advance; (d) a pledge of all Equity Interests in the DIP Loan Parties (other than Hawk Parent) and their subsidiaries; (e) all proceeds relating to the foregoing, and (f) subject to entry of the Final DIP Order, the proceeds of all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "<u>Avoidance Actions</u>") (collectively, the "<u>DIP Collateral</u>").<br><br>**Priority**:  All obligations of the DIP Loan Parties to the DIP Lenders and the DIP Agent under the DIP Facility shall have the following rankings and priorities (subject in all respects to the Carve-Out and the priorities set forth in <u>Annex IV</u> hereto):<br><br>(a) *First Priority Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized and automatically valid, fully and properly perfected first priority liens on and security interests in all DIP Collateral that is not subject to Permitted Senior Liens (as defined below), including, for the avoidance of doubt, subject to entry of the Final DIP Order, proceeds of Avoidance Actions (collectively, the "<u>Unencumbered Property</u>");<br><br>(b) *Priming DIP Liens and Junior DIP Liens*. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective liens on and security interests in all DIP Collateral (other than as described above in clause (a)), which DIP Liens (A) shall be subject and subordinate to Permitted Senior Liens, (B) shall be subject to the priorities set forth in <u>Annex IV</u> hereto, and (C) shall be senior to all other liens on and security interests in any DIP Collateral (including, without limitation, any Prepetition Collateral and any DIP Collateral that would otherwise constitute Prepetition Collateral), including, without limitation, any Adequate Protection Liens and any Prepetition Obligations. |

| | |
|---|---|
| | It is understood and agreed that the priming liens described herein shall be subject to valid, non-avoidable and properly perfected liens that are (a) in existence on the Petition Date, (b) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (c) senior in priority to the Prepetition Liens, and (d) permitted to be incurred under the DIP Credit Agreement, in each case, to the extent indicated as "Permitted Senior Liens" on Schedule 7.08 to the DIP Credit Agreement (such liens, the "<u>Permitted Senior Liens</u>").[4]

To the fullest extent permitted by applicable law, all of the liens described herein with respect to the assets of the DIP Loan Parties shall be effective and perfected as of the date of the Interim DIP Order (solely to the extent of the then outstanding obligations) and/or the Final DIP Order and shall be granted without the necessity of the execution or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements, and the DIP Loan Parties shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the DIP Loan Parties and the DIP Agent (acting at the direction of the requisite DIP Lenders).

Each DIP Order shall contain provisions prohibiting each of the DIP Loan Parties from incurring any indebtedness which (x) ranks *pari passu* with or senior to the DIP Obligations, (y) benefits from a first priority lien under section 364 of the Bankruptcy Code, or (z) except as set forth in this DIP Term Sheet (including in <u>Annex IV</u>), purports to have payment priority *pari passu* with or above DIP Manager Advances, and shall further prohibit any DIP Loan Party from creating, incurring, assuming or permitting to exist, directly or indirectly, any lien on or with respect to equity interests in Hawk Parent. |
| **Availability** | **Initial Advance**: On the date of the Bankruptcy Court's entry of an interim order approving the DIP Facility (the "<u>Interim Effective Date</u>"), in form and substance agreed to by the Required DIP Lenders ("<u>Interim DIP Order</u>"), subject to (A) the execution and delivery of the DIP Documents, (B) compliance with the terms, conditions and covenants described in this DIP Term Sheet and the DIP Documents, (C) the consent of the Required Consenting AHG Noteholders, and (D) delivery of an Approved Budget (as defined below), each New Money Lender shall make a new money loan (an "<u>Interim Term Loan</u>") in an aggregate initial principal amount of not more than such New Money Lender's share of the up to $5,000,000 Initial Term Loan commitments (the "<u>Initial Term Loan Commitments</u>").

**Delayed Draw Advance**: After the Interim Effective Date and prior to the Termination Date (as defined below), or if earlier, prior to an Occurrence (as defined below), the remaining amount of the outstanding New Money Commitments shall be available for borrowing in one or more advances (the "<u>Delayed Draw Term Loans</u>" and such commitments inclusive of any additional commitments that become New Money Commitments agreed to from time to time pursuant to the "Accordion Increase" mechanic described below, the "<u>Delayed Draw Term Loan Commitments</u>"), subject to (A) the execution and delivery of the DIP Documents, (B) compliance with the terms, conditions and covenants described in this Term Sheet and the DIP Documents and (C) delivery of an Approved Budget (as defined below), which shall be delivered prior to |

---

[4] For the avoidance of doubt, as used herein and in <u>Annex IV</u>, no reference to the "Permitted Senior Liens" shall refer to or include the Prepetition Liens. In addition, for the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Senior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition Liens as such claim had on the Petition Date. DIP Orders shall provide that all parties in interest shall reserve the right to the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Senior Lien to the extent they have standing to do so.

| | |
|---|---|
| | each draw and approved by the Required DIP Lenders prior to such draw. Subject to the terms hereof and of the DIP Documents, the Delayed Draw Term Loans may be borrowed from time to time prior to each draw in amounts, and at intervals, to be set forth in the Approved Budget and in the DIP Documentation; *provided* that no DIP Lender shall have an obligation to fund any subsequent advances after the occurrence of an Event of Default, Change of Control, Asset Disposition or if the DIP Loan Parties fail to obtain the requisite consent from the Required Majority Consenting AHG Noteholder described in the Section labeled "AHG Noteholder Consent Matters" below  (any of the foregoing, an "Occurrence") unless such DIP Lender waives the Occurrence in its sole discretion; and provided further that prior to entry of the Final DIP Order, the aggregate principal amount of Delayed Draw Term Loan Commitments available for Borrowing shall not exceed $4,000,000 (or such other amount agreed by the DIP Lender in its sole discretion provided such additional amounts are also included in the then Approved Budget). <br><br> **Roll-Up Loans**: On the Interim Effective Date, the Incremental Lender shall become entitled to roll up the Incremental Loan into DIP Loans (subject to and upon entry of the Final DIP Order (as defined below)).  Upon the Bankruptcy Court's entry of the Final DIP Order, and from and after the Bankruptcy Court's entry of a final order approving the DIP Facility, in form and substance agreed to by the Required DIP Lenders (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders," and each, a "DIP Order"), each DIP Lender will be deemed to have funded Roll-Up Loans equal to the Roll-Up Amount. |
| **Accordion Increase** | If no Default or Event of Default then exists, the Borrowers may request additional New Money Commitments from time to time pursuant to the terms, and subject to the conditions, described below. In order to increase the principal amount of outstanding New Money Loans and available New Money Commitments (collectively, the "Aggregate Outstandings") to a dollar amount in excess of $35,000,000 (such Aggregate Outstanding amount *plus* capitalized interest and, to the extent the Required Majority Consenting AHG Noteholders have previously consented to a commitment increase, such additional amount of Aggregate Outstandings then permitted, the "New Money Cap"), such additional commitment increases shall be conditioned on, and subject to (i) the additional conditions described below, (ii), and the DIP Loan Parties (x) receiving (A) the consent of the Required Majority Consenting AHG Noteholders and (B) the consent of at least one of the DIP Lenders agreeing to such requested commitment increase, and (y) delivering a duly executed and completed Borrower's Upsize Certificate (as defined below) to the DIP Lenders and the Collateral Agent, for such commitment increase (the consent described in this clause (ii)(y), the "Consent Threshold").  If the Consent Threshold is satisfied, the Required Consenting AHG Noteholders so consenting (or their affiliates) shall be offered the opportunity to participate in New Money Commitments for New Money Loans in excess of the New Money Cap on a ratable basis with the existing DIP Lenders providing such additional New Money Commitments (pro rata to the principal amount of their holdings (together with their affiliates' holdings) of Prepetition Notes plus any outstanding principal amount of their holdings (together with their affiliates' holdings) of Prepetition Loans). <br><br> **Mechanics for Requesting an Increase:** <br><br> If no Default or Event of Default then exists, the Borrowers may from time to time after entry of the Final DIP Order deliver a notice (an "Accordion Increase Request") to the DIP Lenders, the Ad Hoc Group (as defined in the RSA), the Control Party (as defined in the RSA), the Prepetition Notes Trustee and requesting an increase in the available DIP Commitments.  Such Accordion Increase Request shall: |

1. Certify that no Default or Event of Default then exists;

2. Notify the addressees of the proposed increase request, including the proposed effective date for such increase (which date shall be a date not earlier than the fifth Business Day after such notice, the "Accordion Increase Effective Date") and the amount of such proposed increase (the proposed "Accordion Increase Amount"), and, in the case of an Accordion Increase Request that would result in the proposed Aggregate Outstandings in excess of the then applicable New Money Cap without the Consent Threshold having first been satisfied, that proposed Aggregate Outstandings would exceed the then applicable New Money Cap; and

3. Offer the opportunity to the DIP Lenders, and in the case of an increase that would result in Aggregate Outstandings in excess of the New Money Cap, to the Prepetition Noteholders, to elect to commit to provide such additional Delayed Draw Term Loans and New Money Commitments.

Following the receipt of an Accordion Increase Request, each DIP Lender (and in the case of an Accordion Increase Request which results in Aggregate Outstandings in excess of the then applicable New Money Cap, each Prepetition Noteholder (or its delegate)) shall have the right for a period of three (3) Business Days (the "Commitment Acceptance Period") to elect by written notice to the Borrowers and the Collateral Agent to:

4. increase its Commitment by delivering a written commitment notice (a "Commitment Acceptance") which includes (a) the name and notice details of such person and (b) the amount by which it elects to increase its DIP Commitment (which amount shall not exceed the requested accordion increase amount (provided, that if such person is not an existing DIP Lender, the additional DIP Commitment shall be in a minimum amount of at least $1,000,000) (the "Proposed Increase Amount")) and (c) any applicable fees (each such person electing to so commit, an "Accordion Increase Lender"); or

5. confirm that it does not elect to increase its DIP Commitment (it being understood that a failure to deliver a written notice of acceptance by the end of the Commitment Acceptance Period shall be deemed to be such DIP Lender or, as the context may require, such Prepetition Noteholder, electing not to increase its DIP Commitment).

If the aggregate amount of the proposed increase in DIP Commitments as demonstrated by the Commitment Acceptances exceeds the relevant proposed Accordion Increase Amount, then the proposed increase in each Accordion Increase Lender shall be reduced on a pro rata basis until the aggregate of the proposed increase in DIP Commitments of all the Accordion Increase Lenders equals the relevant Accordion Increase Amount (it being understood that, unless the DIP Lender agrees otherwise, the Prepetition Noteholders that become Accordion Increase Lenders shall only be able to participate ratably in Commitments provided after such date in excess of the New Money Cap) and the Collateral Agent shall inform all the Accordion Increase Lenders of such reduced Commitments accordingly.

No later than two (2) Business Days prior to the Accordion Increase Effective Date:

1. each DIP Lender which is an Accordion Increase Lender shall deliver to the Collateral Agent and the Borrowers a duly completed and executed Borrower's Upsize Certification;

2. each Accordion Increase Lender that was not already a "DIP Lender" shall deliver to the Borrowers and the Collateral Agent a duly completed and executed Accordion Accession

| | |
|---|---|
| | Letter in the form attached to the DIP Credit Agreement along with all supporting documentation required thereby; |
| | 3. the Borrowers shall deliver a certificate in form and substance satisfactory to the DIP Lenders certifying that the Consent Threshold has been previously satisfied attaching any supporting documentation provided by the Prepetition Noteholders, the Control Party or the Ad Hoc Group, as the context may require, demonstrating the same (such fully completed certificate, a "Borrower's Upsize Certification").<br><br>On the Accordion Increase Effective Date, the Collateral Agent and the Borrowers shall execute each Borrower's Upsize Certification and each duly completed and executed Accordion Accession Letter delivered to it which shall take effect in accordance with the terms of the DIP Credit Agreement.<br><br>Notwithstanding the foregoing, no DIP Lender or Prepetition Noteholder shall have any obligation to increase its DIP Commitments or become a Lender. Any decision to become a DIP Lender or to increase DIP Commitments shall be made by such DIP Lender, or as the context requires, such Prepetition Noteholder, in such person's sole discretion independently from any other person. If a DIP Lender or a Prepetition Noteholder declines or is deemed to have declined an Accordion Increase Request, the DIP Commitments and obligations of such DIP Lender or other Person shall remain unchanged. |
| **Reporting and Information** | **DIP Reporting:**<br><br>The DIP Orders and DIP Documents will contain the reporting and information covenants made by the DIP Loan Parties under the Prepetition Credit Agreements and the other Prepetition Credit Documents, as applied in all respects to this DIP Term Sheet and the DIP Facility *mutatis mutandis,* and the DIP Loan Parties shall also provide to the DIP Lenders the information and documentation set forth below:<br><br>i. within forty-five (45) days after the end of each fiscal period, unaudited monthly balance sheet and income statement together with a compliance certificate;<br><br>ii. no later than three (3) business days prior to funding a DIP Manager Advance (or, if not practicable, as soon as reasonably practicable), documentation outlining, on a line-by-line basis, the fees and expenses comprising such DIP Manager Advance, consistent with the documentation previously required by the Prepetition Loan Parties for extensions of credit to be provided to the Prepetition Notes Trustee<br><br>iii. any other business or financial information which may be reasonably requested by any of the DIP Lenders and Consenting AHG Noteholders or, as the context may require, the Control Party, the Prepetition Notes Trustee, or any of the Prepetition Noteholders;<br><br>iv. the Proposed Budgets, Approved Budget and Variance Reports (each as defined below) along with updates on modifications to such Proposed Budgets and Variance Reports requested by the Control Party, the Prepetition Notes Trustee, or any of the Prepetition Noteholders or any other person whose consent is required in order to approve a Proposed Budget or a Variance Report;<br><br>v. as soon as practicable but in no event later than three (3) days in advance of filing (to the extent practicable), (a) the proposed filing versions of the Interim DIP Order and the Final DIP Order and the motion seeking their approval, (b) all other proposed orders and pleadings related to the DIP Facility, (c) all other "first day motions" and related orders, (d) any plan of reorganization or liquidation, and/or any disclosure statement and/or plan supplement related to such plan (which plan, disclosure statement and/or plan |

supplement shall comply with the requirements of the Interim DIP Order or Final DIP Order, as applicable), (e) any confirmation order relating to any plan of reorganization or liquidation, (f) any motion and proposed form of order filed with the Court relating to the assumption, rejection, modification or amendment of any material contract, and (g) all other material filings to be filed by or on behalf of the Debtors or any of their subsidiaries or affiliates;

vi.    (a) copies of any other motions to be filed by or on behalf of any DIP Loan Party in the Chapter 11 Cases at least three (3) business days prior to such filing (or, if not practicable, as soon as reasonably practicable), (b) all notices required to be given to all parties specified in any DIP Order; and (c) such other customary information (including access to the DIP Loan Parties' books, records, personnel and advisors) as the DIP Agent and/or the Required DIP Lenders may reasonably request;

vii.    at the request of the DIP Lenders, but not more often than once per calendar week, the DIP Loan Parties shall hold a call(each, an "Update Call") to provide updates on the DIP Loan Parties' business, asset sales, store closures, licensing, franchise opportunities (collectively, the "Opportunities") and such other topics as the DIP Lenders request (so long as, for any additional topics that have not otherwise been mutually agreed between the DIP Loan Parties and the DIP Lenders, the DIP Lenders provide an agenda for such additional topics one Business Day prior to such call (or such shorter period as agreed among the DIP Loan Parties and the DIP Lenders (including by email)); and

viii.    as soon as practicable, but in no event later than the next Business Day after receipt, information regarding any objections received by the Loan Parties or their advisors from any of the Prepetition Notes Secured Parties regarding any Proposed Increase in respect of New Money Commitments or any Proposed Budget.

**Prepetition Secured Party Reporting:**

The Debtors agree to provide the Prepetition Secured Parties, including the Prepetition Notes Secured Parties (including the Control Party), with the same reporting provided to the DIP Secured Parties contemporaneously with such reporting being provided to the DIP Secured Parties and will provide the Consenting AHG Noteholders and the Control Party with the opportunity to request an Update Call or any other reasonable reporting, and advance notice of any Update Call and the opportunity to participate in such Update Calls regarding the Opportunities and such other matters as the Control Party or Required Consenting AHG Noteholders may mutually agree with the Prepetition Notes Secured Parties. In addition, the Debtors agree to provide the Consenting AHG Noteholders and the Control Party with copies of any requested amendments prior to executing any material amendments that could reasonably be expected to affect the Consenting AHG Noteholders' interests in advance of executing any such amendments (it being understood that the Consenting AHG Noteholders and the Control Party (and or their counsel) being copied or blind copied on an email notice from the Debtors shall be notice of the same).

| | |
|---|---|
| **Permitted Variances** | The DIP Facility shall contain provisions substantially consistent with the Prepetition MA Loan Credit Agreement relating to performance milestones, governance and reporting, including delivery of, and updates to, a budget which shall include a 13-week statement of receipts and disbursements for the next 13-weeks of the DIP Loan Parties and projection of the DIP Loan Parties cash flows for such period, prepared by the DIP Loan Parties in consultation with their financial advisors, broken down by week, which shall be updated no less than once every four (4) weeks for the subsequent 13-week period and include narrative descriptions where additional |

supporting evidence described the sources, uses and transactions contemplated (each as approved by the Required DIP Lenders and the Required Majority Consenting AHG Noteholders in their sole discretion, and including the sources and uses described therein, the "Proposed Budget"); provided that the DIP Loan Parties shall cooperate to address the Consenting AHG Noteholders reasonable requests for additional breakdown or detail. Upon the receipt of the consent of the Required Majority Consenting AHG Noteholders and the Required DIP Lenders with respect to such Proposed Budget (which approval shall be in the Required DIP Lenders and the Required Majority Consenting AHG Noteholders' sole discretion (and may be withheld for any reason)), such Proposed Budget shall become an "Approved Budget" (and such required consents, the "Budget Consents").  The first of these shall be delivered and approved prior to the Initial Advance and subsequently Approved Budgets shall replace the then-operative Approved Budget for all purposes.  The DIP Loan Parties shall operate in accordance with the Approved Budget and all disbursements (including further payments made as DIP Manager Advances including those amounts used for debt service, professional fees and capital expenditures) shall be consistent with the provisions of the Approved Budget (subject to Permitted Variances). The DIP Loan Parties may submit additional budgets to the DIP Lenders, Consenting AHG Noteholders, the Control Party, the Prepetition Notes Trustee, or any of the other Prepetition Noteholders, but until the DIP Loan Parties have the Budget Consents required for an Approved Budget, no Proposed Budget will be an Approved Budget and until the required Budget Consents are received, the DIP Loan Parties shall continue to comply with the then-operative Approved Budget and the DIP Lenders shall be permitted to rely on such previously Approved Budget for purposes of determining the amount of New Money Loans to advance.

