

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 30, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Hooters of America, LLC, *et al.*,[1] | Case No. 25-80078 (SWE) |
| Debtors. | (Jointly Administered) |

### ORDER (I) APPROVING
### THE DISCLOSURE STATEMENT ON A FINAL BASIS AND (II) CONFIRMING
### THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF HOOTERS OF AMERICA, LLC AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010).  The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

Upon the filing by Hooters of America, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as may be further amended, modified or supplemented, the "Plan") which is attached hereto as **Exhibit A**; and the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 564] (as amended, modified, or supplemented, the "Disclosure Statement"); and the Bankruptcy Court having entered the *Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement on a Final Basis and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation and Voting Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status; (IV) Conditionally Approving the Disclosure Statement, and (V) Granting Related Relief* [Docket No. 567] (the "Conditional Disclosure Statement Order"), which among other things, (i) conditionally approved the Disclosure Statement, (ii) approved the related solicitation and voting procedures (the "Solicitation and Voting Procedures"), including the notices, forms (including the Opt-In Form), and Ballots, and (iii) scheduled a combined hearing to consider approving the Disclosure Statement on a final basis and confirmation of the Plan for August 20, 2025 at 9:30 a.m. (prevailing Central Time) (the "Combined Hearing"); the Debtors having Filed the following: the *Notice of Filing of Plan Supplement* [Docket No. 722] (the "First Plan Supplement"), the *Notice of the First Amended Plan*

---

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan, the Disclosure Statement, the DIP Orders, or the Bankruptcy Code, as applicable.  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

*Supplement* [Docket No. 770] (the "Amended Plan Supplement"), the *Notice of the Second Amended Plan Supplement* [Docket No. 902] (the "Second Amended Plan Supplement"), the *Notice of the Third Amended Plan Supplement* [Docket No. 1045] (the "Third Amended Plan Supplement" and, together with the First Plan Supplement, the Amended Plan Supplement, the Second Amended Plan Supplement, the "Plan Supplement") which included, among other things, the Second Amended & Restated Base Indenture, the Identity of the Members of the New Board, the New Organizational Documents, the Assumption Schedule, the Schedule of Retained Causes of Action, the Schedule of Litigation Trust Causes of Action, the Wind-Down Officer Identity and Engagement Agreement, the Restructuring Steps Memorandum, the Litigation Trust Agreement, the Brand Management Agreement, the License Agreement, the Buyer Group APAs, the Transition Services Agreement, and Supplemental Tax Disclosures; and the Debtors' having Filed the following:

A. *Declaration of Keith Maib, Chief Restructuring Officer of the Debtors, In Support of the Debtors' Chapter 11 Petitions and First Day Motions* on April 1, 2025 [Docket No. 19];

B. *Affidavit of Service of Stanislav Kesler* on August 6, 2025 [Docket No. 731] confirming distribution of the *Notice of (I) Combined Hearing on the Final Approval of the Disclosure Statement, Confirmation of the Chapter 11 Plan, and Related Matters, and (II) Objection Deadlines and Summary of the Plan* (the "Combined Hearing Notice");

C. *Affidavit of Service of Stanislav Kesler* on August 8, 2025 [Docket No. 742] confirming distribution of the Solicitation Packages and further supplemented by the *Affidavit of Service of Stanislav Kesler* on August 14, 2025 [Docket No. 765] (together with the Combined Hearing Notice, the "Solicitation Affidavits");

D. *Certificate of Publication* of Stanislav Kesler on behalf of Kroll Restructuring Administration LLC ("Kroll") on July 18, 2025 [Docket No. 619] (the "Certificate of Publication");

E. *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 771] (the "Voting Report");

F.  *Declaration of George N. Koutsonicolis in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 795] (the "Koutsonicolis Declaration");

G.  *Declaration of Keith Maib Chief Restructuring Officer of the Debtors in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 794] (the "Maib Declaration", and together with the Koutsonicolis Declaration and the Voting Report, the "Confirmation Declarations"); and

H.  *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors; (II) Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors; and (III) Omnibus Reply to Objections Thereto* [Docket No. 775].

((A) through (H), collectively, the "Confirmation Documents"); and this Bankruptcy Court having found that the Combined Hearing Notice and the opportunity for any party in interest to object to final approval of the Disclosure Statement and Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and this Bankruptcy Court having commenced the Combined Hearing on August 20, 2025 and having concluded the Combined Hearing on September 30, 2025; and any objections to confirmation of the Plan having been settled, withdrawn, resolved, or overruled on the merits by this Bankruptcy Court; and upon the Confirmation Documents, and the evidence adduced at, and the record of, the Combined Hearing; and upon the record of these Chapter 11 Cases; and after due deliberation:

**THIS BANKRUPTCY COURT HEREBY FINDS:**

A.  The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.      This Bankruptcy Court has jurisdiction over these Chapter 11 Cases pursuant to
28 U.S.C. § 1334.  This Bankruptcy Court has exclusive jurisdiction to determine whether the
Disclosure Statement and the Plan comply with the applicable provisions of chapter 11 of title 11
of the United States Code (the "Bankruptcy Code") and should be approved and confirmed,
respectively.  Venue of these proceedings and the Chapter 11 Cases in this district is proper
pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §
157(b)(2), and this Bankruptcy Court may enter a final order hereon under Article III of the United
States Constitution.

C.      The Debtors were and are entities eligible for relief under section 109 of the
Bankruptcy Code.  The Debtors were and are proper plan proponents under section 1121(a) of the
Bankruptcy Code.

D.      On March 31, 2025 (the "Petition Date") the Debtors commenced these Chapter 11
Cases by each filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the
Bankruptcy Rules, and the Local Rules of the United States Bankruptcy Court for the Northern
District of Texas (the "Local Rules"). On April 2, 2025, the Bankruptcy Court entered an order
authorizing the joint administration and procedural consolidation of these Chapter 11 Cases
pursuant to Bankruptcy Rule 1015(b).  [Docket No. 91].  Since the Petition Date, the Debtors have
operated their businesses and managed their properties as debtors in possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in
these chapter 11 cases.  The United States Trustee for the Northern District of Texas (the
"U.S. Trustee") appointed an official committee of unsecured creditors (the
"Creditors' Committee") on April 15, 2025 [Docket No. 187] as amended by [Docket No. 189].

E.      The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court, including, without limitation, all pleadings and other documents Filed, and orders entered thereon.  The Bankruptcy Court also takes judicial notice of all hearing transcripts, evidence proffered or adduced, and all arguments made at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases.

F.      The Disclosure Statement (i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy rules, laws, and regulations, including the Securities Act, and (ii) contains "adequate information" (as such term is defined in 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Chapter 11 Cases, the Plan, and the transactions contemplated therein, and (iii) is hereby approved in all respects.  The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

G.      As is evidenced by the Solicitation Affidavits, the transmittal and service of the Combined Hearing Notice, the Plan, the Plan Supplement, the Disclosure Statement, the Ballots, and the Notice of Non-Voting Status were adequate and sufficient under the circumstances, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Conditional Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws and regulations, and such parties have had a full and fair opportunity to appear and be heard with respect thereto.  No additional or further notice is required under the circumstances.

H.      As described in the Voting Report and the Confirmation Declarations (as applicable) the Plan, the Disclosure Statement, the applicable Ballot, the Committee Letter, the

Combined Hearing Notice, and the Conditional Disclosure Statement Order (collectively, the "Solicitation Packages") were transmitted to and served on the parties identified therein, including all Holders of Claims in the Voting Classes, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Conditional Disclosure Statement Order, and any applicable nonbankruptcy law.  Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases.  No additional or further notice is required under the circumstances.

I.        As set forth in the Voting Report, the Solicitation Packages were distributed to Holders that held a Claim in the Voting Classes as of June 27, 2025 (the date specified in such documents for the purpose of the solicitation, the "Voting Record Date").  The establishment and notice of the Voting Record Date were reasonable and sufficient.

J.        The Debtors published the Combined Hearing Notice in *The Wall Street Journal*, in compliance with the Conditional Disclosure Statement Order and Bankruptcy Rule 2002(l), as evidenced by the Certificate of Publication.

K.        As evidenced in the Voting Report, with respect to each Debtor, the votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations.

L.        The Holders of Claims in Class 2 (Securitization Class A-2 Note Claims), Class 3 (Securitization Class B Note Claims), Class 4 (Non-Securitization Manager Advance Term Loan Claims), and Class 8 (General Unsecured Claims) (collectively, the "Voting Classes") have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  However, even if

the Holders of General Unsecured Claims in Class 8 had voted to reject the Plan as a class, the

Plan would still be confirmable for the reasons set forth in this Confirmation Order.  Pursuant to

the Conditional Disclosure Statement Order, the Ballots the Debtors used to solicit votes to accept

or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of

these Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept

or reject the Plan.

      M.      Holders of Claims and Interests in Class 7 (Securitization Manager Advance

Claims), Class 9 (Other Intercompany Claims), Class 10 (Intercompany Interests), Class 11

(Securitization Prepetition Master Issuer Equity Interests), Class 12 (Other Securitization

Prepetition Equity Interests), and Class 13 (Non-Securitization Prepetition Equity Interests) are

deemed to have rejected the Plan (the "Rejecting Classes").  Notwithstanding the fact that the

Rejecting Classes are deemed to reject the Plan, the Plan may be confirmed pursuant to section

1129(b)(1) of the Bankruptcy Code because (a) there is no Class of Claims or Interests similarly

situated to the Rejecting Classes that is receiving better treatment than such Rejecting Classes

under the Plan, (b) no Holder of any Claim or Interest that is junior to the Claims and Interests

represented by the Rejecting Classes shall receive or retain any property under the Plan on account

of such junior Claim or Interest, (c) no Holder of a Claim in a class senior to the Rejecting Classes

is receiving more than 100% recovery on account of its Claim, and (d) all of the requirements of

section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), have been met.  Finally,

Holders of Claims in each of the Voting Classes voted to accept the Plan in sufficient number and

in sufficient amount to constitute accepting classes under the Bankruptcy Code.  Accordingly, the

Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and therefore, may be

confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

N.      The period during which the Debtors solicited acceptances or rejections of the Plan was a reasonable and sufficient period of time for each Holder in the Voting Classes to make an informed decision to accept or reject the Plan.

O.      The Debtors served Holders of Claims or Interests in the Non-Voting Classes with the Combined Hearing Notice, the Notice of Non-Voting Status, and the Opt-In Form in accordance with the Conditional Disclosure Statement Order.

P.      The Plan Supplement (including any modifications or supplements thereto) complies with section 1129(a)(5) of the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents are good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and other applicable rules, laws, and regulations, and no other or further notice is required.  All documents included in the Plan Supplement (including any modification or supplements thereto) and all other documents necessary or appropriate to implement the Plan are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan and the Restructuring Support Agreement, and only consistent therewith and subject to all consent rights provided therein, the Debtors reserve the right to alter, amend, update, or modify, in each case in whole or in part, the Plan Supplement before the Effective Date.  All parties were provided due, adequate, and sufficient notice of the Plan Supplement and the documents contained therein, and the filing of any further supplements thereto will provide due, adequate and sufficient notice thereof.

Q.      The Plan and any modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately Filed the Disclosure Statement and Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and Plan

describe, in bold font and with specific and conspicuous language, all acts to be enjoined by such provisions and identify the Entities that will be subject to such injunctions, thereby satisfying Bankruptcy Rule 3016(c).

R.    The Claims and Interests placed in each Class are substantially similar to other Claims and Interests in each such Class, and thus the Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and the Debtors' classification scheme reflects no improper purpose and does not unfairly discriminate between Holders of Claims or Interests.  Furthermore, the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

S.    The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. Article III of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired (the "Unimpaired Classes") under the Plan within the meaning of section 1124 of the Bankruptcy Code: Class 1 (Priority Non-Tax Claims); Class 5 (Other Secured Claims); and Class 6 (Non-Securitization Term Loan Claims (Secured). Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Allowed DIP Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and Restructuring Expenses will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

T.    The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims in the following Classes (the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes: Class 2 (Securitization Class A-2 Note Claims); Class 3

(Securitization Class B Note Claims); Class 4 (Non-Securitization Manager Advance Term Loan Claims); Class 7 (Securitization Manager Advance Claims); Class 8 (General Unsecured Claims); Class 9 (Other Intercompany Claims); Class 10 (Intercompany Interests); Class 11 (Securitization Prepetition Master Issuer Equity Interests); Class 12 (Other Securitization Prepetition Equity Interests); and Class 13 (Non-Securitization Prepetition Equity Interests).

U.      The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest.

V.      The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan, and in the exhibits and attachments to the Plan, the Plan Supplement, and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including regarding: (a) the general settlement of Claims and Interests; (b) the authorization of the Debtors, Wind-Down Officer and/or Reorganized Debtors to take all actions necessary to effectuate the Plan, including those actions necessary to effectuate the Restructuring Transactions, the GUC Settlement, and the Buyer Group Arrangements; (c) the funding and sources of consideration for the Plan distributions; (d) the issuance of the New Debt and New Equity Interests; (e) the adoption of the New Organizational Documents; (f) the vesting of assets in the Reorganized Debtors; (g) the creation of the Litigation Trust and the transfer of the Litigation Trust Assets to the Litigation Trust; (h) the cancellation of existing interests, indebtedness, and other obligations; (i) the authorization and approval of corporate actions under the Plan; (j) the appointment of the New Board; (k) the dissolution of

certain Debtors; (l) the preservation of Causes of Action; and (m) the ultimate closing of these Chapter 11 Cases as provided in the Plan.

W.     The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. Article IV.F of the Plan provides that the New Organizational Documents will comply with section 1123(a)(6) of the Bankruptcy Code.  The New Organizational Documents prohibit the issuance of non-voting equity securities to the extent prohibited by 1123(a)(6) of the Bankruptcy Code.

X.     The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.G of the Plan sets forth the establishment of the New Board.  The directors on the New Board will be identified by the Debtors in the Plan Supplement prior to the Effective Date, and shall be deemed appointed on the Effective Date.  Article IV.J of the Plan sets forth the structure of the Litigation Trust and selection of the Litigation Trustee.  The Litigation Trustee was identified in the Plan Supplement. Article IV.I of the Plan sets forth the selection of the Wind-Down Officer.  The Wind-Down Officer was identified in the Plan Supplement. The directors and officers (if any) of the Reorganized Debtors and Wind-Down Entity, and the Litigation Trustee were selected in a manner consistent with the interests of creditors and with public policy.

Y.     The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

Z.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  Article V of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases not included on the Assumption Schedule, not an Existing Franchise Agreement, or not previously assumed, assumed and assigned, or rejected during these Chapter 11 Cases under section 365 of the Bankruptcy Code, and the payment of Cures, if any, related thereto.

AA.    The Debtors' determinations regarding the assumption (or assumption and assignment) or rejection of Executory Contracts and Unexpired Leases are based on, and within, the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties-in-interest in the Chapter 11 Cases.  Entry of this Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumption and assignments, and/or rejections, as applicable, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement pursuant to sections 365 and 1123 of the Bankruptcy Code.

BB.    The Debtors, as proponents of the Plan, have met their burden of proving all applicable provisions of sections 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.  Each witness who testified or submitted a declaration on behalf of the Debtors or any other party, in support of the Disclosure Statement, Plan, and Confirmation in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in their testimony.

CC.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

DD.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code and, thus, have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and Bankruptcy Rules 2022, 3017, 3018, and 3019.  The Debtors and their agents transmitted the Solicitation Packages and related documents and solicited and tabulated votes with respect to the

Plan fairly, in good faith, and in compliance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code.

EE.    The Plan (including the Plan Supplement and all other documents necessary or appropriate to effectuate the Plan) has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.    In so finding, the Bankruptcy Court has considered the totality of the circumstances of these Chapter 11 Cases and found that all constituencies acted in good faith.    The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.    The Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate and honest purpose of maximizing the value of the Estates and allowing the Debtors to implement the Restructuring Transactions, effectuate the Buyer Group Arrangements, reorganize, and emerge from bankruptcy to allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.    Further, the Plan's classification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and each is integral to the Plan, supported by valuable consideration, and necessary to the Debtors' successful reorganization.    Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

FF.    The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

GG.    The directors on the New Board will be identified by the Debtors in the Plan Supplement prior to the Effective Date, and the New Board shall be deemed appointed on the Effective Date. The Wind-Down Officer was identified in the Plan Supplement and shall be deemed appointed on the Effective Date.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

HH.    Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  Further, as the Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission, section 1129(a)(6) of the Bankruptcy Code is satisfied.

II.    The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis set forth in Exhibit E to the Disclosure Statement (as may be amended from time to time, the "Liquidation Analysis") and other evidence proffered or adduced prior to, or in connection with the Combined Hearing, including the Confirmation Declarations: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of a Claim or Interest in an Impaired Class either has accepted the Plan or will receive or retain under the Plan, on account of such Allowed Claim or Allowed Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  All parties in interest have been given the opportunity to challenge the Liquidation Analysis.  The Liquidation Analysis is: (a) reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered; and (b) uses reasonable and appropriate methodologies and assumptions.  As a result, the Debtors have

demonstrated that the Plan is in the best interests of their creditors, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

JJ.    As evidenced by the Voting Report, the Plan has been accepted by creditors in excess of two-thirds in amount and one-half in number of holder of Claims who timely voted to accept or reject the Plan in all of the Impaired Classes that were entitled to vote on the Plan. Accordingly, as to such Classes, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied. In addition, as set forth above, Holders of Claims and Interests in the Unimpaired Classes are unimpaired under the Plan and are, therefore, conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

KK.    Holders of Claims and Interests in Classes 7, 9, 10, 11, 12, and 13 are not receiving or retaining any distribution or property on account of their claims and interests and, as such, are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As to these classes, the Plan may be confirmed under the cramdown provisions of section 1129(b) of the Bankruptcy Code.

LL.    The treatment of Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims, under <u>Article II</u> of the Plan, and of Priority Non-Tax Claims under <u>Article III</u> of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

MM.    As set forth below, the releases, exculpations, and injunctions in <u>Article VIII</u> of the Plan are appropriate under applicable law.

      (a)    **Debtor Releases**.  For the reasons set forth in the Confirmation Documents, the releases being provided by the Debtors (i) in favor of the Released Parties and (ii) of Avoidance Actions against any Released Party pursuant to <u>Article VIII.C</u> of the Plan (collectively, the "<u>Debtor Release</u>") are: (a) fair, equitable, and reasonable; (b) integral elements of the Plan and resolution of the Chapter 11 Cases, without which the Debtors' ability to

16

confirm the Plan would be seriously impaired; and (c) in the best interests of the Debtors, the Estates, and creditors. Accordingly, such releases constitute a sound exercise of the Debtors' business judgment and, to the extent applicable, otherwise satisfy the standard articulated in *In re Mirant Corp.*, 348 B.R. 725, 737–39 (Bankr. N.D. Tex. 2006). The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases. The Debtor Release is appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan.

(b)     **Releases by Releasing Parties**.    For the reasons set forth in the Confirmation Documents, the releases being provided by the Releasing Parties in favor of the Released Parties pursuant to <u>Article VIII.D</u> of the Plan (collectively, the "<u>Non-Debtor Release</u>") are appropriate. The Non-Debtor Release is: (a) consensual under controlling precedent because Releasing Parties are those who affirmatively opted into such releases; (b) specific in language and scope; (c) given in exchange for the substantial contributions made and the good and valuable consideration provided by the Released Parties, which are integral to the success of the Plan; (d) a condition to the good faith settlement and compromise of the Claims and Causes of Action released by the Non-Debtor Release; (e) in the best interests of the Debtors and all holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due and adequate notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Non-Debtor Release.

(c)     **Exculpation.**  The exculpation provisions contained in <u>Article VIII.E</u> of the Plan and this Confirmation Order are appropriately tailored to the circumstances of these Chapter 11 Cases and are appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.,* 48 F. 4th 419 (5th Cir. 2022), because they are supported by proper evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope. The Exculpated Parties reasonably relied upon the exculpation provisions as a material inducement to engage in postpetition negotiations with key stakeholders that culminated in the Plan, and all other settlements and compromises therein that maximize value for the Debtors' Estates. The record in these Chapter 11 Cases supports that the exculpation provisions are appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contain appropriate carve outs for actions determined by a Final Order to have constituted actual fraud.

(d)     **Injunction.**  For the reasons set forth in the Confirmation Documents, the injunction set forth in <u>Article VIII.F</u> of the Plan is appropriate in that such injunction is necessary to implement, preserve, and enforce the releases and

exculpations set forth in <u>Article VIII</u> of the Plan, and is narrowly tailored to achieve such purpose.

NN.    The settlements and compromises incorporated in the Plan (including, without limitation, the settlement and compromise of Claims, Interests, Causes of Action and controversies relating to the contractual, legal, equitable, and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Allowed Interest), and the settlements and compromises set forth in the GUC Settlement and the Restructuring Support Agreement are in the best interests of the Debtors, the Estates, the Debtors' creditors, Holders of any Interests, and other parties in interest, are both fair and equitable, and are within the range of reasonableness, and satisfy the requirements of applicable law for approval pursuant to Bankruptcy Rule 9019.  The compromises and settlements embodied in the Plan are the result of extensive, arm's-length, good faith negotiations that resulted in the Plan, which preserves value for the Debtors, their Estates, and all their stakeholders, avoid extended, uncertain, time-consuming, and value-destructive litigation, and represent a fair and reasonable compromise of all Claims, Interests, and controversies and entry into which represented a sound exercise of the Debtors' business judgment.

OO.    The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

PP.    The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, Classes 2,3,4, and 8, which are Impaired, voted to accept the Plan by the requisite number and amount of Claims—determined without including any acceptance of the Plan by any Insider (as such term is defined in section 101(31) of the Bankruptcy

Code)—as specified under the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

QQ.    The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The financial projections attached to the Disclosure Statement as <u>Exhibit D</u> (as may be amended from time to time, the "<u>Financial Projections</u>") and the other evidence supporting Confirmation of the Plan or in the Confirmation Declarations, Filed, proffered, or adduced by the Debtors at, prior to, or in connection with the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; (d) establish that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan, except as provided in the Plan; and (e) establish that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan, including on account of any contingent, unliquidated, and other Disputed Claims that ultimately become Allowed after the Effective Date.  Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

RR.    The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. <u>Article XII.D</u> of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

SS.    Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code are not applicable to these Chapter 11 Cases.  The Debtors owe no retiree benefits, domestic support obligations, are not individuals, and are not non-profit corporations.

TT.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of the Chapter 11 Cases.

UU.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan, as evidenced by its terms, is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

VV.    None of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

WW.    Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

XX.    Each of the conditions precedent to the Effective Date, as set forth in <u>Article IX.A</u> of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with <u>Article IX.B</u> of the Plan.

YY.    All documents and agreements necessary to implement the Plan and all other relevant and necessary documents, including the Second Amended & Restated Base Indenture, the Litigation Trust Agreement, and other documents contained in the Plan Supplement, and all other relevant and necessary documents have been or will be negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

ZZ.    The Debtors have disclosed all material facts regarding the Plan, including with respect to consummation of the Restructuring Transactions, the GUC Settlement and the Buyer Group Arrangements.

AAA.  The terms and conditions of the New Debt and the Debtors' entry into the New Notes Documents, including all actions, undertakings, and transactions contemplated thereby, and payment of all fees, indemnities, and expenses provided for thereunder, are essential elements of the Plan, necessary for the consummation thereof, and in the best interest of the Debtors, the Estates, and Holders of Claims and Interests.  The New Debt is critical to the overall success and feasibility of the Plan, and the Debtors have exercised reasonable business judgment in determining to enter into the New Notes Documents, which have been negotiated in good faith and at arm's-length, without the intent to hinder, delay, or defraud any creditor of the Debtors, and any credit extended and loans made or deemed to be made by the Debtors (prior to the Effective Date) or the Reorganized Debtors pursuant to the New Debt, and any fees paid thereunder, are deemed to have been extended, issued, and made, or deemed made in good faith and for legitimate business purposes.

BBB.  Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, DIP Lenders and Prepetition Lenders, the Ad Hoc Group, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties, any of such individuals, the Reorganized Debtors, nor the Wind-Down Entity will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

**IT IS HEREBY ORDERED THAT:**

**A.      Finding of Facts and Conclusions of Law**

1.     The Plan satisfies or complies with all applicable provisions of sections 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy Code and is confirmed pursuant to section 1129 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors (as applicable) are authorized to take all actions required to effectuate the Plan and the transactions contemplated therein.

2.     The amendments and modifications to the Plan since the filing of the *Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors*, in accordance with the terms of the Restructuring Support Agreement, including as may be reflected in the Plan and this Confirmation Order, are approved in accordance with section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a).  These modifications are consistent with the disclosures made in the Disclosure Statement and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  Accordingly, the Plan is properly before this Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

3.     The above findings of fact and conclusions of law, as well as any additional findings of fact and conclusions of law announced by the Bankruptcy Court at the Combined Hearing, are hereby incorporated in this Confirmation Order.

**B.     Disclosure Statement Approved**

4.     The Disclosure Statement (i) contains adequate information of a kind generally consistent with the disclosure requirements of all applicable nonbankruptcy law, including the Securities Act, (ii) contains "adequate information" (as such term is defined in section 1125(a)(1)

and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the Restructuring Transactions contemplated therein, and (iii) is approved on a final basis in all respects.

**C.   Confirmation of the Plan**

5.      All requirements for Confirmation of the Plan have been satisfied.   The Plan, attached hereto as **Exhibit A**, including (a) all modifications to the Plan Filed with the Bankruptcy Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement, is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code.   The terms of the Plan, the documents included in the Plan Supplement including, but not limited to, the Litigation Trust Agreement, the New Notes Documents, the Buyer Group Documents, and the exhibits thereto are incorporated by reference into and are an integral part of this Confirmation Order; provided that, if there is any direct conflict between the terms of the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

6.      All parties have had a full and fair opportunity to be heard on all issues raised by the objections to final approval of the Disclosure Statement and Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon provisions as set forth in this Order.   Any and all objections, responses, statements, reservations of rights, comments in opposition, and joinders to final approval of the Disclosure Statement or Confirmation of the Plan that have not been withdrawn, waived, settled, or resolved prior to entry of this Confirmation Order, or are not otherwise resolved as stated by the Debtors on the record of the Combined Hearing, are OVERRULED and DENIED on the merits and in their entirety with prejudice, and all withdrawn objections are deemed withdrawn with prejudice.   All objections to final approval of the Disclosure Statement or Confirmation of the Plan not filed and served prior

to the Objection Deadline as set forth in the Combined Hearing Notice, if any, are deemed waived and forever barred.

7.      The Debtors, the Reorganized Debtors, the Wind-Down Entity, and the Litigation Trustee, as applicable, may take all actions as may be necessary to effectuate the Plan, the Buyer Group Arrangements, and the transactions contemplated therein.

8.      The Debtors, the Creditors' Committee, the Released Parties, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to: (a) consummate the Plan, the Restructuring Transactions, and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Order; and (b) take any actions authorized and directed or contemplated by this Order.

9.      Subject to the occurrence of the Effective Date, on and after the entry of this Confirmation Order, the provisions of the Plan shall immediately bind every Holder of a Claim against or Interest in the Debtors and inure to the benefit of, and be binding on such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has accepted the Plan.

10.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and the Disclosure Statement, including the documents contained in the Plan Supplement, the implementation and consummation of the Buyer Group Arrangements, and any other documents or acts that may be necessary or appropriate for the implementation or consummation of the Plan.  Pursuant to section 1142(b) of the Bankruptcy

Code, as well as applicable nonbankruptcy law, no action of the respective directors or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with implementation of the Plan.

11.    All actions contemplated by the Plan and the documents included in the Plan Supplement are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors, Reorganized Debtors, the Wind-Down Entity, or the Wind-Down Officer and with the effect that such actions had been taken by the unanimous action, consent, approval and vote of each of such officers, directors, managers, members, or equity holders.

12.    Subject to payment of any applicable filing fees under applicable nonbankruptcy law, each federal, state, commonwealth, local, foreign or other governmental agency shall accept for filing and/or recording any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.  To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the documents included in the Plan Supplement, including the Buyer Group Documents and Litigation Trust Agreement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365 of the Bankruptcy

Code, (v) the grant of collateral under the New Notes Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including this Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.    Adequate and sufficient notice of any amendments and modifications to the solicitation version of the Plan made prior to entry of this Order (collectively, the "Subsequent Plan Modifications") has been given and no other or further notice is or shall be required and such Subsequent Plan Modifications are approved in full in accordance with section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a). The Plan, as modified by the Subsequent Plan Modifications, is deemed accepted by all creditors who have previously accepted the Plan. The Subsequent Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do

they require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

14. Without further order or authorization of this Bankruptcy Court, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan (subject to the consent rights contained in each of the Plan and the Restructuring Support Agreement), unless such modifications require relief under section 1127 of the Bankruptcy Code. Execution versions of the documents comprising or contemplated by the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all mortgages, Liens, deeds of trust, pledges, and security interests purported to be created thereby.

15. Subject to Article XII.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, the terms of the Plan, the documents included in the Plan Supplement (including, but not limited to, the Litigation Trust Agreement), the exhibits thereto, and this Confirmation Order shall be immediately enforceable and deemed binding as of the Effective Date on all parties in interest, including the Debtors, the Reorganized Debtors, the Creditors' Committee, the Litigation Trust, the Wind-Down Entity, as applicable, and any and all Holders of Claims against, Intercompany Interests, or Interests in the Debtors (irrespective of whether such Claims, Intercompany Interests, or Interests are presumed to have accepted or rejected the Plan, as applicable), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity receiving, retaining, or otherwise acquiring property under the Plan, and any and all non-Debtor parties to

Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan, regardless of whether any Holder of a Claim or Interest has voted on the Plan.

16.     The Restructuring Transactions set forth in the Plan are hereby approved and authorized in all respects. The applicable Debtors or Reorganized Debtors are authorized to consummate the Restructuring Transactions described in or contemplated by Article IV of the Plan, subject to the terms and conditions set forth therein, in this Confirmation Order, and in the Definitive Documents.

17.     For the avoidance of doubt, pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and authorized in their entirety and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan, immediately on the Effective Date without further order or action by the Bankruptcy Court, any of the parties to such release, or any other Person or Entity: (a) Debtor Releases (Article VIII.C); (b) Non-Debtor Releases (Article VIII.D); (c) Exculpation (Article VIII.E); and (d) Injunction (Article VIII.F).

18.     Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a creditor or a Holder of Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. Entry of this Order shall constitute this Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, including approval of the GUC Settlement, as well as a finding by this Bankruptcy Court that such compromise or settlement, including the

GUC Settlement, is in the best interests of the Debtors, their Estates, and Holders of such Allowed

Claims and Allowed Interests, and is fair, equitable, and reasonable.

19.     The Litigation Trust shall, consistent with the Plan, be entitled to assert any

Litigation Trust Causes of Action against any Debtor D&Os and to obtain a judgment against or

settlement with the Debtor D&Os; provided, however, that the Litigation Trust shall first collect

from available insurance proceeds to satisfy the judgment or settlement, but will not enforce the

judgment or settlement beyond applicable insurance limits.  In the event there is no available

insurance because of the fraud, willful conduct or personal profit exclusions in the D&O Liability

Insurance Policies, any judgment or settlement shall be enforced without any limitation.

20.     The Debtors shall cause to be served a notice of the entry of this Confirmation

Order and occurrence of the Plan Effective Date (the "Notice of Effective Date") upon (a) all

parties listed in the creditor matrix maintained by Kroll, and (b) such additional persons and entities

as deemed appropriate by the Reorganized Debtors, no later than two (2) Business Days after the

Effective Date, or as soon as practicable thereafter.

**D.     Implementing the Plan**

21.     Following the Confirmation Date or as soon as reasonably practicable thereafter,

the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, with the consent

of the Required Consenting Creditors (such consent not to be unreasonably withheld), may take

all actions as may be necessary or appropriate in their discretion to effectuate any transaction

described in, approved by, contemplated by, the Plan or the Restructuring Steps Memo, or

necessary to effectuate the Plan or the Buyer Group Arrangements, including (i) the execution and

delivery of appropriate agreements or other documents of merger, amalgamation, consolidation,

restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale,

purchase, or liquidation containing terms that are consistent with the terms of the Plan; including,

but not limited to, the Buyer Group Documents, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, including, the execution of the Litigation Trust Agreement and the transfer to the Litigation Trust of the Litigation Trust Assets; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Buyer Group Documents; (vi) the issuance of the New Debt and New Equity Interests; (vii) performing the Debtors' obligations under the Buyer Group Documents and any related agreements entered into in connection therewith, including the Transition Services Agreement (as defined in the Buyer Group APAs); and (viii) all other actions that the Debtors, Reorganized Debtors, or the Wind-Down Entity determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, or the Wind-Down Entity.

22.     Upon the Effective Date, as set forth in the Plan (including the documents included in the Plan Supplement), the New Board shall take office and replace the then-existing boards of directors, boards of managers, or similar governing bodies of the Reorganized Debtors.  All members of such existing boards shall cease to hold office or have any authority from and after the Effective Date to the extent not expressly included in the roster of the New Board.

23.      The terms of the New Organizational Documents as set forth in the Plan Supplement are approved in all respects.  To the extent any New Organizational Documents are not filed in the Plan Supplement as of the date of this Confirmation Order, such New Organizational Documents shall be Filed with the Bankruptcy Court prior to the Effective Date, and each such New Organizational Document is approved to the extent it is consistent with this Confirmation Order, the Plan, and the Plan Supplement (including any applicable consent rights therein).  The obligations of the Reorganized Debtors under the applicable New Organizational Documents, will, upon execution, constitute legal, valid, binding, and authorized obligations of such Reorganized Debtor, enforceable in accordance with their terms and not in contravention of any state or federal law.  On the Effective Date, without any further action by the Bankruptcy Court or the directors, officers, or equity holders of any of the Reorganized Debtors, each applicable Reorganized Debtor will be and is authorized to enter into the New Organizational Documents, and all related documents to which such Reorganized Debtor is contemplated to be a party on the Effective Date.  In addition, on the Effective Date, without any further action by the Bankruptcy Court or the directors, officers, or equity holders of any of the Reorganized Debtors, each applicable Reorganized Debtor will be and is authorized and directed to: (a) execute, deliver, file, and record any other contracts, assignments, certificates, instruments, agreements, guaranties, or other documents executed or delivered in connection with the New Organizational Documents; (b) issue the New Debt or New Equity, as applicable; (c) perform all of its obligations under the New Organizational Documents; (d) take all such other actions as any of the responsible officers of such Reorganized Debtor may determine are necessary, appropriate or desirable in connection with the consummation of the transactions contemplated by the New Organizational Documents. Notwithstanding anything to the contrary in this Confirmation Order or Article XI of the Plan,

after the Effective Date, any disputes arising under the New Organizational Documents will be governed by the jurisdictional provisions therein.

24.    On the Effective Date, subject to the terms of the Plan, the Wind-Down Officer shall be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and shall have the power and authority to take any action(s) necessary to effectuate the Wind-Down Process, including to commence, litigate, and settle any Retained Causes of Action, sell or monetize any remaining Assets of the Wind-Down Entities, and make distributions pursuant to the terms of the Plan.  The Wind-Down Officer shall act in a fiduciary capacity on behalf of the interests of the Holders of Claims and Interests entitled to distributions under the Plan.  The Wind-Down Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Entities are dissolved in accordance with the Plan and (ii) the date on which the Wind-Down Officer resigns, is terminated or is otherwise unable to serve.

25.    The Litigation Trust Agreement is hereby approved in all respects.  The Litigation Trust will be established and the Litigation Trustee appointed on the Effective Date and the Litigation Trust will be funded pursuant to, and in accordance with, the terms of the Plan and the Litigation Trust Agreement.  On the Effective Date, the Debtors shall execute the Litigation Trust Agreement, and, along with the Litigation Trustee shall take all steps necessary to establish the Litigation Trust and the beneficial interest therein in accordance with the Plan.  On the Effective Date, and subject to the Plan and the Buyer Group Arrangements, the Debtors shall transfer and shall be deemed to transfer to the Litigation Trust all of their rights, title, and interest in the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets (including the GUC Cash Settlement Amount) shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  The Litigation

Trust shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Litigation Trust Assets including, but not limited to, the Litigation Trust Causes of Action.  The initial Litigation Trustee of the Litigation Trust shall be Olympus Guardians LLC.

26.    On the Effective Date (i) the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, the other DIP Facility Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, and the other DIP Facility Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent, as applicable, and any predecessor thereof vis-à-vis parties other than the Released Parties under this Plan; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Credit Agreement, as applicable; and (c) preserve any rights of (1) the Prepetition Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of Non-Securitization Manager Advance Term

Loan Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors, and, (2) the Prepetition Securitization Trustee, any predecessor thereof, and the Control Party to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Securitization Notes Claims, including the Prepetition Securitization Trustee's priority in respect of payment under section 6.10 of the Securitization Notes Indenture and/or the right to exercise the Prepetition Securitization Trustee's charging lien under section 7.06(d) of the Prepetition Securitization Notes Indenture, and to enforce its rights, claims and interests, vis-à-vis any party other than the Debtors, and (3) the DIP Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of DIP Claims, including rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; and (d) allow the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; <u>provided,</u> that notwithstanding Confirmation or the occurrence of the Effective

Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, and the DIP Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.

27.    Except as otherwise provided in the Plan, the documents included in the Plan Supplement (including the Buyer Group Documents and the Litigation Trust Agreement), or this Confirmation Order, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate (except for the Litigation Trust Assets), all Retained Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors but not assigned to the Brand Management Co., Buyer Group (or their respective designees), and any property acquired by any of the Debtors shall vest in each respective Reorganized Debtor and Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.  On the Effective Date, the Litigation Trust Assets shall vest or be deemed to be vested in the Litigation Trust.  Any transfer of the equity interests of Debtors HOA Franchising LLC and HOOTS Franchising LLC to HOA Franchise HoldCo LLC shall be free and clear of all Claims, Liens, encumbrances, or interests. On and after the Effective Date, except as otherwise provided herein or in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

28.     On the Effective Date, all insurance policies to which the Debtors are a party, shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors or Wind-Down Entity on behalf of the applicable Debtor unless such policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the Combined Hearing Date. Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions with the Debtors after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies. Except as set forth in Article IV.R.1 of the Plan, nothing in the Plan, the documents included in the Plan Supplement, the Disclosure Statement, or this Confirmation Order, (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (b) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Wind-Down Entity or draw on any collateral or security therefor.

29.     The procedures for resolving contingent, unliquidated, and disputed Claims contained in Article VII of the Plan shall be, and hereby are, approved in their entirety.  For the avoidance of doubt, no distributions shall be made on account of any Claim under the Plan,

including any contingent, unliquidated, or other Disputed Claim, unless and until such Claim becomes Allowed in accordance with <u>Article VII</u> of the Plan.

30.     On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**E.      Exemption from Certain Taxes**

31.     Pursuant to section 1146 of the Bankruptcy Code, all transfers contemplated herein and in the Plan, including the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors or Wind-Down Entities, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, sales tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**F.      Executory Contracts and Unexpired Leases**

32.     The Debtors have exercised sound business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, <u>Article V</u> of the Plan, and as set

forth in the Plan Supplement.  Except as set forth herein or in separate orders entered by the

Bankruptcy Court relating to the assumption of Executory Contracts or Unexpired Leases, the

Debtors have cured or provided adequate assurance that the Debtors will cure defaults (if any)

under or relating to each Executory Contract or Unexpired Lease assumed under the Plan and, for

each Executory Contract or Unexpired Lease being assigned under the Plan (if any), such assignee

has provided adequate assurance of future performance as required under section 365(f)(2)(B) of

the Bankruptcy Code.

33.     The provisions governing the treatment of Executory Contracts and Unexpired

Leases set forth in Article V of the Plan and the Plan Supplement are hereby authorized.  On the

Effective Date, all Executory Contracts or Unexpired Leases will be deemed rejected by the

applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365

and 1123 of the Bankruptcy Code, unless such contract or lease (i) was identified on the

Assumption Schedule; (ii) was previously expired or terminated pursuant to their own terms; (iii)

was the subject of a motion to reject that is pending on the on or before the Confirmation Date;

(iv) is a D&O Liability Insurance Policy; (v) is a Legacy License Agreement (as defined in the

Brand Management Agreement); (vi) is deemed assumed pursuant to Article IV.R of the Plan; (vii)

is an Existing Franchise Agreement; or (viii) is to be assumed by the Debtors or assumed by the

Debtors and assigned to Brand Management Co. or the Buyer Group (or their respective designees)

in connection with the Buyer Group Arrangements.  The assumption of Executory Contracts and

Unexpired Leases may include the assignment of certain of such contracts and leases as set forth

in the Plan Supplement.

34.     Subject to (i) satisfaction of the conditions set forth in Article V.A of the Plan,

(ii) resolution of any disputes in accordance with Article V.D of the Plan with respect to the

contracts or leases subject to such disputes, and (iii) the occurrence of the Effective Date, for

Executory Contracts, entry of this Order shall constitute approval of the assumptions or rejections

provided for in the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.

35.     Any change of control provision in any contract, agreement, or other document of

the Debtors, including any Executory Contract or Unexpired Lease assumed or assumed and

assigned, shall be deemed modified in accordance with section 365 of the Bankruptcy Code such

that such assumption or assumption and assignment and the transactions contemplated by the Plan

shall not (a) be prohibited, restricted, or conditioned on account of such provision or require any

consent thereunder, (b) breach or result in the modification or termination of such Executory

Contract or Unexpired Lease, (c) result in any penalty or other fees or payments, accelerated or

increased obligations, renewal or extension conditions, or any other entitlement in favor of such

non-Debtor party thereunder, or (d) entitle the non-Debtor party thereto to do or impose any of the

foregoing or otherwise exercise any other default-related rights or remedies with respect thereto.

For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and

assigned pursuant to the Plan or otherwise may not be terminated on account of such assumption

or on account of the Plan, the transactions contemplated therein, or any change of control or

ownership interest composition or entity conversion that may occur at any time before, on, or in

connection with the Effective Date. The Debtors, Reorganized Debtors, Wind-Down Entities,

Brand Management Co., and the Buyer Group (and their respective designees) may rely on the

Plan and this Confirmation Order as a complete defense to any action by a party to an assumed

Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease

on account of such assumption or on account of the Plan, the transactions contemplated herein, or

any change of control or ownership interest composition that may occur at any time before or on

the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to <u>Article V</u> of the Plan shall revest in and be fully enforceable by the Debtors, Reorganized Debtors, or Wind-Down Entities in accordance with its terms, except as modified by the provisions of the Plan, any order of this Bankruptcy Court authorizing and providing for its assumption, or applicable law.

36.    Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all amendments, assignments, attachments, change orders, confidentiality agreements, exhibits, extensions, guaranties, hold harmless agreements, modifications, restatements, revisions, schedules, side letters, supplements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Amendments, assignments, attachments, change orders, confidentiality agreements, exhibits, extensions, guaranties, hold harmless agreements, modifications, restatements, revisions, schedules, side letters, and supplements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

37.    Nothing in this Order or in any notice or any other document is or shall be deemed an admission by the Debtor or Reorganized Debtors that any assumed contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

38.    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to <u>Article V.C</u> of the Plan shall

result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

39.    All Claims for damages resulting from the rejection of an Executory Contract or Unexpired Lease shall be asserted in accordance with Article V.B of the Plan.  Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Litigation Trust, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, or property of the foregoing parties, without the need for any objection by the Litigation Trust, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged,

notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of Article VII.E of the Plan, the Litigation Trust Agreement, and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**G.    Distributions**

40.    The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.

**H.    Professional Fee Claims**

41.    All Professionals seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall file, on or before the date that is sixty (60) calendar days after the Effective Date, their respective applications (collectively, the "Final Fee Applications") for final requests for payment of Professional Fee Claims and serve such applications upon the following parties (collectively, the "Notice Parties"): (a) the attorneys for the Debtors, (i) Ropes & Gray LLP, 191 North Wacker Drive, Chicago, Illinois 60606 (Attn: Chris L. Dickerson (chris.dickerson@ropesgray.com), Rahmon J. Brown (rahmon.brown@ropesgray.com), Michael K. Wheat (michael.wheat@ropesgray.com)), and (ii) Foley & Lardner LLP, 2021 McKinney Avenue, Suite 1600, Dallas, TX 75201 (Attn: Holland N. O'Neil (honeil@foley.com), Stephen A. Jones (sajones@foley.com), and Zachary C. Zahn (zzahn@foley.com)); (b) Counsel to the DIP Lender: Sidley Austin LLP (i) 1999 Avenue of the Stars, 17th Floor, Los Angeles, CA 90067 (Attn: Genevieve G. Weiner (gweiner@sidley.com)), (ii) 2021 McKinney Avenue #2000, Dallas, TX 75201 (Attn: Jeri Leigh Miller (jeri.miller@sidley.com)); (c) counsel to AHG Noteholders, White

& Case LLP (i) 200 South Biscayne Blvd., Suite 4900, Miami, FL 33131 (Attn: Brian Pfeiffer (brian.pfeiffer@whitecase.com), Amanda Parra Criste (aparracriste@whitecase.com)), (ii) 1221 Avenue of the Americas, New York, NY (Attn: David Thatch (dthatch@whitecase.com)); (d) counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017 (Attn: Bradford J. Sandler (bsandler@pszjlaw.com), Judith Elkin (jelkin@pszjlaw.com), Robert J. Feinstein (rfeinstein@pszjlaw.com), Shirley Cho (scho@pszjlaw.com)); and (e) the U.S. Trustee (Attn: Meredyth Kippes (meredyth.kippes@usdoj.gov), Asher Bublick (Asher.Bublick@usdoj.gov)).  Any objection to any Final Fee Application must be Filed with this Bankruptcy Court, and served upon the applicable Professional, counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee, so as to be actually received no later than 4:00 p.m. (prevailing Central Time) on the date that is no later than twenty-one (21) calendar days after the filing of the applicable final applications requesting compensation of a Professional Fee Claim.

42.     The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Reserve Amount on the Effective Date. No funds in the Professional Fee Escrow account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow account after all Allowed Professional Fee Claims have been paid, will be turned over to the Reorganized Debtors, except that the Excess UCC Professional Fee Amount, if any, will be turned over to the Litigation Trust.   Upon the Confirmation Date, any requirement that

Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**I.        Administrative Claims Bar Date**

43.        Except as otherwise provided in this Confirmation Order or the Plan, and except with respect to Administrative Claims that are DIP Claims, Restructuring Expenses or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors by the first Business Day that is thirty (30) calendar days following the Effective Date (the "Administrative Claims Bar Date"); provided that the Administrative Claims Bar Date does not apply to DIP Claims, Restructuring Expenses, or Professional Fees.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Estates, or the property of any of the foregoing, and such Administrative Claims shall be deemed discharged as of the Effective Date.

**J.        Provisions Regarding Governmental Units**

44.        Subject to the requirements applicable to Governmental Units set forth in the Bar Date Order, nothing in the Plan or this Confirmation Order shall effect a release of any claim by any Governmental Unit or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental Laws, or any criminal Laws of the United States or any state or local authority against any party or Person, nor shall anything in the Plan or this Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or Person for any liability

of such Persons whatsoever, including, without limitation, any claim, suit, or action arising under

the Internal Revenue Code, the environmental Laws, or any criminal Laws of the United States or

any state or local authority against such persons, nor shall anything in the Plan or this Confirmation

Order exculpate any party or Person from any liability to any Governmental Unit or any state and

local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the

environmental Laws, or any criminal Laws of the United States or any state or local authority

against any party or Person.

**K.    Administrative Agents**

45.    Nothing in the Plan or this Confirmation Order shall limit or affect the rights of any

of the DIP Agent, the Prepetition Securitization Trustee, Brand Management Co., the Buyer Group

(or their respective designees) or the Control Party to exercise any rights to compensation,

contribution, expense reimbursement, or indemnification under the DIP Facility, the DIP Credit

Agreement, the Buyer Group Documents, or the New Notes Indenture, against any Person that is

not a Debtor or a Reorganized Debtor.

46.    Subject to the performance by the Prepetition Agent of its obligations under the

Plan, the Prepetition Agent and its agents shall be relieved of all further duties and responsibilities

related to the Prepetition Loan Documents upon the occurrence of the Effective Date and the

Prepetition MA Credit Agreement and the Prepetition Term Credit Agreement shall automatically

be terminated on the Effective Date except to the extent they expressly survive by their terms

(*provided*, that the Surviving Prepetition Credit Facility Provisions[3] shall survive in accordance

with the terms of the Prepetition Loan Documents); (ii) subject to the performance by the

---

[3]    The "Surviving Prepetition Credit Facility Provisions" means any provisions of the Prepetition Credit Agreements
that by their terms survive the termination of the Prepetition Credit Agreements.

Prepetition Securitization Trustee of its obligations under the Plan, the Prepetition Securitization Trustee and the Control Party and each of its agents shall be relieved of all further duties and responsibilities related to the Securitization Notes Documents upon the occurrence of the Effective Date and the Securitization Notes Documents shall automatically be terminated on the Effective Date except to the extent they expressly survive by their terms; and (iii) subject to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its agents shall be relieved of all further duties and responsibilities related to the DIP Facility Documents upon the occurrence of the Effective Date (provided, that the Surviving DIP Provisions shall survive in accordance with the terms of the DIP Facility Documents).

**L.       Payment of Statutory Fees**

47.       All fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717) as of the Confirmation Date will be paid on the Effective Date or as soon as reasonably practicable thereafter.  Notwithstanding anything to the contrary in the Plan, such fees are not subject to an allowance procedure under 11 U.S.C. § 503(b), nor is the U.S. Trustee required to file a request for payment of such fees.

48.       Following confirmation, the Debtors, the Reorganized Debtors, or the Wind-Down Officer, as applicable shall pay quarterly fees to the U.S. Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717); *provided that* if a final decree has not been entered and the Chapter 11 Cases closed solely as a result of the Wind-Down Officer's ongoing activities, then such quarterly fees shall be paid by the Wind-Down Entity.  Quarterly fees shall be payable for any case that is reopened.  So long as the Debtors, the Reorganized Debtors, or the Wind-Down Officer, as applicable, are required to make these payments, the Wind-Down Officer, shall file with the Court quarterly reports in the form specified by the U.S. Trustee for that purpose.

**M.    Reports**

49.    After the Effective Date, the Debtors have no obligation to file with the Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before such Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided, however,* that the Debtors, or the Reorganized Debtors, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.

**N.    Closing of the Chapter 11 Cases**

50.    The Wind-Down Officer shall, promptly after the full administration of the Chapter 11 Cases, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases; *provided that,* as of the Effective Date, the Wind-Down Officer may submit separate orders to the Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further,* that, subject to paragraph 13 of Schedule 1 to this Confirmation Order, the Wind-Down Officer shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Debtors and the Wind-Down Officer, in consultation with the Litigation Trustee, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such remaining Chapter 11 Case.  Any request for such relief shall be made on motion served on the U.S. Trustee, and the Court shall rule on such request after notice and a hearing other than with respect to any case closings authorized by entry of this Confirmation Order.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Wind-Down Officer shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

O.      **Miscellaneous**

51.      Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Entity shall have the authority (other than with respect to Class 8 General Unsecured Claims): (i) to File, withdraw, or litigate to judgment objections to Claims or Interests; and (ii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

52.      Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any Disputed Claim or Disputed Interest without further notice to or action, order, or approval by the Bankruptcy Court.

53.      Except as otherwise specifically provided in the Plan and the Litigation Trust Agreement and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Litigation Trustee shall have the sole authority to File and prosecute objections to Class 8 General Unsecured Claims, and shall have the authority, without further notice to or action, order, or approval by the Bankruptcy Court, to (i) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all such General Unsecured Claims; (ii) settle, compromise, or resolve any Disputed General Unsecured Claims; and (iii) administer and direct the adjustment of the Claims Register to reflect any such settlements or compromises.

54.      <u>New Debt</u>.  On the Effective Date, the New Notes Documents shall constitute legal, valid, binding, and authorized obligations of HOA RoyaltyCo LLC and the other Reorganized Debtors enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Notes Documents are being extended, and shall be deemed to have been

extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable nonbankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted under the New Notes Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Notes Documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

55.    <u>New Equity Interests</u>.  On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to the Plan. The New Organizational Documents shall be binding

on all holders of the New Equity Interests (and their respective successors and assigns), whether such New Equity Interests are received or to be received on or after the Effective Date.  All of the New Equity Interests issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable.  Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date.

56.    <u>Books and Records</u>.  The Buyer Group agrees that the Wind-Down Officer and Litigation Trustee on behalf of the Litigation Trust shall have the same rights as the Sellers under the Buyer Group APAs solely for the purpose of accessing the Debtors' books and records and information purchased or transferred and assigned to the Buyers to the extent set forth in the Buyer Group APAs after the Effective Date, including but not limited to sections 6.9, 7.5, and 12.13 of the Buyer Group APAs.

57.    <u>Buyer Group Arrangements.</u>  The findings of fact and conclusions of law set forth on **<u>Schedule 1</u>** to this Confirmation Order are incorporated herein by reference in their entirety and shall govern the sale of the assets from the Debtors to the Buyer Group, consistent with the Buyer Group Documents and any related agreements, including the Buyer Group APAs.

58.    <u>Lags Stipulation and Agreement Resolving Plan Confirmation Objections.</u>  The facts and agreements set forth in **<u>Schedule 2</u>** are incorporated into this Confirmation Order by reference and shall have full force and effect as if set forth herein in full, notwithstanding anything to the contrary herein.

59.    <u>Continuing Insurer Claims.</u>   Notwithstanding anything to the contrary in this Confirmation Order, the Plan or any Plan Supplement, the insurance policies maintained by Liberty Mutual, Pennsylvania Manufacturers' Association Insurance Company, and Manufacturers Alliance Insurance Company (each a "<u>Continuing Insurer</u>") to which the Debtors and/or Reorganized Debtors are insureds shall continue in full force and effect in accordance with their respective terms such that the Reorganized Debtors shall become and remain jointly and severally liable in full for, and shall satisfy, any premiums, deductibles, self-insured retentions, and/or any other amounts or obligations arising in any way out of the receipt of payment from any of the Continuing Insurers in respect of the insurance policies and applicable deductible reimbursement and security agreements and as to which no Proof of Claim, Administrative Claim, or Cure Cost claim need be filed. Each Continuing Insurer shall be permitted to take any actions relating to its insurance policies, including any actions taken to collect from, setoff, or recoup any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors) and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors), all in accordance with the applicable insurance policies, in such order as such Continuing Insurer may determine. Solely with respect to such insurance policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit the Continuing Insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors) and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors) under the

applicable insurance policy and applicable deductible reimbursement and security agreements, in such order as such Continuing Insurer may determine.

60.    <u>Westchester Fire Insurance Company.</u>  Westchester Fire Insurance Company and, as applicable, its subsidiaries, affiliates, parents, and/or successors (collectively, the "<u>Surety</u>"), issued certain surety bonds on behalf of the Debtors (collectively, the "<u>Surety Bonds</u>" and each individually, a "<u>Surety Bond</u>").  The Surety issued their respective Surety Bonds pursuant to certain Agreement of Indemnity executed by one or more of the Debtors "<u>Indemnity Agreement</u>"). Nothing in this Confirmation Order, the Plan, or any sale transaction authorized by the Plan shall be: (i) deemed to be a sale, transfer, assumption or assumption and assignment of any Surety Bond or the Indemnity Agreement, or any documents or rights related to any Surety Bond or the Indemnity Agreement, including collateral agreements; (ii) deemed to provide Surety's consent to the involuntary substitution of any principal under any Surety Bond; or (iii) interpreted to alter, diminish or enlarge the rights or obligations of Surety in regard to state and federal agencies, third parties or otherwise under any Surety Bond, the Indemnity Agreements or applicable law nor shall any of the foregoing be deemed to enjoin Surety from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties including, without limitation, any of Surety's non-Debtor indemnitors, insurers, or otherwise under any Surety Bond, the Indemnity Agreements or applicable law.    Surety shall not be required or obligated to issue any new bonds or renew any existing Surety Bonds. Notwithstanding anything herein to the contrary, the Surety, the Debtors, the Reorganized Debtors, or the Wind-Down Officer, as applicable, shall work in good faith with all other necessary third parties to evaluate potential defenses to bond claims, obtain the requisite releases of all Surety Bonds, satisfy or reimburse any losses and expenses to Surety incurred under the Surety Bonds.  Notwithstanding the foregoing, neither the Litigation

Trust nor the Litigation Trustee shall have any liabilities, obligations or duties in connection with the Surety Bond or Indemnity Agreement.

61.    <u>Texas Comptroller of Public Accounts</u>.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Texas Comptroller of Public Accounts (the "<u>Texas Comptroller</u>") reserves the following rights: (1) any statutory or common law setoff rights in accordance with 11 U.S.C. § 553; (2) any rights to pursue any non-debtor third parties for tax debts or claims; (3) subject to any applicable limitation of the Bankruptcy Code, to the extent that interest is payable with respect to any administrative expense, priority, or secured tax claim of the Texas Comptroller, the statutory rate of interest pursuant to Texas Tax Code 111.060 applies; and (4) the Texas Comptroller is not required to file a motion or application for payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(D). The Texas Comptroller's priority tax claims shall accrue interest at the statutory rate of interest, currently 8.5% per annum, from the Plan's Effective Date until paid in full.

62.    If the Wind-Down Officer fails to pay any Allowed Claims of the Texas Comptroller pursuant to the terms of the Plan, and such failure continues for fifteen (15) calendar days following receipt of written notice to the Wind-Down Entity of such failure from the Texas Comptroller, the Texas Comptroller may exercise all rights and remedies under applicable nonbankruptcy Law and seek such relief as may be appropriate in the Bankruptcy Court.  Notice of such default shall be served by first-class mail to Drivetrain LLC 410 Park Avenue, Suite 900 New York, New York 10022 (Attn: Tim Daileader (tdaileader@drivetrainllc.com), Marc Rosenberg (mrosenberg@drivetrainllc.com)). The Wind-Down Entity shall be allowed to cure up to two such defaults, however, the third default cannot be cured.

63.    The Texas Comptroller may amend their claims after the Effective Date but are not required to do so in order to be Allowed, to reflect the certified tax amounts without having to receive prior authorization to do so.

64.    <u>Texas Taxing Authorities[4] and Orange County Tax Collector.</u>    Any of the Texas Taxing Authorities' and the Orange County, Florida Tax Collector's (the "<u>Taxing Authorities</u>") ad valorem taxes assessed on non-Divested Stores shall be deemed Priority Tax Claims as of the Effective Date and shall be paid by the Distribution Agent when Allowed pursuant to the language set forth in the Plan, including any post-petition interest that may have accrued under with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.    Pursuant to section 503(b)(1)(D) of the Bankruptcy Code, the Taxing Authorities shall not be required to file an Administrative Claim. The Taxing Authorities are entitled to amend their estimated 2025 tax claims following plan confirmation without permission of the Court, the applicable Reorganized Debtor, the Wind-Down Entity, the Buyer Group (or Buyer Group SPEs, as applicable) or the Litigation Trustee to reflect the actual amounts of the assessed 2025 Personal Property Taxes.

65.    <u>Other Unresolved Cure Claims.</u>    Unless a party to an Executory Contract or Unexpired Lease being assumed (or assumed and assigned) under the Plan has timely objected to

---

[4]    Texas Taxing Authorities means: Cameron County, Nueces County, San Marcos CISD, Bexar County, City of El Paso, Ector CAD, Brazoria County, Clear Creek Independent School District, Frisco Independent School District, City of Garland, Garland Independent School District, City of Grapevine, Grapevine-Colleyville Independent School District, City of Houston, Humble Independent School District, Pasadena Independent School District, Plano Independent School District, Potter County, Spring Independent School District, West Memorial Municipal Utility District, Dallas County, Dallas College, Parkland Hospital District, City of Dallas, Dallas Independent School District, City of Cedar Hill, Cedar Hill Independent School District, Town of Addison, City of Grand Prairie, City of Irving, Irving Independent School District, City of Mesquite, Mesquite Independent School District, City of Frisco, Lewisville Independent School District, Tarrant County, Tarrant County College District, Tarrant County Hospital District, Tarrant County Regional Water District, City of Arlington, Arlington Independent School District, City of North Richland Hills, Birdville Independent School District, City of Fort Worth, Fort Worth Independent School District, Bowie CAD, Denton County, Guadalupe County, Hays County, Taylor County CAD, Williamson County, Fort Bend County, Harris County Emergency Services District #11, Harris County Emergency Services District #28, City of Houston (for those accounts collected by Linebarger), Houston Community College System, Houston Independent School District, City of Humble, Katy Independent School District, Lone Star College System, City of Pasadena, City of Seabrook, and City of Webster.

the assumption or assumption and assignment of such Executory Contract or Unexpired Lease or the Cure Claim and such objection is unresolved as of the Effective Date, the Debtors' payment of such Cure Claim in accordance with the terms of the Plan and the assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release, discharge and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment and the counterparty to such Executory Contract or Unexpired Lease shall be deemed to have consented to such assumption or assumption and assignment.  Notwithstanding anything to the contrary in the Plan, in the event such dispute cannot be resolved consensually by the applicable parties, then the Reorganized Debtors shall, within thirty (30) days after the Effective Date, file a notice of dispute with the Bankruptcy Court (and promptly serve such notice on the applicable counter-party) and such dispute shall be set for a status conference at the next scheduled omnibus hearing in these Chapter 11 Cases, with subsequent evidentiary hearings to be established by the Bankruptcy Court, if necessary; provided, that, the Reorganized Debtors (with the consent of the Buyer Group, to the extent related to the Buyer Group Arrangements) may settle any dispute with the applicable counterparty after the Effective Date without further notice to any party or action, order, or approval of the Bankruptcy Court.

66.    Franchise and Legacy License Agreements.  All Franchise Agreements and Legacy License Agreements (each as defined in the Brand Management Agreement) will be assumed pursuant to the Plan, unless otherwise specified. The assumption of such Franchise Agreements

and Legacy License Agreements is approved. Notwithstanding the foregoing, the Applegate Franchise Agreements[5] shall be rejected on the Effective Date.

67.     <u>ROA Franchise Agreements</u>. All franchise agreements entered into by or held by any Debtor with Restaurants of America, Inc. ("<u>ROA</u>") or any of its wholly owned affiliates[6] (collectively, the "<u>ROA Franchise Agreements</u>") and rights related thereto will be assumed pursuant to the Plan, unless otherwise specified with notice to ROA and its counsel. The assumption of such ROA Franchise Agreements is approved; provided, that the applicable franchisees that are counterparties to such ROA Franchise Agreements, reserve and do not waive or release any reimbursement claims for gift card obligations arising on or before February 14, 2023, notwithstanding anything to the contrary herein.

68.     <u>Intercompany Licenses</u>. All Existing License Agreements shall automatically be terminated upon the applicable Closing or Deferred Closing of all Restaurants subject to the Existing License Agreement (as defined in the Buyer Group APAs), notwithstanding any consent rights held by parties in interest other than those set forth in the Buyer Group APAs.

69.     <u>Indemnification</u>. Any and all obligations of the Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers,

---

[5]   The "Applegate Franchise Agreements" consist of the franchise agreements for the following restaurant locations: (i) 60 Cottontail Ln, Somerset, NJ 08873; and (ii) 250 HY 202, Flemington, NJ 08822.

[6]   The ROA Franchisees include: (i) Albuquerque Hooters, Inc., 4601 San Mateo N.E. Albuquerque NM, 87109; (ii) Albuquerque West Hooters, Inc., 1708 NM Hwy 528. Albuquerque NM, 87114; (iii) Bloomington Hooters, Inc., Mall of America 404 E. Broadway Bloomington MN 55425; (iv) Broadway Hooters, LP, 7280 E. Broadway Blvd. Tucson AZ 85710; (v) Fiesta Mall Hooters, Inc., 1665 S. Alma School Road, Mesa AZ 86210; (vi) Las Cruces Hooters, LTD., 3530 Foothills Road, Suite D, Las Cruses NM, 88011; (vii) Hooters of Metro Center, LP, 10023 N. Metro Parkway East, Phoenix AZ 85051; (viii) Parker Road Hooters, Inc., 2610 South Parker Road, Aurora, CO 80014; (ix) Thunder Mountain Hooters, LLC, 4230 Byrd Drive, Loveland, CO 80538; (x) Hooters of Westminster, LP, 1111 W 120th Ave., Westminster CO, 80234; (xi) Colorado Springs Hooters, 750 Citadel Dr. # 1012, Colorado Springs, CO 80909; (xii) Lone Tree Hooters, Inc., 8334 S. Willow St., Suite G, Lone Tree, CO 80215; (xiii) Phoenix Hooters Inc., 455 N. 3rd St. #190, Phoenix, AX 850035; (xiv) West Phoenix Hooter, Inc., 2820 N. 75th Ave. Phoenix, AZ, 85035; and (xv) Yuma Hooters, Inc., 1519 S. Yuma Palms, Parkway, Yuma AZ 85365 (collectively, the "ROA Franchisees").

agents, or employees against any Claims or Causes of Action as provided in the Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law (the "Indemnification Obligations") shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims arising under the foregoing documents shall be treated as General Unsecured Claims against the Debtors to the extent Allowed. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this paragraph.

70.     Notwithstanding anything to the contrary in Article VIII.F (Injunction), Article VI.I (Setoffs and Recoupment), and Article VII (Procedures for Resolving Contingent, Unliquidated, and Disputed Claims) of the Plan, nothing in the Plan or this Confirmation Order shall release or waive Big Wings Holdings, LLC's rights to assert any defenses, setoffs, recoupments, in any proceeding brought in, under, or related to the Debtors' bankruptcy cases.  This reservation includes, without limitation, the right to respond to or defend against any claim, demand, adversary, claim objection, or other process initiated by or on behalf of the Debtors, Estates, Reorganized Debtors, Wind-Down Entity, Litigation Trustee, and any successors.

71.     Subject to Bankruptcy Rules 3020(e), 6004(h), 6006(d), and 7062, as applicable, the Debtors are authorized to consummate the Plan after the entry of this Confirmation Order, subject to the satisfaction or waiver (in accordance with Article IX.B of the Plan) of the conditions precedent to the Effective Date (as set forth in Article IX.A of the Plan), and all parties in interest shall be entitled to rely upon this Confirmation Order in taking any actions or performing any

obligations to consummate the Plan.  On the Effective Date, the Plan shall be deemed to be substantially consummated under section 1101(2) of the Bankruptcy Code.

72.    If consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; (iii) the Committee Challenge Deadline (as defined in the DIP Order), which would otherwise terminate on the Effective Date of the Plan, shall be extended for thirty (30) days from the date the Plan is revoked or withdrawn; (iv) and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, or (d) be used against the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths and weaknesses of any of the parties' positions, arguments, or claims.

73.    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, Buyer Group Arrangements and this Confirmation Order.

74.    If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or

undertaken under or in connection with the Plan before the Debtors' or the Reorganized Debtors' receipt of written notice of any such order; nor shall such reversal, modification, or vacatur of this Confirmation Order affect the validity or enforceability of such act or obligation. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order before the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Supplement, the Buyer Group Documents, and all documents, instruments and agreements related thereto or any amendments or modifications thereto.

75.    Without the need for further order or authorization of the Bankruptcy Court, the Debtors, Reorganized Debtors, or the Wind-Down Entities, as applicable, are authorized and empowered, to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (subject in all respects to any applicable consents or consultation rights incorporated and set forth therein or in the Litigation Trust Agreement or Restructuring Support Agreement or Buyer Group Arrangements). Subject to the terms of the Plan and certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors and the Reorganized Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry

out the purposes and intent of the Plan (subject in all respects to any applicable consents or consultation rights incorporated and set forth therein or in the GUC Settlement or Restructuring Support Agreement or the Buyer Group Arrangements).  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

76.     On the Effective Date, and as a condition precedent to consummation of the Plan, the Debtors or the Reorganized Debtors, as applicable, shall pay in full in Cash, all Restructuring Expenses, including the fees and expenses of the Prepetition Agent and the DIP Agent, and any other fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement or pursuant to an order of the Bankruptcy Court.

77.     Pursuant to rule 9005 of the Bankruptcy Rules, any error or defect that does not affect a party's substantial rights shall be disregarded by the Bankruptcy Court.

78.     The provisions of the Plan and this Confirmation Order, including any findings of fact and conclusions of law set forth in this Confirmation Order, are (a) valid and enforceable in accordance with its terms.

79.     This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

80.     Each term and provision of the Plan, as it may have been altered or interpreted in accordance with Article XII.J of the Plan, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors, (y) the Required Consenting

Creditors, and (z) the Buyer Group and Hooters Brand Management, LLC, <u>provided</u> that, any such deletion or modification shall be consistent with the GUC Settlement, Litigation Trust Agreement, the Buyer Group Arrangements or Restructuring Support Agreement, as applicable, and the consent rights contained therein; and (iii) nonseverable and mutually dependent.

81.     Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court that is in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

82.     Except as otherwise may be provided in the Plan or herein, notice of all subsequent pleadings in these cases after the Effective Date shall be limited to: (i) the Notice Parties; and (ii) any party known to be directly affected by the relief sought.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Bankruptcy Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

83.     Notwithstanding the entry of this Confirmation Order, if the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to or in connection with the Plan (other than the provisions of that certain *Order (I) Approving the Break-Up Fee Pertaining to the Sale Of Certain of the Debtors' Assets Through a Plan and (II) Granting Related Relief* [Docket No. 569]) will be null and void, <u>provided</u>, that nothing herein shall be deemed or construed to waive or impair any party's right to assert, pursue, or otherwise bring substantial contribution claims or Administrative Claims against the Debtors' Estates or any claim against any party relating to

breach of the Restructuring Support Agreement; and (c) nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

84.    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

85.    The rights of the Debtors and Reorganized Debtors, as applicable, are fully reserved and preserved to request, including on an emergency basis, that the Bankruptcy Court waive any stay of this Confirmation Order under any Bankruptcy Rule for good cause shown.

86.    Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

87.    Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

88.    References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision

of the Plan in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by reference.

89.    After the Effective Date, the Debtors, the Reorganized Debtors, or the Wind-Down Entities as applicable, shall have no obligation (a) to provide any reports to any parties otherwise required under the "first" day orders and any "second" day orders entered in the Chapter 11 Cases, including the Interim or Final Cash Collateral Order or (b) to file with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Bankruptcy Court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed prior the Effective Date); provided, however, that the Debtors, the Reorganized Debtors, or the Wind-Down Entities as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.

90.    This Confirmation Order is a Final Order and the period in which an appeal must be Filed shall commence upon the entry hereof.  Notwithstanding Bankruptcy Rules 7062 or 3020(e), this Confirmation Order shall be effective and enforceable immediately upon its entry.

91.    Subject to Article XI of the Plan, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, this Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters arising from or related to these Chapter 11 Cases, the Plan, and the implementation of this Confirmation Order, including, without limitation, those matters set forth in Article XI of the Plan.

**# # # END OF ORDER # # #**

## **SCHEDULE 1**

**Buyer Group Arrangements**

## Schedule 1

### Buyer Group Arrangements[1]

**THE BANKRUPTCY COURT HEREBY MAKES THE FOLLOWING FINDINGS:**

### Findings of Fact and Conclusions of Law

A.     The findings and conclusions set forth herein constitute the Bankruptcy Court's finding of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such. These findings of fact and conclusions of law in this Schedule 1 are incorporated into the Confirmation Order by reference and shall have full force and effect as if set forth therein in full.

### Jurisdiction and Venue

B.     This Bankruptcy Court has jurisdiction over the transactions contemplated by the Buyer Group Arrangements,[2] including the Buyer Group APAs and the Brand Management

---

[1]   Terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* as may be amended, supplemented, or modified from time to time [Docket No. 1142] (the "Plan").

[2]   As used herein, the term "Buyer Group Arrangements" shall mean collectively, (a) that certain Asset Purchase Agreement, dated as of June 16, 2025, by and among Hooter's Inc., Debtor Hawk Parent, LLC, and all other selling entities identified on the signature pages thereto (including all transition services agreements, interim management agreements, and all other related or ancillary agreements, instruments, schedules, exhibits, statements of work, or documents entered into in connection therewith, as may be amended, supplemented, or modified from time to time, the "HI APA"), (b) that certain Asset Purchase Agreement, dated as of June 16, 2025, by and among Hoot Owl Restaurants, L.L.C., Debtor Hawk Parent, LLC, and all other selling entities identified on the signature pages thereto (including all transition services agreements, interim management agreements, and all other related or ancillary agreements, instruments, schedules, exhibits, statements of work, or documents entered into in connection therewith, as may be amended, supplemented, or modified from time to time, the "Hoot Owl APA" and, together with the HI APA, the "Buyer Group APAs"), (c) that certain Brand Management Agreement, dated as of the Effective Date by and among HOA FRANCHISING, LLC, HOOTS FRANCHISING, LLC, FUTURE FRANCHISING, LLC, HOA FRANCHISE HOLDCO, LLC, HOA SYSTEMS, LLC, HI LIMITED PARTNERSHIP, LLC, and HOOTERS BRAND MANAGEMENT, LLC, including all other related or ancillary agreements, instruments, schedules, exhibits, statements of work, powers of attorney, or documents entered into in connection therewith (the "Brand Management Agreement"), (d) the Approved Operating Agreements (as defined herein), (e) the License Agreement, (f) the Transition Services Agreement, (g) the assumption and assignment of any executory contract or unexpired lease in connection with the foregoing, and (h) any and all other contracts, certificates, side letters, transition documents, and instruments contemplated by,

Agreement (and the transactions contemplated therein), the transfer of assets and rights that are contemplated to be transferred in connection with the Buyer Group Arrangements (including the Acquired Assets[3] (as defined in the Buyer Group APAs)) (such assets and rights, the "<u>Transferred Assets</u>"), and the transfer and assumption of the liabilities and obligations that are contemplated to be transferred and assumed in connection with the Buyer Group Arrangements (including the Assumed Liabilities (as defined in the Buyer Group APAs)) (the "<u>Transferred Liabilities</u>"), pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and proceedings is proper in this District and this Bankruptcy Court under 28 U.S.C. §§ 1408 and 1409.

### Title to the Transferred Assets

C.      Subject to the terms of the Buyer Group Arrangements, the Transferred Assets constitute property of the Debtors' estates and good title is presently vested in the Debtors within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Buyer Group Arrangements, the Debtors are the sole and rightful owner of such Transferred Assets with all rights, title and interests to the Transferred Assets, and no other person has any ownership right, title, or interests therein.

### Notice and Opportunity to Object

D.      As evidenced by the certificates of service [Docket Nos. 604, 763] the *Certificate of Publication*, dated July 18, 2025 [Docket No. 619], the *Affidavit of Service of Stanislav Kesler* confirming distribution of *the Notice of (I) Combined Hearing on the Final Approval of the*

---

arising out of, or executed in connection with the foregoing, whether entered into prior to, on, or after the Closing Date.

[3]      The Acquired Assets include, among other things, the assets primarily related to the Restaurants (as defined in the Buyer Group APAs) set forth in **<u>Annex C</u>** attached hereto.

*Disclosure Statement, Confirmation of the Chapter 11 Plan, and Related Matters, and (II) Objection Deadlines and Summary of the Plan* [Docket No. 731], the *Notice of Possible Assumption and Assignment with Respect to Executory Contracts and Unexpired Leases of the Debtors*, dated June 25, 2025 [Docket No. 529] (the "<u>First Assumption Notice</u>"), the *Supplemental Notice of Possible Assumption and Assignment with Respect to Executory Contracts and Unexpired Leases of the Debtors*, dated July 25, 2025 [Docket No. 690] (the "<u>Second Assumption Notice</u>"), the *Second Supplemental Notice of Possible Assumption and Assignment with Respect to Executory Contracts and Unexpired Leases of the Debtors*, dated August 5, 2025 [Docket No. 721] (together with the First Assumption Notice, the Second Assumption Notice, and any other notice of the proposed assumption and assignment of any Desired 365 Contract in connection with the Buyer Group Arrangements, collectively, the "<u>Assumption Notices</u>"), each previously filed with the Bankruptcy Court, and all parties in interest having either been heard or afforded an opportunity to be heard, the Debtors have provided due, proper, timely, adequate, and sufficient notice to all interested Persons and entities of the Buyer Group Arrangements in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and the Disclosure Statement Order.

## <u>Compliance with the Plan</u>

E.      As demonstrated by the evidence proffered or adduced at the Combined Hearing and the representations of counsel at the Combined Hearing, the Debtors have complied in all material respects with the Disclosure Statement Order and Plan.  The Debtors and their professionals have adequately and appropriately marketed the Transferred Assets in accordance with the Debtors' fiduciary duties.  Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Transferred Assets.

F.     The marketing and sale process conducted by the Debtors was substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Transferred Assets.  The Debtors conducted the marketing and sale process without collusion and in accordance with the requirements of the Bankruptcy Code and the Plan.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Transferred Assets for greater value to the Debtors' estates than the Buyer Group[4] pursuant to the Buyer Group Arrangements.

G.     The Buyer Group has complied in all respects with the Plan, the Bankruptcy Court, and all applicable orders of this Bankruptcy Court in negotiating and entering into the Buyer Group Arrangements (including the Brand Management Agreement and the Buyer Group APAs).

**<u>Sale in Best Interests of the Debtors' Estates</u>**

H.     The Buyer Group Arrangements, including the form and total consideration to be realized by the Debtors' estates and their creditors under the Buyer Group Arrangements, (i) constitute the highest and best offer received by the Debtors for the Transferred Assets; (ii) are fair and reasonable; and (iii) are in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

I.     The Debtors' determination that the consideration provided by the Buyer Group under the Buyer Group Arrangements constitutes the highest and best offer for the Transferred Assets constitutes a valid and sound exercise of the Debtors' business judgment.

---

[4]     As used in this Schedule 1, the term "<u>Buyer Group</u>" shall mean, collectively, Hooter's Inc., Hoot Owl Restaurants, L.L.C., each of the "Buyer Designees" (as defined in the Buyer Group APAs), the "Manager" (as defined in the Brand Management Agreement), and each of their respective Related Parties (as defined in the Plan).

J.      Good and sufficient reasons for approval of the Buyer Group Arrangements and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Plan is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Buyer Group Arrangements other than in the ordinary course of business, pursuant to sections 365, 1123, and 1141 of the Bankruptcy Code, in that, among other things, the immediate consummation of the Buyer Group Arrangements to the Buyer Group is necessary and appropriate to maximize the value of the Debtors' estates.

K.      The Buyer Group Arrangements must be approved and consummated promptly in order to preserve the viability of the Debtors' businesses as a going concern and to maximize the value of the Debtors' estates.  Time is of the essence in consummating the Buyer Group Arrangements.  Given all of the circumstances of these Chapter 11 Cases, the evidence submitted to the Bankruptcy Court, and the adequacy and fair value of the Purchase Price, the proposed Buyer Group Arrangements constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

L.      The consummation of the Buyer Group Arrangements and the assumption and assignment of the Assigned Contracts (as defined in the Buyer Group APAs) are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 365, 1123, and 1141 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

### Corporate Authority

M.      Subject to entry of the Confirmation Order and as evidenced by the representations and warranties set forth in the Buyer Group APAs, the Debtors (i) have full corporate power and

5

authority to execute and deliver the Buyer Group APAs and all other documents contemplated thereby, (ii) have all of the necessary corporate power and authority to consummate the transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Brand Management Agreement, the Buyer Group APAs, and the assumption and assignment of the Assigned Contracts, (iii) have taken all corporate action necessary to authorize and approve the Buyer Group Arrangements and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, the Brand Management Agreement, the Buyer Group APAs, and the assumption and assignment of the Assigned Contracts, and (iv) subject to entry of the Confirmation Order, need no consents or approvals, including any consents or approvals from any non-Debtor entities, other than those expressly set forth in the Buyer Group Arrangements, the DIP Orders or the Confirmation Order, to consummate the transactions contemplated thereby, including, without limitation, the Brand Management Agreement, the Buyer Group APAs, and the assumption and assignment of the Assigned Contracts.

N.      The record and declarations in support of confirmation establish that the Buyer Group Arrangements were not entered into, and none of the Debtors, including the Sellers, or the Buyer Group has entered into the Buyer Group Arrangements or proposes to consummate the Buyer Group Arrangements, for the purpose of hindering, delaying or defrauding the Debtors' creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**<u>Good Faith</u>**

O.      As demonstrated by the record and declarations in support of the Buyer Group Arrangements, the marketing and sale process engaged in by the Debtors and the Buyer Group,

6

including, without limitation, the marketing of the Transferred Assets and the negotiation of the

Buyer Group Arrangements, was non-collusive, in good faith, and substantively and procedurally

fair to all parties in interest.  None of the Debtors or the Buyer Group has engaged in any conduct

that would cause or permit the Buyer Group Arrangements (including, without limitation, the

Brand Management Agreement, the Buyer Group APAs, and the assumption and assignment of

the Assigned Contracts) to be avoided, or costs or damages to be imposed, under the Bankruptcy

Code.

P.      The Debtors and the Buyer Group have complied, in good faith, in all respects with

the orders of this Bankruptcy Court and the Bankruptcy Code.  The Debtors, and their respective

agents, advisors and representatives, and the Buyer Group and its agents, advisors and

representatives, each actively participated in the marketing process and in the sale, and each acted

in good faith and without collusion or fraud of any kind.

Q.      The form and total consideration to be realized by the Debtors and their estates

under the Buyer Group Arrangements constitutes fair value, fair, full and adequate consideration,

reasonably equivalent value and reasonable market value for the Transferred Assets and the rights

granted to the Buyer Group and the Manager (as defined in the Brand Management Agreement)

pursuant to the Buyer Group Arrangements.

## Free and Clear

R.      The transfer of the Transferred Assets to the Buyer Group will be a legal, valid, and

effective transfer of the Transferred Assets and will vest the Buyer Group with all right, title, and

interest of the Debtors to the Transferred Assets free and clear of all claims, liens, liabilities,

Interests, rights and Encumbrances,[5] and all other matters of any kind and nature (including any

---

[5]     As used herein, the term "Encumbrance" means any lien, mortgage, pledge, security interest, charge,
        encroachment, deed of trust, lease, easement, right of way, option, encumbrance, servitude, encumbrance, right,

statutory lien on real and personal property and all "liens" as that term is defined and used in the

Bankruptcy Code, including section 101(37) thereof (but expressly excluding the liens securing

the 2025 Personal Property Taxes (as defined herein)), whether known or unknown, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed

by agreement, understanding, law, equity or otherwise, including claims otherwise arising under

any theory, law or doctrine of successor or transferee liability or theories of liability related to

acting in concert or active participation with the Debtors or related theories (all of the foregoing,

including, without limitation, Liens and Liabilities, but excluding Transferred Liabilities,

collectively being referred to in this Confirmation Order as "Claims" and, as used in this

Confirmation Order, the term "Claims" includes, without limitation, any and all "claims" as that

term is defined and used in the Bankruptcy Code, including section 101(5) thereof); provided,

however, that such transfer shall not be free and clear of any Permitted Liens and Transferred

Liabilities.

     S.     The Debtors may transfer the Transferred Assets free and clear of all Claims,

Interests and Encumbrances (other than any Permitted Liens and Transferred Liabilities),

including, without limitation, free and clear of all rights or claims based on any successor or

---

restriction (whether on voting, sale, transfer, disposition or otherwise), conditional sale or other title retention
agreement, or other encumbrance of any kind (including any "interest" as that term is used in section 363(f) of
the Bankruptcy Code), whether arising by agreement, statute or otherwise and whether or not perfected or
enforceable, including the filing of any financing statement.

transferee liability or theories of liability related to actions in concert or active participation with the Debtors.

T.     Those (a) holders of Claims or Interests and (b) non-Debtor parties to the Assigned Contracts, who did not timely object or who withdrew their objections to the Plan, are deemed to have consented pursuant to Bankruptcy Code section 365.  Those (i) holders of Claims or Interests and (ii) non-Debtor parties to the Assigned Contracts, who did timely object, fall within one or more of the other subsections of Bankruptcy Code section 365 or are adequately protected.

U.     Each DIP Lender, Prepetition Lender, and Consenting AHG Noteholder (each as defined in the DIP Orders) has consented, or is deemed to consent, to the transfer of the Transferred Assets to the Buyer Group pursuant to the Buyer Group Arrangements free and clear of any Claims, Interests, or Encumbrances (other than the Permitted Liens and Transferred Liabilities) of any DIP Lender, Prepetition Lender, or Consenting AHG Noteholder against the Transferred Assets (the "Secured Lender's Liens"), and any reference herein to Claims, Interests, or Encumbrances shall include any Lien held by any such party.

V.     The Buyer Group would not have entered into the Buyer Group Arrangements and would not consummate the transactions contemplated thereby, including, without limitation, the Buyer Group APAs and the assumption and assignment of the Assigned Contracts, (i) if the transfer of the Transferred Assets were not free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Transferred Liabilities) pursuant to sections 1123 and 1141 of the Bankruptcy Code, or (ii) if the Buyer Group would, or in the future could, be liable for any such Claims, Interests, and Encumbrances (other than any Permitted Liens and Transferred Liabilities).  The Buyer Group will not consummate the transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Buyer Group Arrangements and

the assumption and assignment of the Assigned Contracts, unless this Bankruptcy Court expressly orders that none of the Buyer Group or the Transferred Assets will have any liability whatsoever (other than any Permitted Liens and Transferred Liabilities) with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims, Interests, and Encumbrances, including in respect of any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

W.      Not transferring the Transferred Assets free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Transferred Liabilities) would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Transferred Assets other than pursuant to a transfer that is free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Transferred Liabilities) would be of substantially less benefit to the Debtors' estates.

X.      Solely by reason of entering into the Buyer Group Arrangements and closing on the sale of the Transferred Assets, neither the Buyer Group nor any of its affiliates are a continuation of the Debtors or their estates, there is no continuity or common identity between the Buyer Group, any of its affiliates and any of the Debtors, and there is no continuity of enterprise between the Buyer Group, any of its affiliates and any of the Debtors.  Solely by reason of entering into the Buyer Group Arrangements and closing on the sale of the Transferred Assets, neither the Buyer Group nor any of its affiliates are holding themselves out to the public as a continuation of any of the Debtors.  Neither the Buyer Group nor any of its affiliates are a successor to any of the Debtors or their estates and none of the transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Buyer Group Arrangements and the assumption

and assignment of the Assigned Contracts amounts to a consolidation, merger, or *de facto* merger of the Buyer Group or any of its affiliates with or into any of the Debtors.

Y.      Without limiting the generality of the foregoing, and other than as may be set forth in the Buyer Group Arrangements, none of the Buyer Group, its affiliates, its and their respective present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims relating to any U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Buyer Group APAs and the assumption and assignment of the Assigned Contracts, or that the Debtors have otherwise incurred prior to the consummation of the transactions contemplated by the Buyer Group Arrangements.

**<u>Validity of Transfer</u>**

Z.      The consummation of the transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Buyer Group APAs and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 365, 1123, and 1141, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Buyer Group Arrangements.

AA.     The transfer of the Debtors' rights, title, and interests to the Transferred Assets will be, as of the Closing Date (as defined in the Buyer Group APAs), a legal, valid and effective transfer of such rights, title, and interests in the Transferred Assets, which transfer vests or will vest the Buyer Group with all rights, title, and interests of the Debtors to the Transferred Assets

free and clear of all Liens, Claims, Interests, and Encumbrances (other than the Permitted Liens and the Transferred Liabilities).

BB.    The Buyer Group APAs have been duly and validly executed and delivered by the Debtors and, subject to the terms of the Buyer Group Arrangements, shall constitute a valid and binding obligation of the parties thereto, enforceable against the parties thereto in accordance with its terms.  The Buyer Group Arrangements and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the parties thereto and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

### Assigned Contracts

CC.    The assumption and assignment of the Assigned Contracts pursuant to the Buyer Group Arrangements and this Confirmation Order is integral to the transactions contemplated by the Buyer Group Arrangements and is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

DD.    Pursuant to the terms of the Buyer Group Arrangements and this Confirmation Order, on or before the Closing Date, the Debtors or the Buyer Group, as applicable, shall have, except as otherwise provided in the Buyer Group Arrangements or this Confirmation Order or as otherwise expressly agreed to between the Debtors or the Buyer Group (as applicable) and such counterparty: (i) cured, or provided adequate assurance of cure of, any monetary default existing as of and including the Closing Date under any of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(A), (ii) provided compensation, or adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Assigned Contracts, within

the meaning of Bankruptcy Code section 365(b)(1)(B), and (iii) provided adequate assurance of future performance under the Assigned Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**General Provisions**</u>

1. Entry into and performance under, and in respect of, the Buyer Group Arrangements, including the Buyer Group APAs attached hereto as <u>**Annex A**</u>, and <u>**Annex B**</u>, respectively, and the Brand Management Agreement filed as <u>Exhibit J</u> to the Plan Supplement, and the consummation of the transactions contemplated thereby, including, without limitation, the assumption and assignment of the Assigned Contracts in accordance with the Buyer Group Arrangements is authorized and approved.

2. Any objections and responses to confirmation of the Plan or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of confirmation of the Plan that failed to timely object thereto are deemed to consent to the relief granted herein.

<u>**Approval of the Buyer Group Arrangements**</u>

3. The Buyer Group Arrangements, all ancillary documents, the transactions contemplated thereby, including, without limitation, the Buyer Group APAs, the Brand Management Agreement, and the assumption and assignment of the Assigned Contracts (but subject to the Buyer Group's rights with respect thereto pursuant to the Buyer Group Arrangements) and all the terms and conditions thereof, are approved.  The failure to specifically include any particular provision of the Buyer Group Arrangements in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Bankruptcy Court that the Buyer Group Arrangements be authorized and approved in their entirety.

4.      The Debtors and their respective officers, employees and agents are authorized to take any and all actions necessary, appropriate or reasonably requested by the Buyer Group to perform, consummate, implement and close the Buyer Group Arrangements, including, without limitation, (a) the sale to the Buyer Group of all Transferred Assets, in accordance with the terms and conditions set forth in the Plan, Buyer Group Arrangements and this Confirmation Order; and (b) execution, acknowledgment and delivery of such deeds, bills of sale, assignments, conveyances and other assurance, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer Group, or reducing to possession, the Transferred Assets, all without further order of this Bankruptcy Court.

5.      Unless otherwise set forth in this Confirmation Order, all persons and entities, including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), Liens, Interests, or Encumbrances against the Debtors or the Transferred Assets owned by the Debtors, arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets owned by the Debtors, the operation or ownership of the Transferred Assets by the Debtors prior to the Closing Date, or the Buyer Group Arrangements, are hereby prohibited, forever barred, and estopped from asserting or pursuing such Claims against Buyer Group, its affiliates, successors, assigns, its property or the Transferred Assets, including, without limitation,

taking any of the following actions with respect to any Claims: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer Group, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer Group, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (c) creating, perfecting, or enforcing any Claim against Buyer Group, its affiliates, any of their respective successors, assigns, assets (including the Transferred Assets), and/or properties; (d) asserting a Claim as a setoff or right of subrogation of any kind against any obligation due to Buyer Group, its affiliates or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Confirmation Order, the Plan, the Buyer Group Arrangements, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Transferred Assets to the Buyer Group in accordance with the terms of the this Confirmation Order, the Plan, and the Buyer Group Arrangements.  No such Person shall assert or pursue against Buyer Group or its affiliates, successors or assigns any such Claim.

6.      The sale of the Transferred Assets to the Buyer Group under the Buyer Group Arrangements constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Transferred Assets are located, and the sale of the Transferred Assets to the Buyer Group may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or

under the laws of the United States, any state, territory, possession thereof or the District of
Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**Transfer of the Transferred Assets Free and Clear**

7.      Pursuant to Bankruptcy Code sections 105(a), 365, 1123, and 1141, the Transferred
Assets shall be sold free and clear of all Claims, Interests, and Encumbrances (other than any
Permitted Liens and Transferred Liabilities), with all such Claims to attach to the proceeds of the
Buyer Group Arrangements to be received by the Debtors with the same validity, force, priority
and effect which they now have against the Transferred Assets, subject to any claims and defenses
the Debtors may possess with respect thereto.

8.      At Closing (as defined in the Buyer Group APAs), all of the Debtors' right, title
and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the
Buyer Group, pursuant to Bankruptcy Code sections 105(a), 365, 1123, and 1141, free and clear
of any and all Claims, Interests, and Encumbrances (other than any Permitted Liens and
Transferred Liabilities).  Such transfer shall constitute a legal, valid, binding and effective transfer
of, and shall vest the Buyer Group with good and marketable title to, the Transferred Assets.  All
persons or entities, presently or on or after the Closing Date, in possession of some or all of the
Transferred Assets are directed to surrender possession of the Transferred Assets to the Buyer
Group or its designees on the Closing Date or at such time thereafter as the Buyer Group may
request.  To the extent set forth in paragraphs 67 and 68 herein, the statutory liens securing the
2025 Personal Property Taxes shall remain attached to the applicable Transferred Assets until such
time as all taxes, plus any applicable penalties and interest, are paid in full.

9.      To the fullest extent permissible under applicable law, this Confirmation Order
is and shall be binding upon and govern the acts of all entities, including, without limitation, all
filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Buyer Group Arrangements.

10.    Except as otherwise expressly provided in the Buyer Group Arrangements or this Confirmation Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors or the Transferred Assets arising under or out of, in connection with, or in any way relating to, the Debtors, their estates, the Debtors' predecessors, the Transferred Assets, the ownership, sale or operation of the Transferred Assets prior to the Closing Date or the transfer of the Transferred Assets to the Buyer Group, are hereby forever barred and estopped from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset, or recover on account of any Claims against the Buyer Group, its successors or assigns, their property or the Transferred Assets, other than Permitted Liens and Transferred Liabilities.  Following the Closing Date, no holder of any Claim, Interest or Encumbrance (other than Permitted Liens and Transferred Liabilities) shall interfere with the Buyer Group's title to or use and enjoyment of the Transferred Assets based on or related to any such Claim, Interest or Encumbrance (other than Permitted Liens

and Transferred Liabilities), or based on any action or omission of the Debtors, including any action or omission the Debtors may take in the Chapter 11 Cases.

11.    The Debtors are authorized to execute such documents as may be necessary to release any Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) of any kind against the Transferred Assets as such Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) that may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, lis pendens or other documents or agreements evidencing Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) against or in the Transferred Assets shall not have delivered to the Debtors prior to the Closing Date of the Buyer Group Arrangements, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) that the person or entity has with respect to the Transferred Assets, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Transferred Assets; (b) the Buyer Group is hereby authorized to file, register or otherwise record a certified copy of this Confirmation Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) against the Buyer Group and the applicable Transferred Assets; (c) the Debtors' creditors and the holders of any Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) are authorized to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) in the Transferred Assets; and (d) the Buyer

Group may seek in this Bankruptcy Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Transferred Liabilities) with respect to the Transferred Assets. Each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Confirmation Order for filing or recording. Notwithstanding the foregoing, the provisions of this Confirmation Order authorizing the sale and assignment of the Transferred Assets free and clear of Claims, Interests, and Encumbrances (other than any Permitted Liens and Transferred Liabilities) shall be self-executing, and none of the Debtors or the Buyer Group shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Confirmation Order.

12.     To the maximum extent permitted under applicable law, the Buyer Group shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Transferred Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, deemed transferred to the Buyer Group as of the applicable closing date, but solely with respect to those Restaurants actually conveyed to the Buyer Group pursuant to the Buyer Group APA as of such date. To the extent the Buyer Group cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, such licenses, permits, registrations and governmental authorizations and approvals shall be in effect while the Buyer Group, with assistance from the Reorganized Debtors (and at the Buyer Group's sole cost and expense), works promptly and diligently to apply for and

secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Buyer Group.

13.     Notwithstanding anything to the contrary in this Confirmation Order, the Buyer Group and their respective designees shall be authorized, from and after the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Restaurants or the Acquired Assets (including liquor licenses, state food service licenses, occupational licenses, or any other licenses reasonably necessary to operate the Restaurants), and all such licenses, permits, registrations and governmental authorizations and approvals of the Restaurants that are actually transferred to the Buyer Group (pursuant to the Buyer Group APA) are deemed to have been, and hereby are, directed to be transferred to the Buyer Group or their respective designees, as applicable, as of the Closing Date.  From and after the Closing, the Buyer Group or their respective designees shall undertake commercially reasonable efforts to apply for and obtain any necessary license or permit promptly after the Closing Date; provided, that the licenses and permits of the Debtors with respect to the Restaurants or the Acquired Assets shall remain in place for the benefit of the members of the Buyer Group and their respective designees until the earlier of (a) either a new license or permit is obtained or the existing license or permit is transferred in accordance with the applicable administrative procedures; (b) one year following the Effective Date; or (c) such other date that is mutually agreed upon between the Parties in writing.

14.     No Governmental Unit (as defined in Bankruptcy Code section 101(27)) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Transferred Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Buyer Group Arrangements to the extent that

20

any such action by a Governmental Unit or any representative thereof would violate Bankruptcy

Code section 525.

### No Successor or Transferee Liability

15. Upon the Closing Date, except as provided in the Buyer Group Arrangements, the

Buyer Group, as a result of any action taken in connection with the Buyer Group Arrangements,

the consummation of the transactions contemplated by the Buyer Group Arrangements (including,

without limitation, entry into the Buyer Group APAs, the Brand Management Agreement, and the

assumption and assignment of the Assigned Contracts, or the transfer or operation of the

Transferred Assets) shall not, nor be deemed to: (a) be a legal successor or successor employer to

the Debtors, or otherwise be deemed a successor to the Debtors, and shall instead be, and be

deemed to be, a new employer with respect to all federal or state unemployment laws, including

any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have,

*de facto*, or otherwise, merged or consolidated with or into the Debtors; or (c) be an alter ego or a

mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or

otherwise be deemed to be acting in concert or active participation with the Debtors, including, in

the case of each of (a)–(c), without limitation, (x) within the meaning of any foreign, federal, state

or local revenue law, pension law, the Employee Retirement Income Security Act, the

Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.)

("WARN"), Comprehensive Environmental Response Compensation and Liability Act

("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended),

the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation

Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (y) in

respect of (i) any environmental liabilities, debts, claims or obligations arising from conditions

first existing on or prior to the Closing Date (including, without limitation, the presence of

hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any

basis, including, without limitation, under CERCLA, (ii) any liabilities, penalties, costs, debts or

obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor,

employment, or other law, rule or regulation (including, without limitation, filing requirements

under any such laws, rules or regulations), (iii) any products liability law or doctrine with respect

to the Debtors' liability under such law, rule or regulation or doctrine or (iv) any consumer

protection law or doctrine with respect to the Debtors' liability under such law, rule or regulation

or doctrine, including, without limitation, any liabilities, penalties, costs, debts or obligations

imposed by the Federal Trade Commission and/or Bureau of Consumer Protection, of or required

to be paid by the Debtors.

16.     Without limiting the generality of the foregoing, and except as otherwise provided

in the Buyer Group Arrangements and this Confirmation Order, neither the Buyer Group nor any

of its affiliates, successors or assigns shall have any responsibility for (a) any liability or other

obligation of the Debtors related to the Transferred Assets or (b) any Claims against the Debtors

or any of their predecessors or affiliates, including any Excluded Liabilities (as defined in the

Buyer Group APAs).  By virtue of the Buyer Group's purchase of the Transferred Assets, neither

the Buyer Group nor any of its affiliates shall have any liability whatsoever with respect to the

Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the

Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or

indirectly, on any theory of successor or vicarious liability of any kind or character, or any theory

based on acting in concert or active participation with the Debtors, or based upon any theory of

antitrust law, environmental law (including, but not limited to CERCLA), successor or transferee

liability, *de facto* merger or substantial continuity, labor and employment law (including, but not

limited to, WARN), consumer protection law, or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Transferred Assets prior to the Closing Date or such later time as Buyer Group is assigned and assumes any Assigned Contract (collectively, with the potential claims set forth in paragraph 15 above, "Successor or Transferee Liability").  The Buyer Group would not have acquired the Transferred Assets but for the foregoing protections against Successor or Transferee Liability.

17.      None of the Buyer Group or its affiliates, successors, assigns, equity holders, employees or professionals, on the one hand, or the Debtors, Reorganized Debtors, and the Wind-Down Entities and their respective successors or assigns, on the other, shall have or incur any liability to, or be subject to any action by any of the other parties or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Buyer Group Arrangements and the entry into and consummation of the Sale of the Transferred Assets, except as expressly provided in the Buyer Group Arrangements and this Confirmation Order.

18.      Except as set forth in the Buyer Group Arrangements, nothing shall require the Buyer Group or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, fringe benefit or any trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or

otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

19.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions that are approved by this Confirmation Order, including, without limitation, the Buyer Group APAs and the Buyer Group Arrangements.

20.     Notwithstanding anything to the contrary herein, pursuant to the HI APA, the Buyer Designees (for the purposes of this paragraph, as defined in the HI APA) shall acquire all Acquired Assets and assume all Transferred Liabilities (each, for the purposes of this paragraph, as defined in the HI APA), as of the applicable Closing (for the purposes of this paragraph, as defined in the HI APA), that are designated by Hooter's Inc. for acquisition or assumption by such Buyer Designee in accordance with Section 2.7 of the HI APA, and to the extent such Acquired Assets are acquired by such Buyer Designee, or such Assumed Liabilities are assumed by such Buyer Designee, then as of such Closing, Hooter's Inc. shall not acquire such Transferred Assets or assume, pay, perform, discharge, or otherwise be liable for such Assumed Liabilities.

21.     Notwithstanding anything to the contrary herein, pursuant to the Hoot Owl APA, the Buyer Designees (for the purposes of this paragraph, as defined in the Hoot Owl APA) shall acquire all Acquired Assets and assume all Transferred Liabilities (each, for the purposes of this paragraph, as defined in the Hoot Owl APA), as of the applicable Closing (for the purposes of this paragraph, as defined in the Hoot Owl APA), that are designated by Hoot Owl Restaurants, L.L.C. for acquisition or assumption by such Buyer Designee in accordance with Section 2.7 of the Hoot Owl APA, and to the extent such Acquired Assets are acquired by such Buyer Designee, or such Assumed Liabilities are assumed by such Buyer Designee, then as of such Closing, Hoot Owl

Restaurants, L.L.C. shall not acquire such Transferred Assets or assume, pay, perform, discharge, or otherwise be liable for such Assumed Liabilities.

## Good Faith Sale

22.    The Buyer Group Arrangements have been negotiated and executed, and the transactions contemplated thereby, including, without limitation, the Buyer Group APAs, the Brand Management Agreement, and the assumption and assignment of the Assigned Contracts, are and have been undertaken, by Debtors, the Buyer Group and their respective representatives without collusion and in "good faith."  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Buyer Group Arrangements shall not affect the validity of the Buyer Group Arrangements.

## Assumption and Assignment of the Assigned Contracts

23.    Except as otherwise expressly provided in the Buyer Group Arrangements, the Plan, or this Confirmation Order, upon the Closing Date, pursuant to Bankruptcy Code sections 105(a), 365, 1123, and 1141 the Debtors are authorized to (a) assume each of the Desired 365 Contracts and assign the Desired 365 Contracts, set forth in Schedule 2.5(b) to the respective Buyer Group APAs (the "Assigned Contracts Exhibit"), which may be subsequently modified pursuant to the Buyer Group APAs and the Plan and upon Buyer Group's delivery of written notice to the Debtors, to add or remove certain executory contracts or unexpired leases, pursuant to the terms of the Buyer Group APAs and the Plan, to the Buyer Group free and clear of all Claims, Interests, Liens, and Encumbrances (other than any Permitted Liens and Transferred Liabilities) and (b) execute and deliver to the Buyer Group such documents or other instruments as may be reasonably requested by Buyer Group to assign and transfer the Desired 365 Contracts to the Buyer Group.

24.     The Cure Costs (as defined in the Buyer Group APAs) listed on the Assumption

Notices and set forth on the Assumption Schedule filed as Exhibit D to the Plan Supplement are

the sole amounts necessary to be paid upon assumption of the Assigned Contracts under

Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A).  All Cure Costs, if any, shall be

paid as set forth in the Buyer Group Arrangements.  Upon the payment of the Cure Costs, if any,

the Assigned Contracts shall remain in full force and effect, and no default shall exist under the

Assigned Contracts nor shall there exist any event or condition which, with the passage of time or

giving of notice, or both, would constitute such a default.  The Cure Costs shall not be subject to

further dispute or audit, including, without limitation, any dispute or audit arising from

performance prior to the Closing Date, irrespective of whether such Assigned Contract contains

an audit clause.  After the payment of the Cure Costs, none of the Debtors or the Buyer Group

shall have any further liabilities to the counterparties to the Assigned Contracts other than the

Buyer Group's obligations under the Assigned Contracts that accrue and become due and payable

on or after the Closing Date.

25.     In the event of a dispute as of, or after, the Closing Date regarding assumption

and assignment or Cure Cost of any executory contract or unexpired lease proposed to be an

Assigned Contract, payment shall be made following the entry of an order of the Bankruptcy Court

resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by

the Buyer Group and such counterparty and, solely with respect to disputes regarding Cure Costs,

the Reorganized Debtors) in each case, subject to the rights of the members of the Buyer Group

and their respective designees to designate such contract or lease for exclusion in accordance with

the terms of the Buyer Group Arrangements, the Plan, the Confirmation Order, or the Bankruptcy

Court's order resolving such dispute, as applicable.  Upon an election of the Buyer Group to

designate an executory contract or unexpired lease as an Excluded Contract (as defined in the Buyer Group APAs), the Buyer Group shall have no liability whatsoever to the counterparty to such executory contract or unexpired lease, the Reorganized Debtors, or the Debtors and any reserve established for Cure Costs related to such excluded contract shall be immediately released in accordance with the Buyer Group APAs; provided, further, that any such Excluded Contract shall be deemed rejected as of the Effective Date.

26.     To the extent any non-Debtor counterparty to an Assigned Contract has failed to timely object to a proposed Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as the Cure Cost listed on the Assumption Notice and Assigned Contracts Exhibit and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time. The non-Debtor counterparty to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of the Cure Costs as provided herein and in the Buyer Group Arrangements, is hereby barred from taking any action against Buyer Group with respect to any claim for cure under the Assigned Contract.

27.     Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to these Buyer Group Arrangements.

28.     Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment, including for purposes of Bankruptcy Code sections 365(c)(1)(B) and 365(e)(2)(A)(ii) and otherwise, if such party failed to timely object to the assumption and assignment of such Assigned Contract.

29.     Each Assigned Contract constitutes an executory contract or unexpired lease under the Bankruptcy Code and all requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer Group of the Assigned Contracts have been, or will be, satisfied.  Upon the Buyer Group's assumption of the Assigned Contracts in accordance with the terms hereof, in accordance with Bankruptcy Code sections 365, 1123, and 1141 (a) the Buyer Group shall be fully and irrevocably vested with all rights, title and interest of the Debtors under the Assigned Contracts, (b) the Buyer Group shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts, and (c) the Debtors shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under the Assigned Contracts.

30.     The Buyer Group has demonstrated adequate assurance of future performance under the relevant Assigned Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

31.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Debtors, Reorganized Debtors, Wind-Down Entities, or the Buyer Group as a result of the assumption, assignment and sale of the Assigned Contracts, except as expressly provided in the Buyer Group Arrangements and as set forth in this Confirmation Order.  Upon assignment to the Buyer Group, the Assigned Contracts shall be valid and binding, in full force and effect and enforceable by the Buyer Group in accordance with their respective terms.

32.     Pursuant to Bankruptcy Code sections 105(a), 365, 1123, and 1141, all counterparties to the Assigned Contracts are forever barred from raising or asserting against the Debtors, the Reorganized Debtors, Wind-Down Entities, or the Buyer Group any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to

the Assigned Contracts existing as of and including the Closing Date under the Buyer Group Arrangements or arising by reason of the consummation of transactions contemplated by the Buyer Group Arrangements, including, without limitation, the Buyer Group Arrangements and the assumption and assignment of the Assigned Contracts.

33.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer Group, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Transferred Assets.

## FDD For Acquired Restaurants

34.     Notwithstanding any applicable federal or state franchise laws or regulations, nothing in this Confirmation Order or the Buyer Group Arrangements shall be construed to require the Buyer Group to obtain or have in effect an approved franchise disclosure document or a formal exemption therefrom as a condition to operating the Acquired Restaurants (as defined in the Buyer Group APAs) on and after the Closing Date.

## Employee Benefits

35.     Notwithstanding anything to the contrary in this Confirmation Order or the Buyer Group APAs, all employee benefits (including, but not limited to, health insurance, dental, vision, and other welfare benefits) shall remain in effect for all Transferred Employees (as defined in the Buyer Group APAs) through the last day of the calendar month for which such benefits have been paid in advance by the Debtors; provided that, for the month that includes the Closing Date, such employee benefits shall be prorated as between the Debtors and the Buyer Group.  For the avoidance of doubt, the Buyer Group shall be responsible solely for the prorated portion attributable to the period following the Closing Date and the Debtors shall be responsible solely

for the prorated portion attributable to the period through and including the Closing Date.  For the further avoidance of doubt, the inclusion of this provision in this Confirmation Order shall not be deemed to create any obligation for (a) any of the Debtors to make any payments or incur any obligations on and after the Closing Date, or (b) any member of the Buyer Group to assume or continue any of the employee benefits offered by the Debtors beyond the Closing Date.

### Failure to Specify Provisions

36.      The failure specifically to include any particular provisions of the Buyer Group Arrangements in this Confirmation Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Buyer Group Arrangements be authorized and approved in its entirety; provided, however, that this Confirmation Order shall govern if there is any inconsistency between the Buyer Group Arrangements (including all ancillary documents executed in connection therewith) and this Confirmation Order.  Likewise, all of the provisions of this Confirmation Order are non-severable and mutually dependent.  To the extent that this Schedule 1 is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases (including the Plan and provisions of this Confirmation Order that are not included on this Schedule 1), the terms of this Schedule 1 shall control.[6]

### Non-Material Modifications

37.      The Buyer Group Arrangements and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Bankruptcy

---

[6]   Provided, for the avoidance of doubt, paragraph 67 of the Confirmation Order shall control over anything in this Schedule 1 solely with respect to the ROA Franchisees.

Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

### Provisions Regarding Gift Cards

38.     From and after the Closing, the Manager shall be obligated to honor Gift Cards (as defined in the Brand Management Agreement) issued to customers in the ordinary course, so long as such Gift Cards were issued on or after February 14, 2023, and have not been fully redeemed as of the Closing.  The Manager, shall not assume, and shall not be deemed to assume, any other liability or obligation (a) on account of any Gift Cards issued prior to February 14, 2023, (b) on account of any Gift Cards issued outside the ordinary course, (c) arising under applicable state or other non-bankruptcy law for the escheatment, turnover, or other disposition of unredeemed Gift Cards, gift certificates, store credits, or similar instruments (including, any such obligations with respect to Gift Cards described in the first sentence of this paragraph), or (d) to remit to any governmental authority the value or proceeds of Gift Cards (including, any such obligations with respect to Gift Cards described in the first sentence of this paragraph), and, in each case, all such liabilities and obligations shall remain liabilities of the Debtors and their estates and shall be treated in accordance with the applicable provisions of the Plan and the Bankruptcy Code.  For the avoidance of doubt, the members of the Buyer Group (other than the Manager) shall have no liability or obligations whatsoever related to Gift Cards.

### Bankruptcy Remote Entities

39.     The Approved Operating Agreements (as defined in the Brand Management Agreement) shall constitute, and are hereby deemed to be, legal, binding, enforceable, non-avoidable, properly authorized, automatically valid, and fully effective obligations of the parties thereto and their respective successors and assigns (the "Operating Agreement Parties"). The Approved Operating Agreements and the provisions of this Schedule 1, including all findings

31

herein, shall be binding upon all parties in interest in Chapter 11 Cases, including, without limitation, the Operating Agreement Parties, and each of their respective successors and assigns, and shall inure to the benefit of the Operating Agreement Parties and their respective successors and assigns.

40.     The Approved Operating Agreements (a) shall constitute legal, valid, binding, reasonable, and authorized obligations of the Operating Agreement Parties enforceable in accordance with their terms, (b) shall have been entered into by the Operating Agreement Parties, in each case, in good faith, for legitimate business purposes, and shall not be subject to avoidance or recharacterization for any purposes whatsoever, in the case of (a) and (b), under the Bankruptcy Code or any other applicable non-bankruptcy law.

41.     Prior to the occurrence of a Trigger Event (as defined in the Franchise HoldCo Approved Operating Agreement) and subject to the terms of the License Agreement, the Reorganized Debtors, Franchise HoldCo, Franchisors, and Licensors (and their successors and assigns, and any trustee, examiner, receiver, custodian, or other fiduciary acting on their behalf) agree that in connection with any Bankruptcy Event involving Franchise HoldCo, any Franchisor, or any Licensor, they shall not: (i) challenge the validity, enforceability, or binding effect of the Brand Management Agreement or the License Agreement (as defined in the Brand Management Agreement); (ii) take or support any action seeking or supporting the rejection, termination, or impairment of the Brand Management Agreement or the License Agreement under section 365 of the Bankruptcy Code or any similar provision under applicable law or regulation; or (iii) condition any consent, approval, or other support for any sale, plan of reorganization, or plan of liquidation upon the rejection, termination, or impairment of the Brand Management Agreement or the

License Agreement; provided, however, that nothing in this paragraph 41 shall prevent any party to the License Agreement from exercising their rights in accordance with the terms thereof.

**License Agreement**

42.     The License Agreement (as defined in the Brand Management Agreement) constitutes a license of intellectual property within the meaning of section 365(n) of the Bankruptcy Code.  In the event of the commencement of a case under the Bankruptcy Code by or against  reorganized HI Limited Partnership ("<u>Reorganized HILP</u>"), the License Agreement and the rights of the Licensees (as defined in the License Agreement) thereunder shall be subject to, and the Licensees shall be entitled to all of the protections afforded by, section 365(n) of the Bankruptcy Code, and any successor or analogous provisions.  Without limiting the foregoing, Licensees shall have the right to retain and enforce their respective rights under the License Agreement in accordance with section 365(n) of the Bankruptcy Code.  The rights granted to Licensees under the License Agreement shall be treated as licenses of "intellectual property" within the meaning of section 101(35A) of the Bankruptcy Code.

43.     Notwithstanding the immediately prior paragraph, in the event of the commencement of a case under the Bankruptcy Code by or against Reorganized HILP, (a) any license of trademarks, trade names, service marks, logos, trade dress and other source identifiers (collectively, "<u>Trademarks</u>") granted under the License Agreement shall remain in full force and effect notwithstanding any rejection or deemed rejection of the License Agreement by Reorganized HILP or a trustee, and (b) the Licensees shall be entitled to retain and exercise all of their respective rights and licenses under the License Agreement to the fullest extent permitted by *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) and applicable non-bankruptcy law.

44.      Notwithstanding anything to the contrary herein, prior to the occurrence of a Trigger Event (as defined in the Franchise HoldCo Approved Operating Agreement) and subject to the terms of the License Agreement, the Court hereby finds and orders that (i) the License Agreement shall remain valid and enforceable in accordance with its terms notwithstanding any foreclosure, sale, transfer, pledge, assignment, or other disposition of the Licensed IP, and shall bind any transferee, successor, or assignee of the Licensed IP, and (ii) the rights of the Licensees under the License Agreement shall not be terminated, impaired, or otherwise affected by any such event except in accordance with the terms of the License Agreement.

### **Transferred Equity Interests**

45.      At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Equity Interests of the Franchisors (as defined in the Brand Management Agreement) (the "Franchisor Equity Interests") shall be immediately vested in Franchise HoldCo, pursuant to Bankruptcy Code sections 105(a), 1123, and 1141, free and clear of any and all Claims, Interests, and Encumbrances.  Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest Franchise HoldCo with good and marketable title to, the Franchisor Equity Interests. All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Franchisor Equity Interests are directed to surrender possession of the Franchisor Equity Interests to Franchise HoldCo or its designees on the Closing Date or at such time thereafter as Franchise HoldCo may request.

46.      To the fullest extent permissible under applicable law, this Confirmation Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property,

administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Plan with respect to the transfer of the Franchisor Equity Interests to Franchise HoldCo.

47.     Except as otherwise expressly provided in this Confirmation Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors arising under or out of, in connection with, or in any way relating to, the Debtors, their estates, the Debtors' predecessors, the ownership, sale or operation of the Debtors' assets prior to the Closing Date or the transfer of the Franchisor Equity Interests to Franchise HoldCo, are hereby forever barred and estopped from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset, or recover on account of any Claims against Franchise HoldCo, the Franchisors, their respective successors or assigns, or their respective property or their assets.  Following the Closing Date, no holder of any Claim, Interest or Encumbrance shall interfere with Franchise HoldCo's title to or use and enjoyment of the Franchisor Equity Interests based on or related to any such Claim, Interest or Encumbrance, or based on any action or omission of the Debtors, including any action or omission the Debtors may take in the Chapter 11 Cases.

48.　　　The Debtors are authorized to execute such documents as may be necessary to release any Claims, Interests, or Encumbrances of any kind against the Franchisor Equity Interests (or the Franchisors' assets) as such Claims, Interests, or Encumbrances that may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, lis pendens or other documents or agreements evidencing Claims, Interests, or Encumbrances against or in the Franchisor Equity Interests shall not have delivered to the Debtors prior to the Effective Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims, Interests, or Encumbrances that the person or entity has with respect to the Franchisor Equity Interests, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Franchisor Equity Interests; (b) Franchise HoldCo is hereby authorized to file, register or otherwise record a certified copy of this Confirmation Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims, Interests, or Encumbrances against Franchise HoldCo and the applicable Franchisor Equity Interests; (c) the Debtors' creditors and the holders of any Claims, Interests, or Encumbrances are authorized to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims, Interests, or in the Franchisor Equity Interests; and (d) the Buyer Group may seek in this Bankruptcy Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims, Interests, or Encumbrances with respect to the Franchisor Equity Interests.  Each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Confirmation Order for filing or recording. Notwithstanding the foregoing, the provisions of this Confirmation Order authorizing the transfer

of the Franchisor Equity Interests free and clear of Claims, Interests, and Encumbrances shall be self-executing, and none of the Debtors or Franchise HoldCo shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Confirmation Order.

49.     To the maximum extent permitted under applicable law, Franchise HoldCo shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Franchisor Equity Interests or the Franchisors' assets.

50.     Any provisions in any executory contract or unexpired leases of the Franchisors (as defined in the Brand Management Agreement) that are assumed by the Franchisors in accordance with the Plan (the "Franchisor Assumed Contracts") that prohibit or condition the assignment of such Franchisor Assumed Contract or allow the party to such Franchisor Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon a change of control, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

51.     Any party that may have had the right to consent to a change of control or ownership of Franchisors under a Franchisor Assumed Contract is deemed to have consented to the change of control and ownership of Franchisor to occur on the Effective Date, including for purposes of Bankruptcy Code sections 365(c)(1)(B) and 365(e)(2)(A)(ii) and otherwise, if such party failed to timely object to the assumption of such Franchisor Assumed Contract.

### HOA NewCo

52.     The Debtors are authorized to form HOA NewCo immediately upon entry of the Confirmation Order, and such formation is hereby approved. Following entry of the Confirmation Order, the Debtors will engage Tim Daileader as independent manager of the Debtors (the

"Independent Manager") and such engagement shall be deemed automatically assumed and assigned to HOA NewCo as of the Effective Date of the Plan, without the need for further action or order of the Court. Immediately upon entry of the Confirmation Order, the Independent Manager is further authorized to take any and all actions necessary or appropriate to carry out, implement, or effectuate his engagement by the Debtors or HOA NewCo and the matters contemplated herein, including, without limitation, taking any and all steps necessary to establish and organize HOA NewCo.

### Additional Provisions

53.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Buyer Group Arrangements and all other transactions contemplated by the Buyer Group Arrangements.

54.    No governmental unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Transferred Assets sold, transferred or conveyed to the Buyer Group on account of the filing or pendency of these Chapter 11 Cases.

55.    Absent the express written consent of the Buyer Group, the Debtors, the Wind-Down Officer, the Litigation Trustee, and the Reorganized Debtors shall not settle or otherwise resolve any existing or future litigation with any third party or any governmental entity other than any settlement pursuant to which no restrictions are placed on or affecting the Transferred Assets or the operation of the business from and after the Closing Date or otherwise directly or indirectly materially affect the operations of, or impose successor or any other theory of liability upon, the Buyer Group.

56.    Except as expressly provided in the Buyer Group Arrangements, nothing in this Confirmation Order shall be deemed to waive, release, extinguish or estop the Debtors or their

estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset (as defined in the Buyer Group Arrangements).

57.    Except as expressly set forth in this Confirmation Order, nothing herein shall impair, modify, or affect the Final DIP Order.

58.    Nothing contained in any plan of liquidation or reorganization, or order of any type or kind entered in these Chapter 11 Cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Confirmation Order, will conflict with or derogate from the terms of this Confirmation Order or the Buyer Group Arrangements.

59.    This Confirmation Order and the Buyer Group Arrangements shall be binding in all respects upon all prepetition and postpetition creditors of the Debtors, all interest holders of the Debtors, all non-Debtor parties to the Assigned Contracts, the Official Committee of Unsecured Creditors, all successors and assigns of the Debtors and their Affiliates and Subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of the Debtors' cases to those under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee.  If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Confirmation Order and the rights granted to the Buyer Group hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates after the occurrence of the Effective Date shall not be a basis for termination, rejection or avoidance (as applicable) of the Buyer Group Arrangements.

60.     This Bankruptcy Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Confirmation Order and the Buyer Group Arrangements, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer Group, and to adjudicate, if necessary, disputes with respect to assumption and assignment of any Assigned Contracts or any cure disputes and any party that has, or asserts, possession, control, or other rights in respect of any of the Transferred Assets; provided, however, that, in the event the Bankruptcy Court abstains from exercising or declines to exercise such jurisdiction with respect to the Buyer Group Arrangements or this Confirmation Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.  This Bankruptcy Court retains jurisdiction to compel delivery of the Transferred Assets, to protect the Debtors and their assets, including the Transferred Assets, against any Claims and Successor or Transferee Liability and to enter orders, as appropriate, pursuant to Bankruptcy Code sections 105(a) or other applicable provisions necessary to transfer the Transferred Assets to the Buyer Group.

61.     The Buyer Group and Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Buyer Group Arrangements.

62.     This Confirmation Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Bankruptcy Court expressly finds there is no reason for delay in the implementation of this Confirmation Order and, accordingly: (a) the terms of this Confirmation Order shall be immediately effective and

enforceable upon its entry; (b) the Debtors are not subject to any stay of this Confirmation Order or in the implementation, enforcement or realization of the relief granted in this Confirmation Order; and (c) the Debtors and the Buyer Group may, in their discretion and without further delay, take any action and perform any act authorized under this Confirmation Order.

63.    The Buyer Group shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362, to give any notice permitted by the Buyer Group Arrangements or to enforce any of its remedies under the Buyer Group Arrangements or any other sale-related document.  The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence; provided however, that this Bankruptcy Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

64.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Confirmation Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Buyer Group Arrangements and the Debtors and the Buyer Group intend to close the Buyer Group Arrangements as soon as practicable.

65.    All time periods set forth in this Confirmation Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

### Access to Books and Records

66.    The Buyer Group agrees that the Wind-Down Officer and Litigation Trustee on behalf of the Litigation Trust shall have the same rights as the Sellers under the Buyer Group APAs solely for the purpose of accessing the Debtors' books and records and information purchased or transferred and assigned to the Buyers to the extent set forth in the Buyer Group APAs after the Effective Date, including but not limited to sections 6.9, 7.5, and 12.13 of the Buyer Group APAs.

**Taxing Authorities**

67.        Notwithstanding anything to the contrary in the Plan, Confirmation Order,
Definitive Documents, Brand Management Agreement, or Buyer Group APAs and Buyer Group
Documents: all statutory liens that secure payment of the Taxing Authorities' ad valorem personal
property taxes (the "2025 Personal Property Taxes") shall remain attached to the respective
personal property subject to such liens until the amounts secured by those liens are paid in full,
including, if any, statutory penalties and interest under applicable non-bankruptcy law.  The
Taxing Authorities are entitled to amend their estimated 2025 tax claims following plan
confirmation without permission of the Court, the applicable Reorganized Debtor, the Wind-Down
Entity, the Buyer Group (or Buyer Group SPEs, as applicable) or the Litigation Trustee to reflect
the actual amounts of the assessed 2025 Personal Property Taxes.  The Buyer Group SPEs assume
payment of the 2025 Personal Property Taxes on their respective Divested Stores and shall pay the
same in the ordinary course of business prior to the state law date of delinquency.  For avoidance
of doubt, (a) the Buyer Group SPEs affirmatively assume liability for the 2025 Personal Property
Taxes on their respective Divested Stores and shall pay the 2025 Personal Property Taxes assessed
on such stores prior to the state law delinquency date; and (b) the statutory ad valorem tax liens
that secure payment of the 2025 Personal Property Taxes shall remain attached to the respective
personal property of the Divested Stores, including any subsequently acquired personal property
at the Divested Stores that would be subject to the ad valorem tax liens under state law, that are
transferred to the Buyer Group SPEs until such time as the responsible Buyer Group SPE has paid
the 2025 Personal Property Taxes for its respective Divested Store in full.  In the event the
responsible Buyer Group SPE fails to timely pay the Taxing Authorities' 2025 Personal Property
Taxes for its respective Divested Store, such unpaid taxes will accrue statutory penalties and
interest pursuant to state law.

68.     Notwithstanding anything to the contrary in the Buyer Group APAs, with respect to each Divested Store, (i) at the Closing, the Debtors shall deliver cash to the Buyers sufficient to satisfy the 2025 Personal Property Taxes allocable to the pre-Closing period, (ii) the 2025 Personal Property Taxes shall be Assumed Liabilities of the corresponding Buyer Group SPE and shall not be Seller Funded Obligations, and (iii) the statutory liens securing the 2025 Personal Property Taxes shall be Permitted Liens (as defined in the Buyer Group APAs).

### Unexpired Lease Cure Amounts

69.     At the Closing, with respect to each Divested Store:  (a) the Debtors shall pay to the applicable Buyer Group SPE the portion of the 2025 ad valorem real property taxes attributable to the period up to and including the Closing Date on account of ad valorem real property taxes assessed on the property where such Divested Store is located (the "Pre-Closing Date Real Property Taxes"), and (b) such Buyer Group SPE shall be responsible for remitting the Pre-Closing Date Real Property Taxes to the applicable taxing authority, but only to the extent of such payment.  Notwithstanding the foregoing, for the Tax Objection Stores:[7]  (x) the Debtors shall pay the Pre-Closing Date Real Property Taxes to the applicable landlord counterparty; and (y) the corresponding Buyer Group SPE shall have no responsibility or obligation to pay such Pre-Closing Date Real Property Taxes.

### # # # END OF ORDER # # #

---

[7]     The term "Tax Objection Stores" shall mean those Restaurants located in the municipalities outlined in the *Joint Limited Objection of the Texas Taxing Authorities and the Orange County, Florida Tax Collector to the Joint Chapter 11 Plan of Reorganization of Hooters Of America, LLC and Its Affiliated Debtors* [Docket No. 758].

# **ANNEX A**

## **HI APA**

[*Filed at Docket No.  770-12*]

# **ANNEX B**

## **Hoot Owl APA**

[*Filed at Docket No. 770-12*]

## **ANNEX C**

**Restaurants**

Restaurant List[1]

| Store Number | Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|---|
| 1007 | Daytona | 2100 International Speedway Drive | Daytona Beach | FL | 32114 | Hooters of Daytona 2025 LLC |
| 1008 | Raleigh | 4206 Old Wake Forest Road | Raleigh | NC | 27609 | PWW Raleigh, LLC |
| 1010 | Myrtle Beach North | 10133 North Kings Highway | Myrtle Beach | SC | 29572 | PWW Myrtle Beach North, LLC |
| 1011 | Wilmington | 5112 Market Street | Wilmington | NC | 28405 | PWW Wilmington, LLC |
| 1014 | Roswell | 795 Holcomb Bridge Road | Roswell | GA | 30076 | Hooters of Roswell 2025 LLC |
| 1023 | Tara Blvd | 6785 Tara Boulevard | Jonesboro | GA | 30236 | Hooters of Tara Blvd 2025 LLC |
| 1025 | Fayetteville NC | 501 N. McPherson Church Road | Fayetteville | NC | 28303 | PWW Fayetteville, LLC |
| 1028 | Maryland Heights | 11835 Lackland Road | St. Louis | MO | 63146 | PWW Maryland Heights, LLC |
| 1031 | Greensboro | 3031 High Point Road | Greensboro | NC | 27403 | PWW Greensboro, LLC |
| 1033 | Jacksonville San Jose | 8938 San Jose Blvd. | Jacksonville | FL | 32257 | Hooters of Jacksonville San Jose 2025 LLC |
| 1036 | Myrtle Beach | 3901 North Kings Highway | Myrtle Beach | SC | 29577 | PWW Myrtle Beach, LLC |
| 1043 | [South County] | 7517 South Lindbergh Boulevard | St. Louis | MO | 63125 | PWW South County, LLC |
| 1046 | Greenville SC | 2401 Laurens Road | Greenville | SC | 29607 | PWW Greenville, LLC |
| 1047 | Lakeland II | 3400 US 98 North | Lakeland | FL | 33809 | Hooters of Lakeland II 2025 LLC |
| 1052 | Oklahoma City South | 2019 West I-240 Service Road | Oklahoma City | OK | 73159 | PWW Oklahoma City South, LLC |
| 1053 | Tulsa | 8108 East 61st | Tulsa | OK | 74133 | PWW Tulsa, LLC |
| 1061 | Newnan | 1001 Bullsboro Drive | Newnan | GA | 30265 | Hooters of Newnan 2025 LLC |
| 1063 | Conyers | 1099 Iris Drive, SE | Conyers | GA | 30012 | Hooters of Conyers 2025 LLC |
| 1074 | Kennesaw | 2102 Old Highway 41 | Kennesaw | GA | 30144 | Hooters of Kennesaw 2025 LLC |
| 1075 | Lake Buena Vista | 8510 Palm Parkway | Orlando | FL | 32836 | Hooters of Lake Buena Vista 2025 LLC |
| 1077 | Fredericksburg | 10400 Spotsylvania Avenue | Fredericksburg | VA | 22408 | PWW Fredericksburg, LLC |
| 1079 | Fairview Heights | 301 Market Place, Suite C | Fairview Heights | IL | 62208 | PWW Fairview Heights, LLC |
| 1085 | Columbus GA | 2650 Adams Farm Road | Columbus | GA | 31909 | Hooters of Columbus GA 2025 LLC |
| 1088 | Concord NC | 7702 Gateway Lane | Concord | NC | 28027 | PWW Concord, LLC |
| 1097 | Hickory | 1211 13th Avenue Drive, S.E. | Hickory | NC | 28602 | PWW Hickory, LLC |
| 1100 | Savannah | 4 Gateway Blvd, W. | Savannah | GA | 31409 | Hooters of Savannah 2025 LLC |
| 1101 | Orlando Airport | 7222 Augusta National Dr | Orlando | FL | 32822 | Hooters of Orlando Airport 2025 LLC |
| 1103 | Overland Park | 10620 Metcalf Lane | Overland Park | KS | 66212 | PWW Overland Park, LLC |
| 1105 | Springfield MO | 2110 E. Independence Ave. | Springfield | MO | 65804 | PWW Springfield, LLC |
| 1112 | Horn Lake | 982 Goodman Rd | Horn Lake | MS | 38637 | PWW Horn Lake, LLC |
| 1118 | North Charleston | 2171 Northwoods Blvd. | Charleston | SC | 29406 | PWW North Charleston, LLC |
| 1131 | Potomac Mills | 2630 Prince William Pkwy | Woodbridge | VA | 22192 | PWW Potomac Mills, LLC |
| 1136 | Burlington NC | 3122 Garden Road | Burlington | NC | 27216 | PWW Burlington, LLC |
| 1137 | Raleigh Airport | 1001 Claren Circle | Morrisville | NC | 27560 | PWW Raleigh Airport, LLC |
| 1138 | St. Peters | 4061 Veterans Memorial Pkwy | St. Peters | MO | 63376 | PWW St. Peters, LLC |
| 1142 | Pelham | 400 Cahaba Valley Rd | Pelham | AL | 35124 | PWW Pelham, LLC |
| 1144 | Topeka | 6100 SW 10th Avenue | Topeka | KS | 66615 | PWW Topeka, LLC |
| 1145 | Laurel | 14707-B Baltimore Avenue | Laurel | MD | 20707 | PWW Laurel, LLC |
| 1147 | Kansas City Speedway | 1712 Village West Parkway | Kansas City | KS | 66111 | PWW Kansas City Speedway, LLC |
| 1151 | Columbia MO | 1101 Woodland Springs Court | Columbia | MO | 65201 | PWW Columbia, LLC |
| 1152 | Trussville | 1917 Edwards Lake Road | Trussville | AL | 32535 | PWW Trussville, LLC |
| 1153 | North Little Rock | 4110 Landers Road | North Little Rock | AR | 72117 | PWW North Little Rock, LLC |
| 1156 | Lawrenceville | 860 Duluth Highway Suite 900 | Lawrenceville | GA | 30043 | Hooters of Lawrenceville 2025 LLC |
| 1161 | Chantilly | 14441 Brookfield Tower Dr. | Chantilly | VA | 20151 | PWW Chantilly, LLC |
| 1167 | Richmond VA | 7912 W. Broad St. | Richmond | VA | 23294 | PWW Richmond, LLC |
| 1168 | Chester | 2401 W. Hundred Road | Chester | VA | 23831 | PWW Chester, LLC |
| 1169 | Chesterfield | 1211 Huguenot Rd. | Midlothian | VA | 23113 | PWW Richmond, LLC |
| 1171 | I Drive | 8801 International Drive | Orlando | FL | 32819 | Hooters of I Drive 2025 LLC |
| 1174 | Council Bluffs | 2910 23rd Avenue | Council Bluffs | IA | 51501 | PWW Council Bluffs, LLC |
| 1175 | Davenport | 110 E. Kimberly Rd. | Davenport | IA | 58206 | PWW Davenport, LLC |
| 1177 | Mall of Georgia | 1950 Mall of Georgia Blvd | Buford | GA | 30519 | Hooters of Mall of GA 2025 LLC |
| 1178 | Cartersville | 887 Joe Frank Harris Pkwy, SE | Cartersville | GA | 30120 | Hooters of Cartersville 2025 LLC |
| 1180 | Saginaw | 5538 Bay Road | Saginaw | MI | 48604 | PWW Saginaw, LLC |
| 1182 | [Fairfax II] | 10060 Fairfax Blvd | Fairfax | VA | 22030 | PWW Fairfax II, LLC |
| 1184 | Ocala | 2711 SW 27th Ave | Ocala | FL | 34471 | Hooters of Ocala 2025 LLC |
| 1185 | Palm Bay | 695 Palm Bay Road | West Melbourne | FL | 32904 | Hooters of Palm Bay 2025 LLC |
| 1187 | Kissimmee West | 8207 West Irlo Bronson Memorial Highway | Kissimmee | FL | 34747 | Hooters of Kissimmee West 2025 LLC |
| 1190 | West Little Rock | 6 Anglers Way | Little Rock | AR | 72211 | PWW West Little Rock, LLC |
| 1192 | Prattville AL | 2585 Bass Pro Boulevard | Prattville | AL | 36066 | PWW Prattville, LLC |
| 1194 | La Vista NE | 12710 Westport Parkway | La Vista | NE | 68138 | PWW La Vista, LLC |
| 2001 | West End | 2201 North Lamar | Dallas | TX | 75202 | Hooters of West End 2025 LLC |
| 2004 | Arlington North | 1151 North Collins | Arlington | TX | 76011 | Hooters of Arlington North 2025 LLC |
| 2009 | Nasa | 20796 Gulf Freeway | Webster | TX | 77598 | Hooters of Nasa 2025 LLC |
| 2010 | North Richland Hills | 7669 Grapevine Hwy | N. Richland Hills | TX | 76180 | Hooters of North Richland Hills 2025 LLC |
| 2011 | San Antonio North | 8527 Wurzbach Rd. | San Antonio | TX | 78240 | Hooters of San Antonio North 2025 LLC |
| 2014 | Mesquite | 3902 Towne Crossing Blvd. | Mesquite | TX | 75150 | Hooters of Mesquite 2025 LLC |
| 2017 | Plano | 720 Central Expressway | Plano | TX | 75074 | Hooters of Plano 2025 LLC |
| 2018 | El Paso | 1170 Sunmount | El Paso | TX | 79925 | Hooters of El Paso 2025 LLC |
| 2020 | Round Rock | 2700 SOUTH I-H 35 | Round Rock | TX | 78681 | Hooters of Round Rock 2025 LLC |

| Store Number | Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|---|
| 2021 | San Pedro TX | 13131 San Pedro | San Antonio | TX | 78216 | Hooters of San Pedro 20225 LLC |
| 2022 | Corpus Christi | 4551 South Padre Island Drive | Corpus Christi | TX | 78411 | Hooters of Corpus Christi 2025 LLC |
| 2023 | Frisco | 4224 Preston Road | Frisco | TX | 75035 | Hooters of Frisco 2025 LLC |
| 2024 | Fort Worth | 5340 Southwest Blvd., | Ft. Worth | TX | 76109 | Hooters of Fort Worth 2025 LLC |
| 2028 | Willowbrook | 17599 Tomball Parkway | Houston | TX | 77064 | Hooters of Willowbrook 2025 LLC |
| 2029 | Sugarland | 12759 S.W. Freeway | Stafford | TX | 77477 | Hooters of Sugarland 2025 LLC |
| 2031 | McKinney | 1775 N. Central Expressway | McKinney | TX | 75070 | Hooters of McKinney 2025 LLC |
| 2032 | Selma | 15412 Interstate 35 N | Selma | TX | 78154 | Hooters of Selma 2025 LLC |
| 2037 | Humble | Highway 59 North | Humble | TX | 77338 | Hooters of Humble 2025 LLC |
| 2039 | Denton | 985 S. I-35 East | Denton | TX | 76205 | Hooters of Denton 2025 LLC |
| 2042 | Odessa | 2660 John Ben Shepperd Parkway | Odessa | TX | 79761 | Hooters of Odessa TX 2025 LLC |
| 2045 | Texarkana | 5101 N. State Line Avenue | Texarkana | TX | 75503 | Hooters of Texarkana 2025 LLC |
| 2046 | Pasadena TX | 3656 E. Sam Houston Pkwy. | Pasadena | TX | 77505 | Hooters of Pasadena TX 2025 LLC |
| 2047 | Katy | 22575 Katy Freeway | Katy | TX | 77450 | Hooters of Katy 2025 LLC |
| 2048 | Garland | 4781 Bass Pro Drive | Garland | TX | 75043 | Hooters of Garland 2025 LLC |
| 2050 | Pearland | 15838 South Freeway | Pearland | TX | 77584 | Hooters of Pearland 2025 LLC |
| 2051 | Harlingen | 98 Bass Pro Drive | Harlingen | TX | 78552 | Hooters of Harlingen 2025 LLC |
| 2052 | San Antonio West | 9802 Ingram Road | San Antonio | TX | 78245 | Hooters of San Antonio West 2025 LLC |
| 2058 | Cedar Hill | 622 Uptown Boulevard | Cedar Hill | TX | 75104 | Hooters of Cedar Hill 2025 LLC |
| 2059 | Abilene | 2042 E. Overland Trail, | Abilene | TX | 79601 | Hooters of Abilene 2025 LLC |
| 2065 | Grand Prairie | 2750 West Interstate 20 | Grand Prairie | TX | 75052 | Hooters of Grand Prairie 2025 LLC |
| 2069 | El Paso East | 1799 Joe Battle Blvd | El Paso | TX | 79936 | Hooters of El Paso East 2025 LLC |
| 3041 | Chattanooga | 5912 Brainerd Rd. | Chattanooga | TN | 37421 | PWW Chattanooga, LLC |
| 3067 | Dupont | 4120 Dutchman's Lane | Louisville | KY | 40207 | PWW Dupont, LLC |
| 3110 | Indy Downtown | 25 W. Georgia Street | Indianapolis | IN | 46225 | PWW Indy Downtown, LLC |
| 3116 | Johnson City | 2288 N. Roane St. | Johnson City | TN | 37601 | PWW Johnson City, LLC |
| 3128 | Kingston Pike | 8050 Kingston Pike Hwy | Knoxville | TN | 37919 | PWW Kingston Pike, LLC |
| 3140 | Lexington | 3101 Richmond Rd. #315 | Lexington | KY | 40509 | PWW Lexington, LLC |
| 3156 | Merrillville | 771 E. 81st Place | Merrillville | IN | 46410 | Hooters of Merrillville 2025 LLC |
| 3214 | Preston | 7701 Preston Hwy | Louisville | KY | 40219 | PWW Preston, LLC |
| 3220 | Rivergate | 654 Wade Circle S. | Goodlettsville | TN | 37072 | PWW Rivergate, LLC |
| 3260 | Toledo | 4782 Monroe St. | Toledo | OH | 43623 | PWW Toledo, LLC |
| 3386 | Alcoa | 1099 Hunter Crossing Drive | Alcoa | TN | 37701 | PWW Alcoa, LLC |
| 3428 | Wolfchase | 2838 New Brunswick Road | Memphis | TN | 38133 | PWW Wolfchase/Memphis, LLC |
| 3468 | Dayton | 6851 Miller Lane | Dayton | OH | 45414 | PWW Dayton, LLC |
| 3472 | Fort Campbell | 750 North Riverside Drive | Clarksville | TN | 37040 | PWW Fort Campbell, LLC |
| 3508 | Florence | 7200 Houston Road | Florence | KY | 41042 | PWW Florence, LLC |
| 3549 | Merchants Drive | 5005 Central Avenue Pike | Knoxville | TN | 37912 | PWW Merchants Drive, LLC |
| 3554 | Schererville | 1650 U.S. Hwy. 41, Suite A | Schererville | IN | 46375 | Hooters of Schererville 2025 LLC |
| 3567 | Mishawaka | 205 W. Day Road | Mishawaka | IN | 46545 | Hooters of Mishawaka 2025 LLC |
| 3568 | Portage | 1655 Olmstead Drive | Portage | IN | 46368 | Hooters of Portage 2025 LLC |
| 3570 | Mason | 9890 Escort Drive | Mason | OH | 45040 | PWW Mason, LLC |

[1] This Restaurant List may be amended, supplemented, or modified at any time three (3) business days prior to the closing of the Buyer Group APAs (as defined in the Plan).

## __SCHEDULE 2__

**Lags Stipulation and Agreement Resolving Plan Confirmation Objections**

**Schedule 2**

**STIPULATION AND AGREEMENT
RESOLVING LAGS PLAN CONFIRMATION OBJECTIONS
AND THE LAGS ADVERSARY PROCEEDINGS[1]**

A.      The facts and agreements set forth in this Schedule 2 are incorporated into the Confirmation Order by reference and shall have full force and effect as if set forth therein in full.

B.      On August 12, 2025, Lags Equipment LLC ("**Lags**") filed its initial objection[2] (the "**Objection**") to the Debtors' *Second Amended Joint Plan of Reorganization*[3] and *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America and its Affiliated Debtors.*

C.      On August 18, 2025, the Debtors filed the *Third Amended Joint Plan of Reorganization* (the "**Plan**")[4] and *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America and its Affiliated Debtors* (the "**Disclosure Statement**").[5]

D.      On September 12, 2025, the Court issued an oral ruling (the "**Ruling**")[6] on the "Core Issues" of what Lags owns or what Lags is owed as a result of various agreements (as stipulated on the record) and the nature of its rights and claims related to the Debtors, which Ruling was not a final order but instead is, and was intended to be, incorporated into this Confirmation Order as part of the final order confirming the Plan.[7]

E.      On September 26, 2025, Lags filed a supplemental objection (the "**Supplemental Objection**") to the Plan and the Disclosure Statement.

---

[1]      As amended by the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (the "Plan"). Terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[2]      Docket No. 757.

[3]      Docket No. 563.

[4]      Docket No. 792.

[5]      Docket No. 564-1.

[6]      Hearing transcript, 9/12/2025 (copy annexed hereto as Exhibit 1).

[7]      Hearing transcript, 9/19/2025, p.32, lines 17-24 (copy annexed in Exhibit 1 hereto).

F.      In resolution of Lags' Objection and Supplemental Objection to the Plan and, except as otherwise explicitly set forth herein, all other disputes by and between the Debtors and Lags, including but not limited to the Lags Adversary Proceedings (defined below) and any Challenge (as defined in the DIP Orders) to the stipulations and provisions, for and in exchange for Lags' agreement to not contest confirmation of the Plan and the other resolutions set forth herein, the following stipulations and agreements (confirmed by counsel's signatures below) are hereby approved, authorized and otherwise Ordered, which terms shall control notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any other related document or agreement.

## Stipulations and Agreements

1.      Ruling. The Court hereby adopts the findings of fact and conclusions of law set forth in the Ruling, a true and correct transcript of which is attached hereto as **Exhibit 1**.  As directed at the hearing conducted on September 30, 2025, the Ruling is hereby modified by inserting the following sentence at page 46, line 8 of Exhibit 1: "Even if Lags had an otherwise-dischargeable claim, the result would be the same as is set forth herein because of the Debtors' election to assume the franchise agreements with the Wings restaurants, which agreements include the modification of the payment terms to Lags, as detailed herein."  The Confirmation Order, inclusive of the Ruling by its incorporation herein, shall constitute a final appealable order, including on the Core Issues consistent with the Ruling.

2.      Lags Plan Payment. Lags shall receive a one-time payment of ONE MILLION SIX HUNDRED THOUSAND DOLLARS ($1,600,000.00) from the Debtors and/or their estates (the "**Lags Plan Payment**").  The Lags Plan Payment shall be remitted as follows:

    a. on the Effective Date of the Plan, $1,380,241.60 shall be remitted to Lags by Wings of South Florida, LLC ("**WSF**"), which sum represents funds otherwise payable to the Debtors (relating to periods 2-9 of calendar year 2025) currently being held by WSF in connection with the WSF Interpleader,[8] and

    b. commencing immediately after the Effective Date of the Plan, $219,758.40 shall be remitted to Lags by WSF, to be paid in the ordinary course in which royalties owing

---

[8] Adversary Proceeding No. 25-08010-swe (the "**WSF Interpleader**").

by WSF to the Debtors would otherwise be payable by WSF to the Debtors, until the Lags Plan Payment is paid in full.

3.      <u>WSF Release</u>.  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, on the one hand, and WSF and the WSF Franchisees (as defined below), on the other, shall be deemed to have each released the other from any liabilities and claims existing as of, or arising prior to, the Effective Date relating to any agreements involving Lags, any Core Issues, and/or these Chapter 11 Cases, including with respect to the sums not remitted to Debtors and now remitted to Lags in the preceding paragraph in satisfaction of the Lags Plan Payment.  For the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors shall each be deemed to have waived and released all liability, demands, and/or indemnification claims against WSF and the WSF Franchisees, existing as of, or arising prior to, the Effective Date, relating and limited to Lags, these Chapter 11 Cases, the Ruling, and/or the royalties payable by WSF and/or the WSF Franchisees directly to Lags as set forth in the Ruling, including any claims and demands as set forth in that certain letter dated July 3, 2025 from the Debtors to WSF, which shall not be reasserted post-Effective Date; provided, however, that nothing in the foregoing sentence shall limit the Reorganized Debtors' right to protect their interest in the intellectual property and enforce their rights under the franchise agreements from and after the Effective Date.  For the avoidance of doubt, notwithstanding anything herein to the contrary, from and after the Effective Date, no claim may be asserted against WSF or the WSF Franchisees with respect to payments made by WSF and/or the WSF Franchisees to Lags in accordance with the Ruling or actions taken consistent therewith.  After the Lags Plan Payment is paid in full to Lags in accordance with the preceding paragraph, all contractual payments thereafter due and owing by WSF to the Debtors in accordance with the Ruling and otherwise under the applicable franchise agreements between the WSF Franchisees and the Debtors shall revert to being due and payable to the Debtors or their successors.

4.      <u>Interpleaders</u>. Within five (5) days after the Effective Date of the Plan: (i) WSF shall dismiss with prejudice the WSF Interpleader, and (ii) Interpleader Plaintiff, HMC Hospitality Group, Inc. (“**HMC**”),    shall    dismiss    with    prejudice    Adversary    Proceeding    No.    25-08007-swe    (the

3

"**HMC Interpleader**").  Upon the dismissal of both the WSF Interpleader and the HMC Interpleader with prejudice, any sums held by HMC or its affiliates relating to the HMC Interpleader shall be remitted to the Debtors' estates, less reasonable and documented attorney's fees of HMC and WSF incurred in connection with the HMC Interpleader or the WSF Interpleader, as applicable (which attorney's fees, in the case of HMC, shall be in the amount of $52,344.82 and in the case of WSF, shall be in the amount of $13,144.18). Lags shall have no responsibility for paying any third-party-interpleader attorney's fees of HMC or WSF, and any such claim by HMC or WSF against Lags shall be deemed released.

5.    <u>DIP Matters</u>. On the Effective Date of the Plan, all sums escrowed or otherwise segregated by the Debtors in accordance with the DIP Order at Docket No. 299 shall be remitted to the Debtors' estates and Lags fully releases any claims related to such amounts.  Any Challenge (as defined in the DIP Order) by Lags shall be deemed satisfied, subject only to the Preserved Appeal Matters (as defined below). The stipulations and findings in the DIP Order at Docket No. 299  are not modified by this Order, but for the avoidance of doubt, any stipulations and findings relating to the ownership, priority, or validity of any interest in any property, proceeds, or rights that were the subject of the Ruling shall remain subject to determination on appeal of the Ruling as part of the Preserved Appeal Matters, and nothing in this paragraph 5 shall constitute a release, waiver, or estoppel of any such Preserved Appeal Matters.

6.    <u>Lags Prepetition Claim</u>. Following Lags' receipt of the Lags Plan Payment as set forth in paragraph 2, any and all prepetition claims of Lags against the Debtors shall be deemed satisfied and released in full, regardless of any claim objection and Lags' existing proofs of claims numbered 833–837 shall be deemed satisfied and expunged and from the claims register. However, Lags shall be entitled to file a proof of claim for a General Unsecured Claim against the Debtors' estates relating to the value of the contingent portion of Lags' claims for future, post-petition royalties owed from the Debtors' stores in the states of Texas, Indiana and Ohio (the "**Company-Owned Stores**"), which the Court by its Ruling determined that Lags was no longer entitled to receive.  The amount of such claim shall be determined either (i) via a post-confirmation claims-estimation process (with Lags being authorized to submit a proof

of claim consistent with this paragraph to the Litigation Trustee within forty-five (45) days of the Effective

Date) or (ii) by agreement between Lags, the Committee, and/or the Litigation Trustee.  The amount of any

such claim may be modified in the future by the effect of a Final Order (as defined in the Plan) with respect

to the Ruling, with this Court retaining jurisdiction to so modify.  Nothing in this paragraph shall be deemed

to waive, release, or otherwise impair in any manner whatsoever any Preserved Appeal Matters.

7.      <u>Plan Amendment</u>.  To the extent that the Plan contradicts the Ruling, the Plan shall be

deemed modified to incorporate the terms and effect of the Ruling and this Schedule 2.  Specifically, and

subject to the Preserved Appeal Matters and any Final Order entered in connection therewith, the Court's

determination via the Ruling that Lags is entitled to receive, and shall continue receiving, its portion of

royalties due by the Wings of South Florida restaurants (the "**WSF Franchisees**") shall not be modified or

impaired by the Plan in any manner, notwithstanding anything to the contrary in the Confirmation Order,

the Plan, or any other related document or agreement. To the extent that the Plan contradicts any future,

final ruling on a Preserved Appeal Matter, the Plan shall be modified to incorporate the terms and effect of

any such final ruling on a Preserved Appeal Matter (subject to the Lags Relief Limitation (as defined

below)).

8.      <u>Preserved Appeal Matters</u>.  The parties intend that the Confirmation Order and this

Schedule 2 thereto shall be read and interpreted to confirm that nothing in the Plan or the Confirmation

Order shall impair any reviewing Court from affording full and meaningful appellate relief with respect to

the Ruling, subject to the Lags Relief Limitation. Notwithstanding anything herein to the contrary, but

subject to the Lags Relief Limitation, all parties agree that Lags, the Debtors, the Reorganized Debtors, the

Wind-Down Debtors, and/or any designee of the foregoing (the "**Appeal Parties**") may appeal the Ruling

(the "**Appeal**") as provided by case law, the Federal Rules and Local Rules. In connection with such

Appeal, the Appeal Parties agree that all issues argued in connection with the Ruling that may be

appropriately raised on appeal are expressly and fully preserved, and may assert and pursue to the fullest

extent under applicable law, all rights, remedies, issues, and arguments related to, or otherwise a part of,

the Ruling to the extent contained within the record of the Ruling (collectively, the "**Preserved Appeal Matters**"), and that they will not seek or assert any contention of waiver of the Preserved Appeal Matters. Pending the issuance of a Final Order on the Appeal, no Claim against the Debtors, Reorganized Debtors and/or the Wind-Down Debtors on account of the Preserved Appeal Matters shall be compromised by any post-Effective Date sale, assignment, pledge, transfer, or encumbrance of, by or on behalf of the Reorganized Debtors and/or the Wind-Down Debtors or any of their assets, and any successor, assignee, or transferee of any of their assets shall take subject to the outcome of any appeal of the Ruling and shall be bound by the Confirmation Order and Appeal(s); provided, that nothing in this sentence shall be interpreted to impair or otherwise limit the ability of any party to enter into and perform under the Plan, the Restructuring Transactions, or the Buyer Group Arrangements. Pending the issuance of a Final Order on the Appeal, in the event that the Reorganized Debtors and/or the Wind-Down Debtors seek to sell, assign, pledge, transfer, or encumber any rights or property subject to or affected by the Ruling (excepting Effective Date transactions in accordance with the Plan, the Restructuring Transactions, and/or the Buyer Group Arrangements), at least ten (10) days advance written notice shall be provided to Lags via its undersigned counsel (email notice being sufficient and shall include a copy to rsimeone@hootersfla.com); provided, that no such notice shall be required for any action taken by the Manager (as defined in the Brand Management Agreement) that does not impact the Lags Royalty. Subject to the Lags Relief Limitation, no party shall be entitled to seek or assert any contention of equitable mootness or other mootness based on events that occurred after, on or prior to the Effective Date. Neither the injunction nor any exculpation or release provisions of the Plan shall bar prosecution of the Preserved Appeal Matters, subject to the limitations set forth in this paragraph. Notwithstanding anything to the contrary herein, to the extent Lags is successful on any of the Preserved Appeal Matters (as defined herein), the Appeal Parties agree that Lags' relief, notwithstanding the legal basis for such success, (i) shall be limited to a monetary claim for the sum of royalties determined to be owed to Lags (which potential monetary claim obviates the basis or need for any stay pending appeal) and/or a redirection of royalties

from the Reorganized Debtors to Lags, pursuant to any Final Order related to the Preserved Appeal Matters, with Lags' rights under its agreements with the Debtors being preserved, including remedial rights in the event of non-payment, underlined provided that, for the avoidance of doubt, in all cases, Lags' relief and remedies in the event of non-payment of such monetary claim shall be limited to those that exist under the existing agreements and in no case shall Lags be entitled to any ownership interest in any intellectual property, but (ii) shall not include the ability to unwind any element of the Plan, the Restructuring Transactions, or the Buyer Group Arrangements (such agreements, collectively, the "**Lags Relief Limitation**").  For the avoidance of doubt, each of the agreements contained in this paragraph is expressly subject to Lags' agreement to the Lags Relief Limitation.

9.      Adversary Proceedings. Conditioned on Lags' receipt of the Lags Plan Payment, Lags agrees to (a) dismiss with prejudice all claims in the adversary proceeding styled *Lags Equipment, LLC v. Celtic Master Fund LP et al.* (Adv. Proceeding 25-08005) (the "**Lender Adversary Proceeding**"), and (b) dismiss with prejudice all claims in its adversary proceeding *Lags Equipment, LLC v. Hooters of America, LLC et al.* (Adv. Proceeding 25-08004) (the "**Debtors Adversary Proceeding**" and together with the Lender Adversary Proceeding, the "**Lags Adversary Proceedings**"), except for Counts 1, 2, 3 and 4 of the Debtors Adversary Proceeding, which shall remain pending solely for purposes of keeping the Debtors Adversary Proceeding case open in connection with the Appeal and resulting adjudication thereafter in accordance with any Final Order related to the Preserved Appeal Matters and the Lags Relief Limitation. The dismissal of the Lender Adversary Proceeding and claims in the Debtors Adversary Proceeding shall not release or waive any Preserved Appeal Matters. The parties agree that a Final Order on the Appeal shall fully and finally dispose of Counts 1, 2, 3 and 4 in the Debtors Adversary Proceeding without any further action required by any party.

10.      Mutual Releases. As of the Effective Date and in consideration of the promises and obligations set forth herein (none of which promises or obligations shall be deemed released), except with respect to the rights and claims: (i) that constitute Preserved Appeal Matters or that the parties

may be entitled to raise or assert as a result of a Final Order on the Ruling, (ii) to enforce the terms of

this stipulation and agreement (and the Confirmation Order and Plan, as modified hereby), (iii) asserted

in the Debtors Adversary Proceeding that are not dismissed with prejudice pursuant to paragraph 9 of

this Schedule 2, (iv) of the Debtors or their successors in defense of the Lags' Proof of Claim to be

filed in accordance with paragraph 6, and (v) otherwise reserved herein: (1) Lags hereby discharges,

acquits and releases the undersigned parties from all claims relating to the Debtors and these Chapter

11 Cases existing or claimed to be existing as of the Effective Date, including claims asserted or that

could have been asserted in the HMC Interpleader, the WSF Interpleader, with respect to the Final DIP

Order and any Challenge related thereto, the Lender Adversary Proceeding, or the Debtors Adversary

Proceeding except as set forth in paragraph 9, and (2) the undersigned parties, individually and

collectively hereby discharge, acquit and release Lags from all claims existing or claimed to be existing

as of the Effective Date relating to the Debtors and these Chapter 11 Cases including claims asserted

or that could have been asserted in these Chapter 11 Cases, the HMC Interpleader, the WSF

Interpleader, with respect to the Final DIP Order and any Challenge related thereto, the Lender

Adversary Proceeding, or the Debtors Adversary Proceeding; provided, notwithstanding anything to

the contrary herein, all claims against HMC on account of the funds that are the subject of the HMC

Interpleader are fully discharged, acquitted, and released by the undersigned parties.

     11.   <u>Policing and Non-Abandonment Acknowledgment</u>.  Notwithstanding the foregoing

releases in this Schedule 2, the undersigned parties, individually and collectively, acknowledge and

agree that the decision to release the above claims is made as part of Debtors' and/or the Reorganized

Debtors' ongoing efforts to police and enforce their trademark rights. Subject in all respects to the

Preserved Appeal Matters, the parties agree that such release does not constitute, and shall not be

construed as, an abandonment, waiver, or relinquishment of any rights in or to the trademarks by

Debtors and/or the Reorganized Debtors and the release of claims is not an admission of any lack of

enforcement or failure to police these trademarks.  Except as expressly released herein, Debtors and/or

the Reorganized Debtors reserve all rights to enforce their trademarks against any future acts of infringement by Lags, WSF, the WSF Franchisees and/or any other party, and Lags reserves all rights with respect to any intellectual property rights and other rights it may have in any way relating to the Preserved Appeal Matters. Nothing in this release shall be construed as granting any license, right, or permission to use Debtors' and/or the Reorganized Debtors' trademarks except as may be separately agreed in writing.

12.     For the avoidance of doubt, (1) no claim or Cause of Action against Lags that is released pursuant to this Schedule 2 shall be (i) retained by any of the Debtors, (ii) be deemed a Retained Cause of Action, an Acquired Cause of Action or a Litigation Trust Cause of Action, or (iii) otherwise be transferred to any other party under the Plan (including to the Litigation Trust, the Litigation Trustee, the Committee, the Buyer Group, or any lender).

13.     On the terms set forth herein, conditioned on Lags' receipt of the Lags Plan Payment and subject to preservation of the Preserved Appeal Matters (and the Lags Relief Limitation), Lags (on the one hand) and the Debtors, Ad Hoc Group, DIP Lenders, WSF, HMC, and Committee/Litigation Trustee (on the other hand) shall be deemed to have agreed to the terms of this Schedule 2 by their signatures below. Notwithstanding Bankruptcy Rule 3020(e), this Schedule 2 shall take effect immediately upon entry of the Confirmation Order and shall not be subject to any stay of effectiveness.

14.     Nothing contained in this Schedule 2 shall release any party's ability to enforce the terms and agreements contained herein, which terms and agreements shall not be used or otherwise deemed relevant to the adjudication of the merits of the Preserved Appeal Matters.

*/s/ Holland N. O'Neil*
**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Co-Counsel to the Debtors*

**ROPES & GRAY LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Counsel to the Debtors*

*/s/ Genevieve G. Weiner*
**SIDLEY AUSTIN LLP**
Genevieve G. Weiner (admitted *pro hac vice*)
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501
Email: gweiner@sidley.com

Jeri Leigh Miller (TX Bar No. 24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3432
Facsimile: (214) 981-3400
Email: jeri.miller@sidley.com
*Counsel for Celtic Master Fund LP and XYQ Cayman Ltd.*

*/s/ Brian Pfeiffer*

**WHITE & CASE LLP**

Brian Pfeiffer (admitted *pro hac vice*)

Amanda Parra Criste (admitted *pro hac vice*)

200 S. Biscayne Blvd., Suite 4900

Miami, Florida 33131

Telephone: (305) 995-5275

Facsimile: (305) 358-5744

Email: brian.pfeiffer@whitecase.com

aparracriste@whitecase.com

Colin West (admitted *pro hac vice*)

1221 Avenue of the Americas

New York, New York 10020

Telephone: (212) 819-8200

Facsimile: (212) 354-8113

Email: cwest@whitecase.com

- and -

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)

Lydia R. Webb (TX Bar No. 24083758)

1601 Elm Street, Suite 4600

Dallas, Texas 75201

Telephone: (214) 954-4135

Facsimile: (214) 953-1332

jbrookner@grayreed.com

lwebb@grayreed.com

*Counsel for BCI, Guggenheim Partners Investment Management, LLC, Marathon Asset Management, LP, TCW Asset Management Company LLC, and Victory Capital Management Inc.*

*/s/ Judith Elkin*
**PACHULSKI STANG ZIEHL & JONES LLP**
Judith Elkin, Esq. (TX Bar No. 06522200)
Maxim B. Litvak, Esq. (TX Bar No. 24002482)
Theodore S. Heckel, Esq. (admitted pro hac vice)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
Email: jelkin@pszjlaw.com
mlitvak@pszjlaw.com
theckel@pszjlaw.com

Bradford J. Sandler, Esq. (admitted pro hac vice)
Robert J. Feinstein, Esq. (admitted pro hac vice)
Shirley S. Cho, Esq. (admitted pro hac vice)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: bsandler@pszjlaw.com
rfeinstein@pszjlaw.com
scho@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

*/s/ Bryan E. Bates*
**BRADLEY ARANT BOULT CUMMINGS LLP**
Jarrod B. Martin
Michael K. Riordan (admitted pro hac vice)
600 Travis, Suite 5600
Houston, Texas 77002
Telephone: 713.576.0300
Email: jbmartin@bradley.com
Email: mriordan@bradley.com

George H. Barber
1445 Ross Avenue, Suite 3600
Dallas, TX 75202
Telephone: 214.257.9783
Email: gbarber@bradley.com

Bryan E. Bates (admitted pro hac vice)
1230 Peachtree Street NE, 21st Floor

Atlanta, GA 30309
Telephone: 404.868.2794
Email: bebates@bradley.com

**LAWSON & MOSHENBERG PLLC**
Nicholas R. Lawson
Avi Moshenberg
2301 Commerce St., Suite 200
Houston, TX 77002
Tel: (903) 316-9155
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

*Counsel for Lags Equipment, LLC*


*/s/ Benjamin W. Butterfield*
**MORRISON & FOERSTER LLP**
Benjamin W. Butterfield (admitted pro hac vice)
250 West 55th Street
New York, New York 10019-9601
Tel: (212) 468-8000
Fax: (212) 468-7900
BButterfield@mofo.com

*Attorneys for Interpleader Plaintiff HMC Hospitality Group, Inc.*


*/s/ Marcus A. Helt*
**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (Texas Bar No. 24052187)
Debbie E. Green (Texas Bar No. 24059852)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:          mhelt@mwe.com
                dgreen@mwe.com

*Attorneys for Interpleader Plaintiff HMC Hospitality Group, Inc. and Interpleader Plaintiff Wings of South Florida, LLC*

# EXHIBIT 1

**Hearing Transcripts**

```
                   IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )   Case No. 25-80078-swe-11
In Re:                              )   Jointly Administered
                                    )
HOOTERS OF AMERICA, LLC,            )   Dallas, Texas
et al.,                             )   September 12, 2025
                                    )   3:00 p.m.
          Debtors.                  )
                                    )   BENCH RULING RE: LAGS CORE
                                    )   ISSUES
_____      )
                                    )
LAGS EQUIPMENT, LLC,                )   Adversary Proceeding 25-8004-swe
                                    )
          Plaintiff,                )
                                    )
v.                                  )   BENCH RULING RE: LAGS CORE
                                    )   ISSUES
HOOTERS OF AMERICA, LLC,            )
et al.,                             )
                                    )
          Defendants.               )
_____      )
```

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SCOTT W. EVERETT,
                 UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:            Chris L. Dickerson
                            ROPES & GRAY, LLP
                            191 North Wacker Drive, 32nd Floor
                            Chicago, IL  60606-4302
                            (312) 845-1200

For the Debtors:            Zachary Zahn
                            FOLEY & LARDNER, LLP
                            2021 McKinney Avenue, Suite 1600
                            Dallas, TX  75201
                            (214) 999-3277

For Lags Equipment, LLC:    Bryan E. Bates
                            BRADLEY ARANT BOULT CUMMINGS, LLP
                            Promenade Tower
                            1230 Peachtree Street, N.E.,
                              20th Floor
                            Atlanta, GA  30309
                            (404) 868-2794

APPEARANCES, cont'd.:

For the Official Committee    Judith Elkin
of Unsecured Creditors:       PACHULSKI STANG ZIEHL & JONES, LLP
                              700 Louisiana Street, Suite 4500
                              Houston, TX  77002
                              (713) 691-9385

For the Official Committee    Bradford J. Sandler
of Unsecured Creditors:       Robert J. Feinstein
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              1700 Broadway, 36th Floor
                              New York, NY  10019
                              (212) 561-7700

For the DIP Lenders:          Jeri Leigh Miller
                              SIDLEY AUSTIN, LLP
                              2021 McKinney Avenue, Suite 2000
                              Dallas, TX  75201
                              (214) 981-3432

For the DIP Lenders:          Genevieve G. Weiner
                              SIDLEY AUSTIN, LLP
                              1999 Avenue of the Stars,
                                17th Floor
                              Los Angeles, CA  90067
                              (310) 595-9707

Recorded by:                  Sara Ferrufino
                              UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
                              (214) 753-2088

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063


          Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

1              DALLAS, TEXAS - SEPTEMBER 12, 2025 - 3:00 P.M.

2              THE COURT:  Thank you.  Please be seated.

3        All right.  Good afternoon.  We're here on the 3:00

4    o'clock docket.  We have a ruling set in the Hooters of

5    America case, 25-80078, and the ruling is also related to the

6    Adversary 25-8004.

7        I'll go ahead and take appearances.

8              MR. ZAHN:  Good afternoon, Your Honor.  Zachary Zahn

9    on behalf of the Debtors.  Online with us is pretty much the

10   whole host, it looks like, of the Ropes & Gray people that

11   were here two weeks ago.  I can go through one by one if you'd

12   like, or we can continue on.

13             THE COURT:  I know who you all are.  I think that's

14   probably good.

15             MR. ZAHN:  Thank you.

16             MR. BATES:  Good afternoon, Your Honor.  Bryan Bates

17   with Bradley Arant Boult Cummings, joined by my team with

18   Bradley Arant as well a client representative, Rich Simeone,

19   as well as co-counsel from the Lawson & Moshenberg firm.

20             THE COURT:  All right.  Good afternoon.

21             MS. MILLER:  Good afternoon.  (audio issues)

22             THE COURT:  Whoever that was, your audio cut out.

23   Maybe try one more time.

24             MS. MILLER:  Good afternoon, Your Honor.  (audio

25   issues)

1           MS. WEINER:  It seems like Jeri Leigh may be having

2    some audio issues, but good afternoon.  This is Genevieve

3    Weiner with Sidley Austin appearing on behalf of the DIP

4    Lender, and Jeri Leigh, my colleague, is also here with me

5    today.

6           THE COURT:  All right.  Thank you.

7       And Ms. Miller, I think that might have been you.  For

8    some reason, your audio is cutting out.  But I do see you and

9    I note your appearance, so thank you.

10          MS. MILLER:  Thank you, Your Honor.

11          MS. ELKIN:  Good afternoon, Your Honor.  Judy Elkin;

12   Pachulski Stang Ziehl & Jones; for the Committee, with my

13   partners Rob Feinstein and Brad Sandler.

14          THE COURT:  Good afternoon.

15      All right.  Last call for appearances.

16      All right.  Any updates for me before we get to the

17   ruling?

18          MR. DICKERSON:  Your Honor, Chris Dickerson from

19   Ropes & Gray.  Not from the Debtors.

20          THE COURT:  All right.  Thank you.

21      All right.  Well, first, preliminary remarks.  On July 29,

22   2025, the Court entered an Order Setting Discovery and

23   Briefing Schedule, Docket No. 696, pursuant to which I

24   committed to resolve as part of the confirmation process the

25   "Core Issues" of what Lags owns or what Lags is owed as a

1   result of the agreements at issue, and the nature of its

2   rights and claims.  This is my oral ruling on those Core

3   Issues.

4        Ordinarily, I would prepare a formal written ruling for a

5   complicated decision like this, but I elected to do an oral

6   script instead because of the urgency of getting a ruling out

7   as quickly as possible so the Debtors can potentially move on

8   to the next stage of confirmation.  An opinion or other formal

9   written ruling would have taken considerably longer to get out

10  the door.

11       I thought it would be helpful to give some verbal cues

12  during the ruling so that it has some structure when it's

13  transcribed.  Therefore, I will begin each new topic of my

14  ruling with a prompt about what heading reference it is and

15  when the heading ends.  Hopefully the transcriber can do

16  headings.  Just try not to laugh if it sounds like I'm

17  dictating, as I will also occasionally indicate when I'm

18  quoting something or describing a parenthetical cite.

19       Every now and then, I may pause and do a sound check to

20  make sure that you all can hear me and that I'm still being

21  recorded.  I don't want to have to read the ruling twice.  I

22  may also take a break or two during the ruling.

23       It will take some time for the ruling to be transcribed.

24  Although this will be a first for me, after I'm done with my

25  ruling I will have my law clerk or courtroom deputy email a

1  PDF version of my draft script to counsel for the parties so

2  that you can begin to read and digest it without having to

3  wait for a transcript.

4     Finally, before I turn to the ruling, I want to compliment

5  counsel for all parties involved.  The briefing, the

6  examination of witnesses, cross-examination, oral arguments,

7  all were excellent.  And I also do appreciate the courtesies

8  that the parties have given to each other, even during some

9  contested hearings.  I don't always get that in all my cases.

10 I do appreciate the civility of the proceedings.

11    I don't want to keep you in suspense throughout the

12 ruling, so the upshot is that Lags gets the royalties from the

13 Wings of South Florida restaurants and the Debtors get the

14 rest.  Here is how I get there.

### A.  Background

16    The Debtors filed these Chapter 11 cases on March 31,

17 2025.  The parties do not appear to dispute the basic

18 transaction history, including which documents were signed and

19 when.  Therefore, I am not going to recite the history of the

20 parties' relationship or detail the various documents at

21 issue.  Instead, the Court incorporates by reference the

22 background facts contained in the "Procedural and Factual

23 Background" section of the Debtors' Trial Memorandum at Docket

24 743 at Pages 5 through 16, but note that I do not adopt any

25 legal arguments or characterizations from the Background

1    Section, including whether Lags has an ownership interest in

2    the underlying intellectual property or whether any of the

3    documents expanded the scope of what has been assigned to

4    Lags.  *See, for example,* Paragraph 22.  I'm just adopting the

5    transaction history and related documents.

6        The documents that I'll refer to the most often are found

7    at these exhibit numbers:

8        The 2024 Royalty Reduction Agreement, or simply the "2024

9    Agreement," is Debtors' Exhibit 52.

10        The Franchise Agreements are at Debtors' Exhibit 58.

11        The 1984 License Agreement is Debtors' Exhibit 41.

12        The 1989 Agreements and Assignments to Lags are at

13    Debtors' Exhibit 42.

14        The 1999 Settlement Agreement is Debtors' Exhibit 44.

15        The 2001 Amendment to Settlement Agreement is Debtors'

16    Exhibit 45.

17        The 2001 Security Agreement is Debtors' Exhibit 47.

18        The 2001 Assumption Agreement is Debtors' Exhibit 46.

19                          **B.  Jurisdiction**

20        The Court has jurisdiction under 28 U.S.C. Sections 1334

21    and 157.  The "Core Issues" of what Lags owns or what Lags is

22    owed are also a "core" matter over which the Court can enter

23    final orders and judgments.

24        Specifically, in this proceeding, the issues tried are

25    integrally related to Plan confirmation; are integrally

1   related to the determination of what is or is not property of

2   the estate; are integrally related to the determination of the

3   amount and nature of the claims asserted; and are a portion of

4   Adversary Proceeding Nos. 25-8004 and 25-8005, in which Lags

5   admitted to the core nature of the relief and consented, if

6   necessary, to entry of final orders and judgments by this

7   Court.

8                           **C.   Burden of Proof**

9        With that background in mind, I'll next turn to the burden

10  of proof.  Courts have interpreted Section 541 of the

11  Bankruptcy Code to mean that (a) property that is under the

12  debtor's dominion or control is presumptively property of the

13  estate, and (b) property is under the debtor's dominion and

14  control if the debtor has the ability to direct the

15  disposition of the transferred property.  *See Jubber v. Search*

16  *Market Direct, Inc. (In re Paige)*, 413 B.R. 882, 909 (Bankr.

17  D. Utah 2009).  And that was cited in Debtors' confirmation

18  brief, Docket 775, at Paragraph 120.

19       In different contexts, the Fifth Circuit likewise has said

20  that the ability to control funds is the key to determining

21  whether they are property of the estate.  *See In re Southmark*

22  *Corp.*, 49 F.3d 1111 at 1116-17 (5th Cir. 1995); and *Coral*

23  *Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 at

24  1358-59 (5th Cir. 1986).

25       I  agree with the Debtors' suggestion that property under

the Debtors' dominion or control is presumptively property of

the estate and that property not under the Debtors' dominion

or control is presumptively not property of the estate.

For the reasons that I will explain shortly, the Lags

Royalties that are generated from company-owned restaurants in

the Lags Territories are presumptively property of the estate,

and those generated from the franchised restaurants in the

Lags Territories are presumptively not.

### D.   Lags's Claims Cover Three Different Periods

The first period:  Lags filed proofs of claim against six

different Debtors, asserting a perfected, secured claim

against each entity for $1,927,239.22 for unpaid prepetition

royalties through the bankruptcy petition date.  The entities

are HOA Systems, LLC; HOA Restaurant Group, LLC; HOA

Restaurant Holder, LLC; HOA Franchising, LLC, which I'll refer

to as "HOA Franchising;" HI Limited Partnership, which I'll

refer to as "HILP;" and Hooters of America, LLC, which I'll

refer to as "HOA."  *See* Proofs of Claim at Lags Exhibit 143.

Two of the Debtors, HOA and HILP, have been the focus of

the Core Issues hearing because of those Debtors' contractual

relationship with Lags.

The second period:  Lags asserts entitlement to

postpetition, preconfirmation royalties derived from its

asserted secured royalty rights and Paragraph 59 of the Final

DIP Order at Docket 299.  In that order, the Debtors agreed to

escrow $750,000, plus $375,000 per month of remittances from company-owned restaurants until the "Lags Adequate Protection Reserve Cutoff Date."

The third and most important period:  Lags asserts a perpetual, nondischargeable entitlement to all future Lags Royalties generated from restaurants in the Lags Territories. The amount of this claim, although not quantified, dwarfs the prepetition claims asserted in the proofs of claim and the postpetition, preconfirmation amounts escrowed under the final DIP order.

(Sound check.)

**E.  Lags's Claims for All Three Time Periods are for Lags Royalties Generated from Two Different Buckets of Restaurants**

The first bucket:  Lags claims the right to the Lags Royalties generated currently from company-owned restaurants in the Lags Territories, and that will be generated, if the Plan is confirmed, from those same restaurants owned indirectly by new owners pursuant to the Plan and Section 363 of the Bankruptcy Code.  The parties have stipulated that there are 39 company-owned restaurants in the Lags Territories.

The second bucket:  Lags claims the right to the Lags Royalties generated by franchised restaurants in the Lags Territories owned by several franchisees that have franchise agreements with one of the Debtors, HOA Franchising.  Those

1  franchisees are owned by a developer called Wings of South

2  Florida, LLC, which I will refer to as "Wings."  Throughout

3  this case, and in some of the underlying documents, the

4  parties have referred to Wings as the franchisee under the

5  franchise agreements, even though technically the franchisees

6  are the parties to the franchise agreements.  For convenience,

7  I will refer to Wings as the franchisee for the franchise

8  agreements covering the Lags Territories.

9       On the face of the Wings franchise agreements, Wings is

10  obligated to pay a percentage of its monthly gross sales to

11  HOA Franchising, the franchisor.  On the face of the

12  documents, no percentage of royalties is paid to Lags.  For

13  the last decade, however, Wings has split that royalty payment

14  into two streams.  Wings has paid part of the percentage,

15  currently four percent, to the Debtors -- either to HOA

16  Franchising or to a designee of HOA Franchising -- and the

17  other portion, three percent, Wings has paid directly to Lags.

18  Under the Plan as proposed, the Debtors, including

19  specifically the franchisor HOA Franchising, seek to assume

20  those franchise agreements under Section 365 of the Bankruptcy

21  Code.  The parties have stipulated that there are 15 Wings-

22  owned restaurants in the Lags Territories.

23       Under the Plan, Lags will no longer receive its three

24  percent of revenues from Wings.  Instead, the Debtors intend

25  to assume the franchise agreements as originally written,

which require the entirety of the royalties to be paid to HOA Franchising.

**F.   Whether Lags "Owns" the Lags Royalties, Whether Lags is "Owed" the Lags Royalties, or Whether Those are Simply Two Ways of Saying the Same Thing under the Facts of this Case**

Unless Lags can establish an ownership interest in some underlying property, Lags's "ownership" of the Lags Royalties is nothing more than a contractual right to receive payments from another party -- in this case, either a Debtor or a nondebtor franchisee.

There is no credible evidence that Lags has an ownership interest in any underlying real property.  Therefore, any comparison to oil and gas overriding royalties, which are a real property interest, is simply not helpful.  The Court floated this comparison earlier in the case in an offhand remark, but the comparison doesn't withstand scrutiny.

Lags's only potential argument to an ownership interest in an underlying property is that of a licensor claiming a beneficial interest in the Hooters trademarks and intellectual property, which I will refer to collectively as the "IP."

For the company-owned restaurants in the Lags Territories, HILP, the record owner of the IP, licenses the IP to other Debtors that directly or indirectly use the IP to operate the restaurants through subsidiaries, and in return, those Debtors are contractually obligated to pay a licensing fee directly or

1   indirectly to HILP or its designees.  *See* Debtors' Exhibits

2   66-75 at Paragraph 7.

3       Likewise, for the franchised restaurants in the Lags

4   Territories, HILP licenses the IP to HOA Franchising, the

5   franchisor under the relevant franchise agreements with Wings.

6   *See* Debtors' Exhibit 65.

7       HOA Franchising in turn sublicenses the IP to Wings.  *See*

8   Franchise Agreements at Debtors' Exhibit 58.

9       In return, Wings then pays two parties.  It pays a certain

10  percentage of gross restaurant revenues to HOA Franchising,

11  and, as it has for the last decade, Wings pays Lags directly

12  three percent of the gross revenues from the Wings

13  restaurants.

14      So HILP, as licensor and record owner of the IP, has the

15  contractual right to receive payments for the use of the IP.

16  It is contractually entitled to receive those payments from

17  other Debtors for company-owned restaurants, and for the

18  franchised restaurants it is contractually entitled to receive

19  those payments, or at least partial payments, from HOA

20  Franchising, which in turn is entitled to payment from Wings.

21      The immediate question is whether Lags is likewise

22  entitled to receive payments on account of its asserted

23  interest in the IP as a licensor, or is Lags instead entitled

24  to receive payments strictly as a contractual obligation,

25  without any beneficial interest in the underlying IP.

1    If Lags has some type of beneficial interest in the IP, it

2  would be difficult, if not impossible, for the Debtors to

3  shake that property interest free from Lags during this

4  bankruptcy.

5    In support of this argument, Lags points to two recitals

6  in the 2024 Agreement that refer to Lags as a "Licensor" under

7  the 1984 License Agreement with respect to the Lags

8  Territories.  The cite there is Debtors' Exhibit 52, the

9  fourth Whereas clause, at Page 1, and the twelfth Whereas

10  clause at Page 2.

11    Lags also points to language in that same twelfth Whereas

12  clause that says "the right to operate a Hooters Restaurant

13  and/or utilize the Hooters brand and marks in the Lags

14  Territories is subject to the Lags Royalty Obligation and

15  payment of the Lags Royalty to LE."  Here, "LE" means Lags.

16    At first, I found this argument appealing, especially

17  considering the language in the agreement that says the

18  recitals are not prefatory language but instead are a material

19  part of the agreement.  *See* Debtors' Exhibit 52, Section 1, at

20  Page 3.

21    Upon further reflection, however, Lags's claim to licensor

22  status, with a corresponding interest in the IP, does not

23  stick for at least five reasons.

24    The first reason Lags has no interest in the IP:  Although

25  the 2024 Agreement says the recitals are not merely prefatory

1   but instead are a material part of the agreement, Section 7.b

2   of the agreement cuts the other way.  I'm paraphrasing the

3   first subparagraph of that section, but it basically says that

4   there are numerous outstanding agreements between the parties,

5   including those referenced in the Whereas clauses, that the

6   2024 Agreement does not address, and that the parties' rights

7   and obligations under those agreements are not changed unless

8   specifically set forth in the 2024 Agreement.  It is simply

9   too much of a stretch to conclude, based on the various and

10  somewhat conflicting provisions of the 2024 Agreement, that

11  the parties gave Lags an interest in the trademarks and other

12  IP, which would be a huge change from historical agreements,

13  practices, and behavior.

14       The second reason Lags has no interest in the IP:  Lags

15  was not assigned any of Hooter's, Inc.'s ownership or property

16  interest in the trademarks and IP under the 1989 Agreements

17  and Assignments.  I'll refer to Hooter's, Inc. going forward

18  as "HI."

19       The 1989 Agreements and Assignments between Lags and HI

20  provided Lags with a very limited portion of HI's rights. The

21  Lags Royalties were limited to the Lags Territories, even

22  though HI had the right to receive royalties for all Hooters

23  restaurants across the country; Lags was not entitled to

24  exclusive -- or any -- use of the trademarks; and Lags was not

25  given any control over the trademarks.

1       The February 1989 Agreement provided Lags with an option

2   to purchase the trademarks in Section 3, but Lags did not

3   exercise this right.

4       HI also expressly stated it was the owner of the

5   Trademarks in Section 9(B) of the February 1989 Agreement and

6   remained such since Lags failed to exercise its option to

7   purchase.

8       And in that discussion that I just read, I'm referring to

9   Lags in that capacity under those documents.  I'm not

10  considering Lags's status, if ever, as a franchisee, which I

11  don't think is relevant for this purpose.

12      The third reason Lags has no interest in the IP:  The

13  Whereas clauses in the 2024 Agreement refer to Lags as the

14  "Licensor," reflecting that Lags was referring to itself as

15  the assignee of payment obligations that HI, the "Licensor"

16  under the original 1984 agreement, transferred to Lags.  The

17  2024 Agreement wasn't referring to Lags as a "licensor" -- in

18  other words, as an actual licensor of intellectual property.

19      The fourth reason Lags has no interest in the IP:  There

20  is no credible evidence in the record that Lags actually

21  considered itself as a licensor of intellectual property or

22  that it has acted as a licensor of intellectual property.  To

23  the contrary, the same twelfth Whereas clause in the 2024

24  Agreement states that "the Lags Royalty and the Lags Royalty

25  Obligation is fully earned, fully paid, irrevocable, and

1  continues in perpetuity, without any obligation or duty

2  required on the part of LE" -- or Lags -- "or any other

3  party."

4       This language reflects that Lags had no intention of

5  taking on the obligations of a licensor of trademarks,

6  including the obligation to ensure quality control of goods or

7  services sold under the licensed mark to maintain the mark's

8  value and protect the public interest.

9       The fifth reason Lags has no interest in the IP:  As

10  mentioned earlier, Lags's payment rights are restricted to a

11  very limited territory, the Lags Territories, a geographic

12  limitation that is inconsistent with ownership of the

13  trademarks and other IP.

14       For representative cases where courts have noted that

15  limitations in an agreement, such as limiting a party's rights

16  to certain geographic territories, are inconsistent with an

17  assignment of a property or ownership interest in a trademark,

18  *see Finance Investment Company v. Geberit AG*, 165 F.3d 526, at

19  531-32 (7th Cir. 1998); and *Calvin Klein Jeanswear v. Tunnel*

20  *Trading*, 2001 WL 1456577, at *5 (S.D.N.Y. 2001).

21       Lags has no beneficial or other interest in the Hooters

22  trademarks and other IP.  In addition, nothing in the 2001

23  Security Agreement suggests that Lags has obtained or even

24  attempted to obtain a security interest in the Hooters IP.

25       Therefore, Lags's claim of ownership of the Lags Royalties

1   is nothing more than a contractual right to receive those

2   payments, either from a Debtor in these bankruptcy cases or

3   from Wings.

4        With respect to the company-owned restaurants, the written

5   contracts the Court has reviewed showed that Lags has a

6   contractual right to payment only against HILP and HOA, not

7   against any other Debtor or nondebtor restaurant owner.  The

8   only potential exception to this is Lags's alleged rights

9   under the 2001 Security Agreement, which the Court will

10  address in a few minutes.

11       Without a security interest or ownership interest in the

12  Hooters IP, Lags's claims against the Debtors are potentially

13  dischargeable as contingent unsecured claims unless Lags has a

14  valid and perfected security interest in other collateral.

15  Without a valid and perfected security interest, Lags risks

16  suffering the same fate as the creditor Sanofi in the

17  *Mallinckrodt* case that was briefed by the parties and that I

18  discussed at closing arguments.

19       Sanofi sold certain gel intellectual property to the

20  debtor Mallinckrodt and received for the purchase price both

21  an upfront payment of $100,000 as well as a promise to pay

22  future royalties on sales of the gel.  Sanofi didn't protect

23  itself by getting a security interest in the underlying

24  intellectual property or in any other assets.  Mallinckrodt

25  later filed bankruptcy, and the district court affirmed the

bankruptcy court's determination that Sanofi's claim for

unpaid future royalties was a contingent claim that was

dischargeable in the bankruptcy.  That opinion is found at 646

F.Supp.3d 565.

Although the Fifth Circuit uses a slightly different test

than that used in the Third Circuit for determining when a

claim for bankruptcy purposes arises, the result is the same

here:  Lags's claim for future royalties arose at the time the

relevant contracts were signed.  *See, for example, Lycoming

Engines v. Superior Air Parts*, 2014 WL 1976757, at *5-6 (N.D.

Tex. May 15, 2014):  A right to an indemnity from a debtor is

a prepetition claim, even if the liability arises

postpetition, because the contract was executed prepetition.

That's a parenthetical description of the *Lycoming Engines*

case.

Because Lags has just a contractual right to payment,

Lags's argument on equitable estoppel falls flat.  Lags argues

that because the Debtors previously admitted many times over

that Lags "owns" the Lags Royalties, the Debtors are now

estopped from denying that fact.  But again, to say that Lags

"owns" the royalties is simply another way of saying that Lags

has a contractual right to payment, either from the Debtors or

a franchisee.  The real issue is how that right to payment and

security interest are treated in this bankruptcy case.

In short, for the company-owned restaurants, Lags needs a

1  valid and perfected security interest in other assets if it

2  has any hope of securing either prepetition or postpetition

3  royalty obligations.  And that's even before we get to Section

4  552.

5      (Sound check.)

6  **G.  With Respect to Company-Owned Restaurants, Lags Currently**

7  **Has a Right to Payment from HILP and HOA, Secured by Those**

8  **Entities' Rights to Receive Certain Payments**

9      Lags's contractual right to payment has changed somewhat

10 over the years.  Under the original 1984 License Agreement,

11 NRA/HOA had an obligation to pay royalties to HI, the original

12 licensor of the IP.

13     In the 1989 Assignments, Lags received an assignment of

14 HI's right to receive royalties from NRA/HOA in the Lags

15 Territories, with HI acting as the servicing agent for the

16 handover of funds.

17     The Debtors and the Lenders argue that, even after the

18 2001 Assumption Agreement, Lags is now owed nothing at all,

19 zippo, because nothing is owed to HI, the original licensor

20 under the 1984 License Agreement.  In other words, the Debtors

21 and the Lenders argue that the 2001 Assumption Agreement

22 merely resulted in HOA and HILP assuming HI's obligations

23 under the 1989 Assignment Agreements but did not result in any

24 change to the scope of the assets that were assigned to Lags

25 under the 1989 Agreements.  Those assets were simply the

1    contractual right to certain royalties "due to" HI.  Since HI

2    is no longer owed royalties, the argument goes, Lags is owed

3    nothing at all.

4        That view of the 2001 Assumption Agreement and related

5    2001 transaction, which the Debtors and the Lenders call the

6    "null set" theory, is too myopic.  Under that agreement, HOA

7    and HILP not only assumed HI's obligations under the 1989

8    Assignments, they also substituted themselves into the

9    arrangement and agreed to make the Lags Royalties payments, or

10   an equivalent amount, to Lags, even if they didn't receive

11   underlying royalty payments from franchisees and licensees.

12   *See, for example,* the 2001 Assumption Agreement, Sections 2,

13   3.c, and 3.d.

14       Under this new arrangement, HOA and HILP agreed, among

15   other things, to "transmit" and "remit" the anticipated future

16   royalties to Lags.  *See* 2001 Assumption Agreement, Sections 2

17   and 3.

18       All parties knew that, going forward, HILP, not HI, was

19   going to be the owner of the IP and thus receiving royalties.

20   Read as a whole and viewed in context, the 2001 Assumption

21   Agreement obligated HILP and HOA to transmit to Lags royalty

22   amounts that they expected to receive going forward as the

23   direct and indirect owners of the IP.  At that point, HI was

24   no longer a servicing agent.

25       For belt and suspenders, the 2001 Assumption Agreement

1  also created an independent obligation by HILP and HOA to pay

2  Lags, even if those Debtors never received the royalties from

3  other parties.

4      HILP and HOA had a right to receive payments from other

5  parties for the use of the IP, and they were never obligated

6  to act a servicing agent for Lags.

7      From the perspective of HOA, the payment obligation that

8  changed was that it was no longer paying HI; instead, it was

9  now, with HILP, paying Lags directly.  In other words, HI, the

10  only servicing agent, was cut out as the middleman.  Because

11  of the 2001 transaction, the fact that amounts are no longer

12  "due to" HI is irrelevant.  In a nutshell, the "null set"

13  theory comes up empty.

14      I've covered Lags's right to payment.  Now I'll address

15  its security interest.

16      Under the 2001 Security Agreement, the obligation of HOA

17  and HILP to make the Lags Royalties payments was secured by,

18  among other things, any right of HOA and HILP to receive three

19  percent of gross sales from franchisees, licensees, and other

20  third parties, whether those rights were then existing or

21  thereafter arising.  *See* 2001 Security Agreement, Paragraphs

22  4, 5, 6, and Exhibit A.  In other words, the 2001 Security

23  Agreement has an after-acquired property clause.

24      This is an unusual debt and security situation, so I'll

25  repeat it:  Under the 2001 Security Agreement and related 2001

1    agreements, the independent obligations of HOA and HILP to pay

2    the Lags Royalties to Lags is secured by the rights of HOA and

3    HILP to receive three percent of gross sales from franchisees,

4    licensees, or other third parties, now or in the future.

5         The Debtors and Lenders sometimes focus on the actual flow

6    of funds, but for this part of the ruling, I'm more concerned

7    about HILP's and HOA's contractual right to receive funds.

8    That right to receive funds is Lags's collateral, and under

9    both the Georgia and Florida versions of Article 9-315, unless

10   Lags authorized HILP's or HOA's disposition of collateral,

11   Lags's security interest continues, subject to commingling

12   and tracing issues that I'll address later.

13        As I will also explain later, HILP and HOA no longer have

14   a right to receive the three percent royalties from Wings that

15   originally would have been payable from Wings to HOA

16   Franchising and then from HOA Franchising to HILP.  That

17   payment stream thus is no longer relevant to the security

18   interest analysis.

19        Also, as explained later, Lags no longer has a claim

20   against or right to payment from HILP or HOA for the three

21   percent royalties that Lags has collected directly from Wings

22   for the past decade.

23        To summarize, Lags asserts a right to payment of three

24   percent royalties from Wings for the franchised restaurants,

25   and Lags asserts a direct claim for the right to payment of

three percent royalties from HILP and HOA for the company-
owned restaurants.  Lags asserts that its right to payment
against HILP and HOA is secured by certain payment streams due
to those entities.

I will now address the arguments of the Debtors and the
Lenders that Lags's security interest is invalid, unperfected,
or extinguished.

I hope this isn't as painful for you all as it is for me,
but I'm going to keep going.

**H.  Lags's Claim against HOA and HILP was Secured and
Partially Perfected on Prepetition Assets Until Lags's
Prepetition Cash Collateral was Commingled with other Debtor
Funds**

In the 2001 Security Agreement, HOA and HILP, which were
defined as the "Debtor," granted a security interest in "all
of that certain personal property owned or hereafter acquired
by the Debtor, whether now existing or hereafter arising, and
wherever located, described on Exhibit A attached hereto" and
in "any cash proceeds of any of that property."  That property
was defined collectively as the "Collateral."

Exhibit A to the 2001 Security Agreement then went on to
describe the Collateral as including, in relevant part, "All
now existing and hereafter arising right of Debtor, however
derived, and whether directly or through franchisees,
licensees, or other third parties, to receive three percent of

1    (a) the gross sales of all Hooters Restaurants" in the Lags

2    Territories, and "(b) all future royalties, franchise fees, or

3    other payments due to the Debtor with respect to the Hooters

4    Restaurants within the" Lags Territories.

5        Before I get into the requirements for a valid and

6    perfected security interest, I'll just briefly observe that

7    Lags has filed proofs of claim in these cases asserting

8    secured, perfected claims against not only HILP and HOA, but

9    also against other Debtors who are not facially parties to the

10   2001 Security Agreement, although that document purports to

11   bind not only HOA and HILP but also their successors and

12   assigns.  *See* Security Agreement, Paragraph 10.b.

13       The Debtors and the Lenders have not objected to those

14   proofs of claim yet.

15       My ruling today is limited to Lags's claims against HILP

16   and HOA and Lags's asserted security interest in certain

17   royalties.  The ruling applies to Lags's claims against those

18   other Debtors only to the extent they could be considered

19   successors or assigns of HILP and HOA under the 2001 Security

20   Agreement, a position Lags has not articulated.  If they are

21   somehow considered successors or assigns, whether through

22   receipt of funds or otherwise, this ruling binds Lags's claims

23   against them for the issues covered by this ruling.

24       For a security interest to be enforceable under Florida

25   law, which governs the 2001 Security Agreement, (1) value must

1    be given, (2) the debtor must have rights in the collateral,

2    and (3) the collateral must be adequately described.  Fla.

3    Stat. Section 679.2031(2)(a)-(c)(1).  *See also* Paragraph 10.e

4    of the 2001 Security Agreement.

5        The Debtors and Lenders argue that Lags fails in all three

6    requirements.

7        The Debtors and the Lenders first assert that it was HI

8    that received value for Lags's security interest, rather than

9    HILP and HOA, so allegedly no value was given.  "Value" under

10   the U.C.C. is any consideration that would be sufficient to

11   support a simple contract, so even a mere peppercorn would

12   suffice.  *J. Aron & Company. v. SemCrude, L.P*, 504 B.R. 39, 55

13   (Bankr. D. Del. 2013).  *See also* Fla. Stat. Section 671.211(4)

14   (a person gives value for rights if the person acquires them

15   in return for any consideration sufficient to support a simple

16   contract).

17       Value therefore includes a benefit given to a third party,

18   or even a detriment to the secured party.  For representative

19   cases that say that, *see In re Reliable Manufacturing Corp.*,

20   703 F.2d 996, 1000 (7th Cir. 1983), applying Illinois law; and

21   *LSQ Funding Group, L.C. v. EDS Field Services*, 879 F.Supp.2d

22   1320, 1329 (M.D. Fla. 2012), applying Florida law.

23       Lags's original security interest against HI comes from

24   Sections 4 [Court correction] and 1 of the first 1989

25   Assignment, in which HI both assigned its currently-existing

security interest to Lags and it also promised to grant Lags a
security interest to perfect Lags's right to receive the Lags
Royalty, respectively.

When HOA exercised the option to purchase HILP, HOA was
obligated under that option to substitute itself for HI as the
debtor in any security agreements and financing statements and
grant Lags a security interest to perfect its interest in the
Lags Royalty.  *See* 1999 Settlement Agreement, Section 7(e), as
amended in 2001.

HOA took that step by signing the 2001 Security Agreement,
the form for which was referenced in the 1999 Settlement
Agreement, as amended in 2001.

And, in consideration of HOA and HILP substituting
themselves for HI, Lags released HI and the other former HILP
partners from future obligations under the 1989 Assignments.
*See* Section 6 of the 2001 Assumption Agreement, found at
Debtors' Exhibit 46.

At the very least, value was given in connection with the
2001 Security Agreement when Lags, in the contemporaneously-
executed and integrally-related 2001 Assumption Agreement,
released HI and the other former HILP partners from future
obligations under the 1989 Assignments.

In addition, HOA received value when it obtained its
interest in HILP pursuant to the 2001 transaction, which was
integrally related to the 2001 Security Agreement.

 1       Lags thus satisfies the first element for an enforceable
 2  security interest.
 3       Next, I'll address the Debtors' or Lenders' claim that
 4  Lags does not satisfy the second element for an enforceable
 5  security interest -- that is, the debtor having rights in the
 6  collateral.  In support of this argument, the Debtors or
 7  Lenders offer three theories, one of which the Court has
 8  already addressed.
 9       First, the Debtors or Lenders argue that nothing is "due
10  to" HOA and HILP because the 1989 Assignments only gave Lags
11  rights in what was "due to" HI.  According to this argument,
12  HOA and HILP have no rights in any payment streams because
13  those streams are "due to" HI.  The Court rejected this "null
14  set" argument when addressing the nature of Lags's right to
15  payments.
16       Second, the Debtors argue that at the time the security
17  interest was granted in 2001, neither HOA nor HILP had any
18  right to receive any royalties.  The evidence on this point is
19  murky at best, but it's reasonable to believe that, at the
20  very least, HILP, the IP owner, was entitled to receive
21  royalties from somebody, somewhere, in 2001.  In any event,
22  the 2001 Security Agreement grants a security interest in
23  after-acquired property, and HOA and HILP undoubtedly have an
24  interest in such proceeds now, as I'll discuss next, subject
25  to commingling issues that I will also address.

1          Third, the Debtors argue that the only entities

2    contractually entitled to receive revenues from the Hooters

3    restaurants in the Lags Territories are HRH Restaurant

4    Holders, DW Restaurant Holders, TW Restaurant Holders, and

5    Hoots Restaurant Holders.  But HILP, as the owner of the IP,

6    has always had a right to receive payments in exchange for the

7    use of its IP.  The IP licenses between HILP and various

8    Debtor entities, including HOA, provide that HILP is entitled

9    to receive a royalty for the use of its IP.  *See* Section 7 of

10   the License Agreements, found at Debtors' Exhibits 65-75.  The

11   license agreements contemplate sublicensing down to the

12   restaurant level.

13         The collateral described in the 2001 Security Agreement

14   includes the right to receive royalties either directly or

15   "through franchisees, licensees, or other third parties," so

16   the collateral includes at least HILP's right to receive

17   royalty payments directly and indirectly.  And the license

18   agreement between HILP, as licensor, and HOA, as licensee --

19   *see* Debtors' Exhibit 74 -- contemplates that HOA itself

20   further sublicenses the IP and receives royalties in return.

21   Therefore, both HILP and HOA appear to have rights in the

22   collateral.

23         Finally, I'll address the Debtors' claim that Lags does

24   not satisfy the third element for an enforceable security

25   interest, an adequate collateral description.  "Accounts,"

"general intangibles," and "supporting obligations" are all

sufficient descriptions because they are types of collateral

defined in the U.C.C.  *See* Fla. Stat. Section 679.1081(2)(c).

*In re Hintze*, 525 B.R. 780 (Bankr. N.D. Fla. 2015), on which

the Debtors rely, only stands for the proposition that "all of

debtor's assets" is insufficient, not that U.C.C.-defined

categories are too broad and generic.  Further, the

description in the 2001 Security Agreement regarding the right

to receive the three-percent royalties is just a more detailed

description of a particular "account" under the U.C.C. because

it is a "right to receive payment of a monetary obligation"

for property "that has or is to be ... licensed."  Fla. Stat.

Section 679.1021(1)(b).

     Furthermore, the 2001 Security Agreement Exhibit A

describes the collateral as, among other things, "Accounts of

Debtor" and "General Intangibles of Debtor," each to the

extent that the royalty streams are considered to be in those

categories.

     In a nutshell, because all three elements required for an

enforceable security interest are met, the 2001 Security

Agreement granted Lags a proper security interest in HOA's and

HILP's rights to receive royalty payments.

     Lenders are correct to note, however, that Lags later

inappropriately attempted to expand the scope of its security

interest by including trademarks and IP in one or more later-

1  filed financing statements.  Those documents do not grant a

2  security interest and cannot expand the scope of Lags's

3  security interests beyond what was granted in the 2001

4  Security Agreement.

5      For an opinion that describes the different functions of

6  security agreements and financing statements, *see American*

7  *Restaurant Supply v. Wilson*, 371 So.2d 489, 490 (Fla. Dist.

8  Ct. App. 1979).

9      I have now covered the elements of an enforceable security

10 interest.  Next, I will turn to perfection and extinguishment

11 issues.

12     The Debtors and Lenders claim that any security interest

13 that Lags possesses is unperfected or lapsed or was

14 extinguished.  Lags largely failed to respond to these

15 arguments in its briefing.

16     First, the Debtors claim that in Georgia, where HOA is

17 located, the continuation statements were ineffective because

18 they were not filed within the time allowed under Georgia law,

19 and thus Lags's claim is unperfected.

20     The Debtors are only partly correct.  Lags filed its first

21 UCC-1 on September 25, 2003.  Under Georgia law, that

22 financing statement remains effective for five years, and a

23 continuation statement must be filed within six months before

24 the financing statement's expiration.  The March 10, 2008

25 continuation statement was ineffective because it was not

1  filed within the prescribed six-month period -- that is, it

2  was filed too soon.  Ga. Code Section 11-9-515(b) and (c).

3  Thus, the September 25, 2003 UCC-1 became ineffective on

4  September 25, 2008, and the subsequent continuation statements

5  filed in 2013, 2018, and 2023 failed to revive the original

6  financing statement.  *See Kubota Tractor Corp. v. Citizens*,

7  403 S.E.2d 218, 222 (Ga. Ct. App. 1991).

8       However, on January 16, 2024, Lags filed a new UCC-1, so

9  its security interest against HOA was again perfected as of

10 that date.  *See* Lags Exhibit 30.

11      The Debtors argue that the new UCC-1 is ineffective

12 because HOA has no rights in the collateral because it doesn't

13 actually receive the royalties, which are instead deposited

14 into commingled accounts.  The Debtors' commingling doesn't

15 prevent HOA's security interest from attaching to its right to

16 receive payments, like an account receivable.  If those

17 proceeds are later commingled and untraceable, that's another

18 issue that I'll address shortly.

19      Second, the Debtors and Lenders claim that the 2012 and

20 2017 continuation statements in Florida, where HILP is

21 located, are ineffective because they were filed by IberiaBank

22 and there is no evidence that Lags authorized the bank to file

23 the continuation statements.  Section 9 of both the December

24 2012 continuation statement and the October 2017 continuation

25 statement name the "Secured Party of Record Authorizing this

1    Amendment" as "IberiaBank."  That's Lags Exhibits 19 and 20.

2    The Florida U.C.C. indicates that a continuation statement is

3    a type of "amendment" that continues the effectiveness of an

4    identified initial financing statement.  Fla. Stat. Section

5    679.1021(1)(bb).  Unless it's a certain type of termination

6    statement, an amendment that does not add collateral or

7    debtors covered by a financing statement -- for example, a

8    continuation statement -- may only be filed by a person so

9    authorized by the secured party of record of the initial

10   financing statement being continued.  *See* Fla. Stat. Section

11   679.509(3).  A filed record is only effective if it was filed

12   by a person who may file such a record.  *See* Fla. Stat.

13   Section 679.510(1).

14        Because there is no evidence that Lags, who is the secured

15   party in the initial UCC-1 filed in Florida in March 2008 --

16   *see* Lags Exhibit 18 -- authorized IberiaBank to file the

17   December 2012 Florida continuation statement, that

18   continuation statement was ineffective.  The initial financing

19   statement was only effective for a period of five years, so

20   Lags's security interest against HILP became unperfected on

21   March 3, 2013.  *See* Fla. Stat. Section 679.515(1), (3), and

22   (5).

23        Third, the Debtors and the Lenders argue that, even if

24   Lags did at one time have a properly perfected security

25   interest in revenue streams due to HOA and HILP, that security

1    interest was extinguished once Lags's cash collateral was

2    hopelessly commingled into accounts owned by different Debtors

3    that contained funds from other restaurants outside the Lags

4    Territories.  Lags did not address this issue in its brief.

5        A security interest in a deposit account is perfected by

6    control.  Ga. Code Ann. Section 11-9-312(b)(1); Fla. Stat.

7    Section 679.3121(2)(a); U.C.C. Section 9-312(b)(1); *see also*

8    Ga. Code Ann. Section 11-9-104(a), setting forth the

9    requirements for control over a deposit account; and Fla.

10   Stat. Section 679.1041(1), also setting forth the requirements

11   for control over a deposit account; *and see* U.C.C. Section 9-

12   104(a) for the same.  *See also Armstrong Bank v. Shraiberg,*

13   *Landau & Page, P.A. (In re Tuscany Energy, LLC)*, 581 B.R. 681,

14   688 (Bankr. S.D. Fla. 2018).  And the parenthetical there is

15   "A security interest in a deposit account cannot be perfected

16   by the filing of a financing statement.  A security interest

17   in a deposit account may only be perfected by control over

18   that deposit account.".

19       Lags has no such control over the Debtors' accounts.

20   Therefore, Lags needs to point to identifiable proceeds of its

21   collateral to maintain its security interest.  Under the

22   U.C.C., a security interest in the proceeds of collateral

23   attaches to any proceeds of collateral so long as those

24   proceeds are "identifiable."  Ga. Code Ann. Section 11-9-

25   315(a)(2); Fla. Stat. Section 679.3151(1)(b); U.C.C. Section

1    9-315(a)(2).  For proceeds that are not goods, such as cash,

2    the proceeds are "identifiable proceeds of collateral" once

3    they are "commingled with other property" only "to the extent

4    that the secured party identifies the proceeds by a method of

5    tracing ..."  Ga. Code Ann. Section 11-9-315(b)(2); Fla. Stat.

6    Section 679.3151(2)(b); U.C.C. Section 9-315(b)(2).  *Also*,

7    *Arkison v. Frontier Asset Management, LLC (In re Skagit*

8    *Pacific Corp.)*, 316 B.R. 330, 337-38 (B.A.P. 9th Cir. 2004).

9    This burden of identifying the proceeds falls on the secured

10   creditor.  *See* Ga. Code Ann. Section 11-9-315(b)(2); Fla.

11   Stat. Section 679.3151(2)(b); U.C.C. Section 9-315(b)(2).

12   *Also, In re Skagit Pacific Corp.*, 316 B.R. at 337-38; *In re*

13   *Willis*, 478 B.R. 388, 393-94 (Bankr. D. Idaho 2012).

14        According to testimony at the May 13, 2025 DIP Financing

15   hearing, most of Lags's prepetition cash collateral was spent

16   by the Debtors in the months leading up to the bankruptcy

17   filing and not turned over and paid to Lags.  *See generally*

18   Transcript of Hearing Held May 13, 2025, Docket No. 388.

19        On the bankruptcy petition date, there would have been a

20   limited amount of revenues from the use of the Hooters IP that

21   would have been due to HILP for the prepetition use of its IP.

22   Those amounts were deposited into bank accounts not owned by

23   HILP and HOA and commingled with other funds from other

24   restaurant operations outside the Lags Territories.

25        In Paragraph 102 of their opening brief at Docket 743, the

1    Debtors state that, as Lags is aware, "the Debtors commingle

2    the 'Royalties,' along with all other operating funds, and any

3    attempt to trace specific collateral would be nearly

4    impossible."

5        I'm having trouble reconciling this statement with

6    numerous other statements in the cash management motion at

7    Docket 12 filed at the beginning of the case.  For example,

8    Paragraph 25 of the cash management motion:  "The Debtors

9    track all fund transfers in their respective accounting

10   systems and can ascertain, trace, and account for all

11   Intercompany Transactions."

12       Paragraph 27:  "Consistent with their prepetition

13   practice, the Debtors will maintain records of all transfers

14   and will continue to ascertain, trace, and account for all of

15   the Intercompany Transactions and comply with their

16   requirements under the DIP Order and DIP Documents."

17       Paragraph 33:  "The Debtors' Cash Management System allows

18   the Debtors to centrally manage cash and includes the

19   necessary accounting controls to enable the Debtors to trace

20   funds through the system and ensure that all transactions are

21   adequately documented and readily ascertainable.  While the

22   Chapter 11 Cases are pending, the Debtors will continue to

23   maintain detailed records reflecting all transfers of funds."

24       In addition, Paragraph 16 of the order at Docket 94

25   approving the cash management motion states, "The Debtors

1   shall continue to maintain records related to the Intercompany

2   Transactions so that transactions can be ascertained, traced,

3   and accounted for on applicable intercompany accounts and

4   distinguished between prepetition and postpetition

5   transactions."

6        Even though I'm concerned about these seemingly-

7   inconsistent beginning-of-case and end-of-case positions by

8   the Debtors, Lags made no attempt at trial to trace any of the

9   claimed proceeds of its prepetition collateral -- that is, the

10  amounts due to HILP and HOA.  It largely ignored this issue.

11  Absent evidence of traceable funds, Lags's security interest

12  in proceeds does not extend to the commingled accounts.  *See*

13  *Arkison*, 316 B.R. at 338-39.  The parenthetical description

14  there is that the creditor had no security interest in

15  proceeds of accounts receivable that were commingled in a bank

16  account containing proceeds of other account receivables

17  because the secured creditor did not use an allowed method of

18  tracing to identify those proceeds connected to its

19  collateral.

20       All right.  I have finished addressing the nature of

21  Lags's claims and whether they were secured and properly

22  perfected as to property acquired by the Debtor prior to the

23  petition date.  I'll now turn to the issue of whether those

24  claims attach to property acquired by the Debtors after the

25  petition date.

1    (Sound check.)

2        By the way, this is Page 20 of 29, so we're getting there.

3    **I.   Lags Has a Security Interest in the Rights of HOA and HILP**

4      **to Receive Lags Royalties from the Operation of Company-Owned**

5        **Restaurants, but that Security Interest was Cut Off on the**

6           **Petition Date by Section 552 of the Bankruptcy Code**

7        HILP, the licensor and owner of the IP, has license

8    agreements with Debtors that own or operate company-owned

9    restaurants directly or indirectly, and those Debtors are

10   contractually obligated to pay HILP royalties based on a

11   percentage of gross sales for the company-owned restaurants.

12   *See, for example*, Debtors' Exhibit 66, Paragraphs 2 and 7.

13       HILP thus appears contractually entitled to receive from

14   other Debtors royalties derived from company-owned

15   restaurants.

16       HOA likewise appears to be contractually entitled to some

17   portion of that revenue stream.  Paragraph 27 of the Debtors'

18   Brief, Docket 743, states that some of the alleged commingled

19   funds make their way to HOA.  There is evidence to that effect

20   in Exhibit C to the Debtors' Cash Management System Motion at

21   Docket 12, which was incorporated by reference into the Maib

22   Declaration at Docket 19.  *See also* Exhibit 4 of the Zahn

23   Declaration, Docket No. 744, although that one is not the best

24   evidence.  It's a declaration of a Foley attorney.  But

25   nevertheless, it's something, and it really is duplicative of

1   the Maib Declaration.

2        In addition, as I mentioned earlier, the license agreement

3   between HILP, as licensor, and HOA, as licensee -- Debtors'

4   Exhibit 74 -- contemplates that HOA itself further sublicenses

5   the IP and receives royalties in return.  For purposes of this

6   ruling, therefore, the Court finds that HOA is likely entitled

7   to payment of some portion of royalties from company-owned

8   restaurants.

9        When HILP and HOA receive or have the right to receive

10   those postpetition revenues, they are acquiring postpetition

11   assets.  Those postpetition assets are subject to the after-

12   acquired property clause in the 2001 Security Agreement.

13        Unfortunately for Lags, Section 552 of the Bankruptcy Code

14   helps a debtor obtain a fresh start by generally invalidating

15   after-acquired property clauses.  Section 552(a) provides

16   that, except as provided in Section 552(b), property acquired

17   by the estate or by the debtor after the petition date is not

18   subject to any lien resulting from any security agreement

19   entered into by the debtor before the petition date.

20        Section 552(b) then provides some exceptions to Section

21   552(a)'s general rule.  With its own exceptions that don't

22   apply here, Section 552(b) provides in relevant part that if a

23   debtor and another party entered into a security agreement

24   prior to bankruptcy, and if that security interest created by

25   such security agreement extends to property of the debtor

1  acquired prior to bankruptcy and to proceeds, products,

2  offspring, or profits of such property, then such security

3  interest extends to such proceeds, products, offspring, or

4  profits acquired by the estate after the bankruptcy to the

5  extent provided by such security agreement and applicable

6  nonbankruptcy law, except to any extent the court, based on

7  the equities of the case, orders otherwise.

8      The 2001 Security Agreement extends to HILP's and HOA's

9  right to payment of royalties, and to the proceeds of those

10  royalties, so the security interest here continues in proceeds

11  acquired by the estate after the bankruptcy to the extent

12  provided by the 2001 Security Agreement and nonbankruptcy law,

13  which here would be the law of Georgia and Florida, except to

14  the extent I order otherwise based on the equities of the

15  case.

16      The primary issue is whether the royalties that are due to

17  HILP and HOA for the postpetition period -- the after-acquired

18  property -- are proceeds of prepetition collateral.  They are

19  not, and a good place to start to explain why not is the

20  *Cafeteria Operators* opinion by my predecessor on the bench,

21  Judge Hale.  That's found at 299 B.R. 400 (Bankr. N.D. Tex.

22  2003), where the debtor argued that, pursuant to Section 552,

23  the lender, with a blanket lien on all prepetition assets,

24  including a control account over the debtor's cash in the

25  bank, did not have a lien on the revenues from the

1    postpetition operations of the debtor's restaurants.  That was

2    the debtor's position.

3        Judge Hale first looked at the U.C.C. definition of

4    "proceeds" under Massachusetts law, the relevant sections of

5    which appear in all material respects to be the same in

6    Georgia and Florida:  "(A) whatever is acquired upon the sale,

7    lease, license, exchange, or other disposition of collateral;

8    (B) whatever is collected on, or distributed on account of,

9    collateral; (C) rights arising out of collateral."

10        Judge Hale determined that the portion of the postpetition

11    restaurant revenues attributable to the labor and services of

12    the debtor's employees was not proceeds of prepetition

13    collateral, relying in part on the famous Supreme Court case,

14    *Local Loan v. Hunt*, 292 U.S. 234 (1934).  In *Local Loan v.*

15    *Hunt*, the Supreme Court enforced the fresh-start policy of

16    bankruptcy law by not enforcing a prepetition lien on future

17    wages generated after the bankruptcy.

18        On the other hand, Judge Hale determined that the portion

19    of the postpetition restaurant revenues attributable to the

20    sale of the lender's inventory collateral was proceeds of the

21    prepetition collateral and thus was not cut off by Section

22    552.

23        Finally, Judge Hale determined that even if all of the

24    debtor's postpetition revenues could somehow be deemed to be

25    proceeds of the lender's collateral under Massachusetts law,

1  the "equities of the case" exception applied because it would

2  be unfair to increase the value of the lender's collateral due

3  to the postpetition toil and effort of the debtor and its

4  employees.

5       The facts in this Hooters case don't neatly fit into the

6  *Cafeteria Operators* analysis, but they show that Lags has an

7  even weaker proceeds argument here.  Unlike the lender in

8  *Cafeteria Operators*, Lags doesn't have a blocked account

9  agreement giving it a perfected interest in cash in the bank

10  and it doesn't have a security interest in the store-level

11  inventory that is sold.  Lags doesn't even have a security

12  interest in the IP of HILP that is used each day at the

13  restaurants, the very Hooters trademarks and IP that make a

14  Hooters restaurant a Hooters restaurant every single day.

15      The payment for the postpetition use of that IP is what is

16  due to HILP and HOA after the petition date.  That payment

17  is not the proceeds of Lags's prepetition collateral, nor did

18  Lags argue that it is somehow the products, offspring, or

19  profits of such property.  Lags offered no evidence or

20  arguments at all on this point.

21      Next, even if the postpetition royalties could somehow be

22  deemed proceeds, products, offspring, or profits of

23  prepetition collateral, I would find the "equities of the

24  case" exception in Section 552(b) applicable here.

25      The Debtors are not substantively consolidated, so my

1    analysis is focused on the most relevant Debtors, HILP and

2    HOA.  Even if those Debtors themselves don't have store-level

3    employees that provide services that help generate revenue,

4    they do have iconic trademarks and other IP, or licenses to

5    use such IP, that help generate revenues.  They, along with

6    the other Debtors, have been in financial distress, leading to

7    this bankruptcy.  It would be unfair to burden them for

8    decades to come with perpetual royalty payments to Lags,

9    especially considering Lags's unperfected security interest

10   against HILP, the owner of the IP and the Debtor with the

11   greatest number of intercompany licenses and rights to

12   intercompany payments.  HILP and HOA are entitled to a fresh

13   start.

14        Finally, citing *Lycoming Engines v. Superior Air Parts*,

15   2014 WL 1976757 (N.D. Tex. May 15, 2014), Lags argues that the

16   Debtors have a nondischargeable duty to "receive and remit" or

17   "collect and remit" the Lags Royalties because that

18   obligation, which is in a nonexecutory contract, survives

19   bankruptcy.  Therefore, according to Lags, if the Debtors

20   don't want to or can't collect and remit, then Lags should be

21   able to collect directly from the "source" -- that is, the

22   restaurant operators.

23        This argument is just a creative rephrasing of the

24   parties' rights and duties, which I've already addressed.  In

25   other words, Lags asserts that it has a direct claim against

1   HILP and HOA, secured by a payment stream due to HILP and HOA,

2   and it wants to exercise its rights under the 2001 Security

3   Agreement to direct other parties to pay it rather than HILP

4   or HOA.   To the extent Lags even has a valid and perfected

5   security interest, Section 552 cuts off Lags's rights under

6   its Security Agreement to direct third parties to pay it

7   rather than the Debtors.

8        It is true that some obligations under nonexecutory

9   contracts survive bankruptcy, as Judge Houser noted in

10  *Lycoming Engines*, such as arbitration clauses.   I incorporate

11  my comments from closing arguments about that case and the

12  *Mallinckrodt* case.   My comments are found at the Transcript of

13  the Hearing Held August 27, 2025, Docket No. 949, at Pages 38-

14  42.

15       But *Lycoming Engines* doesn't address the specific facts we

16  have here, including a security agreement with an after-

17  acquired property clause, which Section 552 cuts off.

18       **J.   Lags Has No Dischargeable Claim Against the Debtors**

19          **Related to the Lags Royalty Due from Wings, and Those**

20             **Royalties are Not Property of the Estate**

21       HILP and HOA may be entitled to a fresh start, but they're

22  not entitled to a head start when it comes to the franchised

23  restaurants.   The 2024 Agreement changed the landscape

24  concerning the payment obligations to Lags for the Wings

25  restaurants in the Lags Territories.

1          As an initial matter, the 2024 Agreement signature page

2     shows signatures for HOA, HILP, and Lags.  The defined term

3     "HOA Entities" in the opening preamble, however, defines HOA

4     Entities to include not only HOA and HILP, but also those

5     companies' affiliates or related parties.

6          In addition, Paragraph 5 of the agreement notes that HOA

7     Franchising is one of those affiliates, and Paragraph 5 then

8     goes on to address matters involving changes to the franchise

9     agreements between Wings and HOA Franchising, including in

10    Paragraphs 5.a and 5.b.  These provisions collectively make

11    clear that HILP and HOA were signing the 2024 Agreement in

12    part on behalf of HOA Franchising.   All of these entities

13    were included in the term "HOA Entities."

14         Then, under the 2024 Agreement, specifically Paragraphs

15    5.c, 5.d, and 5.e, the parties did three things:

16         First, in Paragraph 5.c, after acknowledging that the HOA

17    Entities, which includes HOA Franchising, previously directed

18    Wings to pay the Lags Royalty directly to Lags, the HOA

19    Entities irrevocably authorized Lags to collect the Lags

20    Royalty directly from Wings, with any such payments offsetting

21    what Wings would otherwise owe to the HOA Entities.

22         Second, in Paragraph 5.d, the HOA Entities released Wings

23    from any and all obligations and liabilities to the HOA

24    Entities for any payment of the Lags Royalty directly to Lags.

25         And third, in Paragraph 5.e, Lags released the HOA

1   Entities from any obligations and liabilities related to the

2   collection and payment of the Lags Royalty in the Lags

3   Territories from Wings.

4       Taking these in reverse order:  Because of the release

5   given by Lags in Paragraph 5.e, Lags no longer has a claim

6   against the Debtors with respect to the Lags Royalty for the

7   Wings restaurants.  Since Lags has no such claim, there is no

8   corresponding dischargeable debt.

9       The first and second items, in Paragraph 5.c and 5.d,

10  reveal that HILP and HOA have little, if any, control over the

11  Lags Royalty from Wings.

12      Paragraph 5.c recognizes the course of conduct between HOA

13  Franchising and Lags for the last 10 years, during which the

14  Lags Royalty has been completely out-of-sight and out-of-mind

15  for the Debtors.  The evidence showed that, for the last

16  decade, Wings has been paying three percent of its revenues

17  directly to Lags, without any accounting to HOA Franchising or

18  the other Debtors.

19      And if that course of conduct were not enough, Paragraph

20  5.c irrevocably authorized that payment arrangement going

21  forward, and in Paragraph 5.d the HOA Entities blessed and

22  released Wings for that payment arrangement.

23      Moreover, the Court can make reasonable inferences from

24  the evidence.  Based on the documents and other evidence, I

25  find that, even though it didn't expressly sign the 2024

1 Agreement, Wings agreed to, consented to, and adopted its

2 terms concerning the Lags Royalty, the payment obligations

3 under the franchise agreements with HOA Franchising,

4 and the other terms concerning forthcoming changes to the

5 Wings franchise agreements with HOA Franchising.

6     That evidence includes, but is not limited to, Mr.

7 Simeone's signature on the 2024 Agreement for Lags, Mr.

8 Simeone's involvement with and ownership interest in the Wings

9 franchisees, and the parties' continuing course of conduct

10 after the 2024 Agreement.

11     At opening and closing arguments, the Debtors put forth

12 three arguments why the direct payment obligations and

13 releases in the 2024 Agreement are not effective and why the

14 Debtors believe they can wrestle control of the Wings three

15 percent away from Lags.  Those arguments don't hold up.

16     The first argument:  The Debtors argue that the 2024

17 Agreement had a limited term, so it was not intended to permit

18 Lags to collect the Lags Royalties from Wings in perpetuity.

19 Although the agreement is limited in term as far as how long

20 the royalty obligations are reduced in amount, the document

21 makes clear that the releases and payment directives

22 were intended to be permanent.

23     For example, in Section 5.c of the agreement, the HOA

24 Entities "irrevocably authorize" Lags to collect the Lags

25 Royalty directly from Wings, as the parties acknowledge in the

 1  same clause has been happening for some time.  Lags's direct

 2  payment rights are not limited in term.

 3     In addition, the "Survival of Obligations" clause in

 4  Section 7.d makes clear that obligations that require

 5  performance after the termination or expiration of the

 6  agreement, or that by their nature would reasonably be

 7  expected to continue in effect after termination or expiration

 8  of the agreement, shall continue in full force and effect

 9  after and notwithstanding its termination or expiration, until

10  they are satisfied in full or, by their nature, expire.

11     In Paragraph 5.d of the 2024 Agreement, the parties

12  acknowledged the prior directive by the HOA Entities to Wings

13  to pay the three percent royalty directly to Lags, and the

14  paragraph then irrevocably authorized Lags to collect directly

15  from Wings.  Wings thus was obligated to pay Lags directly,

16  and that obligation survived by its irrevocable nature.

17     The Debtors' second argument in support of control over

18  the Lags Royalties from Wings is that Wings did not sign the

19  2024 Agreement, rendering ineffective any of that document's

20  purported changes to the franchise agreements to which Wings

21  and HOA Franchising are parties.  But as I've already noted,

22  the 2024 Agreement binds the HOA Entities, which includes HOA

23  Franchising, and Wings likewise consented to its terms.

24     The Debtors' third argument in support of control over the

25  Lags Royalty from Wings is that HOA Franchising is assuming

1   the franchise agreements with Wings under Section 365 of the

2   Bankruptcy Code, and the face of the agreements being assumed

3   require all royalties to be paid to HOA Franchising.  And

4   according to the Debtors, the prior course of conduct between

5   Wings, HOA Franchising, and Lags, where Wings paid Lags three

6   percent directly, is ineffective to change the terms of the

7   franchise agreements because Section 22.1 of those agreements

8   provides that no course of dealing shall operate to amend,

9   modify, terminate, or waive any express written provision in

10  the agreement.  Section 22.2 also prohibits modifications

11  unless they are contained in writing, signed by both parties.

12      The franchise agreements appear to be governed by Georgia

13  law, unless Georgia renders any provision in the agreements

14  unenforceable, in which case they are governed by the laws of

15  the franchisees' jurisdiction if the provision is enforceable

16  there.  The franchisees' jurisdiction appears to be Florida.

17  *See* Section 25.2 of the various Franchise Agreements.

18      It is well established under both Georgia and Florida law

19  that a written contract can be modified by subsequent conduct

20  of the parties, even if that contract purports to prohibit

21  such modification.  *See Hanham v. Access Management Group,*

22  *L.P.*, 825 S.E.2d 217, 220 (Ga. 2019); and *ConSeal*

23  *International, Inc. v. Neogen Corp.*, 488 F.Supp.3d 1257, 1268

24  (S.D. Fla. 2020).  The Court believes this concept to be true

25  in just about any other jurisdiction that might apply here.

1    Therefore, the payment rights and obligations under the

2    franchise agreements were modified by a long-standing course

3    of conduct.  And aside from a prior course of conduct, both

4    HOA Franchising and Wings reaffirmed the modified payment

5    terms of the franchise agreements by agreeing or consenting to

6    the 2024 Agreement.

7    Where the debtor assumes an executory contract, it must

8    assume the entire contract *cum onere* -- the debtor accepts

9    both the obligations and the benefits of the executory

10   contract.  *In re National Gypsum Co.*, 208 F.3d 498, 506 (5th

11   Cir. 2000).  Those burdens include any amendments to the

12   executory contract that are less favorable to the debtor.  The

13   Debtors here are stuck with the less-favorable amendment that

14   allows Lags to collect directly from Wings.

15   Finally, even if HOA Franchising were to reject the

16   franchise agreements with Wings, that rejection would be a

17   mere breach and would not deprive Wings of its rights to

18   continue to use the Hooters trademarks and IP, and, with

19   certain exceptions not relevant here, it would not excuse the

20   obligation of Wings to keep paying both the Debtors and Lags.

21   *See Mission Product Holdings, Inc. v. Tempnology, LLC*,

22   587 U.S. 370 (2019).

23   In short, the Debtors have a limited, if any, ability to

24   pay the Debtors' own creditors with the Wings-to-Lags payment

25   stream, so that property is presumptively not property of the

1    estate.  The Debtors have not overcome that presumption.

2         Even if the Lags Royalty from Wings restaurants were

3    somehow presumptively property of the estate, Lags has shown

4    that such royalty is not property of the estate because of the

5    small or nonexistent control that the Debtors have over that

6    payment stream.

### K.  Miscellaneous

8         I'll wrap up this ruling with a few comments.

9         First, I admitted and considered the expert report of

10   Scott Weingust, but as my understanding of the facts increased

11   and my analysis progressed, I ended up relying very little, if

12   at all, on his report or testimony.  Mr. Weingust is very

13   knowledgeable about payment streams and how they can be

14   transferred and used, but that general knowledge didn't

15   translate to useful information about the specific facts of

16   this case, including how the Bankruptcy Code and the

17   applicable state U.C.C. provisions apply to the situation.

18        Second, I considered the testimony of various witnesses

19   about their understanding of the agreements and their reliance

20   on the agreements and statements in the agreements, but at the

21   end of the day that testimony did not move the needle for me

22   on how to rule.

23        Third, I've addressed one argument by the Debtors that

24   there was no value given in the 2001 Security Agreement

25   transaction.  As I noted, even a peppercorn of consideration

1    to support a simple contract sufficed.  The Debtors also argue

2    that there was no consideration for any of the other

3    agreements.  I have considered each agreement carefully, and I

4    conclude that there was at least a peppercorn of consideration

5    for each.

6        Fourth, the Debtors argue that the various agreements,

7    including in 2001, that purport to require payment of the Lags

8    Royalties are for an indefinite term and may be terminated at

9    will.  The Court agrees with Lags's reply brief, Docket 774,

10   that the obligation to pay royalties is perpetual and not

11   terminable at will.  Of course, the Bankruptcy Code

12   and the U.C.C. change the outcome here, as I've addressed at

13   length.

14       Fifth, the Debtors ask that I use my equitable powers

15   under Section 105 of the Bankruptcy Code to discharge any

16   remaining obligation of the Debtors to pay Lags.  I decline

17   that invitation, as there are other Bankruptcy Code sections

18   that directly address the allowance and determination of

19   Lags's claims.

20       Sixth, it appears that the Plan is in a state of flux.

21   For example, the Brand Management Agreement has many

22   references to "NTD:  Subject to ongoing review/revision," and

23   there are other indications that the Plan may be undergoing

24   nonmaterial modifications, or at least they appear to be

25   nonmaterial with respect to the Lags issues.  My ruling is

1  based on the current Plan, as best as I can understand it,

2  with the documents still being revised.

3      Finally, if the Debtors are still ready, willing, and able

4  to proceed with confirmation after my ruling, counsel should

5  contact my courtroom deputy for a setting for the next phase

6  of confirmation.

7      That concludes my ruling.  My law clerk or courtroom

8  deputy will send my draft ruling script to counsel in PDF

9  format.

10     All right.  Are you all still awake?

11         MR. DICKERSON:  Yes, Your Honor.  Chris Dickerson

12  here from the Debtors.

13     Thank you for that, and we appreciate you taking the time,

14  and we will -- I think I can speak for the Debtors' and the

15  Lenders' side -- we do need to confer amongst ourselves.  We

16  will likely also be conferring with Lags.  And then obviously

17  hopefully we will be moving forward with confirmation in

18  chief.  And we will, as you addressed or indicated, we will

19  contact your clerk to coordinate that scheduling.

20         THE COURT:  All right.  And apologies.  I know we had

21  this set for ruling on Monday.  I didn't think I was going to

22  have to cry uncle, but at 12:30 a.m. on Monday morning, I just

23  figured, well, we're not going to get there.  It took us a few

24  more days than I expected.  So thank you for your patience

25  while I tidied up the ruling.

1    All right.  Anything else this afternoon?

2         MR. BATES:  Thank you, Your Honor.  Bryan Bates for

3    Lags Equipment.  Just confirming we will confer with Mr.

4    Dickerson, as indicated, reserving all rights.  And we will be

5    talking with them and take it from there.  Thank you, Your

6    Honor.

7         THE COURT:  All right.  Last call for comments.

8    All right.  Well, thank you all.  I hope you have a good

9    weekend.  The Court will be in recess.

10         MR. ZAHN:  Thank you, Your Honor.

11         MR. DICKERSON:  Thank you, Your Honor.

12    (Proceedings concluded at 4:43 p.m.)

13                          --oOo--

14

15

16

17

18

19

20                        CERTIFICATE

21    I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **09/18/2025**

24   _____        _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

55

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                       4

END OF PROCEEDINGS                                           54

INDEX                                                        55

1  IN THE UNITED STATES BANKRUPTCY COURT

2  FOR THE NORTHERN DISTRICT OF TEXAS

3

4
   ----------------------------x
5  IN THE MATTER OF:                   CASE NO. 25-80078-swe
                                       CHAPTER 11
6  HOOTERS OF AMERICA, LLC,

7            DEBTOR.
   ----------------------------x
8

9            United States Bankruptcy Court

10           110 Commerce Street

11           Dallas, TX 75242

12

13

14

15           Friday, September 19, 2025

16           4:02 p.m.

17

18
   B E F O R E:
19
   HON. SCOTT W. EVERETT
20
   U.S. BANKRUPTCY JUDGE
21

22

23

24     Proceedings recorded by FTR electronic sound recording;
            transcript produced by transcription service.
25

1                          APPEARANCES:

2    FOR THE DEBTOR:                    ZACHARY ZAHN, ESQ.
                                        FOLEY & LARDNER, LLP
3                                       2021 McKinney Avenue
                                        Suite 1600
4                                       Dallas, TX  75201

5                                       CHRIS DICKERSON, ESQ.
                                        ROPES & GRAY, LLP
6                                       1211 North Wacker Drive
                                        32nd Floor
7                                       Chicago, IL  60606

8
     FOR THE OFFICIAL COMMITTEE OF      JUDITH ELKIN, ESQ.
9    UNSECURED CREDITORS:               PACHULSKI STANG ZIEHL &
                                         JONES, LLP
10                                      700 Louisiana Street
                                        Suite 4500
11                                      Houston, TX  77002

12
     FOR CREDITOR, LAGS EQUIPMENT:      AVI MOSHENBERG, ESQ.
13                                      LAWSON & MOSHENBERG, PLLC
                                        2301 Commerce Street
14                                      Houston, TX  77002

15
     FOR DIP LENDERS:                   GENEVIEVE WEINER, ESQ.
16                                      SIDLEY AUSTIN, LLP
                                        1999 Avenue of the Stars
17                                      Los Angeles, CA  90067

18   COURTROOM DEPUTY:                  JB
                                        Clerk's Office
19                                      U.S. Bankruptcy Court
                                        1100 Commerce St., Rm. 1254
20                                      Dallas, TX  75242

21
     TRANSCRIPTION SERVICE:             ACORN TRANSCRIPTS, LLC
22                                      3572 Acorn Street
                                        North Port, FL 34286

23

24

25

1                              C A L E N D A R

2                                                              PAGE

3    STATUS CONFERENCE                                          4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  I'll do my own sound check.  Ms. Elkin

3  or somebody else give me a thumbs up if you can hear me.

4  All right.

5          All right.  So we're on a 4 o'clock status

6  conference in the Hooters case, Case Number 25-80078.  I'll

7  go ahead and take appearances, please.

8          MR. MOSHENBERG:  Hi, Judge.  Good afternoon.  This

9  is Avi Moshenberg here for Lags.  Thanks for seeing us on

10  short notice, Your Honor.

11          THE COURT:  Good afternoon.

12          MS. ELKIN:  Good afternoon --

13          MR. ZAHN:  Good afternoon, Your -- go ahead, Judy.

14          MS. ELKIN:  Good afternoon, Your Honor.  Judy

15  Elkin, Pachulski Stang Ziehl & Jones for the Committee.

16          THE COURT:  Good afternoon.

17          MR. ZAHN:  Good afternoon, Your Honor.  Zachary

18  Zahn with Foley & Lardner on behalf of the debtors.  I

19  believe on line with us is Mr. Dickerson with Ropes & Gray

20  and it looks like a few others from Ropes & Gray.

21          THE COURT:  All right.  Good afternoon.

22          MS. WEINER:  Good afternoon, Your Honor.  This is

23  Genevieve Weiner of Sidley Austin on behalf of the DIP

24  lender.

25          THE COURT:  Welcome back.

1           MS. WEINER:  Thank you.

2           THE COURT:  All right.  Last call for appearances.

3           All right.  Well, thank you all for being on --

4    available on such short notice.  I received word from the

5    courtroom deputy that there was -- I don't know if it was an

6    impasse, but some discussion going on about scheduling the

7    next stage of the confirmation hearing and trying to find

8    some available dates that worked for all the parties, and I

9    guess before we get to the scheduling it might be helpful if

10   we could just start and maybe the debtors could start and

11   tell me -- putting aside the LAGS' issues, which I'll get to

12   in a minute, do you have a rough estimate of how much time

13   you believe you would need for the non-LAGS confirmation

14   issues?

15           MR. DICKERSON:  Your Honor, Chris Dickerson from

16   Ropes & Gray for the debtors.

17           We believe that we will have no objecting party

18   other than LAGS, to the extent they are objecting.  We are

19   working with them to try to get to a consensual resolution.

20   But we believe we've resolved or are about to resolve other

21   -- all other issues.

22           We've resolved our issues with the U.S. Trustee.

23   We have some taxing authorities that we need to agree to a

24   language, but I think that is being -- is very close to

25   being finalized.

1          THE COURT:  All right.

2          All right, then with respect to the Lags' issues,

3   Mr. Moshenberg, could you tell me, maybe we can go through

4   them one-by-one, what remaining issues you intend to present

5   at confirmation, if there's no settlement, one-by-one what

6   are the remaining issues and then we'll chat about them one

7   at a time?

8          MR. MOSHENBERG:  Off the cuff, Your Honor, the

9   remaining issues that are -- we'll be going through three

10  witnesses total.  We plan on examining Mr. Maib about

11  planned components, particularly about best interest of the

12  creditors, feasibility.  Those are the main drivers by far,

13  Your Honor, not to say there won't be other things.  That's

14  the crux of it.

15          In addition to Mr. Maib, we'll be having Mr. Cohen

16  on from Stout, Your Honor, and he will also be talking about

17  the best interest of the creditors analysis and feasibility

18  analysis, as the Court knows, 1129(a)(3) -- excuse me,

19  1129(a)(11).

20          And then also in addition to that, Your Honor, in

21  connection with feasibility we'll also be having Mr. Simeone

22  testify.  That's who we anticipate right now as witnesses in

23  the confirmation hearing.

24          Again, that's not to say, you know, as I sit here

25  today that there won't be other arguments, but I want to be

1   clear the main, main argument's best interest of the

2   creditors.  We have feasibility concerns.  We have big

3   feasibility concerns, Your Honor, and so we'll be holding

4   the debtors to their burden on the plan, Your Honor.

5         THE COURT:  So help me with the -- help me with

6   the logic here.  If you prevail on feasibility and the plan

7   is denied, are you expecting the debtor to file another plan

8   that is feasible?

9         MR. MOSHENBERG:  Your Honor, I haven't gone that

10  far.  I mean, candidly, I think there's a world where a

11  Chapter 7 makes more sense for Lags, but that's not to

12  say -- I think that would be asking me to decide whether

13  there's any plan out there that might work for Lags, and I

14  don't know what the plan terms are.  It's kind of a

15  hypothetical, and I don't mean to punt, Judge, but it's sort

16  of hard to anticipate if there were a different plan whether

17  that would be acceptable to Lags.

18        I know that this plan doesn't work, especially

19  because it's doomed to fail from the outset, and we'll cover

20  that at the confirmation hearing, Judge.

21        THE COURT:  So my kids are really into the Marvel

22  movies and this concept of the multiverse, and so I'm trying

23  to think in the bankruptcy multiverse what outcome would

24  there be a plan where I don't rule the same way on the Lags'

25  issues with respect to the company-owned stores.

1          MR. MOSHENBERG:  I'm having trouble following that

2    question, Judge.  I'm sorry.  I didn't catch that.

3          THE COURT:  So you're -- you want to deny

4    confirmation of the plan in the hopes that it gets converted

5    to a Chapter 7 so that you get nothing?

6          MR. MOSHENBERG:  Well, Judge, it's not that we get

7    nothing, first of all.  It's just the question is under the

8    confirmation elements, under -- is this plan better than a

9    7?  I think the answer is they can't prove it is.

10         In terms of is this plan feasible or is it doomed

11   to fail, I think it's not feasible.  It is doomed to fail,

12   Judge.  And I want to be clear here, and Mr. Simeone is

13   really going to talk to the Court about this at the

14   confirmation hearing, that even when you set aside, you

15   know, the payment under the plan itself, the terms that a

16   creditor like Lags would receive under the plan itself, in

17   addition to that Lags is going to the (indiscernible) with

18   the fate of Hooters going forward, Your Honor, and as you

19   know with the South Florida Wings, Your Honor, royalties.

20   The success of the Hooters' brand, the Hooters' enterprise,

21   the success of that going forward is going to affect what

22   Lags gets just even out of the franchise-owned stores, Your

23   Honor, the franchise stores.

24         And so to endorse a plan, to allow a plan to get

25   confirmed that's doomed to fail it's going to inevitably

1  lead to another reorganization or an eventual liquidation.

2  That's not in Lags' best interest, Your Honor.  It's not in

3  the best interest of anyone who's really sincerely

4  interested in the future growth and success of the Hooters'

5  enterprise.  I don't think this plan is in their interest,

6  and I'm looking forward to putting Mr. Simeone on to explain

7  all that to you, Your Honor, because, you know, candidly,

8  Your Honor, I think the Court saw -- the Court issues

9  testimony that Mr. Simeone of all the people, and of all the

10  parties, and Lags of all the people and all the parties in

11  this proceeding is the one that's most interested in the

12  success of Hooters going forward.

13       And so for us to endorse a plan that cannot pay

14  for itself, for us to endorse a plan that's based on numbers

15  that are not even remotely realistic, projections that are

16  not remotely realistic, that's going to lead to another

17  bankruptcy which is bad for business, that's not a good

18  thing, Your Honor.  We don't endorse that.

19       THE COURT:  So didn't you tell me earlier on that

20  if you won on both counts, the company-owned stores and the

21  wings stores, that you would not contest feasibility?  I'm

22  pretty sure you did.

23       MR. MOSHENBERG:  Correct -- no, we did say that,

24  Your Honor.  I didn't know -- what was the question, Your

25  Honor?  I'm sorry.

1      THE COURT:  So if the plan is not feasible and

2  you're joined at the hip with Hooters, but you had gotten

3  your way in the company-owned stores, you're telling me you

4  would still object to confirmation on feasibility and best

5  interest test because long-term it's not going to work out.

6  Is that -- that seems to be inconsistent with what you told

7  me before, which is that if you prevailed on all counts you

8  would not contest the rest of confirmation.

9      MR. MOSHENBERG:  Well, first of all, Your Honor,

10 we -- we're not in that world.  Just to be clear, we have

11 not prevailed as to the company-owned stores.

12     THE COURT:  No, but I'm talking about the

13 arguments that you made before.  I could be wrong, but I

14 could swear that at some point you guys said if you win and

15 you get your way on the wings stores or wings restaurants

16 and the company-owned restaurants, you wouldn't stand in the

17 way of confirmation on the balance of the issues.

18     Am I remembering incorrectly or does -- am I

19 right?

20     MR. MOSHENBERG:  Well, yes and no, Your Honor.  I

21 think what we clarified at the end of the hearing, that was

22 a statement -- I think you're referring to thing --

23 something I said the first day, Your Honor.  But what we

24 clarified later on is we're still very concerned about this

25 plan because of the -- of what it jeopardizes for Lags'

1  royalties going forward about the future success of the

2  store.

3          I don't have the record cite offhand, but I

4  remember us talking about that, Your Honor, the last day of

5  the hearing.

6          THE COURT:  Was this the before and after lunch

7  comment where I was surprised by your change of position?

8  Maybe that's -- I think there was a before lunch comment

9  that you guys were not going to stand in the way of

10  confirmation.  Then we had lunch and then you -- it's coming

11  back -- and I think after lunch you had a change of heart.

12          MR. MOSHENBERG:  Right.  Well, Judge, and I want

13  to be clear because we're painting with very broad strokes,

14  right, and one of the things I want to be clear when we talk

15  about success versus no success.  In our world, a world of

16  success would have allowed us to pursue direct collection

17  rights against the stores regardless of what happened in

18  this plan.

19          And so if we weren't paid in full in our view of

20  what the documents say what Lags is entitled to in our view,

21  we would have been able to pursue the company-owned stores

22  and receive our royalty from our direct collection rights.

23  And so we weren't quite as joined at the hip in our view of

24  what --

25          THE COURT:  You mean outside of bankruptcy?  I'm

1  not following that.

2              MR. MOSHENBERG:  Yes, Your Honor.  Well, even

3  inside of bankruptcy, Your Honor.  We would have had that

4  direct collection right.  Even if the plan had been

5  confirmed, if we weren't being paid and we had a direct

6  collection right against the company and the stores

7  regardless of how well the plan performed, we would have

8  had --

9              THE COURT:  That's not correct.  That's not

10 correct.  I determined that your rights for post-petition

11 royalties were cut off by the Bankruptcy Code, not the plan.

12             MR. MOSHENBERG:  Right.  And what you're asking is

13 if we had succeeded would we have still cared, and the

14 answer is yes because under the plan -- the Court was asking

15 and maybe we're not on the same page here  -- the Court was

16 asking now would we have gotten out of the way.  Well, we

17 would have had, had we won entirely.  The answer in part is

18 yes because we would have had direct collection rights.  But

19 the Court --

20             THE COURT:  No, no, no.  When would you have had

21 direct collection rights?  Given that we're in a bankruptcy,

22 even setting aside the plan, I determined that your -- the

23 after-acquired property clause and your direct collection

24 rights to go with it under the security agreement were

25 displaced by a Bankruptcy Code provision that has nothing to

1   do with the plan.  It's the Bankruptcy Code.  It's not the

2   plan that affected your after-acquired property clause and

3   your right to direct collection for post-petition revenues,

4   right?

5           MR. MOSHENBERG:  Well, yeah, but that's -- I

6   wouldn't call that a success in our -- your -- if the

7   question is in a world where we have totally succeeded we

8   would be able to go forward and have direct collection

9   rights, Your Honor, and we would have those post-petition

10  rights to the collateral.

11          I understand the Court made a ruling that, you

12  know, was not a success in our mind.  But we're reserving

13  our rights.  We're going to take that up post-trial, Your

14  Honor, but --

15          THE COURT:  But in a Chapter 7, the -- it's the

16  same result.

17          MR. MOSHENBERG:  I don't think that's quite true,

18  Your Honor, but --

19          THE COURT:  Well, look at the -- let me look at

20  the code.  There are certain code provisions that apply in

21  11 and a 7.  Offhand, I don't think 552 is one of them.  Let

22  me look.

23  (Pause)

24          MR. MOSHENBERG:  Your Honor, and I say this

25  respectfully, we disagree with the Court's ruling on 552,

1   and that's -- I guess that's where we're on the different

2   page because I think you're presenting it in a world where

3   we agree with you on the ruling of 552 (indiscernible).

4            THE COURT:  No, I understand.  But you're -- you

5   have the right to appeal and so I'm trying to figure out --

6   what I'm really getting at is the continuing confirmation

7   objection -- well, I guess I ought to be careful what I say.

8   Is it really just to cause delay and expense because I'm not

9   seeing in the bankruptcy multiverse any situation where your

10  client is better off than appealing my ruling, other than a

11  dismissal of the case.

12           MR. MOSHENBERG:  So there's a lot to unpack there.

13  So let me take it one step at a time, Your Honor.  First and

14  foremost, I think my communications to the Court -- I'm not

15  sure if you saw my emails directly to your staff, Your

16  Honor.  We're talking about --

17           THE COURT:  Let me -- I purposely don't see those.

18  So --

19           MR. MOSHENBERG:  Okay.

20           THE COURT:  -- the only information that I got

21  from my courtroom deputy is that the parties were in

22  discussions on the next phase of the hearing and there was a

23  disagreement on days.  I don't see the emails.  I don't want

24  to see the emails, so I have not seen the emails.

25           MR. MOSHENBERG:  Can we -- if you can -- let me

1  give a little bit of foundation here, Your Honor.  I think

2  that would help.

3        The reason that we had an issue is with this

4  coming Wednesday because it's a Jewish holiday, Your Honor.

5        THE COURT:  I did hear that.  I did hear that.  I

6  did hear they were trying to reschedule days and I

7  understand there's some Jewish holidays coming up over the

8  next couple of weeks.  So I got that, but I didn't see any

9  of the emails themselves.

10       MR. MOSHENBERG:  Sure.  But my point is the first

11 point the Court raised is are we trying to do this for delay

12 and increase expense.  We're talking about moving

13 confirmation a few days, Your Honor.  No one's talking about

14 anything significant.  We're just --

15       THE COURT:  No, but I'm -- but I'm not talking

16 about the scheduling issue yet.  I'm just talking generally

17 about what are you trying to do whenever we set it.  So I'm

18 not talking about the scheduling issue yet.  I'm just trying

19 to understand what the issues are --

20       MR. MOSHENBERG:  Sure.

21       THE COURT:  -- that you're arguing.  It doesn't

22 matter when they're set.  So --

23       MR. MOSHENBERG:  Yeah, in terms --

24       THE COURT:  -- we'll get -- so we'll get to

25 scheduling in a minute.  So I'm just trying to understand

1   what are you trying to accomplish for your client.

2          MR. MOSHENBERG:  We're trying to accomplish this

3   plan, Your Honor, is a bad plan.  And I understand that the

4   Court is skeptical about whether -- what the better

5   alternatives are, but the question under the Bankruptcy Code

6   is is this plan confirmable or is it not, and it's their

7   burden to prove it.  And what we intend to show where we've

8   objected, Your Honor, we have rights, and what we intend to

9   show is this plan is not confirmable.  What happens the day

10  after if the Court finds that the plan's not confirmable?

11  What options are available then?  I leave that to the Court,

12  Your Honor, and we can revisit that.

13         But the question is the Court has been presented

14  with a plan.  The debtor must prove certain elements under

15  1129.  Those elements include whether their plan is

16  feasible.  The Court is going to hear evidence that the

17  numbers and their projections are concocted, to put it

18  lightly, Your Honor.  They're not realistic.  That the

19  plan's terms, the math does not work out.  The plan will not

20  pay for itself and then it's going to eventually lead to a

21  reorganization or a liquidation.

22         And I think we're parties-in-interest, we get to

23  raise that, and we get to hold the debtor to their burden,

24  and I don't -- I don't know why we have to endorse and --

25  you know, I don't know why we have to be onboard of the

1  plan, why we have to be forced to agree to a plan we don't

2  agree to, Your Honor, that we have a problem --

3          THE COURT:  I didn't say -- I didn't say you had

4  to be onboard.  I was trying to understand what your

5  objection was, because I wasn't understanding what it was,

6  and I'm trying to figure out --

7          MR. MOSHENBERG:  Sure.

8          THE COURT:  -- how much time -- how much time it's

9  going to take to resolve it.  So --

10          MR. MOSHENBERG:  Sure.

11          THE COURT:  -- tell me again.  So the --

12          MR. MOSHENBERG:  I think --

13          THE COURT:  -- the witnesses that you intend to

14  call are -- give them to me again.

15          MR. MOSHENBERG:  Well, the three witnesses that I

16  imagine will be testifying -- we weren't going to -- I

17  suspect that they were going to call Mr. Maib and we would

18  cross-examine Mr. Maib.  Then we would have Mr. Cohen and

19  then we would have Mr. Simeone.

20          THE COURT:  Let's do it -- sorry, one at a time.

21          MR. MOSHENBERG:  Sure.

22          THE COURT:  Mr. Maib, how much time do you

23  anticipate with -- for your questions for Mr. Maib?

24          MR. MOSHENBERG:  I think two hours would be very

25  conservative.  I think it would be probably closer to an

1  hour.

2          THE COURT:  Okay.  One to two hours.

3          Next witness?

4          MR. MOSHENBERG:  It would be Mr. Cohen.  I think

5  we would be putting on a direct not knowing how long they

6  would want to cross him for.  I think the direct would

7  probably take about, again, probably an hour, but let's say

8  two hours to be very conservative.  More like an hour.

9          THE COURT:  This is your feasibility expert?

10          MR. MOSHENBERG:  And best interest of the

11  creditors, yes, Your Honor.

12          THE COURT:  Okay.

13          And then Mr. Simeone?

14          MR. MOSHENBERG:  Correct.  That would be, again,

15  about an hour, maybe two hours just to be conservative

16  again.  I'm not picturing -- you know, I think it's

17  basically a full -- one full day on our issues, Your Honor,

18  I think is fair to say.

19          THE COURT:  All right.  And that -- this is part

20  of the reason I was asking because I'm -- I was having

21  trouble finding time on the calendar for back-to-back days

22  with the schedule.

23          MR. MOSHENBERG:  Sure.

24          THE COURT:  I'm trying to figure out an open day

25  that -- where we can potentially get all this knocked out,

1  and I have on my notes that sundown on September 22nd, the

2  nightfall on September 24th are out.  Is that correct?

3           MR. MOSHENBERG:  I'm sorry, the audio cut out.

4  Would you mind saying that again, Judge?

5           THE COURT:  Sure.  The -- your conflict days, I'm

6  assuming September 22nd to the 24th?

7           MR. MOSHENBERG:  Yeah, that's technically the Rosh

8  Hashanah period.  I mean, the hearing was only set for the

9  24th, so I will mention that.  But, yes, that's the Rosh

10  Hashanah and then Yom Kippur, Your Honor, is October 1st at

11  sundown, October 2nd sundown.

12           THE COURT:  All right.  So let me ask the parties,

13  would October 30th be too far out?  There's one hearing set

14  on that day that I think I can move, which would give you

15  the full day on October 30th.  The alternatives are partial

16  days at some point next week.  So --

17           MR. DICKERSON:  You mean September 30th, I assume,

18  Your Honor.  I'm sorry.  Chris Dickerson.

19           THE COURT:  What did I say?

20           MR. DICKERSON:  You said October.

21           THE COURT:  I'm sorry.  September 30th.  September

22  30th we have one hearing in the afternoon that I think I can

23  move, which would give you the full day on the 30th.

24           MR. MOSHENBERG:  Judge, for LAG -- I'm sorry.

25           THE COURT:  I'm sorry, go ahead, Mr. Moshenberg.

1          MR. MOSHENBERG:  Oh, no, I was going to say that

2     for Lags that will work for us, Your Honor, and we

3     appreciate that.

4          MR. DICKERSON:  So, Your Honor, Chris Dickerson on

5     behalf of the debtors, and I appreciate the effort to try to

6     make sure that we don't interfere with anyone's religious

7     commitments.  I certainly get that.

8          What I would like to point out, though, is that we

9     are, without getting into substance because I don't think it

10    would be appropriate at this time, we're having

11    conversations with Lags with respect to the open issues, and

12    I am relatively optimistic that we can come to an

13    understanding and an agreement.

14         I think that there are some other issues that are

15    of import, most notably around the escrow that was put in

16    place because of the DIP, and the interplead funds that is

17    important to Lags.  It's important to the debtors and other

18    parties as well.

19         And so we are working diligently to try to get to

20    an agreement with respect to that, and I'm hopeful that in

21    light of that, that may result in us not having to have any

22    contested issues.

23         I know we're not there, but my point is is that to

24    the extent that we do get there, I think it makes sense to,

25    if it's okay with Your Honor, to keep the 24th, the

1   afternoon of the 24th.  That would be if we don't have any

2   contested issues, and if not, if we are having a contested

3   hearing then keep the 30th.  I know that's tying up your

4   calendar, Your Honor, but I think that would be helpful to

5   the parties because I'll channel my -- what I know Ms.

6   Weiner will say with respect to the DIP lender side is that

7   this is an expensive case, and the sooner that we get it out

8   of bankruptcy the better for all parties, including Lags, as

9   Your Honor has rightly pointed out.

10          And then I'll -- I just need to say that I'm

11  really struggling with the feasibility argument in that

12  the -- I do remember that Lags did indicate if that they had

13  won completely that they would not argue feasibility.  And

14  so for them to say that now that they have won, you know,

15  half that that somehow makes -- changes the plan to be un --

16  infeasible, that doesn't make sense.  It defies logic

17  because the -- if Lags had won completely, we would have

18  to -- the new owners would have to pay them a significantly

19  larger amount of money going forward.  So by definition,

20  it's only better from a feasibility standpoint.

21          So I'll stop there and respectfully request that

22  we keep the 24th in the hopes that we're not fighting.  But

23  if we can't, then the debtors are available on the 30th.

24          THE COURT:  So, Mr. Moshenberg, if you reach an

25  agreement by the 24th, would somebody be able to stand in

1  for you?

2          MR. MOSHENBERG:  I wouldn't, but I could -- we

3  could figure that out.  That would assume an agreement.  But

4  just to be very clear, Your Honor, on the confirmation fight

5  I am the one leading that charge, and so I -- if we had a --

6  we could not do the 24th if there was a dispute, Your Honor,

7  just to be clear.

8          But the -- that being said, I just want to just

9  quickly address -- like I said, the 30th is fine for us.

10          I just want to be clear, Your Honor, we've invited

11  discussions.  It's been a lot of radio silence.  We've

12  communicated what we want.  I'm hopeful.  I'm taking

13  Mr. Dickerson at his word that we're going to hear back and

14  hear great things.  We certainly have been wanting to talk,

15  so I'm hoping that happens, Your Honor.

16          But I just want to be clear, I'm not sure -- I

17  don't -- I don't want to lead the Court on.  So far we

18  haven't heard anything, and so I think more realistically,

19  unless things change dramatically, we'll be going forward on

20  the 30th, Your Honor.

21          As for feasibility, I think we've already

22  discussed it, but I'll say one last point, which is none of

23  this is supported by any authority in the Bankruptcy Code.

24  The Bankruptcy Code is very simple.  You have to establish

25  under 1129 the plan you're proposing, the debtor has to

1  propose, is feasible.  That's the analysis.  It's that

2  simple.

3         If it is, that element is checked off.  If it

4  isn't, that element is not checked off and the plan cannot

5  be confirmed.  All of this other questions about Lags'

6  motivations and sincerity and all of this stuff, Your Honor,

7  I can address it.  I can speak to it, but the reality is it

8  is a red herring under the Bankruptcy Code.  They're trying

9  to confuse the issue, which is they have a burden to prove

10 this plan is feasible.

11        And I bring all that up, Your Honor, because as

12 we're preparing for the 30th, I would like to invite the

13 Court to set a hard plan supplement deadline because a lot

14 of the documents that are supposed to be there to support a

15 plan have not been provided, including the indenture, Your

16 Honor.  And so that -- you know, that matters, Your Honor.

17 We want to hold them to their burden because this plan, as

18 far as we know, it is not a good plan.

19        And so I'm not trying to create a rabbit hole.

20 What I'm trying to do is to close off rabbit holes.  They

21 have a burden.  They need to produce documents.  We're ready

22 to go forward on the 30th, and I really hope that the

23 debtors and the lenders come to us before then and we can

24 work out something, but it hasn't happened yet, Your Honor.

25        MR. DICKERSON:  Your Honor, just -- I'm sorry,

1  Your Honor.  I just have to speak about this because this

2  is -- I've talked to Mr. Bates, who represents Lags, every

3  day since your ruling about issues to try to come to a

4  resolution.  So for Mr. Moshenberg to say that we haven't

5  talked to the Lags' side at all is completely

6  mischaracterizing what has happened and I'm outraged that he

7  would even say that.  We are working diligently to try to

8  resolve every issue.  And, lastly, we will meet our burden

9  with respect to providing all of the requirements under

10 1129.  We look forward to doing that.

11         So, Your Honor, again, I'm hopeful, given my

12 conversations with Mr. Bates, that we can come to a

13 resolution by the 24th and will not have to burden Your

14 Honor's Court with anything more than putting on the last of

15 the evidence that's needed to -- for you to confirm this

16 plan.  And if not, then we're happy to move forward on the

17 30th on a contested basis, and we will meet our burden then.

18 Thank you.

19         THE COURT:  All right.  Just now I'm curious,

20 Mr. Moshenberg, are you in touch with Mr. Bates, and is it

21 correct that he's been on the phone with Mr. Dickerson every

22 day for the -- it's kind of a side issue, but you did say

23 there's been radio silence since my ruling, and if in fact

24 Mr. Dickerson's been talking with Mr. Bates, are you sure

25 there's been radio silence?

1        MR. MOSHENBERG:  There's been radio silence in

2  terms of responses to the offers that we've made, is my

3  understanding.  They -- I know they have spoken.  If I

4  wasn't clear, what I'm saying is we made certain offers.

5  They have not been responded to.  In the big picture, Your

6  Honor, and that's --

7        THE COURT:  Okay.

8        MR. MOSHENBERG:  -- that's what I was trying to

9  convey.

10        THE COURT:  Okay.

11        MR. MOSHENBERG:  Yeah.

12        THE COURT:  So that's enough of that.  So just to

13  confirm, if things work out and there's an agreement,

14  somebody else is available to stand in for you on the 24th

15  so we can keep that date.  Is that correct?

16        MR. MOSHENBERG:  If it's remote, if you're okay

17  with remote, Your Honor, then I can confidently say yes.

18  We'll figure that out.

19        THE COURT:  Yes, absolutely.

20        MR. MOSHENBERG:  Okay.

21        THE COURT:  Absolutely.  And then if -- let me --

22  I'm going to check on one thing.  I was doing some advance

23  planning on the possibility of moving the other hearing

24  that's set on September 30th.  Let me see if I have any

25  updates on that real quick.

1          All right.  Well, I'm going to make the executive

2    decision that, yes, I'm going to free up the 30th.

3          MR. MOSHENBERG:  I really appreciate that, Judge.

4          THE COURT:  So the 30th at -- what time would the

5    parties like to start on the 30th, 9 o'clock or 9:30?

6          MR. DICKERSON:  The debtors are available as early

7    as possible, Your Honor.

8          MR. MOSHENBERG:  Same boat, Judge, and I just --

9    again, I want to stress that I appreciate the Court

10   accommodating our conflict.

11         THE COURT:  Not a problem.  So we'll do --

12   Mr. Dickerson, if you could do a notice of hearing then

13   that -- well, it will be on usual hearing, but it's -- we're

14   going to pencil in both the 24th and the 30th.  If things

15   work out, then the 30th will come off.

16         MR. DICKERSON:  We'll do that, Your Honor.

17         THE COURT:  How about 9 o'clock in the morning,

18   that way -- we can also start at 8:30.  If you want to be

19   conservative, we can start at 8:30 Central Time in the

20   morning or 9, whatever -- whatever you all think.

21         MR. MOSHENBERG:  9 works great for us, Your Honor.

22         MR. DICKERSON:  9 is fine, Your Honor.

23         THE COURT:  All right.  All right, very good.

24         MR. DICKERSON:  And we will get the notice out.

25         THE COURT:  Okay.  Do we -- I don't want to

1   prolong the video hearing but, Mr. Dickerson, do you want to

2   address the request from Mr. Moshenberg about any plan

3   supplements?

4           MR. DICKERSON:  Your Honor, I think as we've

5   discussed previously, I think that's a little bit of, again,

6   looking for reasons to provide for a delay.  We have

7   provided near final forms of all the plan supplement

8   documents.  The only remaining holes are ones that are not

9   material to any creditor's decision with respect to whether

10  or not the plan meets the confirmation standards.

11          We are continuing to provide and to work with

12  those documents.  We will -- we will file them in due

13  course.  To the extent that we end up having an issue and

14  are contest -- have a contested hearing on the 30th, we're

15  happy to address any specific issues that Lags would raise

16  as to why that a near final document isn't sufficient for

17  them to have analyzed and determined whether or not we meet

18  our burden with respect to the confirmation standards.

19          I don't think that there's anything that's missing

20  now that would prevent them from understanding what it is on

21  a go forward basis.  And most importantly, as you rightly

22  point out, it is in their interest that we be able to move

23  forward and get out of bankruptcy and allow this company to

24  operate outside of bankruptcy so that it works for the

25  benefit, obviously, of all the other franchisees and

1  employees and others, as well as the Lags' franchisees.

2          THE COURT:  All right.  So, Mr. Moshenberg, I

3  guess we'll take up any open issues on the 30th, and I wish

4  you all good luck.  I hope things work out.  I hope we have

5  an agreed confirmation hearing on the 24th.  If not, not a

6  problem.  I'll be available to call balls and strikes on the

7  30th.

8          MR. MOSHENBERG:  Thank you, Judge.

9          MR. DICKERSON:  Thank you, Your Honor.

10          THE COURT:  All right.  Anything else for this

11  afternoon?

12          COURTROOM DEPUTY:  Judge, I have a question.

13          THE COURT:  Yes.

14          COURTROOM DEPUTY:  This is Jenni.  Is it going to

15  be the 24th at 9:30 or at the regular -- the scheduled time

16  at 2?  Because I had -- I had floated the idea of an earlier

17  start since our matter came off.

18          MR. DICKERSON:  Your Honor, if I -- if I may.  I

19  think if we do not -- if we do in fact have an agreement

20  with Lags, which again I will work diligently to try to get

21  there and I'm hopeful that we will, I don't think we need to

22  start earlier in the day.  We can just keep the 2 o'clock.

23          COURTROOM DEPUTY:  Okay.  Thank you.

24          THE COURT:  All right.  Very good.  So we'll be

25  looking for a notice of hearing then for the 24th at 2

1    o'clock and the 30th at 9 o'clock a.m..

2              MR. MOSHENBERG:  Thanks again, Your Honor,

3    especially on a Friday.  I appreciate that.

4              THE COURT:  No --

5              MR. DICKERSON:  Your Honor, I thought that someone

6    else was trying to make a point, but just --

7              MS. WEINER:  Oh, thank you, Mr. Dickerson.  This

8    is Genevieve Weiner with Sidley.  I was actually asking the

9    same question with respect to the time on the 24th, because

10   I had heard rumblings of an earlier start.  So I'm set, but

11   thank you though.

12             THE COURT:  All right.  And I'll -- I see Mr.

13   Stanford.

14             MR. STANFORD:  Yes, Your Honor, yes.  I represent

15   Sheer Services, LLC.  We have a small matter that's on the

16   agenda under the assumption and cure objections.  The agenda

17   that was filed with the Court showed that the debtor was

18   going to proceed through final approval of disclosure

19   statements and Chapter 11 plan confirmation first before

20   moving onto those issues.  I see there's a handful of

21   matters.  If there is a settlement agreement for

22   confirmation next Wednesday, then is it the Court's

23   intention to move on to assumption and cure issues or that

24   would be on the 30th?

25             THE COURT:  I'll have to ask Mr. Dickerson to

1  weigh in.

2          MR. DICKERSON:  I think if we have a deal, Your

3  Honor, with Lags, then I think we can address those issues

4  for sure on the 24th.

5          MR. STANFORD:  Okay.

6          THE COURT:  Does that work for you, Mr. Standford?

7          MR. STANFORD:  Yes, certainly.

8          THE COURT:  All right.  I'll pause just to see if

9  anybody else has any other comments, questions, or concerns.

10         MS. WEINER:  I apologize, Your Honor.  This is

11 Genevieve Weiner with Sidley again.  I did have one more --

12 I'm not sure which of the dockets it falls in, but in terms

13 of your ruling, Your Honor's ruling from the 12th, and in

14 particular with respect to any time for an appeal to the

15 extent ether of the parties -- I heard Mr. Moshenberg make

16 reference to post-trial remedies.  Is there going to be an

17 order embodying that ruling or will it be in the

18 confirmation order?

19         THE COURT:  It doesn't matter to me.  I can -- I

20 guess I was thinking that it would just be wrapped up in the

21 confirmation order.  If the parties want to prepare a --

22 well, let me think about that -- do the parties have a

23 preference?  Sitting here, I don't -- I'm not thinking of a

24 strong preference.  You can probably build it into the

25 confirmation order and just incorporate my ruling that way,

1  unless you want a separate order.

2         MS. WEINER:  No, I think certainly from my

3  perspective the confirmation order is fine.  I just wanted

4  to make sure that the parties had a clear view of what the

5  timeline was for any appeal.  And so I think the way I see

6  it then is to the extent your ruling, Your Honor's ruling is

7  embodied in the confirmation order, then the 14-day appeal

8  period would start from entry of confirmation order.

9         THE COURT:  Yeah, even if I did a separate order,

10 it would be, I think, an interlocutory order which would

11 then be wrapped up in the confirmation order.  So I don't

12 think the appellate deadlines will change.  So I don't -- I

13 don't think it matters either way, but -- for planning

14 purposes if you just want to plan on building it into the

15 confirmation order, I think that works.

16        Or if you disagree about the appellate deadline,

17 I'm all -- I'm happy to consider your thoughts.  But just

18 sitting here, I don't -- I don't think a separate order on

19 Phase 1 of confirmation would be appealable until the

20 confirmation order is entered.  But that's just off the top

21 of my head.

22        Is it okay with the parties, can we build it into

23 the confirmation order?

24        MR. MOSHENBERG:  Judge, I'm not -- I mean, I'd

25 have to dig into the law that -- to just get to the bottom

1   of that.  I've seen some mixed things in the past about when

2   a Court makes something in writing, a decision, that might

3   trigger some deadlines.  And so I don't -- I don't know

4   offhand, so I don't want to say yes or no, Your Honor.  I

5   just -- I'm letting you know.  I'm not trying to -- I just

6   don't know the answer offhand about when the actual deadline

7   would be triggered because you did give us the draft order

8   that you read orally, Your Honor.  I don't know if that keys

9   the deadlines or not.  I just don't know.

10           THE COURT:  Well, I hope you all have -- you

11  should take 100 percent comfort that that -- I did not

12  intend that to trigger any deadlines.  Giving you a draft is

13  really just a courtesy so that you can start looking at the

14  unofficial ruling, so you didn't have to wait for a

15  transcript.  And so --

16           MR. MOSHENBERG:  Understood.

17           THE COURT:  -- to the extent you need

18  clarification, it's my intent that my ruling on that -- the

19  Lags' core issues I consider to be integrally related to

20  confirmation.  There are no appellate deadlines running.  I

21  did not intend that to be a final order.  I think it would

22  make sense to build or have the confirmation order

23  incorporate my ruling because I consider that Phase 1 of

24  confirmation.

25           MR. MOSHENBERG:  That's fair, Judge.

1              MS. WEINER:  Thank you, Your Honor.  That's

2     very -- that's very clarifying.  Thank you.

3              THE COURT:  All right.  All right.

4              Well, last call for any other comments, questions,

5     concerns.

6              MR. MOSHENBERG:  No, Your Honor.  We appreciate

7     it.

8              THE COURT:  All right.  Well, thank you.

9     (Proceeding concluded at 4:39 p.m.)

10

11              C E R T I F I C A T E

12

13              I, Nancy B. Gardelli of Acorn Transcripts, LLC,

14    court-approved transcriptionist, hereby certify that the

15    foregoing transcript is a correct transcript, to the best of

16    my ability, from the official electronic sound recording of

17    the proceedings in the above-entitled matter.

18

19    ACORN TRANSCRIPTS, LLC

20

21

22    /s/ *Nancy B. Gardelli*            Dated:  September 24, 2025

23    Nancy B. Gardelli

24    Federally Approved Transcriptionist

25                        *  *  *

# **EXHIBIT A**

## **Plan**

[*Filed at Docket No.1142*]

**ROPES & GRAY LLP**

Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
Michael K. Wheat (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com
michael.wheat@ropesgray.com

*Counsel to the Debtors*

**FOLEY & LARDNER LLP**

Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: honeil@foley.com
sajones@foley.com
zzahn@foley.com

*Co-Counsel to the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>Hooters of America, LLC, *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 25-80078 (SWE)<br><br>(Jointly Administered) |

**FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF HOOTERS OF AMERICA, LLC AND ITS AFFILIATED DEBTORS**

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

# TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, AND GOVERNING LAW** ........................................................................... 1

    A.    Defined Terms ............................................................................................1

    B.    Rules of Interpretation ...............................................................................25

    C.    Computation of Time .................................................................................26

    D.    Governing Law ..........................................................................................26

    E.    Reference to Monetary Figures...................................................................27

    F.    Reference to the Debtors ............................................................................27

    G.    Controlling Document ...............................................................................27

    H.    Certain Consent Rights ..............................................................................27

**ARTICLE II ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**............................ 28

    A.    Administrative Claims ...............................................................................28

    B.    DIP Claims ...............................................................................................29

    C.    Professional Fee Claims .............................................................................30

    D.    Priority Tax Claims....................................................................................31

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**
........................................................................................................................... 32

    A.    Summary of Classification..........................................................................32

    B.    Treatment of Claims and Interests ..............................................................33

    C.    Special Provision Governing Unimpaired Claims..........................................39

    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code ........................................................................................................39

    E.    Subordinated Claims .................................................................................39

    F.    Elimination of Vacant Classes ....................................................................40

    G.    Voting Classes; Presumed Acceptance by Non-Voting Classes.........................40

    H.    Controversy Concerning Impairment ...........................................................40

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN**.................................. 40

    A.    Finality of Distributions.............................................................................40

    B.    No Substantive Consolidation.....................................................................41

    C.    Sources of Consideration for Plan Distributions ...........................................41

    D.    New Debt .................................................................................................41

    E.    New Equity Interests..................................................................................42

    F.    New Organizational Documents..................................................................42

    G.    New Board ...............................................................................................43

H.  Vesting of Assets in the Reorganized Debtors ......................................................43

I.  Wind-Down Process and Wind-Down Officer ......................................................43

J.  Litigation Trust ......................................................44

K.  Litigation Trustee......................................................46

L.  New HOA Franchise HoldCo ......................................................48

M.  Creation of HOA NewCo......................................................48

N.  Cancellation of Existing Interests, Indebtedness, and Other Obligations............48

O.  Corporate Action......................................................50

P.  Effectuating Documents; Restructuring Transactions ......................................................50

Q.  Exemption from Certain Taxes and Fees......................................................51

R.  Preservation of Causes of Action......................................................52

S.  Insurance Policies ......................................................53

T.  Closing of Chapter 11 Cases ......................................................54

U.  Dissolution of Certain Debtors ......................................................54

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**......................................................**54**

A.  Assumption and Rejection of Executory Contracts and Unexpired Leases ..........54

B.  Claims Based on Rejection of Executory Contracts or Unexpired Leases............56

C.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .........56

D.  Dispute Resolution......................................................57

E.  Modifications, Amendments, Supplements, Restatements, or Other Agreements 58

F.  Reservation of Rights......................................................58

G.  Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)..............58

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ......................................................**59**

A.  General......................................................59

B.  Timing and Calculation of Amounts to Be Distributed ......................................................59

C.  Rights and Powers of Distribution Agent ......................................................59

D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........60

E.  Securities Registration Exemption......................................................62

F.  Compliance with Tax Requirements......................................................63

G.  Allocations ......................................................64

H.  No Postpetition Interest on Claims ......................................................64

I.  Setoffs and Recoupment ......................................................64

J.  Claims Paid or Payable by Third Parties ......................................................65

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** .................................................................. **66**

    A.    Allowance of Claims and Interests ................................................66

    B.    Claims and Interests Administration Responsibilities .........................66

    C.    Estimation of Claims........................................................67

    D.    Adjustment to Claims Register Without Objection .............................67

    E.    Time to File Objections to Claims .............................................68

    F.    Disallowance of Claims ......................................................68

    G.    Amendments to Claims .......................................................68

    H.    Disputed Claims Reserve ....................................................68

    I.    Distributions After Allowance ...............................................70

    J.    Single Satisfaction of Claims ...............................................70

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................................................................... **70**

    A.    Compromise and Settlement of Claims, Interests, and Controversies..................70

    B.    Discharge of Claims and Termination of Interests ...............................71

    C.    Releases by the Debtors ......................................................71

    D.    Releases by the Releasing Parties ............................................73

    E.    Exculpation ................................................................74

    F.    Injunction .................................................................75

    G.    Debtor D&O Claims ..........................................................76

    H.    No Release of Any Claims Held by Governmental Units ..........................77

    I.    Subordination Rights .......................................................77

    J.    Release of Liens ............................................................77

**ARTICLE IX CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** .... **78**

    A.    Conditions Precedent to the Effective Date .....................................78

    B.    Waiver of Conditions........................................................80

    C.    Substantial Consummation ...................................................80

    D.    Effect of Non-Occurrence of Conditions to the Effective Date............................80

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** **80**

    A.    Modification and Amendments....................................................80

    B.    Effect of Confirmation on Modifications .......................................81

    C.    Revocation or Withdrawal of the Plan...........................................81

**ARTICLE XI RETENTION OF JURISDICTION** ................................................................. **82**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ................................................................. **85**

iii

A.    Votes Solicited in Good Faith ................................................................................85

B.    Immediate Binding Effect ......................................................................................85

C.    Additional Documents ...........................................................................................86

D.    Payment of Statutory Fees .....................................................................................86

E.    Reservation of Rights .............................................................................................86

F.    Successors and Assigns ..........................................................................................86

G.    Service of Documents ............................................................................................86

H.    Term of Injunctions or Stays .................................................................................88

I.    Entire Agreement ...................................................................................................89

J.    Nonseverability of Plan Provisions ........................................................................89

K.    Dissolution of Committee ......................................................................................89

L.    Expedited Tax Determination ................................................................................89

## INTRODUCTION

Hooters of America, LLC and its Debtor affiliates propose this *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors*. Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in Article IA of the Plan.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    **Acquired Causes of Action** means, (A) with respect to a Restaurant that becomes subject to a Closing, all avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law against any counterparty to an Assigned Contract relating to such Restaurant, Transferred Employee of such Restaurant, or any vendor, supplier, merchant or manufacturer that continues to conduct business with such Restaurant post-Closing, provided that the foregoing claims or causes of action shall be waived at such Closing, and (B) to the extent primarily related to the Assumed Liabilities assumed by Buyer or a Relevant Buyer Designee at a Closing, or to the extent relating to the ownership or operation of the Acquired Assets following such Closing, all other rights, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment of the Relevant Selling Entity against third parties (i.e., Persons other than the Relevant Selling Entity or any of its Affiliates or  representatives). Any capitalized terms used in this definition that are not otherwise defined in the Plan shall have the meanings ascribed to them in the Buyer Group APAs.

2.    **Ad Hoc Group** means the ad hoc group of Holders of Securitization Notes Claims under the Prepetition Securitization Indenture represented by the Ad Hoc Group Advisors.

3.    **Ad Hoc Group Advisors** means (i) White & Case LLP, counsel to the Ad Hoc Group, (ii) Gray Reed, local counsel to the Ad Hoc Group, and (iii) M3 Partners, LP, financial advisor to the Ad Hoc Group.

1

4.      ***Adjourned Cure Dispute*** shall have the meaning ascribed to such term in Article V.D of the Plan.

5.      ***Administrative Claim*** means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) Restructuring Expenses; (iv) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (v) fees payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; and (vi) DIP Claims.

6.      ***Administrative Claims Bar Date*** means the deadline for filing request for payment of an Administrative Claim, except for Professional Fee Claims, Restructuring Expenses, and DIP Claims, which shall be the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

7.      ***Affiliates*** means "Affiliates" as such term is defined in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that directly or indirectly wholly owns or controls such Entity or any other Entity that is directly or indirectly wholly-owned or controlled by such Entity.

8.      ***Allowed*** means with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest arising on or before the Effective Date that is either (a) evidenced by a Proof of Claim or Interest that is, as applicable, timely Filed by the Claims Bar Date in accordance with the Claims Bar Date Order or this Plan, (b) a Claim for which a Proof of Claim is not or shall not be required to be Filed pursuant to the Plan, the Bankruptcy Code, DIP Orders, or a Final Order of the Bankruptcy Court, (c) listed in the Schedules, if any, as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed by the applicable Claims Bar Date; (ii) Allowed pursuant to the Plan, written agreement of the Litigation Trust, or a Final Order (including the DIP Order); provided that, with respect to a Claim or Interest described in clauses (a)-(c) above, such Claim or Interest shall be considered Allowed only if and to the extent that, with respect to such Claim or Interest, no objection to the allowance thereof or motion for estimation has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection or motion is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; provided, further, that unless expressly waived by the Plan, the Allowed amount of a Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

9.      ***Alternative Proposals*** means proposals other than the Buyer Group's proposal, for the acquisition of assets which the Buyer Group seeks to acquire.

10.     ***Approved Budget*** means the budget approved by the Required DIP Lenders and Required Consenting AHG Noteholders in accordance with the DIP Facility Documents.

2

11.     ***Assumption Dispute*** means a pending objection relating to assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

12.     ***Assumption Schedule*** means the schedule of Executory Contracts and Unexpired Leases that will be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to another Entity pursuant to the Plan or the Buyer Group Arrangements, as applicable, to be Filed as part of the Plan Supplement, and as may be amended, supplemented, or modified from time to time in accordance with the Plan, the Confirmation Order, and the Buyer Group Documents.

13.     ***Avoidance Actions*** means any and all actual or potential avoidance, recovery, subordination, or other similar Claims and Causes of Action (including, but not limited to any preference, fraudulent transfer, or similar causes of action) that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, or other similar related, local, state, federal statutes and common law.

14.     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

15.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent any reference made under section 157 of the Judicial Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of the District Court having jurisdiction over the Chapter 11 Cases under section 151 of the Judicial Code.

16.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under sections 2075 of title 28 of the United States Code, 27 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

17.     ***BMA Physical Assets*** means all physical assets transferred to RoyaltyCo pursuant to that certain Bill of Sale dated as of the Effective Date between Hooters of America, LLC and RoyaltyCo.

18.     ***Brand Management Agreement*** means that certain agreement between Hooters Brand Management, LLC, as manager, HOA Franchise HoldCo LLC, as Franchise HoldCo, HOA Systems, LLC, as licensor, HI Limited Partnership, as licensor and IP Owner (as such term is defined therein), HOA Future Franchising, LLC, as franchisor, HOA Franchising, LLC, as franchisor, and Hoots Franchising, LLC, as franchisor, that memorializes the brand-related, franchising-related, and management-related functions to be performed by Hooters Brand Management, LLC on and after the Effective Date, together with all schedules, exhibits, and ancillary documents thereto.

19.     ***Business Day*** means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York are required or authorized to close by law or other governmental action.

20.     ***Buyer Group*** means Hooters, Inc. and Hoot Owl Restaurants, LLC, and, as applicable, their respective Buyer Group SPEs.

21.     ***Buyer Group APAs*** means the two separate asset purchase agreement by and among the Debtors and the Buyer Group, pursuant to which the Buyer Group (or their respective Buyer Group SPEs) will acquire substantially all assets of certain Debtor-owned restaurants and assume certain limited liabilities related thereto, together with all schedules, exhibits, and ancillary documents thereto, on the terms and conditions set forth in therein.

22.     ***Buyer Group Arrangements*** means the series of transactions and agreements contemplated by the Buyer Group APAs and the Brand Management Agreement, each of which will be approved by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.

23.     ***Buyer Group Documents*** means the Buyer Group APAs, the Brand Management Agreement, the Assumption Schedule, the Plan, and the Confirmation Order, together with all schedules, exhibits, and ancillary documents thereto, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors and the Buyer Group.

24.     ***Buyer Group SPE*** means a single purpose entity, wholly-owned, directly or indirectly, by a member of the Buyer Group, which will acquire certain assets and assume certain liabilities, in each case, on the terms and conditions set forth in the Buyer Group APAs.

25.     ***Cash*** means the legal tender of the United States of America or the equivalent thereof.

26.     ***Cause of Action*** means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, mature or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any Claim pursuant to section 362; (iv) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Actions.

27.     ***Chapter 11 Cases*** means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Chapter 11 Case No. 25-80078 (SWE).

28.    ***Claim*** shall have the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

29.    ***Claims Bar Date*** means such time and date established pursuant to the Claims Bar Date Order by which Proofs of Claim must be Filed for all Claims and Interests (other than Administrative Claims and Claims held by Governmental Units).

30.    ***Claims Bar Date Order*** means that certain order entered by the Bankruptcy Court on April 3, 2025 [Docket No. 99], establishing the Claims Bar Date.

31.    ***Claims Objection Deadline*** means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and an opportunity for a hearing, upon a motion by the Reorganized Debtors or Wind-Down Entity, or as applicable, the Litigation Trustee, that is Filed before the date that is 180 days after the Effective Date.

32.    ***Claims Register*** means the official register of Claims maintained by Kroll Restructuring Administration LLC, as the claims, noticing, and solicitation agent in the Chapter 11 Cases.

33.    ***Class*** means any group of Claims or Interests classified under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

34.    ***Class A-2 Notes*** means those certain 4.723% senior secured notes, alphanumerically designated as "Class A-2" in accordance with, and outstanding in a principal amount of $266,579,032.04 under the Prepetition Securitization Indenture.

35.    ***Class B Notes*** means those certain 7.432% senior secured notes, alphanumerically designated as "Class B" in accordance with, and outstanding in a principal amount of $40,000,000.00 under the Prepetition Securitization Indenture.

36.    ***Combined Hearing*** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and final approval of the Disclosure Statement.

37.    ***Confirmation*** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.    ***Confirmation Date*** means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.    ***Confirmation Order*** means the order entered by the Bankruptcy Court approving the Buyer Group Arrangements and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent with the Restructuring Support Agreement and reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Buyer Group.

40.     ***Consenting AHG Noteholders*** means Holders of the Securitization Notes Claims that are members of the Ad Hoc Group (in each case solely in their capacity as such) or become a party to the Restructuring Support Agreement.

41.     ***Consenting Creditors*** means the Consenting AHG Noteholders and the Prepetition Lenders (in each case solely in their capacity as such).

42.     ***Consenting Stakeholders*** means the Buyer Group, Prepetition Lenders, and the Consenting AHG Noteholders that are or become party to the Restructuring Support Agreement together with their respective successors and permitted assigns.

43.     ***Control Party*** means Drivetrain Agency Services, LLC, not in its individual capacity but solely as the control party as defined under the Prepetition Securitization Indenture.

44.     ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on April 15, 2025, pursuant to the *Appointment of the Official Unsecured Creditors' Committee* [Docket No. 187] as amended by [Docket No. 189].

45.     ***Cure Claim*** means a Claim based upon the applicable Debtor's monetary defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

46.     ***Cure Notice*** means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objection to proposed assumptions of Executory Contacts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

47.     ***D&O Liability Insurance Policies*** means any insurance policy to which one or more of the Debtors is a party that provides director and officer liability insurance coverage for any of the Debtors' directors and officers or any other insured under the policy.

48.     ***Debtor*** means each of the Debtors, in its respective individual capacity as debtor and debtor in possession in the Chapter 11 Cases.

49.     ***Debtor D&Os*** means any Person or Entity that serves or served as a director, manager, officer, principal, or fiduciary of the Debtors at any time between January 1, 2023 and the Effective Date.

50.     ***Debtors*** means, collectively (i) Hooters of America, LLC; (ii) Owl Holdings, LLC; (iii) Hawk Parent, LLC; (iv) HOA Holdings, LLC; (v) Night Owl, LLC; (vi) Owl Wings, LLC; (vii) Owl Restaurant Holdings, LLC; (viii) HOA Restaurant Group, LLC; (ix) Derby Wings Holdings, LLC; (x) Derby Wings, LLC; (xi) HOA Gift Cards, LLC; (xii) Elf Owl Investments, LLC; (xiii) TW Lonestar Wings, LLC; (xiv) Alamo Wings, LLC; (xv) HOA Holdco, LLC; (xvi) HOA Systems, LLC; (xvii) HOA Funding, LLC; (xviii) HOA Restaurant Holder, LLC; (xix) HOOTS Restaurant Holder, LLC; (xx) HOA IP GP, LLC; (xxi) HOOTS Franchising, LLC;

(xxii) HOA Franchising, LLC; (xxiii) HOA Maryland Restaurant Holder, LLC; (xxiv) HOA Kansas Restaurant Holder, LLC; (xxv) TW Restaurant Holder, LLC; (xxvi) DW Restaurant Holder, LLC; (xxvii) HI Limited Partnership; (xxviii) HOA Towson, LLC; (xxix) HOA Waldorf, LLC; and (xxx) HOA Laurel, LLC.

51.     ***Definitive Documents*** means all of the definitive documents implementing the Restructuring Transactions (which, for the avoidance of doubt, shall be Filed and entered in a form acceptable to the Required Consenting AHG Noteholders and the Buyer Group), including: (a) the Restructuring Support Agreement; (b) the Plan (and the Plan Supplement and all related, exhibits, term sheets, or agreements related thereto); (c) the Confirmation Order; (d) the Disclosure Statement and any documents or Solicitation Materials including the Disclosure Statement Approval Order; (e) the first day pleadings and all orders sought pursuant thereto, including the DIP Orders; (f) the DIP Facility Documents; (g) the Restructuring Steps Memo; (h) the New Notes Documents; (i) the Buyer Group Documents (including the Buyer Group APAs and the Brand Management Agreement); (j) the New Organizational Documents; and (k) any documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement any of the foregoing.

52.     ***DIP Agent*** means U.S. Bank Trust Company, National Association, in its capacity as collateral agent and calculation agent under the DIP Credit Agreement, and any successor and permitted assign.

53.     ***DIP Claims*** means Claims in respect of any obligations, including all interest, premiums, fees, expenses, and other amounts owing under the DIP Facility Documents, including the fees and expenses of the DIP Agent, and in accordance therewith, held by, or otherwise owing to, any or all of the DIP Agent and the DIP Lenders.

54.     ***DIP Credit Agreement*** means that certain *Superpriority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time) by and among Hawk Parent, LLC and Hooters of America, LLC, as borrowers, certain subsidiaries from time to time party thereto as guarantors, the lenders from time to time party thereto, and U.S. Bank Trust Company, National Association, as collateral agent and calculation agent under the DIP Facility.

55.     ***DIP Facility Amendments*** means the amendments to the DIP Credit Agreement filed with the Court (and consented to by the Required Consenting AHG Noteholders), including, the *Notice of Filing of Accordion Increase Request and Credit Agreement Amendment* [Docket No. 754]; the *Notice of Filing of Second Credit Agreement Amendment* [Docket No. 923]; the *Notice of Filing of Third Credit Agreement Amendment* [Docket No. 955]; and the *Notice of Filing of Fourth Credit Agreement Amendment* [Docket No. 1022].

56.     ***DIP Facility Documents*** means, collectively, the DIP Credit Agreement, the DIP Facility Amendments, the DIP Order, the security and guaranty documents, fee letters, notes, the Approved Budget, and any other ancillary documents entered into in connection therewith.

57.     ***DIP Facility*** means that certain superpriority consensual, priming debtor-in-possession term-loan facility in an aggregate principal amount of up to $55,000,000 on

the terms and conditions set forth in the DIP Facility Term Sheet and the DIP Credit Agreement, together with any additional amounts authorized pursuant to the DIP Facility Documents.

58.      **DIP Lenders** means, collectively Celtic Master Fund LP and certain of its Affiliates and other persons that become lenders from time to time.

59.      **DIP Liens** means Liens on property of the Debtors arising out of or related to the DIP Facility as provided by the DIP Order.

60.      **DIP Motion** means the *Motion* Filed by the Debtors seeking, among other things, entry of an order approving the Debtors' entry into the DIP Facility [Docket No. 4].

61.      **DIP Noteholders** means certain Holders of Securitization Notes Claims with the same investment advisor as the DIP Lenders.

62.      **DIP Order** means, one or more orders entered by the Bankruptcy Court, in connection with the Debtors' DIP Motion, setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing [Docket No. 299].

63.      **DIP Roll-Up Amount** means $5,000,000.

64.      **Disallowed** means any Claim, or any portion thereof, that (i) has been disallowed by Final Order,  settlement, the Plan, or Confirmation Order; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.

65.      **Disclosure Statement** means the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors*, Filed by the Debtors in support of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with, among other things, applicable securities Law, sections 1125 and 1126 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable law, in form and substance reasonably satisfactory to the Required Consenting Creditors.

66.      **Disclosure Statement Approval Order** means one or more orders entered by the Bankruptcy Court: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

67.     **Disclosure Statement Motion** means the motion of the Debtors seeking entry of an order approving the Disclosure Statement and authorizing solicitation of the Plan.

68.     **Disputed** means, with respect to a Claim, a Claim that is (i) not yet Allowed or Disallowed, (ii) subject to a pending objection that has been Filed and has not been resolved pursuant to a Final Order, or (iii) is listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Claims Bar Date Order.

69.     **Disputed Claims Reserve** means, with respect to each Debtor, a reserve to be established by the Debtors or the Litigation Trust on the Effective Date comprised of Cash or other sources of distributions under the Plan, as applicable, in an amount to be determined by the Debtors in consultation with the Required Consenting Creditors based on the amount of Disputed Claims as of the Combined Hearing.

70.     **Disputed Contract** means any executory contract or unexpired lease designated to be assumed by the Debtors and assigned to the Buyer Group that is subject, as of the Effective Date, to an informal or formal objection to the cure amount set forth in the Cure Notice by the contract counterparty.

71.     **Distribution Agent** means, as applicable, the Debtors or the Wind-Down Entity or any Entity that the Debtors or the Wind-Down Entity select, in consultation with the Required Consenting Creditors, to make or to facilitate distributions in accordance with the Plan.

72.     **Distribution Record Date** means, other than with respect to securities deposited with the DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be two (2) Business Days following the Confirmation Date or such other date as agreed upon among the Debtors and the Required Consenting Creditors.

73.     **Divested Stores** means the Associated Restaurant Assets to be acquired, and the Associated Restaurant Liabilities to be assumed, by the Buyer Group SPEs on the terms and conditions set forth in the Buyer Group APAs.

74.     **DTC** means the Depository Trust Company.

75.     **Effective Date** means, with respect to the Plan, the date that is a Business Day selected by the Debtors, in consultation with the Consenting Stakeholders and the Buyer Group, on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX of the Plan have been satisfied or waived in accordance with the Plan; and (iii) the Plan is declared effective. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

76.     **Entity** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

77.     **Estate** means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

78.    ***Excess UCC Professional Fee Amount*** means the remaining amount, if any, of the UCC Professional Fee Amount after payment of all Creditors' Committee Professionals' Allowed Professional Fee Claims.

79.    ***Exculpated Fiduciaries*** means, collectively, and in each case solely in their capacities as such: (i) the Debtors, (ii) each independent director of the Debtors, and (iii) the Creditors' Committee and each of its members.

80.    ***Exculpated Party*** means each of the Exculpated Fiduciaries in their capacity as such, and, in each case, subject to the maximum extent permitted by law.

81.    ***Executory Contract*** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

82.    ***Existing Franchise Agreement*** means a franchise agreement by and between a Debtor and franchisee-counterparty in effect on the Petition Date.

83.    ***File***, ***Filed***, or ***Filing*** means file, filed, or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

84.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated, revoked, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

85.    ***General Unsecured Claim*** means any Claim that is neither secured by collateral, subordinated, nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court and is not a: (a) Priority Tax Claim; (b) Priority Non-Tax Claim; (c) Securitization Class A-2 Note Claim; (d) Securitization Class B Note Claim; (e) Non-Securitization Manager Advance Term Loan Claim; (f) Securitization Manager Advance Claim; (g) Other Secured Claim; (h) Non-Securitization Term Loan Claim (Secured); (i) Other Intercompany Claims; or (j) any Interests. For the avoidance of doubt, General Unsecured Claims do not include any Claims of the Securitization Noteholders but General Unsecured Claims shall include any Prepetition Term Loan Deficiency Claims and any Claims or cause of action, whether existing now or arising in the future, known or unknown, and whether held by any governmental or quasi-governmental entity—including but not limited to local, state, federal, or foreign or

private party, against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Effective Date.

86.     ***Governmental Unit*** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

87.     ***GUC Cash Settlement Amount*** means Cash in the amount of $3,000,000, which shall be funded to the Litigation Trust on the Effective Date and be available for distribution to Holders of Allowed General Unsecured Claims (excluding Holders of Prepetition Term Loan Deficiency Claims) notwithstanding the Litigation Trust Interest Allocation.

88.     ***GUC Litigation Trust Allocation*** means 37.5% of the Litigation Trust Interests, which shall be allocated Pro Rata to Holders of Allowed General Unsecured Claims (excluding Holders of Prepetition Term Loan Deficiency Claims and any Claims of the Securitization Noteholders), and which shall entitle the Holders of Allowed General Unsecured Claims (excluding Holders of Prepetition Term Loan Deficiency Claims and any Claims of the Securitization Noteholders) to receive 37.5% of the net proceeds of the Litigation Trust. Notwithstanding the foregoing, 100% of the GUC Cash Settlement Amount is distributable only to Holders of Allowed General Unsecured Claims (excluding Holders of Prepetition Term Loan Deficiency Claims and any Claims of the Securitization Noteholders).

89.     ***GUC Settlement*** means the global settlement between the Debtors, Creditors' Committee, and Consenting Creditors the terms of which are embodied in this Plan.

90.     ***HOA Franchise HoldCo*** means a new limited liability company to be formed on or prior to the Effective Date, which, through the Restructuring Transactions shall be 100% owned by HOA NewCo and to which 100% of the equity interests of HOA Franchising, LLC and HOOTS Franchising, LLC may be transferred on or prior to the Effective Date.

91.     ***HOA Franchise HoldCo LLC Agreement*** means the limited liability company agreement to be executed on the Effective Date which shall govern HOA Franchise HoldCo, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

92.     ***HOA NewCo*** means the limited liability company to be formed prior to the Effective Date in connection with the Restructuring Transactions, the equity interests of which shall be owned 50% by the Holders of Manager Advance Term Loan Claims and 50% by the Holders of Class B Note Claims.

93.     ***HOA NewCo LLC Agreement*** means the limited liability company agreement to be executed on the Effective Date which shall govern HOA NewCo, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

94.     ***HOA RoyaltyCo*** means, HOA Funding, LLC, as reorganized under the Plan and renamed pursuant to the New Organizational Documents on and after the Effective Date.

95.     ***Holder*** means any Person or Entity holding a Claim or an Interest, as applicable, solely in its capacity as such.

96. ***Hooters Brand Management, LLC*** means a new entity owned by the Buyer Group, which either directly or through a subsidiary will oversee all brand-related, franchising-related, and management-related functions as specified in the Brand Management Agreement, appended to the Plan Supplement.

97. ***Impaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

98. ***Incremental Loan*** means, the $5,000,000 funded to the Debtors on February 21, 2025, under the Prepetition MA Credit Agreement.

99. ***Insider*** shall have the meaning as set forth in section 101(31) of the Bankruptcy Code.

100. ***Insurance Carrier*** means any entity, including any insurer or other provider of insurance-related services, that issued, underwrote, or is otherwise responsible for any insurance policy, or related agreement providing coverage to, or for the benefit of, the Debtors, its Affiliates, or Insiders prior to the Petition Date, and that provides coverage, extended reporting (tail) coverage, or potential liability in connection with such policies, regardless of whether such coverage is primary, excess, umbrella, or otherwise.

101. ***Intellectual Property*** means: (i) all United States and foreign patents and utility models and applications therefor and all reissues, divisions, renewals, reexaminations, extensions, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights anywhere in the world in inventions, disclosures, and discoveries, whether or not patentable, and whether or not reduced to practice ("**Patents**"); (ii) all trade secrets, know-how, proprietary information, technical data, improvements, technology, computer programs (in source code and executable code form, and whether embodied in software, firmware or otherwise), documentation (including recipes, store designs, software documentation), drawings, designs, flow charts, specifications, logic diagrams, programmer notes, protocols, files, records, databases, formulae, compositions, processes, manufacturing and production processes and techniques, research and development information, improvements, proposals, and technical data ("**Technical Information**"); (iii) all copyrights, works of authorship, copyright registrations and applications therefor and all other rights corresponding thereto throughout the world ("**Copyrights**"), excluding maskworks; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) any similar, corresponding or equivalent rights to any of the foregoing anywhere in the world, including but not limited to computer program rights and registrations and applications therefor; (vi) all copies and tangible embodiments of the foregoing (in whatever form or media) and (vii) any and all other rights, title, and interests in and to Intellectual Property, including, without limitation, the right to sue for and collect damages for past infringement in respect thereof and any other commercial tort or other claims arising with respect to, under or in connection with the assets and rights described above.

102. ***Intellectual Property Rights*** means all rights in, arising out of, or associated with the Intellectual Property.

103. ***Intercompany Interest*** means an Interest held by a Debtor in another Debtor.

104.    ***Interest*** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security.

105.    ***Judicial Code*** means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

106.    ***Lien*** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

107.    ***Litigation Trust*** means the trust established for the benefit of the Litigation Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Litigation Trust Agreement.

108.    ***Litigation Trust Agreement*** means that certain trust agreement establishing and delineating the terms and conditions for the creation and operation of the Litigation Trust which shall be in form and substance acceptable to the Creditors' Committee and the Required Consenting Creditors, (b) be included in the Plan Supplement, (c) provide for the identity and appointment of the Litigation Trustee, and (d) contain provisions setting forth the procedures governing the prosecution of the Litigation Trust Causes of Action and the source of payment of legal fees related thereto (which may include a portion of the Litigation Trust Initial Funding).

109.    ***Litigation Trust Assets*** means (a) the Litigation Trust Initial Funding, (b) the Litigation Trust Causes of Action, (c) the Excess UCC Professional Fee Amount; (d) the GUC Cash Settlement Amount; underlined provided that the GUC Cash Settlement Amount shall only be available for distribution to the Holders of Allowed General Unsecured Claims (excluding the Prepetition Term Loan Deficiency Claims) and to pay UCC Professional Fees incurred prior to the Effective Date, if any, in excess of the UCC Professional Fee Amount.

110.    ***Litigation Trust Beneficiaries*** means, each in their capacity as such, Holders of General Unsecured Claims (excluding the Holders of Prepetition Term Loan Deficiency Claims), the Holders of Securitization Notes Claims (excluding the Securitization Notes Claims held by the DIP Noteholders), and the Holders of Prepetition Term Loan Deficiency Claims, in each case in accordance with their respective Litigation Trust Interest Allocation.

111.    ***Litigation Trust Causes of Action*** means all Causes of Action that belong to the Debtors and their Estates under section 1123(b)(3) of the Bankruptcy Code, including, but not limited to (i) any Avoidance Actions, (ii) other Causes of Action related to or against the Non-Released Parties, (iii) the Preserved Other Intercompany Claims, and (iv) all Causes of Actions or other claims identified on the Schedule of Litigation Trust Causes of Action, but excluding any Causes of Action (i) that are Acquired Causes of Action (which, for the avoidance of doubt, shall be transferred to the Buyer Group in accordance with the Buyer Group Documents), (ii) against any Released Party (including the Ordinary Course Parties with respect to any Avoidance Actions), (iii) that are Retained Cause of Action, (iv) related to Intellectual Property or Intellectual Property Rights, (v) that have been waived or settled during the Chapter 11 Cases or as otherwise agreed by

13

the Creditors' Committee, or (vi) arising from or related to any payments or transactions authorized by order of the Bankruptcy Court, including, but not limited to, payments or other distributions made or authorized to be made in satisfaction of prepetition claims.

112.    ***Litigation Trust Fees and Expenses*** means all reasonable and documented fees, expenses, and costs (including any taxes or fees imposed on or payable by the Litigation Trust or in respect of the Litigation Trust Assets) incurred by the Litigation Trust, any professionals retained by the Litigation Trust, and any additional amount determined necessary by the Litigation Trustee to adequately reserve for the operating expenses of the Litigation Trust.

113.    ***Litigation Trust Initial Funding*** means Cash in the amount of $125,000.

114.    ***Litigation Trust Interest Allocation*** means the GUC Litigation Trust Allocation, the Securitization Noteholders Litigation Trust Allocation, and the Prepetition Term Loan Lender Litigation Trust Allocation.

115.    ***Liquidation Trust Interests*** means collectively, the non-certificated beneficial interests in the Litigation Trust, which shall entitle the Litigation Trust Beneficiaries to receive proceeds of the Litigation Trust Assets net of the Litigation Trust Fees and Expenses pursuant to the Litigation Trust Agreement and which shall be allocated to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Interest Allocation.

116.    ***Litigation Trustee*** means the Person or Entity (or any successor thereto) appointed by the Creditors' Committee, in consultation with the Debtors and Required Consenting Creditors, who or which shall have the rights, powers, and duties as set forth in this Plan and the Litigation Trust Agreement.

117.    ***Manager Advance*** shall have the meaning given to such term in the Prepetition Securitization Indenture.

118.    ***Master Issuer*** means HOA Funding, LLC, as Master Issuer under the Prepetition Securitization Indenture.

119.    ***New Board*** to be selected in accordance with the Restructuring Support Agreement or as otherwise agreed by the Prepetition Lenders and the Required Consenting AHG Noteholders; the identities of the New Board will be disclosed in the Plan Supplement prior to Confirmation.

120.    ***New Class A-1 Notes*** means the new first-lien, first-out notes to be issued by HOA RoyaltyCo to Holders of DIP Claims under the Plan in a principal amount equal to the New Class A-1 Principal Amount plus accrued and unpaid interest and on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

121.    ***New Class A-1 Principal Amount*** means the sum of the DIP Roll-Up Amount and the total new-money component actually funded and outstanding as a Manager Advance under the

DIP Facility as of the Effective Date (which new money component shall be funded consistent with the terms of the DIP Order).

122.    ***New Class A-2I Notes*** means new first-lien notes to be issued by HOA RoyaltyCo to Holders of Allowed Securitization Class A-2 Notes Claims under the Plan in a principal amount equal to that of the Securitization Class A-2 Notes Claims on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

123.    ***New Class A-2II Notes*** means new first-lien, second-out notes to be issued by HOA RoyaltyCo to Holders of Allowed Manager Advance Term Loan Claims under the Plan in a principal amount not to exceed $18,000,000 on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

124.    ***New Class B Notes*** new first-lien notes to be issued by HOA RoyaltyCo to Holders of Allowed Securitization Class B Notes Claims under the Plan in a principal amount equal to that of the Securitization Class B Notes Claims on the terms set forth in the New Notes Documents (which shall be consistent with the Restructuring Support Agreement).

125.    ***New Debt*** means the indebtedness to be issued by HOA RoyaltyCo and guaranteed by the Reorganized Debtors under the New Notes Documents, including the New Class A-1 Notes, New Class A-2I Notes, New Class A-2II Notes, and New Class B Notes.

126.    ***New Equity Interests*** means the equity interests in HOA NewCo after giving effect to the Restructuring Transactions.

127.    ***New Organizational Documents*** means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of HOA NewCo, HOA Franchise HoldCo, and any Debtors being reorganized, in form and substance satisfactory to the Required Consenting Creditors.

128.    ***New Notes Documents*** means, collectively, the New Notes Indenture and corresponding supplement(s) for the New Class A-1 Notes, New Class A-2I Notes, New Class A-2II Notes, and New Class B Notes, all guarantee and collateral arrangements, and, to the extent required and not addressed exclusively pursuant to the priority of payments provisions in the New Notes Indenture, an intercreditor agreement, and any other documents or agreements the Required Consenting Creditors and the Required DIP Lenders, in their sole discretion, deem necessary to effectuate the Plan and Restructuring Transactions.

129.    ***New Notes Indenture*** means the new base indenture for each of the New Class A-1 Notes, New Class A-2I notes, New Class A-2II notes, and New Class B notes, to be entered into and effective as of the Effective Date.

130.    ***Non-Released Parties*** means: (i) any party that is a current or former director, manager, officer, Insider, principal, equity holder, parent, member, fiduciary, shareholder or Affiliate of the Debtors (other than Keith Maib and Adam Paul); (ii) Insurance Carriers; (iii) any Person or Entity against whom a Claim or Cause of Action under the Schedule of Retained Causes of Action are or may be asserted; (iv) any Person or Entity against whom a Claim or Cause of Action under the Schedule of Litigation Trust Causes of Action, including any Debtor against

whom a Preserved Other Intercompany Claim may be asserted; and (v) any Related Party of clauses (i)-(iv) of this definition, regardless of whether such party submits an Opt-In Form in accordance with the *Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement on a Final Basis and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation and Voting Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status; (IV) Conditionally Approving the Disclosure Statement, and (V) Granting Related Relief* [Docket No. 567].

131.    ***Non-Securitization Entities*** means, collectively, Hawk Parent, LLC, HOA Holdings, LLC, Night Owl, LLC, Owl Wings, LLC, Owl Restaurant Holdings, LLC, Owl Holdings, LLC, Elf Owl Investments, LLC, TW Lonestar Wings, LLC, Alamo Wings, LLC, HOA Restaurant Group, LLC, Derby Wings Holdings, LLC, Derby Wings, LLC, Hooters of America, LLC, and HOA Gift Cards, LLC.

132.    ***Noteholder Equity Entitlement*** means 50% of the New Equity Interests to be allocated among the Holders of Securitization Class B Notes Claims on a *pro rata* basis in accordance with their respective holdings of the Securitization Class B Notes Claims.

133.    ***Non-Securitization Manager Advance Term Loan Claims*** means Parent Funded Debt Claims, to the extent of the value of the Securitization Manager Advance Claims.

134.    ***Non-Securitization Prepetition Equity Interests*** means all Prepetition Equity Interests in the Non-Securitization Entities.

135.    ***Non-Securitization Term Loan Claims (Secured)*** means Parent Funded Debt Claims in excess of the value of the Securitization Manager Advance Claims but only to the extent of any Term Loan Non-Repayment Collateral.

136.    ***Ordinary Course Parties*** means any non-insider (i) counterparties to an Executory Contract or Unexpired Lease with any Debtor as of the Petition Date or (ii) party that was a vendor, merchant, supplier or manufacturer of goods or services provided to any Debtor as of the Petition Date, but, in each case, excluding any counterparty to an Executory Contract or Unexpired Lease that is assumed and assigned to the Buyer Group or Buyer Group SPE pursuant to the Buyer Group APAs or any vendor, supplier, merchant or manufacturer that continues to conduct business with any Divested Restaurant after the Effective Date.

137.    ***Other Intercompany Claim*** means any Claim held by a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor against a Debtor arising before the Petition Date; provided, for the avoidance of doubt, the Other Intercompany Claims shall not include the Securitization Manager Advance Claims.

138.    ***Other Postpetition Intercompany Claim*** means any Claim held by a Debtor or a non- Debtor direct or indirect subsidiary of a Debtor against a Debtor arising after the Petition Date.

139.    ***Other Secured Claim*** means a Secured Claim, other than an Administrative Claim, a DIP Claim, a Priority Tax Claim, a Non-Securitization Manager Advance Term Loan Claim, or

a Securitization Notes Claim, including, for the avoidance of doubt, any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more of the Debtors, the reimbursement obligation for which is either secured by a Lien on collateral of is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

140. ***Other Securitization Prepetition Equity Interests*** means all Prepetition Equity Interests in the Securitization Entities other than the Master Issuer, HOA Holdco, LLC, and HOA Systems, LLC.

141. ***Parent Funded Debt Claims*** means, collectively, (i) $8,387,000 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition MA Credit Agreement, <u>plus</u> (ii) the Incremental Loan, <u>plus</u> (iii) $55,976,213 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Term Loan Credit Agreement, all as secured by the Securitization Manager Advance Claims.

142. ***Person*** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

143. ***Petition Date*** means March 31, 2025.

144. ***Plan*** means this joint chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, and the terms hereof and with the consent of the Required Consenting Creditors and the Buyer Group.

145. ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms of applicable documents, schedules, and exhibits to the Plan to be Filed with the Bankruptcy Court (in each case, in form and substance reasonably satisfactory to the Required Consenting Creditors and, in the case of the Litigation Trust Agreement, in form and substance reasonably satisfactory to the Creditors' Committee, and if such document constitutes a Buyer Group Document, the Buyer Group), including, but not limited to, the following: (i) Buyer Group APAs, (ii) Brand Management Agreement, (iii) Identities of the New Board, (iv) the Schedules of Retained Causes of Action and Litigation Causes of Action, (v) the HOA NewCo LLC Agreement, (vi) [reserved] (vii) New Organizational Documents, (viii) the identity of the Wind-Down Officer, (ix) the Wind-Down Officer's engagement letter, (x) the Wind-Down Budget, (xi) the Assumption Schedule, (xii) the Transition Services Agreement, and (xiii) supplemental tax disclosures (if any), all of which are incorporated by reference into, and are an integral part of, this Plan; <u>provided</u> that through the Effective Date, the Debtors shall have the right to amend the documents contained in the Plan Supplement in accordance with the terms of the Plan and with the consent of the Required Consenting Creditors, and in the case of the Litigation Trust Agreement, with the consent of the Creditors' Committee, and, to the extent such document is a Buyer Group Document, the Buyer Group. The Plan Supplement shall be Filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.

146. **Prepetition Agents** means U.S. Bank Trust Company, National Association as collateral agent and calculation agent under the Prepetition Term Credit Agreement and U.S. Bank Trust Company, National Association as collateral agent and calculation agent under the Prepetition MA Credit Agreement.

147. **Prepetition Credit Agreements** means the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement together with all collateral and security documents, control agreements, manager advance acknowledgements, other agreements, guarantees, pledges, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including without limitation the "Loan Documents" (as defined in the Prepetition MA Credit Agreement), in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

148. **Prepetition Equity Interests** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (in each case whether or not arising under or in connection with any employment agreement).

149. **Prepetition Lender Claim** means any Claim against any Debtor arising under, derived from, based on or related to the loans under the Prepetition MA Credit Agreement or the Prepetition Term Loan Credit Agreement, including, for the avoidance of doubt, any Manager Advances (as defined in the Prepetition Term Loan Credit Agreement), and any guarantees thereof.

150. **Prepetition Lenders** means those certain secured lenders under the Prepetition Credit Agreements that are party to the Restructuring Support Agreement.

151. **Prepetition MA Credit Agreement** means that certain Credit Agreement, dated September 27, 2024 (as amended, modified, or restated from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

152. **Prepetition Management Agreement** means that certain Amended and Restated Management Agreement, dated as of August 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect immediately prior to the Petition Date).

153. **Prepetition Manager** means Hooters of America, LLC.

154. **Prepetition Securitization Indenture** means that certain Amended and Restated Base Indenture, dated August 19, 2021, by and between HOA Funding, LLC as the master issuer and CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee under the Prepetition Securitization Indenture.

155. ***Prepetition Securitization Trustee*** means CITIBANK, N.A., a national banking association, not in its individual capacity but solely as the indenture trustee under the Prepetition Securitization Indenture.

156. ***Prepetition Term Loan Credit Agreement*** means that certain Credit Agreement, dated March 9, 2022, (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Hawk Parent, LLC as borrower, the guarantors party thereto, the lenders thereto, and the administrative and collateral agent.

157. ***Prepetition Term Loan Deficiency Claims*** means the Prepetition Lenders' deficiency Claims for the amount of the Parent Funded Debt Claims that exceed the total value of the Securitization Manager Advance Claims and the Term Loan Non-Repayment Right Collateral.

158. ***Prepetition Term Loan Lender Litigation Trust Allocation*** means 25.0% of the Litigation Trust Interests, which shall be allocated Pro Rata to Holders of the Prepetition Term Loan Deficiency Claims, and which shall entitle the Holders of Allowed Prepetition Term Loan Deficiency Claims to receive 25.0% of the net proceeds of the Litigation Trust (excluding the GUC Cash Settlement Amount).

159. ***Preserved Other Intercompany Claims*** means Other Intercompany Claims which are required to be asserted for purposes of bringing a Claim or Cause of Action against a non-Debtor; provided that such Other Intercompany Claims shall only be enforced against the applicable Debtor to the extent required to access recoveries from such non-Debtor party and no Debtor shall enforce any judgement or assert any monetary claim against another Debtor in respect of such Other Intercompany Claim.

160. ***Priority Non-Tax Claim*** means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim and (ii) a Priority Tax Claim.

161. ***Priority Tax Claim*** means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

162. ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

163. ***Professional*** means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

164. ***Professional Fee Claims*** means all Claims for compensation of any Professional Fees incurred by such Professional on or after the Petition Date through and including the Effective

Date to the extent such fees and expenses have not been previously paid pursuant to an order of the Bankruptcy Court.

165.     ***Professional Fee Escrow*** means an escrow account established and funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount pursuant to Article II.C.2 of the Plan.

166.     ***Professional Fee Reserve Amount*** means the aggregate unpaid Professional Fee Claims through and including the Effective Date, as estimated in accordance with Article II.C.3 of the Plan, *provided* that the amount allocated to the Professional Fee Claims of the Creditors' Committee's Professionals shall not exceed the UCC Professional Fee Amount.

167.     ***Professional Fees*** means fees and expenses (including transaction and success fees) incurred by a Professional.

168.     ***Proof of Claim*** means a proof of Claim Filed in the Chapter 11 Cases.

169.     ***Reinstate, Reinstated,* or *Reinstatement*** means, with respect to Claims and Interests, leaving a Claim or Interest Unimpaired under the Plan.

170.     ***Related Party*** means, in their capacities as such, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees; provided that, notwithstanding anything to the contrary herein, no Related Party of a Released Party shall be deemed a Released Party solely by virtue of its relationship to a Released Party if such Related Party is also a Non-Released Party.

171.     ***Released Parties*** means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Wind-Down Entity, (iii) Adam Paul, (iv) Keith Maib, (v) the Consenting Creditors, (vi) the Sponsors, (vii) the DIP Agent, (viii) the DIP Lenders, (ix) the Prepetition Securitization Trustee, (x) the Control Party, (xi) the Prepetition Agents, (xii) each Holder of a Prepetition Lender Claim or Securitization Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to the foregoing Entities and Persons in clause (a)(iii) – (a)(xii), all of their respective Related Parties (except for any Related Party that is a Non-Released Party to the maximum extent permitted by law); provided that the Ordinary Course Parties shall be "Released Parties" solely with respect to any Avoidance Actions; provided, further that solely for purposes of preserving the Preserved Other Intercompany Claims, the Debtors shall not be "Released Parties." Notwithstanding the foregoing or anything contrary in the Plan, any Entity or Person in clauses (a)(iii) and (a)(xii) of this definition shall not be a Released Party if it does not

opt into the releases set forth in <u>Article VIII.D</u> of the Plan; <u>provided</u>, <u>further</u>, for the avoidance of doubt, no Non-Released Party, nor any of its Related Parties, shall be deemed a Released Party under the Plan.

172.    ***Releasing Parties*** means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are presumed to accept the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party (a) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v) or (b) would be obligated to grant a release under principles of agency if it were so directed by an entity in clauses (i) through (v); <u>provided</u>, that, in each case, an Entity shall not be a Releasing Party if it does not affirmatively elect to opt into the releases set forth in <u>Article VIII.D</u> of this Plan.

173.    ***Reorganized Debtors*** means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established by the Debtors in connection with the implementation of the Restructuring Transactions as well as (i) HOA Holdco, LLC; (ii) HOA Systems, LLC; (iii) HOA Funding, LLC; (iv) HOA Restaurant Holder, LLC; (v) HOOTS Restaurant Holder, LLC; (vi) HOA IP GP, LLC; (vii) HOOTS Franchising, LLC; (viii) HOA Franchising, LLC; (ix) HOA Maryland Restaurant Holder, LLC; (x) HOA Kansas Restaurant Holder, LLC; (xi) TW Restaurant Holder, LLC; (xii) DW Restaurant Holder, LLC; (xiii) HI Limited Partnership; (xiv) HOA Laurel, LLC (xv) HOA Towson, LLC; and (xvi) HOA Waldorf, LLC. For the avoidance of doubt, Reorganized Debtors shall not include any Wind-Down Entity, Hooters Brand Management, LLC, or the Buyer Group.

174.    ***Repayment Right*** means the Prepetition Manager's priority right to reimbursement of the Manager Advances that is part of the respective Prepetition Lenders' collateral under the Prepetition Term Loan Credit Agreement and the Prepetition MA Credit Agreement.

175.    ***Required Consenting AHG Noteholders*** means, as of the date of determination, Consenting AHG Noteholders holding, collectively, in excess of 66.67% of the aggregate outstanding principal amount of the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims held by the Consenting AHG Noteholders (which, for the avoidance of doubt, shall be calculated without reference to Securitization Notes Claims held by the DIP Noteholders).

176.    ***Required Consenting Creditors*** means the Required Consenting AHG Noteholders (which, for the avoidance of doubt, shall be calculated without reference to Securitization Notes Claims held by the DIP Noteholders) and the Required Prepetition Lenders (in each case solely in their capacity as such).

177.    ***Required DIP Lenders*** means the DIP Lenders having DIP Loans and unused commitments representing more than 50% of the aggregate outstanding DIP Loans and unused commitments at such time.

178.  **Required Majority Consenting AHG Noteholders** means Consenting AHG Noteholders collectively holding in excess of 50% of the aggregate outstanding principal amount of the Securitization Notes Claims collectively held by the Consenting AHG Noteholders.

179.  **Required Prepetition Lenders** means, as of the date of determination, Prepetition Lenders holding at least 66.67% in aggregate outstanding principal amount of the Prepetition Lender Claims.

180.  **Restructuring Expenses** means the reasonable and documented fees and expenses related to the negotiation and implementation of the Restructuring Transactions pursuant to the Restructuring Support Agreement, incurred by the Prepetition Agents, the Ad Hoc Group, any Prepetition Lenders, any DIP Lender, the DIP Agent, the Prepetition Securitization Trustee, and the Control Party, including but not limited to the fees and expenses of: (i)  White & Case LLP, Sidley Austin LLP, and any other counsel; (ii)  Houlihan Lokey, Inc., as financial advisor to the Prepetition Lenders and DIP Lenders; (iii) Shipman & Goodwin LLP, as counsel to the DIP Agent and the Prepetition Agent, and (iv) M3 Partners, LP, as financial advisor to the Ad Hoc Group.

181.  **Restructuring Steps Memo** means that memorandum included in the Plan Supplement that outlines the various Restructuring Transactions to occur on or prior to the Effective Date under the Plan.

182.  **Restructuring Support Agreement** means that certain Restructuring Support Agreement, dated as of March 31, 2025, by and between the Debtors and the Consenting Stakeholders, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

183.  **Restructuring Transactions** shall have the meaning set forth in Article IV.K.1 of the Plan.

184.  **Retained Causes of Action** means the Claims and Causes of Action, if any, that belong to the Debtors or their Estates under section 1123(b)(3) of the Bankruptcy Code that are identified on the Schedule of Retained Causes of Action, which shall be preserved and retained by the applicable Reorganized Debtors or Wind-Down Entity under the Plan, and which, for the avoidance of doubt, shall exclude any Claims or Causes of Action that are (i) Litigation Trust Causes of Action or (ii) released, waived or transferred to another Person pursuant to the Plan, including any Causes of Action assigned or transferred to the Buyer Group or Hooters Brand Management, LLC pursuant to the Buyer Group Documents (which, for the avoidance of doubt, shall be transferred to the Buyer Group or Hooters Brand Management, LLC in accordance with the Buyer Group Documents).

185.  **Schedule of Litigation Trust Causes of Action** means a schedule of certain Claims and Causes of Action of the Debtors that shall vest or be transferred to the Litigation Trust on the Effective Date which shall be reasonably acceptable to the Required Consenting Creditors, the DIP Lender, and the Creditors' Committee; provided, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party vest or be transferred to the Litigation Trust.

186.    **Schedule of Retained Causes of Action** means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, assigned, or transferred pursuant to the Plan; provided, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party that is released pursuant to <u>Article VIII</u> of the Plan be retained, which shall be reasonably acceptable to the Required Consenting Creditors, the DIP Lender, and the Creditors' Committee.

187.    **Schedules** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended, supplemented, or modified from time to time.

188.    **Secured Claim** means a Claim (a) secured by a Lien on any Debtor's interest in property, which Lien is valid, perfected, and enforceable pursuant to applicable law,  to the extent of the value of such interest as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code (including the DIP Order) or (b) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

189.    **Securities Act** means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

190.    **Security** shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

191.    **Securitization Class A-2 Note Claims** means $266,579,032.04 in outstanding principal amount of Class A-2 Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Securitization Indenture, as supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Holders of Class A-2 Notes, and all other notes documents in connection therewith.

192.    **Securitization Class B Note Claims** means $40,000,000 in outstanding principal amount of Class B Notes, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Securitization Indenture, as supplemented by the Series 2021-1 Supplement, each dated August 19, 2021, in each case, to the Holders of Class B Notes, and all other notes documents in connection therewith.

193.    **Securitization Entities** means, collectively, HOA Funding, LLC, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, HOOTS Restaurant Holder, LLC, HOA IP GP, LLC, HOOTS Franchising, LLC, HOA Franchising, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant Holder, LLC, TW Restaurant Holder, LLC, DW Restaurant Holder, LLC, HI Limited Partnership, HOA Towson, LLC, HOA Waldorf, LLC, and HOA Laurel, LLC.

194.    **Securitization Manager Advance Claims** means the claim of the Prepetition Manager against the Securitization Entities, which is Allowed hereunder, for reimbursement of (a) prepetition Manager Advances totalling $22,092,357 (including the Manager Advance made with proceeds of the Incremental Loan), (b) all additional Manager Advances extended to the

Securitization Entities during the pendency of the Chapter 11 Cases in accordance with the DIP Order (including the Approved Budget) (c) accrued and unpaid interest, fees, and other charges and expenses arising and payable in respect of any such Manager Advances under the Prepetition Management Agreement, and (d) any other Manager Advances that form part of the "Obligations" (as defined in the Prepetition Securitization Indenture (as amended, restated, amended and restated or otherwise modified from time to time)).

195.    ***Securitization Notes Claims*** means, collectively, the Securitization Class A-2 Note Claims and the Securitization Class B Note Claims, which for the avoidance of doubt shall include any Securitization Class A-2 Note Claims and any Securitization Class B Note Claims held by the DIP Noteholders.

196.    ***Securitization Noteholders*** means the Holders of Securitization Notes Claims.

197.    ***Securitization Notes Documents*** means the Prepetition Securitization Indenture together with all other agreements, guarantees, pledges, collateral and security documents, management agreements, control agreements, instruments, certificates, notes and other documents executed, recorded and/or delivered in connection therewith, including the "Indenture Documents" and "Related Documents" (each as defined in the Prepetition Securitization Indenture), in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

198.    ***Securitization Noteholders Litigation Trust Allocation*** means 37.5% of the Litigation Trust Interests, which shall be allocated pro rata to Holders of Securitization Notes Claims (excluding the Securitization Notes Claims held by the DIP Noteholders), and which shall entitle the Holders of Allowed Securitization Notes Claims (excluding the Securitization Notes Claims held by the DIP Noteholders) to receive 37.5% of the net proceeds of the Litigation Trust (excluding the GUC Cash Settlement Amount).

199.    ***Securitization Prepetition Master Issuer Equity Interests*** means the Prepetition Equity Interests in the Master Issuer.

200.    ***SIR*** means self-insured retention.

201.    ***Sponsors*** means the Holders of Interests in Hawk Parent, LLC.

202.    ***Solicitation Materials*** means all documents, forms, and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

203.    ***Term Loan Non-Repayment Right Collateral*** means any and all collateral securing the obligations under the Prepetition Term Loan Credit Agreement and Prepetition Manager Advance Credit Agreement other than the Repayment Right.

204.    ***UCC Professional Fee Amount*** means Cash in amount of no greater than $1,500,000 allocated for payment of the Creditors' Committee's Professionals' Allowed Professional Fee Claims, which shall be paid by the Debtors, Reorganized Debtors, or the Wind-Down Entity, as applicable, in accordance with <u>Article II.A</u> of the Plan.

205.   ***U.S. Trustee*** means the Office of the United States Trustee for the Northern District of Texas.

206.   ***Unallocated Stores*** means the Excluded Assets and Excluded Liabilities that relate to stores owned by the Debtors that are not acquired by the Buyer Group pursuant to the Buyer Group Arrangements.

207.   ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

208.   ***Unimpaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

209.   ***Voting Deadline*** means the date by which all Persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan and submit an election with respect to the releases by holders of Claims and Interests provided in <u>Article VIII.D</u> of the Plan in accordance with the Disclosure Statement Approval Order.

210.   ***Waterfall*** means the priority of payments waterfall for the reimbursement of Manager Advances pursuant to the Prepetition Management Agreement, as may be amended from time to time in accordance with the terms of the Plan.

211.   ***Wind-Down Budget*** means the budget governing the fees, expenses, and disbursements required to fund the Wind-Down Process and certain activities of the Reorganized Debtors, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

212.   ***Wind-Down Entity*** means, collectively, any Debtor identified on or after the Effective Date by the Debtors or the Wind-Down Officer to be subject to a Wind-Down Process, which shall be acceptable to the DIP Lenders and Required Consenting AHG Noteholders; the Wind-Down Entities may be composed of one or more of the Non-Securitization Entities; which for the avoidance of doubt, shall include: (i) Hawk Parent, LLC; (ii) HOA Holdings, LLC; (iii) Night Owl, LLC; (iv) Owl Wings, LLC; (v) Owl Restaurant Holdings, LLC; (vi) HOA Restaurant Group, LLC; (vii) Hooters of America, LLC; (viii) Derby Wings Holdings, LLC; (ix) Derby Wings, LLC; (x) HOA Gift Cards, LLC; (xi) Owl Holdings, LLC; (xii) Elf Owl Investments, LLC; (xiii) TW Lonestar Wings, LLC; and (xiv) Alamo Wings, LLC.

213.   ***Wind-Down Officer*** means the Person or Entity appointed pursuant to <u>Article IV.I</u> of the Plan, in his or her capacity as such, to oversee the Wind-Down Process.

214.   ***Wind-Down Process*** means, upon the Effective Date, the orderly wind-down of the Wind-Down Entities in accordance with the Wind-Down Budget.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except

as otherwise specified herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (xv) any reference to an Entity as a Holder of a Claim or Interest includes such Entity's permitted successors and assigns.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors

not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors, the Reorganized Debtors, or the Wind-Down Entity shall mean the Debtors and the Reorganized Debtors or the Wind-Down Entity, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement (other than the Buyer Group Documents), any other instrument or document created or executed pursuant to the Plan (other than the Buyer Group Documents), or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that in the event of a conflict between the Confirmation Order, on the one hand, and any of the Plan and the Plan Supplement, on the other hand, the Confirmation Order shall govern and control in all respects. In the event of any inconsistency between the Plan and the Buyer Group Documents, the Buyer Group Documents shall control.

H.    *Certain Consent Rights*

Notwithstanding anything in the Plan to the contrary, any and all consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A of the Plan) and fully enforceable as if stated in full herein, subject to the limitations and other terms and conditions set forth in the Restructuring Support Agreement. For the avoidance of doubt, the Buyer Group's consent rights are subject in all respects to the Restructuring Support Agreement remaining in effect.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent and DIP Lenders as set forth in the DIP Facility Documents and DIP Order, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such

27

documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the Buyer Group as set forth in the Buyer Group Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the Creditors' Committee as set forth in the *HOA Global Settlement Term Sheet* relating to the form and substance of the GUC Settlement in this Plan, all related exhibits to the Plan, the Plan Supplement, any of the Definitive Documents that could reasonably be expected to affect the rights of General Unsecured Claims, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II

## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims, and Administrative Claims, including Professional Fee Claims, and Other Postpetition Intercompany Claims, have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in <u>Article III</u> of the Plan.

A.    *Administrative Claims*

Except with respect to Professional Fee Claims and Restructuring Expenses, and except to the extent that an Administrative Claim (i) has been assumed by the Buyer Group or Hooters Brand Management, LLC under the terms and conditions set forth in the Buyer Group Documents, (ii) has already been paid during the Chapter 11 Cases or (iii) a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (x) on the Effective Date, if such Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (y) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; <u>provided</u> <u>that</u> if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors, the

Reorganized Debtors, or the Wind-Down Entity, as applicable, shall pay in full in Cash all Restructuring Expenses, including the fees and expenses of the DIP Agent and the Prepetition Agent, due and owing pursuant to invoices delivered to the Debtors at least one (1) Business Day prior to the Effective Date and that are required to be paid under or pursuant to the DIP Order.

Except as otherwise provided in this Article II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are DIP Claims, Restructuring Expenses, or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Reorganized Debtors and Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

Objections to such requests, if any, must be Filed and served on the Debtors, or from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity (if not the objecting party) and the requesting party on or before the Claims Objection Deadline.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability (as defined in the Buyer Group Documents) under the Buyer Group Documents shall be resolved between the Hooters Brand Management, LLC or the Buyer Group, as applicable, and the Holder of such Assumed Liability.

B.    *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the New Class A-1 Principal Amount plus all interest accrued and unpaid thereon through and including the date of payment.

Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such DIP Claim, and subject to Article II.B, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder of a DIP Claim shall receive, pursuant to the Restructuring Transactions, New Class A-1 Notes issued by HOA RoyaltyCo in an amount equal to its respective DIP Claims.

C.    *Professional Fee Claims*

    1.    <u>FINAL FEE APPLICATIONS</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the DIP Lender, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

    2.    <u>PROFESSIONAL FEE ESCROW</u>

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Debt or otherwise). The Professional Fee Escrow Account (including funds held in the Professional Fee Escrow Account) (i) shall not be and shall not be deemed property of the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Entity and (ii) shall be held in trust for the Professionals; <u>provided</u>, <u>that</u> funds remaining in the Professional Fee Escrow after all Professional Fee Claims have been Allowed and irrevocably paid in full or Disallowed shall promptly be paid to HOA RoyaltyCo without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Allowed Professional Fee Claims shall be paid in Cash by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court; <u>provided</u> that the amount paid to Professionals for the Creditors' Committee on account of their Allowed Professional Fee Claims shall not exceed the UCC Professional Fee Amount.  Notwithstanding the foregoing, to the extent the UCC Professional Fees incurred prior to the Effective Date exceed the UCC Professional Fee Amount, such excess fees (as allowed by the Court) may be paid from the GUC Cash Settlement Amount.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the DIP Agent, the Holders of Prepetition Lender Claims, the Prepetition Credit Agreements Agent, the Holders of Securitization Notes Claims, or be subject to claims, including any DIP Claims, Adequate Protection Claims, 507(b) Claims, or claims held by the Prepetition Lenders or the Securitization Noteholders, and shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Facility Documents, nor shall the Prepetition Lenders, the Securitization Noteholders, or the DIP Lenders  be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Agreements, the Prepetition Securitization Indenture, the DIP Facility Documents, or the DIP Order.

3.      PROFESSIONAL FEE RESERVE AMOUNT

No later than one (1) Business Day prior to the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Effective Date, including any fees and expenses projected to be outstanding as of the Effective Date, and the Debtors shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors without any further action or order of the Bankruptcy Court.

4.      POST-EFFECTIVE DATE FEES AND EXPENSES

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors or Wind-Down Entity shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and prosecution of final requests for payment of Professional Fee Claims incurred after the Effective Date (or any appeals in connection with the Plan) by (i) the Debtors, (ii) the DIP Lenders, (iii) the Ad Hoc Group, (iv) the Prepetition Securitization Trustee, and (v) Creditors' Committee (not to exceed the UCC Professional Fee Amount), within five (5) Business Days of receipt of invoice therefor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and Wind-Down Entity may employ and pay any Professional for fees incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.  *Summary of Classification*

All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Classes 2, 3, 7, 11, and 12 are comprised of Claims or Interests in or against the Securitization Entities.  Classes 4, 6, and 13 are comprised of Claims or Interests in or against the Non-Securitization Entities.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan.

1.  CLASS IDENTIFICATION

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Securitization Class A-2 Note Claims | Impaired | Yes |
| 3 | Securitization Class B Note Claims | Impaired | Yes |
| 4 | Non-Securitization Manager Advance Term Loan Claims | Impaired | Yes |

32

| 5 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
|---|---|---|---|
| 6 | Non-Securitization Term Loan Claims (Secured) | Unimpaired | No (Presumed to Accept) |
| 7 | Securitization Manager Advance Claims | Impaired | No (Deemed to Reject) |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | Other Intercompany Claims | Impaired | No (Deemed to Reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to Reject) |
| 11 | Securitization Prepetition Master Issuer Equity Interests | Impaired | No (Deemed to Reject) |
| 12 | Other Securitization Prepetition Equity Interests | Impaired | No (Deemed to Reject) |
| 13 | Non-Securitization Prepetition Equity Interests | Impaired | No (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

    1.    <u>CLASS 1 – PRIORITY NON-TAX CLAIMS</u>

        a.    *CLASSIFICATION*: Class 1 consists of all Priority Non-Tax Claims.

        b.    *TREATMENT*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, at the option of the Debtors: (i) each such Holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) on the Effective Date, such other treatment as to render such Holder's Allowed Priority Non-Tax Claim unimpaired.

        c.    *VOTING*: Class 1 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

2.    CLASS 2 – SECURITIZATION CLASS A-2 NOTE CLAIMS

a.    *CLASSIFICATION*: Class 2 consists of all Securitization Class A-2 Note Claims.

b.    *TREATMENT*: Except to the extent that a Holder of a Securitization Class A-2 Note Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each such Holder shall receive, pursuant to the Restructuring Transactions, (i) New Class A-2I Notes issued by HOA RoyaltyCo in an amount equal to its respective Allowed Securitization Class A-2 Note Claims, which Securitization Class A-2 Note Claims are Allowed in full and (ii) its Pro Rata share of the Securitization Notes Litigation Trust Allocation.

c.    *VOTING:* Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

3.    CLASS 3 – SECURITIZATION CLASS B NOTE CLAIMS

a.    *CLASSIFICATION*: Class 3 consists of all Securitization Class B Note Claims.

b.    *TREATMENT*: On or after the Effective Date, each holder of a Securitization Class B Note Claim will receive (i) its Pro Rata share of the Noteholder Equity Entitlement, (ii) New Class B Notes issued by HOA RoyaltyCo in an amount equal to its respective Allowed Securitization Class B Note Claims, which Securitization Class B Note Claims are Allowed in full, and (iii) Pro Rata share of the Securitization Notes Litigation Trust Allocation.

c.    *VOTING*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

4.    CLASS 4 – NON-SECURITIZATION MANAGER ADVANCE TERM LOAN CLAIMS

a.    *CLASSIFICATION*: Class 4 consists of all Non-Securitization Manager Advance Term Loan Claims.

b.    *TREATMENT*: Except to the extent that a Holder of an Allowed Non-Securitization Manager Advance Term Loan Claim agrees to a less

favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Non-Securitization Manager Advance Term Loan Claim, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share (based on its respective Non-Securitization Manager Advance Term Loan Claim) of (i) New Class A-2II Notes issued by HOA RoyaltyCo which will be subject to the terms and conditions in the New Notes Documents and (ii) 50% of the New Equity Interests.

c.     *VOTING*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

5.     CLASS 5 – OTHER SECURED CLAIMS

a.     *CLASSIFICATION*: Class 5 consists of all Other Secured Claims.

b.     *TREATMENT*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors: (i) each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Claim; (ii) on the Effective Date, such Holder's Allowed Other Secured Claim shall be Reinstated; (iii) on the Effective Date, such Holder shall receive such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) on the Effective Date, such Holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

c.     *VOTING*: Class 5 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

6.     CLASS 6 – NON-SECURITIZATION TERM LOAN CLAIMS (SECURED)

a.     *CLASSIFICATION*: Class 6 consists of all Non-Securitization Term Loan Claims (Secured).

b.     *TREATMENT*:  Except to the extent that a Holder of an Allowed Non-Securitization Term Loan Claim (Secured) against the Debtors agrees to a

less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Non-Securitization Term Loan Claims (Secured), on the Effective Date, Holders of Allowed Non-Securitization Term Loan Claims (Secured) shall receive the value of any Term Loan Non-Repayment Right Collateral and/or any proceeds of such Term Loan Non-Repayment Right Collateral, as applicable, which Non-Securitization Term Loan Claims (Secured) are Allowed in full to the extent of the value of any Term Loan Non-Repayment Right Collateral.

c.      *VOTING*: Class 6 is Unimpaired under the Plan. Each Holder of Non-Securitization Term Loan Claims (Secured) is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Term Loan Claims (Secured) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to the Non-Securitization Term Loan Claims (Secured).

7.      CLASS 7 – SECURITIZATION MANAGER ADVANCE CLAIMS

a.      *CLASSIFICATION*: Class 7 consists of all Securitization Manager Advance Claims.

b.      *TREATMENT*: Holders of Class 7 Securitization Manager Advance Claims agree that the treatment provided to Class 4 Non-Securitization Manager Advance Term Loan Claims and the DIP Claims in Article II.B of this Plan shall be in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Class 7 Securitization Manager Advance Claims.

c.      *VOTING*: Class 7 is Impaired under the Plan. Holders of Securitization Manager Advance Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Manager Advance Claims are not entitled to vote to accept or reject the Plan.

8.      CLASS 8 – GENERAL UNSECURED CLAIMS

a.      *CLASSIFICATION*: Class 8 consists of all General Unsecured Claims.

b.      *TREATMENT*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, (A) each Holder of an Allowed General Unsecured Claim that is not a Prepetition Term Loan Deficiency Claim, shall receive its Pro Rata Share of (i) the GUC Cash Settlement Amount to be distributed by the Litigation Trust and (ii) the GUC Litigation Trust Allocation and (B) each Holder of an Allowed General Unsecured Claim that is an Allowed Prepetition Term Loan Deficiency Claim shall be entitled

to its Pro Rata share of the Prepetition Term Loan Lender Litigation Trust Allocation.

c. *VOTING:* Class 8 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

9. <u>CLASS 9 – OTHER INTERCOMPANY CLAIMS</u>

a. *CLASSIFICATION*: Class 9 consists of all Other Intercompany Claims.

b. *TREATMENT*: On the Effective Date, except as provided herein, including with respect to the Securitization Manager Advance Claims, (A) each Preserved Other Intercompany Claim shall be Allowed and reinstated and (B)(i) each Allowed Other Intercompany Claim that is not a Preserved Other Intercompany Claim shall either be cancelled, released, reinstated, contributed, distributed, or transferred such that Other Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner and (ii) no distributions shall be made on account of any Other Intercompany Claims.

c. *VOTING*: Except as provided herein, including with respect to the Securitization Manager Advance Claims, holders of allowed Other Intercompany Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Other Intercompany Claims will not be entitled to vote to accept or reject the Plan.

10. <u>CLASS 10 – INTERCOMPANY INTERESTS</u>

a. *CLASSIFICATION*: Class 10 consists of all Intercompany Interests.

b. *TREATMENT*: On the Effective Date, each Intercompany Interest shall either be cancelled, released, extinguished, reinstated, reissued or transferred pursuant to the Buyer Group Arrangements such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

c. *VOTING*: Class 10 is Impaired under the Plan. Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.    <u>CLASS 11 – SECURITIZATION PREPETITION MASTER ISSUER EQUITY INTERESTS</u>

    a.    *CLASSIFICATION*: Class 11 consists of all Securitization Prepetition Master Issuer Equity Interests.

    b.    *TREATMENT*: On the Effective Date, each Securitization Prepetition Master Issuer Equity Interests shall either be cancelled, released, extinguished, reinstated, reissued or transferred such that Securitization Prepetition Master Issuer Equity Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of a Securitization Prepetition Master Issuer Equity Interest shall not receive or retain any distribution, property, or other value on account of its Securitization Prepetition Master Issuer Equity Interest.

    c.    *VOTING*: Class 11 is Impaired under the Plan. Holders of Securitization Prepetition Master Issuer Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Securitization Prepetition Master Issuer Equity Interests are not entitled to vote to accept or reject the Plan.

12.    <u>CLASS 12 – OTHER SECURITIZATION PREPETITION EQUITY INTERESTS</u>

    a.    *CLASSIFICATION*: Class 12 consists of all Other Securitization Prepetition Equity Interests.

    b.    *TREATMENT*: On the Effective Date, each Other Securitization Prepetition Equity Interests shall either be cancelled, released, extinguished, reinstated, reissued or transferred such that Other Securitization Prepetition Equity Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of an Other Securitization Prepetition Equity Interest shall not receive or retain any distribution, property, or other value on account of its Other Securitization Prepetition Equity Interest.

    c.    *VOTING*: Class 12 is Impaired under the Plan. Holders of Other Securitization Prepetition Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

13.    <u>CLASS 13 – NON-SECURITIZATION PREPETITION EQUITY INTERESTS</u>

    a.    *CLASSIFICATION*: Class 13 consists of all Non-Securitization Prepetition Equity Interests.

    b.    *TREATMENT*: On the Effective Date, each Non-Securitization Prepetition Equity Interests shall either be cancelled, released, extinguished, reinstated, reissued or transferred such that Non-Securitization Prepetition Equity

Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each Holder of a Non-Securitization Prepetition Equity Interest shall not receive or retain any distribution, property, or other value on account of its Non-Securitization Prepetition Equity Interest.

c.    *VOTING*: Class 13 is Impaired under the Plan. Holders of Non-Securitization Prepetition Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Non-Securitization Prepetition Equity Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors', the Reorganized Debtors', or the Wind-Down Entity's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors', the Reorganized Debtors', and the Wind-Down Entity's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.    *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors', and the Wind-Down Entity reserve the right to reclassify any Allowed

Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Finality of Distributions*

As discussed in greater detail in the Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to <u>Article VI</u> of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.    *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

C.    *Sources of Consideration for Plan Distributions*

The Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall fund distributions under the Plan with (i) Cash on hand, (ii) the issuance of the New Debt, and (iii) the issuance of the New Equity Interests. On the Effective Date, the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, will fund the Litigation Trust with the Litigation Trust Initial Funding and the GUC Cash Settlement Amount from Cash on hand. The Litigation Trust will fund the distributions it is responsible for making under the Plan with the Litigation Trust Assets.

D.    *New Debt*

On the Effective Date, the Master Issuer shall be renamed HOA RoyaltyCo, LLC, and all Other Securitization Prepetition Equity Interests shall be cancelled, released, extinguished, reinstated, reissued, or transferred in a manner that, to the extent reasonably practicable, ensures tax-efficient treatment, and results in such interests being held, directly or indirectly, by HOA RoyaltyCo. HOA RoyaltyCo shall issue the New Debt and provide any related guarantees, pursuant to and subject to the terms and conditions set forth in the New Notes Documents. The Reorganized Debtors shall provide guarantees related to the New Debt pursuant to and subject to the terms and conditions set forth in the New Notes Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Debt and related guarantees, including the New Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors may deem to be necessary to consummate the New Debt. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to HOA RoyaltyCo and any affiliate of HOA RoyaltyCo. The obligations incurred by the Reorganized Debtors pursuant to the New Notes Indenture and the New Notes Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Notes Documents.

On the Effective Date, the New Notes Documents shall constitute legal, valid, binding, and authorized obligations of HOA RoyaltyCo and the other Reorganized Debtors enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Notes Documents are being extended, and shall be deemed to have been extended, and all related

payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted under the New Notes Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Notes Documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.    *New Equity Interests*

On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to the Plan. Any Person's acceptance of New Equity Interests shall be deemed to constitute its agreement to be bound by the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms. The New Organizational Documents shall be binding on all holders of the New Equity Interests (and their respective successors and assigns), whether such New Equity Interests are received or to be received on or after the Effective Date and regardless of whether such holder executes or delivers a signature page to the New Organizational Documents.

All of the New Equity Interests issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.    *New Organizational Documents*

On or prior to the Effective Date, the New Organizational Documents shall be Filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent

required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

G.    *New Board*

As of the Effective Date, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

H.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Buyer Group Documents and the Litigation Trust Agreement), on the Effective Date, all property in each Estate (except for the Litigation Trust Assets), all Retained Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors but not assigned to the Buyer Group or Buyer Group SPE, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor and Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Retained Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.    *Wind-Down Process and Wind-Down Officer*

The Wind-Down Officer shall be appointed by the Debtors in consultation with the DIP Lenders and Required Consenting AHG Noteholders to serve on behalf of the Wind-Down Entity and to implement and take all actions on behalf of the Debtors and their Estates under the Plan, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. Once identified the identity of the Wind-Down Officer shall be disclosed in the Plan Supplement, and the Wind-Down Officer's engagement letter shall be included in the Plan Supplement. The Wind-Down Officer shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

On and after the Effective Date, subject to the terms of the Plan, the Wind-Down Officer will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Officer shall have the power and authority to take any action(s) necessary to effectuate the Wind-Down Process using funds in accordance with the Wind-Down Budget. As soon as practicable after the Effective Date, the Wind-Down Officer shall cause the Debtors or Reorganized Debtors to comply with, and abide by, the terms of the Plan and take any actions as the Wind-Down Officer may determine to be necessary or desirable to carry out the purposes of the Plan, subject to the terms of the Plan.

43

The Wind-Down Entity shall succeed to the rights, title, and interests of those Debtors identified by the Debtors or the Wind-Down Officer (acceptable to the DIP Lenders and the Required Consenting AHG Noteholders) in and to their respective property and assets. The Wind-Down Entity will not be involved in any business operations on a go-forward basis and will be charged with conducting the Wind-Down Process. Expenses incurred by the Wind-Down Officer and its professionals in connection with the Wind-Down Process shall be paid from the Wind-Down Budget and any proceeds generated by the Wind-Down Process. Any remaining proceeds or unused funds under the Wind-Down Budget shall be remitted to the trustee of the New Notes Indenture for application, in accordance with the waterfall, toward the payment of any outstanding indebtedness.

The Wind-Down Officer shall serve as successor to and representative of the Wind-Down Entity's Estate under section 1123(b) of the Bankruptcy Code for the purposes of effectuating the Wind-Down Process, including to commence, litigate and settle any Retained Causes of Action, sell or monetize any remaining Assets of the Wind-Down Entity, and make distributions pursuant to the terms of the Plan. The Wind-Down Officer shall act in a fiduciary capacity on behalf of the interests of the Holders of Claims and Interests entitled to distributions under the Plan. The Wind-Down Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Entity is dissolved in accordance with the Plan and (ii) the date on which the Wind-Down Officer resigns, is terminated or is otherwise unable to serve. The Wind-Down Officer shall be entitled to the indemnification and limitation of liability provisions set forth in its engagement letter.

J.      *Litigation Trust*

In connection with the GUC Settlement, on the Effective Date, (i) the Debtors shall execute the Litigation Trust Agreement and shall take such steps as necessary to establish the Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of Litigation Trust Beneficiaries, (ii) the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries in accordance with the terms of this Plan and the Litigation Trust Agreement, and (iii) the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title, and interest in the GUC Cash Settlement Amount for the benefit of the Holders of Allowed General Unsecured Claims (excluding Holders of Prepetition Term Loan Deficiency Claims). Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets (including the GUC Cash Settlement Amount) shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in this Plan.

The Litigation Trust shall be initially funded with the Litigation Trust Initial Funding. The Litigation Trust Initial Funding shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The Litigation Trust Initial Funding shall be used for the administration of the Litigation Trust, to pay Litigation Trust Fees and Expenses, and to pursue the Litigation Trust Causes of Action and shall not be distributed to Litigation Trust Beneficiaries. The Litigation Trust shall not be precluded from entering into contingency fee agreements or raising financing, including any litigation financing; provided, however, any such contingency fee arrangements or financing must be on market terms, subject to

Court approval, and an equal opportunity to participate in such financing must be offered on the same terms and on a Pro Rata basis to all beneficial holders of Litigation Trust Interests. All proceeds of the Litigation Trust Assets shall be used by the Litigation Trustee to pay the Litigation Trust Fees and Expenses, pursuit of the Litigation Trust Causes of Action, and distribution to the Litigation Trust Beneficiaries in accordance with their applicable Litigation Trust Interest Allocation.

The (i) establishment, purpose, and administration of the Litigation Trust, (ii) appointment, rights, and powers, of the Litigation Trustee, and (iii) treatment of the Litigation Trust for federal income tax purposes, among other things, shall be governed by the Litigation Trust Agreement. On and after the Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets. The Litigation Trust Agreement shall contain customary indemnification provisions and entitle the Litigation Trustee to be indemnified from the Litigation Trust Assets.

Any and all Litigation Trust Interests shall be non-transferable other than if transferred by will, intestate succession, if required to be transferred as part of a liquidation or winding up of a holder, or otherwise by operation of Law. In addition, any and all Litigation Trust Interests, to the extent such units may be deemed "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state or local securities Laws, will not be registered pursuant to the Securities Act or any applicable state or local securities Law pursuant to section 1145 of the Bankruptcy Code, to the extent permitted and available, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

In furtherance of this section of the Plan: (i) it is intended that the Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Allowed General Unsecured Claims, the Holders of Allowed Securitization Notes Claims, and Holders of Allowed Prepetition Term Loan Deficiency Claims, consistent with the terms of the Plan, and accordingly, all assets held by the Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Allowed General Unsecured Claims, the Holders of Allowed Securitization Notes Claims, and Holders of Allowed Prepetition Term Loan Deficiency Claims, as applicable, and then contributed by such Holders of Allowed General Unsecured Claims, Holders of Allowed Securitization Notes Claims, and Holders of Allowed Prepetition Term Loan Deficiency Claims to the Litigation Trust in exchange for their interest in the Litigation Trust, and accordingly, the Holders of Allowed General Unsecured Claims, the Holders of Allowed Securitization Notes Claims, and the Holders of Allowed Prepetition Term Loan Deficiency Claims shall be treated as the grantors and owners of their respective shares of the Litigation Trust Assets; (ii) the sole purpose of the Litigation Trust shall be the liquidation and distribution of the Litigation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Allowed General Unsecured

45

Claims receiving Litigation Trust Interests, the Holders of Allowed Securitization Notes Claims receiving Litigation Trust Interests, Holders of Allowed Prepetition Term Loan Deficiency Claims receiving Litigation Trust Interests, and the Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Allowed General Unsecured Claims receiving Litigation Trust Interests, the Holders of Allowed Securitization Notes Claims receiving Litigation Trust Interests, Holders of Allowed Prepetition Term Loan Deficiency Claims receiving Litigation Trust Interests, and the Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Litigation Trust as determined by the Litigation Trustee (or its designee); (v) the Litigation Trustee shall be responsible for filing all applicable tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Litigation Trustee shall annually send to each Holder of a Litigation Trust Interest a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may timely elect to (i) treat any portion of the Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B9 (and make any appropriate elections) and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Litigation Trust Assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Allowed General Unsecured Claims receiving Litigation Trust Interests, the Holders of Allowed Securitization Notes Claims receiving Litigation Trust Interests, Holders of Allowed Prepetition Term Loan Deficiency Claims receiving Litigation Trust Interests, and the Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

K.    *Litigation Trustee*

On or after the Effective Date, the Litigation Trustee shall assume all of its obligations, powers and authority under the Litigation Trust Agreement to (x) review, reconcile, and if necessary, object to General Unsecured Claims, and (y) investigate, pursue, litigate and/or settle Litigation Trust Causes of Action (collectively, the "**Litigation Trustee Duties**"). The Litigation Trustee shall have the sole discretion with respect to the prosecution, funding, and settlement or other resolution of the Litigation Trust Causes of Action subject to the Litigation Trustee's

business judgment in the exercise of its fiduciary duties carrying out the Litigation Trust Duties as set forth in the Litigation Trust Agreement and the distribution of property of the Litigation Trust, subject to the Litigation Trust Interest Allocations and the terms of the Litigation Trust Agreement and the Plan. The Litigation Trustee shall have such qualifications and experience as are sufficient to enable the Litigation Trustee to perform its obligations under this Plan and under the Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Litigation Trust Agreement. The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with this Plan and the Litigation Trust Agreement.

Solely to the extent necessary and in furtherance of the Litigation Trustee Duties, following the Effective Date, the Litigation Trustee shall be deemed to be a judicial substitute for the Reorganized Debtors as the party in interest in the Chapter 11 Cases, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. With respect to the Litigation Trust Causes of Action, the Litigation Trustee shall be deemed to be the assignee of the Litigation Trust Causes of Action and the successor-in-interest to all privileges of the Debtors, including, but not limited to, attorney-client and work product privilege. The Reorganized Debtors and Wind-Down Entity, as applicable, and the Litigation Trust shall enter into a common interest agreement whereby the Reorganized Debtors and Wind-Down Entity will be able to share documents, information, or communications (whether written or oral) relating to the claims of the Litigation Trust Beneficiaries and the Litigation Trust Causes of Action. The Litigation Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The Litigation Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. Reasonable agreements will be made with the Litigation Trustee such that confidential information and privileges are preserved, while permitting the Litigation Trustee to use, as necessary to administer the Litigation Trust and effectuate the Litigation Trust Duties, such information and privilege; absent such agreements, either the Litigation Trustee or the Reorganized Debtors and Wind-Down Entity may present the issue to the Bankruptcy Court for resolution.

The Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct; provided that, notwithstanding the foregoing, the Litigation Trustee shall owe a fiduciary duty of care and loyalty to all Litigation Trust Beneficiaries (but, for the avoidance of doubt, the Litigation Trustee shall not owe a fiduciary duty to the Debtors, the Reorganized Debtors, or the Wind-Down Entity).

The Litigation Trustee may be removed by the Bankruptcy Court upon application by any party in interest for cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Litigation Trustee, the New Board shall designate another Person to become the Litigation Trustee and thereupon the successor Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

L.    *New HOA Franchise HoldCo*

On or prior to the Effective Date, HOA Franchise HoldCo may be formed and, on or after the Effective Date, the equity interests or assets of Debtors' HOA Franchising, LLC and HOOTS Franchising, LLC shall be transferred or assigned to HOA Franchise HoldCo. If HOA Franchise HoldCo is formed, it shall be governed by the HOA Franchise HoldCo LLC Agreement and shall enter into the Brand Management Agreement.

M.    Creation of HOA NewCo

On or prior to the Effective Date, HOA NewCo may be formed by HOA Systems, LLC. On or after the Effective Date, the equity interests in HOA Franchise HoldCo and HOA RoyaltyCo shall be transferred or assigned to HOA NewCo in accordance with the steps set forth in the Restructuring Steps Memorandum. The equity interests in HOA NewCo shall be owned 50% by the Holders of Manager Advance Term Loan Claims and 50% by the Holders of Class B Note Claims. If formed, HOA NewCo shall be governed by the HOA NewCo LLC Agreement.

N.    *Cancellation of Existing Interests, Indebtedness, and Other Obligations*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, the other DIP Facility Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the Prepetition Credit Agreements, the other Prepetition Loan Documents, the Prepetition Securitization Indenture, the other Securitization Notes Documents, the DIP Credit Agreement, and the other DIP Facility Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties under this Plan; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Prepetition Credit Agreements, the Prepetition Securitization Indenture, or the DIP Credit Agreement, as applicable; and (c) preserve any rights of (1) the Prepetition Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of Non-Securitization Manager Advance Term Loan Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors, and, (2) the Prepetition Securitization Trustee, any predecessor thereof, and the Control Party to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Securitization Notes Claims, including the Prepetition Securitization Trustee's priority in respect of payment under section 6.10 of the Securitization Notes Indenture and/or the right to exercise the Prepetition Securitization Trustee's charging lien under section 7.06(d) of the Prepetition

Securitization Notes Indenture, and to enforce its rights, claims and interests, vis-à-vis any party other than the Debtors, and (3) the DIP Agent and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to Holders of DIP Claims, including and rights to priority of payment and/or to exercise charging liens, and to enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; and (d) allow the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, or the DIP Agent to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, and the DIP Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.

Except for the foregoing, (i) subject to the performance by the Prepetition Agent of its obligations under the Plan, the Prepetition Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Loan Documents upon the occurrence of the Effective Date and the Prepetition MA Credit Agreement and the Prepetition Term Credit Agreement shall automatically be terminated on the Effective Date except to the extent they expressly survive by their terms (provided, that the Surviving Prepetition Credit Facility Provisions shall survive in accordance with the terms of the Prepetition Loan Documents); (ii) subject to the performance by the Prepetition Securitization Trustee of its obligations under the Plan, the Prepetition Securitization Trustee and the Control Party and each of its agents shall be relieved of all further duties and responsibilities related to the Securitization Notes Documents upon the occurrence of the Effective Date and the Securitization Notes Documents shall automatically be terminated on the Effective Date except to the extent they expressly survive by their terms; and (iii) subject to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its agents shall be relieved of all further duties and responsibilities related to the DIP Facility Documents upon the occurrence of the Effective Date (provided, that the Surviving DIP Provisions shall survive in accordance with the terms of the DIP Facility Documents).

The commitments and obligations (if any) of the Prepetition Lenders and/or any of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Term Loan Credit Agreement or the DIP Facility Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations,

satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

O.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the New Debt and the New Equity Interests; (ii) entry into the New Notes Documents; (iii) consummation of the Buyer Group Arrangements; (iv) implementation of the Restructuring Transactions; (v) establishment of the Litigation Trust, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors, Reorganized Debtors, or the Wind-Down Entity, and any corporate or other organizational action required by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Entity. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law. The foregoing does not extend to any equity holder or board actions required under applicable law with respect to HOA RoyaltyCo and any affiliate of HOA RoyaltyCo after the Effective Date.

P.      *Effectuating Documents; Restructuring Transactions*

1.      RESTRUCTURING TRANSACTIONS

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors and the Wind-Down Entity, as applicable, with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld), may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by the Plan or the Restructuring Steps Memo, or any transactions necessary to effectuate the Plan or the Buyer Group Arrangements, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement,

continuance, or dissolution pursuant to applicable state or local law; (iv) the issuance of securities; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Buyer Group Documents or the Restructuring Steps Memo (as applicable); (vi) the issuance of the New Debt and New Equity Interests; (vii) performing the Debtors' obligations under the Buyer Group Documents and any related agreements entered into in connection therewith, including the Transition Services Agreement (as defined in the Buyer Group APAs); and (viii) all other actions that the Debtors, Reorganized Debtors, or the Wind-Down Entity determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, or the Wind-Down Entity (collectively, the "***Restructuring Transactions***"). The foregoing does not extend to any equity holder or board actions required under applicable law with respect to HOA RoyaltyCo and any direct or indirect parent entity of HOA RoyaltyCo after the Effective Date.

 2.     <u>BUYER GROUP ARRANGEMENTS</u>

 On the Effective Date, certain of the Debtors will enter into a series of transactions with the Buyer Group or Hooters Brand Management, LLC pursuant to which: (i) each Divested Store will be acquired by a Buyer Group SPE; (ii) each lease related to a Divested Store will be assigned by the corresponding Debtor to the corresponding Buyer Group SPE; (iii) a franchisee agreement (or license agreement, if applicable) with respect to each Divested Store will be entered into by the corresponding Buyer Group SPE; (iv) royalty arrangements will be entered into between HOA RoyaltyCo and Hooters Brand Management, LLC in respect of the royalties generated by the Divested Stores and certain other licenses or monetization of IP; (v) all gift card liabilities shall be borne by Hooters Brand Management, LLC or the applicable franchisee (in each case, solely to the extent that such gift cards were issued on or prior to March 31, 2025 and have not been redeemed as of the closing of the Buyer Group Arrangements)[2]; (vi) each Buyer Group SPE will assume, for its corresponding Divested Store, certain current store-related liabilities incurred in the ordinary course that are not more than 30 days past due as of closing; and (vii) the parties will enter into certain other agreements and arrangements as agreed upon by the Debtors, the Buyer Group, or Hooters Brand Management, LLC, as applicable, and the Consenting Creditors. The Plan Supplement will contain any agreements entered into to effectuate the Buyer Group Arrangements.

 Q.     *Exemption from Certain Taxes and Fees*

 To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, including the Buyer Group Arrangements, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a)

---

[2]   NTD: subject to ongoing review.

of the Bankruptcy Code, (v) the grant of collateral under the New Notes Indenture, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

R.      *Preservation of Causes of Action*

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, transferred, or sold pursuant to the Buyer Group Documents or transferred and assigned to the Litigation Trust, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan and the Buyer Group Documents, the Reorganized Debtors or the Wind-Down Entity, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived as of the Effective Date.

The Reorganized Debtors and Wind-Down Entity may pursue such Retained Causes of Action in accordance with their respective best interests. The Reorganized Debtors and Wind-Down Entity shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors and Wind-Down Entity shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; provided, that any proceeds received by the Reorganized Debtors or the Wind-Down Entity, as applicable, on account of Causes of Action assigned to the Buyer Group or Hooters Brand Management, LLC, shall be immediately transferred to the Buyer Group or Hooters Brand Management, LLC, as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Debtors, Wind-Down Entity, or Litigation Trust shall not pursue any such Causes of Action against it, except as otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.** Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, or are assigned or transferred to (i) the Litigation Trust or (ii) Hooters Brand Management, LLC or the Buyer Group pursuant to the Buyer Group Documents, all such Causes of Action shall be expressly reserved by the Reorganized Debtors and Wind-Down

Entity for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

S.     *Insurance Policies*

1.     <u>DIRECTOR AND OFFICER LIABILITY INSURANCE</u>

Each insurance policy, including any director and officer liability insurance policies, to which the Debtors are a party as of the Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Debtors or Wind-Down Entity on behalf of the applicable Debtor effective as of the Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions with the Debtors after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

2.     <u>OTHER INSURANCE POLICIES</u>

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, each insurance policy to which the Debtors are a party as of the Effective Date shall be assumed by the Reorganized Debtor or Wind-Down Entity unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Combined Hearing.

3.     <u>ALL INSURANCE POLICIES</u>

Except as set forth in <u>Article IV.Q.1</u> of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Wind-Down Entity or draw on any collateral or security therefor.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, shall retain all rights and defenses under such

insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, the Reorganized Debtors and the Wind-Down Entity, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

T.    *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Reorganized Debtors and Wind-Down Entity shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

U.    *Dissolution of Certain Debtors*

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the Wind-Down Entity. The Reorganized Debtors and Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan (including the Buyer Group Documents), the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Assumption Schedule Filed with the Plan Supplement; (ii) as

54

of the Effective Date, is subject to a pending motion to assume or reject such Executory Contract or Unexpired Lease Filed by the Debtors on or before the Confirmation Date; (iii) terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is a D&O Liability Insurance Policy; (v) is deemed assumed pursuant to Article IV.Q of the Plan; (vi) is an Existing Franchise Agreement; or (vii) is to be assumed by the Debtors and assigned to Hooters Brand Management, LLC or the Buyer Group in connection with the Buyer Group Arrangements.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan and the Assumption Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors and Wind-Down Entity has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with Article V.D of the Plan and payment of the applicable Cure Claim, if any; provided, further, that the Plan shall not be construed as limiting the Debtors' authority to assume and assign Executory Contracts and Unexpired Leases pursuant to the Buyer Group Documents. Any Executory Contract or Unexpired Lease assumed under the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Wind-Down Entity in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors and Wind-Down Entity with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, reserve the right to alter, amend, modify, or supplement the Assumption Schedule with the consent of the Required Consenting Creditors, and subject to the terms of the Buyer Group Documents, at any time up to and including the later of the three (3) Business Days prior to the initial closing under the Buyer Group APAs and five (5) Business Days following the final resolution of any Disputed Contract, on no less than seven (7) days' notice to the applicable non-Debtor counterparties.  Any such contract that is removed from the Assumption Schedule shall be deemed rejected as of the Effective Date after the applicable notice period has expired.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or the Buyer Group Documents restricts or prevents, or purports to restrict or prevent, or is breached or deemed

breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan and the Buyer Group Documents shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the Buyer Group Arrangements and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease, and (iii) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Entity, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>Article VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors, in consultation with the DIP Lenders and Required Consenting AHG Noteholders, may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Dispute Resolution*

Prior to the Combined Hearing, the Debtors shall provide Cure Notices of proposed Cures to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cures or the Debtors', the Reorganized Debtors', Hooters Brand Management, LLC's, the Buyer Group's, or the Wind-Down Entity's ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be Filed, served, and received by counsel to the Debtors by the objection deadline set forth in the applicable Cure Notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have consented to such assumption or Cure.

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors, the Reorganized Debtors, Hooters Brand Management, LLC, the Buyer Group, the Wind-Down Entity, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor, the Reorganized Debtor,  or Wind-Down Entity, as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, Reorganized Debtor, or Wind-Down Entity (as applicable) may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Combined Hearing, such Assumption

57

Dispute may be scheduled to be heard by the Bankruptcy Court after the Combined Hearing (an "***Adjourned Cure Dispute***"); provided, that the Reorganized Debtor and the Wind-Down Entity may settle any Adjourned Cure Dispute with the applicable counterparty after the Effective Date without further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules or the Assumption Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Reorganized Debtors, or Wind-Down Entity shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, or the Wind-Down Entity under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Reorganized Debtors, Hooters Brand Management, LLC, the Buyer Group, or the Wind-Down Entity, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

G.      *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *General*

For the avoidance of doubt, all Allowed General Unsecured Claims shall receive distributions in accordance with the applicable provisions of this Plan and the Litigation Trust Agreement.

B.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, based on each Debtors' respective several liability in accordance with Article VII.J, but in no event shall the aggregate distribution exceed one-hundred percent of the underlying Allowed Claim plus applicable interest; provided, that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.    *Rights and Powers of Distribution Agent*

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>RECORD DATE FOR DISTRIBUTION</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, unless otherwise set forth in the DIP Order or the DIP Facility Documents.  The Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the holders of which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan or otherwise in accordance with the applicable procedures of DTC. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

2.    <u>DELIVERY OF DISTRIBUTIONS</u>

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim (except for distributions to Holders of Allowed General Unsecured Claims which are handled through the Litigation Trust) or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, shall be deposited with the Prepetition Agent and the DIP Agent, as applicable, for distribution to Holders of Non-Securitization Manager Advance Term Loan Claims or DIP Claims in accordance with the terms of the Prepetition Term Loan Credit Agreement and the DIP Credit Agreement, as applicable.  Distributions other than Cash will not be made to or by the DIP Agent or the Prepetition Agent and the DIP Agent and Prepetition Agent shall have no responsibility with respect to such distributions.  Rather, all distributions other than of Cash on account of Non-Securitization Manager Advance Term Loan Claims or DIP Claims, if any, may, with the consent of the Prepetition Agent and the DIP Agent, as applicable, be made by the Distribution Agent directly to Holders of Non-Securitization

Manager Advance Term Loan Claims and DIP Claims in accordance with the terms of the Plan, the Prepetition Term Loan Credit Agreement, and the DIP Credit Agreement, as applicable. Notwithstanding the foregoing, all distributions of Cash on account of Securitization Notes Claims, if any, shall be deposited with the Prepetition Securitization Trustee for distribution to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture, except to the extent that the Prepetition Securitization Trustee provides prior written consent to the Debtors that some or all of such distributions may be made by the Distribution Agent directly to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture. Distributions other than Cash will not be made to or by the Prepetition Securitization Trustee and the Prepetition Securitization Trustee shall have no responsibility with respect to such distributions. Rather, all distributions other than of Cash on account of Holders of Securitization Notes Claims, if any, shall be made by the Distribution Agent directly to Holders of Securitization Notes Claims in accordance with the terms of the Plan and the Prepetition Securitization Indenture. To the extent the Prepetition Agent, the Prepetition Securitization Trustee, or the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Agent, the Prepetition Securitization Trustee, and the DIP Agent shall be deemed a "Distribution Agent" for purposes of the Plan.

The amount of any reasonable and documented fees and expenses incurred by the Prepetition Agents, the Prepetition Securitization Trustee, and the DIP Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) shall be paid in Cash by the Reorganized Debtor or Wind-Down Entity and will not be deducted from distributions made to Holders of Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtor and Wind-Down Entity and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent, as determined by the Debtors or the Reorganized Debtors, as applicable.

3.    NO FRACTIONAL SHARES

No fractional shares or units of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of New Equity Interests that is not a whole number, such New Equity Interests shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares or units of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.     UNDELIVERABLE DISTRIBUTIONS AND UNCLAIMED PROPERTY

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent or Litigation Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this Article VI.C.4, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed New Equity Interests, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Debtors and the Wind-Down Entity without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent or Litigation Trustee, as applicable, of an intent to accept a particular distribution; (iii) responded to the requests of the Distribution Agent or Litigation Trustee, as applicable, for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

E.     *Securities Registration Exemption*

The offer, issuance, and sale under the Plan of the New Equity Interests in exchange for Claims pursuant to Article III of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from registration under the Securities Act or any other applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, except with respect to any New Equity Interests issued to an Entity that is an "underwriter" with respect to such New Equity Interests, as that term is defined in section 1145(b) of the Bankruptcy Code, which shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

The offering, issuance, and distribution of the New Debt in exchange for Claims pursuant to Article II and Article III of the Plan and, where applicable, in accordance with the terms of the Confirmation Order, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States or state securities laws pursuant to section 4(a)(2) of the Securities Act and equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Accordingly, the New Debt, and any New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act, if any, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law, such

as under certain conditions, the resale provisions of Rule 144 or Rule 144A of the Securities Act, and subject, further, to any restrictions on transferability thereof included in the New Notes Documents, the Shareholders Agreement, if any, and the New Organizational Documents, as applicable

With respect to the foregoing equity securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, (ii) is an "affiliate" of the issuer (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer, in each case subject to the restrictions, if any, on the transferability thereof in the Shareholders Agreement, if any, and the New Organizational Documents. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

None of the Debtors, the Wind-Down Entity, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests and New Debt under applicable securities laws. DTC, any transfer agent (as applicable), and all other Persons shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests and New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests or New Debt are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

F.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, or the Litigation Trust as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.  A General Unsecured Claim may be deemed disallowed in the event no written response is received to a request for tax identification information by the Litigation Trust upon not less than 90 days' notice. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, the Reorganized Debtors, and Wind-Down Entity, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe

are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent, the Reorganized Debtors, or Wind-Down Entity, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor or Wind-Down Entity and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.    *Allocations*

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

H.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I.    *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors or the Wind-Down Entity, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind-Down Entity may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Wind-Down Entity of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor, the Reorganized Debtor, or the Wind-Down Entity, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything herein to the contrary, neither the Reorganized Debtors, the Wind-Down Entity, nor the

Debtors may set off or recoup against any distributions made on account of any Non-Securitization Manager Advance Term Loan Claims, Securitization Notes Claims, or DIP Claims or any distributions to be made to parties to the Restructuring Support Agreement.

J.     *Claims Paid or Payable by Third Parties*

    1.    <u>CLAIMS PAID BY THIRD PARTIES</u>

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, the Distribution Agent, or the Litigation Trust. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Debtor, the Wind-Down Entity, the Distribution Agent, or the Litigation Trust on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Debtor, the Wind-Down Entity, the Distribution Agent or the Litigation Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors, the Wind-Down Entity, or the Litigation Trust may pursue any rights and remedies against such Holder under applicable law.

    2.    <u>CLAIMS PAYABLE BY INSURANCE CARRIERS</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

If an applicable insurance policy has or is subject to an SIR, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall, upon written approval of the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, have an Allowed General Unsecured Claim against the applicable Debtor's Estate up to the amount of the SIR amount that may be established upon the liquidation of the Claim, and such Holder's recovery from the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under the Plan. Such SIR shall be considered satisfied in full pursuant to the Plan through allowance of the General Unsecured Claim solely in the amount of the applicable SIR, if any; <u>provided</u>, <u>however</u> that nothing herein obligates the Debtors, the Reorganized Debtors, or the Litigation Trustee to actually disburse proceeds to satisfy any SIR in full under any insurance policy, including any reimbursement cost and expenses up to the SIR amount.

Any recovery on account of the Claim in excess of the SIR amount established upon the liquidation of the Claim shall be recovered solely from the Debtors' or Reorganized Debtors' insurance, if any, and only to the extent of available insurance and any proceeds thereof. If an applicable insurance policy has a retrospective premium retention or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have a Claim that can be recovered solely from the Debtors' insurance, if any, and only to the extent of available insurance and any proceeds thereof.

3.    <u>APPLICABILITY OF INSURANCE POLICIES</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII**

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance of Claims and Interests*

After the Effective Date, the Reorganized Debtors, the Litigation Trust, and the Wind-Down Entity shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

For the avoidance of doubt, all Assumed Liabilities (as defined in the Buyer Group Arrangements) shall be subject solely to the terms of the Buyer Group Arrangements and shall not be subject to the terms of the Plan.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have the authority (other than with respect to General Unsecured Claims) to: (i) to File, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors and the Wind-Down Entity shall have and retain any and all rights and defenses the Debtors had

66

immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

Except as otherwise specifically provided in the Plan and the Litigation Trust Agreement and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Litigation Trustee shall have the sole authority to File and prosecute objections to General Unsecured Claims, and shall have the authority, without further notice to or action, order, or approval by the Bankruptcy Court, to (i) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all such General Unsecured Claims; (ii) settle, compromise, or resolve any Disputed General Unsecured Claims; and (iii) administer and direct the adjustment of the Claims Register to reflect any such settlements or compromises.

To the extent a Claim is Filed against the Debtors that asserts Claims in more than one Class or asserting multiple priorities, the Reorganized Debtors, the Wind-Down Entity, and the Litigation Trustee shall cooperate in good faith on an efficient method to address, object to, or otherwise administer such Claim.

C.     *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Entity, or after the Effective Date as to any General Unsecured Claims, the Litigation Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors, the Reorganized Debtors, the Wind-Down Entity, or Litigation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.     *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, the Wind-Down Entity, or the Litigation Trust

upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

The Debtors, the Reorganized Debtors, the Wind-Down Entity, and the Litigation Trust, as applicable, shall be entitled to object to Claims before the Claims Objection Deadline, as such deadline may be extended from time to time. After the Effective Date, except as expressly provided herein to the contrary, the Reorganized Debtors, the Wind-Down Entity, and the Litigation Trustee shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline. The expiration of such period shall not limit or affect the Debtors', the Reorganized Debtors', the Wind-Down Entity's, or the Litigation Trust's rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the applicable Reorganized Debtor, the Wind-Down Entity, or Litigation Trust, as applicable. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. Any Claim filed after the Claims Bar Date without leave of Court or the consent of the Reorganized Debtors or the Litigation Trustee, as applicable, will be deemed Disallowed.

G.      *Amendments to Claims*

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Reorganized Debtor, the Wind-Down Entity, or the Litigation Trustee. Absent such authorization, any new or amended Claim Filed after the General Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

H.      *Disputed Claims Reserve*

The Reorganized Debtors, the Wind-Down Entity, or the Litigation Trustee, as applicable, shall establish each of the Disputed Claim Reserves, to the extent required or necessary, by either

establishing a segregated account or establishing book entry accounts, in the sole discretion of the Reorganized Debtors, the Wind-Down Entity, or, with respect to Disputed General Unsecured Claims, the Litigation Trustee, as applicable; provided that any Disputed Claims Reserve established for Disputed General Unsecured Claims shall be funded solely with the Litigation Trust Assets.

Any amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the applicable Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Combined Hearing in consultation with the Required Consenting Creditors, and with respect to Disputed General Unsecured Claims, in consultation with the Creditors' Committee, based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and the Disputed Claims Reserves shall be established on the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Distribution Agent or Litigation Trust shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B- 9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Distribution Agent, the Litigation Trust, and the holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disputed Claim Reserve shall be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Litigation Trustee shall distribute to the holder thereof out of the Disputed Claims Reserve established by the Litigation Trust any amount or property to which such holder is entitled hereunder (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution). No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

In the event the remaining assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied pro rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed by the Litigation Trust Pro Rata to all holders of Allowed General Unsecured Claims.

The Distribution Agent or Litigation Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

I.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Distribution Agent or Litigation Trustee shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors and the Wind-Down Entity may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

B.    *Discharge of Claims and Termination of Interests*

For the avoidance of doubt, upon consummation of the Buyer Group Arrangements as set forth in the Buyer Group Documents, the assets sold in such Buyer Group Arrangements shall be transferred to and vest in Hooters Brand Management, LLC or the Buyer Group, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances (other than Permitted Liens and Assumed Liabilities, each as defined in the applicable Buyer Group Documents) pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order and the Buyer Group APAs, as applicable.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "*event of default*" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Debtors, the Wind-Down Entity, or any of their Assets or property.

C.    *Releases by the Debtors*

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims,**

obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement, the New Notes Indenture, the Buyer Group Documents, Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing.

Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this Article VIII.C shall not be construed as (i) releasing any Non-Released Party; (ii) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (iii) releasing Preserved Other Intercompany Claims, (iv) releasing any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (v) releasing any Retained Causes of Action, any Litigation Trust Causes of Action, or any Causes of Action transferred pursuant to the Buyer Group Documents and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties; **provided**, **however**, that the special

**committee of officers of Hooters of America, LLC shall not so designate the Prepetition Lenders, the Prepetition Agent, the Prepetition Securitization Trustee, the Control Party, the Consenting AHG Noteholders, the DIP Lenders, or the DIP Agent, and the Prepetition Lenders, the Prepetition Agent, the DIP Lenders, the Prepetition Securitization Trustee, the Consenting AHG Noteholders, the Control Party, and the DIP Agent shall be and shall indefinitely remain Released Parties under the terms of the Plan. Notwithstanding anything to the contrary in the foregoing or in the defined term "Released Parties," Avoidance Actions against any Released Parties (including the Ordinary Course Parties) shall be deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged by the Debtors, the Wind-Down Entity, and the Estates.**

D.    *Releases by the Releasing Parties*

**Except as otherwise provided in the Plan or in the Confirmation Order, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Wind-Down Entity, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement, the New Notes Indenture, the Buyer Group Documents, the Prepetition Credit Agreements, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and**

consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related to the foregoing. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in this **Article VIII.D** shall not be construed as releasing, and do not release, (i) any Non-Released Party; (ii) any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, (iii) any Preserved Other Intercompany Claim, (iv) any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Buyer Group Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (v) any rights of Holders of Allowed Claims to receive distributions under the Plan, and (II) to the extent that the special committee of officers of Hooters of America, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the applicable Releasing Party will be null and void and the Releasing Party will have no obligations to offer or consent to such releases of such party or any of its Related Parties. For the avoidance of doubt, the releases set forth in this Article VIII.D shall not be construed as releasing any Litigation Trust Causes of Action, Retained Causes of Action, or Acquired Causes of Action.

E.      *Exculpation*

        Without affecting or limiting the releases set forth in **Article VIII.C and Article VIII.D** of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility Documents, the Restructuring Support Agreement, the Plan (including the New Notes Documents and the Plan Supplement), the Disclosure Statement, the Restructuring Transactions, the New Debt, the Prepetition Loan Documents, the Securitization Notes Documents, the prepetition and postpetition marketing process, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Debt, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to

the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this **Article VIII.E** of the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including, without limitation, the New Notes Documents, and the New Organizational Documents.

F.    *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO **ARTICLE VIII.E** OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN

**CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.**

**THE RELEASES AND INJUNCTION SET FORTH IN THIS ARTICLE VIII IN FAVOR OF NON-DEBTOR PARTIES SHALL ONLY APPLY TO HOLDERS OF CLAIMS OR INTERESTS IF SUCH HOLDER OF A CLAIM OR INTEREST TIMELY OPTS INTO THE RELEASES.  FOR THE AVOIDANCE OF DOUBT, ALL HOLDERS OF CLAIMS AND INTERESTS, WHETHER OR NOT THEY OPT INTO THE RELEASES SHALL BE ENJOINED FROM ASSERTING OR CONTINUING TO PURSUE ANY CLAIM OR CAUSE OF ACTION ARISING PRIOR TO ENTRY OF THE CONFIRMATION ORDER AGAINST THE DEBTORS OR THEIR ESTATES TO THE EXTENT SUCH CLAIMS ARE ADDRESSED BY, OR SATISFIED IN ACCORDANCE WITH, THIS PLAN.**

**THE INJUNCTIONS IN THIS ARTICLE VIII.F SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE WIND-DOWN ENTITY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

G.    *Debtor D&O Claims*

Notwithstanding anything to the contrary herein, Claims and Causes of Action against the Debtors' directors and officers shall not be released pursuant to the Plan, and are expressly preserved. The Litigation Trust shall be entitled to assert any Litigation Trust Causes of Action against any Debtor D&O and to obtain a judgment against or settlement with the Debtor D&O with respect to such Claim or Cause of Action, which judgment or settlement shall not be limited to available insurance proceeds; provided, however, that the Litigation Trust shall, in enforcing

the judgment or settlement, first collect from available insurance proceeds to satisfy the judgment or settlement, but will not enforce the judgment or settlement beyond applicable insurance limits. In the event there is no available insurance because of the fraud, willful conduct or personal profit exclusions in the D&O Liability Insurance Policies, any judgment or settlement shall be enforced without any limitation. No provision of the Plan shall be construed as a release or waiver of any Insurance Carrier's obligations to provide coverage for any claim or Cause of Action asserted against any Debtor D&O.

H. *No Release of Any Claims Held by Governmental Units*

Nothing in the Confirmation Order or this Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

I. *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

J. *Release of Liens*

Except (i) with respect to the Liens securing the New Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Buyer Group Documents, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Entity and its successors and assigns. On and after the Effective Date, the Reorganized

Debtors and the Wind-Down Entity (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of this Article VIII.H.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

The Prepetition Agent and the DIP Agent will reasonably cooperate with respect to any requests made in writing by the Debtors or Reorganized Debtors regarding specific release documentation reasonably required, and the Debtors or Reorganized Debtors will pay the fees and expenses of the Prepetition Agent and the DIP Agent promptly on request for any work necessary and requested by the Debtors or Reorganized Debtors to effectuate the Plan, including with respect to releases.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to consummation of the Plan that the conditions in (1)-(16) shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B of the Plan); provided that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "Prerequisite Condition") may be required to occur prior to another condition precedent (a "Subsequent Condition") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred:

1.    The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

2.    The Definitive Documents shall (i) be consistent in all respects with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent in all respects with the Restructuring Support Agreement and the Restructuring Term Sheet;

3.    The DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the Required DIP Lenders party thereto;

4.      The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

5.      The Confirmation Order confirming the Plan and approving the Buyer Group Arrangements shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;

6.      The New Notes Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the Required DIP Lenders, and the Required Consenting AHG Noteholders), other than such conditions that relate to the effectiveness of the Plan and related transaction;

7.      The New Equity Interests shall have been issued (with all conditions precedent thereto having been satisfied or waived);

8.      All Restructuring Expenses, including the fees and expenses of the Prepetition Agent and the DIP Agent, and any other fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement pursuant to an order of the Bankruptcy Court shall have been paid in full in Cash;

9.      Buyer Group shall have provided to the DIP Lenders and the Required Consenting AHG Noteholders definitive documentation satisfactory to the DIP Lenders and the Required Consenting AHG Noteholders in respect of committed capital the Buyer Group has available to fund capital expenditures, operational expenditures, and other funding expenditures needed for the Divested Stores;

10.      The conditions precedent to closing the Buyer Group Arrangements and the Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Effective Date;

11.      Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions, the Buyer Group Arrangements, and the Plan shall have been obtained (including as set forth in the applicable purchase agreement);

12.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the Restructuring Transactions, the Plan, or any other transaction contemplated hereby;

13.      The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

14.      There shall not be in effect any order by a governmental authority or court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the

Restructuring Transactions or the Buyer Group Arrangements or any material portion or aspect thereof;

15.     All conditions precedent to the effectiveness of the Litigation Trust Agreement shall have been satisfied or duly waived by the party whose consent is required thereunder and the Litigation Trust Agreement shall be in full force and effect; and

16.     The Litigation Trust Initial Funding and the GUC Cash Settlement Amount shall have been paid to the Litigation Trust and the Litigation Trust Causes of Action shall have been transferred to the Litigation Trust.

B.     *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this <u>Article IX</u> may be waived only by the Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); (iii) the Creditors' Committee as to any conditions which impact or relate to the formation and funding of the Litigation Trust and the transfer of the Litigation Trust Assets to the Litigation Trust; and (iv) the Buyer Group or Hooters Brand Management, LLC, whose consent rights under the Plan are subject in all respects to the Restructuring Support Agreement remaining in effect at the time of any such waiver and are solely to the extent the waiver adversely affects the Buyer Group or Hooters Brand Management, LLC, as applicable (such consent not to be unreasonably withheld, conditioned, or delayed), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.     *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.     *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments*

The Debtors, with the consent of (i) the Required Consenting AHG Noteholders (which consent shall not be unreasonably withheld, conditioned, or delayed); (ii) the Required DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); (iii) the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed); and (iv) the Buyer Group and Hooters Brand Management, LLC (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of (a) the Required Consenting Creditors (which consent shall not be unreasonably withheld, conditioned, or delayed); (b) the DIP Lenders (such consent not to be unreasonably withheld, conditioned, or delayed); (c) the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed); and (d) the Buyer Group and Hooters Brand Management, LLC, whose consent rights under the Plan are subject in all respect to the Restructuring Support Agreement remaining in effect at the time any modification is requested (such consent not to be unreasonably withheld, conditioned, or delayed), as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Buyer Group Arrangements.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan, in accordance with Article X.A of the Plan occurring after the solicitation thereof but before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date, in consultation with the DIP Lenders and Required Consenting AHG Noteholders. If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; (iii) the Committee Challenge Deadline (as defined in the DIP Order), which would otherwise terminate on the Effective Date of the Plan, shall be extended for thirty (30) days from the date the Plan is revoked or withdrawn; and (iv) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, or (d) be used against the Debtors or any other Entity as evidence

(or in any other way) in any litigation, including with regard to the strengths and weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors, the Reorganized Debtors, or the Wind-Down Entity, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption,  assumption and assignment, or rejection  of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to

such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.        adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including the Buyer Group Arrangements;

9.        enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the consummation of the Plan, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, implementation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including with respect to the Buyer Group Arrangements and the Litigation Trust;

12.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other

provisions contained in <u>Article VIII</u> of the Plan and enter such orders as may be necessary or appropriate to implement such releases, exculpations, injunctions, and other provisions;

14.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Article VI.I</u> of the Plan;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    enforce or determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the DIP Facility Documents, the DIP Orders, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

17.    hear and determine disputes arising in connection with Buyer Group Arrangements;

18.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

20.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

23.    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

24.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in the Plan, including under <u>Article VIII</u> hereof;

25.    enforce all orders previously entered by the Bankruptcy Court;

26.    hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

27.     enter an order concluding or closing the Chapter 11 Cases;

28.     recover all assets of the Debtors and property of the Debtors' Estates, wherever located, and

29.     enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in <u>Article VIII</u> of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

A.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Ad Hoc Group, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties, any of such individuals, the Reorganized Debtors, nor the Wind-Down Entity will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

B.      *Immediate Binding Effect*

Subject to <u>Article IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the Wind-Down Entity, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

C.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided*, that any material documents Filed shall be in consultation with the DIP Lenders, the Required Consenting AHG Noteholders, the Creditors' Committee (to the extent such documents relate to or impact the Litigation Trust or the treatment of General Unsecured Creditors under the Plan), and the Buyer Group. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.    *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors and Wind-Down Entity, as applicable, shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

E.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with <u>Article IX.A</u> of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or any other party with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the Reorganized Debtors or Wind-Down Entity, the Consenting AHG Noteholders, Counsel to the DIP Lender, and the Buyer Group or Hooters Brand Management, LLC shall be served on:

| | |
|---|---|
| Debtors: | Hooters of America, LLC<br>1815 The Exchange SE,<br>Atlanta, GA 30339<br>Attn: Keith Maib (kmaib@accordion.com) |
| | with copies to: |
| Counsel to Debtors: | Ropes & Gray LLP<br>191 North Wacker, 32nd Floor<br>Chicago, IL 60606<br>Attn:  Chris L. Dickerson (chris.dickerson@ropesgray.com)<br>         Rahmon J. Brown (rahmon.brown@ropesgray.com)<br>         Michael Wheat (michael.wheat@ropesgray.com) |
| | - and - |
| | Foley & Lardner LLP<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201<br>Attn: Holland N. O'Neil (honeil@foley.com)<br>         Stephen A. Jones (sajones@foley.com)<br>         Zachary C. Zahn (zzahn@foley.com) |
| Counsel to the Consenting AHG Noteholders: | White & Case LLP<br>200 South Biscayne Blvd., Suite 4900<br>Miami, FL 33131<br>Attn:      Brian Pfeiffer (brian.pfeiffer@whitecase.com)<br>            Amanda Parra Criste (aparracriste@whitecase.com)<br>            Andrew Rudolph (andrew.rudolph@whitecase.com) |
| | -and- |
| | White & Case LLP<br>1121 Avenue of the Americas<br>New York, NY 10020<br>Attn:  David Thatch (dthatch@whitecase.com) |
| Counsel to the DIP Lender: | Sidley Austin LLP<br>1999 Avenue of the Stars, 17th Floor<br>Los Angeles, CA 90067<br>Attn:  Genevieve G. Weiner (gweiner@sidley.com) |
| | Sidley Austin LLP<br>787 7th Avenue<br>New York, NY 10019<br>Attn:  Elizabeth R. Tabas Carson (etabas@sidley.com) |

-and-

Sidley Austin LLP
2021 McKinney Avenue #2000
Dallas, TX 75201
Attn: Jeri Leigh Miller (jeri.miller@sidley.com)

| Counsel to the Buyer Group and Hooters Brand Management, LLC | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attn: Benjamin W. Butterfield (bbutterfield@mofo.com)<br>    Ilayna Guevrekian (iguevrekian@mofo.com) |
| --- | --- |
| Counsel to the Official Committee of Unsecured Creditors | Pachulski Stang Ziehl & Jones LLP<br>700 Louisiana Street, Suite 4500<br>Houston, TX 77002<br>Attention: Maxim Litvak (mlitvak@pszjlaw.com)<br>Judith Elkin (jelkin@pszjlaw.com)<br>Theodore Heckel (theckel@pszjlaw.com)<br><br>-and-<br><br>Pachulski Stang Ziehl & Jones LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>Attn: Bradford Sandler (bsandler@pszjlaw.com)<br>    Robert Feinstein (rfeinstein@pszjlaw.com)<br>    Shirley Cho (scho@pszjlaw.com) |

H.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, which request shall be consistent with the terms of the Restructuring Support Agreement, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors , (y) the Required Consenting Creditors, and (z) solely to the extent that the Restructuring Support Agreement remains effective as to the Buyer Group, and to the extent that such alteration materially impacts the Buyer Group, then the Buyer Group and Hooters Brand Management, LLC The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors, (y) the Required Consenting Creditors, and (z) the Buyer Group and Hooters Brand Management, LLC; and (iii) nonseverable and mutually dependent.

K.      *Dissolution of Committee*

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims. Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

L.      *Expedited Tax Determination*

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns Filed or to be Filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Effective Date.

**\*\*\*\***

Respectfully submitted, as of October 30, 2025

Hawk Parent, LLC
HOA Holdings, LLC
Night Owl, LLC
Owl Wings, LLC
Owl Restaurant Holdings, LLC
Owl Holdings, LLC
Elf Owl Investments, LLC
TW Lonestar Wings, LLC
Alamo Wings, LLC
HOA Restaurant Group, LLC
Derby Wings Holdings, LLC
Derby Wings, LLC
Hooters of America, LLC
HOA Funding, LLC
HOA Holdco, LLC
HOA Systems, LLC
HOA Restaurant Holder, LLC
HOOTS Restaurant Holder, LLC
HOA IP GP, LLC
HOOTS Franchising, LLC
HOA Franchising, LLC
HOA Maryland Restaurant Holder, LLC
HOA Kansas Restaurant Holder, LLC
TW Restaurant Holder, LLC
DW Restaurant Holder, LLC
HI Limited Partnership
HOA Towson, LLC
HOA Waldorf, LLC
HOA Laurel, LLC
HOA Gift Cards, LLC

By:     */s/ Keith Maib*
Name: Keith Maib
Title:  Authorized Officer