# EXHIBIT A

**Second Amended & Restated Base Indenture**

# EXHIBIT A.1(a)

## Second Amended & Restated Base Indenture

**EXECUTION VERSION**

---

**HOA ROYALTYCO LLC**,
as Master Issuer

and

**CITIBANK, N.A.**,
as Trustee and Securities Intermediary

---

**SECOND AMENDED AND RESTATED BASE INDENTURE**

Dated as of October 31, 2025

---

Royalty Backed Notes

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND INCORPORATION BY REFERENCE ................................. 2

    Section 1.1.    Definitions ........................................................................................ 2

    Section 1.2.    Cross-References ................................................................................ 2

    Section 1.3.    Accounting and Financial Determinations; No Duplication ............................ 2

    Section 1.4.    Rules of Construction ........................................................................ 2

ARTICLE II THE NOTES ...................................................................................... 4

    Section 2.1.    Designation and Terms of Notes ............................................................ 4

    Section 2.2.    Notes Issuable in a Single Series. .......................................................... 4

    Section 2.3.    Execution and Authentication ............................................................... 4

    Section 2.4.    Registrar and Paying Agent ................................................................. 5

    Section 2.5.    Paying Agent to Hold Money in Trust ...................................................... 6

    Section 2.6.    Calculation and Reporting Agent ........................................................... 7

    Section 2.7.    Noteholder List ................................................................................ 8

    Section 2.8.    Transfer and Exchange ....................................................................... 9

    Section 2.9.    Persons Deemed Owners .................................................................... 10

    Section 2.10.    Replacement Notes .......................................................................... 10

    Section 2.11.    Treasury Notes ............................................................................... 11

    Section 2.12.    Book-Entry Notes ............................................................................ 11

    Section 2.13.    Definitive Notes .............................................................................. 13

    Section 2.14.    Cancellation .................................................................................. 13

    Section 2.15.    Principal and Interest ....................................................................... 14

    Section 2.16.    Tax Treatment; AHYDO Catch-Up ...................................................... 15

    Section 2.17.    Subsequent Mandatory Exchange ........................................................ 16

ARTICLE III SECURITY ..................................................................................... 16

    Section 3.1.    Grant of Security Interest. .................................................................. 16

    Section 3.2.    Certain Rights and Obligations of the Master Issuer Unaffected .................... 18

    Section 3.3.    Performance of Collateral Documents ................................................... 18

    Section 3.4.    Stamp, Other Similar Taxes and Filing Fees ........................................... 19

    Section 3.5.    Authorization to File Financing Statements ............................................ 19

ARTICLE IV REPORTS ....................................................................................... 20

i

Section 4.1.    Reports and Instructions to Trustee ................................................................ 20

Section 4.2.    Rule 144A Information ............................................................................... 21

Section 4.3.    Reports and Other Information to Noteholders ........................................... 21

Section 4.4.    No Constructive Notice ............................................................................. 22

ARTICLE V ALLOCATION AND APPLICATION OF COLLECTIONS ............................. 22

Section 5.1.    Collection Account .................................................................................... 22

Section 5.2.    Collection Account Administrative Accounts .............................................. 23

Section 5.3.    Trustee as Securities Intermediary ............................................................ 24

Section 5.4.    Collections and Investment Income ........................................................... 25

Section 5.5.    Application of Monthly Collections on Monthly Allocation Dates ............... 27

Section 5.6.    Optional Prepayments ............................................................................... 28

Section 5.7.    Determination of Monthly Interest ............................................................ 29

Section 5.8.    Prepayment of Principal ............................................................................ 29

Section 5.9.    Operating Expense Account. ...................................................................... 29

Section 5.10.   Replacement of Ineligible Accounts ........................................................... 29

ARTICLE VI DISTRIBUTIONS ....................................................................................... 30

Section 6.1.    Distributions in General ............................................................................ 30

ARTICLE VII REPRESENTATIONS AND WARRANTIES ................................................ 30

Section 7.1.    Existence and Power ................................................................................. 30

Section 7.2.    Company and Governmental Authorization ................................................ 31

Section 7.3.    No Consent .............................................................................................. 31

Section 7.4.    Binding Effect .......................................................................................... 31

Section 7.5.    Employee Benefit Plans ............................................................................ 32

Section 7.6.    Disclosure ................................................................................................ 32

Section 7.7.    Investment Company Act .......................................................................... 32

Section 7.8.    Regulations T, U and X ............................................................................ 32

Section 7.9.    Ownership of Equity Interests; Subsidiaries .............................................. 32

Section 7.10.   Security Interests ..................................................................................... 33

Section 7.11.   Related Documents ................................................................................... 34

Section 7.12.   Compliance with Contractual Obligations and Laws .................................. 34

Section 7.13.   No Employees .......................................................................................... 34

Section 7.14.   Insurance ................................................................................................. 35

Section 7.15.   Intellectual Property ................................................................................ 35

ARTICLE VIII COVENANTS ........................................................................................... 35

Section 8.1.    Payment of Notes.................................................................... 35

Section 8.2.    Payment and Performance of Obligations ....................................... 36

Section 8.3.    Maintenance of Existence........................................................... 36

Section 8.4.    Compliance with Laws............................................................... 36

Section 8.5.    Inspection of Property; Books and Records ..................................... 37

Section 8.6.    Actions under the Collateral Documents and Related Documents.................. 37

Section 8.7.    Notice of Defaults and Other Events ............................................. 37

Section 8.8.    Further Requests .................................................................... 37

Section 8.9.    Further Assurances .................................................................. 38

Section 8.10.   Liens ................................................................................ 38

Section 8.11.   Other Indebtedness .................................................................. 38

Section 8.12.   Litigation ........................................................................... 39

Section 8.13.   Mergers .............................................................................. 39

Section 8.14.   Asset Dispositions .................................................................. 39

Section 8.15.   Dividends, Officers' Compensation, etc............................................ 40

Section 8.16.   Legal Name, Location Under Section 9-301 or 9-307 .................... 40

Section 8.17.   Covenants Regarding the Collateral IP ........................................... 41

Section 8.18.   1940 Act ............................................................................. 41

Section 8.19.   Real Property ........................................................................ 41

Section 8.20.   No Employees......................................................................... 41

ARTICLE IX REMEDIES .......................................................................... 41

Section 9.1.    Events of Default ................................................................... 41

Section 9.2.    Rights of the Trustee upon Event of Default..................................... 44

Section 9.3.    Waiver of Appraisal, Valuation, Stay and Right to Marshaling.................... 47

Section 9.4.    Limited Recourse..................................................................... 47

Section 9.5.    Waiver of Past Events................................................................ 47

Section 9.6.    Limitation on Suits .................................................................. 48

Section 9.7.    Unconditional Rights of Noteholders to Receive Payment ........................... 48

Section 9.8.    The Trustee May File Proofs of Claim.............................................. 48

Section 9.9.    Undertaking for Costs................................................................ 49

Section 9.10.   Restoration of Rights and Remedies ............................................... 49

Section 9.11.   Rights and Remedies Cumulative...................................................... 49

Section 9.12.   Delay or Omission Not Waiver ....................................................... 50

Section 9.13.   Waiver of Stay or Extension Laws .................................................. 50

ARTICLE X THE TRUSTEE ............................................................................................ 50

Section 10.1.    Duties of the Trustee.................................................................................... 50

Section 10.2.    Rights of the Trustee.................................................................................... 53

Section 10.3.    Individual Rights of the Trustee .................................................................. 56

Section 10.4.    Notice of Events of Default and Defaults..................................................... 56

Section 10.5.    Compensation and Indemnity ...................................................................... 57

Section 10.6.    Replacement of the Trustee ......................................................................... 57

Section 10.7.    Successor Trustee by Merger, etc ................................................................ 58

Section 10.8.    Eligibility Disqualification .......................................................................... 59

Section 10.9.    Appointment of Co-Trustee or Separate Trustee.......................................... 59

Section 10.10.   Representations and Warranties of Trustee .................................................. 60

ARTICLE XI DISCHARGE OF INDENTURE............................................................................ 61

Section 11.1.    Termination of the Master Issuer's and Guarantors' Obligations ................. 61

Section 11.2.    Application of Trust Money ......................................................................... 62

Section 11.3.    Repayment to the Master Issuer .................................................................. 63

Section 11.4.    Reinstatement ............................................................................................. 63

ARTICLE XII AMENDMENTS ................................................................................................ 63

Section 12.1.    Without Consent of the Required Holders. ................................................... 63

Section 12.2.    With Consent of the Required Holders.......................................................... 66

Section 12.3.    Supplements................................................................................................ 67

Section 12.4.    Revocation and Effect of Consents .............................................................. 67

Section 12.5.    Notation on or Exchange of Notes ............................................................... 68

Section 12.6.    The Trustee to Sign Amendments, etc........................................................... 68

Section 12.7.    Amendments and Fees ................................................................................ 68

Section 12.8.    Amendment of Other Related Documents...................................................... 68

ARTICLE XIII MISCELLANEOUS ......................................................................................... 70

Section 13.1.    Notices ....................................................................................................... 70

Section 13.2.    Communication by Noteholders With Other Noteholders ............................. 72

Section 13.3.    Officer's Certificate and Opinion of Counsel as to Conditions Precedent...... 72

Section 13.4.    Statements Required in Certificate ............................................................... 72

Section 13.5.    Rules by the Trustee .................................................................................... 72

Section 13.6.    Benefits of Indenture ................................................................................... 73

Section 13.7.    Payment on Business Day ........................................................................... 73

Section 13.8.    Governing Law ............................................................................................ 73

Section 13.9.    Successors .................................................................................................. 73

Section 13.10.   Severability ............................................................................................... 73

Section 13.11.   Counterpart Originals ............................................................................. 73

Section 13.12.   Table of Contents, Headings, etc .......................................................... 74

Section 13.13.   No Bankruptcy Petition Against the Obligor Entities ...................... 74

Section 13.14.   Recording of Indenture ......................................................................... 74

Section 13.15.   Waiver of Jury Trial ............................................................................... 74

Section 13.16.   Submission to Jurisdiction; Waivers .................................................. 74

Section 13.17.   Permitted Asset Dispositions; Release of Collateral ....................... 75

Section 13.18.   Electronic Signatures and Transmission ............................................ 75

Section 13.19.   Amendment and Restatement .............................................................. 76

## ANNEXES

Annex A        Base Indenture Definitions List

## EXHIBITS

Exhibit A       Monthly Noteholders' Report
Exhibit B       Form of Investor Request Certification

SECOND AMENDED AND RESTATED BASE INDENTURE, dated as of October 31, 2025 (the "Closing Date"), by and between HOA ROYALTYCO LLC (f/k/a HOA Funding, LLC), a Delaware limited liability company (the "Master Issuer"), and CITIBANK, N.A., a national banking association, as trustee (in such capacity, the "Trustee"), and as securities intermediary.

W I T N E S E T H :

WHEREAS, the Trustee and the Master Issuer and certain other Securitization Entities (as defined in the Original Base Indenture (as defined below)) previously entered into the Base Indenture, dated as of August 12, 2014 (the "Original Base Indenture"), which was amended and restated by the Amended and Restated Base Indenture, dated as of August 19, 2021 (the "First A&R Base Indenture"), between the Master Issuer and the Trustee;

WHEREAS, on March 31, 2025, Hooters of America, LLC and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, which initiated the chapter 11 cases jointly administered under lead case *In re Hooters of America, LLC*, Case No. 25-80078 (SWE);

WHEREAS, pursuant to the Approved Plan, the Debtors have agreed to restructure their business;

WHEREAS, in accordance with the Approved Plan, the Master Issuer has duly authorized the execution and delivery of this Second Amended and Restated Base Indenture (this "Base Indenture") to provide for the issuance on the date hereof of the series of royalty backed notes (the "Notes"), as provided in this Base Indenture and in a supplement to this Base Indenture, dated as of the date hereof (the "Series Supplement");

WHEREAS, in accordance with the Approved Plan and substantially concurrently with the effectiveness of this Base Indenture, all Notes as defined under and issued pursuant to the First A&R Base Indenture have been cancelled in exchange for the issuance of Notes under this Base Indenture and/or for interests in other securities as follows: (i) the debtor-in-possession term-loan facility as described in the Approved Plan has been converted into Series 2025-1 Class A-1 Notes hereunder, (ii) Series 2021-1 Class A-2 Notes (as defined under and issued pursuant to the First A&R Base Indenture) have been cancelled in exchange for the issuance of Series 2025-1 Class A-2I Notes hereunder, (iii) manager advance claims that were outstanding under the First A&R Base Indenture (as described in the Approved Plan) have been cancelled in exchange for the issuance of Series 2025-1 Class A-2II Notes hereunder and (iv) Series 2021-1 Class B Notes (as defined under and issued pursuant to the First A&R Base Indenture) have been cancelled in exchange for the issuance of Series 2025-1 Class B Notes hereunder and for interests in other securities; and

WHEREAS, all things necessary to make this Base Indenture a legal, valid and binding agreement of the Master Issuer, in accordance with its terms, have been done, and the Master Issuer proposes to do all the things necessary to make the Notes, when executed by the Master Issuer and authenticated and delivered (or registered in the case of Uncertificated Notes) by the Trustee hereunder and duly issued by the Master Issuer, the legal, valid and binding obligations of the Master Issuer as hereinafter provided and to amend and restate, and to regrant the security interests

created pursuant to this Base Indenture in favor of the Trustee for the ratable benefit of the Secured Parties (as hereinafter defined);

NOW, THEREFORE, for and in consideration of the premises and the receipt of the Notes by the Noteholders, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Noteholders (in accordance with the priorities set forth herein and in the Series Supplement), as follows:

# ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1.    Definitions.

Capitalized terms used herein (including the preamble and the recitals hereto) shall have the meanings assigned to such terms in the Base Indenture Definitions List attached hereto as Annex A (the "Base Indenture Definitions List"), as such Base Indenture Definitions List may be amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof.

Section 1.2.    Cross-References.

Unless otherwise specified, references in the Indenture and in each other Related Document to any Article or Section are references to such Article or Section of the Indenture or such other Related Document, as the case may be, and, unless otherwise specified, references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

Section 1.3.    Accounting and Financial Determinations; No Duplication.

Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any accounting computation is required to be made, for the purpose of the Indenture or any other Related Document, such determination or calculation shall be made, to the extent applicable and except as otherwise specified in the Indenture or such other Related Document, in accordance with GAAP. When used herein, the term "financial statement" shall include the notes and schedules thereto. All accounting determinations and computations hereunder or under any other Related Documents shall be made without duplication.

Section 1.4.    Rules of Construction.

In the Indenture and the other Related Documents, unless the context otherwise requires:

(a)    the singular includes the plural and vice versa;

(b)    reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by the Indenture and the other applicable Related Documents, as the case may be, and reference to any Person in a particular capacity only refers to such Person in such capacity;

2

(c)      reference to any gender includes the other gender;

(d)      reference to any Requirement of Law means such Requirement of Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time;

(e)      "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(f)      the word "or" is always used inclusively herein (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both"), unless used in an "either . . . or" construction;

(g)      reference to any Related Document or other contract or agreement means such Related Document, contract or agreement as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, except (i) with respect to the defined terms that define such Related Document or other contract or agreement as of certain amendments or other modifications thereto and (ii) as the context otherwise requires;

(h)      with respect to the determination of any period of time, except as otherwise specified, "from" means "from and including" and "to" means "to but excluding";

(i)      if (i) any funds deposited to an Account are to be paid or allocated, or any action described in the Monthly Noteholders' Report is to be taken on or prior to the "following Monthly Allocation Date", the "Monthly Allocation Date immediately following" or on the "immediately following Monthly Allocation Date", such payment, allocation or action shall occur on (or prior to, if applicable) the Monthly Allocation Date related to the Monthly Collection Period in which such deposit occurs or on (or prior to, if applicable) the Monthly Allocation Date to which the Monthly Noteholders' Report relates, as applicable, and (ii) an action or event is to occur with respect to a Monthly Collection Period immediately preceding a Monthly Allocation Date, such action or event shall occur with respect to the most recent Monthly Collection Period ending prior to such Monthly Allocation Date;

(j)      references to (i) the "Monthly Collection Period" means the most recent Monthly Collection Period ending prior to the indicated date and (ii) the "immediately preceding Monthly Collection Period" means the most recent Monthly Collection Period ending prior to the indicated date;

(k)      this Indenture and the other Related Documents shall be interpreted in a manner consistent with the implementation of the Approved Plan; and

(l)      if the Master Issuer is required hereunder or under any Related Document to perform or cause another party to perform an action, the Master Issuer's obligation to perform such action shall be considered satisfied by contracting with a third party to perform such action.

# ARTICLE II

# THE NOTES

Section 2.1.    Designation and Terms of Notes.

(a)    The Notes shall be substantially in the form specified in the Series Supplement and shall bear, upon their face, the designation for the Series to which it belongs as selected by the Master Issuer, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted hereby or by the Series Supplement and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined to be appropriate by the Authorized Officers of the Master Issuer executing such Notes, as evidenced by execution of such Notes by such Authorized Officers. All Notes shall, except as specified in the Series Supplement and in the Base Indenture, be equally and ratably entitled as provided herein to the benefits hereof without preference, priority or distinction on account of the actual time or times of authentication and delivery (or registration in the case of the Uncertificated Notes), all in accordance with the terms and provisions of this Base Indenture and the Series Supplement. The aggregate principal amount of Notes which may be authenticated and delivered (or registered, in the case of the Uncertificated Notes) under this Base Indenture is limited to the aggregate principal amount of the Notes issued on the date hereof. The Notes shall be issued in the denominations set forth in the Series Supplement.

Section 2.2.    Notes Issuable in a Single Series.

There shall be a single Series of Notes, issued on the date hereof and created pursuant to the Series Supplement. Such Notes shall be executed (other than with respect to any Uncertificated Notes, which shall be registered in accordance with this Base Indenture and the Series Supplement) by the Master Issuer and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered by the Trustee upon the receipt by the Trustee of (i) the Series Supplement, (ii) a Company Order authorizing and directing the authentication and delivery of the Notes (or registration in the case of any Uncertificated Notes) by the Trustee and specifying the designation of the Series, the Initial Principal Amount of each Class, Subclass or Tranche of the Notes (or the method for calculating such Initial Principal Amount) to be authenticated and the Note Rate with respect to each such Class, Subclass or Tranche, and (iii) such other documents, instruments, certificates, agreements or other items as the Trustee may reasonably require.

Section 2.3.    Execution and Authentication.

(a)    The Notes (other than Uncertificated Notes) shall, upon issuance, be executed on behalf of the Master Issuer by an Authorized Officer of the Master Issuer and delivered by the Master Issuer to the Trustee for authentication and redelivery as provided herein. The signature of each such Authorized Officer on the Notes may be manual or facsimile. If an Authorized Officer of the Master Issuer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note shall nevertheless be valid.

(b)    No Note (other than Uncertificated Notes) shall be entitled to any benefit under the Indenture or be valid for any purpose unless there appears on such Note a certificate of

4

authentication substantially in the form provided for below, duly executed by the Trustee by the manual, facsimile or electronic signature of a Trust Officer. Such signatures on such certificate shall be conclusive evidence, and the only evidence, that the Note has been duly authenticated under this Base Indenture. The Trustee may appoint an authenticating agent acceptable to the Master Issuer to authenticate Notes. Unless limited by the term of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Base Indenture to authentication by the Trustee includes authentication by such authenticating agent. The Trustee's certificate of authentication shall be in substantially the following form:

"This is one of the Notes issued under the within mentioned Indenture.

Citibank, N.A., as Trustee

By: _____
Authorized Signatory"

(c)     Each Note (other than Uncertificated Notes) shall be dated and issued as of the date of its authentication by the Trustee.

(d)     Notwithstanding the foregoing, if any Note shall have been authenticated and delivered hereunder but never issued and sold by the Master Issuer, and the Master Issuer shall deliver such Note to the Trustee for cancellation as provided in Section 2.14 together with a written statement to the Trustee (which need not comply with Section 13.3) stating that such Note has never been issued and sold by the Master Issuer, for all purposes of the Indenture such Note shall be deemed never to have been authenticated and delivered hereunder and shall not be entitled to the benefits of the Indenture.

Section 2.4.    Registrar and Paying Agent.

(a)     The Master Issuer shall (i) appoint an agent that maintains an office or agency where Notes may be presented for registration of transfer or for exchange (or de-registration in the case of Uncertificated Notes) (the "Registrar") and (ii) have appointed a paying agent (which shall satisfy the eligibility criteria set forth in Section 10.8(a)) (the "Paying Agent") at whose office or agency Notes (or evidence of ownership of Uncertificated Notes) may be presented for payment. The Registrar shall keep a register of the Notes (including the name and address of each such Noteholder) and of their transfer and exchange. The Trustee shall indicate in its books and records the principal amount owing to each Noteholder from time to time. The Master Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Paying Agent" shall include any additional paying agent and the term "Registrar" shall include any co-registrars. The Master Issuer may change the Paying Agent or the Registrar without prior notice to any Noteholder. The Master Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Base Indenture. The Trustee is hereby initially appointed as the Registrar and the Paying Agent and shall send copies of all notices and demands received by the Trustee (other than those sent by the Master Issuer to the Trustee and those addressed to the Master Issuer) in connection with the Notes to the Master Issuer. Upon any resignation or removal of the Registrar, the Master Issuer shall promptly appoint a successor Registrar or, in the absence of such appointment, the Master Issuer shall assume the duties of the Registrar.

5

(b)     The Master Issuer shall enter into an appropriate agency agreement with any Agent not a party to this Base Indenture. Such agency agreement shall implement the provisions of this Base Indenture that relate to such Agent. If the Master Issuer fails to maintain a Registrar or Paying Agent, the Trustee hereby agrees to act as such, and shall be entitled to appropriate compensation in accordance with this Base Indenture until the Master Issuer shall appoint a replacement Registrar or Paying Agent, as applicable.

Section 2.5.   <u>Paying Agent to Hold Money in Trust</u>.

(a)     The Master Issuer shall cause, or have caused, the Paying Agent (if the Paying Agent is not the Trustee) to execute and deliver to the Trustee an instrument in which the Paying Agent shall agree with the Trustee (and if the Trustee is the Paying Agent, it hereby so agrees), subject to the provisions of this <u>Section 2.5</u>, that the Paying Agent shall:

(i)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(ii)     give the Trustee notice of any default by the Master Issuer of which it has Actual Knowledge in the making of any payment required to be made with respect to the Notes;

(iii)     at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent;

(iv)     immediately resign as the Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Trustee hereunder at the time of its appointment; and

(v)     comply with all requirements of the Code and other applicable tax law with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

(b)     The Master Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of the Indenture or for any other purpose, by Company Order direct the Paying Agent to pay to the Trustee all sums held in trust by the Paying Agent, such sums to be held by the Trustee in trust upon the same terms as those upon which the sums were held in trust by the Paying Agent. Upon such payment by the Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to such money.

(c)     Subject to applicable laws with respect to escheat of funds, any money held by the Trustee or the Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for two years after such amount has become due and payable shall be discharged from such trust and be paid to the Master Issuer upon delivery of a Company Request. The Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Master

Issuer for payment thereof (but only to the extent of the amounts so paid to the Master Issuer), and all liability of the Trustee or the Paying Agent with respect to such trust money paid to the Master Issuer shall thereupon cease; provided, however, that the Trustee or the Paying Agent, before being required to make any such repayment, may, at the expense of the Master Issuer, cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in New York City, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Master Issuer. The Trustee may also adopt and employ, at the expense of the Master Issuer, any other commercially reasonable means of notification of such repayment.

Section 2.6.    Calculation and Reporting Agent.

(a)    The Master Issuer agrees that, for so long as any Notes remain Outstanding, an agent shall be appointed at all times to calculate the monthly interest payable on each related Monthly Allocation Date, and in performing such duties, the Master Issuer shall cause such agent to maintain records of its calculations for inspection upon reasonable notice (such agent, the "Calculation and Reporting Agent"). Pursuant to the Calculation and Reporting Agency Agreement, the Master Issuer has appointed Alter Domus (US) LLC to serve in the capacity of the initial Calculation and Reporting Agent. Pursuant to the Calculation and Reporting Agency Agreement, the Calculation and Reporting Agent may be removed by any of the Master Issuer or the Trustee (acting at the written direction of the Required Holders), at any time, with or without cause. If the Calculation and Reporting Agent is unable or unwilling to act, resigns, or is removed, the Master Issuer or the Trustee (acting at the written direction of the Required Holders) shall promptly appoint a successor Calculation and Reporting Agent and shall notify the Trustee and the Noteholders of such appointment.

(b)    Pursuant to, and subject to the terms of, the Calculation and Reporting Agency Agreement, the Master Issuer shall cause the Calculation and Reporting Agent, prior to each Monthly Allocation Date, to calculate the aggregate amount of monthly interest accrued during any Interest Accrual Period and payable on the next succeeding Monthly Allocation Date and the amount of such monthly interest allocated to each Class of Notes. Such amounts shall be rounded to the nearest cent, with one-half of one cent rounded upward, and shall be communicated to the Master Issuer and the Trustee for inclusion by the Master Issuer in the Monthly Noteholders' Report. The monthly interest amount determined by the Calculation and Reporting Agent for any Interest Accrual Period shall, in the absence of manifest error, be final and binding upon all parties.

(c)    Pursuant to, and subject to the terms of, the Calculation and Reporting Agency Agreement, the Master Issuer shall cause the Calculation and Reporting Agent to:

(i)    compile the Monthly Noteholders' Report, including preparing the calculations of the Priority of Payments for the applicable Monthly Collection Period to be included in the Monthly Noteholders' Report;

(ii)    maintain records of all calculations and determinations it makes hereunder for inspection by the Master Issuer, Trustee, or their representatives upon reasonable notice; and

(iii)    cooperate with any audit or regulatory examination related to its role hereunder.

(d)    The Calculation and Reporting Agent shall perform the duties described herein subject to all rights, protections, indemnities, and immunities afforded to it under the Calculation and Reporting Agency Agreement.

(e)    Pursuant to, and subject to the terms of, the Calculation and Reporting Agency Agreement, the Calculation and Reporting Agent has agreed to provide certain reports, notices, instructions and other services on behalf of the Master Issuer. The Noteholders by their acceptance of the Notes consent to the provision of such reports and notices to the Trustee by the Calculation and Reporting Agent on behalf of the Master Issuer pursuant to and subject to the terms of the Calculation and Reporting Agency Agreement. Any such reports and notices that are required to be delivered to the Noteholders hereunder shall be delivered by the Trustee. The Trustee shall have no obligation whatsoever to verify, reconfirm or recalculate any information or material contained in any of the reports, financial statements or other information delivered to it. All distributions, allocations, remittances and payments to be made by the Trustee or the Paying Agent hereunder or under the Series Supplement shall be made based solely upon the most recently delivered written reports and instructions provided to the Trustee or Paying Agent, as the case may be.

(f)    The Master Issuer shall indemnify and hold harmless the Calculation and Reporting Agent (including any affiliate, director, officer, or employee thereof) against any loss, liability, cost, or expense (including reasonable attorneys' fees and disbursements) incurred in connection with the performance of its duties under the Calculation and Reporting Agency Agreement, except to the extent such loss, liability, cost, or expense is found in a final, non-appealable judgment to have resulted from the Calculation and Reporting Agent's gross negligence or willful misconduct.

Section 2.7.    <u>Noteholder List</u>.

(a)    The Trustee shall furnish or cause to be furnished by the Registrar to the Master Issuer, the Calculation and Reporting Agent, or the Paying Agent, within five (5) Business Days after receipt by the Trustee of a request therefor from the Master Issuer, the Calculation and Reporting Agent, or the Paying Agent, respectively, in writing, the Outstanding Principal Amount of each Tranche of Notes Outstanding (after giving effect to the application of funds on deposit in the Collection Account in accordance with the Priority of Payments on such Monthly Allocation Date) and, if requested, the names and addresses of the Noteholders, in each case, as of the most recent Record Date for payments to such Noteholders or as of such other date as may be reasonably requested. Unless otherwise provided in the Series Supplement, the Trustee, after having been adequately indemnified by Note Owners (the "<u>Applicants</u>") for its costs and expenses, shall afford or shall cause the Registrar to afford such Applicants access during normal business hours to the most recent list of Noteholders held by the Trustee and shall give the Master Issuer notice that such request has been made, within five (5) Business Days after the receipt of such application. Such list shall be as of a date no more than forty-five (45) days prior to the date of receipt of such Applicants' request.  Every Noteholder, by receiving and holding a Note, agrees with the Trustee that neither the Trustee, the Registrar nor any of their respective agents shall be held accountable

by reason of the disclosure of any such information as to the names and addresses of the Noteholders hereunder, regardless of the source from which such information was obtained.

(b)     The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Noteholders. If the Trustee is not the Registrar, the Master Issuer shall furnish to the Trustee at least seven (7) Business Days before each Monthly Allocation Date and at such other time as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Noteholders.

Section 2.8.    <u>Transfer and Exchange</u>.

(a)     Upon surrender for registration of transfer of any Note (or as set forth in the Series Supplement with respect to the transfer and registration or de-registration of any Uncertificated Notes) at the office or agency of the Registrar, if the requirements of <u>Section 2.8(f)</u> and Section 8-401(a) of the New York UCC are met, the Master Issuer shall (except in the case of Uncertificated Notes) execute and, after the Master Issuer has executed, the Trustee shall authenticate and deliver to the Noteholder, in the name of the designated transferee or transferees, one or more new Notes, in any authorized denominations, of the same Class (and, if applicable, Subclass) and a like original aggregate principal amount of the Notes so transferred. At the option of any Noteholder, Notes may be exchanged (or de-registered) for other Notes of the same Class in authorized denominations of like original aggregate principal amount of the Notes so exchanged (or in the case of an exchange for Uncertificated Notes, registered), upon surrender of the Notes to be exchanged (or de-registered) at any office or agency of the Registrar maintained for such purpose. Whenever Notes are so surrendered for exchange, if the requirements of <u>Section 2.8(f)</u> and Section 8-401(a) of the New York UCC are met, the Master Issuer shall execute (other than Uncertificated Notes), and after the Master Issuer has executed, the Trustee shall authenticate and deliver to the Noteholder, the Notes (other than Uncertificated Notes) which the Noteholder making the exchange is entitled to receive.

(b)     Every Note presented or surrendered for registration of transfer or exchange shall be (i) (other than Uncertificated Notes) duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing with a medallion signature guarantee and (ii) accompanied by such other documents as the Trustee or the Registrar may require. The Master Issuer shall execute and deliver to the Trustee or the Registrar, as applicable, Notes in such amounts and at such times as are necessary to enable the Trustee to fulfill its responsibilities under the Indenture and the Notes.

(c)     All Notes issued and authenticated upon any registration of transfer or exchange of the Notes (other than Uncertificated Notes) shall be the valid obligations of the Master Issuer, evidencing the same indebtedness, and entitled to the same benefits under the Indenture, as the Notes surrendered upon such registration of transfer or exchange.

(d)     The preceding provisions of this <u>Section 2.8</u> notwithstanding, (i) the Trustee, the Master Issuer or the Registrar, as the case may be, shall not be required (A) to issue, register the transfer of or exchange (or de-registration) of any Note for a period beginning at the opening

9

of business fifteen (15) days preceding the selection of any Notes for redemption and ending at the close of business on the day of the mailing of the relevant notice of redemption or (B) to register the transfer of or exchange any Note so selected for redemption, and (ii) no assignment or transfer of a Note or any commitment in respect thereof shall be effective until such assignment or transfer shall have been recorded in the Note Register and in the books and records of the Trustee, as applicable, pursuant to Section 2.4(a).

(e)    Unless otherwise provided in the Series Supplement, no service charge shall be payable for any registration of transfer or exchange (or de-registration) of Notes, but the Master Issuer, the Registrar or the Trustee, as the case may be, may require payment by the Noteholder of a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any transfer or exchange, registration or de-registration of Notes.

(f)    Unless otherwise provided in the Series Supplement, registration of transfer of Notes containing a legend relating to the restrictions on transfer of such Notes (which legend shall be set forth in the Series Supplement) shall be effected only if the conditions set forth in such Series Supplement are satisfied. Notwithstanding any other provision of this Section 2.8 and except as otherwise provided in Section 2.13 or the Series Supplement with respect to Uncertificated Notes, the typewritten Note or Notes representing Book-Entry Notes may be transferred, in whole but not in part, only to another nominee of the Clearing Agency, or to a successor Clearing Agency selected or approved by the Master Issuer or to a nominee of such successor Clearing Agency, only if in accordance with this Section 2.8 and Section 2.12.

Section 2.9.    Persons Deemed Owners.

Prior to due presentment for registration of transfer of any Note (or any other transfer and de-registration of Uncertificated Notes), the Trustee, the Calculation and Reporting Agent, any Agent and the Master Issuer shall deem and treat the Person in whose name any Note is registered (as of the day of determination) as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever (other than purposes in which the vote or consent of a Note Owner is expressly required pursuant to this Base Indenture or the Series Supplement), whether or not such Note is overdue, and none of the Trustee, the Calculation and Reporting Agent, any Agent nor the Master Issuer shall be affected by notice to the contrary.

Section 2.10.    Replacement Notes.

(a)    If (i) any mutilated Note is surrendered to the Trustee, or the Trustee receives evidence to its reasonable satisfaction of the destruction, loss or theft of any Note and (ii) there is delivered to the Master Issuer and the Trustee such security or indemnity as may be required by them to hold the Master Issuer and the Trustee harmless then, provided that the requirements of Section 2.8(f) and Section 8-405 of the New York UCC are met, the Master Issuer shall execute and upon its request the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become, or within seven (7) days shall be, due and payable, instead of issuing a replacement Note, the Master Issuer may pay such destroyed, lost or stolen

Note when so due or payable without surrender thereof. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the preceding sentence, a protected purchaser (within the meaning of Section 8-303 of the New York UCC) of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Master Issuer and the Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a protected purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Master Issuer or the Trustee in connection therewith.

(b)     Upon the issuance of any replacement Note (or registration, in the case of Uncertificated Notes) under this Section 2.10, the Master Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any Tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Trustee and the Registrar) connected therewith.

(c)     Every replacement Note issued (or registered in the case of Uncertificated Notes) pursuant to this Section 2.10 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Master Issuer and such replacement Note shall be entitled to all the benefits of the Indenture equally and proportionately with any and all other Notes duly issued under the Indenture (in accordance with the priorities and other terms set forth herein and in the Series Supplement).

(d)     The provisions of this Section 2.10 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.11.   Treasury Notes.

In determining whether the Noteholders of the required Aggregate Outstanding Principal Amount of Notes or the required Outstanding Principal Amount of any Class of Notes have concurred in any direction, waiver or consent, Notes owned, legally or beneficially, by the Master Issuer or any Subsidiary of the Master Issuer shall be considered as though they are not Outstanding, except that for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes of which a Trust Officer has received written notice of such ownership shall be so disregarded. Absent written notice to a Trust Officer of such ownership, the Trustee shall not be deemed to have knowledge of the identity of the individual Note Owners.

Section 2.12.   Book-Entry Notes.

(a)     Unless otherwise provided in the Series Supplement (including with respect to Uncertificated Notes), the Notes of each Class, upon original issuance, shall be issued in the form of typewritten Notes representing Book-Entry Notes and delivered to the depository (or its custodian) specified in the Series Supplement (the "Depository") which shall be the Clearing Agency on behalf of such Class. The Notes of each Class shall, unless otherwise provided in the

Series Supplement (including with respect to Uncertificated Notes), initially be registered on the Note Register in the name of the Clearing Agency or the nominee of the Clearing Agency. No Note Owner shall receive a definitive note representing such Note Owner's interest in the Notes, except as provided in <u>Section 2.13</u>. Unless and until definitive, fully registered Notes of any Class of Notes ("<u>Definitive Notes</u>") have been issued to Note Owners pursuant to <u>Section 2.13</u>:

(i) the provisions of this <u>Section 2.12</u> shall be in full force and effect with respect to each such Class;

(ii) the Master Issuer, the Paying Agent, the Registrar, the Trustee and the Calculation and Reporting Agent may deal with the Clearing Agency and the applicable Clearing Agency Participants for all purposes (including the payment of principal of, premium, if any, and interest on the Notes and the giving of instructions or directions hereunder or under the Series Supplement) as the sole Holder of the Notes, and shall have no obligation to the Note Owners;

(iii) to the extent that the provisions of this <u>Section 2.12</u> conflict with any other provisions of the Indenture, the provisions of this <u>Section 2.12</u> shall control with respect to each such Class, Subclass or Tranche of the Notes;

(iv) the rights of Note Owners of each such Class, Subclass or Tranche of Notes shall be exercised only through the Clearing Agency and the applicable Clearing Agency Participants and shall be limited to those established by law and agreements between such Note Owners and the Clearing Agency and/or the Clearing Agency Participants, and all references in the Indenture to actions by the Noteholders shall refer to actions taken by the Clearing Agency upon instructions from the Clearing Agency Participants, and all references in the Indenture to distributions, notices, reports and statements to the Noteholders shall refer to distributions, notices, reports and statements to the Clearing Agency, as registered holder of the Notes of such Class, Subclass or Tranche for distribution to the Note Owners in accordance with the Applicable Procedures of the Clearing Agency; and

(v) whenever the Indenture requires or permits actions to be taken based upon instructions or directions of Noteholders evidencing a specified percentage of the Aggregate Outstanding Principal Amount of Notes or the Outstanding Principal Amount of a Subclass, Tranche or Class of Notes, the applicable Clearing Agency shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Note Owners and/or their related Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in the Outstanding Notes or such Subclass, Tranche or such Class of such Notes Outstanding, as the case may be, and has delivered such instructions in writing to the Trustee.

(b) Pursuant to the Depository Agreement applicable to the Note, unless and until Definitive Notes are issued pursuant to <u>Section 2.13</u>, the initial Clearing Agency shall make book-entry transfers among the Clearing Agency Participants and receive and transmit

distributions of principal, premium, if any, and interest on the Notes to such Clearing Agency Participants.

(c)     Whenever notice or other communication to the Noteholders is required under the Indenture, unless and until Definitive Notes shall have been issued to Note Owners pursuant to Section 2.13, the Trustee and the Master Issuer shall give all such notices and communications specified herein to be given to Noteholders to the applicable Clearing Agency for distribution to the Note Owners in accordance with the Applicable Procedures of the Clearing Agency.

Section 2.13.   Definitive Notes.

(a)     Class B Notes may be issued in the form of Definitive Notes to the extent provided in the Series Supplement. The Series Supplement shall set forth the legend relating to the restrictions on transfer of such Definitive Notes and such other restrictions as may be applicable.

(b)     With respect to the Notes of any Subclass, Tranche or Class issued in the form of typewritten Notes representing Book-Entry Notes, if (A) the Master Issuer advises the Trustee in writing that the Clearing Agency with respect to any such Subclass, Tranche or Class of Notes is no longer willing or able to discharge properly its responsibilities under the applicable Depository Agreement and (B) the Trustee or the Master Issuer is unable to locate a qualified successor, the Trustee shall notify all Note Owners of such Subclass, Tranche or Class, through the applicable Clearing Agency Participants, of the occurrence of any such event and of the availability of Definitive Notes (or Uncertificated Notes) to Note Owners of such Subclass, Tranche or Class.  Upon surrender to the Trustee of the Notes of such Subclass, Tranche or Class by the applicable Clearing Agency, accompanied by registration instructions from the applicable Clearing Agency for registration, the Master Issuer shall execute and the Trustee shall authenticate (other than with respect to Uncertificated Notes), upon receipt of a Company Order, and deliver an equal aggregate principal amount of Definitive Notes in accordance with the instructions of the Clearing Agency. Neither the Master Issuer nor the Trustee shall be liable for any delay in delivery of such instructions and may each conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Notes (or Uncertificated Notes) of such Subclass, Tranche or Class all references herein to obligations imposed upon or to be performed by the applicable Clearing Agency shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Notes (or Uncertificated Notes), and the Trustee shall recognize the Holders of the Definitive Notes (or Uncertificated Notes) of such Subclass, Tranche or Class as Noteholders of such Subclass, Tranche or Class hereunder and under the Series Supplement.

Section 2.14.   Cancellation.

The Master Issuer may at any time deliver to the Trustee for cancellation any Notes previously authenticated and delivered (or registered in the case of Uncertificated Notes) hereunder which the Master Issuer or an Affiliate thereof may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled (or de-registered) by the Trustee. Immediately upon the delivery of any Notes by the Master Issuer to the Trustee for cancellation pursuant to this Section 2.14 (or as set forth in the Series Supplement with respect to

de-registration of Uncertificated Notes), the security interest of the Secured Parties in such Notes shall automatically be deemed to be released by the Trustee, and the Trustee shall execute and deliver to the Master Issuer any and all documentation reasonably requested and prepared by the Master Issuer at its expense to evidence such automatic release. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment (or de-registration of Uncertificated Notes). The Trustee shall cancel (or de-register) all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation (or de-registration). All cancelled Notes held by the Trustee shall be disposed of in accordance with the Trustee's standard disposition procedures unless the Master Issuer shall direct that cancelled Notes be returned to it for destruction pursuant to a Company Order. No cancelled (or de-registered) Notes may be reissued. No provision of this Base Indenture or any Supplement that relates to prepayment procedures, penalties, fees, make-whole payments or any other related matters shall be applicable to any Notes cancelled (or de-registered) pursuant to and in accordance with this <u>Section 2.14</u>.

Section 2.15.    <u>Principal and Interest</u>.

(a)    The principal of and premium, if any, on each Class, Subclass or Tranche of Notes shall be due and payable at the times and in the amounts set forth in the Series Supplement and in accordance with the Priority of Payments.

(b)    Each Class, Subclass or Tranche of Notes shall accrue interest as provided in the Series Supplement and such interest shall be due and payable on each Monthly Allocation Date in accordance with the Priority of Payments, except as otherwise deferred as set forth in this <u>Section 2.15</u>. If the Retained Collections with respect to the preceding Monthly Collection Period deposited into the Collection Account pursuant to Section 5.4(b)(ii) is not sufficient cash to make any payment of interest then due and payable on the related Monthly Allocation Date, interest in an amount equal to the difference between the amount of interest then due on such Monthly Allocation Date and then available cash (such difference, "<u>Deferred Interest</u>"), which amount shall be as calculated and set forth in the Monthly Noteholders' Report, shall be deferred and shall not be considered "due and payable" for purposes of <u>Section 9.1(a)</u> (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the next applicable Monthly Allocation Date on which funds are available to pay such Deferred Interest in accordance with the Priority of Payments, (ii) any prepayment date with respect to a prepayment in full of such Class or Tranche of Notes and (iii) the Legal Final Maturity Date for such Class or Tranche of Notes. Deferred Interest on any Class or Tranche of Notes shall be payable on the first Monthly Allocation Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the Legal Final Maturity Date for such Class or Tranche of Notes. Interest will cease to accrue on each Note or, in the case of a partial repayment, on such repaid part, from the date of repayment. To the extent lawful and enforceable, interest on any interest (including Deferred Interest) that is not paid when due on any Class or Tranche of Notes shall accrue at the applicable Note Rate for such Class or Tranche until paid as provided herein and such amount shall become part of the Deferred Interest on any such Note.

(c)    Except as provided in the following sentence, the Person in whose name any Note is registered at the close of business on any Record Date with respect to a Monthly Allocation Date for such Note shall be entitled to receive the principal, premium, if any, and

interest payable on such Monthly Allocation Date notwithstanding the cancellation (or de-registration) of such Note upon any registration of transfer, exchange or substitution of such Note subsequent to such Record Date. Any interest payable at maturity shall be paid to the Person to whom the principal of such Note is payable. The Master Issuer shall have no obligation to separately deliver cash for any accrued and unpaid interest on any Note pursuant to priorities (iv), (vi), (vii) or (ix) of the Priority of Payments to the extent that such accrued and unpaid interest is Deferred Interest.

(d)     Pursuant to the authority of the Paying Agent under Section 2.5(a)(v), the Paying Agent shall make all payments of interest on the Notes net of any applicable withholding taxes and Noteholders shall be treated as having received as payments of interest any amounts withheld with respect to such withholding taxes.

Section 2.16.    Tax Treatment; AHYDO Catch-Up.

(a)     The Master Issuer has structured this Base Indenture and the Notes (other than the Class B Notes) have been (or shall be) issued with the intention that (1) the Notes (other than the Class B Notes) shall qualify under applicable tax law as indebtedness of the Master Issuer and (2) the Class B Notes shall qualify under applicable tax law as equity interests in the Master Issuer that is not "preferred stock" within the meaning of Section 305 of the Code. Any entity acquiring any direct or indirect interest in any Note by acceptance of its Notes (or, in the case of a Note Owner, by virtue of such Note Owner's acquisition of a beneficial interest therein) agrees to treat (x) the Notes (other than the Class B Notes) (or beneficial interests therein or registration of an Uncertified Note) for all purposes of federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as indebtedness of the Master Issuer and (y) the Class B Notes (or beneficial interests therein or registration of an Uncertificated Note) for all purposes of federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as equity interests in the Master Issuer that is not "preferred stock" within the meaning of Section 305 of the Code.

(b)     Each Noteholder or Note Owner, by its acceptance of a Note or, in the case of a Note Owner, a beneficial interest in a Note, agrees to provide and shall provide to the Trustee, the Paying Agent and/or the Master Issuer (or other Person responsible for withholding of taxes) with the Tax Information, and will update or replace such Tax Information as necessary at any time required by law or promptly upon request. Further, each Noteholder and Note Owner is deemed to understand, acknowledge and agree that the Trustee, the Paying Agent and Issuer (or other Person responsible for withholding of taxes) have the right to withhold on payments with respect to a Note (without any corresponding gross-up) where an applicable party fails to comply with the requirements set forth in the preceding sentence or the Trustee, the Paying Agent or Issuer (or other Person responsible for withholding of taxes) is otherwise required to so withhold under applicable law.

(c)     Notwithstanding any provision of this Base Indenture to the contrary, the Master Issuer shall make all AHYDO Catch-Up Payments on the Notes.

Section 2.17.   Subsequent Mandatory Exchange.

Each Person that would have otherwise received Class B Notes pursuant to the Approved Plan (such Persons, the "Exit Class B Holders") hereby agrees and directs the Trustee to deliver the Class B Notes (that such Exit Class B Holder would have otherwise received) to NewCo on or about the Closing Date, to be held by NewCo in definitive form. Each Exit Class B Holder and the Trustee hereby acknowledge and agree that, in exchange for the foregoing, such Exit Class B Holder shall instead receive a like principal amount of NewCo Class B Notes to be issued pursuant to the NewCo Indenture (such exchange, the "Subsequent Mandatory Exchange"). From and after the Subsequent Mandatory Exchange, all right, title and interest to all outstanding Class B Notes will be deemed transferred hereunder to NewCo, and the only entitlement provided by the Class B Notes to the Exit Class B Holders thereof from and after the Subsequent Mandatory Exchange shall be the right of such Exit Class B Holders to receive a like principal amount of NewCo Class B Notes.

# ARTICLE III

# SECURITY

Section 3.1.   Grant of Security Interest.

(a)   To secure the Obligations, the Master Issuer hereby pledges, assigns, conveys, delivers, transfers and sets over to the Trustee, for the benefit of the Secured Parties, and hereby grants to the Trustee, for the benefit of the Secured Parties, a security interest in the Master Issuer's right, title and interest in, to and under all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, health care insurance receivables, instruments, inventory, money, proceeds, securities, securities accounts and other investment property and letter of credit rights (in each case, as defined in the New York UCC), including all of the following property to the extent now owned or at any time hereafter acquired by the Master Issuer or in which the Master Issuer now has or at any time in the future may acquire any right, title or interest (collectively, the "Indenture Collateral"), which shall include, but not be limited to:

(i)   the Equity Interests of any Person owned by the Master Issuer and all rights as a member, partner or shareholder of each such Person under the Charter Documents of each such Person;

(ii)   with respect to the IP Holder, the Collateral IP and the right to bring in the name of the IP Holder an action at law or in equity for any infringement, misappropriation, dilution or other violation thereof occurring prior to, on or after the Closing Date, and to collect all damages and settlements (except to the extent that a licensee or sublicensee has such rights under its respective license agreement or the Brand Management Agreement) and the IP Holder's right to receive the IP License Fees and other recoveries, if any, under any license agreement, including the IP License Agreement, the Brand Management Agreement and the Founders License Agreements;

16

(iii)     the Accounts and all amounts on deposit in or otherwise credited to the Accounts;

(iv)     the books and records (whether in physical, electronic or other form) of the Master Issuer, including those books and records maintained by the Calculation and Reporting Agent on behalf of the Master Issuer relating to the Collateral IP, Brand Management Agreement and other Related Documents;

(v)     the rights, powers, remedies and authorities of the Master Issuer under each of the Related Documents (other than the Indenture and the Notes) to which the Master Issuer (as applicable) is a party;

(vi)     any and all other property of the Master Issuer now or hereafter acquired, including, without limitation, all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, health-care-insurance receivables, instruments, inventory, securities, securities accounts and other investment property and letter-of-credit rights (in each case, as defined in the New York UCC); and

(vii)     all payments, proceeds, supporting obligations and accrued and future rights to payment with respect to the foregoing;

provided that the Indenture Collateral shall exclude and no liens shall attach to the Excluded Assets for so long as they remain Excluded Assets subject to the Collateral Exclusions.

Notwithstanding anything herein to the contrary, in no event shall the security interests and Liens granted under Section 3.01(a) hereof attach to, and the term "Collateral" (and the component terms thereof) shall not include, (i) any property, interest or other rights for so long as the grant of such security interest shall constitute or result in (A) a breach or termination pursuant to the terms of, or a default under, any General Intangible, lease, license, contract, agreement or other document, (B) a breach of any law or regulation which prohibits the creation of a security interest thereunder (other than to the extent that any such term specified in clause (A) or (B) above is rendered ineffective pursuant to Section 9-406, 9 407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other then-applicable law (including any applicable bankruptcy laws) or principles of equity) or (C) require the consent of a Governmental Authority to permit the grant of a security interest therein (and such consent has not been obtained); provided, however, that such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation, unenforceability breach or termination shall no longer be effective and to the extent severable, shall attach immediately to any portion of such property or other rights that does not result in any of the consequences specified in clause (A), (B) or (C) above; and (ii) any United States "intent-to-use"  Trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such application under applicable federal law (other than to the extent such rights can be perfected by the filing of a financing statement under the UCC) (the assets described in preceding clauses (i) through (ii) hereof, collectively, the "Collateral Exclusions" and such assets, the "Excluded Assets").

17

(b)     The foregoing grant reaffirms the existing security interests and reconfirms that the grant is made in trust to secure the Obligations and to secure compliance with the provisions of this Base Indenture and the Series Supplement, all as provided in this Base Indenture. The Trustee, on behalf of the Secured Parties, acknowledges such grant, accepts the trusts under this Base Indenture in accordance with the provisions of this Base Indenture and agrees to perform its duties required in this Base Indenture. The Indenture Collateral shall secure the Obligations equally and ratably without prejudice, priority or distinction (except, with respect to the Notes, as otherwise stated in the Series Supplement or in the applicable provisions of this Base Indenture).

(c)     The parties hereto agree and acknowledge that each certificated Equity Interest constituting Indenture Collateral may be held by a custodian on behalf of the Trustee.

Section 3.2.    Certain Rights and Obligations of the Master Issuer Unaffected.

(a)     The grant of the security interest by the Master Issuer in the Indenture Collateral to the Trustee on behalf of the Secured Parties shall not (i) relieve the Master Issuer from the performance of any term, covenant, condition or agreement on the Master Issuer's part to be performed or observed under or in connection with any of the Collateral Documents or (ii) impose any obligation on the Trustee or any of the Secured Parties to perform or observe any such term, covenant, condition or agreement on the Master Issuer's part to be so performed or observed or impose any liability on the Trustee or any of the Secured Parties for any act or omission on the part of the Master Issuer or from any breach of any representation or warranty on the part of the Master Issuer.

(b)     The Master Issuer hereby agrees to indemnify and hold harmless the Trustee and each Secured Party (including its directors, officers, employees and agents) from and against losses, liabilities (including liabilities for penalties), claims, demands, actions, suits, judgments, reasonable and documented out-of-pocket costs and expenses arising out of or resulting from the security interest granted hereby, whether arising by virtue of any act or omission on the part of the Master Issuer or otherwise, including the reasonable and documented out-of-pocket costs, expenses and disbursements (including reasonable and documented attorneys' fees and expenses of (i) the Trustee and (ii) a single firm of external counsel for the Noteholders taken as a whole (in their capacity as Noteholders) and such local and specialist counsel as necessary) incurred by the Trustee or any Secured Party in enforcing the Indenture or any other Related Document or preserving any of its rights to, or realizing upon, any of the Collateral; provided, however, that the foregoing indemnification shall not extend to any action by the Trustee or any Secured Party which constitutes gross negligence, bad faith or willful misconduct by the Trustee or any Secured Party or any other indemnified person hereunder. The indemnification provided for in this Section 3.2 shall survive the removal of, or a resignation by, any Person as Trustee as well as the termination of this Base Indenture or the Series Supplement.

Section 3.3.    Performance of Collateral Documents.

Upon the occurrence of a default or breach (after giving effect to any applicable notice, grace or cure periods) by any Person party to (a) a Collateral Related Document, (b) the IP License Agreement or (c) the Brand Management Agreement (in each case, only if an Event of Default has occurred and is continuing), promptly following a request from the Trustee to do so and at the

Master Issuer's expense, the Master Issuer agrees to take (or direct its designee to take on its behalf) such commercially reasonable and lawful action as permitted under this Base Indenture as the Trustee (acting at the written direction of the Supermajority Noteholders) may reasonably request to compel or secure the performance and observance by such Person of its obligations to the Master Issuer, and to exercise such rights, remedies, powers and privileges lawfully available to the Master Issuer to the extent and in the manner directed by the Trustee (acting at the written direction of the Supermajority Noteholders), including, without limitation, the transmission of notices of default and the institution of legal or administrative actions or proceedings to compel or secure performance by such Person of its obligations thereunder. If (i) the Master Issuer shall have failed, within fifteen (15) Business Days of receiving the written direction of the Trustee, to take action to accomplish such directions of the Trustee, (ii) the Master Issuer refuses to take any such action, as reasonably determined by the Trustee in good faith, or (iii) the Required Holders reasonably determines that such action must be taken immediately, in any such case the Supermajority Noteholders may, but shall not be obligated to, take, and the Trustee shall take (if so directed by the Supermajority Noteholders), at the expense of the Master Issuer, such previously directed action and any related action permitted under this Base Indenture which the Supermajority Noteholders thereafter determine is appropriate (without the need under this provision or any other provision under this Base Indenture to direct the Master Issuer to take such action), on behalf of the Master Issuer and the Secured Parties.

Section 3.4.    <u>Stamp, Other Similar Taxes and Filing Fees</u>.

The Master Issuer shall indemnify and hold harmless the Trustee and each Secured Party from any present or future claim for liability for any stamp, documentary or other similar tax and any penalties or interest and expenses with respect thereto, that may be assessed, levied or collected by any jurisdiction in connection with the Indenture, any other Related Document or any Indenture Collateral. The Master Issuer shall pay, and indemnify and hold harmless each Secured Party against, any and all amounts in respect of all search, filing, recording and registration fees, taxes, excise taxes and other similar imposts that may be payable or determined to be payable in respect of the execution, delivery, performance and/or enforcement of the Indenture or any other Related Document (except to the extent such amounts are owed as a direct result from gross negligence, willful misconduct or fraud by the Trustee or any Secured Party).

Section 3.5.    <u>Authorization to File Financing Statements</u>.

(a)    The Master Issuer hereby irrevocably authorizes the Trustee (at the written direction of the Required Holders) on behalf of the Secured Parties at any time and from time to time to file or record in any filing office in any applicable jurisdiction financing statements and other filing or recording documents or instruments with respect to the Indenture Collateral, including, without limitation, any and all United States registered Intellectual Property other than Excluded Assets and the Excepted Collateral IP Assets (to the extent set forth in <u>Section 8.17</u>), to perfect the security interests of the Trustee for the benefit of the Secured Parties under this Base Indenture. The Master Issuer authorizes the filing of any such financing statement naming the Trustee as secured party and indicating that the Indenture Collateral includes (a) "all assets" or words of similar effect or import regardless of whether any particular assets comprised in the Indenture Collateral fall within the scope of Article 9 of the UCC, including, without limitation, any and all Collateral IP other than Excepted Collateral IP Assets, or (b) as being of an equal or

lesser scope or with greater detail. The Master Issuer agrees to furnish any information as reasonably necessary to accomplish the foregoing promptly upon the Trustee's request. The Master Issuer also hereby ratifies and authorizes the filing on behalf of the Trustee for the benefit of the Secured Parties of any financing statement with respect to the Indenture Collateral made prior to the date hereof. Notwithstanding anything to the contrary in the Base Indenture or any related agreement, no Person shall be required to make any filings or take any other actions to perfect, evidence or create a security interest in any Collateral IP except for filings in the PTO and the United States Copyright Office and the filing of UCC financing statements.

(b)     The Master Issuer acknowledges that the Indenture Collateral includes certain rights of the Master Issuer as a secured party under the Related Documents. The Master Issuer hereby irrevocably appoints the Trustee as its representative with respect to all financing statements filed to perfect such security interests and authorizes the Trustee (at the written direction of the Required Holders) on behalf of the Secured Parties to make such filings it deems necessary to reflect the Trustee as secured party of record with respect to such financing statements.

(c)     Notwithstanding anything to the contrary in this <u>Section 3.5</u> or the Base Indenture, the Trustee's authority, right or power to file financing statements or other filings or recording documents or instruments shall not impose upon the Trustee any obligations or duties, including, without limitation, any obligations or duties to maintain perfection of any liens or security interests or the filing or recording of any documents including financing statements, continuation statements, amendments or termination statements, and the Trustee shall have no liability for failure of the maintenance of the priority or perfection of any lien or security interest.

## ARTICLE IV

## REPORTS

Section 4.1.     <u>Reports and Instructions to Trustee</u>.

(a)     <u>Monthly Noteholders' Report</u>. On or before the third Business Day prior to each Monthly Allocation Date, the Master Issuer shall provide (or cause the Calculation and Reporting Agent to provide), a statement (determined as of the last day of the related Monthly Collection Period) substantially in the form of <u>Exhibit A</u> (each, a "<u>Monthly Noteholders' Report</u>") to the Trustee and each Paying Agent.

(b)     <u>Monthly Compliance Certificates</u>. On or before the third Business Day prior to each Monthly Allocation Date, the Master Issuer shall deliver to the Trustee an Officer's Certificate (each, a "<u>Monthly Compliance Certificate</u>") to the effect that, except as provided in a notice delivered pursuant to <u>Section 8.7</u>, to their knowledge, no Default or Event of Default has occurred or is continuing.

(c)     <u>Audit Inspection Rights</u>. Upon a written direction of the Trustee (on behalf of the Required Holders), the Master Issuer shall exercise, or shall cause the Guarantors to exercise, the audit rights described in Section 3.3(b) of the Brand Management Agreement and share such information with the Noteholders and, for informational purposes only, the Trustee (in each case, subject to all restrictions and limitations thereon contained in the Brand Management Agreement).

(d)    <u>Instructions as to Withdrawals and Payments</u>. The Master Issuer shall furnish, or cause to be furnished, to the Trustee or the Paying Agent, as applicable, written instructions (which instructions may be deemed made by delivery of the Monthly Noteholders' Report to the Trustee) to make withdrawals and payments from the Collection Account and any other Base Indenture Account, as contemplated herein and in the Series Supplement. The Trustee and the Paying Agent shall promptly follow any such written instructions.

Section 4.2.    <u>Rule 144A Information</u>.

For so long as any of the Notes are "restricted securities" within the meaning of Rule 144(a)(3) under the 1933 Act, the Master Issuer agrees to provide to any Noteholder or Note Owner, and to any prospective purchaser of Notes designated by such Noteholder or Note Owner upon the request of such Noteholder or Note Owner or prospective purchaser, any information required to be provided to such holder, owner or prospective purchaser to satisfy the conditions set forth in Rule 144A(d)(4) under the 1933 Act.

Section 4.3.    <u>Reports and Other Information to Noteholders</u>.

The Trustee shall make the Base Indenture, the Guarantee and Collateral Agreement, the Series Supplement, the Monthly Noteholders' Reports, the Monthly Compliance Certificates and any reports referenced in <u>Section 4.1(c)</u> (collectively, the "<u>Noteholder Materials</u>") available to the Noteholders and the Calculation and Reporting Agent via the Trustee's internet website at <u>www.sf.citidirect.com</u> or such other address as the Trustee may specify from time to time. Assistance in using such website can be obtained by calling the Trustee's customer service desk at 888-855-9695 or such other telephone number as the Trustee may specify from time to time. The Noteholder Materials shall only be accessible in a password-protected area of the internet website and the Trustee shall require each party (other than the Calculation and Reporting Agent) accessing such password-protected area to register as a Noteholder and to make, for the benefit of the Master Issuer, the applicable representations and warranties described below in an Investor Request Certification in the form of <u>Exhibit B</u>.  The Trustee may disclaim responsibility for any information distributed by it for which the Trustee was not the original source. Each time a Noteholder accesses the internet website, it shall be deemed to have confirmed such representations and warranties as of the date thereof. The Trustee shall have the right to change the way such statements are made available in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

The Trustee shall make available, upon reasonable advance notice and at the expense of the requesting party, copies of the Noteholder Materials to any Noteholder and (other than the Series Supplement) to any prospective investor that provides the Trustee with an Investor Request Certification in the form of <u>Exhibit B</u> to the effect that such party (i) is a Noteholder or prospective investor, as applicable, (ii) understands that the items contain confidential information and (iii) is requesting the information solely for use in evaluating such party's investment or potential investment, as applicable, in the Notes and shall keep such information strictly confidential (*provided* that such party may disclose such information only (A) to (1) those personnel employed by it who need to know such information, which have agreed to keep such information strictly confidential and to use such information only for evaluating such party's investment or potential

investment in the Notes, (2) its attorneys and outside auditors which have agreed to keep such information strictly confidential and to use such information only for evaluating such party's investment or possible investment in the Notes, or (3) a regulatory or self-regulatory authority pursuant to applicable law or regulation or (B) by judicial process). Notwithstanding the foregoing, a recipient of such items may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions and any related tax strategies to the extent necessary to prevent the transaction from being described as a "confidential transaction" under U.S. Treasury Regulations Section 1.6011-4(b)(3).

Section 4.4.    No Constructive Notice.

Delivery of reports, information, Officer's Certificates and documents to the Trustee is for informational purposes only and the Trustee's receipt of such reports, information, Officer's Certificates and documents shall not constitute constructive notice to the Trustee of any information contained therein or determinable from information contained therein, including any Obligor Entity's, the Calculation and Reporting Agent's or any other Person's compliance with any of its covenants under the Indenture, the Notes or any other Related Document (as to which the Trustee is entitled to rely exclusively on the most recent Monthly Compliance Certificate described above).

# ARTICLE V

## ALLOCATION AND APPLICATION OF COLLECTIONS

Section 5.1.    Collection Account.

(a)    Establishment of Collection Account. The Master Issuer has established with the Trustee the Collection Account in the name of the Master Issuer for the benefit of the Secured Parties, bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Secured Parties. The Collection Account shall be an Eligible Account.

(b)    Administration of the Collection Account. All amounts held in the Collection Account shall be invested in Eligible Investments at the written direction (which may be standing directions) of the Master Issuer and such amounts may be transferred by the Master Issuer into an investment account for the sole purpose of investing in Eligible Investments so long as such investment account is (A) an Eligible Account, (B) pledged by the Master Issuer to the Trustee for the benefit of the Secured Parties pursuant to Section 3.1 and (C) if not established with the Trustee, subject to an Account Control Agreement; provided, however, that any such investment in the Collection Account shall mature not later than the Business Day prior to the next succeeding Monthly Allocation Date. In the absence of written investment instructions hereunder, funds on deposit in the Collection Account shall be invested as fully as practicable in the Standby Investment or shall be held in cash if such investment is unavailable. All income or other gain from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such investments shall be charged to the Collection Account.  The Master Issuer shall not direct (or permit) the disposal of any Eligible Investments prior to the maturity thereof if such disposal would result in a loss of any portion of the initial purchase price of such Eligible Investment.

(c)     Earnings from Collection Account. All interest and earnings (net of losses and investment expenses) paid on funds on deposit in the Collection Account shall be deemed to be Investment Income on deposit for distribution in accordance with Section 5.5.

Section 5.2.    Collection Account Administrative Accounts.

(a)     Establishment of Collection Account Administrative Accounts. On or prior to the Closing Date, the Master Issuer shall establish, and shall maintain the following administrative accounts associated with the Collection Account, each of which shall be an Eligible Account, either in the name of the Trustee for the benefit of the Secured Parties or subject to an Account Control Agreement liened in favor of the Trustee (collectively, the "Collection Account Administrative Accounts"):

(i)     an account for the deposit of Operating Expenses (the "Operating Expense Account"); and

(ii)    one or more administrative accounts that the Master Issuer  may establish from time to time that is consistent with the Related Documents and necessary or desirable in order to implement the business of the Master Issuer.

(b)     Administration of the Collection Account Administrative Accounts. All amounts held in the Collection Account Administrative Accounts shall be invested in Eligible Investments at the written direction (which may be standing directions) of the Master Issuer and such amounts may be transferred by the Master Issuer into an investment account for the sole purpose of investing in Eligible Investments so long as such investment account is (A) an Eligible Account, (B) pledged by the Master Issuer to the Trustee for the benefit of the Secured Parties pursuant to Section 3.1 and (C) if not established with the Trustee, subject to an Account Control Agreement; provided, however, that any such investment in the Collection Account Administrative Accounts shall mature not later than the Business Day prior to the next succeeding Monthly Allocation Date. In the absence of written investment instructions hereunder, funds on deposit in the Collection Account Administrative Accounts shall be invested as fully as practicable in the Standby Investment or shall be held in cash if such investment is unavailable. All income or other gain from such Eligible Investments shall be credited to the related Collection Account Administrative Account, and any loss resulting from such investments shall be charged to the related Collection Account Administrative Account. The Master Issuer shall not direct (or permit) the disposal of any Eligible Investments prior to the maturity thereof if such disposal would result in a loss of any portion of the initial purchase price of such Eligible Investment.

(c)     Earnings from the Collection Account Administrative Accounts. All interest and earnings (net of losses and investment expenses) paid on funds on deposit in the Collection Account Administrative Accounts shall be deposited therein and shall be deemed to be Investment Income on deposit for distribution in accordance with Section 5.4.

(d)     Account Closures.  Other than the Collection Account and Operating Expense Account, all other accounts opened or created in connection with the Original Base Indenture and/or First A&R Base Indenture shall be closed by the Trustee.

Section 5.3.  Trustee as Securities Intermediary.

(a)  The Trustee or other Person holding any Base Indenture Account held in the name of the Trustee for the benefit of the Secured Parties (collectively the "Trustee Accounts") shall be the "Securities Intermediary". If the Securities Intermediary in respect of any Trustee Account is not the Trustee, the Master Issuer shall obtain the express agreement of such other Person to the obligations of the Securities Intermediary set forth in this Section 5.3.

(b)  The Securities Intermediary agrees that:

(i)  the Trustee Accounts are accounts to which "financial assets" within the meaning of Section 8-102(a)(9) ("Financial Assets") of the UCC in effect in the State of New York (the "New York UCC") shall or may be credited;

(ii)  the Trustee Accounts are "securities accounts" within the meaning of Section 8-501 of the New York UCC and the Securities Intermediary qualifies as a "securities intermediary" under Section 8-102(a) of the New York UCC;

(iii)  all securities or other property (other than cash) underlying any Financial Assets credited to any Trustee Account shall be registered in the name of the Securities Intermediary, indorsed to the Securities Intermediary or in blank or credited to another securities account maintained in the name of the Securities Intermediary and in no case shall any Financial Asset credited to any Trustee Account be registered in the name of the Master Issuer, payable to the order of the Master Issuer or specially indorsed to the Master Issuer;

(iv)  all property delivered to the Securities Intermediary pursuant to this Base Indenture shall be promptly credited to the appropriate Trustee Account;

(v)  each item of property (whether investment property, security, instrument or cash) credited to a Trustee Account shall be treated as a Financial Asset under Article 8 of the New York UCC;

(vi)  if at any time the Securities Intermediary shall receive any entitlement order from the Trustee (including those directing transfer or redemption of any Financial Asset) relating to the Trustee Accounts, the Securities Intermediary shall comply with such entitlement order without further consent by the Master Issuer or any other Person;

(vii)  the Trustee Accounts shall be governed by the laws of the State of New York, regardless of any provision of any other agreement. For purposes of all applicable UCCs, New York shall be deemed to be the Securities Intermediary's jurisdiction and the Trustee Accounts (as well as the "securities entitlements" (as defined in Section 8-102(a)(17) of the New York UCC) related thereto) shall be governed by the laws of the State of New York;

(viii)  the Securities Intermediary has not entered into, and until termination of this Base Indenture, shall not enter into, any agreement with any other

24

Person relating to the Trustee Accounts and/or any Financial Assets credited thereto pursuant to which it has agreed to comply with entitlement orders (as defined in Section 8-102(a)(8) of the New York UCC) of such other Person and the Securities Intermediary has not entered into, and until the termination of this Base Indenture shall not enter into, any agreement with the Master Issuer purporting to limit or condition the obligation of the Securities Intermediary to comply with entitlement orders as set forth in Section 5.3(b)(vi); and

(ix)    except for the claims and interest of the Trustee, the Secured Parties, the Master Issuer and the other Obligor Entities in the Trustee Accounts, neither the Securities Intermediary nor, in the case of the Trustee, any Trust Officer has Actual Knowledge of any claim to, or interest, in the Trustee Accounts or in any Financial Asset credited thereto. If the Securities Intermediary or, in the case of the Trustee, a Trust Officer has Actual Knowledge of the assertion by any other person of any Lien, encumbrance, or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against any Trustee Account or in any Financial Asset carried therein, the Securities Intermediary shall promptly notify the Trustee and the Master Issuer thereof.

(c)    At any time after the occurrence and during the continuation of an Event of Default for which acceleration has occurred, the Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Trustee Accounts and in all Proceeds thereof, and (acting at the written direction of the Required Holders) shall be the only Person authorized to originate entitlement orders in respect of the Trustee Accounts; provided, however, that at all other times the Master Issuer shall, subject to the terms of the Indenture and the other Related Documents, be authorized to instruct the Trustee to originate entitlement orders in respect of the Trustee Accounts.

(d)    The parties hereto agree that, with respect to each securities account, the law in force in the State of New York is applicable to all issues specified in Article 2(1) of the Hague Securities Convention. The Securities Intermediary represents that it has an office in the State of New York which is engaged in a business or other regular activity of maintaining securities accounts.

Section 5.4.    Collections and Investment Income.

(a)    Deposits to the Concentration Account. Until the Indenture is terminated the Master Issuer shall deposit (or cause to be deposited) the following amounts to the Concentration Account, to the extent owed to it or the other Obligor Entities upon receipt (unless otherwise specified below):

(i)    whether received directly from licenses or from a third-party payment processor, the Master Issuer and Guarantors' share of IP License Fees, all other amounts received under all license agreements, including the IP License Agreement and the Founders License Agreements, and all amounts received in respect of the Collateral IP, including recoveries (except to the extent that a licensee or sublicensee is entitled to such recoveries under its respective license agreement or such amounts are necessary to remain

with such license, sub-license or necessary to pay for anticipated expenses in connection therewith) from the enforcement of the Collateral IP;

    (ii)    within two (2) Business Days of receipt, any Asset Disposition Proceeds or Insurance/Condemnation Proceeds; and

    (iii)    within five (5) Business Days of receipt, all other amounts constituting Retained Collections not referred to in the preceding clauses.

    (b)    <u>Withdrawals from the Concentration Account</u>. The Paying Agent may (and with respect to <u>sub-clause (ii)</u> below, shall) withdraw available amounts on deposit in the Concentration Account to make the following payments and deposits:

    (i)    on a daily basis, as necessary, to the extent of amounts deposited to the Concentration Account that the Paying Agent or the Master Issuer determines were required to be deposited to another account or were deposited to the Concentration Account in error; and

    (ii)    on a monthly basis, at or prior to 10:00 a.m. (New York City time) on each Monthly Allocation Date, all Retained Collections with respect to the preceding Monthly Collection Period then on deposit in the Concentration Account to the Collection Account (which, for the avoidance of doubt, shall include any Investment Income with respect thereto) for application to make payments and deposits in the order of priority set forth in the Priority of Payments.

    (c)    <u>Deposits to the Collection Account</u>. The Master Issuer shall deposit or cause to be deposited to the Collection Account the following amounts, in each case promptly after receipt (unless otherwise specified below):

    (i)    the amounts required to be withdrawn from the Concentration Account and deposited to the Collection Account pursuant to <u>Section 5.4(b)</u>;

    (ii)    amounts obtained by the Trustee on account of or as a result of the exercise by the Trustee of any right under the Indenture, including without limitation, under <u>Article IX</u> hereof shall be deposited directly to the Collection Account and applied in accordance with <u>Section 9.2(e)</u>; and

    (iii)    any other amounts required to be deposited to the Collection Account hereunder or under any other Related Documents.

    (d)    <u>Investment Income</u>. At least once per annum, the Master Issuer shall direct the Trustee to transfer any Investment Income on deposit in the Accounts (other than the Collection Account) to the Collection Account for application as Collections on the next succeeding Monthly Allocation Date.

    (e)    <u>Payment Instructions</u>. The Master Issuer shall provide (or cause to be provided) to the Trustee and the Paying Agent all payment instructions (which instructions may

be deemed made by delivery of the Monthly Noteholders' Report to the Trustee) required to be provided by the Master Issuer under this Base Indenture and the Series Supplement.

(f)     Misdirected Collections. The Master Issuer agrees that if any Collections shall be received by the Master Issuer or any other Obligor Entity in an account other than an Account or in any other manner, such monies, instruments, cash and other proceeds shall not be commingled by the Master Issuer or such other Obligor Entity with any of their other funds or property, if any, but shall be held separate and apart therefrom and shall be held in trust by the Master Issuer or such other Obligor Entity for, and, within one (1) Business Day of the identification of such payment, paid over to, the Trustee, with any necessary endorsement. The Trustee shall withdraw from the Collection Account any monies on deposit therein for which the Trustee is notified in writing are not Retained Collections. In addition, to the extent any amounts become payable by the Trustee in its capacity as secured party under any Account Control Agreement to an account bank or securities intermediary, amounts held in the Collection Account may be withdrawn by the Trustee and paid to such account bank or securities intermediary. All monies, instruments, cash and other proceeds of the Collateral received by the Trustee pursuant to the Indenture shall be immediately deposited in the Collection Account and shall be applied as provided in this Article V.

Section 5.5.     Application of Monthly Collections on Monthly Allocation Dates.

On each Monthly Allocation Date, the Trustee shall, based solely on the Monthly Noteholders' Report, withdraw the amount of Retained Collections on deposit in the Collection Account as of 10:00 a.m. (New York City time) on such Monthly Allocation Date in respect of such preceding Monthly Collection Period for allocation or payment in the following order of priority (the "Priority of Payments"):

(i)     First, Permitted Tax Payments and Permitted NewCo Expenses;

(ii)     Second, fees and expenses payable to the Trustee and the Calculation and Reporting Agent for each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes and Class B Notes or payable to the Trustee and the Calculation and Reporting Agent under the Indenture, the Calculation and Reporting Agency Agreement or any other Related Documents;

(iii)     Third, (A) fees and expenses payable to external legal counsel relating to the IP or the operations of the Master Issuer or the Guarantors, and (B) to deposit to the Operating Expense Account an amount necessary to pay estimated fees, expenses or operating costs of the Master Issuer for the next six (6) months;

(iv)     Fourth, (A) first, all accrued, unpaid interest on the Class A-1 Notes (excluding Deferred Interest but including current interest on Deferred Interest) to the Class A-1 Noteholders and (B) second, all previously Deferred Interest on the Class A-1 Notes to the Class A-1 Noteholders;

(v)     Fifth, all unpaid principal on the Class A-1 Notes to the Class A-1 Noteholders;

(vi)    <u>Sixth</u>, (A) first, all accrued, unpaid interest (excluding Deferred Interest and any Post-ARD Contingent Interest, but including current interest on Deferred Interest) on the Class A-2II Notes and the Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively and (B) second, all previously Deferred Interest on the Class A-2II Notes and the Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively;

(vii)    <u>Seventh</u>, accrued, unpaid interest (excluding Deferred Interest but including current interest on Deferred Interest) on the Class B Notes to the Class B Noteholders in an amount up to 2% per annum of the Outstanding Principal Amount of the Class B Notes;

(viii)    <u>Eighth</u>, (a) until the Class A-2II Notes have been repaid in full, split (1) 50% of such proceeds to pay unpaid principal on the Class A-2II Notes to the Class A-2II Noteholders and (2) 50% of such proceeds to pay unpaid principal on the Class A-2I Notes to the Class A-2I Noteholders and (b) after repayment in full of the Class A-2II Notes, 100% of such proceeds to the repayment of the Class A-2I Notes to the Class A-2I Noteholders until the Class A-2I Notes have been repaid in full;

(ix)    <u>Ninth</u>, (A) first, all remaining accrued, unpaid interest (excluding Deferred Interest and any Post-ARD Contingent Interest, but including current interest on Deferred Interest) on the Class B Notes to the Class B Noteholders and (B) second, all previously Deferred Interest on the Class B Notes to the Class B Noteholders;

(x)    <u>Tenth</u>, all unpaid principal on the Class B Notes to the Class B Noteholders until the Class B Notes have been repaid in full;

(xi)    <u>Eleventh</u>, any accrued, unpaid Post-ARD Contingent Interest on Class A-2I Notes to the Class A-2I Noteholders;

(xii)    <u>Twelfth</u>, any accrued, unpaid Post-ARD Contingent Interest on Class B Notes to the Class B Noteholders; and

(xiii)    <u>Thirteenth</u>, to distribute 100% of any Residual Amounts in cash distributions to the Master Issuer for distribution to NewCo.

Section 5.6.    <u>Optional Prepayments</u>.

The Master Issuer shall have the right to optionally prepay the Outstanding Principal Amount of any Class, Subclass or Tranche of Notes, in whole or in part in accordance with the Series Supplement; <u>provided</u> that all funds allocated to such prepayment shall be applied in accordance with the Priority of Payments as if the applicable prepayment date were a Monthly Allocation Date.

Section 5.7.    Determination of Monthly Interest.

Monthly payments of cash interest on each Class, Subclass or Tranche of Notes shall be determined and distributed in accordance with the procedures set forth in the Series Supplement and Deferred Interest shall be determined in accordance with Section 2.15 above.

Section 5.8.    Prepayment of Principal.

Mandatory prepayments of principal of each Class, Subclass or Tranche of Notes shall be distributed in accordance with the procedures set forth in the Series Supplement.

Section 5.9.    Operating Expense Account.

On any Business Day, the Master Issuer may withdraw (or, to the extent the Operating Expense Account is in the name of the Trustee, instruct the Trustee in writing to withdraw) from the Operating Expense Account an amount equal to the lesser of (i) the sum of all Operating Expenses then due and payable and (ii) the amount on deposit in the Operating Expense Account after giving effect to any deposits thereto pursuant to the Priority of Payments on the immediately preceding Monthly Allocation Date and apply such funds, on a pro rata basis, to pay all Operating Expenses then due and payable. To the extent the Trustee is instructed to withdraw and pay any Operating Expenses on behalf of the Master Issuer pursuant to this Section 5.9, the Master Issuer shall provide (or cause to be provided) to the Trustee any additional information the Trustee may reasonably request to effectuate the distribution of such funds.

Section 5.10.    Replacement of Ineligible Accounts.

If, at any time, any of the Collection Account or any Collection Account Administrative Account shall cease to be an Eligible Account (each, an "Ineligible Account"), the Master Issuer shall (i) within five (5) Business Days of obtaining knowledge thereof, notify the Trustee thereof and (ii) upon the written instruction of the Required Holders, within sixty (60) days of obtaining knowledge thereof (or such longer period agreed with the Trustee including by email), (A) establish, or cause to be established, a new account that is an Eligible Account in substitution for such Ineligible Account, (B) following the establishment of such new Eligible Account, transfer, or with respect to the Trustee Accounts maintained at the Trustee, instruct the Trustee in writing to transfer, all cash and investments from such Ineligible Account into such new Eligible Account, and (C) pledge, or cause to be pledged, such new Eligible Account to the Trustee for the benefit of the Secured Parties and, if such Ineligible Account is required to be subject to an Account Control Agreement in accordance with the terms of the Indenture, cause such new Eligible Account to be subject to an Account Control Agreement in form and substance reasonably acceptable to the Required Holders.

Section 5.11.    Instructions and Directions.

Any instructions or directions to be provided by or on behalf of the Master Issuer referenced in this Article V with respect to a Monthly Allocation Date may be contained in the applicable Monthly Noteholders' Report for the related Monthly Allocation Date.

# ARTICLE VI

## DISTRIBUTIONS

Section 6.1.     Distributions in General.

(a)     Unless otherwise specified in the Series Supplement, on each Monthly Allocation Date, the Paying Agent shall pay to the Noteholders of record on the preceding Record Date (or in the case of optional prepayments made in accordance with the Series Supplement, the Noteholders of record on the applicable prepayment date as specified therein) the amounts payable thereto in cash (A) in the case of Book-Entry Notes, by wire transfer in immediately available funds released by the Paying Agent from the Collection Account and (B) in the case of Definitive Notes (i) by wire transfer in immediately available funds released by the Paying Agent from the Collection Account no later than 12:30 p.m. (New York City time) if a Noteholder has provided to the Paying Agent and the Trustee wiring instructions at least five (5) Business Days prior to the applicable Monthly Allocation Date or (ii) by check mailed first-class postage prepaid to such Noteholder at the address for such Noteholder appearing in the Note Register if such Noteholder has not provided wire instructions pursuant to clause (i) above; provided, however, that the final principal payment due on a Note shall only be paid upon due presentment and surrender of such Note for cancellation in accordance with the provisions of the Note at the applicable Corporate Trust Office which surrender shall also constitute a general release by the applicable Noteholder from any claims against the Obligor Entities, the Agents, the Trustee and their affiliates. Deferred Interest payments shall be made in the manner described in Section 2.15 above.

(b)     Unless otherwise specified in the Series Supplement or in this Base Indenture, all distributions to Noteholders of all Tranches of Notes shall be made from amounts allocated in accordance with the Priority of Payments) and pro rata among holders of Notes within each Tranche.

(c)     Unless otherwise specified in the Series Supplement, the Trustee shall distribute all amounts owed to the Noteholders of any Class of Notes pursuant to the written instructions of the Master Issuer whether set forth in a Monthly Noteholders' Report, Company Order or otherwise.

# ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

The Master Issuer hereby represents and warrants, for the benefit of the Trustee and the Noteholders, as follows, as of the Closing Date after giving effect to the effectuation of the Approved Plan:

Section 7.1.     Existence and Power.

Each Obligor Entity (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) is duly qualified to do business as a foreign entity and in good standing under the laws of each jurisdiction where the character of its property, the nature

of its business or the performance of its obligations under the Related Documents make such qualification necessary, except to the extent that the failure to so qualify is not reasonably likely to result in a Material Adverse Effect, and (c) has all limited liability company, limited partnership, corporate or other powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as will be conducted after giving effect to the Approved Plan and the consummation of the transactions contemplated thereby and for purposes of the transactions contemplated by the Indenture and the other Related Documents.

Section 7.2.    Company and Governmental Authorization.

The execution, delivery and performance by the Master Issuer of this Base Indenture and the Series Supplement and by the Master Issuer and each other Obligor Entity of the other Related Documents to which it is a party (a) is within such Obligor Entity's limited liability company, limited partnership, corporate or other powers and has been duly authorized by all necessary limited liability company, limited partnership, corporate or other action, (b) requires no action by or in respect of, or filing with, any Governmental Authority which has not been obtained (other than any actions or filings that may be undertaken as part of the Approved Plan or after the Closing Date pursuant to the terms of this Base Indenture or any other Related Document or in connection with the effectuation of the Approved Plan) and (c) does not contravene, or constitute a default under, any Requirements of Law with respect to such Obligor Entity or any Contractual Obligation with respect to such Obligor Entity or result in the creation or imposition of any Lien on any property of any Obligor Entity, except for Liens created by this Base Indenture or the other Related Documents. This Base Indenture and each of the other Related Documents to which each Obligor Entity is a party has been executed and delivered by a duly Authorized Officer of such Obligor Entity.

Section 7.3.    No Consent.

Except as set forth in the Approved Plan, no consent, action by or in respect of, approval or other authorization of, or registration, declaration or filing with, any Governmental Authority or other Person is required for the valid execution and delivery by the Master Issuer of this Base Indenture and the Series Supplement and by the Master Issuer and each other Obligor Entity of any Related Document to which it is a party or for the performance of any of the Obligor Entities' obligations hereunder or thereunder other than such consents, approvals, authorizations, registrations, declarations or filings (a) as shall have been obtained or made by such Obligor Entity prior to the Closing Date or as are permitted to be obtained subsequent to the Closing Date in accordance with Section 7.10 or Section 8.17, (b) obtained pursuant to a court order or as required in connection with the effectuation of the Approved Plan or (c) relating to the performance of the IP License Agreement the failure of which to obtain is not reasonably likely to have a Material Adverse Effect.

Section 7.4.    Binding Effect.

This Base Indenture and each other Related Document to which an Obligor Entity is a party is a legal, valid and binding obligation of each such Obligor Entity enforceable against such Obligor Entity in accordance with its terms (except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors'

rights generally or by general equitable principles, whether considered in a proceeding at law or in equity and by an implied covenant of good faith and fair dealing).

Section 7.5.    Employee Benefit Plans.

No Obligor Entity or any member of a Controlled Group that includes an Obligor Entity has established, maintains, contributes to, or has any liability in respect of any Pension Plan, except as would not reasonably be expected to result in a Material Adverse Effect on any Obligor Entity.

Section 7.6.    Disclosure.

All certificates, reports, statements, notices, documents and other information furnished in writing (other than projections, budgets, other estimates and general market, industry and economic data) to the Trustee or the Noteholders by or on behalf of the Obligor Entities pursuant to any provision of the Indenture or any other Related Document, are, at the time the same are so furnished, complete and correct in all material respects (when taken together with all other information furnished by or on behalf of the Obligor Entities to the Trustee or the Noteholders, as the case may be), and give the Trustee or the Noteholders, as the case may be, true and accurate knowledge of the subject matter thereof in all material respects, and the furnishing of the same to the Trustee or the Noteholders, as the case may be, shall constitute a representation and warranty by the Master Issuer made on the date the same are furnished to the Trustee or the Noteholders, as the case may be, to the effect specified herein.

Section 7.7.    Investment Company Act.

No Obligor Entity is, or is controlled by, an "investment company" within the meaning of the Investment Company Act.

Section 7.8.    Regulations T, U and X.

The proceeds of the Notes shall not be used to purchase or carry any "margin stock" (as defined or used in the regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X thereof) in such a way that could cause the transactions contemplated by the Related Documents to fail to comply with the regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X thereof. No Obligor Entity owns or is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock.

Section 7.9.    Ownership of Equity Interests; Subsidiaries. As of the Closing Date after giving effect to the transactions contemplated by the Approved Plan:

(a)    All of the issued and outstanding limited liability company interests of the Master Issuer are directly owned by NewCo, have been duly authorized and validly issued, are fully paid and non-assessable, to the extent such concept is applicable to such limited liability company interests, and free and clear of all Liens other than Permitted Liens.

(b)    All of the issued and outstanding limited liability company interests of HOA IP GP are directly owned by the Master Issuer, have been duly authorized and validly issued, are

fully paid and non-assessable, to the extent such concept is applicable to such limited liability company interests, and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(c)    All of the issued and outstanding limited partnership interests of the IP Holder are directly owned by the Master Issuer, have been duly authorized and validly issued, are fully paid and non-assessable, to the extent such concept is applicable to such limited partnership interests, and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(d)    All of the issued and outstanding general partnership interests of the IP Holder are directly owned by HOA IP GP, have been duly authorized and validly issued, are fully paid and non-assessable, to the extent such concept is applicable to such general partnership interests, and are owned of record by HOA IP GP free and clear of all Liens other than Permitted Liens.

Section 7.10.    Security Interests.

(a)    The Master Issuer and each Guarantor owns and has good title to its assets constituting the Collateral, free and clear of Liens other than Permitted Liens. Other than the Accounts, the Indenture Collateral consists of securities, loans, investments, accounts, commercial tort claims, inventory, equipment, fixtures, health care insurance receivables, chattel paper, money, deposit accounts, instruments, financial assets, documents, investment property, general intangibles, letter of credit rights, and other supporting obligations (in each case, as defined in the UCC). Upon giving effect to the Approved Plan, the effectiveness of this Base Indenture and the filing of UCC financing statements, this Base Indenture and the Guarantee and Collateral Agreement will constitute a valid and continuing Lien on the Collateral in favor of the Trustee on behalf of and for the benefit of the Secured Parties, which Lien on the Collateral has been perfected to the extent required pursuant to the terms of this Base Indenture and the Guarantee and Collateral Agreement and is prior to all other Liens (other than Permitted Liens), and is enforceable as such as against creditors of and purchasers from the Master Issuer and each Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general equitable principles, whether considered in a proceeding at law or in equity and by an implied covenant of good faith and fair dealing. After giving effect to the Approved Plan and the transactions occurring in connection therewith, the Master Issuer and the Guarantors have received all consents and approvals required by the terms of this Base Indenture and the Collateral to the pledge of the Collateral to the Trustee hereunder and under the Guarantee and Collateral Agreement subject only to the Collateral Exclusions and limitations on counsel agreed with the Required Holders.  The Master Issuer and the Guarantors shall have caused, or shall cause promptly following the effectiveness of the Approved Plan, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the first-priority security interest (subject to Permitted Liens) in the Collateral granted to the Trustee hereunder or under the Guarantee and Collateral Agreement within ten (10) Business Days of the date of this Base Indenture, or, in the case of Intellectual Property, shall take such additional action necessary to perfect such first-priority security interest consistent with the obligations set forth in Section 8.17. Notwithstanding anything to the contrary in the Base

Indenture or the Series Supplement, no Master Issuer or Guarantor shall be required to make any filings or take any other actions to perfect, evidence or create a lien on or security interest in any Intellectual Property, including the Collateral IP, except for filings in the PTO and the United States Copyright Office and the filing of UCC financing statements, and no Master Issuer or Guarantor shall be required to reimburse the Trustee for any costs incurred in connection with any filings or actions to perfect, evidence or create a lien on or security interest in any Intellectual Property other than in connection with such filings in the PTO or the United States Copyright Office and the filing of such UCC financing statements.

(b)    Other than the security interest granted to the Trustee hereunder, pursuant to the other Related Documents or any other Permitted Lien, neither the Master Issuer nor any of the Guarantors has pledged, assigned, sold or granted a security interest in the Collateral (that is not a Permitted Lien or that has been otherwise consented to by the Required Holders). Such actions necessary (including the filing of UCC-1 financing statements and filings with the PTO and the United States Copyright Office) to protect and evidence the Trustee's security interest in the Collateral in the United States has been, or shall be, duly and effectively taken by the Trustee, consistent with the obligations set forth in <u>Section 7.10(a)</u>. No effective security agreement, financing statement, equivalent security or lien instrument or continuation statement authorized by the Master Issuer and any Guarantor and listing the Master Issuer or such Guarantor as debtor covering all or any part of the Collateral is on file or of record in any jurisdiction, except in respect of Permitted Liens or liens being discharged pursuant to the Approved Plan or such as may have been filed, recorded or made by the Master Issuer or such Guarantor in favor of the Trustee on behalf of the Secured Parties in connection with this Base Indenture and the Guarantee and Collateral Agreement, and neither the Master Issuer nor any Guarantor has authorized any such filing except in respect of Permitted Liens or liens being discharged pursuant to the Approved Plan.

Section 7.11.    <u>Related Documents</u>.

The Indenture Documents, the Collateral Related Documents and the Depository Agreements, with respect to the Notes are in full force and effect. There are no outstanding defaults thereunder nor have events occurred which, with the giving of notice, the passage of time or both, would constitute a default thereunder (it being understood that any defaults or Events of Default that occurred or existed prior to the effectiveness of the Approved Plan shall been deemed waived or cured upon the effectiveness of the Approved Plan).

Section 7.12.    <u>Compliance with Contractual Obligations and Laws</u>.

No Obligor Entity is in violation of (a) its Charter Documents, (b) any Requirement of Law with respect to such Obligor Entity or (c) any Contractual Obligation with respect to an Obligor Entity except, solely with respect to <u>clauses (b)</u> and <u>(c)</u>, to the extent such violation could not reasonably be expected to result in a Material Adverse Effect.

Section 7.13.    <u>No Employees</u>.

Notwithstanding any other provision of the Indenture or any Charter Documents of any Obligor Entity to the contrary, no Obligor Entity has any permanent employees.

Section 7.14.   <u>Insurance</u>.

The Obligor Entities maintain insurance coverage in such amounts and covering such risks as is adequate for the conduct of their respective businesses and the value of their respective properties and as is customary for companies engaged in similar businesses in similar industries.

Section 7.15.   <u>Intellectual Property</u>.

(a)   Except as permitted by the Approved Plan, all of the registrations and applications included in the Collateral IP are subsisting, unexpired and have not been abandoned in any applicable jurisdiction except where such expiration or abandonment could not reasonably be expected to have a Material Adverse Effect.

(b)   Except as previously disclosed by the Master Issuer in writing, (i) the use of the Collateral IP and the operation of the Obligor Entities, the Branded Restaurant System do not infringe or violate the rights of any third party in a manner that could reasonably be expected to have a Material Adverse Effect, (ii) to the Master Issuer's knowledge, the Collateral IP is not being infringed or violated by any third party in a manner that could reasonably be expected to have a Material Adverse Effect and (iii) there is no action or proceeding pending or, to the Master Issuer's knowledge, threatened, alleging same that could reasonably be expected to have a Material Adverse Effect.

(c)   Except as previously disclosed by the Master Issuer in writing including pursuant to the Approved Plan, no action or proceeding is pending or, to the Master Issuer's knowledge, except as previously disclosed by the Master Issuer in writing, threatened, that seeks to limit, cancel, or challenge the validity of any Collateral IP, or the use thereof, that could reasonably be expected to have a Material Adverse Effect.

(d)   The IP Holder owns all of the Collateral IP free and clear of all Liens, encumbrances and set-offs, of whatsoever kind or nature, other than Permitted Liens, except as could not reasonably be expected to have a Material Adverse Effect.

(e)   The Master Issuer has not made any assignment, pledge, mortgage, hypothecation or transfer of any of the Collateral IP other than (i) Permitted Liens and (ii) Permitted Asset Dispositions.

# ARTICLE VIII

## COVENANTS

Section 8.1.   <u>Payment of Notes</u>.

(a)   The Master Issuer shall pay or cause to be paid the principal of, and premium, if any, and interest, subject to <u>Section 2.15(d)</u>, on the Notes when due pursuant to the provisions of this Base Indenture and the Series Supplement. Principal, premium, if any, and interest (except for Deferred Interest) shall be considered paid on the date due if the Paying Agent holds on that date money designated for and sufficient to pay all principal, premium, if any, and interest then due in cash, and Deferred Interest shall be considered paid on the Monthly Allocation

Date on which funds are available to be used for such purpose in accordance with the Priority of Payments. Except as otherwise provided pursuant to any Related Document, amounts properly withheld under the Code or any applicable state, local or foreign law by any Person from a payment to any Noteholder of interest or principal or premium, if any, shall be considered as having been paid by the Master Issuer to such Noteholder for all purposes of the Indenture and the Notes.

(b)    By acceptance of its Notes, each Noteholder agrees that the failure to provide the Paying Agent with appropriate tax certifications (which includes (i) an Internal Revenue Service Form W-9 for United States persons (as defined under Section 7701(a)(30) of the Code) or any applicable successor form or (ii) an applicable Internal Revenue Service Form W-8, for Persons other than United States persons, or applicable successor form) may result in amounts being withheld from payments to such Noteholder under this Base Indenture and the Series Supplement and that amounts withheld pursuant to applicable laws shall be considered as having been paid by the Master Issuer as provided in clause (a) above.

Section 8.2.    Payment and Performance of Obligations.

The Master Issuer shall, and shall cause the other Obligor Entities to, pay and discharge and fully perform, at or before maturity, all of their respective material obligations and liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon the Obligor Entity or upon the income, properties or operations of any Obligor Entity, judgments, settlement agreements and all obligations of each Obligor Entity under the Collateral Documents, except where the same may be contested in good faith by appropriate proceedings (and without derogation from the material obligations of the Master Issuer hereunder and the Guarantors under the Guarantee and Collateral Agreement regarding the protection of the Collateral from Liens (other than Permitted Liens)), and shall maintain, in accordance with GAAP, reserves as appropriate for the accrual of any of the same.

Section 8.3.    Maintenance of Existence.

The Master Issuer shall, and shall cause each other Obligor Entity that is not a Wind-Down Entity to, maintain its existence as a limited liability company, limited partnership or corporation validly existing and in good standing under the laws of its state of organization and duly qualified as a foreign limited liability company, limited partnership or corporation licensed under the laws of each state in which the failure to so qualify would be reasonably likely to result in a Material Adverse Effect. The Master Issuer shall elect to be treated as a corporation for U.S. federal tax purposes, and shall cause each other Obligor Entity to be treated as a disregarded entity within the meaning of U.S. Treasury Regulations section 301.7701-2(c)(2). The Master Issuer shall not permit any other Obligor Entity to be classified as a corporation or as an association taxable as a corporation or a publicly traded partnership taxable as a corporation for U.S. federal tax purposes.

Section 8.4.    Compliance with Laws.

The Master Issuer shall, and shall cause each other Obligor Entity to, comply in all respects with all Requirements of Law with respect to the Master Issuer or such other Obligor Entity except where such noncompliance would not be reasonably likely to result in a Material Adverse Effect.

Section 8.5.    Inspection of Property; Books and Records.

The Master Issuer shall, and shall cause each other Obligor Entity to, keep proper books of record and accounts in which full, true and correct entries shall be made of all dealings and transactions, business and activities. The Master Issuer shall, and shall cause each other Obligor Entity to, permit, at reasonable times upon reasonable notice, the Trustee, any Person appointed by the Trustee, or any person designated pursuant to the written direction of the Noteholders (after a vote in which the Required Holders affirmatively vote in favor of the direction), any of them to act as its agent to visit and inspect any of its properties, to examine and make abstracts from any of its books and records and to discuss its affairs, finances and accounts with its officers, directors, managers, general and limited partners, employees and independent certified public accountants. The reasonable costs and documented out-of-pocket expenses of one such visit and inspection by the Trustee or any Person appointed by it, shall be reimbursable as an Operating Expense per calendar year; provided, however, that during the continuance of an Event of Default, or to the extent expressly required without the written instruction of any other party under the terms of any Related Documents, any such Person may visit and conduct such activities at any time and all such visits and activities shall constitute an Operating Expense.

Section 8.6.    Actions under the Collateral Documents and Related Documents.

Except as may be required to effectuate the Approved Plan, the Master Issuer shall not, and shall not permit any Obligor Entity to, take any action which would permit any Person party to a Related Document to have the right to refuse to perform any of its respective obligations under any of the Related Documents to which an Obligor Entity is a party or that would result in the amendment, waiver, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any Related Document; provided however, that the Master Issuer and the Obligor Entities may take such actions as necessary in the case of a breach by the Manager of the Charter Documents or the Brand Management Agreement to replace the Manager in order to ensure the performance of the Obligations and/or the Collateral.

Section 8.7.    Notice of Defaults and Other Events.

Promptly (and in any event within three (3) Business Days) following an Authorized Officer having Actual Knowledge of (i) any Default, (ii) any Event of Default or (iii) any default under any Related Document (other than the Brand Management Agreement), the Master Issuer shall give the Trustee, the Agents and the Noteholders, together with an Officer's Certificate setting forth the details thereof and any action with respect thereto taken or contemplated to be taken by the Master Issuer. The Master Issuer shall, at its expense, promptly provide to the Agents, the Noteholders, and the Trustee such additional information as the Manager, the Noteholders, or the Trustee may reasonably request from time to time in connection with the matters so reported, and the actions so taken or contemplated to be taken.

Section 8.8.    Further Requests.

The Master Issuer shall, and shall cause each other Obligor Entity to, promptly furnish to the Trustee such other information as, and in such form as, the Trustee may reasonably request

(including at the written direction of the Required Holders) in connection with the transactions contemplated hereby or by the Series Supplement.

Section 8.9.    <u>Further Assurances</u>.

(a)    The Master Issuer shall, and shall cause each other Obligor Entity to, do such further commercially reasonable acts and things, and execute and deliver to the Trustee such additional assignments, agreements, powers and instruments, as are necessary or desirable to obtain or maintain the security interest of the Trustee in the Collateral on behalf of the Secured Parties as a perfected security interest in the Collateral subject only to Permitted Liens, to carry into effect the purposes of the Indenture and the other Related Documents or to better assure and confirm unto the Trustee, the Noteholders or the other Secured Parties their rights, powers and remedies hereunder including, without limitation, the filing of such financing or continuation statements or amendments under the UCC in effect in any applicable filing jurisdiction with respect to the liens and security interests granted hereby and by the Guarantee and Collateral Agreement as requested by the Trustee or the Required Holders.

(b)    On or before September 30 of each calendar year commencing in 2029, the Master Issuer shall furnish to the Trustee an Opinion of Counsel either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording and refiling of this Base Indenture, any indentures supplemental hereto, the Guarantee and Collateral Agreement and any other requisite documents and with respect to the execution and filing of any financing statements, continuation statements and amendments to financing statements and such other documents as are, necessary to maintain the perfection of the Lien and security interest created by this Base Indenture and the Guarantee and Collateral Agreement under Article 9 of the New York UCC in the United States and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the perfection of such Lien and security interest. Each such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Base Indenture, any indentures supplemental hereto, the Guarantee and Collateral Agreement and any other requisite documents and the execution and filing of any financing statements, continuation statements and amendments or other documents that shall, in the opinion of such counsel, be required, to maintain the perfection of the lien and security interest of this Base Indenture and the Guarantee and Collateral Agreement under Article 9 of the New York UCC in the Collateral in the United States until September 30 in the following calendar year.

Section 8.10.    <u>Liens</u>.

The Master Issuer shall not, and shall not permit any other Obligor Entity to, create, incur, assume or permit to exist any Lien upon any of its property (including the Collateral), other than (i) Liens in favor of the Trustee for the benefit of the Secured Parties and (ii) other Permitted Liens.

Section 8.11.    <u>Other Indebtedness</u>.

The Master Issuer shall not, and shall not permit any other Obligor Entity to, create, assume, incur, suffer to exist or otherwise become or remain liable in respect of any Indebtedness, without the prior written consent of the Supermajority Noteholders, other than (i) Indebtedness hereunder or under the Guarantee and Collateral Agreement or any other Related Document, (ii) any

guarantee by any Obligor Entity of the obligations of any other Obligor Entity, (iii) Indebtedness of an Obligor Entity owed to an Obligor Entity or (iv) Permitted Debt.

Section 8.12.  <u>Litigation</u>.

The Master Issuer shall, on each Monthly Allocation Date, provide a written report (to be appended to the Monthly Noteholders' Report) that sets forth any outstanding material litigation, arbitration or other proceedings against any Obligor Entity that would have been required to be disclosed in the annual reports, quarterly reports and other public filings which the Master Issuer would have been required to file with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the 1934 Act if the Master Issuer were subject to such Sections.

Section 8.13.  <u>Mergers</u>.

On and after the Plan Effective Date, except as contemplated by the Approved Plan, the Master Issuer shall not, and shall not permit any other Obligor Entity that is not a Wind-Down Entity to, merge or consolidate with or into any other Person (whether by means of a single transaction or a series of related transactions) other than any merger or consolidation of any Obligor Entity with any other Obligor Entity or any merger or consolidation of any Obligor Entity with any other entity to which the Required Holders have given prior written consent.

Section 8.14.  <u>Asset Dispositions</u>.

The Master Issuer shall not, and shall not permit any other Obligor Entity that is not a Wind-Down Entity to, sell, transfer, lease, license, liquidate or otherwise dispose of any of its property (whether by means of a single transaction or a series of related transactions), including any Equity Interests of any other Obligor Entity, except to the extent required by the Approved Plan or if such action would not be reasonably expected to result in a Material Adverse Effect and falls within one of the following categories (each, a "<u>Permitted Asset Disposition</u>"); <u>provided</u> that, notwithstanding anything to the contrary herein, Permitted Tax Payments are excluded from the following and are expressly permitted hereunder:

(a)     any disposition of Eligible Investments;

(b)     any licenses of Collateral IP existing on the Plan Effective Date or permitted under the Brand Management Agreement or the IP License Agreement or other franchise agreements, joint development agreements, brand management agreements and entering into licenses, financed royalty arrangements and similar arrangements with persons not materially and adversely affecting the value of the Collateral in any material respect;

(c)     any dispositions of property of an Obligor Entity contemplated by the Approved Plan to any other Obligor Entity not otherwise prohibited under the Related Documents;

(d)     any decision to abandon, permit to lapse, fail to pursue or maintain, or otherwise dispose of Collateral IP made in the Master Issuer's reasonable business judgment in light of the cost, potential remedy, or other factors;

(e)     Investments, Liens and distributions permitted hereunder;

(f)        transfers of properties subject to condemnation or casualty events;

(g)        any decision to abandon, fail to pursue, settle, or otherwise resolve any claim, proceeding, investigation or cause of action to enforce or seek remedy for the infringement, misappropriation, dilution or other violation of any Collateral IP, or other remedy against any third party where the Master Issuer determines to pursue such claim or remedy in its reasonable business judgment in light of the cost, potential remedy, or other factors; provided, that such action (or failure to act) would not reasonably be expected to have a Material Adverse Effect;

(h)        any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of any Obligor Entity's business, in each case, that would not reasonably be expected to result in a Material Adverse Effect;

(i)        any other sale, lease, license, transfer or other disposition of property to which the Required Holders have given the relevant Obligor Entity prior written consent and entering into customary contingent fee arrangements and similar arrangements with attorneys and advisors in connection with the settlement of such disputes existing as of the Plan Effective Date and other future litigations and disputes so long as such arrangement has been approved by NewCo.

Upon any sale, transfer, lease, license, liquidation or other disposition of any property by any Obligor Entity permitted by this Section 8.14, all Liens with respect to such property created in favor of the Trustee for the benefit of the Secured Parties under this Base Indenture and the other Related Documents shall be automatically released, and the Trustee shall be entitled to an Officer's Certificate of the Master Issuer certifying that all conditions precedent to such release have been satisfied.

Section 8.15.   Dividends, Officers' Compensation, etc.

The Master Issuer shall not declare or pay any cash distributions on its limited liability company interests; provided, however, that notwithstanding anything to the contrary herein, (a) this covenant will not prohibit (i) the distribution of Permitted NewCo Expenses, (ii) payments and reimbursements necessary to comply with the Approved Plan and the transactions and agreements contemplated thereby, (iii) Permitted Tax Payments and (iv) to the extent constituting a distribution, payments contemplated as part of, and in connection with, the Subsequent Mandatory Exchange, and (b) so long as no Event of Default has occurred and is continuing or would result therefrom, the Master Issuer may declare and pay distributions with Residual Amounts to the extent permitted under Section 18-607 of the Delaware Limited Liability Company Act, and the Master Issuer's Charter Documents.

Section 8.16.   Legal Name, Location Under Section 9-301 or 9-307.

The Master Issuer shall not, and shall not permit any other Obligor Entity to, change its location (within the meaning of Section 9-301 or 9-307 of the applicable UCC) or its legal name without prior written notice to the Trustee.

In the event that the Master Issuer or any other Obligor Entity desires to so change its location or change its legal name, the Master Issuer shall, or shall cause such other Obligor Entity

to, make any required filings and prior to actually changing its location or its legal name, the Master Issuer shall, or shall cause such other Obligor Entity to, deliver to the Trustee (i) an Officer's Certificate confirming that all required filings have been made to continue the perfected interest of the Trustee on behalf of the Secured Parties in the Collateral under Article 9 of the applicable UCC in respect of the new location or new legal name of the Master Issuer or other Obligor Entity and (ii) copies of all such required filings with the filing information duly noted thereon by the office in which such filings were made.

Section 8.17.   <u>Covenants Regarding the Collateral IP</u>.

The Master Issuer shall use and shall direct the Manager and their agents to use commercially reasonable efforts to execute, deliver, and file such documents or instruments reasonably necessary to perfect (to the extent a security interest can be perfected by such filings) or protect the Trustee's security interest in any material Collateral IP (excluding any Excepted Collateral IP Assets) in the United States Patent and Trademark Office and the United States Copyright Office.

Section 8.18.   <u>1940 Act</u>.

The Master Issuer shall take or omit to take action as necessary in order to ensure the Master Issuer is not an "investment company" as set forth in Section 3(a)(1) of the 1940 Act, as such section may be amended from time to time.

Section 8.19.   <u>Real Property</u>.

The Master Issuer shall not, and shall not permit any other Obligor Entity to, enter into any lease of real property. The Master Issuer shall not, and shall not permit any other Obligor Entity to, acquire any fee interest in real property.

Section 8.20.   <u>No Employees</u>.

The Master Issuer and the other Obligor Entities shall have no permanent employees.

## ARTICLE IX

## REMEDIES

Section 9.1.   <u>Events of Default</u>.

If any one of the following events shall occur (each an "<u>Event of Default</u>"):

(a)     the Master Issuer defaults in the payment of interest on any Notes Outstanding when the same becomes due and payable from available amounts in accordance with the Priority of Payments and such default continues for two (2) Business Days (or in the case of a failure to pay such interest when due resulting solely from an administrative error or omission by the Trustee, such default continues for a period of two (2) Business Days after the earlier of the date on which the Trustee receives written notice or an Authorized Officer of the Trustee has Actual Knowledge of such error or omission);

(b)      the Master Issuer (i) defaults in the payment of any principal of any Notes on their Legal Final Maturity Date or as and when due in connection with any mandatory or optional prepayment or (ii) fails to make any other principal payments or allocations due from funds available in the Collection Account in accordance with the Priority of Payments and the Series Supplement on any Monthly Allocation Date; provided that in the case of a failure to pay or allocate principal resulting solely from an administrative error or omission by the Trustee, such default continues for a period of two (2) Business Days after the earlier of the date on which the Trustee receives written notice or an Authorized Officer of the Trustee has Actual Knowledge of such error or omission;

(c)      any Obligor Entity fails to perform or comply with any of the covenants (other than those covered by clause (a) or clause (b) above) (including any covenant to pay any amount other than interest on or principal of the Notes when due in accordance with the Priority of Payments), or any of its representations or warranties contained in any Related Document (except the Brand Management Agreement) to which it is a party proves to be incorrect in any material respect as of the date made or deemed to be made, and such default, failure, breach or incorrect representation or warranty continues for a period of thirty (30) consecutive days or, in the case of a failure to comply with any of the agreements, covenants or provisions of the IP License Agreement, such longer cure period as may be permitted under the IP License Agreement, or, solely with respect to a failure to comply with (i) any obligation to deliver a notice, report or other communication within the specified time frame set forth in the applicable Related Document, such failure continues for a period of five (5) consecutive Business Days after the specified time frame for delivery has elapsed or (ii) Sections 8.6, 8.10, 8.11, 8.12, 8.13, 8.15, 8.16, 8.17, 8.18, 8.19 and 8.20, such failure continues for a period of ten (10) consecutive Business Days, in each case, following the earlier to occur of the Actual Knowledge of an Authorized Officer of such Obligor Entity of such breach or failure and the default caused thereby or written notice to such Obligor Entity by the Trustee of such default, breach or failure;

(d)      the occurrence of an Event of Bankruptcy after the Closing Date with respect to any Obligor Entity;

(e)      the SEC or other regulatory body having jurisdiction reaches a final determination that any Obligor Entity is required to register as an "investment company" under the Investment Company Act or is under the "control" of a Person that is required to register as an "investment company" under the Investment Company Act;

(f)      any of the Related Documents or any material portion thereof ceases to be in full force and effect or enforceable in accordance with its terms (other than in accordance with the express termination provisions thereof) or any Obligor Entity so asserts in writing;

(g)      other than with respect to Collateral with an aggregate fair market value of less than $5 million, the Trustee ceases to have for any reason a valid and perfected first priority security interest in the Collateral (subject to Permitted Liens) in which perfection can be achieved under the UCC by the filing of a financing statement to the extent required by the Related Documents or any Obligor Entity or any Affiliate thereof so asserts in writing;

(h)    one or more outstanding final non-appealable judgments are rendered against any Obligor Entity in an aggregate amount exceeding $2,500,000 (to the extent not covered by independent third-party insurance as to which the issuer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), and either (i) enforcement proceedings are commenced by any creditor upon such judgment or order or (ii) there is any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, that any judgments related to litigation that survive implementation of the Approved Plan shall not constitute an Event of Default under this clause (h);

(i)    any ERISA Event occurs that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect on any Obligor Entity;

(j)    the IRS files notice of a Lien pursuant to Section 6323 of the Code with regard to the assets of any Obligor Entity and such Lien has not been released within sixty (60) days; or

(k)    a final non-appealable non-monetary judgment has been made by a court of competent jurisdiction that materially impairs (i) the Obligor Entities' Collateral, taken as a whole, or (ii) the exercise of the Obligor Entities' or of the Trustee's rights with respect to the Obligor Assets; provided that in the case of the foregoing clauses (g) or (h) through (k), any matters occurring as a direct result of the effectuation of the Approved Plan and the legal proceedings related thereto shall not constitute an Event of Default;

then (i) in the case of any event described in each clause above (except for clause (d) thereof) that is continuing the Trustee, at the written direction of the Required Holders and on behalf of the Noteholders, by written notice to the Master Issuer, shall declare the Notes to be immediately due and payable, and upon any such declaration the unpaid principal amount of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, and all other amounts due to the Noteholders and the other Secured Parties under the Indenture Documents shall become immediately due and payable or (ii) in the case of any event described in clause (d) above, the unpaid principal amount of the Notes, together with interest accrued but unpaid thereon through the date of acceleration, and all other amounts due to the Noteholders and the other Secured Parties under the Indenture, shall immediately and without further act become due and payable. Promptly following its receipt of written notice hereunder of any Event of Default, the Trustee shall send a copy thereof to the Master Issuer, the Agents, each Noteholder and each other Secured Party.

If any Obligor Entity obtains Actual Knowledge that a Default or an Event of Default has occurred and is continuing, the Master Issuer shall promptly notify the Trustee.

At any time after such a declaration of acceleration of maturity has been made relating to the Notes and before a judgment or decree for payment of the money due has been obtained by the Trustee, as hereinafter provided in this Article IX, the Required Holders, by written notice to the Master Issuer and to the Trustee, may rescind and annul such declaration and its consequences, if the Master Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue installments of interest and principal on the Notes (excluding principal amounts due solely as a result of the acceleration), and (b) all unpaid Taxes, administrative expenses and other sums paid

by the Trustee under the Related Documents and the reasonable compensation, expenses and disbursements of the Trustee, their agents and counsel and other amounts payable to the Trustee under the Related Documents and (ii) all existing Events of Default, other than the non- payment of the principal of the Notes which has become due solely by such declaration of acceleration, have been cured or waived as provided in <u>Section 9.5</u>. No such rescission shall affect any subsequent default or impair any right consequent thereon. Any acceleration resulting from any event described in <u>clause (d)</u> above may not be rescinded.

Section 9.2.    <u>Rights of the Trustee upon Event of Default</u>.

(a)    <u>Payment of Principal and Interest</u>. The Master Issuer covenants that if (i) default is made in the payment of any interest on any Notes Outstanding when the same becomes due and payable, (ii) the Notes are accelerated following the occurrence of an Event of Default or (iii) default is made in the payment of the principal of, or premium, if any, on any Notes Outstanding when due and payable, the Master Issuer shall, to the extent of funds available, upon demand of the Trustee, at the written direction of the Required Holders, pay to the Trustee, for the benefit of the Noteholders, the whole amount then due and payable on the Notes for principal, premium, if any, and interest, and, to the extent payment at such rate of interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Rate and any default rate, as applicable, and in addition thereto such further amount as shall be sufficient to cover costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

(b)    <u>Proceedings To Collect Money</u>. In case the Master Issuer shall fail forthwith to pay such amounts upon such demand, the Trustee at the written direction of the Required Holders, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Master Issuer and collect in the manner provided by law out of the property of the Master Issuer, wherever situated, the moneys adjudged or decreed to be payable.

(c)    <u>Other Proceedings</u>. If and whenever an Event of Default shall have occurred and be continuing, the Trustee, at the written direction of the Required Holders shall take one or more of the following actions:

(i)    proceed to protect and enforce its rights and the rights of the Noteholders and the other Secured Parties, by such appropriate Proceedings as the Required Holders shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in the Indenture or any other Related Document or in aid of the exercise of any power granted therein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by the Indenture or any other Related Document or by law, including any remedies of a secured party under applicable law;

(ii)    (A) direct the Master Issuer to exercise (and the Master Issuer agrees to exercise) all rights, remedies, powers, privileges and claims of the Master Issuer or any Obligor Entity against any party to any Related Document arising as a result of the

44

occurrence of such Event of Default or otherwise, including the right or power to take any action to compel performance or observance by any such party of its obligations to the Master Issuer, and any right of the Master Issuer to take such action independent of such direction shall be suspended, and (B) if (x) the Master Issuer shall have failed, within ten (10) Business Days of receiving the written direction of the Trustee (given at the written direction of the Required Holders), to take commercially reasonable action to accomplish such directions of the Trustee, (y) the Master Issuer refuses to take such action or (z) the Required Holders reasonably determines that such action must be taken immediately, take (or the Required Holders on behalf of the Trustee shall take) such previously directed action (and any related action as permitted under the Indenture thereafter determined by the Trustee to be appropriate without the need under this provision or any other provision under the Indenture to direct the Master Issuer to take such action);

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Base Indenture or, to the extent applicable, any other Related Document, with respect to the Collateral and, to the extent permitted by applicable law, any other Obligor Assets; provided that the Trustee shall not be required to take title to any real property in connection with any foreclosure or other exercise of remedies hereunder or under such Related Documents and title to such property shall instead be acquired in an entity designated and (unless owned by a third party) controlled by the Required Holders (or one or more acquisition vehicles designated by it); and/or

(iv)     sell all or a portion of the Collateral and, to the extent permitted by applicable law, any other Obligor Assets, at one or more public or private sales called and conducted in any manner permitted by law; provided, however, that the Trustee shall not proceed with any such sale without the prior written consent of the Required Holders and the Trustee shall provide notice to the Master Issuer and each Holder of the Notes of a proposed sale of Collateral or Obligor Assets, to the extent permitted by applicable law.

(d)     Sale of Collateral. In connection with any sale of the Collateral hereunder, under the Guarantee and Collateral Agreement (which may proceed separately and independently from the exercise of remedies under the Indenture) or under any judgment, order or decree in any judicial proceeding for the foreclosure or involving the enforcement of the Indenture, the Guarantee and Collateral Agreement or any other Related Document, or any sale of Obligor Assets, to the extent permitted by applicable law:

(i)     any of the Trustee, any Noteholder and/or any other Secured Party may bid for and purchase the property being sold, and upon compliance with the terms of the sale may hold, retain, possess and dispose of such property in its own absolute right without further accountability;

(ii)     the Trustee (acting at the written direction of the Required Holders) may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale and instrument of assignment and transfer of the property sold;

(iii)     all right, title, interest, claim and demand whatsoever, either at law or in equity or otherwise, of any Obligor Entity of, in and to the property so sold shall be

divested; and such sale shall be a perpetual bar both at law and in equity against such Obligor Entity, its successors and assigns, and against any and all Persons claiming or who may claim the property sold or any part thereof from, through or under such Obligor Entity or its successors or assigns; and

(iv)    the receipt of the Trustee or of the officer thereof making such sale shall be a sufficient discharge to the purchaser or purchasers at such sale for its or their purchase money, and such purchaser or purchasers, and its or their assigns or personal representatives, shall not, after paying such purchase money and receiving such receipt of the Trustee or of such officer thereof, be obliged to see to the application of such purchase money or be in any way answerable for any loss, misapplication or non-application thereof.

(e)    <u>Application of Proceeds</u>. Any amounts obtained by the Trustee on behalf of the Trustee on account of or as a result of the exercise by the Trustee of any right hereunder or under the Guarantee and Collateral Agreement (i) shall be deposited into the Collection Account and, other than with respect to amounts owed to a depositary bank or securities intermediary under the related Account Control Agreement, shall be held by the Trustee as additional collateral for the repayment of the Obligations and (ii) shall be applied first to pay a depositary bank or securities intermediary in respect of amounts owed to it under the related Account Control Agreement and then as provided in the priority set forth in the Priority of Payments.

(f)    <u>Additional Remedies</u>. In addition to any rights and remedies now or hereafter granted hereunder or under applicable law (x) with respect to the Collateral, the Trustee shall have all of the rights and remedies of a secured party under the UCC as enacted in any applicable jurisdiction and (y) with respect to the other Obligor Assets, the Trustee shall have all of the rights and remedies of an unsecured creditor in any applicable jurisdiction.

(g)    <u>Proceedings</u>. The Trustee may maintain a Proceeding even if it does not possess any of the Notes or does not produce any of them in the Proceeding, and any such Proceeding instituted by the Trustee shall be in its own name as trustee. All remedies are cumulative to the extent permitted by law.

(h)    <u>Power of Attorney</u>. The Master Issuer hereby grants to the Trustee an absolute and irrevocable power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the PTO, United States Copyright Office, any similar office or agency in each foreign country in which any Collateral IP is located, or any other Governmental Authority in order to effect an absolute assignment of all right, title and interest in or to any Collateral IP other than Excepted Collateral IP Assets, and record the same.

(i)    <u>Collateral IP</u>. The Master Issuer shall cause the IP Holder to grant to the Trustee, for the sole purposes of enabling the Trustee, on behalf of the Secured Parties, to exercise its rights and remedies under this Indenture during any Event of Default, a non-exclusive license (without payment of royalty or other compensation to the IP Holder) to use and sublicense the Collateral IP. This license is subject, in the case of licensed Trademarks, to sufficient rights of quality control and inspection in favor of the Trademark owner (who may designate an agent to conduct inspections) to avoid the risk of invalidation of the Trademarks. To the extent that this

46

license is a sublicense of the IP Holder's rights as a licensee under any third party license, the license shall be subject to any limitations in such third party license. Consistent with the foregoing, the license shall include access to all media in which any of the Collateral IP may be recorded or stored and to all computer programs used for the compilation and printout thereof, to the extent that the IP Holder is lawfully able to provide such access. The license shall be irrevocable until the termination of this Indenture, but any licenses or sublicenses lawfully granted by the Trustee under the license granted by the IP Holder in accordance with this <u>Section 9.2(i)</u> shall survive as direct licenses (or sublicenses) of the IP Holder, as applicable, notwithstanding any subsequent cure of the applicable Event of Default or the termination of this Indenture.

Section 9.3.   <u>Waiver of Appraisal, Valuation, Stay and Right to Marshaling</u>. To the extent it may lawfully do so, the Master Issuer, for itself and for any Person who may claim through or under it hereby:

(a)   agrees that neither it nor any such Person shall step up, plead, claim or in any manner whatsoever take advantage of any appraisal, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (i) the performance, enforcement or foreclosure of the Indenture or the Guarantee and Collateral Agreement, (ii) the sale of any of the Collateral or Obligor Assets, to the extent permitted by applicable law or (iii) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(b)   waives all benefit or advantage of any such laws;

(c)   waives and releases all rights to have the Collateral and/or the Obligor Assets marshaled upon any foreclosure, sale or other enforcement of the Indenture; and

(d)   consents and agrees that, subject to the terms of the Indenture and the Guarantee and Collateral Agreement, all the Collateral and all of the Obligor Assets (to the extent permitted by applicable law) may at any such sale be sold by the Trustee as an entirety or in such portions as the Trustee may (upon written direction by the Required Holders) determine.

Section 9.4.   <u>Limited Recourse</u>.

Notwithstanding any other provision of the Indenture, the Notes or any other Related Document or otherwise, the liability of the Obligor Entities to the Noteholders and any other Secured Parties under or in relation to the Indenture, the Guarantee and Collateral Agreement, the Notes or any other Related Document or otherwise, is limited in recourse to the assets of the Obligor Entities. Following the proceeds of such assets having been applied in accordance with the terms hereof, none of the Noteholders or any other Secured Parties shall be entitled to take any further steps against any Obligor Entity to recover any sums due but still unpaid hereunder, under the Notes or under any of the other agreements or documents described in this <u>Section 9.4</u>, all claims in respect of which shall be extinguished.

Section 9.5.   <u>Waiver of Past Events</u>.

Prior to the declaration of the acceleration of the maturity of the Notes Outstanding as provided in <u>Section 9.1</u>, any existing Default or Event of Default described in any clause of <u>Section</u>

9.1 (except clause (d) thereof), and its consequences, may be waived by of the Required Holders by written notice to the Trustee; provided, however, that before any waiver may be effective, the Trustee must have received any reimbursement then due or payable in respect of unreimbursed amounts then due to the Trustee hereunder or under the Related Documents. Upon any such waiver, such Default shall cease to exist and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon. A Default or an Event of Default described in Section 9.1(d) shall not be subject to waiver without the consent of the Supermajority Noteholders.

Section 9.6.    Limitation on Suits.

Any other provision of the Indenture to the contrary notwithstanding, a Holder of Notes may pursue a remedy with respect to the Indenture or any other Related Document only if:

(a)    the Noteholder gives to the Trustee written notice of a continuing Event of Default;

(b)    the Noteholders of at least 25% of the aggregate Principal Amount of all then Outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)    such Noteholder or Noteholders offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;

(d)    the Trustee does not comply with the request within sixty (60) days after receipt of the request and the offer and, if requested, the provision of indemnity reasonably satisfactory to it; and

(e)    during such sixty (60) day period, the Required Holders do not give the Trustee a written direction inconsistent with the request;

A Noteholder may not use the Indenture or any other Related Document to prejudice the rights of another Noteholder or to obtain a preference or priority over another Noteholder.

Section 9.7.    Unconditional Rights of Noteholders to Receive Payment.

Notwithstanding any other provision of the Indenture, the right of any Holder of a Note to receive payment of principal of, and premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates, is absolute and unconditional and shall not be impaired or affected without the consent of the Holder of the Note.

Section 9.8.    The Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel), the Noteholders and any other Secured Party (as applicable) allowed in any judicial

proceedings relative to the Master Issuer (or any other obligor upon the Notes), its creditor or its property, and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claim and any custodian in any such judicial proceeding is hereby authorized by each Noteholder and each other Secured Party to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Noteholders or any other Secured Party, to pay the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 10.5. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 10.5 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money and other properties which any of the Noteholders or any other Secured Party may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder or any other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Noteholder or any other Secured Party, or to authorize the Trustee to vote in respect of the claim of any Noteholder or any other Secured Party in any such proceeding.

Section 9.9.    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under the Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of any undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 9.9 does not apply to a suit by the Trustee, a suit by a Noteholder pursuant to Section 9.6 or a suit by Noteholders of more than 10% of the Aggregate Outstanding Principal Amount of all Notes.

Section 9.10.    Restoration of Rights and Remedies.

If the Trustee, any Noteholder or any other Secured Party has instituted any Proceeding to enforce any right or remedy under the Indenture or any other Related Document and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Trustee or to such Noteholder or other Secured Party, then and in every such case the Trustee and the Noteholders shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee, the Noteholders and the other Secured Parties shall continue as though no such Proceeding had been instituted.

Section 9.11.    Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of Notes or any other Secured Party is intended to be exclusive of any other right or remedy, and every right or remedy shall, to the extent permitted by law, be cumulative and in addition to every

other right and remedy given under the Indenture or any other Related Document or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy under the Indenture or any other Related Document, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 9.12.   Delay or Omission Not Waiver.

No delay or omission of the Trustee, any Holder of any Note or any other Secured Party to exercise any right or remedy accruing upon any Default or Event of Default shall impair any such right or remedy or constitute a waiver of any Default or Event of Default or an acquiescence therein. Every right and remedy given by this Article IX or by law to the Trustee, the Holders of Notes or any other Secured Party may be exercised from time to time to the extent not inconsistent with the Indenture, and as often as may be deemed expedient, by the Trustee, the Holders of Notes or any other Secured Party, as the case may be.

Section 9.13.   Waiver of Stay or Extension Laws.

The Master Issuer covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of the Indenture or any other Related Document; and the Master Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantages of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

# ARTICLE X

# THE TRUSTEE

Section 10.1.   Duties of the Trustee.

(a)   If an Event of Default of which a Trust Officer of the Trustee has Actual Knowledge has occurred and is continuing, the Trustee will (except in the case of the receipt of written directions with respect to such matter from Noteholders in accordance with the terms of this Base Indenture or another Related Document, in which event the Trustee's sole responsibility will be to await written direction and act or refrain from acting in accordance therewith) shall exercise such of the rights and powers vested in it by the Indenture and the other Related Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; provided, however, that the Trustee shall have no liability in connection with any action or inaction taken, or not taken, by it upon the deemed occurrence of an Event of Default of which a Trust Officer has not received written notice; provided, further, however, that the Trustee shall have no liability in connection with any action or inaction due to the acts or failure to act of the requisite percentage of Noteholders, as applicable, in connection with any Event of Default or for acting or failing to act due to any written direction or lack of written direction from the requisite percentage of Noteholders. The preceding sentence shall not have the effect of insulating the Trustee from

liability arising out of the Trustee's for its own grossly negligent action, bad faith or willful misconduct. The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports (including any Monthly Noteholders' Reports), documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of the Indenture, shall examine them to determine whether they conform to the requirements of this Indenture; provided, however, that the Trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report (including any Monthly Noteholders' Reports), document, order or other instrument furnished by the Master Issuer under the Indenture.

(b)     Except during the occurrence and continuance of an Event of Default of which a Trust Officer shall have Actual Knowledge:

(i)     The Trustee undertakes to perform only those duties that are specifically set forth in the Indenture or any other Related Document to which it is a party and no others, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no other duties or implied covenants or obligations shall be read into the Indenture or any other Related Document against the Trustee; and

(ii)     In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of the Indenture and any other applicable Related Document; provided, however, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine such certificates or opinions to determine whether or not they conform to the requirements of the Indenture and shall promptly notify the party of any non-conformity.

(c)     The Trustee may not be relieved from liability for its own grossly negligent action, bad faith or willful misconduct, except that:

(i)     This clause (c) does not limit the effect of clause (b) of this Section 10.1.

(ii)     The Trustee shall not be liable in its individual capacity for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was grossly negligent, acted in bad faith or engaged in willful misconduct in ascertaining the pertinent facts.

(iii)     The Trustee shall not be liable in its individual capacity with respect to any action it takes, suffers or omits to take in good faith in accordance with a written direction received by it pursuant to the Indenture or a Related Document.

(iv)     The Trustee shall not be charged with knowledge of any Default or Event of Default until such time as a Trust Officer shall have Actual Knowledge or have received written notice thereof. In the absence of such Actual Knowledge or receipt of such notice, the Trustee may conclusively assume that no such event has occurred or is continuing.

(d)     Notwithstanding anything to the contrary contained in the Indenture or any of the other Related Documents, no provision of the Indenture or the other Related Documents shall require the Trustee to expend or risk its own funds or incur any financial liability in the performance of any of its duties or exercise of its rights or powers hereunder or thereunder, if it has reasonable grounds for believing that the repayment of such funds or adequate security or indemnity against such risk or liability is not reasonably assured to it. The Trustee may refuse to perform any duty or exercise any right or power unless it receives indemnity satisfactory to it against any risk, loss, liability or expense.

(e)     Subject to Section 10.3, all moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law or the Indenture or any of the other Related Documents.

(f)     Whether or not therein expressly so provided, every provision of the Indenture and the other Related Documents relating to the conduct of, affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section 10.1.

(g)     The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Obligor Entities to the Collateral, for insuring the Collateral or for the payment of Taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. Except as otherwise provided herein, the Trustee shall have no duty to inquire as to the performance or observance of any of the terms of the Indenture or the other Related Documents by the Obligor Entities.

(h)     The Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the Indenture or at the written direction of the requisite percentage of Noteholders, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, under the Indenture.

(i)     The Trustee shall have no duty (i) to see to any recording, filing or depositing of this Base Indenture or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recordings or filing or depositing or to any rerecording, refilling or redeposition of any thereof; (ii) to see to any insurance, (iii) to see to the payment or discharge of any Tax, assessment or other governmental charge or any lien or encumbrance of any kind or (iv) to confirm or verify the contents of any reports (including any Monthly Noteholders' Report) or certificates of the Calculation and Reporting Agent and Paying Agent delivered to the Trustee pursuant to this Base Indenture or any other Related Document believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.

(j)      The Trustee shall not be personally liable for special, indirect, consequential or punitive damages arising out of, in connection with or as a result of the performance of its duties under the Indenture.

(k)      The Trustee's sole obligation with respect to any Consent Requests, consents, directions, instructions or actions shall be to provide notice of the Consent Request or the matter requiring such consents, directions, instructions or actions to the Noteholders and to await direction from the Required Holders. The Master Issuer shall thereupon seek the consent, direction, instruction or appropriate action from the Required Holders and shall provide the Trustee with evidence of such consent, direction or instruction or the specific action to be taken. If the Master Issuer does not provide the Trustee with evidence that the Required Holders has provided such consent, direction, instruction or specific action, the Trustee shall have no further responsibility with respect to the relevant proposed consent, direction, instruction or specific action, any rights, remedies or obligations of the Trustee.

Section 10.2.  <u>Rights of the Trustee</u>. Except as otherwise provided by <u>Section</u> <u>10.1</u>:

(a)      The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting based upon any resolution, Officer's Certificate, Opinion of Counsel, certificate, instrument, report (including any Monthly Noteholders' Reports), consent, order, document or other paper reasonably believed by it to be genuine and to have been signed by or presented by the proper person.

(b)      The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)      The Trustee may act through agents, custodians and nominees and shall not be liable for any misconduct or negligence on the part of, or for the supervision of, any such non-affiliated agent, custodian or nominee so long as such agent, custodian or nominee is appointed with due care; <u>provided</u>, <u>however</u>, the Trustee shall have received the consent of the Required Holders prior to the appointment of any agent, custodian or nominee performing any material obligation of the Trustee hereunder.

(d)      The Trustee shall not be liable for any action it takes, suffers or omits to take in the absence of negligence which it believes to be authorized or within the discretion or rights or powers conferred upon it by the Indenture or the applicable Related Documents.

(e)      The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Base Indenture, the Series Supplement or any other Related Document, or to institute, conduct or defend any litigation hereunder or thereunder or in relation hereto or thereto, at the request, order or direction of the Required Holders, any of the Noteholders or any other Secured Party, pursuant to the provisions of this Base Indenture or the Series Supplement, unless the Trustee shall have been offered security or indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby.

(f)      Prior to the occurrence of an Event of Default, the Trustee shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Noteholders of at least 25% of the aggregate Principal Amount of all then Outstanding Notes. If the Trustee is so requested or determines in its own discretion to make such further inquiry or investigation into such facts or matters as it sees fit, the Trustee shall be entitled to examine the books, records and premises of the Obligor Entities, personally or by agent or attorney, at the sole cost of the Master Issuer and the Trustee shall incur no liability by reason of such inquiry or investigation.

(g)      The right of the Trustee to perform any discretionary act enumerated in this Base Indenture shall not be construed as a duty, and the Trustee shall be not be liable in the absence of negligence or willful misconduct for the performance of such act.

(h)      In accordance with Section 326 of the U.S.A. Patriot Act, to help fight the funding of terrorism and money laundering activities, the Trustee shall obtain, verify, and record information that identifies individuals or entities that establish a relationship or open an account with the Trustee. The Trustee shall ask for the name, address, tax identification number and other information that shall allow the Trustee to identify the individual or entity who is establishing the relationship or opening the account. The Trustee may also ask for formation documents such as articles of incorporation or other identifying documents to be provided.

(i)      Notwithstanding anything to the contrary herein, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary or sensitive information and sent by electronic mail shall be encrypted. The recipient of the email communication shall be required to complete a one-time registration process.

(j)      The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service, accidents; labor disputes; acts of civil or military authority or governmental actions (it being understood that the Trustee shall use commercially reasonable efforts to resume performance as soon as practicable under the circumstances).

(k)      The Trustee shall not be required to give any bond or surety in respect of the execution of the trust created hereby or the powers granted hereunder.

(l)      All rights of action and claims under this Base Indenture may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto, any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payments to the Trustee provided for in Section 10.5, be distributed in accordance with Section 9.2(e).

(m)      The Trustee may request written direction from any applicable party any time the Indenture provides that the Trustee may be directed to act.

(n)      Any request or direction of the Master Issuer mentioned herein shall be sufficiently evidenced by a Company Order.

(o)      Whenever in the administration of the Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee may, in the absence of bad faith, gross negligence or willful misconduct on its part, rely upon an Officer's Certificate of the Master Issuer shall incur no liability for its reliance thereon.

(p)      The Trustee shall not be responsible for the accuracy of the books or records of, or for any acts or omissions of, DTC, any transfer agent (other than the Trustee itself acting in that capacity), Clearstream, Euroclear, any Calculation and Reporting Agent (other than the Trustee itself acting in that capacity), or any agent appointed by it with due care or any Paying Agent (other than the Trustee itself acting in that capacity).

(q)      The Trustee and its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as an investment advisor, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments. The Trustee does not guarantee the performance of any Eligible Investments.

(r)      The Trustee shall have no obligation to invest and reinvest any cash held in the absence of timely and specific written investment direction as specified herein or in the other Related Documents. In no event shall the Trustee be liable for the selection of investments or for investment losses incurred thereon. The Trustee shall have no liability in respect of losses incurred as a result of the liquidation of any investment prior to its stated maturity or the failure of the Master Issuer to provide timely written investment direction.

(s)      The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee, in each case, with respect to its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(t)      The Trustee shall be afforded, in each Related Document, all of the rights, powers, immunities and indemnities granted to it in this Base Indenture as if such rights, powers, immunities and indemnities were specifically set out in each such Related Document.

(u)      For any purpose under the Related Documents, the Trustee may conclusively assume without incurring liability therefor that no Notes are held by any of the Obligor Entities, any other obligor upon the Notes, the Calculation and Reporting Agent or any Affiliate of any of them unless a Trust Officer has received written notice at the Corporate Trust Office that any Notes are so held by any of the Obligor Entities, any other obligor upon the Notes, the Manager or any Affiliate of any of them.

(v)      The Trustee shall not have any responsibility to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of an engagement of Independent Accountants by the Master Issuer (or the Calculation and Reporting Agent on behalf of the Master Issuer) or the terms of any agreed upon procedures in respect of such engagement; provided that the Trustee shall be authorized, upon receipt of a Company Order directing the same, to execute any acknowledgment or other agreement with the Independent Accountants required for the Trustee to receive any of the reports or instructions provided herein, which acknowledgment or agreement may include, among other things, (i) acknowledgment that the Master Issuer had agreed that the procedures to be performed by the Independent Accountants are sufficient for the Master Issuer's purposes, (ii) releases by the Trustee (on behalf of itself and the Holders) of claims against the Independent Accountants, and (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent Accountants (including to the Holders). Notwithstanding the foregoing, in no event shall the Trustee be required to execute any agreement in respect of the Independent Accountants that the Trustee reasonably deter-mines adversely affects it.

(w)      Citibank, N.A., a national banking association (in each of its capacities, the "Bank"), agrees to accept and act upon instructions or directions pursuant to this Base Indenture, the Guarantee and Collateral Agreement or any documents executed in connection herewith or therewith sent by unsecured email transmission or other similar unsecured electronic methods; pro-vided, however, that any person providing such instructions or directions shall provide to the Bank an incumbency certificate listing persons designated to provide such instructions or directions (including the email addresses of such persons), which incumbency certificate shall be amended whenever a person is added or deleted from the listing. If such person elects to give the Bank email (of .pdf or similar files) (or instructions by a similar electronic method) and the Bank in its discretion elects to act upon such instructions, the Bank's reasonable understanding of such instructions shall be deemed controlling. The Bank shall not be liable for any losses, costs or expenses arising directly or indirectly from the Bank's reliance upon and compliance with such instructions notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction. Any person providing such instructions or directions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bank, including without limitation the risk of the Bank acting on unauthorized instructions, and the risk of interception and misuse by third parties.

Section 10.3.    Individual Rights of the Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Master Issuer or any Affiliate of the Master Issuer with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights.

Section 10.4.    Notice of Events of Default and Defaults.

If an Event of Default, a Default occurs and is continuing of which a Trust Officer of the Trustee has Actual Knowledge, or written notice of the existence thereof has been delivered to a Trust Officer, the Trustee shall promptly provide the Noteholders, the Calculation and Reporting Agent and the Master Issuer with notice of such Event of Default or Default, to the extent that the Notes are Book-Entry Notes, by telephone and facsimile and otherwise by first class mail.

Section 10.5.   <u>Compensation and Indemnity</u>.

(a)     The Master Issuer shall promptly pay to the Trustee from time to time compensation for its acceptance of the Indenture and services hereunder and under the other Related Documents to which the Trustee is a party as the Trustee and the Master Issuer shall from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Master Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services in accordance with the provisions of the Indenture (including, without limitation, the Priority of Payments). Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and outside counsel. The Master Issuer shall not be required to reimburse any expense incurred by the Trustee through the Trustee's own willful misconduct or negligence. When the Trustee incurs expenses or renders services after an Event of Default occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under the Bankruptcy Code.

(b)     The Master Issuer shall indemnify and hold harmless the Trustee or any predecessor Trustee and their respective directors, officers, agents and employees from and against any loss, liability, claim, expense (including Taxes, other than Taxes based upon, measured by or determined by the income of the Trustee or such predecessor Trustee), damage or injury suffered or sustained by reason of any acts, omissions or alleged acts or omissions arising out of or in connection with (i) the activities of the Trustee or such predecessor Trustee pursuant to this Base Indenture, the Series Supplement or any other Related Documents to which the Trustee is a party and (ii) the security interest granted hereby, whether arising by virtue of any act or omission on the part of the Master Issuer or otherwise, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses reasonably incurred in connection with the defense of any actual or threatened action, proceeding, claim (whether asserted by the Master Issuer or any Noteholder or any other Person), liability in connection with the exercise or performance of any of its powers or duties hereunder or under any Related Document, the preservation of any of its rights to, or the realization upon, any of the Collateral, or in connection with enforcing the provisions of this <u>Section 10.5(b)</u>; <u>provided</u>, <u>however</u>, that the Master Issuer shall not indemnify the Trustee, any predecessor Trustee or their respective directors, officers, employees or agents if such acts, omissions or alleged acts or omissions constitute willful misconduct, bad faith or negligence by the Trustee or such predecessor Trustee, as the case may be.

(c)     The provisions of this <u>Section 10.5</u> shall survive the termination of the Indenture and the resignation and removal of the Trustee.

Section 10.6.   <u>Replacement of the Trustee</u>.

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this <u>Section 10.6</u>.

(b)     The Trustee may, after giving thirty (30) days' prior written notice to the Master Issuer, the Noteholders and the Agents, resign at any time from its office and be discharged

from the trust hereby created; provided, however, that no such resignation of the Trustee shall be effective until a successor trustee has assumed the obligations of the Trustee hereunder. The Required Holders or the Master Issuer may remove the Trustee or any Noteholder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee, if at any time:

> (i)    the Trustee fails to comply with Section 10.8 and fails to resign after written request that it do so by the Master Issuer, by the Required Holders in accordance with this Base Indenture;

> (ii)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under the Bankruptcy Code;

> (iii)    the Trustee fails generally to pay its debts as such debts become due; or

> (iv)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason, the Master Issuer shall promptly, with the prior written consent of the Required Holders, appoint a successor Trustee. Within one year after the successor Trustee takes office, a Required Holders may appoint a successor Trustee to replace the successor Trustee appointed by the Master Issuer.

> (c)    If a successor Trustee is not appointed and an instrument of acceptance by a successor Trustee is not delivered to the Trustee within thirty (30) days after the retiring Trustee resigns or is removed, at the written direction of the Required Holders, the retiring Trustee, at the expense of the Master Issuer, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

> (d)    A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee or removed Trustee and to the Master Issuer. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Base Indenture, the Series Supplement and any other Related Document to which the Trustee is a party. The successor Trustee shall mail a notice of its succession to Noteholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided, however, that all sums owing to the retiring Trustee hereunder have been paid. Notwithstanding replacement of the Trustee pursuant to this Section 10.6, the Master Issuer's obligations under Section 10.5 shall continue for the benefit of the retiring Trustee.

> (e)    No successor Trustee may accept its appointment unless at the time of such acceptance such successor is qualified and eligible under this Base Indenture has been provided and the Required Holders has provided its consent with respect to such appointment.

Section 10.7.    Successor Trustee by Merger, etc.

Subject to Section 10.8, if the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor

corporation without any further act shall be the successor Trustee; provided that written notice of such consolidation, merger or conversion shall be provided to the Master Issuer and the Noteholders; provided further that the resulting or successor corporation is eligible to be a Trustee under Section 10.8.

Section 10.8.   Eligibility Disqualification.

(a)   There shall at all times be a Trustee hereunder which shall be a Qualified Trust Institution.

(b)   At any time the Trustee shall cease to satisfy the eligibility requirements of Section 10.8(a), the Trustee shall resign immediately in the manner and with the effect specified in Section 10.6.

Section 10.9.   Appointment of Co-Trustee or Separate Trustee.

(a)   Notwithstanding any other provisions of this Base Indenture, the Series Supplement or any other Related Document, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Obligor Assets may at the time be located, the Trustee shall have the power upon notice to the Master Issuer and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Obligor Assets, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders and the other Secured Parties, such title to the Collateral (or other rights in and to the Obligor Assets), or any part thereof, and, subject to the other provisions of this Section 10.9, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. Any co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 10.8 or shall be otherwise acceptable to the Required Holders. No notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 10.6. No co- trustee shall be appointed without the consent of the Required Holders and the Master Issuer unless such appointment is required as a matter of state law or to enable the Trustee to perform its functions hereunder.

(b)   Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)   the Notes (other than Uncertificated Notes) shall be authenticated and delivered solely by the Trustee or an authenticating agent appointed by the Trustee;

(ii)   all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Collateral (or other rights in and to the Obligor Assets) or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the written direction of the Trustee;

(iii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder and such appointment shall not, and shall not be deemed to, constitute any such trustee or co-trustee as an agent of the Trustee; and

(iv)     the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Base Indenture and the conditions of this Article X. Each separate trustee and co- trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Base Indenture, the Series Supplement and any other Related Documents to which the Trustee is a party, specifically including every provision of this Base Indenture, the Series Supplement, or any other Related Document which the Trustee is a party relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Issuer.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect to this Base Indenture, the Series Supplement or any other Related Document on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 10.10. Representations and Warranties of Trustee.

The Trustee represents and warrants to the Master Issuer and the Noteholders that:

(a)     the Trustee is a national banking association, organized, existing and in good standing under the laws of the United States;

(b)     the Trustee has full power, authority and right to execute, deliver and perform this Base Indenture, the Series Supplement issued concurrently with this Base Indenture and each other Related Document to which it is a party and to authenticate the Notes (other than Uncertificated Notes which shall be registered), and has taken all necessary action to authorize the execution, delivery and performance by it of this Base Indenture, the Series Supplement issued concurrently with this Base Indenture and any such other Related Document and to authenticate the Notes;

(c)     this Base Indenture and each other Related Document to which it is a party has been duly executed and delivered by the Trustee; and

(d)     the Trustee meets the requirements of eligibility as a trustee hereunder set forth in Section 10.8(a).

# ARTICLE XI

# DISCHARGE OF INDENTURE

Section 11.1.   Termination of the Master Issuer's and Guarantors' Obligations.

(a)   Satisfaction and Discharge. The Indenture and the Guarantee and Collateral Agreement shall be discharged and cease to be of further effect when all Outstanding Notes theretofore authenticated and issued (other than destroyed, lost or stolen Notes which have been replaced or repaid) have been delivered to the Trustee for cancellation (or de-registration), the Master Issuer has paid all sums payable hereunder and under each other Related Document and all payments by the Master Issuer thereunder have been paid or otherwise provided for; except that (i) the Master Issuer's obligations under Section 10.5 and the Guarantors' guaranty thereof, (ii) the Trustee's and the Paying Agent's obligations under Sections 11.2 and 11.3 and (iii) the Noteholders' and the Trustee's obligations under Section 13.13 shall survive. The Trustee, on demand of the Obligor Entities, shall execute proper instruments acknowledging confirmation of, and discharge under, the Indenture and the Guarantee and Collateral Agreement.  Upon the termination of the Series Supplement, at the election of the Master Issuer, the Indenture, the Guarantee and Collateral Agreement and all other Indenture Documents shall be discharged and cease to be of further effect, except that (i) the Master Issuer's obligations under Section 10.5 and the Guarantors' guaranty thereof, (ii) the Trustee's and the Paying Agent's obligations under Sections 11.2 and 11.3 and (iii) the Noteholders' and the Trustee's obligations under Section 13.13 shall survive.  The Trustee, on demand and at the expense of the Obligor Entities, shall execute proper instruments acknowledging confirmation of and discharge under the Indenture and the Guarantee and Collateral Agreement.

(b)   Indenture Defeasance. The Master Issuer may terminate all of its obligations under the Indenture and all obligations of the Guarantors under the Guarantee and Collateral Agreement in respect thereof and release all collateral if:

(i)   the Master Issuer irrevocably deposits in trust with the Trustee or at the option of the Trustee, with a trustee reasonably satisfactory to the Required Holders, the Trustee and the Master Issuer under the terms of an irrevocable trust agreement in form and substance satisfactory to the Trustee, U.S. Dollars and/or Government Securities in an amount sufficient (after giving effect to the application of funds on deposit in the Collection Account in accordance with the Priority of Payments), in the opinion of a nationally recognized firm of independent certified public accountants expressed in a written certification thereof delivered to the Trustee, to pay (without consideration of any reinvestment), when due, principal, premiums (including make-whole prepayment premiums), if any, and interest on the Outstanding Notes (including additional interest that accrues after an anticipated repayment date or renewal date, if applicable) to the applicable prepayment date, redemption date or maturity date, as the case may be, and to pay all other sums payable by them hereunder and under each other Related Document; provided that any Government Securities deposited in trust shall provide for the scheduled payment of all principal and interest thereon not later than the Business Day prior to the applicable prepayment date, redemption date or maturity date, as the case may be; and provided, further, that if (x) the deposit is held by a trustee of an irrevocable trust other than the

61

Trustee, such trustee shall have been irrevocably instructed by the Master Issuer to pay such money or the proceeds of such U.S. Government Securities to the Trustee on or prior to the prepayment date, redemption date or maturity date, as applicable, and (y) the Trustee shall have been irrevocably instructed by the Master Issuer to apply such money or the proceeds of such U.S. Government Securities to the payment of said principal, premiums (if any), make-whole prepayment consideration (if any) and interest with respect to the Notes and such other obligations;

(ii)    the Master Issuer delivers notice of prepayment, redemption or maturity of the Notes in full to the Noteholders of Outstanding Notes, the Trustee and the Required Holders, which notice is expressly stated to be, or has become as of the prepayment date, redemption date or maturity date, as applicable, irrevocable (provided, that such notice may be conditioned upon the contemporaneous closing of a financing the proceeds of which shall be used to fund all or a portion of such deposit), and the date of prepayment, redemption or maturity as specified in such notice when delivered was not longer than twenty (20) Business Days after the date of such notice;

(iii)    the Master Issuer delivers notice of such deposit to the Trustee, on or before the date of the deposit; and

(iv)    solely to the extent requested by the Trustee, an Opinion of Counsel is delivered to the Trustee by the Master Issuer to the effect that all conditions precedent set forth herein with respect to such termination have been satisfied.

Upon satisfaction of such conditions, the Indenture, the Guarantee and Collateral Agreement and each of the Related Documents shall cease to be of further effect (other than any provisions which by their express terms survive the termination thereof); except that (i) the rights and obligations of the Trustee hereunder, including, without limitation, the Trustee's rights to compensation and indemnity under Section 10.5, and the Guarantor's guaranty thereof, (ii) the Trustee's and the Paying Agent's obligations under Section 11.2 and Section 11.3, (iii) the Noteholders' and the Trustee's obligations under Section 13.13, (iv) this Section 11.1(b) and (v) the Noteholders' rights to registration of transfer and exchange under Section 2.8 and to replacement or substitution of mutilated, destroyed, lost or stolen Notes under Section 2.10(a) shall survive. The Trustee, on demand of the Obligor Entities, shall execute proper instruments acknowledging confirmation of and discharge under the Indenture and the Guarantee and Collateral Agreement.

(c)    After the conditions set forth in Section 11.1(a) have been met, or after the irrevocable deposit is made pursuant to Section 11.1(b) and satisfaction of the other conditions set forth therein have been met, the Trustee upon request of the Obligor Entities shall reassign (without recourse upon, or any warranty whatsoever by, the Trustee) and deliver all Collateral and documents then in the custody or possession of the Trustee promptly to the applicable Obligor Entities.

Section 11.2.    Application of Trust Money.

The Trustee or a trustee satisfactory to the Required Holders, the Trustee and the Master Issuer shall hold in trust money or Government Securities deposited with it pursuant to Section

<u>11.1</u>.  The Trustee shall apply the deposited money and the money from Government Securities through the Paying Agent in accordance with this Base Indenture and the other Related Documents to the payment of principal, premium, if any, and interest on the Notes and the other sums referred to above. The provisions of this <u>Section 11.2</u> shall survive the expiration or earlier termination of the Indenture.

Section 11.3.   <u>Repayment to the Master Issuer</u>.

(a)     The Trustee and the Paying Agent shall promptly pay to the Master Issuer upon written request any excess money or, pursuant to <u>Sections 2.10</u> and <u>2.14</u>, return any cancelled Notes held by them at any time.

(b)     Subject to <u>Section 2.5(c)</u>, the Trustee and the Paying Agent shall pay to the Master Issuer upon written request any money held by them for the payment of principal, premium or interest that remains unclaimed for two years after the date upon which such payment shall have become due.

(c)     The provisions of this <u>Section 11.3</u> shall survive the expiration or earlier termination of the Indenture.

Section 11.4.   <u>Reinstatement</u>.

If the Trustee is unable to apply any funds received under this <u>Article XI</u> by reason of any proceeding, order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Master Issuer's obligations under the Indenture or the other Indenture Documents and in respect of the Notes and the Guarantors' obligations under the Guarantee and Collateral Agreement shall be revived and reinstated as though no deposit had occurred, until such time as the Trustee is permitted to apply all such funds or property in accordance with this <u>Article XI</u>. If the Master Issuer or Guarantors make any payment of principal, premium or interest on any Notes or any other sums under the Indenture Documents while such obligations have been reinstated, the Master Issuer and the Guarantors shall be subrogated to the rights of the Noteholders or Note Owners or other Secured Parties who received such funds or property from the Trustee to receive such payment in respect of the Notes.

## ARTICLE XII

## AMENDMENTS

Section 12.1.   <u>Without Consent of the Required Holders.</u>

(a)     Without the consent of the Required Holders, the Master Issuer and the Trustee, at any time and from time to time, may enter into one or more Supplements or waivers to either the Base Indenture or the Series Supplement, in form satisfactory to the Trustee, for any of the following purposes:

(i)     to add to the covenants of the Obligor Entities for the benefit of any Noteholders or any other Secured Parties (and if such covenants are to be for the benefit of less than all Notes, stating that such covenants are expressly being included solely for the

benefit of such Notes) or to surrender for the benefit of the Noteholders and the other Secured Parties any right or power herein conferred upon the Obligor Entities; provided, however, that the Master Issuer will not pursuant to this Section 12.1(a)(i) surrender any right or power it has under the Related Documents;

(ii)     to mortgage, pledge, convey, assign and transfer to the Trustee any property or assets as security for the Obligations and to specify the terms and conditions upon which such property or assets are to be held and dealt with by the Trustee and to set forth such other provisions in respect thereof as may be required by the Indenture or as may, consistent with the provisions of the Indenture, be deemed appropriate by the Master Issuer and the Trustee, or to correct or amplify the description of any such property or assets at any time so mortgaged, pledged, conveyed and transferred to the Trustee;

(iii)     to correct any manifest error or defect or to cure any ambiguity, defect or inconsistency or to correct or supplement any provisions herein or in the Series Supplement which may be inconsistent with any other provision herein or therein;

(iv)     to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code);

(v)     to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of the Indenture as shall be necessary to provide for or facilitate the administration of the trusts by more than one Trustee;

(vi)     to comply with Requirements of Law (solely to the extent requested by the Trustee, as evidenced by an Opinion of Counsel);

(vii)     to facilitate the transfer of Notes in accordance with applicable law (solely to the extent requested by the Trustee, as evidenced by an Opinion of Counsel);

(viii)     to take any action necessary or helpful to avoid the imposition, under and in accordance with applicable law, of any Tax, including withholding Tax; or

(ix)     to take any action necessary and appropriate to facilitate the management and preservation of the IP License Agreement; or

(x)     at the written direction of the Master Issuer, to correct or supplement any provision hereunder or in the Series Supplement that may be inconsistent with any other provision or to make consistent any other provisions with respect to matters or questions arising hereunder, under any Supplement, in the Guarantee and Collateral Agreement or in any other Indenture Document;

(xi)     to make such other provisions in regard to matters or questions arising under this Base Indenture or the Series Supplement as the parties thereto may deem necessary or desirable, which are not inconsistent with the provisions thereof and which will not materially and adversely affect the interests of any holder or any other Secured

Party; provided that an Officer's Certificate and, solely to the extent requested by the Trustee, an Opinion of Counsel, shall be delivered to the Trustee to such effect; or

(xii)    to amend this Base Indenture or the Series Supplement in order to accommodate (A) a replacement Brand Management Agreement if at any time (x) such agreement is terminated or (y) the Manager is either unwilling or unable to perform its obligations under the Brand Management Agreement, (B) a replacement of the Manager, (C) a replacement Calculation and Reporting Agency Agreement if at any time (x) such agreement is terminated or (y) the Calculation and Reporting Agent is either unwilling or unable to perform its obligations under the Calculation and Reporting Agency Agreement and (D) a replacement of the Calculation and Reporting Agent;

provided, however, that in the case of any Supplement pursuant to any of the foregoing clauses (ii), (iii), (viii), (ix), (x) or, solely with respect to amendments in connection with a replacement Brand Management Agreement, clause (xii), the Trustee shall have received an Officer's Certificate (and shall be entitled to conclusively rely thereon) certifying that such action could not reasonably be expected to adversely affect in any material respect the interests of any Noteholder, the Trustee or any other Secured Party.

(b)    Additionally, the Master Issuer and the Trustee hereby agree that:

(i)    without the consent of any Noteholder or any other Secured Party, the applicable Obligor Entity and the Trustee may amend or terminate any Account Control Agreement to reflect the closure of, or determination by the applicable Obligor Entity to no longer utilize, such account upon the delivery by the Manager of an Officer's Certificate to the Trustee stating that (a) such account has been closed or is dormant, (b) there are no remaining Collections or other Collateral credited thereto and (c) the Manager has taken reasonable best efforts (including, if applicable, notifying third parties) to ensure that no Collections or other Collateral will be deposited to such account in the future; provided, that to the extent any Collections or other Collateral are deposited in any such account thereafter, the Manager shall have agreed to cause such Collections or other Collateral to be transferred within two Business Days to an account that is subject to an Account Control Agreement; and

(ii)    notwithstanding anything to the contrary herein or in any other Related Document and without the consent of any Noteholder or any other Secured Party (excluding the Trustee under clause (x) of this Section 12.1(b)(ii)), the Master Issuer may permit (x) the transactions necessary to facilitate the Subsequent Mandatory Exchange, including but not limited to any agreements related thereto or any amendments to the Indenture or any Related Document necessary to (A) effect the Subsequent Mandatory Exchange or (B) correct or supplement any provision of the Indenture or any Related Document which is defective as a result of the Subsequent Mandatory Exchange or is otherwise inconsistent with the intent of the Subsequent Mandatory Exchange, so long as, in each case under this clause (x), such amendment does not adversely affect the interests of holders of the NewCo Class B Notes in any material respect, and (y) upon the Master Issuer's reasonable determination that a Wind-Down Entity holds an amount of assets immaterial to the principal amount of the Notes, the dissolution of such Wind-Down Entity

and such Wind-Down entity shall, upon written notice to the Trustee, be automatically released from its obligations as a Guarantor under the Related Documents and related Liens released in accordance with <u>Section 13.17</u> and as contemplated by the Approved Plan.

Section 12.2.    <u>With Consent of the Required Holders</u>.

(a)    Except as provided in <u>Section 12.1</u>, the provisions of this Base Indenture and the Series Supplement (unless otherwise provided in such Series Supplement) may, from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing in a Supplement and the Required Holders consent in writing to such amendment, modification or waiver. Notwithstanding the foregoing:

(i)    any amendment, waiver or other modification that would reduce the percentage of the Aggregate Outstanding Principal Amount or the Outstanding Principal Amount of the Notes, the consent of the Noteholders of which is required for any Supplement under this <u>Section 12.2</u> or the consent of the Noteholders of which is required for any waiver of compliance with the provisions of the Indenture or any other Related Document or defaults hereunder or thereunder and their consequences provided for in herein and therein or for any other action hereunder or thereunder shall require the consent of each affected Noteholder;

(ii)    any amendment, waiver or other modification that would permit the creation of any Lien (other than Permitted Liens) ranking prior to or on a pari basis with the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents with respect to any material part of the Collateral or except as otherwise permitted hereunder or under the Related Documents or the Approved Plan (including allowing Permitted Liens), terminate the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents on any material portion of the Collateral at any time subject thereto or deprive any Secured Party of any material portion of the security provided by the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents shall require the consent of each affected Noteholder and each other affected Secured Party;

(iii)    any amendment, waiver or other modification that would (A) extend the due date for, or reduce the amount of any scheduled repayment or prepayment of principal of, premium, if any, or interest on any Note and the other Obligations (or reduce the principal amount of, premium, if any, or rate of interest on any Note and the other Obligations) (it being understood that Deferred Interest is expressly permitted without any need for any further consent or notice of any Person); (B) materially and affect adversely the interests, rights or obligations of any Noteholder individually in comparison to any other Noteholder; (C) change the provisions of the Priority of Payments or certain provisions governing distributions or allocations, to and from, the Accounts (for the avoidance of doubt, amendments that affect amounts payable under the Priority of Payments do not change the provisions of the Priority of Payments for purposes of this <u>clause (C)</u>); (D) change any place of payment where, or the coin or currency in which, any Notes and the other Obligations or the interest thereon is payable (it being understood that allowing for the payment of Deferred Interest shall not require any consent); (E) impair the

66

right to institute suit for the enforcement of the provisions of the Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes and the other Obligations owing to Noteholders on or after the respective due dates thereof, (F) subject to the ability of the Required Holders to waive certain events as set forth in Section 9.5, amend or otherwise modify any of the specific language of the following definitions: "Default," "Event of Default," "Outstanding," or "Required Holders" (as defined in the Base Indenture or the Series Supplement) or (G) amend, waive or otherwise modify this Section 12.2, shall require the consent of the each affected Noteholder and/or each other affected Secured Party; and

(iv)    any amendment, waiver or other modification that would change the time periods with respect to any requirement to deliver to any specific Noteholders notice with respect to any repayment, prepayment or redemption shall require the consent of each affected Noteholder.

Notwithstanding anything herein to the contrary, in addition to any amendment, modification or waiver effected in accordance with this Section 12.2, if at any time any change in GAAP would affect the computation of any covenant or other restriction affecting any Obligor Entity that is set forth herein or in the Series Supplement, this Base Indenture or the Series Supplement may be amended with the consent of the Required Holders to amend the provisions of this Base Indenture or the Series Supplement, as the case may be, related to such covenant, incurrence test or other restriction to preserve the original intent thereof in light of such change in GAAP.

(b)    No failure or delay on the part of any Noteholder, the Trustee or any other Secured Party in exercising any power or right under the Indenture or any other Related Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

Section 12.3.   Supplements.

Each amendment or other modification to this Base Indenture, the Series Supplement or the Notes shall be set forth in a Supplement, a copy of which shall be delivered to the, the Agents, and the Master Issuer. The initial effectiveness of each Supplement shall be subject to the delivery to the Trustee of an Opinion of Counsel that such Supplement is authorized or permitted by this Base Indenture and the conditions precedent set forth herein with respect thereto have been satisfied. In addition to the manner provided in Sections 12.1 and 12.2, the Series Supplement may be amended as provided in the Series Supplement.

Section 12.4.   Revocation and Effect of Consents.

Until an amendment or waiver becomes effective, a consent to it by a Noteholder of a Note is a continuing consent by the Noteholder and every subsequent Noteholder of a Note or portion of a Note that evidences the same debt as the consenting Noteholder's Note, even if notation of the consent is not made on any Note. Any such Noteholder or subsequent Noteholder, however, may revoke the consent as to his Note or portion of a Note if the Trustee receives written notice of revocation before the date the amendment or waiver becomes effective. An amendment or waiver becomes effective in accordance with its terms and thereafter binds every Noteholder. The Master

Issuer may fix a record date for determining which Noteholders must consent to such amendment or waiver.

Section 12.5.   Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment or waiver on any Note thereafter authenticated. The Master Issuer, in exchange for all Notes, may issue and the Trustee shall authenticate new Notes that reflect the amendment or waiver. Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment or waiver.

Section 12.6.   The Trustee to Sign Amendments, etc.

The Trustee shall sign any Supplement or amendment (or accept any waiver) authorized pursuant to this Article XII if such Supplement or amendment (or waiver) does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may, but need not, sign it. In signing such Supplement or amendments (or accepting any waiver), the Trustee shall be entitled to receive, if requested, an indemnity reasonably satisfactory to it and to receive and, subject to Section 10.1, shall be fully protected in relying upon, an Officer's Certificate of the Master Issuer and, solely to the extent requested by the Trustee, an Opinion of Counsel, as conclusive evidence that such Supplement or amendment (or waiver) is authorized or permitted by this Base Indenture and that all conditions precedent have been satisfied, and that it shall be valid and binding upon the Master Issuer and the Guarantors in accordance with its terms.

Section 12.7.   Amendments and Fees.

The Master Issuer and the Required Holders shall negotiate any amendments, waivers or modifications to the Indenture or the other Related Documents that require the consent of the Required Holders in good faith, and any consent required to be given by the Required Holders shall not be unreasonably denied or delayed. The Required Holders shall be entitled to be reimbursed by the Master Issuer only for the reasonable out of pocket expenses (including counsel fees) incurred by the Required Holders in reviewing and approving any amendment or in providing any consents, the Required Holders shall not be entitled to any additional fee compensation in connection with any amendments or consents to this Base Indenture or to any Related Document.

Section 12.8.   Amendment of Other Related Documents.

Without the consent of the Required Holders or any other Secured Party, the Master Issuer may enter into one or more amendments or waivers to each Related Document (other than this Base Indenture and the Series Supplement), in form satisfactory to the Trustee, for any of the following purposes:

(i)     to correct any manifest error or defect or to cure any ambiguity, defect or inconsistency or to correct or supplement any provisions in the Related Documents (other than this Base Indenture and the Series Supplement) which may be inconsistent with any provision therein or any other Indenture Document;

(ii)     to evidence and provide for the acceptance of appointment under this Base Indenture and Related Documents by a successor Trustee and to add to or change

any of the provisions of the Indenture as will be necessary to provide for or facilitate the administration of the trusts hereunder or thereunder by more than one Trustee;

(iii)    to comply with Requirements of Law (solely to the extent requested by the Trustee, as evidenced by an Opinion of Counsel) and to effectuate the Approved Plan;

(iv)    to take any action necessary or helpful to avoid the imposition, under and in accordance with applicable law, of any Tax, including withholding Tax;

(v)    to take any action necessary and appropriate to facilitate the Brand Management Agreement and management and preservation of the IP License Agreement and of the Collateral;

(vi)    to allow any additional assets (and related cash flows thereon) similar to the Obligor Assets to be acquired by the Obligor Entities;

(vii)    at the written direction of the Master Issuer, correct or supplement any provision in the Related Documents (other than this Base Indenture and the Series Supplement) that may be inconsistent with any other provision or to make consistent any other provisions with respect to matters or questions arising under this Base Indenture, in the Series Supplement, in any Supplement, in the Guarantee and Collateral Agreement or any other Indenture Document;

(viii)    to make such other provisions in regard to matters or questions arising under the Related Documents (other than this Base Indenture and the Series Supplement) as the parties thereto may deem necessary or desirable, which are not inconsistent with the provisions thereof and which will not materially and adversely affect the interests of any holder or any other Secured Party; provided that an Officer's Certificate and, solely to the extent requested by the Trustee, an Opinion of Counsel (which Opinion of Counsel may rely on the Officer's Certificate as to matters of fact in determining that such amendment will not materially and adversely affect the interests of any holder or any other Secured Party), will be delivered to the Trustee to such effect;

(ix)    to add to the covenants of any Obligor Entity for the benefit of the Secured Parties;

(x)    to amend any Related Document in order to accommodate (a) a replacement Brand Management Agreement or Manager, if at any time (x) such agreement is terminated or (y) the Manager is terminated pursuant to the terms of the Brand Management Agreement or the Charter Documents of such Person or the Manager is otherwise unwilling or unable to perform its obligations under the Brand Management Agreement or (b) a replacement Calculation and Reporting Agency Agreement or Calculation and Reporting Agent, if at any time (x) such agreement is terminated or (y) the Calculation and Reporting Agent is terminated pursuant to the terms of the Calculation and Reporting Agency Agreement or the Charter Documents of such Person or the Calculation and Reporting Agent is otherwise unwilling or unable to perform its obligations under the Calculation and Reporting Agency Agreement; or

(xi)     to terminate any Related Document if any party thereto (other than an Obligor Entity) becomes, in the reasonable judgment of the Master Issuer, unable to pay its debts as they become due, even if such party has not yet defaulted on its obligations under the Related Document, so long as the Master Issuer enters into a replacement agreement with a new party within ninety (90) days of the termination of the Related Document.

Notwithstanding the foregoing, (i) any amendment, waiver or other modification that would permit the creation of any Lien ranking prior to or on a pari basis with the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents with respect to any material part of the Collateral or except as otherwise permitted by the Related Documents, terminate the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents on any material portion of the Collateral at any time subject thereto or deprive any Secured Party of any material portion of the security provided by the Lien created by the Indenture, the Guarantee and Collateral Agreement or any other Related Documents shall require the consent of each affected Noteholder and each other affected Secured Party and (ii) any amendment, waiver or other modification that would materially and adversely affect the rights, duties or obligations of the Calculation and Reporting Agent shall require the written consent of the Calculation and Reporting Agent.

Notwithstanding anything to the contrary herein, in addition to any amendment, modification or waiver effected in accordance with the above, if at any time any change in GAAP would affect the computation of any covenant or other restriction affecting any Obligor Entity that is set forth in any Related Document (other than this Base Indenture and the Series Supplement), such Related Document may be amended with the consent of the Required Holders to amend the provisions of such Related Document, as the case may be, related to such covenant, incurrence test or other restriction to preserve the original intent thereof in light of such change in GAAP.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.1.  Notices.

(a)     Any notice or communication by the Master Issuer, the Agents or the Trustee to any other party hereto shall be in writing and delivered by email, posted on a password protected website for which the recipient has granted access or mailed by first-class mail (registered or certified, return receipt requested) or overnight air courier guaranteeing next day delivery or, except in the case of the Master Issuer or the Agents, by facsimile to such other party's address:

If to the Master Issuer:

HOA RoyaltyCo LLC
c/o Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022

Attention: Tim Daileader
Phone: 212 856 9700
Email: tdaileader@drivetrainllc.com

If to the Trustee:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attention: Citibank Agency & Trust–HOA RoyaltyCo LLC
Email: esotericabs@citi.com or call (888) 855-9695 to obtain
Citibank, N.A. account manager's email address

(b)     The Master Issuer or the Trustee by notice to each other party may designate additional or different addresses for subsequent notices or communications; provided, however, the Master Issuer may not at any time designate more than a total of three (3) addresses to which notices must be sent in order to be effective.

(c)     Any notice (i) given by first class mail shall be deemed given five days after the date that such notice is mailed, (ii) delivered by facsimile shall be deemed given on the date of delivery of such notice, (iii) delivered by overnight air courier shall be deemed delivered one (1) Business Day after the date that such notice is delivered to such overnight courier, (iv) when posted on a password-protected website shall be deemed delivered after notice of such posting has been provided to the recipient and (v) delivered by email shall be deemed delivered on the date of delivery of such notice.

(d)     Notwithstanding any provisions of the Indenture to the contrary, the Trustee shall have no liability based upon or arising from the failure to receive any notice required by or relating to the Indenture, the Notes or any other Related Document (except to the extent such failure results from gross negligence, willful misconduct or fraud by the Trustee).

(e)     If the Master Issuer delivers a notice or communication to Noteholders, it shall deliver a copy to the Agents and the Trustee at the same time.

(f)     Where the Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if sent in writing and mailed, first-class postage prepaid, to each Noteholder affected by such event, at its address as it appears in the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed (if any) for the giving of such notice. In any case where notice to a Noteholder is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given. Where the Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver. In the case by reason of the suspension of regular mail service

or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made that is satisfactory to the Trustee shall constitute a sufficient notification for every purpose hereunder.

Section 13.2.   <u>Communication by Noteholders With Other Noteholders</u>.

Noteholders may communicate with other Noteholders with respect to their rights under the Indenture or the Notes.

Section 13.3.   <u>Officer's Certificate and Opinion of Counsel as to Conditions Precedent</u>.

Upon any request or application by the Master Issuer to the Agents or the Trustee to take any action under the Indenture or any other Related Document, the Master Issuer to the extent requested by the Agents or the Trustee shall furnish to the Agents and the Trustee (a) an Officer's Certificate of the Master Issuer in form and substance reasonably satisfactory to the Agents or the Trustee, as applicable (which shall include the statements set forth in <u>Section 13.4</u>), stating that all conditions precedent and covenants, if any, provided for in the Indenture or such other Related Documents relating to the proposed action have been complied with and (b) solely to the extent requested by the Trustee, an Opinion of Counsel confirming the same, which Opinion of Counsel shall be at the expense of the Master Issuer; *provided* that, no such Officer's Certificate or Opinion of Counsel shall be required to dissolve any Wind-Down Entity or immaterial subsidiary or release any Liens, in each case, as contemplated in <u>Section 12.1(b)(ii)(y)</u>, <u>Section 13.17</u> and the Approved Plan.

Section 13.4.   <u>Statements Required in Certificate</u>.

Each certificate with respect to compliance with a condition or covenant provided for in the Indenture or any other Related Document shall include:

(a)     a statement that the Person giving such certificate has read such covenant or condition;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements contained in such certificate are based;

(c)     a statement that, in the opinion of such Person, he has made such examination or investigation as is necessary to enable him to reach an informed opinion as to whether or not such covenant or condition has been complied with; and complied with.

(d)     a statement as to whether or not such condition or covenant has been complied with.

Section 13.5.   <u>Rules by the Trustee</u>.

The Trustee may make reasonable rules for action by or at a meeting of Noteholders.

Section 13.6.    Benefits of Indenture.

Except as set forth in the Series Supplement, nothing in this Base Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Calculation and Reporting Agent, the Holders and the other Secured Parties, any benefit or any legal or equitable right, remedy or claim under the Indenture.

Section 13.7.    Payment on Business Day.

In any case where any Monthly Allocation Date, redemption date or maturity date of any Note shall not be a Business Day, then (notwithstanding any other provision of the Indenture) payment of interest or principal (and premium, if any), as the case may be, need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on the Monthly Allocation Date, redemption date or maturity date; provided, however, that no interest shall accrue for the period from and after such Monthly Allocation Date, redemption date or maturity date, as the case may be.

Section 13.8.    Governing Law.

**THIS BASE INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

Section 13.9.    Successors.

All agreements of each of the Master Issuer in the Indenture, the Notes and each other Related Document to which it is a party shall bind its successors and assigns; provided, however, the Master Issuer may not assign its obligations or rights under the Indenture or any other Related Document, except with the written consent of the Required Holders. All agreements of the Trustee in the Indenture shall bind its successors.

Section 13.10. Severability.

In case any provision in the Indenture, the Notes or any other Related Document shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.11. Counterpart Originals.

The parties may sign any number of copies of this Base Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.12. Table of Contents, Headings, etc.

The Table of Contents and headings of the Articles and Sections of the Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.13. No Bankruptcy Petition Against the Obligor Entities.

Each of the Noteholders, the Trustee and the other Secured Parties hereby covenants and agrees that, prior to the date which is one year and one day after the payment in full of the latest maturing Note, it shall not institute against, or join with any other Person in instituting against, any Obligor Entity any arrangement or Insolvency proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing in this Section 13.13 shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document. In the event that any such Noteholder or other Secured Party or the Trustee takes action in violation of this Section 13.13, each affected Obligor Entity shall file or cause to be filed an answer with the bankruptcy court or otherwise properly contesting the filing of such a petition by any such Noteholder or Secured Party or the Trustee against such Obligor Entity or the commencement of such action and raising the defense that such Noteholder or other Secured Party or the Trustee has agreed in writing not to take such action and should be estopped and precluded therefrom and such other defenses, if any, as its counsel advises that it may assert. The provisions of this Section 13.13 shall survive the termination of the Indenture and the resignation or removal of the Trustee. Nothing contained herein shall preclude participation by any Noteholder or any other Secured Party or the Trustee in the assertion or defense of its claims in any such proceeding involving any Obligor Entity.

Section 13.14. Recording of Indenture.

If the Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Master Issuer and at its expense.

Section 13.15. Waiver of Jury Trial.

**EACH OF THE MASTER ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS BASE INDENTURE, THE NOTES, THE OTHER RELATED DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.**

Section 13.16. Submission to Jurisdiction; Waivers.

Each of the Master Issuer and the Trustee hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to the Indenture and the other Related Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the

courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Master Issuer or the Trustee, as the case may be, at its address set forth in Section 13.1 or at such other address of which the Trustee shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.16 any special, exemplary, punitive or consequential damages.

Section 13.17. Permitted Asset Dispositions; Release of Collateral.

After consummation of a Permitted Asset Disposition (including the dissolution of a Wind-Down Entity), all Liens with respect to the disposed property created in favor of the Trustee for the benefit of the Secured Parties under the Base Indenture and the other Related Documents shall be automatically released, and upon request of the Master Issuer, the Trustee, at the written direction of the Required Holders, shall execute and deliver to the Master Issuer any and all documentation reasonably requested and prepared by the Master Issuer at its expense to effect or evidence the release by the Trustee of the Secured Parties' security interest in the property disposed of in connection with such Permitted Asset Disposition.

Section 13.18. Electronic Signatures and Transmission.

For purposes of this Base Indenture and any of the Indenture Documents or Related Documents, any reference to "written" or "in writing" means any form of written communication, including, without limitation, electronic signatures, and any such written communication may be transmitted by Electronic Transmission.    "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.    The Trustee is authorized to accept written instructions, directions, reports, notices or other communications delivered by Electronic Transmission and shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by Electronic Transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such Electronic

Transmission, and the Trustee shall not have any liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information to the Trustee, including, without limitation, the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties (except to the extent such action results from gross negligence, willful misconduct or fraud by the Trustee). Any requirement in the Indenture, Indenture Documents or Related Documents, that a document, including any Notes, is to be signed or authenticated by "manual signature" or similar language shall not be deemed to prohibit signature to be by facsimile or electronic signature and shall not be deemed to prohibit delivery thereof by Electronic Transmission; provided that upon the request of any Noteholder that any of its Notes be delivered in physical form, the Master Issuer and the Trustee shall cooperate to deliver such Notes to such Noteholder in physical form as soon as reasonably practicable, but in no more than ten (10) Business Days from the date of such request in any event. Notwithstanding anything to the contrary in this Base Indenture, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary and/or sensitive information and sent by Electronic Transmission will be encrypted.  The recipient of the Electronic Transmission will be required to complete a one-time registration process.

Section 13.19. <u>Amendment and Restatement</u>.

This Base Indenture constitutes an amendment and restatement of the First A&R Base Indenture, effective from and after the date hereof. Each of the parties hereto hereby acknowledges and agrees that the pledge and grant of the security interests in the Indenture Collateral pursuant to <u>Article III</u> of this Base Indenture is not intended to, nor shall it be construed to be, a release of any prior pledge or security interests granted by the Master Issuer in favor of the Trustee under the First A&R Base Indenture.

**[Signature Pages Follow]**

**ANNEX A**

BASE INDENTURE DEFINITIONS LIST

"1933 Act" means the Securities Act of 1933, as amended.

"1934 Act" means the Securities Exchange Act of 1934, as amended.

"Account Control Agreement" means each control agreement, in form and substance reasonably satisfactory to the Trustee, pursuant to which the Trustee is granted the right to control deposits and withdrawals from, or otherwise to give instructions or entitlement orders in respect of, a deposit and/or securities account and any lock-box related thereto.

"Accounts" means, the Collection Account, the Collection Account Administrative Accounts, and such other accounts subject to an Account Control Agreement as the Trustee may establish from time to time pursuant to its authority to establish additional accounts pursuant to the Indenture.

"Actual Knowledge" means the actual knowledge of (i) in the case of any Obligor Entity, with respect to a relevant matter or event, an Authorized Officer of such Obligor Entity directly responsible for managing the relevant asset or for administering the transactions relevant to such matter or event, (ii) with respect to the Trustee, an Authorized Officer of the Trustee responsible for administering the transactions relevant to the applicable matter or event or (iii) with respect to any other Person, any member of senior management of such Person.

"Additional IP License Agreement" means any license agreement entered into in connection with the Approved Plan by, among others, the IP Holder and one or more wholly-owned subsidiaries of Franchise HoldCo, in each case, with respect to the Collateral IP, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Additional Perfection Country" means any country other than the United States and the Specified Countries which represents ten percent (10%) of the number of the Branded Restaurants operating in jurisdictions outside the United States.

"Affiliate" or "Affiliated" means, with respect to any specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person; *provided*, *however*, that no direct or indirect equity holder of NewCo or any Affiliate of such equity holder will be deemed to be an Affiliate of any Obligor Entity. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other ownership or beneficial interests, by contract or otherwise; and the terms "controlling" and "controlled" have the meanings correlative to the meaning of "control."

"After-Acquired Collateral IP" means all Intellectual Property (other than Excluded IP or Intellectual Property that is an Excluded Asset) created, developed, authored or acquired by or on behalf of, or licensed to (to the extent of the rights licensed) or on behalf of, the IP Holder after

the Closing Date pursuant to the IP License Agreement or otherwise, including, without limitation, all Manager-Developed IP and all Licensee-Developed IP, in each case to the extent owned by an Obligor Entity (including pursuant to the terms of the Brand Management Agreement).

"Agent" means any Registrar, Calculation and Reporting Agent or Paying Agent.

"Aggregate Outstanding Principal Amount" means the sum of the Outstanding Principal Amounts with respect to all Notes.

"AHYDO Catch-up Payment" means a payment in such amount and at such times as is necessary to avoid the characterization of any Note as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code and the Treasury Regulations thereunder.

"Applicable Procedures" means the provisions of the rules and procedures of DTC, the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream, as in effect from time to time.

"Applicants" has the meaning set forth in Section 2.7(a) of the Base Indenture.

"Approved Plan" means the confirmation and consummation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and its Affiliated Debtors* [Docket No. 1142] (as such may be amended, supplemented, or amended and supplemented from time to time), which Approved Plan was filed with and approved by the United States Bankruptcy Court for the Northern District of Texas in the jointly administered cases styled *In re Hooters of America, LLC*, Case No. 25-80078 (SWE), including for the avoidance of doubt and for the purposes of the covenants and terms set forth herein and in the Base Indenture and the other Related Documents, the consummation of the plan described therein and the restructuring steps set forth as Exhibit H in the Third Amended Plan Supplement (as such may be amended, supplemented, or amended and supplemented from time to time).

"Asset Disposition Proceeds" means, with respect to any disposition of property by an Obligor Entity, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such disposition (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable property and that is required to be repaid in connection with such disposition (other than Indebtedness under the Notes) to the extent such principal amount is actually repaid, (B) the reasonable and customary out-of-pocket expenses incurred or estimated to be incurred by the Obligor Entities and/or third-parties, including the Manager acting on their behalf or acting pursuant to the Brand Management Agreement and/or other documents entered into in connection with the Approved Plan, in connection with such disposition and (C) income Taxes reasonably estimated to be actually payable within two years of such disposition as a result of any gain recognized in connection therewith.

"Authorized Officer" means, with respect to (i) any Obligor Entity, any officer who is authorized to act for such Obligor Entity in matters relating to such Obligor Entity or (ii) the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a

2

Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Bank" has the meaning assigned to such term in Section 10.2(w) of the Base Indenture.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. Section 101 et seq.

"Base Indenture" means the Second Amended and Restated Base Indenture, dated as of the Closing Date, by and among the Master Issuer, the Trustee and the Securities Intermediary, as amended, amended and restated, supplemented or otherwise modified from time to time, exclusive of the Series Supplement.

"Base Indenture Account" means any account or accounts authorized and established pursuant to the Base Indenture for the benefit of the Secured Parties, including, without limitation, each account established pursuant to Article V of the Base Indenture.

"Base Indenture Definitions List" has the meaning set forth in Section 1.1 of the Base Indenture.

"Board of Directors" means the Board of Directors of any corporation or any unlimited company, or any authorized committee of such Board of Directors.

"Book-Entry Notes" means beneficial interests in the Notes, ownership and transfers of which shall be evidenced or made through book entries by a Clearing Agency as described in Section 2.12 of the Base Indenture; provided that, after the occurrence of a condition whereupon book-entry registration and transfer are no longer permitted and Definitive Notes are issued to the Note Owners, such Definitive Notes shall replace Book-Entry Notes.

"Brand Management Agreement" means the Management Agreement, dated as of the effective date of the Approved Plan, by and among Hooters Brand Management LLC, as manager, Franchise HoldCo, HOA Franchising, HOOTS Franchising, HOA Future Franchising, LLC, HOA Systems, LLC, and the IP Holder, as amended, restated, supplemented, or otherwise modified from time to time, and any successor management agreement thereto pursuant to which a Manager is engaged to manage, maintain, promote, or otherwise administer rights associated with the Hooters Brand and/or Hoots Wings Brand.

"Branded Restaurant System" means the Hooters Restaurant System and/or the Hoots Wings Restaurant System, as applicable.

"Branded Restaurants" means the Hooters Restaurants and/or the Hoots Wings Restaurants, as applicable.

"Business Day" means any day other than Saturday or Sunday or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, New York,

New York, Atlanta, Georgia, Chicago, Illinois or the city in which the Corporate Trust Office of any successor Trustee is located if so required by such successor.

"Calculation and Reporting Agency Agreement" means that certain Calculation and Reporting Agency Agreement, dated as of the date hereof, among the Master Issuer and the Calculation and Reporting Agent.

"Calculation and Reporting Agent" has the meaning set forth in Section 2.6(a) of the Base Indenture.

"Cash Management Obligations" means (1) obligations in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements, electronic fund transfer, treasury services and cash management services, including controlled disbursement services, deposit and other accounts and merchant services, or other cash management arrangements or any automated clearing house arrangements, (2) other obligations in respect of netting or setting off arrangements, credit, debit or purchase card programs, and similar arrangements and (3) obligations in respect of any other services related, ancillary or complementary to the foregoing (including any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, and related programs or any automated clearing house transfers of funds).

"Charter Document" means, with respect to any entity and at any time, the certificate of incorporation, certificate of formation, operating agreement, by-laws, memorandum of association, articles of association, limited liability company agreement, partnership agreement or such other similar document, as applicable to such entity in effect at such time.

"Class" means any one of the classes of the Series 2025-1 Notes as specified in the Series Supplement.

"Class A Notes" means, collectively, the Class A-1 Notes, the Class A-2I Notes and the Class A-2II Notes.

"Class A-1 Notes" means the Notes alphanumerically designated as "Class A-1" pursuant to the Series Supplement.

"Class A-2I Notes" means the Notes alphanumerically designated as "Class A-2I" pursuant to the Series Supplement.

"Class A-2II Notes" means the Notes alphanumerically designated as "Class A-2II" pursuant to the Series Supplement.

"Class B Notes" means the Notes alphanumerically designated as "Class B" pursuant to the Series Supplement.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act or any successor provision thereto or Euroclear or Clearstream.

"Clearing Agency Participant" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Clearstream" means Clearstream Banking, société anonyme.

"Closing Date" means October 31, 2025.

"Closing Date Collateral IP" means all Intellectual Property created, developed, authored, acquired or owned by, or licensed to (to the extent of the rights licensed), the IP Holder as of the Closing Date related to (i) the Hooters Brand or the Hoots Wings Brand, (ii) products or services sold or distributed under the Hooters Brand or the Hoots Wings Brand, or (iii) the Hooters Restaurant System or the Hoots Wings Restaurant System.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, reformed or otherwise modified from time to time, and any successor statute of similar import, in each case as in effect from time to time. References to sections of the Code also refer to any successor sections.

"Collateral" means, collectively, the Indenture Collateral, the "Collateral" as defined in the Guarantee and Collateral Agreement and any property subject to any other Indenture Document that grants a Lien to secure any Obligations.

"Collateral Documents" means, collectively, the IP License Agreement and the Collateral Related Documents.

"Collateral Exclusions" has the meaning set forth in Section 3.1(a) of the Base Indenture.

"Collateral IP" means, collectively, the Closing Date Collateral IP and the After-Acquired Collateral IP, except that, solely for the purposes of the licenses granted under the IP License Agreement and any license granted by the IP Holder to the Trustee under the Indenture for the purpose of exercising its remedies upon the occurrence of an Event of Default, "Collateral IP" shall not include any rights to licensed third-party Intellectual Property to the extent that such rights are not sublicensable under the applicable third-party license agreement or would otherwise be Excluded Assets.

"Collateral Related Documents" means the Charter Documents of each Obligor Entity, the Brand Management Agreement and the Account Control Agreements.

"Collection Account" means account no. 1127600 entitled "Citibank, N.A. f/b/o HOA RoyaltyCo LLC – Collection Account" maintained by the Trustee pursuant to Section 5.1 of the Base Indenture or any successor securities account maintained pursuant to Section 5.1 of the Base Indenture.

"Collection Account Administrative Accounts" has the meaning set forth in Section 5.2 of the Base Indenture.

"Collections" means, with respect to each Monthly Collection Period, all amounts received by or for the account of the Obligor Entities during such Monthly Collection Period, including (without duplication):

      (i)     all IP License Fees, all other amounts received under any license agreement, including the IP License Agreement and the Founders License Agreements, and any other amounts received in respect of the Collateral IP, including recoveries (except to the extent that a licensee or sublicensee is entitled to such recoveries under its respective license agreement) from the enforcement of the Collateral IP;

      (ii)     all Insurance/Condemnation Proceeds, Asset Disposition Proceeds and (without duplication) all other amounts received upon the disposition of the Obligor Assets, in each case that are required to be deposited into the Concentration Account or the Collection Account;

      (iii)     any Investment Income earned on amounts on deposit in the Accounts;

      (iv)     to the extent not otherwise included above, all Excluded Amounts; and

      (v)     any other payments or proceeds received with respect to the Obligor Assets;

provided that any payments received by any Wind-Down Entity shall not be required to be included in the Collections unless and until such amounts are available for distribution by such Wind-Down Entity in a manner consistent with the Approved Plan.

"Company Order" and "Company Request" mean a written order or request signed in the name of the Master Issuer by any Authorized Officer of the Master Issuer and delivered to the Trustee or the Paying Agent.

"Concentration Account" means the account maintained in the name of the Master Issuer and pledged to the Trustee into which the Master Issuer causes amounts to be deposited pursuant to Sections 5.4(a) of the Base Indenture.

"Consent Request" means any request for a direction, waiver, amendment, consent or certain other action under the Related Documents.

"Contractual Obligation" means, with respect to any Person, any provision of any security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Controlled Group" means any trade or business (whether or not incorporated) that, together with any Obligor Entity, is treated as a single employer under Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"Copyrights" has the meaning set forth in the definition of "Intellectual Property."

"<u>Corporate Trust Office</u>" means the corporate trust office of the Trustee at (a) for Note transfer purposes and presentment of the Notes for final payment thereon, Citibank, N.A., 480 Washington Boulevard, 16th Floor, Jersey City, New Jersey 07310, Attention: Agency & Trust – HOA RoyaltyCo LLC and (b) for all other purposes, Citibank, N.A., 388 Greenwich Street, New York, New York 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC, or call (888) 855-9695 to obtain Citibank, N.A.'s account manager's email address, or such other address as the Trustee may designate from time to time by notice to the Holders and the Master Issuer or the principal corporate trust office of any successor Trustee.

"<u>Default</u>" means any Event of Default or any occurrence that with notice or the lapse of time or both would become an Event of Default.

"<u>Deferred Interest</u>" has the meaning set forth in <u>Section 2.15(b)</u> of the Base Indenture.

"<u>Definitive Notes</u>" has the meaning set forth in <u>Section 2.12(a)</u> of the Base Indenture.

"<u>Depository</u>" has the meaning set forth in <u>Section 2.12(a)</u> of the Base Indenture.

"<u>Depository Agreement</u>" means, with respect to any Book-Entry Notes, the agreement among Master Issuer, the Trustee and the Clearing Agency governing the deposit of such Notes with the Clearing Agency, or as otherwise provided in the Series Supplement.

"<u>Dollar</u>" and the symbol "<u>$</u>" mean the lawful currency of the United States.

"<u>DTC</u>" means The Depository Trust Company.

"<u>Electronic Transmission</u>" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"<u>Eligible Account</u>" means (a) a segregated identifiable trust account established in the trust department of a Qualified Trust Institution or (b) a separately identifiable deposit or securities account established at a Qualified Institution.

"<u>Eligible Investments</u>" means (a) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank or trust company that (i) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) whose short-term debt is rated at least "A-2" (or then equivalent grade) by KBRA and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 90 days from the date of acquisition thereof; (b) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; <u>provided</u>, that the full faith and credit of the United States of America is pledged in support thereof; (c) commercial paper issued by any person organized under the laws

of any state of the United States of America and rated at least "A-2" (or the then equivalent grade) by KBRA, with maturities of not more than 180 days from the date of acquisition thereof; and (d) investments, classified in accordance with GAAP as current assets of the relevant Person making such investment, in money market investment programs registered under the 1940 Act, which have the highest rating obtainable from KBRA, and the portfolios of which are invested primarily in investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition. Notwithstanding the foregoing, all Eligible Investments must either (A) be at all times available for withdrawal or liquidation at par (or for commercial paper issued at a discount, at the applicable purchase price) or (B) mature on or prior to, in the case of the Collection Account, the Business Day prior to the immediately succeeding Weekly Allocation Date, and (iii) in the case of each other Account, the Business Day prior to the last Business Day of the immediately succeeding Monthly Collection Period.

"Equity Interest" means any (a) membership interest in any limited liability company, (b) general or limited partnership interest in any partnership, (c) common, preferred or other stock interest in any corporation, (d) share, participation, unit or other interest in the property or enterprise of an issuer that evidences ownership rights therein, (e) ownership or beneficial interest in any trust or (f) option, warrant or other right to convert any interest into or otherwise receive any of the foregoing.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, in each case as in effect from time to time. References to sections of ERISA also refer to any successor sections.

"ERISA Event" means any of the following events or conditions: (a) any Obligor Entity engages in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; (b) any "accumulated funding deficiency" or failure to meet the "minimum funding standard" (as defined in Section 302 of ERISA), whether or not waived, exists with respect to any Pension Plan and is not discharged within thirty (30) days thereafter; (c) any Lien in an amount equal to at least $1 million in favor of the PBGC or a Pension Plan arises on the assets of any Obligor Entity and is not discharged within thirty (30) days thereafter; (d) a Reportable Event occurs with respect to, or proceedings commence to have a trustee appointed, or a trustee is appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee results in the termination of such Single Employer Plan for purposes of Title IV of ERISA; or (e) any Obligor Entity incurs or is likely to incur, any liability in connection with a complete or partial withdrawal from, or the Insolvency or termination of, a Multiemployer Plan.

"Euroclear" means Euroclear Bank, S.A./N.V., or any successor thereto, as operator of the Euroclear System.

"Event of Bankruptcy" shall be deemed to have occurred with respect to a Person if:

(a)      a case or other proceeding is commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or any

substantial part of its assets, or any similar action with respect to such Person under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding continues undismissed, or unstayed and in effect, for a period of sixty (60) consecutive days; or an order for relief in respect of such Person is entered in an involuntary case under the federal bankruptcy laws or other similar laws now or hereafter in effect; or

(b)        such Person commences a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar law now or hereafter in effect, or consents to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for such Person or for any substantial part of its property, or makes any general assignment for the benefit of creditors; or

(c)        the Board of Directors or board of managers (or similar body) of such Person votes to implement any of the actions set forth in clause (b) above.

"Event of Default" means any of the events set forth in Section 9.1 of the Base Indenture.

"Excepted Collateral IP Assets" means (i) any right to use third-party Intellectual Property pursuant to a license to the extent such rights are not able or permitted to be pledged; and (ii) any application for registration of a Trademark that would be invalidated, canceled, voided or abandoned due to the grant and/or enforcement of an assignment or security interest, including intent-to-use applications filed with the PTO pursuant to 15 U.S.C. Section 1051(b) prior to the filing of a statement of use or amendment to allege use pursuant to 15 U.S.C. Section 1051(c) or (d); provided that at such time as the grant and/or enforcement of the assignment or security interest would not cause such application to be invalidated, canceled, voided or abandoned, such Trademark application shall cease to be considered an Excepted Collateral IP Asset; provided further that no Excluded Asset shall constitute an Excepted Collateral IP Asset.

"Excluded Amounts" means (i) any statutory foreign taxes included in Collections, but required to be remitted to a Governmental Authority, (ii) fees and expenses paid by or on behalf of the IP Holder in connection with registering, maintaining and enforcing the Collateral IP and paying third party licensing fees, and (iii) any other amounts deposited into the Concentration Account that are not required to be deposited into the Collection Account pursuant to Section 5.4 of the Base Indenture.

"Excluded Assets" has the meaning set forth in Section 3.1(a) of the Base Indenture.

"Excluded IP" means any commercially available, off-the-shelf, unmodified Software licensed on standard terms and conditions to or on behalf of the Obligor Entities.

"FDIC" means the U.S. Federal Deposit Insurance Corporation.

"Financial Assets" has the meaning set forth in Section 5.3(b)(i) of the Base Indenture.

"Founders License Agreements" means (i) the License Agreement between Hooters of America, Inc., individually and as former general partner of the IP Holder, as licensor, and Hooters, Inc., as licensee; (ii) the License Agreement between Hooters of America, Inc., individually and

as former general partner of the IP Holder, as licensor, and Hooters Foods, Inc., as licensee; and (iii) the License Agreement between IP Holder, as licensor, and Hooters Gaming Corporation, as licensee, each dated March 21, 2001, as the same may be amended, supplemented or otherwise modified from time to time.

"Franchise HoldCo" means HOA Franchise HoldCo, LLC, a Delaware limited liability company, and its successors and assigns.

"Franchised Restaurant Business" means the Hooters Franchised Restaurant Business and/or the Hoots Wings Franchised Restaurant Business, as applicable.

"GAAP" means the U.S. generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors and successors in effect from time to time.

"Government Securities" means readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof and as to which obligations the full faith and credit of the United States of America is pledged in support thereof.

"Governmental Authority" means the government of the United States of America or any other nation or any political subdivision of the foregoing, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be (i) with respect to a Guarantee pursuant to clause (a) above, an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith or (ii) with respect to a Guarantee pursuant to clause (b) above, the fair market value of the

assets subject to (or that could be subject to) the related Lien. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee and Collateral Agreement" means the Second Amended and Restated Guarantee and Collateral Agreement, dated as of the Closing Date, by the Guarantors in favor of the Trustee, as amended, supplemented or otherwise modified from time to time.

"Guarantors" means, collectively, the IP Holder, HOA IP GP and the Wind-Down Entities.

"Hague Securities Convention" means the Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary, concluded 5 July 2006.

"HOA Franchising" means HOA Franchising, LLC, a Delaware limited liability company, and its successors and assigns.

"HOA IP GP" means HOA IP GP, LLC, a Delaware limited liability company, and its successors and assigns.

"Hooters Brand" means the Hooters® name and Trademarks, whether alone or in combination with other words or symbols, and any variations or derivatives of any of the foregoing, and the Trademark elements of the Hooters Restaurant System.

"Hooters Franchised Restaurant Business" means the business of franchising or licensing Hooters Restaurants and the provision of ancillary goods and services in connection therewith.

"Hooters Restaurant System" means a distinctive system for the establishment and operation of Hooters Restaurants that offer a limited menu featuring chicken wings, seafood and burgers, together with beer, wine, and liquor and other food and beverage offerings and merchandise, which system includes the distinctive exterior and interior restaurant designs associated with the Hooters Brand, trade dress, décor, and color scheme, distinctive standards, specifications, and procedures for operations, procedures for quality control, training and ongoing operational assistance, and advertising and promotional programs, all of which the Obligor Entities, or the Manager, may add to, delete from, and modify from time to time.

"Hooters Restaurants" means, as of any date of determination, all restaurants, without regard to whether such restaurants offers sit-down dining, operated in the United States or internationally under the Hooters Brand as of such date.

"HOOTS Franchising" means HOOTS Franchising, LLC, a Delaware limited liability company, and its successors and assigns.

"Hoots Wings Brand" means the Hoots Wings® name and Trademarks, whether alone or in combination with other words or symbols, and any variations or derivatives of any of the foregoing, and the Trademark elements of the Hoots Wings Restaurant System.

"Hoots Wings Franchised Restaurant Business" means the business of franchising or licensing Hoots Wings Franchised Restaurants and the provision of ancillary goods and services in connection therewith.

"Hoots Wings Restaurant System" means a distinctive system for the establishment and operation of Hoots Wings Restaurants that offer a limited menu featuring chicken wings, together with beer, wine, and liquor and other food and beverage offerings and merchandise.

"Hoots Wings Restaurants" means, as of any date of determination, all restaurants, without regard to whether such restaurants offer counter service, operated in the United States or internationally, under the Hoots Wings Brand as of such date.

"Improvements" means, with respect to Intellectual Property, proprietary rights in any additions, modifications, derivatives, developments, variations, refinements, enhancements or improvements or, with respect to real estate, the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the real property constituting a part of each property.

"Indebtedness" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money in any form, including derivatives, (b) notes payable, (c) any obligation owed for all or any part of the deferred purchase price for property or services, which purchase price is (i) due more than one year from the date of the incurrence of the obligation in respect thereof or (ii) evidenced by a note or similar written instrument (other than an earn-out obligation until such obligation becomes a liability on the balance sheet of such Person under GAAP), (d) all indebtedness secured by any Lien on any property or asset owned by that Person regardless of whether the indebtedness secured thereby has been assumed by that Person or is nonrecourse to the credit of that Person, and (f) all Guarantees of such Person in respect of any of the foregoing. Notwithstanding the foregoing, Indebtedness shall not include (i) any liability for federal, state, local or other taxes owed or owing to any governmental entity, (ii) amounts payable under third party license agreements and third-party supply agreements or similar trade debt incurred in the ordinary course of business or representing deferred compensation to employees and other service providers of the Master Issuer and Subsidiaries of NewCo incurred in connection with the Brand Management Agreement, or otherwise in the ordinary course of business or as part of the transactions occurring in order to effectuate the Approved Plan and the Brand Management Agreement; (iii) indemnification obligations or obligations in respect of purchase price or other similar adjustments (including "earn outs" or similar obligations and mark to market adjustments with respect to the foregoing) and deferred compensation arrangements, contingent fee arrangements and similar arrangements incurred in connection with the Approved Plan, wind-down, brand management agreement and licensing activities not otherwise restricted by the Related Documents; (iii) amounts owed to dissenting equity holders in connection with, or as a result of, their exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto (including any accrued interest), with respect to the transactions that are not restricted under this Indenture; (iv) liabilities associated with customer prepayments and deposits and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business and as contemplated by the Brand Management Agreement; (v) for the avoidance of doubt, any obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes owed in connection with the Approved Plan; (vi) premiums payable to, and advance commissions or claim payments from, insurance companies; (vii) short-term intercompany payment and reimbursement obligations; or (viii) that portion of obligations with respect to any lease of any

property, whether real, personal or mixed and whether or not such lease is pursuant to a sale-leaseback transaction (for the avoidance of doubt, whether or not such sale-leaseback transaction is accounted for under the financing method).

"Indenture" means the Base Indenture, together with the Series Supplement, as amended, supplemented or otherwise modified from time to time by Supplements thereto in accordance with its terms.

"Indenture Collateral" has the meaning set forth in Section 3.1(a) of the Base Indenture.

"Indenture Documents" means, collectively, the Base Indenture, the Series Supplement, the Notes, the Guarantee and Collateral Agreement, the Account Control Agreements and any other agreements relating to the issuance or the purchase of the Notes or the pledge of Collateral under any of the foregoing.

"Independent" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person and (ii) is not connected with such Person or an Affiliate of such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if, in addition to satisfying the criteria set forth above, the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants. Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Independent Accountants" means the firm of Independent accountants appointed pursuant to the Brand Management Agreement or any successor Independent accountant.

"Ineligible Account" has the meaning set forth in Section 5.10 of the Base Indenture.

"Initial Principal Amount" means, with respect to any Class (or Subclass) of Notes, the aggregate initial principal amount of such Class (or Subclass) of Notes specified in the Series Supplement.

"Insolvency" means liquidation, insolvency, bankruptcy, rehabilitation, composition, reorganization or conservation; and when used as an adjective "Insolvent."

"Insolvency Law" means any applicable federal, state or foreign law relating to liquidation, insolvency, bankruptcy, rehabilitation, composition, reorganization, conservation or other similar law now or hereafter in effect.

"Insurance/Condemnation Proceeds" means an amount equal to: (i) any cash payments or proceeds received by the Obligor Entities (a) by reason of theft, physical destruction or damage or any other similar event with respect to any properties or assets of the Obligor Entities under any policy of insurance (other than liability insurance) in respect of a covered loss thereunder or (b) as

a result of any non-temporary condemnation, taking, seizing or similar event with respect to any properties or assets of the Obligor Entities by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii)(a) any actual and reasonable costs incurred by the Obligor Entities in connection with the adjustment or settlement of any claims of the Obligor Entities in respect thereof and (b) any bona fide direct costs incurred in connection with any disposition of such assets as referred to in clause (i)(b) of this definition, including Taxes (or distributions to a direct or indirect parent for Taxes) paid or reasonably expected to be actually payable with respect to the Obligor Entities' consolidated group as a result of any gain recognized in connection therewith. For the avoidance of doubt, "Insurance/Condemnation Proceeds" shall not include any proceeds of policies of insurance not described above, such as business interruption insurance, food safety insurance coverage and other insurance procured in the ordinary course of business, which will be treated as Collections.

"Intellectual Property" or "IP" means all rights in intellectual property of any type throughout the world, including: (i) Trademarks; (ii) Patents; (iii) rights in databases and computer programs, whether in source code or object code, together with related documentation and explanatory materials, whether machine readable or otherwise, including any Copyrights (as defined below), Patents and Trade Secrets (as defined below) therein ("Software"); (iv) copyrights (whether registered or unregistered) in unpublished and published works, works of authorship (whether or not copyrightable) or design rights, and all registrations and recordations thereof and all applications in connection therewith, along with all reversions, extensions and renewals thereof ("Copyrights"); (v) trade secrets and other confidential or proprietary information, including with respect to recipes, unpatented inventions, operating procedures, know how, data, procedures and formulas, specifications, inventory methods, customer service methods, financial control methods, and training techniques ("Trade Secrets"); (vi) all Improvements of or to any of the foregoing; (vii) all social media account names or identifiers (e.g., Twitter® handle or Facebook® account name); (viii) all registrations, applications for registration or issuances, recordings, renewals and extensions relating to any of the foregoing; and (ix) the sole and exclusive rights to prosecute and maintain any of the foregoing, to enforce any past, present or future infringement, misappropriation or other violation of any of the foregoing, and to defend any pending or future challenges to any of the foregoing.

"Interest Accrual Period" means with respect to (a) the Class A-1 Notes and the Class A-2II Notes, the immediately preceding Monthly Collection Period and (b) the Class A-2I Notes and the Class B Notes, a period commencing on and including the immediately preceding Monthly Allocation Date to but excluding the then-current Monthly Allocation Date; provided, however, that the initial Interest Accrual Period shall commence on and include the Closing Date and end on the date specified in the Series Supplement; provided further that the Interest Accrual Period, immediately preceding the Monthly Allocation Date on which the last payment on the Notes is to be made shall end on such Monthly Allocation Date.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Income" means the investment income earned on a specified account during a specified period, in each case net of all losses and expenses allocable thereto.

"Investments" means, with respect to any Person(s), all investments by such Person(s) in other Persons in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel, moving and other similar advances to officers, directors, employees and consultants of such Person(s) (including Affiliates) made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person.

"IP Holder" means HI Limited Partnership, a Florida limited partnership, and its successors and assigns.

"IP License Agreement" means the Hooters IP License Agreement, dated as of the Closing Date, by, among others, the IP Holder, as licensor, HOA Franchising, HOOTS Franchising, HOA Future Franchising, LLC and HOA Systems, LLC, each as licensee, as may be amended, amended and restated, restated, supplemented or otherwise modified from time to time, and any Additional IP License Agreements.

"IP License Fees" means all license fees payable to the IP Holder pursuant to any license agreement, including the IP License Agreement or the Founders License Agreements.

"Legal Final Maturity Date" means, with respect to any Class or Tranche of Notes, its "Legal Final Maturity Date" set forth in the Series Supplement.

"Licensee-Developed IP" means all Intellectual Property (other than Excluded IP) created, developed, authored, acquired or owned by or on behalf of any licensee or permitted sublicensee under the IP License Agreement (including, for the avoidance of doubt, any Manager-Developed IP) related to (i) the Hooters Brand or the Hoots Wings Brand, (ii) products or services sold or distributed under the Hooters Brand or the Hoots Wings Brand, (iii) Branded Restaurants, (iv) the Branded Restaurant System, or (v) the Franchised Restaurant Business, including, without limitation, all Improvements to any Collateral IP.

"Lien" means, when used with respect to any Person, any interest in any real or personal property, asset or other right held, owned or being purchased or acquired by such Person which secures payment or performance of any obligation, and shall include any mortgage, lien, pledge, encumbrance, charge, retained security title of a conditional vendor or lessor, or other security interest of any kind, whether arising under a security agreement, mortgage, lease, deed of trust, chattel mortgage, assignment, pledge, retention or security title, financing or similar statement, or arising as a matter of law, judicial process or otherwise.

"Manager" means any Person acting as manager pursuant to a brand management agreement, including any successor thereto.

"Manager-Developed IP" means all Intellectual Property (other than Excluded IP) created, developed, authored, acquired or owned by or on behalf of the Manager or any licensee managed by the Manager, in each case, related to or intended to be used by (i) the Hooters Brand or the Hoots Wings Brand, (ii) products or services sold or distributed under the Hooters Brand or the Hoots Wings Brand, (iii) Branded Restaurants, (iv) the Branded Restaurant System or (v) the

Franchised Restaurant Business, including without limitation all Improvements to any Collateral IP.

"Master Issuer" means HOA RoyaltyCo LLC, a Delaware limited liability company.

"Material Adverse Effect" means

(a)      with respect to the Collateral, a material adverse effect with respect to (i) the Hooters Brand or Hoots Wings Brand in any jurisdiction that is material to the business of the Obligor Entities or with respect to the Collateral IP taken as a whole, the enforceability of the terms thereof, the likelihood of the payment of the amounts required with respect thereto in accordance with the terms thereof, the value thereof, or the security interest in the rights thereto granted by the Obligor Entities under the terms of the Related Documents or (ii) the Collateral taken as a whole, the enforceability of the terms thereof, the likelihood of the payment of the amounts required with respect thereto in accordance with the terms thereof, the value thereof, the ownership thereof by the Obligor Entities (as applicable) or the Lien of the Indenture or Guarantee and Collateral Agreement on such Collateral;

(b)      with respect to the Obligor Entities, a materially adverse effect on the results of operations, business, properties or financial condition of the Obligor Entities, taken as a whole, or the ability of the Obligor Entities, taken as a whole, to conduct their business or to perform in any material respect their obligations under the Related Documents; or

(c)      with respect to any Person or matter, a material impairment to the rights of or benefits available to, taken as a whole, the Obligor Entities, the Trustee, or the Noteholders under any Related Document or the enforceability of any material provision of any Related Document;

provided, that where "Material Adverse Effect" is used in any Related Document without specific reference, such term shall have the meaning specified in clauses (a) through (c), as the context may require. It being understood that the transactions being effectuated pursuant to and in furtherance of the consummation of the Approved Plan shall not be deemed to have a Material Adverse Effect.

"Monthly Allocation Date" means the 20th day of each calendar month, or if such day is not a Business Day, the next succeeding Business Day, commencing in December 2025.

"Monthly Collection Period" means each period commencing on and including the first day of a Monthly Fiscal Period and ending on but excluding the first day of the immediately following Monthly Fiscal Period. Any reference to a Monthly Collection Period relating to a Monthly Allocation Date means the Monthly Collection Period most recently ended prior to such Monthly Allocation Date, and any reference to an Interest Accrual Period relating to a Monthly Allocation Date means the Interest Accrual Period most recently ended prior to such Monthly Allocation Date.

"Monthly Compliance Certificate" has the meaning set forth in Section 4.1(b) of the Base Indenture.

"Monthly Fiscal Period" means the following monthly fiscal periods of the Obligor Entities: (a) thirteen 4-week fiscal periods of the Obligor Entities in connection with their 52-week fiscal years and (b) twelve 4-week fiscal periods and one 5-week fiscal period of the Obligor Entities in connection with their 53-week fiscal years, whereby the 5-week period is the last fiscal period in such fiscal year.

"Monthly Noteholders' Report" has the meaning set forth in Section 4.1(a) of the Base Indenture.

"Moody's" means Moody's Investors Service, Inc. or any successor thereto.

"Multiemployer Plan" means any Pension Plan that is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"New York UCC" has the meaning set forth in Section 5.3(b)(i) of the Base Indenture.

"NewCo" means HOA NewCo LLC, a Delaware limited liability company.

"NewCo Class B Notes" means the Class B Notes issued pursuant to the NewCo Indenture.

"NewCo Indenture" means the Base Indenture, dated as of October 31, 2025, by and between HOA NewCo LLC, as Master Issuer, and Citibank, N.A., as Trustee and Securities Intermediary, as supplemented by the Series Supplement thereto, dated as of October 31, 2025, by and between HOA NewCo LLC, as Master Issuer, and Citibank, N.A., as Trustee.

"Note" or "Notes" means the Notes described in the recitals to the Base Indenture and any additional Notes that are authenticated and delivered under this Indenture from time to time. Unless the context otherwise requires, for all purposes of this Indenture, (i) all references to the "Notes" shall include the Notes and any additional Notes that are actually issued, and (ii) references to "principal amount" of the Notes shall include any Notes outstanding, including any increase in the principal amount of the outstanding Notes as a result of the issuance of additional Notes.

"Note Owner" means, with respect to a Book-Entry Note, the Person who is the beneficial owner of such Book-Entry Note, as reflected on the books of the Clearing Agency that holds such Book-Entry Note, or on the books of a Person maintaining an account with such Clearing Agency (directly or as an indirect participant, in accordance with the rules of such Clearing Agency).

"Note Rate" means, with respect to any Class, Subclass or Tranche of Notes, the annual rate at which interest (other than contingent additional interest) accrues on the Notes of such Class, Subclass or Tranche (or the formula on the basis of which such rate will be determined) as stated in the Series Supplement.

"Note Register" means the register maintained pursuant to Section 2.4(a) of the Base Indenture, providing for the registration of the Notes and transfers and exchanges thereof, subject to such reasonable regulations as the Master Issuer may prescribe.

"Noteholder" and "Holder" means the Person in whose name a Note is registered in the Note Register.

17

"Noteholder Materials" has the meaning set forth in <u>Section 4.3</u> of the Base Indenture.

"Obligations" means (a) all principal, interest and premium, if any, at any time and from time to time, owing by the Master Issuer on the Notes (inclusive of any Deferred Interest) or owing by the Guarantors pursuant to the Guarantee and Collateral Agreement, (b) the payment and performance of all other obligations, covenants and liabilities of the Master Issuer or the Guarantors arising under the Indenture, the Notes, any other Indenture Document or of the Guarantors under the Guarantee and Collateral Agreement and (c) the obligation of the Master Issuer to pay to the Trustee all fees and expenses payable to the Trustee under the Indenture and the other Related Documents to which it is a party when due and payable as provided in the Indenture.

"Obligor Assets" means all assets owned by the Obligor Entities, including but not limited to the Collateral.

"Obligor Entities" means, collectively, the Master Issuer and the Guarantors.

"Officer's Certificate" means a certificate signed by an Authorized Officer of the party delivering such certificate.

"Operating Expense Account" means account no. 11277100 entitled "Citibank, N.A. f/b/o HOA RoyaltyCo LLC – Securities Operating Expense Account" maintained by the Trustee in accordance with <u>Section 5.2(a)(i)</u> of the Base Indenture.

"Operating Expenses" means all expenses incurred by or on behalf of or for the benefit of the Obligor Entities and payable to Affiliates and third parties in connection with the maintenance and operation of the Obligor Entities and the transactions contemplated by the Brand Management Agreement and Related Documents to which they are a party (other than those paid for from the Concentration Account), including (i) accrued and unpaid Taxes (other than federal, state, local and foreign Taxes based on income, profits or capital, including franchise, excise, withholding or similar Taxes), filing fees and registration fees payable by and attributable to the Obligor Entities to any federal, state, local or foreign Governmental Authority; (ii) fees and expenses payable to independent certified public accountants (including, for the avoidance of doubt, any incremental auditor costs) or external legal counsel relating to the operations of the Master Issuer or the Guarantors; (iii) the indemnification obligations of the Obligor Entities under the Related Documents to which they are a party; and (iv) fees and expenses related to the protection and preservation of cash flows, the Collateral and profits, including related expenses paid to external legal counsel.

"Opinion of Counsel" means a written opinion from legal counsel who is reasonably acceptable to the Trustee for which purpose the counsel may be an employee of, or counsel to, the Obligor Entities or the Manager, as the case may be.

"Outstanding" means, with respect to the Notes, as of any time, all of the Notes theretofore authenticated and delivered under the Indenture except:

(i)     Notes theretofore canceled by the Registrar or delivered to the Registrar for cancellation;

(ii)      Notes, or portions thereof, for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee in trust for the Noteholders of such Notes pursuant to the Indenture; provided that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to the Indenture or provision therefore reasonably satisfactory to the Trustee has been made;

(iii)      Notes in exchange for, or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture, unless proof reasonably satisfactory to the Trustee is presented that any such Notes are held by a holder in due course;

(iv)      Notes that have been defeased in accordance with Section 11.1 hereof; and

(v)      Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in the Indenture;

provided that, (A) in determining whether the Noteholders of the requisite Outstanding Principal Amount have given any request, demand, authorization, direction, notice, consent, waiver or vote under the Indenture, the following Notes shall be disregarded and deemed not to be Outstanding: (x) Notes owned by the Obligor Entities or any other obligor upon the Notes and (y) Notes held in any accounts with respect to which the Master Issuer exercises discretionary voting authority; provided, further, that in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or vote, only Notes as described under clause (x) or (y) above that a Trust Officer or an Authorized Officer, as applicable, actually knows to be so owned shall be so disregarded; and (B) Notes owned in the manner indicated in clause (x) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not an Obligor Entity or any other obligor upon the Notes, or any account for which the Master Issuer exercises discretionary voting authority.

"Outstanding Principal Amount" means, with respect to the Notes, the amount calculated in accordance with the Series Supplement.

"Patents" means United States and non-United States patents, (including, during the term of the patent, the inventions claimed thereunder), patent disclosures, industrial designs, inventions (whether or not patentable or reduced to practice), invention disclosures, and applications, divisions, continuations, continuations-in-part, provisionals, reexaminations and reissues for any of the foregoing.

"Paying Agent" has the meaning set forth in Section 2.4(a) of the Base Indenture.

"PBGC" means the Pension Benefit Guaranty Corporation established under Section 4002 of ERISA.

"Pension Plan" means any "employee pension benefit plan," as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA and to which any company in the same Controlled Group as the Master Issuer has liability under Title IV of ERISA, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of

ERISA for any time within the preceding five years or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Permitted Asset Dispositions" has the meaning set forth in Section 8.14 of the Base Indenture.

"Permitted Debt" means  (a) to the extent constituting Indebtedness, Cash Management Obligations and other amounts owed in respect of netting services, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds (including Indebtedness owed on a short term basis to banks and other financial institutions incurred in the ordinary course of business with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances thereof); (b) to the extent constituting Indebtedness, Indebtedness representing any taxes, assessments or governmental charges which are not overdue for a period of more than 90 days or which are being contested in good faith and adequate reserves have been provided therefor in conformity with GAAP; and (c) to the extent constituting Indebtedness, such amounts required to be invested in insurance and wind-down obligations in order for such persons to maintain insurance and/or to meet minimum regulatory requirements and/or to comply with the Approved Plan, applicable law, rule or regulation or to the extent requested or required by the Approved Plan.

"Permitted Liens" means (a) Liens for (i) Taxes, assessments or other governmental charges not delinquent or (ii) Taxes, assessments or other charges being contested in good faith and by appropriate proceedings and with respect to which adequate reserves have been established, and are being maintained, in accordance with GAAP, (b) all Liens created or permitted under the Related Documents in favor of the Trustee for the benefit of the Secured Parties, (c) Liens existing on the Closing Date, which were released on such date or that the Required Holders have not required to be terminated as a condition to the Closing Date; it being understood that mortgage and intellectual property recordations needed not have been terminated of record on the Closing Date so long as such mortgage and intellectual property recordations were terminated of record within sixty (60) days of the Closing Date or such later date as described in the Approved Plan or as agreed with the Trustee (acting at the written direction of the Required Holders), (d) encumbrances in the nature of any licenses or sublicenses granted in the Collateral IP under the IP License Agreement, the Brand Management Agreement, any Founders License Agreement, or any other licenses or sublicenses granted in the ordinary course of business that do not conflict with restrictions or exclusive grants in the IP License Agreement or Founders License Agreements, (e) deposits or pledges made (i) in connection with casualty insurance maintained in accordance with the Related Documents, (ii) to secure the performance of bids, tenders, contracts or leases, (iii) to secure statutory obligations or surety or appeal bonds,(iv) to secure indemnity, performance or other similar bonds in the ordinary course of business of any Obligor Entity or (v) in connection with the Approved Plan and the various transactions and activities contemplated thereby, (f) Liens of carriers, warehouses, mechanics and similar Liens, in each case securing obligations (i) that are not yet due and payable or not overdue for more than forty five (45) days from the date of creation thereof or that will be discharged as part of the Approved Plan and/or and the various transactions and activities contemplated thereby or (ii) being contested in good faith by any Obligor Entity in appropriate proceedings (so long as such Obligor Entity shall, in accordance with GAAP, have set aside on its books adequate reserves with respect thereto), (g) restrictions under federal, state or

foreign securities laws on the transfer of securities, (h) any liens arising under law or pursuant to documentation governing permitted accounts in connection with the Obligor Entities' cash management system, (i) Liens arising from judgment, decrees or attachments in circumstances not constituting an Event of Default, (j) Liens arising in connection with any Indebtedness that is permitted under the Indenture, (k) Liens not securing Indebtedness that attach to any Collateral in an aggregate outstanding amount not exceeding $500,000 at any time, (l) easements, encumbrances, leases, licenses, subleases, sublicenses, franchise agreements, brand management agreements and/or covenants not to sue granted to others (whether or not on an exclusive or non-exclusive basis) that are entered into in as part of the Approved Plan or otherwise in the ordinary course of business and/or consistent with industry practice or past practice or that do not (i) interfere in any material respect with the business of the Master Issuer and the other Obligor Entities, when taken as a whole or (ii) secure any Indebtedness, (m) Liens on receivables and related assets incurred in connection with financed royalty arrangements that exist as of the Plan Effective Date or that are entered into as part of the Approved Plan and additional arrangements described in the Brand Management Agreement or otherwise permitted from time to time, so long as such financed royalty arrangement has been approved by the Board of Directors of NewCo, (n) to the extent constituting a Lien, brand management agreements, contingent fee arrangements, deferred fee, success fee arrangements and cost reimbursements and similar encumbrances of attorneys and advisors; provided that such arrangements are entered into in connection with the transactions contemplated by the Approved Plan or the Board of Directors of NewCo has consented to such arrangements, and (o) with the consent of the Supermajority Noteholders, any other Liens.

"Permitted NewCo Expenses" means the costs, expenses and disbursements necessary to maintain the existence and good standing of NewCo, to facilitate the Approved Plan and the Subsequent Mandatory Exchange and to pay its costs, expenses and reimbursements and Taxes (other than Taxes included in Permitted Tax Payments) (including, without limitation, payment and reimbursement of expenses for lawyers, accountants, directors and other advisors and professionals).

"Permitted Tax Payments" means (i) any AHYDO Catch-up Payments; (ii) Taxes owed by Master Issuer or NewCo (as a result of the assets and/or operations of Master Issuer, including by reason of Master Issuer being included in a consolidated / combined Tax group for which NewCo is the common parent) in an amount not to exceed actual Taxes due and payable for a rolling three quarters plus an estimate due for the current quarter.

"Person" means an individual, corporation (including a business trust), partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Plan" means (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (ii) any "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Section 4975 of the Code and (iii) any entity whose underlying assets are deemed to include assets of a plan described in (i) or (ii) for purposes of Title I of ERISA and/or Section 4975 of the Code.

"Plan Effective Date" means the effective date of the Approved Plan.

"Post-ARD Contingent Interest" means any Senior Notes Accrued Monthly Post-ARD Contingent Interest Amount and Senior Subordinated Notes Accrued Monthly Post-ARD Contingent Interest Amount.

"Principal Amount" means, with respect to each Class, Subclass or Tranche of Notes, the amount specified in the Series Supplement.

"Priority of Payments" means the allocation and payment obligations described in Section 5.5 of the Base Indenture as supplemented by the allocation and payment obligations with respect to the Notes described in the Series Supplement.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds" has the meaning specified in Section 9-102(a)(64) of the applicable UCC.

"Protected Purchaser" has the meaning specified in Section 8-303 of the UCC.

"PTO" means the U.S. Patent and Trademark Office and any successor U.S. federal office.

"Qualified Institution" means a depository institution organized under the laws of the United States of America or any state thereof or incorporated under the laws of a foreign jurisdiction with a branch or agency located in the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities that at all times (i) is authorized under such laws to act as a trustee or in any other fiduciary capacity, (ii) has capital, surplus and undivided profits of not less than $250,000,000 as set forth in its most recent published annual report of condition and (iii) has a long term deposits rating of not less than "BBB+" by S&P or KBRA.

"Qualified Trust Institution" means an institution organized under the laws of the United States of America or any state thereof or incorporated under the laws of a foreign jurisdiction with a branch or agency located in the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities that at all times (i) is authorized under such laws to act as a trustee or in any other fiduciary capacity, (ii) has capital, surplus and undivided profits of not less than $250,000,000 as set forth in its most recent published annual report of condition and (iii) has a long term deposits rating of not less than "Baa1" by Moody's and "BBB+" by S&P or KBRA.

"Record Date" means, with respect to any Monthly Allocation Date, the close of business on the Business Day preceding such Monthly Allocation Date; provided, with respect to any optional prepayment or redemption of the Notes, the Record Date will be the Business Day prior to the date of such payment or redemption.

"Registrar" has the meaning set forth in Section 2.4(a) of the Base Indenture.

"Related Documents" means the Indenture, the Notes, the Guarantee and Collateral Agreement, each Account Control Agreement, the Brand Management Agreement, the Calculation and Reporting Agency Agreement, each note purchase agreement pursuant to which Notes are purchased, the IP License Agreement, the Charter Documents, and any additional document identified as a "Related Document" in the Series Supplement and any other material agreements entered into, or certificates delivered, pursuant to the foregoing documents.

"Reportable Event" means any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived).

"Required Holders" means, with respect to the Noteholders (or, if specified, any subset thereof) and as of any day of determination, Noteholders that hold in excess of 50% of the Outstanding Principal Amount of the Notes or any beneficial interest therein as of such date of determination.

"Requirements of Law" means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, limited liability company agreement, partnership agreement or other organizational or governing documents of such Person or any of its property, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to, or binding upon, such Person or any of its property or to which such Person or any of its property is subject, whether federal, state, local or foreign (including, without limitation, usury laws, the Federal Truth in Lending Act, state franchise laws and retail installment sales acts).

"Residual Amount" means, for any Monthly Allocation Date with respect to any Monthly Collection Period, the amount, if any, by which the amount on deposit in the Collection Account on such Monthly Allocation Date exceeds the sum of the amounts to be paid and/or allocated on such Monthly Allocation Date pursuant to priorities (i) through (xiii) of the Priority of Payments.

"Retained Collections" means, with respect to any specified period of time, the amount equal to (A) Collections received over such period *minus* (B) without duplication, the Excluded Amounts (to the extent such amounts are included in clause (A)) over such period.

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means the Trustee, the Noteholders and the Calculation and Reporting Agent, together with their respective successors and assigns.

"Securities Intermediary" has the meaning set forth in Section 5.3(a) of the Base Indenture.

"Senior Noteholder" means any Holder of Class A Notes.

"Senior Notes Accrued Monthly Post-ARD Contingent Interest Amount" means, for each Monthly Allocation Date with respect to a Monthly Collection Period, and with respect to any Senior Notes Outstanding, the amount identified as "Senior Notes Accrued Monthly Post-ARD Contingent Interest Amount" in the Series Supplement.

"Senior Subordinated Noteholder" means any Holder of Class B Notes.

"Senior Subordinated Notes Accrued Monthly Post-ARD Contingent Interest Amount" means, for each Monthly Allocation Date with respect to a Monthly Collection Period, and with respect to any Senior Notes Outstanding, the amount identified as "Senior Subordinated Notes Accrued Monthly Post-ARD Contingent Interest Amount" in the Series Supplement.

"Series Supplement" means the Series 2025-1 Supplement to the Base Indenture, dated as of the Closing Date, between the Master Issuer and the Trustee.

"Single Employer Plan" means any Pension Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Software" has the meaning set forth in the definition of "Intellectual Property."

"Specified Countries" means Canada and Mexico, and "Specified Country" means each individually.

"Standby Investment" means Dreyfus Government Cash Management Investor Class (0672) CUSIP 262006307 or such other Eligible Investment as may be directed in writing from time to time by the Issuer to the Trustee.

"Subclass" means, with respect to any Class of Notes, any one of the subclasses of Notes of such Class as specified in the Series Supplement.

"Subsequent Mandatory Exchange" has the meaning set forth in Section 2.17 of the Base Indenture.

"Subsidiary" means, with respect to any Person (herein referred to as the "Parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, controlled or held by the Parent or (b) that is, at the time any determination is being made, otherwise controlled by the Parent or one or more Subsidiaries of the Parent or by the Parent and one or more Subsidiaries of the Parent.

"Supermajority Noteholders" means, as of any date of determination, Noteholders (or, if specified, any subset thereof) that hold in excess of 66-2/3% of the Outstanding Principal Amount of the Notes or any beneficial interest therein as of such date of determination.

"Supplement" means a supplement to the Base Indenture complying (to the extent applicable) with the terms of Article XII of the Base Indenture.

"Tax" means (i) any U.S. federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, environmental, customs duties, capital stock, profits, documentary, property, franchise, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, or other tax of any kind whatsoever,

including any interest, penalty, fine, assessment or addition thereto and (ii) any transferee liability in respect of any items described in clause (i) above.

"Tax Information" means information and/or properly completed and signed tax certifications sufficient to eliminate the imposition of or to determine the amount of any withholding of tax.

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property."

"Trademarks" means all United States, state and non-United States trademarks, service marks, trade names, trade dress, designs, logos, slogans and other indicia of source or origin, whether registered or unregistered, registrations and pending applications to register the foregoing, internet domain names, and all goodwill of any business connected with the use of or symbolized thereby.

"Tranche" means, with respect to any Class or Subclass of Notes, any one of the tranches of Notes of such Class or Subclass as specified in the Series Supplement.

"Trust Officer" means any officer within the corporate trust department of the Trustee, including any Vice President, Assistant Vice President or Assistant Treasurer of the Corporate Trust Office, or any trust officer, or any officer customarily performing functions similar to those performed by the person who at the time shall be such officers, in each case having direct responsibility for the administration of this Indenture, and also any officer to whom any corporate trust matter is referred because of his knowledge of and familiarity with a particular subject.

"Trustee" means the party named as such in the Indenture until a successor replaces it in accordance with the applicable provisions of the Indenture and thereafter means the successor serving thereunder.

"Trustee Accounts" has the meaning set forth in Section 5.3(a) of the Base Indenture.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the Trustee in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Uncertificated Note" means any Note issued in uncertificated, fully registered form evidenced by entry in the Note Register.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Wind-Down Entities" means, collectively, HOA Holdco, LLC, HOA Systems, LLC, HOA Restaurant Holder, LLC, HOA Maryland Restaurant Holder, LLC, HOA Kansas Restaurant

Holder, LLC, DW Restaurant Holder, LLC, TW Restaurant Holder, LLC, HOOTS Restaurant Holder, LLC, HOA Laurel, LLC and HOA Waldorf, LLC.

"written" or "in writing" means any form of written communication, including, without limitation, electronic signatures, and any such written communication may be transmitted by Electronic Transmission.

**Exhibit A**

**Monthly Noteholders' Report**

See attached.

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

## Dates / Periods[1]

**Monthly Allocation Date**

**Monthly Collection Period**
    **Beginning Date**
    **Ending Date**

## Collections and Retained Collections

**Collections**

| | |
|---|---|
| IP License Fees and other amounts received under IP License Agreement and the Founders License Agreements[2] | $ |
| Insurance/Condemnation Proceeds, Asset Disposition Proceeds and other disposition proceeds | $ |
| Amounts received from the Wind-Down Entities | $ |
| Investment Income | $ |
| Excluded Amounts | $ |
| Any other amounts received with respect to the Collateral | $ |
| **Total Collections during Monthly Collection Period** | $ |

LESS: Excluded Amounts

| | |
|---|---|
| Collections payable to Governmental Authorities as tax | $ |
| Foreign withholding taxes payable to Governmental Authorities | $ |
| Collateral IP registration, maintenance and enforcement fees and third party licensing fees | $ |
| Any other amounts deposited into any Concentration Account that are not requested to be deposited | $ |
| **Retained Collections during Monthly Collection Period** | $ |

| | |
|---|---|
| Aggregate amount of Retained Collections Contributions made during Monthly Collection Period | $ |
| Aggregate amount of Retained Collection Contributions made during current annual period | $ |
| Aggregate amount of Retained Collection Contributions made since Closing Date | $ |

## Debt Service

**Asset Disposition Proceeds**

| | |
|---|---|
| Aggregate Asset Disposition Proceeds as of prior Monthly Allocation Date | $ |
| Plus: Additional Disposition Proceeds related to the Collateral | $ |
| Aggregate Disposition Proceeds as of current Monthly Allocation Date | $ |

**Series 2025-1 Interest**

| | |
|---|---|
| Series 2025-1 Class A-1 Notes Monthly Interest due | $ |
| Amount of interest to be paid in priority (ii) of the Priority of Payments | $ |
| Amount of interest to be Deferred Interest | $ |
| Series 2025-1 Class A-2I Notes Monthly Interest due | $ |

---

[1] The time periods provided for the monthly cash reporting are not required to match to the "System Data" at the end of this report.
[2] Wire amounts will be provided by the Manager in accordance with Section 4.1(f) of the Brand Management Agreement.

*Confidential*

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

| | |
|---|---|
| Amount of interest to be paid in priority (iv) of the Priority of Payments | $ _____ |
| Amount of interest to be Deferred Interest | $ _____ |
| Series 2025-1 Class A-2II Notes Monthly Interest due | $ _____ |
| Amount of interest to be paid in priority (iv) of the Priority of Payments | $ _____ |
| Amount of interest to be Deferred Interest | $ _____ |
| Series 2025-1 Class B Notes Monthly Interest due | $ _____ |
| Amount of interest to be paid in priority (v) of Priority of Payments | $ _____ |
| Amount of interest to be Deferred Interest | $ _____ |

| | |
|---|---|
| Series 2025-1 Class A-1 Notes Deferred Interest | |
| Aggregate Deferred Interest as of prior Monthly Allocation Date | $ _____ |
| Plus: Amount of interest to be Deferred Interest on current Monthly Allocation Date | $ _____ |
| Aggregate Deferred Interest as of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class A-2I Notes Deferred Interest | |
| Aggregate Deferred Interest as of prior Monthly Allocation Date | $ _____ |
| Plus: Amount of interest to be Deferred Interest on current Monthly Allocation Date | $ _____ |
| Aggregate Deferred Interest as of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class A-2II Notes Deferred Interest | |
| Aggregate Deferred Interest as of prior Monthly Allocation Date | $ _____ |
| Plus: Amount of interest to be Deferred Interest on current Monthly Allocation Date | $ _____ |
| Aggregate Deferred Interest as of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class A-B Notes Deferred Interest | |
| Aggregate Deferred Interest as of prior Monthly Allocation Date | $ _____ |
| Plus: Amount of interest to be Deferred Interest on current Monthly Allocation Date | $ _____ |
| Aggregate Deferred Interest as of current Monthly Allocation Date | $ _____ |

| | |
|---|---|
| Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest | $ _____ |
| Series 2025-1 Class B Monthly Post-ARD Contingent Interest | $ _____ |

### Outstanding Principal Balances

| | |
|---|---|
| Series 2025-1 Class A-1 Notes Outstanding Principal Amount | |
| As of prior Monthly Allocation Date | $ _____ |
| As of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class A-2I Notes Outstanding Principal Amount | |
| As of prior Monthly Allocation Date | $ _____ |
| As of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class A-2II Notes Outstanding Principal Amount | |
| As of prior Monthly Allocation Date | $ _____ |
| As of current Monthly Allocation Date | $ _____ |
| Series 2025-1 Class B Notes Outstanding Principal Amount[3] | |
| As of prior Monthly Allocation Date | $ _____ |
| As of current Monthly Allocation Date | $ _____ |

### Series 2025-1 Payments of Principal

| | |
|---|---|
| Amount of Series 2025-1 Class A-1 Notes principal to be paid on Monthly Allocation Date | $ _____ |
| Amount of Series 2025-1 Class A-2I Notes principal to be paid on Monthly Allocation Date | $ _____ |
| Amount of Series 2025-1 Class A-2II Notes principal to be paid on Monthly Allocation Date | $ _____ |
| Amount of Series 2025-1 Class B Notes principal to be paid on Monthly Allocation Date | $ _____ |

---

[3] The aggregate Outstanding Principal Amount of the NewCo Class B Notes will match this Series 2025-1 Class B Notes Outstanding Principal Amount.

*Confidential*

# Monthly Noteholders' Report

# HOA RoyaltyCo LLC

*Confidential*

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

<div style="background-color:#c9ddb0"></div>

### Priority of Payments

**Available Funds**

| | | |
|---|---|---|
| Retained Collections | $ | _____ |
| **Total Funds Available for Allocations during Monthly Collection Period** | $ | _____ |

**Priority of Payments during Monthly Collection Period**

| | | | |
|---|---|---|---|
| i. | | Permitted Tax Payments and Permitted NewCo Expenses | |
| ii. | | Fees and expenses payable to the Trustee and the Calculation and Reporting Agent for each of the Class A-1 Notes, Class A-2II Notes, Class A-2I Notes and Class B Notes or payable to the Trustee and the Calculation and Reporting Agent under the Indenture, the Calculation and Reporting Agency Agreement or any other Related Documents | $ _____ (Trustee Fees/Expenses) $ _____ (Calculation and Reporting Agent Fees/Expenses) |
| iii. | a. | Fees and expenses payable to external legal counsel relating to the IP or the operations of the Master Issuer or the Guarantors | $ _____ |
| | b. | Amounts reserved for estimated fees, expenses or operating costs of the Master Issuer for the next six (6) months to the Operating Expense Account | $ _____ |
| iv. | a. | First, all accrued, unpaid interest on the Class A-1 Notes (excluding Deferred Interest but including current interest on Deferred Interest) to the Class A-1 Noteholders | $ |
| | b. | Second, all previously Deferred Interest on the Class A-1 Notes to the Class A-1 Noteholders | $ |
| v. | | Unpaid principal on the Class A-1 Notes to the Class A-1 Noteholders | $ |
| vi. | a. | First, all accrued, unpaid interest (excluding Deferred Interest and any Post-ARD Contingent Interest but including current interest on Deferred Interest) on the Class A-2II Notes and the Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively | $ _____ Class A-2II Notes $ _____ Class A-2I Notes |
| | b. | Second, all previously Deferred Interest on the Class A-2II Notes and the Class A-2I Notes, pro rata, to the Class A-2II Noteholders and the Class A-2I Noteholders, respectively | $ _____ Class A-2II Notes $ _____ Class A-2I Notes |
| vii. | | Accrued, unpaid interest (excluding Deferred Interest but including current interest on Deferred Interest) on the Class B Notes to the Class B Noteholders (in an amount up to 2% per annum of the Outstanding Principal Amount of the Class B Notes) | $ _____ |
| viii. | a. | Until the Class A-2II Notes have been repaid in full, split (1) 50% of such proceeds to pay unpaid principal on the Class A-2II Notes to the Class A-2II Noteholders and (2) 50% of such proceeds to pay unpaid principal on the Class A-2I Notes to the Class A-2I Noteholders; and | $ _____ Class A-2II Notes $ _____ Class A-2I Notes |
| | b. | After repayment in full of the Class A-2II Notes, 100% of such proceeds to the repayment of the Class A-2I Notes to the Class A-2I Noteholders (until the Class A-2I Notes have been repaid in full) | $ _____ |
| ix. | a. | First, all remaining accrued, unpaid interest (excluding Deferred Interest and any Post-ARD Contingent Interest but including current interest on Deferred Interest) on the Class B Notes to the Class B Noteholders | $ |
| | b. | Second, all previously Deferred Interest on the Class B Notes to the Class B Noteholders | $ |
| x. | | All unpaid principal on the Class B Notes to the Class B Noteholders (until the Class B Notes have been repaid in full) | $ |
| xi. | | Any accrued, unpaid Post-ARD Contingent Interest on Class A-2I Notes to the Class A-2I Noteholders | $ |

*Confidential*

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

| | | |
|---|---|---|
| xii. | Any accrued, unpaid Post-ARD Contingent Interest on Class B Notes to the Class B Noteholders | $ _____ |
| xiii | Distribute 100% of any Residual Amounts in cash distributions to the Master Issuer for distribution to NewCo | $ |

*Confidential*

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

### System Data[45]

*As of the 4 Week Period Ending _____:*

**Domestic Restaurant Count: Hooters**
    Legacy Franchised Restaurants
    Franchised Confirmed Stores (once Company-owned)
    Franchised Royalty Holiday Stores (once Company-owned)
    New Franchised Restaurants
**Total Domestic Restaurant Count: Hooters**

**Domestic Restaurant Count: Hoots Wings**
    Franchised Restaurants
**Total Restaurant Count: Hoots Wings**

*For the 4 Week Period Ending _____:*

**Net Revenue: Hooters**
    Legacy Franchised Restaurants $
    Franchised Confirmed Stores (once Company-owned) $
    Franchised Royalty Holiday Stores (once Company-owned) $
    New Franchised Restaurants $
**Total Net Revenue: Hooters** $

**Net Revenue: Hoots Wings**
    Franchised Restaurants $
**Total Net Revenue: Hoots Wings** $

**Domestic Systemwide Net Revenue**

| | BMC | RoyaltyCo | Total |
|---|---|---|---|
| **Hooters Royalties Collected** | | | |
|   Legacy Franchised Restaurants | $ | $ | $ |
|   Franchised Confirmed Stores (once Company-owned) | $ | $ | $ |
|   Franchised Royalty Holiday Stores (once Company-owned) | $ | $ | $ |
|   New Franchised Restaurants | $ | $ | $ |
| **Total Hooters Royalties Collected** | $ | $ | $ |
| | | | |
| **Total Hoots Royalties Collected** | $ | $ | $ |
| | | | |
| **Total Domestic Royalties Collected** | | | |
| **International Franchisor Revenue** | | | |
| **License Revenue:** | | | |
|   Legacy Licensees | $ | $ | $ |
|   New Licensees (50/50 split) | $ | $ | $ |
|   New Licensees (75/25 split) | $ | $ | $ |
| **Total Licensing Revenue** | $ | $ | $ |
| **Franchise Fees (new stores)** | $ | $ | $ |
| **Other Fees/Revenues** | $ | $ | $ |
| **Total Franchisor Revenue** | $ | $ | $ |

**Revenue Allocation**

---

[4] To be provided by the Manager in accordance with Section 4.1(f) of the Brand Management Agreement.

[5] The timing of this "System Data" is not required to match to the time periods provided for the monthly cash reporting above.

*Confidential*

# Monthly Noteholders' Report

## HOA RoyaltyCo LLC

| | |
|---|---|
| HOA RoyaltyCo LLC | $ |
| Hooters Brand Management LLC | $ |

**Allocated Expenses**

| | |
|---|---|
| HOA RoyaltyCo LLC | $ |
| Hooters Brand Management LLC | $ |

**Net Royalty Allocation**

| | |
|---|---|
| HOA RoyaltyCo LLC | $ |
| Hooters Brand Management LLC | $ |

*Confidential*

## Monthly Noteholders' Report

## HOA RoyaltyCo LLC

IN WITNESS HEREOF, solely for ministerial and administrative purposes, and subject to the terms of the Calculation and Reporting Agency Agreement, the undersigned hereby executes this Monthly Noteholders' Report,

ALTER DOMUS (US) LLC, as Calculation and Reporting Agent solely on behalf of the Master Issuer

_____

By:

*Confidential*

## Monthly Noteholders' Report

## HOA RoyaltyCo LLC

**[Insert report provided by the Master Issuer pursuant to Section 8.12 of the Base Indenture]**

**<u>Exhibit B</u>**

### <u>Form of Investor Request Certification</u>

Citibank, N.A.
388 Greenwich Street
New York, NY 10013

Email: esotericabs@citi.com or call (888) 855-9695 to obtain Citibank, N.A. account manager's email address

Attention: Citibank Agency & Trust–HOA RoyaltyCo LLC

Pursuant to <u>Section 4.3</u> of the Second Amended and Restated Base Indenture, dated as of October 31, 2025, by and among HOA RoyaltyCo LLC, a Delaware limited liability company, as Master Issuer (the "<u>Master Issuer</u>"), and Citibank, N.A., as Trustee (in such capacity, the "<u>Trustee</u>") and Securities Intermediary (the "<u>Base Indenture</u>"), the undersigned hereby certifies and agrees to the following conditions.  Capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed thereto in Annex A to the Base Indenture.

1.      The undersigned is a [Noteholder][Note Owner][prospective purchaser] of Class [__] Notes.

2.      In the case that the undersigned is a Note Owner, the undersigned is a beneficial owner of Notes.  In the case that the undersigned is a prospective purchaser, the undersigned has been designated by a Noteholder or a Note Owner as a prospective transferee of Notes.

3.      The undersigned is requesting all information and copies of all documents that the Trustee is required to deliver to such Noteholder, Note Owner or prospective purchaser, as the case may be, pursuant to Section 4.3 of the Base Indenture.  In the case that the undersigned is a Noteholder or a Note Owner, pursuant to Section 4.3 of the Base Indenture, the undersigned is also requesting access for the undersigned to the password- protected area of the Trustee's website at www.sf.citidirect.com relating to the Notes.

4.      The undersigned is requesting such information solely for use in evaluating the undersigned's investment, or possible investment in the case of a prospective purchaser, in the Notes.

5.      The undersigned understands [documents it has requested][and][the Trustee's website] contain[s] confidential information.

6.      In consideration of the Trustee's disclosure to the undersigned, the undersigned will keep the information confidential, and such information will not be disclosed by the undersigned or by its officers, directors, partners, employees, agents or representatives in any manner whatsoever, without the prior written consent of the Trustee; <u>provided</u>, however, that the undersigned shall be permitted to disclose such information: (A)(1) to those personnel employed by it who need to know such information which have agreed to keep such information strictly confidential and to use such information only for evaluating the undersigned's investment or

potential investment in the Notes, (2) to its attorneys and outside auditors which have agreed to keep such information strictly confidential and to use such information only for evaluating the undersigned's investment or possible investment in the Notes, or (3) to a regulatory or self-regulatory authority pursuant to applicable law or regulation or (B) by judicial process; provided, that it may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions and any related tax strategies to the extent necessary to prevent the transaction from being described as a "confidential transaction" under U.S. Treasury Regulations Section 1.6011-4(b)(3).

7.    The undersigned will not use or disclose the information in any manner which could result in a violation of any provision of the Securities Act or the Exchange Act or would require registration of any non-registered security pursuant to the Securities Act.

IN WITNESS WHEREOF, the undersigned has caused its name to be signed hereto by its duly authorized officer.

[Name of [Noteholder][Note Owner][prospective purchaser]]

By: _____    Date: _____

      Name:

      Title:

# EXHIBIT A.2

**Series 2025-1 Supplement**

**EXECUTION VERSION**

---

**HOA ROYALTYCO LLC,**
**as Master Issuer,**

**and**

**CITIBANK, N.A.,**

**as Trustee**

**SERIES 2025-1 SUPPLEMENT**

**Dated as of October 31, 2025**

**to**

**SECOND AMENDED AND RESTATED BASE INDENTURE**

**Dated as of October 31, 2025**

---

$77,500,000 Series 2025-1 Floating Rate Senior Secured Notes, Class A-1
$268,012,953 Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I
$18,000,000 Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II
$40,338,568 Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B

---

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

DESIGNATION ............................................................................................................... 1

ARTICLE I DEFINITIONS ............................................................................................. 1

ARTICLE II SERIES 2025-1 ALLOCATIONS; PAYMENTS......................................... 2

Section 2.1    Monthly Allocation Date Applications.........................................2
Section 2.2    Series 2025-1 Interest ...................................................................2
Section 2.3    Payment of Series 2025-1 Note Principal......................................6
Section 2.4    Calculation and Reporting Agent.................................................10

ARTICLE III FORM OF SERIES 2025-1 NOTES ........................................................ 10

Section 3.1    Issuance of Series 2025-1 Class A-1 Notes ...............................10
Section 3.2    Issuance of Series 2025-1 Class A-2I Notes................................11
Section 3.3    Issuance of Series 2025-1 Class A-2II Notes ............................12
Section 3.4    Issuance of Series 2025-1 Class B Notes.....................................13
Section 3.5    Transfer Restrictions of Series 2025-1 Notes .............................14
Section 3.6    Note Owner Representations and Warranties ............................21
Section 3.7    Limitation on Liability................................................................23

ARTICLE IV GENERAL................................................................................................. 23

Section 4.1    Information ..................................................................................23
Section 4.2    Exhibits ......................................................................................23
Section 4.3    Ratification of Base Indenture ...................................................23
Section 4.4    Prior Notice by Trustee to the Noteholders ..............................23
Section 4.5    Counterparts................................................................................23
Section 4.6    Governing Law ...........................................................................23
Section 4.7    Amendments...............................................................................24
Section 4.8    Termination of Series Supplement..............................................24
Section 4.9    Electronic Signatures and Transmission.....................................24
Section 4.10   Entire Agreement .......................................................................24
Section 4.11   1934 Act......................................................................................25

**ANNEXES**

Annex A                    Series 2025-1 Supplemental Definitions List

**EXHIBITS**

Exhibit A-1:              Form of Series 2025-1 Class A-1 Rule 144A Global Note
Exhibit A-2:              Form of Series 2025-1 Class A-2I Rule 144A Global Note
Exhibit A-3:              Form of Series 2025-1 Class A-2II Rule 144A Global Note
Exhibit A-4:              Form of Series 2025-1 Class B Rule 144A Global Note
Exhibit A-5:              Form of Series 2025-1 Class A-1 Temporary Regulation S Global Note
Exhibit A-6:              Form of Series 2025-1 Class A-2I Temporary Regulation S Global Note
Exhibit A-7:              Form of Series 2025-1 Class A-2II Temporary Regulation S Global Note
Exhibit A-8:              Form of Series 2025-1 Class B Temporary Regulation S Global Note
Exhibit A-9:              Form of Series 2025-1 Class A-1 Permanent Regulation S Global Note
Exhibit A-10:            Form of Series 2025-1 Class A-2I Permanent Regulation S Global Note
Exhibit A-11:            Form of Series 2025-1 Class A-2II Permanent Regulation S Global Note
Exhibit A-12:            Form of Series 2025-1 Class B Permanent Regulation S Global Note
Exhibit A-13:            Form of Series 2025-1 Class B Definitive Note
Exhibit B-1:              Form of Transferee Certificate for Transfers of Interests in Rule 144A
                         Global Notes to Interests in Temporary Regulation S Global Notes
Exhibit B-2:              Form of Transferee Certificate for Transfers of Interests in Rule 144A
                         Global Notes to Interests in Permanent Regulation S Global Notes
Exhibit B-3:              Form of Transferee Certificate for Transfers of Interests in Temporary
                         Regulation S Global Notes or Permanent Regulation S Global Notes to
                         Persons Taking Delivery in the Form of an Interest in a Rule 144A Global
                         Note
Exhibit B-4:              Form of ERISA Certificate

SERIES 2025-1 SUPPLEMENT, dated as of October 31, 2025 (this "Series Supplement"), by and between HOA ROYALTYCO LLC, a Delaware limited liability company (the "Master Issuer") and CITIBANK, N.A., a national banking association, as trustee (in such capacity, the "Trustee"), to the Second Amended and Restated Base Indenture, dated as of October 31, 2025, by and between the Master Issuer and CITIBANK, N.A., as Trustee and as Securities Intermediary (as amended, modified or supplemented from time to time, exclusive of Series Supplements, the "Base Indenture").

PRELIMINARY STATEMENT

WHEREAS, in connection with the Base Indenture, the Master Issuer and the Trustee wish to enter into this Series Supplement for the purpose of authorizing the issuance of a Series of Notes (as defined in Annex A of the Base Indenture) upon satisfaction of the conditions set forth therein; and

WHEREAS, all such conditions have been met for the issuance of the Series of Notes authorized hereunder.

NOW, THEREFORE, the parties hereto agree as follows:

DESIGNATION

There is hereby created a Series of Notes to be issued pursuant to the Base Indenture and this Series Supplement, and such Series of Notes shall be designated as Series 2025-1 Notes.  On the Closing Date, four Classes of Notes of such Series shall be issued:  (a) Series 2025-1 Floating Rate Senior Secured Notes, Class A-1 (as referred to herein, the "Series 2025-1 Class A-1 Notes"), (b) Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I (as referred to herein, the "Series 2025-1 Class A-2I Notes"), (c) Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II (as referred to herein, the "Series 2025-1 Class A-2II Notes", together with the Series 2025-1 Class A-2I Notes, the "Series 2025-1 Class A-2 Notes") and (d) Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (as referred to herein, the "Series 2025-1 Class B Notes", and together with the Series 2025-1 Class A-1 Notes and the Series 2025-1 Class A-2 Notes, the "Series 2025-1 Notes").  For purposes of the Base Indenture, the Series 2025-1 Class A-1 Notes and the Series 2025-1 Class A-2 Notes shall be deemed to be "Senior Notes" and the Series 2025-1 Class B Notes shall be deemed to be "Senior Subordinated Notes."

**ARTICLE I**

**DEFINITIONS**

All capitalized terms used herein (including in the preamble and the recitals hereto) and not otherwise defined herein shall have the meanings assigned to such terms in the Series 2025-1 Supplemental Definitions List attached hereto as Annex A (the "Series 2025-1 Supplemental Definitions List") as such Series 2025-1 Supplemental Definitions List may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.  All capitalized terms not otherwise defined herein or therein shall have the meanings assigned thereto in the Base Indenture Definitions List attached to the Base Indenture as Annex A thereto, as such Base Indenture Definitions List may be amended, supplemented or otherwise modified from time

to time in accordance with the terms of the Base Indenture.  Unless otherwise specified herein, all Article, Exhibit, Section or Subsection references herein shall refer to Articles, Exhibits, Sections or Subsections of the Base Indenture or this Series Supplement (as indicated herein).  The rules of construction set forth in Section 1.4 of the Base Indenture shall apply for all purposes under this Series Supplement.

## ARTICLE II
## SERIES 2025-1 ALLOCATIONS; PAYMENTS

With respect to the Series 2025-1 Notes, the following shall apply:

Section 2.1   <u>Monthly Allocation Date Applications</u>.  On each Monthly Allocation Date, the Master Issuer shall instruct the Trustee in writing in accordance with the applicable Monthly Noteholders' Report to pay from the Collection Account all amounts relating to the Series 2025-1 Notes pursuant to, and to the extent that funds are available therefor in accordance with the provisions of, the Priority of Payments.

Section 2.2   <u>Series 2025-1 Interest</u>.

(a)   <u>Series 2025-1 Class A-1 Notes Interest</u>.  From the Closing Date, until the Series 2025-1 Class A-1 Outstanding Principal Amount has been paid in full, the Series 2025-1 Class A-1 Outstanding Principal Amount (after giving effect to all payments of principal made to Series 2025-1 Class A-1 Noteholders as of the first day of each Interest Accrual Period, and also giving effect to prepayments, repurchases and cancellations of Series 2025-1 Class A-1 Notes during such Interest Accrual Period) shall accrue interest at the Series 2025-1 Class A-1 Note Rate. Such accrued Series 2025-1 Class A-1 Interest Amount shall be due and payable in arrears on each Monthly Allocation Date, from amounts that are available for payment thereof on such Monthly Allocation Date in accordance with the Priority of Payments, commencing on the Monthly Allocation Date in December 2025; <u>provided</u> that to the extent that, on any date (other than the Series 2025-1 Legal Final Maturity Date) when there are Series 2025-1 Class A-1 Notes Outstanding, there are insufficient amounts available pursuant to the Priority of Payments to pay all accrued interest on the Series 2025-1 Class A-1 Notes in full in cash, such interest payment may be deferred (and for the avoidance of doubt, (x) any such interest that is deferred shall be "Deferred Interest" for purposes of the Base Indenture and (y) failure to pay such interest in cash shall not be an Event of Default) until the earliest of (i) the Monthly Allocation Date on which funds are available to pay such Deferred Interest in accordance with the Priority of Payments and (ii) the Series 2025-1 Legal Final Maturity Date; <u>provided</u>, further, that in any event all accrued but unpaid interest on the Series 2025-1 Class A-1 Notes shall be due and payable in full on the Series 2025-1 Legal Final Maturity Date, on any Series 2025-1 Prepayment Date with respect to a prepayment in full of the Series 2025-1 Class A-1 Outstanding Principal Amount or on any other day on which all of the Series 2025-1 Class A-1 Outstanding Principal Amount is required to be paid in full.  To the extent any interest accruing at the Series 2025-1 Class A-1 Note Rate is not paid when due, such unpaid interest shall accrue interest at the Series 2025-1 Class A-1 Note Rate.  All computations of interest at the Series 2025-1 Class A-1 Note Rate shall be made on the basis of a year of 360 days and twelve 30-day months.

(b)      Series 2025-1 Class A-2I Notes Interest.  From the Closing Date until the Series 2025-1 Class A-2I Outstanding Principal Amount has been paid in full, the Series 2025-1 Class A-2I Outstanding Principal Amount (after giving effect to all payments of principal made to Series 2025-1 Class A-2I Noteholders as of the first day of each Interest Accrual Period, and also giving effect to prepayments, repurchases and cancellations of Series 2025-1 Class A-2I Notes during such Interest Accrual Period) shall accrue interest at the Series 2025-1 Class A-2I Note Rate.  Such accrued interest shall be due and payable in arrears on each Monthly Allocation Date, from amounts that are available for payment thereof on such Monthly Allocation Date in accordance with the Priority of Payments, commencing on the Monthly Allocation Date in December 2025; provided that to the extent that, on any date (other than the Series 2025-1 Legal Final Maturity Date) when there are Series 2025-1 Class A-1 Notes Outstanding, there are insufficient amounts available pursuant to the Priority of Payments to pay all accrued interest on the Series 2025-1 Class A-2I Notes in full in cash, such interest payment may be deferred (and for the avoidance of doubt, (x) any such interest that is deferred shall be "Deferred Interest" for purposes of the Base Indenture and (y) failure to pay such interest in cash shall not be an Event of Default) until the earliest of (i) the Monthly Allocation Date on which funds are available to pay such Deferred Interest in accordance with the Priority of Payments and (ii) the Series 2025-1 Legal Final Maturity Date; provided, further, that all accrued but unpaid interest on the Series 2025-1 Class A-2I Notes shall be due and payable in full on the Series 2025-1 Legal Final Maturity Date, on any Series 2025-1 Prepayment Date with respect to a prepayment in full of the Series 2025-1 Class A-2I Outstanding Principal Amount or on any other day on which all of the Series 2025-1 Class A-2I Outstanding Principal Amount is required to be paid in full.  To the extent any interest accruing at the Series 2025-1 Class A-2I Note Rate is not paid when due, such unpaid interest shall accrue interest at the Series 2025-1 Class A-2I Note Rate.  All computations of interest at the Series 2025-1 Class A-2I Note Rate shall be made on the basis of a year of 360 days and twelve 30-day months.

(c)      Series 2025-1 Class A-2II Notes Interest.  From the Closing Date until the Series 2025-1 Class A-2II Outstanding Principal Amount has been paid in full, the Series 2025-1 Class A-2II Outstanding Principal Amount (after giving effect to all payments of principal made to Series 2025-1 Class A-2II Noteholders as of the first day of each Interest Accrual Period, and also giving effect to prepayments, repurchases and cancellations of Series 2025-1 Class A-2II Notes during such Interest Accrual Period) shall accrue interest at the Series 2025-1 Class A-2II Note Rate.  Such accrued Series 2025-1 Class A-2II Interest Amount shall be due and payable in arrears on each Monthly Allocation Date, from amounts that are available for payment thereof on such Monthly Allocation Date in accordance with the Priority of Payments, commencing on the Monthly Allocation Date in December 2025; provided that to the extent that, on any date (other than the Series 2025-1 Legal Final Maturity Date) when there are Series 2025-1 Class A-1 Notes Outstanding, there are insufficient amounts available pursuant to the Priority of Payments to pay all accrued interest on the Series 2025-1 Class A-2II Notes in full in cash, such interest payment may be deferred (and for the avoidance of doubt, (x) any such interest that is deferred shall be "Deferred Interest" for purposes of the Base Indenture and (y) failure to pay such interest in cash shall not be an Event of Default) until the earliest of (i) the Monthly Allocation Date on which funds are available to pay such Deferred Interest in accordance with the Priority of Payments and (ii) the Series 2025-1 Legal Final Maturity

Date; provided, further, that all accrued but unpaid interest on the Series 2025-1 Class A-2II Notes shall be due and payable in full on the Series 2025-1 Legal Final Maturity Date, on any Series 2025-1 Prepayment Date with respect to a prepayment in full of the Series 2025-1 Class A-2II Outstanding Principal Amount or on any other day on which all of the Series 2025-1 Class A-2II Outstanding Principal Amount is required to be paid in full.  To the extent any interest accruing at the Series 2025-1 Class A-2II Note Rate is not paid when due, such unpaid interest shall accrue interest at the Series 2025-1 Class A-2II Note Rate. All computations of interest at the Series 2025-1 Class A-2II Note Rate shall be made on the basis of a year of 360 days and twelve 30-day months.

(d)     Series 2025-1 Class B Notes Interest.  From the Closing Date until the Series 2025-1 Class B Outstanding Principal Amount has been paid in full, the Series 2025-1 Class B Outstanding Principal Amount (after giving effect to all payments of principal made to Series 2025-1 Class B Noteholders as of the first day of each Interest Accrual Period, and also giving effect to prepayments, repurchases and cancellations of Series 2025-1 Class B Notes during such Interest Accrual Period) shall accrue interest at the Series 2025-1 Class B Note Rate.  Such accrued interest shall be due and payable in arrears on each Monthly Allocation Date, from amounts that are available for payment thereof on such Monthly Allocation Date in accordance with the Priority of Payments, commencing on the Monthly Allocation Date in December 2025; provided that to the extent that, on any date (other than the Series 2025-1 Legal Final Maturity Date) when there are Series 2025-1 Class A-1 Notes Outstanding, there are insufficient amounts available pursuant to the Priority of Payments to pay all accrued interest on the Series 2025-1 Class B Notes in full in cash, such interest payment may be deferred (and for the avoidance of doubt, (x) any such interest that is deferred shall be "Deferred Interest" for purposes of the Base Indenture and (y) failure to pay such interest in cash shall not be an Event of Default) until the earliest of (i) the Monthly Allocation Date on which funds are available to pay such Deferred Interest in accordance with the Priority of Payments and (ii) the Series 2025-1 Legal Final Maturity Date; provided, further, that all accrued but unpaid interest on the Series 2025-1 Class B Notes shall be due and payable in full on the Series 2025-1 Legal Final Maturity Date, on any Series 2025-1 Prepayment Date with respect to a prepayment in full of the Series 2025-1 Class B Outstanding Principal Amount or on any other day on which all of the Series 2025-1 Class B Outstanding Principal Amount is required to be paid in full.  To the extent any interest accruing at the Series 2025-1 Class B Note Rate is not paid when due, such unpaid interest shall accrue interest at the Series 2025-1 Class B Note Rate.  All computations of interest at the Series 2025-1 Class B Note Rate shall be made on the basis of a year of 360 days and twelve 30-day months.

(e)     Series 2025-1 Monthly Post-ARD Contingent Interest.

(i)     Post-ARD Contingent Interest (Class A-2I Notes).  From and after the Series 2025-1 Anticipated Repayment Date, until the Series 2025-1 Class A-2I Outstanding Principal Amount has been paid in full, additional interest shall accrue on the Series 2025-1 Class A-2I Notes ("Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest") at a rate equal to 5.00% per annum (such rate, the "Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest Rate").  The Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest shall accrue and

4

be payable in addition to the interest accrued on the Series 2025-1 Class A-2I Notes at the Series 2025-1 Class A-2I Note Rate.

(ii)     <u>Post-ARD Contingent Interest (Class B Notes)</u>.  From and after the Series 2025-1 Anticipated Repayment Date, until the Series 2025-1 Class B Outstanding Principal Amount has been paid in full, additional interest shall accrue on the Series 2025-1 Class B Notes ("<u>Series 2025-1 Class B Monthly Post-ARD Contingent Interest</u>" and, together with the Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest, the "<u>Series 2025-1 Monthly Post-ARD Contingent Interest</u>") at a rate equal to 5.00% per annum (such rate, the "<u>Series 2025-1 Class B Monthly Post-ARD Contingent Interest Rate</u>" and, together with the Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest Rate, the "<u>Series 2025-1 Monthly Post-ARD Contingent Interest Rate</u>").  The Series 2025-1 Class B Monthly Post-ARD Contingent Interest shall accrue and be payable in addition to the interest accrued on the Series 2025-1 Class B Notes at the Series 2025-1 Class B Note Rate.

(iii)     <u>Computations</u>.  All computations of Series 2025-1 Monthly Post-ARD Contingent Interest shall be made on the basis of a 360-day year of twelve 30-day months; provided that no Series 2025-1 Monthly Post-ARD Contingent Interest shall accrue on any Tranche of Notes that has been paid in full.

(iv)     <u>Payment of Series 2025-1 Monthly Post-ARD Contingent Interest</u>. Any Series 2025-1 Monthly Post-ARD Contingent Interest shall be due and payable on any Monthly Allocation Date only as and when amounts are made available for payment thereof in accordance with the Priority of Payments.  Series 2025-1 Class A-2I Monthly Post-ARD Contingent Interest shall be included in the Senior Notes Accrued Monthly Post-ARD Contingent Interest Amount for purposes of the Priority of Payments.  Series 2025-1 Class B Monthly Post-ARD Contingent Interest shall be included in the Senior Subordinated Notes Accrued Monthly Post-ARD Contingent Interest Amount for purposes of the Priority of Payments.  For the avoidance of doubt, Series 2025-1 Monthly Post-ARD Contingent Interest shall accrue and be payable in addition to the interest accrued on the applicable Tranche of Notes at the applicable Series 2025-1 Note Rate.  The failure to pay any Series 2025-1 Monthly Post-ARD Contingent Interest on any Monthly Allocation Date (including on the Series 2025-1 Legal Final Maturity Date) in excess of available amounts in accordance with the foregoing shall not be an Event of Default and interest shall not accrue on any unpaid portion thereof.

(f)     <u>Series 2025-1 Initial Interest Accrual Period</u>.  The initial Interest Accrual Period for the Series 2025-1 Notes shall commence on the Closing Date and end on (but exclude) (x) with respect to the Series 2025-1 Class A-1 Notes and the Series 2025-1 Class A-2II Notes, December 1, 2025 and (y) with respect to the Series 2025-1 Class A-2I Notes and the Series 2025-1 Class B Notes, December 20, 2025.

Section 2.3      Payment of Series 2025-1 Note Principal.

(a)      Series 2025-1 Notes Principal Payment at Legal Maturity.  The Series 2025-1 Outstanding Principal Amount shall be due and payable on the Series 2025-1 Legal Final Maturity Date.  The Series 2025-1 Outstanding Principal Amount is not prepayable, in whole or in part, except as set forth in this Section 2.3 of this Series Supplement.

(b)      Series 2025-1 Anticipated Repayment Date.  The "Series 2025-1 Anticipated Repayment Date" means the Monthly Allocation Date occurring in November 2035.

(c)      Mandatory Payments of Principal.

(i)      The Master Issuer shall make payments with respect to the Series 2025-1 Class A-1 Notes in accordance with, and to the extent of amounts available pursuant to, the Priority of Payments.  Failure to pay any principal amounts with respect to the Series 2025-1 Class A-1 Notes in excess of available amounts in accordance with the foregoing shall not be an Event of Default.

(ii)      The Master Issuer shall make payments with respect to the Series 2025-1 Class A-2I Notes in accordance with, and to the extent of amounts available pursuant to, the Priority of Payments.  Failure to pay any principal amounts with respect to the Series 2025-1 Class A-2I Notes in excess of available amounts in accordance with the foregoing shall not be an Event of Default.

(iii)      The Master Issuer shall make payments with respect to the Series 2025-1 Class A-2II Notes in accordance with, and to the extent of amounts available pursuant to, the Priority of Payments.  Failure to pay any principal amounts with respect to the Series 2025-1 Class A-2II Notes in excess of available amounts in accordance with the foregoing shall not be an Event of Default.

(iv)      The Master Issuer shall make payments with respect to the Series 2025-1 Class B Notes in accordance with, and to the extent of amounts available pursuant to, the Priority of Payments.  Failure to pay any principal amounts with respect to the Series 2025-1 Class B Notes in excess of available amounts in accordance with the foregoing shall not be an Event of Default.

(d)      Optional Prepayment of Series 2025-1 Notes.  Subject to **Error! Reference source not found.** of this Series Supplement, the Master Issuer shall have the option to prepay the Outstanding Principal Amount of each Tranche of Series 2025-1 Notes in whole or in part on any Business Day and that is specified as the Series 2025-1 Prepayment Date in the applicable Prepayment Notices; provided that all optional prepayments must be applied first, to the Series 2025-1 Class A-1 Notes until the Series 2025-1 Class A-1 Notes have been paid in full, second, to the Series 2025-1 Class A-2 Notes (with the amount of such prepayment being allocated 50% to the Series 2025-1 Class A-2I Notes and 50% to the Series 2025-1 Class A-2II Notes until such time as the Series 2025-1 Class A-2II Notes have been paid in full) until the Series 2025-1 Class A-2 Notes have been paid in full and third, to the Series 2025-1 Class B Notes; provided further, that the Master Issuer shall not

make any optional prepayment in part pursuant to this <u>Section 2.3(d)</u> in a principal amount for any single prepayment of less than $1,000,000 on any Business Day (except that any such prepayment may be in a principal amount less than such amount if effected on the same day as any partial mandatory prepayment or repayment pursuant to this Series Supplement).  Subject to the foregoing, the Master Issuer may prepay any Series 2025-1 Class A-1 Notes, any Series 2025-1 Class A-2 Notes or any Series 2025-1 Class B Notes in full at any time regardless of the number of prior optional prepayments or any minimum payment requirement.

(e)     <u>Notices of Optional Prepayments</u>.  The Master Issuer shall give prior written notice (each, a "<u>Prepayment Notice</u>") at least ten (10) Business Days but not more than twenty (20) Business Days prior to any Series 2025-1 Prepayment Date pursuant to <u>Section 2.3(d)</u> of this Series Supplement to each affected Series 2025-1 Noteholder and the Trustee; <u>provided</u> that at the written request of the Master Issuer, such written notice to the affected Series 2025-1 Noteholders shall be given by the Trustee in the name and at the expense of the Master Issuer.  In connection with any such Prepayment Notice, the Master Issuer shall provide a written report to the Trustee directing the Trustee to distribute such prepayment in accordance with the applicable provisions of <u>Section 2.3(g)</u> of this Series Supplement. With respect to each such Series 2025-1 Prepayment, the related Prepayment Notice shall specify (A) the Series 2025-1 Prepayment Date on which such prepayment shall be made, which in all cases shall be a Business Day and (B) the Series 2025-1 Prepayment Amount. The Master Issuer shall have the option, by written notice to the Trustee and the Series 2025-1 Noteholders of the applicable Tranche, to withdraw, or amend the Series 2025-1 Prepayment Date set forth in any Prepayment Notice relating to an optional prepayment at any time up to the second (2nd) Business Day before the Series 2025-1 Prepayment Date set forth in such Prepayment Notice.  Any such optional prepayment and Prepayment Notice may, in the Master Issuer's discretion, be subject to the satisfaction of one or more conditions precedent set forth in the related Prepayment Notice, including, without limitation, the contemporaneous closing of a financing the proceeds of which shall be used to fund all or a portion of such Series 2025-1 Prepayment.  The Master Issuer shall have the option to provide in any Prepayment Notice that the payment of the amounts set forth in <u>Section 2.3(d)</u> of this Series Supplement and the performance of the Master Issuer's obligations with respect to such optional prepayment may be performed by another Person. All Prepayment Notices shall be (i)  transmitted through the Applicable Procedures of DTC to each such affected Series 2025-1 Noteholder and (ii) in accordance with Section 13.1 of the Base Indenture to the Trustee.  A Prepayment Notice may be revoked or amended by the Master Issuer if the Trustee receives written notice of such revocation or amendment no later than 12:00 p.m. (Eastern time) two (2) Business Days prior to the applicable Series 2025-1 Prepayment Date.  The Master Issuer shall give written notice of such revocation or amendment to the Trustee, and at the written request of the Master Issuer, the Trustee shall forward the notice of revocation or amendment to each affected Series 2025-1 Noteholder.

(f)     <u>Series 2025-1 Prepayments</u>.  On each Series 2025-1 Prepayment Date with respect to any Series 2025-1 Prepayment, the Series 2025-1 Prepayment Amount shall be due and payable.  The Master Issuer shall pay the Series 2025-1 Prepayment Amount by depositing such amounts in the Collection Account on or prior to the related Series 2025-

1 Prepayment Date, to be distributed by the Trustee in accordance with <u>Section 2.3(g)</u> of this Series Supplement.

    (g)    <u>Distributions of Series 2025-1 Optional Prepayment</u>.

    (i)    On the Series 2025-1 Prepayment Date for a Series 2025-1 Class A-1 Prepayment to be made pursuant to <u>Section 2.3(d)</u> of this Series Supplement in respect of the Series 2025-1 Class A-1 Notes, the Trustee shall, in accordance with Section 6.1 of the Base Indenture (except that notwithstanding anything to the contrary therein, in the case of a prepayment to be made on a date that is not a Monthly Allocation Date, references to the distributions being made on a Monthly Allocation Date shall be deemed to be references to distributions made on such Series 2025-1 Prepayment Date and references to the Record Date shall be deemed to be references to the Prepayment Record Date) and based solely on either a written report which shall be provided by or on behalf of the Master Issuer to the Trustee or the applicable Monthly Noteholders' Report, as applicable, distribute to the Series 2025-1 Class A-1 Noteholders of record on the preceding Prepayment Record Date the amount deposited in the Collection Account pursuant to <u>Section 2.3(f)</u> of this Series Supplement with respect to such Series 2025-1 Class A-1 Prepayment, in order to repay the applicable portion of the Series 2025-1 Class A-1 Outstanding Principal Amount.  All accrued and unpaid interest on the Series 2025-1 Class A-1 Outstanding Principal Amount prepaid shall be payable on the immediately following Monthly Allocation Date in accordance with the Priority of Payments.

    (ii)    On the Series 2025-1 Prepayment Date for a Series 2025-1 Class A-2I Prepayment to be made pursuant to <u>Section 2.3(d)</u> of this Series Supplement in respect of the Series 2025-1 Class A-2I Notes, the Trustee shall, in accordance with Section 6.1 of the Base Indenture (except that notwithstanding anything to the contrary therein, in the case of a prepayment to be made on a date that is not a Monthly Allocation Date, references to the distributions being made on a Monthly Allocation Date shall be deemed to be references to distributions made on such Series 2025-1 Prepayment Date and references to the Record Date shall be deemed to be references to the Prepayment Record Date) and based solely on either a written report which shall be provided by or on behalf of the Master Issuer to the Trustee or the applicable Monthly Noteholders' Report, as applicable, distribute to the Series 2025-1 Class A-2I Noteholders of record on the preceding Prepayment Record Date the amount deposited in the Collection Account pursuant to <u>Section 2.3(f)</u> of this Series Supplement with respect to such Series 2025-1 Class A-2I Prepayment, in order to repay the applicable portion of the Series 2025-1 Class A-2I Outstanding Principal Amount.  All accrued and unpaid interest on the Series 2025-1 Class A-2I Outstanding Principal Amount prepaid shall be payable on the immediately following Monthly Allocation Date in accordance with the Priority of Payments.

    (iii)    On the Series 2025-1 Prepayment Date for a Series 2025-1 Class A-2II Prepayment to be made pursuant to <u>Section 2.3(d)</u> of this Series Supplement in

respect of the Series 2025-1 Class A-2II Notes, the Trustee shall, in accordance with Section 6.1 of the Base Indenture (except that notwithstanding anything to the contrary therein, in the case of a prepayment to be made on a date that is not a Monthly Allocation Date, references to the distributions being made on a Monthly Allocation Date shall be deemed to be references to distributions made on such Series 2025-1 Prepayment Date and references to the Record Date shall be deemed to be references to the Prepayment Record Date) and based solely on either a written report which shall be provided by or on behalf of the Master Issuer to the Trustee or the applicable Monthly Noteholders' Report, as applicable, distribute to the Series 2025-1 Class A-2II Noteholders of record on the preceding Prepayment Record Date the amount deposited in the Collection Account pursuant to <u>Section 2.3(f)</u> of this Series Supplement with respect to such Series 2025-1 Class A-2II Prepayment, in order to repay the applicable portion of the Series 2025-1 Class A-2II Outstanding Principal Amount.  All accrued and unpaid interest on the Series 2025-1 Class A-2II Outstanding Principal Amount prepaid shall be payable on the immediately following Monthly Allocation Date in accordance with the Priority of Payments.

(iv)     On the Series 2025-1 Prepayment Date for a Series 2025-1 Class B Prepayment to be made pursuant to <u>Section 2.3(d)</u> of this Series Supplement in respect of the Series 2025-1 Class B Notes, the Trustee shall, in accordance with Section 6.1 of the Base Indenture (except that notwithstanding anything to the contrary therein, in the case of a prepayment to be made on a date that is not a Monthly Allocation Date, references to the distributions being made on a Monthly Allocation Date shall be deemed to be references to distributions made on such Series 2025-1 Prepayment Date and references to the Record Date shall be deemed to be references to the Prepayment Record Date) and based solely on either a written report which shall be provided by or on behalf of the Master Issuer to the Trustee or the applicable Monthly Noteholders' Report, as applicable, distribute to the Series 2025-1 Class B Noteholders of record on the preceding Prepayment Record Date the amount deposited in the Collection Account pursuant to <u>Section 2.3(f)</u> of this Series Supplement with respect to such Series 2025-1 Class B Prepayment, in order to repay the applicable portion of the Series 2025-1 Class B Outstanding Principal Amount.  All accrued and unpaid interest on the Series 2025-1 Class B Outstanding Principal Amount prepaid shall be payable on the immediately following Monthly Allocation Date in accordance with the Priority of Payments.

(h)     <u>Series 2025-1 Notices of Final Payment</u>.  The Master Issuer shall notify the Trustee on or before the Prepayment Record Date preceding the Series 2025-1 Prepayment Date that shall be the Series 2025-1 Final Payment Date; <u>provided</u>, <u>however</u>, that with respect to any Series 2025-1 Final Payment that is made in connection with any mandatory or optional prepayment in full, the Master Issuer shall not be obligated to provide any additional notice to the Trustee of such Series 2025-1 Final Payment beyond the notice required to be given in connection with such prepayment pursuant to <u>Section 2.3(e)</u> of this Series Supplement.  The Trustee shall provide any written notice required under this <u>Section 2.3(h)</u> to each Person in whose name a Series 2025-1 Note is registered at the close

of business on such Prepayment Record Date of the Series 2025-1 Prepayment Date that shall be the Series 2025-1 Final Payment Date. Such written notice to be sent to the Series 2025-1 Noteholders shall be made at the expense of the Master Issuer and shall be mailed by the Trustee within five (5) Business Days of receipt of notice from the Master Issuer indicating that the Series 2025-1 Final Payment shall be made and shall specify that such Series 2025-1 Final Payment shall be payable only upon presentation and surrender of the Series 2025-1 Notes and shall specify the place where the Series 2025-1 Notes may be presented and surrendered for such Series 2025-1 Final Payment.

Section 2.4     Calculation and Reporting Agent.  Pursuant to, and subject to the terms of, the Calculation and Reporting Agency Agreement, the Calculation and Reporting Agent has agreed to provide certain reports, notices, instructions and other services on behalf of the Master Issuer.  The Series 2025-1 Noteholders by their acceptance of the Series 2025-1 Notes consent to the provision of such reports and notices to the Trustee by the Calculation and Reporting Agent on behalf of the Master Issuer pursuant to and subject to the terms of the Calculation and Reporting Agency Agreement.  Any such reports and notices that are required to be delivered to the Series 2025-1 Noteholders hereunder shall be made available on the Trustee's website in the manner set forth in Section 4.3 of the Base Indenture.

## ARTICLE III

## FORM OF SERIES 2025-1 NOTES

Section 3.1     Issuance of Series 2025-1 Class A-1 Notes.  The Series 2025-1 Class A-1 Notes are being originally issued pursuant to the exemption from registration under the 1933 Act, provided by Section 4(a)(2) thereunder.  The Series 2025-1 Class A-1 Notes may thereafter be transferred in reliance on Rule 144A and/or Regulation S and in accordance with the procedure described herein.  The Series 2025-1 Class A-1 Notes shall be Book-Entry Notes and DTC shall be the Depository for the Series 2025-1 Class A-1 Notes.  The Applicable Procedures shall apply to transfers of beneficial interests in the Series 2025-1 Class A-1 Notes.  The Series 2025-1 Class A-1 Notes shall be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

(a)     Series 2025-1 Class A-1 Rule 144A Global Notes.  The Series 2025-1 Class A-1 Notes issued on the Closing Date to Persons that are Qualified Institutional Buyers shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in Exhibit A-1 hereto, registered in the name of Cede & Co. ("Cede"), as nominee of DTC, and deposited with the Trustee, as custodian for DTC (collectively, the "Series 2025-1 Class A-1 Rule 144A Global Notes").  The aggregate principal amount of the Series 2025-1 Class A-1 Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal amount of the Series 2025-1 Class A-1 Temporary Regulation S Global Notes or Series 2025-1 Class A-1 Permanent Regulation S Global Notes, as hereinafter provided.

(b)     <u>Series 2025-1 Class A-1 Temporary Regulation S Global Notes and Series 2025-1 Class A-2I Permanent Regulation S Global Notes</u>.  Any Series 2025-1 Class A-1 Notes issued on the Closing Date to Persons that are not U.S. persons (as defined in Regulation S, a "<u>U.S. Person</u>") shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in <u>Exhibit A-5</u> hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC, for credit to the respective accounts at DTC of the designated agents holding on behalf of Euroclear or Clearstream.  Until such time as the Restricted Period shall have terminated with respect to any Series 2025-1 Class A-1 Note, such Series 2025-1 Class A-1 Notes shall be referred to herein collectively, as the "<u>Series 2025-1 Class A-1 Temporary Regulation S Global Notes</u>".  After such time as the Restricted Period shall have terminated, the Series 2025-1 Class A-1 Temporary Regulation S Global Notes shall be exchangeable, in whole or in part, for interests in one or more permanent global notes in registered form without interest coupons, substantially in the form set forth in <u>Exhibit A-9</u> hereto, as hereinafter provided (collectively, the "<u>Series 2025-1 Class A-1 Permanent Regulation S Global Notes</u>" and, together with the Series 2025-1 Class A-1 Rule 144A Global Notes and the Series 2025-1 Class A-1 Temporary Regulation S Global Notes, the "<u>Series 2025-1 Class A-1 Global Notes</u>").  The aggregate principal amount of the Series 2025-1 Class A-1 Temporary Regulation S Global Notes or the Series 2025-1 Class A-1 Permanent Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase of aggregate principal amount of the Series 2025-1 Class A-1 Rule 144A Global Notes, as hereinafter provided.

Section 3.2    <u>Issuance of Series 2025-1 Class A-2I Notes</u>.  The Series 2025-1 Class A-2I Notes are being originally issued on the Closing Date pursuant to the exemption from registration under the 1933 Act provided by Section 4(a)(2) thereunder.  The Series 2025-1 Class A-2I Notes may thereafter be transferred in reliance on Rule 144A and/or Regulation S and in accordance with the procedure described herein.  The Series 2025-1 Class A-2I Notes shall be Book-Entry Notes and DTC shall be the Depository for the Series 2025-1 Class A-2I Notes.  The Applicable Procedures shall apply to transfers of beneficial interests in the Series 2025-1 Class A-2I Notes. The Series 2025-1 Class A-2I Notes shall be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

(a)     <u>Series 2025-1 Class A-2I Rule 144A Global Notes</u>.  The Series 2025-1 Class A-2I Notes issued on the Closing Date to Persons that are Qualified Institutional Buyers shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in <u>Exhibit A-2</u> hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC (collectively, the "<u>Series 2025-1 Class A-2I Rule 144A Global Notes</u>").  The aggregate principal amount of the Series 2025-1 Class A-2I Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal amount of the Series 2025-1 Class A-2I Temporary Regulation S Global Notes or Series 2025-1 Class A-2I Permanent Regulation S Global Notes, as hereinafter provided.

11

(b)     <u>Series 2025-1 Class A-2I Temporary Regulation S Global Notes and Series 2025-1 Class A-2I Permanent Regulation S Global Notes</u>.  Any Series 2025-1 Class A-2I Notes issued on the Closing Date to Persons that are not U.S. Persons shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in <u>Exhibit A-6</u> hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC, for credit to the respective accounts at DTC of the designated agents holding on behalf of Euroclear or Clearstream. Until such time as the Restricted Period shall have terminated with respect to any Series 2025-1 Class A-2I Note, such Series 2025-1 Class A-2I Notes shall be referred to herein collectively, as the "<u>Series 2025-1 Class A-2I Temporary Regulation S Global Notes</u>". After such time as the Restricted Period shall have terminated, the Series 2025-1 Class A-2I Temporary Regulation S Global Notes shall be exchangeable, in whole or in part, for interests in one or more permanent global notes in registered form without interest coupons, substantially in the form set forth in <u>Exhibit A-10</u> hereto, as hereinafter provided (collectively, the "<u>Series 2025-1 Class A-2I Permanent Regulation S Global Notes</u>" and, together with the Series 2025-1 Class A-2I Rule 144A Global Notes and the Series 2025-1 Class A-2I Temporary Regulation S Global Notes, the "<u>Series 2025-1 Class A-2I Global Notes</u>").  The aggregate principal amount of the Series 2025-1 Class A-2I Temporary Regulation S Global Notes or the Series 2025-1 Class A-2I Permanent Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase of aggregate principal amount of the Series 2025-1 Class A-2I Rule 144A Global Notes, as hereinafter provided.

Section 3.3     <u>Issuance of Series 2025-1 Class A-2II Notes</u>.  The Series 2025-1 Class A-2II Notes are being originally issued on the Closing Date pursuant to the exemption from registration under the 1933 Act provided by Section 4(a)(2) thereunder.  The Series 2025-1 Class A-2II Notes may thereafter be transferred in reliance on Rule 144A and/or Regulation S and in accordance with the procedure described herein.  The Series 2025-1 Class A-2II Notes shall be Book-Entry Notes and DTC shall be the Depository for the Series 2025-1 Class A-2II Notes.  The Applicable Procedures shall apply to transfers of beneficial interests in the Series 2025-1 Class A-2II Notes.  The Series 2025-1 Class A-2II Notes shall be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

(a)     <u>Series 2025-1 Class A-2II Rule 144A Global Notes</u>.  The Series 2025-1 Class A-2II Notes issued on the Closing Date to Persons that are Qualified Institutional Buyers shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in <u>Exhibit A-3</u> hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC (collectively, the "<u>Series 2025-1 Class A-2II Rule 144A Global Notes</u>").  The aggregate principal amount of the Series 2025-1 Class A-2II Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal amount of the Series 2025-1 Class A-2II Temporary Regulation S Global Notes or Series 2025-1 Class A-2II Permanent Regulation S Global Notes, as hereinafter provided.

(b)    Series 2025-1 Class A-2II Temporary Regulation S Global Notes and Series 2025-1 Class A-2II Permanent Regulation S Global Notes. Any Series 2025-1 Class A-2II Notes issued on the Closing Date to Persons that are not U.S. Persons shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in Exhibit A-7 hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC, for credit to the respective accounts at DTC of the designated agents holding on behalf of Euroclear or Clearstream. Until such time as the Restricted Period shall have terminated with respect to any Series 2025-1 Class A-2II Note, such Series 2025-1 Class A-2II Notes shall be referred to herein collectively as the "Series 2025-1 Class A-2II Temporary Regulation S Global Notes". After such time as the Restricted Period shall have terminated, the Series 2025-1 Class A-2II Temporary Regulation S Global Notes shall be exchangeable, in whole or in part, for interests in one or more permanent global notes in registered form without interest coupons, substantially in the form set forth in Exhibit A-11 hereto, as hereinafter provided (collectively, the "Series 2025-1 Class A-2II Permanent Regulation S Global Notes" and, together with the Series 2025-1 Class A-2II Rule 144A Global Notes and the Series 2025-1 Class A-2II Temporary Regulation S Global Notes, the "Series 2025-1 Class A-2II Global Notes"). The aggregate principal amount of the Series 2025-1 Class A-2II Temporary Regulation S Global Notes or the Series 2025-1 Class A-2II Permanent Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase of aggregate principal amount of the Series 2025-1 Class A-2II Rule 144A Global Notes, as hereinafter provided.

Section 3.4    Issuance of Series 2025-1 Class B Notes. The Series 2025-1 Class B Notes are being originally issued pursuant to the exemption from registration under the 1933 Act provided by Section 4(a)(2) thereunder. The Series 2025-1 Class B Notes may thereafter be transferred in reliance on Rule 144A and/or Regulation S and in accordance with the procedure described herein. The Series 2025-1 Class B Notes shall be Book-Entry Notes and DTC shall be the Depository for the Series 2025-1 Class B Notes. The Applicable Procedures shall apply to transfers of beneficial interests in the Series 2025-1 Class B Notes. The Series 2025-1 Class B Notes shall be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

(a)    Series 2025-1 Class B Rule 144A Global Notes. The Series 2025-1 Class B Notes issued on the Closing Date to Persons that are Qualified Institutional Buyers shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in Exhibit A-4 hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC (collectively, the "Series 2025-1 Class B Rule 144A Global Notes"). The aggregate principal amount of the Series 2025-1 Class B Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal amount of the Series 2025-1 Class B Temporary Regulation S Global Notes or Series 2025-1 Class B Permanent Regulation S Global Notes, as hereinafter provided.

(b)    <u>Series 2025-1 Class B Temporary Regulation S Global Notes and Series 2025-1 Class B Permanent Regulation S Global Notes</u>.  Any Series 2025-1 Class B Notes issued on the Closing Date to Persons that are not U.S. Persons shall be issued in the form of one or more global notes in fully registered form, without coupons, substantially in the form set forth in <u>Exhibit A-8</u> hereto, registered in the name of Cede, as nominee of DTC, and deposited with the Trustee, as custodian for DTC, for credit to the respective accounts at DTC of the designated agents holding on behalf of Euroclear or Clearstream.  Until such time as the Restricted Period shall have terminated with respect to any Series 2025-1 Class B Note, such Series 2025-1 Class B Notes shall be referred to herein collectively, as the "<u>Series 2025-1 Class B Temporary Regulation S Global Notes</u>".  After such time as the Restricted Period shall have terminated, the Series 2025-1 Class B Temporary Regulation S Global Notes shall be exchangeable, in whole or in part, for interests in one or more permanent global notes in registered form without interest coupons, substantially in the form set forth in <u>Exhibit A-12</u> hereto, as hereinafter provided (collectively, the "<u>Series 2025-1 Class B Permanent Regulation S Global Notes</u>" and, together with the Series 2025-1 Class B Rule 144A Global Notes and the Series 2025-1 Class B Temporary Regulation S Global Notes, collectively, the "<u>Series 2025-1 Class B Global Notes</u>").  The aggregate principal amount of the Series 2025-1 Class B Temporary Regulation S Global Notes or the Series 2025-1 Class B Permanent Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase of aggregate principal amount of the Series 2025-1 Class B Rule 144A Global Notes, as hereinafter provided.

(c)    <u>Definitive Notes</u>.  Upon the request of a Series 2025-1 Class B Noteholder, the Trustee may issue (upon delivery of any reasonable documentation that the Trustee may require), or exchange a Series 2025-1 Class B Global Note in its entirety for, one or more Definitive Notes in fully registered form without interest coupons, substantially in the form set forth in <u>Exhibit A-13</u> hereto (collectively, the "<u>Series 2025-1 Class B Definitive Notes</u>") pursuant to Section 2.13 of the Base Indenture and this <u>Section 3.4(c)</u> in accordance with their terms. Upon complete exchange of a Series 2025-1 Class B Global Note for a Series 2025-1 Class B Definitive Note, such Series 2025-1 Class B Global Note shall be surrendered for cancellation at the applicable Corporate Trust Office.

Section 3.5    <u>Transfer Restrictions of Series 2025-1 Notes</u>.

(a)    A Series 2025-1 Global Note may not be transferred, in whole or in part, to any Person other than DTC or a nominee thereof, or to a successor Depository or to a nominee of a successor Depository, and no such transfer to any such other Person may be registered; <u>provided</u>, <u>however</u>, that this <u>Section 3.5(a)</u> shall not prohibit any transfer of a Series 2025-1 Note that is issued in exchange for a Series 2025-1 Global Note in accordance with Section 2.8 of the Base Indenture and shall not prohibit any transfer of a beneficial interest in a Series 2025-1 Global Note effected in accordance with the other provisions of this <u>Section 3.55</u>.

(b)    The transfer by a Series 2025-1 Note Owner holding a beneficial interest in a Series 2025-1 Note in the form of a Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Rule 144A Global Note shall

be made upon the deemed representation of the transferee that it is purchasing for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a Qualified Institutional Buyer, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Master Issuer as such transferee has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A.

(c)     If a Series 2025-1 Note Owner holding a beneficial interest in a Series 2025-1 Note in the form of a Rule 144A Global Note wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the Temporary Regulation S Global Note, or to transfer such interest to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Temporary Regulation S Global Note, such exchange or transfer may be effected, subject to the Applicable Procedures, only in accordance with the provisions of this Section 3.5(c).  Upon receipt by the Registrar, at the applicable Corporate Trust Office, of (i) written instructions given in accordance with the Applicable Procedures from a Clearing Agency Participant directing the Registrar to credit or cause to be credited to a specified Clearing Agency Participant's account a beneficial interest in the Temporary Regulation S Global Note of a Tranche, in a principal amount equal to that of the beneficial interest in such Rule 144A Global Note of the same Tranche to be so exchanged or transferred, (ii) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Clearing Agency Participant (and the Euroclear or Clearstream account, as the case may be) to be credited with, and the account of the Clearing Agency Participant to be debited for, such beneficial interest and (iii) a certificate in substantially the form set forth in Exhibit B-1 hereto given by the Series 2025-1 Note Owner holding such beneficial interest in such Rule 144A Global Note, the Registrar shall instruct the Trustee, as custodian of DTC, to reduce the principal amount of the applicable Rule 144A Global Note, and to increase the principal amount of the Temporary Regulation S Global Note of the same Tranche, by the principal amount of the beneficial interest in such Rule 144A Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (which shall be the Clearing Agency Participant for Euroclear or Clearstream or both, as the case may be) a beneficial interest in the Temporary Regulation S Global Note having a principal amount equal to the amount by which the principal amount of such Rule 144A Global Note was reduced upon such exchange or transfer.

(d)     If a Series 2025-1 Note Owner holding a beneficial interest in a Rule 144A Global Note wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the Permanent Regulation S Global Note, or to transfer such interest to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Permanent Regulation S Global Note, such exchange or transfer may be effected, subject to the Applicable Procedures, only in accordance with the provisions of this Section 3.5(d). Upon receipt by the Registrar, at the applicable Corporate Trust Office, of (i) written instructions given in accordance with the Applicable Procedures from a Clearing Agency Participant directing the Registrar to credit or cause to be credited to a specified Clearing Agency Participant's account a beneficial interest in the Permanent Regulation S Global

Note of a Tranche in a principal amount equal to that of the beneficial interest in such Rule 144A Global Note of the same Tranche to be so exchanged or transferred, (ii) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Clearing Agency Participant (and the Euroclear or Clearstream account, as the case may be) to be credited with, and the account of the Clearing Agency Participant to be debited for, such beneficial interest and (iii) a certificate in substantially the form of <u>Exhibit B-2</u> hereto given by the Series 2025-1 Note Owner holding such beneficial interest in such Rule 144A Global Note, the Registrar shall instruct the Trustee, as custodian of DTC, to reduce the principal amount of the applicable Rule 144A Global Note, and to increase the principal amount of the Permanent Regulation S Global Note of the same Tranche, by the principal amount of the beneficial interest in such Rule 144A Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (which shall be the Clearing Agency Participant for Euroclear or Clearstream or both, as the case may be) a beneficial interest in the Permanent Regulation S Global Note having a principal amount equal to the amount by which the principal amount of such Rule 144A Global Note was reduced upon such exchange or transfer.

(e)    If a Series 2025-1 Note Owner holding a beneficial interest in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note wishes at any time to exchange its interest in such Temporary Regulation S Global Note or such Permanent Regulation S Global Note for an interest in the Rule 144A Global Note, or to transfer such interest to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Rule 144A Global Note, such exchange or transfer may be effected, subject to the Applicable Procedures, only in accordance with the provisions of this <u>Section 3.5(e)</u>. Upon receipt by the Registrar, at the applicable Corporate Trust Office, of (i) written instructions given in accordance with the Applicable Procedures from a Clearing Agency Participant directing the Registrar to credit or cause to be credited to a specified Clearing Agency Participant's account a beneficial interest in the Rule 144A Global Note of a Tranche in a principal amount equal to that of the beneficial interest in such Temporary Regulation S Global Note or such Permanent Regulation S Global Note, as the case may be, of the same Tranche to be so exchanged or transferred, (ii) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Clearing Agency Participant (and the Euroclear or Clearstream account, as the case may be) to be credited with, and the account of the Clearing Agency Participant to be debited for, such beneficial interest and (iii) with respect to a transfer of a beneficial interest in such Temporary Regulation S Global Note or such Permanent Regulation S Global Note, a certificate in substantially the form set forth in <u>Exhibit B-3</u> hereto given by such Series 2025-1 Note Owner holding such beneficial interest in such Temporary Regulation S Global Note or such Permanent Regulation S Global Note, the Registrar shall instruct the Trustee, as custodian of DTC, to reduce the principal amount of the applicable Temporary Regulation S Global Note or Permanent Regulation S Global Note, as the case may be, and to increase the principal amount of the Rule 144A Global Note, by the principal amount of the beneficial interest in such Temporary Regulation S Global Note or such Permanent Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (which shall be the Clearing Agency Participant for DTC) a beneficial interest in the Rule 144A Global Note

of the same Tranche having a principal amount equal to the amount by which the principal amount of such Temporary Regulation S Global Note or such Permanent Regulation S Global Note, as the case may be, was reduced upon such exchange or transfer.

(f)     Until the termination of the Restricted Period with respect to any Series 2025-1 Note, interests in the Temporary Regulation S Global Notes representing such Series 2025-1 Note may be held only through Clearing Agency Participants acting for and on behalf of Euroclear and Clearstream; provided that this Section 3.5(f) shall not prohibit any transfer in accordance with Section 3.5(d) of this Series Supplement.  After the expiration of the applicable Restricted Period, interests in the Permanent Regulation S Global Notes may be transferred without requiring any certifications other than those set forth in this Section 3.55.

(g)     The Series 2025-1 Global Notes and the Series 2025-1 Class B Definitive Notes shall bear the following legend:

THE ISSUANCE AND SALE OF THIS SERIES 2025-1 NOTE HAVE NOT BEEN AND SHALL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**").  THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE

INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING SHALL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT SHALL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE SHALL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A [TEMPORARY REGULATION S GLOBAL NOTE] [RULE 144A GLOBAL NOTE] OR [PERMANENT REGULATION S GLOBAL NOTE] SHALL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND SHALL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING SHALL BE OF NO FORCE AND EFFECT AND SHALL BE VOID AB INITIO AND SHALL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER.  THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON".  THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT SHALL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER

PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

(h)     The Series 2025-1 Notes Temporary Regulation S Global Notes shall also bear the following legend:

UNTIL FORTY (40) DAYS AFTER THE ORIGINAL ISSUE DATE OF THE NOTES (THE "**RESTRICTED PERIOD**") IN CONNECTION WITH THE OFFERING OF THE NOTES IN THE UNITED STATES FROM OUTSIDE OF THE UNITED STATES, THE SALE, PLEDGE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS.  THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT SUCH HOLDER IS EITHER NOT A "U.S. PERSON" OR IS THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER, AND THAT THIS NOTE HAS NOT BEEN REGISTERED UNDER THE 1933 ACT AND AGREES FOR THE BENEFIT OF THE MASTER ISSUER THAT THIS NOTE MAY BE TRANSFERRED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER OR IN COMPLIANCE WITH THE 1933 ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES, AND PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD, ONLY (I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE 1933 ACT OR (II) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE 1933 ACT.

(i)     The Series 2025-1 Global Notes shall bear the following legend:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.  UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

(j)     The Series 2025-1 Class A-2 Notes and the Series 2025-1 Class B Notes shall bear the following legend:

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

(k)     The Series 2025-1 Notes (other than the Series 2025-1 Class B Notes) shall bear the following legend:

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

(l)     The required legends set forth above shall not be removed from the applicable Series 2025-1 Notes except as provided herein.  The legend required for a Series 2025-1 Note may be removed from such Series 2025-1 Note if there is delivered to the Master Issuer and the Registrar such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by the Master Issuer that neither such legend nor the restrictions on transfer set forth therein are required to ensure that transfers of such Series 2025-1 Note shall not violate the registration requirements of the 1933 Act.  Upon provision of such satisfactory evidence, the Trustee at the written direction of the Master Issuer, shall authenticate and deliver in exchange for such Series 2025-1 Note one or more Series 2025-1 Notes having an equal aggregate principal amount that do not bear such legend.  If such a legend required for a Series 2025-1 Note has been removed from a Series 2025-1 Note as provided above, no other Series 2025-1 Notes issued in exchange for all or any part of such Series 2025-1 Note shall bear such legend, unless the Master Issuer has

reasonable cause to believe that such other Series 2025-1 Note is a "restricted security" within the meaning of Rule 144 under the 1933 Act and instructs the Trustee to cause a legend to appear thereon.

Section 3.6    Note Owner Representations and Warranties. Each Person who becomes a Noteholder of, or a Note Owner of a beneficial interest in, a Series 2025-1 Note shall be deemed to represent, warrant and agree on the date such Person acquires any interest in any Series 2025-1 Note as follows:

(a)    With respect to Series 2025-1 Notes acquired after the Closing Date pursuant to Rule 144A, it is a Qualified Institutional Buyer pursuant to Rule 144A, and is aware that such sale of Series 2025-1 Notes to it shall be made in reliance on Rule 144A. Its acquisition of Series 2025-1 Notes shall be for its own account or for the account of another Qualified Institutional Buyer.

(b)    With respect to Series 2025-1 Notes acquired after the Closing Date outside the United States pursuant to Regulation S, at the time that the buy order for such Series 2025-1 Notes was originated, it was outside the United States and it is not a U.S. Person, and was not purchasing for the account or benefit of a U.S. Person.

(c)    It shall, and each account for which it is purchasing shall, hold and transfer at least the minimum denomination of Series 2025-1 Notes.

(d)    It understands that the Master Issuer may receive a list of Noteholders and of participants holding positions in the Series 2025-1 Notes from one or more book-entry depositories.

(e)    It understands that the Master Issuer may receive (i) a list of Noteholders and Note Owners that have requested access to the Trustee's password-protected website or that have voluntarily registered as a Note Owner with the Trustee, (ii) copies of Noteholder and Note Owner confirmations of representations and warranties executed to obtain access to the Trustee's password-protected website and (iii) copies of prospective investor confirmations of representations and warranties executed to obtain access to the Noteholder Materials.

(f)    It shall provide to each person to whom it transfers Series 2025-1 Notes notices of any restrictions on transfer of such Series 2025-1 Notes.

(g)    It understands that (i) the Series 2025-1 Notes are being issued in a transaction not involving any public offering in the United States within the meaning of the 1933 Act, (ii) the Series 2025-1 Notes have not been registered under the 1933 Act, (iii) such Series 2025-1 Notes may be offered, resold, pledged or otherwise transferred only (A) to the Master Issuer or an Affiliate of the Master Issuer, (B) in the United States to a Person who the seller reasonably believes is a Qualified Institutional Buyer in a transaction meeting the requirements of Rule 144A, (C) outside the United States to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S or (D) to any other Person in a transaction exempt from the registration requirements of the 1933 Act and the applicable securities laws of any state of the United States and any other

jurisdiction, in each such case in accordance with the Indenture and any applicable securities laws of any state of the United States and (iv) it shall, and each subsequent holder of a Series 2025-1 Note is required to, notify any subsequent purchaser of a Series 2025-1 Note of the resale restrictions set forth in <u>clause (iii)</u> above.

(h)    In the case of any Person acquiring a beneficial interest in a Rule 144A Global Note or a Permanent Regulation S Global Note, it understands that the certificates evidencing the Rule 144A Global Notes and Permanent Regulation S Global Notes shall bear legends substantially similar to those set forth in <u>Section 3.5(g)</u> and <u>Section 3.5(i)</u> of this Series Supplement.

(i)    In the case of any Person acquiring a beneficial interest in a Temporary Regulation S Global Note, it understands that the certificates evidencing the Temporary Regulation S Global Notes shall bear legends substantially similar to those set forth in <u>Section 3.5(g)</u>, <u>Section 3.5(h)</u> and <u>Section 3.5(i)</u> of this Series Supplement.

(j)    With respect to (a) the Series 2025-1 Class A-1 Notes and (b) the Series 2025-1 Class A-2 Notes and the Series 2025-1 Class B Notes issued on the Closing Date with the consent of the Issuer and pursuant to such investor's provision of a certification substantially in the form set forth in <u>Exhibit B-4</u> hereto, (A) either (i) it is not acquiring or holding the Notes (or any interest therein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) its acquisition, holding and disposition of the Notes (or any interest therein) shall not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if it is a Plan, it represents, warrants and agrees that (i) none of the Master Issuer, the Guarantors or any other party to the Related Documents, nor any of their affiliates has provided, and none of them shall provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited; and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Notes.

(k)    With respect to the Series 2025-1 Class A-2 Notes and the Series 2025-1 Class B Notes acquired after the Closing Date, it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Laws.

(l)      It understands that any subsequent transfer of the Series 2025-1 Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and it agrees to be bound by, and not to resell, pledge or otherwise transfer the Series 2025-1 Notes or any interest therein except in compliance with, such restrictions and conditions and the 1933 Act.

Section 3.7      Limitation on Liability.  None of the Master Issuer, any Paying Agent, or any of their respective Affiliates shall have any responsibility or liability for any aspects of the records maintained by DTC or its nominee or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Rule l44A Global Note or a Regulation S Global Note.  None of the Master Issuer, the Trustee, any Paying Agent or their respective Affiliates shall have any responsibility or liability with respect to any records maintained by the Noteholder with respect to the beneficial holders thereof or payments made thereby on account of beneficial interests held therein.

## ARTICLE IV

## GENERAL

Section 4.1      Information.  On or before each Monthly Allocation Date, the Master Issuer shall provide (or shall cause the Calculation and Reporting Agent to provide) a Monthly Noteholders' Report to the Trustee, substantially in the form of Exhibit A to the Base Indenture. Any Series 2025-1 Noteholder may obtain copies of each Monthly Noteholders' Report in accordance with the procedures set forth in Section 4.1 of the Base Indenture.

Section 4.2      Exhibits.  The annexes, exhibits and schedules attached hereto and listed on the table of contents hereto supplement the annexes, exhibits and schedules included in the Base Indenture.

Section 4.3      Ratification of Base Indenture.   As supplemented by this Series Supplement, the Base Indenture is in all respects ratified and confirmed and the Base Indenture as so supplemented by this Series Supplement shall be read, taken and construed as one and the same instrument.

Section 4.4      Prior Notice by Trustee to the Noteholders.  Subject to Section 10.1 of the Base Indenture, the Trustee agrees that it shall not exercise any rights or remedies available to it as a result of the occurrence of an Event of Default until after the Trustee has given prior written notice thereof to the Noteholders and obtained the written direction of the Required Holders.

Section 4.5      Counterparts.  This Series Supplement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all of such counterparts shall together constitute but one and the same instrument.

Section 4.6      Governing Law.    **THIS SERIES SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

Section 4.7    <u>Amendments</u>.  This Series Supplement may not be modified or amended except in accordance with the terms of the Base Indenture.

Section 4.8    <u>Termination of Series Supplement</u>.  This Series Supplement shall cease to be of further effect when (i) all Outstanding Series 2025-1 Notes theretofore authenticated and issued have been delivered (other than destroyed, lost, or stolen Series 2025-1 Notes that have been replaced or paid) to the Trustee for cancellation and (ii) the Master Issuer has paid all sums payable hereunder; <u>provided</u> that any provisions of this Series Supplement required for the Series 2025-1 Final Payment to be made shall survive until the Series 2025-1 Final Payment is paid to the Series 2025-1 Noteholders.

Section 4.9    <u>Electronic Signatures and Transmission</u>.

(a)    For purposes of this Series Supplement, any reference to "written" or "in writing" means any form of written communication, including, without limitation, electronic signatures, and any such written communication may be transmitted by Electronic Transmission.  "<u>Electronic Transmission</u>" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.  The Trustee is authorized to accept written instructions, directions, reports, notices or other communications delivered by Electronic Transmission and shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by Electronic Transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such Electronic Transmission, and the Trustee shall not have any liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information to the Trustee, including, without limitation, the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

(b)    Any requirement in the Indenture that a document, is to be signed or authenticated by "manual signature" or similar language shall not be deemed to prohibit signature to be by facsimile or electronic signature and shall not be deemed to prohibit delivery thereof by Electronic Transmission.

(c)    Notwithstanding anything to the contrary in this Series Supplement, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary and/or sensitive information and sent by Electronic Transmission shall be encrypted.  The recipient of the Electronic Transmission shall be required to complete a one-time registration process.

Section 4.10    <u>Entire Agreement</u>.  This Series Supplement, together with the exhibits and schedules hereto and the other Indenture Documents, contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall

constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all previous oral statements and other writings with respect thereto.

Section 4.11   <u>1934 Act</u>.  The Master Issuer hereby represents and warrants, for the benefit of the Trustee and the Noteholders, that payments on the Notes shall not depend primarily on cash flow from self-liquidating financial assets within the meaning of Section 3(a)(79) of the 1934 Act.

**[Signature Pages Follow]**

EXHIBIT A-1

THE ISSUANCE AND SALE OF THIS RULE 144A GLOBAL SERIES 2025-1 CLASS A-1 NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A TEMPORARY REGULATION S GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE

REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION,

NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR

OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF RULE 144A GLOBAL SERIES 2025-1 CLASS A-1 NOTE

No. R-                                                               up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: 403962 AA1

ISIN Number: US403962AA18

HOA ROYALTYCO LLC

SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-1

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Rule 144A Global Series 2025-1 Class A-1 Note (this "Note") at the Series 2025-1 Class A-1 Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation  Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes.  Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-1 Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-1 (herein called the "Series 2025-1 Class A-1 Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-1 Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-1 Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-1 Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-1 Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-1 Notes will be made pro rata to the holders of Series 2025-1 Class A-1 Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-1 Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-1 Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-1 Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-1 Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-1 Notes, by acceptance of a Series 2025-1 Class A-1 Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-1 Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-1 Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-1 Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-1 Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-1 Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-1 Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-1 Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-1 Notes and upon all future holders of Series 2025-1 Class A-1 Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that (A) either (i) it is not acquiring or holding this Note (or any interest herein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) its acquisition, holding and disposition of this Note (or any interest herein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if it is a Plan, it represents, warrants and agrees that (i) none of the Master Issuer, the Guarantors or any other party to the Securitization Transaction, nor any of their affiliates has provided, and none of them shall provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Notes.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-1 Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By: _____[1]

Signature Guaranteed:

_____

---

[1] NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN RULE 144A GLOBAL SERIES 2025-1
CLASS A-1 NOTE

     The initial principal balance of this Rule 144A Global Series 2025-1 Class A-1 Note is $[_____]. The following exchanges of an interest in this Rule 144A Global Series 2025-1 Class A-1 Note for an interest in a corresponding Temporary Regulation S Global Series 2025-1 Class A-1 Note or a Permanent Regulation S Global Series 2025-1 Class A-1 Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Rule 144A Global Note | Remaining Principal Amount of this Rule 144A Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

EXHIBIT A-2

THE ISSUANCE AND SALE OF THIS RULE 144A GLOBAL SERIES 2025-1 CLASS A-2I NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A TEMPORARY REGULATION S GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE

REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION,

NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR

OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF RULE 144A GLOBAL SERIES 2025-1 CLASS A-2I NOTE

No. R-                                                                    up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: 403962 AB9

ISIN Number: US403962AB90

HOA ROYALTYCO LLC

SERIES 2025-1 4.723% FIXED RATE SENIOR SECURED NOTES, CLASS A-2I

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Rule 144A Global Series 2025-1 Class A-2I Note (this "Note") at the Series 2025-1 Class A-2I Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

A-2-0

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes.  Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2I Notes of the Master Issuer designated as its Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I (herein called the "Series 2025-1 Class A-2I Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2I Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2I Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2I Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2I Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2I Notes will be made pro rata to the holders of Series 2025-1 Class A-2I Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2I Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2I Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2I Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2I Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2I Notes, by acceptance of a Series 2025-1 Class A-2I Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2I Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2I Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2I Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2I Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2I Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2I Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2I Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2I Notes and upon all future holders of Series 2025-1 Class A-2I Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2I Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By: _____ [2]

Signature Guaranteed:

_____

---

[2]     NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

A-2-7

## SCHEDULE OF EXCHANGES IN RULE 144A GLOBAL SERIES 2025-1
## CLASS A-2I NOTE

The initial principal balance of this Rule 144A Global Series 2025-1 Class A-2I Note is $[_____]. The following exchanges of an interest in this Rule 144A Global Series 2025-1 Class A-2I Note for an interest in a corresponding Temporary Regulation S Global Series 2025-1 Class A-2I Note or a Permanent Regulation S Global Series 2025-1 Class A-2I Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Rule 144A Global Note | Remaining Principal Amount of this Rule 144A Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-3

THE ISSUANCE AND SALE OF THIS RULE 144A GLOBAL SERIES 2025-1 CLASS A-2II NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A TEMPORARY REGULATION S GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE

REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION,

NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR

OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF RULE 144A GLOBAL SERIES 2025-1 CLASS A-2II NOTE

No. R-                                                                     up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: 403962 AC7

ISIN Number: US403962AC73

## HOA ROYALTYCO LLC

### SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-2II

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Rule 144A Global Series 2025-1 Class A-2II Note (this "Note") at the Series 2025-1 Class A-2II Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note;

provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes.  Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2II Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II (herein called the "Series 2025-1 Class A-2II Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2II Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2II Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2II Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2II Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2II Notes will be made pro rata to the holders of Series 2025-1 Class A-2II Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2II Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2II Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2II Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2II Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2II Notes, by acceptance of a Series 2025-1 Class A-2II Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2II Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2II Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2II Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2II Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2II Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2II Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2II Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2II Notes and upon all future holders of Series 2025-1 Class A-2II Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2II Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By: _____ [3]

Signature Guaranteed:

_____

---

[3]   NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

## SCHEDULE OF EXCHANGES IN RULE 144A GLOBAL SERIES 2025-1
## CLASS A-2II NOTE

The initial principal balance of this Rule 144A Global Series 2025-1 Class A-2II Note is $[_____]. The following exchanges of an interest in this Rule 144A Global Series 2025-1 Class A-2II Note for an interest in a corresponding Temporary Regulation S Global Series 2025-1 Class A-2II Note or a Permanent Regulation S Global Series 2025-1 Class A-2II Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Rule 144A Global Note | Remaining Principal Amount of this Rule 144A Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-4

THE ISSUANCE AND SALE OF THIS RULE 144A GLOBAL SERIES 2025-1 CLASS B NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A TEMPORARY REGULATION S GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE

REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

## FORM OF RULE 144A GLOBAL SERIES 2025-1 CLASS B NOTE

No. R-                                                                                    up to $[_____]

### SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: [  ]

ISIN Number: [  ]

## HOA ROYALTYCO LLC

### SERIES 2025-1 7.432% FIXED RATE SENIOR SUBORDINATED SECURED NOTES, CLASS B

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Rule 144A Global Series 2025-1 Class B Note (this "Note") at the Series 2025-1 Class B Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class B Notes of the Master Issuer designated as its Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (herein called the "Series 2025-1 Class B Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class B Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class B Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class B Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class B Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class B Notes will be made pro rata to the holders of Series 2025-1 Class B Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class B Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class B Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class B Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class B Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class B Notes, by acceptance of a Series 2025-1 Class B Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class B Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class B Notes will qualify under applicable tax law as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class B Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class B Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class B Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class B Notes. The Indenture also contains provisions permitting the Required Holders to waive

compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class B Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class B Notes and upon all future holders of Series 2025-1 Class B Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class B Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By:  _____[1]

Signature Guaranteed:

---

[1]    NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever..

## SCHEDULE OF EXCHANGES IN RULE 144A GLOBAL SERIES 2025-1
## CLASS B NOTE

The initial principal balance of this Rule 144A Global Series 2025-1 Class B Note is $[_____]. The following exchanges of an interest in this Rule 144A Global Series 2025-1 Class B Note for an interest in a corresponding Temporary Regulation S Global Series 2025-1 Class B Note or a Permanent Regulation S Global Series 2025-1 Class B Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Rule 144A Global Note | Remaining Principal Amount of this Rule 144A Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |

EXHIBIT A-5

THE ISSUANCE AND SALE OF THIS TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-1 NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE REQUIRED TO MAKE THE

APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

UNTIL FORTY (40) DAYS AFTER THE ORIGINAL ISSUE DATE OF THE NOTES (THE "**RESTRICTED PERIOD**") IN CONNECTION WITH THE OFFERING OF THE NOTES IN THE UNITED STATES FROM OUTSIDE OF THE UNITED STATES, THE SALE, PLEDGE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT SUCH HOLDER IS EITHER NOT A "U.S. PERSON" OR IS THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER, AND THAT THIS NOTE HAS NOT BEEN REGISTERED UNDER THE 1933 ACT AND AGREES FOR THE BENEFIT OF THE MASTER ISSUER THAT THIS NOTE MAY BE TRANSFERRED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER OR IN COMPLIANCE WITH THE 1933 ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES, AND PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD, ONLY (I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER

THE 1933 ACT OR (II) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE 1933 ACT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-1 NOTE

No. S-                                                                                              up to $[            ]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAA8

ISIN Number: USU4334PAA85

## HOA ROYALTYCO LLC

### SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-1

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Temporary Regulation S Global Series 2025-1 Class A-1 Note (this "Note") at the Series 2025-1 Class A-1 Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note or a Permanent Regulation S Global Note; <u>provided</u> that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; <u>provided</u> that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-1 Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-1 (herein called the "Series 2025-1 Class A-1 Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-1 Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-1 Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-1 Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-1 Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-1 Notes will be made pro rata to the holders of Series 2025-1 Class A-1 Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-1 Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-1 Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-1 Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-1 Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-1 Notes, by acceptance of a Series 2025-1 Class A-1 Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-1 Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-1 Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-1 Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-1 Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-1 Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-1 Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-1 Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-1 Notes and upon all future holders of Series 2025-1 Class A-1 Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that (A) either (i) it is not acquiring or holding this Note (or any interest herein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) its acquisition, holding and disposition of this Note (or any interest herein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if it is a Plan, it represents, warrants and agrees that (i) none of the Master Issuer, the Guarantors or any other party to the Securitization Transaction, nor any of their affiliates has provided, and none of them shall provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Notes.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-1 Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee:___

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____

By: _____ [1]

Signature Guaranteed:

_____

---

[1] NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN TEMPORARY REGULATION S
GLOBAL SERIES 2025-1 CLASS A-1 NOTE

The initial principal balance of this Temporary Regulation S Global Series 2025-1 Class A-1 Note is $[_____]. The following exchanges of an interest in this Temporary Regulation S Global Series 2025-1 Class A-1 Note for an interest in a corresponding Rule 144A Global Series 2025-1 Class A-1 Note or a Permanent Regulation S Global Series 2025-1 Class A-1 Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |

EXHIBIT A-6

THE ISSUANCE AND SALE OF THIS TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-2I NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE REQUIRED TO MAKE THE

APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

UNTIL FORTY (40) DAYS AFTER THE ORIGINAL ISSUE DATE OF THE NOTES (THE "**RESTRICTED PERIOD**") IN CONNECTION WITH THE OFFERING OF THE NOTES IN THE UNITED STATES FROM OUTSIDE OF THE UNITED STATES, THE SALE, PLEDGE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT SUCH HOLDER IS EITHER NOT A "U.S. PERSON" OR IS THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER, AND THAT THIS NOTE HAS NOT BEEN REGISTERED UNDER THE 1933 ACT AND AGREES FOR THE BENEFIT OF THE MASTER ISSUER THAT THIS NOTE MAY BE TRANSFERRED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER OR IN COMPLIANCE WITH THE 1933 ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES, AND PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD, ONLY (I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER

THE 1933 ACT OR (II) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE 1933 ACT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD

TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-2I NOTE

No. S-                                                                        up to $[            ]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAB6

ISIN Number: USU4334PAB68

HOA ROYALTYCO LLC

SERIES 2025-1 4.723% FIXED RATE SENIOR SECURED NOTES, CLASS A-2I

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Temporary Regulation S Global Series 2025-1 Class A-2I Note (this "Note") at the Series 2025-1 Class A-2I Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note or a Permanent Regulation S Global Note; <u>provided</u> that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; <u>provided</u> that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2I Notes of the Master Issuer designated as its Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I (herein called the "Series 2025-1 Class A-2I Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2I Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2I Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2I Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2I Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2I Notes will be made pro rata to the holders of Series 2025-1 Class A-2I Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2I Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2I Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2I Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2I Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2I Notes, by acceptance of a Series 2025-1 Class A-2I Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2I Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2I Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2I Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2I Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2I Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2I Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2I Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2I Notes and upon all future holders of Series 2025-1 Class A-2I Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law..

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2I Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee:____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration
thereof, with full power of substitution in the premises.

Dated:_____

By:  _____ [1]
        Signature Guaranteed:


        _____

---

[1] NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN TEMPORARY REGULATION S
GLOBAL SERIES 2025-1 CLASS A-2I NOTE

The initial principal balance of this Temporary Regulation S Global Series 2025-1 Class A-2I Note is $[_____]. The following exchanges of an interest in this Temporary Regulation S Global Series 2025-1 Class A-2I Note for an interest in a corresponding Rule 144A Global Series 2025-1 Class A-2I Note or a Permanent Regulation S Global Series 2025-1 Class A-2I Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-7

THE ISSUANCE AND SALE OF THIS TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-2II NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM

REQUIRED BY THE INDENTURE AND WILL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

UNTIL FORTY (40) DAYS AFTER THE ORIGINAL ISSUE DATE OF THE NOTES (THE "**RESTRICTED PERIOD**") IN CONNECTION WITH THE OFFERING OF THE NOTES IN THE UNITED STATES FROM OUTSIDE OF THE UNITED STATES, THE SALE, PLEDGE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT SUCH HOLDER IS EITHER NOT A "U.S. PERSON" OR IS THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER, AND THAT THIS NOTE HAS NOT BEEN REGISTERED UNDER THE 1933 ACT AND AGREES FOR THE BENEFIT OF THE MASTER ISSUER THAT THIS NOTE MAY BE TRANSFERRED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER OR IN COMPLIANCE WITH THE 1933 ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES, AND PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD, ONLY

(I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE 1933 ACT OR (II) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE 1933 ACT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL

OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS A-2II NOTE

No. S-                                                                up to $[            ]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAC4

ISIN Number: USU4334PAC42

HOA ROYALTYCO LLC

SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-2II

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Temporary Regulation S Global Series 2025-1 Class A-2II Note (this "Note") at the Series 2025-1 Class A-2II Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note or a Permanent Regulation S Global Note; <u>provided</u> that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; <u>provided</u> that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2II Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II (herein called the "Series 2025-1 Class A-2II Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2II Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2II Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2II Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2II Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2II Notes will be made pro rata to the holders of Series 2025-1 Class A-2II Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2II Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2II Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2II Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2II Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2II Notes, by acceptance of a Series 2025-1 Class A-2II Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2II Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2II Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2II Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2II Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2II Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2II Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2II Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2II Notes and upon all future holders of Series 2025-1 Class A-2II Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Laws.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2II Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee:____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____

By: _____ [1]
Signature Guaranteed:

_____

---

[1] NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN TEMPORARY REGULATION S
GLOBAL SERIES 2025-1 CLASS A-2II NOTE

The initial principal balance of this Temporary Regulation S Global Series 2025-1 Class A-2II
Note is $[_____]. The following exchanges of an interest in this Temporary Regulation S Global
Series 2025-1 Class A-2II Note for an interest in a corresponding Rule 144A Global Series 2025-
1 Class A-2II Note or a Permanent Regulation S Global Series 2025-1 Class A-2II Note have been
made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-8

THE ISSUANCE AND SALE OF THIS TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS B NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE OR PERMANENT REGULATION S GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL BE REQUIRED TO MAKE THE

APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

UNTIL FORTY (40) DAYS AFTER THE ORIGINAL ISSUE DATE OF THE NOTES (THE "**RESTRICTED PERIOD**") IN CONNECTION WITH THE OFFERING OF THE NOTES IN THE UNITED STATES FROM OUTSIDE OF THE UNITED STATES, THE SALE, PLEDGE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT SUCH HOLDER IS EITHER NOT A "U.S. PERSON" OR IS THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER, AND THAT THIS NOTE HAS NOT BEEN REGISTERED UNDER THE 1933 ACT AND AGREES FOR THE BENEFIT OF THE MASTER ISSUER THAT THIS NOTE MAY BE TRANSFERRED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER OR IN COMPLIANCE WITH THE 1933 ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES, AND PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD, ONLY (I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER

THE 1933 ACT OR (II) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE 1933 ACT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF TEMPORARY REGULATION S GLOBAL SERIES 2025-1 CLASS B NOTE

No. S-                                                                                          up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: [  ]

ISIN Number: [  ]

## HOA ROYALTYCO LLC

### SERIES 2025-1 7.432% FIXED RATE SENIOR SUBORDINATED SECURED NOTES, CLASS B

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Temporary Regulation S Global Series 2025-1 Class B Note (this "Note") at the Series 2025-1 Class B Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note or a Permanent Regulation S Global Note; <u>provided</u> that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; <u>provided</u> that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class B Notes of the Master Issuer designated as its Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (herein called the "Series 2025-1 Class B Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class B Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class B Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class B Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class B Notes are subject to mandatory prepayment as described for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class B Notes will be made pro rata to the holders of Series 2025-1 Class B Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class B Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class B Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class B Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class B Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class B Notes, by acceptance of a Series 2025-1 Class B Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class B Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class B Notes will qualify under applicable tax law as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class B Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class B Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class B Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class B Notes. The Indenture also contains provisions permitting the Required Holders to waive

compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class B Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class B Notes and upon all future holders of Series 2025-1 Class B Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Laws.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class B Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

By: _____ [1]
   Signature Guaranteed:


   _____

---

[1]     NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

## SCHEDULE OF EXCHANGES IN TEMPORARY REGULATION S
## GLOBAL SERIES 2025-1 CLASS B NOTE

The initial principal balance of this Temporary Regulation S Global Series 2025-1 Class B Note is $[       ]. The following exchanges of an interest in this Temporary Regulation S Global Series 2025-1 Class B Note for an interest in a corresponding Rule 144A Global Series 2025-1 Class B Note or a Permanent Regulation S Global Series 2025-1 Class B Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-9

THE ISSUANCE AND SALE OF THIS PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-1 NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL

BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-1 NOTE

No. U-                                                                      up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAA8

ISIN Number: USU4334PAA85

HOA ROYALTYCO LLC

SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-1

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Permanent Regulation S Global Series 2025-1 Class A-1 Note (this "Note") at the Series 2025-1 Class A-1 Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-1 Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-1 (herein called the "Series 2025-1 Class A-1 Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-1 Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-1 Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-1 Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-1 Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-1 Notes will be made pro rata to the holders of Series 2025-1 Class A-1 Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-1 Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-1 Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-1 Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-1 Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-1 Notes, by acceptance of a Series 2025-1 Class A-1 Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-1 Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-1 Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-1 Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-1 Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-1 Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-1 Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-1 Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-1 Notes and upon all future holders of Series 2025-1 Class A-1 Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that (A) either (i) it is not acquiring or holding this Note (or any interest herein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) its acquisition, holding and disposition of this Note (or any interest herein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if it is a Plan, it represents, warrants and agrees that (i) none of the Master Issuer, the Guarantors or any other party to the Securitization Transaction, nor any of their affiliates has provided, and none of them shall provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Notes.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-1 Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

By: _____ [9]

Signature Guaranteed:

_____

---

[9]      NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN PERMANENT REGULATION S
GLOBAL SERIES 2025-1 CLASS A-1 NOTE

The initial principal balance of this Permanent Regulation S Global Series 2025-1
Class A-1 Note is $[_____]. The following exchanges of an interest in this Permanent Regulation
S Global Series 2025-1 Class A-1 Note for an interest in a corresponding Rule 144A Global Series
2025-1 Class A-1 Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |

EXHIBIT A-10

THE ISSUANCE AND SALE OF THIS PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-2I NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL

BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-2I NOTE

No. U-                                                                                    up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAB6

ISIN Number: USU4334PAB68

HOA ROYALTYCO LLC

SERIES 2025-1 4.723%  FIXED RATE SENIOR SECURED NOTES, CLASS A-2I

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Permanent Regulation S Global Series 2025-1 Class A-2I Note (this "Note") at the Series 2025-1 Class A-2I Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2I Notes of the Master Issuer designated as its Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I (herein called the "Series 2025-1 Class A-2I Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2I Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2I Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2I Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2I Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2I Notes will be made pro rata to the holders of Series 2025-1 Class A-2I Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2I Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2I Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2I Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2I Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2I Notes, by acceptance of a Series 2025-1 Class A-2I Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2I Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2I Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2I Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2I Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2I Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2I Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2I Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2I Notes and upon all future holders of Series 2025-1 Class A-2I Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2I Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration
thereof, with full power of substitution in the premises.

Dated: _____

By: _____ [10]

Signature Guaranteed:

_____

---

[10]   NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

SCHEDULE OF EXCHANGES IN PERMANENT REGULATION S
GLOBAL SERIES 2025-1 CLASS A-2I NOTE

The initial principal balance of this Permanent Regulation S Global Series 2025-1
Class A-2I Note is $[_____]. The following exchanges of an interest in this Permanent Regulation
S Global Series 2025-1 Class A-2I Note for an interest in a corresponding Rule 144A Global Series
2025-1 Class A-2I Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## EXHIBIT A-11

THE ISSUANCE AND SALE OF THIS PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-2II NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL

BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("**OID**") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY FOR THE NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE MASTER ISSUER AT 410 PARK AVENUE, SUITE 900, NEW YORK, NY 10022, ATTN: TIM DAILEADER.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS A-2II NOTE

No. U-                                                                                     up to $[_____]

SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: U4334PAC4

ISIN Number: USU4334PAC42

## HOA ROYALTYCO LLC

### SERIES 2025-1 FLOATING RATE SENIOR SECURED NOTES, CLASS A-2II

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Permanent Regulation S Global Series 2025-1 Class A-2II Note (this "Note") at the Series 2025-1 Class A-2II Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date through the last day of the Monthly Collection Period immediately preceding the then current Monthly Allocation Date and (ii) thereafter, the Monthly Collection Period immediately preceding the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class A-2II Notes of the Master Issuer designated as its Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II (herein called the "Series 2025-1 Class A-2II Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class A-2II Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class A-2II Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class A-2II Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class A-2II Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class A-2II Notes will be made pro rata to the holders of Series 2025-1 Class A-2II Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class A-2II Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class A-2II Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

A-11-8

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class A-2II Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class A-2II Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class A-2II Notes, by acceptance of a Series 2025-1 Class A-2II Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class A-2II Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class A-2II Notes will qualify under applicable tax law as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class A-2II Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as Indebtedness of the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class A-2II Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class A-2II Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class A-2II Notes. The Indenture also contains provisions permitting the Required Holders

to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class A-2II Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class A-2II Notes and upon all future holders of Series 2025-1 Class A-2II Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class A-2II Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

By: _____ [11]
     Signature Guaranteed:

_____

---

[11]    NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

## SCHEDULE OF EXCHANGES IN PERMANENT REGULATION S
## GLOBAL SERIES 2025-1 CLASS A-2II NOTE

The initial principal balance of this Permanent Regulation S Global Series 2025-1 Class A-2II Note is $[_____]. The following exchanges of an interest in this Permanent Regulation S Global Series 2025-1 Class A-2II Note for an interest in a corresponding Rule 144A Global Series 2025-1 Class A-2II Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|------|------|------|------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

EXHIBIT A-12

THE ISSUANCE AND SALE OF THIS PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS B NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE. EACH PERSON TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE IN THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE AND WILL

BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("**DTC**"), A NEW YORK CORPORATION, 55 WATER STREET, NEW YORK, NEW YORK 10004, OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE MASTER ISSUER OR THE REGISTRAR, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL BECAUSE THE REGISTERED OWNER, CEDE & CO., HAS AN INTEREST HEREIN.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

FORM OF PERMANENT REGULATION S GLOBAL SERIES 2025-1 CLASS B NOTE

No. U-                                                                              up to $[_____]

### SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: [  ]

ISIN Number: [  ]

### HOA ROYALTYCO LLC

### SERIES 2025-1 7.432% FIXED RATE SENIOR SUBORDINATED SECURED NOTES, CLASS B

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Permanent Regulation S Global Series 2025-1 Class B Note (this "Note") at the Series 2025-1 Class B Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Interests in this Note are exchangeable or transferable in whole or in part for interests in a Rule 144A Global Note; provided that such transfer or exchange complies with the applicable provisions of the Indenture relating to the transfer of the Notes. Interests in this Note in certain circumstances may also be exchangeable or transferable in whole but not in part for duly executed and issued registered Definitive Notes; provided that such transfer or exchange complies with Sections 2.8 and 2.13 of the Base Indenture and Section 3.5 of the Series 2025-1 Supplement.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class B Notes of the Master Issuer designated as its Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (herein called the "Series 2025-1 Class B Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class B Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class B Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class B Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class B Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class B Notes will be made pro rata to the holders of Series 2025-1 Class B Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class B Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class B Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds to the account designated by DTC or its nominee.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Master Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Trustee, the Master Issuer and the Registrar duly executed by, the holder of Series 2025-1 Class B Notes hereof or his or her attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and accompanied by such other documents as the Trustee and the Registrar may require and as may be required by the Series 2025-1 Supplement, and thereupon one or more new Series 2025-1 Class B Notes of authorized denominations in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the transferor may be required to pay a sum sufficient to cover any Tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each holder of Series 2025-1 Class B Notes, by acceptance of a Series 2025-1 Class B Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class B Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class B Notes will qualify under applicable tax law as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class B Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class B Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class B Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class B Notes. The Indenture also contains provisions permitting the Required Holders to waive

compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class B Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class B Notes and upon all future holders of Series 2025-1 Class B Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class B Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By: _____ [1]
Signature Guaranteed:

---

[1]    NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever.

## SCHEDULE OF EXCHANGES IN PERMANENT REGULATION S
## GLOBAL SERIES 2025-1 CLASS B NOTE

The initial principal balance of this Permanent Regulation S Global Series 2025-1 Class B Note is $[_____]. The following exchanges of an interest in this Permanent Regulation S Global Series 2025-1 Class B Note for an interest in a corresponding Rule 144A Global Series 2025-1 Class B Note have been made:

| Date | Amount of Increase (or Decrease) in the Principal Amount of this Regulation S Global Note | Remaining Principal Amount of this Temporary Regulation S Global Note following the Increase or Decrease | Signature of Authorized Officer of Trustee or Registrar |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT A-13

THE ISSUANCE AND SALE OF THIS SERIES 2025-1 CLASS B NOTE (THIS "**NOTE**") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER RELEVANT JURISDICTION, AND HOA ROYALTYCO LLC (THE "**MASTER ISSUER**") HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**1940 ACT**"). THIS NOTE OR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE MASTER ISSUER OR AN AFFILIATE THEREOF, (B) IN THE UNITED STATES, TO A PERSON WHO IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE 1933 ACT ("**RULE 144A**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION OR (C) OUTSIDE THE UNITED STATES, TO A PERSON WHO IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE 1933 ACT ("**REGULATION S**"), ACTING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH SUCH PERSON EXERCISES SOLE INVESTMENT DISCRETION, NONE OF WHICH ARE A U.S. PERSON, IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S, AND, IN EACH CASE, IN COMPLIANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION.

BY ITS ACQUISITION OR ACCEPTANCE HEREOF, THE HOLDER (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) REPRESENTS THAT (A) IT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A OR (Y) NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION, AS APPLICABLE, (B) IT IS ACTING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER PERSON WHICH IS EITHER (X) A QUALIFIED INSTITUTIONAL BUYER OR (Y) NOT A U.S. PERSON, AND IN EACH CASE WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING WILL HOLD AND TRANSFER AT LEAST THE MINIMUM DENOMINATION OF NOTES, (D) IT UNDERSTANDS THAT THE MASTER ISSUER MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN ITS NOTES FROM ONE OR MORE BOOK-ENTRY DEPOSITORIES AND (E) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS TO ANY SUBSEQUENT TRANSFEREES.

EACH PERSON (IF NOT THE MASTER ISSUER OR AN AFFILIATE OF THE MASTER ISSUER) TAKING DELIVERY OF THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS REFERRED TO IN THE INDENTURE.

ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO ANY PERSON CAUSING SUCH VIOLATION,

NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE MASTER ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

IF THIS NOTE WAS ACQUIRED IN THE UNITED STATES, AND THE HOLDER IS DETERMINED NOT TO HAVE BEEN A QUALIFIED INSTITUTIONAL BUYER AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS A QUALIFIED INSTITUTIONAL BUYER. THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS NOT A QUALIFIED INSTITUTIONAL BUYER.

IF THIS NOTE WAS ACQUIRED OUTSIDE THE UNITED STATES, AND THE HOLDER IS DETERMINED TO HAVE BEEN A "U.S. PERSON" AT THE TIME OF ACQUISITION OF THIS NOTE, THE MASTER ISSUER HAS THE RIGHT TO REQUIRE SUCH HOLDER TO SELL THIS NOTE TO A PURCHASER WHO IS NOT A "U.S. PERSON". THE MASTER ISSUER ALSO HAS THE RIGHT TO REFUSE TO HONOR A TRANSFER TO A PERSON WHO IS A "U.S. PERSON".

BY ACCEPTING THIS NOTE, EACH PURCHASER COVENANTS THAT IT WILL NOT AT ANY TIME PRIOR TO THE DATE WHICH IS ONE (1) YEAR AND ONE (1) DAY AFTER THE PAYMENT IN FULL OF THE LATEST MATURING NOTE, INSTITUTE AGAINST, OR JOIN WITH ANY OTHER PERSON IN INSTITUTING AGAINST, ANY OBLIGOR ENTITY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS, UNDER ANY FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

A PROSPECTIVE TRANSFEREE OF THIS NOTE OR ANY INTEREST THEREIN MUST REPRESENT (AND SHALL BE DEEMED TO REPRESENT) THAT IT IS NOT AND IS NOT ACTING ON BEHALF OF, OR USING THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (B) A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, (C) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY (WITHIN THE MEANING OF DEPARTMENT OF LABOR REGULATION 29 C.F.R. 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA) (THE PLANS AND ENTITIES DESCRIBED IN SUBSECTIONS (A) THROUGH (C), "**BENEFIT PLANS**"), AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("**SIMILAR LAW**") OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH PLAN, ITS ACQUISITION, CONTINUED HOLDING AND DISPOSITION OF SUCH NOTES (OR ANY INTEREST THEREIN) WILL NOT CONSTITUTE A NON-EXEMPT VIOLATION OF ANY APPLICABLE SIMILAR LAW.

THE PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

## FORM OF SERIES 2025-1 CLASS B NOTE

No. R-                                                                                        up to $[_____]

### SEE REVERSE FOR CERTAIN CONDITIONS

CUSIP Number: N/A

ISIN Number: N/A

### HOA ROYALTYCO LLC

### SERIES 2025-1 7.432% FIXED RATE SENIOR SUBORDINATED SECURED NOTES, CLASS B

HOA ROYALTYCO LLC, a limited liability company formed under the laws of the State of Delaware (herein referred to as the "Master Issuer"), for value received, hereby promises to pay to [_____] or registered assigns, up to the principal sum of [_____] DOLLARS ($[_____]) as provided below and in the Indenture referred to herein. Payments of principal shall be payable in the amounts and at the times set forth in the Indenture described herein; provided, however, that the entire unpaid principal amount of this Note shall be due on the Monthly Allocation Date occurring in November 2055 (the "Series 2025-1 Legal Final Maturity Date"). The Master Issuer will pay interest on this Series 2025-1 Class B Note (this "Note") at the Series 2025-1 Class B Note Rate for each Interest Accrual Period in accordance with the terms of the Indenture. Such interest will be payable in arrears on each Monthly Allocation Date, which will be on the 20th day (or, if such date is not a Business Day, the next succeeding Business Day) of each calendar month (each, a "Monthly Allocation Date"), commencing on the Monthly Allocation Date in December 2025. Such interest will accrue for each Monthly Allocation Date with respect to (i) initially, the period from and including the Closing Date to but excluding the 20th day of the calendar month that includes the then current Monthly Allocation Date and (ii) thereafter, the period from and including the 20th day of the calendar month in which the immediately preceding Monthly Allocation Date occurred to but excluding the 20th day of the calendar month that includes the then-current Monthly Allocation Date (each, an "Interest Accrual Period").

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Master Issuer with respect to this Note shall be applied as provided in the Indenture.

This Note is subject to mandatory and optional prepayment as set forth in the Indenture.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note. Although a summary of certain provisions of the Indenture is set forth below and on the reverse hereof and made a part hereof, this Note does not purport to summarize the Indenture and reference is made to the Indenture for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Master Issuer and the Trustee. A copy of the Indenture may be requested from the Trustee by writing to the Trustee at: Citibank, N.A., 388 Greenwich Street, New York, NY 10013, Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Indenture. In the event of any inconsistency between the provisions of this Note and the Indenture, the provisions of the Indenture shall govern.

Subject to the next following paragraph, the Master Issuer hereby certifies and declares that all acts, conditions and things required to be done and performed and to have happened prior to the creation of this Note and to constitute it as the valid obligation of the Master Issuer enforceable in accordance with its terms, have been done and performed and have happened in due compliance with all applicable laws and in accordance with the terms of the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

[Remainder of page intentionally left blank]

[REVERSE OF NOTE]

This Note is one of a duly authorized issue of Series 2025-1 Class B Notes of the Master Issuer designated as its Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (herein called the "Series 2025-1 Class B Notes"), all issued under (i) the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (such Second Amended and Restated Base Indenture, as amended, supplemented or modified, is herein called the "Base Indenture"), between the Master Issuer and Citibank, N.A., as trustee (the "Trustee", which term includes any successor Trustee under the Base Indenture) and as securities intermediary, and (ii) a Series 2025-1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"), among the Master Issuer, the Trustee and Citibank, N.A., as series 2025-1 securities intermediary. The Base Indenture and the Series 2025-1 Supplement are referred to herein as the "Indenture". The Series 2025-1 Class B Notes are subject to all terms of the Indenture. All terms used in this Note that are defined in the Indenture, as supplemented, modified or amended, shall have the meanings assigned to them in or pursuant to the Indenture, as so supplemented, modified or amended.

The Series 2025-1 Class B Notes are and will be secured by the Collateral pledged as security therefor as provided in the Indenture.

The Notes will be issued in minimum denominations of $50,000 and integral multiples of $1 in excess thereof.

As provided for in the Indenture, the Series 2025-1 Class B Notes may be prepaid, in whole or in part, at the option of the Master Issuer. In addition, the Series 2025-1 Class B Notes are subject to mandatory prepayment as provided for in the Indenture. As described above, the entire unpaid principal amount of this Note shall be due and payable on the Series 2025-1 Legal Final Maturity Date. All payments of principal of the Series 2025-1 Class B Notes will be made pro rata to the holders of Series 2025-1 Class B Notes entitled thereto.

Principal of and interest on this Note, which are payable on a Monthly Allocation Date or on any date on which payments are permitted to be made as provided for in the Indenture, shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the applicable Record Date or Prepayment Record Date, as the case may be.

Interest and contingent interest, if any, will each accrue on the Series 2025-1 Class B Notes at the rates set forth in the Indenture. The interest and contingent interest, if any, will be computed on the basis set forth in the Indenture. The amount of interest payable on the Series 2025-1 Class B Notes on each Monthly Allocation Date will be calculated as set forth in the Indenture.

Payments of principal and interest on this Note are subordinated to the payment of certain other amounts in accordance with the Priority of Payments and certain other provisions of the Indenture.

If an Event of Default shall occur and be continuing, this Note may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Amounts payable in respect of this Note shall be made by wire transfer of immediately available funds as instructed to the Trustee to the Series 2025-1 Class B Noteholders of record on the preceding Record Date.

Each holder of Series 2025-1 Class B Notes, by acceptance of a Series 2025-1 Class B Note, covenants and agrees that by accepting the benefits of the Indenture that prior to the date that is one (1) year and one (1) day after the payment in full of the latest maturing note issued under the Indenture, such holder of Series 2025-1 Class B Notes will not institute against, or join with any other Person in instituting against, any Obligor Entity any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings, under any federal or state bankruptcy or similar law; provided, however, that nothing herein shall constitute a waiver of any right to indemnification, reimbursement or other payment from the Obligor Entities pursuant to the Indenture or any other Related Document.

It is the intent of the Master Issuer that the Series 2025-1 Class B Notes will qualify under applicable tax law as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity. Each holder of Series 2025-1 Class B Notes, by the acceptance of this Note, agrees to treat this Note (or beneficial interests herein) for all purposes of United States federal, state, local and foreign income or franchise Taxes and any other Tax imposed on or measured by income, as equity interests in the Master Issuer or, if the Master Issuer is treated as a division of another entity for federal income tax purposes, such other entity.

The Indenture permits certain amendments to be made thereto without the consent of any holder of Series 2025-1 Class B Notes, provided that certain conditions precedent are satisfied. The Indenture also permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Master Issuer and the rights of the holders of Series 2025-1 Class B Notes under the Indenture at any time by the Master Issuer with the consent of the Required Holders and without the consent of any other holders of Series 2025-1 Class B Notes. The Indenture also contains provisions permitting the Required Holders to waive compliance by the Master Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences without the consent of any other holders of Series 2025-1 Class B Notes. Any such consent or waiver of this Note (or any one or more predecessor Notes) shall be conclusive and binding upon such holders of Series 2025-1 Class B Notes and upon all future holders of Series 2025-1 Class B Notes of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

Each purchaser or transferee of this Note (or any interest herein) shall be deemed to represent and warrant that it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose

underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law.

The term "Master Issuer" as used in this Note includes any successor and assign to the Master Issuer under the Indenture.

The Series 2025-1 Class B Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations set forth therein.

This Note and the Indenture shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflicts of law principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Master Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

[Remainder of page intentionally left blank]

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____, attorney, to transfer said Note on the books kept for registration thereof,
with full power of substitution in the premises.

Dated: _____

By: _____[13]

Signature Guaranteed:

---

[13]    NOTE: The signature to this assignment must correspond with the name of the registered owner as it
appears on the face of the within Note, without alteration, enlargement or any change whatsoever..

EXHIBIT B-1

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFERS
OF INTERESTS IN RULE 144A GLOBAL NOTES TO
INTERESTS IN TEMPORARY REGULATION S GLOBAL NOTES

Citibank, N.A.,
    as Trustee
480 Washington Boulevard, 30th Floor
Jersey City, NJ 07310
Attention: Securities Window – HOA RoyaltyCo LLC

Re:    HOA RoyaltyCo LLC $[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class
A-1 / $[_____] Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I /
$[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II / $[_____]
Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (the
"Notes")

Reference is hereby made to (i) the Second Amended and Restated Base Indenture,
dated as of October 31, 2025 (as amended, supplemented or otherwise modified from time to time, the
"Base Indenture"), between HOA RoyaltyCo LLC, as master issuer (the "Master Issuer"), and
Citibank, N.A., as trustee (the "Trustee") and as securities intermediary, and (ii) the Series 2025-
1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"
and, together with the Base Indenture, the "Indenture"), among the Master Issuer, the Trustee and
Citibank, N.A., as series 2025-1 securities intermediary. Capitalized terms used but not defined
herein shall have the meanings assigned to them pursuant to the Indenture.

This certificate relates to U.S. $[_____] aggregate principal amount of Notes,
which are held in the form of an interest in a Rule 144A Global Note with DTC (CUSIP (CINS)
No. [_____]) in the name of [_____] [name of transferor] (the "Transferor"), who wishes to
effect the transfer of such Notes in exchange for an equivalent beneficial interest in a Temporary
Regulation S Global Note in the name of [_____] [name of transferee] (the "Transferee").

In connection with such request, and in respect of such Notes, the Transferee does
hereby certify that either (A) it is the Master Issuer or an Affiliate of the Master Issuer or (B) such
Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture,
relating to the Notes, and (ii) pursuant to an exemption from registration under the Securities Act
of 1933, as amended (the "1933 Act"), and the applicable securities laws of any state of the United
States and any other jurisdiction and in accordance with the Indenture and any applicable securities
laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit
of the Master Issuer, the Registrar and the Trustee that either the Transferee is the Master Issuer
or an Affiliate of the Master Issuer, or:

1.    at the time that the buy order for such Series 2025-1 Notes was originated,
the Transferee was outside the United States and it is not a U.S. Person, and was not purchasing
for the account or benefit of a U.S. Person;

2.      no General Solicitation or directed selling efforts, as defined in Rule 902 under the 1933 Act, have been made in contravention of the requirements of Rule 903(a) or 904(a) under the 1933 Act;

3.      the transaction is not part of a plan or scheme to evade the registration requirements of the 1933 Act, and the Transferee is aware that the sale to it is being made in reliance on an exemption from the registration requirements of the 1933 Act provided by Regulation S;

4.      the Transferee is not a U.S. person (as defined in Regulation S);

5.      if the sale is made during a restricted period and the provisions of Rule 903(b)(2) or (3) or Rule 904(b)(1) of Regulation S are applicable thereto, the Transferee confirms that such sale has been made in accordance with the applicable provisions of Rule 903(b)(2) or (3) or Rule 904(b)(1), as the case may be;

6.      the Transferee is acquiring the Series 2025-1 Notes for its own account or the account of another person which is either a Qualified Institutional Buyer or not a U.S. Person, as applicable, with respect to which it exercises sole investment discretion;

7.      the Transferee will, and each account for which it is purchasing will, hold and transfer at least the minimum denomination of Series 2025-1 Notes;

8.      the Transferee understands that the Master Issuer may receive a list of Noteholders and of participants holding positions in the Series 2025-1 Notes from one or more book-entry depositories;

9.      the Transferee understands that the Master Issuer may receive (i) a list of Noteholders and Note Owners that have requested access to the Trustee's password-protected website or that have voluntarily registered as a Note Owner with the Trustee, (ii) copies of Noteholder and Note Owner confirmations of representations and warranties executed to obtain access to the Trustee's password-protected website and (iii) copies of prospective investor confirmations of representations and warranties executed to obtain access to Noteholder Materials;

10.     the Transferee will provide to each person to whom it transfers Series 2025-1 Notes notices of any restrictions on transfer of such Series 2025-1 Notes;

11.     the Transferee understands that the Series 2025-1 Notes will bear the legend set out in the applicable form of Series 2025-1 Notes attached to the Series 2025-1 Supplement and be subject to the restrictions on transfer described in such legend;

12.     in the case of Class A-1 Notes, (A) either (i) the Transferee is not acquiring or holding the Series 2025-1 Notes (or any interest therein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) the Transferee's acquisition, holding and disposition of the Series 2025-1 Notes (or any interest therein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if such Transferee is a Plan,

such Transferee represents, warrants and agrees that (i) none of the Master Issuer, Guarantors or other party to the Related Documents, nor any of their Affiliates, has provided, and none of them will provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Series 2025-1 Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Series 2025-1 Notes;

13.     in the case of Series 2025-1 Notes other than Class A-1 Notes, it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law; and

14.     the Transferee is:

_____ (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code") and a properly completed and signed Internal Revenue Service ("IRS") Form W-9 (or applicable successor form) is attached hereto; or

_____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code and a properly completed and signed IRS Form W-8 (or applicable successor form) is attached hereto.

The representations made pursuant to the preceding paragraphs shall be deemed to be made on each day from the date the Transferee acquires any interest in any Note through and including the date on which such Transferee disposes of its interest in the applicable Note.

The Transferee agrees to provide prompt written notice to the Master Issuer, the Registrar and the Trustee of any change of the status of the Transferee that would cause it to breach the representations made in the preceding paragraphs. The Transferee further agrees to indemnify and hold harmless the Master Issuer, the Registrar, the Trustee and the initial purchasers and their respective Affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements. Any purported transfer of the applicable Notes (or interests therein) that does not comply with the requirements of this paragraph and the preceding paragraphs shall be null and void *ab initio*.

The Transferee understands that the Master Issuer, the Trustee, the Registrar and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and

are irrevocably authorized to produce this certificate or a copy thereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby, and the Transferee hereby consents and agrees to such reliance and authorization.

[Name of Transferee]

By: _____

       Name
       Title:

Dated: _____, _____

Taxpayer Identification Number:                 Address for Notices
Wire Instructions for Payments:

Bank: _____
Address: _____
Bank ABA #: _____    Tel: _____
Account No.: _____    Fax: _____
FAO: _____    Attn.: _____
Attention: _____

Registered Name (if Nominee):

cc:       HOA RoyaltyCo LLC
        c/o Drivetrain, LLC
        410 Park Avenue, Suite 900
        New York, NY 10022
        Attention: Tim Daileader
        Phone: 212-856-9700
        Email: tdaileader@drivetrainllc.com

EXHIBIT B-2

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFERS
OF INTERESTS IN RULE 144A GLOBAL NOTES TO
INTERESTS IN PERMANENT REGULATION S GLOBAL NOTES

Citibank, N.A.,
   as Trustee
480 Washington Boulevard, 30th Floor
Jersey City, NJ 07310
Attention: Securities Window – HOA RoyaltyCo LLC

Re:   HOA RoyaltyCo LLC $[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class
     A-1 / $[_____] Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I /
     $[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II / $[_____]
     Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (the
     "Notes")

       Reference is hereby made to (i) the Second Amended and Restated Base Indenture,
dated as of October 31, 2025 (as amended, supplemented or otherwise modified from time to time, the
"Base Indenture"), between HOA RoyaltyCo LLC, as master issuer (the "Master Issuer"), and
Citibank, N.A., as trustee (the "Trustee") and as securities intermediary, and (ii) the Series 2025-
1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"
and, together with the Base Indenture, the "Indenture"), among the Master Issuer, the Trustee and
Citibank, N.A., as series 2025-1 securities intermediary. Capitalized terms used but not defined
herein shall have the meanings assigned to them pursuant to the Indenture.

       This certificate relates to U.S. $[_____] aggregate principal amount of Notes, which
are held in the form of an interest in a Rule 144A Global Note with DTC (CUSIP (CINS) No.
[_____]) in the name of [_____] [name of transferor] (the "Transferor"), who wishes to
effect the transfer of such Notes in exchange for an equivalent beneficial interest in a Permanent
Regulation S Global Note in the name of [____] [name of transferee] (the "Transferee").

       In connection with such request, and in respect of such Notes, the Transferee does
hereby certify that either (A) it is the Master Issuer or an Affiliate of the Master Issuer or (B) such
Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture,
relating to the Notes, and (ii) pursuant to an exemption from registration under the Securities Act
of 1933, as amended (the "1933 Act"), and the applicable securities laws of any state of the United
States and any other jurisdiction and in accordance with the Indenture and any applicable securities
laws of any state of the United States or any other jurisdiction.

       In addition, the Transferee hereby represents, warrants and covenants for the benefit
of the Master Issuer, the Registrar and the Trustee that either the Transferee is the Master Issuer
or an Affiliate of the Master Issuer, or:

       1.    at the time that the buy order for such Series 2025-1 Notes was originated,
the Transferee was outside the United States and it is not a U.S. Person, and was not purchasing
for the account or benefit of a U.S. Person;

2.      no General Solicitation or directed selling efforts, as defined in Rule 902 under the 1933 Act, have been made in contravention of the requirements of Rule 903(a) or 904(a) under the 1933 Act;

3.      the transaction is not part of a plan or scheme to evade the registration requirements

4.      of the 1933 Act, and the Transferee is aware that the sale to it is being made in reliance on an exemption from the registration requirements of the 1933 Act provided by Regulation S;

5.      the Transferee is not a U.S. person (as defined in Regulation S); the Transferee is acquiring the Series 2025-1 Notes for its own account or the account of another person which is either a Qualified Institutional Buyer or not a U.S. Person, as applicable, with respect to which it exercises sole investment discretion;

6.      the Transferee will, and each account for which it is purchasing will, hold and transfer at least the minimum denomination of Series 2025-1 Notes;

7.      the Transferee understands that the Master Issuer may receive a list of Noteholders and of participants holding positions in the Series 2025-1 Notes from one or more book-entry depositories;

8.      the Transferee understands that the Master Issuer may receive (i) a list of Noteholders and Note Owners that have requested access to the Trustee's password-protected website or that have voluntarily registered as a Note Owner with the Trustee, (ii) copies of Noteholder and Note Owner confirmations of representations and warranties executed to obtain access to the Trustee's password-protected website and (iii) copies of prospective investor confirmations of representations and warranties executed to obtain access to Noteholder Materials;

9.      the Transferee will provide to each person to whom it transfers Series 2025-1 Notes notices of any restrictions on transfer of such Series 2025-1 Notes;

10.     the Transferee understands that the Series 2025-1 Notes will bear the legend set out in the applicable form of Series 2025-1 Notes attached to the Series 2025-1 Supplement and be subject to the restrictions on transfer described in such legend;

11.     in the case of Class A-1 Notes, (A) either (i) the Transferee is not acquiring or holding the Series 2025-1 Notes (or any interest therein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) the Transferee's acquisition, holding and disposition of the Series 2025-1 Notes (or any interest therein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if such Transferee is a Plan, such Transferee represents, warrants and agrees that (i) none of the Master Issuer, Guarantors or other party to the Related Documents, nor any of their Affiliates, has provided, and none of them will provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise

acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Series 2025-1 Notes (unless a statutory or administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Series 2025-1 Notes;

12.    in the case of Series 2025-1 Notes other than Class A-1 Notes, it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law; and

13.    the Transferee is:

_____ (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code") and a properly completed and signed Internal Revenue Service ("IRS") Form W-9 (or applicable successor form) is attached hereto; or

_____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code and a properly completed and signed IRS Form W-8 (or applicable successor form) is attached hereto.

The representations made pursuant to the preceding paragraphs shall be deemed to be made on each day from the date the Transferee acquires any interest in any Note through and including the date on which such Transferee disposes of its interest in the applicable Note. The Transferee agrees to provide prompt written notice to the Master Issuer, the Registrar and the Trustee of any change of the status of the Transferee that would cause it to breach the representations made in the preceding paragraphs. The Transferee further agrees to indemnify and hold harmless the Master Issuer, the Registrar, the Trustee and the initial purchasers and their respective Affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements. Any purported transfer of the applicable Notes (or interests therein) that does not comply with the requirements of this paragraph and the preceding paragraphs shall be null and void *ab initio*.

The Transferee understands that the Master Issuer, the Trustee, the Registrar and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and are irrevocably authorized to produce this certificate or a copy thereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby, and the Transferee hereby consents and agrees to such reliance and authorization.

[Name of Transferee]

By: _____

                Name
                Title:

Dated: _____, _____

Taxpayer Identification Number:                  Address for Notices
Wire Instructions for Payments:

Bank: _____
Address: _____
Bank ABA #: _____      Tel: _____
Account No.: _____      Fax: _____
FAO: _____      Attn.: _____
Attention: _____

Registered Name (if Nominee):

cc:        HOA RoyaltyCo LLC
           c/o Drivetrain, LLC
           410 Park Avenue, Suite 900
           New York, NY 10022
           Attention: Tim Daileader
           Phone: 212-856-9700
           Email: tdaileader@drivetrainllc.com

EXHIBIT B-3

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFERS
OF INTERESTS IN TEMPORARY REGULATION S GLOBAL NOTES OR
PERMANENT REGULATION S GLOBAL NOTES TO PERSONS TAKING DELIVERY IN
THE FORM OF AN INTEREST IN A RULE 144A GLOBAL NOTE

Citibank, N.A.,
     as Trustee
480 Washington Boulevard, 30th Floor
Jersey City, NJ 07310
Attention: Securities Window – HOA RoyaltyCo LLC

Re:     HOA RoyaltyCo LLC $[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class
        A-1 / $[_____] Series 2025-1 4.723% Fixed Rate Senior Secured Notes, Class A-2I /
        $[_____] Series 2025-1 Floating Rate Senior Secured Notes, Class A-2II / $[_____]
        Series 2025-1 7.432% Fixed Rate Senior Subordinated Secured Notes, Class B (the
        "Notes")

          Reference is hereby made to (i) the Second Amended and Restated Base Indenture,
dated as of October 31, 2025 (as amended, supplemented or otherwise modified from time to time,
the "Base Indenture"), between HOA RoyaltyCo LLC, as master issuer (the "Master Issuer"), and
Citibank, N.A., as trustee (the "Trustee") and as securities intermediary, and (ii) the Series 2025-
1 Supplement to the Base Indenture, dated as of October 31, 2025 (the "Series 2025-1 Supplement"
and, together with the Base Indenture, the "Indenture"), among the Master Issuer, the Trustee and
Citibank, N.A., as series 2025-1 securities intermediary. Capitalized terms used but not defined
herein shall have the meanings assigned to them pursuant to the Indenture.

          This certificate relates to U.S. $[_____] aggregate principal amount of Notes
which are held in the form of [an interest in a Temporary Regulation S Global Note with DTC]
[an interest in an Permanent Regulation S Global Note with DTC] (CUSIP (CINS) No. [_____])
in the name of [_____] [name of transferor] (the "Transferor"), who wishes to effect the transfer
of such Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Note in the
name of [_____] [name of transferee] (the "Transferee").

          In connection with such request, and in respect of such Notes, the Transferee does
hereby certify that either (A) it is the Master Issuer or an Affiliate of the Master Issuer or (B) such
Notes are being transferred (i) in accordance with the applicable transfer restrictions set forth in
the Indenture, relating to the Notes, and (ii) pursuant to Rule 144A under the Securities Act of
1933, as amended, (the "1933 Act"), and the applicable securities laws of any state of the United
States and any other jurisdiction and in accordance with the Indenture and any applicable securities
laws of any state of the United States or any other jurisdiction.

          In addition, the Transferee hereby represents, warrants and covenants for the benefit
of the Master Issuer, the Registrar and the Trustee that either the Transferee is the Master Issuer
or an Affiliate of the Master Issuer, or:

1.      the Transferee is (a) a Qualified Institutional Buyer pursuant to Rule 144A, (b) aware that such sale of the Series 2025-1 Notes to it will be made in reliance on Rule 144A and (c) acquiring such Series 2025-1 Notes for its own account or for the account of another person who is a Qualified Institutional Buyer and with respect to which it exercises sole investment discretion;

2.      no General Solicitation or directed selling efforts, as defined in Rule 902 under the 1933 Act, have been made in contravention of the requirements of Rule 903(a) or 904(a) under the 1933 Act;

3.      the Transferee is acquiring the Series 2025-1 Notes for its own account or the account of another person which is either a Qualified Institutional Buyer or not a U.S. Person, as applicable, with respect to which it exercises sole investment discretion;

4.      the Transferee will, and each account for which it is purchasing will, hold and transfer at least the minimum denomination of Series 2025-1 Notes;

5.      the Transferee understands that the Master Issuer may receive a list of Noteholders and of participants holding positions in the Series 2025-1 Notes from one or more book-entry depositories;

6.      the Transferee understands that the Master Issuer may receive (i) a list of Noteholders and Note Owners that have requested access to the Trustee's password-protected website or that have voluntarily registered as a Note Owner with the Trustee, (ii) copies of Noteholder and Note Owner confirmations of representations and warranties executed to obtain access to the Trustee's password-protected website and (iii) copies of prospective investor confirmations of representations and warranties executed to obtain access to Noteholder Materials;

7.      the Transferee will provide to each person to whom it transfers Series 2025-1 Notes notices of any restrictions on transfer of such Series 2025-1 Notes;

8.      the Transferee understands that the Series 2025-1 Notes will bear the legend set out in the applicable form of Series 2025-1 Notes attached to the Series 2025-1 Supplement and be subject to the restrictions on transfer described in such legend;

9.      in the case of Class A-1 Notes, (A) either (i) the Transferee is not acquiring or holding the Series 2025-1 Notes (or any interest therein) for or on behalf of, or with the assets of, a Plan or a governmental, church, non-U.S. or other plan which is subject to any Similar Law or (ii) the Transferee's acquisition, holding and disposition of the Series 2025-1 Notes (or any interest therein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any Similar Law, and (B) if such Transferee is a Plan, such Transferee represents, warrants and agrees that (i) none of the Master Issuer, Guarantors or other party to the Related Documents, nor any of their Affiliates, has provided, and none of them will provide, any investment advice within the meaning of Section 3(21) of ERISA to it or to any Plan Fiduciary in connection with its decision to invest in the Notes, and they are not otherwise acting as a fiduciary, as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code, in connection with the Plan's acquisition of the Series 2025-1 Notes (unless a statutory or

administrative exemption applies (all of the applicable conditions of which are satisfied) or the transaction is not otherwise prohibited); and (ii) the Plan Fiduciary is exercising its own independent judgment in evaluating the investment in the Series 2025-1 Notes;

10.    in the case of Series 2025-1 Notes other than Class A-1 Notes, it is not and is not acting on behalf of, or using the assets of (A) an "employee benefit plan" (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA, (B) a "plan" (as defined in Section 4975(e)(1) of the Code), that is subject to Section 4975 of the Code, (C) an entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity (within the meaning of Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA), and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Law; and

11.    the Transferee is:

_____ (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code") and a properly completed and signed Internal Revenue Service ("IRS") Form W-9 (or applicable successor form) is attached hereto; or

_____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code and a properly completed and signed IRS Form W-8 (or applicable successor form) is attached hereto.

The representations made pursuant to the preceding paragraphs shall be deemed to be made on each day from the date the Transferee acquires any interest in any Note through and including the date on which such Transferee disposes of its interest in the applicable Note. The Transferee agrees to provide prompt written notice to the Master Issuer, the Registrar and the Trustee of any change of the status of the Transferee that would cause it to breach the representations made in the preceding paragraphs. The Transferee further agrees to indemnify and hold harmless the Master Issuer, the Registrar, the Trustee and the initial purchasers and their respective Affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements. Any purported transfer of the applicable Notes (or interests therein) that does not comply with the requirements of this paragraph and the preceding paragraphs shall be null and void *ab initio*.

The Transferee understands that the Master Issuer, the Trustee, the Registrar and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and are irrevocably authorized to produce this certificate or a copy thereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby, and the Transferee hereby consents and agrees to such reliance and authorization.

[Name of Transferee]

By: _____

     Name
     Title:

Dated: _____, _____

Taxpayer Identification Number:                    Address for Notices
Wire Instructions for Payments:

    Bank: _____
    Address: _____
    Bank ABA #: _____    Tel: _____
    Account No.: _____    Fax: _____
    FAO: _____    Attn.: _____
    Attention: _____

Registered Name (if Nominee):

cc:       HOA RoyaltyCo LLC
         c/o Drivetrain, LLC
         410 Park Avenue, Suite 900
         New York, NY 10022
         Attention: Tim Daileader
         Phone: 212-856-9700
         Email: tdaileader@drivetrainllc.com

EXHIBIT B-4

**FORM OF ERISA CERTIFICATE
FOR INITIAL SERIES 2025-1 CLASS A-2 NOTEHOLDERS AND
INITIAL SERIES 2025-1 CLASS B NOTEHOLDERS**

Citibank, N.A.,
as Registrar
388 Greenwich Street
New York, NY 10013
Attention: Citibank Agency & Trust – HOA RoyaltyCo LLC

HOA RoyaltyCo LLC
c/o Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022
Attention: Tim Daileader

> Re:   HOA RoyaltyCo LLC
>        Series 2025-1 Class A-2 Notes and Series 2025-1 Class B Notes

Reference is hereby made to the Series 2025-1 Supplement, dated as of October 31, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "Series 2025-1 Supplement"), by and between HOA RoyaltyCo LLC ("RoyaltyCo"), as Master Issuer, Citibank, N.A., as Trustee (the "Trustee") and securities intermediary, to the Second Amended and Restated Base Indenture, dated as of October 31, 2025 (as amended, restated, supplemented or otherwise modified from time to time, "Base Indenture"), by and between RoyaltyCo and the Trustee. Capitalized terms used herein and not defined herein shall have the meanings given to them in the Series 2025-1 Supplement.

This letter relates to the initial purchase of US$ _____ principal amount of the [Series 2025-1 Class A-2I Notes (the "Class A-2I Notes")] [Series 2025-1 Class A-2II Notes (the "Class A-2II Notes")] [Series 2025-1 Class B Notes (the "Class B Notes")] pursuant to the Series 2025-1 Supplement.

In connection with the initial purchase of the [Class A-2I Notes] [Class A-2II Notes] [Class B Notes] or any beneficial interest therein by the undersigned (the "Initial Purchaser"), the Initial Purchaser does hereby represent and warrant that it is, or the entity on whose behalf it is acting is, a(n):

☐      Section 1.      Employee Benefit Plans Subject to ERISA or the Code. "Employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to the fiduciary responsibility provisions of Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

☐      Section 2.      Entity Holding Plan Assets. Entity or fund whose underlying assets include "plan assets" by reason of the investment of a person described in Section

1 directly above in such entity, and it, and any such entity on whose behalf it is acting, are not a Controlling Person.

Each of the persons described in Section 1 or 2 directly above is referred to in this Certificate as a "Benefit Plan Investor."

If you check the box in Section 2, please indicate the maximum percentage of the entity or fund that will constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code: _____ percent. **An entity or fund that does not provide the foregoing percentage hereby acknowledges that for purposes of determining whether Benefit Plan Investors own less than 25 percent of the value of the Class B Notes, 100 percent of the assets of the entity or fund will be treated as "plan assets."**

☐   Section 3.    Controlling Person.  Any of:  (i) the Master Issuer, (ii) any person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Master Issuer, (iii) any person (other than a Benefit Plan Investor) who provides investment advice for a fee (direct or indirect) with respect to such assets or (iv) any "affiliate" of any of the above persons.  "Affiliate" shall have the meaning set forth in Department of Labor Regulation 29 C.F.R. 2510.3-101.  Each of the persons described in the first sentence of this Section 3 is referred to in this Certificate as a "Controlling Person."

☐   None of the above.  Person that is not described in any of Sections 1, 2 or 3 directly above.

The Initial Purchaser further represents and warrants as follows:

i)   The Initial Purchaser's acquisition and holding of a Note or any interest therein will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or a similar violation of any applicable Similar Laws.

ii)  The Initial Purchaser will not transfer its Note to a subsequent transferee unless such subsequent transferee is not and is not acting on behalf of, or using the assets of a Benefit Plan Investor, and if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law or an entity whose underlying assets include assets of any such plan, its acquisition and holding of such Notes or any interest therein will not constitute a violation of any applicable Similar Laws.

This letter of representation and the statements contained herein are made for your benefit and for the benefit of RoyaltyCo and the Trustee.

[Insert Name of Initial Purchaser]

By: _____
Name:
Title:

## **EXHIBIT A.3**

**Second Amended & Restated**
**Guarantee and Collateral Agreement**

**EXECUTION VERSION**

SECOND AMENDED AND RESTATED
GUARANTEE AND COLLATERAL AGREEMENT

made by

HOA HOLDCO, LLC,
HOA SYSTEMS, LLC,
HI LIMITED PARTNERSHIP,
HOA IP GP, LLC,
HOA RESTAURANT HOLDER, LLC,
HOA MARYLAND RESTAURANT HOLDER, LLC,
HOA KANSAS RESTAURANT HOLDER, LLC,
DW RESTAURANT HOLDER, LLC,
TW RESTAURANT HOLDER, LLC,
HOOTS RESTAURANT HOLDER, LLC,
HOA LAUREL, LLC and
HOA WALDORF, LLC

each as a

Guarantor

in favor of

CITIBANK, N.A.,

as Trustee

Dated as of October 31, 2025

# TABLE OF CONTENTS

**Page**

SECTION 1 DEFINED TERMS .................................................................................. 2

  1.1.  Definitions.................................................................................................... 2

SECTION 2 GUARANTEE ........................................................................................ 2

  2.1.  Guarantee .................................................................................................... 2

  2.2.  No Subrogation ........................................................................................... 3

  2.3.  Amendments, etc. with respect to the Guaranteed Obligations ................... 4

  2.4.  Guarantee Absolute and Unconditional ...................................................... 4

  2.5.  Reinstatement ............................................................................................. 5

  2.6.  Payments .................................................................................................... 5

  2.7.  Information .................................................................................................. 5

SECTION 3 SECURITY ............................................................................................ 5

  3.1.  Grant of Security Interest............................................................................ 5

  3.2.  Certain Rights and Obligations of the Guarantors Unaffected ..................... 7

  3.3.  Performance of Collateral Documents......................................................... 7

  3.4.  Stamp, Other Similar Taxes and Filing Fees .............................................. 8

  3.5.  Authorization to File Financing Statements ................................................ 8

SECTION 4 REPRESENTATIONS AND WARRANTIES ......................................... 9

  4.1.  Existence and Power ................................................................................... 9

  4.2.  Company and Governmental Authorization ................................................ 9

  4.3.  No Consent.................................................................................................. 10

  4.4.  Binding Effect ............................................................................................ 10

  4.5.  Ownership of Equity Interests; Subsidiaries............................................... 10

  4.6.  Security Interests........................................................................................ 12

SECTION 5 COVENANTS ........................................................................................ 13

  5.1.  Covenants in Base Indenture and Other Related Documents ....................... 13

  5.2.  Further Assurances...................................................................................... 13

  5.3.  Legal Name, Location Under Section 9-301 or 9-307.................................. 13

SECTION 6 REMEDIAL PROVISIONS ................................................................... 13

  6.1.  Rights of the Trustee upon Event of Default ............................................... 13

  6.2.  Waiver of Appraisal, Valuation, Stay and Right to Marshaling ................... 16

  6.3.  Limited Recourse ....................................................................................... 17

  6.4.  The Trustee May File Proofs of Claim ........................................................ 17

6.5.    Undertaking for Costs .................................................................................. 17

6.6.    Restoration of Rights and Remedies ............................................................ 18

6.7.    Rights and Remedies Cumulative ................................................................ 18

6.8.    Delay or Omission Not Waiver .................................................................... 18

6.9.    Waiver of Stay or Extension Laws .............................................................. 18

SECTION 7 THE TRUSTEE'S AUTHORITY ........................................................ 19

SECTION 8 MISCELLANEOUS ............................................................................. 19

8.1.    Amendments ................................................................................................. 19

8.2.    Notices .......................................................................................................... 19

8.3.    Governing Law ............................................................................................. 20

8.4.    Successors ..................................................................................................... 20

8.5.    Severability ................................................................................................... 20

8.6.    Counterpart Originals ................................................................................... 20

8.7.    Table of Contents, Headings, etc ................................................................. 21

8.8.    Recording of Agreement .............................................................................. 21

8.9.    Waiver of Jury Trial ..................................................................................... 21

8.10.    Submission to Jurisdiction; Waivers .......................................................... 21

8.11.    Currency Indemnity .................................................................................... 22

8.12.    Acknowledgment of Receipt; Waiver ........................................................ 22

8.13.    Termination; Partial Release ...................................................................... 22

8.14.    Third Party Beneficiary .............................................................................. 23

8.15.    Entire Agreement ........................................................................................ 23

8.16.    Amendment and Restatement ..................................................................... 23

# SECOND AMENDED AND RESTATED
# GUARANTEE AND COLLATERAL AGREEMENT

SECOND AMENDED AND RESTATED GUARANTEE AND COLLATERAL AGREEMENT (as amended, amended and restated, restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of October 31, 2025, made by HOA HOLDCO, LLC, a Delaware limited liability company, HOA SYSTEMS, LLC, a Delaware limited liability company, HI LIMITED PARTNERSHIP, a Florida limited partnership, HOA IP GP, LLC, a Delaware limited liability company, HOA RESTAURANT HOLDER, LLC, a Delaware limited liability company, HOA MARYLAND RESTAURANT HOLDER, LLC, a Delaware limited liability company, HOA KANSAS RESTAURANT HOLDER, LLC, a Kansas limited liability company, DW RESTAURANT HOLDER, LLC, a Delaware limited liability company, TW RESTAURANT HOLDER, LLC, a Delaware limited liability company, HOOTS RESTAURANT HOLDER, LLC, a Delaware limited liability company, HOA LAUREL, LLC, a Delaware limited liability company, and HOA WALDORF, LLC, a Delaware limited liability company (each of the above, collectively, the "Guarantors") in favor of CITIBANK, N.A., a national banking association, as trustee under the Indenture referred to below (in such capacity, together with its successors, the "Trustee") for the benefit of the Secured Parties.

## W I T N E S S E T H:

WHEREAS, the Trustee, HOA RoyaltyCo LLC (f/k/a HOA Funding, LLC), a Delaware limited liability company (the "Master Issuer"), and certain other Securitization Entities (as defined in the Original Base Indenture (as defined below)) previously entered into the Base Indenture, dated as of August 12, 2014 (the "Original Base Indenture"), which was amended and restated by the Amended and Restated Base Indenture, dated as of August 19, 2021 (the "First A&R Base Indenture"), between the Master Issuer and the Trustee;

WHEREAS, concurrent with the First A&R Base Indenture, the Guarantors and the Trustee entered into an Amended and Restated Guarantee and Collateral Agreement, dated as of August 19, 2021 (the "Prior Guarantee and Collateral Agreement");

WHEREAS, on March 31, 2025, Hooters of America, LLC and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, which initiated the chapter 11 cases jointly administered under lead case *In re Hooters of America, LLC*, Case No. 25-80078 (SWE);

WHEREAS, pursuant to the Approved Plan, the Debtors have agreed to restructure their business;

WHEREAS, in accordance with the Approved Plan, the Master Issuer, the Trustee and Citibank, N.A., as securities intermediary, have entered into the Second Amended and Restated Base Indenture, dated as of the date of this Agreement (as amended, modified or supplemented from time to time, exclusive of any Series Supplement, the "Base Indenture" and, together with the Series Supplement, the "Indenture"), which amends and restates the First A&R Base Indenture;

WHEREAS, in accordance with the Approved Plan and substantially concurrently with the effectiveness of the Indenture, all Notes as defined under and issued pursuant to the First A&R Base Indenture were cancelled in exchange for the issuance of the Series 2025-1 Notes under the Indenture or for interests in other securities;

WHEREAS, in consideration of the Indenture, the parties hereto wish to amend and restate the Prior Guarantee and Collateral Agreement and to regrant the security interests created thereunder in favor of the Trustee for the ratable benefit of the Secured Parties; and

WHEREAS, the Indenture and the other Related Documents require that the parties hereto execute and deliver this Agreement;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby agrees with the Trustee, for the benefit of the Secured Parties, as follows:

## SECTION 1

## DEFINED TERMS

1.1.    Definitions.

(a)    Unless otherwise defined herein, terms defined in the Base Indenture Definitions List attached to the Base Indenture as Annex A thereto and used herein shall have the meanings given to them in such Base Indenture Definitions List.

(b)    The following terms shall have the following meanings:

"Collateral" has the meaning assigned to such term in Section 3.1(a).

"Guaranteed Obligations" means all Obligations owed by the Master Issuer to the Secured Parties under the Indenture and the other Related Documents.

"Other Currency" has the meaning assigned to such term in Section 8.12.

"Termination Date" has the meaning assigned to such term in Section 2.1(d).

## SECTION 2

## GUARANTEE

2.1.    Guarantee.

(a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Trustee, for the benefit of the Secured Parties, the prompt and complete payment and performance by the Master Issuer when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations. In furtherance of the foregoing and not in limitation of any other right that the Trustee or any other Secured Party has

at law or in equity against any Guarantor by virtue hereof, upon the failure of the Master Issuer to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby jointly and severally promises to and shall forthwith pay, or cause to be paid when due, to the Trustee for distribution to the applicable Secured Parties in accordance with the Indenture, in cash, the amount of such unpaid Guaranteed Obligation. This is a guarantee of payment and not merely of collection.

(b) Anything herein or in any other Related Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Related Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors.

(c) Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of the Trustee or any other Secured Party hereunder.

(d) The guarantee contained in this Section 2 shall remain in full force and effect until the date (the "Termination Date") on which this Agreement ceases to be of further effect in accordance with Article XI of the Base Indenture, notwithstanding that from time to time prior thereto the Master Issuer may be free from any Guaranteed Obligations.

(e) No payment made by the Master Issuer, any of the Guarantors, any other guarantor or any other Person or received or collected by the Trustee or any other Secured Party from the Master Issuer, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guaranteed Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Guaranteed Obligations or any payment received or collected from such Guarantor in respect of the Guaranteed Obligations), remain liable hereunder for the Guaranteed Obligations up to the maximum liability of such Guarantor hereunder until the Termination Date.

2.2. No Subrogation. Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Trustee or any other Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Trustee or any other Secured Party against the Master Issuer or any other Guarantor or any collateral security or guarantee or right of offset held by the Trustee or any other Secured Party for the payment of the Guaranteed Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Master Issuer or any other Guarantor in respect of payments made by such Guarantor hereunder, until the Termination Date. If any amount shall be paid to any Guarantor on account of such subrogation, contribution or reimbursement rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Trustee and the other Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Trustee in the exact form received by such Guarantor (duly endorsed by such Guarantor to the

Trustee, if required), to be applied against the Guaranteed Obligations, whether matured or unmatured, in such order as the Trustee may determine in accordance with the Indenture.

2.3.    <u>Amendments, etc. with respect to the Guaranteed Obligations</u>. Each Guarantor shall be and remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Guaranteed Obligations made by the Trustee or any other Secured Party may be rescinded by the Trustee or such other Secured Party and any of the Guaranteed Obligations continued, and the Guaranteed Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Trustee or any other Secured Party, and the Base Indenture and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, from time to time, and any collateral security, guarantee or right of offset at any time held by the Trustee or any other Secured Party for the payment of the Guaranteed Obligations may be sold, exchanged, waived, surrendered or released (it being understood that this <u>Section 2.3</u> is not intended to affect any rights or obligations set forth in any other Related Document). Neither the Trustee nor any other Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Guaranteed Obligations or for the guarantee contained in this <u>Section 2</u> or any property subject thereto.

2.4.    <u>Guarantee Absolute and Unconditional</u>. Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by the Trustee or any other Secured Party upon the guarantee contained in this <u>Section 2</u> or acceptance of the guarantee contained in this <u>Section 2</u>; the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this <u>Section 2</u> and the grant of the security interests pursuant to <u>Section 3</u>; and all dealings between the Master Issuer and any of the Guarantors, on the one hand, and the Trustee and the other Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this <u>Section 2</u> and the grant of the security interests pursuant to <u>Section 3</u>. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Master Issuer or any of the Guarantors with respect to the Guaranteed Obligations. Each Guarantor understands and agrees that the guarantee contained in this <u>Section 2</u> and the grant of the security interests pursuant to <u>Section 3</u> shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the Indenture or any other Related Document, any of the Guaranteed Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Trustee or any other Secured Party, (b) any defense, set-off or counterclaim (other than a defense of full payment or performance) which may at any time be available to or be asserted by the Master Issuer or any other Person against the Trustee or any other Secured Party, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Master Issuer or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Master Issuer for the Guaranteed Obligations, or of such Guarantor under the guarantee contained in this <u>Section 2</u> and the grant of the security interests pursuant to <u>Section 3</u>, in bankruptcy or in any other

instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Trustee or any other Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Master Issuer, any other Guarantor or any other Person or against any collateral security or guarantee for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by the Trustee or any other Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from any Master Issuer, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Master Issuer, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Trustee or any other Secured Party against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

2.5.    Reinstatement. The guarantee contained in this Section 2 shall be and continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by the Trustee or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Master Issuer or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Master Issuer or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

2.6.    Payments. Each Guarantor hereby guarantees that payments hereunder shall be paid to the Trustee without set-off or deduction or counterclaim in immediately available funds in Dollars at the office of the Trustee.

2.7.    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Master Issuer's and each other Guarantor's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Trustee nor any other Secured Party shall have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

## SECTION 3

## SECURITY

3.1.    Grant of Security Interest.

(a)    To secure the Obligations, each Guarantor hereby pledges, assigns, conveys, delivers, transfers and sets over to the Trustee, for the benefit of the Secured Parties, and hereby grants to the Trustee, for the benefit of the Secured Parties, a security interest in such Guarantor's right, title and interest in, to and under all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, health-care-

insurance receivables, instruments, inventory, money, proceeds, securities, securities accounts and other investment property and letter-of-credit rights (in each case, as defined in the New York UCC), including all of the following property to the extent now owned or at any time hereafter acquired by such Guarantor or in which such Guarantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"):

(i)    the Equity Interests of any Person owned by such Guarantor and all rights as a member, partner or shareholder of each such Person under the Charter Documents of each such Person;

(ii)    with respect to the IP Holder, the Collateral IP and the right to bring in the name of the IP Holder an action at law or in equity for any infringement, misappropriation, dilution or other violation thereof occurring prior to, on or after the Closing Date, and to collect all damages and settlements (except to the extent that a licensee or sublicensee has such rights under its respective license agreement or the Brand Management Agreement) and the IP Holder's right to receive the IP License Fees and other recoveries, if any, under the IP License Agreement, the Brand Management Agreement and the Founders License Agreements;

(iii)    the Accounts and all amounts on deposit in or otherwise credited to the Accounts;

(iv)    any additional Equity Interests of any Subsidiary from time to time acquired by or issued to such Guarantor in any manner, together with all claims, rights, privileges, authority and powers of such Guarantor relating to any such Equity Interests or granted to it under any organizational document of any such Subsidiary formed or acquired from time to time;

(v)    the books and records (whether in physical, electronic or other form) of each of the Guarantors, including those books and records maintained by the Master Issuer on behalf of the Guarantors relating to the Collateral IP, Brand Management Agreement and other Related Documents;

(vi)    the rights, powers, remedies and authorities of the Guarantors under each of the Related Documents (other than the Indenture and the Notes) to which they are a party;

(vii)    any and all other property of the Guarantors now or hereafter acquired; and

(viii)    all payments, proceeds, supporting obligations and accrued and future rights to payment with respect to the foregoing;

provided that the Collateral shall exclude and no liens shall attach to the Excluded Assets for so long as they remain Excluded Assets subject to the Collateral Exclusions. The Trustee, on behalf of the Secured Parties, acknowledges that it shall have no security interest in any Collateral Exclusions.

(b)     The foregoing grant reaffirms the existing security interests and reconfirms that the grant is made in trust to secure the Obligations and to secure compliance with the provisions of this Agreement, all as provided in this Agreement. The Trustee, on behalf of the Secured Parties, acknowledges such grant, accepts the trusts under this Agreement in accordance with the provisions of this Agreement and agrees to perform its duties required in this Agreement. The Collateral shall secure the Obligations equally and ratably without prejudice, priority or distinction (except, with respect to the Notes, as otherwise stated in the Series Supplement or in the applicable provisions of the Base Indenture).

(c)     The parties hereto agree and acknowledge that each certificated Equity Interest constituting Collateral may be held by a custodian on behalf of the Trustee.

3.2.    <u>Certain Rights and Obligations of the Guarantors Unaffected</u>.

(a)     The grant of the security interest by the Guarantors in the Collateral to the Trustee on behalf of the Secured Parties hereunder shall not (i) relieve any Guarantor from the performance of any term, covenant, condition or agreement on such Guarantor's part to be performed or observed under or in connection with any of the Collateral Documents or (ii) impose any obligation on the Trustee or any of the Secured Parties to perform or observe any such term, covenant, condition or agreement on such Guarantor's part to be so performed or observed or impose any liability on the Trustee or any of the Secured Parties for any act or omission on the part of such Guarantor or from any breach of any representation or warranty on the part of such Guarantor.

(b)     Each Guarantor hereby jointly and severally agrees to indemnify and hold harmless the Trustee and each Secured Party (including its directors, officers, employees and agents) from and against losses, liabilities (including liabilities for penalties), claims, demands, actions, suits, judgments, reasonable and documented out-of-pocket costs and expenses arising out of or resulting from the security interest granted hereby, whether arising by virtue of any act or omission on the part of such Guarantor or otherwise, including, the reasonable and documented out-of-pocket costs, expenses and disbursements (including reasonable and documented attorneys' fees and expenses of (i) the Trustee and (ii) a single firm of external counsel for the Noteholders taken as a whole (in their capacity as Noteholders) and such local and specialist counsel as necessary) incurred by the Trustee or any Secured Party in enforcing this Agreement or any other Related Document or preserving any of its rights to, or realizing upon, any of the Collateral; provided, however, that the foregoing indemnification shall not extend to any action by the Trustee or any Secured Party which constitutes gross negligence, bad faith or willful misconduct by the Trustee or any Secured Party or any other indemnified person hereunder. The indemnification provided for in this <u>Section 3.2</u> shall survive the removal of, or a resignation by, any Person as Trustee as well as the termination of this Agreement.

3.3.    <u>Performance of Collateral Documents</u>. Upon the occurrence of a default or breach (after giving effect to any applicable notice, grace or cure periods) by any Person party to (a) a Collateral Related Document, (b) the IP License Agreement or (c) the Brand Management Agreement (in each case, only if an Event of Default has occurred and is continuing), promptly following a request from the Trustee to do so and at the Guarantors' expense, the Guarantors agree jointly and severally to take (or direct its designee to take on its behalf) such commercially

reasonable and lawful action as permitted under this Agreement as the Trustee (acting at the written direction of the Supermajority Noteholders) may reasonably request to compel or secure the performance and observance by such Person of its obligations to any Guarantor, and to exercise such rights, remedies, powers and privileges lawfully available to any Guarantor to the extent and in the manner directed by the Trustee (acting at the written direction of the Supermajority Noteholders), including, without limitation, the transmission of notices of default and the institution of legal or administrative actions or proceedings to compel or secure performance by such Person of its obligations thereunder. If (i) any Guarantor shall have failed, within fifteen (15) Business Days of receiving the written direction of the Trustee, to take action to accomplish such directions of the Trustee, (ii) any Guarantor refuses to take any such action, as reasonably determined by the Trustee in good faith, or (iii) the Required Holders reasonably determine that such action must be taken immediately, in any such case the Supermajority Noteholders may, but shall not be obligated to, take, and the Trustee shall take (if so directed by the Supermajority Noteholders), at the expense of the Guarantors, such previously directed action and any related action permitted under this Agreement which the Supermajority Noteholders thereafter determine is appropriate (without the need under this provision or any other provision under this Agreement to direct the Guarantor to take such action), on behalf of the Guarantor and the Secured Parties.

3.4.    <u>Stamp, Other Similar Taxes and Filing Fees</u>. The Guarantors shall jointly and severally indemnify and hold harmless the Trustee and each Secured Party from any present or future claim for liability for any stamp, documentary or other similar tax and any penalties or interest and expenses with respect thereto, that may be assessed, levied or collected by any jurisdiction in connection with this Agreement, any other Related Document or any Collateral. The Guarantors shall pay, and jointly and severally indemnify and hold harmless each Secured Party against, any and all amounts in respect of all search, filing, recording and registration fees, taxes, excise taxes and other similar imposts that may be payable or determined to be payable in respect of the execution, delivery, performance and/or enforcement of this Agreement or any other Related Document (except to the extent such amounts are owed as a direct result from gross negligence, willful misconduct or fraud by the Trustee or any Secured Party).

3.5.    <u>Authorization to File Financing Statements</u>.

(a)    Each Guarantor hereby irrevocably authorizes the Trustee (at the written direction of the Required Holders) on behalf of the Secured Parties at any time and from time to time to file or record without the signature of such Guarantor to the extent permitted by applicable law in any filing office in any applicable jurisdiction financing statements and other filing or recording documents or instruments with respect to the Collateral, including, without limitation, any and all United States registered Intellectual Property other than Excluded Assets and the Excepted Collateral IP Assets (to the extent set forth in <u>Section 8.17</u> of the Base Indenture) to perfect the security interests of the Trustee for the benefit of the Secured Parties under this Agreement. Each Guarantor authorizes the filing of any such financing statement, other filing, recording document or instrument naming the Trustee as secured party and indicating that the Collateral includes (a) "all assets" or words of similar effect or import regardless of whether any particular assets comprised in the Collateral fall within the scope of <u>Article 9</u> of the UCC, including, without limitation, any and all Collateral IP other than Excluded Assets and Excepted Collateral IP Assets, or (b) as being of an equal or lesser scope or with greater detail. Each Guarantor agrees to furnish any information as reasonably necessary to accomplish the foregoing

promptly upon the Trustee's request.  Notwithstanding anything to the contrary in this Agreement, no Guarantor shall be required to make any filings or take any other actions to perfect, evidence or create a security interest in any Collateral IP except for filings in the PTO and the United States Copyright Office and the filing of a UCC financing statement, and no Guarantor shall be required to reimburse the Trustee or any other Person for any costs incurred in connection with any filings or actions to perfect, evidence or create a security interest in any Collateral IP other than in connection with such filings in the United States Patent and Trademark Office or the United States Copyright Office and the filing of UCC financing statements.

(b)    Each Guarantor acknowledges that the Collateral under this Agreement includes certain rights of the Guarantors as secured parties under the Related Documents. Each Guarantor hereby irrevocably authorizes the Trustee (at the written direction of the Required Holders) on behalf of the Secured Parties to make such filings as they deem necessary to reflect the Trustee as secured party of record with respect to such financing statements.

(c)    Notwithstanding anything to the contrary in this <u>Section 3.5</u> or this Agreement, the Trustee's authority, right or power to file financing statements or other filings or recording documents or instruments shall not impose upon the Trustee any obligations or duties, including, without limitation, any obligations or duties to maintain perfection of any liens or security interests or the filing or recording of any documents including financing statements, continuation statements, amendments or termination statements, and the Trustee shall have no liability for failure of the maintenance of the priority or perfection of any lien or security interest.

## SECTION 4

## <u>REPRESENTATIONS AND WARRANTIES</u>

Each Guarantor hereby represents and warrants, for the benefit of the Trustee and the Secured Parties, as follows as of the Closing Date after giving effect to the effectuation of the Approved Plan:

4.1.    <u>Existence and Power</u>. Each Guarantor (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) is duly qualified to do business as a foreign entity and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations under the Related Documents make such qualification necessary, except to the extent that the failure to so qualify is not reasonably likely to result in a Material Adverse Effect, and (c) has all limited liability company, limited partnership, corporate or other powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as will be conducted after giving effect to the Approved Plan and the consummation of the transactions contemplated thereby and for purposes of the transactions contemplated by the Indenture and the other Related Documents.

4.2.    <u>Company and Governmental Authorization</u>. The execution, delivery and performance by each Guarantor of this Agreement and the other Related Documents to which it is a party (a) is within such Guarantor's limited liability company, limited partnership, corporate or other powers and has been duly authorized by all necessary limited liability company, limited

partnership, corporate or other action, (b) requires no action by or in respect of, or filing with, any Governmental Authority which has not been obtained (other than any actions or filings that may be undertaken as part of the Approved Plan or after the Closing Date pursuant to the terms of this Agreement or any other Related Document or in connection with the effectuation of the Approved Plan) and (c) does not contravene, or constitute a default under, any Requirements of Law with respect to such Guarantor or any Contractual Obligation with respect to such Guarantor or result in the creation or imposition of any Lien on any property of any Obligor Entity, except for Liens created by this Agreement or the other Related Documents.

4.3.    No Consent. Except as set forth in the Approved Plan or on Schedule 7.3 to the Base Indenture, no consent, action by or in respect of, approval or other authorization of, or registration, declaration or filing with, any Governmental Authority or other Person is required for the valid execution and delivery by each Guarantor of this Agreement or any Related Document to which it is a party or for the performance of any of the Guarantors' obligations hereunder or thereunder other than such consents, approvals, authorizations, registrations, declarations or filings (a) as shall have been obtained or made by such Guarantor prior to the Closing Date or as are permitted to be obtained subsequent to the Closing Date in accordance with Section 4.6 hereof or Section 7.10 or Section 8.17 of the Base Indenture, (b) obtained pursuant to a court order or as required in connection with the effectuation of the Approved Plan or (c) relating to the performance of the IP License Agreement the failure of which to obtain is not reasonably likely to have a Material Adverse Effect.

4.4.    Binding Effect. This Agreement, and each other Related Document to which a Guarantor is a party, is a legal, valid and binding obligation of each such Guarantor enforceable against such Guarantor in accordance with its terms (except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general equitable principles, whether considered in a proceeding at law or in equity and by an implied covenant of good faith and fair dealing).

4.5.    Ownership of Equity Interests; Subsidiaries. As of the Closing Date after giving effect to the transactions contemplated by the Approved Plan:

(a)    All of the issued and outstanding limited liability company interests of HOA Systems are directly owned by the Master Issuer, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(b)    All of the issued and outstanding limited liability company interests of the Master Issuer are directly owned by NewCo, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by NewCo free and clear of all Liens other than Permitted Liens.

(c)    All of the issued and outstanding limited liability company interests of HOA Restaurant Holder are directly owned by the Master Issuer, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(d)        All of the issued and outstanding limited liability company interests of HOOTS Restaurant Holder are directly owned by the Master Issuer, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(e)        All of the issued and outstanding limited liability company interests of HOA IP GP are directly owned by the Master Issuer, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(f)        All of the issued and outstanding general partnership interests of the IP Holder are directly owned by HOA IP GP, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by HOA IP GP free and clear of all Liens other than Permitted Liens.

(g)        All of the issued and outstanding limited partnership interests of the IP Holder are directly owned by the Master Issuer, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by the Master Issuer free and clear of all Liens other than Permitted Liens.

(h)        All of the issued and outstanding limited liability company interests of DW Restaurant Holder are directly owned by HOA Restaurant Holder, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by HOA Restaurant Holder free and clear of all Liens other than Permitted Liens.

(i)        All of the issued and outstanding limited liability company interests of TW Restaurant Holder are directly owned by HOA Restaurant Holder, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by HOA Restaurant Holder free and clear of all Liens other than Permitted Liens.

(j)        All of the issued and outstanding limited liability company interests of HOA Kansas Restaurant Holder are directly owned by HOA Restaurant Holder, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by HOA Restaurant Holder free and clear of all Liens other than Permitted Liens.

(k)        All of the issued and outstanding limited liability company interests of HOA Maryland Restaurant Holder are directly owned by HOA Restaurant Holder, have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable and are owned of record by HOA Restaurant Holder free and clear of all Liens other than Permitted Liens.

(l)        All of the issued and outstanding limited liability company interests of HOA Laurel Restaurant Holder have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable. Substantially all of such interests

are directly owned by HOA Maryland Restaurant Holder. The interests owned of record by HOA Maryland Restaurant Holder are free and clear of all Liens other than Permitted Liens.

(m)     All of the issued and outstanding limited liability company interests of HOA Waldorf Restaurant Holder have been duly authorized and validly issued, and to the extent such concepts are applicable, are fully paid and non-assessable. A plurality all of such interests are directly owned by HOA Maryland Restaurant Holder. The interests owned of record by HOA Maryland Restaurant Holder are free and clear of all Liens other than Permitted Liens.

4.6.    Security Interests.

(a)     Each Guarantor owns and has good title to its assets constituting the Collateral, free and clear of Liens other than Permitted Liens. Other than the Accounts, the Collateral consists of securities, loans, investments, accounts, commercial tort claims, inventory, equipment, fixtures, health care insurance receivables, chattel paper, money, deposit accounts, instruments, financial assets, documents, investment property, general intangibles, letter of credit rights, and other supporting obligations (in each case, as defined in the UCC). Upon giving effect to the Approved Plan, the effectiveness of this Agreement and the filing of UCC financing statements, this Agreement and the Base Indenture will constitute a valid and continuing Lien on the Collateral in favor of the Trustee on behalf of and for the benefit of the Secured Parties, which Lien on the Collateral has been perfected to the extent required pursuant to the terms of this Agreement and the Base Indenture, and is enforceable as such as against creditors of and purchasers from each Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general equitable principles, whether considered in a proceeding at law or in equity and by an implied covenant of good faith and fair dealing. After giving effect to the Approved Plan and the transactions occurring in connection therewith, each Guarantor has received all consents and approvals required by the terms of this Agreement and the Collateral to the pledge of the Collateral to the Trustee hereunder or under the Base Indenture subject only to the Collateral Exclusions and limitations on counsel agreed with the Required Holders. Each Guarantor shall have caused, or shall cause promptly following the effectiveness of the Approved Plan, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the first-priority security interest (subject to Permitted Liens) in the Collateral granted to the Trustee hereunder or under the Base Indenture within ten (10) Business Days of the date of this Agreement, or, in the case of Intellectual Property, shall take such additional action requested by the Trustee (acting at the written direction of the Required Holders) and necessary to perfect such security interest consistent with the obligations set forth in Section 8.17 of the Base Indenture.

(b)     Other than the security interest granted to the Trustee hereunder, pursuant to the other Related Documents or any other Permitted Lien, none of the Guarantors has pledged, assigned, sold or granted a security interest in the Collateral (that is not a Permitted Lien or that has been otherwise consented to by the Required Holders). Such actions necessary (including the filing of UCC-1 financing statements and filings with the PTO and the United States Copyright Office) to protect and evidence the Trustee's security interest in the Collateral in the United States has been, or shall be, duly and effectively taken by the Trustee, consistent with the obligations set forth in Section 7.10(a) of the Base Indenture. No effective security agreement,

financing statement, equivalent security or lien instrument or continuation statement authorized by any Guarantor and listing the such Guarantor as debtor covering all or any part of the Collateral is on file or of record in any jurisdiction, except in respect of Permitted Liens or liens being discharged pursuant to the Approved Plan or such as may have been filed, recorded or made by such Guarantor in favor of the Trustee on behalf of the Secured Parties in connection with this Agreement or the Base Indenture, and no Guarantor has authorized any such filing except in respect of Permitted Liens or liens being discharged pursuant to the Approved Plan.

## SECTION 5

## COVENANTS

5.1.    <u>Covenants in Base Indenture and Other Related Documents</u>. Each Guarantor shall take, or shall refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor or any of its Subsidiaries. All covenants of each Guarantor made in the Base Indenture and in each other Related Document are repeated herein as though fully set forth herein.

5.2.    <u>Further Assurances</u>.  Each Guarantor shall do such further commercially reasonable acts and things, and execute and deliver to the Trustee such additional assignments, agreements, powers and instruments, as are necessary or desirable to obtain or maintain the security interest of the Trustee in the Collateral on behalf of the Secured Parties as a perfected security interest in the Collateral subject only to Permitted Liens, to carry into effect the purposes of this Agreement and the other Related Documents or to better assure and confirm unto the Trustee or the other Secured Parties their rights, powers and remedies hereunder including, without limitation, the filing of such financing or continuation statements or amendments under the UCC in effect in any applicable filing jurisdiction with respect to the liens and security interests granted hereby requested by the Trustee or the Required Holders.

5.3.    <u>Legal Name, Location Under Section 9-301 or 9-307</u>. No Guarantor shall change its location (within the meaning of Section 9-301 or 9-307 of the applicable UCC) or its legal name without prior written notice to the Trustee. In the event that any Guarantor desires to so change its location or change its legal name, such Guarantor shall make any required filings and prior to actually changing its location or its legal name such Guarantor shall deliver to the Trustee (i) an Officer's Certificate confirming that all required filings have been made to continue the perfected interest of the Trustee on behalf of the Secured Parties in the Collateral under <u>Article 9</u> of the applicable UCC or other applicable law in respect of the new location or new legal name of such Guarantor and (ii) copies of all such required filings with the filing information duly noted thereon by the office in which such filings were made.

## SECTION 6

## REMEDIAL PROVISIONS

6.1.    <u>Rights of the Trustee upon Event of Default</u>.

(a)    <u>Proceedings To Collect Money</u>. In case any Guarantor shall fail forthwith to pay such amounts due on this Guaranty following such demand, the Trustee (at the written direction of the Required Holders), in its own name and as trustee of an express trust, may institute a Proceeding for the collection of such outstanding sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against any Guarantor and collect in the manner provided by law out of the property of any Guarantor, wherever situated, the moneys adjudged or decreed to be payable.

(b)    <u>Other Proceedings</u>. If and whenever an Event of Default shall have occurred and be continuing (after giving effect to any applicable notice, grace or cure periods), the Trustee (at the written direction of the Supermajority Noteholders), may take one or more of the following actions:

(i)    proceed to protect and enforce its rights and the rights of the Secured Parties, by such appropriate Proceedings as the Required Holders shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or any other Related Document or in aid of the exercise of any power granted therein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Agreement or any other Related Document or by law, including any remedies of a secured party under applicable law;

(ii)    (A) direct the Guarantors to exercise (and each Guarantor agrees to exercise) all rights, remedies, powers, privileges and claims of any Guarantor against any party to any Collateral Document arising as a result of the occurrence of such Event of Default or otherwise, including the right or power to take any action to compel performance or observance by any such party of its obligations to any Guarantor, and any right of any Guarantor to take such action independent of such direction shall be suspended, and (B) if (x) the Guarantors shall have failed, within ten (10) Business Days of receiving the written direction of the Trustee (given at the written direction of the Required Holders), to take commercially reasonable action to accomplish such directions of the Trustee, (y) any Guarantor refuses in writing to take such action or (z) the Supermajority Noteholders reasonably determine that such action must be taken immediately, take (or the Supermajority Noteholders on behalf of the Trustee shall take) such previously directed action (and any related action as permitted under this Agreement thereafter determined by the Trustee to be appropriate without the need under this provision or any other provision under this Agreement to direct the Guarantors to take such action);

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Agreement or, to the extent applicable, any other Related Document, with respect to the Collateral, to the extent permitted by applicable law; <u>provided</u> that the Trustee shall not be required to take title to any real property in connection with any foreclosure or other exercise of remedies hereunder or under such Related Documents and title to such property shall instead be acquired in an entity designated and (unless owned by a third party) controlled by the Required Holders (or one or more acquisition vehicles designated by it); and/or

(iv)    sell all or a portion of the Collateral at one or more public or private sales called and conducted in a commercially reasonable manner in accordance with applicable law; provided, however, that the Trustee shall not proceed with any such sale without the prior written consent of the Supermajority Noteholders and the Trustee shall provide notice to the Guarantors and each Holder of the Notes of a proposed sale, to the extent permitted by applicable law.

(c)    Sale of Collateral. In connection with any sale of the Collateral hereunder (which may proceed separately and independently from the exercise of remedies under the Indenture) or under any judgment, order or decree in any judicial proceeding for the foreclosure or involving the enforcement of this Agreement or any other Related Document, or any sale of Obligor Assets, to the extent permitted by applicable law:

(i)    any of the Trustee, any Noteholder and/or any other Secured Party may bid for and purchase the property being sold, and upon compliance with the terms of the sale may hold, retain, possess and dispose of such property in its own absolute right without further accountability;

(ii)    the Trustee (acting at the written direction of the Required Holders) may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale and instrument of assignment and transfer of the property sold;

(iii)    all right, title, interest, claim and demand whatsoever, either at law or in equity or otherwise, of any Guarantor of, in and to the property so sold shall be divested; and such sale shall be a perpetual bar both at law and in equity against any Guarantor, its successors and assigns, and against any and all Persons claiming or who may claim the property sold or any part thereof from, through or under such Guarantor or its successors or assigns; and

(iv)    the receipt of the Trustee or of the officer thereof making such sale shall be a sufficient discharge to the purchaser or purchasers at such sale for its or their purchase money, and such purchaser or purchasers, and its or their assigns or personal representatives, shall not, after paying such purchase money and receiving such receipt of the Trustee or of such officer thereof, be obliged to see to the application of such purchase money or be in any way answerable for any loss, misapplication or non-application thereof.

(d)    Application of Proceeds. Any amounts obtained by the Trustee, on behalf of the Trustee or the Secured Parties, on account of or as a result of the exercise by the Trustee of any right hereunder or under the Base Indenture (i) shall be deposited into the Collection Account and, other than with respect to amounts owed to a depositary bank or securities intermediary under the related Account Control Agreement, shall be held by the Trustee as additional collateral for the repayment of the Obligations and (ii) shall be applied first to pay a depositary bank or securities intermediary in respect of amounts owed to it under the related Account Control Agreement and then as provided in the priority set forth in the Priority of Payments.

(e)     <u>Additional Remedies</u>. In addition to any rights and remedies now or hereafter granted hereunder or under applicable law with respect to the Collateral, the Trustee shall have all of the rights and remedies of a secured party under the UCC as enacted in any applicable jurisdiction.

(f)     <u>Proceedings</u>. The Trustee may maintain a Proceeding even if it does not possess any of the Notes or does not produce any of them in the Proceeding, and any such Proceeding instituted by the Trustee shall be in its own name as trustee. All remedies are cumulative to the extent permitted by law.

(g)     <u>Power of Attorney</u>. The IP Holder hereby grants to the Trustee an absolute and irrevocable power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the PTO, United States Copyright Office, any similar office or agency in each foreign country in which any Collateral IP is located, or any other Governmental Authority in order to effect an absolute assignment of all right, title and interest in or to any Collateral IP other than Excluded Assets and the Excepted Collateral IP Assets, and record the same.

(h)     <u>Collateral IP</u>. The IP Holder hereby grants to the Trustee, for the sole purpose of enabling the Trustee, on behalf of the Secured Parties, to exercise its rights and remedies under this Agreement during any Event of Default (after giving effect to any applicable notice, grace or cure periods), a non-exclusive license (without payment of royalty or other compensation to the IP Holder) to use and sublicense the Collateral IP. This license is subject to sufficient rights of quality control and inspection in favor of the Trademark owner (who may designate an agent to conduct inspections) to avoid the risk of invalidation or material harm to the value of the Trademarks. To the extent that this license is a sublicense of the IP Holder's rights as a licensee under any third party license, the license shall be subject to any limitations in such third party license. Consistent with the foregoing, the license shall include access to all media in which any of the Collateral IP may be recorded or stored and to all computer programs used for the compilation and printout thereof, to the extent that the IP Holder is lawfully able to provide such access. The license shall be irrevocable until the termination of this Agreement and shall be exercisable by Trustee only upon the occurrence and during the continuance of an Event of Default,, but any licenses or sublicenses lawfully granted by the Trustee under the license granted by the IP Holder in accordance with this <u>Section 6.1(h)</u> shall survive as direct licenses (or sublicenses) of the IP Holder, as applicable, notwithstanding any subsequent cure of the applicable Event of Default or the termination of this Indenture.

6.2.     <u>Waiver of Appraisal, Valuation, Stay and Right to Marshaling</u>. To the extent it may lawfully do so, each Guarantor for itself and for any Person who may claim through or under it hereby:

(a)     agrees that neither it nor any such Person shall step up, plead, claim or in any manner whatsoever take advantage of any appraisal, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (i) the performance, enforcement or foreclosure of this Agreement, (ii) the sale of any of the Collateral or (iii) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(b)　　　waives all benefit or advantage of any such laws;

(c)　　　waives and releases all rights to have the Collateral marshaled upon any foreclosure, sale or other enforcement of this Agreement; and

(d)　　　consents and agrees that, subject to the terms of this Agreement and the Indenture, all the Collateral may at any such sale be sold by the Trustee as an entirety or in such portions as the Trustee may (upon written direction by the Required Holders) determine.

6.3.　　　<u>Limited Recourse</u>. Notwithstanding any other provision of this Agreement or any other Related Document or otherwise, the liability of the Guarantors to the Secured Parties under or in relation to this Agreement or any other Related Document or otherwise is limited in recourse to the Collateral. The Collateral having been applied in accordance with the terms hereof, none of the Secured Parties shall be entitled to take any further steps against any Guarantor to recover any sums due but still unpaid hereunder or under any of the other agreements or documents described in this <u>Section 6.3</u>, all claims in respect of which shall be extinguished.

6.4.　　　<u>The Trustee May File Proofs of Claim</u>. The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and any other Secured Party (as applicable) allowed in any judicial proceedings relative to any Guarantor, its creditors or its property, and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claim and any custodian in any such judicial proceeding is hereby authorized by each Noteholder and each other Secured Party to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Noteholders or any other Secured Party, to pay the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under <u>Section 10.5</u> of the Base Indenture. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under <u>Section 10.5</u> of the Base Indenture out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money and other properties which any of the Noteholders or any other Secured Party may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder or any other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Noteholder or any other Secured Party, or to authorize the Trustee to vote in respect of the claim of any Noteholder or any other Secured Party in any such proceeding.

6.5.　　　<u>Undertaking for Costs</u>. In any suit for the enforcement of any right or remedy under this Agreement or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of any undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the

merits and good faith of the claims or defenses made by the party litigant. This <u>Section 6.5</u> does not apply to a suit by the Trustee, a suit by a Noteholder pursuant to <u>Section 9.6</u> of the Base Indenture or a suit by Noteholders of more than 10% of the Aggregate Outstanding Principal Amount of all Notes.

6.6.    <u>Restoration of Rights and Remedies</u>. If the Trustee, any Noteholder or any other Secured Party has instituted any Proceeding to enforce any right or remedy under this Agreement or any other Related Document and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Trustee or to such Noteholder or other Secured Party, then and in every such case the Trustee, the Noteholders and any such other Secured Party shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the other Secured Parties shall continue as though no such Proceeding had been instituted.

6.7.    <u>Rights and Remedies Cumulative</u>. No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of Notes or any other Secured Party is intended to be exclusive of any other right or remedy, and every right or remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given under this Agreement or any other Related Document or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy under this Agreement or any other Related Document, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

6.8.    <u>Delay or Omission Not Waiver</u>. No delay or omission of the Trustee, any Holder of any Note or of any other Secured Party to exercise any right or remedy accruing upon any Default or Event of Default shall impair any such right or remedy or constitute a waiver of any such Default or Event of Default or an acquiescence therein. Every right and remedy given by this <u>Section 6</u> or by law to the Trustee, the Holders of Notes or any other Secured Party may be exercised from time to time to the extent not inconsistent with the Indenture or this Agreement, and as often as may be deemed expedient, by the Trustee, the Holders of Notes or any other Secured Party, as the case may be.

6.9.    <u>Waiver of Stay or Extension Laws</u>. Each Guarantor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement or any other Related Document; and each Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantages of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## SECTION 7

## THE TRUSTEE'S AUTHORITY

Each Guarantor acknowledges that the rights and responsibilities of the Trustee under this Agreement with respect to any action taken by the Trustee or the exercise or non-exercise by the Trustee of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Trustee and the other Secured Parties, be governed by the Indenture and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Trustee and the Guarantors, the Trustee shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, it being understood that the Trustee (at the written direction of the Required Holders) directly shall be the only party entitled to exercise remedies under this Agreement; and no Guarantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

## SECTION 8

## MISCELLANEOUS

8.1.    _Amendments_. None of the terms or provisions of this Agreement may be amended, supplemented, waived or otherwise modified except in accordance with Article XI of the Base Indenture.

8.2.    _Notices_.

(a)    Any notice or communication by the Guarantors or the Trustee to any other party hereto shall be in writing and delivered by email, posted on a password protected website for which the recipient has granted access or mailed by first-class mail (registered or certified, return receipt requested) or overnight air courier guaranteeing next day delivery or, except in the case of any Guarantor, by facsimile to such other party's address:

If to any Guarantor:

[*Name of Guarantor*]
c/o Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022
Attention: Tim Daileader
Phone: 212 856 9700
Email: tdaileader@drivetrainllc.com

If to the Trustee:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013

Attention: Citibank Agency & Trust–HOA RoyaltyCo LLC
Email: esotericabs@citi.com or call (888) 855-9695 to obtain Citibank, N.A. account manager's email address

(b)    The Guarantors or the Trustee by notice to each other party may designate additional or different addresses for subsequent notices or communications; provided, however, the Guarantors may not at any time designate more than a total of three (3) addresses to which notices must be sent in order to be effective.

(c)    Any notice (i) given by first class mail shall be deemed given five days after the date that such notice is mailed, (ii) delivered by facsimile shall be deemed given on the date of delivery of such notice, (iii) delivered by overnight air courier shall be deemed delivered one (1) Business Day after the date that such notice is delivered to such overnight courier, (iv) when posted on a password-protected website shall be deemed delivered after notice of such posting has been provided to the recipient and (v) delivered by email shall be deemed delivered on the date of delivery of such notice.

(d)    Notwithstanding any provisions of this Agreement to the contrary, the Trustee shall have no liability based upon or arising from the failure to receive any notice required by or relating to this Agreement or any other Related Document (except to the extent such failure results from gross negligence, willful misconduct or fraud by the Trustee).

8.3.    <u>Governing Law</u>. **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

8.4.    <u>Successors</u>. All agreements of each of the Guarantors in this Agreement and each other Related Document to which it is a party shall bind its successors and assigns; provided, however, no Guarantor may assign its obligations or rights under this Agreement or any Related Document, except with the written consent of the Required Holders. All agreements of the Trustee in the Indenture and in this Agreement shall bind its successors as permitted by the Related Documents.

8.5.    <u>Severability</u>. In case any provision in this Agreement or any other Related Document shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.6.    <u>Counterpart Originals</u>. The parties may sign any number of copies of this Agreement. Each signed copy shall be an original, but all of them together represent the same agreement. For purposes of this Agreement, any reference to "written" or "in writing" means any form of written communication, including, without limitation, electronic signatures, and any such written communication may be transmitted by Electronic Transmission. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may

be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process. The Trustee is authorized to accept written instructions, directions, reports, notices or other communications delivered by Electronic Transmission and shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by Electronic Transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such Electronic Transmission, and the Trustee shall not have any liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information to the Trustee, including, without limitation, the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties (except to the extent such action results from gross negligence, willful misconduct or fraud by the Trustee). Any requirement in this Agreement that is to be signed or authenticated by "manual signature" or similar language shall not be deemed to prohibit signature to be by facsimile or electronic signature  and shall not be deemed to prohibit delivery thereof by Electronic Transmission. Notwithstanding anything to the contrary in this Agreement, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary and/or sensitive information and sent by Electronic Transmission will be encrypted. The recipient of the Electronic Transmission will be required to complete a one-time registration process.

8.7.    Table of Contents, Headings, etc. The Table of Contents and headings of the Sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

8.8.    Recording of Agreement. If this Agreement is subject to recording in any appropriate public recording offices, such recording is to be effected by the Guarantors and at their expense.

8.9.    Waiver of Jury Trial. **EACH OF THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER RELATED DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.**

8.10.    Submission to Jurisdiction; Waivers. Each of the Guarantors and the Trustee hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Related Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Guarantors or the Trustee, as the case may be, at its address set forth in Section 8.2 or at such other address of which the Trustee shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.10 any special, exemplary, punitive or consequential damages.

8.11.    Currency Indemnity. Each Guarantor shall make all payments of amounts owing by it hereunder in Dollars. If a Guarantor makes any such payment to the Trustee or any other Secured Party in a currency (the "Other Currency") other than Dollars (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment shall constitute a discharge of the liability of such party hereunder in respect of such amount owing only to the extent of the amount of Dollars which the Trustee or such Secured Party is able to purchase, with the amount it receives on the date of receipt. If the amount of Dollars which the Trustee or such Secured Party is able to purchase is less than the amount of such currency originally so due in respect of such amount, such Guarantor shall indemnify and save the Trustee or such Secured Party, as applicable, harmless from and against any loss or damage arising as a result of such deficiency; provided, however, that the foregoing indemnification shall not extend to any action by the Trustee or any Secured Party which constitutes gross negligence, bad faith or willful misconduct by the Trustee or such Secured Party. This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Agreement, shall give rise to a separate and independent cause of action, shall survive termination hereof, shall apply irrespective of any indulgence granted by the Trustee or such Secured Party and shall continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

8.12.    Acknowledgment of Receipt; Waiver. Each Guarantor acknowledges receipt of an executed copy of this Agreement and, to the extent permitted by applicable law, waives the right to receive a copy of any financing statement, financing change statement or verification statement in respect of any registered financing statement or financing change statement prepared, registered or issued in connection with this Agreement.

8.13.    Termination; Partial Release.

(a)    This Agreement and any grants, pledges, assignments and reaffirmations hereunder shall become effective on the date hereof and shall terminate on the Termination Date.

(b)    On the Termination Date, the Collateral shall be automatically released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Trustee and each Guarantor shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Guarantors. At the request and sole expense of any Guarantor following any such termination, the Trustee shall deliver to such Guarantor any Collateral held by the Trustee hereunder, and execute and deliver to such Guarantor such documents as such Guarantor shall reasonably request to evidence such termination.

(c)    Notwithstanding anything to the contrary herein or in any other Related Document, any of the Wind-Down Entities may dispose of any or all of its assets, and upon the Master Issuer's reasonable determination that such Wind-Down Entity holds an amount of assets immaterial to the principal amount of the Notes, the Master Issuer may permit the dissolution of such Wind-Down Entity and such Wind-Down entity shall, upon written notice to the Trustee, be automatically released from its obligations as a Guarantor hereunder and under the Related Documents. For the avoidance of doubt, all proceeds of asset disposition shall constitute Asset Disposition Proceeds to the extent such amount is available to make distributions and is not used to wind up such entity. Any such amount shall be deposited to the Concentration Account and applied as provided in Article V of the Base Indenture.

(d)    Any partial release of Collateral hereunder requested by the Master Issuer in connection with any Permitted Asset Disposition shall be governed by <u>Section 8.14</u> and <u>Section 13.17</u> of the Base Indenture.

8.14.    <u>Third Party Beneficiary</u>. Each of the Secured Parties is an express third party beneficiary of this Agreement.

8.15.    <u>Entire Agreement</u>.

This Agreement, the Indenture and the other Related Documents, contain a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all previous oral statements and writings with respect thereto.

8.16.    <u>Amendment and Restatement</u>.

This Agreement constitutes an amendment and restatement of the Prior Guarantee and Collateral Agreement and the Prior Base Indenture, effective from and after the date hereof. The parties hereto agree that in each of their respective capacities under the Prior Guarantee and Collateral Agreement that (i) this Agreement amends, restates and supersedes the Prior Guarantee and Collateral Agreement in its entirety by this Agreement and shall be of no further force or effect except as amended and restated hereby and (ii) from and after the date hereof, all references in each Related Document to the Prior Guarantee and Collateral Agreement or the "Guarantee and Collateral Agreement" shall be deemed and agreed to refer to this Agreement. Except as

contemplated by the Approved Plan, each of the parties hereto hereby acknowledges and agrees that the pledge and grant of the security interests in the Collateral pursuant to Article III of this Agreement is not intended to, nor shall it be construed to be, a release of any prior pledge or security interest granted by the Guarantors in favor of the Trustee under the Prior Guarantee and Collateral Agreement or a release of any prior pledge or security interest granted by the Master Issuer in favor of the Trustee under the Prior Base Indenture.

[Remainder of page intentionally left blank.]