# EXHIBIT C

## New Organizational Documents

# EXHIBIT C.1

**Amended and Restated
Limited Liability Company Agreement of
HOA NewCo LLC**

*Execution Draft*

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HOA NewCo LLC**

**Effective October 31, 2025**

THE UNITS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN. SUCH UNITS ARE ALSO SUBJECT TO THE ADDITIONAL RESTRICTIONS ON TRANSFER AND SALE PROVISIONS SET FORTH IN THIS AGREEMENT.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS                                                                                1

1.1    Definitions...................................................................................................1

ARTICLE II FORMATION                                                                                 6

2.1    Organization................................................................................................6
2.2    Name..........................................................................................................6
2.3    Term...........................................................................................................7
2.4    Registered Agent and Office........................................................................7
2.5    Principal Office............................................................................................7
2.6    Purpose.......................................................................................................7
2.7    Statutory Compliance..................................................................................7
2.8    Preservation of Status as Limited Liability Company ...................................7
2.9    Title to Property ..........................................................................................8
2.10   Payments of Individual Obligations..............................................................8
2.11   No State-Law Partnership ............................................................................8
2.12   Tax Status...................................................................................................8

ARTICLE III MEMBERSHIP UNITS                                                                         8

3.1    Capital Structure; Record of Ownership.......................................................8
3.2    Certification of Units ..................................................................................8
3.3    Register of Members....................................................................................9
3.4    Issuance of Additional Units........................................................................9
3.5    Loans from Members; No Capital Contributions ...........................................9
3.6    Preemptive Rights........................................................................................9
3.7    Return of Contributions .............................................................................10

ARTICLE IV MEMBERS                                                                                  11

4.1    Admission of New Members ......................................................................11
4.2    Liability of Members..................................................................................11
4.3    Covenant Not to Withdraw or Dissolve......................................................11
4.4    Power to Bind the Company ......................................................................12

ARTICLE V DISTRIBUTIONS                                                                             12

5.1    Distributions.............................................................................................12

ARTICLE VI MEMBER REPRESENTATIONS AND WARRANTIES                                                    12

6.1    Representations and Warranties...................................................................12

i

ARTICLE VII EXCULPATION AND INDEMNIFICATION                    13

7.1   Exculpation ...................................................................................................13
7.2   Indemnification ............................................................................................13
7.3   Insurance ......................................................................................................15
7.4   Severability ..................................................................................................16
7.5   Amendments .................................................................................................16

ARTICLE VIII MANAGEMENT                                         16

8.1   Management of the Company ........................................................................16
8.2   Business Opportunities; Other Activities......................................................17
8.3   Compensation of the Manager ......................................................................17
8.4   Officers ........................................................................................................18
8.5   No Fiduciary Duties; Contract Supersedes ....................................................18
8.6   Member Consent Rights ...............................................................................19
8.7   Member Voting Procedures ..........................................................................21

ARTICLE IX DISPOSITION OF UNITS                                22

9.1   Restrictions on Transfer ...............................................................................22
9.2   Tag-Along Rights..........................................................................................22
9.3   Approved Sale; Drag-Along Obligations.......................................................24

ARTICLE X ACCOUNTING AND RECORDS                               26

10.1  Records to be Maintained .............................................................................26
10.2  Financial Statements ....................................................................................26

ARTICLE XI DISSOLUTION AND WINDING UP                          26

11.1  Dissolution; Liquidating Events ...................................................................26
11.2  Effect of Dissolution ....................................................................................27
11.3  Liquidation Trustee......................................................................................27
11.4  Distribution of Assets on Dissolution ...........................................................27
11.5  Winding Up and Certificate of Cancellation .................................................27
11.6  Termination...................................................................................................27

ARTICLE XII MISCELLANEOUS PROVISIONS                           28

12.1  Expenses .......................................................................................................28
12.2  Further Assurances........................................................................................28
12.3  Notices .........................................................................................................28
12.4  Interpretation................................................................................................29
12.5  Severability ..................................................................................................29
12.6  Entire Agreement .........................................................................................29
12.7  Successors and Assigns; Assignments............................................................29
12.8  No Third-Party Beneficiaries ........................................................................30

12.9     Amendment and Modification ..................................................................................30
12.10   Waiver.......................................................................................................................30
12.11   Governing Law .........................................................................................................30
12.12   Submission to Jurisdiction .......................................................................................30
12.13   Waiver of Jury Trial..................................................................................................30
12.14   Equitable Remedies ..................................................................................................31
12.15   Remedies Cumulative ...............................................................................................31
12.16   Counterparts..............................................................................................................31
12.17   Compliance with Law ...............................................................................................31
12.18   Confidentiality ..........................................................................................................31

**EXHIBIT A**          Form of Joinder Agreement

**AMENDED AND RESTATED
LIMITED LIABILITY
COMPANY AGREEMENT
OF
HOA NEWCO LLC**

This Amended and Restated Limited Liability Company Agreement (the "Agreement") of HOA NewCo LLC, a Delaware limited liability company (the "Company"), is made and entered into as of October 31, 2025 (the "Effective Date"),by and among the Company, each Person on the Register of Members and each other Person who after the date hereof acquires Units in accordance with the terms of this Agreement and becomes a party to this Agreement by executing a Joinder Agreement (collectively, the "Members").

WHEREAS, the Company was formed on October 9, 2025, as a limited liability company in the State of Delaware, for the purpose of conducting and operating the business of the Company as currently conducted or contemplated to be conducted and the sole member at the time of formation entered into a written agreement pursuant to the Act (as defined below) governing the affairs of the Company and the conduct of its business (the "Original Agreement");

WHEREAS, as of the Effective Date, each Member owns the number and percentage of the issued and outstanding Units as set forth in the register of Members kept on the Company's books and records (the "Register of Members"); and

WHEREAS, the Members, as of the Effective Date, desire to amend and restate the Original Agreement as set forth herein to set forth their respective rights as Members of the Company.

NOW, THEREFORE, in consideration of the mutual terms, covenants and conditions contained herein, the Members hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Definitions.

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

"1934 Act" means the United States Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder. Any reference herein to a specific Section, rule or regulation of the 1934 Act shall be deemed to include any corresponding provisions of future law.

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.).

"Action" means any action, charge, claim, lawsuit, litigation, investigation or other similarly formal legal proceeding brought by or pending before any Governmental Authority, arbitrator, mediator or other tribunal.

"Affiliate" shall mean, with respect to any Person, any other Person that controls, is controlled by or is under common control with such Person; provided, however, no Member shall be considered an Affiliate of the Company or any of its Subsidiaries for the purposes of this Agreement (and nor shall any Person controlling such Member merely by virtue of such control); provided, that, no "portfolio company" (as such term is commonly used in the private equity industry) or similar investment of any investment fund affiliated with a Member shall be deemed an Affiliate of such Member and vice versa.  For the purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, voting power or otherwise.

"Agreement" has the meaning set forth in the Preamble. Words such as "herein," "hereinafter," "hereto," "hereof," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"Applicable Law" means all applicable provisions of: (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards or decrees of, or agreements with, any Governmental Authority.

"Available Cash" means the gross cash proceeds of the Company from all sources, including from any sale of assets of the Company and distributions from RoyaltyCo, less all amounts used to pay or establish reserves for (i) any and all obligations under the Indenture and (ii) all Company expenses, as determined by the Manager, taking into account the reasonable business needs and obligations of the Company.

"Bankruptcy" means, with respect to any Person, the occurrence of any of the following events: (a) the filing of an application by such Person for, or a consent to, the appointment of a trustee or custodian of such Person's assets; (b) the filing by such Person of a voluntary petition in bankruptcy or the seeking of relief under Title 11 of the United States Code, as now constituted or hereafter amended, or the filing of a pleading in any court of record admitting in writing such Person's inability to generally pay its debts as they become due; (c) the inability of such Person to pay its debts as such debts become due (taking into account any extensions, modifications, and/or any relief offered by the applicable creditors); (d) the making by such Person of a general assignment for the benefit of creditors; (e) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering, a bankruptcy petition filed against such Person in any bankruptcy proceeding or petition seeking relief under Title 11 of the United States Code, as now constituted or as hereafter amended; or (f) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person as bankrupt or insolvent or for relief in respect of such Person or appointing a trustee or

custodian of such Person's assets and the continuance of such order, judgment or decree unstayed and in effect for a period of sixty (60) consecutive calendar days.

"Business Day" means a day that is not a Saturday, a Sunday or any other day on which commercial banking institutions are authorized or required by Applicable Law to be closed for regular banking business in Boston, Massachusetts or New York, New York.

"Capital Contribution" means, with respect to a Member, a contribution of capital to the Company by such Member with respect to the Units held or purchased by such Member (including, for the avoidance of doubt, any contributions made following the Effective Date). The aggregate amount of Capital Contributions by each Member is set forth on the Register of Members, as it may be amended, modified or supplemented from time to time pursuant to the terms of this Agreement.

"Certificate of Formation" means the Certificate of Formation filed with the Secretary of State of the State of Delaware on October 9, 2025.

"Change of Control" means any transaction or series of transactions (whether structured as a stock sale, merger, consolidation, reorganization, recapitalization, redemption, asset sale, business combination or otherwise, including a transaction with a "special purpose acquisition company" or a "blank check company"), which results in the sale or transfer to a Third-Party Purchaser of (a) a majority of the assets of the Company and its Subsidiaries taken as a whole (determined based on the Fair Market Value of such assets as determined by the Manager in good faith and approved by the Required Members), (b) beneficial ownership or control of a majority of the Units or other equity, ownership, proprietary or voting interests in the Company, or (c) beneficial ownership or control of a majority of the capital stock of, or equity, ownership, proprietary or voting interest in, any one or more of the Company's Subsidiaries owning, controlling or otherwise constituting a majority of the assets of the Company and its Subsidiaries taken as a whole (determined based on the Fair Market Value of such assets as determined by the Manager in good faith and approved by the Required Members); provided, that in no event shall a Change of Control be deemed to include any transaction effected solely for the purpose of changing, directly or indirectly, the form of organization or the organizational structure of the Company or any of its Subsidiaries.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Company" has the meaning set forth in the Preamble.

"Confidential Information" has the meaning set forth in Section 12.18(a).

"Covered Person" means (i) any Member or any Affiliate of such Member, (ii) any Manager or any Affiliate of such Manager, (iii) each then-current or former officer, director, equityholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates and (iv) each then-current or former officer, Manager, employee, advisor, representative or agent of the Company and its Subsidiaries.

"Distribution" means a distribution or transfer of cash, securities or other property by the Company to a Member.

"Effective Date" has the meaning set forth in the Preamble.

"Fair Market Value" means, with respect to any asset or security, the fair market value for such asset or security as between a willing buyer and a willing seller in an arm's length transaction occurring on the date of valuation, taking into account all relevant factors determinative of value, as reasonably determined by the Manager in good faith.

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year

"GAAP" means United States generally accepted accounting principles consistently applied from period to period and throughout any period.

"Governmental Authority" means any court or tribunal, administrative, governmental or regulatory body, stock exchange or self-regulatory organization, legislature, department, commission, board, agency, bureau, instrumentality, division, public body or other authority of any nation or government or any political subdivision thereof (supranational, national, federal, provincial, state or local or foreign).

"Indenture" means that certain Second Amended and Restated Base Indenture by and between RoyaltyCo and Citibank, N.A., a national banking association as trustee and as securities intermediary, dated as of October 31, 2025.

"Independent Manager Agreement" means that certain Independent Manager Agreement, dated as of October 6, 2025, by and between the Company and Tim Daileader.

"Initial Public Offering" means the initial public offering that results in the Company's (or its Subsidiary's or successor's) Units or other equity securities being listed on a U.S. national securities exchange.

"Investment" has the meaning set forth in Section 2.6.

"Joinder Agreement" means the joinder agreement in form and substance of Exhibit A attached hereto.

"Losses" means any tax, loss, liability, penalty, fine, damage (but excluding any amounts in respect of punitive or exemplary damages, except to the extent awarded to a third party), amount paid in settlement or expense (including court costs and attorneys' and other outside professionals' fees and expenses).

"Manager" means Tim Daileader, and each replacement Manager appointed pursuant to Section 8.1(b).

"Member" has the meaning set forth in the Preamble.

"Organizational Document" means the certificate of formation, operating agreement, charter, or similar governing, constituent or organizational documents of a Person, as each may be amended, or amended and restated, from time to time.

"Permitted Transferee" means (a) any other Member, (b) any Affiliate of a Member, (c) with respect to any Member (or any of its Permitted Transferees) that is not a natural person, any investment fund, vehicle or similar entity of which such Member (or any of its Permitted Transferees) or an Affiliate, advisor or manager of such Member (or any of its Permitted Transferees) serves as the general partner, sponsor, manager or advisor (but excluding any "portfolio company" (as such term is commonly used in the private equity industry) or similar investment of any of the foregoing), or (d) with respect to any Member that is a natural person or a trust for the benefit of one or more natural persons, (i) upon the death of such Person pursuant to the Applicable Laws of descent and distribution and (ii) such natural person's spouse and descendants (whether natural or adopted) and any trust, partnership, limited liability company or similar vehicle established and maintained solely for the benefit of (or the sole members or partners of which are) such natural person, such natural person's spouse and/or such natural person's descendants, in each case of this clause (ii) only if such natural person retains control of any rights to vote Units transferred to such Permitted Transferee.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Plan" means that certain Third Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors, filed in the Chapter 11 cases styled *In re Hooters of America, Inc.*, jointly administered under Case No. 25-80078 in the United States Bankruptcy Court for the Northern District of Texas.

"Pro Rata Percentage" means, with respect to any Member, as of any date of determination, a fraction, the numerator of which is the number of Units held by such Member, as applicable, and the denominator of which means the aggregate number of Units collectively held by all Members as of such date.

"Regulations" means, except where the context indicates otherwise, the final and temporary regulations of the U.S. Department of the Treasury under the Code, as such regulations may be lawfully changed from time to time.

"Representative" means, with respect to any Person, any and all directors, managers, direct or indirect members or partners, officers, employees, consultants, financial advisors, counsel, accountants and other agents or advisors of such Person.

"Required Members" means, as of any time, the Members holding a majority of all outstanding Units; provided, that such majority shall include each Member that, together with its Affiliates, holds in the aggregate at least 20% of the number of outstanding Units as of the Effective Date, until such time as such Member, together with its Affiliates, ceases to hold at least 20% of the then outstanding Units (each a "Major Holder").

"RoyaltyCo" means HOA RoyaltyCo LLC, a Delaware limited liability company.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" means with respect to any Person, any corporation, partnership, joint venture, limited liability company, trust, association or other entity of which the outstanding equity securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power (or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests) are owned, directly or indirectly, by such Person.

"Third-Party Purchaser" means any Person or a "group" (as such term is defined under Regulation 13D under the 1934 Act) that is not a Member or an Affiliate of a Member immediately prior to the contemplated transaction.

"Transfer" means to, directly or indirectly, sell, transfer, assign, gift or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, gift or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person; provided, for the avoidance of doubt, that any sale, transfer, assignment or other disposal, directly or indirectly, of equity securities in any Member or any direct or indirect equityholder of any Member not intended for the purpose of transferring the Units shall not constitute a "Transfer" of Units or equity securities hereunder. "Transfer" when used as a noun shall have a correlative meaning.

"Units" means the common units of the Company and any securities issued in respect thereof, or in substitution therefor, in connection with any unit split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

## ARTICLE II

## FORMATION

This Agreement is entered into and shall be effective as of the Effective Date by and among the Members set forth on the signature pages hereof, pursuant to the provisions of the Act, on the following terms and conditions:

2.1    Organization. The Members hereby enter into this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Act.

2.2    Name. The name of the Company is "HOA NewCo LLC" or such other name or names as the Manager may from time to time designate; provided, that, the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC". Notice of any such change shall be given to the Members, which notice may be provided after such change has occurred. All business of the Company shall be conducted under that name or under any other name but, in any case, only to the extent permitted by Applicable Law.

2.3     Term. The term of the Company commenced upon the filing of the Certificate of Formation in accordance with the Act, and shall continue until the existence of the Company is terminated pursuant to Article XI.

2.4     Registered Agent and Office. The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Act and Applicable Law. The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Act and Applicable Law.

2.5     Principal Office. The principal office of the Company shall be located at such place as determined by Manager from time to time in the manner provided by the Act and Applicable Law. Notice of any such change shall be given to the Members, which notice may be provided after such change has occurred.

2.6     Purpose. The purposes of the Company shall be to (i) acquire, hold for investment, protect and, when applicable, dispose of, equity interests of RoyaltyCo and its Subsidiaries (the "Investment") and conduct any and all activities necessary or incidental thereto, and (ii) engage in any lawful act or activity for which limited liability companies may be formed under the Act and all acts or activities as the Company deems necessary, advisable or incidental to the furtherance of the foregoing. The Company shall possess and may exercise all the powers and privileges granted by the Act or by any other Applicable Law or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary, appropriate, advisable, incidental or convenient to the conduct, promotion or attainment of the business or activities of the Company.

2.7     Statutory Compliance. The Company shall exist under and be governed by, and this Agreement shall be construed in accordance with, the Applicable Law of the State of Delaware. The Manager shall cause an authorized person within the meaning of the Act to execute and file in the appropriate records any assumed or fictitious name certificates and other documents and instruments as may be necessary or appropriate with respect to the formation of, and conduct of business by, the Company. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.8     Preservation of Status as Limited Liability Company. The Company shall (a) maintain its existence as a legal entity separate from the Members and any other Person; (b) not commingle its assets with assets of any other Person and hold all of its assets in its own name; (c) conduct its business and own its properties in its own name and comply in all material respects with organizational formalities to maintain its separate existence; and (d) observe in all material respects the formalities required of a limited liability company under the Applicable Law of the State of Delaware.

2.9     Title to Property. All real and personal property owned by the Company shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be deemed personal property for all purposes. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

2.10     Payments of Individual Obligations. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of a Member.

2.11     No State-Law Partnership. The Members have formed the Company under the Act, and expressly do not intend hereby to form (i) a partnership under any partnership or limited partnership act or (ii) a joint venture, (b) the Members do not intend to be partners to one another, or partners as to any third party, nor does any Member intend to be a joint venturer of any other Member for any other purposes and (c) to the extent any Member, by word or action, represents to another Person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

2.12     Tax Status.     It is the intention of the Company and the Members that the Company be treated as a corporation for United States federal and applicable state and local income tax purposes. The Company shall make an election pursuant to Treasury Regulations Section 301.7701-3 (and any relevant state and local law) to treat the Company as a corporation for federal, state and local tax purposes, effective as of the date of formation. The Manager is hereby authorized to take any and all actions reasonably necessary to ensure such treatment. Each Member and the Company shall file all tax returns and shall take all tax and financial reporting positions in a manner consistent with such treatment, no Member will take any action inconsistent with such treatment, and no Member nor any other person authorized to do so shall elect to treat the Company as a partnership pursuant to Regulations Section 301.7701-3

## ARTICLE III

## MEMBERSHIP UNITS

3.1     Capital Structure; Record of Ownership. Subject to the terms of this Agreement, the Company is authorized to issue limited liability company interests in the Company, which shall constitute limited liability company interests under the Act. As of the Effective Date, (i) the Company has one authorized class of Units and (ii) the total number of Units issued and outstanding is set forth on, and held by, the Persons set forth on the Register of Members. As of the Effective Date, subject to the terms and conditions set forth in this Agreement, the Company shall issue to each Member and each Member shall receive from the Company the Units set forth opposite such Member's name on the Register of Members.

3.2     Certification of Units. Unless and until the Manager determines otherwise, the Units shall be uncertificated and recorded in the books and records of the Company and on the Register of Members. If at any time the Manager shall determine to certificate the Units, such

certificates will contain such legends as the Manager shall reasonably and in good faith determine are necessary or advisable.

3.3     Register of Members. The Register of Members shall at all times set forth the following information with respect to each Member as of the Effective Date: (i) name; (ii) address; (iii) Capital Contribution; (iv) number of Units owned; and (v) percentage of total outstanding Units owned. The Company shall maintain the Register of Members on the books and records of the Company. Each Member that, together with its Affiliates, holds in the aggregate at least 20% of the Units outstanding as of any time shall have the right to receive a copy of the Register of Members, upon prior written request to the Company.

3.4     Issuance of Additional Units. The Manager, subject to receiving the Required Members' approval pursuant to Section 8.6, shall have the right to cause the Company to issue and/or create and issue for such amount and form of consideration as the Manager may determine (i) additional Units (including creating additional classes or series thereof having such powers, designations, preferences and rights as may be determined by the Manager in its sole discretion), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units and (iii) warrants, options or other rights to purchase or otherwise acquire Units. In connection with the foregoing, the Manager shall have the power to make such amendments to this Agreement to give effect to such additional issuance, and such power, designations and preferences and rights as the Manager, acting reasonably, deems necessary or appropriate to give effect to such additional authorization or issuance.

3.5     Loans from Members; No Capital Contributions. If any Member loans any funds to the Company, the funds loaned to the Company shall not constitute any capital contribution to the Company. Rather, the amount of any such loans shall be a debt of the Company owed to such Member, and shall be payable in accordance with the terms and conditions upon which such loans are made.

3.6     Preemptive Rights.

(a)     Except for issuances of:

(i)     Units on the date hereof as set forth on the Register of Members on the date hereof;

(ii)     equity securities issued as purchase consideration in any merger, acquisition, joint venture, recapitalization, business combination or similar strategic transaction;

(iii)     equity securities issued pursuant to a reorganization or restructuring without the involvement of an unaffiliated third party;

(iv)     equity securities issued in connection with any split, dividend, combination or other similar conversion, exchange, recapitalization reorganization or reclassification of equity securities;

(v)      equity securities issued to any employee, director, officer or consultant of the Company or any of its Subsidiaries in connection with a management incentive or individual compensation plan,

(vi)      equity securities sold in an Initial Public Offering;

(vii)      equity securities issued by a Subsidiary of the Company and fully subscribed by the Company or one of its Subsidiaries, as applicable;

(viii)      equity securities issued to financial institutions, commercial lenders, broker/finders or any similar party, or their respective designees, as "equity kickers" in connection with the incurrence or guarantee of indebtedness; or

(ix)      securities issued by a Subsidiary of the Company to an equityholder of such Subsidiary (other than the Company or a Subsidiary of the Company) in accordance with applicable preemptive rights under the organizational documents of, and any other applicable equityholders agreement applicable to, such Subsidiary, if

subject to obtaining the Required Members' approval pursuant to Section 8.6, the Company or any of its Subsidiaries sells or offers to sell any debt or equity securities of the Company to any Person (other than to the Company or any of its Subsidiaries, the "Offered Securities"), the Company shall offer to sell to each Member, (the "Preemptive Rights Holders"), the number of Offered Securities equal to the product obtained by multiplying (x) the total number of Offered Securities being offered for sale by each such Member's Pro Rata Percentage (such Preemptive Rights Holders' "Proportional Share"). Each such Preemptive Rights Holder shall be entitled to purchase all or any portion of such Offered Securities at the most favorable price and on the most favorable terms as such Offered Securities are to be offered; provided, that if the Person to whom such Offered Securities are proposed to be issued is required to also purchase other securities of the Company in connection with such offering, the other Preemptive Rights Holders exercising their rights pursuant to this Section 3.6 shall also be required to purchase the same strip of securities (on the same terms and subject to the same conditions) that such Person is required to purchase. In order to exercise its purchase rights hereunder, a Preemptive Rights Holder must within 20 calendar days after receipt of written notice from the Company (describing in reasonable detail the securities being offered, the purchase price thereof, the payment terms and such Preemptive Rights Holder's Proportional Share) (such period, the "Preemptive Rights Election Period"), deliver a written notice to the Company irrevocably exercising such Preemptive Rights Holder's purchase rights hereunder, including the number of such Offered Securities to be purchased (up to such Preemptive Rights Holder's Proportional Share).

3.7      Return of Contributions. Except as otherwise provided herein, (a) a Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Contributions, (b) an unrepaid Capital Contribution is not a liability of the Company or of any Member and (c) a Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

## ARTICLE IV

## MEMBERS

4.1     <u>Admission of New Members</u>.

(a)     New Members may be admitted from time to time (i) in connection with the issuance of Units by the Company, subject to compliance with the provisions of Article VIII and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of <u>Article IX</u> and, in either case, following compliance with the provisions of <u>Section 4.1(b)</u>.

(b)     In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. In the event of the issuance or Transfer of any Units to any Person in accordance with the terms of this Agreement, upon such Person's execution of a Joinder Agreement, (i) the Register of Members and the books and records of the Company shall be amended accordingly by the Manager without any additional approval of the Manager or any Member and such adjustments shall not constitute amendments to this Agreement which require approval of the Manager or any Member and (ii) upon such amendment of the Register of Members by the Manager and, to the extent applicable, the receipt by the Company of payment for the issuance of Units in the case of an issuance, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company.

(c)     Any Member who proposes to Transfer its Units (or any portion thereof) shall be responsible for the payment of expenses incurred by it in connection with such Transfer, whether or not consummated.

4.2     <u>Liability of Members</u>. Except as otherwise expressly provided in this Agreement or expressly required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member (in their capacity as such) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

4.3     <u>Covenant Not to Withdraw or Dissolve</u>. Notwithstanding any provision of the Act, but except as otherwise provided in this Agreement, each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) withdraw or attempt to withdraw from the Company, (b) exercise any power under the Act to dissolve the Company, (c) transfer all or any portion of his, her or its Units in the Company (other than in accordance with the terms of this Agreement), (d) petition for judicial dissolution of the Company or (e) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits),

in each case, without the prior written consent of the Manager.<u>Power to Bind the Company</u>. Other than as set forth in this Agreement, the Members shall not participate in the management or control of the Company's business nor shall they transact any business for the Company, nor shall they have the power to act for or bind the Company, said powers being vested solely and exclusively in the Manager.

**ARTICLE V**

**<u>DISTRIBUTIONS</u>**

5.1    <u>Distributions</u>. Distributions of Available Cash and any other property of the Company (to the extent permitted by Section 18-607 of the Act) shall be made quarterly and may be made at such other times and in such amounts as determined by the Manager, acting reasonably, which Distributions shall be made to the Members *pro rata* in accordance with their respective Units.

**ARTICLE VI**

**<u>MEMBER REPRESENTATIONS AND WARRANTIES</u>**

6.1    <u>Representations and Warranties</u>. Each Member, severally and not jointly, represents and warrants to the Company and each other Member that:

(a)    Such Member is duly organized, validly existing and in good standing (to the extent such concept is applicable) under the laws of the jurisdiction in which it is organized.

(b)    Such Member has full capacity and all necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of such Member.  Such Member has duly executed and delivered this Agreement.

(c)    This Agreement constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby require no action by, or in respect of, or filing with, any Governmental Authority.

(d)    The execution, delivery and performance by such Member of this Agreement and the consummation of the transactions contemplated hereby do not: (i) conflict with or result in any violation or breach of any provision of any of the governing documents of such Member; (ii) conflict with or result in any violation or breach of any provision of any Applicable

12

Law; or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which the Member is a party.

(e)     Subject to the other provisions of this Agreement, the representations and warranties contained herein shall survive the date of this Agreement and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof).

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

7.1     Exculpation.

(a)     To the fullest extent permitted by Applicable Law, no Covered Person shall be liable to the Company or to any other Member or any other Person for any liability arising out of or relating to the Company, its business, assets, properties, Subsidiaries or liabilities or any act taken or omitted to be taken with respect thereto, except to the extent that any such liability arises out of (i) the willful misconduct or fraud of such Person, (ii) a violation of the express terms of this Agreement (including Sections 8.4(c) and 8.5) by such Person, (iii) a breach of the implied contractual covenant of good faith and fair dealing or (iv) the receipt by such Person from the Company of a personal benefit which such person is not entitled to receive under the terms of this Agreement or Applicable Law.

(b)     Each Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters such Covered Person reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

7.2     Indemnification.

(a)     Third-Party Claims. The Company, its receiver or its trustee (to the extent of the Company's assets) shall indemnify, defend and hold harmless, to the fullest extent permitted by Applicable Law, each Covered Person from and against any and all claims, liabilities, damages, Losses, costs and reasonable and documented expenses (including reasonable and documented attorney fees and all amounts paid in satisfaction of judgments, compromises and settlements, as fines and penalties and documented legal or other costs and expenses of investigating or defending against any claim or alleged claim actually incurred) of any nature whatsoever, known or unknown, liquidated or unliquidated ("Indemnifiable Losses"), incurred by such Covered Person arising out of, in connection with, or resulting from any Action brought by a third party in which such Covered Person may be involved, as a party, a witness, or otherwise, and arising out of or relating to the Company, its business, assets, properties, Subsidiaries, or liabilities by reason of (x) any act or omission performed or omitted by such Covered Person in relation thereto or (y) the fact that such Covered Person is or was acting in connection with the business of

the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any of its Subsidiaries; provided, that, such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful; provided, further, that no Covered Person shall be entitled to indemnification under this Section 7.2(a) with respect to any Indemnifiable Losses arising from (i) the willful misconduct or fraud on the part of such Covered Person; (ii) a breach of the express terms of this Agreement by such Covered Person; (iii) a breach of the implied contractual covenant of good faith and fair dealing by such Covered Person; or (iv) the receipt by such Covered Person from the Company of a personal benefit to which such Covered Person is not entitled to receive under the terms of this Agreement or Applicable Law.

(b)     No Direct Member Indemnity. Members shall not be required directly to indemnify any Person entitled to indemnification pursuant to Section 7.2(a).

(c)     Limitations.

