# EXHIBIT J

**Brand Management Agreement**

**MANAGEMENT AGREEMENT**

**Dated as of October 31, 2025**

**by and among**

**HOA FRANCHISING, LLC,**
**HOOTS FRANCHISING, LLC,**
and
**HOA FUTURE FRANCHISING, LLC,**

**each as Franchisor,**

**HOA FRANCHISE HOLDCO LLC,**

**as Franchise HoldCo,**

**HOA SYSTEMS, LLC,**

**as Licensor,**

**HI LIMITED PARTNERSHIP**

**as Licensor and IP Owner,**

**and**

**HOOTERS BRAND MANAGEMENT LLC,**

**as the Manager.**

Article I Definitions ...................................................................................................2
    Section 1.1    Certain Definitions.................................................................2
    Section 1.2    Interpretation and Rules of Construction.................................13
    Section 1.3    Computation of Time Periods...............................................14

Article II Administration and Services of Manager.......................................................14
    Section 2.1    Management of Franchisors by Manager ................................14

Article III Royalties and Financial Oversight ..............................................................18
    Section 3.1    Royalties and Third-Party Service Provider ...........................18
    Section 3.2    Accounts..........................................................................20
    Section 3.3    Records and Right of Examination and Audit .........................21
    Section 3.4    Compensation and Expenses................................................22
    Section 3.5    Allocated Expense Dispute Resolution...................................24
    Section 3.6    Indemnification.................................................................24
    Section 3.7    Sub-Manager Responsibility................................................25

Article IV Statements and Reports .............................................................................25
    Section 4.1    Reporting by the Manager ..................................................25
    Section 4.2    Appointment of Independent Accountant ...............................26

Article V The Manager .............................................................................................26
    Section 5.1    Representations and Warranties Concerning the Manager ........26
    Section 5.2    Existence; Status as Manager..............................................28
    Section 5.3    Right to Receive Instructions...............................................28
    Section 5.4    Notice of Certain Events.....................................................28
    Section 5.5    Capitalization....................................................................29
    Section 5.6    No Competitive Business.....................................................29
    Section 5.7    Restrictions on Modifying Other Fees...................................29
    Section 5.1    Additional Responsibilities of the Manager ...........................29

Article VI Reserved .................................................................................................30

Article VII Reserved ................................................................................................30

Article VIII Termination Events ................................................................................30
    Section 8.1    Manager Termination Events...............................................30
    Section 8.2    IP Owner and Franchisor Termination Events.........................31
    Section 8.3    Manager's Transitional Role................................................32
    Section 8.4    Third-Party Intellectual Property .........................................33
    Section 8.5    Rights Cumulative.............................................................33

Article IX Confidentiality .........................................................................................34
    Section 9.1    Confidentiality ..................................................................34

Article X Miscellaneous Provisions.............................................................................35
    Section 10.1    Bankruptcy Remoteness.....................................................35
    Section 10.2    Survival...........................................................................35
    Section 10.3    Amendment......................................................................35
    Section 10.4    Governing Law; Dispute Resolution .....................................35
    Section 10.5    Notices............................................................................36
    Section 10.6    Severability of Provisions ...................................................37

Section 10.7    Delivery Dates ..........................................................................37
Section 10.8    Binding Effect; Assignment; Third-Party Beneficiaries...........................37
Section 10.9    Article and Section Headings................................................................37
Section 10.10  Counterparts.................................................................................37
Section 10.11  Entire Agreement ........................................................................37
Section 10.12  Limitation of Nature of Liability .............................................................37
Section 10.13  Waiver of Jury Trial; Jurisdiction; Consent to Service of Process ...........37
Section 10.14  Force Majeure .............................................................................38
Section 10.15  Cooperation Regarding Transfer of Debtor Assets...................................38
Section 10.16  Designated Representative........................................................................38

Exhibit A – List of Acquired Restaurants

Exhibit B – Trademarks

Exhibit C – Power of Attorney Form

Exhibit D – Approved Operating Agreements

Exhibit E – Bill of Sale

Schedule 1 – Segregated Accounts

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT, dated as of October 31, 2025 (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), is entered into by and among **HOA FRANCHISING, LLC**, a Delaware limited liability company, **HOOTS FRANCHISING, LLC**, a Delaware limited liability company and **HOA FUTURE FRANCHISING, LLC**, a Delaware limited liability company (each a "*Franchisor*" and collectively, the "*Franchisors*"), **HOA FRANCHISE HOLDCO LLC**, a Delaware limited liability company ("*Franchise HoldCo*"), **HI LIMITED PARTNERSHIP**, a Florida limited partnership (in one capacity as "**Licensor**" and in a separate capacity as "**IP Owner**"), **HOA SYSTEMS, LLC**, a Delaware limited liability company ("**HOA Systems**" or a "**Licensor**," and together with IP Owner in its capacity as a Licensor, the "**Licensors**"), and **HOOTERS BRAND MANAGEMENT LLC**, a Florida limited liability company (the "*Manager*").

## RECITALS

WHEREAS, Hooters of America, LLC and certain of its affiliates (collectively, the "*Debtors*") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*") on March 31, 2025, which initiated the chapter 11 cases jointly administered under lead case *In re Hooters of America, LLC*, Case No. 25-80078 (SWE);

WHEREAS, on October 30, 2025, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "*Plan*");

WHEREAS, pursuant to the Plan, the Debtors agreed to restructure their business, in part by selling the Acquired Restaurants to Hooter's Inc. or Hoot Owl Restaurants, L.L.C. or certain of their respective affiliates (together, the "*Buyer Group*") pursuant to the Buyer Group APAs (as defined in the Plan) and appointing an affiliate of the Buyer Group, Hooters Brand Management LLC, in its capacity as "Manager" hereunder, to perform the services set forth herein for and on behalf of the Franchisors and Licensors;

WHEREAS, the Plan also provided for the formation of Franchise HoldCo and the transfer of 100% of the equity interests in the Franchisors and certain Management Assets (as defined below) to Franchise HoldCo;

WHEREAS, the Franchisors and Licensors are parties to various existing Franchise Agreements, Development Agreements, and Third-Party License Agreements and are expected to enter into additional Franchise Agreements, Development Agreements, and Third-Party License Agreements in the future;

WHEREAS, IP Owner owns certain Intellectual Property and owns or has the exclusive right to use certain assets, including Trademarks, relating to the Brand, the Business, and the System;

WHEREAS, IP Owner, HOA Systems, and the Franchisors executed that certain *HOOTERS IP LICENSE AGREEMENT*, dated as of October 31, 2025 (the "*License Agreement*") pursuant to which IP Owner granted HOA Systems and the Franchisors an exclusive (except as to

1

IP Owner and Licensors in respect of Third-Party License Agreements), revocable (in accordance with the License Agreement), royalty-bearing (to the extent of the Royalties due and payable to IP Owner thereunder and hereunder), transferable (in accordance with the License Agreement), sub-licensable (in accordance with the License Agreement) license throughout the world during the Term (as such term is defined therein) and in exchange the Franchisors have agreed to perform certain activities to protect the Licensed IP;

WHEREAS, the Franchisors are managed by their sole Member, Franchise HoldCo, and Manager intends to provide the Services to Franchise HoldCo and the Franchisors at the direction of Franchise HoldCo;

WHEREAS, the Franchisors and Licensors desire to engage the Manager to provide the services set forth herein on their behalf, including performing the Franchisors' and Licensors' duties and obligations, as applicable, as (i) "licensees" under the License Agreement, (ii) "franchisors" (and positions of similar import) under all existing and future Franchise Agreements and Development Agreements, and (iii) "licensors" under all existing and future Third-Party License Agreements;

WHEREAS, the Manager desires to perform such obligations and duties, all in accordance with the Managing Standard and the terms of this Agreement; and

WHEREAS, the parties acknowledge and agree that Franchise HoldCo, and each of the Franchisors as wholly-owned and controlled subsidiaries of Franchise HoldCo (collectively, the "***Bankruptcy Remote Entities***") are intended to be "bankruptcy remote" entities, and that Manager shall have customary bankruptcy-remote rights and protections, as set forth in the Approved Operating Agreements (as defined herein) governing each of the Bankruptcy Remote Entities and in the order of the Bankruptcy Court approving this Agreement (the "***Sale Order***"), designed to prevent the occurrence of any Bankruptcy Event with respect to the Bankruptcy Remote Entities, including preventing the Bankruptcy Remote Entities from voluntarily commencing or consenting to the commencement of any bankruptcy or insolvency proceeding, or taking any action (including the incurrence of indebtedness) that could reasonably be expected to result in a Bankruptcy Event with respect to the Bankruptcy Remote Entities.

NOW THEREFORE, in consideration of the premises and the mutual agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.    Capitalized terms used herein but not otherwise defined shall have the following meanings:

"***2023 FDD***" has the meaning ascribed to such term in <u>Section 3.2(b)</u>.

"***Acquired Restaurants***" means approximately 111 Hooters™ and Hoots Wings™ restaurants that were or will be acquired by the Buyer Group pursuant to the Plan and listed on **Exhibit A** hereto.

"***Ad Fund Fees***" means the fees required to be paid by Franchisees and deposited in the National Ad Fund under the Franchise Agreements, whether accrued or collected prior to, on, or after the Closing Date, and all rights to receive the same.

"***Advertising Fund Account***" has the meaning set forth in <u>Section 3.2(a)</u>.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocated Expenses***" means all (i) third-party (including governmental) costs, expenses, fees, assessments, charges, or levies (including amounts charged by the Third-Party Service Provider, legal expenses, and auditing expenses) incurred by Franchise HoldCo, the Franchisors, and the Licensors after the Closing (solely in their respective capacities as "licensors" under any Third-Party License Agreements and under Sections 8(b) and 8(d) of the License Agreement, "licensees" under the License Agreement, or "franchisors" under any Franchise Agreements or Development Agreements) in connection with the services provided or rights exercised under this Agreement, and (ii) internal costs and expenses (including taxes) incurred by Franchise HoldCo and the Franchisors; <u>provided</u>, that the term "Allocated Expenses" shall not include (a) claims, actions, demands, damages, liabilities, losses, judgments, fines, penalties, settlements, costs, and expenses (including attorneys' fees and expenses of litigation or arbitration) arising out of, resulting from, or in connection with any breach of this Agreement by any party, or (b) unless expressly provided otherwise in this Agreement or included in the scope of either (i) or (ii) of this definition, all legal and auditing expenses of the Manager, HOA Systems (other than in its capacity as a "licensor" under the Third-Party License Agreements, "licensee" under the License Agreement, or a "franchisor" under the Franchise Agreements or Development Agreements), IP Owner (in any capacity other than as a "licensor" under the Third-Party License Agreements or under Sections 8(b) and 8(d) of the License Agreement), or RoyaltyCo.

"***Approved Operating Agreements***" has the meaning ascribed to such term in Section 10.1(a).

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Bankruptcy Event***" means with respect to any party, the occurrence of any of the following events:  (a) the party becomes insolvent within the meaning of 11 U.S.C. § 101(32) or any other debtor relief law applicable to such party; (b) the party generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on its indebtedness, or proposes a compromise or arrangement or deed of company between it and any class of its creditors; (c) the party voluntarily files for relief or institutes a proceeding under any applicable bankruptcy, insolvency, or other similar law affecting creditors' rights generally (including liquidation, administration, assignment for the benefit of creditors, dissolution, winding-up, reorganization, scheme of arrangement, restructuring, compromise, arrangement, adjustment, protection, moratorium, relief) or seeks similar relief under general principles of equity (whether such relief is sought in a proceeding in equity or at law) or files an answer admitting the material allegations of a petition filed against it or otherwise consents or acquiesces to the relief requested in any such proceeding; (d) an involuntary petition, application, or other proceeding is filed, made, or otherwise instituted against the party under any applicable bankruptcy or insolvency law and is not dismissed within ninety (90) calendar days of filing; (e) the party initiates any suspension or stay imposed by a court, governmental authority, or operation of law on the enforcement of claims,

rights, remedies, or obligations relating to indebtedness; (f) the party takes any action, corporate or otherwise, including, an affirmative vote by a board of directors (or equivalent management or oversight body) of any other party, to commence any insolvency proceeding or to approve, effect, consent to or authorize any of the actions described in the above sub-sections, or otherwise acts in furtherance thereof; (g) the appointment of a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, compulsory manager, voluntary administrator, administrative receiver, or other similar manager, official, or officer over a material portion of the party's assets, which is not stayed or vacated within ninety (90) days; or (h) any other event or circumstance occurs which has an effect equivalent to any of the events or circumstance referred to in the clauses (a)-(f) of this definition.

"***Bankruptcy Remote Entities***" has the meaning set forth in the recitals.

"***Brand***" means any and all of the Trademarks associated with the Branded Restaurants or the Business and included in the Licensed IP, including the Trademarks set forth in **<u>Exhibit B</u>**.

"***Brand Risk***" means any compromise, challenge, or material risk to the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or the other Licensed IP, in each case, caused by the acts or omissions of Manager or any Sublicensee, including, without limitation, any act or omission that could reasonably be expected to, or does in fact, result in a material adverse impact on the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark), regardless of whether or not the Brand as a whole is materially affected.

"***Branded Restaurant***" means any restaurant (including, but not limited to, casual or fast casual restaurants) or other dining establishment, food service business, or food service operation bearing or displaying the Brand, including HOOTERS or HOOTS-branded restaurants (excluding third party infringers of the Intellectual Property).

"***Business***" means the business of:  (i) managing the Licensed IP, the Brand, and relationships with Franchisees and Sublicensees; (ii) development of the Brand, including through new Franchise Agreements and/or Development Agreements; (iii) development, sales, and distribution of products bearing the Brand or other Licensed IP related to the Brand; and (iv) advertising and media outreach and engagements in connection with the Brand and other Licensed IP.

"***Business Day***" means any day other than a Saturday, Sunday, or a day on which banks are authorized or required by law to be closed in New York City, New York.

"***Buyer Group***" has the meaning set forth in the recitals.

"***Change of Control***" means any transaction or series of transactions resulting, directly or indirectly, in (i) one or more Restricted Entities owning fifty percent (50%) or more of the equity interests in Manager, (ii) one or more Restricted Entities having the right to appoint fifty percent (50%) or more of the members of Manager's board of managers, (iii) Manager selling, assigning, or otherwise transferring all or substantially all of its assets to which this Agreement relates to any third party (including any third-party that is a successor-in-interest with respect to all or substantially all of such assets) for which a Restricted Entity owns fifty percent (50%) or more of

the equity interests in such third party or has the right to appoint fifty percent (50%) or more of the members of such third party's board of directors.

"***Closing***" means the consummation of the transactions contemplated by this Agreement, which shall occur on the Closing Date, following the satisfaction or waiver of all conditions to Closing set forth herein, and shall take place in the manner and at the time and place (or by electronic exchange of documents) mutually agreed by the parties.

"***Closing Date***" means the date on which the transactions contemplated by this Agreement become effective, following satisfaction or waiver of all closing conditions.

"***Competitive Business***" means the business of franchising, managing, and/or operating full-service casual dining restaurant featuring sports-themed entertainment and emphasizing service provided by waitstaff whose attire, appearance, and image constitute an integral part of the restaurant's branding and customer experience; <u>provided</u>, that the term "Competitive Business" shall not include the Business.

"***Confidential Information***" means trade secrets and other information (including know how, ideas, techniques, recipes, formulas, customer lists, customer information, financial information, business methods and processes, marketing plans, specifications, and other similar information as well as internal materials prepared by the owner of such information containing or based, in whole or in part, on any such information) that is confidential and proprietary to its owner and that is disclosed by one party to another party to this Agreement whether in writing or disclosed orally, and whether or not designated as confidential; <u>provided</u>, that the term "Confidential Information" shall not include information that the Recipient can demonstrate: (a) is already known to Recipient without restriction on use or disclosure prior to receipt of such information from the Discloser; (b) is or becomes part of the public domain other than by breach of this Agreement by, or other wrongful act of, the Recipient; (c) is developed by the Recipient independently of and without reference to any Confidential Information of the Discloser; or (d) is received by the Recipient from a third party who is not under any obligation to the Discloser to maintain the confidentiality of such information.

"***Consent***" means a consent, approval, authorization, or instructions for a proposed action, decision, or transaction delivered by a party to one or more other parties pursuant to this Agreement.

"***Consent Request***" means any written request delivered by a party to one or more other parties pursuant to this Agreement, seeking such party's consent, approval, authorization, or instructions for a proposed action, decision, or transaction.

"***Continuity of Services***"  has the meaning set forth in <u>Section 8.3(a)</u>.

"***CPO***" means that collaborative purchasing organization affiliated with the Business, which negotiates and coordinates bulk purchasing of certain food and materials to be purchased and used by Franchisees at the Branded Restaurants and shall be maintained and administered, after the Closing Date, by Manager or its designee.

"***CPO Participants***" has the meaning ascribed to such term in <u>Section 3.2(e)</u>.

"***CPO Rebates***" has the meaning ascribed to such term in <u>Section 3.2(e)</u>.

"***CPO Surcharges***" has the meaning ascribed to such term in <u>Section 3.2(e)</u>.

"***CPO Surplus***" has the meaning ascribed to such term in <u>Section 3.2(e)</u>.

