# EXHIBIT K

**License Agreement**

**PROPOSED FINAL VERSION**

**HOOTERS IP LICENSE AGREEMENT**

**Dated as of October 31, 2025**

**between**

**HI LIMITED PARTNERSHIP,**

**as Licensor,**

**and**

**HOA FRANCHISING, LLC,**
**HOOTS FRANCHISING, LLC,**
**HOA FUTURE FRANCHISING, LLC, and**
**HOA SYSTEMS, LLC,**

**as Licensees.**

v.

## **TABLE OF CONTENTS**

1.  Certain Definitions..................................................................................................2
2.  Interpretation and Rules of Construction..................................................................8
3.  Computation of Time Periods...................................................................................8
4.  Grant of License. .....................................................................................................8
5.  Royalty Payment.  ...................................................................................................9
6.  Term.......................................................................................................................10
7.  Quality Control. .....................................................................................................10
8.  Ownership and Protection of Rights........................................................................10
9.  Intellectual Property Hereafter Acquired................................................................13
10. Licensor's Representations and Warranties..............................................................13
11. Licensees's Representations and Warranties............................................................14
12. Disclaimer of Warranty. .........................................................................................16
13. Sublicensing and Franchising..................................................................................16
14. Confidentiality. ......................................................................................................18
15. Remedies and Termination. ....................................................................................20
16. Assignability...........................................................................................................22
17. Miscellaneous. .......................................................................................................22

Exhibit A – List of Acquired Restaurants
Exhibit B – List of Trademarks
Exhibit C – Power of Attorney

## HOOTERS IP LICENSE AGREEMENT

This HOOTERS IP LICENSE AGREEMENT (together with all Exhibits attached hereto, this "Agreement"), dated as of October 31, 2025, is entered into by and among **HI LIMITED PARTNERSHIP**, a Florida limited partnership ("Licensor"), **HOA FUTURE FRANCHISING, LLC**, a Delaware limited liability company ("Future Franchising"), **HOA FRANCHISING, LLC**, a Delaware limited liability company ("HOA Franchising"), **HOOTS FRANCHISING, LLC**, a Delaware limited liability company ("HOOTS Franchising") and **HOA SYSTEMS, LLC**, a Delaware limited liability company ("HOA Systems" and together with HOA Franchising, HOOTS Franchising, and Future Franchising, each individually a "Licensee" and collectively, the "Licensees").

WHEREAS, Hooters of America, LLC and certain of its affiliates, including the Licensor (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas on March 31, 2025, which initiated the chapter 11 cases (the "Bankruptcy Cases") jointly administered under lead case *In re Hooters of America, LLC*, Case No. 25-80078 (SWE);

WHEREAS, on October 30, 2025, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1142] (as amended, supplemented, or modified from time to time, the "Plan");

WHEREAS, the Plan contemplates (i) the sale of a majority of the Debtors' company-owned stores to Hooters, Inc., Hoot Owl Restaurants, L.L.C., or certain of their respective affiliates (the "Buyer Group"); (ii) the reorganization and renaming of HOA Funding, LLC as RoyaltyCo, LLC ("RoyaltyCo"), who will continue to own 100% of the equity interests in Licensor and thereby indirectly own the Intellectual Property; (iii) the creation of limited liability company HOA NewCo, LLC ("HOA NewCo") by HOA Systems, LLC, which shall be owned 50% by the Holders of Manager Advance Term Loan Claims and 50% by the Holders of Class B Note Claims (each as defined in the Plan); (iv) the creation of a new bankruptcy-remote, special purpose entity, Franchise HoldCo, LLC ("Franchise HoldCo"), whose membership interests will be owned by HOA NewCo, and to which the equity interests or assets of HOA Franchising and HOOTS Franchising shall be transferred or assigned, and (v) the creation of a new entity, Future Franchising, whose membership interests will be owned by Franchise HoldCo, and which will be the counterparty to New Franchise Agreements and New License Agreements (each, as defined in the Brand Management Agreement);

WHEREAS, on October 30, 2025, the Court entered the *Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Fourth Amended Joint Chapter 11 Plan of Reorganization of Hooters of America, LLC and Its Affiliated Debtors* [Docket No. 1146];

WHEREAS, in connection with the transactions contemplated in the Plan, the Buyer Group will form a new entity, Hooters Brand Management LLC, which will oversee, among other things, all brand-related and franchising-related functions of Licensees pursuant to that certain Management Agreement, by and among each of the Licensor, Licensees, HOA Franchise HoldCo, LLC, HOA Systems, Licensor, and Hooters Brand Management LLC (the "Manager," and such agreement, the "Brand Management Agreement");

1

WHEREAS, Licensor owns certain Intellectual Property and owns or has the right to use certain assets, including Trademarks, relating to the Brand, the Business, and the System; and

WHEREAS, Licensees desire to license the Licensed IP from Licensor in connection with business activities, and Licensor agrees to grant such license to each Licensee, in each case, on the terms and subject to the conditions set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree, effective as of the Effective Date, as follows:

1.    <u>Certain Definitions.</u>

For all purposes of this Agreement, the following terms shall have the following meanings: "<u>Acquired Restaurants</u>" means approximately 111 Hooters™ and Hoots Wings™ restaurants that were acquired by the Buyer Group pursuant to the Plan and listed on **<u>Exhibit A</u>** hereto.

(b)    "<u>Allocated Expenses</u>" shall have the meaning ascribed to such term in the Brand Management Agreement.

(c)    "<u>Bankruptcy Event</u>" means with respect to any party, the occurrence of any of the following events:  (a) the party becomes insolvent within the meaning of 11 U.S.C. § 101(32) or any other debtor relief law applicable to such party; (b) the party generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on its indebtedness, or proposes a compromise or arrangement or deed of company between it and any class of its creditors; (c) the party voluntarily files for relief or institutes a proceeding under any applicable bankruptcy, insolvency, or other similar law affecting creditors' rights generally (including liquidation, administration, assignment for the benefit of creditors, dissolution, winding-up, reorganization, scheme of arrangement, restructuring, compromise, arrangement, adjustment, protection, moratorium, relief) or seeks similar relief under general principles of equity (whether such relief is sought in a proceeding in equity or at law) or files an answer admitting the material allegations of a petition filed against it or otherwise consents or acquiesces to the relief requested in any such proceeding; (d) an involuntary petition, application, or other proceeding is filed, made, or otherwise instituted against the party under any applicable bankruptcy or insolvency law and is not dismissed within ninety (90) calendar days of filing; (e) the party initiates any suspension or stay imposed by a court, governmental authority, or operation of law on the enforcement of claims, rights, remedies, or obligations relating to indebtedness; (f) the party takes any action, corporate or otherwise, including, an affirmative vote by a board of directors (or equivalent management or oversight body) of any other party, to commence any insolvency proceeding or to approve, effect, consent to or authorize any of the actions described in the above sub-sections, or otherwise acts in furtherance thereof; (g) the appointment of a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, compulsory manager, voluntary administrator, administrative receiver, or other similar manager, official, or officer over a material portion of the party's assets, which is not stayed or vacated within ninety (90) days; or (h) any other event or circumstance occurs which has an effect equivalent to any of the events or circumstance referred to in the clauses (a)-(f) of this definition.

(d)     "<u>Brand</u>" means any and all of the Trademarks associated with the Branded Restaurants or the Business and included in the Licensed IP, including the Trademarks set forth in **<u>Exhibit B</u>**.

(e)     "<u>Brand Risk</u>" means any compromise, challenge, or material risk to the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or the other Licensed IP, in each case, caused by the acts or omissions of any Licensee or Sublicensee, including, without limitation, any act or omission that could reasonably be expected to, or does in fact, result in a material adverse impact on the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark), regardless of whether or not the Brand as a whole is materially affected.

(f)     "<u>Branded Restaurant</u>" means any restaurant (including, but not limited to, casual or fast casual restaurants) or other dining establishment, food service business, or food service operation bearing or displaying the Brand, including HOOTERS or HOOTS-branded restaurants (excluding third party infringers of the Intellectual Property).

(g)     "Breach Notice" has the meaning set forth in Section 16(e).

(h)     "<u>Business</u>" means the business of: (i) managing the Licensed IP, the Brand, and relationships with Franchisees and Sublicensees; (ii) development of the Brand, including through new Franchise Agreements and/or Development Agreements; (iii) development, sales, and distribution of products bearing the Brand or other Licensed IP related to the Brand; and (iv) advertising and media outreach and engagements in connection with the Brand and other Licensed IP.

(i)     "<u>Business Day</u>" means any day other than a Saturday, Sunday, or a day on which banks are authorized or required by law to be closed in New York City, New York.

(j)     "<u>Closing</u>" means the consummation of the transactions contemplated by the Brand Management Agreement and the Plan, which shall occur on the Closing Date, following the satisfaction or waiver of all conditions to Closing set forth herein, and shall take place in the manner and at the time and place (or by electronic exchange of documents) mutually agreed by the parties.

(k)     "<u>Closing Date</u>" means the date on which the transactions contemplated by the Brand Management Agreement and the Plan become effective, following satisfaction or waiver of all closing conditions.

(l)     "<u>Centralized Purchasing Organization</u>" means that collaborative purchasing organization affiliated with the Business, which negotiates and coordinates bulk purchasing of certain food and materials to be purchased and used by Franchisees at the Branded Restaurants and shall be maintained and administered, after the Closing Date, by Manager or its designee.

(m)     "<u>Confidential Information</u>" means trade secrets and other information (including know how, ideas, techniques, recipes, formulas, customer lists, customer information, financial information, business methods and processes, marketing plans, specifications, and other similar information as well as internal materials prepared by the owner of such information

containing or based, in whole or in part, on any such information) that is confidential and proprietary to its owner and that is disclosed by one party to another party to this Agreement whether in writing or disclosed orally, and whether or not designated as confidential; provided, that the term "Confidential Information" shall not include information that the Recipient can demonstrate:  (a) is already known to Recipient without restriction on use or disclosure prior to receipt of such information from the Discloser; (b) is or becomes part of the public domain other than by breach of this Agreement by, or other wrongful act of, the Recipient; (c) is developed by the Recipient independently of and without reference to any Confidential Information of the Discloser; or (d) is received by the Recipient from a third party who is not under any obligation to the Discloser to maintain the confidentiality of such information.

(n)     "Databases" means data, databases and other compilations and collections of data or information.

(o)     "Designated Representative" has the meaning set forth in Section 7(c).

(p)     "Developer" means any individual, partnership, corporation, or other legal entity that, on or after the Closing Date, is a party to a Development Agreement with Licensor or a Licensee granting such party the right to develop one or more Branded Restaurants.

(q)     "Development Agreement" means any area development agreement, area option agreement, area representative agreement, or similar agreement with a Developer, in each case, granting the right to develop one or more Branded Restaurants.

(r)     "Domain Names" means domain names, web addresses, uniform resource locators and other names and locators associated with the Internet, and all goodwill associated with any of the foregoing.

(s)     "Franchise Agreement" means any franchise agreement, license agreement, or similar agreement granting a party the right to operate a Branded Restaurant using the System.

(t)     "Franchisee" means any individual, partnership, corporation, or other legal entity that, on or after the Closing Date, is a party to a Franchise Agreement granting the right to operate a Branded Restaurant.

(u)     "Franchisee Data" means all operational and financial data relating to the Branded Restaurants.

(v)     "Governmental Authority" means any:   (a) United States, State, Commonwealth, District, Territory, municipality, or foreign state, or (b) any department, agency or instrumentality of the United States, a State, Commonwealth, District, Territory, a municipality, or a foreign state; or (c) other foreign or domestic government.

(w)     "Hooters Manual" means the confidential operating manuals provided to Franchisees pertaining to the operation of a Branded Restaurant, including training manuals and materials, operations manuals, plans, system standards, specifications, and policies, as they may be modified from time to time in accordance with this Agreement.

(x)    "Intellectual Property" means any and all:  (i) recipes, technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, concepts, creations, inventions, discoveries, and improvements (whether patentable or unpatentable and whether or not reduced to practice); (ii) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel, customer service, online analytics and other information, research, and materials; (iii) customer lists, customer data, customer contact and registration information, customer correspondence and customer purchasing histories; (iv) specifications, designs, industrial designs, models, devices, prototypes, network configurations and architecture, user interfaces, schematics and development tools; (v) Software; (vi) Works of Authorship; (vii) Databases; (viii) Trademarks; (ix) Domain Names; (x) social media, YouTube, and other online content accounts, tags, registrations or usernames (including "handles"); (xi) Manuals (including the Hooters Manuals); (xii) Proprietary Information; (xiii) calendars (including the Hooters calendar sold in connection with the Business); and (xiv) tangible, digital, and other electronic embodiments and representations of any of the foregoing, in any form or media whether or not specifically listed in this definition.