**Forecast Variances**:  Commencing on the second full week following the Petition Date, no later than 5:00 p.m. ET on the Wednesday of each subsequent calendar week, the DIP Loan Parties shall deliver to the DIP Lenders, the Control Party, and the Consenting AHG Noteholders a variance report in form acceptable to the DIP Lenders in their sole discretion (each, a "Variance Report") setting forth (i) the DIP Loan Parties' aggregate cash receipts and disbursements on a line-by-line basis (including debt service, professional fees and capital expenditures) during the immediately preceding calendar week ending on Sunday; (ii) disbursements for the DIP Loan Parties' administrative expenses of the Chapter 11 Cases including professionals' fees; and (iii) the variance in dollar amounts and as a percentage of the actual aggregate cash receipts and disbursements (including debt service, professional fees and capital expenditures) for each weekly period ending on Sunday from those reflected for the corresponding period in the then-operative Approved Budget (such comparison, the "Variance").

"Permitted Variance" means a Variance from the then-current Approved Budget during any Variance Testing Period that is not more than 15.0% of each of (x) the cumulative receipts on a combined basis during the Variance Testing Period, and (y) all cumulative disbursements during the Variance Testing Period; provided, that disbursements on account of professional fees and expenses shall be tested on a line-by-line basis and subject to a Permitted Variance of not more than 15.0% from the then-current Approved Budget for each line item during any Variance Testing Period during the Variance Testing Period.

"Variance Testing Period" means, starting the second full week following the Closing Date (as defined below), (i) the one-week period ending on the first Sunday thereafter, (ii) the two-week period ending on the second Sunday thereafter, (iii) the three-week period ending on the third Sunday thereafter, (iv) the four-week period ending on the fourth Sunday thereafter and (v) each subsequent four-week period ending on each Sunday thereafter; whereby the cumulative actuals

| | |
|---|---|
| | are compared against the cumulative budget for the then-current Approved Budget plus actuals for any prior week not forecasted in the then-current Approved Budget.<br><br>The DIP Loan Parties hereby agree that during any Variance Testing Period, the Variance from the then-current Approved Budget shall not exceed the Permitted Variances. |
| **Adequate Protection** | Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Credit Agreement Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "<u>Prepetition Loan Adequate Protection</u>"):<br><br>i.    Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition MA Loan Agent, the Prepetition Term Loan Agent, the Prepetition MA Loan Lender, in its capacity as such, and the Prepetition Term Loan Lender, in its capacity as such;<br><br>ii.    To the extent of any aggregate diminution in value of the Prepetition MA Loan Secured Parties' interests in the Prepetition MA Loan Collateral from and after the Petition Date, for any reason provided for under the Bankruptcy Code ("<u>Diminution in Value</u>"), replacement liens (the "<u>Prepetition MA Loan Adequate Protection Liens</u>") on the Prepetition MA Loan Collateral and Prepetition Term Loan Collateral to secure adequate protection claims, which Prepetition MA Loan Adequate Protection Liens will be subject to the lien priority set forth in the "DIP Collateral; Priority" section above;<br><br>iii.    To the extent of any aggregate Diminution in Value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Term Loan Collateral, adequate protection liens (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with Prepetition MA Loan Adequate Protection Liens, "<u>Prepetition Loan Adequate Protection Liens</u>") on all DIP Collateral to secure the Prepetition Loan 507(b) Claims (as defined below), which Prepetition Term Loan Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in <u>Annex IV</u>, and (c) senior to any and all other all other liens on and security interests in the DIP Collateral;<br><br>iv.    To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "<u>Prepetition Loan 507(b) Claims</u>"), which Prepetition Loan 507(b) Claims will be (a) subject and subordinate to the Carve-Out, and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in <u>Annex IV</u>, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever;<br><br>v.    Upon entry of the Final DIP Order, the consummation of the Roll Up; and<br><br>vi.    Delivery of all reports and notices provided for in the DIP Documents and the DIP |

Orders, in each case when and as required thereunder.

Subject to and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Notes Secured Parties will receive as adequate protection under the DIP Orders (the following, collectively, the "Prepetition Notes Adequate Protection," and together with the Prepetition Loan Adequate Protection, the "Adequate Protection"):

i.   Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Prepetition Notes Trustee, in its capacity as such, the Control Party in its capacity as such, and the ad hoc group of consenting Prepetition Noteholders (the "Ad Hoc Group"), in its capacity as such;

ii.   To the extent of any Diminution in Value of the Prepetition Notes Secured Parties' interests in the Prepetition Notes Collateral, adequate protection liens (the "Prepetition Notes Adequate Protection Liens") on all DIP Collateral to secure the Prepetition Notes 507(b) Claims (as defined below), which Prepetition Notes Adequate Protection Liens will be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other all other liens on and security interests in the DIP Collateral;

iii.   To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the DIP Loan Parties' assets and property, and proceeds and products thereof (the "Prepetition Notes 507(b) Claims"), which Prepetition Notes 507(b) Claims shall be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in Annex IV, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising of any kind or nature whatsoever; and

iv.   Delivery of all reports and notices provided for in the DIP Documents and the DIP Orders, in each case when and as required thereunder.

The foregoing adequate protection liens (the "Adequate Protection Liens") shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP Agent, the Prepetition  MA Loan Agent, the Prepetition Term Loan Agent or the Prepetition Notes Trustee determine (at the direction of the requisite creditors) to file any financing statements, notice of liens or similar instruments (in each consistent with the DIP Orders), the DIP Loan Parties will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings.

The Interim DIP Order and Final DIP Order (as applicable) shall provide for the payment of all professional fees and expenses payable as Adequate Protection (a) in the case of fees invoiced prior to the entry of the Interim DIP Order, within seven (7) days after entry of the Interim DIP Order and (b) in the case of professional fees and expenses invoiced thereafter, within three (3) days after the expiration of the ten (10) day review period applicable to such fees and expenses under the DIP Orders.

| | |
|---|---|
| **DIP Orders** | The DIP Orders shall, among other things, (i) upon entry of the Interim DIP Order, provide that in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, (ii) upon entry of the Final DIP Order, approve the DIP Loan Parties' and the Prepetition Secured Parties' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (iii) contain stipulations by the DIP Loan Parties ratifying the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition Credit Agreements (including the amount and validity of the Manager Advances) but shall reserve on the matters described in "Reservation of Rights," below, solely as set forth therein, (iv) contain findings by the Court that the negotiation, extension and execution of the RSA and the DIP Loans do not violate the terms of Section 14.13 of the Prepetition Base Indenture or any similar non-petition or non-disturbance agreement entered into by the Prepetition Secured Parties, and (v) otherwise be in form and substance satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders. |
| **Closing Date** | The closing date of the DIP Facility (the "<u>Closing Date</u>") shall occur within two (2) business days of the Interim DIP Order being granted and shall be the first business day on which the conditions precedent set forth in definitive documentation governing the DIP Facility have been satisfied or waived by the DIP Lenders. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate and fees under the DIP Facility and for Manager Advances are set forth in <u>Annex I</u> hereto.<br><br>Interest shall accrue on the principal balance of the DIP Loans, from time to time, based on a 360-day year and charged for the actual number of days outstanding.  DIP Borrowers shall pay interest, default interest and any fees monthly in cash and in kind (as applicable) in arrears on the last business day of each calendar month and on the Termination Date. |
| **Voluntary Prepayments** | The DIP Facility may be voluntarily prepaid, and the commitments thereunder voluntarily reduced by the DIP Borrowers, in whole or in part, without premium or penalty, at any time upon three (3) business days' prior written notice to the DIP Lenders (subject to actual breakage costs (if any)), which notice shall specify the principal amount of such prepayment and the date on which such prepayment is to be made. |
| **Mandatory Prepayments & Manager Advance Reimbursement** | (a)    **Mandatory Prepayment**s: Unless the Required DIP Lenders consent to waive such prepayment, mandatory prepayments of the DIP Loans shall be required in connection with a Change of Control (as defined below), Asset Disposition (other than (x) inventory in the ordinary course of business or (y) in accordance with the Sale Transactions (as defined in the RSA)), Extraordinary Receipts (as defined below), and the incurrence of Indebtedness (as defined in the DIP Credit Agreement) (other than Indebtedness otherwise permitted under the DIP Documents). Any mandatory payment resulting from Extraordinary Receipts or Asset Dispositions at any Securitization Entity will be applied in accordance with the Priority of Payments Waterfall in the Prepetition Base Indenture, including the repayment of any DIP Manager Advances if such payment is then used by the Debtors to permanently repay the outstanding principal amount of DIP Loans. The terms used above, shall have the following definitions:<br><br>"<u>Change of Control</u>" means the occurrence of any of the following (i) the sale, lease, transfer, or other Disposition, directly or indirectly, in one transaction or a series of related transactions, of all or substantially all of the assets of the DIP Loan Parties to any Person other than the Parent or a wholly-owned subsidiary of the Parent; (ii) the Parent |

ceasing to own, directly or indirectly, 100% of the total economic and voting power of the issued and outstanding Capital Stock of any other DIP Loan Party; (iii) the termination of HOA in its capacity as Manager under the Management Agreement; (iv) the Ultimate Parent ceasing to own directly or indirectly, at least 51% of the total voting and economic power of the issued and outstanding Voting Stock of the Parent; (v) the adoption of a plan by the stockholders of Securitization Entities relating to the liquidation or dissolution of Securitization Entities or a Manager Termination Event (as defined in the Management Agreement); or (vi) a "change of control" or any comparable term under, and as defined in, any agreement governing any Indebtedness of any DIP Loan Party or any of their subsidiaries in an aggregate principal amount exceeding $5,000,000. For the avoidance of doubt, no Change of Control shall be deemed to have occurred solely by virtue of the consummation of the Sale Transactions in the manner described in the RSA and the Approved Plan.

"Extraordinary Receipts" means any cash or Cash Equivalents or other proceeds received by or paid to or for the account of any Person other than in the ordinary course of business in respect of tax refunds, pension plan reversions, proceeds of insurance, indemnity payments and purchase price adjustments received in connection with any purchase agreement (or other similar agreement) and payments in respect of judgments or settlements of claims, litigation or proceedings, any settlement of or payment in respect of any property, casualty insurance claim or condemnation proceeding relating to any asset of any DIP Loan Party or any of their subsidiaries; *provided* that for purposes of the DIP Credit Agreement provisions governing mandatory prepayments from proceeds of such Extraordinary Receipts, Extraordinary Receipts shall not include insurance proceeds that are anticipated to be received; *provided*, that no default then exists and all such amounts are applied as a Manager Advance to repay invoices and out-of-pocket expenses Incurred to repair the fire damage and reopen at that certain restaurant owned by the DIP Loan Parties located at 2201 N Lamar Street, Dallas, Texas 75201.

(b) <u>Manager Advance Reimbursement Offer</u>. Promptly, and in any event within two (2) business days following each date on which HOA has received a reimbursement of a DIP Manager Advance, the DIP Borrowers shall make an offer to prepay the DIP Loans by providing written notice to the DIP Lenders that includes, among other things, an acknowledgement that the DIP Lenders may elect to accept or reject such offer for prepayment in their sole discretion. If the DIP Lenders elect to accept such offer for prepayment, the Borrowers shall prepay the DIP Loans in the amount of such reimbursement, together with accrued and unpaid interest and other DIP Obligations on the amount so prepaid, payable in connection with such prepayment.

All voluntary or mandatory prepayments of the DIP Loans (including through the acceptance of any mandatory prepayment offer) shall be applied to prepay the DIP Loans and any DIP Manager Advances until all such DIP Loans and DIP Manager Advances are repaid in full. Any DIP Lender may decline to accept all (but not less than all) of its share of any such prepayment by providing written notice to the Lender Representative (as defined in the DIP Credit Agreement) within one (1) Business Day prior to the proposed date of such prepayment and any such declined amount shall also remain for purposes of calculating the then outstanding DIP Manager Advances, a corresponding amount of outstanding Manager Advances that may continue to be applied by the Debtors in accordance with the then Approved Budget.

| | |
|---|---|
| **Conditions Precedent to Initial Advance** | The closing of the DIP Facility, each Advance and the DIP Loan Parties' right to use Cash Collateral pursuant to the terms hereof, will be subject to customary closing conditions, including, without limitation, the satisfaction of the applicable conditions precedent listed on <u>Annex II.A</u> attached hereto, and such other conditions as set forth herein.<br><br>Modifications of the Interim DIP Order shall require approval of the Required DIP Lenders in their sole discretion. |
| **Conditions Precedent to All Advances** | The obligation of each DIP Lender to make any Advance, including the availability of any Delayed Draw Term Loans and any further availability of the balance of the DIP Facility, will be subject to the satisfaction of each of the applicable conditions precedent listed on <u>Annex II.B</u> attached hereto, on and as of the date of each such Advance.<br><br>Modifications of the DIP Orders shall require approval of (i) the Required DIP Lenders and (ii) the Required Majority Consenting AHG Noteholders or the Required Consenting AHG Noteholders (as more specifically set forth in this Term Sheet or in the Interim DIP Order), each in their respective discretion (and of the Control Party with respect to any provisions that could reasonably be expected to affect the Control Party). |
| **Covenants** | Substantially similar to such covenants as set forth in the Prepetition Credit Documents and Manager Advance Acknowledgement, as modified to reflect the nature of the cases, this financing, and including certain additional covenants appropriate for a debtor-in-possession financing facility (including, without limitation, certain milestones and provisions regarding DIP Manager Advances, direction and application of proceeds (as set forth below), any sale process and continued retention of the Financial Advisor.<br><br><u>Milestones</u>.  The DIP Loan Parties shall comply with the following deadlines (the "<u>Chapter 11 Milestones</u>"); *provided*, *however*, that such Chapter 11 Milestones may be extended from time to time with the prior written consent of the Required DIP Lenders (with email being sufficient):[5]<br><br>(a)  The Debtors shall commence the Chapter 11 Cases no later than March 31, 2025;<br><br>(b)  No later than the Petition Date, the DIP Motion shall have been filed;<br><br>(c)  No later than two (2) business days after the Petition Date, the Interim DIP Order shall have been entered;<br><br>(d)  No later than ten (10) days after the Petition Date, the prearranged chapter 11 plan approving, among other things, the Buyer Group Arrangement (as defined in the RSA) in form and substance acceptable to the Required DIP Lenders (the "<u>Approved Plan</u>") and the disclosure statement in form and substance acceptable to the Required DIP Lenders(the "<u>Disclosure Statement</u>") shall have been filed;<br><br>(e)  No later than twenty-eight (28) days after the Petition Date, the Loan Parties and Buyer Group shall have entered into the Buyer Group Arrangement (as defined in the RSA) and any other Sale Documents (as defined in the RSA) necessary to effectuate the Buyer Group Arrangement;<br><br>(f)  No later than thirty-five (35) calendar days after the Petition Date, the Final DIP Order shall have been entered;<br><br>(g)  No later than forty (40) days after the Petition Date, the Bankruptcy Court shall hold a |

---

[5] The consent rights for the Required Consenting AHG Noteholders with respect to the Chapter 11 Milestones are as set forth in the Restructuring Term Sheet.  Nothing herein is intended to, or does, alter such consent rights. ]

hearing to consider conditional approval of the adequacy of the Disclosure Statement;

(h) No later than forty (40) calendar days after the Petition Date, the Debtors shall commence solicitation of votes on the Approved Plan;

(i) No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider final approval of the Disclosure Statement and confirmation of a chapter 11 plan, including approval of the Approved Plan; and

(j) No later than eighty (80) calendar days following the Petition Date (the "Outside Date"), the Plan Effective Date (as defined in the RSA) shall have occurred, provided, however, that the Outside Date may be automatically extended (without need for further action by any party) by up to an additional fifteen (15) calendar days with the written consent of the Required DIP Lenders; provided, further that any additional extension of the Outside Date requires the written consent of the DIP Lenders.