(i)     Any indemnity under this Section 7.2 shall be provided solely out of, and only to the extent of, the Company assets. None of the provisions of this Section 7.2 shall be deemed to create any rights in favor of anyone other than such Covered Persons. The preceding sentence excludes, among others, any right of subrogation in favor of any insurer or surety.

(d)     Expenses. The Company shall pay the reasonable and documented expenses (including reasonable and documented attorneys' fees and disbursements) incurred by a Covered Person in defending any Action in advance of the final disposition of such Action upon receipt of an undertaking by or on behalf of such Covered Person to repay the amount so advanced if it is ultimately determined that such Covered Person is not entitled to be indemnified by the Company pursuant to this Section 7.2.

(e)     Notice of Claims; Procedures. Promptly after receipt by a Covered Person of a notice of any claim, assertion or other commencement of any Action with respect to which the Company may be obligated to provide indemnification pursuant to this Section 7.2, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of the commencement of such Action, provided, that, the failure of any Covered Person to give notice as provided herein shall not relieve the Company of its obligations under this Section 7.2, except to the extent that the Company is actually materially prejudiced by such failure to give notice. In case any such Action is brought against a Covered Person (other than a derivative suit in right of the Company), the Company will be entitled to participate in and to assume the defense thereof to the extent that the Company may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Company to such Covered Person of the Company's election to assume the defense of such Action, the Company will not be liable for legal expenses subsequently incurred by such Covered Person in connection with the defense thereof; provided, however, that such Covered Person shall have the right to retain

14

one separate counsel, with the fees and expenses to be paid by the Company, if representation of such Covered Person by the counsel retained by the Company would be inappropriate due to actual or potential differing interests between such Covered Person and any other Person represented by such counsel in such Action. The Company will not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect of such claim.

(f)      Rights Cumulative. The right of any Covered Person to the indemnification and advancement provided herein shall be cumulative with, and in addition to, any and all rights to which such indemnified Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns and legal representatives.

(g)      Enforcement of Indemnification. To the extent any Covered Person brings a claim for indemnification hereunder and a court of competent jurisdiction, in a final non-appealable order, determines that such Covered Person is entitled to indemnification hereunder, the Company shall also pay all reasonable and documented attorneys' fees and expenses incurred by such Covered Person in enforcing their right to indemnification hereunder.

(h)      No Presumption upon Settlement. The termination of any proceeding by settlement shall not, in and of itself without more, be deemed to create a presumption that the Covered Person involved in such settlement acted in a manner which constituted (i) the willful misconduct or fraud of such Person, (ii) a violation of the express terms of this Agreement by such Person, (iii) a breach of the implied contractual covenant of good faith and fair dealing or (iv) the receipt by such Covered Person from the Company of a personal benefit to which such Covered Person is not entitled to receive under the terms of this Agreement or Applicable Law. The exculpation, indemnification and advancement of expenses provisions of this Section 7.1 and this Section 7.2 may be asserted and enforced by, and shall be for the benefit of, each Covered Person, and each Covered Person is hereby specifically empowered to assert and enforce such right; provided, that, any Covered Person who enters into a settlement of any proceeding without the prior approval of the Company (which shall not be unreasonably withheld, conditioned or delayed) shall not be entitled to indemnification provided in this Section 7.2.

7.3      Insurance. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Indemnifiable Losses covered by the foregoing indemnification provisions and to otherwise cover Indemnifiable Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager may reasonably determine; provided, that, the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Indemnifiable Losses.

7.4     <u>Severability</u>. In the event that any provision of this <u>Article VII</u> is determined to be invalid in whole or in part, the remainder of such article shall be enforceable to the maximum extent permitted by Applicable Law.

7.5     <u>Amendments</u>. Any repeal or modification of this <u>Article VII</u> shall not adversely affect any rights of such Covered Person pursuant to this <u>Article VII</u>, including the right to indemnification and to the advancement of expenses of a Covered Person existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

**ARTICLE VIII**

**<u>MANAGEMENT</u>**

8.1     <u>Management of the Company</u>.

(a)     <u>Manager Authority</u>. To the fullest extent permitted by Delaware law, and subject to the express limitations provided in this Agreement, the Manager shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions and take all actions regarding the business of the Company and shall have the power to act for or bind the Company.  Any action taken by the Manager shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no Person shall be required to inquire into the authority of the Manager to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Manager as set forth in this Agreement.  The initial Manager shall be Tim Daileader. The Manager shall remain in office until his or her death, disability, resignation or removal, and in the event of death, disability, resignation or removal of a Manager, the vacancy created shall be filled as provided in <u>Section 8.1(b)</u>.  Except as otherwise specifically provided in this Agreement, the Manager shall have all rights and powers of a "manager" under the Act, and shall have such authority, rights and powers in the management of the Company business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)     <u>Manager Resignation, Removal and Replacement</u>. The Manager may resign at any time by giving written notice to the Company and to each Member that, at the time of such resignation, is listed on the Register of Members as a Major Holder.  The resignation of the Manager shall take effect thirty (30) days following receipt of notice thereof by each such Member, or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The Manager may be removed from his or her position as Manager only upon the vote or written consent of the Required Members; <u>provided</u>, that the Manager may be removed by vote or written consent of the Members which, at the time of such action, together with their respective Affiliates, hold in the aggregate at least forty percent (40%) of the Units outstanding at such time by reason of (i) the willful misconduct or fraud of the Manager, (ii) a violation of the express terms of this Agreement by the Manager, (iii) a breach of the implied contractual covenant of good faith and fair dealing or (iv) the receipt by the Manager from the Company of a personal benefit which the Manager is not entitled to receive under the terms of this Agreement or Applicable Law (the

16

circumstances described in clauses (i) through (iv) being referred to as "cause"). If at any time the Manager position is vacant by reason of the death, disability, removal or resignation of the Manager, a successor Manager shall be appointed by the vote or written consent of the Required Members. If the Required Members fail, following good faith discussions, to fill any such vacancy, at any time following the date that is twenty (20) Business Days after such position becomes vacant and such position continues to be vacant, an interim Manager may be appointed by any Member which, at the time of such action, together with their respective Affiliates, holds in the aggregate at least forty percent (40%) of the Units outstanding at such time, and if no such Member exists, Members holding a majority of the Units outstanding at such time (the "Interim Manager"). Such Interim Manager shall continue to serve as the Manager of the Company for a ninety (90) day period during which time the Members shall continue to discuss the designation of a successor Manager in good faith. The Required Members may, at any time during such period the Interim Manager is serving, agree on a permanent successor Manager to replace any such Interim Manager. If Required Members have not appointed a permanent replacement for the Interim Manager by the end of such ninety (90) day period, the Interim Manager shall continue to serve as Manager until such Interim Manager's death, disability, resignation or removal in accordance with this Agreement; provided, that at any time following such ninety (90) day period during which Required Members have not appointed a permanent Manager, the Members which, together with their respective Affiliates, hold a majority of all outstanding Units as of such time may agree by written consent delivered to the Company and the Interim Manager to remove such Interim Manager for any reason and appoint a replacement Interim Manager (the "Replacement Manager") who shall continue in such role until such time as Required Members appoint a permanent Manager or such Replacement Manager's earlier death, disability, resignation or removal for cause.

(c)    Actions by Written Consent or Virtual Conference. Any action permitted or required by the Act, the Certificate or this Agreement requiring the vote of the Manager may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Manager. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware.

8.2    Business Opportunities; Other Activities. Each Member acknowledges and agrees that, except as otherwise agreed in writing, no Member shall, in its capacity as a Member, be bound to devote any of such Member's business time to the affairs of the Company, and that each Member and such Member's Affiliates do and will continue to engage for such Member's own account and for the account of others in other business ventures. Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Investment. None of the Members nor any of their respective Affiliates shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from other such activities or businesses. None of the Members nor any of their respective Affiliates shall be obligated to inform the Company or the other Member of any business opportunity of any type or description.

8.3    Compensation of the Manager. Unless approved by the Required Members, the Manager shall not be compensated for its service as Manager; provided, that the parties hereto acknowledge that the compensation of the Manager as of the Effective Date set forth in the

Independent Manager Agreement has been duly approved by the Required Members. Notwithstanding the foregoing, the Company shall reimburse the Manager for all ordinary, necessary and direct expenses incurred by the Manager on behalf of the Company in carrying out the Company's business activities. All reimbursements for expenses shall be reasonable in amount (and may include flight, hotel and other travel expenses consistent with the travel policies of any of the Members).

8.4     Officers.

(a)     Designation and Appointment. The Manager may, from time to time, employ and retain Persons as may be necessary or appropriate for the conduct of the Company's business (subject to the supervision and control of the Manager), including employees, agents and other Persons (any of whom may be the Manager) who may be designated as Officers of the Company, with titles including "Chief Executive Officer," "President," "Chief Strategy Officer," "Chief Operating Officer," "Chief Compliance Officer," "General Counsel," "Vice President," "Treasurer," "Secretary," "Assistant Secretary," and "Chief Financial Officer," as and to the extent authorized by the Manager.  Any number of offices may be held by the same Person.  In its discretion, the Manager may choose not to fill any office for any period as it may deem advisable. Officers need not be residents of the State of Delaware or Members.  Any Officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them.  The Officers shall have the general powers and duties of management and supervision usually vested in such officers to conduct the normal day to day operations of the business.  The Manager may assign titles to particular Officers.  Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.  The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Manager. The initial "President" of the Company shall be the Manager.

(b)     Resignation/Removal. Any Officer may resign as such at any time. Such resignation shall be made in writing delivered to the Manager and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause, at any time by the Manager.  Designation of an Officer shall not of itself create any contractual or employment rights.

(c)     Duties of Certain Officers. The Officers of the Company who are full-time employees of the Company or a Subsidiary thereof, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware. Any Officer of the Company who is an Affiliate of any Member shall not be bound by this Section 8.4(c).

8.5     No Fiduciary Duties; Contract Supersedes. Except as set forth in Section 8.4(c), to the fullest extent permitted by Applicable Law, neither any Covered Person, nor any of its Affiliates or any of their respective partners, members, equityholders, directors, managers, officers, employees, agents or representatives (for purposes of this Section 8.5 but subject to

18

Section 8.4(c), other than (a) the Manager (to the extent acting in its capacity as Manager and not in its capacity as a Member) and (b) a Covered Person or other Person who is a paid officer or employee of the Company or any of its Subsidiaries in his or her capacity as such, each of whom shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware) shall be liable to the Company or to any Member for breach of any duty (including fiduciary duties, but other than a duty to act in accordance with the implied contractual covenant of good faith and fair dealing) if such Person relied in good faith on the provisions of this Agreement. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall act in good faith in performing its duties to the Company hereunder; provided, however, it shall not be presumed that a Covered Person is not acting in good faith solely because he acts in a manner consistent with what he believes to be in his own interest.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person. For the avoidance of doubt, none of the provisions of this Section 8.5 shall eliminate the duty of good faith or otherwise waive any claim by any of the parties hereto for fraud.

8.6    Member Consent Rights.

(a)    Notwithstanding anything to the contrary in this Agreement or any Organizational Document of the Company or any of its Subsidiaries, neither the Company nor any of its Subsidiaries, by virtue of Manager action or approval or otherwise, shall take, or cause to be taken, any of the following actions without the prior written consent of the Required Members (and any such action purported to be taken by the Company or the Manager without such prior written consent shall be null and void ab initio):

(i)    making any amendment or modification of or to the Organizational Documents of the Company or any of its Subsidiaries in a manner that would adversely affect the rights of one or more Members in relation to one or more other Members;

(ii)    splitting, combining, subdividing, recapitalizing or reclassifying any equity securities or making any material change in the capital structure of the Company or any of its Subsidiaries;

(iii)    making any issuances of Units (including creating additional classes or series thereof) or other debt or equity securities, obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other debt or equity securities, warrants, options or other rights to purchase or otherwise acquire Units or other debt or equity securities;

(iv)     making any non-pro rata dividends or distributions of any kind or any non pro-rata acquisition, repurchase, redemption or retirement for value of any Units or other equity securities;

(v)     entering into or consummating any Change of Control transaction;

(vi)     granting rights to require the Company or any of its Subsidiaries to register securities for sale under the Securities Act;

(vii)     consummating a public offering of the Units or other equity securities of the Company or any of its Subsidiaries (including an Initial Public Offering) or listing any Units or other equity securities on any securities exchange or substantially equivalent market, including any private Rule 144A market;

(viii)     acquiring (whether by merger, stock purchase, asset purchase, partnership or joint venture or otherwise) any securities, assets (other than assets used in the ordinary course of its existing business) or businesses;

(ix)     selling, assigning, granting, pledging, subjecting to any lien, leasing, licensing, sublicensing, covenanting not to assert, or permitting the lapsing, abandonment, encumbrance or other transfer or disposition of, any assets, properties or businesses of the Company or any of its Subsidiaries (including intellectual property assets), other than encumbrances existing pursuant to financings in place as of the Effective Date and other than any licensing or sublicensing in the ordinary course of the Company's existing business;

(x)     (A) incurring any new indebtedness for borrowed money, (B) amending the material economic terms of any debt facilities in effect as of the Effective Date or (C) guaranteeing or otherwise becoming responsible for the material obligations of another Person (other than of wholly-owned Subsidiaries);

(xi)     hiring, appointing, terminating or making other material changes (including a change of responsibilities) with respect to the principal officers of the Company or any of its Subsidiaries or modifying, amending or terminating any employment, severance, change of control or other similar agreement such any such principal officer;

(xii)     effecting any change to its business purpose or entering into or developing any new line of business which is materially different from the business of the Company and its Subsidiaries as of the Effective Date or ceasing, terminating or discontinuing any existing line of business;

(xiii)     making any material tax election (other than the initial tax election of the Company) or any change in accounting policies, other than as required by Applicable Law or changes in GAAP;

(xiv)   commencing, settling or compromising any Action (including Actions relating to any material taxes) involving damages in excess of $1,000,000 or that would otherwise impose a material limitation on the operations of the Company or any of its Subsidiaries;

(xv)   adopting or entering into any equity incentive plan;

(xvi)   initiating and/or consummating any Bankruptcy, liquidation, dissolution, winding up, assignment for the benefit of creditors or similar proceeding;

(xvii)   subject to Section 8.1(b), establishing a board of managers or directors, as applicable, which, in the case of the Company, is comprised of members other than the Manager;

(xviii)  subject to Section 8.1(b), removing or replacing the Manager;

(xix)   entering into, amending, modifying, supplementing or terminating  any agreement or transaction with a Member or any of its Affiliates (other than the entry into those agreements in effect as of the Effective Date or that are contemplated by the New Notes Documents (as defined in the Plan));

(xx)   making any material amendment to, or terminating, or waiving any material rights under, the Brand Management Agreement (including the termination of the Manager (as defined in the Brand Management Agreement) or appointing a successor Manager (as defined in the Brand Management Agreement) thereunder) or entering into any new brand management or similar agreement;

(xxi)   making any capital or operating expenditure or incurring any liability in excess of $250,000 per annum;

(xxii)   entering into any agreement or transaction that would have or is likely to have a material adverse impact on royalties due to the Company or any of its Subsidiaries; or

(xxiii)  creating any new Subsidiary other than new Subsidiaries that do not result in material economic consequences and otherwise do not require the consent of the Manager or Members.

(b)   In the event that any vote or decision of the Members with respect to any matter that requires the approval of the Required Members under Section 8.6(a) (other than the matters set forth in Sections 8.6(a)(xi), (xvii) or (xviii)) results in an even number of Major Holders approving and disapproving the matter being voted upon, such matter shall be submitted to the Manager for its approval, and the decision of the Manager shall be final and binding on each Member with respect to such matter.

8.7   Member Voting Procedures.  Any action requiring the affirmative vote of Members under this Agreement, unless otherwise specified herein, may be taken by vote at a meeting or, in lieu thereof, by written consent of requisite Members. If such action taken pursuant

to such written consent of the Members is adopted by less than unanimous written consent, the Company shall provide the Members that did not take such action with prompt notice of the action taken.

## ARTICLE IX

## DISPOSITION OF UNITS

9.1    <u>Restrictions on Transfer</u>.

(a)    Except as otherwise provided in this <u>Article IX</u>, no Member shall Transfer all or any portion of its Units without the written consent of the Manager; <u>provided</u>, <u>that</u>, this <u>Section 9.1(a)</u> shall not apply to Transfers to a Permitted Transferee. No Transfer of Units to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with <u>Section 4.1(b)</u>.

(b)    Prior to consummation of any direct Transfer by any Member of any of its Units to any Person, including a direct Transfer to a Permitted Transferee, such Member shall cause any transferee who is not already a party to this Agreement to execute and deliver to the Company a Joinder Agreement in which such transferee agrees to be bound by the terms and conditions of this Agreement.  Upon any direct Transfer of Units by any Member in accordance with this <u>Section 9.1(b)</u> and the other terms of this Agreement, (x) the transferee thereof shall be substituted for, and shall assume all the rights and obligations under this Agreement of, the transferring Member and (y) the Company shall amend the Register of Members to reflect such Transfer and the admission of such transferee as a Member.

(c)    Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Units for all purposes of this Agreement.

9.2    <u>Tag-Along Rights</u>

(a)    <u>Participation Right</u>. At least twenty (20) days prior to any Transfer of any Units in excess of 20% of the then outstanding Units (other than one or more Transfers (i) pursuant to an internal reorganization or restructuring, (ii) to a Permitted Transferee, (iii) to the Company or any of its respective Subsidiaries, or (v) an Approved Sale (as defined below)), each Member making such Transfer (the "<u>Transferring Member</u>") shall deliver a written notice (the "<u>Sale Notice</u>") to the Company and to the non-Transferring Members (it being understood that, in the case of an indirect Transfer, the Transferring Member shall be deemed to be the holder of the Units that are being indirectly Transferred), specifying in reasonable detail the identity of the prospective Transferee(s), the number and class of Units being Transferred, and the terms and conditions of the Transfer (including the price per Unit).  The Transferring Member shall also provide to the non-Transferring Members, when available (which may occur less than 20 days prior to the applicable Transfer but which must be provided by 5:00 p.m. eastern prevailing time on the date that is two (2) days prior to the Tag Along Election Deadline), copies of the definitive agreements providing for such Transfer. The notified Members may elect to participate in the

contemplated Transfer (on the same terms and conditions, including the same form of consideration and price per Unit (including that if such Transferee has an option for the form of consideration being received, the notified Members will be given the same option), on which such Units are proposed to be sold to the Transferee(s)) by delivering written notice to the Transferring Member prior to 5:00 p.m. eastern prevailing time on the date that is ten (10) days after delivery of the Sale Notice (such deadline, the "Tag Along Election Deadline"). Such participation (as a share of total proceeds) shall be based upon the Pro Rata Percentages represented by the Units held by each Member relative to the Pro Rata Percentages of all Units held by the Members participating in such Transfer (including the Transferring Member). If no notified Member has properly elected to participate in the contemplated Transfer by the Tag Along Election Deadline, then the Transferring Member may Transfer the Units specified in the Sale Notice at a price and on terms substantially no more favorable to the Transferee(s) thereof than specified in the Sale Notice at any time during the 120 day period immediately following the delivery of the Sale Notice (or such later date as of which all required approvals for such Transfer have been obtained and all required waiting periods have expired). Any Transferring Member's Units not Transferred within such 120 day period (or such later date as of which all required approvals for such Transfer have been obtained and all required waiting periods have expired) shall again be subject to the provisions of this Section 9.2 prior to any subsequent Transfer.

(b)    Participation Procedure; Conditions. With respect to any Transfer subject to Section 9.2(a), each Transferring Member shall use its commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Member(s) who have properly elected to participate in any contemplated Transfer on the same terms and conditions, and for the same form and price per Unit consideration (including that if such Transferee has an option for the form of consideration being received, the other Investors will be given the same option) as the Transferring Member, and no Transferring Member shall Transfer any of its Units to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of such Member(s) on the terms provided herein, unless in connection with such Transfer, one or more of the Transferring Members or their respective Affiliates purchase (on the same terms and conditions, including the same form of consideration and price per Unit (including that if such Transferee has an option for the form of consideration being received, the other Members will be given the same option)), on which such Units were to be sold to the Transferee(s)) the number and class of Units from each Member that such Member would have been entitled to sell pursuant to Section 9.2(a). Each Member Transferring Units pursuant to this Section 9.2 shall pay its share (determined in accordance with their relative Pro Rata Percentages) of the expenses incurred by the Transferring Member in connection with such Transfer and shall be obligated to join in accordance with their relative Pro Rata Percentages in any indemnification or other obligations that the Transferring Member(s) agrees to provide in connection with such Transfer (other than any such obligations that relate specifically to a particular Member such as indemnification with respect to representations and warranties given by a Member regarding having no obligation to pay any fees or commissions to brokers, and such Member's due authorization, enforceability and title to and ownership of Units); provided, that any escrow or holdback of proceeds of any such transaction shall be withheld in accordance with their relative Pro Rata Percentages; provided further, that no Member Transferring Units pursuant to this Section 9.2 (i) will be required to make any representation or warranty to the prospective Transferee other than those that relate specifically to having no obligation to pay and fees or commissions to brokers, and such Member's authority, due authorization, enforceability and title to and ownership of securities and (ii) will be

obligated to enter into any indemnification obligations in excess of the net proceeds received by such Member in such Transfer. In connection with the participation by such Person in any Transfer made pursuant to this <u>Section 9.2</u>, no Member shall be required to enter into any non competition or non solicitation agreement or any other agreement of similar import.

      9.3   <u>Approved Sale; Drag-Along Obligations</u>. In the event the Required Members approve a Change of Control transaction (an "<u>Approved Sale</u>") the Required Members must deliver written notice of such Approved Sale to each other Member setting forth the material terms of the Approved Sale including (i) the number and class of Units to be acquired from the Members, and (ii) the estimated aggregate consideration to be received by the Members in the Approved Sale. Upon receipt of such notice and the request of the Required Members, each Member shall:

      (a)   vote for (whether at a meeting of Members or by written consent), consent to and raise no objections against such Approved Sale;

      (b)   if the Approved Sale is structured as a sale of Units or other securities, agree to sell or dispose of (and shall sell and dispose of) all (or such lesser portion as is proportionate to the aggregate portion of Units that is being sold or disposed of in such Approved Sale) of such Member's Units and other securities of the Company on the terms and conditions applicable to the Approved Sale; and

      (c)   take all necessary or desirable actions in connection with the consummation of the Approved Sale as reasonably requested by the Manager, including executing and delivering any and all consents, agreements, instruments and other documents approved by the Manager (including any applicable purchase agreement, equityholders agreement or indemnification or contribution agreement; *provided*, that in no event shall any Member be required to enter into any non competition or non solicitation agreement or any other agreement of similar import in connection with any Approved Sale).

      (d)   In connection with any Approved Sale, the Company shall (and the Company shall cause each of its Subsidiaries and each of its and their respective officers, managers, directors, employees, financial advisors, consultants, attorneys and other agents and representatives to) take, at the Company's sole cost and expense, all necessary or commercially reasonable actions in connection with the consummation of the Approved Sale and any related transactions (including any auction or competitive bid process in connection with or preceding such Approved Sale) as reasonably requested by the Manager, including (i) retaining investment bankers and other advisors approved by the Manager; (ii) participating in management meetings and preparing pitchbooks and confidential information memoranda; (iii) furnishing information and copies of documents; (iv) preparing and making filings with Governmental Entities; (v) providing assistance with legal, accounting, Tax, financial, benefits and other due diligence; and (vi) otherwise cooperating with the Manager, the prospective buyer(s), any investment bankers, consultants or other professional advisors who have been retained in connection with such Approved Sale and their respective representatives.

      (e)   The obligations of the Members with respect to the Approved Sale are subject to the satisfaction of the conditions that (and the Company shall take such actions as

are necessary so that) (i) each Member shall receive in exchange for the Units held by such Member the same portion of the aggregate consideration (or, in the event of a sale of less than all of the issued and outstanding Units, the equity value implied by such aggregate consideration), however described or allocated, from such transaction that such Member would have received if such aggregate consideration (or equity value) had been distributed by the Company in accordance with the provisions of Article V (with it being understood and agreed that all consideration (however described or allocated) that is paid directly or indirectly to any Member in connection with the Approved Sale shall be deemed to be proceeds of the Approved Sale and shall be allocated among the Members in accordance with the provisions of Article V) and (ii) if any Member has an option as to the form of consideration being paid, each other Member shall have the same option.

(f)       Notwithstanding anything herein to the contrary, the Members shall be severally obligated to join in accordance with their relative Pro Rata Percentages (as if such indemnification obligations reduced the aggregate proceeds available for distribution or payment to the Members in such Approved Sale) in any indemnification obligations approved by the Required Members in connection with such Approved Sale; provided, that no Member shall be obligated to enter into indemnification obligations with respect to matters particular to any other Member or such other Member's (or its Permitted Transferees') Units, and no Member shall be required to agree to indemnification obligations in excess of the proceeds actually received by such Member (and its Permitted Transferees) in such Approved Sale; provided further, that any escrow of proceeds of any such transaction shall be withheld in accordance with the relative Pro Rata Percentages among all Members (as if such escrow reduced the aggregate proceeds available for distribution or payment to the Members in such Approved Sale). Each Member shall pay its share determined in accordance with their relative Pro Rata Percentages (as if such expenses reduced the aggregate proceeds available for distribution or payment to the Members in such Approved Sale) of the expenses incurred by the Company pursuant to an Approved Sale to the extent such expenses are incurred for the benefit of all Members (as reasonably determined by the Manager). Expenses incurred by any Member on its own behalf will not be considered costs incurred for the benefit of all Members and, to the extent not paid by the Company, will be the responsibility of such Member. Each Member shall enter into any indemnification, contribution or equityholder/seller representative agreement requested by the Manager and approved by the Required Members to ensure compliance with this Section 9.2, in each case, in form and substance reasonably customary, and hereby consents and agrees to abide by the customary provisions of any merger or similar agreement providing for an equityholder/seller representative, subject to the terms of this Agreement. Subject to the terms of this Agreement, each Member shall enter into any other agreement that the Manager reasonably requests.

(g)       In no manner shall this Section 9.2 be construed to grant to any Member any dissenter's rights or appraisal rights or give any Member any right to vote in any transaction structured as a merger or consolidation, it being understood that the Members hereby expressly waive rights under Section 18 210 of the Delaware Act (entitled "Contractual Appraisal Rights") in all circumstances (whether an Approved Sale or otherwise) and grant to the Required Members the sole right to approve or consent to a merger or consolidation of the Company with any such Person without approval or consent of the other Members or any class, series or group thereof.

# ARTICLE X

## ACCOUNTING AND RECORDS

10.1    <u>Records to be Maintained</u>.

(a)    The Company shall maintain at its principal office separate books of account for the Company which shall reflect a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of its business.

(b)    The Company shall maintain the following records at its principal office, which shall be open to inspection and copying by any Member that, together with its Affiliates, holds in the aggregate at least 4.5% of the number of then outstanding Units (the "<u>Ownership Threshold</u>") or its authorized agents during reasonable business hours and upon ten (10) Business Days' prior notice to the Manager for any purpose reasonably related to such Member's interest in the Company; <u>provided</u>, that the Register of Members shall be available for inspection and copying solely pursuant to <u>Section 3.3</u>:

(i)    a copy of the Certificate of Formation and all amendments and restatements thereto;

(ii)    copies of the Company's federal, foreign, state and local income tax returns and reports, if any, for the six (6) most recent years;

(iii)    copies of this Agreement, including all amendments and restatements thereto; and

(iv)    any financial statements of the Company and its consolidated Subsidiaries for the six (6) most recent Fiscal Years or such shorter period in which the Company has been in existence.

10.2    <u>Financial Statements</u>. The Company shall prepare and distribute the following to each Member for so long as it holds Units in excess of the Ownership Threshold as of the relevant time of determination: (i) annual audited financial statements of the Company within 150 days following the end of the first fiscal year ended after the Effective Date, and within 120 days following the end of each fiscal year thereafter and (ii) quarterly unaudited financial statements within 90 days following the end of the first two fiscal quarters ended following the date hereof and 60 days following the end of each fiscal quarter thereafter (other than the last fiscal quarter of a fiscal year).

# ARTICLE XI

## DISSOLUTION AND WINDING UP

11.1    <u>Dissolution; Liquidating Events</u>. The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    the date on which none of the Members holds any Units;

(b)    mutual agreement of all Members in writing; or

(c)    a determination by the Manager to terminate, dissolve, liquidate or wind up the Company in accordance with the terms of this Agreement.

11.2    <u>Effect of Dissolution</u>. Upon dissolution, the Company shall cease carrying on business but shall not be terminated and shall wind up current Company business. The Company shall continue in existence until the winding up of the affairs of the Company is completed and the certificate of cancellation has been filed and made effective with the Secretary of State of the State of Delaware with respect to the Certificate of Formation.

11.3    <u>Liquidation Trustee</u>. Upon dissolution, the Manager shall appoint a liquidating trustee (the "<u>Trustee</u>") to conduct and supervise the liquidation, which Trustee shall be an individual who is knowledgeable about the business (if possible) and has substantial experience in the purchase and sale of businesses (or if a Trustee is not identified within forty-five (45) days of the date of dissolution, the American Arbitration Association shall appoint such Trustee). The Trustee shall cause a full accounting of the assets, liabilities and operations of the Company to be taken and audited by independent accountants.

11.4    <u>Distribution of Assets on Dissolution</u>. Upon the winding up of the Company, the Company's assets shall be distributed:

(a)    to creditors, including Members who are creditors (but only in their capacity as such) to the extent required by Applicable Law, in satisfaction of Company liabilities (including the expenses of winding up and liquidation (whether by payment or the making of reasonable provision for the payment thereof); and to the establishment of reasonable reserves, if any, in such amounts as the Trustee deems reasonably necessary for the payment of unliquidated claims or any contingent or unforeseen liabilities or other obligations of the Company); and

(b)    to Members in accordance with <u>Article V</u>. Such Distributions shall be in cash or property (which shall be distributed proportionately) or partly in both, as determined in good faith by the Trustee.