"***Databases***" means data, databases and other compilations and collections of data or information.

"***Designated Representative***" has the meaning set forth in <u>Section 4.3</u>.

"***Developer***" means any individual, partnership, corporation, or other legal entity that, on or after the Closing Date, is a party to a Development Agreement with a Franchisor or Licensor granting such party the right to develop one or more Branded Restaurants.

"***Development Agreement***" means any area development agreement, area option agreement, area representative agreement or similar agreement with a Developer, in each case, granting the right to develop one or more Branded Restaurants.

"***Discloser***" has the meaning set forth in <u>Section 9.1</u>.

"***Disentanglement***" has the meaning set forth in <u>Section 8.3(a)</u>.

"***Disentanglement Period***" has the meaning set forth in <u>Section 8.3(d)</u>.

"***Disentanglement Services***" has the meaning set forth in <u>Section 8.3(a)</u>.

"***Domain Names***" means domain names, web addresses, uniform resource locators and other names and locators associated with the Internet, and all goodwill associated with any of the foregoing.

"***Electronic Transmission***"  means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

 "***Entity***"  means any joint venture, general partnership, limited partnership, limited liability company, corporation, trust, business trust, cooperative, association or other incorporated or unincorporated entity.

"***Franchise Agreement***" means any franchise agreement, license agreement, or similar agreement granting a party the right to operate a Branded Restaurant using the System.

"***Franchisor***" has the meaning set forth in the preamble.

"***Franchisee***" means any individual, partnership, corporation, or other legal entity that, on or after the Closing Date, is a party to a Franchise Agreement granting the right to operate a Branded Restaurant.

"***Franchisee Data***" means all operational and financial data relating to the Branded Restaurants.

"***Gift Cards***" means any stored value, prepaid, or similar payment device, whether in physical, digital, or other form, issued, sold, or otherwise distributed, including gift certificates, gift codes, and other instruments or accounts that may be redeemed or applied for goods or services at any Branded Restaurant or through any System-related sales channel, whether sold, given away, issued as a promotion, or otherwise distributed, and in each case regardless of whether a balance remains thereon.

"***Gift Card Issuer***" has the meaning ascribed to such term in <u>Section 3.2(d)</u>.

"***Governmental Authority***" means any:  (a) United States, State, Commonwealth, District, Territory, municipality, or foreign state, or (b) any department, agency or instrumentality of the United States, a State, Commonwealth, District, Territory, a municipality, or a foreign state; or (c) other foreign or domestic government.

"***Hooters Manual***" means the confidential operating manuals provided to Franchisees pertaining to the operation of a Branded Restaurant, including training manuals and materials, operations manuals, plans, system standards, specifications, and policies, as they may be modified from time to time in accordance with this Agreement.

"***Independent Accountant***" has the meaning set forth in <u>Section 4.2</u>.

"***Intellectual Property***" means any and all:  (i) recipes, technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, concepts, creations, inventions, discoveries, and improvements (whether patentable or unpatentable and whether or not reduced to practice); (ii) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel, customer service, online analytics and other information, research, and materials; (iii) customer lists, customer data, customer contact and registration information, customer correspondence and customer purchasing histories; (iv) specifications, designs, industrial designs, models, devices, prototypes, network configurations and architecture, user interfaces, schematics and development tools; (v) Software; (vi) Works of Authorship; (vii) Databases; (viii) Trademarks; (ix) Domain Names; (x) social media, YouTube, and other online content accounts, tags, registrations or usernames (including "handles"); (xi) Manuals (including the Hooters Manuals); (xii) Proprietary Information; (xiii) calendars (including the Hooters calendar sold in connection with the Business); and (xiv) tangible, digital, and other electronic embodiments and representations of any of the foregoing, in any form or media whether or not specifically listed in this definition.

"***Intellectual Property Rights***" means any and all forms of intellectual property rights and other proprietary rights and protections throughout the world, whether statutory, common law, or otherwise, including all:  (i) copyrights and all other rights with respect to published and unpublished Works of Authorship, including Software, images, graphics, text, writings, reports, analyses, graphs, photographs, artwork, audiovisual works, collective works, derivative works, literary works, and sound recordings, and all registrations thereof and applications therefor (including moral and economic rights, however denominated), and any registrations and applications for registration thereof; (ii) rights with respect to Trademarks, and all registrations thereof and applications therefor; (iii) rights in Domain Names; (iv) rights in Proprietary Information; (v) other rights in Databases and designs (ornamental or otherwise); (vi) other rights of attribution and integrity and other moral rights of an author; (vii) rights in, arising out of, or associated with a person's name, voice, signature, photograph, or likeness, including rights of

personality, privacy, and publicity and similar rights, in each case whether currently existing or hereafter developed or acquired, arising under statutory law, common law, or by contract, and whether or not perfected, registered or issued, including all applications, disclosures, registrations, issuances and extensions with respect thereto; (viii) all claims and causes of action arising out of or related to infringement or misappropriation of any of the foregoing; and (ix) other proprietary or intellectual property rights now known or hereafter recognized in any jurisdiction worldwide relating to or arising from the Intellectual Property.

"***Interim Successor Manager***" means a Person that temporarily assumes the role of Manager, in its capacity as manager hereunder, in the event the original Manager resigns, provides a notice of termination of this Agreement, is removed, becomes incapacitated, or is otherwise unable to serve.

"***IP Activities***" means Manager's performance of certain obligations of the Franchisors and HOA Systems in their respective capacities as licensees of Intellectual Property under the License Agreement and of the Licensors in their respective capacities as franchisors and licensors under certain Franchise Agreements and Third-Party License Agreements, as well as Manager's exercise of activities and rights under this Agreement pertaining to the Licensed IP, including all activities or obligations of Franchisors or HOA Systems under the License Agreement relating to the prosecution, maintenance, defense, enforcement, licensing, use or other exploitation of Licensed IP in any manner, including taking, or using commercially reasonable efforts to cause Franchisors and HOA Systems to take, such actions as are necessary or appropriate in furtherance of the following activities and obligations of Franchisors and HOA Systems in each case subject to the terms of the License Agreement:  (i) in connection with any agreement through which a Franchisor or Licensor licenses, sub-licenses, or assigns the use of any Licensed IP, including, but not limited to, Franchise Agreements, Development Agreements, and any Third-Party License Agreements; (ii) acquisition, development, management, maintenance, protection, enforcement, defense, licensing, and sublicensing of the Licensed IP; and (iii) performance of such other duties and activities as may be necessary or desirable in connection with the Licensed IP, all in accordance with and subject to the terms of this Agreement including, without limitation, the Managing Standard and Quality Control Standards.  IP Activities shall include the following and be performed by Manager, on behalf of Franchisors and Licensors, as set forth in this Agreement:  (i) searching, screening and clearing any Licensed IP (including any after-acquired Intellectual Property) to assess the risk of potential infringement; (ii) filing, prosecuting and maintaining applications and registrations for the Licensed IP in IP Owner's name domestically and in such international markets in which IP Owner, Licensors or Franchisors operate, including filing of evidence of use, applications for renewal and affidavits of use and/or incontestability, paying of registration and maintenance fees, responding to third-party oppositions of applications or challenges to registrations, and responding to office actions, reexaminations, interferences or other office or examiner requests or requirements; (iii) monitoring third-party use and registration of Licensed IP and taking actions appropriate to oppose or contest the use and any application or registration for Licensed IP; (iv) confirming IP Owner's legal title in and to any or all of the Licensed IP; (v) monitoring the use of Licensed IP, by a licensee, sub-licensee, or assignee, the quality of goods and services offered in connection with such Licensed IP by a licensee, sub-licensee, or assignee, and rendering any approvals (or disapprovals) with respect to any use of any such Licensed IP by any such licensee, sub-licensee, or assignee to enforce compliance with the Quality Control Standards of this Agreement and usage provisions of the applicable license

agreement, Franchise Agreement, Development Agreement, or Third-Party License Agreement; (vi) protecting, policing, and enforcing Licensed IP, including, (x) preparing and responding to cease-and-desist, demand and notice letters, and requests for a license; and (y) commencing, prosecuting and/or resolving claims or suits involving imitation, infringement, dilution, misappropriation, the unauthorized use or other violation of the Licensed IP, and seeking monetary and equitable remedies appropriate in connection therewith; and IP Owner, Franchisors and HOA Systems shall, and agree to, join as a party to any such suits to the extent necessary to maintain standing; (vii) paying or causing to be paid or discharged any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the Licensed IP or contesting the same in good faith; (viii) obtaining licenses of third-party Intellectual Property for use and Sublicense in connection with the Business and other ventures permitted under this Agreement; and (ix) sublicensing the Licensed IP to suppliers, manufacturers, advertisers and other service providers in connection with the provision of products and services for use in the Branded Restaurants.

"***IP Owner Indemnified Parties***" means IP Owner and its affiliates, equityholders, directors, officers, employees, agents, representatives, and professionals (other than the Manager Indemnified Parties).

"***IP Owner Royalties***" has the meaning set forth in Section 3.1(c) of this Agreement.

"***LAGS***" means Lags Equipment, LLC.

"***Legacy Franchised Restaurants***" consists of all Branded Restaurants that are not Acquired Restaurants or New Restaurants.

"***Legacy License Agreements***" consists of all Third-Party License Agreements that have been executed prior to the Closing Date.

"***Licensed IP***" means any and all Intellectual Property and Intellectual Property Rights (a) owned or purported to be owned by IP Owner and/or any of its affiliates related to the System or the Business, including the Brand and/or (b) all New IP.

"***Licensor***" has the meaning set forth in the preamble.

"***Management Assets***" has the meaning set forth in Section 2.1(f).

"***Manager***" means Hooters Brand Management LLC, in its capacity as Manager hereunder, unless a successor Person shall have become the Manager pursuant to the applicable provisions of this Agreement, and thereafter "Manager" shall mean such successor Person.

"***Manager Indemnified Parties***" means Manager and its affiliates, equityholders, directors, officers, employees, agents, representatives, and professionals (other than the IP Owner Indemnified Parties); provided, that, notwithstanding any appointment of a Successor Manager or anything to the contrary herein, Hooters Brand Management LLC shall still be deemed the Manager for purposes of this definition for the period prior to the date the appointment of such Successor Manager becomes effective.

"***Manager Termination Event***" means any event or occurrence that gives the Manager the right to terminate the Agreement pursuant to Section 8.1(a).

"***Managing Standard***" means standards that:  (a) are consistent with the standards as Manager would implement or observe if the Licensed IP was owned by Manager at such time, in any event, at least equivalent in all material respects to then-current practices or prevailing standards of the applicable Franchisor with respect to the System or any manager of the System as of the Closing Date; and (b) are in material compliance with all applicable law or regulation; <u>provided</u>, that Manager may modify the Managing Standard to the extent required by applicable law or regulation or in any other manner that does not (and would not reasonably be expected to) adversely and materially impact the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark); <u>provided</u>, <u>further</u>, that any material modification to the Managing Standard shall require IP Owner's prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed and email being sufficient).

"***Manuals***" means trade secrets and other confidential and proprietary information, know how, and other materials not generally known to the public, whether tangible or intangible, including operations manuals.

"***Material Adverse Effect***" means any event, change, development, circumstance, condition, or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on:  (a) the value, validity, or enforceability of the Licensed IP; (b) the ability of any party to perform its obligations under this Agreement; (c) the ability of Manager to use the Licensed IP as contemplated by this Agreement; or (d) the rights granted to Manager under this Agreement or the commercial viability of the business associated with the Licensed IP.

"***NAF Trust Fund***" has the meaning ascribed to such term in <u>Section 3.2(b)</u>.

"***National Ad Fund***" means that certain national advertising fund affiliated with the Branded Restaurants which shall be maintained and administered, after the Closing Date, by Manager or its designee.

"***National Ad Fund Oversight***" means (i) the management, administration and oversight of local, national and international advertising, promotional, and public relations activities; (ii) paying costs of producing, preparing, distributing, and using marketing, advertising, and other materials and programs; (iii) administering national, regional, and other marketing programs; (iv) purchasing sports sponsorships and other media placements or spots; (v) employing advertising, public relations, and other agencies and firms; (vi) supporting market research; (vii) sponsoring conventions and other events, (viii) otherwise engaging in strategic marketing and paying reasonable administrative costs, accounting fees and similar types of advertising and promotional expenses, and (ix) any other activities permitted to be funded by the National Ad Fund, in each case, solely to the extent funded by the National Ad Fund.

"***New Development Agreements***" consist of all Development Agreements executed on or after the Closing Date.

"***New Franchise Agreements***" consist of all Franchise Agreements executed on or after the Closing Date.

"***New IP***" means any and all Intellectual Property and Intellectual Property Rights created, conceived, developed, authored, or otherwise acquired by IP Owner, HOA Systems, Franchisors, Franchise HoldCo or Manager (or any Franchisee or Sublicensee) during the Term that either (i) are used (or held for use) in, or relate to, the System, Business, and/or Brand or (ii) constitute improvements, enhancements, derivatives, derivative works, modifications, substitutions, replacements or new versions of any of the foregoing; <u>provided</u>, that "New IP" shall not include any Intellectual Property or Intellectual Property Right that is, as of the Closing Date, subject to a carveout under a Franchise Agreement for a Legacy Franchised Restaurant that allows the Franchisee thereto to retain such property or right created by them (and, for the avoidance of doubt, Manager shall have no liability or other obligation with respect to any such carved-out Intellectual Property or Intellectual Property Right); for the avoidance of doubt, Manager may not grant carveouts to any Franchisee or Sublicensee for any New IP arising after the Closing Date without the prior written (email sufficient) consent of IP Owner (such consent not to be unreasonably withheld, conditioned or delayed); <u>provided further</u>, that "New IP" shall not include any Intellectual Property or Intellectual Property Right that is owned or controlled, as of the Closing Date,  by a third party (other than IP Owner) and licensed to Franchise HoldCo, Franchisors, HOA Systems, Manager, Franchisee, or Sublicensee.

"***New License Agreements***" consist of all Third-Party License Agreements executed on or after the Closing Date.

"***New Restaurant***" means any Branded Restaurant that is opened by a new or existing Franchisee after the Closing Date.

"***Other Fees***" means any startup fees, initial franchise fees, development fees (including fees payable under any Development Agreement), advertising fees, technology fees, training fees, and other similar fees, in each case, that are not Royalties; provided, that the term "Other Fees" shall not include the Ad Fund Fees.

"***Person***"  means an individual, firm, Entity, group or organization of any kind, including a Governmental Authority.

"***Power of Attorney***" means the authority granted by Service Recipients and IP Owner, respectively, to the Manager pursuant to a Power of Attorney in substantially the form set forth as **Exhibit C** hereto.

"***Proprietary Information***" means brand standards, business plans, standards and specifications, restaurant plans, layouts and designs, advertising guidelines, merchandise designs, technical data, franchisee or sublicensee data (including Franchisee Data), customer lists, membership information (including HootClub Rewards membership information), customer transaction information, pricing and cost information, bills of material, ideas, designs, formulas, methods, processes, programs, prototypes, systems, and techniques, trade secrets and other confidential and proprietary information, know-how, and other materials not generally known to the public, whether tangible or intangible.

"***Privileged Information***" means any information, in written, oral, electronic or other tangible or intangible forms, including any attorney-client privileged communications, memoranda and other materials including attorney work product prepared by attorneys or under their direction, as to which either Manager or any Service Recipient would be entitled to assert or

have asserted a privilege or other protections, including the attorney-client and/or attorney work product privileges and protections, confidential settlement or mediation communications under Cal. Evid. Code §§ 1115 et seq., and other communications deemed privileged by governing law. For the avoidance of doubt, the term "Privileged Information" shall include all privileged, and legally protected or protectable materials and information, including client confidences, litigation strategy and/or options, legal analysis, conclusions, decisions, arguments, and settlement information, analysis strategies, mental impressions, legal theories, legal research, counsel's factual investigation and analyses, whether oral, electronic or in writing. Privileged Information also includes, as applicable, written communications, memoranda, products, laboratory notebooks, study reports, notes, interview reports, search reports, deposition transcripts, materials provided to and communications to or from or prepared by any consultant retained by the Manager (on behalf of Service Recipients) or Service Recipients (or an expert retained or any of its litigation counsel to the extent the communication is not discoverable under Federal Rule of Civil Procedure 26) and correspondence with insurers' claims representatives and their counsel reflecting or including any Privileged Information; and reports of experts and consultants, and/or investigations, opinions, and analyses, legal briefs, motions and arguments, litigation strategies, settlement positions, expert opinions, and all other factual or legal information expressed in any documents, recordings, communications, or media, of whatever nature and in any form, whether written, oral, or electronic.

"***Quality Control Standards***" means standards that:  (i) are consistent with the quality control standards imposed on Franchisors and Licensors under the License Agreement; (ii) comply with all applicable federal, state, local, and foreign laws; (iii) except as otherwise permitted by IP Owner, are of a nature and quality at least equal to the standards and reputation for quality of the products and services offered by Branded Restaurants under the Licensed IP as of the Closing Date; and (iv) include terms that are at least as protective as the brand guidelines and quality control standards set forth or referenced in the Franchise Agreements, Development Agreements, and Third-Party License Agreements, as applicable.