(y)    "Intellectual Property Rights" means any and all forms of intellectual property rights and other proprietary rights and protections throughout the world, whether statutory, common law, or otherwise, including all:  (i) copyrights and all other rights with respect to published and unpublished Works of Authorship, including Software, images, graphics, text, writings, reports, analyses, graphs, photographs, artwork, audiovisual works, collective works, derivative works, literary works, and sound recordings, and all registrations thereof and applications therefor (including moral and economic rights, however denominated), and any registrations and applications for registration thereof; (ii) rights with respect to Trademarks, and all registrations thereof and applications therefor; (iii) rights in Domain Names; (iv) rights in Proprietary Information; (v) other rights in Databases and designs (ornamental or otherwise); (vi) other rights of attribution and integrity and other moral rights of an author; (vii) rights in, arising out of, or associated with a person's name, voice, signature, photograph, or likeness, including rights of personality, privacy, and publicity and similar rights, in each case whether currently existing or hereafter developed or acquired, arising under statutory law, common law, or by contract, and whether or not perfected, registered or issued, including all applications, disclosures, registrations, issuances and extensions with respect thereto; (viii) all claims and causes of action arising out of or related to infringement or misappropriation of any of the foregoing; and (ix) other proprietary or intellectual property rights now known or hereafter recognized in any jurisdiction worldwide relating to or arising from the Intellectual Property.

(z)    "IP Activities" means Licensees' performance (either directly or through their respective agents or managers) of certain of obligations of Licensor in its capacity as a licensor of Intellectual Property, as well as Licensees' exercise of activities and rights under this Agreement, including all activities or obligations under this Agreement relating to the prosecution, maintenance, defense, enforcement, licensing, use or other exploitation of Licensed IP in any manner, including (i) in connection with any agreement through which a Licensee licenses, sub-licenses, or assigns the use of any Licensed IP, including, but not limited to, Franchise Agreements, Development Agreements, and any Third-Party License Agreements; (ii) acquisition, development, management, maintenance, protection, enforcement, defense, licensing, and sublicensing of the Licensed IP; and (iii) performance of such other duties and activities as may be necessary or desirable in connection with the Licensed IP, all in accordance with and subject to

the terms of this Agreement including, without limitation, the Managing Standard and Quality Control Standards. IP Activities shall include the following and be performed by Licensees (or their manager or agent) as set forth in this Agreement: (i) searching, screening and clearing any Licensed IP (including any after-acquired Intellectual Property) to assess the risk of potential infringement; (ii) filing, prosecuting and maintaining applications and registrations for the Licensed IP in Licensor's name domestically and in such international markets in which Licensor or Licensees operate including filing of evidence of use, applications for renewal and affidavits of use and/or incontestability, paying of registration and maintenance fees, responding to third-party oppositions of applications or challenges to registrations, and responding to office actions, reexaminations, interferences or other office or examiner requests or requirements; (iii) monitoring third-party use and registration of Licensed IP and taking actions Licensees (or their agent or manager) deem appropriate to oppose or contest the use and any application or registration for Licensed IP; (iv) confirming Licensor's legal title in and to any or all of the Licensed IP; (v) monitoring the use of Licensed IP, by a licensee, sub-licensee, or assignee, the quality of goods and services offered in connection with such Licensed IP by a licensee, sub-licensee, or assignee, and rendering any approvals (or disapprovals) with respect to any use of any such Licensed IP by any such licensee, sub-licensee, or assignee to enforce compliance with the Quality Control Standards of this Agreement and usage provisions of the applicable license agreement, Franchise Agreement, Development Agreement, or Third-Party License Agreement; (vi) protecting, policing, and enforcing Licensed IP, including, (x) preparing and responding to cease-and-desist, demand and notice letters, and requests for a license; and (y) commencing, prosecuting and/or resolving claims or suits involving imitation, infringement, dilution, misappropriation, the unauthorized use or other violation of the Licensed IP, and seeking monetary and equitable remedies as Licensees (or their agent or manager) deem appropriate in connection therewith; and Licensor shall, and agrees to, join as a party to any such suits to the extent necessary to maintain standing; (vii) paying or causing to be paid or discharged any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the Licensed IP or contesting the same in good faith; (viii) obtaining licenses of third-party Intellectual Property for use and Sublicense in connection with the Business and other ventures permitted under this Agreement; and (ix) sublicensing the Licensed IP to suppliers, manufacturers, advertisers and other service providers in connection with the provision of products and services for use in the Branded Restaurants.

(aa)    "Legacy Franchised Restaurants" consists of all Branded Restaurants that are not Acquired Restaurants or New Restaurants.

(bb)    "Legacy License Agreements" consists of all Third-Party License Agreements that have been executed prior to the Closing Date.

(cc)    "Licensed IP" means any and all Intellectual Property and Intellectual Property Rights (a) owned or purported to be owned by Licensor and/or any of its affiliates related to the System or the Business, including the Brand and/or (b) all New IP.

(dd)    "Licensed Materials" means all uses of the Licensed IP by a Licensee or its Sublicensees and all products, services, advertising or promotional programs or other materials incorporating or bearing any Licensed IP.

(ee)    "Limited Partnership Agreement" means the Fourth Amended and Restated Limited Partnership Agreement of HI Limited Partnership dated as of October 31, 2025 (as amended, restated, supplemented, or otherwise modified from time to time).

(ff)    "Manager" means Hooters Brand Management LLC, in its capacity as Manager under the Brand Management Agreement, unless a successor person shall have become the Manager pursuant to the applicable provisions of the Brand Management Agreement, and thereafter "Manager" shall mean such successor person.

(gg)    "Managing Standard" means standards that: (a) are consistent with the standards as Licensees would implement or observe if the Licensed IP was owned by Licensees at such time, in any event, at least equivalent in all material respects to then-current practices or prevailing standards of the applicable Licensees with respect to the System or any manager of the System as of the Closing Date; and (b) are in material compliance with all applicable law or regulation; provided, that Licensees may modify the Managing Standard to the extent required by applicable law or regulation or requested by Manager in any other manner that does not (and would not reasonably be expected to) adversely and materially impact the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark); provided, further, that any material modification to the Managing Standard shall require Licensor's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed and in each case email being sufficient).

(hh)    "Manuals" means trade secrets and other confidential and proprietary information, know how, and other materials not generally known to the public, whether tangible or intangible, including operations manuals.

(ii)    "Material Adverse Effect" means any event, change, development, circumstance, condition, or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on: (a) the value, validity, or enforceability of the Licensed IP; (b) the ability of Licensor or Licensees to perform their respective obligations under this Agreement; (c) the ability of any Licensee to use the Licensed IP as contemplated by this Agreement; or (d) the rights granted to Licensees under this Agreement or the commercial viability of the Business associated with the Licensed IP.

(jj)    "National Ad Fund" means that certain national advertising fund affiliated with the Branded Restaurants which shall be maintained and administered, after the Closing Date, by Manager or its designee.

(kk)    "National Ad Fund Oversight" means (i) the management, administration and oversight of local, national and international advertising, promotional, and public relations activities; (ii) paying costs of producing, preparing, distributing, and using marketing, advertising, and other materials and programs; (iii) administering national, regional, and other marketing programs; (iv) purchasing sports sponsorships and other media placements or spots; (v) employing advertising, public relations, and other agencies and firms; (vi) supporting market research; (vii) sponsoring conventions and other events, (viii) otherwise engaging in strategic marketing and paying reasonable administrative costs, accounting fees and similar types of advertising and

promotional expenses, and (ix) any other activities permitted to be funded by the National Ad Fund, in each case, solely to the extent funded by the National Ad Fund.

(ll)    "New IP" means any and all Intellectual Property and Intellectual Property Rights created, conceived, developed, authored, or otherwise acquired by Licensor, Licensees (or any Sublicensee), Franchise HoldCo, or Manager during the Term that either (i) are used (or held for use) in, or relate to, the System, Business, and/or Brand or (ii) constitute improvements, enhancements, derivatives, derivative works, modifications, substitutions, replacements or new versions of any of the foregoing; provided, that "New IP" shall not include any Intellectual Property or Intellectual Property Right that is, as of the Closing Date, subject to a carveout under a Franchise Agreement for a Legacy Franchised Restaurant that allows the Franchisee thereto to retain such property or right created by them (and, for the avoidance of doubt, Licensee shall have no liability or other obligation with respect to any such carved-out Intellectual Property or Intellectual Property Right); for the avoidance of doubt, Licensees may not grant carveouts for any New IP arising after the Closing Date without the prior written (email sufficient) consent of Licensor (such consent not to be unreasonably withheld, conditioned or delayed); provided further, that "New IP" shall not include any Intellectual Property or Intellectual Property Right that, as of the Closing Date, is owned or controlled by a third party (other than Licensor, Licensees (or any Sublicensee), Franchise HoldCo, or Manager) and licensed to Licensees or Sublicensees.

(mm)    "New License Agreements" consist of all Third-Party License Agreements executed on or after the Closing Date.

(nn)    "New Restaurant" means any Branded Restaurant that is opened by a new or existing Franchisee after the Closing Date.

(oo)    "Organizational Documents" means the documents governing the formation, organization, and internal affairs of an entity, including (i) in the case of a corporation, its articles or certificate of incorporation and bylaws; (ii) in the case of a limited liability company, its certificate of formation and operating agreement; (iii) in the case of a partnership, its partnership agreement; and (iv) in the case of any other entity, the comparable governing documents, in each case as amended, restated, supplemented, or otherwise modified from time to time.

(pp)    "Privileged Information" means any information, in written, oral, electronic or other tangible or intangible forms, including any attorney-client privileged communications, memoranda and other materials including attorney work product prepared by attorneys or under their direction, as to which either Licensor or Licensees would be entitled to assert or have asserted a privilege or other protections, including the attorney-client and/or attorney work product privileges and protections, confidential settlement or mediation communications under Cal. Evid. Code §§ 1115 et seq., and other communications deemed privileged by governing law. For the avoidance of doubt, the term "Privileged Information" shall include all privileged, and legally protected or protectable materials and information, including client confidences, litigation strategy and/or options, legal analysis, conclusions, decisions, arguments, and settlement information, analysis strategies, mental impressions, legal theories, legal research, counsel's factual investigation and analyses, whether oral, electronic or in writing. Privileged Information also includes, as applicable, written communications, memoranda, products, laboratory notebooks, study reports, notes, interview reports, search reports, deposition transcripts, materials provided to

and communications to or from or prepared by any consultant retained by the Licensees (on behalf of Licensor) or Licensor (or an expert retained or any of its litigation counsel to the extent the communication is not discoverable under Federal Rule of Civil Procedure 26) and correspondence with insurers' claims representatives and their counsel reflecting or including any Privileged Information; and reports of experts and consultants, and/or investigations, opinions, and analyses, legal briefs, motions and arguments, litigation strategies, settlement positions, expert opinions, and all other factual or legal information expressed in any documents, recordings, communications, or media, of whatever nature and in any form, whether written, oral, or electronic.

(qq)    "Proprietary Information" means brand standards, business plans, standards and specifications, restaurant plans, layouts and designs, advertising guidelines, merchandise designs, technical data, franchisee or sublicensee data (including Franchisee Data), customer lists, membership information (including HootClub Rewards membership information), customer transaction information, pricing and cost information, bills of material, ideas, designs, formulas, methods, processes, programs, prototypes, systems, and techniques, trade secrets and other confidential and proprietary information, know-how, and other materials not generally known to the public, whether tangible or intangible.

(rr)    "Quality Control Standards" means the standards that: (i) comply with all applicable federal, state, local, and foreign laws; (ii) except as otherwise permitted by Licensor, are of a nature and quality at least equal to the standards and reputation for quality of the products and services offered by Branded Restaurants under the Licensed IP as of the Closing Date; and (iii) include terms that are at least as protective as the brand guidelines and quality control standards set forth or referenced in the Franchise Agreements, Development Agreements, and Third-Party License Agreements, as applicable.