Manager's Application of Proceeds.  Manager shall apply any proceeds received from the Securitization Entities or from an event that triggers a Mandatory Repayment, in accordance with the Priority of Payments Waterfall, which application if used to permanently repay the outstanding DIP Loans shall also correspondingly reduce the then outstanding DIP Manager Advances by an equal amount.  Manager may only waive its right to receive a reimbursement for any Manager Advances pursuant to the Priority of Payments Waterfall with the prior written consent of the Required DIP Lenders and the Required Consenting AHG Noteholders (it being understood that, with respect to the Required Consenting AHG Noteholders, continuing to use such proceeds in accordance with the then Approved Budget shall not require a further consent from the Required Consenting AHG Noteholders).

Authorization to File Financing Statements. Subject to customary further assurances on DIP Collateral and perfection of such DIP Collateral, the DIP Agent, on behalf of the DIP Secured Parties, is authorized (but not obligated) to file financing statements, without notice to the DIP Loan Parties, with all appropriate jurisdictions to perfect or protect DIP Agent's and DIP Lenders' interest or rights hereunder. Such financing statements may indicate the DIP Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in DIP Agent's discretion (at the direction of the Required DIP Lenders).

| | |
|---|---|
| **Representations and Warranties** | Substantially similar to the representations and warranties set forth in the Prepetition Credit Documents and in the Manager Advance Acknowledgement, as modified to reflect the Chapter 11 Cases, the nature of this financing, and including certain additional representations and warranties appropriate for a debtor-in-possession financing facility, the cases, the Manager Advances, the proposed sale transaction and taking into account the DIP Loan Parties' present affairs. |
| **Carve-Out** | The DIP Orders shall include customary carve-out provisions that shall be subject to approval by the DIP Lenders in their sole consent (the "Carve-Out"). |
| **Events of Default** | Substantially similar to such events of default as set forth in the Prepetition Credit Documents, as modified to reflect the nature of this financing, and including certain additional events of default appropriate for a debtor-in-possession financing facility and taking into account the DIP Loan Parties' present affairs.<br><br>The events of default ("Events of Default") in the DIP Credit Agreement shall include, without limitation, the following: |

|  | a. | **Breach of Representation**. The inaccuracy in any material respect of any representation or warranty of any DIP Loan Party on the date when made or deemed to have been made; |
|  | b. | **Nonpayment**. The failure of any DIP Loan Party to pay when due (i) any interest on any DIP Loan or any fee or premium payable under the DIP Credit Agreement or any other DIP Document, and such failure continues for a period of five (5) Business Days or (ii) all or a portion of the principal of the DIP Loans. |
|  | c. | **Noncompliance**. The failure of any DIP Loan Party (a) to comply with the Variance Covenant, (b) to satisfy any Milestone, (c) to have an Approved Budget; or (d) to comply with any negative covenant or affirmative covenants or agreements in this DIP Term Sheet, the DIP Facility Documentation or with any other covenant or agreement contained in the Financing Orders in any respect; |
|  | d. | **Bankruptcy Event of Default**. The occurrence of any of the events or circumstances in the Chapter 11 Cases as specified in Annex III. |
|  | e. | **Effectiveness**. Any DIP Document ceases to be in full force and effect or any DIP Loan Party asserts that its obligations under the DIP Facility, including the Guarantee or any other DIP Document is invalid, unenforceable or impaired; |

"Default" shall mean any event, act or condition set forth in this section which, with notice or lapse of time, in each case, as set forth above, would (without cure or waiver) constitute an Event of Default under the DIP Facility.

| **Remedies** | The DIP Facility will provide upon the occurrence of an Event of Default, then, and in every such event, and at any time thereafter during the continuance of such event, upon written notice by the DIP Agent (acting upon the instructions of the Required DIP Lenders) to the DIP Loan Parties, to the Prepetition Secured Note Parties, any statutory committee appointed in the Chapter 11 Cases and the U.S. Trustee (with a copy filed with the Bankruptcy Court) and an opportunity for a hearing (*provided*, that the only issue that may be raised by any party in opposition to the actions proposed or available to be taken shall be whether, in fact, an Event of Default has occurred and is continuing), the DIP Agent (acting at the direction of the DIP Lenders) may take the following actions (which shall not be exclusive): |
|---|---|

|  | (a) | (i) declare all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) terminate, reduce or restrict any unfunded commitments on account of the New Money Loans to the extent any such commitments remain outstanding (other than as required to fund the Carve-Out), and (iii) terminate any DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations; |
|  | (b) | terminate, reduce or restrict the DIP Loan Parties' ability to use any Cash Collateral (subject to the Carve-Out to fund the wind down of the DIP Loan Parties in accordance with the Approved Budget and other than Cash Collateral for payroll and other expenses critically necessary to preserve the value of the business of the DIP Loan Parties); |
|  | (c) | sell or deliver any DIP Collateral or other asset at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the DIP Agent deems advisable (at the direction of the Required DIP Lenders), in its sole discretion and at the direction |

|  | of the DIP Lenders; |
|---|---|
|  | (d) the DIP Lenders may direct all DIP Loan Parties to repay the DIP Manager Advances on terms and conditions acceptable to the Required DIP Lenders pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules; |
|  | (e) declare that the application of the Carve-Out has occurred by causing the occurrence of the Trigger Date (as defined in the DIP Orders); |
|  | (f) charge the Default Rate (as defined below) under the DIP Facility; and |
|  | (g) exercise all other rights and remedies available to the DIP Lenders under the DIP Documents, the DIP Orders, under applicable law, or in equity. |
| **Maturity/ Termination Date** | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earliest to occur (the "Termination Date") of (i) eighty-five (85) days after the Petition Date (the "Scheduled Maturity Date"), (ii) the effective date of a Chapter 11 Plan, (iii) thirty-five (35) days after the Petition Date unless on or before such day the Final DIP Order has been entered by the Bankruptcy Court, ((iv) the date of termination of the Commitments under the DIP Facility and the acceleration of the Loans pursuant to an Event of Default and in accordance with the terms of the DIP Documents; and (v) the date of repayment in cash in full by the DIP Loan Parties of all DIP Obligations and termination of the Commitments in accordance with the terms of the DIP Facility; *provided* that if any such day described above is not a Business Day, the Termination Date shall be the Business Day immediately preceding such day.

On the Termination Date, the DIP Borrowers shall either (a) repay in cash to the DIP Agent for the ratable account of each DIP Lender, the aggregate principal amount of such DIP Lender's DIP Loans outstanding on such date, together with all other DIP Obligations or (b) subject to the prior written consent of the DIP Lenders in their sole discretion, convert the DIP Facility into new Class A Notes (as defined in the RSA) and Class B-1 Notes (as defined in the RSA) in accordance with terms and conditions pursuant to the RSA in connection with an Approved Plan and otherwise satisfactory to the Required DIP Lenders in their sole discretion and subject to documents acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion (such conversion, a "Conversion").

Any confirmation order entered in the Chapter 11 Cases ("Confirmation Order") shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Agent and the DIP Lenders under the DIP Facility, other than after  (A) the payment in full and in cash to the DIP Agent and the DIP Lenders of all obligations under the DIP Facility on or before the effective date of such Chapter 11 Plan or (B) a Conversion). |
| **Required         DIP Lenders** | DIP Lenders having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time, date or, if no Loan is outstanding, one or more Lenders having or holding an aggregate principal amount of the Commitment as of such date representing more than 50% of the total Commitments hereunder as of such date (the "Required DIP Lenders"). |
| **Credit Bidding** | The DIP Agent, upon the instruction of the Required DIP Lenders, shall have the right to credit bid up to the full amount of the outstanding DIP Obligations.  The Prepetition Term Loan Agent, |

|  | upon the instruction of the Prepetition Term Loan Lender, and the Prepetition MA Loan Agent, upon the Prepetition MA Loan Lender, shall have the right to credit bid up to the full amount of their Prepetition Obligations. The Prepetition Notes Trustee, upon instruction from the Prepetition Noteholders as set forth in the Prepetition Notes Documents, shall have the right to credit bid up to the full amount of their Prepetition Obligations. |
|---|---|
| **Section 506(c) Waiver** | The Final DIP Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Required DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Required DIP Lenders. |
| **No Marshaling** | The Final DIP Order shall include a ruling that the DIP Agent, the DIP Lenders, and each of the Prepetition Secured Parties may exercise all remedies available under the DIP Documents and Prepetition Financing Documents, in a manner consistent with the DIP Orders, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy.  The Final DIP Order shall include a ruling that in no event shall any of the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility or the Prepetition Financing Documents. |
| **Section 552(b)** | The Final DIP Order shall include a ruling that the DIP Secured Parties and the Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. |
|  | Furthermore, the Final DIP Order shall include a ruling that the DIP Loan Parties and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties on any property acquired by any of the DIP Loan Parties or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties upon the collateral securing the DIP Facility or the Prepetition Financing Agreements, as applicable. |
| **Application of Funds** | The DIP Documents will provide in connection with a voluntary or mandatory prepayment or after the exercise of remedies provided for in the DIP Documents (or after the DIP Obligations have automatically become immediately due and payable), any amounts received on account of the DIP Obligations shall be applied in the following order:<br><br>(a) *First*, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to (i) the DIP Agent and then (ii) the DIP Lenders in their respective capacities as such; |

<table>
<tr><td></td><td>(b) <em>Second</em>, to the DIP Loans, ratably among the Lenders entitled thereto in accordance with the amounts of principal, interest and premium, if any, due to such Lenders until paid in full in cash;<br><br>(c) <em>Third</em>, to the payment of all other DIP Obligations of the DIP Lenders that are due and payable to the DIP Agent and the other DIP Lenders on such date; and<br><br>(d) <em>Last,</em> the balance, if any, after all of the DIP Obligations have been paid in full, to the DIP Borrowers or as otherwise required by applicable law.</td></tr>
<tr><td><strong>Amendments</strong></td><td>No amendment or waiver of any provision of this DIP Term Sheet or the DIP Facility, and no consent to any departure by the DIP Borrowers or any DIP Lender therefrom, shall be effective unless in writing and agreed to by (i) the Required DIP Lenders, (ii) the DIP Borrowers, and (iii) with respect to this DIP Term Sheet and matters relating to the DIP Facility requiring that the Debtors receive consent of the Required Consenting AGH Noteholders, (a) the Required Consenting AHG Noteholders and (b) and of the Control Party (solely with respect to any provisions that could reasonably be expected to affect the Control Party). Such amendment or waiver may be in the form of an email or other written communication and may come from primary counsel to the DIP Lenders or the DIP Borrowers, as applicable, and shall be acknowledged by the DIP Agent (at the direction of the Required DIP Lenders). Each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, <em>provided</em> that the DIP Documents shall provide that without the consent of each DIP Lender no such amendment, waiver or consent shall:<br><br>(a) Extend, increase or reinstate the DIP Loan Commitment of any DIP Lender, without the written consent of each DIP Lender directly and adversely affected thereby;<br><br>(b) postpone any date scheduled for any payment of principal or interest with respect to any DIP Loan (other than any interest at the Default Rate) or with respect to any fee or premium payable pursuant to Annex I without the written consent of each DIP Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment, any condition precedent or any Event of Default (other than a nonpayment Event of Default) shall not constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of interest or any payment of fees;<br><br>(c) extend the Scheduled Maturity Date of any DIP Loan without the written consent of the DIP Lenders;<br><br>(d) amend, modify or waive any provision of the Application of Payments (as defined in the DIP Credit Agreement) or the definition of any term defined in the DIP Credit Agreement (including those terms defined by reference to another agreement, instrument or other source);<br><br>(e) reduce the principal of, or the rate of interest specified herein on, any DIP Loan or any fees or other amounts payable hereunder or under any related documents without the written consent of each DIP Lender directly and adversely affected thereby; change this provision on amendments or the definition of "Required DIP Lenders" or any other provision specifying the number of DIP Lenders required to take any action under the</td></tr>
</table>

|  | DIP Facility without the written consent of each DIP Lender directly and adversely affected thereby; |
|---|---|
|  | (f) amend, modify or waive any provision of this DIP Term Sheet affecting the rights, duties or obligations of the DIP Agent without the prior written consent of the DIP Agent; |
|  | (g) release or subordinate the DIP Liens of the DIP Agent in all or substantially all of the DIP Collateral without the written consent of one or more DIP Lenders having or holding an aggregate principal amount of Loans outstanding that represents at least 75% of the DIP Loans; or |
|  | (h) consent to the assignment or transfer by any DIP Loan Party of any of its rights and obligations under any DIP Document without the written consent of one or more Lenders having or holding an aggregate principal amount of Loans outstanding that represents at least 75% of the of the DIP Loans. |
| **Guarantee** | All DIP Obligations will be unconditionally guaranteed, jointly and severally, on a first priority secured basis (the "<u>Guarantee</u>") by each of the DIP Loan Parties, if any, other than the DIP Borrowers. |
| **Reimbursement; Indemnity** | The DIP Facility will provide for customary indemnification and reimbursement provisions for facilities of this kind, in addition, the Interim DIP Order shall approve such indemnity and reimbursement provisions and provide that Debtors shall pay all costs or expenses (including attorney's fees and expenses) incurred by the DIP Agent, the DIP Lenders, the Control Party, the Prepetition Notes Trustee and the Consenting Noteholders (including reasonable and documented out-of-pocket fees and disbursements of outside counsel), in each case incurred, the DIP Lenders and Prepetition Secured Parties in connection with the preparation, negotiation, administration, of the DIP Documents, any Default or Events of Default, workout, restructuring or negotiations with respect to the DIP Documents or DIP Loans, any legal proceedings, court approval and enforcement of the DIP Documents or the DIP Orders and the Chapter 11 Cases and the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any successor cases by the DIP Agent, any DIP Lender, the Control Party, the Prepetition Notes Trustee and any Consenting Noteholder, or any workout, restructuring or negotiations in connection therewith or in respect of such DIP Loans (including, without limitation, the legal fees and expenses of (i) Sidley Austin LLP, counsel for the DIP Lenders, (ii) Shipman & Goodwin LLP, counsel to the DIP Agent, (iii) White & Case LLP, counsel for the Consenting AHG Noteholders, (iv) Seward & Kissel LLP, counsel for the Control Party, (v) Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C, counsel for the Prepetition Notes Trustee, (vi) one local counsel in each applicable jurisdiction for the Lenders as a group and a separate local counsel in each applicable jurisdiction for the DIP Agent, (vii) one of each of any specialty/regulatory/tax counsel as reasonably required by the DIP Agent or the DIP Lenders, (viii) one local counsel for each of the Control Party, the Prepetition Notes Trustee, and the Consenting AHG Noteholders (taken as a whole) in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions, in each case, in relevant jurisdictions material to the interests of the DIP Lenders) and (ix) in the event of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction for each DIP Lender, group of similarly affected DIP Lenders (taken as a whole), or group of similarly affected) subject to such conflict); (vii) the Consenting AHG Noteholders (taken as a whole) subject to such conflict)..<br><br>The Interim DIP Order will provide that the Debtors shall defend, protect, indemnify, pay and hold harmless the DIP Agent, each DIP Lender, the Control Party, the Prepetition Notes Trustee, |

| | |
|---|---|
| | each Consenting Noteholder, and each of their respective officers, directors, affiliates, attorneys, employees and agents (each an "<u>Indemnified Party</u>") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and disbursements of any kind or nature whatsoever, including, but not limited to, reasonable and documented out-of-pocket fees and disbursements of one counsel for the DIP Agent's Indemnified Parties and one counsel for the DIP Lenders' Indemnified Parties (taken as a whole) (and, in the event of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction for each Indemnified Party or group of similarly affected Indemnified Parties (taken as a whole) subject to such conflict) arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this DIP Term Sheet, any documents or instruments relating thereto, and/or the transactions contemplated hereby or thereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, preparation, execution, delivery, administration or enforcement of the DIP Term Sheet, any documents or instruments relating thereto, and/or the transactions contemplated hereby, (iii) DIP Borrowers failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this DIP Term Sheet, (iv) the enforcement of any of the rights and remedies of the DIP Agent, any DIP Lender, or any of the Control Party, the Prepetition Notes Trustee, Consenting AHG Noteholder under this DIP Term Sheet and any documents or instruments relating thereto, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any anti-terrorism law by the DIP Borrowers, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any governmental body or instrumentality or any other person with respect to any transaction contemplated by, or referred to in, or any matter related to, this DIP Term Sheet, any documents or instruments relating thereto, whether or not the DIP Agent, any DIP Lender, the Control Party, the Prepetition Notes Trustee, or any Consenting Noteholder is a party thereto; except to the extent any portion of such claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and disbursements are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Governing Law and Jurisdiction** | The DIP Loan Parties submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury.  New York law shall govern this DIP Term Sheet and the DIP Facility (without regard to the principles of conflicts of laws thereof that would mandate the application of the laws of any other jurisdiction). |
| **Release** | Each DIP Loan Party, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lender, the Prepetition MA Loan Agent, the Prepetition MA Loan Lender, the Control Party, the Prepetition Notes Trustee and the Prepetition Noteholders, each in its capacity as such, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, financial advisors, investment bankers, agents, representatives, successors and assigns (collectively, the "<u>Released Parties</u>") from any and all claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which the DIP Loan Party may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to this DIP Term |