11.5    <u>Winding Up and Certificate of Cancellation</u>. The winding up of the Company shall be completed when all debts of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining assets of the Company have been distributed to the Members, in each case, in accordance with <u>Section 11.4</u>. Upon the completion of winding up of the Company, a certificate of cancellation shall be delivered to the Secretary of State of the State of Delaware for filing. The certificate of cancellation shall set forth the information required by the Act.

11.6    <u>Termination</u>.

(a)    This Agreement shall terminate, and the Company shall be dissolved once the Distributions provided for in <u>Section 11.4</u> have been made and at such time as the

Company has been wound up and a certificate of cancellation has been filed and made effective as provided for in <u>Section 11.5</u> (the "<u>Agreement Termination Date</u>").

(b)    Upon the termination of this Agreement, no party shall have any liability or obligation to any other party hereunder; <u>provided</u>, <u>that</u>, (i) the termination of this Agreement shall not relieve a party from liability for any breach of this Agreement on or prior to the Agreement Termination Date, and (ii) <u>Article VII</u>, this <u>Article XI</u> and <u>Article XII</u> shall survive termination of this Agreement in accordance with their terms.

## ARTICLE XII

## <u>MISCELLANEOUS PROVISIONS</u>

12.1    <u>Expenses</u>.  Except as otherwise expressly provided herein or as otherwise agreed in writing, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with any amendment or waiver of this Agreement, and any transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

12.2    <u>Further Assurances</u>. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or the Manager, to execute and deliver such additional documents, certificates, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

12.3    <u>Notices</u>.

(a)    All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (iii) on the date sent by email of a PDF document (with confirmation of transmission and provided that such notice is also sent on the same day by a nationally recognized overnight courier (receipt requested) or mailed, by certified or registered mail, return receipt requested, postage prepaid) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient.

(b)    Such communications in <u>Section 12.3(a)</u> must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 12.3</u>):

(c)    if to the Company, at its principal office address;

(d)    if to a Member, at the address set forth on the Register of Members; and

(e)    if to a Permitted Transferee of Units or any other Person who becomes a Member following the Effective Date, (A) at the address set forth on the respective

Joinder Agreement executed by such party; or (B) if an address is neither set forth on such Joinder Agreement nor provided to the Company in a notice given in accordance with this <u>Section 12.3</u>, at such party's last known address.

      12.4  <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.  The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

      12.5  <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

      12.6  <u>Entire Agreement</u>. This Agreement (together with the Schedules and Exhibits hereto) (a) constitutes the entire agreement, and supersede all other prior agreements and understandings, both written and oral, among the Members and the Company and between each of the Members with respect to the subject matter hereof and (b) except as otherwise expressly provided herein, is not intended to and shall not confer upon any Person other than the Members and the Company, any rights or remedies hereunder.

      12.7  <u>Successors and Assigns; Assignments</u>. Subject to the rights and restrictions on Transfers set forth in this Agreement, this Agreement is binding upon and inures to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.  This Agreement may not be assigned by any Member except as expressly permitted in this Agreement (or as otherwise consented to in writing by the Manager) and any such assignment in violation of this Agreement shall be null and void.

12.8    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns and, except as expressly set forth herein, nothing in this Agreement is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12.9    Amendment and Modification.  This Agreement may be modified by an instrument in writing signed by the Manager, which will be binding upon the Company and each Member; provided, that any amendment, waiver or modification of this Agreement that disproportionately, materially and adversely affects any Member shall require the prior written consent of such Member.

12.10    Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

12.11    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Delaware.

12.12    Submission to Jurisdiction.

(a)    The parties hereto hereby agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject-matter jurisdiction, in the Superior Court of the State of Delaware or other state court located in the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such Action, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware.

(b)    Each of the parties hereto hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the venue of any such Action in any such court or that any such Action which is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice or other document by certified or registered mail to the address set forth in Section 12.3 shall be effective service of process for any Action brought in any such court.

12.13    Waiver of Jury Trial. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES,  TO  THE  FULLEST  EXTENT  PERMITTED  BY

APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.14    Equitable Remedies. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

12.15    Remedies Cumulative. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

12.16    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

12.17    Compliance with Law. Each party hereto shall comply in all material respects with all Applicable Laws of any Governmental Authority in connection with its ownership of Units or other equity securities of the Company, except to the extent that the failure to so comply with such Applicable Laws of any Governmental Authority would not have (or be expected to have) a material adverse effect on the Company and its Subsidiaries (taken as a whole).

12.18    Confidentiality.

(a)    Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without

31

limiting the applicability of any other agreement to which any Member is subject, each Member shall, and shall cause its Representatives to, keep confidential and not, directly or indirectly, disclose at any time any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall, and shall cause its Representatives to, take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)      Nothing contained in Section 12.18(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and are subject to confidentiality obligations substantially similar to the provisions of this Section 12.18; (vi) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such potential Permitted Transferee is subject to confidentiality obligations substantially similar to the provisions of this Section 12.18; or (vii) in connection with such Member's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such Member's (or any of its Affiliates') Affiliates, employees, auditors, attorneys or other agents, as long as the recipient is subject to confidentiality obligations substantially similar to the provisions of this Section 12.18; provided, that, in the case of clauses (i) through (iii), such Member shall notify the Company of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company); provided, further, that in the case of clauses (i) through (iii), such Member shall use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available

(c)      The restrictions of Section 12.18(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member or any of its Representatives in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members or any of their respective Representatives; provided, that, such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

12.19   Eligible Members

(a)      Pursuant to the Plan, certain Persons are entitled to receive Units of the Company (each, an "Eligible Person"). As of the Effective Date, any Eligible Person who has not delivered to the Company (i) a counterpart signature page to this Agreement and (ii) all other information and documentation required to be delivered by Members generally under this Agreement and the Plan (the "Required Information") shall not be admitted as a Member on the Effective Date.

(b)        Notwithstanding the foregoing, any Eligible Person shall be admitted as a Member of the Company effective as of the Effective Date if such Eligible Person delivers a counterpart signature page to this Agreement and the Required Information to the Company within forty-five (45) days following the Effective Date. The Company and the other Members shall take all actions reasonably necessary to reflect such admission as of the Effective Date. The rights of Eligible Persons to be admitted as Members pursuant to this Section shall not be amended, modified, or waived except to the extent expressly permitted under the Plan.

(c)        If any Eligible Person delivers the Required Information and executes a counterpart signature page after the forty-five (45) day period, such Person may be admitted as a Member at such later time and with such effect (including, for the avoidance of doubt, admission as of a date after the Effective Date) at the option of and, as determined by, the requisite Members. Any admission under this may be conditioned on such Person providing such additional information, representations, agreements, and/or compensation or consideration to the Company and/or the Members as the requisite Members may approve.

(d)        Any Person admitted as a Member shall not be entitled to receive (i) any distributions made prior to the date of such admission, or (ii) any allocations of income, gain, loss, deduction, credit, or similar items attributable to periods prior to the date of such admission, except in each case as otherwise determined by the requisite Members.

(e)        The Company shall reallocate Units to effect the provisions of this section among all Members.

***

# EXHIBIT A

## FORM OF JOINDER AGREEMENT

Reference is made to that certain Limited Liability Company Agreement of HOA NewCo LLC, effective as of October 31, 2025 (as may it be amended or otherwise modified from time to time, the "Agreement") by and among each Person identified on the Register of Members and each other Person who has become a party to the Agreement by executing a Joinder Agreement. All capitalized terms used and not defined in this Joinder Agreement shall have the meaning ascribed to such terms in the Agreement.

Pursuant to and in accordance with the Agreement, the undersigned hereby agrees that upon the execution of this Joinder Agreement, he, she or it shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed to be a "Member" for all purposes thereof.

The provisions in Article XII of the Agreement are incorporated herein by reference, *mutatis* mutandis, save that any references to this "Agreement" shall be read as references to this Joinder Agreement.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Joinder Agreement as of the day of _____, 20__.

[NAME]

_____

Address:

_____

_____

_____

Acknowledged and Agreed:

HOA NEWCO LLC

By:_____

Name:

Title:

# EXHIBIT C.2

**Second Amended and Restated
Limited Liability Company Agreement of
HOOTS Franchising, LLC**

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HOOTS FRANCHISING, LLC**

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOOTS Franchising, LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025 (the "Effective Date"), is entered into by HOA Franchise HoldCo LLC, a Delaware limited liability company, as the sole member of the Company (together with each other Person admitted as a member of the Company in accordance with Section 6(b) of this Agreement, each, a "Member" and collectively, the "Members").

W I T N E S S E T H:

**WHEREAS**, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on June 25, 2018 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation");

**WHEREAS**, HOA Funding, LLC, a Delaware limited liability company (the "Former Member") previously entered into the Amended and Restated Limited Liability Company Agreement of the Company, dated as of August 19, 2021 (the "Existing LLC Agreement"), as the sole member of the Company;

**WHEREAS**, the Former Member transferred 100% of the membership interests of the Company to the Member on or about the date hereof; and

**WHEREAS**, the Member agrees that the membership in and management of the Company shall be governed by the terms set forth herein; and

**WHEREAS**, pursuant to Section 30 of the Existing LLC Agreement, the Former Member and Member desire to amend and restate the Existing LLC Agreement in its entirety in the manner set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, (i) confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, this Agreement and the Act and (ii) amend and restate in its entirety the Existing LLC Agreement pursuant to Section 30 of the Existing LLC Agreement as follows:

1.  <u>Name</u>. The name of the Company is "HOOTS Franchising, LLC."

2.  <u>Purpose</u>. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

3.  <u>Principal Business Office</u>. The principal business office of the Company shall be located at

c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

4.      Registered Office. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

5.      Registered Agent. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

6.      Members.

(a)      Initial Member. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| HOA Franchise HoldCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 |

(b)      Additional Members. One or more additional members may be admitted to the Company with the written consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members.  Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c)      Limited Liability Company Interests; Certificates. The Company will not issue any certificates to evidence ownership of the limited liability company interests.

7.      Management.

(a)      Authority; Powers and Duties of the Member. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)      Election of Officers; Delegation of Authority. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

2

8.      Liability of Member; Indemnification.

(a)      Liability of Member. Except as otherwise required in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or participating in the management of the Company.

(b)      Indemnification of the Member. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by the Member relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member on behalf of the Company; provided, however, that any indemnity under this Section 8(b) shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

(c)      Indemnification of the Officers. To the fullest extent permitted under the Act, the Company may indemnify an Officer who was or is a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, and whether formal or informal (a "Proceeding") because such Officer is or was an Officer of the Company, or is or was serving at the request of the Company as a manager, director, trustee, partner or officer of another entity, against any liability and reasonable expenses (including attorneys' fees) incurred by such Officer in connection with such Proceeding unless such Officer has engaged in willful misconduct or a knowing violation of the criminal law or has knowingly exceeded the authority granted by or pursuant to this Agreement; provided, however, that any indemnity under this Section 8(c) shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof. No amendment of this Section shall have any effect on the rights provided herein with respect to any act or omission occurring prior to such amendment.

9.      Term. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 13.

10.      Initial Capital Contributions. The Member hereby agrees to contribute to the Company such cash, property or services as determined by the Member in its sole discretion.

11.      Tax Status; Income and Deductions.

(a)      Tax Status. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state tax purposes and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

(b)      Income and Deductions. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit

of the Member.

12.    <u>Distributions</u>. Distributions shall be made to the Member at the times and in the amounts determined by the Member.

13.    <u>Dissolution; Liquidation</u>.

(a)    The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member; or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)    Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d)    Upon the completion of the winding up of the Company, the Member shall file a certificate of cancellation in accordance with the Act.

14.    <u>Miscellaneous</u>.

(a)    <u>Amendments</u>. Amendments to this Agreement may be made only with the written consent of the Member.

(b)    <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(c)    <u>Severability</u>. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

## EXHIBIT C.3

**Third Amended and Restated
Limited Liability Company Agreement of
HOA Franchising, LLC**

**THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HOA FRANCHISING, LLC**

This THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOA Franchising, LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025 (the "Effective Date"), is entered into by HOA Franchise HoldCo LLC, a Delaware limited liability company, as the sole member of the Company (together with each other Person admitted as a member of the Company in accordance with Section 6(b) of this Agreement, each, a "Member" and collectively, the "Members").

W I T N E S S E T H:

**WHEREAS**, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on April 28, 2014 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation");

**WHEREAS**, HOA Funding, LLC, a Delaware limited liability company (the "Former Member") previously entered into the Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of August 19, 2021 (the "Existing LLC Agreement"), as the sole member of the Company;

**WHEREAS**, the Former Member transferred 100% of the membership interests of the Company to the Member on or about the date hereof; and

**WHEREAS**, the Member agrees that the membership in and management of the Company shall be governed by the terms set forth herein; and

**WHEREAS**, pursuant to Section 30 of the Existing LLC Agreement, the Former Member and Member desire to amend and restate the Existing LLC Agreement in its entirety in the manner set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, (i) confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, this Agreement and the Act and (ii) amend and restate in its entirety the Existing LLC Agreement pursuant to Section 30 of the Existing LLC Agreement as follows:

1.      Name. The name of the Company is "HOA Franchising, LLC."

2.      Purpose. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

3.    <u>Principal Business Office</u>. The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

4.    <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

5.    <u>Registered Agent</u>. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

6.    <u>Members</u>.

(a)    <u>Initial Member</u>. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows:

| Name | Address |
|---|---|
| HOA Franchise HoldCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 |

(b)    <u>Additional Members</u>. One or more additional members may be admitted to the Company with the written consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c)    <u>Limited Liability Company Interests; Certificates</u>. The Company will not issue any certificates to evidence ownership of the limited liability company interests.

7.    <u>Management</u>.

(a)    <u>Authority; Powers and Duties of the Member</u>. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)    <u>Election of Officers; Delegation of Authority</u>. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "<u>Officer</u>"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument

2

designating such officer and the authority delegated to him or her.

      8.    <u>Liability of Member; Indemnification</u>.

      (a)    <u>Liability of Member</u>. Except as otherwise required in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or participating in the management of the Company.

      (b)    <u>Indemnification of the Member</u>. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by the Member relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member on behalf of the Company; provided, however, that any indemnity under this <u>Section 8(b)</u> shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

      (c)    <u>Indemnification of the Officers</u>. To the fullest extent permitted under the Act, the Company may indemnify an Officer who was or is a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, and whether formal or informal (a "<u>Proceeding</u>") because such Officer is or was an Officer of the Company, or is or was serving at the request of the Company as a manager, director, trustee, partner or officer of another entity, against any liability and reasonable expenses (including attorneys' fees) incurred by such Officer in connection with such Proceeding unless such Officer has engaged in willful misconduct or a knowing violation of the criminal law or has knowingly exceeded the authority granted by or pursuant to this Agreement; provided, however, that any indemnity under this <u>Section 8(c)</u> shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof. No amendment of this Section shall have any effect on the rights provided herein with respect to any act or omission occurring prior to such amendment.

      9.    <u>Term</u>. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with <u>Section 13</u>.

      10.    <u>Initial Capital Contributions</u>. The Member hereby agrees to contribute to the Company such cash, property or services as determined by the Member in its sole discretion.

      11.    <u>Tax Status; Income and Deductions</u>.

      (a)    <u>Tax Status</u>. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state tax purposes and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

      (b)    <u>Income and Deductions</u>. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated

3

for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

12.     Distributions. Distributions shall be made to the Member at the times and in the amounts determined by the Member.

13.     Dissolution; Liquidation.

(a)     The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member; or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)     Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d)     Upon the completion of the winding up of the Company, the Member shall file a certificate of cancellation in accordance with the Act.

14.     Miscellaneous.

(a)     Amendments. Amendments to this Agreement may be made only with the written consent of the Member.

(b)     Governing Law. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(c)     Severability. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

4

# **EXHIBIT C.4**

**Limited Liability Company Agreement of
HOA Future Franchising, LLC**

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## HOA FUTURE FRANCHISING, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOA Future Franchising, LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025 (the "Effective Date"), is entered into by HOA Franchise HoldCo LLC, a Delaware limited liability company, as the sole member of the Company (together with each other Person admitted as a member of the Company in accordance with Section 6(b) of this Agreement, each, a "Member" and collectively, the "Members").

W I T N E S S E T H:

**WHEREAS**, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on October 9, 2025 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation"); and

**WHEREAS**, the Member agrees that the membership in and management of the Company shall be governed by the terms set forth herein.

**NOW, THEREFORE**, the Member agrees as follows:

1.      Name. The name of the Company is "HOA Future Franchising, LLC."

2.      Purpose. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

3.      Principal Business Office. The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

4.      Registered Office. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

5.      Registered Agent. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

6.      Members.

(a)      Initial Member. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows:

| Name | Address |
|---|---|
| HOA Franchise HoldCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 |

(b)      <u>Additional Members</u>. One or more additional members may be admitted to the Company with the written consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c)      <u>Limited Liability Company Interests; Certificates</u>. The Company will not issue any certificates to evidence ownership of the limited liability company interests.

7.      <u>Management</u>.

(a)      <u>Authority; Powers and Duties of the Member</u>. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)      <u>Election of Officers; Delegation of Authority</u>. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "<u>Officer</u>"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

8.      <u>Liability of Member; Indemnification</u>.

(a)      <u>Liability of Member</u>. Except as otherwise required in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or participating in the management of the Company.

(b)      <u>Indemnification of the Member</u>. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by the Member relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member on behalf of the Company; provided, however, that any indemnity under this <u>Section 8(b)</u> shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

2

(c)      Indemnification of the Officers. To the fullest extent permitted under the Act, the Company may indemnify an Officer who was or is a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, and whether formal or informal (a "Proceeding") because such Officer is or was an Officer of the Company, or is or was serving at the request of the Company as a manager, director, trustee, partner or officer of another entity, against any liability and reasonable expenses (including attorneys' fees) incurred by such Officer in connection with such Proceeding unless such Officer has engaged in willful misconduct or a knowing violation of the criminal law or has knowingly exceeded the authority granted by or pursuant to this Agreement; provided, however, that any indemnity under this Section 8(c) shall be provided out of and to the extent of the Company's assets only, and neither the Member nor any other person shall have any personal liability on account thereof. No amendment of this Section shall have any effect on the rights provided herein with respect to any act or omission occurring prior to such amendment.

9.      Term. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 13.

10.     Initial Capital Contributions. The Member hereby agrees to contribute to the Company such cash, property or services as determined by the Member in its sole discretion.

11.     Tax Status; Income and Deductions.

(a)      Tax Status. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state tax purposes and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

(b)      Income and Deductions. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

12.     Distributions. Distributions shall be made to the Member at the times and in the amounts determined by the Member.

13.     Dissolution; Liquidation.

(a)      The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member; or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)      Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c)      In the event of dissolution, the Company shall conduct only such activities as are

necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d)      Upon the completion of the winding up of the Company, the Member shall file a certificate of cancellation in accordance with the Act.

14.    <u>Miscellaneous</u>.

(a)      <u>Amendments</u>. Amendments to this Agreement may be made only with the written consent of the Member.

(b)      <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(c)      <u>Severability</u>. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

4

## **EXHIBIT C.5**

**Fourth Amended and Restated
Limited Partnership Agreement of
HI Limited Partnership**

*Execution Version*

**FOURTH AMENDED AND RESTATED**


**LIMITED PARTNERSHIP AGREEMENT OF**

**HI LIMITED PARTNERSHIP**
**(a Florida Limited Partnership)**


**Dated as of October 31, 2025**

# TABLE OF CONTENTS

ARTICLE 1 Organization and Activities of Partnership ..................................................2

    **1.1**    **Formation of Limited Partnership** ..........................................................2

    **1.2**    **Name**.................................................................................................................2

    **1.3**    **Limited Purposes**. .........................................................................................2

    **1.4**    **Limitations on the Limited Partnership's Activities**. ................................3

    **1.5**    **Separate Identity; Limited Liability** ...........................................................6

    **1.6**    **Registered Office and Agent, and Principal Business Office**...................6

    **1.7**    **Fiscal Year** .....................................................................................................7

    **1.8**    **Transfers** ........................................................................................................7

    **1.9**    **Certain Tax Matters** .....................................................................................7

ARTICLE 2 Capital Contributions ....................................................................................7

    **2.1**    **Capital Contributions to the Partnership**.................................................7

    **2.2**    **No Return of Capital Contributions** ..........................................................7

    **2.3**    **No Interest** .....................................................................................................7

ARTICLE 3 Rights and Obligations of Partners ...............................................................7

    **3.1**    **Management of Partnership** .........................................................................7

    **3.2**    **Officers** ...........................................................................................................8

    **3.3**    **[RESERVED]** .................................................................................................8

    **3.4**    **Liability of Partners** .....................................................................................8

    **3.5**    **Other Activities of Partners** ........................................................................8

    **3.6**    **Acts of the General Partner** .........................................................................8

ARTICLE 4 Exculpation and Indemnity ...........................................................................9

    **4.1**    **Exculpation**....................................................................................................9

    **4.2**    **Indemnity** .......................................................................................................9

    **4.3**    **Survival** ..........................................................................................................9

ARTICLE 5 Distributions and Allocations........................................................................9

    **5.1**    **Distributions** ..................................................................................................9

    **5.2**    **Tax Allocations** ...........................................................................................10

ARTICLE 6 Admissions, Registration, Transfers and Withdrawals ...........................10

    **6.1**    **Admission of New Partners**........................................................................10

    **6.2**    **Registration and Transfers of Partnership Interests**.............................10

    **6.3**    **Substituted Partners** ..................................................................................11

    **6.4**    **Withdrawal of Partners**..............................................................................11

**6.5**    **Consent** ...............................................................................................................12

ARTICLE 7 General Accounting Provisions and Reports ...............................................12

**7.1**    **Books of Account; Tax Returns** .........................................................................12

**7.2**    **Place Kept; Inspection** ......................................................................................12

**7.3**    **Tax Matters Partner** ..........................................................................................12

ARTICLE 8 Amendments and Waivers ...........................................................................12

**8.1**    **With or Without Limited Partner Consent** .....................................................12

**8.2**    **Limitations on Amendments** ............................................................................12

ARTICLE 9 Dissolution and Termination .........................................................................13

**9.1**    **Dissolution** ........................................................................................................13

**9.2**    **Accounting on Dissolution** ...............................................................................13

**9.3**    **Termination** .......................................................................................................14

**9.4**    **No Negative Capital Account Obligation** ........................................................14

**9.5**    **No Other Cause of Dissolution** .......................................................................14

**9.6**    **Merger** ...............................................................................................................14

ARTICLE 10 Miscellaneous .............................................................................................14

**10.1**    **[RESERVED]** ....................................................................................................14

**10.2**    **Entire Agreement** .............................................................................................14

**10.3**    **Severability** .......................................................................................................14

**10.4**    **Notices** ..............................................................................................................15

**10.5**    **Governing Laws** ...............................................................................................15

**10.6**    **Successors and Assigns** ....................................................................................15

**10.7**    **Counterparts** .....................................................................................................15

**10.8**    **Headings** ............................................................................................................15

**10.9**    **Binding Agreement** ..........................................................................................15

**10.10**  **Rules of Construction; Other Terms** ................................................................15

**10.11**  **Power of Attorney** ............................................................................................16

SCHEDULE A — Definitions

# HI LIMITED PARTNERSHIP
# FOURTH AMENDED AND RESTATED
# LIMITED PARTNERSHIP AGREEMENT

This Fourth Amended and Restated Limited Partnership Agreement (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") of HI Limited Partnership, a Florida limited partnership (the "Partnership"), dated and made effective as of October 31, 2025, is entered into by and between (i) HOA IP GP, LLC, a Delaware limited liability company, as the sole general partner (the "General Partner"), and (ii) HOA RoyaltyCo LLC (f/k/a HOA Funding, LLC), a Delaware limited liability company, as the sole limited partner (together with each other Person admitted as a limited partner of the Partnership in accordance with the terms of this Agreement, each, a "Limited Partner" and collectively, the "Limited Partners" and, together with the General Partner, each, a "Partner" and collectively, the "Partners"). Capitalized terms used and not defined herein shall have the meanings set forth or incorporated by reference in SCHEDULE A attach hereto and made a part hereof.

## W I T N E S S E T H:

WHEREAS, the Partners previously entered into the Third Amended and Restated Limited Partnership Agreement, dated as of August 19, 2021 (the "Existing Agreement"), between the Partners, to set forth their respective rights and obligations and other matters with respect to the Partnership;

WHEREAS, Section 16(b) of the Existing Agreement permits the Existing Agreement to be amended and restated with the affirmative consent of holders of 100% of the Partnership interests under the Existing Agreement;

WHEREAS, on October 30, 2025, Hooters of America and certain of its affiliates filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan"); and

WHEREAS, the Partners of 100% of the Partnership interests desire to amend and restate the Existing Agreement to modify the rights and obligations of the Partners and the Partnership, and give effect to such other terms and provisions as are set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the premises and the covenants set forth herein and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree to (i) continue the Partnership without dissolution as a limited partnership pursuant to and in accordance with the Florida Revised Uniform Limited Partnership Act of 2005, as amended from time to time (the "Act"), and (ii) amend and restate the Existing Agreement in its entirety as follows:

## ARTICLE 1
## Organization and Activities of Partnership

**1.1** **Formation of Limited Partnership**. The Partnership was organized as a limited partnership pursuant to and in accordance with the provisions of Section 620.108 of the Florida Revised Uniform Limited Partnership Act (1986) on October 13, 1999 by the filing of a certificate of limited partnership with the office of the Florida Department of State. An amended certificate of limited partnership was filed pursuant to and in accordance with the provisions of Section 620.108 of the Florida Revised Uniform Limited Partnership Act (1986) with the Florida Department of State on April 19, 2001. The filings of the certificate of limited partnership and the amended certificate of limited partnership are hereby ratified and confirmed.

**1.2** **Name**. The name of the Partnership as previously organized and continued hereby is "HI Limited Partnership". The General Partner may, in its sole discretion, change the name of the Partnership from time to time, and shall give prompt written notice thereof to the Limited Partner. In any such event, the General Partner shall promptly file in the office of the Florida Secretary of State an amendment to the Partnership's amended certificate of limited partnership reflecting such change of name.

**1.3** **Limited Purposes**.

(a)    Subject to Section 1.4, the purposes of the Partnership shall be, and shall be limited to, the following:

(i)    to engage in its business and activities as permitted by the Related Documents;

(ii)    without limitation of Section 1.3(b), to acquire, own, hold, sell, transfer and pledge the Securitization IP as permitted under the Related Documents;

(iii)    to acquire, own (directly or indirectly), hold, sell, transfer and pledge equity interests in any entities as permitted under the Related Documents, and any of their respective subsidiaries, and to receive distributions therefrom, and to make capital contributions with respect thereto, from time to time, in each case as permitted under the Related Documents;

(iv)    to make distributions from time to time to the Partners as permitted under the this Agreement;

(v)    without limitation of Section 1.3(b), to enter into and exercise its rights and perform its obligations under the IP License Agreements, the Retained Restaurants License Agreement, the Founders License Agreement and all agreements relating to the Plan;

(vi)    without limitation of Section 1.3(b), to issue future licenses with respect to the Securitization IP to Securitization Entities, the Franchisors (as defined in the Management Agreement) and other subsidiaries of NewCo ( the "Non-Securitization Entities") or third parties for use of the Securitization IP in connection with products and services other than the development, opening and operation of Hooters Restaurants and fields of use exclusively granted under the Founders License Agreements, IP License Agreement (defined in the Indenture), the Management Agreement and all agreements relating to the Plan and/or any of the foregoing;

(vii)    without limitation of <u>Section 1.3(b)</u>, to enter into the Guarantee and Collateral Agreement (as defined in the Indenture), pursuant to which the Partnership will guarantee the Notes and any additional Series of Notes from time to time and grant the Indenture Trustee a lien on the collateral specified in the Indenture and as may be further specified in the Series Supplements from time to time as security for the guaranteed obligations;

(viii)    without limitation of <u>Section 1.3(b)</u>, to enter into the Management Agreement and other related and incidental agreements and extensions and amendments thereof;

(ix)    to hold the rights and obligations previously held by each applicable Non-Securitization Entity under the Material Contracts, if any, contributed to and retained by the Partnership pursuant to the HI Limited Partnership Contribution Agreement;

(x)    without limitation of <u>Section 1.3(b)</u>, (A) to otherwise enter into, perform its obligations under and take any action required or permitted by, the other Related Documents and all documents, agreements, certificates, financing statements or instruments contemplated thereby or related thereto and to exercise any rights given to it under any Related Document and such other documents, agreements, certificates, financing statements and instruments and (B) to pay any and all fees, costs and expenses in connection therewith; and

(xi)    (A) to enter into all such other documents, agreements, certificates, financing statements and instruments, and to engage in and perform any lawful act or activity and to exercise any powers not prohibited by the Related Documents permitted to limited partnerships organized under the laws of the State of Florida that are related or incidental to, and necessary, convenient or advisable for, the accomplishment of the above mentioned purposes and (B) to pay any and all fees, costs and expenses in connection therewith.

(b)    The Partnership is hereby authorized to execute, deliver and perform, by or through the General Partner or any Officer of the Partnership, either acting on behalf of the Partnership, and the General Partner and any Officer of the Partnership is hereby authorized to execute and deliver, (i) the Related Documents to which the Partnership is a party and (ii) all documents, agreements, certificates, financing statements or instruments contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of General Partner or any Officer of the partnership to enter into other agreements or documents on behalf of the Partnership, each to the extent consistent with and related or incidental to, or necessary, convenient or advisable for, the accomplishment of the permitted purposes set forth in <u>clause (a)</u> above.