"***Recipient***" has the meaning ascribed to such term in <u>Section 9.1</u>.

"***Restricted Entity***" means a Person that as of the date of occurrence of a Change of Control (i) is not in good standing as a Franchisee for failure to meet any legal, contractual, or financial obligations, and (ii) has not been a Franchisee for at least two (2) years immediately preceding such Change of Control; <u>provided</u>, that the term "Restricted Entity" shall not include (x) an employee of an entity that is not a Restricted Entity, (y) an heir of a former employee of an entity that is not a Restricted Entity, or (z) any Person who is a director, officer, or shareholder (direct or indirect) of Manager, Hooter's Inc., or Piece of Work Wings LLC as of the execution of this Agreement.

"***Royalties***" means, without duplication, periodic payments calculated as a percentage of gross sales or revenues that are (i) payable by a Franchisee under a Franchise Agreement for the right and license to use the Licensed IP in respect of any Branded Restaurant, or (ii) payable by any party under any Third-Party License Agreement for the right and license to use the Licensed IP (including, without limitation, in branded products, digital services, media, or other commercial applications).

"***RoyaltyCo***" means HOA Funding, LLC, which is the direct or indirect owner of 100% of the equity interests of IP Owner, and thereby the indirect owner of the Licensed IP.

"*Royalty Shortfall*" means, for the twelve (12)-month period measured from the first anniversary of the Closing Date, or from any subsequent anniversary thereafter, the amount by which the total Royalties received during such period are less than seventy-five percent (75%) of the total Royalties received during the first twelve (12) months following the Closing Date. The existence and amount of any Royalty Shortfall shall be determined (a) annually, beginning on the second anniversary of the Closing Date, and (b) by deeming any Royalties from the Legacy Franchised Restaurants or Legacy License Agreements that are not the subject of a *bona fide* dispute to have been received when due to Franchisor, Licensor, or Franchise HoldCo.

"*Sale Order*" has the meaning set forth in the recitals.

"*Service Recipients*" has the meaning ascribed to such term in Section 2.1(a).

"*Services*" means, together, (i) the Stewardship Activities, including the IP Activities; (ii) performing the obligations of the Franchisors and Licensors under the Franchise Agreements and Development Agreements; and (iii) performing the obligations of the Franchisors and Licensors under the Third-Party License Agreements.

"*Software*" means computer programs and applications and other software.

"*Stewardship Activities*" means the IP Activities and all other brand-related, franchising-related, marketing-related, and Brand management-related functions, including the National Ad Fund Oversight, Centralized Purchasing Organization operations oversight, and management of the System, including, on behalf of Franchisors and Licensors, any new franchising operations, and developing, managing, licensing, and sub-licensing the Licensed IP in furtherance of the Business.

"*Sublicense*" means a grant of a license or sublicense to use or exercise rights under the Licensed IP pursuant to a Franchise Agreement or a Third-Party License Agreement.

"*Sublicensee*" means any third party that has been granted a license or sublicense to use or exercise rights under the Licensed IP pursuant to a Franchise Agreement or a Third-Party License Agreement; <u>provided</u>, for the avoidance of doubt, the term "Sublicensee" shall not include Manager or Franchise HoldCo.

"*Sublicensor*" means a Franchisor or Licensor in its capacity as the party granting a license or sublicense, including to Franchisees, to use or exercise rights under the Licensed IP pursuant to a Franchise Agreement or a Third-Party License Agreement.

"*Successor Manager*" means any Person that is duly appointed or designated to assume the role of Manager in accordance with the applicable provisions of this Agreement, following the resignation, removal, incapacity, or termination of the previous Manager. Upon such appointment, the Successor Manager shall have all the rights, powers, duties, and obligations of the Manager, and all references to the "Manager" herein shall be deemed to refer to such Successor Manager.

"*System*" means the system that Branded Restaurants must use and follow, including (i) distinctive business formats, methods, procedures, rules, designs, layouts, signs, recipes, ingredients, product and service mix, standards, specifications and other confidential and proprietary information; and (ii) the rules, requirements, standards, suggestions and guidance for the development and operation of Branded Restaurants. The System is reflected in the Hooters

Manual, which may be improved, further developed or otherwise modified from time to time by Manager in a manner that does not (and would not reasonably be expected to) adversely and materially impact the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark); provided, further, that the prior written consent of IP Owner (as conveyed by IP Owner to Manager in writing and, such consent not to be unreasonably withheld, conditioned or delayed and email being sufficient) is required for any material improvements, developments, or modifications to the System.  Any such improvements, developments, or modifications shall comply with the Managing Standards and Quality Control Standards.

"***Third-Party License Agreements***" means any and all license agreements, service agreements to the extent they involve licensing of the Licensed IP, or other similar agreements involving the Licensed IP, including those related to non-restaurant uses of the Licensed IP, in each case, that are (a) disclosed in writing to Manager or of which Manager's officers have actual knowledge (and not constructive or imputed knowledge) of (and, for the avoidance of doubt, Manager shall have no responsibility or liability for any Third-Party License Agreement until so disclosed or actually known), or (b) executed by Manager on behalf of a Franchisor or Licensor on or after the Closing Date; provided, that the term "Third-Party License Agreements" shall not include Development Agreements and Franchise Agreements; provided, further, that the term "Third-Party License Agreements" shall include each license agreement identified on the Assumption Schedule filed as Exhibit D to the Plan Supplement (as defined in the Plan).

"***Third-Party Service Provider***" means OnePoint BPO Services, LLC, or any Person that is duly selected as agreed between RoyaltyCo and the Manager to assume the role of Third-Party Service Provider in accordance with the applicable provisions of this Agreement, following the resignation, removal, incapacity, or termination of the previous Third-Party Service Provider.

"***Transition Plan***" means a written plan developed and agreed upon by the Franchisors and Manager that outlines the process, responsibilities, and timeline for winding down, transferring, or transitioning the services, rights, obligations, and operations governed by this Agreement, including any disentanglement activities required upon termination or expiration of the Agreement.

"***Term***" means the period beginning on the Closing Date and continuing until this Agreement is terminated in accordance with the provisions set forth herein.

"***Termination Notice***" has the meaning set forth in Section 8.1(a).

"***Termination Notice Period***" has the meaning set forth in Section 8.1(a).

"***Trademarks***" means trademarks, service marks, trade names, service names, product names, slogans, 800 numbers, brand names, trade dress, logos, corporate names, and other source or business identifiers, together with the goodwill associated with any of the foregoing.

"***Unauthorized Change of Control***" means the occurrence of a Change of Control without IP Owner's consent (as conveyed by IP Owner to Manager in writing).

"***Works of Authorship***" means websites, content, images, logos, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses,

writings (including the Franchise Disclosure Document, Franchise Agreements, and related contracts), and other works of authorship and copyrightable subject matter.

Section 1.2    Interpretation and Rules of Construction.

(a)    Each term defined in the singular form in Section 1.1 or elsewhere in this Agreement shall mean the plural thereof when the plural form of such term is used in this Agreement and each term defined in the plural form in Section 1.1 shall mean the singular thereof when the singular form of such term is used herein.

(b)    The words "hereof," "herein," "hereunder" and similar terms when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references herein are references to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified.

(c)    Unless as otherwise provided herein, the word "including" as used herein shall mean "including without limitation."

(d)    Unless as otherwise provided herein, the term "and/or" or "or" is intended to be inclusive, shall not be construed to imply exclusivity or to require the presence of all listed elements, and shall be interpreted to mean any one or more of the connected elements or a combination thereof.

(e)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Manager notifies Franchisors and IP Owner that the Manager requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

Section 1.3    Computation of Time Periods.  Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

**ARTICLE II**
**ADMINISTRATION AND SERVICES OF MANAGER**

Section 2.1    Management of Franchisors by Manager.

(a)    Engagement of the Manager.  The Manager is hereby authorized by each Franchisor, Licensor, and Franchise HoldCo (collectively, the "***Service Recipients***"), and hereby agrees, to perform the Services subject to and in accordance with the Managing Standard and in compliance with the Quality Control Standards and the terms of this Agreement.  For the avoidance of doubt, the parties hereto acknowledge and agree that the Manager is providing Services directly to each Service Recipient.  Manager shall perform all agreed upon Services subject to the terms of this Agreement (and Service Recipient shall reasonably cooperate with Manager in connection

15

therewith) and if Service Recipient reasonably believes Manager should provide additional services that materially deviate from or supplement the Services, such Service Recipient shall consult with Manager with respect thereto and Manager shall have no obligation to provide such deviated or supplemental Services unless Manager consents in writing (such consent not to be unreasonably withheld, conditioned or delayed and email being sufficient).

(i)     <u>Stewardship Activities</u>.  With respect to the Stewardship Activities, the Manager shall perform such Stewardship Activities in accordance with the Managing Standard and Quality Control Standards.   Manager shall perform the Stewardship Activities (including the preparation and filing of any Franchise Disclosure Document) and all other acts Manager deems reasonably necessary or desirable in furtherance of the Stewardship Activities with respect to all Branded Restaurants (including the Legacy Franchised Restaurants); <u>provided</u>, that Manager and IP Owner shall confer prior to Manager taking any act or omissions outside of the scope of Stewardship Activities that Manager believes, in its reasonable business judgment, to be necessary or desirable to further the Business or prevent a Brand Risk; <u>provided</u>, <u>further</u>, that Manager shall obtain IP Owner's written consent (not to be unreasonably withheld, conditioned, or delayed and email being sufficient) with respect to any action or omission that would materially modify, expand or contract the scope of the Stewardship Activities or that would be reasonably likely to create a Brand Risk.   For the avoidance of doubt, the preparation and filing of any Franchise Disclosure Document shall be included in the definition of Stewardship Activities.

(ii)    <u>Franchise Agreements and Development Agreements</u>.   Manager shall, subject to the terms of this Agreement, perform the obligations of the Franchisors and Licensors under the Franchise Agreements and Development Agreements.   Manager shall operate the System in compliance with the Managing Standard and the Quality Control Standards and is permitted to develop the Brand and Business and negotiate New Franchise Agreements and New Development Agreements on behalf of the Franchisors and Licensors.  Manager shall be entitled to execute and deliver, on behalf of Franchisors and Licensors, any New Franchise Agreements or New Development Agreements that are consistent with the License Agreement and which are (a) on arms-length terms for fair and reasonable value as determined by Manager in its reasonable business judgment, taking into consideration the obligations of the Manager under this Agreement and the interests of IP Owner, and (b) on terms that are no less protective of IP Owner's ownership of and rights in the Licensed IP than those contained in the License Agreement, including requiring Franchisee compliance with the Quality Control Standard and other protections of the validity, enforceability and

ownership of the Licensed IP and the goodwill appurtenant thereto. Manager shall obligate all Franchisees and/or Sublicensees to comply with the Quality Control Standards and Manager shall exercise its reasonable business judgment to enforce the Franchise Agreements and the Development Agreements, including (a) all Quality Control Standards against Franchisees and Developers, and (b) the commencement and conduct of litigation or other enforcement actions in connection with a breach of a Franchise Agreement by a Franchisee or a Development Agreement by a Developer; provided that if IP Owner, in its reasonable business judgment, determines that any breach by a Franchisee of the Quality Control Standards is (or may be) directly or indirectly injurious or prejudicial to the Brand (or the goodwill symbolized thereby) or IP Owner's rights therein or thereto or otherwise causes any Brand Risk, then within ten (10) business days of receipt of written notice (email sufficient) thereof from IP Owner, Manager shall, on behalf of Franchisors and Licensors, take all reasonable actions to remedy such non-compliance or cause the remedy or cessation thereof.

(iii)    Third-Party License Agreements.    Manager shall, subject to the terms of this Agreement, perform the obligations of the Service Recipients under the Third-Party License Agreements.    Manager shall be permitted to negotiate New License Agreements on behalf of the Service Recipients in compliance with the Managing Standard and the Quality Control Standards.    Manager shall be entitled to execute and deliver, on behalf of Service Recipients, any New License Agreements that are consistent with the License Agreement and which (a) obligate the Sublicensee to utilize the Licensed IP in material compliance with the Managing Standard and the Quality Control Standards (b) are on arms-length terms for fair and reasonable value as determined by Manager in its reasonable business judgment, taking into consideration the obligations of the Manager under this Agreement and the interests of Service Recipients, and (c) are on terms that are no less protective of IP Owner's ownership of and rights in the Licensed IP than those contained in the License Agreement, including requiring Sublicensee compliance with the Quality Control Standard and other protections of the validity, enforceability and ownership of the Licensed IP and the goodwill appurtenant thereto.

(b)    Compliance with Legal Restrictions.    The definition of "Stewardship Activities" and "IP Activities" shall not include any acts that Manager is legally prohibited from performing on behalf of Service Recipients under applicable law or regulation; provided, however, that Manager shall reasonably promptly notify IP Owner (email being sufficient) of its inability to take such action under applicable law or regulation to which it has knowledge of after reasonable diligence.

(c)    <u>Ownership of New IP</u>.

(i)    The Manager hereby agrees that as between Manager, Franchise HoldCo, HOA Systems, and Franchisors, on the one hand, and IP Owner, on the other hand, any New IP, and all goodwill appurtenant thereto, shall be owned by and inure exclusively to the benefit of IP Owner and shall be deemed, and included in, the Licensed IP for all purposes hereunder, and the use thereof shall be governed by the terms of this Agreement and the License Agreement. Each Service Recipient and Manager hereby agree that any New IP developed by Manager and/or each Service Recipient is deemed "work made for hire" (as such term is defined in 17 U.S.C. §101) and to irrevocably assign and transfer, and hereby do assign and transfer without further consideration, all such Intellectual Property, together with all right, title, and interest worldwide therein and appurtenant goodwill to IP Owner, that Manager or Service Recipient, as applicable, has or may have. Manager shall take all necessary and appropriate measures to assign any such Intellectual Property to IP Owner, with all third-party costs and expenses incurred in taking such measures deemed Allocated Expenses. Each Service Recipient, Franchise HoldCo, and Manager hereby acknowledge that, as between Manager, Franchise HoldCo, and Service Recipients, as applicable, on the one hand, and IP Owner, on the other hand, any New IP shall be solely owned by IP Owner, and each Service Recipient, Franchise HoldCo, and Manager agree to reasonably promptly disclose to IP Owner all New IP to which it has knowledge of after reasonable due diligence.

(ii)    The Manager agrees to cooperate in good faith with the Service Recipients, Franchise HoldCo, and IP Owner for the purpose of securing and preserving the IP Owner's rights in and to the applicable New IP, including executing any documents and taking any actions, at the IP Owner's reasonable request (which shall be communicated by IP Owner to Manager in writing), or as deemed necessary or advisable by the Manager, to confirm, file and record in any appropriate registry the IP Owner's sole legal title in and to such New IP, it being acknowledged and agreed that any expenses in connection therewith shall be paid by the IP Owner in accordance with the License Agreement. The Service Recipients and IP Owner have appointed and hereby appoint the Manager as their attorney-in-fact authorized to execute such documents (it being understood that such appointment is a power coupled with an interest and therefore irrevocable) with full power of substitution and delegation.

(d)    <u>Grant of Power of Attorney</u>. In order to provide the Manager with the authority to perform and execute its duties and obligations as set forth herein, IP Owner and the Service Recipients shall execute and deliver on the Closing Date a Power of Attorney in substantially the form set forth as **<u>Exhibit C</u>**, which shall grant Manager certain rights of IP Owner

or that IP Owner has granted to Service Recipients pursuant to the License Agreement or Third-Party License Agreements, as applicable; <u>provided</u>, <u>however</u>, that if Manager is unable to exercise such power of attorney on behalf of IP Owner or Service Recipients due to applicable law or regulation or a counterparty's objection, IP Owner and Service Recipients shall reasonably cooperate in good faith to facilitate the performance and execution of Manager's duties and obligations as set forth herein.

(e)    <u>Insurance</u>.    Each party shall, at its own expense, maintain insurance coverage customary and reasonable for the nature and scope of its business operations.  Such insurance shall be maintained with financially sound and reputable insurers and in amounts that are commercially reasonable and appropriate.  Each party shall be named as an additional insured under all such policies to the extent related to the subject matter of this Agreement.  Upon a party's request, the other party shall provide certificates of insurance or other evidence of such coverage, including confirmation of the party's additional insured status.

(f)    <u>Manager License</u>. In exchange for Manager's agreement to perform the Services, Franchise HoldCo hereby grants to Manager a limited, exclusive, revocable (upon termination of this Agreement), and non-transferable license to use the proprietary assets transferred to Franchise HoldCo pursuant to the Plan (the "***Management Assets***"), solely for purposes of Manager's performance of the Services during the term of this Agreement.  Franchise HoldCo, solely during the term of this Agreement, grants Manager a power of attorney to act on its behalf and exercise any of its rights and obligations in respect of the Management Assets in furtherance of Manager's performance of the Services consistent with the terms of the Agreement.

(g)    <u>Cooperation</u>.    The parties acknowledge that Manager is relying on the assistance, cooperation, complete and accurate information and data, files, documents, and other resources reasonably requested by the Manager from the Service Recipients and/or IP Owner to enable it to perform the Services and Service Recipients and/or IP Owner shall do all acts reasonably requested by Manager in furtherance of the foregoing.