(ss)    "Royalties" means, without duplication, periodic payments calculated as a percentage of gross sales or revenues that are (i) payable by a Franchisee under a Franchise Agreement for the right and license to use the Licensed IP in respect of any Branded Restaurant, or (ii) payable by any party under any Third-Party License Agreement for the right and license to use the Licensed IP (including, without limitation, in branded products, digital services, media, or other commercial applications).

(tt)    "RoyaltyCo" means HOA Funding, LLC, which is the direct or indirect owner of 100% of the equity interests of Licensor, and thereby the indirect owner of the Licensed IP.

(uu)    "Secured Party" means the holder of any claim against Licensor or RoyaltyCo and their successors and assigns or any lien on the property of Licensor or RoyaltyCo.

(vv)    "Services" means, collectively, (i) the IP Activities, (ii) acting as franchisor or sub-licensor under the Franchise Agreements and Development Agreements; and (iii) acting as sub-licensor under the Third-Party License Agreements.

(ww)    "Software" means computer programs and applications and other software.

(xx)    "Sublicense" means a grant of a license or sublicense to use or exercise rights under the Licensed IP pursuant to a Franchise Agreement or a Third-Party License Agreement.

(yy)   "Sublicensee" means any third party that has been granted a license or sublicense, including Franchisees, to use or exercise rights under the Licensed IP pursuant to a Franchise Agreement or a Third-Party License Agreement; provided, for the avoidance of doubt, the term "Sublicensee" shall not include Manager or Franchise HoldCo.

(zz)   "System" means the system that Branded Restaurants must use and follow, including (i) distinctive business formats, methods, procedures, rules, designs, layouts, signs, recipes, ingredients, product and service mix, standards, specifications and other confidential and proprietary information; and (ii) the rules, requirements, standards, suggestions and guidance for the development and operation of Branded Restaurants.  The System is reflected in the Hooters Manual, which may be improved, further developed or otherwise modified from time to time by Licensees (or their agent or manager) in a manner that does not (and would not reasonably be expected to) adversely and materially impact the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark); provided, further, that the prior written consent of Licensor (as conveyed by Licensor to Licensees in writing and, in each case, such consent not to be unreasonably withheld, conditioned or delayed and email being sufficient) is required for any material improvements, developments, or modifications to the System.  Any such improvements, developments, or modifications shall comply with the Managing Standards and Quality Control Standards.

(aaa)   "Term" has the meaning set forth in Section 6.

(bbb)   "Third-Party License Agreements" means any and all license agreements, service agreements to the extent they involve licensing of the Licensed IP, or other similar agreements involving the Licensed IP, including those related to non-restaurant uses of the Licensed IP, in each case, that are (a) disclosed in writing to Licensees (or their agent or manager) or of which Manager's officers have actual knowledge (and not constructive or imputed knowledge) of (and, for the avoidance of doubt, Manager shall have no responsibility or liability for any Third-Party License Agreement until so disclosed or actually known), or (b) executed by Manager on behalf of a Franchisor or Licensor on or after the Closing Date; provided, that the term "Third-Party License Agreements" shall not include Development Agreements and Franchise Agreements; provided, further, that the term "Third-Party License Agreements" shall include each license agreement identified on the Assumption Schedule filed as Exhibit D to the Plan Supplement (as defined in the Plan).

(ccc)   "Trademarks" means trademarks, service marks, trade names, service names, product names, slogans, 800 numbers, brand names, trade dress, logos, corporate names, and other source or business identifiers, together with the goodwill associated with any of the foregoing.

(ddd)   "Works of Authorship" means websites, content, images, logos, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings (including the Franchise Disclosure Document, Franchise Agreements, and related contracts), and other works of authorship and copyrightable subject matter.

2.      <u>Interpretation and Rules of Construction</u>.

A.      Each term defined in the singular form in <u>Section 1</u> or elsewhere in this Agreement shall mean the plural thereof when the plural form of such term is used in this Agreement and each term defined in the plural form in <u>Section 1</u> shall mean the singular thereof when the singular form of such term is used herein.

B.      The words "hereof," "herein," "hereunder" and similar terms when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references herein are references to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified.

C.      Unless as otherwise provided herein, the word "including" as used herein shall mean "including without limitation."

D.      Unless as otherwise provided herein, the term "and/or" or "or" is intended to be inclusive, shall not be construed to imply exclusivity or to require the presence of all listed elements, and shall be interpreted to mean any one or more of the connected elements or a combination thereof.

3.      <u>Computation of Time Periods</u>.

Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

4.      <u>Grant of License</u>.

(a)      <u>License</u>.  Subject to the terms and conditions set forth herein and in the Third-Party License Agreements, Licensor hereby grants to each Licensee, and each Licensee hereby accepts, for no additional consideration (other than Royalties) an exclusive (except as to Licensor, Manager, Franchise HoldCo, and to each other Licensee and to HOA Systems as to any Third-Party License Agreements), revocable (in accordance with this Agreement), royalty-bearing (to the extent of the Royalties due and payable to Licensor hereunder and thereunder), transferable (in accordance with this Agreement), sub-licensable (in accordance with this Agreement) license throughout the world (the "<u>Territory</u>") during the Term to use, display, reproduce, distribute, perform, create derivative works of, and practice the Licensed IP in connection with the IP Activities and the other conduct of the Business in accordance with this Agreement; provided that Licensor shall not use Licensed IP during the Term except (i) in connection with the Third-Party License Agreements, and any renewals or extensions thereto, or (ii) to comply with, exercise its rights under, or enforce the terms of this Agreement.

(b)      <u>Manager and Franchise HoldCo Rights</u>.  Licensor acknowledges and agrees that (i) Manager and Franchise HoldCo have rights and obligations under the Brand Management Agreement and Approved Operating Agreements (as defined in the Brand Management Agreement); (ii) the performance by the Manager and Franchise HoldCo of their respective duties, responsibilities, and obligations under the Brand Management Agreement and the Approved

Operating Agreements, in each case in accordance with the terms thereof, is expressly permitted under this Agreement and shall not constitute, give rise to, or be deemed an infringement, misappropriation, or other violation of any Licensed IP; (iii) to the extent Manager or Franchise HoldCo require a license under the Licensed IP to perform such duties, responsibilities, or obligations, Licensor hereby permits Licensees to grant to Manager or Franchise HoldCo a Sublicense to use, display, reproduce, distribute, perform, create derivative works of, and practice the Licensed IP solely as necessary to perform such duties, responsibilities, and obligations; and (iv) Licensor will not assert, commence, or pursue any claim, action, or proceeding against Manager or Franchise HoldCo alleging the infringement, misappropriation, or other violation of any portion of the Licensed IP, solely to the extent required for Manager and Franchise HoldCo to perform such duties, responsibilities, and obligations and solely to the extent in compliance with the terms of any such Sublicense and the Brand Management Agreement.

(c)  <u>Reservation of Rights</u>.  All rights not expressly licensed or granted by Licensor under this Agreement are expressly reserved by Licensor and except for the foregoing express licenses granted in <u>Section 4</u>, nothing in this Agreement will be construed as a sale, assignment, or transfer to any Licensee of (or to confer any ownership interest, license, or other rights upon any Licensee as to), whether by implication, estoppel, by operation of law, or otherwise, any Licensed IP.

5.  <u>Royalties</u>

(a)  <u>Licensor's Royalty Payment</u>.  In consideration of the licenses granted hereunder, each Licensee agrees to pay (or cause to be paid) to Licensor (or its designee) (for the benefit of RoyaltyCo) on a monthly basis, the applicable portion of the following Royalties allocable to such Licensee, which shall be collected by such Licensee as an agent of Licensor and distributed to Licensor net of any Allocated Expenses allocated to Licensor consistent with and subject to the Brand Management Agreement (including Section 3.4 thereof):

(i)  One hundred percent (<u>100%</u>) of Royalties collected on account of the Legacy Franchised Restaurants.

(ii)  One hundred percent (<u>100%</u>) of Royalties collected on account of the Legacy License Agreements.

(iii) Thirty-five percent (<u>35%</u>) of Royalties collected on account of the Acquired Restaurants.

(iv) Fifty percent (<u>50%</u>) of Royalties collected on account of the New Restaurants.

(v)  Fifty percent (<u>50%</u>) of Royalties collected on account of New License Agreements; <u>provided</u>, that if any New License Agreement is capable of being structured as an annual royalty but is instead sold or otherwise significantly monetized after the Closing Date, the proceeds collected on account of such New License Agreement shall be distributed seventy-five percent (<u>75%</u>) to Licensor or its designee (for the benefit of RoyaltyCo).

(b)    <u>Management Fee</u>. The Parties acknowledge that, in consideration of the Manager providing services under the Brand Management Agreement, each Licensee has agreed to pay (or cause to be paid) to Manager on a monthly basis, the applicable portion of the following Royalties allocable to such Licensee, which shall be collected by such Licensee as an agent of Manager and distributed to Manager net of any Allocated Expenses allocated to Manager consistent with and subject to the Brand Management Agreement (including Section 3.4 thereof):

(i)    Sixty-five percent (<u>65%</u>) of Royalties collected on account of the Acquired Restaurants; plus

(ii)    Fifty percent (<u>50%</u>) of Royalties collected on account of the New Restaurants; plus

(iii)    Fifty percent (<u>50%</u>) of Royalties collected on account of New License Agreements; <u>provided</u>, that if any New License Agreement is capable of being structured as an annual royalty but is instead sold or otherwise significantly monetized after the Closing Date, the proceeds collected on account of such New License Agreement shall be distributed twenty-five percent (<u>25%</u>) to Manager.

The allocation of Royalties to Manager set forth in this <u>Section 5(b)</u> shall cease upon termination of the Brand Management Agreement; provided, however, that this cessation shall not affect the Manager's right to receive any amounts that remain payable to it under the Brand Management Agreement following such termination, including the amounts specified in the second proviso of Section 8.1(a) thereof, solely to the extent applicable.

(c)    <u>Protection of Royalty Payment</u>. Licensees covenant and agree that the definition of "Gross Sales" in each Franchise Agreement shall be materially consistent with: (i) for Acquired Restaurants acquired by Hooter's Inc. or its respective designees, the definition set forth in the Franchise Agreement for the Legacy Franchised Restaurants owned by Hooter's Inc.; (ii) for Acquired Restaurants acquired by Hoot Owl Restaurants, L.L.C. or its respective designees, the definition set forth in the Franchise Agreement for the Legacy Franchised Restaurants owned by Hoot Owl Restaurants, L.L.C.; and (iii) for New Restaurants, the definition set forth in the Franchise Agreement for the Legacy Franchised Restaurants, in each case, as of June 2, 2025. Licensees further covenant and agree that any amendment, waiver, or modification of any Franchise Agreement, Third-Party License Agreement, or Development Agreement, and any New Franchise Agreement, New License Agreement, or New Development Agreement, shall be (a) on arms-length terms for fair and reasonable value as would be determined by Licensee in their reasonable business judgment, taking into consideration their obligations under this Agreement and the interests of Licensor, and (b) on terms that are no less protective of Licensor's ownership of and rights in the Licensed IP than those contained in the License Agreement, including requiring Franchisee compliance with the Quality Control Standard and other protections of the validity, enforceability and ownership of the Licensed IP and the goodwill appurtenant thereto.

6.    Term.  This Agreement shall remain in effect for a term (the "Term") commencing on the Closing Date and continuing until terminated in accordance with this Agreement.

7.    Quality Control.

(a)    Preservation of Quality Control.  Licensor represents that it is not aware of any materials related to the Quality Control Standards that have not been delivered by the Licensor to the Licensees.  Each Licensee acknowledges that it is familiar with the Quality Control Standards, and that it at all times will use the Licensed IP in compliance with the Quality Control Standards and will perform the IP Activities in compliance with the Quality Control Standards. Each Licensee shall obligate its Sublicensees and Manager to comply with the Quality Control Standards and each Licensee shall exercise its reasonable business judgment to enforce the Franchise Agreements, the Development Agreements, and the Third-Party License Agreements, including (a) all Quality Control Standards against Sublicensees and Developers, and (b) the commencement and conduct of litigation or other enforcement actions in connection with a breach of a Franchise Agreement by a Franchisee, a Development Agreement by a Developer, or a Third-Party License Agreement by a Sublicensee; provided that if Licensor, in its reasonable business judgment, determines that any breach by a Licensee, Developer, or Sublicensee of the Quality Control Standards is (or may be) directly or indirectly injurious or prejudicial to the Brand (or the goodwill symbolized thereby) or Licensor's rights therein or thereto or otherwise causes any Brand Risk, then within ten (10) business days of receipt of written notice (email sufficient) thereof from Licensor, Licensees shall take all reasonable actions to remedy such non-compliance or cause the remedy or cessation thereof.