| | |
|---|---|
| | Sheet, the DIP Facility, the DIP Documents or any document or instrument relating thereto, the Prepetition MA Loan Credit Agreement, the Prepetition MA Loan Documents, or any document or instrument relating thereto, the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Documents, or any document or instrument relating thereto, or the Prepetition Notes Documents or any document or instrument relating thereto (collectively, the "Released Matters"); *provided*, that Released Matters shall not include any claims (including any indemnification claims), causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order. Each DIP Loan Party represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) that the foregoing constitutes a full and complete release of all such claims. Notwithstanding anything herein to the contrary, none of the Debtors shall release each other or any of the Released Parties with respect to any claims or counterclaims and or other rights described or contemplated by the reserved matters in the "Reservation of Rights" below. |
| **Tax** | The DIP Facility will (i) be structured in a tax-efficient manner in consultation with and with the prior express consent of the DIP Lenders and (ii) include customary provisions reasonably acceptable to the DIP Lenders to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever. |
| **Structure Flex** | The DIP Lenders retain the right to modify the terms, conditions, pricing and/or structure of the DIP Facility and the other transactions and documents described herein and to make structuring changes in relation to the transactions (a) for tax reasons or (b) in response to reasonable comments from independent directors of the Securitization Entities with the consent of the Required Consenting AHG Noteholders. |
| **Reservation of Rights** | Notwithstanding anything to the contrary herein, the Parties agree and acknowledge that (i) the full amount of the Incremental Loan was funded and the Consenting AHG Noteholders have consented to (a) its treatment as a Manager Advance and (b) the Manager's right to reimbursement thereof (plus interest) in accordance with the Priority of Payments Waterfall, and (ii) the Consenting AHG Noteholders have agreed, solely upon consummation of an Approved Plan, that (a) an amount of $18,000,000 shall be recognized as prepetition Manager Advances and treated under the Approved Plan as Manager Advance Term Loan Claims which shall be converted to new Class A-2II Notes on the terms set forth in the RSA and with the payment priority set forth in the Waterfall (as defined in the Restructuring Term Sheet), and (b) any remaining claimed prepetition Manager Advance Term Loan Claims relating to remaining claimed prepetition Manager Advances shall be recognized as valid and shall be converted to equity in RoyaltyCo, LLC as set forth herein and in the RSA. Except as specified in the foregoing clauses (i) and (ii), the Prepetition Secured Note Parties preserve all rights, claims (including indemnification claims), arguments, and objections to dispute the validity and amount of any claimed prepetition Manager Advances, or the characterization of any claimed Manager Advances as prepetition Manager Advances (collectively, the "Prepetition Secured Note Parties Reserved Matters"), and neither the Debtors' stipulation to the Manager Advances (as set forth in this DIP Term Sheet and in the Interim DIP Order) nor the fact that the Consenting AHG Noteholders have made the agreements reflected in clauses (i) and (ii) above shall operate as a waiver of any rights, claims (including indemnification claims), arguments, or objections or an admission in respect of a claimed prepetition Manager Advance, nor alters or affects the Consenting AHG Noteholders' reservation of rights as set forth herein. The Debtors, including |

|  | the Manager in its capacity as Manager, each Prepetition Credit Secured Party and each DIP Secured Party preserve all rights, claims and counterclaims (including indemnification claims or counterclaims), arguments, and objections with respect to the Prepetition Secured Note Parties Reserved Matters.  Any claims that may result from the Consenting AHG Noteholders' pursuit of, or success on, the Prepetition Secured Note Parties' Reserved Matters do not become DIP Obligations; *provided*, *however*, that nothing herein alters any prepetition indemnification rights that may otherwise exist. |
|---|---|
| **AHG Noteholder Consent Matters** | The Debtors and DIP Lenders have agreed to provide consultation, consent (not to be unreasonably conditioned, withheld or delayed), and information rights to the Prepetition Noteholders constituting at least the Required Consenting AHG Noteholders (or, as specifically provided below, the Required Majority Consenting AHG Noteholders) including the following matters which will be included in the Interim DIP Order:<br><br>    (a) consent to the form and substance of (i) modifications of the Interim DIP Order and Final DIP Order; (ii) the Approved Plan and (iii) the Disclosure Statement;<br><br>    (b) (i) consultation in respect of the extension of the Outside Date by up to an additional fifteen (15) calendar days and (ii) consent in respect of any additional extension of the Outside Date;<br><br>    (c) consent to (i) increases to the amount of cash pay interest or fees charged on the DIP Loans by the DIP Lenders (other than capitalization of interest and application of the default rate as provided for in the DIP Documents); (ii) waive any provision of this DIP Term Sheet expressly requiring the Required Consenting AHG Noteholders consent (including this section titled "AHG Noteholder Consent Matters" and the "Reservation of Rights" section); and (iii) in response to reasonable comments from independent directors of the Securitization Entities to the matters described in clause (b) of the "Structure Flex" section, above;<br><br>    (d) the Required Majority Consenting AHG Noteholders' consent to (i) increases to the then applicable New Money Cap; and (ii) any Proposed Budget becoming an Approved Budget; and<br><br>    (e) to provide:<br><br>        i.   notice of any Accordion Increase Request;<br><br>        ii.   the reporting and information described in "Reporting and Information" above; and<br><br>        iii.   copies of (a) any material amendments requested by the Debtors to the DIP Facility (to the extent reasonably practicable, such notices shall be provided in advance of such amendments becoming effective if they relate to matters that are described or that are of the type that would require more than a "Required Lender" consent under the  DIP Facility) and (b) of the deliveries provided to the DIP Lenders described in <u>Annex II</u> and <u>Annex III</u>.<br><br>Such AHG Noteholder consent and consultation rights shall be set forth in the DIP Orders and shall be enforceable against the DIP Loan Parties.  The AHG Noteholders may request additional information about material amendments from the Debtors.  All parties' rights are reserved to seek Bankruptcy Court approval of any matter that requires such Required Majority Consenting AHG Noteholder consent in lieu of obtaining such consent. |

|  | With respect to the matters described in subsection (d), above, requiring the consent of the Required Majority Consenting AHG Noteholders, counsels to the Ad Hoc Group and the Control Party shall set up a consent process reasonably acceptable to the Ad Hoc Group, the Debtors, the Required DIP Lenders, and the Control Party, as the context may require, for obtaining such notices and acceptances in a timely manner. It being understood that if a specific item requires the consent of the Required Majority Consenting AHG Noteholders in addition to receiving affirmative consents as to such matters from the Required Majority Consenting AHG Noteholders, the Debtors (and correspondingly the DIP Collateral Agent, DIP Secured Parties and the Control Party, as the context may require) may rely on having received no objection in writing by the third (3rd) Business Day after such notice or request is provided to the Consenting AHG Noteholders.  It being understood that a failure to object in writing to such proposed increase by the third Business Day thereafter will be deemed to be an acceptance as to the consents so specified and evidence of such consent having been obtained by the Required Majority Consenting AHG Noteholders. |
|---|---|
| **Assignments; Participation** | To be consistent with Prepetition MA Loan Credit Agreement. |
| **Fiduciary; Agency** | It is understood and agreed that the DIP Lender will act under this DIP Term Sheet and the transaction contemplated hereby as an independent contractor and nothing herein, the transaction contemplated hereby or otherwise, shall be deemed to create a fiduciary duty or fiduciary or agency relationship between any Debtor, any direct or indirect equity owners of the Debtors or any of their subsidiaries or affiliates or any of their respective affiliates, subsidiaries, investors, employees or creditors ("Borrower Related Persons"), on the one hand, and the DIP Lender or any of its subsidiaries or affiliates or any of their respective affiliates, investors, employees or creditors, on the other. The Debtors agree on their own behalf and on behalf of the Borrower Related Persons that they shall not make, and hereby waives, any claim based on an assertion of such a fiduciary duty or agency relationship. Nothing in this DIP Term Sheet is intended to confer upon any other person (including affiliates, stockholders, employees or creditors of the DIP Borrowers or other Borrower Related Person) any rights or remedies hereunder or by reason hereof. |

**Annex I**

**Interest, Premiums, Fees, Etc.**

**Interest:**                     To be paid in cash on a monthly basis in arrears.

Interest Rate: Prime + 3.00%; after a default, the applicable rate shall increase by 2.00% *per annum* above the otherwise applicable rate (the "Default Rate").

**Agency Fees**:                 As agreed with the DIP Agent.

<u>**Annex II**</u>

**Summary of Conditions Precedent to the DIP Facility**

This Summary of Conditions Precedent to the DIP Facility outlines certain of the conditions precedent to the DIP Facility referred to in the Senior Secured Superpriority Debtor-in-Possession Term Loan Facility Term Sheet (the "<u>DIP Term Sheet</u>"):

**A.  <u>Conditions Precedent to Initial Advance</u>**

i.    satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Chapter 11 Cases and the receipt of all required court approvals of the DIP Facility;

ii.   the Lender Representative and the DIP Agent shall have received the following, each in form and substance satisfactory to the Required DIP Lenders:

   a.   the DIP Agent shall have received executed counterparts to the DIP Documents from each DIP Lender;

   b.   a certificate of an Officer of each DIP Loan Party countersigned by a second Officer or responsible person of such DIP Loan Party, pursuant to which officer attaches and certifies as to the following:

      i.    the names and true signatures of the Officers of such DIP Loan Party authorized to sign and provide notice under each DIP Document to which such DIP Loan Party is or will be a party and the other documents to be executed and delivered by such DIP Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Officers;

      ii.   a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each DIP Loan Party certifying as of a recent date not more than thirty (30) days prior to Interim Effective Date as to the subsistence in good standing or qualification of such DIP Loan Party in such jurisdictions;

      iii.  true and complete copies of the Governing Documents (as defined in the DIP Credit Agreement) of such DIP Loan Party together with all amendments thereto, including a copy of the charter, certificate of formation or incorporation, or other publicly filed Governing Document of each DIP Loan Party certified as of a recent date not more than thirty (30) days prior to Interim Effective Date by an appropriate official of the jurisdiction of organization of such DIP Loan Party which shall set forth the same complete name of such DIP Loan Party as is set forth herein;

   c.   an Approved Budget;

   d.   such other agreements, instruments, approvals, and other documents, each satisfactory to the DIP Lenders in form and substance, as the DIP Lenders may reasonably request, including in respect of any "know-your-customer" requirements, Anti-Money Laundering Laws and Anti-Corruption Laws;

   e.   receipt of customary debtor in possession financing closing deliverables, resolutions, good

standing certificates in each DIP Loan Party's jurisdiction of formation (to the extent such concept is applicable), incumbency certificates, organizational documents, and lien searches, all in form and substance reasonably satisfactory to the Required DIP Lenders; and

f.  evidence of the reimbursement in full in cash of the reasonable and documented fees and expenses (including legal and other professional fees) of the DIP Agent, DIP Lender, and, solely to the extent provided for in the Prepetition Credit Agreements, Prepetition Agents and Prepetition Lenders;

iii.  the Petition Date shall have occurred;

iv.  no later than three (3) days prior to filing, the DIP Loan Parties shall have provided the DIP Lenders with a copy of the "first day" motions, including without limitation the DIP motion, the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases;

v.  orders approving all "first day" motions shall have been entered by the Bankruptcy Court, and in the case of any "first day" motions and orders that affect the rights or duties of the DIP Agent or DIP Lenders (including without limitation the DIP Orders and orders approving or otherwise impacting cash management practices) shall have been entered by the Bankruptcy Court, which orders shall be in form and substance reasonably acceptable to the Required DIP Lenders;

vi.  an Interim DIP Order, substantially on the terms contemplated in this DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Required DIP Lenders, shall have been entered by the Bankruptcy Court within two (2) business days following the Petition Date and shall not have been reversed, amended, stayed, modified or appealed without prior written consent of the Required DIP Lenders. For the avoidance of doubt, the DIP Facility (as defined herein) shall include all terms set forth in the proposed Interim DIP Order attached to the RSA, including, but not limited to those concerning collateral, lien and claim priority, adequate protection, and releases.  In the event of a conflict between this DIP Term Sheet, the DIP Credit Agreement, and any of the DIP Orders (as defined below), the DIP Orders shall control;

vii.  the DIP Lenders shall have received satisfactory evidence of the entry of all "first day" orders (including the approval of the cash management system), which shall be satisfactory in form and substance to the Required DIP Lenders, and which "first day" orders shall have been entered upon an application or motion of the Debtors (satisfactory in form and substance to the Required DIP Lenders) and upon prior written notice to such parties required to receive notice.

viii.  the DIP Lenders shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to the Required DIP Lenders evidencing the absence of any other liens or mortgages on the DIP Collateral, except the liens securing the Prepetition Loan Documents, Permitted Liens, and other existing liens acceptable to the Required DIP Lenders.

ix.  since the Petition Date there shall not have been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

x.  the representations and warranties of the Debtors contained in the section entitled "Representations and Warranties" shall be true and correct as described therein;

xi.  all consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the transactions contemplated by the DIP Documents or the conduct of the DIP Loan Parties' business shall have been obtained and shall be in full force and effect; and

xii.  other than the Bankruptcy Cases, there shall exist no claim, action, suit, investigation, litigation or proceeding (including shareholder or derivative litigation), threatened in writing or pending in any court or before any arbitrator or Governmental Authority which could reasonably be expected to have a Material Adverse Effect.

## B.  Conditions Precedent to All Advances

i.  (a) with respect to the Initial Advance, the Interim DIP Order shall have been entered and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with respect to any Advance thereafter, a Final DIP Order, substantially on the terms contemplated by this DIP Term Sheet and in form and substance acceptable to the Required DIP Lenders shall have been entered, and shall not have been vacated or reversed, and shall not be subject to any stay;

ii.  the Lender Representative shall have received a duly executed notice of borrowing;

iii.  other than as set forth in the RSA, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the Required DIP Lenders;

iv.  since the Petition Date, there shall have been no Material Adverse Effect;

v.  reimbursement in full in cash of the DIP Agent's and DIP Lenders' reasonable and documented fees and expenses (including legal and other professional fees);

vi.  there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Chapter 11 Cases) in any court or before any governmental authority that, in the reasonable opinion of the Required DIP Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to result in a Material Adverse Effect;

vii.  the Debtors shall be in compliance with the Milestones and the DIP Orders, as applicable;

viii.  In connection with all DIP Manager Advances, the DIP Lenders, the DIP Agent shall have received (with copies to  the Consenting AHG Noteholders):

a.  the Manager Advance Acknowledgment, duly executed by each of the parties thereto, which Schedule attached to such Manager Advance Acknowledgement shall have been updated to reflect the DIP Manager Advance to be made on or immediately following the Funding Date with the proceeds of the applicable DIP Loan; and

b.  a certificate of an Officer of each of the Borrowers (i) attaching the Approved Budget that identifies the amounts that will be paid via such proposed DIP Manager Advance or DIP Manager Advances and (ii) certifying that such proposed DIP Manager Advance or DIP Manager Advances will comply, and will be made in a manner that complies, in all respects

with the Prepetition Base Indenture, the Management Agreement and all other Related Documents; *provided* that, the amount of DIP Manager Advances outstanding after giving effect to the applicable New Money Term Loan shall not be less than 100% of the DIP Obligations and there shall be no outstanding challenge to the treatment of any such payment as a DIP Manager Advance entitled to the Superpriority Manager Advance Payment Right;

ix.     no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the DIP Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any DIP Loan Party without the prior written consent of the Required DIP Lenders;

x.      the DIP Lenders shall have received the latest Approved Budget and Variance Report required to be delivered in accordance with the DIP Orders;

xi.     the Trustee and the Independent Directors shall have agreed to a waiver of any objections related to the DIP Facility, entry of the DIP Orders and a release of claims in respect of the DIP Loans and advance of DIP proceeds;

xii.    each of the representations and warranties of the Debtors in this DIP Term Sheet, the DIP Credit Agreement, and any other DIP Documents, as applicable, shall be true and correct, unless otherwise agreed by the Required DIP Lenders; and

xiii.   there shall be no defaults or Events of Default under the RSA or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the Required DIP Lenders or cured pursuant to the terms thereof.