### 1.4    <u>Limitations on the Limited Partnership's Activities</u>.

(a)    This <u>Section 1.4</u> is set forth herein in order to comply with certain provisions required in order to qualify the Partnership as a "special purpose" entity.

(b)    None of the Partners, any Officer or any other Person or group of Persons acting together, shall, pursuant to <u>Section 8.1</u> or <u>8.2</u>, amend, alter, change or repeal any of the sections of this Agreement without the prior written consent of the General Partner. Subject to this

Section 1.4(b), the General Partner may amend, alter, change or repeal any provision contained in this Agreement in accordance with Sections 8.1 and 8.2.

(c)     The Partnership shall do all things necessary to preserve and keep in full force and effect its existence, rights (under this Agreement and statutory) and limited partnership powers; provided, however, that the Partnership shall not be required to preserve any such right or limited partnership powers if the General Partner shall determine that the preservation thereof is no longer desirable for the conduct of the Partnership's business and that the loss thereof would not be disadvantageous in any material respect to the Partnership. The Partnership shall be operated in such a manner as the General Partner deems reasonable and necessary or appropriate to (a) preserve the limited liability of the Limited Partner(s), and (b) preserve the separateness of the Partnership from the business and affairs of the Partners or any Affiliate of the Partners, the Partnership shall:

(i)     if determined by the General Partner, or in compliance with the Indenture, maintain its own separate financial and business books and records that accurately reflect its assets, liabilities and financial affairs, separate and apart from those of any Person, except as otherwise permitted under the Related Documents;

(ii)     maintain its own bank accounts and books of account separate from those of any Person, except as otherwise permitted under the Related Documents;

(iii)     at all times hold itself out to the public as a distinct legal entity separate from and not a division of any Person and correct any known misunderstanding regarding its status as a separate entity;

(iv)     adhere to appropriate organizational formalities as required under the laws of its jurisdiction of formation and its organizational documents;

(v)     [Intentionally Omitted];

(vi)     prepare, or cause to be prepared, and file its own tax returns, if any, as may be required under applicable law, to the extent it is (i) not part of a consolidated group filing a consolidated return or returns or (ii) not treated as a division, for tax purposes, of another taxpayer or otherwise disregarded for tax purposes, and pay any taxes so required to be paid under applicable law;

(vii)     not commingle its own assets and liabilities with the assets and liabilities of any other Person, including, without limitation, any member or partner, or any direct or indirect parent of any member or partner, and hold all of its assets and liabilities in its own name, except as contemplated by the Related Documents;

(viii)     conduct its own business solely in its own name so as not to mislead others as to its identity and strictly comply with all organizational formalities necessary to maintain its separate existence;

(ix)    separately identify its own assets, liabilities and financial affairs separate from those of any other Person, except as contemplated by the Related Documents or by the General Partner;

(x)    pay all of its obligations and Indebtedness from its own funds and assets, except as contemplated in the Related Documents;

(xi)    pay the salaries of its own employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations, except as contemplated under the Plan, the Management Agreement, the IP License Agreement, the Indenture and the Related Documents;

(xii)    pay its own operating expenses and liabilities and the fees and expenses of its agents, out of its own funds and assets and maintain a sufficient number of employees in light of its contemplated business operations, except as contemplated by the Plan, the Management Agreement, the IP License Agreement, the Indenture and the Related Documents;

(xiii)    not guarantee or become obligated for the debts of any other entity or hold out its credit or its assets as being available to satisfy the obligations of any other entity or pledge its assets for the benefit of any other entity or make any loans or advances to any other entity, except as contemplated in the Related Documents or Indenture;

(xiv)    not charge or otherwise allocate to its Affiliates its general overhead and administrative expenses, and, to the extent it will share office space or services with any of its Affiliates, allocate the associated costs fairly and reasonably among the relevant Persons, except as contemplated in the Related Documents;

(xv)    use separate stationery, invoices, checks and other business forms separate from those of any other Person, except as contemplated in the Related Documents;

(xvi)    observe, with respect to the Partnership, all required Florida limited partnership formalities;

(xvii)    cause its General Partner, to the extent permitted by law and in accordance with the terms of this Agreement, make decisions with respect to the business and daily operations of the Partnership independent of, and not dictated by, any Limited Partner, or any Affiliate of a Limited Partner (other than the General Partner), except as contemplated under the Related Documents;

(xviii)    not acquire any obligations, securities or interests issued by any Partner, except as otherwise permitted in the Related Documents;

(xix)    observe all limited partnership formalities required under the Act;

(xx)    not make any guarantee with respect to the obligations of any Affiliate of the Partnership, except as contemplated by the Indenture and the Related Documents;

(xxi)    not incur, create or assume any Indebtedness, except as contemplated by the Related Documents or Indenture;

(xxii)  to the fullest extent permitted by law, not engage, directly or indirectly, in any business other than the actions required or permitted to be performed under the Plan, the Management Agreement, the IP License Agreement, the Indenture, the Related Documents and this Agreement;

(xxiii) not make, or permit to remain outstanding, any loan or advance to, or own or acquire any stock or securities of, any Person, except as contemplated by the Indenture and the Related Documents, and invest only in investments permitted under the Related Documents;

(xxiv)  not enter into any transaction or merger or consolidation, purchase or otherwise acquire all or substantially all of the assets of any other person or entity, change its form of organization or its business, or liquidate or, to the fullest extent permitted by law, dissolve itself except as permitted under the Plan, the Management Agreement, the IP License Agreement, the Indenture and the Related Documents;

(xxv)  not form, acquire or hold any subsidiary, except as contemplated by the Related Documents; and

(xxvi)  maintain an arm's length relationship with each Affiliate, properly record in its books and records all transactions with Affiliates and cause all business entered into by it with any Affiliate to be on terms that are fair and reasonable and not materially more or less favorable to it than terms and conditions available to it at the time for comparable arm's length transactions with unaffiliated Persons, except as contemplated by the Plan, the Management Agreement, the IP License Agreement, the Indenture and the Related Documents.

(d)  the Partner shall not institute, or join any other Person in instituting, or authorize a trustee or other Person acting on its behalf or on behalf of others to institute, any involuntary bankruptcy, reorganization, arrangement, insolvency, liquidation or receivership proceedings or other involuntary proceedings under any U.S. federal or state bankruptcy, insolvency or similar law against the Partnership, or, to the fullest extent permitted by law, consent to or make application for or institute or maintain any action for, the dissolution of the Partnership, in each case under the Act or any other applicable law.

**1.5**  **Separate Identity; Limited Liability**. The failure of the Partnership, or any Partner on behalf of the Partnership, to comply with the foregoing covenants or any other covenants set forth herein, shall not affect the status of the Partnership as a separate legal entity or the limited liability of the limited partners.

**1.6**  **Registered Office and Agent, and Principal Business Office**. The name and address of the Partnership's registered agent and office in the State of Florida are Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301. The principal business office of the Partnership shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the General Partner. The General Partner shall promptly file in the office of the Florida Secretary of State an amendment to the Partnership's amended certificate of limited partnership in the event the principal business office address is changed.

**1.7** **Fiscal Year**. The fiscal year of the Partnership (the "Fiscal Year") shall end on or about December 31 of each calendar year unless the General Partner otherwise determines. The General Partner shall give prompt written notice of any change to the Fiscal Year to the Limited Partner. The Partnership shall have the same fiscal year for United States federal income tax purposes and for accounting purposes.

**1.8** **Transfers**. Any Partner may sell, assign, pledge, hypothecate or otherwise transfer, in whole or in part, its interest in the Partnership, or take or omit to take any action, filing, election, or other action that could result in a deemed sale, assignment, encumbrance, transfer, or other disposition. The Partners agree that the partnership interests shall not be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of Florida or any other applicable jurisdiction).

**1.9** **Certain Tax Matters**. The Partners intend that the Partnership be treated for United States federal tax purposes as a disregarded entity pursuant to United States Treasury Regulations § 301.7701-2(c)(2), and neither the Partnership nor the Partners shall take any action or position for any purpose that is inconsistent with such intent.

## ARTICLE 2
## Capital Contributions

**2.1** **Capital Contributions to the Partnership**.

(a) The Partners contributed capital to the Partnership in proportion to their respective Partnership interests. The Partners shall have no obligation to make any other initial capital contributions.

(b) Subject to Section 2.1(a), after the capital contributions referred to in Section 2.1(a) were made, the Partners shall make additional capital contributions to the Partnership pro rata in accordance with their respective Partnership interests. Such capital contributions shall be made from time to time if, as and when the General Partner may approve.

**2.2** **No Return of Capital Contributions**. No Partner is entitled to a withdrawal or return of its capital contributions. Instead, each Partner shall look solely to distributions from the Partnership for such purpose.

**2.3** **No Interest**. No Partner shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Partnership's funds shall be included in the Partnership's property.

## ARTICLE 3
## Rights and Obligations of Partners

**3.1** **Management of Partnership**. The management, Control, and direction of the Partnership and its operations, business, and affairs shall be vested exclusively in the General Partner, which, subject to Section 1.4, shall have the right, power, and authority, acting solely by itself and without the necessity of approval by the Limited Partner or any other Person, to carry out any and all of the purposes of the Partnership and to perform or refrain from performing any

and all acts that the General Partner may deem necessary, desirable, appropriate, or incidental thereto. The Limited Partner may not participate in the management, Control, or direction of the Partnership's operations, business, or affairs, transact any business for the Partnership, or have the power to act for or on behalf of or to bind the Partnership, such powers being vested solely and exclusively in the General Partner.

3.2     **Officers**. The General Partner may appoint, and remove with or without cause, such officers (each an "Officer") of the Partnership as the General Partner from time to time may determine, in its sole and absolute discretion. Any Officer so appointed by the General Partner shall serve in the capacity so appointed until (i) removed with or without cause by the General Partner, (ii) such Officer's successor shall be duly elected and appointed by the General Partner or (iii) such Officer's death, disability or resignation and shall have such powers and perform such duties with respect to the management of the Partnership as may be authorized from time to time by the General Partner. The Officers of the Partnership on the date hereof shall be as set forth on SCHEDULE B hereto. The authority granted to the Officers of the Partnership shall be subject to the terms and conditions set forth in Section 1.4.

3.3     **[RESERVED]**.

3.4     **Liability of Partners**. The General Partner shall be personally liable for the debts and obligations of the Partnership if (but solely to the extent) required by applicable law; provided, however, that all such debts and obligations shall be paid or discharged first with the property of the Partnership (including insurance proceeds) before the General Partner shall be obligated to pay or discharge any such debt or obligation with its personal assets. Notwithstanding the preceding sentence, the General Partner shall not be personally liable for any debts or obligations that are nonrecourse or that, under the terms thereof, do not create or impose such liability. The Limited Partner shall not be personally liable for any of the debts or obligations of the Partnership.

3.5     **Other Activities of Partners**. Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Partner or any Affiliate thereof to engage in or derive profit or compensation from any activities or investments, nor give any other Partner any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.6     **Acts of the General Partner**. Except as otherwise expressly provided in this Agreement, any action to be taken in the name and on behalf of the Partnership shall require the prior approval of the General Partner and the actions of the General Partner shall bind the Partnership. Except as otherwise expressly provided in this Agreement, the General Partner may take any and all actions (including, without limitation, executing, delivering and performing on behalf of the Partnership any and all contracts, agreements, certificates, undertakings or other documents or instruments) and do any and all things necessary, desirable, convenient or incidental to carry on the purposes of the Partnership.

## ARTICLE 4
## Exculpation and Indemnity

**4.1**     **Exculpation**. To the fullest extent permitted by law, none of the Partners, any Affiliate of the Partners, any Officer, agent, employee or advisor of the Partnership, nor any officer, director, manager, member, employee, stockholder, or partner of the Partners or their respective Affiliates (each a "Indemnified Person" and collectively, the "Indemnified Persons"), shall be liable, responsible, or accountable in Damages or otherwise to the Partnership or any Partner by reason of, or arising from or relating to the management and conduct of the operations, business, or affairs of, or any action taken or failure to act on behalf of, the Partnership, except to the extent that any of the foregoing is determined, by a final, nonappealable order of a court of competent jurisdiction, to have been primarily caused by the gross negligence, willful misconduct, or bad faith of the Person claiming exculpation or the willful violations of the express provisions hereof by the Person claiming exculpation.

**4.2**     **Indemnity**. To the fullest extent permitted by applicable law, the Partnership shall indemnify each Indemnified Person, and if so determined by the General Partner, each employee, representative and agent of the Partners or any of their respective Affiliates, against any claim, loss, damage, liability, or expense (including reasonable attorneys' fees, court costs, and costs of investigation and appeal) suffered or incurred by any such indemnitee by reason of, or arising from or relating to the operations, business, or affairs of, or any action taken or failure to act on behalf of, the Partnership, except (a) to the extent any of the foregoing is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the gross negligence, willful misconduct, or bad faith of the Person claiming indemnification or (b) to the extent any of the foregoing is suffered or incurred as a result of any claim (other than a claim for indemnification under this Agreement) asserted by the indemnitee as plaintiff against the Partnership. Unless a determination has been made (by final, nonappealable order of a court of competent jurisdiction) that indemnification is not required, the Partnership shall, upon the request of any indemnitee, advance or promptly reimburse such indemnitee's reasonable costs of investigation, litigation, or appeal, including reasonable attorneys' fees; provided, however, that the affected indemnitee shall, as a condition of such indemnitee's right to receive such advances and reimbursements, undertake in writing to repay promptly the Partnership for all such advancements or reimbursements if a court of competent jurisdiction determines that such indemnitee is not then entitled to indemnification under this Section 4.2. No Partner shall be required to contribute capital in respect of any indemnification claim under this Section 4.2 unless otherwise provided in any other written agreement to which such Partner is a party.

**4.3**     **Survival**. The foregoing provisions of this Article 4 shall survive the resignation, removal or termination of any indemnitee hereunder or any termination of this Agreement.

## ARTICLE 5
## Distributions and Allocations

**5.1**     **Distributions**. The Partners shall receive the following shares of profits, income, gains, losses, deductions and credits (and all other distributions of cash or other property) of the Partnership, which shares shall constitute the respective interest of the Partners in the Partnership (their respective "Percentage Interests"):

General Partner:          1%

Limited Partner:         99%

All cash and other Partnership property shall be distributed at such time or times (if any) as the General Partner determines; provided, however, that distributions of cash or other property of the Partnership shall be made only if and to the extent not prohibited by the Related Documents.

**5.2    Tax Allocations**. Net profits and net losses and all related items of income, gain, loss, deduction and credit for federal income tax purposes shall be allocated among the Partners in such a manner as shall cause the capital accounts of the Partners to equal, as nearly as possible, the amounts such Partners would receive if all cash on hand at the end of such year were distributed to the Partners under Section 5.1, and all assets on hand at the end of such year were sold for cash at the book values of such assets, all Partnership liabilities were satisfied to the extent required by their terms, and all remaining cash were distributed to the partners under Section 5.1.

**ARTICLE 6**
**Admissions, Registration, Transfers and Withdrawals**

**6.1    Admission of New Partners**.

(a)    New Partners may be admitted to the Partnership only with the written consent of the General Partner and subject to and in accordance with the terms of the Related Documents. No Partner's interest in the Partnership shall be diluted or otherwise reduced unless approved in writing by such diluted Partner. Substituted Partners shall not be deemed new Partners for purposes of this Section 6.1.

(b)    Notwithstanding Section 6.1(a), (i) any direct or indirect owner of a majority economic interest in the General Partner may acquire (either directly from the Partnership through an additional issuance of such interest by the Partnership or as a contribution from its member), an additional General Partner interest in the Partnership, and (ii) any direct or indirect owner of a majority economic interest in the Limited Partner may acquire (either directly from the Partnership through an additional issuance of such interest by the Partnership or as a contribution from its member) an additional Limited Partner interest in the Partnership, in either case so long as the Person acquiring such interest is, at the time of acquisition of such General Partner interest or Limited Partner interest, as the case may be, contractually obligated under a Related Document to contribute such General Partner interest or Limited Partner interest, on the date of receipt thereof, and prior to taking any action with respect thereto, to the General Partner or the Limited Partner, respectively, or to a Person that is so obligated.

**6.2    Registration and Transfers of Partnership Interests**.

(a)    Any Partner may sell, assign, pledge, hypothecate or otherwise transfer, in whole or in part, its Partnership interest in the Partnership, or take or omit to take any action, filing, election, or other action that could result in a deemed sale, assignment, encumbrance, transfer, or other disposition.

(b)    A Partner may sell all or a portion of its Partnership interest in the Partnership to another Person and such other Person shall be admitted to the Partnership as a Partner of the Partnership, if and only if such transferee (i) executes an instrument signifying its agreement to be bound by the terms and conditions of this Agreement in form and substance satisfactory to the Partnership (which instrument may be a counterpart signature page to this Agreement) and (ii) delivers to the Partnership an opinion of counsel satisfactory to the Partnership that no registration under the Securities Act or registration or qualification under the securities laws of any state shall be required and, immediately following such admission, the transferor Partner shall cease to be a Partner of the Partnership. Notwithstanding anything in this Agreement to the contrary, any successor to a Partner by merger or consolidation in compliance with the Related Documents shall, without further act, be a Partner hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Partnership shall continue without dissolution. Notwithstanding the foregoing, no assignment of a Partner's limited partnership interest or any portion thereof shall be permitted if such assignment would result in any assets of the Partnership being deemed to constitute "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended. Notwithstanding anything in this Agreement to the contrary, any successor to a Partner by merger or consolidation in accordance with the Related Documents shall, without further act, be a Partner hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Partnership shall continue without dissolution.

(c)    If a Partner (the "Pledgor") pledges all or a portion of its partnership interest in the Partnership pursuant to this Section 6.2 to another Person (the "Pledgee"), the Pledgee (or any assignee of the Pledgee) shall not be admitted to the Partnership as a Partner unless such Pledgee exercises the rights of a secured creditor in accordance with (i) the relevant documents governing the applicable secured obligations and (ii) applicable law (the exercise of such rights pursuant to clauses (i) and (ii) of this subsection (c), "Foreclosure"). Following a Foreclosure, such Pledgee or a direct transferee of such Pledgee shall, notwithstanding any provision to the contrary in this Agreement, be admitted as a Partner, succeeding to the partnership interest of the Pledgor, and, immediately following such admission, the Pledgor shall cease to be a Partner of the Partnership.

**6.3**    **Substituted Partners**. Except as otherwise explicitly provided for in Section 6.1(b) and Section 6.2(c), a transferee of any general or limited partnership interest in the Partnership may become a substituted General Partner or Limited Partner (as the case may be) in place of the transferor only upon the written consent of the General Partner. The General Partner or its Affiliates shall have the right to be a Limited Partner or to become a substituted Limited Partner. Unless a transferee of any Partnership interest of a Partner becomes a substituted General Partner or substituted Limited Partner in accordance with the provisions of this Agreement, such transferee shall not be entitled to any of the rights granted to a Partner hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions, or returns of capital to which his or its transferor would otherwise be entitled with respect to the Partnership interest so transferred.

**6.4**    **Withdrawal of Partners**. Except in connection with a transfer permitted under this Article 6, no Partner shall have any right to withdraw or resign from the Partnership until after the Notes are paid in full.

**6.5**     **Consent**. Any Partner whose consent is required or permitted pursuant to this Article 6 may give or withhold (whether reasonably or unreasonably) such consent in the sole discretion of such Partner.

**ARTICLE 7**
**General Accounting Provisions and Reports**

**7.1**     **Books of Account; Tax Returns**. The General Partner shall prepare and file, or shall cause to be prepared and filed, all United States federal, state, and local income and other tax returns required to be filed by the Partnership and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Partnership's operations, business, and affairs as are usually entered into records and books of account that are maintained by Persons engaged in business of like character or are required by the Act. Except as otherwise expressly provided herein, such books and records shall be maintained in accordance with the basis utilized in preparing the Partnership's United States federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the General Partner be prepared on either a cash basis or accrual basis.

**7.2**     **Place Kept; Inspection**. The books and records shall be maintained at the principal place of business of the Partnership, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Partner during the ordinary business hours of the Partnership.

**7.3**     **Tax Matters Partner**. The General Partner shall be the tax matters partner of the Partnership and, in such capacity, shall exercise all rights conferred, and perform all duties imposed, upon a tax matters partner under Sections 6221 through 6233 of the Code and the regulations promulgated thereunder.

**ARTICLE 8**
**Amendments and Waivers**

**8.1**     **With or Without Limited Partner Consent**. Subject to Sections 1.4 and 8.2, the General Partner may, whether with or without the consent or vote of the Limited Partner or any other Person, amend or waive any provision of this Agreement.

**8.2**     **Limitations on Amendments**.

(a)     Subject to Section 1.4, no amendment to or waiver of any provision of this Agreement shall be effective against a given Partner without the consent or vote of such Partner if such amendment or waiver would (a) cause the Partnership to fail to be treated as a limited partnership under the Act or cause the Limited Partner to become liable as a general partner of the Partnership, (b) change Section 2.1 of this Agreement to increase a Partner's obligations to contribute to the capital of the Partnership, (c) change Section 2.24.1 or 4.2 of this Agreement to affect adversely any Partner's rights to exculpation or indemnification, (d) change Section 5.1 or 5.2 of this Agreement to affect adversely the participation of such Partner in the income, gains, losses, deductions, expenses, credits, capital, or distributions of the Partnership (including any amendments to admit one or more new limited partners or General Partners), or (e) change the

percentage of Partners necessary for any consent or vote required hereunder to the taking of any action.

(b)       No Partner or Partners shall be authorized or empowered to amend, alter, change or repeal the provisions of this Agreement set forth in <u>Section 1.4</u> of this Agreement except in compliance with the conditions set forth in <u>Section 1.4</u> of this Agreement and satisfaction of the obligations set forth in the Indenture.

## <u>ARTICLE 9</u>
### <u>Dissolution and Termination</u>

**9.1       <u>Dissolution</u>**.

(a)       Subject to <u>Section 1.4</u>, the Partnership shall be dissolved upon the first to occur of any of the following:

(i)       the sale or disposition of all of the assets of the Partnership and the receipt in cash of all consideration therefor;

(ii)       the termination of the legal existence of the last remaining Partner of the Partnership or the occurrence of any other event which terminates the partnership of the last remaining Partner of the Partnership unless the business of the Partnership is continued in a manner permitted by this Agreement or the Act;

(iii)       the entry of a decree of judicial dissolution under the Act; and

(iv)       upon the election in writing of NewCo and the manager of NewCo.

(b)       upon the occurrence of any event that causes the last remaining Limited Partner or the last remaining General Partner of the Partnership to cease to be a Partner of the Partnership, to the fullest extent permitted by law, the personal representative of such Partner is hereby authorized and directed to, within 90 days after the occurrence of the event that terminated the partnership of such Partner in the Partnership, agree in writing (i) to continue the Partnership and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Limited Partner or General Partner, as applicable, of the Partnership, effective as of the occurrence of the event that terminated the partnership of the last remaining Partner of the Partnership in the Partnership.

(c)       The events set forth in <u>Section 9.1(a)</u> shall be the only events that shall cause the termination of the legal existence of the Partnership. Notwithstanding any other provision of this Agreement, the occurrence of an Event of Bankruptcy of any Partner shall not cause such Partner to cease to be a Partner of the Partnership and upon the occurrence of such an event, the business of the Partnership shall continue without dissolution.

**9.2       <u>Accounting on Dissolution</u>**. Following the dissolution of the Partnership pursuant to <u>Section 9.1</u> of this Agreement, the books of the Partnership shall be closed, and a proper accounting of the Partnership's assets, liabilities, and operations shall be made by the General Partner, all as of the most recent practicable date. The General Partner shall serve as the liquidator

of the Partnership unless it has been removed or unless it otherwise fails or refuses to serve. If the General Partner does not serve as the liquidator, one or more other Persons or entities maybe elected to serve by vote or consent of the Limited Partner. The expenses incurred by the liquidator in connection with the dissolution, liquidation, and termination of the Partnership shall be borne by the Partnership.

9.3 **Termination**. As expeditiously as practicable, but in no event later than one year (except as may be necessary to realize upon any material amount of property that may be illiquid), after the dissolution of the Partnership pursuant to Section 9.1, the liquidator shall cause the Partnership to pay the current liabilities of the Partnership and (a) establish a reserve fund (which may be in the form of cash or other property, as the liquidator shall determine) for any and all other liabilities, including contingent liabilities, of the Partnership in a reasonable amount determined by the liquidator to be appropriate for such purposes or (b) otherwise make adequate provision for such other liabilities. To the extent that cash required for the foregoing purposes is not otherwise available, the liquidator may sell property, if any, of the Partnership for cash. Thereafter, all remaining cash or other property, if any, of the Partnership shall be distributed to the Partners in accordance with the provisions of Section 5.1. At the time final distributions are made in accordance with Section 5.1, a certificate of cancellation shall be filed in accordance with the Act, and the legal existence of the Partnership shall terminate, but if at any time thereafter any reserved cash or property is released because in the judgment of the liquidator the need for such reserve has ended, then such cash or property shall be distributed in accordance with Section 5.1.

9.4 **No Negative Capital Account Obligation**. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Partner who has a negative capital account upon final distribution of all cash and other property of the Partnership be required to restore such negative account to zero.

9.5 **No Other Cause of Dissolution**. The Partnership shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this Article 9.

9.6 **Merger**. Subject to Section 1.4, the Partnership may, with the written consent of the General Partner, adopt a plan of merger and engage in any merger permitted by applicable law.

## ARTICLE 10
## Miscellaneous

10.1 **[RESERVED]**.

10.2 **Entire Agreement**. This Agreement constitutes the entire agreement among the Partners with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

10.3 **Severability**. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid under the applicable law of any jurisdiction, the remainder of this Agreement or the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby. Also, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to

conform with such law. Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

**10.4** **Notices**. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if sent by overnight courier, hand delivered, mailed (first class registered mail or certified mail, postage prepaid), or sent by telex or telecopy if to the Partners, at the addresses or telex or facsimile numbers set forth on SCHEDULE B hereto, and if to the Partnership, at the address of its principal place of business at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022, or to such other address as the Partnership or any Partner shall have last designated by notice to the Partnership and all other parties hereto in accordance with this Section 10.4. Notices sent by hand delivery shall be deemed to have been given when received; notices mailed in accordance with the foregoing shall be deemed to have been given three business days following the date so mailed; notices sent by telex or telecopy shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day following the date so sent.

**10.5** **Governing Laws**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).

**10.6** **Successors and Assigns**. Except as otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the Partners and their respective successors and permitted assigns.

**10.7** **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means of communication), each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

**10.8** **Headings**. The section and article headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provision hereof.

**10.9** **Binding Agreement**. Notwithstanding any other provision of this Agreement, the Partners agree that this Agreement constitutes a legal, valid and binding agreement of the Partners, and is enforceable against the Partners in accordance with its terms.

**10.10** **Rules of Construction; Other Terms**.

(a) The rules of construction set forth in Section 2 of SCHEDULE A to this Agreement shall apply for all purposes of this Agreement and the schedules and exhibits hereto.

(b) Whenever any provision of this Agreement requires or permits the General Partner to take or omit to take any action, or make or omit to make any decision, unless the context clearly requires otherwise, such provision shall be interpreted to authorize an action taken or omitted, or a decision made or omitted, by the General Partner acting alone and in good faith.

**10.11  <u>Power of Attorney</u>**. By execution of this Agreement, the Limited Partner hereby makes, constitutes, and appoints the General Partner, with full power of substitution and resubstitution in the General Partner (in its sole discretion), as the Limited Partner's true and lawful attorney in fact ("Attorney") for and in the Limited Partner's name, place, and stead and for his use and benefit, to prepare, execute, certify, acknowledge, swear to, file, deliver, or record any or all of the following:

(a)  the Partnership's certificate of limited partnership or any other agreement, certificate, report, consent, instrument, filing, or writing made by or relating to the Partnership that the Attorney deems necessary, desirable, or appropriate for any lawful purpose, including (i) organizing the Partnership under the Act, (ii) admitting or changing Partners or substitute Partners with respect to the Partnership, (iii) pursuing or effecting any rights or remedies available under this Agreement or otherwise with respect to a defaulting Partner, (iv) qualifying the Partnership to do business in any jurisdiction, and (v) complying with any law, agreement, or obligation applicable to the Partnership;

(b)  any agreement, certificate, report, consent, instrument, filing, or writing made by or relating to the Partnership that the Attorney deems necessary, desirable, or appropriate to effectuate the business purposes of, or the dissolution, termination, or liquidation of, the Partnership pursuant to applicable law or the respective terms of this Agreement; and

(c)  any amendment to or modification or restatement of this Agreement, the Partnership's certificate of limited partnership, or any other agreement, certificate, report, consent, instrument, filing, or writing of any type described in <u>clause (a)</u> or <u>(b)</u> of this <u>Section 10.11</u>, provided that any amendment of or modification to this Agreement shall first have been adopted in accordance with <u>Article 8</u> of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

# SCHEDULE A

## Definitions

Section 1.    <u>Definitions</u>. When used in this Agreement, the following terms shall have the following meanings:

"<u>Act</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, such Person.

"<u>Agreement</u>" means this Fourth Amended and Restated Limited Partnership Agreement, together with the schedules and exhibits attached hereto.