## ARTICLE III
## ROYALTIES AND FINANCIAL OVERSIGHT

Section 3.1    <u>Royalties and Third-Party Service Provider</u>.

(a)    <u>Third-Party Service Provider</u>.  Manager shall cause the Service Recipients to employ the Third-Party Service Provider, who shall be responsible for, among other things, monitoring, calculating, and auditing gross sales or revenues related to any Royalties, the calculation of Royalties, Ad Fund Fees, and Other Fees payable under any Franchise Agreements, Development Agreements, or Third-Party License Agreements. The Third-Party Service Provider shall calculate the Management Fee and the IP Owner Royalties and distribute Royalties in accordance with Section 3.1(b) and Section 3.1(c).  In the event that the Third-Party Service Provider needs to be replaced, such replacement Third-Party Service Provider shall be mutually agreed upon by Manager, the Franchisors, Licensors, and IP Owner in writing (such consent not to be unreasonably withheld, conditioned, or delayed and, in each case, email being sufficient).

(b)    <u>Management Fee</u>.  The Manager and the Service Recipients acknowledge and agree that in exchange for Manager providing the Services under this Agreement, the Service Recipients have agreed to pay (or cause to be paid) to Manager on a monthly basis, an amount (the

"***Management Fee***") equal to the following Royalties, which shall be collected by the Service Recipients as an agent of Manager and distributed to Manager net of any Allocated Expenses (as defined herein and subject to Section 3.4), allocated to Manager, and that Manager is entitled to receive the Management Fee:

     (i)     Sixty-five percent (65%) of Royalties collected on account of the Acquired Restaurants; plus

     (ii)     Fifty percent (50%) of Royalties collected on account of the New Restaurants; plus

     (iii)     Fifty percent (50%) of Royalties collected on account of New License Agreements; provided, that if any New License Agreement is capable of being structured as an annual royalty but is instead sold or otherwise significantly monetized after the Closing Date, the proceeds collected on account of such New License Agreement shall be distributed twenty-five percent (25%) to Manager.

For the avoidance of doubt, the calculation of the Management Fee shall not include any Royalties collected on account of the Legacy Franchised Restaurants and the Legacy License Agreements.

     (c)     IP Owner Royalties. The Manager and the Service Recipients acknowledge and agree that in consideration of the license granted under the License Agreement, Franchisors and Licensors have agreed to pay (or cause to be paid) to IP Owner (or its designee) (for the benefit of RoyaltyCo) on a monthly basis, an amount (the "***IP Owner Royalties***"), equal to the following Royalties, which shall be collected by Franchisors or Licensors, as applicable, as an agent of IP Owner and distributed to IP Owner net of any Allocated Expenses (as defined herein and subject to Section 3.4), allocated to IP Owner (for the benefit of RoyaltyCo), and that IP Owner is entitled to receive such IP Owner Royalties:

     (i)     One hundred percent (100%) of Royalties collected on account of the Legacy Franchised Restaurants; plus

     (ii)     One hundred percent (100%) of Royalties collected on account of the Legacy License Agreements; plus

     (iii)     Thirty-five percent (35%) of Royalties collected on account of the Acquired Restaurants; plus

     (iv)     Fifty percent (50%) of Royalties collected on account of the New Restaurants; plus

     (v)     Fifty percent (50%) of Royalties collected on account of New License Agreements; provided, that if any New License Agreement is capable of being structured as an annual royalty but is instead sold or otherwise significantly monetized after the Closing Date, the proceeds collected on account of such New License Agreement shall be distributed seventy-five percent (75%) to IP Owner or its designee (for the benefit of RoyaltyCo).

(d)      Excess Royalty Amount.  If a Service Recipient collects Royalties from a Franchisee or Sublicensee in excess of the Royalties then owed by such Franchisee or Sublicensee (the "***Excess Royalty Amount***"), then Manager (or the Third-Party Service Provider, acting at Manager's direction) shall (i) report such Excess Royalty Amount to IP Owner, and (ii) be authorized to credit the Franchisee or Sublicensee by deducting the Excess Royalty Amount from future Royalties to be collected from such Franchisee or Sublicensee.  If no such future Royalties are collected, Manager (or the Third-Party Service Provider, acting at Manager's direction) shall be authorized to refund such Excess Royalty Amount to the Franchisee or Sublicensee (with such refund to be funded by Manager and IP Owner in proportion to the underlying royalty split relating to such Franchisee or Sublicensee).

(e)      LAGS Treatment.  To the extent LAGS is entitled to any Royalties relating to any Third-Party License Agreements or Franchise Agreements with Wings of South Florida, LLC or its affiliates, successors, or assigns (the "**LAGS Agreements**"), such Royalties shall (i) not be deducted from the Management Fee or Other Fees to be paid to Manager under this Agreement, and (ii) be paid from the Royalties that would otherwise be paid to IP Owner under the License Agreement (unless paid directly to LAGS under the LAGS Agreements).  Under no circumstances (including if the Royalties paid to IP Owner under the License Agreement are insufficient to cover the foregoing Royalties) shall LAGS be entitled to any amounts that would be required to be distributed to Manager under this Agreement, and IP Owner shall indemnify Manager with respect to the same.  Manager shall not cause any Franchisor or Licensor to enter into any amendments, extensions or renewals of any LAGS Agreements, unless such amendment, extension, or renewal provides for all Royalties to be paid directly to Franchisors.  Any New Restaurants to be opened by Wings of South Florida, LLC or its affiliates, successors, or assigns shall be subject to a new Franchise Agreement that provides for all Royalties to be paid directly to Franchisors and is otherwise substantially consistent with the Franchise Agreements in place as of the Closing Date.

(f)      Franchise Disclosure Documents.  To the extent required by applicable franchise laws and regulations, the Franchise Disclosure Documents for Franchisors shall include information reasonably necessary for appropriate disclosure to Franchisees including, but not limited to, details regarding the Management Fee paid to Manager hereunder, the Royalties paid to IP Owner under the License Agreement, the calculation of such Royalties, data collection in connection with the payment of Royalties, Manager's authorization to perform the obligations of the Franchisors under the Franchise Agreements, and the use of the Third-Party Service Provider as set forth herein.

Section 3.2      Accounts.

(a)      Segregated Accounts.    Manager shall instruct all Franchisees and Sublicensees to deposit all Royalties directly into a segregated account of each Franchisor and Licensor as set forth in **Schedule 1** hereto.  Funds deposited into the Franchisor's and Licensor's accounts identified on Schedule 1 hereto shall be swept on a daily basis into a central account maintained by Franchise HoldCo.  Each such account shall provide the Third-Party Service Provider with access to deposit, withdraw, or otherwise transfer funds in accordance with the terms of Section 3.1 and this Section 3.2.

(b)      Advertising Funds.    At the Closing, the Debtors shall transfer (i) the National Ad Fund to Manager, (ii) to Manager, solely to the extent relating to Franchisees that are

not Debtors, the right to receive all Ad Fund Fees (including all accounts receivable relating to Ad Fund Fees, whether invoiced or unbilled, and whether due or to become due), (iii) to Manager, all rights, interests, and authority of the Debtors to operate, administer, and control the charitable organization known as HOOCEF (including all related registrations, permits, consents, approvals, governance rights, donor lists, goodwill, and other intangible assets relating thereto), if any and (iv) to a segregated account maintained by the Manager for the benefit of the National Ad Fund and designated as the "***Advertising Fund Account***," an amount equal to the sum of (A) all funds held by the Debtors for the benefit of the National Ad Fund (the "***NAF Trust Fund***") immediately prior to the Closing, which amount shall not be less than $379,000, plus (B) to the extent not previously contributed to the NAF Trust Fund, an amount equal to one percent (1%) of "Gross Sales" (as defined in that certain Franchise Disclosure Document issued by the Debtors as of April 25, 2023 (the "***2023 FDD***")) generated between March 31, 2025 and the Closing Date by any Branded Restaurant owned by the Debtors.  The funding of all amounts set forth in clauses (A) and (B) shall be a condition precedent to the Manager's obligation to consummate the Closing and, upon such funding, any obligation of the Debtors to make further payments to the National Ad Fund on account of Gross Sales generated prior to the Petition Date by any Branded Restaurant owned by the Debtors shall be deemed irrevocably waived and released.  From and after the Closing, Manager shall ensure that all Ad Fund Fees collected from the Franchisees (including on account of the Acquired Restaurants) are deposited into the Advertising Fund Account and used exclusively for purpose of the National Ad Fund Oversight.

(c)    Other Fees.    Franchise HoldCo, Licensors, and/or Franchisors shall maintain and administer an account designated as the "***Other Fee Account***."  Manager shall cause all Other Fees actually collected from the Branded Restaurants and Sublicensees to be deposited into the Other Fee Account.  At the direction of Manager, which may be made from time to time or at any time, Franchise HoldCo, Licensors, and/or Franchisors shall cause the Third-Party Service Provider to distribute all Other Fees (to which Manager is entitled under this Agreement) in the Other Fee Account to Manager.  Manager shall be entitled to retain all Other Fees.

(d)    Gift Cards.    The parties acknowledge that from and after the Closing, pursuant to the Buyer Group APAs, Manager shall be obligated to honor Gift Cards issued to customers in the ordinary course, so long as such Gift Cards were issued on or after February 14, 2023 and have not been fully redeemed as of the Closing.  At the Closing, pursuant to the Buyer Group APAs, the Debtors shall transfer $100,000 to Manager, which amount shall be used by Manager exclusively for the purpose of satisfying the foregoing obligations with respect to Gift Cards.  The transfer of the amount set forth in the immediately prior sentence shall be a condition precedent to the Manager's obligation to consummate the Closing.

(e)    Central Purchasing Organization.    The Debtors operate a centralized purchasing organization designed to increase purchasing power, the CPO, for owners of Branded Restaurants, including the Debtors and Franchisees (collectively, the "***CPO Participants***").  In the ordinary course of business, the CPO imposes surcharges on the CPO Participants (the "***CPO Surcharges***") collects rebates and similar payments from vendors that sell goods to CPO Participants (together with any and all related receivables, accrued receivables, rights to payment, credits, or other amounts due (whether or not invoiced, recorded, recognized, or booked from an accounting perspective), and any payments made or received from any such vendor after the Closing that relate to transactions, sales, purchases, or other activities occurring prior to the Closing (the "***CPO Rebates***").  To the extent the buying costs imposed by the CPO on the CPO

Participants (including the CPO Surcharges) exceed the actual cost of goods (*e.g.*, per pound of wings) purchased by the CPO (after accounting for the CPO Rebates collected by the CPO), the resulting difference creates a surplus (the "***CPO Surplus***") that represents funds due from the CPO to the CPO Participants.  At Closing, the Debtors shall transfer (i) to the Manager, the CPO and all rights to CPO Rebates (whether accrued or collected prior to, on, or after the Closing Date, and all rights to receive the same), and (ii) to a segregated account maintained by the Manager for the benefit of the CPO and designated as the "CPO Account," an amount equal to the CPO Surplus as of the Closing, which amount shall equal $200,000.  The funding of the amount set forth in clause (ii) above shall be a condition precedent to the Manager's obligation to consummate the Closing.

(f)    Deposit of Misdirected Funds.  Franchisors and Licensors shall direct the Third-Party Service Provider to take any actions necessary to cause all payments in respect of the Licensed IP that are incorrectly deposited into any account to be deposited or transferred into the proper account within two Business Days following actual knowledge of the Third-Party Service Provider of the receipt thereof and in the form received with any necessary endorsement or in cash.

Section 3.3    Records and Right of Examination and Audit.

(a)    The Manager shall, in accordance with historical practice, retain copies of all material data (including computerized records), books, records, bank statements, receipts, contracts, reports, accounting systems, and other documents or electronic data maintained by the Manager or any affiliate or agent thereof relating directly to, or maintained in direct connection with, the servicing of the Licensed IP and the Services, or otherwise as required to be maintained hereunder (the "***Records***") at its primary place of business (or at an off-site storage facility determined by Manager in its reasonable discretion, provided that such facility must at all times be located in the United States), and shall give IP Owner and other Service Recipients access to the Records, during normal business hours and upon reasonable advance notice; provided, that IP Owner and other Service Recipients shall not unreasonably interfere with Manager's business in connection with such access.

(b)    RoyaltyCo and its designated representatives (including legal, financial, and forensic accounting advisors) ("***Inspectors***") shall have the right, upon reasonable notice and during normal business hours, to examine, inspect, and audit the Records (an "***Examination***"). Each Examination under this Section 3.3**Error! Reference source not found.** will neither: (i) interfere with Manager's business, nor (ii) be conducted more than once per twelve-month period. IP Owner will cause the Inspectors to comply with Manager's security procedures, including but not limited to ensuring the Inspectors maintain proper access logs and comply with industry standard security protocols. IP Owner will be responsible for any unauthorized access, introduction of malicious code, or damage caused by the Inspectors and shall promptly cause them to remediate any resulting issues at their own expense.  Manager shall not be required to provide access to any Records or other information to the extent prohibited by applicable law or regulation.  The costs of any Examination shall be (i) an Allocated Expense, to the extent the Examination relates to Royalties, and (ii) borne solely by RoyaltyCo, to the extent the Examination relates to matters other than Royalties.  Manager shall reasonably cooperate with any such Examination and shall preserve all Records for at least three (3) years following the date of their creation, or for such longer period as may be required by applicable law or regulation.  Any failure by Manager to provide access in accordance with this Section 3.3 shall constitute a breach under this Agreement,

subject, in all circumstances, to the rights of Manager under Section 8.2(a), including with respect to cure or mitigation of any such breach.

(c)     Manager shall not be required to disclose (i) information subject to attorney–client privilege or the attorney work product doctrine, or (ii) information subject to contractual confidentiality obligations with third parties, unless and until RoyaltyCo and its representatives have executed a confidentiality agreement acceptable to such third party.

Section 3.4     Compensation and Expenses.

(a)     Allocated Expenses.     All Allocated Expenses that are validated in accordance with this Section 3.4 shall be borne fifty-percent (50%) by the Manager and fifty-percent (50%) by IP Owner, provided, if the share of any Allocated Expense (or series of related Allocated Expenses arising from the same action, occurrence, or transaction) allocated to Manager or IP Owner is reasonably expected to exceed $250,000, such Allocated Expense shall require the prior written approval of both the IP Owner and the Manager (such approval not to be unreasonably withheld, conditioned, or delayed and email being sufficient).

(b)     Process for Validation of Allocated Expenses.     Manager shall submit to IP Owner and the Third-Party Service Provider, on a monthly basis, a preliminary invoice listing all Allocated Expenses incurred during the preceding month (each, a "**Monthly Report**").     To the extent IP Owner seeks payment of any outstanding Allocated Expenses, IP Owner shall likewise submit a Monthly Report to Manager and the Third-Party Service Provider for such month.     For clarity, although Monthly Reports are expected to be submitted on a monthly basis, a party may submit a Monthly Report for any prior month at any time, and such submission shall be valid for purposes of seeking reimbursement of Allocated Expenses, so long as the expenses are otherwise valid and properly documented.     Upon submission of a Monthly Report, Manager or Third-Party Service Provider, as applicable, shall deduct from (i) the Management Fee otherwise payable to Manager, an amount equal to Manager's share of the Allocated Expenses set forth therein, and (ii) the IP Owner Royalties, an amount equal to IP Owner's share of the Allocated Expenses set forth therein (each of (i) and (ii), an "**Interim Deduction**").     Any such deduction shall be subject to the review and reconciliation process described in Section 3.4(a), Section 3.4(c) and 3.4(d), and Manager or Third-Party Service Provider, as applicable, shall promptly true up any overpayment or underpayment following completion of such process.

(c)     Monthly Reports.     All Monthly Reports shall have reasonable detail sufficient to permit IP Owner or Manager, as applicable, to identify and evaluate each charge. Upon receipt, the receiving party shall have fifteen (15) business days to review and, if applicable, dispute or provide comments on the contents of the Monthly Report.     Any disputed amounts shall be subject to the provisions set forth in Section 3.5.

(d)     Monthly Invoices.     Following the expiration of the review period, all undisputed Allocated Expenses set forth the applicable Monthly Report shall be reflected in a formal invoice (the "**Monthly Invoice**") submitted to IP Owner or Manager, as applicable, and the Third-Party Service Provider.

(e)     IP Owner Deductible Amounts.     To the extent IP Owner is obligated to pay any Allocated Expenses that have been incurred by Manager or to indemnify Manager under this Agreement consistent with Section 3.4 (collectively, "**IP Owner Deductible Amounts**"),

(i) Manager shall be irrevocably authorized to deduct and shall cause the Third-Party Service Provider to deduct such IP Owner Deductible Amounts from any Royalties that are to be distributed to IP Owner under the License Agreement (as acknowledged in <u>Section 3.1(c)</u> of this Agreement), net of any Interim Deduction previously taken pursuant to <u>Section 3.4(b)</u> on account of such Allocated Expenses, and to remit such withheld amount directly to Manager in accordance with the instructions Manager provides (and IP Owner will remain fully liable for the payment of such amount if such Third-Party Service Provider does not comply with Manager's payment instruction until Manager receives payment in full and final satisfaction of such amount); and (ii) IP Owner hereby appoints the Manager as its attorney-in-fact authorized to execute all documents and perform all actions necessary to effectuate the foregoing clause (i) (it being understood that such appointment is a power coupled with an interest and therefore irrevocable) with full power of substitution and delegation.