(b)    Inspections.  Licensor may perform reasonable inspections upon reasonable notice and during normal business hours (but no more than twice per twelve-month period) of Services provided by Licensee or Manager, and such reasonable inspection may include visiting and inspecting any of their properties and discussing their affairs with their officers and directors. Upon reasonable request, a Licensee shall provide (and obligate Manager to provide) Licensor or its designee with samples of products and services constituting the Licensed Materials or Services. Licensees will ensure any agreements entered into with Manager permit the Licensor's inspection as set forth in this Section 7(a).  Licensor shall have the right to exercise any right of review or inspection provided to Licensees under any Franchise Agreement or Third-Party License Agreement and Licensees each agree to permit Licensor to exercise such rights.

(c)    Designated Representative.  Prior to Closing, Licensor and each Licensee shall designate in writing to the other Parties a single individual (the "Designated Representative") authorized to provide or withhold any consent on behalf of Licensor and each Licensee, respectively, required to be obtained under this Agreement.  Licensor and Licensees shall ensure that their respective applicable Designated Representatives are properly authorized to provide consents.  Any Party may change its Designated Representative by providing written notice to the other Parties identifying the new Designated Representative, and any such change shall be effective upon receipt of such notice by the other Parties.  Until such written notice is received, Licensor and Licensees shall be entitled to continue to rely upon the last Designated Representative identified in writing by the other Party.

14

8.      Ownership and Protection of Rights.

(a)      Ownership of Rights.

(i)      Each Licensee recognizes the value of the goodwill associated with the Licensed IP and acknowledges that, as between Licensor and Licensee, Licensor is (and shall remain) the sole and exclusive owner of all legal and beneficial worldwide rights, title, and interest in and to the Licensed IP (including New IP) and all goodwill symbolized by or arising or accruing from the foregoing.  All use of the Licensed IP (including New IP), and any goodwill resulting from such use, shall inure, and hereby does inure, solely to the benefit of Licensor, and the use thereof shall be governed by the terms of this Agreement.  No Licensee shall (and each Licensee shall obligate its Sublicensees and Manager not to) claim or assert any ownership interest therein or thereto, and any attempt to do so shall be null and void.  Each Licensee hereby agrees to irrevocably assign and transfer, and hereby does assign and transfer without further consideration, all Licensed IP (including New IP), together with all right, title, and interest therein and appurtenant goodwill, to Licensor.  In the event that it is determined that Licensor does not own all legal right, title, and interest in and to the Licensed IP, then each Licensee agrees to assign and hereby do assign to Licensor all legal right, title, and interest in and to the Licensed IP within Licensee's custody or control.  Each Licensee shall take all necessary and appropriate measures to assign any such Intellectual Property to Licensor, with all third-party costs and expenses incurred in taking such measures deemed Allocated Expenses in accordance with the Brand Management Agreement.  Licensor and each Licensee agree that to the fullest extent allowed by law, any copyrightable material included in the foregoing Intellectual Property shall be considered a "work made for hire" as that term is defined in Section 101 of the United States Copyright Act of 1976, as amended, owned by Licensor as the legal author thereof.  Each Licensee hereby acknowledges that any New IP shall be solely owned by Licensor, and each Licensee agrees to reasonably promptly disclose to Licensor all New IP to which they have knowledge of after reasonable due diligence.  Each Licensee shall ensure that any agreements entered into with a Sublicensee are consistent with Licensor maintaining ownership in all Licensed IP (including New IP).

(ii)      No Licensee will acquire any ownership interest (or any other rights, titles, or interests) in or to any Intellectual Property or Intellectual Property Rights owned by Licensor (including the Licensed IP or all goodwill symbolized by or arising or accruing from the foregoing).  If a Licensee (or any of its Sublicensees) acquires any Intellectual Property Rights in or to any Licensed IP (including any New IP), by operation of law or otherwise, such Licensee agrees to irrevocably assign (and without limiting the foregoing, hereby does irrevocably assign) and shall obligate its Sublicensees to validly and presently irrevocably assign to Licensor (free-of-charge and without providing any consideration or attribution to, or receiving the consent of, any Sublicensee) any and all Licensed IP (including New IP).  Each Licensee hereby acknowledges that any New IP shall be solely owned by Licensor and each Licensee agrees to reasonably promptly disclose to Licensor all New IP to which it has knowledge of after reasonable due diligence.

(b)      Enforcement of Rights.

(i)      Each Licensee shall have the obligation to (and shall) take an appropriate course of action to enforce the Licensed IP or otherwise abate the infringement,

misappropriation, dilution, or other violation of such rights, to take (or refrain from taking) appropriate action to enforce such rights, to defend any declaratory judgments seeking to invalidate or hold such rights unenforceable, to control any litigation or other enforcement action and to enter into or permit the settlement of any such litigation, declaratory judgments, or other enforcement action with respect to such rights, in each case in compliance with the Quality Control Standards; provided, however, each Licensee shall not (and cause its Manager, if any, not to) enter into any consent or settlement of any enforcement claim or litigation or any other claim or litigation related to the Licensed IP (nor waive any actual or alleged claim related to the Licensed IP) in any manner that would reasonably be expected to adversely and materially impact Licensor or any Licensed IP (including the validity, enforceability or value thereof, which for the avoidance of doubt, includes the amount of Royalties due and payable to Licensor under this Agreement), any goodwill symbolized by the foregoing, or any rights of Licensor therein or thereto, and use reasonable efforts to consult with Licensor with respect to the form, manner, and substance of any enforcement action or litigation. Licensor shall join as a necessary party to any such enforcement action, at such Licensee's request.

(ii)     If Licensee fails to perform the foregoing in a diligent manner, in addition to other remedies available to it, Licensor shall have the right, but not the obligation, to enforce the Licensed IP against any infringement, misappropriation, dilution, or other violation of such rights (including, but not limited to, breaches of Franchise Agreements). Licensees shall provide Licensor with reasonably prompt notice of any infringement, misappropriation or unauthorized use of the Licensed IP that such Licensee has knowledge of (including by Franchisees).

(c)     <u>No Challenge of Rights</u>.  Each Licensee agrees that it shall not during the Term, or thereafter, challenge or attack the validity or enforceability of any of the Licensed IP or Licensor's exclusive ownership thereof nor shall Licensee challenge or attack the validity or enforceability of this Agreement, and Licensees shall not directly or indirectly assist any third party to do the same.  Licensee shall not and (shall obligate its Sublicensees not to) claim or assert any ownership interest therein or thereto, and any attempt to do so shall be null and void.

(d)     <u>Maintenance of the Licensed IP</u>.  Each Licensee shall have the obligation to (and shall) take an appropriate course of action to file, prosecute, maintain, and defend applications and registrations for Trademarks constituting Licensed IP, including paying all registration, maintenance, and renewal fees, and filing all affidavits, responses, recordations, certificates, and other documents, in each case as needed to obtain, maintain, perfect, preserve, and renew such applications or registrations. Each Licensee shall keep Licensor reasonably informed of any such action, and consider Licensor's comments and recommendations, with respect thereto.  Any other registered Licensed IP shall follow an equivalent procedure.  If Licensee fails to perform the foregoing in a diligent manner, then Licensor shall have the right, but not the obligation, to perform the foregoing or take an appropriate course of action with respect thereto (in addition to any other remedies available to it).

9.      Intellectual Property Hereafter Acquired.  If Licensees intend to permit a Sublicensee or Manager to (i) use or authorize the use of any portion of the Licensed IP in connection with a new product or service; or (ii) create, develop, or acquire any derivatives of the Licensed IP; Licensees shall, in each case, ensure that such activities do not (and would not reasonably be expected to) adversely and materially impact the validity, enforceability, ownership, distinctiveness, or value of the Brand and/or any specific element of any Licensed IP (including any individual Trademark); provided, that the prior written consent of Licensor (such consent to not be unreasonably withheld, conditioned or delayed and email being sufficient) is required for any material improvements, developments, or modifications to the Licensed IP, and any such improvements, developments, or modifications shall comply with the Managing Standards and Quality Control Standards; provided, further, that the creation, development, or acquisition of any new Trademarks shall first receive approval from Licensor.

10.      Licensor's Representations and Warranties.  Licensor represents and warrants to each Licensee, as of the date hereof, as follows:

(a)      Organization and Standing.

(i)      Licensor is a Florida limited partnership, duly formed and organized, validly existing and in good standing under the laws of the State of Florida, and has the power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and has the power, authority and legal right to grant the license to the Licensed IP granted herein.

(ii)      Licensor is duly qualified to do business as a foreign limited partnership in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the conduct of its business requires such qualifications, except where the failure to so qualify would not have a Material Adverse Effect.

(b)      Legal Conflicts.  The execution, delivery and performance by Licensor of this Agreement are within Licensor's power, have been duly authorized by all necessary action, and do not contravene: (i) Licensor's Limited Partnership Agreement; (ii) any laws applicable to Licensor of any Governmental Authority having jurisdiction over Licensor or its properties; or (iii) any contractual restriction binding on or affecting Licensor (including any federal, state, or foreign law regarding licensing and consumer protection); and in the case of clause (ii) or (iii) above, the violation of which could reasonably be expected to have a Material Adverse Effect, and do not result in the creation of any lien (other than the liens created under this Agreement and other permitted liens) upon or with respect to any of its properties.

(c)      Due Execution and Delivery.  This Agreement has been duly executed and delivered by the Licensor and constitutes a legal, valid, and binding instrument enforceable against the Licensor in accordance with its terms.

(d)      Ownership.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs (as defined in the Plan), Licensor is the sole and exclusive owner of all right, title, and interest in and to the Licensed IP.

(e)    <u>Granted Rights</u>.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs, Licensor has not granted and will not grant any licenses, liens, security interests, or other encumbrances in, to, or under any of the Licensed IP that would result in any material adverse effect on Licensees or Sublicensees or any of their respective rights under this Agreement.

(f)    <u>Infringement</u>.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs, Licensees' and Sublicensees' exercise of the rights and license granted under this Agreement will not infringe or otherwise conflict with any third party's rights.

(g)    <u>No Litigation</u>.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs, there are no actions, suits, investigations, or proceedings pending or, to the actual knowledge of the Licensor, threatened against or affecting the Licensor, before or by any Governmental Authority having jurisdiction over the Licensor or any of its properties or with respect to any of the transactions contemplated by this Agreement, that could reasonably be expected to have a Material Adverse Effect on the Licensor.

(h)    <u>Compliance with Requirements of Law</u>.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs, the Licensor is in compliance with all applicable law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect on the Licensees.

(i)    <u>No Default</u>.  To Licensor's knowledge, and subject to anything filed on the docket in the Bankruptcy Cases and any related adversary proceedings, or in connection with the Buyer Group APAs, the Licensor is not in default under any agreement, contract, or instrument to which the Licensor is a party or with respect to any order of any Governmental Authority which could reasonably be expected to have a Material Adverse Effect on the Licensor, taken as a whole; and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument, or with respect to any such order of any Governmental Authority.

(j)    <u>Enforceability</u>.  This Agreement is the legal, valid, and binding obligation of Licensor enforceable against Licensor in accordance with its terms, subject to performance of the Parties in accordance with this Agreement. Solely to the extent the Brand Management Agreement has not been terminated, the Parties agree that, in connection with any Bankruptcy Event involving any Party, they (and their successors and assigns, and any trustee, examiner, receiver, custodian, or other fiduciary acting on their behalf) will not, except to the extent this Agreement has been validly terminated or is terminable in accordance with its terms: (i) challenge the validity, enforceability, or binding effect of this Agreement; (ii) take or support any action seeking or supporting the rejection, termination, or impairment of this Agreement under section 365 of the Bankruptcy Code or any similar provision under applicable law or regulation; or (iii) condition any consent, approval, or other support for any sale or plan of reorganization or liquidation upon the rejection or termination of this Agreement.  Any such assignment, participation, or transfer not

18

made in compliance with the foregoing shall be null and void.  Notwithstanding anything in this Section 10(j) to the contrary, nothing in this Section 10(j) shall prevent any Party from exercising their rights in accordance with the terms of this Agreement, including any termination rights.

11.    <u>Licensees' Representations and Warranties.</u>

(a)    HOA Franchising, LLC's Representations and Warranties.    HOA Franchising, LLC represents and warrants to Licensor, as of the date hereof, as follows: <u>Organization and Standing</u>.