## Annex III

"<u>Bankruptcy Event of Default</u>" means the occurrence of any of the following events or circumstances in the Chapter 11 Cases:

(a)     the bringing of a motion or taking of any action by any of the DIP Loan Parties to use cash collateral of the DIP Agent and the other DIP Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Required DIP Lenders, except as provided in the Interim DIP Order or the Final DIP Order;

(b)     the entry of an order in any of the Chapter 11 Cases terminating or modifying the Debtors' exclusive right to file a Plan of Reorganization with respect to the Debtors pursuant to section 1121 of the Bankruptcy Code;

(c)     the RSA is terminated for any reason or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required DIP Lenders;

(d)     any DIP Loan Party's failure to object to a motion seeking to terminate or modify the DIP Loan Parties' exclusive right to file a Plan of Reorganization within the required time for filing such objection;

(e)     the filing by any of the DIP Loan Parties of a Plan of Reorganization (or plan of liquidation) or disclosure statement attendant thereto, or any amendment, modification or supplement to such Plan of Reorganization (or plan of liquidation) or disclosure statement attendant thereto, other than an Approved Plan;

(f)     (i) the entry of an order in any of the Chapter 11 Cases (i) approving a disclosure statement in respect of a plan other than an Acceptable Disclosure Statement (an "<u>Alternate Disclosure Statement</u>") or confirming a Plan of Reorganization (or a plan of liquidation) that is not an Approved Plan (an "<u>Alternate Plan</u>"), or (ii) any of the DIP Loan Parties or any of their subsidiaries proposes or supports, or fails to contest in good faith, the entry of the Alternate Disclosure Statement or Alternate Plan, unless Alternate Plan (along with the attendant Alternate Disclosure Statement) contemplates indefeasibly paying the DIP Obligations in full, in cash on the effective date of such plan;

(g)     any or all of the DIP Loan Parties or their respective subsidiaries shall withdraw or terminate the Approved Plan without the prior written consent of the Required DIP Lenders;

(h)     (i) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order in any material respect without the written consent of the Required DIP Lenders or (ii) the Interim DIP Order or the Final DIP Order not being in full force and effect;

(i)     after entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against, the DIP Agent, any DIP Lender, any other DIP Secured Party or any of the Collateral without the prior written consent of the Required DIP Lenders;

(j)     the entry of an order granting relief from the Automatic Stay under section 362 of the Bankruptcy Code so as to allow a third-party to exercise remedies against a material portion of the Collateral or the assets of any of the DIP Loan Parties or their subsidiaries;

(k) the appointment of a trustee under section 1104 of the Bankruptcy Code, a receiver or an examiner (other than a fee examiner) in any of the Chapter 11 Cases with expanded powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code to operate or manage the financial affairs, the business, or reorganization of the DIP Loan Parties and/or their subsidiaries;

(l) the sale, without the Required DIP Lenders' consent, of all or substantially all of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in any of the Chapter 11 Cases or otherwise that does not result in either the payment in full in cash of all the DIP Obligations, treatment of the DIP Obligations in accordance with the RSA, or as otherwise agreed by the Required DIP Lenders;

(m) the dismissal of any of the Chapter 11 Cases, or any DIP Loan Party and/or its subsidiaries shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code;

(n) (A) the conversion of any of the Chapter 11 Cases to a Chapter 7 case, (B) the appointment of a Chapter 11 trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any DIP Loan Party and/or its Subsidiaries under section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases, (C) the grant, Incurrence, creation, assumption or allowance of (other than as provided for herein) any other superpriority claim (including any adequate protection claim) or any other DIP Lien (including any Adequate Protection Liens) or right of payment that is *pari passu* with or senior to the claims, DIP Liens and rights to payment in favor of the DIP Agent (for the benefit of the DIP Secured Parties) and the DIP Secured Parties securing the DIP Obligations or of the Prepetition Agents (for the benefit of the Prepetition Secured Parties) and the Prepetition Secured Parties securing the Prepetition Obligations in any of the Chapter 11 Cases or (D) the reduction, disallowance or reduction of the amount of the Manager Advances or the granting of any right of payment senior or *pari passu* to the Superpriority Manager Advance Payment Right (as defined in the DIP Credit Agreement) against the Securitization Entities or their estates that is not included in the Approved Budget;

(o) the entry of a final, non-appealable order of the Bankruptcy Court substantively consolidating any of the Debtors' estates;

(p) the Bankruptcy Court shall enter an order in favor of the Committee, if any, any ad hoc committee or any other parties in interest, (i) sustaining an objection to claims of the DIP Agent or any of the DIP Lenders, (ii) avoiding any DIP Liens held by the DIP Agent or any of the DIP Lenders, (iii) sustaining an objection to claims of the Prepetition Agents or any of the Prepetition Lenders, (iv) avoiding any DIP Liens held by the Prepetition Agents or any of the Prepetition Lenders except as otherwise agreed by the Required DIP Lenders in writing or (v) reducing, disallowance or reducing the amount of the Manager Advances or granting any right of payment senior or *pari passu* to the Superpriority Manager Advance Payment Right against the Securitization Entities or their estates that is not included in the Approved Budget;

(q) any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter an order (i) approving payment of any prepetition claim in excess of $100,000 in the aggregate other than (x) as approved for in the "first day" and "second day" orders in any of the Chapter 11 Cases and included in the Approved Budget or otherwise consented to by the Required DIP Lenders in writing; (ii) granting relief from or modifying the Automatic Stay (x) to permit foreclosure on any assets without the consent of the Required DIP Lenders or (y) to allow any creditor (other than the DIP Agent) to execute upon or enforce a DIP Lien on any material portion of the Collateral or restrict the right to, priority of payment of or guarantee of the Superpriority Manager Advance Payment Right; (iii) except with respect to the Prepetition Loan

Documents as provided in the DIP Orders, approving any settlement or other stipulation not approved by the Required DIP Lenders (which approval shall not be unreasonably withheld) and not included in the Approved Budget with any secured creditor of any DIP Loan Party or its subsidiaries providing for payments as adequate protection or otherwise to such secured creditor; and (iv) permitting other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(r)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against the DIP Agent, any DIP Lender or any other DIP Secured Party and, as to any suit or action brought by any Person other than a DIP Loan Party or a subsidiary, officer or employee of a DIP Loan Party, where such suit or action remains unopposed by a DIP Loan Party for thirty (30) days and asserts or seeks by or on behalf of a DIP Loan Party or its subsidiaries, a claim or any legal or equitable remedy or the entry of an order in any of the Chapter 11 Cases that would (x) have the effect of invalidating, disgorging (in connection with payments made), avoiding, subordinating or challenging any or all of the DIP Obligations or DIP Liens of the DIP Agent (on behalf of the DIP Secured Parties) to any other claim, changing the size, frequency or priority of payment of the Manager Advances, or (y) have a Material Adverse Effect on the rights and remedies of the DIP Agent or the collectability of all or any portion of the DIP Obligations (other than a challenge as to whether an Event of Default has, in fact, occurred and is continuing);

(s)    any DIP Loan Party or its subsidiaries shall engage in or support (except to the extent provided in the DIP Orders) any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders;

(t)    the entry of an order in any of the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under this Agreement;

(u)    the failure of any DIP Loan Party or its subsidiaries to perform in all material respects any of its obligations under the DIP Orders, any Sale Order or the Scheduling Order, in each case, as determined by the Bankruptcy Court;

(v)    any DIP Loan Party or its subsidiaries shall attempt to invalidate, reduce or otherwise impair the DIP Loans, the DIP Liens granted to or the security interests of the DIP Lenders and the DIP Agent under the DIP Documents;

(w)    any DIP Lien or security interest created by this Agreement or the DIP Orders with respect to the DIP Collateral shall, for any reason, cease to be valid;

(x)    the filing of any motion or application in any of the Chapter 11 Cases, or the entry of any order of the Bankruptcy Court in any of the Chapter 11 Cases (i) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code and such motion does not provide for the payment of all DIP Obligations in full immediately upon the consummation of such financing; (ii) to revoke, reverse, stay, modify, supplement or amend any of the DIP Orders in a manner inconsistent with the DIP Documents;

(y)    the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than the Obligations in, or as otherwise permitted under the applicable DIP Documents or permitted under the DIP Orders, entitled to superpriority administrative expense claim status in any of the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the DIP Agent and the other DIP Secured Parties under this

Agreement and the other DIP Documents, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 of the Bankruptcy Code or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any DIP Lien on the DIP Collateral having a priority senior to or *pari passu* with the DIP Liens and security interests granted herein (including, without limitation, the Superpriority Manager Advance Payment Right), except, in each case, as expressly provided in the DIP Documents or with express prior written consent of the Required DIP Lenders (and, with respect to any provisions that materially affect the rights, privileges, immunities or duties of the DIP Agent, the DIP Agent);

(z)      the Interim DIP Order (prior to the entry of the Final DIP Order) or, on and after entry thereof, the Final DIP Order shall cease (i) to create a valid and perfected DIP Lien on the DIP Collateral, (ii) to grant valid, perfected and enforceable superpriority claims with respect to the DIP Facility with the priority provided in the RSA (including, without limitation, the Superpriority Manager Advance Payment Right) or (iii) to be in full force and effect;

(aa)      an order of the Bankruptcy Court shall be entered reversing, modifying, amending, staying, vacating, or subjecting to stay pending appeal, in the case of modification or amendment, any DIP Document, the Prepetition Loan Documents, the Superpriority Manager Advance Payment Right, the Approved Plan or the Confirmation Order in a manner adverse to the DIP Lenders without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications or supplements that affect the rights, privileges, immunities or duties of the DIP Agent, the DIP Agent);

(bb)      an order in any of the Chapter 11 Cases shall be entered (i) charging any of, or authorizing the recovery of any amount from, the DIP Collateral under section 506(c) of the Bankruptcy Code, (ii) prohibiting or limiting the extension under section 552(b) of the Bankruptcy Code of the DIP Liens of the Prepetition Agents on the DIP Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any DIP Loan Party after the Petition Date or (iii) prohibiting, limiting, subordinating or reducing the amount of the Manager Advances below the amount of the outstanding DIP Obligations or the Superpriority Manager Advance Payment Right;

(cc)      if the Final DIP Order (A) does not (i) include a waiver, in form and substance reasonably satisfactory to the Required DIP Lenders, of the right to surcharge, or recover any amount from, the DIP Collateral under section 506(c) of the Bankruptcy Code, or (ii) prohibit the imposition of any exception to the extension under section 552(b) of the Bankruptcy Code of the DIP Liens of the of the Prepetition Agents on the DIP Collateral to any proceeds, products, offspring, or profits of the DIP Collateral acquired by any DIP Loan Party after the Petition Date or (B) reaffirms the full amount of the Manager Advances and the Superpriority Manager Advance Payment Right;

(dd)      an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the DIP Loan Parties;

(ee)      the filing of any motion or application in any of the Chapter 11 Cases, or the entry of any order of the Bankruptcy Court in any of the Chapter 11 Cases providing for the rejection or repudiation of the Management Agreement or any portion of the Manager Advances and/or the DIP Agent's or other DIP Secured Parties' right thereto without the prior written consent of the Required DIP Lenders;

(ff)      an order materially adversely impacting the rights and interests of the DIP Secured Parties under the DIP Documents, as reasonably determined by the Required DIP Lenders in good faith, shall have been entered by the Bankruptcy Court or any other court of competent jurisdiction;

(gg)    without the Required DIP Lenders' prior written consent, the entry of any order by the Bankruptcy Court granting, or the filing by any DIP Loan Party of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the DIP Collateral without the consent of the DIP Agent (at the direction of the Required DIP Lenders) or to obtain any financing under section 364 of the Bankruptcy Code other than the DIP Documents;

(hh)    any DIP Loan Party or any of its subsidiaries or any person acting validly on behalf of any of them shall file any motion seeking authority to consummate a sale or other Disposition of assets (constituting DIP Collateral or otherwise) outside the ordinary course of business and as contemplated by the RSA, the Approved Budget (for the avoidance of doubt, a Credit Bid Sale and a Sale Transaction shall each be permitted hereunder, in each case, to the extent in accordance with an Approved Bankruptcy Court Order) without the consent of the Required DIP Lenders;

(ii)    any DIP Loan Party or any of its subsidiaries shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise or on account of any prepetition Indebtedness or payables, in each case, except as otherwise permitted under this Agreement, one or more "first day" or "second day" orders, the DIP Orders, or other Approved Bankruptcy Court Orders and consistent with the Approved Budget (subject to Permitted Variances);

(jj)    (i) any DIP Loan Party or any of its subsidiaries shall file a motion or application seeking, or the Bankruptcy Court shall enter an order precluding, the Prepetition Agents from having the right to or being permitted to "credit bid" any amount of the applicable Prepetition Obligations, with respect to the assets of the DIP Loan Parties or (ii) the Bankruptcy Court enters an order prohibiting, restricting, precluding or otherwise impairing the unqualified right of the Prepetition Agents from having the right to or being permitted to "credit bid" any amount of the applicable Prepetition Obligations, with respect to the assets of the Debtors;

(kk)    other than pursuant to the Approved Plan, the Securitization Indenture, the Prepetition Credit Agreements or any Prepetition Loan Documents shall be amended, waived, supplemented or otherwise modified in a manner that adversely and disproportionately impacts the interests of the Prepetition Agents, the Prepetition Noteholders, the Prepetition Trustee and the Prepetition Lenders, as applicable, in the Prepetition Collateral and/or the right to payment from the assets of the Debtors without the consent of the Required DIP Lenders and the DIP Agent;

(ll)    any of the DIP Loan Parties or any of their subsidiaries shall (i) file a motion or other pleading, or agree in writing to support any other person's motion, to disallow, in whole or in part, the DIP Secured Parties' claims in respect of the DIP Obligations under the DIP Documents and/or Prepetition Credit Agreement Secured Parties' Prepetition Obligations under the Prepetition Loan Documents or (ii) contest any provision of this Agreement, the Manager Advance Acknowledgement or the Superpriority Manager Advance Payment Right;

(mm)    the DIP Loan Parties or any of their subsidiaries or any other person shall file a motion or an application seeking entry of any of the orders described in clauses (n), (q), (pp) and (qq) of this Annex III and the DIP Loan Parties and their subsidiaries shall not contest (in good faith and as reasonably determined by the Required DIP Lenders) such motion or application;

(nn)    unless otherwise approved by the Required DIP Lenders, the Bankruptcy Court shall grant an order providing for a change in venue with respect to any of the Chapter 11 Cases and such order shall not be reversed or vacated within thirty (30) days;

(oo)    the DIP Loan Parties and their subsidiaries shall fail (a) to comply with <u>Section 7.16,</u> (b) to have an Approved Budget or (c) to comply with any negative covenant or affirmative covenants or agreements in the DIP Documents or with any other covenant or agreement contained in the DIP Orders in any respect;

(pp)    without the consent of the Required DIP Lenders, (i) the DIP Loan Parties and their subsidiaries shall use the proceeds of the DIP Loans in a manner which is not in accordance with the Approved Budget (subject to Permitted Variances) and (ii) the variances from the then-current Approved Budget shall exceed the Permitted Variances and/or (iii) the application of such proceeds is for payments that are not Manager Advances;

(qq)    the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after the Petition Date;

(rr)    the entry of a Sale Order that is not in accordance with the RSA or an Approved Plan, as applicable;

(ss)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) brought by a DIP Loan Party or a subsidiary or any Person other than a DIP Loan Party or a subsidiary, officer or employee of a DIP Loan Party, where such suit or action asserts or seeks by or on behalf of a DIP Loan Party or its subsidiaries to terminate the Manager and such suit or action remains unopposed by a DIP Loan Party for thirty (30) days;

(tt)    unless all of the DIP Collateral has been released from the DIP Liens of the DIP Agent in accordance with the provisions of the DIP Documents, any Loan Party or any of their subsidiaries shall assert in writing that any such DIP Lien is invalid, unenforceable or impaired;

(uu)    the DIP Agent fails to have a perfected security interest in any portion of the DIP Collateral with a value greater than $100,000 or its non-U.S. currency equivalent;

(vv)    any DIP Loan Party fails to comply for five (5) consecutive days with its material obligations contained in the DIP Orders or the DIP Documents, except for a failure with respect to assets or property with an aggregate value of less than $100,000 or its non-U.S. currency equivalent; or

(ww)    any DIP Loan Party fails to comply with its post-closing obligations set forth in the DIP Credit Agreement and such failure continues and is not waived by the DIP Lender for three (3) days.

**Annex IV**

**Lien; Priority Chart**

| Priority | DIP Collateral That Constitutes or Would Otherwise Constitute Prepetition Loan Collateral | | DIP Collateral That Constitutes or Would Otherwise Constitute Prepetition Notes Collateral | | DIP Collateral That Would Otherwise Constitute Unencumbered Property[6] | |
|---|---|---|---|---|---|---|
| | *Liens* | *Claims* | *Liens* | *Claims* | *Liens* | *Claims* |
| *First* | Carve-Out | Carve-Out | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| *Second* | Permitted Senior Liens | Claims secured by Permitted Senior Liens | Permitted Senior Liens | Claims secured by Permitted Senior Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | Priming DIP Liens | DIP Superpriority Claims | Priming DIP Liens | DIP Superpriority Claims | Prepetition Loan Adequate Protection Liens / Prepetition Notes Adequate Protection Liens *(pari passu)* | Prepetition Loan 507(b) Claims / Prepetition Notes 507(b) Claims *(pari passu)* |
| *Fourth* | Prepetition Loan Adequate Protection Liens | Prepetition Loan 507(b) Claims | Prepetition Notes Adequate Protection Liens | Prepetition Notes 507(b) Claims | - | - |
| *Fifth* | Prepetition Credit Agreement Liens* *Include liens on Manager Advance Collateral* | Prepetition Credit Agreement Secured Obligations | Prepetition Indenture Liens | Prepetition Notes Secured Obligations (subject to Priority of Payments Waterfall) *Includes, among other things, any rights and claims in respect of any Manager Advances "Manager Advance Collateral"* | | |
| *Sixth* | Prepetition Notes Adequate Protection Liens | Prepetition Notes 507(b) Claims | Prepetition Loan Adequate Protection Liens | Prepetition Loan 507(b) Claims | | |

---

[6] Subject to certain exclusions as set forth in Paragraph 5(a) of the Interim DIP Order (other than for Carve-Out).

# EXHIBIT C

**Debtors' Organizational Structure**



# EXHIBIT D

## Financial Projections

## Financial Projections[1]

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated Financial Projections to holders of Claims or other parties in interest going forward.

In connection with the Disclosure Statement, SOLIC in consultation with the Company (defined below) and Accordion, the Debtors' financial advisor, prepared the Financial Projections for the years 2025 through 2035 (the "Projection Period"). The Financial Projections are based on several assumptions with respect to the future performance of the Reorganized Debtors' operations. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. ALTHOUGH THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED IN GOOD FAITH AND THE ASSUMPTIONS ARE BELIEVED TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and its Affiliated Debtors* (the "Disclosure Statement"), to which these Financial Projections are attached as Exhibit D.

they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Company's (defined below) control. Although these assumptions are reasonable under the circumstances, such assumptions are subject to uncertainties surrounding the inability to collect royalty fees from the Divested Stores or existing franchised store locations burdened by such fees, which could result directly from decreases in customer traffic, operational performance, and financial performance of the stores. Should one or more of the risks occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections.  Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.  The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction, or guaranty of the Reorganized Debtors' future performance.