"<u>Bankruptcy</u>" means (a) an Event of Bankruptcy as defined in the Indenture, and (b) to the extent not inconsistent with, or modified by, such definition in the Indenture, means, with respect to any Person, if (i) such Person makes an assignment for the benefit of creditors, (ii) such Person files a voluntary petition in bankruptcy, (iii) such Person is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) such Person files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, or similar relief under any statute, law or regulation, (v) such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) such Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. With respect to the Partner(s), the foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101 (1) and 18-304 of the Act.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"<u>Damages</u>" means for any expenses, claims, damages, liabilities and losses (including, without limitation, judgments, interest on judgments, fines, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or any appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission),

whether pending or merely threatened, whether or not such indemnifying or exculpated Person, as applicable, is or may be a party thereto, including interest on any of the foregoing.

"Fiscal Year" has the meaning specified in Section 1.7.

"Founders License Agreements" has the meaning set forth in the Indenture.

"General Partner" has the meaning set forth in the preamble to this Agreement.

"HI Limited Partnership Contribution Agreement" means the Contribution Agreement, dated as of August 8, 2014, between HOA Funding, LLC, as the contributor, and the Partnership, as the contributee.

"Hooters of America" means Hooters of America, LLC, a Georgia limited liability company, and any successor thereto.

"Indebtedness" has the meaning set forth in the Indenture.

"Indenture" means the Second Amended and Restated Base Indenture, by and among the Master Issuer and the Indenture Trustee, dated as of October 31, 2025, including, with respect to any Series of Notes, the related Series Supplement, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Indenture Trustee" means "Citibank, N.A.", not in its individual capacity, but solely in its capacity as indenture trustee under the Indenture, its successors in interest and any successor indenture trustee under the Indenture.

"IP License Agreement" has the meaning set forth in the Indenture.

"Limited Partner" has the meaning set forth in the preamble to this Agreement.

"Management Agreement" means that certain Brand Management Agreement, dated as of October 31, 2025, by and among, the Partnership, HOA Franchise HoldCo LLC, a Delaware limited liability company, HOA Systems, LLC, a Delaware limited liability company, Hooters Brand Management LLC, a Florida limited liability company, HOOTS Franchising, LLC, a Delaware limited liability company, HOA Franchising, LLC, a Delaware limited liability company and HOA Future Franchising, LLC, a Delaware limited liability company.

"Master Issuer" means RoyaltyCo, LLC, a Delaware limited liability company, and any successor thereto.

"Material Contracts" means all vendor, supplier, distribution and other third-party agreements entered into by NewCo or any of its Affiliates expected to make more than $500,000 in payments in any annual period that are contributed to the Partnership pursuant to the HI Limited Partnership Contribution Agreement.

"NewCo" means HOA NewCo LLC, a Delaware limited liability company.

"Non-Securitization Entities" has the meaning set forth in the Indenture.

"Notes" or "Series of Notes" has the meaning specified in the Indenture.

"Officer" has the meaning set forth in Section 3.2 of this Agreement.

"Partner" has the meaning set forth in the preamble to this Agreement.

"Partnership" has the meaning set forth in the preamble to this Agreement.

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Related Documents" has the meaning specified in the Indenture in addition to the Transition Service Agreement, the Management Agreement, the IP License Agreement, the Retained Restaurants License Agreement, the Founders License Agreements, the Plan, and all agreements relating to any of the foregoing, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Retained Restaurants License Agreement" has the meaning specified in the Indenture.

"Securitization Entities" has the meaning set forth in the Indenture.

"Securitization IP" has the meaning set forth in the Indenture.

"Series Indenture Supplement" means, with respect to any Series of Notes outstanding, the supplement to the Indenture executed and delivered in connection with the issuance of such Series of Notes, as amended, restated or otherwise modified.

"Series of Notes" means any series of notes issued pursuant to the Indenture and the related Series Indenture Supplement.

"Series Supplement" has the meaning specified in the Indenture.

"Transition Services Agreement" has the meaning specified in the Plan.

Section 2.    Rules of Construction. Unless the context otherwise clearly requires in this Agreement: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (d) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein); (f) any reference to any law shall include all statutory and regulatory rules, regulations and other provisions consolidating,

amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; (g) any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; (h) all references in this instrument to designated "Articles," "Sections," "subsections," "clauses" and other subdivisions are to the designated Articles, Sections, subsections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision; (i) all accounting terms not otherwise defined herein shall be construed in accordance with generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors and successors from time to time; (j) "day" shall mean a calendar day and (k) terms defined in the Uniform Commercial Code and not otherwise defined in this Agreement shall have the meanings assigned to such terms under the Uniform Commercial Code of the applicable jurisdiction.

**SCHEDULE B**

**Officers**

| Name | Title |
|---|---|
| Tim Daileader | President and Chief Executive Officer |

# EXHIBIT C.6

**Limited Liability Company Agreement of
HOA Franchise HoldCo LLC**

*Execution Version*

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HOA FRANCHISE HOLDCO LLC**

**Dated as of October 31, 2025**

# TABLE OF CONTENTS

Section 1.    Organization and Name. ......................................................................... 2

Section 2.    Principal Business Office.......................................................................... 2

Section 3.    Registered Office. .................................................................................... 2

Section 4.    Registered Agent...................................................................................... 2

Section 5.    Member and Membership Interests. .......................................................... 3

Section 6.    Certificate of Formation; Existence. ......................................................... 3

Section 7.    Limited Purposes. .................................................................................... 3

Section 8.    Powers....................................................................................................... 5

Section 9.    Management................................................................................................ 5

Section 10.    Limited Liability........................................................................................ 12

Section 11.    Capital Contributions............................................................................... 12

Section 12.    Additional Contributions. ......................................................................... 12

Section 13.    Allocation of Profits and Losses. ............................................................. 13

Section 14.    Distributions. ........................................................................................... 13

Section 15.    Common Interest....................................................................................... 13

Section 16.    Books and Records. .................................................................................. 14

Section 17.    Tax Classification. ................................................................................... 14

Section 18.    Exculpation and Indemnification............................................................... 14

Section 19.    Resignation. ............................................................................................. 16

Section 20.    Dissolution, Winding-Up and Termination; Continuation. ............................ 16

Section 21.    Waiver of Participation; Nature of Interest. ................................................ 17

Section 22.    Benefits of Agreement; No Third-Party Rights.............................................. 17

Section 23.    Severability of Provisions......................................................................... 17

Section 24.    Entire Agreement...................................................................................... 18

Section 25.    Governing Law. ......................................................................................... 18

Section 26.    Amendments. ........................................................................................... 18

Section 27.    Counterparts............................................................................................. 18

Section 28.    Notices. ................................................................................................... 18

Section 29.    Binding Agreement..................................................................................... 18

SCHEDULE A — Definitions

This LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, this "Agreement") of HOA Franchise HoldCo LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025, is entered into by HOA NewCo LLC, a Delaware limited liability company, as the sole member of the Company (the "Member") and Hooters Brand Management LLC ("BMC"), Florida limited liability company, as Manager. Capitalized terms used herein and not otherwise defined have the meanings set forth on Schedule A hereto.

## W I T N E S S E T H:

WHEREAS, Hooters of America, LLC and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas on March 31, 2025, which initiated the chapter 11 cases jointly administered under lead case *In re Hooters of America, LLC*, Case No. 25-80078 (SWE);

WHEREAS, on October 30, 2025, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan");

WHEREAS, pursuant to the Plan, the Debtors agreed to restructure their business, in part by selling a substantial majority of their company-owned restaurants to a buyer and entering into certain arrangements for the management and operation of the business;

WHEREAS, pursuant to the Plan, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on October 17, 2025 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement, the "Certificate of Formation");

WHEREAS, the name of the limited liability company as previously organized was "Franchise HoldCo, LLC";

WHEREAS, on October 22, 2025 the name of the Company was continued as "HOA Franchise HoldCo LLC" by filing an amendment to the Company's certificate of formation with the office of the Delaware Secretary of State;

WHEREAS, as consideration for the Member Interests of the Company being granted to HOA NewCo LLC, a Delaware limited liability company, for the benefit of HOA RoyaltyCo LLC a Delaware limited liability company ("RoyaltyCo"), RoyaltyCo is (i) transferring to the Company all of the equity interests of Hoots Franchising, LLC, a Delaware limited liability company ("Hoots Franchising"), and HOA Franchising, LLC, a Delaware limited liability company ("HOA Franchising", and together with Hoots Franchising and HOA Future Franchising, LLC, a Delaware limited liability company, the "Franchisors"), and (ii) causing HI Limited Partnership, a Florida limited partnership ("HILP") and an indirect wholly owned subsidiary of RoyaltyCo, to enter into

that certain License Agreement with the Franchisors and HOA Systems, LLC, a Delaware limited liability company ("HOA Systems"), dated as of the date hereof (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and this Agreement, the "License Agreement"), pursuant to which HILP will grant certain licenses and rights to the Franchisors and HOA Systems in exchange for royalty payments.;

WHEREAS, contemporaneously with the execution of this Agreement, the Company, BMC, HILP, HOA Systems, and the Franchisors are entering into a Management Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and this Agreement, the "Brand Management Agreement," and together with the License Agreement and any other agreement entered into in accordance with the foregoing agreements in connection with the ordinary course operation of the Business, the "Royalty Transaction Documents"), pursuant to which BMC will agree with the Company, HILP, and Franchisors to perform services for the Company, HILP, HOA Systems, and the Franchisors described therein and serve under this Agreement as Manager; and

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, the Act and this Agreement as follows:

**Section 1.    Organization and Name.**

The Company has been organized as a limited liability company pursuant to Section 18-201 of the Act by the filing of the Certificate of Formation. The name of the limited liability company is "HOA Franchise HoldCo LLC".

**Section 2.    Principal Business Office.**

The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member and, if prior to the occurrence of a Trigger Event, the BMC Manager.

**Section 3.    Registered Office.**

The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

**Section 4.    Registered Agent.**

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

**Section 5.** **Member and Membership Interests.**

(a) <u>Member</u>. The Member shall, at all times and for all purposes, be the sole member of the Company and shall own one hundred percent (100%) of the limited liability company interests in the Company.  The name and mailing address of the Member are as follows:

| <u>Name</u> | <u>Address</u> |
|---|---|
| HOA NewCo LLC | 901 N Market Street, Suite 100, Wilmington, DE 19801 |

(b) <u>Member Interests</u>.

(i) Member shall hold one hundred percent (100%) of the limited liability company interests (within the meaning of the Act) in the Company with all the rights, privileges and responsibilities of limited liability interests (within the meaning of the Act) in the Company (the "<u>Member Interests</u>").

(ii) Member Interests shall not be represented by certificates.

(iii) Until the occurrence of a Trigger Event, no Member may sell, assign, transfer, pledge, encumber or otherwise dispose of, whether directly or indirectly, by operation of law or otherwise, all or any portion of its Member Interests (a "<u>Transfer</u>"), and the Company shall not issue any additional Member Interests, units or other equity securities of the Company (an "<u>Issuance</u>"), in each case without the prior written consent of the Manager (which consent may be granted or withheld in the Manager's sole and absolute discretion).  Any Transfer or Issuance made in violation of this Section shall be *void ab initio* and of no force or effect and shall not be recognized by the Company for any purpose.

**Section 6.** **Certificate of Formation; Existence.**

(a) <u>Certificate of Formation</u>. Express authorization was given to Tim Daileader for the exclusive purpose of executing the Certificate of Formation of the Company which has been filed in the Office of the Secretary of State of the State of Delaware. The filing of the Certificate of Formation with the Secretary of State of the State of Delaware on October 17, 2025 by Tim Daileader as "authorized person" is hereby ratified and approved in all respects. The Manager is hereby authorized to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business or obtain any licenses necessary or advisable in any other jurisdiction in which the Company may wish to conduct business and all such filings and other actions of the Manager in furtherance of the foregoing made prior to the date hereof are hereby ratified.

(b) <u>Existence</u>. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

**Section 7.** **Limited Purposes.**

(a) <u>Purposes</u>. The purposes to be conducted or promoted by the Company shall be:

(i)     to engage in the activities described in Sections 7(b);

(ii)    to make distributions from time to time to the Member as permitted under this Agreement;

(iii)   to directly or indirectly own and hold equity interests in Franchisors, to receive distributions therefrom, and to make capital contributions with respect thereto, from time to time, in each case as permitted under this Agreement and the governing documents for each such entity;

(iv)    to serve as the managing member of the Franchisors in accordance with the terms of this Agreement and the governing documents for the Franchisors;

(v)     to cause the Franchisors to (A) hold existing Franchise Agreements, Development Agreements and Third-Party License Agreements, (B) enter into and hold new Franchise Agreements, Development Agreements and Third-Party License Agreements, (C) coordinate with BMC in its capacity as "Manager" under the Brand Management Agreement to perform the Franchisors' obligations and exercise the Franchisors' rights under the Franchise Agreements, the Development Agreements and the Third-Party License Agreements, (D) file and maintain any required disclosures or other documentation, and make any required payments in connection with, each Franchisor's role as a franchisor for the Business, in each case as required by applicable law, and (E) take such actions as are reasonably required in furtherance of the obligations of the Company Entities pursuant to the Brand Management Agreement;

(vi)    without limitation of Section 7(b), to enter into the Brand Management Agreement, and to perform each Company Entity's obligations and exercise each Company Entity's rights thereunder, in each case in accordance with the terms of this Agreement and the Brand Management Agreement;

(vii)   to cause the Franchisors to enter into the Related Agreements to which they are party and to perform their obligations and exercise their rights thereunder, in each case in accordance the terms of this Agreement and such Related Agreements;

(viii)  without limitation of Section 7(a)(iii) and Section 7(a)(vii), to cause the Franchisors to make distributions to the Company sufficient to enable the Company to pay or cause to be paid from such distributions the amounts owed to HILP under the License Agreement and BMC under the Brand Management Agreement, in accordance with the terms of this Agreement and the Royalty Transaction Documents;

(ix)    to engage, together with and on behalf of the Franchisors as their managing member, the Third-Party Service Provider to provide the services as described in the Brand Management Agreement, and to cooperate with the Third-Party Service Provider and BMC to calculate and distribute the amounts owed to HILP under the License Agreement and BMC under the Brand Management Agreement;

(x)     without limitation of Section 7(b), (A) to otherwise enter into, perform its obligations under and take any action required or permitted by, the Related Agreements and all documents, agreements, certificates or instruments contemplated thereby or related thereto and to

exercise any rights given to it under any Related Agreements and such other documents, agreements, certificates and instruments, and (B) to pay any and all fees, costs and expenses in connection therewith; and

(xi)    (A) to enter into all such other documents, agreements, certificates and instruments, and to engage in and perform any lawful act or activity and to exercise any powers not prohibited by the Related Agreements permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to, and necessary, convenient or advisable for, the accomplishment of the above mentioned purposes, and (B) to pay any and all fees, costs and expenses in connection therewith.

(b)    <u>Execution of Related Agreements</u>. The Company is hereby authorized to execute, deliver and perform, by or through the Manager, and the Manager is hereby authorized to execute and deliver, (i) the Related Agreements to which the Company is a party, and (ii) all documents, agreements, certificates or instruments contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Member or the Manager to enter into other agreements or documents on behalf of the Company, each to the extent consistent with and related or incidental to, or necessary, convenient or advisable for, the accomplishment of the permitted purposes set forth in <u>Section 7(a)</u> above and otherwise permitted under this Agreement.

**Section 8.    Powers.**

Subject to <u>Section 9(j)</u>, the Company, and Manager on behalf of the Company (and Member with respect to <u>Section 9(j)(ii)</u>), (a) shall have all of the powers and rights conferred upon limited liability companies formed pursuant to the Act necessary, convenient or incidental to, or for the furtherance of, the purposes of the Company set forth in <u>Section 7</u> (including, without limitation, to bind the Company), and (b) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

**Section 9.    Management.**

(a)    <u>Management; Resignation/Removal</u>.  Subject to the Member's right to remove and replace Manager and <u>Section 9(j)</u>, the business and affairs of the Company, as set forth in Section 7, shall be managed by or under the direction of the Manager.  Except as otherwise set forth in this Agreement, the Manager shall remain in office until it resigns, and any replacement thereof shall be appointed by the Member.

(b)    <u>Trigger Event</u>.  From and after the date of this Agreement until the occurrence of a Trigger Event, BMC shall be designated as the sole Manager (the "<u>BMC Manager</u>").  Upon the occurrence of a Trigger Event, automatically and without any further action on the part of any Person, (i) the BMC Manager shall cease to be the Manager and shall have no further authority, rights or powers under this Agreement (including, without limitation, under <u>Section 9(j)</u>) and the Member shall be designated as the sole Manager, (ii) such designation shall be made automatically upon the occurrence of a Trigger Event, (iii) no action by the Member or any other Person shall be required to effect such designation, and (iv) any action that caused such Trigger Event (other than

the delivery by Manager to the Company of a Termination Notice (as defined in the Brand Management Agreement)) shall be deemed to be null and void, ultra vires, and of no force and effect.

(c)     Acts of the Manager. Except as otherwise expressly provided in this Agreement (including Section 9(j)), any action to be taken in the name and on behalf of the Company shall require the prior approval of the Manager and the actions of the Manager shall bind the Company. Except as otherwise expressly provided in this Agreement (including Section 9(j)), the Manager may take any and all actions (including, without limitation, executing, delivering and performing on behalf of the Company any and all contracts, agreements, certificates, undertakings or other documents or instruments) and do any and all things necessary, desirable, convenient or incidental to carry on the purposes of the Company as set forth in Section 7.

(d)     [Reserved.]

(e)     Limitations on the Company's Activities.

(i)     This Section 9(e) is set forth herein in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)     Except as otherwise agreed by Member and Manager, the Company, through its Manager (and Member with respect to Section 9(j)(ii)), shall do all things necessary to preserve and keep in full force and effect its existence, rights (under this Agreement and statutory) and limited liability company powers.  The Company shall be operated in such a manner as reasonable, necessary or appropriate to (a) preserve the limited liability of the Member, and (b) preserve the separateness of the Company from the business and affairs of the Member or any Affiliate of the Member.  The Company shall:

(A)     maintain its own separate financial and business books and records that accurately reflect its assets, liabilities and financial affairs, separate and apart from those of any Person;

(B)     maintain its own bank accounts and books of account separate from those of any Person;

(C)     at all times hold itself out to the public as a distinct legal entity separate from and not a division of any Person and correct any known misunderstanding regarding its status as a separate entity;

(D)     adhere to appropriate organizational formalities as required under the laws of its jurisdiction of formation and its organizational documents;

(E)     prepare, or cause to be prepared, and file its own tax returns, if any, as may be required under applicable law, to the extent it is (i) not part of a consolidated group filing a consolidated return or returns or (ii) not treated as a division, for tax purposes, of another taxpayer or otherwise disregarded

for tax purposes, and pay any taxes so required to be paid under applicable law;

(F)      not commingle its own assets and liabilities with the assets and liabilities of any other Person, including, without limitation, the Member, or any direct or indirect parent of the Member, and hold all of its assets and liabilities in its own name;

(G)      conduct its own business solely in its own name so as not to mislead others as to its identity and strictly comply with all organizational formalities necessary to maintain its separate existence;

(H)      separately identify its own assets, liabilities and financial affairs separate from those of any other Person;

(I)      pay all of its obligations and Indebtedness from its own funds and assets;

(J)      pay the salaries of its own employees, if any, and maintain a sufficient number of employees (or contractors, if applicable) in light of its contemplated business operations;

(K)      pay its own operating expenses and liabilities and the fees and expenses of its agents, out of its own funds;

(L)      not guarantee or become obligated for the debts of any other entity or hold out its credit or its assets as being available to satisfy the obligations of any other entity or pledge its assets for the benefit of any other entity or make any loans or advances to any other entity;

(M)      not charge or otherwise allocate to its Affiliates its general overhead and administrative expenses, and, to the extent it will share office space or services with any of its Affiliates, allocate the associated costs fairly and reasonably among the relevant Persons;

(N)      use separate stationery, invoices, checks and other business forms separate from those of any other Person;

(O)      observe, with respect to the Company, all required Delaware limited liability company formalities;

(P)      cause its Manager, to the extent permitted by law, to make decisions with respect to the business and daily operations of the Company independent of, and not dictated by, any Member, or any Affiliate of a Member;

(Q)      not acquire any obligations, securities or interests issued by any Member;

(R)     observe all limited liability company formalities required under the Act;

(S)     not make any guarantee with respect to the obligations of any Affiliate of the Company;

(T)     not incur, create or assume any Indebtedness;

(U)     to the fullest extent permitted by law, not engage, directly or indirectly, in any business other than the actions required or permitted to be performed under the Plan, the Brand Management Agreement, the License Agreement, and this Agreement;

(V)     not make, or permit to remain outstanding, any loan or advance to, any Person, except as authorized by the Brand Management Agreement or the License Agreement, and not own or acquire any stock or securities of any Person;

(W)     not enter into any transaction or merger or consolidation, purchase or otherwise acquire all or substantially all of the assets of any other person or entity, change its form of organization or its business, or liquidate or, to the fullest extent permitted by law;

(X)     not form, acquire or hold any subsidiary, other than the Company Entities; and

(Y)     maintain an arm's length relationship with each Affiliate, properly record in its books and records all transactions with Affiliates and cause all business entered into by it with any Affiliate to be on terms that are fair and reasonable and not materially more or less favorable to it than terms and conditions available to it at the time for comparable arm's length transactions with unaffiliated Persons.

(f)     <u>Waiver of Fiduciary Duties</u>.  To the fullest extent permitted by the Act, including Section 18-1101(c) thereof, each of the Member, the Manager, and any officer, director, employee, agent, or Affiliate of the Company, the Member or the Manager (each, a "<u>Covered Person</u>") shall owe no fiduciary duties to the Company, the Member, or any other Person; <u>provided</u>, that, notwithstanding the foregoing, to the extent the BMC Manager takes any actions on behalf of the Company or otherwise in its capacity as Manager of the Company that are not contemplated by, or in furtherance of Manager's obligations expressly set forth in, the Brand Management Agreement in its capacity as "Manager" thereunder, the BMC Manager shall have a fiduciary duty of loyalty and care to the Company and the Member identical to that of directors of business corporations organized under the General Corporation Law of the State of Delaware, as amended. The provisions of this Agreement, to the extent they restrict, eliminate or otherwise modify the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities to the maximum extent permitted by law.

(g)    <u>Nonpetition Covenant</u>. Until the occurrence of a Trigger Event, the Member and BMC Manager agree, on behalf of themselves and their respective Affiliates, not to acquiesce, petition or otherwise invoke or cause the Company or the Franchisors to invoke the process of any court or Governmental Authority for the purpose of taking any Material Action without obtaining the prior written consent of the Member and the BMC Manager. The BMC Manager shall be deemed to have consented to the provisions of this <u>Section 9(g)</u> by accepting appointment as Manager.  The Member shall be deemed to have consented to the provisions of this <u>Section 9(g)</u> by executing this Agreement, and covenants and agrees that it has caused and will cause its Affiliates to comply with, and be bound by, the provisions of this <u>Section 9(g)</u>.  The Company, the Member, and the BMC Manager shall have the right to enforce the provisions of this <u>Section 9(g)</u>.

(h)    <u>Expenses</u>. The Manager may be paid its expenses in performing its obligations under this Agreement. The expenses of the Manager, so long as Manager is the BMC Manager, shall be paid to the BMC Manager in accordance with Section 14(b)(i).

(i)    <u>Notices by Manager</u>.  Until the occurrence of a Trigger Event, the Manager shall provide to the Member:

(i)    all notices that the Manager is required to deliver pursuant to and in accordance with the Brand Management Agreement, at the times and in the manner specified therein;

(ii)    for any matters not governed by the Brand Management Agreement, within ten (10) Business Days of receipt of any written notice of any action, claim, suit, inquiry, investigation, instruction, or other legal or administrative proceeding directly involving a Company Entity that would reasonably be expected to result in a Material Adverse Change, a copy of such notice and any materials related thereto;

(iii)    prompt written notice upon becoming aware of any material breach or default under the Related Agreements that would reasonably be expected to result in a Material Adverse Change; and

(iv)    prompt written notice after the Manager has knowledge of any Material Action.

The Manager shall promptly respond to any reasonable requests for additional information made by Member with respect to the foregoing matters and such other matters as may be reasonably requested by Member.

(j)    <u>Other Matters</u>.

(i)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member or the Manager, but in all cases so long as no Trigger Event has occurred and subject to the specified rights and obligations of the Company and BMC Manager to the contrary under the terms of the Brand Management Agreement, the Company shall not, and shall cause the Franchisors not to, take any of the following actions without the prior written consent of the Member and the Manager (<u>provided</u>, for actions the Manager reasonably determines are not material to bankruptcy remoteness, such

consent from the Manager shall not be unreasonably withheld, conditioned, or delayed), it being understood that any such action taken or purported to be taken without obtaining such consent from the Member and Manager shall, to the fullest extent permitted by law, be null and void (and shall, in the case of any action taken by Manager without obtaining consent from the Member (if prior to a Trigger Event), be deemed a breach by the Manager of its obligations under this Agreement):

(1)     cause or permit any Company Entity to amend, modify, change or waive any term of the Brand Management Agreement or the License Agreement;

(2)     except as contemplated by the Brand Management Agreement, cause or permit any Company Entity to exercise a right available to it to terminate any Related Agreement other than the Brand Management Agreement or the License Agreement;

(3)     cause or permit any Company Entity to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except as expressly permitted under Section 7 or Section 14(b);

(4)     except as may be the result of a successful litigation proceeding (including to enforce intellectual property rights of the Company Entities), cause or permit any Company Entity to acquire any securities or business of any Person or a material portion of the assets thereof;

(5)     cause or permit any Company Entity to enter into any agreement or transaction that would have or is likely to have a material adverse effect on royalties due to the Company Entities;

(6)     cause or permit any Company Entity to make any material tax election (other than the initial tax election of the Company) or any change in accounting policies, other than as required by applicable law or changes in GAAP;

(7)     cause or permit any Company Entity to hire, terminate or make other material changes to the employment arrangements of the principal officers the Company, if any; provided, however, that the BMC Manager may appoint one or more officers of the Company solely for administrative, ministerial or legal purposes without the prior written consent of the Member;

(8)     cause or permit any Company Entity to adopt or enter into any equity incentive plan or arrangement;

(9) cause or permit any Company Entity to directly or indirectly enter into or permit to exist any material transaction with BMC, any Affiliate of BMC, Member, or any Affiliate of Member, other than those authorized by the Brand Management Agreement or the License Agreement;

(10) cause or permit any Company Entity to directly or indirectly make any Investment (including, without limitation, by the formation of any subsidiary);

(11) cause or permit any Company Entity to amend, modify or change its organizational documents;

(12) cause or permit any Company Entity to enter into any agreement or arrangement reasonably expected to result in expenditures by such Company Entity, other than those expenditures authorized or contemplated by the Brand Management Agreement or the License Agreement or expenditures that are administrative or ministerial in nature (including expenditures reasonably necessary to maintain the Company Entities' legal existence, good standing, or compliance with applicable tax or reporting obligations);

(13) cause or permit any Company Entity to change its fiscal year, name, state of organization, form of organization, organizational identification number or federal taxpayer identification number;

(14) cause or permit any Company Entity to consummate any Change of Control or public securities offering transaction;

(15) cause or permit any Company Entity to create, incur, assume or suffer to exist any Lien upon any assets or property of such Company Entity, whether now owned or hereafter acquired, other than Permitted Liens;

(16) cause or permit any Company Entity to create, incur, assume or suffer to exist any Indebtedness with respect to such Company Entity;

(17) cause or permit any Company Entity to make any Disposition other than Permitted Transfers;

(18) cause or permit any Company Entity to liquidate or dissolve or to take any Material Action;

(19)    cause or permit any Company Entity to engage in any line of business other than the Business;

(20)    (y) settle or compromise any litigation, arbitration or other legal proceedings or (z) make any Key Decision with respect to any action, claim, suit, inquiry, investigation, instruction, or other legal or administrative proceeding, in the case of (y) or (z), arising from matters for which BMC Manager does not have enforcement rights on behalf of the Company or the Franchisors under the Brand Management Agreement, which, (i) involve liabilities or potential liabilities of any Company Entity in excess of $1,000,000 that are not covered by insurance or (ii) have or are reasonably expected to have a material impact on any intellectual property owned, licensed, used or held for use by any Company Entity;

(21)    cause or permit any Company Entity to enter into any contract, or grant any right to any other Person, that in any case would conflict with the Related Agreements; or

(22)    cause or permit any Company Entity to discontinue any existing business of any Company Entity.

(ii)    Notwithstanding any other provision of this Agreement (including Section 9(j)(i) of this Agreement) and any provision of law,

(A)    until the occurrence of a Trigger Event, the Manager shall cause any Company Entity to comply with its obligations under the Related Agreements, as applicable and consistent with the terms thereof;

(B)    the Member may directly, without any action or consent or approval of the Manager, cause any Company Entity to (1) provide written notice to the BMC Manager of a breach by BMC Manager or a dispute with BMC Manager on behalf of any Company Entity under the Brand Management Agreement, (2) exercise or waive a right available to any Company Entity to terminate BMC Manager or resolve a dispute with BMC Manager under the Brand Management Agreement, each solely in accordance with the terms of the Brand Management Agreement, (3) settle or compromise any litigation, arbitration or other legal proceedings arising from matters adverse to the BMC Manager, (4) make any Key Decision with respect to any action, claim, suit, inquiry, investigation, instruction, or other legal or administrative proceeding that is adverse to the BMC Manager, (5) exercise a right available to it to terminate the Brand Management Agreement in accordance with its terms, or (6) acting reasonably and in consultation with Manager, take any such action set forth in Section 9(j)(i) above to the extent approved by Manager in accordance with Section 9(j)(i) and not effected by Manager in a diligent manner thereafter.