(f)    <u>Manager Deductible Amounts</u>.  To the extent Manager is obligated to pay any Allocated Expenses that have been incurred by IP Owner or to indemnify IP Owner under this Agreement consistent with <u>Section 3.4</u> (collectively, "***Manager Deductible Amounts***"), Franchise HoldCo and/or Franchisors shall be irrevocably authorized to deduct and shall cause the Third-Party Service Provider to deduct such Manager Deductible Amounts from any Management Fees that are to be distributed to Manager under this Agreement, net of any Interim Deduction previously taken pursuant to <u>Section 3.4(b)</u> on account of such Allocated Expenses, and to remit such withheld amount directly to IP Owner in accordance with the instructions IP Owner provides (and Manager will remain fully liable for the payment of such amount if such Third-Party Service Provider does not comply with IP Owner's payment instruction until IP Owner receives payment in full and final satisfaction of such amount); and (ii) Manager hereby appoints the IP Owner as its attorney-in-fact authorized to execute all documents and perform all actions necessary to effectuate the foregoing clause (i) (it being understood that such appointment is a power coupled with an interest and therefore irrevocable) with full power of substitution and delegation.

(g)    <u>Party-Specific Expenses</u>.  Except as provided in this Agreement, each Party shall be solely responsible for all of its own internal costs and expenses, including without limitation its administrative, operational, overhead, and personnel costs, and any other costs that are not third-party expenses reimbursable under this Agreement (such costs and expenses, the "***Party-Specific Expenses***").

(h)    <u>Allocated Expense Reserve</u>.  The first Fifty Thousand Dollars ($50,000) of IP Owner Royalties otherwise payable to IP Owner under this Agreement and the first Fifty Thousand Dollars ($50,000) of Management Fees otherwise payable to Manager under this Agreement shall, in each case, be contributed to a segregated reserve account maintained at Franchise HoldCo (the "***Allocated Expense Reserve***").  The Allocated Expense Reserve shall be used by Manager exclusively to fund Allocated Expenses in the ordinary course consistent with this Agreement.  In the event the balance of the Allocated Expense Reserve falls below One Hundred Thousand Dollars ($100,000), then, prior to the payment of any further IP Owner Royalties to IP Owner or Management Fees to Manager, the Allocated Expense Reserve shall be restored to a balance of One Hundred Thousand Dollars ($100,000), which restoration shall be funded fifty percent (50%) from IP Owner Royalties and fifty percent (50%) from Management Fees.  Once the Allocated Expense Reserve has been so restored, any remaining IP Owner Royalties and Management Fees shall be released and paid to IP Owner and Manager, respectively, in accordance with the terms of this Agreement.  For the avoidance of doubt, (x) the Allocated

Expense Reserve is a mechanism to facilitate payment of Allocated Expenses in the ordinary course in a manner consistent with this Agreement and shall not be deemed to limit, cap, or otherwise modify the obligation of each of IP Owner and Manager to bear fifty percent (50%) of all Allocated Expenses in accordance with this Agreement, and (y) if at any time the Allocated Expense Reserve is insufficient to pay Allocated Expenses, each of IP Owner and Manager shall remain responsible for its respective share of such Allocated Expenses pursuant to the terms of this Agreement.

Section 3.5    <u>Allocated Expense Dispute Resolution</u>.  In the event of a dispute regarding the classification or allocation of any expense, the parties shall first attempt in good faith to resolve such dispute within fifteen (15) calendar days of notice from the applicable party.  If the dispute cannot be resolved through good faith efforts within such time period, the applicable parties shall follow the dispute resolution provision in 0.

Section 3.6    <u>Indemnification</u>.

(a)    <u>IP Owner Indemnification</u>.  IP Owner shall indemnify, defend, and hold harmless the Manager Indemnified Parties from and against any and all claims, actions, demands, damages, liabilities, losses, judgments, fines, penalties, settlements, costs, and expenses (including reasonable attorneys' fees and expenses of litigation or arbitration) arising out of, resulting from, or in connection with:

(i)    IP Owner's gross negligence, willful misconduct, or actual fraud in connection with IP Owner's performance under this Agreement; or

(ii)    IP Owner's knowing and intentional violation of applicable law, regulation, or governmental order directly related to IP Owner's obligations under this Agreement.

(b)    <u>Manager Indemnification</u>.  Manager shall indemnify, defend, and hold harmless the IP Owner Indemnified Parties from and against any and all claims, actions, demands, damages, liabilities, losses, judgments, fines, penalties, settlements, costs, and expenses (including reasonable attorneys' fees and expenses of litigation or arbitration) arising out of, resulting from, or in connection with:

(i)    Manager's gross negligence, willful misconduct, or actual fraud in connection with Manager's performance under this Agreement; or

(ii)    Manager's knowing and intentional violation of applicable law, regulation, or governmental order directly related to Manager's obligations under this Agreement.

If a court decides that any indemnifying party must pay money to an indemnitee under the indemnification terms of this Agreement, the indemnitee shall be authorized to cause Third-Party Service Provider to withhold that amount from the indemnifying party's Management Fee, or IP Owner Royalties, as applicable.  The indemnitee shall be authorized to cause Third-Party Service Provider to then pay that amount directly to the indemnitee.  This right to withhold is in addition to any other rights the indemnitee may have under this Agreement or the law.

(c)   Third-Party Claims.  The parties shall reasonably cooperate in the defense of any third-party claims that may be brought against Manager, Franchisors, Franchise HoldCo, Licensors, or IP Owner, provided that the Parties shall not be required to cooperate in the defense of any third-party claim if such cooperation would result in a conflict of interest or if such parties' interests materially diverge with respect to the matter at issue.  Subject to Section 3.6(a) and (b), to the extent resulting from a third-party claim that (i) use by Manager, Franchise HoldCo, Licensors, or the Franchisors (or their Franchisees or Sublicensees) of the Licensed IP, in each case, as expressly permitted under and in accordance with this Agreement or the License Agreement, infringes any Intellectual Property Rights owned or controlled by such third party, or (ii) any Service Recipient is in breach or has failed to perform under any Franchise Agreement, Third-Party License Agreement, or Development Agreement that is managed by Manager pursuant to this Agreement, any third-party costs or expenses incurred by any party in connection with the defense of such claim (or, if applicable, any final, non-appealable damages or awards that may be awarded to such third party as a result of such claim) shall be borne equally by Manager, on the one hand, and IP Owner, on the other.

Section 3.7    Sub-Manager Responsibility.

In the event that the Manager engages with sub-managers to perform any portion of the Services under this Agreement (a "**Sub-Manager**"), the Manager will remain fully responsible for the Sub-Manager as if its work was performed directly by the Manager.  The Manager shall ensure that all obligations, requirements, and standards set forth in this Agreement are communicated to, and adhered to by, any Sub-Manager.  The Manager shall be liable for any acts, omissions, or breaches under this Agreement by Sub-Manager to the same extent as if such acts, omissions, or breaches were committed by the Manager.

**ARTICLE IV**
**STATEMENTS AND REPORTS**

Section 4.1    Reporting by the Manager.

(a)   Franchisee Termination Notices.  The Manager shall send to the IP Owner, as soon as reasonably practicable, but in no event later than fifteen (15) Business Days of the receipt thereof, a copy of any notices of termination of one or more Franchise Agreements sent by the Manager to any Franchisee.

(b)   Additional Information.  The Manager shall permit, at reasonable times upon reasonable notice, IP Owner to visit and inspect any of its corporate offices and discuss its affairs with its officers and directors.

(c)   Conference Calls.  Manager agrees to reasonable conference call updates, at IP Owner's specific request, to discuss, among other things:  (i) Manager's Stewardship Activities for the purposes of assessing the likelihood of the occurrence of a Brand Risk; (ii) New IP; and (iii) Other Fees.

(d)   Periodic Meetings.  Manager and IP Owner shall meet on a quarterly basis, or as otherwise mutually agreed, to review and discuss current and potential uses of the Licensed IP (including any New IP), as well as to address any issues related to the enforcement of the Quality Control Standards (including with respect to Franchisees and Sublicensees).

(e)      <u>Unauthorized Change of Control</u>.  The Manager shall promptly notify IP Owner of any transaction or series of transactions, before executing such transactions, that would result in an Unauthorized Change of Control.

(f)      <u>Period Reports</u>.  The Manager shall, or shall cause Third-Party Service Provider to, provide RoyaltyCo or its agent (x) the amount of each wire sent to RoyaltyCo with respect to IP License Fees or other amounts received under the IP License Agreement and the Founders License Agreements within five (5) Business Days of payment and (y) the information designated as the Manager's responsibility in the report attached hereto as <u>Schedule 2</u> related to the most recent four-week period data no later than 15 calendar days or as soon as reasonably practicable thereafter following the end date of the most recent four-week reporting period, with delivery by email being sufficient for each of the foregoing.  The Manager shall, and shall cause the Third-Party Service Provider to, cooperate with RoyaltyCo in its reasonable requests related to the form and substance of the period reporting and any reasonable requests for clarifications related to any period report delivered.

Section 4.2      <u>Appointment of Independent Accountant</u>.  The parties may mutually agree to appoint an independent, third-party accounting firm (the "***Independent Accountant***") to conduct periodic reviews or audits of cash flows or distributions, beyond any reviews conducted by the Third-Party Service Provider.  The scope, frequency, and procedures of such reviews shall be determined jointly by the parties at the time of appointment.  Any costs and expenses associated with the engagement of the Independent Accountant shall be borne as agreed upon by the parties in writing.  The parties shall cooperate in good faith to facilitate such reviews, including providing timely access to relevant books, records, and personnel.

In the event of any dispute between the parties regarding any financial matter reviewed by the Independent Accountant, such dispute shall be submitted to the Independent Accountant for resolution.  The determination of the Independent Accountant shall be final, binding, and conclusive on the parties (absent manifest error).  Each party shall bear its own costs related to the dispute, and the costs of the Independent Accountant's resolution shall be shared equally, unless otherwise agreed in writing.

Section 4.3      <u>Designated Representative.</u>

(a)      <u>Appointment of Representative</u>.  Prior to Closing, IP Owner and Manager shall designate in writing to the other party a single individual (the "***Designated Representative***") authorized to provide or withhold any Consent on behalf of IP Owner or Manager, respectively, required to be obtained under this Agreement.  IP Owner and Manager shall ensure that their respective applicable Designated Representative is properly authorized and available to provide Consents.  Either Party may change its Designated Representative by providing written notice to the other party identifying the new Designated Representative, and any such change shall be effective upon receipt of such notice by the other Party.  Until such written notice is received, Manager and IP Owner shall be entitled to continue to rely upon the last Designated Representative identified in writing by the other party.

(b)      <u>Requests and Effectiveness of Consent; Reliance</u>.  Delivery by Manager or IP Owner of a request for Consent to the then-current applicable Designated Representative (which may be by email) constitutes a valid request for such Consent, satisfies such party's obligation to request such Consent under this Agreement, and shall be deemed effective without any additional

delivery required under <u>Section 10.5</u>.  Consent is effective upon the applicable Designated Representative's express communication granting Consent (which may be by email unless this Agreement expressly requires otherwise).  Any Consent communicated by the applicable Designated Representative binds Manager or IP Owner, as applicable, as its Consent for all purposes of this Agreement, and the other party has no duty to investigate the applicable Designated Representative's actual authority or internal approvals.

**ARTICLE V**
**THE MANAGER**

Section 5.1    <u>Representations and Warranties Concerning the Manager</u>.  The Manager represents and warrants to Franchisors and Franchise HoldCo, as of the Closing Date, as follows:

(a)    <u>Organization and Good Standing</u>.  The Manager (i) is a limited liability company, duly formed and organized, validly existing and in good standing under the laws of the State of Florida; (ii) is duly qualified to do business as a foreign corporation and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations hereunder make such qualification necessary, except to the extent the failure to be qualified could not reasonably be expected to have a Material Adverse Effect on the Manager; and (iii) has the power and authority to perform its obligations under this Agreement.

(b)    <u>Power and Authority; No Conflicts</u>.  The execution and delivery by the Manager of this Agreement and its performance of, and compliance with, the terms hereof are within the power of the Manager and have been duly authorized by all necessary corporate action on the part of the Manager.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein, nor compliance with the provisions hereof, shall conflict with or result in a breach or constitute a default under, any order or any Governmental Authority or any of the provisions of any Requirement of Law binding on the Manager, or the charter or bylaws or other organizational documents of the Manager, or any of the provisions of any material mortgage, lease, contract or other instrument to which the Manager is a party or by which it or its property is bound or result in the creation or imposition of any Lien upon any of its property pursuant to the terms of any such mortgage, leases, contract or other instrument, except to the extent such default, creation or imposition could not reasonably be expected to have a Material Adverse Effect on the Manager.

(c)    <u>Consents</u>.  Except (i) for registrations as a franchise broker or franchise seller as may be required under state franchise statutes and regulations; (ii) to the extent that a state or foreign franchise law requires filing and other compliance actions by virtue of considering the Manager as a "sub-franchisor;" (iii) for any consents, licenses, approvals, authorizations, registrations, notifications, waivers, or declarations that have been obtained or made and are in full force and effect; and (iv) to the extent that a failure to do so could not reasonably be expected to have a Material Adverse Effect on the Manager, the Manager is not required to obtain the consent of any other party or the consent, license, approval, or authorization of any Governmental Authority in connection with the execution, delivery, or performance by the Manager of this Agreement.

(d)    <u>Due Execution and Delivery</u>.  This Agreement has been duly executed and delivered by the Manager and constitutes a legal, valid, and binding instrument enforceable against

29

the Manager in accordance with its terms (subject to applicable insolvency laws and to general principles of equity).

(e)     No Litigation.  There are no actions, suits, investigations, or proceedings pending or, to the actual knowledge of the Manager, threatened against or affecting the Manager, before or by any Governmental Authority having jurisdiction over the Manager or any of its properties or with respect to any of the transactions contemplated by this Agreement which could reasonably be expected to have a Material Adverse Effect on the Manager, taken as a whole.

(f)     Compliance with Requirements of Law.  The Manager is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect on the Manager, Franchisors, or Franchise HoldCo.

(g)     No Default.  The Manager is not in default under any agreement, contract, or instrument to which the Manager is a party or with respect to any order of any Governmental Authority which could reasonably be expected to have a Material Adverse Effect on the Manager, taken as a whole; and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument, or with respect to any such order of any Governmental Authority.

(h)     Taxes.  The Manager has filed or caused to be filed and shall file or cause to be filed all federal tax returns and all material state and other tax returns that are required to be filed by the Manager except where the failure to do so could not reasonably be expected to have a Material Adverse Effect on the Manager.  The Manager has paid or caused to be paid, and shall pay or cause to be paid, all taxes owed by the Manager and all assessments made against it or any of its property (other than any amount of tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of the Manager) except where the failure to do so could not reasonably be expected to have a Material Adverse Effect on the Manager.  The charges, accruals, and reserves on the Manager's books in respect of taxes are and shall be, in the Manager's reasonable opinion, adequate.

(i)     No Manager Termination Event.  No Manager Termination Event has occurred or is continuing, and, to the actual knowledge of the Manager, there is no event which, with notice or lapse of time, or both, would constitute a Manager Termination Event.

(j)     **DISCLAIMER**.     **EXCEPT    FOR    THE    MANAGER'S REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, THE MANAGER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SUBJECT MATTER HEREOF TO ANY OTHER PARTY, AND EACH PARTY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES, INCLUDING WARRANTY OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE**.

Section 5.2    Existence; Status as Manager.  The Manager shall keep in full effect its existence under the laws of the state of its formation, and maintain its rights and privileges necessary or desirable in the normal conduct of its business and the performance of its obligations

hereunder, and shall obtain and preserve its qualification to do business in each jurisdiction in which the failure to so qualify either individually or in the aggregate would be reasonably likely to have a Material Adverse Effect.

Section 5.3    <u>Right to Receive Instructions</u>.

(a)    In the event that the Manager is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement, or any such provision is, in the good faith judgment of the Manager, ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that this Agreement permits any determination by the Manager or is silent or is incomplete as to the course of action which the Manager is required to take with respect to a particular set of facts, the Manager may make a Consent Request to IP Owner for written instructions and, to the extent that the Manager shall have acted or refrained from acting in good faith in accordance with instructions, if any, received from IP Owner with respect to such Consent Request, the Manager shall not be liable on account of such action or inaction to any Person; provided that IP Owner shall be under no obligation to provide any such instruction if it is unable to decide between alternative courses of action.  Subject to the Managing Standard, if the Manager shall not have received appropriate instructions from IP Owner within ten (10) calendar days of such notice (or within such shorter period of time as may be specified in such notice), the Manager may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement, as the Manager shall deem to be in the best interests of the Franchisors and Licensors.  The Manager shall have no liability for such action or inaction taken in reliance on the preceding sentence except for the Manager's own bad faith, negligence, or willful misconduct.  The Manager's duties and obligations to Franchisors, Licensors, Franchise HoldCo, and IP Owner under this Agreement are solely as expressly set forth in this Agreement, and no additional fiduciary, trustee, or other common-law duties shall be implied or imposed on the Manager by virtue of this Agreement.