A.    HOA Franchising, LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the full power and authority to own its properties and conduct its business as presently owned or conducted and to execute, deliver, and perform its obligations under this Agreement.

B.    HOA Franchising, LLC is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, except where the failure to so qualify would not have a Material Adverse Effect.

(ii)    <u>Legal Conflicts</u>.  The execution, delivery and performance by HOA Franchising, LLC of this Agreement are within HOA Franchising, LLC's power, have been duly authorized by all necessary action, and do not contravene (x) its articles of organization or its operating agreement, (y) any law applicable to HOA Franchising, LLC of any Governmental Authority having jurisdiction over HOA Franchising, LLC or its properties, or (z) any contractual restrictions binding on or affecting Licensee (including any federal, state or foreign law regarding licensing and consumer protection), in the case of clause (y) or (z) above, the violation of which could reasonably be expected to have a Material Adverse Effect.

(iii)    <u>Enforceability</u>.  This Agreement is the legal, valid and binding obligation of HOA Franchising, LLC enforceable against HOA Franchising, LLC in accordance with its terms.

(b)    HOOTS Franchising, LLC's Representations and Warranties.    HOOTS Franchising, LLC represents and warrants to Licensor, as of the date hereof, as follows: <u>Organization and Standing</u>.

A.    HOOTS Franchising, LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the full power and authority to own its properties and conduct its business as presently owned or conducted, and to execute, deliver, and perform its obligations under this Agreement.

B.    HOOTS Franchising, LLC is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, except where the failure to so qualify would not have a Material Adverse Effect.

(ii)    <u>Legal Conflicts</u>.  The execution, delivery and performance by HOOTS Franchising, LLC of this Agreement are within HOOTS Franchising, LLC's power, have been duly authorized by all necessary action, and do not contravene (x) its articles of organization or its operating agreement, (y) any law applicable to HOOTS Franchising, LLC of any Governmental Authority having jurisdiction over HOOTS Franchising, LLC or its properties or (z) any contractual restrictions binding on or affecting Licensee (including any federal, state or foreign law regarding licensing and consumer protection), in the case of clause (y) or (z) above, the violation of which could reasonably be expected to have a Material Adverse Effect.

(iii)    <u>Enforceability</u>.  This Agreement is the legal, valid and binding obligation of HOOTS Franchising, LLC enforceable against HOOTS Franchising, LLC in accordance with its terms.

(c)    HOA Systems, LLC's Representations and Warranties.  HOA Systems, LLC represents and warrants to Licensor, as of the date hereof, as follows:  <u>Organization and Standing</u>.

A.    HOA Systems, LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the full power and authority to own its properties and conduct its business as presently owned or conducted and to execute, deliver, and perform its obligations under this Agreement.

B.    HOA Systems, LLC is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, except where the failure to so qualify would not have a Material Adverse Effect.

(ii)    <u>Legal Conflicts</u>.  The execution, delivery and performance by HOA Systems, LLC of this Agreement are within HOA Systems, LLC's power, have been duly authorized by all necessary action, and do not contravene (x) its articles of organization or its operating agreement, (y) any law applicable to HOA Systems, LLC of any Governmental Authority having jurisdiction over HOA Systems, LLC or its properties or (z) any contractual restrictions binding on or affecting Licensee (including any federal, state or foreign law regarding licensing and consumer protection), in the case of clause (y) or (z) above, the violation of which could reasonably be expected to have a Material Adverse Effect.

(iii)    <u>Enforceability</u>.  This Agreement is the legal, valid and binding obligation of HOA Systems, LLC enforceable against HOA Systems, LLC in accordance with its terms.

(d)    HOA Future Franchising, LLC's Representations and Warranties.  HOA Future Franchising, LLC represents and warrants to Licensor, as of the date hereof, as follows: <u>Organization and Standing</u>.

A.    HOA Future Franchising, LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the full power and authority to own its properties and conduct its business as presently owned or conducted and to execute, deliver, and perform its obligations under this Agreement.

B.    HOA Future Franchising, LLC is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, except where the failure to so qualify would not have a Material Adverse Effect.

(ii)    <u>Legal Conflicts</u>.  The execution, delivery and performance by HOA Future Franchising, LLC of this Agreement are within HOA Future Franchising, LLC's power, have been duly authorized by all necessary action, and do not contravene (x) its articles of organization or its operating agreement, (y) any law applicable to HOA Future Franchising, LLC of any Governmental Authority having jurisdiction over HOA Future Franchising, LLC or its properties or (z) any contractual restrictions binding on or affecting Licensee (including any federal, state or foreign law regarding licensing and consumer protection), in the case of clause (y) or (z) above, the violation of which could reasonably be expected to have a Material Adverse Effect.

(iii)    <u>Enforceability</u>.  This Agreement is the legal, valid and binding obligation of HOA Future Franchising, LLC enforceable against HOA Future Franchising, LLC in accordance with its terms.

12.    <u>Disclaimer of Warranty</u>.

**EXCEPT AS OTHERWISE EXPLICITLY PROVIDED HEREUNDER, NO PARTY TO THIS AGREEMENT MAKES ANY WARRANTIES HEREUNDER, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND EACH PARTY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.**

13.    <u>Sublicensing and Franchising</u>.

(a)    <u>Terms and Conditions</u>.  Each Licensee is authorized by Licensor, to Sublicense its rights in the Licensed IP in connection with the Services, including sublicensing to Manager to perform such services on behalf of Licensees; <u>provided</u> that Licensee shall perform (or shall ensure Manager performs) all agreed upon IP Activities subject to the terms of this Agreement (and Licensor shall reasonably cooperate with Licensees in connection therewith) and if Licensor reasonably believes Licensees (or Manager) should provide additional services that materially deviate from or supplement the IP Activities, Licensor shall consult with Licensees with respect thereto.  If the Licensor retains consent rights with respect to the Services or any other terms under this Agreement, the Licensee shall forward to the Licensor any requests for such consent.  The Licensor shall respond in writing (email being sufficient) to such request for consent, and such consent shall not be unreasonably withheld, conditioned, or delayed.

(b)    <u>Power of Attorney</u>.  To provide Licensees with the authority to perform and execute their duties and obligations as set forth herein, Licensor shall execute and deliver on the Closing Date a power of attorney in a form set forth in **Exhibit C**; <u>provided</u>, however, that if a Licensee is unable to exercise such power of attorney on behalf of Licensor due to applicable law

or a counterparty's objection, Licensor shall reasonably cooperate in good faith to facilitate the performance and execution of Licensee's duties and obligations as set forth herein.  If a power of attorney from Licensee to Licensor is required for Licensor to maintain or protect its interests in the Licensed IP or otherwise perform its obligations or enforce its rights under this Agreement, Licensee shall execute and deliver a power of attorney in a form mutually agreeable to the Parties.

(c)     _Protection of Licensor's Interests_.  Each agreement entered into on or after the Closing Date by a Licensee with each Sublicensee with respect to the Licensed IP shall contain provisions necessary to ensure and/or maintain the ownership, validity, and enforceability of the Licensed IP and the goodwill appurtenant thereto and shall provide that ownership of the Licensed IP and the goodwill appurtenant thereto vests in and inures to the benefit of Licensor.  Each agreement entered into after the Closing Date hereof by a Licensee with each Sublicensee with respect to the Licensed IP shall contain provisions no less protective of the Licensor's rights in the Licensed IP than those contained in this Agreement.

(d)     _Meetings and Conference Calls_.  Licensees agree to reasonable conference call updates, at Licensor's specific request to discuss: (i) Licensees' IP Activities and all other brand-related, franchising related, and Brand management-related functions, including the National Ad Fund Oversight, Centralized Purchasing Organization operations oversight, and management of the System, including any new franchising operations, developing, managing, licensing, and sub-licensing the Licensed IP in furtherance of the Business (collectively, "Stewardship Activities") for the purposes of assessing the likelihood of the occurrence of a Brand Risk; (ii) New IP; and (iii) Other Fees (as defined in the Brand Management Agreement).  Further, Licensor, and each Licensee shall, and Licensee shall instruct Manager (if any) to meet on a quarterly basis, or as otherwise mutually agreed, to review and discuss current and potential uses of the Licensed IP (including any New IP), as well as to address any issues related to the enforcement of the Quality Control Standards (including with respect to Franchisees and Sublicensees).

(e)     _Licensor as Third-Party Beneficiary of Sublicenses_.  Each agreement entered into on or after the Closing Date hereof by Licensee with each Sublicensee with respect to the Licensed IP shall contain a provision by which the parties thereto acknowledge and agree that the Licensor will be a third-party beneficiary of Licensee's rights (but none of the duties, obligations, or liabilities) arising under such Sublicense.

(f)     _Assignment of Intellectual Property Hereafter Acquired_.  Each agreement entered into after the Closing Date by each Licensee with each Sublicensee shall provide that (i) any New IP and all goodwill appurtenant thereto shall be owned by and inure exclusively to Licensor and such Sublicensee waives all moral rights in and to such New IP (to the extent permitted by applicable law), (ii) any copyrightable material included in any New IP shall, to the fullest extent allowed by law, be considered a "work made for hire" under applicable copyright law (including as that term is defined in Section 101 of the United States Copyright Act of 1976, as amended), and owned by Licensor as the author thereof, and (iii) such Sublicensee shall agree to assign and transfer and irrevocably presently assign and transfer without further consideration, all right, title, and interest to any New IP and appurtenant goodwill to Licensor (or to Licensee who hereby assigns and transfers such Intellectual Property to Licensor pursuant to Section 8(a) hereof).

(g)    <u>Enforcement by Sublicenses</u>.    To the extent set forth in the Brand Management Agreement and subject to the rights of the Manager under the Brand Management Agreement, Licensees shall take all reasonable actions to enforce, or cause the enforcement of, the provisions of any agreements with Sublicensees that relate to the use of the Licensed IP in order to protect and maintain Licensor's rights in the Licensed IP, including the ownership and validity thereof.  Sublicensees may, to the extent permitted by the applicable Sublicense, be granted the same enforcement rights (but subject to the same restrictions and obligations) as Licensees under <u>Section 8</u> above.

(h)    <u>Approval of Changes</u>.    Prior to entering into or authorizing any other agreement with a Sublicensee in the Territory that changes the provisions relating to the use of the Licensed IP in a manner that is material and adverse to the Licensor, Licensee shall submit for Licensor's approval each such change, which approval for such change shall not be unreasonably withheld, conditioned, or delayed.  To the extent any agreement between a Licensee and a Sublicensee (or Manager) requires the approval or consent of Licensor, Licensee shall be required to request such approval or disapproval from the Licensor, which approval for such requests shall not be unreasonably withheld, conditioned, or delayed, and shall be authorized to relay the Licensor's approval or disapproval to the Sublicensee (or Manager).

(i)    <u>Standards for Sublicenses Granted</u>.  Licensee shall only grant Sublicenses (a) on arms-length terms for fair and reasonable value as determined by Licensee in its reasonable business judgment, taking into consideration its obligations under this Agreement and the interests of Licensor (provided, however, that any rights granted to Hooters, Inc. under its existing Franchise Agreement shall continue in full force and effect after the Effective Date, including any provisions thereof that would reduce or eliminate Royalties due from Hooters, Inc. with respect to any New Restaurants opened within certain territories specified therein) and (b) on terms that are no less protective of Licensor's ownership of and rights in the Licensed IP than those contained in this Agreement, including compliance with the Quality Control Standards and other protections of the validity, enforceability and ownership of the Licensed IP and the goodwill appurtenant thereto.

14.    <u>Allocated Expenses</u>.    Each of the parties hereto acknowledges that Allocated Expenses will be paid in accordance with the Brand Management Agreement.

15.    <u>Confidentiality</u>.

(a)    Each of the parties hereto acknowledges that during the Term such party (the "<u>Recipient</u>") may receive Confidential Information of another party hereto (the "<u>Discloser</u>").  The Recipient agrees to maintain the Confidential Information of the Discloser in the strictest of confidence during and after the Term and shall not, except as otherwise contemplated herein or in the Brand Management Agreement, at any time, use, disseminate or disclose any Confidential Information to any person or entity other than those of its owners, officers, directors, managers, employees, agents, financing sources, suppliers, service providers, landlords, advisors or representatives (including legal counsel and accountants) and similar parties ("<u>Representatives</u>") who have a "need to know" and who have been apprised of this restriction.  The Recipient shall be liable for any breach of this <u>Section 15(a)</u> by any person or entity to whom it has disclosed Confidential Information and shall immediately notify Discloser upon learning of any loss or disclosure of any Confidential Information of the Discloser.  Upon termination of this Agreement,

23

Recipient shall return to the Discloser, or at Discloser's request, destroy, all documents and records in its possession containing the Confidential Information of the Discloser, provided that Recipient and its Representatives will be entitled to retain a copy of such Confidential Information in accordance with its data retention policies to the maximum extent permitted by applicable law or regulation, provided further that such Confidential Information will remain subject to the non-use and non-disclosure requirements of this Section 15.