## 1)  General Assumptions

### A.  Overview

Hooters of America Inc. ("HOA" and from time to time, the "Company"), operates as a leader in the casual dining and sports entertainment dining sector, and has cultivated a robust, globally recognized, iconic brand, since the Company's inception in 1983 in Clearwater, Florida. In 2001, HOA purchased the Hooters brand's trademark and licensing rights from the original Hooters franchisees and has since subsequently owned the brand.  Today, HOA owns and operates an expansive network of Hooters restaurants domestically with 119 company-owned stores ("Company-Owned Stores") and 152 franchised stores ("Franchised Stores").

### B.  Presentation and Accounting Policies

The Financial Projections are presented on the basis of accounting consistent with Generally Accepted Accounting Principles ("GAAP") basis accounting. Royalty and licensing income is recorded in the same period that such royalty and licensing fees are accrued.

Earnings before Interest, Taxes and Depreciation ("EBITDA") presented within **Annex A** ("Projected Income Statement") is not reduced by incomes taxes.

### C.  Transaction Structure and Financial Forecast

Certain Franchisees of Hooters, led by Hooters, Inc. (the "Buyer Group") have made a comprehensive proposal to acquire 103 [2] Company-Owned Stores (the "Divested Stores") currently owned by the Securitization Entities.  As part of the comprehensive transaction, The DIP Lender, a pre-petition lender, and the Class B Securitized Note Holders will i) each acquire a 50% equity interest in RoyaltyCo in exchange for certain claims, and ii) will receive new senior secured notes, issued by RoyaltyCo (as further described in Section E Capital Structure below), pursuant to a Restructuring Support Agreement ("RSA").  The transaction will be implemented through the Plan.

The Financial Projections were prepared based on the sale of all 103 Divested Stores to the Buyer Group, through the Buyer Group Arrangements outlined in the Plan.  The Buyer Group Arrangements consist of a series of transactions with the Buyer Group SPEs or Brand Management Co. for the acquisition of Debtor (i) stores; (ii) leases, (iii) new franchise agreements, (iv) royalty arrangements, (v) gift card liabilities, and (vi) certain store-level liabilities. The Financial Projections reflect the simplified business model of RoyaltyCo under the Plan, in which RoyaltyCo operates primarily as a royalty collection entity.

RoyaltyCo will license the brand and intellectual property from the current owner HI Limited Partnership (owned 50% / 50% by the DIP Lender and the Holders of Class B Notes). RoyaltyCo's financial forecast will primarily consist of revenue derived from royalty income or fees and will include royalty fees at a (i) 6% royalty rate paid by the Divested Stores (103)[3] and (ii) existing store level royalty fees paid by Franchised Stores (152) at a weighted average rate of 4%.  While RoyaltyCo will primarily serve as a collector of royalty fees, it will also incur general and administrative expenses and will owe royalty fees to Brand Management Co.  RoyaltyCo will not, however, bear the cost of any Divested Store operating expenses including payroll or lease-related expenses, such as rent or maintenance capital expenditures, which is the obligation of the Buyer Group.

### D.  Plan Consummation

The Financial Projections assume that the Plan will be consummated on or around August 5, 2025.

### E.  Capital Structure

The Reorganized Debtors' estimated post-emergence capital structure is assumed to be effective beginning August 5, 2025, or shortly thereafter.  The Financial Projections assume the following key assumptions at emergence:

---

[2]  The RSA and these Financial Projections assume the Buyer Group will acquire 103 Company-Owned Stores, however, this number is a baseline figure, and the Buyer Group may ultimately acquire additional Company-Owned Stores.

[3]  Divested Stores royalty fees include 70 stores paying a 6% royalty rate beginning immediately upon the Effective Date of sale transaction, with 33 stores paying a 6% royalty rate beginning in the 25th month post the Effective Date of the Plan.

- Class A-1 Notes (DIP Facility Claims): Principal amount of $40 million bearing cash interest at an annual rate of prime[4] + 3%.

- Class A-2II Notes (Manager Advance Term Loan Claims): Principal amount of $18 million bearing cash interest at an annual rate of federal funds rate.[5]

- Class A-2I Notes (Securitization Class A-2 Note Claim)**: Principal amount of $267 million bearing cash interest at an annual rate of 4.7%, and a maturity date of 30 years. Accelerated Repayment Date ("ARD") interest will begin accruing 10 years from the Plan Effective Date.

- Class B Notes (Securitization Class B Note Claims): Principal amount of $40 million bearing cash interest at an annual rate of 7.4%, and a maturity date of 30 years. ARD interest will begin accruing 10 years from the Plan Effective Date.

## 2) Assumptions with Respect to the Projected Income Statement

### A. Overview

The Projected Income Statement is forecasted over the Projected Period beginning on August 5, 2025.

### B. Revenue

Store Count: The Financial Projections assume the Divested Stores (103) stores are acquired by the Buyer Group. The Financial Projections assume existing Franchised Stores of 152 remains constant with no new Franchised Stores.

Annual Systemwide Sales & RoyaltyCo Revenue Growth: Assumes a gradual increase to nominal annual growth of 1.5% by 2027 in sales in all Divested Stores and resultant royalty fees, and nominal annual growth of 1.5% in licensing revenues received by RoyaltyCo.

Royalty Revenue: Royalties are paid to RoyaltyCo at different rates (as a % of net sales) based on whether stores are Existing Franchise stores or Divested Stores. The forecast assumes existing Franchised Stores (152) pay a current store-level weighted average royalty rate of approximately 4%. The forecast assumes 70 of the Divested Stores pay a 6% royalty rate beginning in month one of the forecast period, and 33 of the Divested Stores pay a 6% royalty fee beginning in month 25 of the forecast period.

Licensing Revenue: RoyaltyCo receives licensing revenue from Hooters branded products sold in grocery store and other retail channels. The forecast assumes that $1.2 million in grocery store and $200,000 in non-grocery store licensing revenues are received by RoyaltyCo beginning in year 1 of the forecast period and grow at an annual rate of 1.5% thereafter.

---

[4]    Effective Prime Rate of 7.5% as of June 4, 2025.
[5]    Effective Federal Funds Rate of 4.3% as of June 4, 2025.

### C.  Selling, General and Administrative Expenses

Selling, general, and administrative expenses ("SG&A") are comprised of a Brand Management Co. Management Fee and RoyaltyCo SG&A expenses.

Brand Management Co. Management Fee: Brand Management Co. will receive a management fee equal to 65% of the royalties paid by the Divested Stores (collectively, the "BMC Royalties").  Brand Management Co. will enter into the Brand License Agreement with RoyaltyCo to provide the services set forth therein in exchange for the BMC Royalties.

RoyaltyCo G&A Expenses: The forecast assumes annual RoyaltyCo operating and administrative expenses of $1 million beginning in year 1 and increasing at 1.5% per year thereafter through the end of the forecast period.

## ANNEX A

### Projected Income Statement

| Hooters of America ("HOA") RoyaltyCo Illustrative Model ($000s) | FY 2H 2025 Fcst | FY 2026 Fcst | FY 2027 Fcst | FY 2028 Fcst | FY 2029 Fcst | FY 2030 Fcst | FY 2031 Fcst | FY 2032 Fcst | FY 2033 Fcst | FY 2034 Fcst | FY 2035 Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | |
| **Store Count** | | | | | | | | | | | |
| *Divested Store Count* | *103* | *103* | *103* | *103* | *103* | *103* | *103* | *103* | *103* | *103* | *103* |
| *Franchised Store Count* | *152* | *152* | *152* | *152* | *152* | *152* | *152* | *152* | *152* | *152* | *152* |
| **Total Store Count** | **255** | **255** | **255** | **255** | **255** | **255** | **255** | **255** | **255** | **255** | **255** |
| **Systemwide Sales** | | | | | | | | | | | |
| Divested Stores Systemwide Sales | $ 107.5 | $ 215.7 | $ 218.9 | $ 222.2 | $ 225.6 | $ 228.9 | $ 232.4 | $ 235.9 | $ 239.4 | $ 243.0 | $ 246.6 |
| Franchised Stores Systemwide Sales | 208.2 | 422.7 | 429.0 | 435.4 | 442.0 | 448.6 | 455.3 | 462.2 | 469.1 | 476.1 | 483.3 |
| **Total Systemwide Sales** | **$ 315.7** | **$ 638.4** | **$ 647.9** | **$ 657.7** | **$ 667.5** | **$ 677.5** | **$ 687.7** | **$ 698.0** | **$ 708.5** | **$ 719.1** | **$ 729.9** |
| *Sales Growth %* | | *N/A* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* |
| **Franchisor Revenue:** | | | | | | | | | | | |
| *Divested Store Royalties* | *4.6* | *9.2* | *11.2* | *13.3* | *13.5* | *13.7* | *13.9* | *14.2* | *14.4* | *14.6* | *14.8* |
| *Franchised Store Royalties* | *8.7* | *17.7* | *18.0* | *18.2* | *18.5* | *18.8* | *19.1* | *19.4* | *19.6* | *19.9* | *20.2* |
| Franchise Revenue | $ 13.3 | $ 26.9 | $ 29.2 | $ 31.6 | $ 32.0 | $ 32.5 | $ 33.0 | $ 33.5 | $ 34.0 | $ 34.5 | $ 35.0 |
| Licensing Revenue | $ 0.7 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.6 |
| **Total Revenue** | **$ 14.0** | **$ 28.3** | **$ 30.6** | **$ 33.0** | **$ 33.5** | **$ 34.0** | **$ 34.5** | **$ 35.0** | **$ 35.5** | **$ 36.1** | **$ 36.6** |
| Brand Management Co. Management Fee | (3.0) | (6.0) | (7.3) | (8.7) | (8.8) | (8.9) | (9.1) | (9.2) | (9.3) | (9.5) | (9.6) |
| RoyaltyCo G&A[1] | (0.5) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) |
| **EBITDA[2]** | **$ 10.5** | **$ 21.3** | **$ 22.3** | **$ 23.3** | **$ 23.6** | **$ 24.0** | **$ 24.3** | **$ 24.7** | **$ 25.1** | **$ 25.5** | **25.8** |

# EXHIBIT E

## Liquidation Analysis

**Liquidation Analysis**[1]

A.     Introduction

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation of the Plan, that each Holder of an impaired Claim or Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors' assets were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  In analyzing whether the best interests of creditors test has been met, the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in a chapter 7 proceeding must be determined.

This hypothetical liquidation analysis ("Liquidation Analysis") was prepared by the Debtors and their advisors and represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs, which would be available for distribution to the Holders of Claims and Interests if the Debtors' assets were to be liquidated pursuant to a hypothetical chapter 7 liquidation.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, Holders of Claims or Interests in Impaired Classes and Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

To conduct the Liquidation Analysis, the Debtors and their advisors have:

- estimated the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case and the assets of such Debtor's Estate were liquidated or sold;

- determined the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7 of the Bankruptcy Code; and

---

[1]     Capitalized terms used by not otherwise defined herein have the meanings ascribed to such terms in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC. and its Affiliated Debtors* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Disclosure Statement"), to which this Liquidation Analysis is attached as Exhibit E or the *Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC. and its Affiliated Debtors* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan"), attached as Exhibit A to the Disclosure Statement.

- compared each Holder's Liquidation Distribution to the estimated distribution under the Plan (the "Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated.

As the Liquidation Analysis is a hypothetical analysis based on certain assumptions, certain aspects may vary from the Plan, as discussed in the Disclosure Statement, including asset values. The Liquidation Analysis is based upon certain estimates and assumptions discussed herein and in the Disclosure Statement, which should be read in conjunction with the Liquidation Analysis.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME PRIOR TO THE CONFIRMATION HEARING.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE.**

B.    Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors hypothetically converted their Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about July 1, 2025 (the "Conversion Date").  The Debtors assume the Conversion Date to be a reasonable proxy for the date by which the Debtors would elect to convert to a chapter 7 liquidation.  The values referenced herein are as of May 18, 2025, unless otherwise noted.  The Liquidation Analysis was prepared on an entity-by-entity basis and summarized into separate consolidated reports for the Securitization and the Non-Securitization Entities.  Asset recoveries accrue first to satisfy Claims at the legal entity level.  To the extent any remaining value exists, it flows to each individual entity's parent organization or appropriate shareholder.

The Liquidation Analysis represents an estimate of recovery values and percentages based on a hypothetical liquidation if a chapter 7 trustee were appointed by the Bankruptcy Court to convert assets into Cash.  The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and their advisors, are inherently subject to significant business, economic, and competitive uncertainties, and contingencies beyond the control of the Debtors and their management team. Inevitably, some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation, if one were to occur, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation, if one were to occur.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  As a result, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the

Liquidation Analysis.  In addition, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the chapter 7 case.

To estimate the liquidation proceeds, the Liquidation Analysis assumes that the Debtors, utilizing their resources and necessary third-party advisors, are wound down during a four-to-eight-week wind-down period (the "Liquidation Period"), during which the assets of the Debtors and their non-Debtor subsidiaries are sold in a straight liquidation through an accelerated sale process. There can be no assurance that the liquidation would be completed in the Liquidation Period, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  The Liquidation Analysis is also based on the assumptions that: (i) the Debtors will not have the prior written consent of the Required DIP Lenders and the Required Consenting AHG Noteholders and accordingly, will not have continued access to cash collateral during the Liquidation Period to fund certain Wind-Down Expenses (as defined below) and (ii) certain key personnel needed to wind down the Debtors' estates (e.g., operations, accounting, finance, etc.) continue to work with the Debtors through the Liquidation Period.  Liquidation proceeds available for distribution to Holders of Claims and Interests would consist of proceeds net of these costs.

The Liquidation Analysis includes an estimate of the taxes due from the sale of the Debtors' inventory but may exclude certain additional federal and state tax consequences that may be triggered upon the liquidation in the manner described above.  Such tax consequences may be material. In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, which may be material.

In preparing the Liquidation Analysis, the Debtors and their advisors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted against the Debtors, but which could be asserted and Allowed in a chapter 7 liquidation, including chapter 7 administrative claims such as wind-down costs, Trustee fees, lease and contract rejection claims, and other expenses related to the wind-down process (together, the "Wind-Down Expenses").  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

C.      Notes

The Liquidation Analysis is presented on a separate basis for Securitization Entity Debtors and Non-Securitization Debtors.

In a chapter 7 liquidation, the Trustee would consider pursuing various potential avoidance actions under chapter 5 of the Bankruptcy Code, including to recover any preference payments made to creditors during the 90-day period prior to the Petition Date, or within one year for payments to insiders. No value is ascribed to avoidance actions or other litigation proceeds, which are highly speculative.

D.    Liquidation Process

The Debtors' hypothetical liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with the Trustee managing the Estates to maximize recovery in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

1.    Generation of Cash proceeds:

- Collection of customer proceeds associated with items already reflected in accounts receivable as of the Conversion Date.

- Liquidation of inventory and Property, Plant, & Equipment (the "PP&E") assets owned by the Company.

2.    Costs related to the liquidation process, including Wind-Down Expenses, corporate expenses (e.g., utilities, rent, etc.), employee salary and retention payments, and other costs.

3.    Distribution of net proceeds generated from asset sales to Holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

E.    Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to Holders of Claims against the Debtors in accordance with section 726 of the Bankruptcy Code, the priority scheme applicable in a chapter 7 proceeding.

Professional fees, Trustee fees, administrative expenses, priority Claims, and other such Claims that may arise in a liquidation scenario would have to be fully paid from the Liquidation Proceeds before any proceeds are made available to Holders of unsecured claims.  Under the priority scheme dictated in chapter 7 of the Bankruptcy Code, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated in chapter 7 of the Bankruptcy Code, as follows:

**Securitization Entities**

1. <u>Wind Down Expenses</u> – The Wind-Down Expenses and other costs related to winding down business operations, including estimated Trustee fees and certain other professional and broker fees, among additional wind-down costs.

2. <u>Debtor-in-Possession Financing Manager Advances</u> – The $35 million, new-money, super-priority secured term loan debtor in possession financing facility (the "<u>DIP Facility</u>") evidenced by the DIP Credit Agreement. The DIP Facility is assumed to be drawn to $23.1 million, plus a $5 million balance from the Amendment No.1 Loans that was rolled up as part the DIP Facility. DIP Manager Advances are assumed to exclude the $5 million roll up. Claims assume all interest is paid current and the principal balance (including all capitalized fees) is paid from liquidation proceeds.

3. <u>Administrative and Other Priority Claims</u> – include, but are not limited to, (i) Priority Tax Claims, (ii) employee costs (accrued payroll) (iii) post-petition trade claims and (iv) professional fee claims.

4. <u>Securitization A-2 Note Claims</u> – Class A-2 Note Claims are senior secured notes, alphanumerically designated as "Class A-2" under the Existing Securitization Indenture. All Claims are assumed to include accrued interest as of the Petition Date.

5. <u>Securitization B Note Claims</u> – Senior Note Claims are senior secured notes, alphanumerically designated as "Class B" under the Existing Securitization Indenture. All Claims are assumed to include accrued interest as of the Petition Date.