**Section 10.    Limited Liability.**

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor the Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager of the Company.

**Section 11.    Capital Contributions.**

The Member has made contributions to the Company in kind as described in the recitals to this Agreement.

**Section 12.    Additional Contributions.**

The Member shall not be required to make any additional capital contribution to the Company. However, the Member may, in its sole discretion, make additional capital contributions to the Company at any time.  The provisions of this Section 12 are intended to benefit the Member, and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

**Section 13.    Allocation of Profits and Losses.**

The Company's profits and losses shall be allocated one hundred percent (100%) to the Member.

**Section 14.    Distributions.**

(a)    Distributions Generally. Subject to Section 9(j) and Section 14(b), the Manager, in its discretion, may make distributions of Distributable Cash to the Member.

(b)    Distributions under Royalty Transaction Documents.  The Manager shall cause the Company to distribute Distributable Cash on a monthly basis in the following order of priority:

(i)    *first*, (1) to the BMC Manager an amount equal to the Management Fee for such month less an amount equal to BMC's share of Allocated Expenses for such month, in accordance with the Brand Management Agreement (provided, however, upon the occurrence of a Trigger Event, BMC Manager shall be paid only such amounts that remain payable to BMC under the Brand Management Agreement, including the amounts specified in the second proviso of Section 8.1(a) thereof, solely to the extent applicable), and (2) to Initial Member, an amount equal to the IP Owner Royalties for such month less an amount equal to HILP's share of Allocated Expenses for such month, in accordance with the License Agreement and Brand Management Agreement, and no distribution or any portion thereof shall be made under Section 14(b)(ii) until such amount has been distributed; and

(ii)    *thereafter*, to the Member.

(iii)     Limitation of Distributions.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interests in the Company if such distribution would violate the Act (including Section 18-607 of the Act) or any other applicable law or the terms of this Agreement.

**Section 15.    Common Interest.**

All information exchanged between the Member and the Manager prior to the occurrence of a Trigger Event containing Privileged Information of the disclosing party or of the Company, regarding matters arising under the Related Agreements will be deemed Privileged Information of the disclosing party or of the Company, as applicable. The Member and the Manager agree and acknowledge that they have not waived, and nothing in this Agreement constitutes a waiver of, any legal privilege concerning the Related Agreements, including privilege under the common interest doctrine and similar or related doctrines.  Notwithstanding anything to the contrary contained herein, to the extent a party has a good faith belief that any information required to be disclosed in connection with any Related Agreement by such party to the other party is protected by attorney-client privilege or any other applicable legal privilege or immunity arising prior to the occurrence of a Trigger Event, such party will not be required to disclose such information and the parties will in good faith cooperate to agree upon a procedure (including entering into a specific common interest agreement, disclosing such information on a "for counsel eyes only" basis or similar procedure) under which such information may be disclosed without waiving or breaching such privilege or immunity.

**Section 16.    Books and Records.**

The Company shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The books of the Company shall at all times be maintained by the Manager. The Member and its duly authorized representatives shall have the right to examine the Company's books, records and documents during normal business hours. The Company shall not have the right to keep confidential from the Member any information that Manager would not otherwise be permitted to keep confidential from the Member pursuant to Section 18-305(c) of the Act. The Company's books of account shall be kept using the method of accounting reasonably agreed between the Member and the Manager. The Company's independent auditor, if any, shall be an independent public accounting firm reasonably agreed between the Member and the Manager.

**Section 17.    Tax Classification.**

The Initial Member intends that the Company be treated for United States federal tax purposes as a disregarded entity pursuant to United States Treasury Regulations § 301.7701-2(c)(2), and neither the Company nor the Member shall take any action or position for any purpose that is inconsistent with such intent.

**Section 18.    Exculpation.**

(a)     General.

(i)      To the fullest extent permitted by law, none of the Member, the Manager, representatives, advisors or agents of the Company, or any member, shareholder, partner, manager, director, officer, employee, representative, agent or Affiliate of any such Person (each a "Exculpated Person" and collectively, the "Exculpated Persons") shall be liable to the Company or any other Person that is a party to, or is otherwise bound by, this Agreement for any Damages incurred by reason of any act or omission performed or omitted by such Exculpated Person in good faith arising out of or in connection with the management or conduct of the business and affairs of the Company in a manner reasonably believed to be within the scope of authority conferred on such Exculpated Person, except that an Exculpated Person shall be liable for any such Damages to the extent that any of the foregoing is determined, by a final, nonappealable order of a court of competent jurisdiction, to have been primarily caused by the gross negligence, willful misconduct, or bad faith of such Exculpated Person claiming exculpation or the willful violations of the express provisions hereof by such Exculpated Person.

(ii)      An Exculpated Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Exculpated Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(iii)      Until the occurrence of a Trigger Event, the Member and the Manager shall not, and shall cause their respective Exculpated Parties not to, directly or indirectly, without obtaining the prior written consent of the Member and the BMC Manager, take any Material Action.

(iv)      To the extent that, at law or in equity, an Exculpated Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Person, such Exculpated Person acting under this Agreement shall not be liable to the Company or to any other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Exculpated Person, except that such Exculpated Person shall not be exculpated from any such liability incurred by reason of such Exculpated Person's gross negligence, bad faith or willful misconduct. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Exculpated Person to the Company or its members otherwise existing at law or in equity, are agreed by the Member to replace such other duties and liabilities of such Exculpated Person.

(b)      Survival. The foregoing provisions of this Section 18 shall survive the resignation, removal or termination of any Exculpated Person hereunder or any termination of this Agreement.

**Section 19.      Resignation.**

(a)      The Member may resign only upon the dissolution of the Company pursuant to Section 20(a).

(b)    The Member shall not have the ability to withdraw or resign from the Company in contravention of this Agreement.  If the Member purports to withdraw or resign other than as expressly permitted under this Agreement, the Member shall not be relieved of any obligation as a Member, shall not be entitled to any distribution or other amount referred to in Section 18-604 of the Act as a result of such purported withdrawal or resignation, and shall be liable to the Company and the Manager for any Damages suffered by them as a result of such purported withdrawal or resignation.

(c)    Upon the occurrence of any event that causes the Member to cease to be a member of the Company, the Manager shall, without any action of any Person and simultaneously with such Member ceasing to be a member of the Company, automatically be admitted to the Company as the Special Member and shall continue the Company without dissolution; *provided*, *however*, the Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member designated by the personal representative (as such term is defined in the Act) of the Initial Member with the consent of Manager (not to be unreasonably withheld, conditioned or delayed); provided, that the admission of the Manager as the Special Member shall not occur if the Company is then Member managed.  The Special Member, in its capacity as Special Member, shall be a member of the Company that has no interest in the profits, losses or capital of the Company and has no right to receive any distributions of Company assets.  Pursuant to Section 18-301 of the Act, the Special Member shall not be required to make any capital contributions to the Company and shall not receive an economic interest in the Company.  The Special Member, in its capacity as Special Member, may not bind the Company.  Except as required by any mandatory provision of the Act or this Agreement, the Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company.

### Section 20.    Dissolution, Winding-Up and Termination; Continuation.

(a)    Dissolution.  The Company shall be dissolved, and its affairs shall be wound up, upon the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    Loss of Management and Control Rights upon Bankruptcy.  Notwithstanding anything to the contrary in this Agreement, upon the occurrence of any event that causes the Member to cease to be a Member under the Act (including, without limitation, the bankruptcy of such Member), such Member shall retain its limited liability company interest in the Company and shall continue to share in the profits and losses of the Company and to receive distributions from the Company with respect to such limited liability company interest, but, from and after the occurrence of such event, the Member shall have no right to participate in the management of the business and affairs of the Company or to exercise any voting or consent rights provided under this Agreement or the Act. All such management, voting and consent rights shall be vested exclusively in the Manager and/or Special Member as provided in Section 19(c).

(c)    Winding-Up. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs, and all remaining assets of the Company shall be distributed as follows:

(i)      *first*, in accordance with Section 14(b)(i) to the extent applicable;

(ii)      *second*, to the setting up of any reserves which the Manager shall determine, in consultation with Member, to be reasonably necessary for contingent, unliquidated or unforeseen liabilities or obligations of the Company; and

(iii)      *third*, to the Member.

(d)      Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement, and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

**Section 21.      Waiver of Participation; Nature of Interest.**

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, the Member hereby irrevocably waives any right or power that it might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company. The Member's Member Interest in the Company is personal property of the Member.

**Section 22.      Benefits of Agreement; No Third-Party Rights.**

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than Exculpated Persons) or by any creditor of any Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Exculpated Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Exculpated Persons).

**Section 23.      Severability of Provisions.**

Each provision of this Agreement shall be considered severable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of, or affect, those portions of this Agreement that are valid, enforceable and legal.

**Section 24.      Entire Agreement.**

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

### Section 25.    Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict or choice of law principles that would cause the application of the internal laws of any other jurisdiction), and all rights and remedies shall be governed by said laws.

### Section 26.    Amendments.

This Agreement may be modified, altered, supplemented or amended only pursuant to a written agreement executed and delivered by the Member and BMC; provided, that following the occurrence of a Trigger Event, the Member may modify, alter, supplement or amend this Agreement without the written agreement of BMC, in its sole and absolute discretion.

### Section 27.    Counterparts.

This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means of transmission), each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

### Section 28.    Notices.

Any notices delivered hereunder ("Notices") shall be in writing and shall be deemed validly served, given or delivered: (i) upon transmission, when sent by electronic mail; (ii) one Business Day after deposit with a reputable overnight courier with all charges prepaid; or (iii) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address as may be designated by written notice to the other parties in accordance with this Section.

### Section 29.    Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, Sections 7, 8, 9, 18, 19, 20, 22, 25 and 29, constitutes a legal, valid and binding agreement of such Member, and is enforceable against such Member in accordance with its terms.

*[Remainder of this page intentionally left blank]*

18

# SCHEDULE A

## Definitions

A.    <u>Definitions</u>. When used in this Agreement, the following terms shall have the following meanings:

"<u>Act</u>" shall have the meaning set forth in the recitals to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For the purposes of this definition and the definitions of the BMC Entities, the Company Entities and the Initial Member Entities, "control" (including "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership of beneficial interests or by contract or otherwise.  Notwithstanding the foregoing, the BMC Entities, the Company Entities and the Initial Member Entities shall not be deemed to be Affiliates of each other.

"<u>Agreement</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Allocated Expenses</u>" shall have the meaning set forth in the Brand Management Agreement.

"<u>Bankruptcy</u>" means, with respect to any Person, if (a) such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding under federal, state, foreign or other applicable law, (iv) files a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, restructuring, moratorium, stay of proceedings of creditors generally (or any class of creditors), winding-up, scheme of arrangement, or any other similar relief under any applicable law or at common law or equity, (v)  files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of the type described in the preceding clauses (i)-(iv), (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, custodian, sequestrator, conservator, administrator, receiver, voluntary administrator, administrative receiver or other similar official of such Person or of all or any substantial part of its properties; (vii) admits in writing its inability to pay its debts as they become due or generally does not pay its debts as they become due; or (viii) takes any corporate, limited liability company or other organizational action to authorize any of the foregoing; or (b) a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any applicable law has been commenced against such Person, and sixty 60 days have expired without dismissal thereof or with respect to which, without such Person's consent or acquiescence a receiver, sequestrator, conservator, custodian, administrator, trustee, liquidator or other similar official of such Person or of all or substantially all of such Person's assets has been appointed and thirty 30 days have expired without such appointment having been vacated or stayed, or thirty 30 days have expired after the date of expiration of a stay, if such appointment has not previously been vacated, or (c) any other event or circumstance occurs

that has substantially the same effect as any of the events described in clauses (a) or (b).  With respect to the Member, the foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18- 101 (1) and 18-304 of the Act.

"BMC" shall have the meaning set forth in the recitals to this Agreement.

"BMC Entities" means (a) BMC, (b) the direct and indirect subsidiaries of BMC, and (c) any other Person that directly or indirectly through one or more intermediaries, controls, or is under common control with, BMC, in each case ((a) through (c)) excluding the Company Entities.

"Brand Management Agreement" shall have the meaning set forth in the recitals to this Agreement.

"Business" shall have the meaning set forth in the License Agreement.

"Certificate of Formation" shall have the meaning set forth in the recitals to this Agreement.

"Change of Control" means, with respect to any Company Entity, (a) a merger, consolidation, or other reorganization of such Company Entity with or into any other entity, after which the equity holders of such Company Entity immediately prior to such transaction own, directly or indirectly, less than fifty percent (50%) of the combined voting power or outstanding equity securities of the surviving or resulting entity; (b) a sale, transfer, or other disposition, in a single transaction or series of related transactions, after which one or more third parties who were not equity holders of such Company Entity immediately prior to the commencement of such transaction(s) collectively own, directly or indirectly, fifty percent (50%) or more of the outstanding equity securities of such Company Entity; or (c) a sale, lease, license (including an exclusive license of all or substantially all of such Company Entity's intellectual property), or other disposition of all or substantially all of the assets of such Company Entity and its subsidiaries, taken as a whole.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in the preamble to this Agreement.

"Company Entities" means the Company and the Franchisors.

"Damages" means for any expenses, claims, damages, liabilities and losses (including, without limitation, judgments, interest on judgments, fines, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or any appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission), whether pending or merely threatened, whether or not such indemnifying or exculpated Person, as applicable, is or may be a party thereto, including interest on any of the foregoing.

"Debtors" shall have the meaning set forth in the recitals to this Agreement.

"Development Agreement" shall have the meaning set forth in the Brand Management Agreement.

"Disposition" means the sale, transfer, out-license, lease or other disposition (including any sale and leaseback transaction, any issuance by any Company Entity of its equity interests other than to another Company Entity) of any asset, property or any economic interest by any Company Entity, including any sale, assignment, transfer, out-license or other disposal, with or without recourse, of any intellectual property assets or notes or accounts receivable or any rights and claims associated therewith, but excluding the following (collectively, the "Permitted Transfers"):

(a)    any disposition authorized or contemplated by the Brand Management Agreement or the License Agreement;

(b)    the sale, lease, license, transfer or other disposition of inventory in the ordinary course of business;

(c)    the sale, lease, license, transfer or other disposition in the ordinary course of business of surplus, obsolete or worn out property no longer used or useful in the conduct of the business of the Company Entities;

(d)    any sale, lease, license, transfer or other disposition of property by one Company Entity to another Company Entity;

(e)    the abandonment or other disposition of assets that are not material or are no longer used or useful in any material respect to the business of any Company Entity;

(f)    licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business and not interfering with the business of the Company Entities;

(g)    any dispositions consisting of the sale, transfer, assignment or other disposition of unpaid and overdue accounts receivable in connection with the collection, compromise or settlement thereof in the ordinary course of business;

(h)    any sale, lease, license or other disposition of property (other than intellectual property rights) in settlement of, or to make payment in satisfaction of, any property or casualty insurance;

(i)    the sale or other disposition of cash in a manner not prohibited by this Agreement or the Related Agreements; and

(j)    sales, leases, licenses, transfers or other dispositions of property (other than intellectual property rights) to the extent that (A) such property is exchanged for credit against the purchase price of similar replacement or property, or (B) the proceeds of such sale, lease, license, transfer or other disposition are promptly applied to the purchase price of similar replacement property.

"Distributable Cash" means (a) all amounts of cash actually received and held by the Company as of such time, including all amounts received by the Company as distributions from the Franchisors, less (b) the sum of all outstanding and unpaid expenses and obligations of the Company and the Franchisors as of such time, and less (c) amounts required as reserves (at any particular time prior to the occurrence of a Trigger Event, pursuant to the Brand Management Agreement, including for the avoidance of doubt, the Allocated Expense Reserve) for the ordinary course operations of the Company and the Franchisors, as determined by the Manager, acting reasonably.

"Exculpated Persons" shall have the meaning set forth in Section 18(a)(i).

"Fiscal Year" means the annual accounting period used by the Company for tax and financial reasons, which period shall end on or about December 28 of each calendar year unless the Manager, subject to Section 9(j), otherwise determines. The Company shall have the same fiscal year for United States federal income tax purposes and for accounting purposes.

"Franchise Agreement" shall have the meaning set forth in the Brand Management Agreement.

"Franchisee" shall have the meaning set forth in the Brand Management Agreement.

"Franchisors" shall have the meaning set forth in the recitals to this Agreement.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"HILP" shall have the meaning set forth in the recitals to this Agreement.

"HOA Franchising" shall have the meaning set forth in the recitals to this Agreement.

"Hoots Franchising" shall have the meaning set forth in the recitals to this Agreement.

"Indebtedness" of any Person means (a) any obligation of such Person for borrowed money, (b) any obligation of such Person evidenced by a bond, debenture, note or other similar instrument, (c) any obligation of such Person to pay the deferred purchase price of property or services (except trade accounts payable that arise in the ordinary course of business), (d) any obligation of such Person as lessee under a capital lease (under GAAP as in effect on the date hereof), (e) any obligation of such Person to purchase securities or other property that arises out of or in connection with the sale of the same or substantially similar securities or property, (f) any non-contingent obligation of such Person to reimburse any other Person in respect of amounts paid under a letter of credit or other guaranty issued by such other Person, (g) any Indebtedness of others secured by a Lien on any asset of such Person, and (h) any Indebtedness of others guaranteed by such Person.

"Initial Member Entities" means (a) Initial Member, (b) the direct and indirect subsidiaries of Initial Member, including RoyaltyCo, HOA IP GP, LLC, a Delaware limited liability company, HOA Systems, and HILP, and (c) any other Person that directly or indirectly through one or more intermediaries, controls, or is under common control with, Initial Member, in each case ((a) through (c)) excluding the Company Entities.

"Initial Member" means HOA NewCo LLC, a Delaware limited liability company.

"Investment" means any beneficial ownership interest in any Person (including stock, partnership, membership or other ownership interest or other equity securities), and any loan, advance or capital contribution to any Person.

"IP Owner Royalties" shall have the meaning set forth in the Brand Management Agreement.

"Key Decisions" means the (A) selection of counsel(s) and barristers and their fee arrangements; (B) strategy regarding arbitration forum(s); (C) coordination of ongoing support, information, and Key Decisions regarding potential intellectual property infringement, litigations, arbitrations and efforts to avoid disputes and/or the need for litigation or arbitration;(D) timing of the institution of arbitration proceedings; (E) potential consolidation of arbitration proceedings; (F) selection of the arbitrators and experts and the identification of witnesses;(G)potential or actual disclosures of Privileged Information; (H) the proposal of any settlement(including terms and amounts) and consideration or acceptance of any settlement offer with insurers; (I) and other key decisions as may be determined by the Member from time to time in its sole discretion, acting reasonably.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property or other priority or preferential arrangement of any kind or nature whatsoever, in each case to secure payment of a debt or performance of an obligation, including any conditional sale or any sale with recourse.

"Management Fee" shall have the meaning set forth in the Brand Management Agreement.

"Manager" means (i) until the occurrence of a Trigger Event, the BMC Manager, and (ii) following the occurrence of a Trigger Event, the Member, in each case, acting as the "manager" of the Company within the meaning of Section 18-101(12) of the Act, subject to the limitations set forth herein.

"Material Action" means to:

(a)     institute any Bankruptcy of any Company Entity;

(b)     petition for or consent to substantive consolidation or merger of any Company Entity with any other Person;

(c)       sell, exchange, lease or otherwise transfer all or substantially all of the assets of any Company Entity or consolidate or merge any Company Entity with another Person whether by means of a single transaction or a series of related transactions;

(d)       amend, alter, change or repeal the definition of "Material Action," or amend, alter change or repeal Sections 7, 8, 9, 17, 18, 19, 20, 22, 25, or 29 or Schedule A (but, with respect to Schedule A, only to the extent that a term defined in Schedule A is used, directly or indirectly, in any of the Sections of this Agreement referenced in this sentence) or any references to Section 9(j) in any other section of this Agreement;

(e)       dissolve, liquidate or wind up the Company, or approve or otherwise cause any proposal relating thereto; or

(f)       increase or reclassify the membership interests of the Company or to issue any additional membership interests of the Company.

"Material Adverse Change" shall mean any effect, event, fact, circumstance, development, occurrence or change that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business or financial condition  of any Company Entity.

"Member" shall have the meaning set forth in the preamble to this Agreement.

"Member Interests" has the meaning set forth in Section 5(b)(i).

"Notices" shall have the meaning set forth in Section 28.

"Permitted Liens" means:

(a)       Liens created by law or arising in the ordinary course of business (other than in respect of borrowed money) that do not secure funded debt;

(b)       Liens in respect of property of any Company Entity imposed by applicable law which were incurred in the ordinary course of business and do not secure Indebtedness, such as carriers', warehousemen's, distributors', wholesalers', materialmen's, mechanics' and landlord's Liens and other similar Liens arising in the ordinary course of business and that secure payment obligations (i) not then due, (ii) if due, not yet overdue by more than thirty (30) days, or (iii) that if overdue by more than thirty (30) days, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with generally accepted accounting principles; or

(c)       Liens for taxes that are not delinquent or remain payable without interest or penalty or that are being contested in good faith and with due diligence by appropriate proceedings and for which adequate reserves have been established in accordance with generally accepted accounting principles.

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" shall have the meaning set forth in the recitals to this Agreement.

"Privileged Information" " means any information, in written, oral, electronic or other tangible or intangible forms, including any attorney-client privileged communications, memoranda and other materials including attorney work product prepared by attorneys or under their direction, as to which either BMC, the Company or the Member would be entitled to assert or have asserted a privilege or other protections, including the attorney-client and/or attorney work product privileges and protections, confidential settlement or mediation communications under Cal. Evid. Code §§ 1115 et seq., and other communications deemed privileged by governing law. For the avoidance of doubt, the term "Privileged Information" shall include all privileged, and legally protected or protectable materials and information, including client confidences, litigation strategy and/or options, legal analysis, conclusions, decisions, arguments, and settlement information, analysis strategies, mental impressions, legal theories, legal research, counsel's factual investigation and analyses, whether oral, electronic or in writing.  Privileged Information also includes, as applicable, written communications, memoranda, products, laboratory notebooks, study reports, notes, interview reports, search reports, deposition transcripts, materials provided to and  communications to or from or prepared by any consultant retained by the Company or the Member (or an expert retained by the Company or the Member or any of its litigation counsel to the extent the communication is not discoverable under Federal Rule of Civil Procedure 26) and correspondence with insurers' claims representatives and their counsel reflecting or including any Privileged Information; and reports of experts and consultants, and/or investigations, opinions, and analyses, legal briefs, motions and arguments, litigation strategies, settlement positions, expert opinions, and all other factual or legal information expressed in any documents, recordings, communications, or media, of whatever nature and in any form, whether written, oral, or electronic.

"Related Agreements" means each of the Royalty Transaction Documents, Franchise Agreements, Development Agreements and Third-Party License Agreements.

"Restricted Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares (or equivalent) of any class of equity interests in the Company, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of (i) any shares (or equivalent) of any class of equity interests of any Company Entity, now or hereafter outstanding, or (ii) any call option on any shares (or equivalent) of any class of equity interests of any Company Entity, or (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of equity interests of any Company Entity, now or hereafter outstanding.

"RoyaltyCo" shall have the meaning set forth in the recitals to this Agreement.

"Royalty Transaction Documents" shall have the meaning set forth in the recitals to this Agreement.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 18(c), the Manager, in such person's capacity as a member of

the Company.  The Special Member shall only have the rights and duties expressly set forth in this Agreement.

"<u>Third-Party License Agreement</u>" shall have the meaning set forth in the Brand Management Agreement.

"<u>Third-Party Service Provider</u>" shall have the meaning set forth in the Brand Management Agreement.

"<u>Trigger Event</u>" means

(a)    The delivery by Manager to the Company of a Termination Notice (as defined in the Brand Management Agreement); or

(b)    A Service Recipient terminates the Brand Management Agreement on account of a Service Recipients Termination Event (for the avoidance of doubt, prior to any Disentanglement Period); or

(c)    Manager materially breaches its obligations under this Agreement and fails to cure such breach within 60 calendar days of receipt of written (email sufficient) notice thereof from Member (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach); or

(d)    Without first obtaining the prior written consent of Member, the taking by Manager of a Material Action.

B.    <u>Rules of Construction</u>. Unless the context otherwise clearly requires in this Agreement: (i) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (ii) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (iii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;" (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall;" (v) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein); (vi) any reference to any law shall include all statutory and regulatory rules, regulations and other provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; (vii) any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; (viii) all references in this instrument to designated "Articles," "Sections," "subsections," "clauses" and other subdivisions are to the designated Articles, Sections, subsections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision; (ix) all accounting terms not otherwise defined herein shall be construed in accordance with generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its

predecessors and successors from time to time; (x) "day" shall mean a calendar day; and (xi) terms defined in the Uniform Commercial Code and not otherwise defined in this Agreement shall have the meanings assigned to such terms under the Uniform Commercial Code of the applicable jurisdiction.

# **EXHIBIT C.7**

**Third Amended and Restated
Limited Liability Company Agreement of
HOA RoyaltyCo LLC**

*Execution Version*

**THIRD AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HOA ROYALTYCO LLC**

**Dated as of**
**October 31, 2025**

# TABLE OF CONTENTS

Section 1.    Organization and Name..................................................................................1

Section 2.    Principal Business Office...............................................................................2

Section 3.    Registered Office...........................................................................................2

Section 4.    Registered Agent............................................................................................2

Section 5.    Members and Membership Interests................................................................2

Section 6.    Certificate of Formation; Existence................................................................2

Section 7.    Purpose............................................................................................................3

Section 8.    Powers.............................................................................................................3

Section 9.    Management......................................................................................................3

Section 10.    Limited Liability............................................................................................4

Section 11.    Capital Contributions.....................................................................................4

Section 12.    Additional Contributions...............................................................................4

Section 13.    Allocation of Profits and Losses....................................................................4

Section 14.    Distributions..................................................................................................4

Section 15.    Books and Records........................................................................................4

Section 16.    Tax Classification..........................................................................................4

Section 17.    [RESERVED]..................................................................................................4

Section 18.    Liability of Member; Indemnification...........................................................4

Section 19.    Registration and Transfers............................................................................6

Section 20.    Resignation....................................................................................................7

Section 21.    Dissolution, Winding-Up and Termination; Continuation............................7

Section 22.    Nature of Interest...........................................................................................8

Section 23.    Benefits of Agreement; No Third-Party Rights.............................................8

Section 24.    Severability of Provisions.............................................................................8

Section 25.    Entire Agreement...........................................................................................9

Section 26.    Governing Law..............................................................................................9

Section 27.    Amendments...................................................................................................9

Section 28.    Counterparts...................................................................................................9

Section 29.    Notices...........................................................................................................9

Section 30.    Binding Agreement.........................................................................................9

SCHEDULE A – Definitions

SCHEDULE B – Members and Member Interest

This THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOA RoyaltyCo LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025, is entered into by HOA NewCo LLC, a Delaware limited liability company, as the sole member of the Company (the "Member"). Capitalized terms used herein and not otherwise defined have the meanings set forth on Schedule A hereto.

W I T N E S S E T H:

WHEREAS, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on April 28, 2014 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation");

WHEREAS, HOA Systems, LLC, a Delaware limited liability company, and the special members party thereto previously entered into that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of August 11, 2014, as amended and restated by that certain Second Amended and Restated Limited Liability Company Agreement of the Company, dated August 19, 2021 (the "Existing LLC Agreement");

WHEREAS, the name of the limited liability company as previously organized was "HOA Funding, LLC";

WHEREAS, on October 30, 2025 the name of the Company was continued as "HOA RoyaltyCo LLC" by filing an amendment to the Company's certificate of formation with the office of the Delaware Secretary of State;

WHEREAS, on October 30, 2025, Hooters of America, LLC and certain of its affiliates filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan"); and

WHEREAS, in connection with the Plan and pursuant to Section 30 of the Existing LLC Agreement, the Member desires to amend and restate the Existing LLC Agreement in its entirety in the manner set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, (i) confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, this Agreement and the Act and (ii) amend and restate in its entirety the Existing LLC Agreement pursuant to Section 30 of the Existing LLC Agreement as follows:

Section 1.     Organization and Name. The Company was previously organized as a limited liability company pursuant to Section 18-201 of the Act by the filing of the Certificate of Formation.  The name of the Company is "HOA RoyaltyCo LLC".

Section 2.    <u>Principal Business Office</u>. The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

Section 3.    <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 4.    <u>Registered Agent</u>. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 5.    <u>Members and Membership Interests</u>.

(a)    <u>Initial Member</u>. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| HOA NewCo LLC | 901 N Market Street, Suite 100, Wilmington, DE 19801 |

(b)    <u>Additional Members</u>. One or more additional members may be admitted to the Company with the written consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c)    <u>Limited Liability Company Interests; Certificates</u>. Member interests shall be limited liability company interests (within the meaning of the Act) in the Company with all the rights, privileges and responsibilities of limited liability interests (within the meaning of the Act) in the Company. The Company will not issue any certificates to evidence ownership of the limited liability company interests.

Section 6.    <u>Certificate of Formation; Existence</u>.

(a)    <u>Certificate of Formation</u>. Express authorization was given to Deborah M. Reusch for the exclusive purpose of executing the Certificate of Formation of the Company which has been filed in the Office of the Secretary of State of the State of Delaware. The filing of the Certificate of Formation with the Secretary of State of the State of Delaware on April 28, 2014 by Deborah M. Reusch as "authorized person" is hereby ratified and approved in all respects. Each Member, and each officer, is hereby authorized to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business or obtain any licenses necessary or advisable in any other jurisdiction in which the Company may wish to conduct business and all such filings made prior to the date hereof are hereby ratified.