(b)    In any circumstance where the Manager is required to obtain the consent, direction, or approval of Franchise Holdco, a Franchisor, Licensors, or IP Owner under this Agreement, such consent, direction, or approval shall instead be obtained from the Designated Representative of IP Owner, and such consent, direction, or approval from the Designated Representative of IP Owner shall constitute the consent, direction, or approval of Franchise HoldCo, such Franchisor, Licensors, or IP Owner, as applicable, for purposes of this Agreement.

Section 5.4    <u>Notice of Certain Events</u>.  The Manager shall give written notice to IP Owner promptly upon the occurrence of any of the following events (but in any event no later than five (5) Business Days after the Manager has actual knowledge of the occurrence of such an event): (a) a Service Recipient Termination Event, or (b) any action, suit, investigation, or proceeding pending against the Manager, before or by any court, administrative agency, arbitrator, or governmental body having jurisdiction over the Manager, asserting the illegality, invalidity, or unenforceability of this Agreement or any of the obligations of Manager hereunder, seeking any determination or ruling that would affect the legality, binding effect, validity, or enforceability of this Agreement or that could reasonably be expected to have a Material Adverse Effect on Manager.

Section 5.5    <u>Capitalization</u>.  Subject to receipt all funds required to be paid to Manager under this Agreement and any other agreement contemplated hereby, the Manager shall have

sufficient capital to perform all of its obligations under this Agreement at all times from the Closing Date through the Term.

Section 5.6    No Competitive Business.  During the Term, the Manager shall not engage in any Competitive Business.

Section 5.7    Restrictions on Modifying Other Fees.  In exchange for retaining all Other Fees, the Manager agrees that:  (i) the Manager shall not take any direct or indirect action or omission (including, without limitation, increasing Other Fees or reclassifying any Royalties as Other Fees) that would reasonably be expected to decrease or diminish the amounts payable to IP Owner hereunder; (ii) the Manager may not take any direct or indirect action or omission that materially increases the Other Fees as compared to the amounts or treatment of Other Fees as of the Closing Date or materially decreases any amounts to which IP Owner is entitled, unless Manager provides IP Owner with prior written notice (email being sufficient) detailing such change and obtains Licensor's prior written consent (email being sufficient) before assessing such materially increased Other Fees; provided, that the Manager may, in good faith, make reasonable adjustments to Other Fees to account for increased costs of goods and services provided by Manager; and (iii) without limiting the foregoing, Manager shall not reclassify any Royalties as Other Fees or take other action with the intention of decreasing or diminishing the Royalties or other amounts to which IP Owner is entitled to.  Subject to the foregoing, Manager is entitled to retain all Other Fees.

Section 5.8    Common Interest.   All information exchanged between the Service Recipients and Manager, in its capacity as Manager, prior to the termination of this Agreement containing Privileged Information of the disclosing party or of the Service Recipients, regarding matters within the scope of Services performed by Manager will be deemed Privileged Information of the Service Recipients. The Service Recipients agree and acknowledge that they have not waived, and nothing in this Agreement, nor any exchange or sharing of Privileged Information between Manager and Service Recipients in respect of performance of the Services, constitutes a waiver of any legal privilege, including attorney-client privilege, work product privilege, privilege under the common interest doctrine and similar or related doctrines.

### ARTICLE VI
### RESERVED

### ARTICLE VII
### RESERVED

### ARTICLE VIII
### TERMINATION EVENTS

Section 8.1    Manager Termination Events.

(a)    Manager Termination Events.  Manager has the right to terminate the Agreement for convenience by providing IP Owner, HOA Systems, Franchise HoldCo and Franchisors with one hundred eighty (180) calendar days' prior written notice (such notice, the "***Termination Notice***," and the period to provide such notice, the "***Termination Notice Period***"); provided that if such termination is prompted by a material breach by IP Owner, HOA Systems,

Franchise HoldCo, or the Franchisors of their respective obligations under this Agreement (and such party fails to cure such breach within 60 calendar days of receipt of written notice thereof from Manager (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach)) (such event, an "***Uncured Franchisor Breach***"), then the "Termination Notice Period" shall be sixty (60) calendar days, which shall not commence until the expiration of the 60-day cure period only if, and so long as, the breaching party is diligently working to cure such breach if capable of being cured; provided, further, that the Management Fee payable to Manager during the duration of the Disentanglement Period shall be reduced to an amount sufficient to cover only reasonable and actual, documented costs and expenses of Manager (including, for the avoidance of doubt, any Party-Specific Expenses of Manager and those set forth in Section 8.3) with any remaining Royalties reverting to IP Owner for the duration of the Disentanglement Period.

(b)     If Manager exercises its termination right:  (i) Licensors, Franchise HoldCo, and the Franchisors will use commercially reasonable efforts to designate a Successor Manager during the Termination Notice Period and (ii) Manager's obligations and rights would continue until the Successor Manager is fully implemented (subject to agreement regarding transition costs and a reasonable transition period); provided, that if Manager exercises its termination right on account of an Uncured Franchisor Breach, and a Successor Manager is not fully implemented by the end of the Termination Notice Period, then, absent the express written consent of Manager in its discretion, Manager will cease the role of "Manager" hereunder and this Agreement will be deemed terminated with respect to the Manager as of the expiration of the pertinent Termination Notice Period, and HOA Systems and the Franchisors shall assume all obligations of Manager under this Agreement and shall act as the Successor Manager and as "franchisor" under all Franchise Agreements and Development Agreements and as "licensor" or "sublicensor" under all Third-Party License Agreements following the expiration of the Termination Notice Period.

Section 8.2     Service Recipient Termination Events.

(a)     The Service Recipients shall have the right to terminate this Agreement under the following circumstances (each, a "***Service Recipients Termination Event***"):

(i)     If Manager materially breaches its obligations under this Agreement and fails to cure such breach within 60 calendar days of receipt of written (email sufficient) notice thereof from any Service Recipient (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach).

(ii)     Upon a final, non-appealable determination by a court of competent jurisdiction that Manager has engaged in gross negligence, willful misconduct, or fraudulent conduct (in each case, after notice and an opportunity to cure, if capable of cure) in connection with the performance of its obligations under this Agreement.   Such termination shall be effective upon written (email sufficient) notice from any Service Recipient to Manager following such judicial determination.

(iii)     The occurrence of an Unauthorized Change of Control.

(iv)    The occurrence of a Bankruptcy Event with respect to Manager.

(v)    Manager materially breaches its obligations to comply with the Managing Standard or Quality Control Standards and fails to cure such breach within 60 calendar days of receipt of written (email sufficient) notice thereof from any Service Recipient (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach).

(vi)    The occurrence of a Royalty Shortfall; provided, however, that in the event of a Royalty Shortfall, Manager will have the right, but not the obligation, to cure such shortfall by paying to IP Owner (or its designee), in immediately available funds, an amount equal to the amount of the Royalty Shortfall; provided, further, that if Manager makes such payment within thirty (30) calendar days following written (email sufficient) notice of the Royalty Shortfall from a Service Recipient, then such Royalty Shortfall shall be deemed cured, and the Service Recipients shall have no right to terminate this Agreement on the basis of such Royalty Shortfall.

(b)    If a Service Recipient terminates this Agreement, such termination shall be deemed automatic and binding on the other Service Recipients and the Manager.

(c)    If a Service Recipient terminates this Agreement, then Service Recipients must either (i) cause Licensors and the Franchisors to assume and perform all obligations and liabilities of Manager and assume the role of "Successor Manager" under this Agreement, including under any then-existing Franchise Agreements, Development Agreements, and Third-Party License Agreements, or (ii) prior to the effective date of such termination, appoint a Successor Manager to assume and perform such obligations and discharge such liabilities, and upon the effective date of such termination, the Management Fee and Other Fees shall no longer accrue to the benefit of the Manager, provided that Manager shall be entitled to any Management Fees and Other Fees accruing prior to the date of termination as well as reimbursement of any costs and expenses to which it is otherwise entitled prior to the date of termination or pursuant to Section 8.3.

(d)    If a Service Recipient terminates this Agreement, Manager will be released from all further obligations under this Agreement (except those terms that expressly survive) and required to turn over all books and records in its possession and control related to any Franchise Agreements, Development Agreements, Third-Party License Agreements, or otherwise related to Licensed IP, other than (i) information to the extent protected by attorney client privilege or work product doctrines, (ii) books and records of Buyer Group solely in their capacity as Franchisees, and (iii) tax returns, corporate and entity records, and employment records of Manager; provided that Manager shall provide reasonable access to corporate and entity records and employment records applicable to the Business and Manager's obligations under this Agreement to the Service Recipients or any Successor Manager to support in the transition of services (which such disclosure shall nonetheless be subject to subpart (i) above).  Manager will be entitled to retain a copy of such books and records in accordance with its data retention policies to the maximum extent permitted by applicable law or regulation.

(e)     Manager shall cease all use of the Licensed IP as promptly as commercially practicable following the effective date of termination of this Agreement, but in no event later than thirty (30) calendar days thereafter.

Section 8.3     <u>Manager's Transitional Role.</u>

(a)     <u>Disentanglement</u>.  Following the delivery of a Termination Notice by Manager to Licensors and Franchisors pursuant to Section <u>8.1(a)</u> above or by Licensors or Franchisor to Manager pursuant to <u>Section 8.2(a)</u>, upon request by IP Owner, the Manager shall use commercially reasonable efforts to cooperate with the Licensors and Franchisors in implementing the Transition Plan (which shall be delivered within three (3) weeks of such request or such other period as mutually agreed by the Parties) and in effecting a complete transition to a Successor Manager, including in connection with any resignation by the Manager, in a manner that avoids any material interruption or materially adverse impact on the provision of Services (the "***Disentanglement***").  To the extent that the Manager's staff and resources are necessary for the implementation of such Transition Plan, the Manager shall use commercially reasonable efforts during the Disentanglement Period (as defined herein) to not materially reduce its existing staff and resources that were devoted to or shared with the provisions of the Services prior to the date of such termination of the Manager (such activities being referred to as "***Continuity of Services***") and shall allow the Successor Manager reasonable access to the Manager's premises, systems and offices during the Disentanglement Period.  Thereafter, the Manager shall use commercially reasonable efforts to cooperate with the Interim Successor Manager or Successor Manager, as the case may be, and otherwise promptly take all actions required to assist in effectuating a complete Disentanglement (subject to subpart (<u>b</u>) below).  The Manager shall use commercially reasonable efforts to provide for the prompt and orderly conclusion of all work, as Licensors and the Franchisors may direct, including completion or partial completion of projects, documentation of all work in progress, and other measures to assure an orderly transition to the Successor Manager. The Manager's obligations under this <u>Section 8.3(a)</u> ("***Disentanglement Services***"), including reasonable training for personnel of the Successor Manager in the performance of the Services, shall be deemed a part of the Services to be performed by the Manager.  The Manager shall use commercially reasonable efforts to utilize existing resources to perform the Disentanglement Services.

(b)     <u>Access to Manager's Premises and Systems</u>.  If Licensors, Franchise HoldCo, or the Franchisors are granted access to Manager's premises, systems, or offices, such access shall be limited to what is reasonably necessary for the Disentanglement and shall be subject to Manager's prior written approval, not to be unreasonably withheld, conditioned, or delayed. Licensors, Franchise HoldCo, and the Franchisors shall use appropriate security measures, maintain proper access logs, and ensure its personnel comply with industry-standard security protocols and shall be responsible for any unauthorized access, introduction of malicious code, or damage caused by its personnel and shall promptly remediate any resulting issues at their own expense.  Manager shall not be required to provide any access or information to the extent prohibited by applicable law or regulation.

(c)     <u>Fees and Charges for the Disentanglement Services</u>.  The Manager shall be entitled to reimbursement of all of its reasonable and documented actual costs for the provision of all Disentanglement Services.

(d)    <u>Duration of Obligations</u>.    The Manager's obligation to provide Disentanglement Services will continue during the period commencing on the date that a Termination Notice is delivered and ending on the date on which the Successor Manager assumes all of the obligations of the Manager hereunder, which in no event will exceed 180 days (the "***Disentanglement Period***").

(e)    <u>Return of Assets</u>.  Before the end of the Disentanglement Period, and for no additional consideration, the Manager shall return any assets that have been transferred to it pursuant to Section 10.15 to Franchise HoldCo, unless directed otherwise by the Licensors.

Section 8.4    <u>Third-Party Intellectual Property</u>.  The Manager shall use commercially reasonable efforts to assist and cooperate with the Successor Manager in obtaining any necessary licenses or consents to use any third-party Intellectual Property then being used by the Manager. The Manager shall assign any such license or sublicense directly to the Successor Manager to the extent the Manager has the rights to assign such agreements to the Successor Manager without incurring any additional cost or liability.

Section 8.5    <u>Rights Cumulative</u>.  All rights and remedies from time to time conferred upon or reserved to the Licensors, Manager, Franchisors or Franchise HoldCo or to any or all of the foregoing are cumulative, and none is intended to be exclusive of another or any other right or remedy which they may have at law or in equity.  Except as otherwise expressly provided herein, no delay or omission in insisting upon the strict observance or performance of any provision of this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy.  Every such right and remedy may be exercised from time to time and as often as deemed expedient.

## ARTICLE IX
## CONFIDENTIALITY

Section 9.1    <u>Confidentiality</u>.

(a)    Each of the parties hereto acknowledges that during the Term such party (the "***Recipient***") may receive Confidential Information of another party hereto (the "***Discloser***"). The Recipient agrees to maintain the Confidential Information of the Discloser in the strictest of confidence during and after the Term and shall not, except as otherwise contemplated herein or in the License Agreement, at any time, use, disseminate or disclose any Confidential Information to any Person other than (i) those of its owners, officers, directors, managers, employees, agents, financing sources, suppliers, service providers, landlords, advisors or representatives (including legal counsel and accountants) and similar parties who have a "need to know" and who have been apprised of this restriction or (ii) in the case of the Manager, to Sublicensees and prospective Sublicensees, Franchisees and prospective Franchisees, or the Third-Party Service Provider under written confidentiality agreements that contain provisions at least as protective as those set forth in this Agreement, or (iii) in the case of the Manager, as otherwise necessary in furtherance of its duties hereunder, including to any Interim Successor Manager or Successor Manager.  The Recipient shall be liable for any breach of this <u>Section 9.1</u> by any Person to whom it has disclosed Confidential Information and shall immediately notify Discloser upon learning of any loss or disclosure of any Confidential Information of the Discloser, provided that Recipient and its advisors will be entitled to retain a copy of such Confidential Information in accordance with its data retention policies to the maximum extent permitted by applicable law or regulation.  Upon

termination of this Agreement, Recipient shall return to the Discloser, or at Discloser's request, destroy, all documents and records in its possession containing the Confidential Information of the Discloser.

(b)     Notwithstanding anything to the contrary contained in <u>Section 9.1(a)</u>, Recipient may use, disseminate or disclose any Confidential Information of Discloser to any Person in connection with enforcement of or the performance of its obligations under this Agreement or as required by applicable law, statute, rule, regulation, subpoena, court order or legal process; <u>provided</u>, however, that prior to disclosing any such Confidential Information:

(i)     to any such Person other than in connection with any judicial or regulatory proceeding, such Person shall agree in writing to maintain such Confidential Information in a manner at least as protective of the Confidential Information as the terms of <u>Section 9.1(a)</u>; or

(ii)     to any such Person in connection with any judicial or regulatory proceeding or as otherwise required by applicable law, statute, rule, regulation, subpoena, court order or legal process, the Recipient will (x) promptly notify Discloser of each such requirement and identify the documents so required thereby, so that Discloser may seek an appropriate protective order or similar treatment and/or waive compliance with the provisions of this Agreement; (y) use reasonable efforts to assist Discloser in obtaining such protective order or other similar treatment protecting such Confidential Information prior to any such disclosure; and (z) other than in connection with a dispute between Discloser or its affiliates, on one hand, and Recipient and its affiliates, on the other hand, consult with Discloser on the advisability of taking legally available steps to resist or narrow the scope of such requirement.  If, in the absence of such a protective order or similar treatment, the Recipient is nonetheless required by mandatory applicable law or order to disclose any part of Discloser's Confidential Information which is disclosed to it under this Agreement, the Recipient may disclose such Confidential Information without liability under this Agreement, except that the Recipient will furnish only that portion of the Confidential Information which is legally required.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1     <u>Bankruptcy Remoteness</u>.

(a)     From and after the Closing, the limited liability company agreements (or equivalent governing documents) for each Bankruptcy Remote Entity shall be in the forms attached hereto as **Exhibit D** (collectively, the "***Approved Operating Agreements***").  The adoption of the Approved Operating Agreements for each Bankruptcy Remote Entity shall be a condition precedent to the obligation of Manager to consummate the Closing.