(b)    Notwithstanding anything to the contrary contained in Section 15(a), Recipient may use, disseminate or disclose any Confidential Information of Discloser to any person or entity in connection with enforcement of or the performance of its obligations under this Agreement or as required by applicable law, statute, rule, regulation, subpoena, court order or legal process; provided, however, that prior to disclosing any such Confidential Information:

(i)    to any such person or entity other than in connection with any judicial or regulatory proceeding, such person or entity shall agree in writing to maintain such Confidential Information in a manner at least as protective of the Confidential Information as the terms of Section 15(a); or

(ii)    to any such person or entity in connection with any judicial or regulatory proceeding or as otherwise required by applicable law, statute, rule, regulation, subpoena, court order or legal process, the Recipient will (x) promptly notify Discloser of each such requirement and identify the documents so required thereby, so that Discloser may seek an appropriate protective order or similar treatment and/or waive compliance with the provisions of this Agreement; (y) use reasonable efforts to assist Discloser in obtaining such protective order or other similar treatment protecting such Confidential Information prior to any such disclosure; and (z) other than in connection with a dispute between Discloser or its affiliates, on one hand, and Recipient and its affiliates, on the other hand, consult with Discloser on the advisability of taking legally available steps to resist or narrow the scope of such requirement.  If, in the absence of such a protective order or similar treatment, the Recipient is nonetheless required by mandatory applicable law or order to disclose any part of Discloser's Confidential Information which is disclosed to it under this Agreement, the Recipient may disclose such Confidential Information without liability under this Agreement, except that the Recipient will furnish only that portion of the Confidential Information which is legally required.

16.    Remedies and Termination.

(a)    Licensee Indemnification.  Licensees, severally (and not jointly) shall indemnify, defend, and hold harmless Licensor and its affiliates, equityholders, directors, officers, employees, agents, representatives, and franchisees from and against any and all claims, actions, demands, damages, liabilities, losses, judgments, fines, penalties, settlements, costs, and expenses (including reasonable attorneys' fees and expenses of litigation or arbitration) arising out of, resulting from, or in connection with:

(i)    Such Licensee's gross negligence, willful misconduct, or actual fraud in connection with such Licensee's performance under this Agreement; or

(ii)      Such Licensee's knowing and intentional violation of applicable law, regulation, or governmental order directly related to such Licensee's obligations under this Agreement.

(b)      <u>Licensee Breach</u>.   If any Licensee shall materially breach any of its obligations under this Agreement and fails to cure such breach within sixty (60) calendar days of receipt of written (email sufficient) notice thereof from Licensor (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach), Licensor shall be entitled to exercise any and all remedies available to it, including under <u>Section 16(e)</u>.  Simultaneously with delivery of such notice to Licensee, Licensor shall deliver a copy of such notice to Manager (if any).

(c)      <u>Licensor Breach</u>.  If Licensor shall materially breach any of its obligations under this Agreement and fails to cure such breach within sixty (60) calendar days of receipt of written (email sufficient) notice thereof from any Licensee (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach). Simultaneously with delivery of such notice to Licensor, such Licensee shall deliver a copy of such notice to Manager (if any).

(d)      <u>Manager Breach</u>.   Licensor may, at its discretion, exercise any right of Licensee under the Brand Management Agreement to terminate such agreement subject to and in accordance with its terms.  Each Licensee acknowledges that it retains its own right to terminate the Brand Management Agreement subject to and in accordance with its terms, and shall, within three (3) weeks of such termination or upon Licensor's request, provide a transition plan (to the extent such a plan is contemplated or defined in the Brand Management Agreement).

(e)      <u>Licensor Termination</u>.  Licensor has the right to terminate this Agreement effective immediately under the following circumstances: (i) if Licensee materially breaches its obligations under this Agreement and fails to cure such breach within 60 calendar days of receipt by Licensee and Manager of written notice of such breach (such notice, the "<u>Breach Notice</u>") thereof from Licensor (or, if cure is not reasonably possible within such 60-day period, fails to take reasonable steps to cure or mitigate such breach) or (ii) upon a final, non-appealable determination by a court of competent jurisdiction that a Licensee has engaged in gross negligence, willful misconduct, or fraudulent conduct (in each case, after notice and an opportunity to cure, if capable of cure) in connection with the performance of its obligations under this Agreement.  Such termination shall be effective upon written (email sufficient) notice from Licensor to Licensee, with a copy to Manager, following such judicial determination.

(f)      <u>Remedies Cumulative and Injunctive Relief</u>.   The remedies described hereunder shall be cumulative and non-exclusive and Licensor shall be entitled to seek injunctive relief to enforce the terms of this Agreement at any time against any Licensee, any Manager, and/or any Sublicensees.

(g)      <u>Requirements for Termination</u>.  Except as provided in <u>Section 16(c)</u>, this Agreement may not otherwise be terminated without the prior written consent of Licensees and Licensor.  This Agreement shall not expire.

(h)    Post-Termination.    Upon termination of this Agreement, Licensees shall immediately cease all use, direct or indirect, of any of the Licensed IP or of any trademarks, service marks, designs, trade dress, logos or other source indicators reasonably determined by Licensor to be confusingly similar to the Licensed IP following a reasonable wind-down period as soon as commercially practicable following the Closing Date of termination, but in no event later than thirty (30) calendar days thereafter; provided that all Sublicenses properly granted by Licensee in accordance with this Agreement shall survive any termination hereof and the license granted hereunder shall remain in effect solely to the extent necessary to permit Licensee to maintain the Sublicenses of the Licensed IP under such agreements for the respective terms thereof, which terms may not be extended or renewed in the discretion of the Licensor.

(i)    In the event of termination of this Agreement, Licensor shall either (i) assume and perform all obligations and liabilities of Licensees and Manager under any then-existing Franchise Agreements and Development Agreements or (ii) prior to the effective date of such termination, have appointed a replacement franchisor to assume and perform such obligations and discharge such liabilities.

17.    Assignability.

(a)    Consent.    Except as provided in Sections 13 and 16(i) hereof, this Agreement may not be delegated or assigned by Licensor or Licensee without the prior written consent (email sufficient) of the other party and any attempt to do otherwise shall be null and void.

(b)    Assumption.    Licensor hereby consents to assumption of this license by a Licensee in a case filed by or against such Licensee under any chapter of Title 11 of the United States Code.

(c)    Permitted Successors and Assigns.    For purposes of this Agreement, Licensor and Licensees are each permitted to grant a security interest in this Agreement to RoyaltyCo or the Secured Parties, and RoyaltyCo or the Secured Parties shall have the right to assign such interests or the Licensed IP itself to a third party in connection with the exercise by RoyaltyCo or the Secured Parties of their available rights and remedies under Licensor's Organizational Documents or the New Notes Documents (as such term is defined in the Plan); provided, however, that solely to the extent the Brand Management Agreement has not been terminated, Licensor shall not (whether under the New Notes Documents or in the future) grant any security interest in the Licensed IP (or otherwise consent to any lien, pledge, or collateral assignment thereof) unless such grant or consent expressly recognizes the validity and continuing effect of this Agreement and Licensees' rights hereunder, notwithstanding any foreclosure, transfer, assignment, sale, or other exercise of remedies by such party.   For the purposes of this Agreement, Licensor's permitted successors and assigns shall include, without limitation, any transferee to which this Agreement is assigned, or otherwise transferred, in connection with the exercise of remedies by RoyaltyCo or the Secured Parties under Licensor's Organizational Documents or the New Notes Documents (as such term is defined in the Plan), subject in all cases to the foregoing acknowledgment requirement.

(d)    Licensor's Pledge.    Licensees each hereby acknowledge that, on the date hereof, Licensor pledges to RoyaltyCo, among other things, all of Licensor's right and title to, and

interest in, this Agreement; and such pledge includes all of Licensor's rights, remedies, powers and privileges, and all claims of Licensor against Licensee, under or with respect to this Agreement (whether arising pursuant to the terms of this Agreement or otherwise available at law or in equity), including (i) the rights of Licensor and the obligations of Licensee hereunder and (ii) the right, at any time, to give or withhold consents, requests, notices, directions, approvals, demands, extensions, or waivers under or with respect to this Agreement or the obligations in respect of Licensee hereunder to the same extent as Licensor may do. Licensee hereby consents to such pledge described above, acknowledges and agrees that RoyaltyCo shall be a third-party beneficiary of the rights (but none of the duties, obligations or liabilities) of Licensor arising hereunder, and agrees that RoyaltyCo may exercise the rights of Licensor hereunder and enforce the obligations of Licensee hereunder, as provided in Licensor's Organizational Documents. Licensor further represents and warrants that it has obtained, and covenants to maintain in effect (solely while the Brand Management Agreement is in effect), the written acknowledgment of RoyaltyCo expressly recognizing the validity and continuing effect of this Agreement and Licensees' rights hereunder, notwithstanding any foreclosure, transfer, assignment, sale, or other exercise of remedies by RoyaltyCo.

18.    <u>Miscellaneous</u>.

(a)    <u>Execution in Counterparts; Severability</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(b)    <u>Limitation of Nature of Liability</u>.  EXCEPT IN CONNECTION WITH ANY BREACH OF <u>SECTIONS 8</u>, OR <u>15</u>, IN NO EVENT SHALL ANY PARTY, ITS AFFILIATES, OR THEIR RESPECTIVE DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES, BE LIABLE TO ANY OTHER PARTY HEREUNDER UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR EXEMPLARY, PUNITIVE, INDIRECT, SPECIAL, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN THIS <u>SECTION 18(b)</u> SHALL LIMIT ANY PARTY'S LIABILITY FOR (OR LIMIT ANY PARTY'S RIGHT TO SEEK) EITHER (I) DAMAGES FOR OR ARISING FROM ANY FAILURE OF LICENSEE TO PERFORM ITS OBLIGATIONS UNDER <u>SECTION 5(a)</u> OF THIS AGREEMENT OR (II) DAMAGES TO VALIDITY, ENFORCEABILITY, OWNERSHIP, DISTINCTIVENESS, OR VALUE OF THE BRAND ARISING FROM THE GROSS NEGLIGENCE, RECKLESSNESS, MALFEASANCE, WILLFUL BREACH OR MISCONDUCT, OR FRAUD OF LICENSEES.

(c)    <u>Governing Law; Jurisdiction; Waiver of Jury Trial; Service</u>.

(i)    <u>Governing Law</u>.  **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CHOICE OF LAW RULES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

(ii)    <u>Dispute Resolution</u>.  Any dispute arising out of or relating to this Agreement shall first be submitted to non-binding mediation in New York City, New York, under the mediation rules of the American Arbitration Association. If the dispute is not resolved through mediation within thirty (30) days, any party to the dispute may submit the matter to binding arbitration in New York City, New York, in accordance with the rules of the American Arbitration Association. The parties shall share equally the costs of mediation and arbitration, including the fees of the mediator or arbitrator.  Each party shall bear its own attorneys' fees and expenses, unless otherwise determined by the arbitrator.  Judgment on the arbitration award may be entered in any court of competent jurisdiction.

(iii)    <u>Waiver of Jury Trial</u>.  **EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

(iv)    <u>Service of Process</u>.  **THE PARTIES HERETO EACH HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.** Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 18(m)</u>.  Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by law. There shall be no double recovery with respect to claims arising under this Agreement and any related agreement, including the Brand Management Agreement.

(d)    <u>Survival.</u>  The following provisions shall survive the termination of this Agreement: (i) Sections 1, 2, 3, 8(a), 8(c), 16, 16 and 18 and (ii) Section 8(b) (with respect to any actions commenced prior to termination).  This Agreement, so long as then in effect per its terms, shall survive any foreclosure or transfer of the Licensed IP.

(e)    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure solely to the benefit of the parties and their respective permitted successors and assigns.  Except for third-party beneficiary rights expressly set forth herein, nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person other than the parties hereto and their respective permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained.