6. <u>Other Secured Claims</u> – Other Secured Claims means a Secured Claim, other than an Administrative Claim, a DIP Claim, a Priority Tax Claim, or a Prepetition Credit Facility Claim, including, any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more of the Debtors, the reimbursement obligation for which is either secured by a Lien on collateral of is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

7. <u>Securitization Manager Advance Claims</u> – Securitization Manager Advance Claims are the claims of the Prepetition Manager against the Securitization Entities, for reimbursement of (a) prepetition Manager Advances, (b) all additional Manager Advances extended to the Securitization Entities during the pendency of the Chapter 11 Cases (c) accrued and unpaid interest, fees, and other charges and expenses arising and payable in respect of any such Manager Advances under the Prepetition Management Agreement, and (d) any other Manager Advances that form part of the "Obligations" (as defined in the Prepetition Securitization Indenture (as amended, restated, amended and restated or otherwise modified from time to time).

8.  <u>General Unsecured Claims</u> – General Unsecured Claims include, but are not limited to, (i) prepetition trade Claims, (ii) lease and contract rejection Claims, (iii) prepetition ordinary course professionals, (iv) Intercompany Claims, and (v) other unsecured Claims.

## **<u>Non-Securitization Entities</u>**

1.  <u>Wind Down Expenses</u> – The Wind-Down Expenses and other costs related to winding down business operations, including estimated Trustee fees and certain other professional and broker fees, among additional wind-down costs.

2.  <u>Debtor-in-Possession Financing</u> – The $35 million, new-money, super-priority secured term loan debtor in possession financing facility (the "<u>DIP Facility</u>") evidenced by the DIP Credit Agreement.  The DIP Facility is assumed to be drawn to $23.1 million, plus a $5 million balance roll up from the Amendment No.1 Loans.  Claims assume all interest is paid current and the principal balance (including all capitalized fees) is paid from liquidation proceeds.

3.  <u>Administrative and Other Priority Claims</u> – Include, but are not limited to, (i) Priority Tax Claims, (ii) employee costs (accrued payroll) (iii) post-petition trade claims and (iv) professional fee claims.

4.  <u>Manager Advance Term Loan Claims</u> – Manager Advance Term Loan Claims are Claims arising under the Prepetition Manager Advance Credit Agreement, excluding the DIP Roll-Up.

5.  <u>Other Secured Claims</u> – Other Secured Claims means a Secured Claim, other than an Administrative Claim, a DIP Claim, a Priority Tax Claim, or a Prepetition Credit Facility Claim, including, any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more of the Debtors, the reimbursement obligation for which is either secured by a Lien on collateral of is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

6.  <u>Term Loan Claims</u> – Term Loan Claims are Parent Funded Debt Claims in excess of the value of such Securitization Manager Advance Claims.

7.  <u>General Unsecured Claims</u> – General Unsecured Claims include, but are not limited to, (i) prepetition trade Claims, (ii) lease and contract rejection Claims, (iii) prepetition ordinary course professionals, (iv) intercompany Claims, and (v) other unsecured Claims.

F.  <u>Conclusion</u>

The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such Holders would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

## Summary of Projected Claims and Recoveries

The following tables compare estimated recoveries under low and high scenarios of the Liquidation Analysis versus estimated recoveries under the Plan.

### Securitization Entities

| Prepetition Debt | | | | | |
|---|---|---|---|---|---|
| Manager Advance Claims | 22,092 | 100.0% | 100.0% | 22,092 | 22,092 |
| Series 2021-1 Class A-2 Senior Secured Notes | 266,579 | 18.1% | 33.2% | 48,371 | 88,613 |
| Series 2021-1 Class B Senior Subordinated Notes | 40,000 | 0.0% | 0.0% | - | - |
| Other Secured Claims | - | 0.0% | 0.0% | - | - |
| Total Secured Claims | 328,671 | 21.4% | 33.7% | 70,464 | 110,706 |
| Employee Priority Claims | - | 0.0% | 0.0% | - | - |
| Tax Claims | - | 0.0% | 0.0% | - | - |
| Total Priority Unsecured Claims | - | 0.0% | 0.0% | - | - |
| LL Claims | 46,577 | 0.0% | 0.0% | - | - |
| Legacy Royalty Obligations | 60,432 | 0.0% | 0.0% | - | - |
| Trade Claims | 8,029 | 0.0% | 0.0% | - | - |
| General Unsecured Claims | 115,038 | 0.0% | 0.0% | - | - |
| **Total Creditor Amounts** | **443,709** | **15.9%** | **25.0%** | **70,464** | **110,706** |

### Non-Securitization Entities

| Prepetition Debt | | | | | |
|---|---|---|---|---|---|
| Manager Advance Term Loans | 8,387 | 74.2% | 100.0% | 6,220 | 8,387 |
| Term Loans | 55,976 | 0.0% | 5.6% | - | 3,116 |
| Secured Vendors | - | 0.0% | 0.0% | - | - |
| Total Secured Claims | 64,363 | 9.7% | 17.9% | 6,220 | 11,503 |
| Employee Priority Claims | - | 0.0% | 0.0% | - | - |
| Gift Card Claims | 10,600 | 0.0% | 0.0% | - | - |
| Tax Claims | - | 0.0% | 0.0% | - | - |
| Total Priority Unsecured Claims | 10,600 | 0.0% | 0.0% | - | - |
| LL Claims | 1,405 | 0.0% | 0.0% | - | - |
| Trade Claims | 5,568 | 0.0% | 0.0% | - | - |
| Employee Claims above Cap | 550 | 0.0% | 0.0% | - | - |
| Legacy Royalty Obligations | 60,432 | 0.0% | 0.0% | - | - |
| Litigation | 12,091 | 0.0% | 0.0% | - | - |
| General Unsecured Claims | 80,046 | 0.0% | 0.0% | - | - |
| **Total Creditor Amounts** | **155,009** | **4.0%** | **7.4%** | **6,220** | **11,503** |

**<u>Liquidation Analysis</u>**

The following Liquidation Analysis was prepared on an entity-by-entity basis for the Securitization Entities and Non-Securitization Entities. The following tables provide a summary of this analysis for each of the Debtor entities. The Liquidation Analysis should be read in conjunction with, and is qualified in its entirety by, the associated notes.

**Notes to the Liquidation Analysis**

*Total Liquidation Proceeds*. Each liquidating entity will seek to recover the value of its assets consistent with the process described above. The total amount collected at each liquidating entity is based on other assumptions further described below. Realizable recovery rates presented in these notes below were determined by the Debtors, in consultation with their advisors, and reflect values deemed reasonable in light of parties' review of the underlying data.

1. The Liquidation Analysis assumes the Debtors enter chapter 7 on or about the Conversion Date of July 1, 2025.

2. The Liquidation Analysis is based on the liquidation of individual legal entity assets. The consolidated waterfall shown in this analysis is a summary based on an aggregation of each Debtor's Claims and recoveries.

3. Unless otherwise indicated, the recoverable value for each asset is calculated based on each asset's value as recorded on the Debtors' balance sheet and as of May 18, 2025, adjusted for the corresponding recovery estimate, for which additional commentary is provided below. The aggregation of all calculated recoverable asset value (the "<u>Total Liquidation Proceeds</u>") is then used as the starting point for each Debtor Entity's recovery waterfall.

## Securitization Entities

| Asset Category | Est. Book Value | Rate | | Estimated CH7 Recovery | |
| --- | --- | --- | --- | --- | --- |
| | 5/18/2025 | Low | High | Low | High |
| **Liquidation Proceeds** | | | | | |
| **Cash Proceeds Available** | | | | | |
| Cash and Equivalents | - | 100.0% | 100.0% | - | - |
| **Total Net Cash Available** | - | | | - | - |
| **Other Asset Proceeds Available** | | | | | |
| Receivables | 6,136 | 77.6% | 88.8% | 4,760 | 5,448 |
| Inventory | 4,281 | 11.0% | 27.2% | 471 | 1,163 |
| Prepaid and Other Current Assets | 1,783 | 21.3% | 30.1% | 381 | 537 |
| Restricted Cash | 1,922 | 0.0% | 0.0% | - | - |
| Property & Equipment | 149,514 | 6.1% | 8.1% | 9,066 | 12,087 |
| Goodwill | 21,073 | 0.0% | 0.0% | - | - |
| Intangible Assets | 153,600 | 63.5% | 84.6% | 97,500 | 130,000 |
| Other assets | 769 | 5.0% | 10.0% | 38 | 77 |
| Right of Use Assets | 350,451 | 0.0% | 0.0% | - | - |
| Liquor Licenses | 205 | 342.3% | 391.2% | 700 | 800 |
| **Total Other Assets** | 689,733 | 16.4% | 21.8% | 112,915 | 150,112 |
| **Total** | 689,733 | | | 112,915 | 150,112 |
| **Administrative Claims and Costs to Liquidate** | | | | | |
| Chapter 7 Trustee Fees Estimated at 3% | | | | 3,387 | 4,503 |
| Chapter 7 Trustee Professionals and other | | | | 2,500 | 1,500 |
| Chapter 7 Operational Wind-Down Costs | | | | 2,103 | 1,577 |
| Chapter 7 Total Fees | | | | 7,990 | 7,581 |
| DIP Manager Advances | | | | 18,423 | 18,423 |
| Accrued Post-Petition Payroll, Severance, and KERP | | | | 5,976 | 5,226 |
| Accrued and Unpaid Sales Tax | | | | 1,710 | 1,710 |
| Accrued Post-petition Accounts Payable | | | | 8,353 | 6,467 |
| Total Accrued and Unpaid Post-Petition Claims, including, AP, Payroll, Seveance, KERP and Taxes | | | | 16,038 | 13,403 |
| Other/Contingency | | | | - | - |
| **Total Liquidation Costs and Reserve Claims** | | | | 42,452 | 39,406 |
| **Net Liquidation Proceeds Available for Distribution** | | | | 70,464 | 110,706 |

## Specific Notes to the Securitization Entities Liquidation Analysis

1. <u>Cash and Cash Equivalents</u>

   a. The Liquidation Analysis assumes that the DIP Lender would sweep all cash accounts upon conversion to chapter 7, and the Debtors will not have access to the cash in their accounts in a chapter 7 case. Any impairment in the Trustee's ability to access cash could adversely affect the Trustee's ability to run an orderly liquidation and further reduce recoveries.

2. <u>Receivables</u>

   a. Receivables were analyzed by type. Receivables from third-party delivery services and credit card companies are assumed to be recoverable at 100%. Franchise fee receivables are assumed to be recoverable at 50%, at the low end, and 75%, at the high end.

3. <u>Inventory</u>

a.    Inventory includes food and beverages served in the restaurants, as well as uniforms, merchandise, and smallwares.

b.    The highest recoveries were assumed for beer, wine, and liquor at 15–45%, with potential recovery limited by applicable state law restrictions on resale of alcohol. Merchandise, uniforms, and smallwares were assumed to have market in Hooters franchisees, as well general interest due to the strength of Hooters's brand, with recovery assumed at 20–30%. Perishable food inventory was assumed to have no recovery value. Food items with a longer shelf life were assumed to have a 0%–5% recovery.

4.    <u>Prepaid Expenses and Other Current Assets</u>

a.    Prepaid Expenses were analyzed by type. Unearned premiums on insurance are assumed to be recovered at 75%–100%. Certain prepaid contracts are assumed to be recovered at 5%–10%, with recovery limited by potential outstanding invoices to these vendors.

b.    Prepaid rents, prepaid workers compensation, prepaid business licenses are assumed to have no recovery.

5.    <u>Restricted Cash</u>

a.    Restricted cash is primarily held in external accounts as collateral for workers compensation claims. It is assumed that these funds would not be recoverable and would have no value in a liquidation.

6.    <u>Property, Plant, and Equipment</u>

a.    The Debtors' Property & Equipment is made up of the following categories, and exclude accumulated depreciation:

- **Leasehold Improvements:** Leasehold Improvements consist of improvements the Debtors have made to leased facilities. It is assumed that the Debtors would be unable to separate these improvements from the leased facilities, and the Debtors would recover no value from these Leasehold Improvements.

- **Furniture and Equipment:** Furniture and Equipment include restaurant furniture and fixtures, TVs and sound systems, computers, and office equipment. These items are held in various restaurants around the country, as well as in the corporate office, therefore shipping costs would limit recovery. Total recovery is assumed at 15%, on the low end, and 20%, on the high end.

7.      Goodwill

    a.      Goodwill is assumed to be no recoverable value.

8.      Intangible Assets

    a.      Intangible Assets are made up of software, franchise agreements, and trademarks, and exclude accumulated amortization. The software is assumed to have no liquidation value. The franchise agreements and trademark were valued using the income method based on the income from franchise royalties and licensing revenue per the financial projections in this disclosure statement, The analysis used a long-term growth rate of 1.5%, a required rate of return of 14.5%, and a tax rate of 25%. The low recovery assumes a 25% reduction in the calculated recoverable value. Intangibles are assumed to have a recovery value of $97.5–$130 million.

9.      Other Assets

    a.      Other assets are primarily made up of deposits. Recoveries are estimated at 5%–10%.

10.     Right of Use Assets

    a.      Right of Use Assets are assets that the Debtors have leased, such as their store locations. Based on a review of the underlying lease portfolio, the Debtors do not believe they have any below market leases and as a result, in a chapter 7 liquidation, the leased properties would be turned over to the resulting in no recoverable value.

11.     Liquor Licenses

    a.      Liquor Licenses represent the proceeds of Debtor-owned liquor licenses. These proceeds are assumed to be $700,000 to $800,000, based on an analysis of a sample of the Debtors' licenses by a broker.

**Securitization Entities Liquidation Costs**

12.     Wind-Down Expenses

    a.      Costs to liquidate the Debtors' assets include payroll and benefits for employees needed for assisting the Trustee in the wind down, as well as non-payroll overhead such rent on locations to store assets for sale, utilities, software licenses, and other expenses. Wind down costs are estimated at 6–8 weeks of corporate payroll, or $1.6 million to $2.1 million.

13.   <u>Chapter 7 Trustee</u>

    a.   In accordance with section 326 of the Bankruptcy Code, the Liquidation Analysis assumes the Trustee receives 3% of Total Liquidation Proceeds, excluding cash.

14.   <u>Chapter 7 Professional Fees</u>

    a.   Professional fees in chapter 7 include costs for professionals engaged by the Trustee after the Conversion Date and may include legal counsel, financial advisors, liquidators, and other professionals.

    b.   The Liquidation Analysis includes an estimate of $1.5–$2.5 million for professional fees and broker fees.

**Securitization Entities Claims**

*Proceeds to External Creditors*:  After the payment of the Wind-Down Expenses, the Debtors will proceed to distribute any remaining proceeds to external and internal creditors in accordance with their relative payment priorities.

15.   <u>DIP Manager Advances</u>

    a.   DIP Manager Advances include $23.1 million on account of the DIP Facility, less the assumed cash sweep of $4.7 million cash balance for a total claim amount of $18.4 million. The cash sweep is due to the assumption described above that the DIP Lenders would sweep all cash on conversion to chapter 7.

    b.   In the securitization waterfall, DIP Manager Advances have priority status for repayment to the non-securitization entities and are assumed to recover 100%.

16.   <u>Accrued Post-Petition Payroll, Severance, and KERP</u>

    a.   Two weeks of payroll is assumed to accrued and unpaid as of Liquidation Date totaling $3.2 million. Severance is estimated at $10,000–$15,000 per store for at an assumed 150 stores, totaling $1.5 million–$2.3 million. Additionally, amounts owed under a KERP plan are assumed to be earned and unpaid totaling $535,000.

17.   <u>Accrued and Unpaid Sales Tax</u>

    a.   The Debtors regularly incur and collect sales tax in the ordinary course of their business in connection with the sale of food and liquor. These taxes are "trust fund taxes" and not considered a part of the Debtors' estates under section 541(d) of the Bankruptcy Code. Accrued and Unpaid Sales Taxes are estimated at $1.7 million as of the Liquidation Date.

18.   Accrued Post-Petition Accounts Payable

    a.    Post-petition Accounts Payable claims are estimated at $6.5 million to $8.3 million, based on four to five weeks of incurred but unpaid expenses.

19.   Manager Advance Claims

    a.    Manager Advance Claims are at the top of the payment waterfall of the Prepetition Securitization Indenture (as described in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 299]), and therefore have priority for payment of prepetition debt. These claims are assumed to recover 100% in a liquidation.

20.   Class A-2 Senior Secured Notes Claims

    a.    The Series 2021-1 Class A-2 Senior Secured Notes are assumed to recover 18.1%–33.2%.

21.   Class B Senior Subordinated Notes Claims

    a.    The Series 2021-1 Class B Senior Subordinated Notes are assumed to have no recovery.

22.   Priority Unsecured Claims

    a.    Priority Claims are tax, wage and other claims subject to priority status under section 507(a)(8) of the Bankruptcy Code. This analysis assumes no recovery for Priority Claims.

23.   General Unsecured Claims

    a.    The prepetition General Unsecured Claims are general unsecured claims related to accounts payable, accrued expenses, the Legacy Royalty Obligations, and other long-term liabilities. Accounts payable estimates are based on the Debtors Accounts Payable ledger as of March 26, 2025. General Unsecured Creditors include contingent liabilities for damages arising from the rejection of leases. These claims also include contingent liabilities for damages arising from the rejection of non-lease contracts and litigation; however, no such amounts have been estimated for purposes of this analysis. These claims also include any intercompany claims between securitization and non-securitization entities not described above. No estimate is made for these intercompany claims.

    b.    This analysis assumes no recovery for General Unsecured Claims.