(b)      Existence. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.      Purpose. The Company has been formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful activity for which Delaware limited liability companies may be organized, and engaging in any and all activities necessary or incidental to the foregoing.

Section 8.      Powers. The Company (i) shall have all of the powers and rights conferred upon limited liability companies formed pursuant to the Act necessary, convenient or incidental to, or for the furtherance of, the purposes of the Company set forth in Section 7 (including, without limitation, to bind the Company) and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.      Management.

(a)      Authority; Powers and Duties of the Member. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a "manager" under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)      Election of Officers; Delegation of Authority. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

(c)      Actions Absent a Meeting. Any action requiring the vote of the Member may be taken without a meeting if such action is consented to in a writing, setting forth the action to be taken, signed by the Member.

(d)      Compensation of the Member. The Company shall reimburse the Member for all ordinary, necessary and direct expenses incurred by the Member on behalf of the Company in carrying out the Company's business activities. All reimbursements for expenses shall be reasonable in amount (and may include flight, hotel and other travel expenses consistent with the travel policies of the Member).

(e)    <u>Fiduciary Duties of Member</u>. The Member (acting in its capacity as the manager of the Company) shall have a fiduciary duty of loyalty and care identical to that of directors and officers of business corporations organized under the General Corporation Law of the State of Delaware, as amended.

Section 10.    <u>Limited Liability</u>. Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or manager of the Company.

Section 11.    <u>Capital Contributions</u>. The Member has made capital contributions to the Company as listed on <u>Schedule B</u> attached hereto.

Section 12.    <u>Additional Contributions</u>. No Member is required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time at its sole discretion. <u>Schedule B</u> of this Agreement shall be revised from time to time to the extent that a Member makes an additional capital contribution to the Company. The provisions of this Agreement, including this <u>Section 12</u>, are intended to benefit the Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 13.    <u>Allocation of Profits and Losses</u>. The Company's profits and losses shall be allocated to the Member(s).

Section 14.    <u>Distributions</u>. Distributions shall be made, from time to time, to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of their interests in the Company if such distribution would violate the Act (including Section 18- 607 of the Act) or any other applicable law or any Related Document.

Section 15.    <u>Books and Records</u>. The Company shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.

Section 16.    <u>Tax Classification</u>. The Member intends that the Company be treated for United States federal tax purposes as a disregarded entity pursuant to United States Treasury Regulations § 301.7701-2(c)(2), and neither the Company nor the Member shall take any action or position for any purpose that is inconsistent with such intent.

Section 17.    <u>[RESERVED]</u>.

Section 18.    <u>Liability of Member; Indemnification</u>.

(a)    <u>General</u>.

(i)    To the fullest extent permitted by law, none of the Members, officers, employees, representatives, advisors or agents of the Company, nor any member, shareholder, partner, manager, director, officer, employee, representative, agent or Affiliate of any such Person (each a "Indemnified Person" and collectively, the "Indemnified Persons") shall be liable to the Company or any other Person that is a party to, or is otherwise bound by, this Agreement for any Damages incurred by reason of any act or omission performed or omitted by such Indemnified Person in good faith arising out of or in connection with the management or conduct of the business and affairs of the Company in a manner reasonably believed to be within the scope of authority conferred on such Indemnified Person, except that an Indemnified Person shall be liable for any such Damages to the extent that any of the foregoing is determined, by a final, nonappealable order of a court of competent jurisdiction, to have been primarily caused by the gross negligence, willful misconduct, or bad faith of such Indemnified Person claiming exculpation or the willful violations of the express provisions hereof by such Indemnified Person.

(ii)    To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless each Indemnified Person for any liability, loss, damage or claim incurred by such Indemnified Person, including attorney's fees and costs and any amounts expended in the settlement of any such claims of liability, loss, damage or claim by reason of any act or omission performed or omitted by such Indemnified Person in good faith in connection with the business of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Indemnified Person by this Agreement, except that no Indemnified Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Indemnified Person by reason of such Indemnified Person's bad faith, gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 18 by the Company shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof. The Company may pay for insurance covering its liability to the Indemnified Persons.

(iii)    To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by an Indemnified Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that the Indemnified Person is not entitled to be indemnified as authorized in this **Error! Reference source not found.**.

(iv)    An Indemnified Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(v)    Each Person bound by this Agreement shall agree, on account of any indemnification or other payment owing to such Indemnified Person by the Company under this Section 18, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the

process of any court or Governmental Authority for the purpose of commencing or sustaining an involuntary case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or, to the fullest extent permitted by law, ordering the winding up or liquidation of the affairs of the Company.

(vi)     To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Person, such Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Indemnified Person, except that such Indemnified Person shall not be exculpated from any such liability incurred by reason of such Indemnified Person's gross negligence, bad faith or willful misconduct. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Indemnified Person to the Company or its members otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnified Person.

(b)     Survival. The foregoing provisions of Section 18 shall survive the resignation, removal or termination of any Indemnified Person hereunder or any termination of this Agreement.

Section 19.    Registration and Transfers.

(a)     General. Any Member may sell, assign, pledge, hypothecate or otherwise transfer, in whole or in part, its interest in the Company, or take or omit to take any action, filing, election, or other action that could result in a deemed sale, assignment, encumbrance, transfer, or other disposition. The Member agrees that the limited liability company interests shall not be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

(b)     Assignment. A Member may sell all or a portion of its limited liability company interest in the Company to another Person and such other Person shall be admitted to the Company as a Member of the Company, if and only if such transferee (i) executes an instrument signifying its agreement to be bound by the terms and conditions of this Agreement in form and substance satisfactory to the Company (which instrument may be a counterpart signature page to this Agreement) and (ii) delivers to the Company an opinion of counsel satisfactory to the Company that no registration under the Securities Act or registration or qualification under the securities laws of any state shall be required and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in compliance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution. Notwithstanding the foregoing, no assignment of a Member's limited liability company interest or any portion thereof shall be permitted if such assignment would result in any assets of the Company being deemed to constitute "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended, or Section

4975 of the Internal Revenue Code of 1986, as amended. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in accordance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

(c)  Pledge. If a Member pledges all or a portion of its limited liability company interest in the Company pursuant to this Section 19(c), the pledgee (or any assignee of the pledgee) shall not be admitted to the Company as a Member of the Company unless such pledgee exercises the rights of a secured creditor in accordance with (i) the relevant documents governing the applicable secured obligations and (ii) applicable law (the exercise of such rights pursuant to clauses (i) and (ii) of this subsection (c), "Foreclosure"). Following a Foreclosure, such pledgee or a transferee of such pledgee, upon satisfaction of the requirements of clauses (i) and (ii) of subsection (b) of this Section 19, shall be admitted to the Company as a Member of the Company of the same class and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

Section 20.  Resignation. The Member may resign only upon satisfaction of the conditions and restrictions, if any, specified in the Related Documents (including, without limitation, the Rating Agency Condition (as defined in the Indenture)) or pursuant to a transfer otherwise permitted by this Agreement. If a Member is permitted to resign pursuant to this Section 20, an additional Person shall be admitted as a Member to the Company, subject to Section 21, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a Member of the Company.

Section 21.  Dissolution, Winding-Up and Termination; Continuation.

(a)  Dissolution.

(i)  The Company shall be dissolved, and its affairs shall be wound up, upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership in the Company of the last remaining member of the Company, unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act, (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act or (iii) the election in writing of the Member and the manager of the Member. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a member of the Company or that causes the last remaining member of the Company to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon the resignation of the Member and the admission of an additional Member of the Company pursuant to Section 20 and Section 21), to the fullest extent permitted by law, the personal representative (as such term is defined in the Act) of such member is hereby authorized and directed, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, to agree in writing (i) to continue the Company and (ii) to its admission, or the

admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company effective as of the occurrence of the event that terminated the continued membership of, such member in the Company.

(ii)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(iii)    Notwithstanding any other provision of this Agreement, each Member and waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member, or the occurrence of an event that causes the Member to cease to be a member of the Company.

(b)    Continuation. Notwithstanding any other provision of this Agreement, (i) the Bankruptcy of a Member shall not cause such Member to cease to be a Member of the Company and (ii) the withdrawal of any Member shall not, in and of itself, constitute a dissolution of the Company; and upon the occurrence of either event set forth in the foregoing clause (i) or (ii), the business of the Company shall continue without dissolution. Notwithstanding any other provision of this Agreement and in furtherance of the foregoing, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of an event that causes any Member to cease to be a member of the Company.

(c)    Winding-Up. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 22.    Nature of Interest. No Member shall have any interest in any specific assets of the Company. Each Member interest in the Company is personal property of the Member holding such Member interest.

Section 23.    Benefits of Agreement; No Third-Party Rights. Except as contemplated by the Related Documents, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than a party entitled to indemnification pursuant to Section 18 (each an "Indemnified Person")) or by any creditor of any Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Indemnified Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Indemnified Persons and except as contemplated by the Related Documents).

Section 24.    Severability of Provisions. Each provision of this Agreement shall be considered severable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity,

unenforceability or illegality shall not impair the operation of, or affect, those portions of this Agreement that are valid, enforceable and legal.

Section 25.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 26.    <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict or choice of law principles that would cause the application of the internal laws of any other jurisdiction), and all rights and remedies shall be governed by said laws.

Section 27.    <u>Amendments</u>. This Agreement may be modified, altered, supplemented or amended only pursuant to a written agreement executed and delivered by the Member, and, upon satisfaction of any condition or restriction specified in the Related Documents.

Section 28.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means of transmission), each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 29.    <u>Notices</u>. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of a Member, to such Member at its address as listed on <u>Schedule B</u> attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 30.    <u>Binding Agreement</u>. Notwithstanding any other provision of this Agreement, each Member agrees that this Agreement, including, <u>Sections Section 7</u>, <u>Section 8</u>, <u>Section 9</u>, <u>Section 18</u>, <u>Section 19</u>, <u>Section 20</u>, <u>Section 21</u>, <u>Section 23</u>, <u>Section 27</u> and <u>Section 30</u>, constitutes a legal, valid and binding agreement of such Member, and is enforceable against such Member in accordance with its terms.

[<em>Remainder of this page intentionally left blank</em>]

## SCHEDULE A

### Definitions

A.  <u>Definitions</u>. When used in this Agreement, the following terms shall have the following meanings:

"<u>Act</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership of beneficial interests or by contract or otherwise.

"<u>Agreement</u>" means this Third Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules and exhibits attached hereto, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"<u>Bankruptcy</u>" means (a) an Event of Bankruptcy as defined in the Indenture, and (b) to the extent not inconsistent with, or modified by, such definition in the Indenture, means, with respect to any Person, if (i) such Person makes an assignment for the benefit of creditors, (ii) such Person files a voluntary petition in bankruptcy, (iii) such Person is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) such Person files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, or similar relief under any statute, law or regulation, (v) such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) such Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. With respect to the Member(s), the foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101 (1) and 18-304 of the Act.

"<u>Brand Management Agreement</u>" has the meaning set forth in the Indenture.

"<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on April 28, 2014, as the same may be amended, supplemented or otherwise modified from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the preamble.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Damages" means for any expenses, claims, damages, liabilities and losses (including, without limitation, judgments, interest on judgments, fines, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or any appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission), whether pending or merely threatened, whether or not such indemnifying or exculpated Person, as applicable, is or may be a party thereto, including interest on any of the foregoing.

"Founders License Agreements" has the meaning set forth in the Indenture.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Indemnified Person" has the meaning set forth in Section 23.

"Indenture" means the Second Amended and Restated Base Indenture, by and among the Company and the Indenture Trustee, dated as of October 31, 2025, including, with respect to any Series of Notes, the related Series Supplement, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Indenture Trustee" means "Trustee" under the Indenture, not in its individual capacity, but solely in its capacity as indenture trustee under the Indenture, its successors in interest and any successor indenture trustee under the Indenture.

"Member" has the meaning set forth in the preamble to this Agreement.

"Non-Securitization Entity" has the meaning specified in the Indenture.

"Note" means any note issued by the Company pursuant to the Indenture.

"Officer" has the meaning set forth in Section 9(b).

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Related Documents" has the meaning specified in the Indenture in addition to the Transition Services Agreement, the Brand Management Agreement, the Retained Restaurants License Agreement, the Founders License Agreements, the Plan, and all agreements relating to any of the foregoing, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Retained Restaurants License Agreement" has the meaning specified in the Indenture.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Series" or "Series of Notes" means any series of notes issued pursuant to the Indenture and the related Series Indenture Supplement.

"Series Indenture Supplement" means, with respect to any Series of Notes outstanding, the supplement to the Indenture executed and delivered in connection with the issuance of such Series of Notes, as amended, restated or otherwise modified.

"Transition Services Agreement" has the meaning specified in the Plan.

B.      Rules of Construction. Unless the context otherwise clearly requires in this Agreement: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;" (d) the word "will" shall be construed to have the same meaning and effect as the word "shall;" (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein); (f) any reference to any law shall include all statutory and regulatory rules, regulations and other provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; (g) any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; (h) all references in this instrument to designated "Articles," "Sections," "subsections," "clauses" and other subdivisions are to the designated Articles, Sections, subsections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision; (i) all accounting terms not otherwise defined herein shall be construed in accordance with generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors and successors from time to time; (j) "day" shall mean a calendar day and (k) terms defined in the Uniform Commercial Code and not otherwise defined in this Agreement shall have the meanings assigned to such terms under the Uniform Commercial Code of the applicable jurisdiction.

**SCHEDULE B**

**Members and Membership Interests**

<u>Member</u>

| <u>Name</u> | <u>Mailing Address</u> | Membership <u>Interest</u> |
|---|---|---|
| HOA NewCo LLC | 901 N Market Street, Suite 100, Wilmington, DE 19801 | 100% |

## EXHIBIT C.8

**Second Amended and Restated
Limited Liability Company Agreement of
HOA IP GP, LLC**

*Execution Version*

**SECOND AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HOA IP GP, LLC**

**Dated as of**
**October 31, 2025**

# TABLE OF CONTENTS

Section 1.        Organization and Name.................................................................1

Section 2.        Principal Business Office ...........................................................2

Section 3.        Registered Office ....................................................................2

Section 4.        Registered Agent .....................................................................2

Section 5.        Members and Membership Interests. ....................................................2

Section 6.        Certificate of Formation; Existence. .................................................2

Section 7.        Limited Purposes......................................................................2

Section 8.        Powers ...............................................................................3

Section 9.        Management. ..........................................................................3

Section 10.       Limited Liability ...................................................................4

Section 11.       Capital Contributions ...............................................................4

Section 12.       Additional Contributions ............................................................4

Section 13.       Allocation of Profits and Losses ....................................................4

Section 14.       Distributions .......................................................................4

Section 15.       Books and Records ...................................................................5

Section 16.       Tax Classification...................................................................5

Section 17.       Other Business ......................................................................5

Section 18.       Exculpation and Indemnification. ....................................................5

Section 19.       Registration and Transfers. .........................................................7

Section 20.       Resignation..........................................................................7

Section 21.       Admission of Additional Members .....................................................8

Section 22.       Dissolution, Winding-Up and Termination; Continuation. ..............................8

Section 23.       Nature of Interest...................................................................9

Section 24.       Benefits of Agreement; No Third-Party Rights ........................................9

Section 25.       Severability of Provisions ..........................................................9

Section 26.       Entire Agreement ....................................................................9

Section 27.       Governing Law........................................................................9

Section 28.       Amendments ..........................................................................9

Section 29.       Counterparts ........................................................................10

Section 30.       Notices .............................................................................10

Section 31.       Binding Agreement ...................................................................10

SCHEDULE A – Definitions

SCHEDULE B – Members and Member Interest

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOA IP GP, LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025, is entered into by HOA RoyaltyCo LLC, a Delaware limited liability company, as the sole member of the Company (together with each other Person admitted as a member of the Company in accordance with Section 21 of this Agreement, each, a "Member" and collectively, the "Members"). Capitalized terms used herein and not otherwise defined have the meanings set forth on Schedule A hereto.

## W I T N E S S E T H:

WHEREAS, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on June 4, 2014 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation");

WHEREAS, this agreement confirms the agreement among the parties concerning the Company's business and internal affairs, and concerning the rights and duties of the parties.

WHEREAS, the Member previously entered into the Limited Liability Company Agreement of the Company, dated as of August 8, 2014, as amended August 19, 2021 (the "Existing LLC Agreement"), as the sole member of the Company;

WHEREAS, on October 30, 2025, Hooters of America, LLC and certain of its affiliates filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan");

WHEREAS, in connection with the Plan and pursuant to Section 30 of the Existing LLC Agreement, the Member desires to amend and restate the Existing LLC Agreement in its entirety in the manner set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, (i) confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, this Agreement and the Act and (ii) amend and restate in its entirety the Existing LLC Agreement pursuant to Section 30 of the Existing LLC Agreement as follows:

Section 1.    Organization and Name. The Company was previously organized as a limited liability company pursuant to Section 18-201 of the Act by the filing of the Certificate of Formation. The name of the limited liability company as previously organized and continued hereby is "HOA IP GP, LLC".

Section 2.    <u>Principal Business Office</u>. The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

Section 3.    <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 4.    <u>Registered Agent</u>. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 5.    <u>Members and Membership Interests</u>.

(a)    <u>Member Address</u>. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| HOA RoyaltyCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 |

(b)    <u>Member Interests</u>.

(i)    Member interests shall be limited liability company interests (within the meaning of the Act) in the Company with all the rights, privileges and responsibilities of limited liability interests (within the meaning of the Act) in the Company.

(ii)    (ii)    Member interests in the Company are not required to be represented by certificates.

Section 6.    <u>Certificate of Formation; Existence</u>.

(a)    <u>Certificate of Formation</u>. Express authorization was given to Deborah M. Reusch for the exclusive purpose of executing the Certificate of Formation of the Company which has been filed in the Office of the Secretary of State of the State of Delaware. The filing of the Certificate of Formation with the Secretary of State of the State of Delaware on June 4, 2014 by Deborah M. Reusch as "authorized person" is hereby ratified and approved in all respects. Each Member and each officer, is hereby authorized to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business or obtain any licenses necessary or advisable in any other jurisdiction in which the Company may wish to conduct business and all such filings made prior to the date hereof are hereby ratified.

(b)    <u>Existence</u>. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.    <u>Limited Purposes</u>.

(a)    <u>Purposes</u>. The Company has been formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful activity for which Delaware limited liability companies may be organized, and engaging in any and all activities necessary or incidental to the foregoing.

(b)    <u>Execution of Related Documents</u>. The Company is hereby authorized to execute, deliver and perform, by or through any Member or officer or other authorized Persons acting on behalf of the Company, and each is hereby authorized to execute and deliver, (i) the limited partnership agreement, or amendments or restatements thereof, of HOA IP Holder in connection with the implementation of the Plan, the Related Documents and its execution, delivery and performance of the Related Documents, (ii) the Related Documents to which the Company is a party, and (iii) all documents, agreements, certificates, financing statements or instruments contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Members or officer or other authorized Persons to enter into other agreements or documents on behalf of the Company, each to the extent consistent with and related or incidental to, or necessary, convenient or advisable for, the accomplishment of the permitted purposes set forth in clause (a) above.

Section 8.    <u>Powers</u>. The Company (i) shall have all of the powers and rights conferred upon limited liability companies formed pursuant to the Act necessary, convenient or incidental to, or for the furtherance of, the purposes of the Company set forth in <u>Section 7</u> (including, without limitation, to bind the Company) and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.    <u>Management</u>.

(a)    <u>Authority; Powers and Duties of the Member</u>. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a "manager" under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)    <u>Election of Officers; Delegation of Authority</u>. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of

any Officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

(c)    <u>Actions Absent a Meeting</u>. Any action requiring the vote of the Member may be taken without a meeting a consent in writing, setting forth the action to be taken, is signed by the Member.

(d)    <u>Compensation of the Member</u>. The Company shall reimburse the Member for all ordinary, necessary and direct expenses incurred by the Member on behalf of the Company in carrying out the Company's business activities. All reimbursements for expenses shall be reasonable in amount (and may include flight, hotel and other travel expenses consistent with the travel policies of the Member).

(e)    <u>Fiduciary Duties of Member</u>. The Member (acting in its capacity as the manager of the Company) shall have a fiduciary duty of loyalty and care identical to that of directors and officers of business corporations organized under the General Corporation Law of the State of Delaware, as amended.

Section 10.    <u>Limited Liability</u>. Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or manager of the Company.

Section 11.    <u>Capital Contributions</u>. The Member has made capital contributions to the Company as listed on <u>Schedule B</u> attached hereto.

Section 12.    <u>Additional Contributions</u>. No Member is required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time at its sole discretion. <u>Schedule B</u> of this Agreement shall be revised from time to time to the extent that a Member makes an additional capital contribution to the Company. The provisions of this Agreement, including this <u>Section 12</u>, are intended to benefit the Members and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 13.    <u>Allocation of Profits and Losses</u>. The Company's profits and losses shall be allocated to the Member.

Section 14.    <u>Distributions</u>. Distributions shall be made, from time to time, to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of their interests in the Company if such distribution would violate the Act (including Section 18- 607 of the Act) or any other applicable law or any Related Document.

Section 15.    <u>Books and Records</u>. The Company shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.

Section 16.    <u>Tax Classification</u>. The Member intends that the Company be treated for United States federal tax purposes as a disregarded entity pursuant to United States Treasury Regulations § 301.7701-2(c)(2), and neither the Company nor the Member shall take any action or position for any purpose that is inconsistent with such intent.

Section 17.    <u>Other Business</u>. Notwithstanding any duty otherwise existing at law or in equity, the Member or any of its Affiliates that control the Member, may engage in or possess an interest in other business ventures of any kind and description, independently or with others, including any business venture that may compete with the business of the Company, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement. To the fullest extent permitted by law, if the Member acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company the Member shall not have any duty hereunder to communicate or offer such opportunity to the Company; provided, however, that if the Member is a party to one or more other agreements that impose such duties, this <u>Section 17</u> shall not relieve the Member of its obligations thereunder. No amendment or repeal of this <u>Section 17</u> shall apply to or have any effect on the liability or alleged liability of the Member for or with respect to any opportunities of which the Member becomes aware prior to such amendment or repeal.

Section 18.    <u>Exculpation and Indemnification</u>.

(a)    <u>General</u>.

(i)    To the fullest extent permitted by law, none of the Members, officers, employees, representatives, advisors or agents of the Company, nor any member, shareholder, partner, manager, director, officer, employee, representative, agent or Affiliate of any such Person (each a "<u>Indemnified Person</u>" and collectively, the "<u>Indemnified Persons</u>") shall be liable to the Company or any other Person that is a party to, or is otherwise bound by, this Agreement for any Damages incurred by reason of any act or omission performed or omitted by such Indemnified Person in good faith arising out of or in connection with the management or conduct of the business and affairs of the Company in a manner reasonably believed to be within the scope of authority conferred on such Indemnified Person, except that an Indemnified Person shall be liable for any such Damages to the extent that any of the foregoing is determined, by a final, nonappealable order of a court of competent jurisdiction, to have been primarily caused by the gross negligence, willful misconduct, or bad faith of such Indemnified Person claiming exculpation or the willful violations of the express provisions hereof by such Indemnified Person.

(ii)    To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless each Indemnified Person for any liability, loss, damage or claim incurred by such Indemnified Person, including attorney's fees and costs and any amounts expended in the settlement of any such claims of liability, loss, damage or claim by reason of any act or omission performed or omitted by such Indemnified Person in good faith in connection with the business of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Indemnified Person by this Agreement, except that no Indemnified

Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Indemnified Person by reason of such Indemnified Person's bad faith, gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this <u>Section 18</u> by the Company shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof. The Company may pay for insurance covering its liability to the Indemnified Persons.

(iii)   To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by an Indemnified Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that the Indemnified Person is not entitled to be indemnified as authorized in this <u>Section 18</u>.

(iv)   An Indemnified Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(v)   Each Person bound by this Agreement shall agree, on account of any indemnification or other payment owing to such Indemnified Person by the Company under this <u>Section 18</u>, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or Governmental Authority for the purpose of commencing or sustaining an involuntary case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or, to the fullest extent permitted by law, ordering the winding up or liquidation of the affairs of the Company.

(vi)   To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Person, such Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Indemnified Person, except that such Indemnified Person shall not be exculpated from any such liability incurred by reason of such Indemnified Person's gross negligence, bad faith or willful misconduct. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Indemnified Person to the Company or its members otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnified Person.

(b)   <u>Survival</u>. The foregoing provisions of this <u>Section 18</u> shall survive the resignation, removal or termination of any Indemnified Person hereunder or any termination of this Agreement.

Section 19.    <u>Registration and Transfers</u>.

(a)    <u>General</u>. The Member may sell, assign, pledge, hypothecate or otherwise transfer, in whole or in part, its interest in the Company, or take or omit to take any action, filing, election, or other action that could result in a deemed sale, assignment, encumbrance, transfer, or other disposition, except, such actions may be taken or omitted only if and to the extent not restricted or prohibited by the Related Documents. Any sale or pledge of interests shall be evidenced by an Indorsement (as defined in Section 8-102 of the UCC), if required pursuant to the Related Documents, thereof by the Member in favor of the buyer or pledgee.

(b)    <u>Assignment</u>. A Member may sell all or a portion of its limited liability company interest in the Company to another Person and such other Person shall be admitted to the Company as a Member of the Company, if and only if such transferee (i) executes an instrument signifying its agreement to be bound by the terms and conditions of this Agreement in form and substance satisfactory to the Company (which instrument may be a counterpart signature page to this Agreement) and (ii) delivers to the Company an opinion of counsel satisfactory to the Company that no registration under the Securities Act or registration or qualification under the securities laws of any state shall be required and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in compliance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution. Notwithstanding the foregoing, no assignment of a Member's limited liability company interest or any portion thereof shall be permitted if such assignment would result in any assets of the Company being deemed to constitute "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in accordance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

(c)    <u>Pledge</u>. If a Member pledges all or a portion of its limited liability company interest in the Company pursuant to this <u>Section 19(c)</u>, the pledgee (or any assignee of the pledgee) shall not be admitted to the Company as a Member of the Company unless such pledgee exercises the rights of a secured creditor in accordance with (i) the relevant documents governing the applicable secured obligations and (ii) applicable law (the exercise of such rights pursuant to clauses (i) and (ii) of this subsection (c), "<u>Foreclosure</u>"). Following a Foreclosure, such pledgee or a transferee of such pledgee, upon satisfaction of the requirements of clauses (i) and (ii) of subsection (b) of this <u>Section 19</u>, shall be admitted to the Company as a Member of the Company of the same class and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

Section 20.    <u>Resignation</u>. Members may resign only upon satisfaction of the conditions and restrictions, if any, specified in the Related Documents (including, without limitation, the Rating Agency Condition (as defined in the Indenture)) or pursuant to a transfer otherwise permitted by this Agreement. If a Member is permitted to resign pursuant to this <u>Section 20</u>, an

additional Person shall be admitted as a Member to the Company, subject to Section 21, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a Member of the Company.

Section 21.    Admission of Additional Members. One or more additional Members of the Company may be admitted to the Company with the written consent of the Member (or the personal representative of the Member when such Member is no longer a member of the Company) and upon satisfaction of the conditions and restrictions, if any, specified in the Related Documents. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members.  Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

Section 22.    Dissolution, Winding-Up and Termination; Continuation.

(a)    Dissolution.

(i)    The Company shall be dissolved, and its affairs shall be wound up, upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership in the Company of the last remaining member of the Company, unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act, (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act or (iii) the election in writing of the Member Parent and the manager of Member Parent. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a member of the Company or that causes the last remaining member of the Company to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon the resignation of the Member and the admission of an additional Member of the Company pursuant to Section 20 and Section 21), to the fullest extent permitted by law, the personal representative (as such term is defined in the Act) of such member is hereby authorized and directed, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, to agree in writing (i) to continue the Company and (ii) to its admission, or the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company effective as of the occurrence of the event that terminated the continued membership of, such member in the Company.

(ii)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(iii)    Notwithstanding any other provision of this Agreement, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member, or the occurrence of an event that causes the Member to cease to be a member of the Company.

(b)     Continuation. Notwithstanding any other provision of this Agreement, (i) the Bankruptcy of a Member shall not cause such Member to cease to be a Member of the Company and (ii) the withdrawal of any Member shall not, in and of itself, constitute a dissolution of the Company; and upon the occurrence of either event set forth in the foregoing clause (i) or (ii), the business of the Company shall continue without dissolution. Notwithstanding any other provision of this Agreement and in furtherance of the foregoing, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of an event that causes any Member to cease to be a member of the Company.

(c)     Winding-Up. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)     Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 23.     Nature of Interest. No Member shall have any interest in any specific assets of the Company. Each Member interest in the Company is personal property of the Member holding such Member interest.

Section 24.     Benefits of Agreement; No Third-Party Rights. Except as contemplated by the Related Documents, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than Indemnified Persons) or by any creditor of any Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Indemnified Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Indemnified Persons and except as contemplated by the Related Documents).

Section 25.     Severability of Provisions. Each provision of this Agreement shall be considered severable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of, or affect, those portions of this Agreement that are valid, enforceable and legal.

Section 26.     Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 27.     Governing Law. This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict or choice of law principles that would cause the application of the internal laws of any other jurisdiction), and all rights and remedies shall be governed by said laws.

Section 28.     Amendments. This Agreement may be modified, altered, supplemented or amended only pursuant to a written agreement executed and delivered by each of the Members and, upon satisfaction of any condition or restriction specified in the Related Documents.