(b)      The entry of the Sale Order in form and substance reasonably acceptable to the parties shall be a condition precedent to the obligation of Manager to consummate the Closing. The Sale Order shall include the following findings of fact and conclusions of law:

(i)      The Approved Operating Agreements shall constitute, and are hereby deemed to be, legal, binding, enforceable, non-avoidable, properly authorized, automatically valid, and fully effective obligations of the parties thereto and their respective successors and assigns (the "***Operating Agreement Parties***").

(ii)     The Approved Operating Agreements and the provisions of this Sale Order, including all findings herein, shall be binding upon all parties in interest in Chapter 11 Cases, including, without limitation, the Operating Agreement Parties, and each of their respective successors and assigns, and shall inure to the benefit of the Operating Agreement Parties and their respective successors and assigns.

(iii)    The Approved Operating Agreements (A) shall constitute legal, valid, binding, reasonable, and authorized obligations of the Operating Agreement Parties enforceable in accordance with their terms under the Bankruptcy Code or any other applicable non-bankruptcy law, (B) shall have been entered into by the Operating Agreement Parties, in each case, in good faith, for legitimate business purposes, and shall not be subject to avoidance or recharacterization for any purposes whatsoever, in the case of (A) and (B), under the Bankruptcy Code or any other applicable non-bankruptcy law.

(iv)    The License Agreement constitutes a license of intellectual property within the meaning of section 365(n) of the Bankruptcy Code.  In the event of the commencement of a case under the Bankruptcy Code by or against the Licensor (as defined in the License Agreement), the License Agreement and the rights of the Licensees (as defined in the License Agreement) thereunder shall be subject to, and the Licensees shall be entitled to all of the protections afforded by, section 365(n) of the Bankruptcy Code, and any successor or analogous provisions. Without limiting the foregoing, Licensees shall have the right to retain and enforce their respective rights under the License Agreement in accordance with section 365(n) of the Bankruptcy Code. The rights granted to Licensees under the License Agreement shall be treated as licenses of "intellectual property" within the meaning of section 101(35A) of the Bankruptcy Code.

(v)     Notwithstanding the immediately prior paragraph, in the event of the commencement of a case under the Bankruptcy Code by or against the Licensors, (a) any license of trademarks, trade names,

service marks, logos, trade dress and other source identifiers granted under the License Agreement shall remain in full force and effect notwithstanding any rejection or deemed rejection of the License Agreement by the Licensors or a trustee, and (b) the Licensees shall be entitled to retain and exercise all of their respective rights and licenses under the License Agreement to the fullest extent permitted by *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) and applicable non-bankruptcy law.

(c)     The Parties agree that, in connection with any Bankruptcy Event involving any Bankruptcy Remote Entity or Licensor, they (and their successors and assigns, and any trustee, examiner, receiver, custodian, or other fiduciary acting on their behalf) will not: (i) challenge the validity, enforceability, or binding effect of this Agreement; (ii) take or support any action seeking or supporting the rejection, termination, or impairment of this Agreement under section 365 of the Bankruptcy Code or any similar provision under applicable law or regulation; or (iii) condition any consent, approval, or other support for any sale, plan of reorganization, or plan of liquidation upon the rejection, termination, or impairment of this Agreement; provided, however, that nothing in this Section 10.1(b) shall prevent any Party from exercising their rights in accordance with the terms of this Agreement, including any termination rights.

Section 10.2   Survival.  The provisions of Section 2.1(c), Section 3.2(f), Section 3.3, Section 3.5, Section 3.6, Section 3.7, Section 4.2, Section 8.2(d), Section 8.2(e), Section 8.3, Section 8.5, Article IX, and Article X (except for Section 10.1) shall survive termination of this Agreement; provided that the provisions of Section 3.3(a), Section 3.3(b), Section 4.2, and Section 8.2(d) shall only survive termination of this Agreement until the earlier of (i) the expiration of the Disentanglement Period or (ii) 180 days after the commencement of the Disentanglement Period; provided, further, that, notwithstanding anything to contrary, the payment obligations of any Party that have accrued prior to the effective date of the termination of this Agreement shall survive such termination.

Section 10.3   Amendment.  This Agreement may only be amended from time to time in writing, upon the written consent of each of the parties.  Any such amendment or modification effected contrary to the provisions of this 0 shall be null and void.

Section 10.4   Governing Law; Dispute Resolution.  **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CHOICE OF LAW RULES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**  Any dispute arising out of or relating to this Agreement shall first be submitted to non-binding mediation in New York City, New York, under the mediation rules of the American Arbitration Association.  If the dispute is not resolved through mediation within thirty (30) days, any party to the dispute may submit the matter to binding arbitration in New York City, New York, in accordance with the rules of the American Arbitration Association.  The parties shall share equally the costs of mediation and arbitration, including the fees of the mediator or arbitrator.  Each party shall bear its own attorneys' fees and expenses, unless otherwise determined by the arbitrator.  Judgment on the arbitration award may be entered in any court of competent jurisdiction.

Section 10.5    Notices.

(a)    Any notices, requests, or other communications desired or required to be given in writing under this Agreement shall be sent to the applicable address set forth below, by (i) nationally recognized overnight courier service, (ii) personally, with a copy also delivered by electronic mail, or (iii) electronic mail transmission of a pdf or similar file, with a following copy to be delivered by one of the foregoing methods or by certified or registered mail.  Any party hereto may change its address or email address for notices hereunder by giving notice of such change to the other parties hereto.  All notices and demands to any Person hereunder shall be deemed to have been given either at the time of the delivery thereof at the address or email address of such Person for notices hereunder, or on the first business day after the mailing thereof to such address, as the case may be.

| | |
|---|---|
| **If to Manager:** | HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:  Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com |
| **With a copy to (which shall not constitute notice):** | MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attn:    Benjamin Butterfield, Esq.<br>          Joseph Sulzbach, Esq.<br>Email:  bbutterfield@mofo.com<br>          jsulzbach@mofo.com |
| **If to Franchise HoldCo:** | HOA Franchise HoldCo LLC<br>c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:     Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:  Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com |
| **With a copy to (which shall not constitute notice):** | MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attn:    Benjamin Butterfield, Esq.<br>          Joseph Sulzbach, Esq.<br>Email:  bbutterfield@mofo.com<br>          jsulzbach@mofo.com |

| | |
|---|---|
| **If to Franchisors** | c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>            Nathan Weatherilt, Chief Financial Officer<br>Email:  Neil.Kiefer@originalhooters.com<br>            Nathan.Weatherilt@originalhooters.com |
| **With a copy to (which shall not constitute notice):** | MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attn:    Benjamin Butterfield, Esq.<br>            Joseph Sulzbach, Esq.<br>Email:  bbutterfield@mofo.com<br>            jsulzbach@mofo.com |
| **If   to   IP   Owner   and Licensors:** | c/o DRIVETRAIN AGENCY SERVICES, LLC<br>410 Park Ave, Suite 900<br>New York, NY 10022<br>Attn:    Tim Daileader<br>Email:  tdaileader@drivetrainllc.com |
| **With a copy to (which shall not constitute notice):** | White & Case LLP<br>200 South Biscayne Blvd., Suite 4900<br>Miami, FL 33131<br>Attn:    Brian Pfeiffer<br>            Amanda Parra Criste<br>Email:  brian.pfeiffer@whitecase.com<br>            aparracriste@whitecase.com<br><br>-and-<br><br>White & Case LLP<br>1121 Avenue of the Americas<br>New York, NY 10020<br>Attn:    David Thatch<br>Email:  dthatch@whitecase.com |

(b)      For purposes of this Agreement, any reference to "written" or "in writing" means any form of written communication, including, without limitation, electronic signatures, and any such written communication may be transmitted by Electronic Transmission.  Any requirement in this Agreement that is to be signed or authenticated by "manual signature" or

similar language shall not be deemed to prohibit signature to be by facsimile or electronic signature and shall not be deemed to prohibit delivery thereof by Electronic Transmission.

Section 10.6    Severability of Provisions.    If one or more of the provisions of this Agreement shall be for any reason whatever held invalid or unenforceable, such provisions shall be deemed severable from the remaining covenants, agreements and provisions of this Agreement and such invalidity or unenforceability shall in no way affect the validity or enforceability of such remaining provisions, or the rights of any parties hereto.  To the extent permitted by law, the parties hereto waive any provision of law that renders any provision of this Agreement invalid or unenforceable in any respect.

Section 10.7    Delivery Dates.    If the due date of any notice, certificate or report required to be delivered by the Manager hereunder falls on a day that is not a Business Day, the due date for such notice, certificate or report shall be automatically extended to the next succeeding day that is a Business Day.

Section 10.8    Binding Effect; Assignment.    The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.  Any assignment of this Agreement without the written consent of Manger, IP Owner, HOA Systems, Franchisors and Franchise HoldCo shall be null and void.

Section 10.9    Article and Section Headings.    The Article and Section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

Section 10.10    Counterparts.    This Agreement may be executed by the parties hereto in several counterparts (including by electronic means of communication), each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute but one and the same agreement.

Section 10.11    Entire Agreement.    This Agreement, the License Agreement, the Sale Order, and the Approved Operating Agreements constitute the entire agreement and understanding among the parties with respect to the subject matter hereof.

Section 10.12    Limitation of Nature of Liability.    EXCEPT IN CONNECTION WITH Article IX HEREOF, IN NO EVENT SHALL ANY PARTY, ITS AFFILIATES, OR THEIR RESPECTIVE DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES, BE LIABLE TO ANY OTHER PARTIES HEREUNDER UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR EXEMPLARY, PUNITIVE, INDIRECT, SPECIAL, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION Section 10.12 SHALL LIMIT ANY PARTY'S LIABILITY FOR (OR LIMIT ANY PARTY'S RIGHT TO SEEK) EITHER (I) DAMAGES FOR OR ARISING FROM ANY FAILURE OF MANAGER TO PERFORM ITS OBLIGATIONS UNDER Section 3.1(c) OF THIS AGREEMENT OR (II) DAMAGES TO VALIDITY, ENFORCEABILITY, OWNERSHIP, DISTINCTIVENESS, OR VALUE OF THE BRAND ARISING FROM THE GROSS NEGLIGENCE, RECKLESSNESS, MALFEASANCE, WILLFUL BREACH OR MISCONDUCT, OR FRAUD OF MANAGER.

Section 10.13  <u>Waiver of Jury Trial; Jurisdiction; Consent to Service of Process</u>.

(a)    **THE PARTIES HERETO EACH HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT**.

(b)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 10.5</u>.  Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(c)    There shall be no double recovery with respect to claims arising under this Agreement and any related agreement, including the License Agreement.

Section 10.14  <u>Force Majeure</u>.  No party, nor any of their respective affiliates, shall bear any responsibility or liability for any delay or failure to perform its obligations under this Agreement to the extent arising out of any unforeseeable delay, inability to perform or interruption of its performance of its obligations under this Agreement to the extent such delay, inability or interruption is caused by events beyond its reasonable control including acts of God, acts of Governmental Authorities, acts of the public enemy or due to war, riot, flood, civil commotion, insurrection, labor strike or work stoppage, severe or adverse weather conditions, lack of or shortage of electrical power, or any other similar cause beyond the reasonable control of such party.

Section 10.15  <u>Cooperation Regarding Transfer of Debtor Assets</u>.  The transfer of assets to Manager pursuant to the Bill of Sale in the form attached hereto as **<u>Exhibit E</u>** shall be a condition to  Manager's obligations hereunder. The parties agree to use commercially reasonable efforts to cooperate in good faith to ensure that any other assets of the Debtors that are necessary or reasonably required for Manager to perform its obligations or functions under this Agreement are transferred to Franchise HoldCo, Franchisors, or Manager (as reasonably determined by the parties) under the Plan, for no additional consideration, free and clear of all claims and encumbrances, in a manner and on terms mutually agreed by the parties; <u>provided</u>, that the equity and assets of Licensors shall not be transferred to Franchise HoldCo. The parties shall act in good faith and use commercially reasonable efforts to document and effectuate such additional transfers consistent with the Plan and the intent of this Agreement.

[*Remainder of Page Intentionally Left Blank*]