(f)    <u>Third-Party Beneficiaries</u>.  The parties acknowledge and agree that RoyaltyCo and the Secured Parties will be third-party beneficiaries of the rights (but none of the duties, obligations, or liabilities) of Licensor arising hereunder.  RoyaltyCo may enforce the

provisions of this Agreement, and RoyaltyCo may exercise the rights of Licensor hereunder pursuant to Licensor's Organizational Documents and the terms hereof. For the avoidance of doubt, if the Brand Management Agreement has not been terminated, the rights granted to RoyaltyCo and the Secured Parties under this Agreement are subject to, and do not limit or impair, the continuing validity and enforceability of this Agreement and Licensees' rights hereunder, notwithstanding any foreclosure, transfer, assignment, sale, or other exercise of remedies by RoyaltyCo or the Secured Parties.

(g)   Waivers; Amendments.   No failure or delay on the part of Licensor or Licensee or any assignee thereof, in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law. Any provision of this Agreement may be amended only by a writing executed by the parties hereto.

(h)   Headings.   The headings in the sections of this Agreement are inserted for convenience of reference only and shall not be deemed a part of this Agreement.

(i)   Entire Agreement.   This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all previous oral statements and other writings with respect thereto.

(j)   Bankruptcy.   The parties acknowledge and agree that this Agreement is deemed a license agreement for purposes of Section 365(n) of the Bankruptcy Code and in the event Licensor or RoyaltyCo becomes the subject to a Bankruptcy Event, Licensees shall have the right to retain and enforce its rights to use (including to sublicense) the Licensed IP under Section 365(n) of the Bankruptcy Code, notwithstanding any rejection of this Agreement or any related agreement.

(k)   Relationship of Parties.   Nothing herein contained shall be construed to constitute the parties hereto as partners or as joint venturers, or either as agent of the other, and neither party shall have any power on account of this Agreement to obligate or bind the other party in any manner whatsoever except as expressly provided herein.

(l)   Point of Contact.   Each party hereto will designate an individual as its primary point of contact for this Agreement, with authority to make all decisions, provide approvals and consents, and receive all notices and communications on behalf of such party. Nothing in this Agreement shall prohibit a Licensee from taking actions reasonably necessary to prevent imminent harm to the Business or to avoid a violation of law; provided, that such Licensee shall promptly notify Licensor of any such actions.

(m)   Notices.   Any notices, requests, or other communications desired or required to be given in writing under this Agreement shall be sent to the applicable address set forth below, by (i) nationally recognized overnight courier service, (ii) personally, with a copy also delivered

by electronic mail, or (iii) electronic mail transmission of a pdf or similar file, with a following copy to be delivered by one of the foregoing methods or by certified or registered mail.

**If to Licensor:**

HI Limited Partnership
c/o DRIVETRAIN AGENCY SERVICES, LLC
410 Park Ave, Suite 900
New York, NY 10022
Attn:   Tim Daileader
Email:   tdaileader@drivetrainllc.com

**With a copy to (which shall not constitute notice):**

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attn:    Brian Pfeiffer
          Amanda Parra Criste
Email:   brian.pfeiffer@whitecase.com
          aparracriste@whitecase.com

-and-

White & Case LLP
1121 Avenue of the Americas
New York, NY 10020
Attn:    David Thatch
Email:   dthatch@whitecase.com

| | |
|---|---|
| HOA Franchising, LLC<br>c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:   Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com | HOOTS Franchising, LLC<br>c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:   Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com |
| HOA Systems, LLC<br>c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:   Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com | HOA Future Franchising, LLC<br>c/o HOOTERS BRAND MANAGEMENT LLC<br>107 Hampton Road, Suite 200<br>Clearwater, FL 33759<br>Attn:    Neil Kiefer, President<br>          Nathan Weatherilt, Chief Financial Officer<br>Email:   Neil.Kiefer@originalhooters.com<br>          Nathan.Weatherilt@originalhooters.com |

**With copies to (which shall not constitute notice):**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Attn:    Benjamin Butterfield, Esq.
         Joseph Sulzbach, Esq.
Email:  bbutterfield@mofo.com
         jsulzbach@mofo.com

**If to RoyaltyCo:**

c/o DRIVETRAIN AGENCY SERVICES, LLC
410 Park Ave, Suite 900
New York, NY 10022
Attn:    Tim Daileader
Email:  tdaileader@drivetrainllc.com

**With copies to (which shall not constitute notice):**


White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attn:    Brian Pfeiffer
         Amanda Parra Criste
Email:  brian.pfeiffer@whitecase.com
         aparracriste@whitecase.com

-and-

White & Case LLP
1121 Avenue of the Americas
New York, NY 10020
Attn:    David Thatch
Email:   dthatch@whitecase.com


Any of the persons in this Section 18(m) may change its address for notices hereunder by giving notice of such change to the other persons.  All notices and demands shall be deemed to have been given either at the time of the delivery thereof to any officer or manager of the person entitled to receive such notices and demands at the address or email address of such person for notices hereunder, or on the first business day after the mailing thereof to such address, as the case may be.

(n)     Common Interest.  All information exchanged between the Licensor and Licensees, in their capacity as Licensees, prior to the termination of this Agreement containing Privileged Information of the disclosing party or of the Licensor, regarding matters within the scope of Services performed by Licensees will be deemed Privileged Information of the Licensor. Licensor agrees and acknowledges that it has not waived, and nothing in this Agreement, nor any exchange or sharing of Privileged Information between Licensees and Licensor in respect of performance of the Services, constitutes a waiver of any legal privilege, including attorney-client privilege, work product privilege, privilege under the common interest doctrine and similar or related doctrines.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

### Exhibit A

### List of Acquired Restaurants

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1007 Daytona | 2100 International Speedway Drive | Daytona Beach | FL | 32114 | Hooters of Daytona 2025 LLC |
| 1008 Raleigh | 4206 Old Wake Forest Road | Raleigh | NC | 27609 | PWW Raleigh, LLC |
| 1010 Myrtle Beach North | 10133 North Kings Highway | Myrtle Beach | SC | 29572 | PWW Myrtle Beach North, LLC |
| 1011 Wilmington | 5112 Market Street | Wilmington | NC | 28405 | PWW Wilmington, LLC |
| 1014 Roswell | 795 Holcomb Bridge Road | Roswell | GA | 30076 | Hooters of Roswell 2025 LLC |
| 1023 Tara Blvd | 6785 Tara Boulevard | Jonesboro | GA | 30236 | Hooters of Tara Blvd 2025 LLC |
| 1025 Fayetteville NC | 501 N. McPherson Church Road | Fayetteville | NC | 28303 | PWW Fayetteville, LLC |
| 1028 Maryland Heights | 11835 Lackland Road | St. Louis | MO | 63146 | PWW Maryland Heights, LLC |
| 1031 Greensboro | 3031 High Point Road | Greensboro | NC | 27403 | PWW Greensboro, LLC |
| 1033 Jacksonville San Jose | 8938 San Jose Blvd. | Jacksonville | FL | 32257 | Hooters of Jacksonville San Jose 2025 LLC |
| 1036 Myrtle Beach | 3901 North Kings Highway | Myrtle Beach | SC | 29577 | PWW Myrtle Beach, LLC |
| 1043 South County | 7517 South Lindbergh Boulevard | St. Louis | MO | 63125 | PWW South County, LLC |
| 1046 Greenville SC | 2401 Laurens Road | Greenville | SC | 29607 | PWW Greenville, LLC |
| 1047 Lakeland II | 3400 US 98 North | Lakeland | FL | 33809 | Hooters of Lakeland II 2025 LLC |
| 1052 Oklahoma City South | 2019 West I-240 Service Road | Oklahoma City | OK | 73159 | PWW Oklahoma City South, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1053 Tulsa | 8108 East 61st | Tulsa | OK | 74133 | PWW Tulsa, LLC |
| 1061 Newnan | 1001 Bullsboro Drive | Newnan | GA | 30265 | Hooters of Newnan 2025 LLC |
| 1063 Conyers | 1099 Iris Drive, SE | Conyers | GA | 30012 | Hooters of Conyers 2025 LLC |
| 1074 Kennesaw | 2102 Old Highway 41 | Kennesaw | GA | 30144 | Hooters of Kennesaw 2025 LLC |
| 1075 Lake Buena Vista | 8510 Palm Parkway | Orlando | FL | 32836 | Hooters of Lake Buena Vista 2025 LLC |
| 1077 Fredericksburg | 10400 Spotsylvania Avenue | Fredericksburg | VA | 22408 | PWW Fredericksburg, LLC |
| 1079 Fairview Heights | 301 Market Place, Suite C | Fairview Heights | IL | 62208 | PWW Fairview Heights, LLC |
| 1085 Columbus GA | 2650 Adams Farm Road | Columbus | GA | 31909 | Hooters of Columbus GA 2025 LLC |
| 1088 Concord NC | 7702 Gateway Lane | Concord | NC | 28027 | PWW Concord, LLC |
| 1097 Hickory | 1211 13th Avenue Drive, S.E. | Hickory | NC | 28602 | PWW Hickory, LLC |
| 1100 Savannah | 4 Gateway Blvd, W. | Savannah | GA | 31409 | Hooters of Savannah 2025 LLC |
| 1101 Orlando Airport | 7222 Augusta National Dr | Orlando | FL | 32822 | Hooters of Orlando Airport 2025 LLC |
| 1103 Overland Park | 10620 Metcalf Lane | Overland Park | KS | 66212 | PWW Overland Park, LLC |
| 1105 Springfield MO | 2110 E. Independence Ave. | Springfield | MO | 65804 | PWW Springfield, LLC |
| 1112 Horn Lake | 982 Goodman Rd | Horn Lake | MS | 38637 | PWW Horn Lake, LLC |
| 1118 North Charleston | 2171 Northwoods Blvd. | Charleston | SC | 29406 | PWW North Charleston, LLC |
| 1131 Potomac Mills | 2630 Prince William Pkwy | Woodbridge | VA | 22192 | PWW Potomac Mills, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1136 Burlington NC | 3122 Garden Road | Burlington | NC | 27216 | PWW Burlington, LLC |
| 1137 Raleigh Airport | 1001 Claren Circle | Morrisville | NC | 27560 | PWW Raleigh Airport, LLC |
| 1138 St. Peters | 4061 Veterans Memorial Pkwy | St. Peters | MO | 63376 | PWW St. Peters, LLC |
| 1142 Pelham | 400 Cahaba Valley Rd | Pelham | AL | 35124 | PWW Pelham, LLC |
| 1144 Topeka | 6100 SW 10th Avenue | Topeka | KS | 66615 | PWW Topeka, LLC |
| 1145 Laurel | 14707-B Baltimore Avenue | Laurel | MD | 20707 | PWW Laurel, LLC |
| 1147 Kansas City Speedway | 1712 Village West Parkway | Kansas City | KS | 66111 | PWW Kansas City Speedway, LLC |
| 1151 Columbia MO | 1101 Woodland Springs Court | Columbia | MO | 65201 | PWW Columbia, LLC |
| 1152 Trussville | 1917 Edwards Lake Road | Trussville | AL | 32535 | PWW Trussville, LLC |
| 1153 North Little Rock | 4110 Landers Road | North Little Rock | AR | 72117 | PWW North Little Rock, LLC |
| 1156 Lawrenceville | 860 Duluth Highway Suite 900 | Lawrenceville | GA | 30043 | Hooters of Lawrenceville 2025 LLC |
| 1161 Chantilly | 14441 Brookfield Tower Dr. | Chantilly | VA | 20151 | PWW Chantilly, LLC |
| 1167 Richmond VA | 7912 W. Broad St. | Richmond | VA | 23294 | PWW Richmond, LLC |
| 1168 Chester | 2401 W. Hundred Road | Chester | VA | 23831 | PWW Chester, LLC |
| 1169 Chesterfield | 1211 Huguenot Rd. | Midlothian | VA | 23113 | PWW Richmond, LLC |
| 1171 I Drive | 8801 International Drive | Orlando | FL | 32819 | Hooters of I Drive 2025 LLC |
| 1174 Council Bluffs | 2910 23rd Avenue | Council Bluffs | IA | 51501 | PWW Council Bluffs, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 1175 Davenport | 110 E. Kimberly Rd. | Davenport | IA | 58206 | PWW Davenport, LLC |
| 1177 Mall of Georgia | 1950 Mall of Georgia Blvd | Buford | GA | 30519 | Hooters of Mall of GA 2025 LLC |
| 1178 Cartersville | 887 Joe Frank Harris Pkwy, SE | Cartersville | GA | 30120 | Hooters of Cartersville 2025 LLC |
| 1180 Saginaw | 5538 Bay Road | Saginaw | MI | 48604 | PWW Saginaw, LLC |
| 1182 Fairfax II | 10060 Fairfax Blvd | Fairfax | VA | 22030 | PWW Fairfax II, LLC |
| 1184 Ocala | 2711 SW 27th Ave | Ocala | FL | 34471 | Hooters of Ocala 2025 LLC |
| 1185 Palm Bay | 695 Palm Bay Road | West Melbourne | FL | 32904 | Hooters of Palm Bay 2025 LLC |
| 1187 Kissimmee West | 8207 West Irlo Bronson Memorial Highway | Kissimmee | FL | 34747 | Hooters of Kissimmee West 2025 LLC |
| 1190 West Little Rock | 6 Anglers Way | Little Rock | AR | 72210 | PWW West Little Rock, LLC |
| 1192 Prattville AL | 2585 Bass Pro Boulevard | Prattville | AL | 36066 | PWW Prattville, LLC |
| 1194 La Vista NE | 12710 Westport Parkway | La Vista | NE | 68138 | La Vista Wings, LLC |
| 2001 West End | 2201 North Lamar | Dallas | TX | 75202 | Hooters of West End 2025 LLC |
| 2004 Arlington North | 1151 North Collins | Arlington | TX | 76011 | Hooters of Arlington North 2025 LLC |
| 2009 Nasa | 20796 Gulf Freeway | Webster | TX | 77598 | Hooters of Nasa 2025 LLC |
| 2010 North Richland Hills | 7669 Grapevine Hwy | N. Richland Hills | TX | 76180 | Hooters of North Richland Hills 2025 LLC |
| 2011 San Antonio North | 8527 Wurzbach Rd. | San Antonio | TX | 78240 | Hooters of San Antonio North 2025 LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 2014 Mesquite | 3902 Towne Crossing Blvd. | Mesquite | TX | 75150 | Hooters of Mesquite 2025 LLC |
| 2017 Plano | 720 Central Expressway | Plano | TX | 75074 | Hooters of Plano 2025 LLC |
| 2018 El Paso | 1170 Sunmount | El Paso | TX | 79925 | Hooters of El Paso 2025 LLC |
| 2020 Round Rock | 2700 SOUTH I-H 35 | Round Rock | TX | 78681 | Hooters of Round Rock 2025 LLC |
| 2021 San Pedro TX | 13131 San Pedro | San Antonio | TX | 78216 | Hooters of San Pedro 20225 LLC |
| 2022 Corpus Christi | 4551 South Padre Island Drive | Corpus Christi | TX | 78411 | Hooters of Corpus Christi 2025 LLC |
| 2023 Frisco | 4224 Preston Road | Frisco | TX | 75035 | Hooters of Frisco 2025 LLC |
| 2024 Fort Worth | 5340 Southwest Blvd., | Ft. Worth | TX | 76109 | Hooters of Fort Worth 2025 LLC |
| 2028 Willowbrook | 17599 Tomball Parkway | Houston | TX | 77064 | Hooters of Willowbrook 2025 LLC |
| 2029 Sugarland | 12759 S.W. Freeway | Stafford | TX | 77477 | Hooters of Sugarland 2025 LLC |
| 2031 McKinney | 1775 N. Central Expressway | McKinney | TX | 75070 | Hooters of McKinney 2025 LLC |
| 2032 Selma | 15412 Interstate 35 N | Selma | TX | 78154 | Hooters of Selma 2025 LLC |
| 2037 Humble | Highway 59 North | Humble | TX | 77338 | Hooters of Humble 2025 LLC |
| 2039 Denton | 985 S. I-35 East | Denton | TX | 76205 | Hooters of Denton 2025 LLC |
| 2042 Odessa | 2660 John Ben Shepperd Parkway | Odessa | TX | 79761 | Hooters of Odessa TX 2025 LLC |
| 2045 Texarkana | 5101 N. State Line Avenue | Texarkana | TX | 75503 | Hooters of Texarkana 2025 LLC |
| 2046 Pasadena TX | 3656 E. Sam Houston Pkwy. | Pasadena | TX | 77505 | Hooters of Pasadena TX 2025 LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 2047 Katy | 22575 Katy Freeway | Katy | TX | 77450 | Hooters of Katy 2025 LLC |
| 2048 Garland | 4781 Bass Pro Drive | Garland | TX | 75043 | Hooters of Garland 2025 LLC |
| 2050 Pearland | 15838 South Freeway | Pearland | TX | 77584 | Hooters of Pearland 2025 LLC |
| 2051 Harlingen | 98 Bass Pro Drive | Harlingen | TX | 78552 | Hooters of Harlingen 2025 LLC |
| 2052 San Antonio West | 9802 Ingram Road | San Antonio | TX | 78245 | Hooters of San Antonio West 2025 LLC |
| 2058 Cedar Hill | 622 Uptown Boulevard | Cedar Hill | TX | 75104 | Hooters of Cedar Hill 2025 LLC |
| 2059 Abilene | 2042 E. Overland Trail, | Abilene | TX | 79601 | Hooters of Abilene 2025 LLC |
| 2065 Grand Prairie | 2750 West Interstate 20 | Grand Prairie | TX | 75052 | Hooters of Grand Prairie 2025 LLC |
| 2069 El Paso East | 1799 Joe Battle Blvd | El Paso | TX | 79936 | Hooters of El Paso East 2025 LLC |
| 3041 Chattanooga | 5912 Brainerd Rd. | Chattanooga | TN | 37421 | PWW Chattanooga, LLC |
| 3067 Dupont | 4120 Dutchman's Lane | Louisville | KY | 40207 | PWW Dupont, LLC |
| 3110 Indy Downtown | 25 W. Georgia Street | Indianapolis | IN | 46225 | PWW Indy Downtown, LLC |
| 3116 Johnson City | 2288 N. Roane St. | Johnson City | TN | 37601 | PWW Johnson City, LLC |
| 3128 Kingston Pike | 8050 Kingston Pike Hwy | Knoxville | TN | 37919 | PWW Kingston Pike, LLC |
| 3140 Lexington | 3101 Richmond Rd. #315 | Lexington | KY | 40509 | PWW Lexington, LLC |
| 3156 Merrillville | 771 E. 81st Place | Merrillville | IN | 46410 | Hooters of Merrillville 2025 LLC |
| 3214 Preston | 7701 Preston Hwy | Louisville | KY | 40219 | PWW Preston, LLC |