**Non-Securitization Entities**

| Asset Category | Est. Book Value | Rate | | Estimated CH7 Recovery | |
|---|---|---|---|---|---|
| | 5/18/2025 | Low | High | Low | High |
| **Liquidation Proceeds** | | | | | |
| **Cash Proceeds Available** | | | | | |
| Cash and Equivalents | - | 100.0% | 100.0% | - | - |
| **Total Net Cash Available** | - | | | - | - |
| **Other Asset Proceeds Available** | | | | | |
| Receivables | 1,032 | 50.0% | 75.0% | 516 | 774 |
| Manager Advances & Other Intercompany Receivables | 55,574 | 39.8% | 39.8% | 22,092 | 22,092 |
| Prepaid and Other Current Assets | 2,751 | 27.0% | 36.0% | 743 | 990 |
| Property & Equipment | 8,514 | 6.1% | 8.2% | 521 | 695 |
| Intangible Assets | 808 | 0.0% | 0.0% | - | - |
| Other assets | 317 | 5.0% | 10.0% | 16 | 32 |
| Right of Use Assets | 677 | 0.0% | 0.0% | - | - |
| DIP Manager Advances | - | N/A | N/A | 23,141 | 23,141 |
| **Total Other Assets** | **69,673** | **67.5%** | **68.5%** | **47,029** | **47,725** |
| **Total** | **69,673** | | | **47,029** | **47,725** |
| **Administrative Claims and Costs to Liquidate** | | | | | |
| Chapter 7 Trustee Fees Estimated at 3% | | | | 1,411 | 1,432 |
| Chapter 7 Trustee Professionals and other | | | | 2,500 | 1,500 |
| Chapter 7 Operational Wind-Down Costs | | | | 1,577 | 1,051 |
| Chapter 7 Total Fees | | | | 5,488 | 3,983 |
| DIP Loan | | | | 25,041 | 25,041 |
| Accrued Post-Petition Payroll, Severance, and KERP | | | | 6,497 | 4,497 |
| Accrued Chapter 11 Professional and UST Fees | | | | 750 | 500 |
| Accrued Post-petition Accounts Payable | | | | 3,033 | 2,200 |
| Total Accrued and Unpaid Post-Petition Claims, including, AP, Payroll, Severance, KERP, and Ch. 11 Professional Fees | | | | 10,281 | 7,198 |
| Other/Contingency | | | | - | - |
| **Total Liquidation Costs and Reserve Claims** | | | | **40,809** | **36,222** |
| **Net Liquidation Proceeds Available for Distribution** | | | | **6,220** | **11,503** |

## Specific Notes to the Non-Securitization Entities Liquidation Analysis

1.    Cash and Cash Equivalents

  a.    The Liquidation Analysis assumes that the DIP Lender would sweep all cash accounts upon conversion to chapter 7, and the Debtors will not have access to the cash in their accounts in a chapter 7 case.  Any impairment in the Trustee's ability to access cash could adversely affect the Trustee's ability to run an orderly liquidation and further reduce recoveries.

2.    Receivables

  a.    Receivables were analyzed by type. Receivables are primarily made up of expected rebates from vendors not received as well as amounts owed to national marking by franchisees. Receivables are assumed to be recoverable at 50%–75%.

3.      Manager Advances & Other Intercompany Receivables

a.      Manager Advances & Other Intercompany Receivables are comprised of Manager Advances and other receivables on the books and records between non-securitization and securitization entities. Manager Advances are assumed to be recoverable at 100%, as they have the highest priority in a liquidation of the securitized entities. All other intercompany receivables are assumed to have no recovery.

4.      Prepaid Expenses and Other Current Assets

a.      Prepaid Expenses include items such as prepaid insurance, prepaid licenses and other prepaids. Prepaid Insurance is assumed to have a 75%–100% value in a liquidation. All other prepaids are assumed to have no value in a liquidation.

5.      Property, Plant, and Equipment

a.      The Debtors' Property & Equipment is made up of the following categories, and exclude accumulated depreciation:

• **Leasehold Improvements:** Leasehold Improvements consist of improvements the Debtors have made to leased facilities. It is assumed that the Debtors would be unable to separate these improvements from the leased facilities, and the Debtors would recover no value from these Leasehold Improvements.

• **Furniture and Equipment:** Furniture and Equipment include computers, furnishings, and office equipment. All equipment would be in one location. Total recovery is assumed at 15%, on the low end, and 20%, on the high end.

• **Computer Software:** Capitalized computer software is assumed to have no value in a liquidation.

• **Other Property**: Other Property consists of capitalized development costs with no recovery value.

6.      Intangible Assets

a.      Intangible Assets exclude accumulated amortization and are primarily made up of software. Recoveries are estimated at 0%.

7.      Other Assets

a.      Other assets are primarily made up of deposits. Recoveries are estimated at 5%–10%.

8.      Right of Use Assets

    a.      Right of Use Assets are assets that the Debtors have leased, such as their headquarters location. Based on a review of the underlying lease portfolio, the Debtors do not believe they have any below market leases and as a result, in a chapter 7 liquidation, the leased properties would be turned over to the resulting in no recoverable value.

9.      DIP Manager Advances

    a.      Obligations incurred under the DIP facility are considered to be DIP Manager Advances. In the securitization waterfall, DIP Manager Advances have priority status for repayment to the non-securitization entities and are assumed to recover 100%.

**Non-Securitization Entities Liquidation Costs**

10.      Wind-Down Expenses

    a.      Costs to liquidate the Debtors' assets include payroll and benefits for employees needed for assisting the Trustee in the wind down, as well as non-payroll overhead such rent on locations to store assets for sale, utilities, software licenses, and other expenses.  Wind down costs are estimated at 4–6 weeks of corporate payroll, or $1.1–$1.6 million.

11.      Chapter 7 Trustee

    a.      In accordance with section 326 of the Bankruptcy Code, the Liquidation Analysis assumes the Trustee receives 3% of Total Liquidation Proceeds, excluding cash.

12.      Chapter 7 Professional Fees

    a.      Professional fees in chapter 7 include costs for professionals engaged by the Trustee after the Conversion Date and may include legal counsel, financial advisors, liquidators, and other professionals.

    b.      The Liquidation Analysis includes an estimate of $1.5–$2.5 million for professional fees and broker fees.

**Non-Securitization Entities Claims**

To the extent there are unencumbered assets, which are estimated to be de minimis, the proceeds generated therefrom are assumed to satisfy fees and expenses associated with the wind-down process.

13. <u>DIP Loan</u>

    a.    The DIP Facility is assumed to be drawn to $23.1 million, plus a $5 million balance
          from the Amendment No.1 Loans that was rolled up as part of the DIP Facility, less
          the assumed cash sweep of $3.1 million projected cash balance for a total claim
          amount of $25 million. The cash sweep is due to the assumption described above
          that the DIP Lenders would sweep all cash on conversion to chapter 7. The DIP
          Loan is also assumed to be current on interest and fees. This Liquidation Analysis
          assumes 100% recovery for the DIP Loan.

14. <u>Accrued Post-Petition Payroll, Severance, and KERP</u>

    a.    Two weeks of payroll is assumed to accrued and unpaid as of Liquidation Date
          totaling $526,000. Severance for corporate employees is estimated at $3 million to
          $5 million. Additionally, amounts owed under a KERP plan are assumed to be
          earned and unpaid totaling $972,000.

15. <u>Accrued Chapter 11 Professional and UST Fees</u>

    a.    The Debtors estimate that professional fees will be incurred consistent with the cash
          flow projections for the week ended May 23, 2025, including those fees subject to
          Bankruptcy Court approval. Any accrued and unpaid professional fees after
          conversion to chapter 7 would be paid subject to 11 U.S.C.A. § 726(b).  This
          Liquidation Analysis estimates $500,000 and $750,000 for Accrued Chapter 11
          Professional Fees that are unpaid as of the Liquidation Date, as well as quarterly
          fees due to the United States Trustee (UST).

16. <u>Accrued Post-Petition Accounts Payable</u>

    a.    Post-petition Accounts Payable claims are estimated at $2.2–$3.0 million, based on
          four to five weeks of incurred but unpaid expenses.

17. <u>Manager Advance Loans</u>

    a.    The Manager Advance Loans are assumed to recover 74.2%–100% in a liquidation.

18. <u>Term Loans</u>

    a.    The Term Loans are assumed to recover 0%–5.6%.

19.     <u>Priority Unsecured Claims</u>

    a.     Priority Claims are tax, wage and other claims subject to priority status under section 507(a)(8) of the Bankruptcy Code. This analysis assumes no recovery for Priority Claims.

20.     <u>General Unsecured Claims</u>

    a.     General Unsecured Claims are general unsecured claims related to accounts payable, accrued expenses, employee claims above the priority cap, the Legacy Royalty Obligations and other long-term liabilities. Accounts payable estimates are based on the Debtors Accounts Payable ledger as of March 26, 2025.  General Unsecured Creditors include contingent liabilities for damages arising from the rejection of leases and include claims on securitization leases that non-securitization entities guarantee.  These claims also include contingent liabilities for damages arising from the rejection of non-lease contracts; however, no such amounts have been estimated for purposes of this analysis. Claims for contingent liabilities related to litigation are estimated as of October 29, 2024, updated for known settlements and assumed to relate entirely to non-securitization entities for purposes of this analysis.  These claims also include any intercompany claims between Securitization and Non-Securitization entities not described above.  No estimate is made for these intercompany claims.  This analysis assumes no recovery for pre-petition General Unsecured Claims.

## **EXHIBIT F**

**Valuation Analysis**

**Valuation Analysis[1]**

### A. Disclaimer

**THE ANALYSIS SET FORTH HEREIN (THE "<u>VALUATION ANALYSIS</u>") REPRESENTS ESTIMATED VALUATION FOR THE REORGANIZED DEBTORS AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW EQUITY INTERESTS DOES NOT PURPORT TO BE OR CONSTITUTE (I) AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS; (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN, THE TERMS AND PROVISIONS OF THE PLAN, OR ANY RESTRUCTURING TRANSACTION CONTEMPLATED UNDER THE PLAN OR OTHERWISE DESCRIBED THEREIN; OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS.**

**THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED FROM ANY INDEBTEDNESS OR SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.**

### B. Valuation Estimate

Solely for the purposes of the Plan, the Debtors directed their investment banker, SOLIC, to estimate the going-concern value of the Reorganized Debtors (the "<u>Enterprise Value</u>"). This analysis has been prepared for the Debtors' sole use and is based on information provided to SOLIC by the Debtors. The analysis herein reflects the combined assets and operations of all Debtor subsidiaries of the Company.

Based on the Financial Projections prepared on behalf of the Debtors, a copy of which are attached to the Disclosure Statement as **<u>Exhibit D</u>**, and subject to the disclaimers and the descriptions of SOLIC's methodology set forth herein, and solely for purposes of the Plan, SOLIC estimates the Enterprise Value of the Reorganized Debtors will be within the range of approximately $384 million to $398 million on or around July 15, 2025 (the "<u>Assumed Effective Date</u>"), with an estimated midpoint of approximately $390 million. This Valuation Analysis assumes that the Reorganized Debtors will have, as of the Assumed Effective Date, funded debt

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and its Affiliated Debtors* (the "<u>Disclosure Statement</u>").

obligations of $365 million (consisting of $40 million outstanding under the New Class A 1 Notes, $18 million outstanding under the New Class A-2II Notes, $266 million outstanding under the New Class A-2I Notes, and $40 million outstanding under the New Class B Notes). The range of total equity value, which takes into account the Enterprise Value *less* the estimated debt as of the Assumed Effective Date, was estimated by SOLIC to be between approximately $19 million and $33 million, with an estimated midpoint of approximately $26 million. The implied Enterprise Value of the Reorganized Debtors should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated Enterprise Value for the Reorganized Debtors, SOLIC:

(i)    reviewed certain historical financial information of the Debtors for recent years and interim periods provided by the Debtors;

(ii)    reviewed certain internal financial and operating data of the Debtors relating to the business, such as earnings, cash flow, assets, liabilities, and other prospects, including the Financial Projections, which were prepared and provided to SOLIC by the Debtors' management team, and which relate to the Debtors' business and its prospects;

(iii)    met with certain members of the Debtors' management team to discuss the Debtors' operations and future prospects;

(iv)    reviewed publicly available financial data and market-implied valuation statistics of public companies deemed by SOLIC to be potentially comparable to the operating businesses of the Debtors;

(v)    considered certain economic and industry information relevant to the Debtors' operating businesses;

(vi)    prepared discounted cash flow ("DCF") analyses based on the Financial Projections for years 2025 through 2035, utilizing various discount rates and assumptions in the calculation of terminal values;

(vii)    considered the implied value of change-of-control transactions undertaken by companies deemed by SOLIC to be comparable to the operating business of the Debtors;

(viii)    conducted such other analyses as SOLIC deemed appropriate.

Although SOLIC conducted a review and analysis of the Debtors' business, operating assets and liabilities, and business plans, SOLIC relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other advisors retained by the Debtors, as well as certain publicly available information as to which SOLIC does not have independent knowledge.

The Financial Projections prepared in consultation with the Debtors and Accordion are for the period beginning July 2025 through 2035 (the "Projection Period"). The Financial Projections: (i) are based on assumptions disclosed fully in Exhibit D to the Disclosure Statement;

(ii) reflect the Debtors' best currently available estimates; and (iii) reflect the good faith judgments of the Debtors.  SOLIC does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and, consequently, are inherently difficult to project.  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual Enterprise Value of the Reorganized Debtors may be significantly higher or lower than the estimated range provided herein.

No independent evaluations or appraisals of the Debtors' assets were sought or obtained in connection with SOLIC's valuation.  SOLIC did not conduct an independent investigation into any of the legal, tax, pension, or accounting matters affecting the Debtors and therefore makes no representations as to their impact on the Debtors' financial statements.

C.  **Valuation Considerations**

This valuation is based upon information available to, and analyses undertaken by, SOLIC as of June 6, 2025 (the "Assumed Valuation Date"), and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections.  The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  For purposes of this valuation, SOLIC has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the Assumed Effective Date.  Events and conditions subsequent to the Assumed Valuation Date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither SOLIC nor the Debtors have any obligation to update, revise, or reaffirm the Enterprise Value.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, market conditions, the Reorganized Debtors' capitalization and available cash as set forth further in the Plan and Disclosure Statement, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.  Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the Enterprise Value of the Reorganized Debtors.  As discussed above, SOLIC's views are also necessarily based on economic, monetary, market, and other conditions as in effect on the Assumed Valuation Date.  Further, the valuation is based on the assumption that the Buyer Group will acquire 103 stores under the Plan, which is subject to change.

Further, the valuation of the New Equity Interests to be issued upon the Assumed Effective Date is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of

securities. Actual prices at which such securities can be sold also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the Enterprise Value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the Enterprise Value ranges associated with SOLIC's Valuation Analysis. The Reorganized Debtors are anticipated to be a private company that will not be obligated to file public reports or disclosures, and the New Equity Interests will not be listed on any securities exchange. There can be no assurance that any trading market will develop for the New Equity Interests. The estimated values for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets.

The estimate of Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing owner of the Debtors' business and assets and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of owning a business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such business. The estimated distributable value in this Valuation Analysis does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, their securities, or their assets, which may be materially higher or lower than the estimated distributable value range herein.

SOLIC's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the solvency of the Debtors or the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Valuation estimates are inherently subject to uncertainties, and consequently, none of the Debtors, SOLIC, or any other professional or person assumes responsibility for any differences between the estimated valuation ranges herein and any actual outcome.

### D. **Valuation Methodology**

In preparing its valuation, SOLIC performed a variety of financial analyses and considered a variety of factors. SOLIC largely relied on three generally accepted valuation techniques: (i) DCF analysis; (ii) comparable public company analysis; and (iii) precedent transactions analysis.

a.  DCF Analysis

DCF analysis is a forward-looking enterprise valuation methodology that can be used to estimate the value of an asset or business by calculating the present value of expected future cash flows generated by that asset or business.  Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate").  The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure and interest tax shield (if any).  The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Financial Projections, plus an estimate for the value of the firm beyond the Projection Period, known as the terminal value.

b.  Comparable Public Company Analysis

Comparable public company analysis estimates the value of a company relative to publicly traded companies with similar operating and financial characteristics.  A set of publicly traded companies was selected based on similar business and financial characteristics to the Reorganized Debtors.  Criteria for the selected reference group included, among other relevant characteristics, similarity in industry, product type, end customers, operations, business risk, and growth prospects.  The selected reference group may not be comparable to the Reorganized Debtors in all aspects and may differ materially in others.  Under this methodology, certain financial multiples that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors.  SOLIC used, among other measures, enterprise value for each selected company as a multiple of such company's publicly available consensus earnings before interest, taxes and depreciation expense ("EBITDA").

The comparable public company methodology has several limitations in this instance, including a limited universe of publicly traded peers, none of which is a perfect comparable with the exact same operating and financial characteristics as the Reorganized Debtors, as discussed above.

c.  Precedent Transaction Analysis

Precedent transaction analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors.  Under this methodology, a multiple is derived using the enterprise value of each such target, calculated as the consideration paid and the net debt assumed in the selected precedent transaction relative to a financial metric, in this case EBITDA for the prior twelve-months from when the transaction occurred.

* * *

The summary herein does not purport to be a complete description of the analyses and factors undertaken to support SOLIC's conclusions.  The preparation of a valuation is a complex process involving various quantitative and qualitative determinations as to the most appropriate

analyses and factors to consider, and the application of those analyses and factors to the particular circumstances of the Debtors.  As a result, the process involved in preparing a valuation is not readily summarized.

[*Remainder of page intentionally left blank.*]