Section 29.   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means of transmission), each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 30.   <u>Notices</u>. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of a Member, to such Member at its address as listed on <u>Schedule B</u> attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 31.   <u>Binding Agreement</u>. Notwithstanding any other provision of this Agreement, each Member agrees that this Agreement, including, <u>Sections Section 7</u>, <u>Section 8</u>, <u>Section 9</u>, <u>Section 18</u>, <u>Section 19</u>, <u>Section 20</u>, <u>Section 21</u>, <u>Section 22</u>, <u>Section 24</u>, <u>Section 28</u> and <u>Section 31</u>, constitutes a legal, valid and binding agreement of such Member, and is enforceable against such Member in accordance with its terms.

[*Remainder of this page intentionally left blank*]

## SCHEDULE A

### Definitions

A.  <u>Definitions</u>. When used in this Agreement, the following terms shall have the following meanings:

"<u>Act</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership of beneficial interests or by contract or otherwise.

"<u>Agreement</u>" means this Second Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules and exhibits attached hereto, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"<u>Bankruptcy</u>" means (a) an Event of Bankruptcy as defined in the Indenture, and (b) to the extent not inconsistent with, or modified by, such definition in the Indenture, means, with respect to any Person, if (i) such Person makes an assignment for the benefit of creditors, (ii) such Person files a voluntary petition in bankruptcy, (iii) such Person is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) such Person files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, or similar relief under any statute, law or regulation, (v) such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) such Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. With respect to the Member(s), the foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101 (1) and 18-304 of the Act.

"<u>Brand Management Agreement</u>" has the meaning set forth in the Indenture.

"<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on June 4, 2014, as the same may be amended, supplemented or otherwise modified from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the preamble.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Damages" means for any expenses, claims, damages, liabilities and losses (including, without limitation, judgments, interest on judgments, fines, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or any appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission), whether pending or merely threatened, whether or not such indemnifying or exculpated Person, as applicable, is or may be a party thereto, including interest on any of the foregoing.

"Founders License Agreements" has the meaning set forth in the Indenture.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"HOA IP Holder" means HI Limited Partnership, a Florida limited partnership, or any successor thereto.

"Indemnified Persons" has the meaning set forth in Section 18(a).

"Indenture" means the Second Amended and Restated Base Indenture, by and among the Master Issuer and the Indenture Trustee, dated as of October 31, 2025, including, with respect to any Series of Notes, the related Series Supplement, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Indenture Trustee" means "Trustee" under the Indenture, not in its individual capacity, but solely in its capacity as indenture trustee under the Indenture, its successors in interest and any successor indenture trustee under the Indenture.

"IP License Agreement" has the meaning set forth in the Indenture.

"Limited Partnership Agreement of HOA IP Holder" means the Fourth Amended and Restated Limited Partnership Agreement of HI Limited Partnership, dated as of the date hereof between the Company, as general partner, and HOA Funding, LLC, as limited partner, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

2

"Master Issuer" means HOA RoyaltyCo LLC, a Delaware limited liability company, or any successor thereto.

"Member" has the meaning set forth in the preamble to this Agreement.

"Member Parent" means HOA NewCo LLC, a Delaware limited liability company, or any successor thereto.

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Related Documents" has the meaning specified in the Indenture in addition to the Transition Service Agreement, the Brand Management Agreement, the Retained Restaurants License Agreement, the Founders License Agreements, the Plan, and all agreements relating to any of the foregoing, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Retained Restaurants License Agreement" has the meaning specified in the Indenture.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Series" or "Series of Notes" means any series of notes issued pursuant to the Indenture and the related Series Indenture Supplement.

"Series Indenture Supplement" means, with respect to any Series of Notes outstanding, the supplement to the Indenture executed and delivered in connection with the issuance of such Series of Notes, as amended, restated or otherwise modified.

"Transition Services Agreement" has the meaning specified in the Plan.

B.     Rules of Construction. Unless the context otherwise clearly requires in this Agreement: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;" (d) the word "will" shall be construed to have the same meaning and effect as the word "shall;" (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein); (f) any reference to any law shall include all statutory and regulatory rules, regulations and other provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; (g) any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; (h) all references in this instrument to designated "Articles," "Sections," "subsections," "clauses" and other subdivisions are to the designated Articles,

Sections, subsections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision; (i) all accounting terms not otherwise defined herein shall be construed in accordance with generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors and successors from time to time; (j) "day" shall mean a calendar day and (k) terms defined in the Uniform Commercial Code and not otherwise defined in this Agreement shall have the meanings assigned to such terms under the Uniform Commercial Code of the applicable jurisdiction.

**SCHEDULE B**

**Members and Membership Interests**

<u>Member</u>

| <u>Name</u> | <u>Mailing Address</u> | Membership <u>Interest</u> |
|---|---|---|
| HOA RoyaltyCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 | 100% |

**<u>EXHIBIT C.9</u>**

**Third Amended and Restated
Limited Liability Company Agreement of
HOA Systems, LLC**

*Execution Version*

**THIRD AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HOA SYSTEMS, LLC**

**Dated as of**
**October 31, 2025**

# TABLE OF CONTENTS

Section 1.        Organization and Name.................................................................................1

Section 2.        Principal Business Office..............................................................................2

Section 3.        Registered Office.........................................................................................2

Section 4.        Registered Agent.........................................................................................2

Section 5.        Members and Membership Interests.............................................................2

Section 6.        Certificate of Formation; Existence.............................................................2

Section 7.        Limited Purposes.........................................................................................2

Section 8.        [RESERVED]...............................................................................................3

Section 9.        Separate Identity; Limited Liability.............................................................4

Section 10.       Powers..........................................................................................................4

Section 11.       Management..................................................................................................4

Section 12.       Limited Liability..........................................................................................5

Section 13.       Capital Contributions...................................................................................5

Section 14.       Additional Contributions.............................................................................5

Section 15.       Allocation of Profits and Losses.................................................................5

Section 16.       Distributions................................................................................................5

Section 17.       Books and Records.......................................................................................5

Section 18.       Tax Classification........................................................................................5

Section 19.       Other Business.............................................................................................5

Section 20.       Exculpation and Indemnification.................................................................6

Section 21.       Registration and Transfers...........................................................................7

Section 22.       Resignation..................................................................................................8

Section 23.       Admission of Additional Members..............................................................8

Section 24.       Dissolution, Winding-Up and Termination; Continuation...........................9

Section 25.       Nature of Interest.......................................................................................10

Section 26.       Benefits of Agreement; No Third-Party Rights.........................................10

Section 27.       Severability of Provisions..........................................................................10

Section 28.       Entire Agreement......................................................................................10

Section 29.       Governing Law..........................................................................................10

Section 30.       Amendments..............................................................................................10

Section 31.       Counterparts..............................................................................................10

Section 32.       Notices.......................................................................................................10

Section 33.       Binding Agreement....................................................................................11

SCHEDULE A – Definitions

SCHEDULE B – Members and Member Interest

This THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules and exhibits attached hereto, and as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") of HOA Systems, LLC, a Delaware limited liability company (the "Company"), dated as of October 31, 2025, is entered into by HOA RoyaltyCo LLC, a Delaware limited liability company, as the sole member of the Company (together with each other Person admitted as a member of the Company in accordance with Section 23 of this Agreement, each, a "Member" and collectively, the "Members"). Capitalized terms used herein and not otherwise defined have the meanings set forth on Schedule A hereto.

## W I T N E S S E T H:

WHEREAS, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), on April 28, 2014 by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation");

WHEREAS, this agreement confirms the agreement among the parties concerning the Company's business and internal affairs, and concerning the rights and duties of the parties.

WHEREAS, the Member previously entered into the Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of August 19, 2021 (the "Existing LLC Agreement"), as the sole member of the Company;

WHEREAS, on October 30, 2025, Hooters of America, LLC and certain of its affiliates filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan"); and

WHEREAS, in connection with the Plan and pursuant to Section 30 of the Existing LLC Agreement, the Member desires to amend and restate the Existing LLC Agreement in its entirety in the manner set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby, by the execution and delivery of this Agreement, (i) confirm the establishment and continuation of the Company without dissolution as a limited liability company pursuant to and in accordance with the Certificate of Formation, this Agreement and the Act and (ii) amend and restate in its entirety the Existing LLC Agreement pursuant to Section 30 of the Existing LLC Agreement as follows:

Section 1.    Organization and Name. The Company was previously organized as a limited liability company pursuant to Section 18-201 of the Act by the filing of the Certificate of Formation. The name of the limited liability company as previously organized and continued hereby is "HOA Systems, LLC".

Section 2.　　Principal Business Office. The principal business office of the Company shall be located at c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 or such other location as may hereafter be determined by the Member(s).

Section 3.　　Registered Office. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 4.　　Registered Agent. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, 19801.

Section 5.　　Members and Membership Interests.

(a)　　Member Address. The Member owns 100% of the limited liability company interests in the Company. The name and mailing address of the Member are as follows.

| Name | Address |
|------|---------|
| HOA RoyaltyCo LLC | c/o DRIVETRAIN AGENCY SERVICES, LLC, 410 Park Ave, Suite 900, New York, NY 10022 |

(b)　　Member Interests.

(i)　　Member interests shall be limited liability company interests (within the meaning of the Act) in the Company with all the rights, privileges and responsibilities of limited liability interests (within the meaning of the Act) in the Company.

(ii)　　Member interests in the Company are not required to be represented by certificates.

Section 6.　　Certificate of Formation; Existence.

(a)　　Certificate of Formation. Express authorization was given to Deborah M. Reusch for the exclusive purpose of executing the Certificate of Formation of the Company which has been filed in the Office of the Secretary of State of the State of Delaware. The filing of the Certificate of Formation with the Secretary of State of the State of Delaware on April 28, 2014 by Deborah M. Reusch as "authorized person" is hereby ratified and approved in all respects. Each Member and each officer, is hereby authorized to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business or obtain any licenses necessary or advisable in any other jurisdiction in which the Company may wish to conduct business and all such filings made prior to the date hereof are hereby ratified.

(b)　　Existence. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.　　Limited Purposes.

(a)     Purposes. The purposes to be conducted or promoted by the Company shall be:

(i)     to engage in the activities described in Section 7(b);

(ii)     to make distributions from time to time to the Member as permitted under this Agreement;

(iii)     without limitation of Section 7(b), to enter into the Guarantee and Collateral Agreement (as defined in the Indenture), pursuant to which the Company will guarantee the Notes and any additional Series of Notes from time to time and grant the Indenture Trustee a Lien on the collateral specified in the Indenture and as may be further specified in the Series Indenture Supplements from time to time as security for the guaranteed obligations;

(iv)     without limitation of Section 7(b), to enter into and exercise its rights and perform its obligations under the Plan and the Related Documents and all agreements relating to or in furtherance of the Plan and the Related Documents to which it or its subsidiaries are party;

(v)     without limitation of Section 7(b), (A) to otherwise enter into, perform its obligations under and take any action required or permitted by, the other Related Documents and all documents, agreements, certificates, financing statements or instruments contemplated thereby or related thereto and to exercise any rights given to it under any Related Document and such other documents, agreements, certificates, financing statements and instruments and (B) to pay any and all fees, costs and expenses in connection therewith; and

(vi)     (A) to enter into all such other documents, agreements, certificates, financing statements and instruments, and to engage in and perform any lawful act or activity and to exercise any powers not prohibited by the Related Documents permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to, and necessary, convenient or advisable for, the accomplishment of the above mentioned purposes and (B) to pay any and all fees, costs and expenses in connection therewith.

(b)     Execution of Related Documents. The Company is hereby authorized to execute, deliver and perform, by or through the Member or officer or other authorized Persons acting on behalf of the Company, and each is hereby authorized to execute and deliver, (i) the Related Documents to which the Company is a party, and (ii) all documents, agreements, certificates, financing statements or instruments contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Members or officer or other authorized Persons to enter into other agreements or documents on behalf of the Company, each to the extent consistent with and related or incidental to, or necessary, convenient or advisable for, the accomplishment of the permitted purposes set forth in clause (a) above.

Section 8.     [RESERVED].

Section 9.    <u>Separate Identity; Limited Liability</u>. The failure of the Company, or any Person on behalf of the Company, to comply with the foregoing covenants or any other covenants set forth herein, shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

Section 10.    <u>Powers</u>. The Company (i) shall have all of the powers and rights conferred upon limited liability companies formed pursuant to the Act necessary, convenient or incidental to, or for the furtherance of, the purposes of the Company set forth in <u>Section 7</u> (including, without limitation, to bind the Company) and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 11.    <u>Management</u>.

(a)    <u>Authority; Powers and Duties of the Member</u>. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a "manager" under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)    <u>Election of Officers; Delegation of Authority</u>. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member, which removal may occur at any time with or without cause. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

(c)    <u>Actions Absent a Meeting</u>. Any action requiring the vote of the Member may be taken without a meeting a consent in writing, setting forth the action to be taken, is signed by the Member.

(d)    <u>Compensation of the Member</u>. The Company shall reimburse the Member for all ordinary, necessary and direct expenses incurred by the Member on behalf of the Company in carrying out the Company's business activities. All reimbursements for expenses shall be reasonable in amount (and may include flight, hotel and other travel expenses consistent with the travel policies of the Member).

(e)    <u>Fiduciary Duties of Member</u>. The Member (acting in its capacity as the manager of the Company) shall have a fiduciary duty of loyalty and care identical to that of

-4-

directors and officers of business corporations organized under the General Corporation Law of the State of Delaware, as amended.

Section 12.    Limited Liability. Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or manager of the Company.

Section 13.    Capital Contributions. The Member has made capital contributions in kind as described in the recitals to this Agreement.

Section 14.    Additional Contributions. The Member shall not be required to make any additional capital contribution to the Company. However, the Member may, in its sole discretion, make additional capital contributions to the Company at any time. The provisions of this Agreement, including this Section 14, are intended to benefit the Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 15.    Allocation of Profits and Losses. The Company's profits and losses shall be allocated to the Member.

Section 16.    Distributions. Distributions shall be made, from time to time, to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of their interests in the Company if such distribution would violate the Act (including Section 18- 607 of the Act) or any other applicable law or any Related Document.

Section 17.    Books and Records. The Company shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.

Section 18.    Tax Classification. The Member intends that the Company be treated for United States federal tax purposes as a disregarded entity pursuant to United States Treasury Regulations § 301.7701-2(c)(2), and neither the Company nor the Member shall take any action or position for any purpose that is inconsistent with such intent.

Section 19.    Other Business. Notwithstanding any duty otherwise existing at law or in equity, the Member or any of its Affiliates that control the Member, may engage in or possess an interest in other business ventures of any kind and description, independently or with others, including any business venture that may compete with the business of the Company, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement. To the fullest extent permitted by law, if the Member acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company, the Member shall not have any duty hereunder to communicate

or offer such opportunity to the Company; provided, however, that if the Member is a party to one or more other agreements that impose such duties, this <u>Section 19</u> shall not relieve the Member of its obligations thereunder. No amendment or repeal of this <u>Section 19</u> shall apply to or have any effect on the liability or alleged liability of the Member for or with respect to any opportunities of which the Member becomes aware prior to such amendment or repeal.

Section 20.   <u>Exculpation and Indemnification</u>.

(a)   <u>General</u>.

(i)   To the fullest extent permitted by law, none of the Member, officers, employees, representatives, advisors or agents of the Company, nor any member, shareholder, partner, manager, director, officer, employee, representative, agent or Affiliate of any such Person (each a "<u>Indemnified Person</u>" and collectively, the "<u>Indemnified Persons</u>") shall be liable to the Company or any other Person that is a party to, or is otherwise bound by, this Agreement for any Damages incurred by reason of any act or omission performed or omitted by such Indemnified Person in good faith arising out of or in connection with the management or conduct of the business and affairs of the Company in a manner reasonably believed to be within the scope of authority conferred on such Indemnified Person, except that an Indemnified Person shall be liable for any such Damages to the extent that any of the foregoing is determined, by a final, nonappealable order of a court of competent jurisdiction, to have been primarily caused by the gross negligence, willful misconduct, or bad faith of such Indemnified Person claiming exculpation or the willful violations of the express provisions hereof by such Indemnified Person.

(ii)   To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless each Indemnified Person for any liability, loss, damage or claim incurred by such Indemnified Person, including attorney's fees and costs and any amounts expended in the settlement of any such claims of liability, loss, damage or claim by reason of any act or omission performed or omitted by such Indemnified Person in good faith in connection with the business of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Indemnified Person by this Agreement, except that no Indemnified Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Indemnified Person by reason of such Indemnified Person's bad faith, gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this <u>Section 20</u> by the Company shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof. The Company may pay for insurance covering its liability to the Indemnified Persons.

(iii)   To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by an Indemnified Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that the Indemnified Person is not entitled to be indemnified as authorized in this <u>Section 20</u>.

(iv)     An Indemnified Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(v)     Each Person bound by this Agreement shall agree, on account of any indemnification or other payment owing to such Indemnified Person by the Company under this Section 20, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or Governmental Authority for the purpose of commencing or sustaining an involuntary case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or, to the fullest extent permitted by law, ordering the winding up or liquidation of the affairs of the Company.

(vi)     To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Person, such Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Indemnified Person, except that such Indemnified Person shall not be exculpated from any such liability incurred by reason of such Indemnified Person's gross negligence, bad faith or willful misconduct. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Indemnified Person to the Company or its members otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnified Person.

(b)     Survival. The foregoing provisions of this Section 20 shall survive the resignation, removal or termination of any Indemnified Person hereunder or any termination of this Agreement.

Section 21.     Registration and Transfers.

(a)     General. The Member may sell, assign, pledge, hypothecate or otherwise transfer, in whole or in part, its Member interest in the Company, or take or omit to take any action, filing, election, or other action that could result in a deemed sale, assignment, encumbrance, transfer, or other Disposition, except, such actions may be taken or omitted only if and to the extent not restricted or prohibited by the Related Documents. Any sale or pledge of Member interests shall be evidenced by an Indorsement (as defined in Section 8-102 of the UCC), if required pursuant to the Related Documents, thereof by the Member in favor of the buyer or pledgee.

(b)     Assignment. The Member may sell all or a portion of its limited liability company interest in the Company to another Person and such other Person shall be admitted to the Company as a Member of the Company, if and only if such transferee (i) executes an instrument signifying its agreement to be bound by the terms and conditions of this Agreement in form and

substance satisfactory to the Company (which instrument may be a counterpart signature page to this Agreement) and (ii) delivers to the Company an opinion of counsel satisfactory to the Company that no registration under the Securities Act or registration or qualification under the securities laws of any state shall be required and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in compliance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution. Notwithstanding the foregoing, no assignment of the Member's limited liability company interest or any portion thereof shall be permitted if such assignment would result in any assets of the Company being deemed to constitute "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in accordance with the Related Documents shall, without further act, be a Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

(c)     Pledge. If a Member pledges all or a portion of its limited liability company interest in the Company pursuant to this Section 21(c), the pledgee (or any assignee of the pledgee) shall not be admitted to the Company as a Member of the Company unless such pledgee exercises the rights of a secured creditor in accordance with (i) the relevant documents governing the applicable secured obligations and (ii) applicable law (the exercise of such rights pursuant to clauses (i) and (ii) of this subsection (c), "Foreclosure"). Following a Foreclosure, such pledgee or a transferee of such pledgee, upon satisfaction of the requirements of clauses (i) and (ii) of subsection (b) of this Section 21, shall be admitted to the Company as a Member of the Company of the same class and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

Section 22.     Resignation. Members may resign only upon satisfaction of the conditions and restrictions, if any, specified in the Related Documents (including, without limitation, the Rating Agency Condition (as defined in the Indenture)) or pursuant to a transfer otherwise permitted by this Agreement. If a Member is permitted to resign pursuant to this Section 22, an additional Person shall be admitted as a Member to the Company, subject to Section 23, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a Member of the Company.

Section 23.     Admission of Additional Members. One or more additional Members of the Company may be admitted to the Company with the consent of the Members (or the personal representative of the last remaining Member when such Member is no longer a member of the Company) and upon satisfaction of the conditions and restrictions, if any, specified in the Related Documents. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members.  Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

Section 24.    <u>Dissolution, Winding-Up and Termination; Continuation</u>.

(a)    <u>Dissolution</u>.

(i)    The Company shall be dissolved, and its affairs shall be wound up, upon the first to occur of the following: (i) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership in the Company of the last remaining Member of the Company, unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act, (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act or (iii) the election in writing of NewCo and the manager of NewCo. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company or that causes the last remaining Member of the Company to cease to be a Member of the Company (other than upon continuation of the Company without dissolution upon the resignation of the Member and the admission of an additional Member of the Company pursuant to <u>Section 22</u> and <u>Section 23</u>), to the fullest extent permitted by law, the personal representative (as such term is defined in the Act) of such Member is hereby authorized and directed, within 90 (i) days after the occurrence of the event that terminated the continued membership of such Member in the Company, to agree in writing (i) to continue the Company and (ii) to its admission, or the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company effective as of the occurrence of the event that terminated the continued membership of, such Member in the Company.

(ii)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a Member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(iii)    Notwithstanding any other provision of this Agreement, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member, or the occurrence of an event that causes the Member to cease to be a Member of the Company.

(b)    <u>Continuation</u>. Notwithstanding any other provision of this Agreement, (i) the Bankruptcy of a Member shall not cause such Member to cease to be a Member of the Company and (ii) the withdrawal of any Member shall not, in and of itself, constitute a dissolution of the Company; and upon the occurrence of either event set forth in the foregoing clause (i) or (ii), the business of the Company shall continue without dissolution. Notwithstanding any other provision of this Agreement and in furtherance of the foregoing, each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of an event that causes any Member to cease to be a Member of the Company.

(c)    <u>Winding-Up</u>. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    <u>Termination</u>. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 25.    <u>Nature of Interest</u>. No Member shall have any interest in any specific assets of the Company. Each Member interest in the Company is personal property of the Member holding such Member interest.

Section 26.    <u>Benefits of Agreement; No Third-Party Rights</u>. Except as contemplated by the Related Documents, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than Indemnified Persons) or by any creditor of any Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Indemnified Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Indemnified Persons and except as contemplated by the Related Documents).

Section 27.    <u>Severability of Provisions</u>. Each provision of this Agreement shall be considered severable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of, or affect, those portions of this Agreement that are valid, enforceable and legal.

Section 28.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 29.    <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict or choice of law principles that would cause the application of the internal laws of any other jurisdiction), and all rights and remedies shall be governed by said laws.

Section 30.    <u>Amendments</u>. This Agreement may be modified, altered, supplemented or amended only pursuant to a written agreement executed and delivered by the Member.

Section 31.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means of transmission), each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 32.    <u>Notices</u>. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of a Member, to such Member at its address as provided to the Company by written notice in accordance with this <u>Section 32</u> and (c) in the case of either of the foregoing, at such other address as may be designated by written notice in accordance with this <u>Section 32</u> to the other party.

Section 33.    <u>Binding Agreement</u>. Notwithstanding any other provision of this Agreement, each Member agrees that this Agreement, including, <u>Sections Section 7</u>, <u>Section 10</u>, <u>Section 11</u>, <u>Section 20</u>, <u>Section 21</u>, <u>Section 22</u>, <u>Section 23</u>, <u>Section 24</u>, <u>Section 26</u>, <u>Section 30</u> and <u>Section 33</u>, constitutes a legal, valid and binding agreement of such Member, and is enforceable against such Member in accordance with its terms.

[*Remainder of this page intentionally left blank*]

# SCHEDULE A

## Definitions

A.    <u>Definitions</u>. When used in this Agreement, the following terms shall have the following meanings:

"<u>Act</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership of beneficial interests or by contract or otherwise.

"<u>Agreement</u>" means this Third Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules and exhibits attached hereto, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"<u>Bankruptcy</u>" means (a) an Event of Bankruptcy as defined in the Indenture, and (b) to the extent not inconsistent with, or modified by, such definition in the Indenture, means, with respect to any Person, if (i) such Person makes an assignment for the benefit of creditors, (ii) such Person files a voluntary petition in bankruptcy, (iii) such Person is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) such Person files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, or similar relief under any statute, law or regulation, (v) such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) such Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. With respect to the Member(s), the foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101 (1) and 18-304 of the Act.

"<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on June 4, 2014, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the preamble.

"Company Entities" means the Company and its direct and indirect subsidiaries.

"Damages" means for any expenses, claims, damages, liabilities and losses (including, without limitation, judgments, interest on judgments, fines, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or any appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission), whether pending or merely threatened, whether or not such indemnifying or exculpated Person, as applicable, is or may be a party thereto, including interest on any of the foregoing.

"Disposition" means the sale, transfer, out-license, lease or other disposition (including any sale and leaseback transaction, any issuance by any Company Entity of its equity interests other than to another Company Entity) of any asset, property or any economic interest by any Company Entity, including any sale, assignment, transfer, out-license or other disposal, with or without recourse, of any intellectual property assets or notes or accounts receivable or any rights and claims associated therewith, but excluding the following (collectively, the "Permitted Transfers"):

(i)      any disposition authorized by the Management Agreement or the IP License Agreement;

(ii)      the sale, lease, license, transfer or other disposition of inventory in the ordinary course of business;

(iii)      the sale, lease, license, transfer or other disposition in the ordinary course of business of surplus, obsolete or worn out property no longer used or useful in the conduct of the business of the Company Entities;

(iv)      any sale, lease, license, transfer or other disposition of property by one Company Entity to another Company Entity;

(v)      the abandonment or other disposition of assets that are not material or are no longer used or useful in any material respect to the business of any Company Entity;

(vi)      licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business and not interfering with the business of the Company Entities;

(vii)      any dispositions consisting of the sale, transfer, assignment or other disposition of unpaid and overdue accounts receivable in connection with the collection, compromise or settlement thereof in the ordinary course of business;

(viii)      any sale, lease, license or other disposition of property (other than intellectual property rights) in settlement of, or to make payment in satisfaction of, any property or casualty insurance;

(ix)    the sale or other disposition of cash in a manner not prohibited by this Agreement; and

(x)    sales, leases, licenses, transfers or other dispositions of property (other than intellectual property rights) to the extent that (A) such property is exchanged for credit against the purchase price of similar replacement or property, or (B) the proceeds of such sale, lease, license, transfer or other disposition are promptly applied to the purchase price of similar replacement property.

"Founders License Agreements" has the meaning set forth in the Indenture.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Indemnified Persons" has the meaning set forth in Section 20(a).

"Indenture" means the Second Amended and Restated Base Indenture, by and among the Master Issuer and the Indenture Trustee, dated as of October 31, 2025, including, with respect to any Series of Notes, the related Series Supplement, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"Indenture Trustee" means "Trustee" under the Indenture, not in its individual capacity, but solely in its capacity as indenture trustee under the Indenture, its successors in interest and any successor indenture trustee under the Indenture.

"IP License Agreement" means that certain License Agreement among the Company, HI Limited Partnership and the other parties thereto, dated as of the date hereof (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and this Agreement).

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property or other priority or preferential arrangement of any kind or nature whatsoever, in each case to secure payment of a debt or performance of an obligation, including any conditional sale or any sale with recourse.

"Management Agreement" means that certain Brand Management Agreement, dated as of October 31, 2025, by and among the Company, HI Limited Partnership, a Florida limited partnership ("HI Limited Partnership"), Hooters Brand Management LLC, a Florida limited liability company, HOOTS Franchising, LLC, a Delaware limited liability company, HOA Franchising, LLC, a Delaware limited liability company and HOA Future Franchising, LLC, a Delaware limited liability company.

"Master Issuer" means HOA Funding, LLC, a Delaware limited liability company, or any successor thereto.

"<u>Member</u>" has the meaning set forth in the preamble to this Agreement.

"<u>NewCo</u>" means HOA NewCo LLC, a Delaware limited liability company.

"<u>Note</u>" means any note issued by the Master Issuer pursuant to the Indenture.

"<u>Person</u>" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"<u>Related Documents</u>" has the meaning specified in the Indenture in addition to the Transition Service Agreement, the Management Agreement, the IP License Agreement, the Retained Restaurants License Agreement, the Founders License Agreements, the Plan, and all agreements relating to any of the foregoing, in each case as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"<u>Retained Restaurants License Agreement</u>" has the meaning specified in the Indenture.

"<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

"<u>Series</u>" or "<u>Series of Notes</u>" means any series of notes issued pursuant to the Indenture and the related Series Indenture Supplement.

"<u>Series Supplement</u>" has the meaning specified in the Indenture.

"<u>Series Indenture Supplement</u>" means, with respect to any Series of Notes outstanding, the supplement to the Indenture executed and delivered in connection with the issuance of such Series of Notes, as amended, restated or otherwise modified.

"<u>Transition Service Agreement</u>" means that certain Transition Services Agreement, dated as of October 31, 2025, by and between Hooter's Inc., a Florida corporation, the Hooters Designees set forth therein, Hoot Owl Restaurants, L.L.C., a Delaware limited liability company, the Hoot Owl Designees set forth therein, Hooters Brand Management LLC, a Florida limited liability company, Hawk Parent, LLC, a Delaware limited liability company, as debtor and debtor-in-possession, and each of the other parties thereto.

B.    <u>Rules of Construction</u>. Unless the context otherwise clearly requires in this Agreement: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;" (d) the word "will" shall be construed to have the same meaning and effect as the word "shall;" (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein); (f) any reference to any law shall include all statutory and regulatory rules, regulations and other provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall,

unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; (g) any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; (h) all references in this instrument to designated "Articles," "Sections," "subsections," "clauses" and other subdivisions are to the designated Articles, Sections, subsections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision; (i) all accounting terms not otherwise defined herein shall be construed in accordance with generally accepted accounting principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors and successors from time to time; (j) "day" shall mean a calendar day and (k) terms defined in the Uniform Commercial Code and not otherwise defined in this Agreement shall have the meanings assigned to such terms under the Uniform Commercial Code of the applicable jurisdiction.