# EXHIBIT A

## List of Acquired Restaurants

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1007 Daytona | 2100 International Speedway Drive | Daytona Beach | FL | 32114 | Hooters of Daytona 2025 LLC |
| 1008 Raleigh | 4206 Old Wake Forest Road | Raleigh | NC | 27609 | PWW Raleigh, LLC |
| 1010 Myrtle Beach North | 10133 North Kings Highway | Myrtle Beach | SC | 29572 | PWW Myrtle Beach North, LLC |
| 1011 Wilmington | 5112 Market Street | Wilmington | NC | 28405 | PWW Wilmington, LLC |
| 1014 Roswell | 795 Holcomb Bridge Road | Roswell | GA | 30076 | Hooters of Roswell 2025 LLC |
| 1023 Tara Blvd | 6785 Tara Boulevard | Jonesboro | GA | 30236 | Hooters of Tara Blvd 2025 LLC |
| 1025 Fayetteville NC | 501 N. McPherson Church Road | Fayetteville | NC | 28303 | PWW Fayetteville, LLC |
| 1028 Maryland Heights | 11835 Lackland Road | St. Louis | MO | 63146 | PWW Maryland Heights, LLC |
| 1031 Greensboro | 3031 High Point Road | Greensboro | NC | 27403 | PWW Greensboro, LLC |
| 1033 Jacksonville San Jose | 8938 San Jose Blvd. | Jacksonville | FL | 32257 | Hooters of Jacksonville San Jose 2025 LLC |
| 1036 Myrtle Beach | 3901 North Kings Highway | Myrtle Beach | SC | 29577 | PWW Myrtle Beach, LLC |
| 1043 South County | 7517 South Lindbergh Boulevard | St. Louis | MO | 63125 | PWW South County, LLC |
| 1046 Greenville SC | 2401 Laurens Road | Greenville | SC | 29607 | PWW Greenville, LLC |
| 1047 Lakeland II | 3400 US 98 North | Lakeland | FL | 33809 | Hooters of Lakeland II 2025 LLC |
| 1052 Oklahoma City South | 2019 West I-240 Service Road | Oklahoma City | OK | 73159 | PWW Oklahoma City South, LLC |
| 1053 Tulsa | 8108 East 61st | Tulsa | OK | 74133 | PWW Tulsa, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1061 Newnan | 1001 Bullsboro Drive | Newnan | GA | 30265 | Hooters of Newnan 2025 LLC |
| 1063 Conyers | 1099 Iris Drive, SE | Conyers | GA | 30012 | Hooters of Conyers 2025 LLC |
| 1074 Kennesaw | 2102 Old Highway 41 | Kennesaw | GA | 30144 | Hooters of Kennesaw 2025 LLC |
| 1075 Lake Buena Vista | 8510 Palm Parkway | Orlando | FL | 32836 | Hooters of Lake Buena Vista 2025 LLC |
| 1077 Fredericksburg | 10400 Spotsylvania Avenue | Fredericksburg | VA | 22408 | PWW Fredericksburg, LLC |
| 1079 Fairview Heights | 301 Market Place, Suite C | Fairview Heights | IL | 62208 | PWW Fairview Heights, LLC |
| 1085 Columbus GA | 2650 Adams Farm Road | Columbus | GA | 31909 | Hooters of Columbus GA 2025 LLC |
| 1088 Concord NC | 7702 Gateway Lane | Concord | NC | 28027 | PWW Concord, LLC |
| 1097 Hickory | 1211 13th Avenue Drive, S.E. | Hickory | NC | 28602 | PWW Hickory, LLC |
| 1100 Savannah | 4 Gateway Blvd, W. | Savannah | GA | 31409 | Hooters of Savannah 2025 LLC |
| 1101 Orlando Airport | 7222 Augusta National Dr | Orlando | FL | 32822 | Hooters of Orlando Airport 2025 LLC |
| 1103 Overland Park | 10620 Metcalf Lane | Overland Park | KS | 66212 | PWW Overland Park, LLC |
| 1105 Springfield MO | 2110 E. Independence Ave. | Springfield | MO | 65804 | PWW Springfield, LLC |
| 1112 Horn Lake | 982 Goodman Rd | Horn Lake | MS | 38637 | PWW Horn Lake, LLC |
| 1118 North Charleston | 2171 Northwoods Blvd. | Charleston | SC | 29406 | PWW North Charleston, LLC |
| 1131 Potomac Mills | 2630 Prince William Pkwy | Woodbridge | VA | 22192 | PWW Potomac Mills, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1136 Burlington NC | 3122 Garden Road | Burlington | NC | 27216 | PWW Burlington, LLC |
| 1137 Raleigh Airport | 1001 Claren Circle | Morrisville | NC | 27560 | PWW Raleigh Airport, LLC |
| 1138 St. Peters | 4061 Veterans Memorial Pkwy | St. Peters | MO | 63376 | PWW St. Peters, LLC |
| 1142 Pelham | 400 Cahaba Valley Rd | Pelham | AL | 35124 | PWW Pelham, LLC |
| 1144 Topeka | 6100 SW 10th Avenue | Topeka | KS | 66615 | PWW Topeka, LLC |
| 1145 Laurel | 14707-B Baltimore Avenue | Laurel | MD | 20707 | PWW Laurel, LLC |
| 1147 Kansas City Speedway | 1712 Village West Parkway | Kansas City | KS | 66111 | PWW Kansas City Speedway, LLC |
| 1151 Columbia MO | 1101 Woodland Springs Court | Columbia | MO | 65201 | PWW Columbia, LLC |
| 1152 Trussville | 1917 Edwards Lake Road | Trussville | AL | 32535 | PWW Trussville, LLC |
| 1153 North Little Rock | 4110 Landers Road | North Little Rock | AR | 72117 | PWW North Little Rock, LLC |
| 1156 Lawrenceville | 860 Duluth Highway Suite 900 | Lawrenceville | GA | 30043 | Hooters of Lawrenceville 2025 LLC |
| 1161 Chantilly | 14441 Brookfield Tower Dr. | Chantilly | VA | 20151 | PWW Chantilly, LLC |
| 1167 Richmond VA | 7912 W. Broad St. | Richmond | VA | 23294 | PWW Richmond, LLC |
| 1168 Chester | 2401 W. Hundred Road | Chester | VA | 23831 | PWW Chester, LLC |
| 1169 Chesterfield | 1211 Huguenot Rd. | Midlothian | VA | 23113 | PWW Richmond, LLC |
| 1171 I Drive | 8801 International Drive | Orlando | FL | 32819 | Hooters of I Drive 2025 LLC |
| 1174 Council Bluffs | 2910 23rd Avenue | Council Bluffs | IA | 51501 | PWW Council Bluffs, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1175 Davenport | 110 E. Kimberly Rd. | Davenport | IA | 58206 | PWW Davenport, LLC |
| 1177 Mall of Georgia | 1950 Mall of Georgia Blvd | Buford | GA | 30519 | Hooters of Mall of GA 2025 LLC |
| 1178 Cartersville | 887 Joe Frank Harris Pkwy, SE | Cartersville | GA | 30120 | Hooters of Cartersville 2025 LLC |
| 1180 Saginaw | 5538 Bay Road | Saginaw | MI | 48604 | PWW Saginaw, LLC |
| 1182 Fairfax II | 10060 Fairfax Blvd | Fairfax | VA | 22030 | PWW Fairfax II, LLC |
| 1184 Ocala | 2711 SW 27th Ave | Ocala | FL | 34471 | Hooters of Ocala 2025 LLC |
| 1185 Palm Bay | 695 Palm Bay Road | West Melbourne | FL | 32904 | Hooters of Palm Bay 2025 LLC |
| 1187 Kissimmee West | 8207 West Irlo Bronson Memorial Highway | Kissimmee | FL | 34747 | Hooters of Kissimmee West 2025 LLC |
| 1190 West Little Rock | 6 Anglers Way | Little Rock | AR | 72210 | PWW West Little Rock, LLC |
| 1192 Prattville AL | 2585 Bass Pro Boulevard | Prattville | AL | 36066 | PWW Prattville, LLC |
| 1194 La Vista NE | 12710 Westport Parkway | La Vista | NE | 68138 | La Vista Wings, LLC |
| 2001 West End | 2201 North Lamar | Dallas | TX | 75202 | Hooters of West End 2025 LLC |
| 2004 Arlington North | 1151 North Collins | Arlington | TX | 76011 | Hooters of Arlington North 2025 LLC |
| 2009 Nasa | 20796 Gulf Freeway | Webster | TX | 77598 | Hooters of Nasa 2025 LLC |
| 2010 North Richland Hills | 7669 Grapevine Hwy | N. Richland Hills | TX | 76180 | Hooters of North Richland Hills 2025 LLC |
| 2011 San Antonio North | 8527 Wurzbach Rd. | San Antonio | TX | 78240 | Hooters of San Antonio North 2025 LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 2014 Mesquite | 3902 Towne Crossing Blvd. | Mesquite | TX | 75150 | Hooters of Mesquite 2025 LLC |
| 2017 Plano | 720 Central Expressway | Plano | TX | 75074 | Hooters of Plano 2025 LLC |
| 2018 El Paso | 1170 Sunmount | El Paso | TX | 79925 | Hooters of El Paso 2025 LLC |
| 2020 Round Rock | 2700 SOUTH I-H 35 | Round Rock | TX | 78681 | Hooters of Round Rock 2025 LLC |
| 2021 San Pedro TX | 13131 San Pedro | San Antonio | TX | 78216 | Hooters of San Pedro 20225 LLC |
| 2022 Corpus Christi | 4551 South Padre Island Drive | Corpus Christi | TX | 78411 | Hooters of Corpus Christi 2025 LLC |
| 2023 Frisco | 4224 Preston Road | Frisco | TX | 75035 | Hooters of Frisco 2025 LLC |
| 2024 Fort Worth | 5340 Southwest Blvd., | Ft. Worth | TX | 76109 | Hooters of Fort Worth 2025 LLC |
| 2028 Willowbrook | 17599 Tomball Parkway | Houston | TX | 77064 | Hooters of Willowbrook 2025 LLC |
| 2029 Sugarland | 12759 S.W. Freeway | Stafford | TX | 77477 | Hooters of Sugarland 2025 LLC |
| 2031 McKinney | 1775 N. Central Expressway | McKinney | TX | 75070 | Hooters of McKinney 2025 LLC |
| 2032 Selma | 15412 Interstate 35 N | Selma | TX | 78154 | Hooters of Selma 2025 LLC |
| 2037 Humble | Highway 59 North | Humble | TX | 77338 | Hooters of Humble 2025 LLC |
| 2039 Denton | 985 S. I-35 East | Denton | TX | 76205 | Hooters of Denton 2025 LLC |
| 2042 Odessa | 2660 John Ben Shepperd Parkway | Odessa | TX | 79761 | Hooters of Odessa TX 2025 LLC |
| 2045 Texarkana | 5101 N. State Line Avenue | Texarkana | TX | 75503 | Hooters of Texarkana 2025 LLC |
| 2046 Pasadena TX | 3656 E. Sam Houston Pkwy. | Pasadena | TX | 77505 | Hooters of Pasadena TX 2025 LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 2047 Katy | 22575 Katy Freeway | Katy | TX | 77450 | Hooters of Katy 2025 LLC |
| 2048 Garland | 4781 Bass Pro Drive | Garland | TX | 75043 | Hooters of Garland 2025 LLC |
| 2050 Pearland | 15838 South Freeway | Pearland | TX | 77584 | Hooters of Pearland 2025 LLC |
| 2051 Harlingen | 98 Bass Pro Drive | Harlingen | TX | 78552 | Hooters of Harlingen 2025 LLC |
| 2052 San Antonio West | 9802 Ingram Road | San Antonio | TX | 78245 | Hooters of San Antonio West 2025 LLC |
| 2058 Cedar Hill | 622 Uptown Boulevard | Cedar Hill | TX | 75104 | Hooters of Cedar Hill 2025 LLC |
| 2059 Abilene | 2042 E. Overland Trail, | Abilene | TX | 79601 | Hooters of Abilene 2025 LLC |
| 2065 Grand Prairie | 2750 West Interstate 20 | Grand Prairie | TX | 75052 | Hooters of Grand Prairie 2025 LLC |
| 2069 El Paso East | 1799 Joe Battle Blvd | El Paso | TX | 79936 | Hooters of El Paso East 2025 LLC |
| 3041 Chattanooga | 5912 Brainerd Rd. | Chattanooga | TN | 37421 | PWW Chattanooga, LLC |
| 3067 Dupont | 4120 Dutchman's Lane | Louisville | KY | 40207 | PWW Dupont, LLC |
| 3110 Indy Downtown | 25 W. Georgia Street | Indianapolis | IN | 46225 | PWW Indy Downtown, LLC |
| 3116 Johnson City | 2288 N. Roane St. | Johnson City | TN | 37601 | PWW Johnson City, LLC |
| 3128 Kingston Pike | 8050 Kingston Pike Hwy | Knoxville | TN | 37919 | PWW Kingston Pike, LLC |
| 3140 Lexington | 3101 Richmond Rd. #315 | Lexington | KY | 40509 | PWW Lexington, LLC |
| 3156 Merrillville | 771 E. 81st Place | Merrillville | IN | 46410 | Hooters of Merrillville 2025 LLC |
| 3214 Preston | 7701 Preston Hwy | Louisville | KY | 40219 | PWW Preston, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 3220 Rivergate | 654 Wade Circle S. | Goodlettsville | TN | 37072 | PWW Rivergate, LLC |
| 3260 Toledo | 4782 Monroe St. | Toledo | OH | 43623 | PWW Toledo, LLC |
| 3386 Alcoa | 1099 Hunter Crossing Drive | Alcoa | TN | 37701 | PWW Alcoa, LLC |
| 3428 Wolfchase | 2838 New Brunswick Road | Memphis | TN | 38133 | PWW Wolfchase/Memphis, LLC |
| 3468 Dayton | 6851 Miller Lane | Dayton | OH | 45414 | PWW Dayton, LLC |
| 3472 Fort Campbell | 750 North Riverside Drive | Clarksville | TN | 37040 | PWW Fort Campbell, LLC |
| 3508 Florence | 7200 Houston Road | Florence | KY | 41042 | PWW Florence, LLC |
| 3549 Merchants Drive | 5005 Central Avenue Pike | Knoxville | TN | 37912 | PWW Merchants Drive, LLC |
| 3554 Schererville | 1650 U.S. Hwy. 41, Suite A | Schererville | IN | 46375 | Hooters of Schererville 2025 LLC |
| 3567 Mishawaka | 205 W. Day Road | Mishawaka | IN | 46545 | Hooters of Mishawaka 2025 LLC |
| 3568 Portage | 1655 Olmstead Drive | Portage | IN | 46368 | Hooters of Portage 2025 LLC |
| 3570 Mason | 9890 Escort Drive | Mason | OH | 45040 | PWW Mason, LLC |

w

**EXHIBIT B**

**Trademarks**

| Proprietary Mark | Date Filed | Registration No. |
|---|---|---|
|  | 02/06/84 | 1,320,029 |
| HOOTERS | 01/23/89 | 1,557,380 |
|  | 03/07/88 | 1,602,377 |
| THE SOON TO BE RELATIVELY FAMOUS | 09/26/02 | 2,736,549 |
| WINGSDAY | 03/26/09 | 3,695,572 |
| THE CURE FOR THE COMMON RESTAURANT | 03/04/08 | 3,488,547 |
|  | 06/03/14 | 4,545,042 |
| HOOTCLUB | 06/27/16 | 5,133,484 |
| HOOTERS MAKES YOU HAPPY! | 11/13/17 | 5,636,057 |
| HOOTIE'S BURGER BAR | 12/19/18 | 5,819,801 |

| Proprietary Mark | Date Filed | Registration No. |
|---|---|---|
| CHICKEN WINGS AND OTHER THINGS | 08/27/20 | 6,352,645 |

**EXHIBIT C**

**Power of Attorney Form**

**POWER OF ATTORNEY**

This POWER OF ATTORNEY is made by _____ with its registered office address at _____ ("**Appointor**") in favor of Hooters Brand Management LLC ("**Manager**").

This Power of Attorney provides as follows:

1.       All capitalized terms used in this Power of Attorney but not otherwise defined shall have the meanings given to them in the Management Agreement, dated October 31, 2025, to which Manager and Appointor are parties ("**Management Agreement**"). This Power of Attorney is subject in all respects to the terms of the Management Agreement and nothing herein is intended to alter the terms of such agreement.

2.       Appointor hereby constitutes and appoints the Manager, with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place, and stead to:

   (a)      perform the Stewardship Activities, including the IP Activities, in accordance with the Management Agreement;

   (b)      exercise all rights and obligations with respect to the Management Assets in furtherance of the Services, in accordance with the Management Agreement;[1]

   (c)      instruct Third-Party Service Provider to withhold from any Royalty payable to Licensor in accordance with Section 3.4(e);

   (d)      do all and perform any and every act on behalf of Appointor as delegated to Manager under the Management Agreement;

   (e)      execute, acknowledge, and deliver on behalf of Appointor all other agreements, instruments and documents that may be necessary or desirable in furtherance of the foregoing in a manner consistent with the Management Agreement; and

   (f)      do and perform any and every act required, necessary or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as Appointor might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, shall lawfully do or cause to be done by virtue of this Power of Attorney and the rights and powers herein granted (collectively, "**Appointed Activities**"); provided, that the rights and powers herein granted,

_____

[1] This shall only apply to the HOA Franchise HoldCo LLC power of attorney.

including, for the avoidance of doubt, the Appointed Activities, are in all respects subject to the terms of the Management Agreement.

3.    The authority to grant this Power of Attorney was approved by the sole member of Appointor pursuant to Appointor's Approved Operating Agreement.

4.    Appointor, through its board of directors, hereby ratifies and confirms all actions that the attorneys in fact or any of them, may lawfully do or cause to be done by virtue of this instrument solely to the extent such action is consistent with the Management Agreement.

5.    Manager shall not be liable for any action taken or not taken under this Power of Attorney unless it is a result of Manager's willful misconduct or gross negligence; <u>provided</u>, that the parties maintain all rights and do not waive any rights under the Management Agreement that may arise as a result of actions taken by Manager pursuant to this Power of Attorney.

6.    Subject to the terms of the Management Agreement, the foregoing Power of Attorney may extend to Manager's heirs, successors, assigns, and representatives. For the avoidance of doubt, in the event of an Unauthorized Change of Control (as defined in the Management Agreement), the foregoing Power of Attorney shall not extend to Manager's heirs, successors, assigns, and representatives. Any assignment of the foregoing Power of Attorney requires the written consent of the Appointor and must be in accordance with the express terms of the Management Agreement, and is otherwise null and void.

7.    Appointor hereby revokes any and all previous powers of attorney with respect to the Appointed Activities and shall not, unless and until this Power of Attorney expires pursuant to Section 8 below, purport to grant any power of attorney with respect to the Appointed Activities.

8.    This Power of Attorney shall only be revocable if the Management Agreement has been terminated in accordance with its terms and the Disentanglement Period has ended.

9.    This Power of Attorney shall remain in effect until the later of termination of the Management Agreement and end of the Disentanglement Period.

*[Remainder of the page left intentionally blank]*

This Power of Attorney shall be governed by and construed in accordance with the laws of the State of New York.

Signed and effective on the October 31, 2025.

**EXHIBIT D**

**Approved Operating Agreements**

**EXHIBIT E**

**Bill of Sale**

## SCHEDULE 1

### Segregated Accounts

| Entity | Bank Account |
|---|---|
| HOA FRANCHISING, LLC | x6181 |
| HOOTS FRANCHISING, LLC | x6162 |
| HOA FUTURE FRANCHISING, LLC | To come. |
| HOA FRANCHISE HOLDCO LLC | To come. |
| HI LIMITED PARTNERSHIP | x0542 |
| HOA SYSTEMS, LLC | x0385 |

**SCHEDULE 2**

**Period Report**

## System Data[1]

*As of the 4 Week Period Ending _____:*

**Domestic Restaurant Count: Hooters**
    Legacy Franchised Restaurants
    Franchised Confirmed Stores (once Company-owned)
    Franchised Royalty Holiday Stores (once Company-owned)
    New Franchised Restaurants
**Total Domestic Restaurant Count: Hooters**

**Domestic Restaurant Count: Hoots Wings**
    Franchised Restaurants
**Total Restaurant Count: Hoots Wings**

*For the 4 Week Period Ending _____:*

**Net Revenue: Hooters**
    Legacy Franchised Restaurants     $
    Franchised Confirmed Stores (once Company-owned)     $
    Franchised Royalty Holiday Stores (once Company-owned)     $
    New Franchised Restaurants     $
**Total Net Revenue: Hooters**     $

**Net Revenue: Hoots Wings**
    Franchised Restaurants     $
**Total Net Revenue: Hoots Wings**     $

**Domestic Systemwide Net Revenue**

| | BMC | RoyaltyCo | Total |
|---|---|---|---|
| **Hooters Royalties Collected** | | | |
| Legacy Franchised Restaurants | $ | $ | $ |
| Franchised Confirmed Stores (once Company-owned) | $ | $ | $ |
| Franchised Royalty Holiday Stores (once Company-owned) | $ | $ | $ |
| New Franchised Restaurants | $ | $ | $ |
| **Total Hooters Royalties Collected** | $ | $ | $ |
| **Total Hoots Royalties Collected** | $ | $ | $ |
| **Total Domestic Royalties Collected** | | | |
| **International Franchisor Revenue** | | | |
| **License Revenue:** | | | |
| Legacy Licensees | $ | $ | $ |
| New Licensees (50/50 split) | $ | $ | $ |
| New Licensees (75/25 split) | $ | $ | $ |

---

[1] To be provided by the Manager in accordance with Section 4.1(f) of the Brand Management Agreement.  The timing of this "System Data" is not required to match to the time periods provided for the monthly cash reporting.

| | | | |
|---|---|---|---|
| **Total Licensing Revenue** | $ | $ | $ |
| **Franchise Fees (new stores)** | $ | $ | $ |
| **Other Fees/Revenues** | $ | $ | $ |
| **Total Franchisor Revenue** | $ | $ | $ |

**Revenue Allocation**
    HOA RoyaltyCo LLC   $
    Hooters Brand Management LLC   $

**Allocated Expenses**
    HOA RoyaltyCo LLC   $
    Hooters Brand Management LLC   $

**Net Royalty Allocation**
    HOA RoyaltyCo LLC   $
    Hooters Brand Management LLC   $