| Store Number Internal Store Name | Address | City | State | Zip | Buyer Entity |
|---|---|---|---|---|---|
| 3220 Rivergate | 654 Wade Circle S. | Goodlettsville | TN | 37072 | PWW Rivergate, LLC |
| 3260 Toledo | 4782 Monroe St. | Toledo | OH | 43623 | PWW Toledo, LLC |
| 3386 Alcoa | 1099 Hunter Crossing Drive | Alcoa | TN | 37701 | PWW Alcoa, LLC |
| 3428 Wolfchase | 2838 New Brunswick Road | Memphis | TN | 38133 | PWW Wolfchase/Memphis, LLC |
| 3468 Dayton | 6851 Miller Lane | Dayton | OH | 45414 | PWW Dayton, LLC |
| 3472 Fort Campbell | 750 North Riverside Drive | Clarksville | TN | 37040 | PWW Fort Campbell, LLC |
| 3508 Florence | 7200 Houston Road | Florence | KY | 41042 | PWW Florence, LLC |
| 3549 Merchants Drive | 5005 Central Avenue Pike | Knoxville | TN | 37912 | PWW Merchants Drive, LLC |
| 3554 Schererville | 1650 U.S. Hwy. 41, Suite A | Schererville | IN | 46375 | Hooters of Schererville 2025 LLC |
| 3567 Mishawaka | 205 W. Day Road | Mishawaka | IN | 46545 | Hooters of Mishawaka 2025 LLC |
| 3568 Portage | 1655 Olmstead Drive | Portage | IN | 46368 | Hooters of Portage 2025 LLC |
| 3570 Mason | 9890 Escort Drive | Mason | OH | 45040 | PWW Mason, LLC |

**Exhibit B**

**List of Trademarks**

| Proprietary Mark | Date Filed | Registration No. |
|---|---|---|
|  | 02/06/84 | 1,320,029 |
| HOOTERS | 01/23/89 | 1,557,380 |
|  | 03/07/88 | 1,602,377 |
| THE SOON TO BE RELATIVELY FAMOUS | 09/26/02 | 2,736,549 |
| WINGSDAY | 03/26/09 | 3,695,572 |
| THE CURE FOR THE COMMON RESTAURANT | 03/04/08 | 3,488,547 |
|  | 06/03/14 | 4,545,042 |
| HOOTCLUB | 06/27/16 | 5,133,484 |
| HOOTERS MAKES YOU HAPPY! | 11/13/17 | 5,636,057 |
| HOOTIE'S BURGER BAR | 12/19/18 | 5,819,801 |
| CHICKEN WINGS AND OTHER THINGS | 08/27/20 | 6,352,645 |

## Exhibit C

### Power of Attorney

This POWER OF ATTORNEY is made by HI LIMITED PARTNERSHIP, a Florida limited partnership ("Appointor") in favor of _____ ("Appointee").

This Power of Attorney provides as follows:

1.  All capitalized terms used in this Power of Attorney but not otherwise defined shall have the meanings given to them in the License Agreement, dated October 31, 2025, to which Appointee and Appointor are parties ("License Agreement") and Brand Management Agreement.  This Power of Attorney is subject in all respects to the terms of the License Agreement and Brand Management Agreement and nothing herein is intended to alter the terms of such agreement.

2.  Appointor hereby constitutes and appoints the Appointee, with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place, and stead to:

    (a)  perform the Stewardship Activities, including the IP Activities, in accordance with the License Agreement and Brand Management Agreement;

    (b)  do all and perform any and every act on behalf of Appointor as delegated to Appointee under the License Agreement and Brand Management Agreement;

    (c)  execute, acknowledge, and deliver on behalf of Appointor all other agreements, instruments and documents that may be necessary or desirable in furtherance of the foregoing in a manner consistent with the License Agreement and Brand Management Agreement; and

    (d)  do and perform any and every act required, necessary or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as Appointor might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, shall lawfully do or cause to be done by virtue of this Power of Attorney and the rights and powers herein granted (collectively, "Appointed Activities"); provided, that the rights and powers herein granted, including, for the avoidance of doubt, the Appointed Activities, are in all respects subject to the rights granted and limitations contained in the License Agreement and Brand Management Agreement.

2.  The authority to grant this Power of Attorney was approved by the general partner of Appointor pursuant to Appointor's Approved Operating Agreement.

3.  Appointor, through its board of directors, hereby ratifies and confirms all actions that the attorneys in fact or an of them, may lawfully do or cause to be done by virtue of this

instrument solely to the extent such actions are consistent with the License Agreement and Brand Management Agreement.

4.      Appointee shall not be liable for any action taken or not taken under this Power of Attorney unless it is a result of Appointee's wilful misconduct or gross negligence; <u>provided</u>, that the parties maintain all rights and do not waive any rights under the License Agreement or Brand Management Agreement that may arise as a result of actions taken my Appointee pursuant to this Power of Attorney.

5.      Subject to the terms of the License Agreement, the foregoing Power of Attorney may extend to Appointee's heirs, successors, assigns, and representatives.  Any assignment of the foregoing Power of Attorney requires the written consent of the Appointor and must be in accordance with the express terms of the License Agreement and Brand Management Agreement, and is otherwise null and void.

6.      Appointor hereby revokes any and all previous powers of attorney with respect to the Appointed Activities and shall not, unless and until this Power of Attorney expires pursuant to Section 7 below, purport to grant any power of attorney with respect to the Appointed Activities.

7.      This Power of Attorney shall only be revocable if the Brand Management Agreement has been terminated in accordance with its terms and the Disentanglement Period has ended.

8.      This Power of Attorney shall remain in effect until the termination of the License Agreement or the Brand Management Agreement (as applicable).

*[Remainder of the page left intentionally blank]*

This Power of Attorney shall be governed by and construed in accordance with the laws of the State of New York.

Signed and effective on the October 31, 2025.

**HI LIMITED PARTNERSHIP**

By:
Name:
Title: